UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

JENNA CLARK,

               Plaintiff,

v.

CARMINE MARCENO, in his official
capacity as Sheriff of Lee County,
Florida,

               Defendant.

Case No. 2:22-cv-614-SPC-NPM

## DEFENDANT'S CASE DISPOSITIVE MOTION FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM LAW

COMES NOW CARMINE MARCENO, as the duly elected Sheriff of Lee County, Florida, ("Sheriff" or "Defendant") by and through his undersigned counsel and pursuant to this Court's Scheduling Order (D.E. 19), Rule 56(a), F.R.Civ.P. and Rule 3.01(a), Local Rules for the Middle District of Florida, hereby submits its Case Dispositive Motion for Summary Judgment and Supporting Memorandum of Law.

## I.   INTRODUCTION

On September 22, 2022, Jenna Clark ("Plaintiff" or "Clark") filed her initial Complaint against the Lee County Sheriff's Office ("LCSO"), asserting multiple counts of alleged violations of federal law arising out of Clark's former employment. (D.E. 1).

In response to her Complaint, Sheriff Carmine Marceno ("the Sheriff" or "Defendant") filed a Motion to Dismiss (D.E. 11), which prompted Clark to file an

ALLEN NORTON & BLUE, P.A.
PROFESSIONAL ASSOCIATION

Amended Complaint.  (D.E. 13).   In her amended pleading, Clark asserted claims of age discrimination (Count I) and retaliation (Count II) in alleged violation of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621 *et seq.* ("ADEA"), and claims of interference (Count III) and retaliation (Count IV) in alleged violation of the Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.* ("FMLA"). The Sheriff responded to Clark's Amended Complaint by filing an Answer and Affirmative Defenses (D.E. 15), denying all of Clark's asserted claims of age-based discrimination, FMLA Interference and FMLA retaliation.

Now with the benefit of discovery, Defendant moves for summary judgment on each of Plaintiff's claims.   Under the undisputed material facts in this record, Defendant eliminated Clark's job classification of Purchasing Director on September 4, 2021, as part of an agency reorganization and reduction-in-force, using an age-neutral process in which the LCSO identified through months of analysis certain job classifications which were not essential to maintain in order to accomplish the agency's law enforcement mission to serve the citizens of Lee County, Florida.

Defendant moves for summary judgment on Clark's asserted FMLA claims, as there was no interference with Clark's FMLA rights, since her request for a leave of absence was approved by her manager and Human Resources, and she suffered no harm by the Sheriff's delay in providing written confirmation that her requested leave was covered by the FMLA.  Clark's FMLA retaliation claim fares no better, as there is no causal nexus between her request to use 7 days of sick leave for a medical

2

ALLEN NORTON & BLUE, P.A.
PROFESSIONAL ASSOCIATION

procedure in August 2021 and the Sheriff's decision to eliminate her job classification as part of the 2021 reduction-in-force ("2021 RIF").  The Undersheriff proposed the elimination of Clark's position as Purchasing Director prior to her request for a medical leave of absence, and the Sheriff accepted the proposed organizational changes.

WHEREFORE, Defendant requests the Court enter summary judgment in his favor as to all counts of Clark's Amended Complaint and submits the following Statement of Material Facts and supporting Memorandum of Law in accordance with the Court's requirements.

## II.  <u>STATEMENT OF MATERIAL FACTS</u>

### *The Parties*

1.  Carmine Marceno currently serves as the duly elected Sheriff of Lee County, Florida.  He was appointed to the position in 2018 and he was most recently elected to the position on November 3, 2020.  (D.E. 28-1, Ex. 2).[1]

2.  John Holloway is the current Undersheriff for the LCSO after starting his employment with the LCSO in November 2013 as its Chief of Legal Services.  (D.E. 28-2, 26:10-20).  As the Undersheriff, Holloway is responsible for the day-to-day operations, budgeting and planning for all aspects of the LCSO.  Prior to becoming

---

[1] Pursuant to the Court's Case Management and Scheduling Order (D.E. 19) and the Court's website instructions for civil filings, Defendant has created an Exhibit Index (D.E. 28-10) and via U.S. mail, is providing the Court with courtesy copies of this Motion and supportive filings.

3

the Undersheriff in late 2021, Holloway was Chief of the Legal Services Bureau and Operations for the LCSO.  (D.E. 28-3, 5:6-25).

3.     Annmarie Reno is currently the Executive Director of the Support Services Division of the LCSO.  From 2017 to 2023, Reno reported to John Holloway, and she was at various times responsible for directly supervising the operations of multiple departments of the LCSO's Support Services Bureau, including Budget and Administrative Services, Purchasing, Finance, Facilities Management, Human Resources, Personnel Services, Planning & Research, Tech Services & Programming and the Fleet Division.  In October 2023, Reno began reporting to Chief Matthew Sands, Chief of the Operational Support Bureau. (D.E. 28-1, ¶¶ 2-3). Reno commenced her employment with the LCSO in 1997, and prior to becoming Executive Director of the Support Services Bureau in 2017, she worked in several job classifications, including as a Budget Analyst, Human Resources Manager and as the agency's Budget Director. (D.E. 28-4, 26:4-25 to 29:1-19).  Reno received training on employment discrimination throughout her tenure with the LCSO and trained new hires and supervisors on the LCSO's policies and procedures while she worked as a Manager in Human Resources.  (D.E. 28-4, 13:2-25 to 15:1-12).

4.     Dawn Heikkila is the former Director of Human Resources for the LCSO.  While employed as Director, Heikkila reported directly to Annmarie Reno. Heikkila left her employment with the LCSO in July 2023 to go to work for Forsyth County Government in Winston-Salem, North Carolina.  (D.E. 28-5, 5:6-25 to 6:1-

4

ALLEN NORTON & BLUE, P.A.
PROFESSIONAL ASSOCIATION

23).   While she was the Director of Human Resources for the LCSO, Heikkila supervised two employees and was responsible for managing the Risk Management Unit, hiring, training, and providing notices to employees regarding their status with the agency.  (D.E. 28-5, 6:24-25 to 7:1-13).  Heikkila has been a member of the Society of Human Resources Management since 2005 and has received considerable training on the topics of employment discrimination.  (D.E. 28-5, 5:9-25, 7:19-24 to 8:1-21). The LCSO's policies prohibit discrimination in employment, including, inter alia, on the basis of an employee's age.  (D.E. 28-6, 9:20-25 to 10:1-8; D.E. 28-6, Ex. 2).

5.      Jill Jones is the current Budget Director of the LCSO. (D.E. 28-7, 17:2-7).  In her role as Budget Director in 2021,  Jones was responsible for monitoring operating accounts within the LCSO to identify individual accounts that were running at a deficit of their allotted budget for the period of October 1, 2020 through September 30 2021 ("FY 2021"), and once found, to find other areas that were over-budgeted and reallocate the unused funds to the accounts which were exceeding their allotted budget for the fiscal year.      (D.E. 28-7, 16:4-21).  Jones also regularly provides reports to command staff of the LCSO to help them make analytical decisions regarding staffing. (D.E. 28-7, 17:10-25 to 18:1-22).

6.      Jenna Clark is the former Purchasing Director for the LCSO, whose job classification was eliminated from the LCSO effective September 4, 2021, as part of an agency reorganization and reduction-in-force. Clark commenced her initial employment with the LCSO on June 5, 1992, and her last day of employment was

ALLEN NORTON & BLUE, P.A.
PROFESSIONAL ASSOCIATION

September 3, 2021.  For the final years of her employment with the LCSO, Clark's immediate supervisor was Annmarie Reno.  (D.E. 28-8, 18:5-19).  As Director, Clark directly supervised the work of the Purchasing Manager, Shannon Lehman. (D.E. 28-8, 40:3-7). As of August 2021, the LCSO's Purchasing Department consisted of Clark (Director), Lehman (Manager) and five (5) full-time Purchasing Agents by the names of Christine Cross, Brenda Hector, Gwen Legler, Daysi Castrillo and Danielle DePonto.  (D.E. 28-1, ¶¶ 16, 18).  Lehman supervised and provided the annual performance evaluations to the Purchasing Agents.  (D.E. 28-8, 40:16-21). Clark signed off on such evaluations, consistent with LCSO policy. (D.E. 28-9, 13:13-20).

*LCSO reorganizations and Reductions-In-Force (2019 and 2021)*

7.     The LCSO's fiscal year runs from October 1 through September 30 of the following calendar year.  The LCSO's FY 19-20 budget was $192,313,441.00, which represented a 3.2 % increase over the adopted FY 18-19 budget.  The LCSO's FY20-21 budget was $197,855,246.00, which represented a 2.8 % increase over the adopted FY 19-20 budget. The LCSO's FY 21-22 budget was $214,297,974.00, which represented an 8.3 % increase over the adopted FY 20-21 budget.  (D.E. 28-1, ¶ 5).

8.     During the period of 2019 through 2022, Annmarie Reno regularly analyzed the annual operational budgets to determine, among other things, whether the agency's staffing levels were appropriate for the departmental missions and objectives of Sheriff Marceno, and within each department's allotted operating budgets.  During this four year period, Reno's analysis discovered significant rising

**ALLEN NORTON & BLUE, P.A.**
PROFESSIONAL ASSOCIATION

operational costs on inmate health care (up from $9.8 million in FY 2018 to $12.08 million in FY 2020), self-funded Health Plan costs (requiring a $4.5 million supplemental contribution from the adopted budget in FY 20-21 to maintain required self-insurance certification), and substantial increases in agency contributions to the Florida Retirement System ("FRS"), with retirement contributions increasing from $16.9 million in FY 17-18 to $18.9 million in FY 20-21.  (D.E. 28-1, ¶ 7).

9.    Despite these increased operational expenses, Sheriff Marceno did not seek supplemental mid-year appropriations from the Lee County Board of County Commissioners in FY 19-20 or 20-21, as is permitted by Florida law for operational emergencies.  In FY 2021 and FY 2022, increased operational expenses were balanced in part by developing greater efficiencies in staffing, including but not limited to eliminating those job classifications which were identified as being susceptible to elimination without impairing operational effectiveness. (D.E. 28-1, ¶ 9; D.E. 28-2, 64;1-23; D.E. 28-2, Ex. 6).

10.    While the LCSO has constantly created and eliminated positions during the period of November 2013 to the present date, John Holloway identifies two significant reductions-in-force since he has been employed by the LCSO as taking place in 2019 and 2021.  (D.E. 28-2, 26;21-25 to 27;1-6, 11-15)  Holloway defines a reduction-in-force as a process consisting of the review of the positions, funding and expenses of the LCSO and making determinations as to what positions, if any, are

**ALLEN NORTON & BLUE, P.A.**
PROFESSIONAL ASSOCIATION

necessary for the mission of the agency, to identify those not necessary for the mission as candidates for elimination from the organizational chart. (D.E. 28-2, 8:16-23).

11.     In calendar year 2019, John Holloway was involved with recommending a reduction-in-force which Sheriff Marceno approved on June 19, 2019 (the "2019 RIF").  (D.E. 28-2, 25:2-6, 13-25 to 26:1-8; D.E. 28-2, Ex. 3).   On June 21, 2019, former Human Resources Director Dawn Heikkila sent out an e-mail to all LCSO personnel, describing the conclusions of the 2019 RIF, which identified twenty-two non-certified positions which could be transferred elsewhere in the agency when the member in the position retired or transferred, with seventeen of the vacated positions then eliminated.  Dawn Heikkila's e-mail further noted that five of the twenty-two positions were occupied when the decision to eliminate the position was made, and the five incumbents were each offered the ability to transfer to other positions within the agency.  The 2019 RIF did not impact the Purchasing Department (D.E. 28-8, 29:6-24), but resulted in saving of over $2.7 million to the LCSO's operating budget for FY 2020.  (D.E. 28-1, ¶ 10).

12.     In the Fall of 2020, the Undersheriff asked Annmarie Reno to help him further evaluate the staffing within the Support Services Bureau to determine whether any of the operational departments were overstaffed, with a focus on management personnel.  (D.E. 28-1, ¶ 11).  By early 2021, the Undersheriff proposed to Sheriff Marceno that the LCSO might be able to reduce staffing to operate more efficiently and more effectively.  Sheriff Marceno encouraged the Undersheriff to go through the

analytical process and to bring him a proposal for the agency's reorganization when he was ready to make a recommendation.  In these discussions, Sheriff Marceno gave no direction to the Undersheriff on the scope of job classifications to be eliminated, or any other specific direction.   Following the Sheriff's comments, John Holloway commenced his analysis of the existing departments in February or March 2021.  (D.E. 28-2, 9:17-25 to 11:1-6).  His analysis included talking to employees throughout the agency, questioning the specific work that was being performed, what procedures were being used, and discussing workloads with managers and directors, and talking with Command Staff as to their ideas for more efficiency in their areas of responsibility. Holloway concluded which job classifications could be eliminated by June or July 2021 and presented his 2021 reduction-in-force proposal ("2021 RIF") to Sheriff Marceno in late July or early August 2021.  (D.E. 28-2, 11:7-25 to 12:1-8).  Holloway's proposal included the number of job eliminations and specific positions to be eliminated, the costs incurred in maintaining the identified positions, with justifications as to whether the level of management matched the responsibilities assigned to the position, and whether the responsibilities could be absorbed elsewhere within the agency.  (D.E. 28-2, 12:24-25 to 13:1-11).

13.    In his 2021 RIF proposal, Holloway identified the Purchasing Director as a position that could be eliminated, concluding that the workload within the Purchasing Department did not justify the number of employees working there, and the workload was not complex enough to require a Director.  Holloway concluded

9

that over a period of time, the Department had suffered from "management inflation" where the management had outgrown the Department's needs, with a Director leading the Department who was not really performing Director or high-level management-level work. (D.E. 28-2, 17:19-25 to 18:1-13). Annmarie Reno assessed during 2021 that from a functional perspective, the Purchasing Director and Purchasing Manager were performing the same work. (D.E. 28-4, 50:4-12). Holloway also did not ever consider having the Purchasing Manager's responsibilities absorbed by the Director of Purchasing, since the needs within the Purchasing Department did not justify the continued employment of a Director level position. (D.E. 28-2, 51:17-24).

14.     Annmarie Reno supported Holloway's assessments, concurring with Holloway that the Department no longer needed both a Director and a Manager to efficiently operate the Department and provide supervision to the five (5) Purchasing Agents then employed. (D.E. 28-3, 10:25 to 11:1-11). In analyzing the staffing for the Support Services Bureau, Reno's focus was on the operational mission of each Department, what work was needed to accomplish the mission, and what staffing levels were necessary to accomplish each department's mission. (D.E. 28-1, ¶ 26). Prior to becoming a stand-alone department, Purchasing had been part of the Finance Department, where both Finance and Purchasing operated under the management of the Finance Director. (D.E. 28-4, 56:9-25). When split off from the Financing Department, Clark was the Purchasing Manager, and she maintained that title when the Purchasing Department started reporting Budget Services. (D.E.28-8, 84:1-10).

10

While Reno did look to the budget impacts of hypothetical organizational changes and job eliminations, such financial impacts were conducted in 2021 to inform the Undersheriff what costs the agency was incurring to maintain the positions under consideration for elimination.  (D.E. 28-2, 12:4-25 to 13:1-3).

15.    Part of Reno's analysis included the fact that the Support Services Bureau had recently introduced a new administrative software system called "Tyler Technologies – Munis" which helped to eliminate several job tasks which had previously been performed manually. (D.E. 28-1, ¶ 13).  In confirming that the Purchasing Director's responsibilities could be absorbed by others, Reno communicated to Holloway that the strongest candidate to retain and lead the Purchasing Department was Shannon Lehman, who had shown a command of the new administrative software system, and who in Reno's opinion had greater skills than did Clark with the new software system.  (D.E. 28-4, 56:9-25 to 58:1-24). After the Director of Purchasing position was eliminated by the Sheriff, Shannon Lehman took up the responsibilities to request quotes from vendors, make furniture purchases and to approve purchase orders up to a limited financial level.   Annmarie Reno picked up the authority for the approval of purchase orders over Lehman's revised spending approval limit and the responsibility of directly supervising Lehman, and Jill Jones assisted Shannon Lehman in putting the budget together for the Purchasing Department.   (D.E. 28-4, 55:5-23)

ALLEN NORTON & BLUE, P.A.
PROFESSIONAL ASSOCIATION

SPDN-868764429-3304433

16.     John Holloway had the final decision to include the elimination of the Purchasing Director's position in his 2021 RIF proposal to the Sheriff.   (D.E. 28-4, 56:6-8; D.E. 28-2, 12:4-20).  Holloway's 2021 RIF proposal also recommended the elimination of five additional positions where the incumbent employee left his or her employment either before or after the proposed position elimination, including one certified position (i.e., Tracy Estep, Major of Professional Standards).  (D.E. 28-4, Ex. 4; D.E. 28-1, ¶ 15).  Sheriff Marceno accepted Holloway's 2021 RIF proposal as presented.  (D.E. 28-2, 14:4-14).   The ages of the persons occupying the positions chosen to be eliminated in the 2021 RIF was not a factor in identifying the position for elimination, or in the discussions between Annmarie Reno and the Undersheriff. (D.E. 28-4, 83:8-14).  The staff member's years of service with the LCSO was also not a factor considered in identifying positions for proposed elimination. (D.E. 28-2, 57:19-23, 59:10-20).

*Notice of Job Elimination to Clark and her Sick Leave Request*

17.     As of August 2021, Jenna Clark worked a schedule of four ten-hour shifts per week.  (D.E. 28-8, 39:9-18).  On August 12, 2021, Clark notified Annmarie Reno that she needed to have a medical procedure that would require her absence from scheduled work and the use of sick leave for seven workdays in August 2021.  Reno approved Clark's request for the requested time off from scheduled work.  (D.E. 28-8, 42:5-25 to 43:1-5).   Clark thereafter also communicated to Dawn Heikkila about the approved seven-day absence for the dates of August 18-20 and 24-27.  (D.E. 28-8, 43:6-

12

14; D.E. 28-8, Ex. 18).  In response, Heikkila notified Clark on August 12, 2021, in writing that she would send her the required FMLA paperwork only if it turned out that her requested absence required more than a seven-day absence.  (D.E. 28-8, Ex. 18; D.E. 28-5, 18:3-12, 24:1-13, 25:1-12).   In 2021, it was the practice of the LCSO to not require an eligible employee to complete FMLA paperwork or submit certifications of a serious health condition to obtain administrative approval for brief absences of seven days or less.  (D.E. 28-5, 20:11-25 to 21:1-2).

18.     On August 17, 2021, Clark left her scheduled shift three hours early to drive to the east coast of Florida where she had planned to have her medical procedure performed.  Clark expected to be away from scheduled work for seven workdays, beginning August 18, 2021. (D.E. 28-8, 46:2-16). Before leaving for her medical procedure and consistent with LCSO policy, Clark completed her time sheet, designating her approved absences as sick leave so that she would receive her normal pay for the approved time off.  (D.E. 28-8, 46:17-25 to 47:1-1-5).  LCSO policy requires an employee on FMLA leave to utilize all available accruals of paid leave benefits while on leave.  (D.E. 28-1, Ex. 7 at pdf 78).

19.     While Clark was out on her approved sick leave, the Undersheriff notified Annmarie Reno that Sheriff Marceno had approved the elimination of the Purchasing Director's job position, effective September 4, 2021, and Reno then notified Heikkila.  (D.E. 28-4, 89:10-24; D.E. 28-6, 31:1-25 to 32:1-14).  Although she had been part of discussions about a possible elimination of the Purchasing Director

13

job, Reno was surprised when she learned on August 20, 2021, that the Sheriff has approved this job elimination. (D.E. 28-4, 89:18-24, 91:5-16; 103:14-18). Clark's position as Purchasing Director had been included in the LCSO's budget proposal for Fiscal Year 2022 (i.e., October 1, 2021 to September 30, 2022). (D.E. 28-4, 114:12-20). In proposing to eliminate the Director of Purchasing position, Holloway did not consider Clark's age, retirement eligibility or seniority within the LCSO. (D.E. 28-2, 60:21-23, 58:20-23, 59:10-20; 57:19-23). Clark's medical condition played no role in the Sheriff's decision to eliminate her position. (D.E. 28-4, 99:21-23).

20.     In response to the Sheriff's decision, Dawn Heikkila prepared a letter on August 20, 2021 to send out to Clark, notifying her of the position elimination. Clark received Heikkila's letter on August 24, 2021. (D.E. 28-8, 60:4-16). Although the letter is erroneously dated August 15, 2021, its metadata confirms that Heikkila did not create the letter until August 20, 2021. (D.E. 28-1, ¶ 19, D.E. 28-8, Ex. 17). Indeed, Heikkila directly communicated to Clark that she had not learned of the Sheriff's decision to eliminate her job until August 20, 2021. (D.E. 28-8, 59:25 to 60:1-16). Heikkila's letter also notified Clark that her approved absences related to her medical procedure in August were being treated by the LCSO as Paid Administrative Leave, rather than as sick leave. Annmarie Reno changed the coding for Clark's approved leave because the LCSO did not want Clark to have to use her accrued sick leave benefits for these absences. (D.E. 28-4, 118:17-25 to 119:1-24).

14

**ALLEN NORTON & BLUE, P.A.**
PROFESSIONAL ASSOCIATION

21.     Annmarie Reno contacted Clark on August 21, 2021, to verbally inform her that the Sheriff had made the decision to eliminate her position.  During this call, Reno encouraged Clark to contact Heikkila on the morning of August 23, 2021, to address questions Clark may have regarding her available options and benefits in light of her job elimination.  (D.E. 28-1, ¶ 20; D.E. 28-4, 117:9-13).

22.     Clark contacted Dawn Heikkila on the morning of August 23, 2021, to discuss the news of her job elimination and her available options.  The telephone call with Heikkila lasted forty (40) minutes, during which Clark and Heikkila discussed the possibility of Clark applying for an open Communications Call Taker position.  Although Heikkila opined that Clark should resign and retire with the FRS (D.E. 28-8, 78:15-21), Clark declined further interest in applying for the Communications position once she learned that if successful, her new position would result in a substantial decrease in her and a significant reduction in her accrued sick leave and vacation pay benefits. (D.E. 28-8, 50:12-25 to 51:1-4, 54:10-25 to 55:1-23).

23.     Clark's separation from her employment as Purchasing Director was predicated on her decision to retire with the FRS on September 3, 2021.  (D.E. 28-8, 37:23-25 to 38:1-2).  In resigning her employment and electing to retire, Clark was paid out her 404.51 hours of unused vacation and 100 hours of unused sick leave, at $45.588/hour - the effective hourly rate of her position as Purchasing Director, consistent with applicable LCSO policies. (D.E. 28-8, Ex. 22).  She also received 103 hours of Paid Administrative Leave for the period of August 17, 2021 through

15

**ALLEN NORTON & BLUE, P.A.**
PROFESSIONAL ASSOCIATION

September 3, 2021, inclusive of all of the missed work hours related to her medical procedure.  (D.E. 28-8, Ex. 13).

24.    Effective November 27, 2022, Purchasing Agent Christine Cross transferred out of the Purchasing Department to go to work at the CORE facility in the LCSO's Corrections Bureau.  Following Cross's transfer, Annmarie Reno elected not to backfill Cross's position. Currently, Shannon Lehman remains the Purchasing Manager, and there are only four (4) additional Purchasing Agents employed since Christine Cross's transfer out of the department.  (D.E. 28-1, ¶ 18; D.E. 28-1, Ex. 2).

**MEMORANDUM OF LAW**

### I.    Clark's position as Purchasing Director was eliminated as part of the 2021 RIF because it was redundant to the work being performed by the Purchasing Manager

The ADEA prohibits employers from terminating an employee who is at least 40 years of age because of that employee's age.  *Sims v. MVM, Inc.,* 704 F.3d 1327, 1331 (11th Cir. 2013).  In this case, Jenna Clark must prove that age was the "but for" cause of the Sheriff's decision to eliminate her position.  *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 176, 129 S.Ct. 2343, 174 L.Ed. 2d 119 (2009).  Clark offers no direct or circumstantial evidence to support such a claim.

With her position eliminated as part of the 2021 RIF, Clark's *prima facie* case requires that she show (1) that she was in a protected age group and was adversely affected by an employment decision, (2) that she was qualified for another available

16
**ALLEN NORTON & BLUE, P.A.**
PROFESSIONAL ASSOCIATION

job with the LCSO at the time of her position elimination, and (3) evidence by which a finder of fact could reasonably conclude that the employer intended to discriminate on the basis of age in reaching that decision.  *Zaben v. Air Products & Chemicals, Inc.,* 129 F.3d 1453, 1457 (11th Cir. 1997).  Here, Clark can only establish that she was in the protected age group, and she points to no position she claims she should have been given at the time of her job elimination.  *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1083 (11th Cir. 1990) (in conducting a reduction-in-force, the employer incurs no duty under the ADEA to transfer a plaintiff to another position within the organization).

Although the Sheriff did eliminate the Purchasing Director's position from the organization effective September 4, 2021, neither the Sheriff nor anyone else at the LCSO terminated Clark's employment on September 3, 2021.  Instead, after being notified of her position elimination, Clark elected to resign her employment *and retire with the FRS*, rather than remain employed at the LCSO by applying for an open, available non-certified position as a Communications Call Taker (D.E. 28-8, 96:8-25 to 100:1-5; D.E. 28-8, Ex. 15), or delaying her retirement to see whether any additional non-certified positions of interest became open at the LCSO that she would have been more interested in applying to undertake.

Clark had the same options as others impacted by the 2021 RIF who were offered an opportunity to seek other open positions within the agency if they occupied a position selected for elimination in the 2019 or 2021 RIFs.  (D.E. 28-2, 35:3-25 to 36:1-5; D.E. 28-1, ¶14).  Notably, James Jones elected to transfer to a lesser paying job

17

of Fleet Services Specialist effective November 4, 2021, when the Sheriff eliminated his job as Fleet Services Director.   James Jones was 51 years of age when his position was eliminated (D.E. 28-2, 54:15-21), and remains employed by the LCSO to the present date.  (D.E. 28-1, ¶ 23).   Tammy Rhodes was also transferred to a new Administrative Assistant position in the Corrections Bureau when her secretarial position in the Communications Department was eliminated as part of the 2021 RIF in August 2021.  (D.E. 28-8, Ex. 5).  At the time of her position elimination, Rhodes was 51 years of age.  Rhodes also remains employed by the LCSO to the present date. (D.E. 28-1, ¶ 24).  Finally, Karen Ciofani's position as Communications Director was eliminated in August 2021 as part of the 2021 RIF, with her title changed to Communications Administrator.  (D.E. 28-8, Ex. 5).   At the time of her position elimination, Ms. Ciofani was 50 years of age.  Ms. Ciofani later transferred from Support Services to the Legal Services Bureau as the Legal Service Administrator, and she remains employed in that position to the present date. (D.E. 28-1, ¶ 25).

More importantly, there is no evidence to support that the elimination of the Purchasing Director job classification was due to Clark's age.  The undisputed facts are that the Undersheriff concluded from his review and the reduction-in-force process he followed in 2021 that Clark and Purchasing Manager Shannon Lehman were performing the same work, and that the scope of work did not require a Director level position going forward.  Reno determined that Lehman (then, age 54) could absorb most of Clark's responsibilities and that Reno herself (then age could add Clark's

18

**ALLEN NORTON & BLUE, P.A.**
PROFESSIONAL ASSOCIATION

former responsibility to approve high dollar purchase orders following the elimination of the Director position.  With a new administrative software system within the Support Services Bureau which Reno determined Lehman to be more proficient with than Clark, the Undersheriff proposed to eliminate the Purchasing Director's position as part of the 2021 RIF, which the Sheriff accepted in August 2021.   No inference of age discrimination arises from these facts, when Shannon Lehman was age 54 at the time of Clark's resignation and retirement, and now at the age of 56, Lehman continues to work as agency's Purchasing Manager to the present date (D.E. 28-1, ¶ 17), with Annmarie Reno (then, age 64) continuing to handle the remainder of Clark's former responsibilities not absorbed by Lehman.  (D.E. 28-1, ¶ 2).  The Purchasing Department functions currently with only four (4) Purchasing Agents employed, rather than the five (5) Purchasing Agents who were employed when Clark was the Purchasing Director.  Through the new administrative support software and elimination of positions within the Purchasing Department in 2021 and 2022, the Purchasing Department has become more efficient which in part has helped the LCSO counterbalance the increasing operational costs of inmate health care, self-funded Health plan, and substantial increases in the agency's contributions to the FRS. (D.E. 28-1, ¶ 7).

## II.   Clark engaged in no protected activity under the ADEA, and thus her age-based retaliation claim fails.

**ALLEN NORTON & BLUE, P.A.**
PROFESSIONAL ASSOCIATION

SPDN-868764429-3304433

In Count II of her Amended Complaint, Clark asserts that she was retaliated against when she "opposed the Defendant's unlawful discriminatory conduct on the basis of her age." (D.E. 13, ¶ 68). Clark contends that her protected activity under the ADEA was her opposition to the job elimination on <u>August 23, 2021</u> – *after she had been notified by Annmarie Reno* that the Sheriff had elected to eliminate her job as part of the 2021 RIF. (D.E. 28-8, 139:17-25 to 140:1-14). Clark argues that she was denied the opportunity to apply for "known job openings." (D.E. 28-8, Ex. 26, Response to Interrogatory No. 6).

Clark's contention of being the victim of alleged retaliation is belied by the undisputed record evidence. Here, the *only* non-certified position available as of August 23, 2021 at the LCSO which interested Clark once she was informed of her position elimination was a Communications Call Taker position (D.E. 28-8, Ex. 4), which carried an initial annual salary of $36,500. She became aware of this available position by checking the LCSO's website listing available openings *after* she was verbally informed of her position elimination on August 21, 2021, and *before* Clark communicated with Dawn Heikkila about her available options on August 23, 2021. Being paid an annualized salary as Purchasing Director in excess of $93,000 annually at the time of her position elimination (D.E. 28-8, 76:1-25 to 77:1-18), Clark knew that her successful application for the available Communications Call Taker position would have resulted in greater than a 50% reduction in her salary and effective hourly rate of pay. In a 40-minute telephone conference with Heikkila on August 23, 2021,

20

Clark discussed the Communications Call Taker position, confirming that by policy, Clark would not be paid her accrued benefits at her Purchasing Director rate of pay if she applied and accepted this lesser paying position.   Once Clark learned the consequence of accepting a new job at a reduced rate of pay and diminishing the amount of her accrued leave benefits if she remained employed in a lesser capacity, she no longer had any interest in the Communications Call Taker position.  (D.E. 28-8, 55:18-23). No one at the LCSO prevented her from learning of available openings or applying for the Communications Call Taker job opening, or for any other non-certified position which may have become available.

Therefore, Sheriff Marceno engaged in no "retaliation" against Clark when he carried out his previous decision to eliminate the position of Purchasing Director, regardless of what decision Clark made with respect to the available Communications Call Taker position, or Heikkila's personal recommendation that Clark should not take the position due to the consequential loss of accrued leave benefits.

### III.   Clark fails to establish a claim for FMLA Interference or FMLA Retaliation

Although Clark was eligible for FMLA leave at the time she took an approved seven-day absence for a medical procedure in August 2021, the undisputed facts demonstrate that her FMLA rights were not in any way interfered with, nor was she retaliated against in any way for taking the requested sick leave.

ALLEN NORTON & BLUE, P.A.
PROFESSIONAL ASSOCIATION

In order to establish a claim for interference under the FMLA, a plaintiff must show that she was denied a benefit to which she was entitled. *Strickland v. Water Works & Sewer Board*, 239 F.3d 1199, 1206-1207 (11th Cir. 2001). Once that showing has been made, the plaintiff then must demonstrate harm or prejudice resulting from the employer's alleged interference with her exercise or attempted exercise of an FMLA benefit. *Graves v. Brandstar, Inc.*, 67 F.4th 1117, 1121 (11th Cir. 2023) (quoting *Ramji v. Hosp. Housekeeping Systems, LLC*, 992 F.3d 1233, 1245 (11th Cir. 2021). Clark cannot demonstrate either element necessary for an FMLA interference claim.

First, Clark sought approval to take a seven-day leave of absence, and her requested leave of absence was approved by her immediate manager (Annmarie Reno) and again by the Sheriff's Human Resources Director (Dawn Heikkila). While Clark completed her time sheet signaling that her approved absence from work would be treated as "sick leave" as was required by LCSO's FMLA policy (D.E. 28-8, Ex. 16), understanding that she would receive pay for her approved absences using her accrued sick leave benefits, she in fact was not denied her right to take leave for her medical procedure in August, 2021.

Due to the Sheriff's decision to eliminate her position from the agency as part of the 2021 RIF, Annmarie Reno revised Clark's time sheets so that she would instead be provided Paid Administrative Leave for her August, 2021 absences and for the remaining scheduled work days until her position was eliminated, so that she would not have to use her accrued sick leave benefits for the absences related to her August,

ALLEN NORTON & BLUE, P.A.
PROFESSIONAL ASSOCIATION

2021 medical procedure. (D.E. 28-8, 79:6-25; D.E. 28-8, Ex. 13).   As a consequence of this change in Clark's time sheets, Clark was fully paid for her August 2021 absences from schedule work and left with the maximum amount of accrued sick leave benefits to take with her in the event she elected to resign her employment prior to the date her position was eliminated.      (D.E. 28-4, 118:13-25 to 119:1-24).   Not surprisingly, therefore, Clark could not identify at her deposition how she had suffered harm in any way from not being provided notice of her FMLA rights prior to her commencement of medical leave related to her August, 2021 medical procedure (including the three hours of scheduled work she missed on August 17, 2021 to travel to the location where the medical procedure would be performed). (D.E. 28-8, 134:22-25 to 135:1-19). Accordingly, Clark's FMLA interference claim fails as a matter of law. *De Bello v. Alutiiq, LLC*, M.D.Fla. Case No. 8:22-cv-2903-WFJ-JSS, 2023 U.S. Dist. LEXIS 138114 *11 (M.D.Fla. Aug. 8, 2023), citing  (holding that defendant's failure to provide FMLA paperwork to employee fails to establish an FMLA interference claim when she was provided her requested leave and was paid for her planned absence from scheduled work).

Clark's FMLA retaliation claim fares no better.  To state a claim for FMLA retaliation, a plaintiff must show: (1) she engaged in statutorily protected activity under the FMLA, (2) she suffered an adverse employment action, and (3) there is a causal connection between the two. *Krutzig v. Pulte Home Corporation*, 602 F.3d 1231 (11th Cir. 2010).  Here, Clark cannot establish the third element of her asserted FMLA retaliation

claim.[2]  Furthermore, she fails to establish that the Sheriff intended to discriminate against her for exercising an FMLA right, which is a required component of her FMLA retaliation claim.  *Martin v. Brevard County Public Schools*, 543 F.3d 1261, 1267 (11th Cir. 2008).

The record evidence confirms that the Undersheriff commenced his analysis for proposing the 2021 RIF in early 2021 (D.E. 28-2, 11:3-88), and that his proposals for multiple job eliminations were completed and submitted to the Sheriff for consideration and approval in June and July, 2021 (D.E. 28-2, 11:23-25) – *prior to* Clark's August 12, 2021 notice to Dawn Heikkila to use sick leave for an August, 2021 medical procedure, which Reno and Heikkila approved. (D.E. 28-8, 141:12-21). Therefore, the Undersheriff's 2021 RIF proposal to eliminate the Purchasing Director job classification preceded Clark's request for the use of accrued sick leave for August, 2021 medical procedure.  Thus, there is no causal nexus between Clark's request to use sick leave in August 2021 and the Sheriff's decision to eliminate her position as of September 4, 2021.  *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir.  2006) ("when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the

---

[2] Clark's asserted adverse action is that with the elimination of her position as Purchasing Director, she was compelled to resign without her full retirement benefits and prevented from applying from other employment positions.  (D.E. 13, ¶ 95).  While Defendant did eliminate her position as part of the 2021 RIF, Clark maintained the opportunity to apply for any open position at the LCSO for which she was qualified, and it was her choice on August 27, 2021 to resign and retire with the FRS (D.E. 28-8, Ex. 15),  in order to maximize her receipt of accrued vacation and sick leave benefits at the hourly rate associated with her employment as Purchasing Director.

24

subsequent adverse employment action does not suffice to show causation."). See also, 29 C.F.R. § 825.216(a) ("an employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period").

Here, the Sheriff eliminated the Purchasing Director position as part of the 2021 RIF, and this decision was independent of Clark's request for sick leave.  Indeed, there is not a shred of evidence that the Sheriff even knew that Clark planned to commence a medical leave of absence on August 18, 2021, and Clark's manager testified that at the time, she and Dawn Heikkila were the only ones who knew that Clark would be away from her scheduled work in August for a medical procedure. (D.E. 28-4, 93:10-19).  Not surprisingly, therefore, when asked at deposition whether it was her belief that her position was eliminated because she requested a leave of absence to have surgery in August 2021, Clark responded: "I don't know."  (D.E. 28-8, 136:7-10).

## IV.   CONCLUSION

For the reasons noted above, Defendant's Motion for Summary Judgment should be granted, and judgment entered in favor of the Sheriff as to each of Clark's asserted claims.

**ALLEN NORTON & BLUE, P.A.**
PROFESSIONAL ASSOCIATION

Dated this 26th day of January 2024.        Respectfully submitted,

*s/ David J. Stefany*
DAVID J. STEFANY
Florida Bar No. 438995
*Counsel for Defendant*

**ALLEN NORTON & BLUE, P.A.**
Hyde Park Plaza - Suite 225
324 South Hyde Park Avenue
Tampa, Florida 33606-4127
(813) 251-1210 | (813) 253-2006 – Fax
E-mail:dstefany@anblaw.com
Secondary: awilliams@anblaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 26th day of January 2024 I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will electronically send a notice of electronic filing to Kyle T. MacDonald, Esquire and to Lauren Wilson, Esquire of Derek Clark Law Group, PLLC, 520 Brickell Key Drive, Suite O-301, Miami, Florida 33131 [k*yle@derekClarklaw.com; lauren@derekClarklaw.com*]

*s/ David J. Stefany*
ATTORNEY

ALLEN NORTON & BLUE, P.A.
PROFESSIONAL ASSOCIATION

SPDN-868764429-3304433