1          UNITED STATES DISTRICT COURT
             MIDDLE DISTRICT OF FLORIDA
2

3

JENNA CLARK,
4
     Plaintiff,
5                              CASE NO.: 2:22-cv-614-SPC-NPM
v.
6
CARMINE MARCENO, in
7 his official capacity
as Sheriff of Lee
8 Country, Florida,

9     Defendant.
  ----------------------/
10
                ZOOM DEPOSITION OF
11
                  ANNMARIE RENO
12
          TAKEN ON BEHALF OF PLAINTIFF
13

14

DATE TAKEN:     Tuesday, October 24, 2023
15
TIME:           10:14 a.m. to 2:27 p.m.
16
PLACE:          All parties appeared via videoconference
17

18

19

20

21

22

          Examination of the witness taken before:
23
               Julie S. Evans
24      Court Reporter and Notary Public

25

Deposition of Annmarie Reno                                    Jenna Clark v. Carmine Marceno

```
 1    APPEARANCES:

 2    KYLE T. MACDONALD, ESQUIRE (via Zoom)
      Derek Smith Law Group, PLLC
 3    520 Brickell Key Dr.
      Suite O-301
 4    Miami, Florida 33131

 5         On behalf of the Plaintiff.

 6    DAVID J. STEFANY, ESQUIRE (via Zoom)
      Allen Norton & Blue, P.A.
 7    324 South Hyde Park Avenue
      Suite 225
 8    Tampa, Florida 33606-4128

 9         On behalf of the Defendant.

10
                         -  -  -  -  -
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Deposition of Annmarie Reno

Jenna Clark v. Carmine Marceno

EXAMINATION INDEX

ZOOM TESTIMONY OF ANNMARIE RENO
    DIRECT BY MR. MACDONALD                          4
    CROSS BY MR. STEFANY                           101

CERTIFICATE OF OATH                                121

CERTIFICATE OF REPORTER                            122

ERRATA SHEET                                       123

NOTIFICATION LETTER                                124


*** NO EXHIBITS WERE MARKED ***

- - - - -

S T I P U L A T I O N S

It is hereby agreed and so stipulated by and between the parties hereto, through their respective counsel, that the reading and signing of the transcript are expressly reserved.

- - - - -

```
 1                    P R O C E E D I N G S
 2          THE COURT REPORTER:  Today is Tuesday, October
 3     24, 2023.   The time is approximately 10:14 a.m.
 4     This is the Zoom deposition of Annmarie Reno, being
 5     taken in the matter of Clark v. Carmine Marceno,
 6     Sheriff of Lee County.   Will counsel please state
 7     their appearance, beginning with Plaintiff's
 8     counsel.
 9          MR. MACDONALD:  Kyle MacDonald, on behalf of
10     the Plaintiff, Jenna Clark.
11          MR. STEFANY:  David Stefany, with Allen Norton
12     & Blue, on behalf of Sheriff Carmine Marceno.
13          THE COURT REPORTER:  Please raise your right
14     hand.   Do you solemnly swear or affirm your
15     testimony will be the truth, the whole truth,
16     nothing but the truth, so help you God?
17          THE WITNESS:  I do.
18     THEREUPON:
19                    ANNMARIE RENO,
20     having first been duly sworn, testified as follows:
21                    DIRECT EXAMINATION
22     BY MR. MACDONALD:
23       Q.   Good morning, Ms. Reno.  My name is Kyle
24     MacDonald, and I represent Jenna Clark in her lawsuit
25     against Carmine Marceno in his official capacity as
```

```
1    Sheriff of Lee County.   Thank you for being here today.
2             Can you please start by stating your full name,
3    for the record.
4         A.    It's Annmarie Sophie Reno.
5         Q.    Have you ever been deposed before, Ms. Reno?
6         A.    Yes.
7         Q.    And when were you deposed previously?
8         A.    It's been a few years ago; I don't remember
9    exactly.
10        Q.    Do you remember what you were deposed for?
11        A.    It was a case about overtime.
12        Q.    And was that case related to your role at the
13   Lee County Sheriff's Office?
14        A.    Yes.
15        Q.    Even though you have been deposed before, I'm
16   going to go over a few things, just to we're both on the
17   same page.   Okay?
18        A.    Okay.
19        Q.    Do you understand that you've been placed under
20   oath and that you have an obligation to testify
21   truthfully today?
22        A.    Yes.
23        Q.    And do you understand that even though we are
24   conducting this deposition via Zoom, your testimony has
25   the same force and effect as if you were testifying in a
```

1   court of law, in front of a judge and jury?

2       A.    Yes.

3       Q.    The court reporter cannot transcribe inaudible

4   responses, such as a gesture or a shrug, so make sure

5   you respond clearly, just as you have been.  Okay?

6       A.    Okay.

7       Q.    The court reporter also cannot accurately

8   reflect your responses if we speak at the same time; so

9   I'll wait for you to finish your responses, and I would

10  just ask that you wait until I finish my questions.

11  Okay?

12      A.    Okay.

13      Q.    Now, we want to make sure that we get your best

14  testimony in this lawsuit, so if there's a question you

15  do not understand or anything you think is confusing,

16  just let me know and I can try to rephrase the question

17  for you.  Okay?

18      A.    Okay.

19      Q.    And if you need to take a break at any point,

20  to go to the bathroom, get a glass of water, anything

21  like that, just let me know and we can go ahead and take

22  a break.  Okay?

23      A.    Okay.

24      Q.    Is there anything that would prevent you from

25  thinking clearly and testifying truthfully here today?

1      A.    No.

2      Q.    Where are you conducting this deposition from?

3      A.    The intel conference room at the Lee County

4  Sheriff's Office.

5      Q.    And is anyone in the room with you there today,

6  besides your counsel?

7      A.    No.

8      Q.    Do you have any documents in front of you?

9      A.    No.

10      Q.    What did you do to prepare for today's

11  deposition?

12      A.    I talked to the attorney, on Friday.

13      Q.    Did you speak with anyone besides your attorney

14  about your deposition here today?

15      A.    No.

16      Q.    Did you tell anyone from the Lee County

17  Sheriff's Office about your deposition today?

18      A.    That I was having one -- that I was having one?

19      Q.    Yes.   Anything about your deposition here

20  today.

21      A.    No.   It's on my calendar, though.

22      Q.    Did you review any documents, prior to your

23  deposition today?

24      A.    Yes.

25      Q.    What documents did you review?

1      A.    I just reviewed the -- an email when we were

2   eliminating positions and, with the attorney, I looked

3   at the actual documents from the case.

4      Q.    Do you remember who that email was sent by that

5   you reviewed?

6      A.    Dawn Heikkila.

7      Q.    And do you remember what specifically that

8   email was about?

9      A.    It was an email that was sent out about

10  elimination of positions.

11     Q.    Do you remember who it was sent to?

12     A.    I believe it was -- I don't want to guess; I'm

13  thinking it was all users.

14     Q.    What is your current address, Ms. Reno?

15     A.    My home address?

16     Q.    Yes.

17     A.    ██████████████████████████████████████

18  ████████.

19     Q.    And how long have you lived at that address

20  for?

21     A.    Three years.

22     Q.    And do you live with anyone at that address?

23     A.    No.

24     Q.    Have you ever been arrested before,

25  Ms. Reno?

1      A.    No.

2      Q.    Have you ever been a party to a civil lawsuit

3  before?

4      A.    No.

5      Q.    Have you ever been a witness to any other

6  lawsuit before?

7      A.    I'm trying to remember.

8          MR. STEFANY:  Other than the deposition she

9      previously had, Counsel?

10         MR. MACDONALD:  Yes.

11 BY MR. MACDONALD:

12     Q.    Other than the deposition that you had

13 previously mentioned related to overtime, I believe you

14 said.

15     A.    Right.  No.

16     Q.    And what was the extent of your involvement as

17 a witness in that lawsuit regarding overtime?

18     A.    To witness the documents, timesheets.

19     Q.    Do you remember who that lawsuit was brought

20 by?

21     A.    It was a current employee -- or, I'm sorry, it

22 was a past employee.

23     Q.    Do you remember that employee's name?

24     A.    Caiazza, I believe, was the last name.

25     Q.    And do you remember roughly when that lawsuit

1    took place?

2         A.    No, I don't remember.

3         Q.    Was it more than five years ago?

4         A.    I'm not sure.  It may have been.

5         Q.    Do you know how to spell that last name; was it

6    Caiazza?

7              MR. STEFANY:  C-A-I-A-Z-Z-A.

8    BY MR. MACDONALD:

9         Q.    Did you attend college, Ms. Reno?

10        A.    Yes.

11        Q.    Where did you attend college?

12        A.    International, International College, and I

13   also -- sorry, I'm trying to think; it's been a while;

14   University -- oh, I can't think.  I think it's on my

15   diploma, but I just haven't thought about it.  It's been

16   a while.  North Central -- sorry, North Central

17   University.

18        Q.    You went to International College you said, and

19   then North Central College; is that right?

20        A.    That's correct.

21        Q.    And what degree did you earn at International?

22        A.    Public administration.

23        Q.    And what year did you graduate from

24   International?

25        A.    I'm trying to think; I guess I need to think

```
 1    about this stuff; I'm sorry.  I'm guessing, about 2012.
 2         Q.    And what degree did you earn at North Central?
 3         A.    Master's in Business Administration.
 4         Q.    And what year did you graduate with your MBA?
 5         A.    I'm trying to remember, sorry.  2000-maybe-17.
 6    I went right consecutively.
 7         Q.    Do you have any professional certifications,
 8    Ms. Reno?
 9         A.    Certified planner, law enforcement planner.
10         Q.    And who was that certification awarded by?
11         A.    I'm trying to think.  I'm sorry, I don't know;
12    I can't remember who it's awarded by.  It's been a
13    while.
14         Q.    Do you remember, roughly, when you earned that
15    certification?
16         A.    About 2008, somewhere around there.
17         Q.    Any other certifications, besides the certified
18    law enforcement planner?
19         A.    No.
20         Q.    Have you ever received any type of specialized
21    training related to human resources?
22         A.    Just college.
23         Q.    So in college, you took courses related to
24    human resources?
25         A.    Yes.
```

1    Q.    Have you ever received any type of training

2  related to human resources in your role at the Lee

3  County Sheriff's Office?

4    A.    I've taken some classes on it; a little bit of

5  training, yes.

6    Q.    What kind of training have you received at the

7  Lee County Sheriff's Office related to human resources?

8    A.    So most of it would have been outside of the --

9  outside of Lee County Sheriff's Office.  Not in -- they

10 wouldn't have done the training internally for me.  I

11 would have taken some classes outside, especially in

12 relationship to taxing and human resource laws, just to

13 keep updated; military laws, things like that.

14   Q.    Where did you take those classes?

15   A.    They would have been probably one of the --

16 like, SkillPath, where they come in, and they do the

17 conferences; I took some through FSA, Florida Sheriffs

18 Association.

19   Q.    Do you remember which trainings you received

20 from the Florida Sheriffs Association?

21   A.    I took some Workers' Comp, also the ABA Ethics.

22   Q.    Any others?

23   A.    I'd have to go back and think.

24   Q.    So you can't recall any other than those two

25 that you mentioned?

```
1      A.    No.  Not right now, no.

2      Q.    And you'd mentioned SkillPath; is that right?

3      A.    Yes, SkillPath.

4      Q.    What is SkillPath?

5      A.    SkillPath is the name of the company that was

6  offering some training locally.

7      Q.    And what training did you receive from

8  SkillPath?

9      A.    It would have been human resource updates,

10 things that were going on in human resources at the

11 time, most of it on laws.

12     Q.    And do you remember when you received that

13 training from SkillPath, roughly?

14     A.    I'm trying to remember... it would have been

15 around 2007 I had some.  When I was in Human Resources.

16     Q.    Have you ever received any internal training

17 from the Lee County Sheriff's Office regarding human

18 resources topics?

19     A.    I'm trying to think.  I know that we conducted

20 some training for new supervisors when I was in there.

21 But other than that, no, I do not remember.

22     Q.    Were you assisting in instructing that training

23 that you mentioned?

24     A.    Yes.

25     Q.    And that was a training that was given to new
```

1    supervisors at the Lee County Sheriff's Office?

2        A.    Yes.

3        Q.    Do you remember roughly when that was?

4        A.    I was in Human Resources then; it would have

5    been around 2007, maybe 2008.

6        Q.    Do you remember what topics were covered in

7    that training that you helped facilitate?

8        A.    My portion was to do -- was the training of the

9    new hires, all of the things that we had to do to

10   on-board a new hire, with FDLE rulings and our own

11   policies.  And then, Dawn Heikkila was the one who

12   actually did the training for understanding the military

13   laws, the ADA, and all the benefits.

14       Q.    Have you ever received any training related to

15   discrimination, specifically, from the Lee County

16   Sheriff's Office?

17       A.    Yes.

18       Q.    What kind of training have you received in

19   regard to discrimination?

20       A.    I know that we had sexual harassment is one of

21   them; I believe we had had some on -- on discrimination.

22   But it's been a while.

23       Q.    And when did you receive the training related

24   to sexual harassment or discrimination?

25       A.    I'm trying to remember, maybe a couple of years

1   ago.  It's probably done through the system, through

2   PowerPoint.

3        Q.   And you said those were PowerPoints that you

4   received?

5        A.   Yes.  It would have been online.

6        Q.   Do you remember what topics were covered in

7   that training?

8        A.   Well, it would have been the discrimination

9   laws.

10       Q.   Anything besides discrimination laws,

11   generally?

12       A.   No, not that I can recall.

13       Q.   Besides those PowerPoints, did you receive any

14   other training related to sexual harassment or

15   discrimination while you've been at the Lee County

16   Sheriff's Office?

17       A.   Not that I can recall.

18       Q.   Where do you currently work, Ms. Reno?

19       A.   My job?  My title of my job?  I'm the executive

20   director of Support Services.

21       Q.   And that's at the Lee County Sheriff's Office;

22   correct?

23       A.   Yes.

24       Q.   And how long have you held that role for?

25       A.   Since 2017.

1    Q.   And what do you do in your role as executive

2  director of Support Services?

3    A.   We oversee the bureau -- at this time, the

4  current time, the way it's structured is I have Human

5  Resources, Personnel Services, Purchasing, Finance,

6  Planning and Research, Accreditation, Victim Advocates,

7  and Facilities; I'm responsible for Facilities.  So I

8  oversee all of those divisions.

9    Q.   And you said those are separate divisions that

10 you oversee within the Lee County Sheriff's Office;

11 correct?

12   A.   Correct.

13   Q.   What responsibilities do you have in

14 supervising those specific areas that you mentioned?

15   A.   I oversee directors and managers who actually

16 oversee those individual divisions; I also am

17 responsible for the financial portions of them and how

18 they run together.

19   Q.   Do the directors and managers of those

20 different areas report directly to you?

21   A.   Yes.

22   Q.   And how do you oversee the financials of those

23 divisions?

24   A.   Through the -- well, we have a computerized

25 system; everything is computerized now, so I can see

```
 1   their spending, or I look at a lot of reports that are
 2   generated, daily, what people are purchasing; watching
 3   the budget.
 4       Q.   Do you assist in allocating the budgets for
 5   those different divisions?
 6       A.   Yes.
 7       Q.   How does that process work?
 8       A.   There's a whole budgeting process; I actually
 9   was the budget director before I went into my new role.
10   And so the budget is -- each division creates a budget
11   for their individual divisions; and then those are
12   submitted to the budget director; then the budget
13   director calculates and puts everything together; and
14   then, after that, then the money is allocated, once it's
15   all approved.
16       Q.   And you mentioned your current responsibilities
17   as executive director.  Have they changed, in your
18   tenure as executive director?
19       A.   Yes.
20       Q.   How has it changed?
21       A.   Some of the divisions that I was responsible
22   for have been moved out from under me, in my
23   participation for looking at actually retiring.  So I
24   kept a portion of it, when we brought somebody new on,
25   to try to absorb and learn all of those different
```

1    divisions; and some were added and some removed, for the

2    betterment of the agency.

3         Q.   When did those changes take place?

4         A.   I want to say... I don't know exactly.  I don't

5    know if it was the end of 2021 or the end of -- I'm

6    trying to remember, sorry.  It could have been around

7    October of 2022.

8         Q.   And what specifically prompted those changes in

9    your role?

10        A.   Anticipation of retirement.

11        Q.   That's your retirement; correct?

12        A.   I'm sorry, yes.

13        Q.   When are you anticipated to retire?

14        A.   I was going to retire January 31 of 2023, but I

15   elected to stay for a couple more years.

16        Q.   Why did you elect to stay for a few more years?

17        A.   The Florida Retirement System changed for those

18   people that are in the DROP program; and since they

19   allowed an extra three years for extension, I asked to

20   stay.

21        Q.   Is there a benefit to staying if you're in that

22   DROP program that you mentioned?

23        A.   It's just another year your pension would go

24   into the account, into the DROP account, for each month

25   you stay.

Deposition of Annmarie Reno

Jenna Clark v. Carmine Marceno

```
1        Q.    So your pension benefits would increase if you
2   stayed?
3        A.    The DROP part of it would; the DROP part would
4   increase, but your pension is frozen at that time.
5        Q.    Can you explain what the DROP program is?
6        A.    Okay.  So -- I'll try; I'm not very good at
7   this, but I'll try.  So the DROP program is in the
8   Florida Retirement System.  You're allow to go in --
9   well, there's a criteria of your age plus your years of
10  service.  So for a civilian like myself, you have to be
11  62 years old or have 30 years of service, in order to go
12  into the DROP program.
13            Once you elect to go into DROP, it calculates
14  what your pension would be at that time, and that
15  pension -- whatever that pension is, your monthly
16  pension, would then be put into high yielding, like a
17  deferred comp program, where it would just accumulate
18  there while you continue to work.
19       Q.    Is that program open to all civilian employees?
20       A.    It's open to anyone who is in the Florida
21  Retirement System, as long as you're in the pension plan
22  and not in the investment plan.
23       Q.    Do you know when your new retirement date is,
24  or has that not yet been determined?
25       A.    It can go out to 2027, January 21 of 2027.  But
```

Deposition of Annmarie Reno                                    Jenna Clark v. Carmine Marceno

```
1    I can elect to leave at any time within that date.
2         Q.    And you mentioned that divisions were added and
3    removed, as part of that role change; is that correct?
4         A.    That's correct.
5         Q.    What divisions were added?
6         A.    The Training Division; Communications was the
7    other one, was added to the bureau.
8         Q.    And what's the bureau?
9         A.    The Support Services Bureau.
10        Q.    And what divisions were removed?
11        A.    Well, they were removed from my portion of --
12   my span of control; they stayed with the bureau where
13   now there's a chief; Chief Sands is over that bureau,
14   and I only kept a portion of the bureau.
15        Q.    Who did you say now oversees it, Chief Sands,
16   like S-A-N-D?
17        A.    S-A-N-D-S.
18        Q.    Got it.  And were you formerly in charge of the
19   entire bureau, prior to Chief Sands taking over?
20        A.    Yes, I was, with the exception of those two
21   divisions.
22        Q.    And you said divisions weren't removed from the
23   Support Services Bureau, they were just removed from
24   your supervision; is that correct?
25        A.    Correct.
```

Deposition of Annmarie Reno

Jenna Clark v. Carmine Marceno

1      Q.    And which divisions were those?   Forgive me if

2    I missed them the first time.

3      A.    The ones that were removed -- oh, the ones that

4    he currently has, or -- I'm sorry, I need to understand

5    what you're asking me.

6      Q.    Of course.   The divisions that you no longer

7    oversee in the Support Services Bureau.

8      A.    I no longer oversee Technical Services,

9    Technical Support; I don't oversee Programming, is

10   another one; Budget, we moved budget under his, so he

11   could better understand it.   Let me think what else we

12   removed.   Now he has Communications and Training, and I

13   think that's it.   And then I have the rest.

14     Q.    And what is Chief Sands current job title?

15     A.    He's chief of Support -- Executive Support

16   Bureau.

17     Q.    And did Chief Sands take over supervision of

18   the bureau also due to your anticipated retirement?

19     A.    Yes.

20     Q.    Did you discuss these changes in anticipation

21   of your retirement with anyone at the Sheriff's Office

22   in particular?

23     A.    I'm sorry.   Discuss how it should be realigned?

24     Q.    Yes.   How did these changes come about, in

25   terms of your anticipated retirement?

1      A.   Well, I would -- I'm not going to speculate how

2  they came about.  I know that we talked about that

3  someone needed to step into the role if I was going to

4  leave.  Again, FRS had changed the criteria to stay

5  longer.  So the change had to come so that the person

6  who was going to step into the role could be able to

7  understand all of the aspects of all of those divisions,

8  especially the financials.

9      Q.   And who did you discuss that with?

10      A.   The undersheriff.

11      Q.   And what is the undersheriff's name?

12      A.   John Holloway.

13      Q.   And when did you discuss these changes with

14  John Holloway?

15      A.   I would -- I'm just guesstimating, to be honest

16  with you; I would think it was probably the end of 2021,

17  the beginning of 2022.  Because it was getting closer.

18      Q.   And did you initiate those discussions with

19  Mr. Holloway?

20      A.   I don't remember if he initiated it with me or

21  I initiated with him.

22      Q.   And what does Mr. Holloway do, as the

23  undersheriff?

24      A.   He oversees all the operations.

25      Q.   All of the operations of the entire Lee County

1    Sheriff's Office?

2        A.    Yes.

3        Q.    And as executive director of Support Services,

4    who do you report to at the Lee County Sheriff's Office?

5        A.    Right now, I -- well, I was reporting to the

6    undersheriff, John Holloway; and right now, since I'm

7    taking a different role, I believe I show, on the old

8    chart, reporting to Chief Sands.

9        Q.    And was that change in reporting made at the

10   same time that Chief Sands began overseeing the bureau?

11       A.    No.

12       Q.    When was that reporting change made?

13       A.    Again, I'm thinking.  I don't know the exact

14   date.  It was probably a few months ago.

15       Q.    And why was that change in reporting made for

16   your position?

17       A.    I thought that -- I actually was the one who

18   initiated that and thought it would be best if people

19   weren't given direction by two people; and it would be

20   so much better for Chief Sands to learn the whole bureau

21   if I reported to him, so he could take the lead.

22       Q.    And who did you present that idea to?

23       A.    To the undersheriff.

24       Q.    And did the undersheriff agree with that

25   suggestion?

1     A.    Yes.

2     Q.    So just so I understand correctly.  Prior to a

3  few months ago, you were reporting directly to the

4  undersheriff, but then the change was made and you now

5  report to Chief Sands; is that accurate?

6     A.    That's accurate.

7     Q.    Do you meet on a regular basis with Chief

8  Sands?

9     A.    Yes.

10     Q.    How often?

11     A.    Daily.

12     Q.    And was that also the case when you reported to

13  the undersheriff?

14     A.    Yes.

15     Q.    When you reported to the undersheriff, what

16  would you discuss in those daily meetings?

17     A.    Whatever had to do with financials.

18     Q.    What about financials did you discuss with the

19  undersheriff?

20     A.    Usually, our spending, you know, trends; how

21  much money we still have left; how we could save money.

22  Things like that.

23     Q.    In your role as executive director, are you

24  involved in decisions to hire or fire employees?

25     A.    As my role -- yes.  The decision to hire, yes.

1    Q.   And what about the decision to fire employees;
2  are you involved in those decisions?
3    A.   No, not in the firing.  That would come through
4  committee or through the sheriff or undersheriff.
5    Q.   You said terminations usually come from a
6  committee or the sheriff or the undersheriff?
7    A.   Yes.  It depends what type of termination it
8  is.
9    Q.   What are the types of terminations?
10    A.   For terminations that would run through an
11  Internal Affairs investigation.  People that are
12  terminated due to probation problems would not come from
13  there; that would go to HR.
14    Q.   And what type of terminations would typically
15  involve the sheriff or the undersheriff?
16    A.   Those would be the internal investigations.
17    Q.   Are you involved in decisions to change job
18  titles or job duties, as executive director?
19    A.   Yes.
20    Q.   And do you make those decisions solely by
21  yourself?
22    A.   No.
23    Q.   Who are those decisions typically made with?
24    A.   It would be with the undersheriff.
25    Q.   And would that still be the case even now that

1    Chief Sands is supervising the bureau?

2        A.   No.   I would make the recommendations to him,

3    to the chief.

4        Q.   What role did you have at the Lee County

5    Sheriff's Office prior to 2017?

6        A.   Oh, I'm sorry.  Budget director; from 2008 to

7    2017, I was budget director.

8        Q.   And what did you do in your role as the budget

9    director?

10       A.   I took care of producing a budget every year

11   based on manpower and operations, capitol equipment; I

12   also was responsible for a couple other small units

13   under me.

14       Q.   What units were you supervising?

15       A.   Programming for a while, and Purchasing.

16       Q.   And did you supervise Programming and

17   Purchasing that entire time that you were budget

18   director?

19       A.   No, not the entire time.

20       Q.   During which time did you supervise the

21   Programming and the Purchasing?

22       A.   I'm trying to remember; I know Programming I

23   did for -- I'm guesstimating -- a couple of years, and

24   then it was maybe allocated to somewhere else when they

25   started making changes to the organization, so we

```
 1   allocated it to somewhere else; Purchasing would have
 2   been to 2012.
 3       Q.   From 2008 to 2012 --
 4       A.   Yes.
 5       Q.   -- you would have supervised?
 6            And did you have a position with the Lee County
 7   Sheriff's Office, prior to being budget director?
 8       A.   Yes.
 9       Q.   And what position is that?
10       A.   I was the human resource manager, from 2005 to
11   2008.
12       Q.   And what did you do in your role as an HR
13   manager?
14       A.   I did all of the hiring.
15       Q.   Anything else, besides hiring?
16       A.   No.  I didn't do the benefits side; I just did
17   the hiring, all the aspects of the hiring.
18       Q.   Did that include onboarding and training for
19   new employees?
20       A.   Yes.
21       Q.   And did you have any role at the Lee County
22   Sheriff's Office prior to being HR manager?
23       A.   Yes.  From 2003 to 2005, I was -- I started a
24   unit called the False Alarm Reduction Unit for them, and
25   I was the manager of that.
```

1    Q.   And what did you do, in that role?

2    A.   I started the -- I managed the people that

3 worked in there, and I started up that unit, from a

4 county ordinance that was put in place to reduce false

5 alarms from burglar alarms.

6    Q.   What was your title in that role?

7    A.   I was the manager.

8    Q.   And what did you do prior -- or sorry, strike

9 that.  Did you have a role at the Lee County Sheriff's

10 Office prior to that manager position?

11    A.   Yes.  I was the budget analyst.

12    Q.   And when were you the budget analyst at the Lee

13 County Sheriff's Office?

14    A.   I'm trying to remember dates, going back; 2000

15 -- I'm trying to remember; I'm sorry, I'm going

16 backwards on dates, I'm sorry.  So probably around 2001

17 to 2003.

18    Q.   And what did you do in your role as a budget

19 analyst?

20    A.   I was learning to put the budget together.  I

21 was doing the operational portion, not the personnel

22 services.

23    Q.   And did you have any role with Lee County

24 Sheriff's Office prior to being a budget analyst?

25    A.   Yes.  I was a secretary for a couple of

1    different bureaus; I worked in Internal Affairs, Patrol,

2    and Special Operations.

3        Q.   And how long were you a secretary for?

4        A.   I was hired in '97... from 1997 until when I

5    went to work in budget and worked for the different

6    divisions.

7        Q.   And did you have any position at the Lee County

8    Sheriff's Office prior to being secretary?

9        A.   I started as a clerk in the west district, in

10   1997.

11       Q.   And what did you do as a clerk?

12       A.   I was a district clerk; so back in those days,

13   they didn't have take-home radios or take-home cars; I

14   would have to assign them all of their equipment when

15   they came in for roll call; I answered the phones and

16   helped transcribe for the detectives for their cases.

17       Q.   And that was the first position that you held

18   with Lee County Sheriff's Office; correct?

19       A.   Yes.

20       Q.   When did you first meet my client, Jenna Clark?

21       A.   I'm trying to remember how long; I probably --

22   again, I'm not absolutely sure.  I probably met her when

23   she was in Purchasing, when I was maybe working in

24   Budget.

25       Q.   And when you say, when you were "working in

```
 1    Budget," would that have been when you were the budget

 2    director?

 3         A.   No.   I was the analyst, the budget analyst.

 4         Q.   Do you remember what Jenna Clark's position

 5    was, at that time?

 6         A.   No.

 7         Q.   Do you know what position Jenna Clark last held

 8    at the Lee County Sheriff's Office?

 9         A.   Purchasing director.

10         Q.   And who did Jenna Clark report to as purchasing

11    director at the Lee County Sheriff's Office?

12         A.   She reported to me.

13         Q.   What were Jenna Clark's job responsibilities as

14    purchasing director?

15         A.   She oversaw the Purchasing division; she could

16    do -- she did a lot of reporting; she also was the

17    person who could convert purchase orders into actual --

18    a requisition into a purchase order, to send to the

19    vendors; she would look for quotes from outside vendors,

20    try to find the best deal we could get.

21         Q.   Are there any other job responsibilities that

22    you can think of besides the ones you listed?

23         A.    Well, she was -- I'm going to -- she probably

24    worked with her manager on performance evals of the

25    employees in there; she was the one who would actually
```

1    reach out for furniture, worked very closely with the

2    facilities director, to make sure that furniture and

3    things came together, whenever we were ready to start up

4    a new unit or move people around.

5        Q.   Who was responsible for evaluating

6    Jenna Clark's job performance as purchasing director?

7        A.   I was.

8        Q.   How would you describe Jenna Clark's job

9    performance as purchasing director?

10           MR. STEFANY:   What period of time?

11           MR. MACDONALD:   Well, let me step back a

12       little.

13   BY MR. MACDONALD:

14       Q.   Do you know what years Jenna Clark was

15   purchasing director for?

16       A.   2012, I believe, Sheriff Scott made her a

17   director.

18       Q.   And were you Jenna Clark's supervisor that

19   entire time, from 2012 onward?

20       A.   No.

21       Q.   When did you first begin to supervise

22   Jenna Clark as purchasing director?

23       A.   I actually supervised her twice; when she was a

24   manager and I was the budget director, she asked to

25   report to me, so she did, so her division fell under

```
 1    Budget; and then when she became a director, in 2012,

 2    she reported to Bill Berkowitz (ph), who was the

 3    executive director of Support Services.

 4         Q.   And as purchasing director, when did Ms. Clark

 5    first start reporting to you?

 6         A.   When I became the executive director; it was

 7    2017.

 8         Q.   During the period that you supervised Ms. Clark

 9    as purchasing director, how would you describe her job

10    performance?

11         A.   She did a good job.

12         Q.   Did you ever have any issues with Ms. Clark's

13    job performance?

14         A.   Just some -- sometimes.  Yeah, a little bit,

15    but not -- we would talk about it.

16         Q.   You would discuss any issues that you had with

17    Ms. Clark's job performance with her?

18         A.   Yes.

19         Q.   Did you ever have any serious issues with

20    Ms. Clark's job performance?

21              MR. STEFANY:   Objection to form.  You can

22         answer.

23              THE WITNESS:   I'm sorry, what did you say?  I'm

24         sorry.

25    BY MR. MACDONALD:
```

1      Q.   Did you ever have any serious issues with
2  Ms. Clark's job performance?
3           MR. STEFANY:  Same objection.
4           THE WITNESS:  Sometimes, yes, I did, only --
5      not -- let me put it this way.  Yes.  Sometimes she
6      would not want to do what I'd asked her to do,
7      things like that, and so we would discuss it.
8      Almost like sometimes she wanted to be a little
9      insubordinate, because she wanted to do it her way;
10     so we would discuss those things.
11  BY MR. MACDONALD:
12     Q.   How many times would you say that you had
13  issues with Ms. Clark being insubordinate?
14     A.   Not very often.  I'm trying to think.  Maybe
15  two, three, four times, that was it.  In that period,
16  yeah, about two or three times.
17     Q.   Did you ever discipline Ms. Clark for these
18  issues with insubordination?
19     A.   No.  Not for insubordination, no.
20     Q.   Did you ever discipline her for anything else?
21     A.   I did, yes.  I did discipline her for one other
22  thing; a reprimand, yes.
23     Q.   And what did you discipline Ms. Clark for?
24     A.   It had to do with policy and on talking to an
25  employee about religious beliefs, and the employee

1    complained about it.

2        Q.    When did that occur?

3        A.    I was trying to remember.  It was a few years

4    back; I'm sorry, I don't remember the exact date.  I

5    want to say, like, well, maybe 2019, somewhere around

6    there.  I'm not real sure.

7        Q.    In what form did you discipline Ms. Clark?

8        A.    In her office; it was in her office; it was

9    verbal.  And then, just, I did put it in her file that

10   she had to understand, in her position, she couldn't do

11   that.

12       Q.    Besides that verbal counseling, was there any

13   other time that you added something to Ms. Clark's

14   personnel file regarding discipline?

15       A.    No.

16       Q.    Did you ever speak to anyone else regarding the

17   insubordination with Ms. Clark that you described?

18       A.    I may have talk to -- yeah.  I talked to the

19   undersheriff about it.

20       Q.    Do you remember when you spoke to the

21   undersheriff regarding the insubordination that you

22   mentioned?

23       A.    There was a time in -- that happened, about

24   August.

25       Q.    August of when?

1    A.    I'm sorry, 2021.

2    Q.    What do you remember about that discussion with
3    the undersheriff?

4    A.    I actually documented it because I had asked to
5    clear out some old uniforms so that we weren't still
6    issuing them; and after I asked twice to do that, it
7    didn't happen, and so I was not happy about that.

8    Q.    And was this a verbal conversation that you had
9    with the undersheriff?

10    A.    I actually put it in writing to him.  Only for
11    documentation purposes; it was not part of her file or
12    anything.

13    Q.    Did you also discuss that writing, verbally,
14    with the undersheriff?

15    A.    Yes.  He asked me a few questions about it,
16    what happened.

17    Q.    What questions did the undersheriff ask you
18    about it?

19    A.    Well, he was trying to understand what all was
20    -- what was going on and why the warehouse was so
21    overcrowded with stuff that we had no room; we were
22    running out of room.  Actually, we were renting some
23    places.  So that's what I kind of told him what was
24    going on, as far as the uniforms not being destroyed
25    that should have been.

Deposition of Annmarie Reno

Jenna Clark v. Carmine Marceno

1      Q.    What was the undersheriff's reaction when you

2   described these issues with Jenna Clark and uniforms?

3      A.    He just said, okay -- I don't remember, to be

4   honest with you, what the whole reaction was.

5      Q.    Was that the only time that you discussed that

6   issue with the undersheriff?

7      A.    That issue, yes.

8      Q.    Did you conduct Ms. Clark's performance

9   evaluations?

10      A.    Yes.

11      Q.    And do you recall whether Ms. Clark had

12   positive job performance evaluations while you

13   supervised her as purchasing director?

14      A.    Yes.

15      Q.    She did have positive performance evaluations?

16      A.    Yes.  Our performance evaluations are "meets

17   standards" or "needs immediate training."

18      Q.    And do you recall if she received a "meets

19   standards" rating?

20      A.    Yes, she did.

21      Q.    Did you ever socialize with Jenna Clark outside

22   of work?

23      A.    I'm trying to remember; I don't think I ever

24   have.

25      Q.    Who else worked in the Purchasing Department

1    besides Ms. Clark, at the time she was purchasing

2    director?

3        A.    We've had a little bit of changeover in there;

4    Shannon Lehman, Daisy, Gwen.   There was a little bit of

5    change in there, so I'm trying to recall.   Brenda was in

6    there, and Christine Cross was in there.   I think that's

7    it.   I'm trying to remember.   Like I said, we did have a

8    little bit of change in personnel in there.

9        Q.    What was Shannon Lehman's job title?

10        A.    Manager.

11        Q.    And do you know how long Ms. Lehman has worked

12    as a manager?

13        A.    As a manager of Purchasing, or a manager in

14    general?

15        Q.    Manager of Purchasing.

16        A.    Okay.   Maybe three years.   I'm not real sure

17    when she went in there, to be honest with you.

18        Q.    And what duties did Ms. Lehman have as a

19    purchasing manager?

20        A.    She oversaw the purchasing assistants; she was

21    making sure that they were following up on the orders

22    coming in, purchase orders going out; working with

23    vendors; making sure new vendors got set up.   And then I

24    believe she was doing the performance evals, but she may

25    have been doing them with Jenna for her subordinates

1    that were under her.

2        Q.    And you mentioned a Daisy; is that correct?

3        A.    I'm sorry?

4        Q.    You mentioned an employee by the name of Daisy?

5        A.    Daisy, yes.

6        Q.    What's Daisy's last name?

7        A.    I'm trying to think; I feel so incompetent

8    right now because I can't remember last names.  Probably

9    Casell, Cassella -- Casell, I think it is.

10       Q.    Do you know how to spell it?

11       A.    No.  I'd have to get it for you, sorry.

12       Q.    What was Daisy's job title when she worked with

13   Ms. Clark as purchasing director?

14       A.    I'm not sure; I think she was the purchasing

15   assistant.  We did make some changes to titles.  She was

16   either purchasing assistant or purchasing agent.  I'm

17   not sure.

18       Q.    And do you know what kind of duties that Daisy

19   would perform as purchasing agent or assistant?

20       A.    She handled all the uniforms for the certified

21   and for the civilians on the vests, ballistic vests.

22       Q.    Anything else, besides the uniform order?

23       A.    She could probably do most of the jobs in

24   there; she would do whatever was asked of her.  Even the

25   warehouse; if she had to pull orders, she would pull

1    orders; she would do receiving.  But that was her core

2    function.

3        Q.   And who did Daisy report to during the time

4    that Jenna Clark was purchasing director?

5        A.   Shannon Lehman.

6        Q.   And who did Ms. Lehman report to at the time

7    Jenna Clark was purchasing director?

8        A.   She would report to Jenna.

9        Q.   And you mentioned an employee by the name of

10   Gwen; is that right?

11       A.   Yes.

12       Q.   What is Gwen's last name?

13       A.   What is her last name?  Is that what you asked?

14       Q.   Yes.

15       A.   It's Legler, I think.  L-E-D-G-L-E-R, something

16   like that.  Legler.

17       Q.   And what was Gwen's job title at the time that

18   Ms. Clark was purchasing director?

19       A.   She was a human resource assistant -- I'm

20   sorry.  Purchasing assistant, sorry.

21       Q.   And what did Gwen do as a purchasing assistant?

22       A.   She did receiving, secured the

23   warehouse/ordering for the warehouse, like the regular

24   office supplies, things like that; and she also helped

25   with the uniforms, so she helped Daisy out too.

1      Q.    Who did Gwen report to while Jenna Clark was

2    purchasing director?

3      A.    She reported to Shannon Lehman.

4      Q.    And you mentioned another employee by the name

5    of Brenda; is that correct?

6      A.    Yes.

7      Q.    What's Brenda's last name?

8      A.    Hector.

9      Q.    Sorry, could you say that one more time?

10     A.    Hector.   It's H-E-C-T-O-R.

11     Q.    And what was Brenda's job title at the time

12    that Jenna Clark was purchasing director?

13     A.    She was a purchasing agent.

14     Q.    And what did Brenda do as a purchasing agent?

15     A.    She handled the orders for specialty units, for

16    the K-9, dog food; aviation; parks, things like that.

17     Q.    And who did Brenda report to?

18     A.    Shannon.

19     Q.    And you also mentioned an employee by the name

20    of Christine Cross; is that right?

21     A.    Yes.

22     Q.    And what was Christine's job title at the time

23    Jenna Clark was purchasing director?

24     A.    Purchasing assistant.

25     Q.    And what did Christine do as purchasing

1    assistant?

2       A.   She secured the front window, like the front

3    window in Purchasing, for people that were picking up

4    stuff they ordered.

5       Q.   And who did Christine report to, while

6    Ms. Clark was purchasing director?

7       A.   Shannon Lehman.

8       Q.   Was Ms. Lehman the only employee that Ms. Clark

9    directly supervised while she was purchasing director?

10      A.   Yes.

11      MR. MACDONALD:  We can go ahead and go off the

12    record at 11:16.  Let's take a ten-minute break.

13    We'll come back at 11:26.

14      THE COURT REPORTER:  We're off the record.

15      (A brief recess was taken.)

16      THE COURT REPORTER:  We're back on the record.

17    BY MR. MACDONALD:

18      Q.   Ms. Reno, when did Jenna Clark leave the Lee

19    County Sheriff's Office?

20      A.   In August -- or September; for official date

21    that she left would have been September 3 of 2021.

22      Q.   Why did Ms. Clark leave the Lee County

23    Sheriff's Office?

24      A.   I know that her job was eliminated.  And then,

25    after that, she spoke with HR, to make a determination

1  of what her options were.

2      Q.   Why was Ms. Clark's position eliminated?

3      A.   It was reorganization, and it had to do with

4  streamlining the way we were operating, saving money.

5      Q.   Are you referring to the Reduction in Force

6  that was conducted by Lee County Sheriff's Office in

7  2021?

8      A.   Yes.

9      Q.   You said that that was conducted due to

10  streamlining and saving money?

11      A.   Yes.  For budgetary purposes.

12      Q.   How did the Reduction in Force save money?

13      A.   Well, what we did was, when we eliminated

14  certain positions, the employee had a right to take

15  another position that we needed or that was open and

16  what was needed in the agency.

17      Q.   So when you say "save money," are you referring

18  to those employees' positions payroll costs?

19      A.   Yes, and benefits.

20      Q.   And did payroll costs and benefits factor into

21  the decision as to which positions were to be

22  eliminated?

23      A.   It would have had something to do with it.  But

24  a lot of it would have been redundancy of workload.  So

25  we would have done a workload assessment to see which

```
 1    positions we could have eliminated and still been able
 2    to do our core services.
 3         Q.   And how were those workload assessments
 4    conducted?
 5         A.   They were done by -- well, we have an
 6    Inspections Department, which we used them; but we also
 7    looked at how much work was actually being done and who
 8    was doing it; Oversight was looking at it.
 9         Q.   Who conducted that workload assessment?
10         A.   For which one?  For the ones that were
11    eliminated?
12         Q.   Yes, for positions that were eliminated.
13         A.   It would -- part of it would have been me; I
14    would have done some of it.  And I guess it depended on
15    where the position was at, during the elimination, or
16    reduction of the job.  So if it was in the district,
17    they would have looked at the district as a whole,
18    through their clerks, things like that, to see what work
19    they were actually doing and what work could be
20    reallocated to another person that was already doing
21    another job.
22         Q.   When did you first learn about the Reduction in
23    Force that was conducted in 2021?
24         A.   It was an ongoing Reduction in Force that
25    started earlier in 2019; it was just a continuation.
```

1    Q.   So the Reduction in Force that was conducted in

2   2021 was part of that same Reduction in Force that was

3   conducted in 2019?

4    A.   It was the continuation, yes.  We were looking

5   at the agency as a whole, trying to operate more like a

6   business.

7    Q.   How do you know that that Reduction in Force in

8   2021 was a continuation of the one in 2019?

9    A.   The only thing I can tell you is, I was a part

10  of some of that discussion as we continued to look at

11  our operations and where we needed to save money.  We

12  knew that we add a lot of unforeseen expenses that came

13  up, with the -- and inmate medical was one of them.  So

14  we were continuously looking at the operations, to see

15  where we could reduce.

16   Q.   When did you first become involved with the

17  Reduction in Force?

18   A.   Probably -- I don't know exactly when, I can

19  say that to you; but I was involved when I was working

20  as the budget director.

21   Q.   As a budget director, you were involved in

22  discussions about the Reduction in Force?

23   A.   Yes.  During the time when we went into a

24  recession and we had to return some money to the county,

25  we had to look at all of our operations, again to go

```
1   back to core services and redo some of the things -- so
2   that the sheriff was still doing what the constituents
3   wanted and the citizens wanted, rather than some of the
4   things that we were doing internally; we had to try to
5   look at how we could reduce and reallocate those people
6   into those other positions we needed.
7        Q.   Would that have been in 2017, or would that
8   have been prior to 2017?
9        A.   It would have been prior.  Around 2007, maybe
10  2008, when the recession hit, there were some
11  elimination of some positions back then.
12       Q.   Did you consider the Reduction in Force that
13  you described in 2007 to be the same one that was
14  conducted in 2019 and 2021?
15       A.   It was for the same reasons, was to save money
16  and to actually do the core services that we needed,
17  yes.
18       Q.   Do you know what positions were eliminated in
19  2021, as part of that Reduction in Force?
20       A.   I believe there was -- I don't know completely
21  in my head, to be honest with you.  There was some
22  services, senior services was one, I believe.  In 2021,
23  I'm trying to think.  There was a couple of positions in
24  Communications; there was a secretarial position in
25  Communications that was eliminated.  Jenna's -- the
```

1    purchase director's position was eliminated, was one.

2    I'm trying to remember what other ones, but there was a

3    couple more.

4        Q.    And you were involved in those discussions to

5    eliminate those positions that you just listed; correct?

6        A.    I would have been part of command, yes; so yes,

7    I would have been involved.

8        Q.    When was the first time that you learned of

9    discussions to eliminate the positions that you just

10   mentioned?

11       A.    It would have been sometime in 2021.  They were

12   being talked about back.  A lot of these positions would

13   have been talked about as part of an ongoing discussion

14   of whether or not they were part of our core services.

15       Q.    Who did you first discuss the elimination of

16   those positions with, in 2021?

17       A.    It would have been with people in command

18   staff; undersheriff would have been one of them, because

19   I reported directly to him.

20       Q.    Anyone else, besides the undersheriff?

21       A.    It probably would have -- I can't remember

22   exactly.  Because he was the person I had most of my

23   conversations with.

24       Q.    And that includes the conversations about the

25   elimination of these positions in 2021?

```
1        A.    Yes.
2        Q.    Did these conversations with the undersheriff
3   about these positions take place in person?
4        A.    Yes.
5        Q.    And were these conversations part of a regular
6   meeting with the undersheriff?
7        A.    Yes.
8        Q.    What meetings were those?
9        A.    It would have been the same type of meetings,
10  daily meetings where we talked about things that were
11  going on, with HR or with Finance.
12       Q.    It was undersheriff the person who initiated
13  the conversation about the elimination of those
14  positions in 2021?
15       A.    I don't remember.
16       Q.    Well, did you initiate the conversations about
17  these positions being eliminated in 2021?
18       A.    I just think it just came up in a general
19  conversation as we were talking about financials, about
20  where we could save money.
21       Q.    The elimination of these positions came up in a
22  conversation between you and the undersheriff, where you
23  were discussing how to save money?
24       A.    Yes.
25       Q.    Was that the primary motivation in discussing
```

1    the elimination of those positions?

2         A.    Yes.

3         Q.    Were there any budgetary issues going on at

4    that time, that motivated that conversation regarding

5    saving money?

6         A.    Yes.

7         Q.    And what were those?

8         A.    The cost of our health plan was one of them.

9    We were trying to get certified through the state,

10   because we're self-insured, so we knew we had to do

11   something about the health plan.  Also as I think I

12   mentioned, inmate medical is another one; the costs

13   really went up there, the medical plan.  The other one

14   was the FRS rates were going up, the percentage going

15   into FRS.

16            And I'm trying to think of what else we had

17   going on at the time.  Of course, we just were coming

18   out of Covid; we had a lot of people that were very sick

19   that worked for us.  Things like that.  Our Workers'

20   Comp claims were very high.

21        Q.    Was there a particular goal in terms of saving

22   money, at the time these discussions were held about

23   eliminating the positions?

24        A.    The goal would have been to put the people in

25   the right place to, again, to streamline so we weren't

1   doing a redundancy of work, and to put more deputies out

2   on the road; that's what the citizens wanted.  So we

3   were trying to figure out how to reallocate our

4   resources in our financials to accommodate the goals.

5       Q.   Was the redundancy of work that you mentioned

6   determined using the workload assessments?

7       A.   I don't know that it was done with that.  It

8   was just something that you could really -- you could

9   see.

10      Q.   You could just see the redundancy in work?

11      A.   Yes.  We had just brought in a brand new

12  system, from Tyler, a new management system for our

13  administration people for our financials, because we

14  were doing everything through manual, a lot of

15  paperwork; the system also streamlined the amount of

16  people that you needed to do the work, especially in

17  Payroll.

18      Q.   Who determined whether a position was redundant

19  in regards to the Reduction in Force in 2021?

20      A.   The person who oversaw it.  Like myself; I

21  would be one.

22      Q.   Who made the final decision as to whether a

23  position was deemed redundant?

24      A.   I would think that it's still -- it would be

25  me.  Like, for my bureau, it would be me; I would be

1    looking at what exactly they were doing and see if there

2    was a better way to do it.  And that's why we brought in

3    the new system, was to help with that.

4        Q.   Who in your bureau did you determine had a

5    position that was redundant?

6        A.   Payroll was -- well, the Payroll was one, only

7    because it was very manual.  But once we brought in the

8    new systems and automated it, so there wasn't a need for

9    four or five people to key payroll.  I noticed Jenna in

10   Purchasing was one; it looked -- the manager and the

11   director were both doing pretty much the same work; we

12   could see that.  And HR, it actually helped there too;

13   there was some redundancy there too.

14       Q.   Which position was eliminated in regards to

15   Payroll?

16       A.   The -- we had two -- well, actually, everybody

17   in Finance one day actually keyed payroll; everything

18   else shut down in Finance, so that they could key the

19   payroll.  By the time we were done, we actually

20   eliminated one Payroll person.  So we went down to one

21   Payroll; we'd had two.

22       Q.   So there were two Payroll employees, and it

23   went down to one after the Reduction in Force?

24       A.   Yes.

25       Q.   And who was in the position that was selected

1    to be eliminated in Payroll?

2         A.    Randy.  Randy Bauer is still in there.  We did

3    eventually add it back, only for -- for to fill in --

4    like, how do I say it... in case of absenteeism in

5    payroll.  So we do have -- she's a fiscal officer also,

6    so she does help.  To do the payroll, she's off.

7         Q.    You said Randy; what was Randy's last name?

8         A.    Bauer, B-E-A...

9              MR. STEFANY:  B-A-U-E-R.

10             THE WITNESS:  B-A-U-E-R, yeah.

11   BY MR. MACDONALD:

12        Q.    Was it Randy's position that was eliminated as

13   a part of the Reduction in Force?

14        A.    No.  It was Doreen, Doreen's position.  And

15   Doreen left and actually went to go fill a job in FRS.

16        Q.    What's Doreen's last name?

17        A.    Savator -- Salva -- it's S-A-L-V-A-G-A...

18   Salvalor -- it's a very -- yeah.

19        Q.    And you said Doreen's position in Payroll was

20   eliminated due to redundancies and it was part of the

21   Reduction in Force; correct?

22        A.    It wasn't eliminated; it was just that the new

23   system actually helped to reduce that position so we

24   didn't need two Payroll people, when we put our new

25   system in, during 2019 -- or 2018/2019.  But she went on

1    to do another job.  But it did get rid of some of the

2    redundancy of work.

3         Q.   So just to clarify, Doreen's position was or

4    was not eliminated as part of the Reduction in Force?

5         A.   We did eliminate the payroll, yes.  Yes.

6         Q.   Okay.  And what was Doreen's title that was

7    eliminated as part of the Reduction in Force?

8         A.   We called them all fiscal officers; they were

9    all called fiscal officers.  Just different jobs within

10   there.

11        Q.   And do you know when Doreen was notified that

12   her fiscal officer position was eliminated as part of

13   the Reduction in Force?

14        A.   I'm trying to think, it wasn't really the

15   Reduction in Force; it was a part of that whole venture.

16   No, she was already wanting to go do a different job

17   anyways, so she had applied for another job within the

18   agency.  So once she applied for the job and she was

19   accepted for the FRS coordinator, then we eliminated it.

20   She moved over and took a different job.

21             Does that make sense what I'm saying?  I'm

22   sorry if I sound... and then we didn't need that extra

23   payroll person.

24        Q.   And when did that change occur that you just

25   described?

1    A.   It had to have been after the payroll was

2    implemented in 2019; somewhere between -- well, 2020 I'm

3    thinking.  2019 or 2020.  We had implemented it in 2019.

4    Q.   And you also mentioned redundancies that led to

5    position eliminations in HR; is that correct?

6    A.   I'm trying to remember which ones they were.

7    We didn't eliminate positions in there.  What we were

8    trying to do was streamline what they were doing so they

9    weren't doing redundant work; so, no, there were no HR

10   people that were eliminated.  No jobs in HR were

11   eliminated.  With the new system we were trying to align

12   them so they weren't doing redundant work.

13   Q.   So just to step back a little.

14   A.   Okay.

15   Q.   As part of the Reduction in Force in 2021, what

16   positions that you oversaw were eliminated as part of

17   the Reduction in Force due to redundancies?

18   A.   Oh, the ones that I oversaw, not the whole

19   agency?

20   Q.   Yes.

21   A.   Oh, okay.  It would have been the payroll

22   position in Finance; a Purchasing position, we actually

23   eliminated two positions in there; Planning & -- I don't

24   remember if Planning & Research had any during that

25   time.  I do know we eliminated some positions in

```
1    Planning & Research; I'm trying to remember the years.
2    I don't want to say something I shouldn't.  I do
3    remember -- no, the victim advocate was too far back, I
4    think.  Those were the ones I can think of.
5         Q.   So as part of the Reduction in Force for
6    employees that you supervised, there was a payroll
7    position that was eliminated, two Purchasing positions,
8    and you also said a Planning & Research position, I
9    believe; is that correct?
10        A.   Yes.
11        Q.   And all four of those positions were eliminated
12   as part of the Reduction in Force in 2021; correct?
13        A.   It could have been part of 2020/2021, yes.
14        Q.   You're not sure if it was 2020 or 2021?
15        A.   No.
16        Q.   Were any of those four positions eliminated at
17   the same time as Jenna Clark's position?
18        A.   No.
19        Q.   So going through those positions, the first one
20   you mentioned was payroll.  Would that be Doreen's
21   position that you described previously?
22        A.   Yes.
23        Q.   And then in Purchasing, you said there were two
24   positions; which positions were eliminated?
25        A.   There was the purchasing director and one of
```

Deposition of Annmarie Reno                                    Jenna Clark v. Carmine Marceno

```
 1     the purchasing assistants has been eliminated.
 2          Q.    Now, the purchasing director, that refers to
 3     Jenna Clark's position, I'm assuming; correct?
 4          A.    Yes.
 5          Q.    Tell me, what redundancies were eliminated with
 6     the purchasing director position?
 7          A.    The request for quotes was picked up by
 8     Shannon; the overseeing of the purchase orders that was
 9     above her limit, the dollar amount of which she could
10     convert to a PO was given to me, I picked that back up;
11     the -- we haven't had any requests for quotes -- or not
12     request for quotes, I'm sorry.  We haven't had any
13     contracts go out.  The furniture, Shannon picked up.
14     Shannon picked up almost everything, except for the
15     ability to sign for certain dollar -- a threshold
16     limitation; I picked that up.  And then --
17          Q.    And you were -- I'm sorry, go ahead.  I didn't
18     mean to interrupt you.
19          A.    The budget; the budget part of the purchasing,
20     Shannon or Jill Jones, who is the budget director now,
21     helps to oversee it and help her.  So Jenna would have
22     put the budget together for Purchasing, so that was
23     picked up -- part of it was picked up by Jill Jones.
24          Q.    And in the discussions to eliminate the
25     purchasing director position, did you make the
```

1    determination that that position was redundant?

2        A.    Yes.

3        Q.    Was that decision made in conjunction with

4    anyone else, or was it made solely by you?

5        A.    It would have been with the undersheriff.

6        Q.    Who had the final decision as to whether the

7    purchasing director position would be eliminated?

8        A.    The undersheriff.

9        Q.    When did you first discuss the elimination of

10   the purchasing director position with the undersheriff?

11       A.    We had been talking about Purchasing and the

12   way the operation, the whole operation, was working.

13   And I can go back and say that under the different

14   sheriffs that I worked for, Purchasing fell under the

15   director of finance and it was always a part of Finance;

16   it was Finance and Purchasing, and I believe Jenna was

17   the manager in there, at that time; and then we had some

18   more turnover with directors who left.  And then Jenna

19   had requested that she would fall under me as the budget

20   director, when the last Finance director left.  And it

21   was probably a good thing because our finance director

22   was pretty new and had a lot on their plate.  So there

23   was always talk about the potential to put it back under

24   Finance and only have one director overseeing both of

25   them.

1     Q.   Do you recall the specific time when you
2  discussed Jenna Clark's position being eliminated with
3  the undersheriff?
4     A.   I can't recall.
5     Q.   Now, you said most of the purchasing director
6  duties were absorbed by Shannon Lehman's position; is
7  that correct?
8     A.   That's correct.
9     Q.   At the time of Ms. Clark's position
10 elimination, wasn't Ms. Lehman subordinate to Ms. Clark?
11    A.   Yes.
12    Q.   Did you or the undersheriff ever consider
13 eliminating Ms. Lehman's position, as opposed to
14 Ms. Clark's position, since she was a subordinate
15 employee?
16    A.   What we did was, we had to look at the
17 strongest candidate.  I had -- we just put in a brand
18 new system, a new management system, which also was on
19 -- was part of Purchasing, connection to financials, and
20 the strongest person in the background of that system
21 was Shannon Lehman.  She was the one who stepped up to
22 really understand and learn it and was pretty much
23 running it.
24    Q.   What was that system called?
25    A.   It's called Tyler Munis.

Deposition of Annmarie Reno

Jenna Clark v. Carmine Marceno

1      THE COURT REPORTER:   Are you saying "Tyler
2    unit"?
3      THE WITNESS:   Munis, M-U-N-I-S.
4  BY MR. MACDONALD:
5      Q.   You believed that Shannon Lehman had stronger
6  skills with the Tyler Munis system than Ms. Clark?
7      A.   Yes.  She did.
8      Q.   And did that play a role in deciding which
9  position to eliminate?
10      A.   Yes.  Plus the fact that we talked about
11  putting it back under Finance, we had been talking about
12  that for a while, so there was only one director.
13      Q.   Now, Ms. Lehman is still -- with the Tyler
14  Munis system, that wouldn't be considered a redundancy;
15  correct?
16      A.   No.
17      Q.   But this was also a consideration in the
18  Reduction in Force in 2021?
19      A.   Yes.  We used to use manual P.O.'s,
20  handwritten.
21      Q.   Did you discuss Ms. Lehman's strength with the
22  Tyler Munis system as opposed to Ms. Clark, when you
23  spoke with the undersheriff?
24      A.   Yes.
25      Q.   Is it fair to say that an employee's individual

Deposition of Annmarie Reno                                    Jenna Clark v. Carmine Marceno

1    skills played a role, then, in the Reduction in Force in

2    2021?

3        A.   Yes.   I would say the skill sets, yes.

4        Q.   And that's the skill sets of the employees that

5    were in these positions; is that right?

6        A.   Correct.

7        Q.   Were any other factors considered in terms of

8    these employees, besides their skills?

9        A.   No.   Just that it was a business decision.   No.

10       Q.   Were these employees' rate of pay considered,

11   when you decided which positions to be eliminated?

12       A.   No.

13       Q.   Wouldn't it make sense to consider an

14   employee's rate of pay, if you were trying to save

15   money?

16       A.   I'm going to have to say, no.   But that's an

17   opinion I have, only because you have to still look at

18   the jobs that are still the redundant jobs and what jobs

19   are in.   We eliminated some first-line clerks, who were

20   very low pay, probably the lowest pay we have; but we

21   eliminated those jobs years ago, because they weren't

22   needed.   They weren't needed anymore, and we knew that

23   we had to do something, in order to, again, streamline

24   and to save the agency money so we could put the money

25   where we really needed it.

1    Q.   Were you aware of the salary that was paid to

2    these employees that were selected to be eliminated?

3    A.   I would have been aware after or at the time of

4    it, but not during the decision-making.  We would have

5    been looking at the positions first.

6    Q.   Did you have any idea how much Ms. Clark made

7    in salary at the time that her position was selected to

8    be eliminated?

9         (A brief recess was taken due to technical

10   difficulties, then the pending question was read back by

11   the reporter.)

12        THE WITNESS:  I would have -- at the time we

13       were looking at, I would have pulled it to see how

14       much she was, yes; how much she was making at that

15       time, yes.

16   BY MR. MACDONALD:

17   Q.   You would have pulled information to see how

18   much Ms. Clark was making at the time her position was

19   being eliminated?

20   A.   I would have.

21   Q.   Why would you pull that information?

22   A.   Well, to see how much of a savings at the time

23   we were looking at them, should we choose to go that

24   way.  I would be looking at that, the FRS.

25   Q.   So how much money you were saving did play a

1    role in selecting which positions were going to be

2    eliminated?

3         A.    It wouldn't have played an exact role; but it

4    would have been telling us what the savings would have

5    been at the end, should we select it.  We were still

6    looking at the redundancy first and how we could

7    consolidate jobs.

8         Q.    So before you made the decision to eliminate

9    Ms. Clark's position, you pulled the amount of her

10   salary and benefits, but you believe that played no role

11   in your decision to eliminate her position?

12        A.    No.  No.  It was just what the savings would

13   have been at the end, had we made the decision to do it.

14        Q.    So you were considering what the savings would

15   have been if you did move forward with eliminating her

16   position, then?

17        A.    Correct.

18        Q.    So the potential savings of eliminating

19   Ms. Clark's position did factor into your decision-

20   making?

21        A.    Yes.  Okay.

22        Q.    Did you pull the salary and benefits

23   information for other employees that were also

24   considered to have their positions eliminated as part of

25   the Reduction in Force?

1    A.    Yes.

2    Q.    And did you pull their salary and benefits

3  information for the same reason, to consider what the

4  potential savings could be?

5    A.    Yes.

6    Q.    Now, when you pulled the salary and benefit

7  information for these employees, did you pull any other

8  information in regards to their employment?

9    A.    No.

10   Q.    Did you discuss the potential savings for those

11 salaries and benefits with the undersheriff?

12   A.    Yes.

13   Q.    When did those discussions take place with the

14 undersheriff, regarding the potential savings of the

15 position eliminations?

16   A.    It would have been back in 2020.

17   Q.    And you said that there was another position in

18 Purchasing that was eliminated as part of the Reduction

19 in Force; is that right?

20   A.    It was -- it was not a part of the Reduction in

21 Force.  But I did not -- I eliminated the position

22 because it was not needed, and so it was just ongoing.

23   Q.    But as a part of the Reduction in Force --

24   A.    No.

25   Q.    -- was there any other position that was

```
 1    eliminated, besides Ms. Clark's, that you supervised?
 2        A.    No.
 3        Q.    So your previous testimony regarding that
 4    Payroll position and the Planning & Research, those were
 5    not related to the Reduction in Force?
 6        A.    They weren't -- no.   They were part of the
 7    bringing on the Tyler Munis that helped with the
 8    Reduction in Force.   Does that make sense what I'm
 9    saying?   So we brought in the new system, that's what
10    helped to reduce those positions as part of reducing the
11    amount of people that had to do those jobs as a
12    redundancy.
13        Q.    So you did or you did not consider Payroll --
14        A.    I did --
15        Q.    Sorry?
16        A.    I'm sorry, it was me.
17        Q.    No, go ahead.
18        A.    Yes, I did.   I did reduce those positions, if
19    we want to make it part of the Reduction in Force; those
20    people moved to different jobs.
21        Q.    So for the Payroll position, was that
22    eliminated as part of the Reduction in Force in 2021?
23        A.    Yes.
24        Q.    And the two Purchasing positions that were
25    eliminated, were those eliminated as part of the
```

1    Reduction in Force conducted in 2021?

2        A.    The one was.  And then the other one came last

3    year.

4        Q.    And which one was part of it?

5        A.    Which one was part?  I'm sorry.

6        Q.    Which Purchasing position was part of the

7    Reduction in Force in 2021?

8        A.    Oh, it was the purchasing assistant.

9        Q.    The purchasing assistant position was part of

10   the Reduction in Force in 2021?

11       A.    No.  It was part of 2022; I reduced it in 2022,

12   eliminated one more position.  It's not a redundant --

13   can I say -- I'm sorry, it's not really a Reduction in

14   Force.  It's just, I realized they did not need that

15   position there.

16       Q.    And what I'm asking you about -- sorry, I

17   didn't mean to cut you off.  Go ahead.

18       A.    That's okay.

19       Q.    So what I'm asking about are the positions that

20   were eliminated as part of the Reduction in Force in

21   2021.

22       A.    Okay.

23       Q.    Which positions that you supervised were

24   eliminated as part of the Reduction in Force in 2021?

25       A.    Okay.  So it would have been the purchasing

1   director and then the payroll.

2        Q.   Only those two positions?

3        A.   Yes.  That reported to me, yes.

4        Q.   And the Payroll position, that was the one that

5   you discussed that with Doreen; correct?

6        A.   Yes.

7        Q.   But to the best of your knowledge, you did not

8   supervise any other employees as part of the Reduction

9   in Force in 2021, besides the Payroll position that was

10  occupied by Ms. Doreen and then Jenna Clark's position;

11  right?

12       A.   Correct.

13       Q.   When the decision was made to eliminate

14  Ms. Doreen's position in Payroll, did you pull the

15  salary and benefits for that role?

16       A.   Yes.

17       Q.   And did you discuss the salary and benefits of

18  Ms. Doreen's position with the undersheriff?

19       A.   Yes.

20       Q.   And did you discuss the potential savings of

21  eliminating Ms. Doreen's position with the undersheriff?

22       A.   Yes.

23       Q.   Now, besides the positions that you supervised

24  that were eliminated as part of the Reduction in Force,

25  did you discuss any other position eliminations with the

1    undersheriff?

2        A.    For people that I didn't supervise?

3        Q.    Correct.  For any other positions.

4        A.    Yes, I would have talked to him about those

5    too.

6        Q.    Do you recall which positions those would have

7    been?

8        A.    It would have been the senior services

9    coordinator, the communications -- the communications

10   supervisor -- or, I'm sorry, communications secretary

11   was one.  I think those were the only two that I was

12   familiar with.  I believe those are the only two I was

13   familiar with.

14       Q.    And what specifically about those positions did

15   you discuss with the undersheriff?

16       A.    That the secretary in Communications wasn't

17   really needed; we needed her somewhere else.  There were

18   enough people in Communications to handle that position,

19   and we could have her back-fill a different job that we

20   needed.

21             And then the one for Senior Services, it was a

22   position that we were doing that really wasn't a part of

23   the Sheriff's Office.  It should have been handled by

24   the county, through Human Services.

25       Q.    Who made the determination as to whether the

```
 1    senior services coordinator and communications secretary
 2    were redundant positions?
 3            MR. STEFANY:  Let me object to the form of the
 4       question.  You may answer it, as you understand the
 5       question.
 6            THE WITNESS:  Again, we were looking at the
 7       positions and what jobs they were filling and what
 8       tasks they were doing and could we actually absorb
 9       it somewhere else.  I don't know if I really
10       answered your question.
11    BY MR. MACDONALD:
12       Q.   Did you play any role in determining whether
13    the senior services coordinator was considered a
14    redundant position?
15       A.   Yes, I did.
16       Q.   And did you play a role in determining whether
17    the communications secretary position was considered
18    redundant?
19       A.   Yes.
20       Q.   Did anyone else play a role in determining
21    whether those two positions were considered redundant?
22       A.   It would have been the manager or the
23    administrator in Communications, and then it would have
24    been the person who was overseeing the senior services
25    coordinator.  And I don't remember who that supervisor
```

1    was at that time.

2        Q.    You don't remember who that person would have

3    been for the senior services coordinator?

4        A.    No.   I don't remember who the supervisor.

5    There were some changes there too so.

6        Q.    Do you remember who the supervisor would have

7    been for the communications secretary?

8        A.    It would have been, I think, Captain Janke.

9        Q.    And what is Captain Janke's position?

10       A.    He was the captain over Communications.

11       Q.    And Captain Janke would have had a role in

12   determining whether the communications secretary

13   position was redundant?

14       A.    Yes.

15       Q.    I'm going to show you a document.   (Screen

16   share began of 8/15/21 letter from Dawn Heikkila to

17   Jenna Clark.)

18           This has been previously marked as Plaintiff's

19   Exhibit 5, and it's Bates label 4350. I'll give you a

20   moment to review this document.

21       A.    (Witness peruses the document.)   Okay.

22       Q.    Do you recognize this document?

23       A.    It's a letter that Dawn sent to Ms. Clark.

24       Q.    Have you seen it before?

25       A.    It's in her file.

Deposition of Annmarie Reno                                    Jenna Clark v. Carmine Marceno

1       Q.   But have you seen this document, prior to
2   today?
3       A.   Yes.   I saw it on Friday.
4       Q.   And you said this was a document written by
5   Dawn Heikkila; is that correct?
6       A.   Yes.
7       Q.   And the letter appears to be dated August 15,
8   2021; is that right?
9       A.   Yes.
10      Q.   And this letter was sent to Jenna Clark, to
11  notify her that her position was being eliminated; is
12  that right?
13      A.   Yes.
14      Q.   Did you instruct Ms. Heikkila to write this
15  letter?
16      A.   It was either I or the undersheriff.
17      Q.   You don't recall if you told Ms. Heikkila to
18  write this letter?
19      A.   No, I don't.
20      Q.   Did you ever discuss this letter with
21  Ms. Heikkila?
22      A.   No.
23      Q.   Did you ever discuss this letter with the
24  undersheriff?
25      A.   This particular letter, no.

Deposition of Annmarie Reno                                    Jenna Clark v. Carmine Marceno

1    Q.   Do you know if anyone else that had their

2  position eliminated as part of the Reduction in Force

3  received a letter that's similar to this one?

4    A.   Yes.

5    Q.   Who would have received a letter that's similar

6  to this one?

7    A.   Stacy Payne, Bill Berkowitz, I believe Terri

8  Taylor.  I don't remember the rest.

9    Q.   What was the first person's name; it was Stacy?

10   A.   Stacy Payne, P-A-Y-N-E.

11   Q.   And what was her position at the time that she

12 received a letter like this?

13   A.   It would have been -- she was director of

14 community outreach, I believe.

15   Q.   And how do you know she received a letter

16 similar to this one?

17   A.   Because I did -- it would be in the file.

18   Q.   When was Stacy Payne's position eliminated?

19   A.   I want to say 2019.

20   Q.   And you also said Bill Berkowitz; is that

21 right?

22   A.   Yes.  Bill Berkowitz.

23   Q.   What was Bill Burkwitz's position at the time

24 that his position was eliminated?

25   A.   He was director of special projects, I believe.

1　　　　Q.　And how do you know that Bill Berkowitz
2　received a letter similar to the one I'm showing you?
3　　　　A.　I just know that she told me that she was
4　sending them letters.  Dawn reported to me back then, I
5　believe.  Yes.
6　　　　Q.　Do you know what year that letter would have
7　been sent to Bill Berkowitz?
8　　　　A.　2019 -- wait, I'm sorry, let me -- yes, 2019.
9　I had to remember.
10　　　　Q.　And then you said Terri Taylor, as well; is
11　that correct?
12　　　　A.　Yes.  I'm not sure when Terri Taylor -- I'm not
13　sure of the date for hers, when she left.
14　　　　Q.　What was Terri Taylor's position?
15　　　　A.　She was the executive director of the sheriff.
16　　　　MR. STEFANY:  Executive director?
17　　　　THE WITNESS:  I'm sorry.  Executive admin
18　　assistant.  Thank you.  Sorry about that.
19　BY MR. MACDONALD:
20　　　　Q.　And do you know if those employees that we just
21　discussed, if they elected to retire?
22　　　　A.　I know Bill Berkowitz Did.  I believe Terri
23　Taylor did.  I'm not sure if Stacy resigned or if she
24　retired; I'm not sure about that one.
25　　　　Q.　I'll show you another exhibit.  This has been

1    previously marked as Plaintiff's Exhibit 4, and it's

2    Defendant's Bates label 123.  I'll give you a minute to

3    look at this document.  And I can zoom in as well, if

4    you need me to.

5         A.   (Witness peruses the document.)  Okay.

6         Q.   Do you recognize the document that I'm showing

7    you?

8         A.   Yes.

9         Q.   What is it?

10        A.   It's Position Elimination Spreadsheet.

11        Q.   And on this document, there are several

12   positions listed; is that right?

13        A.   Yes.

14        Q.   Are the positions listed on this document all

15   of the positions that were eliminated as part of the

16   Reduction in Force in 2021?

17        A.   Yes.

18        Q.   Are there any positions that were part of that

19   Reduction in Force in 2021 that are not listed on here?

20        A.   The only one I don't see would be the Payroll

21   position.

22        Q.   Do you know why the Payroll position wouldn't

23   be included on this list?

24        A.   Because we actually used the position for our

25   capital assets coordinator.  So we would have just

1    reutilized that position, to clarify this.

2       Q.   What do you mean, that you would have

3    reutilized the position?

4       A.   So we have authorized positions, and so we

5    would have simply taken that authorized position and

6    moved it to the capital assets project and utilized it

7    for another position that we needed.

8       Q.   But it's your understanding that that position

9    was eliminated?

10      A.   Yes.  We went down to one payroll person.

11      Q.   And who is in that position?  It was

12   Ms. Doreen; is that right?

13      A.   Yes.

14      Q.   Does Ms. Doreen still work for Lee County

15   Sheriff's Office?

16      A.   Yes, she does.

17      Q.   And what role does she have?

18      A.   She's -- she was doing the FRS coordinating

19   position, but then she went part-time; so she works

20   part-time in Human Resources.

21      Q.   Would Ms. Doreen have received a letter similar

22   to the one that I showed you that Ms. Clark received?

23      A.   No.

24      Q.   Why not?

25      A.   Because she already accepted a job somewhere

1    else, before we eliminated the position; so she vacated

2    the position before it was even eliminated.

3         Q.   And that was the FRS position with the Lee

4    County Sheriff's Office that she'd accepted?

5         A.   Yes.

6         Q.   And listed first on this list it states the

7    position of senior services coordinator; do you see

8    that?

9         A.   Yes.

10        Q.   And it appears that that position was filled by

11   Jamie Bartz; is that right?

12        A.   That's correct.

13        Q.   Do you know if Jamie Bartz received a letter

14   similar to the one that Ms. Clark received?

15        A.   No, I don't know that.

16        Q.   And looking at this document, it appears that

17   on 1/31/2021, the senior services coordinator position

18   was eliminated-slash-retired; is that right?

19        A.   Correct.

20             MR. STEFANY:   I'm going to object to the

21        question as phrased, Counsel, since -- the way you

22        phrased it, I'm objecting to.  So the witness has

23        answered it; that's fine.

24   BY MR. MACDONALD:

25        Q.   Did you discuss the elimination of the senior

1   services coordinator position, prior to January 31 of

2   2021, with the undersheriff?

3       A.   We would have been looking at it a year ago,

4   yes.

5       Q.   And did you pull the salary and benefits

6   information for the senior services coordinator prior to

7   or while discussing the elimination of that position?

8       A.   I may have.

9       Q.   And does Ms. Bartz still work for the Lee

10  County Sheriff's Office?

11      A.   No.  She retired.

12      Q.   And the next position listed there is the

13  secretary of traffic; is that right?

14      A.   That's correct.

15      Q.   And that position was filled by Ms. Sprankel,

16  Ms. Marcia Sprankel, I should say?

17      A.   Mm-hm.

18      Q.   Were you involved in any discussions regarding

19  the elimination of the secretary of traffic position?

20      A.   No.

21      Q.   And looking at this document, it appears that

22  the secretary of traffic position is listed as

23  "retired-slash-position eliminated"; is that right?

24      A.   Yes.  The position was eliminated because the

25  person retired, yes.

Deposition of Annmarie Reno

Jenna Clark v. Carmine Marceno

1      Q.   And the major of professional standards

2   position is also listed here as well; correct?

3      A.   Correct.

4      Q.   And that position was filled by Tracy Estep; is

5   that right?

6      A.   Yes.

7      Q.   Were you involved in any decisions to eliminate

8   the major of professional standards position?

9      A.   No.

10     Q.   And the next position listed there is the

11  director of purchasing position; correct?

12     A.   Yes.

13     Q.   And that was the position we had previously

14  discussed that Ms. Clark had filled; is that right?

15     A.   That's correct.

16     Q.   And you were involved in discussions to

17  eliminate the director of purchasing position; correct?

18     A.   Correct.

19     Q.   And the date listed for the elimination of the

20  director of purchasing position appears to be 9/4/2021;

21  is that right?

22     A.   That's correct.

23     Q.   And the next position listed is community

24  liaison.  Do you see that?

25     A.   Yes.

1    Q.    Were you involved in any discussions for the
2  elimination of the community liaison position?
3    A.    No.
4    Q.    And the next position listed is the director of
5  fleet management; do you see that?
6    A.    Yes.
7    Q.    Were you involved in any discussions regarding
8  the elimination of the director of fleet management
9  position?
10   A.    Yes.
11   Q.    In what regard were you involved in those
12 discussions?
13   A.    Fleet Management reported to me.
14   Q.    Did you have discussions with the undersheriff
15 regarding the director of fleet management position
16 being redundant?
17   A.    Yes.
18   Q.    And did you have those discussions with the
19 undersheriff?
20   A.    Yes.
21   Q.    Why was the director of fleet management
22 position deemed redundant?
23   A.    Because we already had a captain over it.
24   Q.    You already had a captain over it, you said?
25   A.    Yes.  Well, they put a captain over it; that's

Deposition of Annmarie Reno

Jenna Clark v. Carmine Marceno

1    correct.

2        Q.   When was a captain put over that position?

3        A.   I can't tell you exactly when.  Because Fleet

4    Management was one of those positions that was

5    reassigned, I believe; I'm trying to remember.  And the

6    fleet moved under somebody else, from under me; so I'm

7    trying to remember that person.  That was a decision to

8    put -- that still reported to me, the captain did.  That

9    was a position that they wanted to put a captain over,

10   and so they eliminated the director's position.

11       Q.   And the captain was put over that area of the

12   Lee County Sheriff's Office after the position was

13   eliminated?

14       A.   Yes.

15       Q.   And it looks like the date listed for that

16   position was 11/4/2021; is that accurate?

17       A.   I believe so.

18       Q.   Did you discuss the elimination of the director

19   of fleet management's position, prior to 11/4/2021?

20       A.   Yes.

21       Q.   Who did you discuss that with?

22       A.   The undersheriff.

23       Q.   Do you remember when, specifically?

24       A.   I'm trying to remember; it was earlier in the

25   year.  I'm sorry, I don't remember exactly when, but it

```
1    was earlier in the year.
2        Q.   And do you see, under the Comment section, it
3    appears to say "Title change to fleet services
4    specialist-slash-position eliminated-slash-pay cut"?
5        A.   Yes.
6        Q.   What does that mean?
7        A.   The fleet manager or the fleet director was
8    reduced down to a specialist, to back-fill the position
9    in Fleet, and he took a pay cut.
10       Q.   And the next position listed is communications
11   manager; is that correct?
12       A.   Correct.
13       Q.   And that position was filled by Anthony Ramsey;
14   is that right?
15       A.   Yes.
16       Q.   Okay.  Were you involved in the discussions to
17   eliminate the communications manager position?
18       A.   No.
19       Q.   So you were not involved in any kind of
20   discussion regarding the redundancy of the
21   communications manager as well?
22       A.   No.
23       Q.   Now, you also previously mentioned a
24   communications secretary position; is that right?
25       A.   That's correct.
```

```
 1        Q.    Do you know why that position isn't listed here
 2   on this document?
 3        A.    No, I don't.  I didn't make this.  I'm not sure
 4   why it's not on there.
 5        Q.    Should it be included on this list of
 6   employees?
 7        A.    Yes.  I would think it should be, since we did
 8   eliminate the position.
 9        Q.    So just to make sure I understand correctly.
10   The director of communications position and the payroll
11   position we previously discussed should be included on
12   this list of positions eliminated as part of the
13   Reduction in Force?
14        A.    Well, I'm a little perplexed.  Because,
15   sometimes, it's not a Reduction in Force.  We utilized
16   the positions -- I would have listed the secretary on
17   there, yes.  I guess both of them could have been listed
18   on here.
19        Q.    What made you consider the elimination of the
20   communications secretary position to be part of the
21   Reduction in Force conducted in 2021?
22        A.    I'm trying to remember if it was one of them or
23   one of them we just spotted as a redundancy of work or
24   not enough work for one person, that the work could be
25   given to somebody else to do, that the secretary was
```

1    doing; and so it might not have been the actual

2    Reduction in Force, but for the huge money savings.

3         Q.    What do you mean, "for the huge money savings"?

4         A.    Well, for the bulk of the Reduction in Force

5    for the dollar amounts, I think those might have been

6    thought about afterwards as we were going along and

7    studying what people were doing, to see if we were

8    actually putting the right people in the right place.  I

9    would have listed them on here, though.

10        Q.    The communications secretary position, you

11   would have listed?

12        A.    I would have, yes.  Because we did reutilize

13   that position some more; we utilized the money.  We were

14   in payroll when we utilized the position, so the savings

15   weren't really there, if that makes sense what I'm

16   saying.  I'm sorry.

17        Q.    And do you remember, roughly, when the

18   communications secretary position was eliminated?

19        A.    I'm trying to think.  No, I don't.  I don't

20   remember the date.  I'm trying to think.  It may not

21   have been during the 2021 -- no, I don't know.  I'm

22   sorry.

23        Q.    Do you know if the senior services coordinator

24   position received a letter similar to the one that I

25   showed you that Ms. Clark received?

1        A.    No.    No.

2        Q.    And do you know if the director of fleet

3    management position received a letter similar to the one

4    that Ms. Clark received?

5        A.    No.

6        Q.    Do you know if the communications secretary

7    position that we had discussed received a letter similar

8    to what Ms. Clark received?

9        A.    No.

10        Q.    So to the best of your knowledge, out of the

11    employees that are listed here on this document, the

12    only one to have received the letter that Ms. Clark

13    received was Ms. Clark; is that right?

14        A.    I'm not sure about Amy Delaquilla, if she got

15    one or not.    And I don't know if Anthony Ramsey got one.

16    I wouldn't know that.

17        Q.    But the only employee that you do know for

18    certain received a letter of that type would be

19    Ms. Clark; is that right, on this list?

20        A.    Yes.

21        Q.    Do you see the age of the employees that are

22    listed here on this document?

23        A.    I'll have to get a little closer... yes.

24        Q.    And going in order from the top here, the ages

25    listed are 58, 66, 48, 59, 58, 51, and 46; is that

Deposition of Annmarie Reno                                    Jenna Clark v. Carmine Marceno

```
 1    right?

 2         A.    That's correct.

 3         Q.    Now, of these employees that were selected to

 4    have their positions eliminated that are listed on this

 5    document, all of them are over the age of 40; is that

 6    right?

 7         A.    Correct.

 8         Q.    Did age play any consideration in the

 9    determination as to which position should be eliminated?

10         A.    No.

11         Q.    Did you or the undersheriff ever discuss the

12    age of the employees that were going to be -- I'm sorry,

13    that were going to have their positions eliminated?

14         A.    No.

15         Q.    Is it possible that age may have played an

16    implicit role in your decision as to which positions

17    were going to be eliminated?

18              MR. STEFANY:   Objection as to form.  You may

19         answer.

20              THE WITNESS:   Age did not play any part of it.

21    BY MR. MACDONALD:

22         Q.    Do you know why no positions were selected to

23    be eliminated that were filled by employees that were

24    younger than 40?

25         A.    I can't answer that.
```

1      Q.   Why can you not answer that?

2      A.   Because I can't think of what positions we -- I

3  would have never looked at their age.  I was only

4  looking at the work they were doing, so.

5      Q.   Now that I'm showing you the ages of the

6  employees that were selected to be eliminated, do you

7  think that could appear to be discriminatory?

8          MR. STEFANY:   Objection as to form.  You may

9      answer the question.

10         THE WITNESS:   No.  Again, I'm not looking at

11     their age.  I was looking at the job they were

12     doing.

13  BY MR. MACDONALD:

14     Q.   When you discussed the positions to be

15  eliminated with the undersheriff, did either of you

16  discuss measures that could be taken to prevent any sort

17  of bias in selecting positions to be eliminated?

18     A.   I don't recall us talking about that.

19     Q.   Do you think that's an important consideration,

20  eliminating bias in selecting positions to be

21  eliminated?

22     A.   I think what we were looking at was the best

23  way to run the agency as a business as well as a

24  government entity, so that we were doing what was right

25  for the citizens of Lee County.  I don't think we took

```
 1   certain things into -- I don't think that's one of the

 2   things we talked about.  We gave the employees an

 3   opportunity to look for another open job within the

 4   agency that they would want to take on where we really

 5   needed them.  (Screen share ended.)

 6        Q.   Now, previously, we discussed some disciplinary

 7   issues that you had with Ms. Clark; is that right?

 8        A.   Yes.

 9        Q.   Did Ms. Clark's disciplinary issues play any

10   role in the decision to eliminate her position from the

11   Lee County Sheriff's Office?

12        A.   No.

13        Q.   Did the disciplinary records of any employees

14   play any role in the decision to eliminate their

15   positions that you were involved in?

16        A.   No.

17        Q.   But the individual skills of the employees that

18   were selected were considered; correct?

19        A.   That's correct.

20        Q.   And the savings in terms of those employees'

21   salary benefits were considered as well, in determining

22   which positions to be eliminated?

23        A.   Yes.  The position, first; and then what the

24   savings would be, second.

25        Q.   I'm going to show you another exhibit.  (Screen
```

1    share of 8/19/21 email began.)   This has been previously

2    marked as Plaintiff's Exhibit 8, and it's Bates labeled

3    565 and 566.  And I'll give you a minute to review this.

4        A.   (Witness peruses the document.)   Could you

5    scroll it up to the next page?

6        Q.   Sure.

7        A.   Thank you.  Okay.

8        Q.   Do you recognize this document that I'm showing

9    you?

10       A.   Yes, I do.

11       Q.   What is it?

12       A.   It was my write-up, just for the undersheriff,

13   to let him know some of the problems I was having with

14   the warehouse being overcrowded and not having enough

15   room for the new uniforms coming in and what was causing

16   the problems.

17       Q.   And this was an email message; is that right?

18       A.   Mm-hm.

19       Q.   And it was sent by you, to the undersheriff; is

20   that right?

21       A.   That's correct.

22       Q.   And looking at this document, it seems to be

23   dated August 19, 2021; is that right?

24       A.   That's correct.

25       Q.   Now, why did you send this to the undersheriff?

1  A. I just wanted to document what was going on, so

2 that I had it fresh in my head, and let him know why I

3 was having problems in the warehouse.

4  Q. And looking at the second page here, you see

5 the sentence that says, "Director Clark clearly defied

6 my directive to have all the old items moved from LCSO

7 inventory as instructed and showed total insubordination

8 towards me as her direct supervisor."

9  A. Okay.

10  Q. Do you see that?

11  A. Yes, I do.

12  Q. That's pretty strong language, wouldn't you

13 agree?

14   MR. STEFANY: Objection as to form. You may

15  answer.

16   THE WITNESS: I was just putting it in writing

17  that she was showing insubordination when I gave

18  her a directive, yes.

19 BY MR. MACDONALD:

20  Q. Had you put any instances of insubordination or

21 other discipline in writing about Ms. Clark, prior to

22 this email?

23  A. No.

24  Q. Why did you choose to put it in writing this

25 time, as opposed to any other instances of disciplinary

1    issues you may have had?

2        A.   I guess I did it this time because she -- the

3    reason I did it was because I had given her a directive,

4    and I felt like she was being insubordinate.  Because I

5    had talked to them twice, her and Lehman, twice about

6    what needed to be done in the warehouse in order to be

7    able to accommodate all the new uniforms coming in,

8    because we were changing them.  And so I felt like there

9    was insubordination there.

10       Q.   Have you ever sent an email that's similar to

11   this one to the undersheriff, regarding any other

12   employee?

13       A.   I'd have to go back and remember; I don't

14   remember, right off the top of my head.

15       Q.   Do you recall ever sending a message similar to

16   this one regarding another employee to the undersheriff?

17       A.   I cannot think about right now whether I did or

18   did not, so I don't want to say.  I could have.  I could

19   have.

20       Q.   Now, I previously showed you a letter to

21   Ms. Clark regarding the Reduction in Force?

22       A.   The one from Dawn Heikkila?

23       Q.   Yes.

24       A.   Yes.

25       Q.   Do you recall that that letter was dated August

1    15, 2021?

2        A.    I remember seeing that date on there; I do.

3        Q.    Now, that would be four days prior to the date

4    of this email; is that right?

5        A.    Yes.

6        Q.    So at the time that you wrote this email, were

7    you already aware that Jenna Clark's position was going

8    to be eliminated?

9        A.    No.

10       Q.    You were not aware, on August 19, 2021, that

11   Ms. Clark's position was going to be eliminated from Lee

12   County Sheriff's Office?

13       A.    No.

14       Q.    But weren't you involved in previous

15   discussions about her position with the undersheriff?

16       A.    The talk, yes, about it being eliminated.  But

17   it wasn't approved.

18       Q.    When was that decision approved?

19       A.    I was told on the 20th.

20       Q.    Of August?

21       A.    Yes.  I'm sorry, yes, of August.

22       Q.    Who informed you that Ms. Clark's position was

23   approved to be eliminated on August 20, 2021?

24       A.    The undersheriff.

25       Q.    Now, do you know why Dawn Heikkila would have

1    written a letter to Ms. Clark notifying her that her

2    position was going to be eliminated, five days prior to

3    its approval?

4        A.    It's my belief that she has the wrong date on

5    the letter.

6        Q.    You said you believe that date is incorrect on

7    that letter?

8        A.    Yes.

9        Q.    So this email would have been sent, then, the

10   day prior to you being notified that Ms. Clark's

11   position was going to be eliminated; is that correct?

12       A.    Yes.

13       Q.    And you said you discussed this email with the

14   undersheriff verbally, at some point; is that right?

15       A.    Yes.

16       Q.    Would that have been that same day that you

17   sent the email, that you discussed it with the

18   undersheriff?

19       A.    Yes.

20       Q.    So on August 19, 2021, you discussed this issue

21   with Ms. Clark and her insubordination; correct?

22       A.    Correct.

23       Q.    And the next day, on August 20, you had a

24   discussion with the undersheriff where he notified you

25   that Ms. Clark's position was approved to be eliminated?

1    A.    Yes.

2    Q.    Is there any relation between those two events,

3  in terms of the proposed timing between the two?

4    A.    I don't believe so.

5    Q.    What was your reaction when the undersheriff

6  notified you that Ms. Clark's position was approved to

7  be eliminated?

8    A.    My reaction?

9    Q.    Yes.

10   A.    I was -- I guess I was surprised that it was

11 approved.

12   Q.    Why were you surprised?

13   A.    I just didn't expect it that quickly.  I know

14 that it was talked about; I told you, over a couple of

15 years ago, about putting those two units back together,

16 for Finance and Purchasing.

17   Q.    When you spoke with the undersheriff and he

18 notified you that Ms. Clark's position was going to be

19 eliminated, did he notify you that any other positions

20 had been approved?

21   A.    No, not at that point.

22   Q.    Was it your understanding that Ms. Clark's

23 position was the only one approved to be eliminated at

24 that time?

25   A.    At that time -- that I knew of, because she

1   reported to me; that's probably why he told me about

2   that one.

3       Q.   But the undersheriff didn't discuss the

4   approval of any other positions to be eliminated from

5   the Lee County Sheriff's Office with you?

6       A.   Not with me, no.

7       Q.   (Screen share ended.)  Is it true that

8   Ms. Clark was on leave at the time that she was notified

9   that her position was being eliminated?

10      A.   She'd took a couple of sick days, yes.  She

11  took some sick days.

12      Q.   Do you know what Ms. Clark had taken sick days

13  for?

14      A.   Yes.

15      Q.   What did Ms. Clark take sick days for?

16      A.   She was having some surgery done.

17      Q.   Was Ms. Clark recovering from her surgery at

18  the time that she was notified that her position was

19  going to be eliminated?

20      A.   Yes.

21      Q.   Did the fact that she was on leave impact the

22  timing of that notification?

23      A.   I'm sorry, I don't... Say that again.

24      Q.   Yes.  Did the fact that Ms. Clark was on leave

25  impact the timing of the notification that she was

1   notified of that elimination?

2        A.   I don't -- I know they sent her the letter in

3   the mail, but I guess I'm not comprehending.

4        Q.   Well, did you ever discuss with any employee

5   the fact that Ms. Clark was on leave when her position

6   was selected to would be eliminated?

7        A.   I made -- yes.  I would have been told, I'm

8   sure, that she wasn't in the office; that's correct,

9   that she was out on a sick day.

10       Q.   Did you discuss holding off on sending that

11  notification because Ms. Clark was on leave?

12       A.   No.

13       Q.   Why is that?

14       A.   I believe it was already done before -- I don't

15  believe that they knew that she was out and what she was

16  out for.  I would have been the one that would have

17  known what she was out for.  But I believe the letter

18  was already -- the approval was already done, and the

19  notification was going out.

20       Q.   Did you discuss the fact that Ms. Clark was on

21  leave at the time her position was selected to be

22  eliminated with Dawn Heikkila?

23       A.   Dawn would have known that she was out.

24       Q.   But did you have discussions with Ms. Heikkila

25  about Ms. Clark being on leave at the time that her --

Deposition of Annmarie Reno

Jenna Clark v. Carmine Marceno

1          A.    No.

2          Q.    -- position was selected to be eliminated?

3          A.    No.

4          Q.    Why were you aware of the reason for

5     Ms. Clark's leave?

6          A.    She told me.

7          Q.    Did Ms. Clark tell you, whenever she needed to

8     take medical leave?

9          A.    Yes.

10         Q.    And was that because you were Ms. Clark's

11    supervisor at the time?

12         A.    Yes.

13         Q.    Were you responsible for approving Ms. Clark's

14    leaves of absence from the Lee County Sheriff's Office?

15         A.    Yes.

16         Q.    What types of leave were you responsible for

17    approving for Ms. Clark?

18         A.    Sick days, vacation dates, personal days,

19    vacation.

20         Q.    Had Ms. Clark taken sick day leave, prior to

21    this instance with her surgery?

22         A.    I'm sure she has, yes.

23         Q.    Do you recall her taking sick leave prior to

24    this?

25         A.    Yes.  She took some sick leave; I'm not sure

1    what year, a couple of years ago or something.

2        Q.   Do you recall how often Ms. Clark would use her

3    sick leave benefits?

4        A.   No.

5        Q.   Do you recall Ms. Clark using any sick leave

6    benefits more than other employees, based on your

7    experience?

8        A.   No.

9        Q.   Do you know if Ms. Clark suffered from any

10   medical conditions?

11       A.   I know she had a problem a couple of years ago.

12   Because she told me when she needed to go out.

13       Q.   What was the problem?

14       A.   Is it okay to talk about other people's -- I

15   know she had something like a growth that was happening

16   near her heart or something that she had to have some

17   surgery on.

18       Q.   And when was that?

19       A.   I don't remember the -- it was a couple of

20   years ago, I believe.  I'm not real sure.

21       Q.   And besides that growth that you had mentioned,

22   are there any other medical conditions that Ms. Clark

23   had discussed with you?

24       A.   There was one other one that she was having a

25   problem with.  But I think she got past -- I know she

```
 1    had severe migraines.  She would have migraines; I'm
 2    trying to think of the equilibrium problem.  I'm trying
 3    to -- what's the name of the equilibrium problem
 4    sometimes with the ears, where there's like fluid gets
 5    in there?  I can't remember what it was.  But she had
 6    little problems with that.
 7         Q.   So problems with equilibrium and something with
 8    the ears that you had mentioned and then also something
 9    related to a growth around her heart; is that right?
10         A.   Correct.
11         Q.   Any other medical conditions that she made you
12    aware of, besides those two?
13         A.   No.
14         Q.   Did any of the other employees in the
15    Purchasing Department ever make you aware of medical
16    conditions that they suffered from?
17         A.   Yes.
18         Q.   Which employees notified you of medical
19    conditions?
20         A.   Shannon, that she would have one, yeah; I'm
21    trying to think -- Brenda has talked to me a few times
22    about a few of her things.  Sometimes we just talk, just
23    normal talk about it.
24         Q.   Did Brenda or Shannon ever take medical leave
25    related to those conditions?
```

Deposition of Annmarie Reno

Jenna Clark v. Carmine Marceno

1    A.    I'm trying to remember; I know -- Shannon did,

2  but not when she was the manager in there; and Brenda.

3  I'm not sure.  I don't remember.

4    Q.    Shannon never took medical leave related to her

5  condition when she was in the Purchasing Department;

6  correct?

7    A.    No.

8    Q.    And you don't recall Shannon taking leave

9  related to a medical condition, either?

10    A.    I know Shannon did.  But not when she was in

11  Purchasing; she did when I worked with her in another

12  job, yes.

13    Q.    The Purchasing Department employees that worked

14  there when Ms. Clark worked in the Purchasing

15  Department, Ms. Clark was the only one that took leave

16  related to medical conditions, as far as you're aware?

17    A.    As far as I'm aware.  Because they would be

18  reporting to her as far as taking leave, instead of to

19  me, because they were her subordinates.  And then,

20  that's when they would have reported it to Dawn Heikkila

21  because then it would have become up an FMLA issue or a

22  sick leave issue.

23    Q.    And was FMLA leave handled differently?

24    A.    Yes.  So you could take sick days and up to 7

25  days before you would have to go on FMLA.  But usually I

1    have people that report to me -- back then it was Florin

2    (ph), she's no longer here.  But they would reach out to

3    Dawn, and then Dawn would tell them everything they

4    needed to do if they were going to be out past the 7

5    days, to get the certification for the FMLA.

6        Q.   Do you know if Jenna Clark ever took FMLA

7    leave?

8        A.   I'm trying to remember if she took it a couple

9    of years ago.  I believe she may have taken it a couple

10   of years ago for the condition that she had.

11       Q.   Do you know if any of the other employees in

12   the Purchasing Department that worked there at the same

13   time as Ms. Clark ever used FMLA leave benefits?

14       A.   I'm trying to think.  Gwen.  Gwen did.  I

15   remember Gwen being out on FMLA.  I'm trying to think if

16   there was anybody else.  Danielle was -- Danielle was

17   out for pregnancy.  But I can't think of any others that

18   I know of, off the top of my head.

19       Q.   Do you recall when Gwen took FMLA leave,

20   roughly?

21       A.   I want to say year ago, maybe a year ago.

22   That's what I'm thinking.

23       Q.   And you said Danielle; who is Danielle?

24       A.   Danielle was -- she left and then came back; I

25   don't -- there's a lot of turnover.  She took FMLA from

1    there, a few years back when she had her child.

2        Q.    And Danielle, what's her last name?

3        A.    Deponto, D-E-P-O-N-T-O.   Deponto.

4        Q.    And what position did Ms. Danielle hold in the

5    Purchasing Department?

6        A.    Purchasing agent.

7        Q.    Does Danielle still work in the Purchasing

8    Department?

9        A.    Yes.

10       Q.    Do you remember when she started working in the

11   Purchasing Department?

12       A.    I'm sorry, no.   She started and then she left

13   and then she -- we rehired her later, a few years later.

14       Q.    Did the amount of leave that Ms. Clark used

15   play any role in the decision to eliminate her position?

16       A.    No.

17       Q.    Did the use of leave benefits play a role in

18   the decision to eliminate any employees that you're

19   aware of?

20       A.    No.

21       Q.    Did Ms. Clark's medical condition play any role

22   in the decision to eliminate her position?

23       A.    No.

24       Q.    Did any employees' medical condition play a

25   role in the decision to eliminate their position?

```
1        A.    No.

2              MR. MACDONALD:  All right.  We can go ahead and

3        go off the record at 1:02.

4              THE COURT REPORTER:  We're off the record.

5              (A brief recess was taken.)

6              THE COURT REPORTER:  Back on the record.

7    BY MR. MACDONALD:

8        Q.    Ms. Reno, do you know how much money was saved

9    by the Reduction in Force that was conducted in 2021?

10       A.    No.  I don't have that information in front of

11   me.

12       Q.    Did you ever discuss the total amount that was

13   saved by the Reduction in Force in the 2021 with the

14   undersheriff?

15       A.    I'm trying to think -- no.  Because I was

16   stepping back away from the budgetary part of it.  So

17   Bill Jones was the budget director and was now keeping

18   track of a lot of that information.

19             MR. MACDONALD:  Those are all the questions I

20       have for you today, Ms. Reno.  I thank you for your

21       time.  Mr. Stefany may have some questions for you.

22             MR. STEFANY:  Kyle, I do have some questions.

23       But I think we need to take a little bit of an

24       extended break, to give the witness a break, for a

25       meal or whatever else.  So I'm guessing we could
```

1    maybe come back at, say, two o'clock.

2           MR. MACDONALD:  We can do that.

3           MR. STEFANY:  And I'm going to just leave this

4    connected.  But let's just resume at two o'clock,

5    and then I'll get organized and hopefully be more

6    efficient with my questions.

7           THE COURT REPORTER:  We're off the record.

8           (A brief recess was taken.)

9           THE COURT REPORTER:  We're back on record.

10          MR. STEFANY:  So I promised Kyle and Julie I'd

11   be efficient, so let me take a shot at being

12   efficient with a few follow-up questions.

13                    CROSS-EXAMINATION

14   BY MR. STEFANY:

15      Q.    So, Ms. Reno, you testified that at some point

16   in time, when Chief Sands came in, you gave up some of

17   your prior responsibilities as executive director of the

18   support bureau here at the Sheriff's Office; correct?

19      A.    That's correct.

20      Q.    So I'm trying to hone in on specifically when

21   it was that you gave up your responsibilities over

22   budget or budgeting.

23      A.    That was just -- I'm trying to remember exactly

24   when it was -- oh, when the decision was made that I

25   would stay, I would stay longer and DROP, I'm trying to

```
 1    think -- it would have been in August of last year or
 2    September.
 3        Q.   September of '22?
 4        A.   Yes.  -- wait, I'm trying to think; I'm sorry.
 5    We're in '23, aren't we?
 6        Q.   We are.
 7        A.   Sorry.  I'm trying to remember exactly when it
 8    was.  They changed the legislation, July of 2023; so I
 9    would have gave up, relinquished budget to him, when I
10    decided to stay on after July of 2023 of this year.
11        Q.   So it would have been probably September of
12    2022?
13        A.   September, yes.  And I decided to budget with
14    him so that he'd get a better understanding, because I'd
15    done the budget for so long, so he could work more
16    closely with Jill.
17        Q.   Okay.  And then with respect to the budgeting
18    process -- and, I know, it's got to be sort of an
19    ongoing effort throughout the course of a year, to plan
20    for your next budget proposal to the county commission;
21    is that true?
22        A.   Yes.
23        Q.   So typically -- let me go back and focus on
24    calendar year 2021, which we've made reference to during
25    the course of your testimony today.  So in calendar year
```

Deposition of Annmarie Reno

Jenna Clark v. Carmine Marceno

1   2021, do you have a recollection of when your budget

2   proposal for the subsequent fiscal year would have been

3   submitted to the county commission?

4       A.   I don't know the exact date; our legislation

5   says -- Florida State Statute says they have to be

6   submitted by June 1st.

7       Q.   So your proposal would have had to be submitted

8   to the county commission by June 1, 2021?

9       A.   Yes.

10      Q.   And that's for your proposed operations for the

11  fiscal year beginning October 1, 2021, through September

12  30, 2022?

13      A.   Correct.

14      Q.   So my understanding is, from your testimony

15  earlier this morning, that you first learned of the

16  approval for the elimination of the purchasing director

17  position on August 20, 2021; correct?

18      A.   Correct.

19      Q.   So your budget proposal for fiscal year --

20  would you call it '22?

21      A.   Yes.

22      Q.   For the period of October 1, 20221 to September

23  30 of 2022, would have already been submitted to the

24  county for approval as of August 20 --

25      A.   Correct.

1      Q.    -- correct?

2      A.    Correct.

3      Q.    And you said that you made your decision to

4   stay on longer -- well, let me rephrase my question.

5           When did you initially make a decision to enter

6   the DROP program, if you remember?

7      A.    Five years ago.  It would have been five years

8   ago.

9      Q.    Okay.  And that decision, as I understand your

10  testimony from earlier, was that you would, yourself, be

11  retiring, based on that decision five years ago, on or

12  about sometime in January of 2023 or '24?

13     A.    2024.

14     Q.    2024.  Okay.  So you then ultimately changed

15  your decision when the legislature changed the

16  parameters of the DROP program; is that right?

17     A.    Correct.

18     Q.    And that was this past summer?

19     A.    Yes.

20     Q.    All right.  So if I understand your testimony

21  and your explanation about how the DROP program works,

22  once a person makes an election -- and let's make it

23  simple; we're going to make it before this recent

24  legislative change which expanded the period from five

25  years, as I understand it, to eight years?

```
 1        A.    Correct.

 2        Q.    So let's go back to prior to this past summer.

 3   If a person had made an election to enter the DROP

 4   program under the state retirement system and the

 5   statutes, they were required to actually retire, at the

 6   latest, five years from the date they elected to enter

 7   DROP?

 8        A.    Correct.

 9        Q.    All right.  So as of 2021 --

10        MR. STEFANY:  Kyle, can you bring up Exhibit 4

11        that you showed before?  Could you share that

12        screen?

13        MR. MACDONALD:  Yes.  Let me bring it up here.

14        MR. STEFANY:  Thank you.  (Screen share began

15        of Bates 123.)

16   BY MR. STEFANY:

17        Q.    So, Ms. Reno, you testified about the content

18   of this document before.  And before I ask you a

19   specific question about this document, let me ask you a

20   couple of other questions about this.  What role, if

21   any, did you have in preparing this document?

22        A.    None.

23        Q.    And do you know, by chance, who did prepare it?

24        A.    No.

25        Q.    Do you know when it was prepared?
```

1    A.    No.

2    Q.    Do you know why it was prepared?

3    A.    No.

4    Q.    Okay.  So let me just ask you a couple of

5    questions.  So the very top person, as shown on that

6    Exhibit 4, I believe, is Jamie Bartz, and her position

7    was senior services coordinator.  And under the Comment

8    it says -- if I'm reading it correctly -- let me help

9    myself.  It looks like a date of January 31, 2021.  And

10   it says "retired/position eliminated"; right?

11   A.    Correct.

12   Q.    So if you don't know any of these answers, just

13   tell me, and I'll move on.

14   A.    Okay.

15   Q.    Do you know whether or not Jamie Bartz had

16   entered the DROP program?

17   A.    I don't know that one.

18   Q.    Okay.  Let me go on to someone else on this

19   list.  Let me say, as an example, Traci Estep, which her

20   position was major of professional standards.  Do you

21   know whether or not, as of the June 24, 2021 date, do

22   you know whether or not Major Estep had entered the DROP

23   program?

24   A.    No.

25   Q.    Let me ask it this way; I'm going to go down

```
 1    the list.  Is there anyone on this program whose

 2    position was --

 3         A.   Marcia --

 4         Q.   Excuse me; let me finish.  Whose position was

 5    eliminated who is shown as "retiring," who had entered

 6    the DROP program before they retired?

 7         A.   Marcia Sprankel, the second one.

 8         Q.   The secretary of traffic?

 9         A.   Mm-hm.

10         Q.   Okay.  So if I'm reading across the line

11    correctly, it looks like it's a February 28, 2021 date;

12    is that right?

13         A.   Yes.

14         Q.   That was the date I could see, excuse me.  That

15    is correct, February 28.  Okay.

16              So as an example, Marcia Sprankel had entered

17    the DROP program; you're confident of that?

18         A.   Yes.

19         Q.   Does the date shown in that column, if you

20    know, represent the dates she was required to have

21    retired, pursuant to the DROP program?

22         A.   I'm not sure if that was the date.

23         Q.   So we would check, what, her personnel file or

24    her FRS file?

25         A.   Yes.  Right.  We also had a spreadsheet of
```

1    these names.

2        Q.    All right.  So let me go back to where I was.

3    All right.  So you were asked several questions about

4    identifying positions eliminated in 2020 or 2021 from

5    the actual bureau -- or Support Services Bureau; do you

6    remember that testimony or those questions this morning?

7        A.    Yes.

8        Q.    So one of the persons, as I understand it --

9    there was a position that was ultimately eliminated, at

10   some point in time, out of the Payroll Department

11   because a new system had come in and was instituted to

12   essentially automate something that was previously done

13   manually; is that a fair description?

14       A.    Yes.

15       Q.    All right.  So as I understand what you

16   testified to earlier -- and I just wanted to confirm --

17   Randy Bauer, B-A-U-E-R, was a payroll clerk who stayed

18   once that new system came in place; is that right?

19       A.    That's correct.

20       Q.    And the person who left or whose position

21   ultimately was eliminated was Doreen Salvagno?

22       A.    Yes.

23            MR. STEFANY:  S-A-L-V-A-G-N-O, Julie, for the

24       spelling.

25            THE WITNESS:  Yes.

```
 1    BY MR. STEFANY:
 2         Q.   And that person, whose payroll clerk position
 3    ultimately was eliminated, stayed as an employee of the
 4    agency; correct?
 5         A.   That's correct.
 6         Q.   And I think you testified, if my notes are
 7    correct, that she was transferred to an FRS position
 8    within HR; is that right?
 9         A.   Correct.
10         Q.   All right.  So -- I don't recall whether you
11    were asked, and maybe you were and I didn't note it, but
12    is Doreen Salvagno still employed --
13         A.   Yes.
14         Q.   -- here at the agency?
15         A.   Yes.
16         Q.   Okay.  And what is she employed as, if you
17    know?
18         A.   She's in HR, part-time.
19         Q.   Part-time?
20         A.   Yes.
21         Q.   All right.  So from the time that her payroll
22    clerk position was identified as something that could be
23    eliminated, all the way through the present date, she's
24    remained employed?
25         A.   Yes.
```

1    Q.   Now, I just want to make sure I have a better

2  understanding from your testimony.  I think you called

3  it the Tyler Munis system --

4    A.   Yes.

5    Q.   -- was the new program or the new -- I guess

6  it's software?

7    A.   It is.

8    Q.   So what does that system do?  Just help me

9  understand what that is.

10    A.   The system is our administration system.  So we

11  always had one for our CAD system and for our deputies,

12  but we never had anything for Administration, so we were

13  virtually doing everything manual; manual purchase

14  orders, manual timesheets, everything was manually done.

15  The Munis -- and even HR was in its own standalone

16  system, so nothing, like, talked to each other;

17  everything had to be duplicated over and over and over.

18  Because even our payroll had to be duplicated from

19  timesheets to key punched into Finance; and even then,

20  it didn't go anywhere; everything was standalone.

21       So we went and we did an RP for software for

22  administration, and the Tyler system was the one we

23  chose, the Tyler Munis, because it would talk to each

24  other.  So HR was talking to Finance, once we started;

25  everything was talking to each other, and you're not

1    duplicating work.  Even our purchasing system we had

2    before Munis, which was called was Procus, was a stand-

3    alone --

4        Q.    Procure-It?

5        A.    Yes, it was called Procure-It.

6        Q.    Okay.  P-R-O-C-U-R-E, it?

7        A.    Yes.  And so it was a stand-alone too, so it

8    virtually did nothing; it didn't talk to our finance

9    system so we could cut checks and pay the bills.  So we

10   ended up bringing this new system on board, which is

11   Tyler Munis, so that everything is hooked together; so

12   it's a whole administration package.

13       Q.    Right.  And so the Tyler Munis system, as I

14   understand, was brought on board and also had some

15   improvements in efficiency that was directed to the

16   Purchasing Department?

17       A.    Yes.

18       Q.    Right.  And what role, if any, in making the

19   decision to go to the Tyler Munis system did Jenna Clark

20   have in that decision?

21       A.    She would have been sitting in when we were

22   looking at all of the different vendors and which ones

23   to choose, and she would have some say-so.

24       Q.    Okay.  And then once that decision was made and

25   it's being implemented, I think your testimony, earlier

1    this morning, is that Shannon Lehman as the purchasing

2    manager, at the time, was the person who became, I

3    guess, most proficient in using that system?

4        A.    Yes.

5        Q.    So how -- whose decision would it have been for

6    Shannon Lehman to gain proficiency in that new system

7    instead of Jenna doing it, for example?

8        A.    I think that Shannon actually was the person

9    who stepped up and really wanted to learn it.  Jenna was

10   still stuck with the Procure-It; that was the system she

11   brought in.  So it was a little bit harder for her to

12   adapt to the change.

13       Q.    Okay.

14       A.    Yeah, or just...

15       Q.    And is the Tyler Munis system still being used

16   in the Purchasing Department here at the agency?

17       A.    Yes.

18       Q.    So one of the other things I wanted to get

19   clarified in my mind is sort of a sequencing.  So I

20   asked you earlier about the budgeting process and when

21   your proposal for budgeting would typically have gone in

22   to the county commission, and you'd answered that

23   question.

24             So let me focus again on calendar year 2021.

25   If you recall, do you recall when, during the course of

Deposition of Annmarie Reno                                     Jenna Clark v. Carmine Marceno

```
 1    that calendar year, the county commission actually
 2    approved your 2022 operating budget that you had
 3    proposed?
 4         A.    It's always approved in September.
 5         Q.    Okay.
 6         A.    So there's two workshops that happen, public
 7    hearings.  I don't know the exact date.
 8         Q.    Okay.
 9         A.    I'd have to look at a calendar to see, or my
10    paperwork.
11         Q.    All right.  So if the public hearings took
12    place in September, are changes that are made during the
13    course -- I'm going to use the period, again, of 2021;
14    if changes were made to the proposed budget for fiscal
15    year '22, during the period of June 1, 2021 and
16    September 1, 2021, would that be reflected, almost in
17    real time, to what the county commission was looking at,
18    as an updated proposal for budget?  How does that work,
19    is what I'm trying to --
20         A.    It does search.
21         Q.    Explain that to me.
22         A.    What would happen is, once we go in with our
23    proposal to the county -- that's the money that they're
24    looking at -- if they wanted a increase, they might pull
25    out that; but to increase, what we would have to do is
```

```
 1    figure out how we're going to make that budget work.
 2              Unfortunately, the state, the Florida
 3    Retirement System, operates in a whole different
 4    calendar than us; they operate from July 1 to June 30.
 5    So we don't even sometimes see the new increase in rates
 6    until after the budget has been proposed; sometimes we
 7    don't receive Workers' Comp increases; we don't even
 8    know about those until after the budget has been
 9    submitted, or if there's going to be any adjustments or
10    increases in anything; then we have to adjust for it and
11    figure out what we're going to give up in that budget.
12         Q.   So as we sit here today, do you happen to have
13    any specific recollection of whether the budget that was
14    approved ultimately, in September of 2021 for fiscal
15    year 2022, would have included or would have excluded
16    the funding of a position for director of purchasing for
17    the period of fiscal year 2022?
18         A.   It would have included it.
19         Q.   It would have included it?
20         A.   Yes.
21         Q.   Okay.  So then, that leads me to the questions,
22    some of the questions, that were asked earlier this
23    morning under direct examination.
24              So you were asked about whether you prepared a
25    salary and benefit impact analysis for proposed
```

1    elimination of positions; do you remember those

2    questions?

3        A.    Mm-hm.

4        Q.    Yes?

5        A.    I'm sorry.  Yes.

6        Q.    Okay.  So -- I'm trying to understand whether

7    the analysis -- first of all, did you do it on your own,

8    or did somebody ask you to do it, when you do those kind

9    of budget impact analyses?

10       A.    Usually it would come from a discussion with

11   the undersheriff.

12       Q.    Okay.  And I don't know, I'm trying to get a

13   better understanding of when in the process of analyzing

14   efficiencies and organizational decisions being made,

15   when the analysis on the budget impact would have been

16   done; would it have been done prior to the final

17   approval of a job elimination? or would it have been

18   done after the approval of the budget elimination? or

19   could it have been either?

20       A.    Could have been either.

21       Q.    Okay.  In Jenna Clark's situation, do you

22   remember whether it was done before or after the

23   approval?

24       A.    The analysis of...?

25       Q.    Of the budget impact of her position being

1    eliminated.

2         A.    It would have been done prior.

3         Q.    So my understanding, from your testimony

4    earlier today, is that the undersheriff communicated to

5    you that the elimination of Jenna Clark's position as

6    director of purchasing took place on August 20, 2021?

7         A.    Yes.

8         Q.    So I think you testified, in response to

9    counsel's question, that when you learned or were told

10   that, you were surprised; is that right?

11        A.    Mm-hm.

12        Q.    Yes?

13        A.    Yes.  I'm sorry.

14        Q.    So after you learned that the approval decision

15   had been made, what did you -- what did you do, from

16   that point, to initiate getting notice to Jenna Clark?

17        A.    I believe I texted her, to see if she could

18   call me -- and I'm trying to remember exactly; and then

19   I didn't hear from her, and then I made another phone

20   call on her cell phone, for her work cell phone; I

21   called her, and I left a message for her to call me back

22   because I needed to talk to her.  And she did call me

23   back.

24        Q.    All right.  And so when she called you back,

25   what conversation did you have with Jenna?

1       A.   Well, I first started to check to see how she

2   was doing and how she was feeling; it wasn't -- it was

3   pretty brief on our conversation.  And then I told her I

4   needed to tell her something, because I didn't want her

5   to be blindsided by a letter that she was going to

6   receive in the mail --

7       Q.   Okay.

8       A.   -- that her position was going to be

9   eliminated.  And I asked her to please contact Dawn

10  Heikkila first thing on Monday, to call her.  You know,

11  I didn't know how she was doing, as far as driving and

12  everything, so I told her, "Just please call on the

13  phone and talk to her," about what her options will be.

14      Q.   So at the time you were calling and having this

15  discussion with Jenna, you were aware that a letter was

16  being sent to her; correct?

17      A.   Yes.

18      Q.   And was that the letter that I guess you looked

19  at this morning, from Dawn Heikkila?

20      A.   Yes, that Dawn sent her.

21      Q.   And then, what was Jenna Clark's response to

22  you during this phone conversation, to the extent you

23  recall?

24      A.   She was very upset and said, "What am I

25  supposed to do now?"  I remember that part; I don't

1    remember the exact words.   And she was very upset; I

2    understand why.   And I just told her that it would be

3    very important for her to contact Dawn, so Dawn could

4    give her her options and learn which jobs were available

5    and what she could do.

6        Q.   And what, if anything, did Jenna Clark say in

7    response to that recommendation?

8        A.   She just said that she would get ahold of Dawn

9    first thing on Monday.

10       Q.   Anything else discussed during that

11   conversation with Jenna Clark that you're describing?

12       A.   No.   No.

13       Q.   Now, you also testified, earlier this morning,

14   that you were responsible for approving Jenna Clark's

15   request for the use of sick days; is that right?

16       A.   That's correct.

17       Q.   And with respect to her absence from scheduled

18   work in August of 2021, do you recall Jenna Clark

19   communicating with you or seeking your approval for her

20   to use sick leave for the procedure she needed to have?

21       A.   Yes.

22       Q.   All right.   And what was your response to that

23   request?

24       A.   That she could take what she needed.

25       Q.   Okay.   And after she went out to have her

1   procedure, did she, in fact -- if you know, did she, in

2   fact, use sick leave for the period of time she was out?

3        A.   No.

4        Q.   Why not?

5        A.   Because I changed it.

6        Q.   I'm sorry?

7        A.   Because we changed it.  We put her on admin

8   leave with pay, because we didn't want her to use her

9   time.

10        Q.   Okay.  So for the period that she was out, for

11   what procedure she needed to take care of, in August of

12   2021, she was placed on administrative leave with pay;

13   is that the term?

14        A.   Yes.

15        Q.   And all that means is, she's getting her

16   continued pay as if she were working?

17        A.   Yes.

18        Q.   Without having to use any of her accrued sick

19   leave; is that right?

20        A.   Correct.

21        Q.   So then when she finally left her employment,

22   she would have all of her accrued sick leave, not

23   reduced at all for an absence in August of 2021?

24        A.   That's correct.

25             MR. STEFANY:  I think that's all I have.  Thank

Deposition of Annmarie Reno

Jenna Clark v. Carmine Marceno

1    you.   I hope I was efficient.

2        MR. MACDONALD:   We can go ahead and suspend the

3    deposition at this time.   I have no further

4    questions.

5        MR. STEFANY:   Very good.   You have the right to

6    read a deposition transcript or you can waive the

7    reading of the transcript and assume that Julie has

8    gotten all of your testimony down, just right.   But

9    she needs to know what you would prefer to do

10   before she finishes the record today.   You can read

11   it or you can waive reading; it's up to you.

12       THE WITNESS:   I would like to read it.

13       MR. STEFANY:   The witness will read.

14       And I don't know whether you're ordering or

15   not; it's your deposition, Counsel.

16       MR. MACDONALD:   We'll go ahead and hold off on

17   ordering now, just until all depositions are

18   completed.

19       (Thereupon, the deposition was terminated at

20   2:27 p.m.)

21

22

23

24

25

Deposition of Annmarie Reno                                        Jenna Clark v. Carmine Marceno

1                    CERTIFICATE OF OATH

2    STATE OF FLORIDA    )
     COUNTY OF ORANGE    )
3

4            I, Julie S. Evans, Professional Court Reporter,

     Notary Public, State of Florida, certify that ANNMARIE
5
     RENO appeared before me via Zoom on October 24, 2023,
6
     and was duly sworn.
7
             Witness my hand and official seal this 27th day
8
     of December 2023.
9

10

11

12       _Julie Evans_

13       JULIE S. EVANS
         Professional Court Reporter
         Notary Public, State of Florida
14       My Commission No. GG939756
         Expires:  1/21/2024
15

16

17

18

19

20

21

22

23

24

25

```
 1                CERTIFICATE OF REPORTER

 2   STATE OF FLORIDA    )
     COUNTY OF ORANGE    )
 3
               I, Julie S. Evans, Professional Court Reporter,
 4
     do hereby certify that I was authorized to and did
 5
     stenographically report the deposition of ANNMARIE RENO;
 6
     that a review of the transcript was requested; and that
 7
     the foregoing transcript, page number 1 through 120, is
 8
     a true and complete record of my stenographic notes.
 9

10             I further certify that I am not a relative,

11   employee, attorney, or counsel of any of the parties,

12   nor am I a relative or employee of any of the parties'

13   attorneys or counsel connected with the action, nor am I

14   financially interested in the action.

15
               Dated this 27th day of December 2023.
16

17

18                           Julie Evans
                             _____
19                           Julie S. Evans
                             Professional Court Reporter
20

21

22

23

24

25
```

Deposition of Annmarie Reno

Jenna Clark v. Carmine Marceno

```
 1                        ERRATA SHEET

 2

 3       I, ANNMARIE RENO, wish to make the following
     alterations:

 4

 5   Page           Line            Correction
         70            7              Bergquist
 6       70            20             Bergquist
 7       70            22             Bergquist
 8       71            1              Bergquist
 9       71            7              Bergquist
10       71            22             Bergquist
11       100           17             Jill Jones
12       32            2              Bergquist
13       70            23             Bergquist
14

15

16

17

18

19

20

21

22   Under penalties of perjury, I declare that I have read
     my deposition and that it is true and correct subject to
23   any changes in form or substance entered here.

24    1 | 16 | 2024          Annmarie Reno
         Date                ANNMARIE RENO
25
```

December 27, 2023


David Stefany, Esquire
Allen Norton & Blue, P.A.
dstefany@anblaw.com

RE.:   Clark v. Marceno, LCSO
       Deposition of Annmarie Reno

Dear Mr. Stefany:

Enclosed herewith is a copy of the transcript of
Ms. Reno's deposition taken in the above-referenced
matter, together with the original Errata Sheet.  Please
have Ms. Reno review the transcript within the next ten
days, note any corrections on the Errata Sheet, and then
sign it.

Once that has been accomplished, please forward the
original Errata Sheet to Mr. MacDonald.

Thankyou for your cooperation in this matter.

Sincerely,


Julie Evans
Everest Court Reporting, LLC

Deposition of Annmarie Reno

Jenna Clark v. Carmine Marceno

## WORD INDEX

**< 1 >**
**1**  103:*8, 11, 22*
113:*15, 16*  114:*4*
122:*2*
**1/21/2024**  121:*13*
**1/31/2021**  74:*17*
**1:02**  100:*3*
**10:14**  1:*9*  4:*3*
**101**  3:*3*
**11/4/2021**  78:*16, 19*
**11:16**  41:*12*
**11:26**  41:*13*
**120**  122:*2*
**121**  3:*4*
**122**  3:*5*
**123**  3:*6*  72:*2*  105:*15*
**124**  3:*7*
**15**  69:*7*  89:*1*
**19**  86:*23*  89:*10*
90:*20*
**1997**  29:*4, 10*
**1st**  103:*6*

**< 2 >**
**2:22-cv-614-SPC-**
**NPM**  1:*5*
**2:27**  1:*9*  120:*20*
**20**  89:*23*  90:*23*
103:*17, 24*  116:*6*
**2000**  28:*14*
**2000-maybe-17**  11:*5*
**2001**  28:*16*
**2003**  27:*23*  28:*17*
**2005**  27:*10, 23*
45:*9, 13*
**2007**  13:*15*  14:*5*
45:*9, 13*
**2008**  11:*16*  14:*5*
26:*6*  27:*3, 11*  45:*10*
**2012**  11:*1*  27:*2, 3*
31:*16, 19*  32:*1*
**2017**  15:*25*  26:*5, 7*
32:*7*  45:*7, 8*
**2018/2019**  51:*25*
**2019**  34:*5*  43:*25*
44:*3, 8*  45:*14*  51:*25*
53:*2, 3*  70:*19*  71:*8*
**2020**  53:*2, 3*  54:*14*

62:*16*  108:*4*
**2020/2021**  54:*13*
**2021**  18:*5*  22:*16*
35:*1*  41:*21*  42:*7*
43:*23*  44:*2, 8*  45:*14,*
*19, 22*  46:*11, 16, 25*
47:*14, 17*  49:*19*
53:*15*  54:*12, 14*
58:*18*  59:*2*  63:*22*
64:*1, 7, 10, 21, 24*
65:*9*  69:*8*  72:*16, 19*
75:*2*  80:*21*  81:*21*
86:*23*  89:*1, 10, 23*
90:*20*  100:*9, 13*
102:*24*  103:*1, 8, 11,*
*17*  105:*9*  106:*9, 21*
107:*11*  108:*4*  112:*24*
113:*13, 15, 16*  114:*14*
116:*6*  118:*18*  119:*12,*
*23*
**2022**  18:*7*  22:*17*
64:*11*  102:*12*  103:*12,*
*23*  113:*2*  114:*15, 17*
**20221**  103:*22*
**2023**  1:*9*  4:*3*  18:*14*
102:*8, 10*  104:*12*
121:*2*  122:*14*  124:*1*
**2024**  104:*13, 14*
**2027**  19:*25*
**20th**  89:*19*
**21**  19:*25*
**22**  102:*3*  103:*20*
113:*15*
**225**  2:*7*
**23**  102:*5*
**24**  1:*9*  4:*3*  104:*12*
106:*21*  121:*2*
**27**  124:*1*
**27th**  121:*2*  122:*14*
**28**  107:*11, 15*

**< 3 >**
**3**  41:*21*
**30**  19:*11*  103:*12, 23*
114:*4*
**31**  18:*14*  75:*1*  106:*9*
**324**  2:*7*
**33131**  2:*4*
**33606-4128**  2:*8*

**33905**  8:*18*

**< 4 >**
**4**  3:*2*  72:*1*  105:*10*
106:*6*
**40**  83:*5, 24*
**4350**  68:*19*
**46**  82:*25*
**48**  82:*25*

**< 5 >**
**5**  68:*19*
**51**  82:*25*
**520**  2:*3*
**565**  86:*3*
**566**  86:*3*
**58**  82:*25*
**59**  82:*25*

**< 6 >**
**62**  19:*11*
**66**  82:*25*

**< 7 >**
**7**  97:*24*  98:*4*

**< 8 >**
**8**  86:*2*
**8/15/21**  68:*16*
**8/19/21**  86:*1*

**< 9 >**
**9/4/2021**  76:*20*
**9502**  8:*17*
**97**  29:*4*

**< A >**
**a.m**  1:*9*  4:*3*
**ABA**  12:*21*
**ability**  55:*15*
**able**  22:*6*  43:*1*  88:*7*
**above-referenced**
124:*1*
**absence**  94:*14*
118:*17*  119:*23*
**absenteeism**  51:*4*
**absolutely**  29:*22*
**absorb**  17:*25*  67:*8*
**absorbed**  57:*6*

**accepted**  52:*19*
73:*25*  74:*4*
**accommodate**  49:*4*
88:*7*
**accomplished**  124:*1*
**account**  18:*24*
**Accreditation**  16:*6*
**accrued**  119:*18, 22*
**accumulate**  19:*17*
**accurate**  24:*5, 6*
78:*16*
**accurately**  6:*7*
**action**  122:*13, 14*
**actual**  8:*3*  30:*17*
81:*1*  108:*5*
**ADA**  14:*13*
**adapt**  112:*12*
**add**  44:*12*  51:*3*
**added**  18:*1*  20:*2, 5,*
*7*  34:*13*
**address**  8:*14, 15, 19,*
*22*
**adjust**  114:*10*
**adjustments**  114:*9*
**admin**  71:*17*  119:*7*
**administration**  10:*22*
11:*3*  49:*13*  110:*10,*
*12, 22*  111:*12*
**administrative**  119:*12*
**administrator**  67:*23*
**advocate**  54:*3*
**Advocates**  16:*6*
**Affairs**  25:*11*  29:*1*
**affirm**  4:*14*
**age**  19:*9*  82:*21*  83:*5,*
*8, 12, 15, 20*  84:*3, 11*
**agency**  18:*2*  42:*16*
44:*5*  52:*18*  53:*19*
59:*24*  84:*23*  85:*4*
109:*4, 14*  112:*16*
**agent**  38:*16, 19*
40:*13, 14*  99:*6*
**ages**  82:*24*  84:*5*
**ago**  5:*8*  10:*3*  15:*1*
23:*14*  24:*3*  59:*21*
75:*3*  91:*15*  95:*1, 11,*
*20*  98:*9, 10, 21*  104:*7,*
*8, 11*
**agree**  23:*24*  87:*13*
**agreed**  3:*12*

Deposition of Annmarie Reno

Jenna Clark v. Carmine Marceno

**ahead** 6:21 41:11
55:17 63:17 64:17
100:2 120:2, 16
**ahold** 118:8
**Alarm** 27:24
**alarms** 28:5
**align** 53:11
**Allen** 2:6 4:11 124:1
**allocated** 17:14
26:24 27:1
**allocating** 17:4
**allow** 19:8
**allowed** 18:19
**alterations** 123:3
**amount** 49:15 55:9
61:9 63:11 99:14
100:12
**amounts** 81:5
**Amy** 82:14
**analyses** 115:9
**analysis** 114:25
115:7, 15, 24
**analyst** 28:11, 12, 19,
24 30:3
**analyzing** 115:13
**ANNMARIE** 1:9 3:2
4:4, 19 5:4 121:2
122:2 123:1, 24
124:1
**answer** 32:22 67:4
83:19, 25 84:1, 9
87:15
**answered** 29:15
67:10 74:23 112:22
**answers** 106:12
**Anthony** 79:13 82:15
**anticipated** 18:13
21:18, 25
**Anticipation** 18:10
21:20
**anybody** 98:16
**anymore** 59:22
**anyways** 52:17
**appear** 84:7
**appearance** 4:7
**APPEARANCES** 2:1
**appeared** 1:9 121:2
**appears** 69:7 74:10,
16 75:21 76:20 79:3
**applied** 52:17, 18

**approval** 90:3 92:4
93:18 103:16, 24
115:17, 18, 23 116:14
118:19
**approved** 17:15
89:17, 18, 23 90:25
91:6, 11, 20, 23 113:2,
4 114:14
**approving** 94:13, 17
118:14
**approximately** 4:3
**area** 78:11
**areas** 16:14, 20
**arrested** 8:24
**asked** 18:19 31:24
33:6 35:4, 6, 15
38:24 39:13 108:3
109:11 112:20
114:22, 24 117:9
**asking** 21:5 64:16, 19
**aspects** 22:7 27:17
**assessment** 42:25
43:9
**assessments** 43:3
49:6
**assets** 72:25 73:6
**assign** 29:14
**assist** 17:4
**assistant** 38:15, 16,
19 39:19, 20, 21
40:24 41:1 64:8, 9
71:18
**assistants** 37:20 55:1
**assisting** 13:22
**Association** 12:18, 20
**assume** 120:7
**assuming** 55:3
**attend** 10:9, 11
**attorney** 7:12, 13 8:2
122:11
**attorneys** 122:13
**August** 34:24, 25
41:20 69:7 86:23
88:25 89:10, 20, 21,
23 90:20, 23 102:1
103:17, 24 116:6
118:18 119:11, 23
**authorized** 73:4, 5
122:2

**automate** 108:12
**automated** 50:8
**available** 118:4
**Avenue** 2:7
**aviation** 40:16
**awarded** 11:10, 12
**aware** 60:1, 3 89:7,
10 94:4 96:12, 15
97:16, 17 99:19
117:15

**< B >**
**back** 12:23 28:14
29:12 31:11 34:4
41:13, 16 45:1, 11
46:12 51:3 53:13
54:3 55:10 56:13, 23
58:11 60:10 62:16
71:4 88:13 91:15
98:1, 24 99:1 100:6,
16 101:1, 9 102:23
105:2 108:2 116:21,
23, 24
**back-fill** 66:19 79:8
**background** 57:20
**backwards** 28:16
**ballistic** 38:21
**Bartz** 74:11, 13 75:9
106:6, 15
**based** 26:11 95:6
104:11
**basis** 24:7
**Bates** 68:19 72:2
86:2 105:15
**bathroom** 6:20
**Bauer** 51:2, 8 108:17
**B-A-U-E-R** 51:9, 10
108:17
**B-E-A** 51:8
**began** 23:10 68:16
86:1 105:14
**beginning** 4:7 22:17
103:11
**BEHALF** 1:9 2:5, 9
4:9, 12
**belief** 90:4
**beliefs** 33:25
**believe** 8:12 9:13, 24
14:21 23:7 31:16
37:24 45:20, 22 54:9

56:16 61:10 66:12
70:7, 14, 25 71:5, 22
78:5, 17 90:6 91:4
93:14, 15, 17 95:20
98:9 106:6 116:17
**believed** 58:5
**benefit** 18:21 62:6
114:25
**benefits** 14:13 19:1
27:16 42:19, 20
61:10, 22 62:2, 11
65:15, 17 75:5 85:21
95:3, 6 98:13 99:17
**Berkowitz** 32:2 70:7,
20, 22 71:1, 7, 22
**best** 6:13 23:18
30:20 65:7 82:10
84:22
**better** 21:11 23:20
50:2 102:14 110:1
115:13
**betterment** 18:2
**bias** 84:17, 20
**Bill** 32:2 70:7, 20, 22,
23 71:1, 7, 22 100:17
**bills** 111:9
**bit** 12:4 32:14 37:3,
4, 8 100:23 112:11
**blindsided** 117:5
**Blue** 2:6 4:12 124:1
**board** 111:10, 14
**brand** 49:11 57:17
**break** 6:19, 22 41:12
100:24
**Brenda** 37:5 40:5,
14, 17 96:21, 24 97:2
**Brenda's** 40:7, 11
**Brickell** 2:3
**brief** 41:15 60:9
100:5 101:8 117:3
**bring** 105:10, 13
**bringing** 63:7 111:10
**brought** 9:19 17:24
49:11 50:2, 7 63:9
111:14 112:11
**budget** 17:3, 9, 10, 12
21:10 26:6, 7, 8, 10,
17 27:7 28:11, 12, 18,
20, 24 29:5, 24 30:1,
3 31:24 32:1 44:20,

Deposition of Annmarie Reno                                    Jenna Clark v. Carmine Marceno

21  55:19, 20, 22
  56:19  100:17  101:22
  102:9, 13, 15, 20
  103:1, 19  113:2, 14,
  18  114:1, 6, 8, 11, 13
  115:9, 15, 18, 25
**budgetary**  42:11
  48:3  100:16
**budgeting**  17:8
  101:22  102:17
  112:20, 21
**budgets**  17:4
**bulk**  81:4
**bureau**  16:3  20:7, 8,
  9, 12, 13, 14, 19, 23
  21:7, 16, 18  23:10, 20
  26:1  49:25  50:4
  101:18  108:5
**bureaus**  29:1
**burglar**  28:5
**Burkwitz's**  70:23
**Business**  11:3  44:6
  59:9  84:23

< C >
**CAD**  110:11
**Caiazza**  9:24  10:6
**C-A-I-A-Z-Z-A**  10:7
**calculates**  17:13
  19:13
**calendar**  7:21
  102:24, 25  112:24
  113:1, 9  114:4
**call**  29:15  103:20
  116:18, 20, 21, 22
  117:10, 12
**called**  27:24  52:8, 9
  57:24, 25  110:2
  111:2, 5  116:21, 24
**calling**  117:14
**candidate**  57:17
**capacity**  1:7  4:25
**capital**  72:25  73:6
**capitol**  26:11
**Captain**  68:8, 9, 10,
  11  77:23, 24, 25  78:2,
  8, 9, 11
**care**  26:10  119:11
**CARMINE**  1:5  4:5,

12, 25
**cars**  29:13
**CASE**  1:5  5:11, 12
  8:3  24:12  25:25
  51:4
**Casell**  38:9
**cases**  29:16
**Cassella**  38:9
**causing**  86:15
**cell**  116:20
**Central**  10:16, 19
  11:2
**certain**  42:14  55:15
  82:18  85:1
**CERTIFICATE**  3:4,
  5  121:1  122:1
**certification**  11:10,
  15  98:5
**certifications**  11:7, 17
**Certified**  11:9, 17
  38:20  48:9
**certify**  121:2  122:2,
  10
**chance**  105:23
**change**  20:3  22:5
  23:9, 12, 15  24:4
  25:17  37:5, 8  52:24
  79:3  104:24  112:12
**changed**  17:17, 20
  18:17  22:4  102:8
  104:14, 15  119:5, 7
**changeover**  37:3
**changes**  18:3, 8
  21:20, 24  22:13
  26:25  38:15  68:5
  113:12, 14  123:23
**changing**  88:8
**charge**  20:18
**chart**  23:8
**check**  107:23  117:1
**checks**  111:9
**chief**  20:13, 15, 19
  21:14, 15, 17  23:8, 10,
  20  24:5, 7  26:1, 3
  101:16
**child**  99:1
**choose**  60:23  87:24
  111:23
**chose**  110:23

**Christine**  37:6  40:20,
  25  41:5
**Christine's**  40:22
**Circle**  8:17
**citizens**  45:3  49:2
  84:25
**civil**  9:2
**civilian**  19:10, 19
**civilians**  38:21
**claims**  48:20
**clarified**  112:19
**clarify**  52:3  73:1
**CLARK**  1:1  4:5, 10,
  24  29:20  30:7, 10
  31:14, 22  32:4, 8
  33:13, 17, 23  34:7, 17
  36:2, 11, 21  37:1
  38:13  39:4, 7, 18
  40:1, 12, 23  41:6, 8,
  18, 22  57:10  58:6, 22
  60:6, 18  68:17, 23
  69:10  73:22  74:14
  76:14  81:25  82:4, 8,
  12, 13, 19  85:7  87:5,
  21  88:21  90:1, 21
  92:8, 12, 15, 17, 24
  93:5, 11, 20, 25  94:7,
  17, 20  95:2, 5, 9, 22
  97:14, 15  98:6, 13
  99:14  111:19  116:16
  118:6, 11, 18  124:1
**Clark's**  30:4, 13
  31:6, 8, 18  32:12, 17,
  20  33:2  34:13  36:8
  42:2  54:17  55:3
  57:2, 9, 14  61:9, 19
  63:1  65:10  85:9
  89:7, 11, 22  90:10, 25
  91:6, 18, 22  94:5, 10,
  13  99:21  115:21
  116:5  117:21  118:14
**classes**  12:4, 11, 14
**clear**  35:5
**clearly**  6:5, 25  87:5
**clerk**  29:9, 11, 12
  108:17  109:2, 22
**clerks**  43:18  59:19
**client**  29:20
**closely**  31:1  102:16

**closer**  22:17  82:23
**Club**  8:17
**college**  10:9, 11, 12,
  18, 19  11:22, 23
**column**  107:19
**come**  12:16  21:24
  22:5  25:3, 5, 12
  41:13  101:1  108:11
  115:10
**coming**  37:22  48:17
  86:15  88:7
**command**  46:6, 17
**Comment**  79:2  106:7
**commission**  102:20
  103:3, 8  112:22
  113:1, 17  121:13
**committee**  25:4, 6
**communicated**  116:4
**communicating**
  118:19
**Communications**
  20:6  21:12  45:24, 25
  66:9, 10, 16, 18  67:1,
  17, 23  68:7, 10, 12
  79:10, 17, 21, 24
  80:10, 20  81:10, 18
  82:6
**community**  70:14
  76:23  77:2
**Comp**  12:21  19:17
  48:20  114:7
**company**  13:5
**complained**  34:1
**complete**  122:2
**completed**  120:18
**completely**  45:20
**comprehending**  93:3
**computerized**  16:24,
  25
**condition**  97:5, 9
  98:10  99:21, 24
**conditions**  95:10, 22
  96:11, 16, 19, 25
  97:16
**conduct**  36:8
**conducted**  13:19
  42:6, 9  43:4, 9, 23
  44:1, 3  45:14  64:1
  80:21  100:9

Deposition of Annmarie Reno                                          Jenna Clark v. Carmine Marceno

conducting 5:*24* 7:*2*
conference 7:*3*
conferences 12:*17*
confident 107:*17*
confirm 108:*16*
confusing 6:*15*
conjunction 56:*3*
connected 101:*4*
122:*13*
connection 57:*19*
consecutively 11:*6*
consider 45:*12*
57:*12* 59:*13* 62:*3*
63:*13* 80:*19*
consideration 58:*17*
83:*8* 84:*19*
considered 58:*14*
59:*7, 10* 61:*24* 67:*13,
17, 21* 85:*18, 21*
considering 61:*14*
consolidate 61:*7*
constituents 45:*2*
contact 117:*9* 118:*3*
content 105:*17*
continuation 43:*25*
44:*4, 8*
continue 19:*18*
continued 44:*10*
119:*16*
continuously 44:*14*
contracts 55:*13*
control 20:*12*
conversation 35:*8*
47:*13, 19, 22* 48:*4*
116:*25* 117:*3, 22*
118:*11*
conversations 46:*23,
24* 47:*2, 5, 16*
convert 30:*17* 55:*10*
cooperation 124:*1*
coordinating 73:*18*
coordinator 52:*19*
66:*9* 67:*1, 13, 25*
68:*3* 72:*25* 74:*7, 17*
75:*1, 6* 81:*23* 106:*7*
copy 124:*1*
core 39:*1* 43:*2* 45:*1,
16* 46:*14*
correct 10:*20* 15:*22*
16:*11, 12* 18:*11* 20:*3,*

*4, 24, 25* 29:*18* 38:*2*
40:*5* 46:*5* 51:*21*
53:*5* 54:*9, 12* 55:*3*
57:*7, 8* 58:*15* 59:*6*
61:*17* 65:*5, 12* 66:*3*
69:*5* 71:*11* 74:*12, 19*
75:*14* 76:*2, 3, 11, 15,*
*17, 18, 22* 78:*1* 79:*11,*
*12, 25* 83:*2, 7* 85:*18,*
*19* 86:*21, 24* 90:*11,*
*21, 22* 93:*8* 96:*10*
97:*6* 101:*18, 19*
103:*13, 17, 18, 25*
104:*1, 2, 17* 105:*1, 8*
106:*11* 107:*15*
108:*19* 109:*4, 5, 7, 9*
117:*16* 118:*16*
119:*20, 24* 123:*22*
Correction 123:*3*
corrections 124:*1*
correctly 24:*2* 80:*9*
106:*8* 107:*11*
cost 48:*8*
costs 42:*18, 20* 48:*12*
counsel 3:*14* 4:*6, 8*
7:*6* 9:*9* 74:*21*
120:*15* 122:*11, 13*
counseling 34:*12*
counsel's 116:*9*
Country 1:*8*
County 4:*6* 5:*1, 13*
7:*3, 16* 12:*3, 7, 9*
13:*17* 14:*1, 15* 15:*15,*
*21* 16:*10* 22:*25* 23:*4*
26:*4* 27:*6, 21* 28:*4, 9,*
*13, 23* 29:*7, 18* 30:*8,*
*11* 41:*19, 22* 42:*6*
44:*24* 66:*24* 73:*14*
74:*4* 75:*10* 78:*12*
84:*25* 85:*11* 89:*12*
92:*5* 94:*14* 102:*20*
103:*3, 8, 24* 112:*22*
113:*1, 17, 23* 121:*2*
122:*2*
couple 14:*25* 18:*15*
26:*12, 23* 28:*25*
45:*23* 46:*3* 91:*14*
92:*10* 95:*1, 11, 19*
98:*8, 9* 105:*20* 106:*4*

course 21:*6* 48:*17*
102:*19, 25* 112:*25*
113:*13*
courses 11:*23*
COURT 1:*1, 24* 4:*2,*
*13* 6:*1, 3, 7* 41:*14, 16*
58:*1* 100:*4, 6* 101:*7,*
*9* 121:*2, 12* 122:*2, 19*
124:*1*
covered 14:*6* 15:*6*
Covid 48:*18*
creates 17:*10*
criteria 19:*9* 22:*4*
CROSS 3:*3* 37:*6*
40:*20*
CROSS-
EXAMINATION
101:*13*
current 8:*14* 9:*21*
16:*4* 17:*16* 21:*14*
currently 15:*18* 21:*4*
cut 64:*17* 79:*4, 9*
111:*9*

< D >
daily 17:*2* 24:*11, 16*
47:*10*
Daisy 37:*4* 38:*2, 4, 5,*
*18* 39:*3, 25*
Daisy's 38:*6, 12*
Danielle 98:*16, 23, 24*
99:*2, 4, 7*
DATE 1:*9* 19:*23*
20:*1* 23:*14* 34:*4*
41:*20* 71:*13* 76:*19*
78:*15* 81:*20* 89:*2, 3*
90:*4, 6* 103:*4* 105:*6*
106:*9, 21* 107:*11, 14,*
*19, 22* 109:*23* 113:*7*
123:*24*
dated 69:*7* 86:*23*
88:*25* 122:*14*
dates 28:*14, 16*
94:*18* 107:*20*
DAVID 2:*6* 4:*11*
124:*1*
Dawn 8:*6* 14:*11*
68:*16, 23* 69:*5* 71:*4*
88:*22* 89:*25* 93:*22,*

*23* 97:*20* 98:*3* 117:*9,*
*19, 20* 118:*3, 8*
day 50:*17* 90:*10, 16,*
*23* 93:*9* 94:*20* 121:*2*
122:*14*
days 29:*12* 89:*3*
90:*2* 92:*10, 11, 12, 15*
94:*18* 97:*24, 25* 98:*5*
118:*15* 124:*1*
deal 30:*20*
Dear 124:*1*
December 121:*2*
122:*14* 124:*1*
decided 59:*11*
102:*10, 13*
deciding 58:*8*
decision 24:*25* 25:*1*
42:*21* 49:*22* 56:*3, 6*
59:*9* 61:*8, 11, 13, 19*
65:*13* 78:*7* 83:*16*
85:*10, 14* 89:*18*
99:*15, 18, 22, 25*
101:*24* 104:*3, 5, 9, 11,*
*15* 111:*19, 20, 24*
112:*5* 116:*14*
decision-making 60:*4*
decisions 24:*24* 25:*2,*
*17, 20, 23* 76:*7*
115:*14*
declare 123:*22*
deemed 49:*23* 77:*22*
Defendant 1:*9* 2:*9*
Defendant's 72:*2*
deferred 19:*17*
defied 87:*5*
degree 10:*21* 11:*2*
Delaquilla 82:*14*
Department 36:*25*
43:*6* 96:*15* 97:*5, 13,*
*15* 98:*12* 99:*5, 8, 11*
108:*10* 111:*16*
112:*16*
depended 43:*14*
depends 25:*7*
Deponto 99:*3*
D-E-P-O-N-T-O 99:*3*
deposed 5:*5, 7, 10, 15*
DEPOSITION 1:*9*
4:*4* 5:*24* 7:*2, 11, 14,*
*17, 19, 23* 9:*8, 12*

Deposition of Annmarie Reno                                                    Jenna Clark v. Carmine Marceno

120:*3, 6, 15, 19*  122:*2*
123:*22*  124:*1*
**depositions**  120:*17*
**deputies**  49:*1*  110:*11*
**Derek**  2:*2*
**describe**  31:*8*  32:*9*
**described**  34:*17*
36:*2*  45:*13*  52:*25*
54:*21*
**describing**  118:*11*
**description**  108:*13*
**destroyed**  35:*24*
**detectives**  29:*16*
**determination**  41:*25*
56:*1*  66:*25*  83:*9*
**determine**  50:*4*
**determined**  19:*24*
49:*6, 18*
**determining**  67:*12,*
*16, 20*  68:*12*  85:*21*
**different**  16:*20*  17:*5,*
*25*  23:*7*  29:*1, 5*  52:*9,*
*16, 20*  56:*13*  63:*20*
66:*19*  111:*22*  114:*3*
**differently**  97:*23*
**difficulties**  60:*10*
**diploma**  10:*15*
**DIRECT**  3:*2*  4:*21*
87:*8*  114:*23*
**directed**  111:*15*
**direction**  23:*19*
**directive**  87:*6, 18*
88:*3*
**directly**  16:*20*  24:*3*
41:*9*  46:*19*
**director**  15:*20*  16:*2*
17:*9, 12, 13, 17, 18*
23:*3*  24:*23*  25:*18*
26:*6, 7, 9, 18*  27:*7*
30:*2, 9, 11, 14*  31:*2, 6,*
*9, 15, 17, 22, 24*  32:*1,*
*3, 4, 6, 9*  36:*13*  37:*2*
38:*13*  39:*4, 7, 18*
40:*2, 12, 23*  41:*6, 9*
44:*20, 21*  50:*11*
54:*25*  55:*2, 6, 20, 25*
56:*7, 10, 15, 20, 21, 24*
57:*5*  58:*12*  65:*1*
70:*13, 25*  71:*15, 16*
76:*11, 17, 20*  77:*4, 8,*

*15, 21*  78:*18*  79:*7*
80:*10*  82:*2*  87:*5*
100:*17*  101:*17*
103:*16*  114:*16*  116:*6*
**directors**  16:*15, 19*
56:*18*
**director's**  46:*1*  78:*10*
**disciplinary**  85:*6, 9,*
*13*  87:*25*
**discipline**  33:*17, 20,*
*21, 23*  34:*7, 14*  87:*21*
**discrimination**  14:*15,*
*19, 21, 24*  15:*8, 10, 15*
**discriminatory**  84:*7*
**discuss**  21:*20, 23*
22:*9, 13*  24:*16, 18*
32:*16*  33:*7, 10*  35:*13*
46:*15*  56:*9*  58:*21*
62:*10*  65:*17, 20, 25*
66:*15*  69:*20, 23*
74:*25*  78:*18, 21*
83:*11*  84:*16*  92:*3*
93:*4, 10, 20*  100:*12*
**discussed**  36:*5*  57:*2*
65:*5*  71:*21*  76:*14*
80:*11*  82:*7*  84:*14*
85:*6*  90:*13, 17, 20*
95:*23*  118:*10*
**discussing**  47:*23, 25*
75:*7*
**discussion**  35:*2*
44:*10*  46:*13*  79:*20*
90:*24*  115:*10*  117:*15*
**discussions**  22:*18*
44:*22*  46:*4, 9*  48:*22*
55:*24*  62:*13*  75:*18*
76:*16*  77:*1, 7, 12, 14,*
*18*  79:*16*  89:*15*
93:*24*
**DISTRICT**  1:*1*  29:*9,*
*12*  43:*16, 17*
**division**  17:*10*  20:*6*
30:*15*  31:*25*
**divisions**  16:*8, 9, 16,*
*23*  17:*5, 11, 21*  18:*1*
20:*2, 5, 10, 21, 22*
21:*1, 6*  22:*7*  29:*6*
**document**  68:*15, 20,*
*21, 22*  69:*1, 4*  72:*3, 5,*
*6, 11, 14*  74:*15*  75:*21*

80:*2*  82:*11, 22*  83:*5*
86:*4, 8, 22*  87:*1*
105:*18, 19, 21*
**documentation**  35:*11*
**documented**  35:*4*
**documents**  7:*8, 22, 25*
8:*3*  9:*18*
**dog**  40:*16*
**doing**  28:*21*  37:*24,*
*25*  43:*8, 19, 20*  45:*2,*
*4*  49:*1, 14*  50:*1, 11*
53:*8, 9, 12*  66:*22*
67:*8*  73:*18*  81:*1, 7*
84:*4, 12, 24*  110:*13*
112:*7*  117:*2, 11*
**dollar**  55:*9, 15*  81:*5*
**Doreen**  51:*14, 15*
52:*11*  65:*5, 10*  73:*12,*
*14, 21*  108:*21*  109:*12*
**Doreen's**  51:*14, 16,*
*19*  52:*3, 6*  54:*20*
65:*14, 18, 21*
**Dr**  2:*3*
**driving**  117:*11*
**DROP**  18:*18, 22, 24*
19:*3, 5, 7, 12, 13*
101:*25*  104:*6, 16, 21*
105:*3, 7*  106:*16, 22*
107:*6, 17, 21*

dstefany@anblaw.com
124:*1*
**due**  21:*18*  25:*12*
42:*9*  51:*20*  53:*17*
60:*9*
**duly**  4:*20*  121:*2*
**duplicated**  110:*17, 18*
**duplicating**  111:*1*
**duties**  25:*18*  37:*18*
38:*18*  57:*6*

< E >
**earlier**  43:*25*  78:*24*
79:*1*  103:*15*  104:*10*
108:*16*  111:*25*
112:*20*  114:*22*  116:*4*
118:*13*
**earn**  10:*21*  11:*2*
**earned**  11:*14*

**ears**  96:*4, 8*
**effect**  5:*25*
**efficiencies**  115:*14*
**efficiency**  111:*15*
**efficient**  101:*6, 11, 12*
120:*1*
**effort**  102:*19*
**eight**  104:*25*
**either**  38:*16*  69:*16*
84:*15*  97:*9*  115:*19,*
*20*
**elect**  18:*16*  19:*13*
20:*1*
**elected**  18:*15*  71:*21*
105:*6*
**election**  104:*22*  105:*3*
**eliminate**  46:*5, 9*
52:*5*  53:*7*  55:*24*
58:*9*  61:*8, 11*  65:*13*
76:*7, 17*  79:*17*  80:*8*
85:*10, 14*  99:*15, 18,*
*22, 25*
**eliminated**  41:*24*
42:*2, 13, 22*  43:*1, 11,*
*12*  45:*18, 25*  46:*1*
47:*17*  50:*14, 20*  51:*1,*
*12, 20, 22*  52:*4, 7, 12,*
*19*  53:*10, 11, 16, 23,*
*25*  54:*7, 11, 16, 24*
55:*1, 5*  56:*7*  57:*2*
59:*11, 19, 21*  60:*2, 8,*
*19*  61:*2, 24*  62:*18, 21*
63:*1, 22, 25*  64:*12, 20,*
*24*  65:*24*  69:*11*  70:*2,*
*18, 24*  72:*15*  73:*9*
74:*1, 2*  75:*23, 24*
78:*10, 13*  80:*12*
81:*18*  83:*4, 9, 13, 17,*
*23*  84:*6, 15, 17, 21*
85:*22*  89:*8, 11, 16, 23*
90:*2, 11, 25*  91:*7, 19,*
*23*  92:*4, 9, 19*  93:*6,*
*22*  94:*2*  106:*10*
107:*5*  108:*4, 9, 21*
109:*3, 23*  116:*1*
117:*9*
**eliminated-slash-pay**
79:*4*
**eliminated-slash-**
**retired**  74:*18*

**eliminating** 8:2
48:23 57:13 61:15,
18 65:21 84:20
**elimination** 8:10
43:15 45:11 46:15,
25 47:13, 21 48:1
56:9 57:10 72:10
74:25 75:7, 19 76:19
77:2, 8 78:18 80:19
93:1 103:16 115:1,
17, 18 116:5
**eliminations** 53:5
62:15 65:25
**email** 8:1, 4, 8, 9
86:1, 17 87:22 88:10
89:4, 6 90:9, 13, 17
**employed** 109:12, 16,
24
**employee** 9:21, 22
33:25 38:4 39:9
40:4, 19 41:8 42:14
57:15 82:17 88:12,
16 93:4 109:3
122:11, 12
**employees** 19:19
24:24 25:1 27:19
30:25 42:18 50:22
54:6 59:4, 8, 10 60:2
61:23 62:7 65:8
71:20 80:6 82:11, 21
83:3, 12, 23 84:6
85:2, 13, 17, 20 95:6
96:14, 18 97:13
98:11 99:18, 24
**employee's** 9:23
58:25 59:14
**employment** 62:8
119:21
**Enclosed** 124:1
**ended** 85:5 92:7
111:10
**enforcement** 11:9, 18
**enter** 104:5 105:3, 6
**entered** 106:16, 22
107:5, 16 123:23
**entire** 20:19 22:25
26:17, 19 31:19
**entity** 84:24
**equilibrium** 96:2, 3, 7

**equipment** 26:11
29:14
**ERRATA** 3:6 123:1
124:1
**especially** 12:11
22:8 49:16
**ESQUIRE** 2:2, 6
124:1
**essentially** 108:12
**Estep** 76:4 106:19,
22
**Ethics** 12:21
**evals** 30:24 37:24
**evaluating** 31:5
**evaluations** 36:9, 12,
15, 16
**Evans** 1:9 121:2, 11
122:2, 18 124:1
**events** 91:2
**eventually** 51:3
**Everest** 124:1
**everybody** 50:16
**exact** 23:13 34:4
61:3 103:4 113:7
118:1
**exactly** 5:9 18:4
44:18 46:22 50:1
78:3, 25 101:23
102:7 116:18
**Examination** 1:9 3:1
4:21 114:23
**example** 106:19
107:16 112:7
**exception** 20:20
**excluded** 114:15
**Excuse** 107:4, 14
**executive** 15:19 16:1
17:17, 18 21:15 23:3
24:23 25:18 32:3, 6
71:15, 16, 17 101:17
**Exhibit** 68:19 71:25
72:1 85:25 86:2
105:10 106:6
**EXHIBITS** 3:7
**expanded** 104:24
**expect** 91:13
**expenses** 44:12
**experience** 95:7
**Expires** 121:13

**explain** 19:5 113:21
**explanation** 104:21
**expressly** 3:15
**extended** 100:24
**extension** 18:19
**extent** 9:16 117:22
**extra** 18:19 52:22

**< F >**
**facilitate** 14:7
**Facilities** 16:7 31:2
**fact** 58:10 92:21, 24
93:5, 20 119:1, 2
**factor** 42:20 61:19
**factors** 59:7
**fair** 58:25 108:13
**fall** 56:19
**False** 27:24 28:4
**familiar** 66:12, 13
**far** 35:24 54:3
97:16, 17, 18 117:11
**FDLE** 14:10
**February** 107:11, 15
**feel** 38:7
**feeling** 117:2
**fell** 31:25 56:14
**felt** 88:4, 8
**figure** 49:3 114:1, 11
**file** 34:9, 14 35:11
68:25 70:17 107:23,
24
**fill** 51:3, 15
**filled** 74:10 75:15
76:4, 14 79:13 83:23
**filling** 67:7
**final** 49:22 56:6
115:16
**finally** 119:21
**Finance** 16:5 47:11
50:17, 18 53:22
56:15, 16, 20, 21, 24
58:11 91:16 110:19,
24 111:8
**financial** 16:17
**financially** 122:14
**financials** 16:22
22:8 24:17, 18 47:19
49:4, 13 57:19
**find** 30:20

**fine** 74:23
**finish** 6:9, 10 107:4
**finishes** 120:10
**fire** 24:24 25:1
**firing** 25:3
**first** 4:20 21:2
29:17, 20 31:21 32:5
43:22 44:16 46:8, 15
54:19 56:9 60:5
61:6 70:9 74:6
85:23 103:15 115:7
117:1, 10 118:9
**first-line** 59:19
**fiscal** 51:5 52:8, 9,
12 103:2, 11, 19
113:14 114:14, 17
**five** 10:3 50:9 90:2
104:7, 11, 24 105:6
**fleet** 77:5, 8, 13, 15,
21 78:3, 6, 19 79:3, 7,
9 82:2
**FLORIDA** 1:1, 8
2:4, 8 8:17 12:17, 20
18:17 19:8, 20 103:5
114:2 121:2, 12
122:2
**Florin** 98:1
**fluid** 96:4
**FMLA** 97:21, 23, 25
98:5, 6, 13, 15, 19, 25
**focus** 102:3 112:24
**following** 37:21
123:1
**follows** 4:20
**follow-up** 101:12
**food** 40:16
**force** 5:25 42:5, 12
43:23, 24 44:1, 2, 7,
17, 22 45:12, 19
49:19 50:23 51:13,
21 52:4, 7, 13, 15
53:15, 17 54:5, 12
58:18 59:1 61:25
62:19, 21, 23 63:5, 8,
19, 22 64:1, 7, 10, 14,
20, 24 65:9, 24 70:2
72:16, 19 80:13, 15,
21 81:2, 4 88:21
100:9, 13

Deposition of Annmarie Reno

Jenna Clark v. Carmine Marceno

foregoing  122:2
Forgive  21:1
form  32:21  34:7
  67:3  83:18  84:8
  87:14  123:23
formerly  20:18
Fort  8:17
forward  61:15  124:1
four  33:15  50:9
  54:11, 16  89:3
fresh  87:2
Friday  7:12  69:3
front  6:1  7:8  41:2
  100:10
frozen  19:4
FRS  22:4  48:14, 15
  51:15  52:19  60:24
  73:18  74:3  107:24
  109:7
FSA  12:17
full  5:2
function  39:2
funding  114:16
furniture  31:1, 2
  55:13
further  120:3  122:10

< G >
gain  112:6
general  37:14  47:18
generally  15:11
generated  17:2
gesture  6:4
getting  22:17  116:16
  119:15
GG939756  121:13
give  68:19  72:2
  86:3  100:24  114:11
  118:4
given  13:25  23:19
  55:10  80:25  88:3
glass  6:20
go  5:16  6:20, 21
  12:23  18:23  19:8, 11,
  13, 25  25:13  41:11
  44:25  51:15  52:16
  55:13, 17  56:13
  60:23  63:17  64:17
  88:13  95:12  97:25
  100:2, 3  102:23

105:2  106:18, 25
  108:2  110:20  111:19
  113:22  120:2, 16
goal  48:21, 24
goals  49:4
God  4:16
going  5:16  13:10
  18:14  22:1, 3, 6
  28:14, 15  30:23
  35:20, 24  37:22
  47:11  48:3, 14, 17
  54:19  59:16  61:1
  68:15  74:20  81:6
  82:24  83:12, 13, 17
  85:25  87:1  89:7, 11
  90:2, 11  91:18  92:19
  93:19  98:4  101:3
  104:23  106:25
  113:13  114:1, 9, 11
  117:5, 8
Good  4:23  19:6
  32:11  56:21  120:5
gotten  22:17
government  84:24
graduate  10:23  11:4
Group  2:2
growth  95:15, 21
  96:9
guess  8:12  10:25
  43:14  80:17  88:2
  91:10  93:3  110:5
  112:3  117:18
guessing  11:1  100:25
guesstimating  22:15
  26:23
Gwen  37:4  39:10, 21
  40:1  98:14, 15, 19
Gwen's  39:12, 17

< H >
hand  4:14  121:2
handle  66:18
handled  38:20  40:15
  66:23  97:23
handwritten  58:20
happen  35:7  113:6,
  22  114:12
happened  34:23
  35:16

happening  95:15
happy  35:7
harassment  14:20, 24
  15:14
harder  112:11
head  45:21  87:2
  88:14  98:18
health  48:8, 11
hear  116:19
hearings  113:7, 11
heart  95:16  96:9
Hector  40:8, 10
H-E-C-T-O-R  40:10
he'd  102:14
Heikkila  8:6  14:11
  68:16  69:5, 14, 17, 21
  88:22  89:25  93:22,
  24  97:20  117:10, 19
held  15:24  29:17
  30:7  48:22
help  4:16  50:3  51:6
  55:21  106:8  110:8
helped  14:7  29:16
  39:24, 25  50:12
  51:23  63:7, 10
helps  55:21
hereto  3:13
herewith  124:1
high  19:16  48:20
hire  14:10  24:24, 25
hired  29:4
hires  14:9
hiring  27:14, 15, 17
hit  45:10
hold  99:4  120:16
holding  93:10
Holloway  22:12, 14,
  19, 22  23:6
home  8:15
hone  101:20
honest  22:15  36:4
  37:17  45:21
hooked  111:11
hope  120:1
hopefully  101:5
HR  25:13  27:12, 22
  41:25  47:11  50:12
  53:5, 9, 10  109:8, 18
  110:15, 24
huge  81:2, 3

human  11:21, 24
  12:2, 7, 12  13:9, 10,
  15, 17  14:4  16:4
  27:10  39:19  66:24
  73:20
Hyde  2:7

< I >
idea  23:22  60:6
identified  109:22
identifying  108:4
immediate  36:17
impact  92:21, 25
  114:25  115:9, 15, 25
implemented  53:2, 3
  111:25
implicit  83:16
important  84:19
  118:3
improvements  111:15
inaudible  6:3
include  27:18
included  72:23  80:5,
  11  114:15, 18, 19
includes  46:24
incompetent  38:7
incorrect  90:6
increase  19:1, 4
  113:24, 25  114:5
increases  114:7, 10
INDEX  3:1
individual  16:16
  17:11  58:25  85:17
information  60:17, 21
  61:23  62:3, 7, 8  75:6
  100:10, 18
informed  89:22
initially  104:5
initiate  22:18  47:16
  116:16
initiated  22:20, 21
  23:18  47:12
inmate  44:13  48:12
Inspections  43:6
instance  94:21
instances  87:20, 25
instituted  108:11
instruct  69:14
instructed  87:7
instructing  13:22

Deposition of Annmarie Reno

Jenna Clark v. Carmine Marceno

**insubordinate** 33:*9, 13* 88:*4*
**insubordination** 33:*18, 19* 34:*17, 21* 87:*7, 17, 20* 88:*9* 90:*21*
**intel** 7:*3*
**interested** 122:*14*
**internal** 13:*16* 25:*11, 16* 29:*1*
**internally** 12:*10* 45:*4*
**International** 10:*12, 18, 21, 24*
**interrupt** 55:*18*
**inventory** 87:*7*
**investigation** 25:*11*
**investigations** 25:*16*
**investment** 19:*22*
**involve** 25:*15*
**involved** 24:*24* 25:*2, 17* 44:*16, 19, 21* 46:*4, 7* 75:*18* 76:*7, 16* 77:*1, 7, 11* 79:*16, 19* 85:*15* 89:*14*
**involvement** 9:*16*
**issue** 36:*6, 7* 90:*20* 97:*21, 22*
**issues** 32:*12, 16, 19* 33:*1, 13, 18* 36:*2* 48:*3* 85:*7, 9* 88:*1*
**issuing** 35:*6*
**items** 87:*6*
**its** 90:*3* 110:*15*

**< J >**
**Jamie** 74:*11, 13* 106:*6, 15*
**Janke** 68:*8, 11*
**Janke's** 68:*9*
**January** 18:*14* 19:*25* 75:*1* 104:*12* 106:*9*
**JENNA** 1:*1* 4:*10, 24* 29:*20* 30:*4, 7, 10, 13* 31:*6, 8, 14, 18, 22* 36:*2, 21* 37:*25* 39:*4, 7, 8* 40:*1, 12, 23* 41:*18* 50:*9* 54:*17* 55:*3, 21* 56:*16, 18* 57:*2* 65:*10* 68:*17* 69:*10* 89:*7* 98:*6*

111:*19* 112:*7, 9* 115:*21* 116:*5, 16, 25* 117:*15, 21* 118:*6, 11, 14, 18*
**Jenna's** 45:*25*
**Jill** 55:*20, 23* 102:*16*
**job** 15:*19* 21:*14* 25:*17, 18* 30:*13, 21* 31:*6, 8* 32:*9, 11, 13, 17, 20* 33:*2* 36:*12* 37:*9* 38:*12* 39:*17* 40:*11, 22* 41:*24* 43:*16, 21* 51:*15* 52:*1, 16, 17, 18, 20* 66:*19* 73:*25* 84:*11* 85:*3* 97:*12* 115:*17*
**jobs** 38:*23* 52:*9* 53:*10* 59:*18, 21* 61:*7* 63:*11, 20* 67:*7* 118:*4*
**John** 22:*12, 14* 23:*6*
**Jones** 55:*20, 23* 100:*17*
**judge** 6:*1*
**Julie** 1:*9* 101:*10* 108:*23* 120:*7* 121:*2, 11* 122:*2, 18* 124:*1*
**July** 102:*8, 10* 114:*4*
**June** 103:*6, 8* 106:*21* 113:*15* 114:*4*
**jury** 6:*1*

**< K >**
**K-9** 40:*16*
**keep** 12:*13*
**keeping** 100:*17*
**kept** 17:*24* 20:*14*
**Key** 2:*3* 50:*9, 18* 110:*19*
**keyed** 50:*17*
**kind** 12:*6* 14:*18* 35:*23* 38:*18* 79:*19* 115:*8*
**knew** 44:*12* 48:*10* 59:*22* 91:*25* 93:*15*
**know** 6:*16, 21* 10:*5* 11:*11* 13:*19* 14:*20* 18:*4, 5* 19:*23* 22:*2* 23:*13* 24:*20* 26:*22* 30:*7* 31:*14* 37:*11* 38:*10, 18* 41:*24* 44:*7,

*18* 45:*18, 20* 49:*7* 52:*11* 53:*25* 67:*9* 70:*1, 15* 71:*1, 3, 6, 20, 22* 72:*22* 74:*13, 15* 80:*1* 81:*21, 23* 82:*2, 6, 15, 16, 17* 83:*22* 86:*13* 87:*2* 89:*25* 91:*13* 92:*12* 93:*2* 95:*9, 11, 15, 25* 97:*1, 10* 98:*6, 11, 18* 100:*8* 102:*18* 103:*4* 105:*23, 25* 106:*2, 12, 15, 17, 21, 22* 107:*20* 109:*17* 113:*7* 114:*8* 115:*12* 117:*10, 11* 119:*1* 120:*9, 14*
**knowledge** 65:*7* 82:*10*
**known** 93:*17, 23*
**KYLE** 2:*2* 4:*9, 23* 100:*22* 101:*10* 105:*10*

**< L >**
**label** 68:*19* 72:*2*
**labeled** 86:*2*
**language** 87:*12*
**latest** 105:*6*
**Law** 2:*2* 6:*1* 11:*9, 18*
**laws** 12:*12, 13* 13:*11* 14:*13* 15:*9, 10*
**lawsuit** 4:*24* 6:*14* 9:*2, 6, 17, 19, 25*
**LCSO** 87:*6* 124:*1*
**lead** 23:*21*
**leads** 114:*21*
**learn** 17:*25* 23:*20* 43:*22* 57:*22* 112:*9* 118:*4*
**learned** 46:*8* 103:*15* 116:*9, 14*
**learning** 28:*20*
**leave** 20:*1* 22:*4* 41:*18, 22* 92:*8, 21, 24* 93:*5, 11, 21, 25* 94:*5, 8, 16, 20, 23, 25* 95:*3, 5* 96:*24* 97:*4, 8, 15, 18, 22, 23* 98:*7, 13, 19* 99:*14, 17* 101:*3*

118:*20* 119:*2, 8, 12, 19, 22*
**leaves** 94:*14*
**led** 53:*4*
**L-E-D-G-L-E-R** 39:*15*
**Lee** 1:*7* 4:*6* 5:*1, 13* 7:*3, 16* 12:*2, 7, 9* 13:*17* 14:*1, 15* 15:*15, 21* 16:*10* 22:*25* 23:*4* 26:*4* 27:*6, 21* 28:*9, 12, 23* 29:*7, 18* 30:*8, 11* 41:*18, 22* 42:*6* 73:*14* 74:*3* 75:*9* 78:*12* 84:*25* 85:*11* 89:*11* 92:*5* 94:*14*
**left** 24:*21* 41:*21* 51:*15* 56:*18, 20* 71:*13* 98:*24* 99:*12* 108:*20* 116:*21* 119:*21*
**legislation** 102:*8* 103:*4*
**legislative** 104:*24*
**legislature** 104:*15*
**Legler** 39:*15, 16*
**Lehman** 37:*4, 11, 18* 39:*5, 6* 40:*3* 41:*7, 8* 57:*10, 21* 58:*5, 13* 88:*5* 112:*1, 6*
**Lehman's** 37:*9* 57:*6, 13* 58:*21*
**LETTER** 3:*7* 68:*16, 23* 69:*7, 10, 15, 18, 20, 23, 25* 70:*3, 5, 12, 15* 71:*2, 6* 73:*21* 74:*13* 81:*24* 82:*3, 7, 12, 18* 88:*20, 25* 90:*1, 5, 7* 93:*2, 17* 117:*5, 15, 18*
**letters** 71:*4*
**liaison** 76:*24* 77:*2*
**limit** 55:*9*
**limitation** 55:*16*
**line** 107:*10* 123:*3*
**list** 72:*23* 74:*6* 80:*5, 12* 82:*19* 106:*19* 107:*1*
**listed** 30:*22* 46:*5* 72:*12, 14, 19* 74:*6* 75:*12, 22* 76:*2, 10, 19, 23* 77:*4* 78:*15* 79:*10*

Deposition of Annmarie Reno                                                          Jenna Clark v. Carmine Marceno

80:*1, 16, 17*  81:*9, 11*
82:*11, 22, 25*  83:*4*
**little**  12:*4*  31:*12*
32:*14*  33:*8*  37:*3, 4, 8*
53:*13*  80:*14*  82:*23*
96:*6*  100:*23*  112:*11*
**live**  8:*22*
**lived**  8:*19*
**LLC**  124:*1*
**locally**  13:*6*
**long**  8:*19*  15:*24*
19:*21*  29:*3, 21*  37:*11*
102:*15*
**longer**  21:*6, 8*  22:*5*
98:*2*  101:*25*  104:*4*
**look**  17:*1*  30:*19*
44:*10, 25*  45:*5*  57:*16*
59:*17*  72:*3*  85:*3*
113:*9*
**looked**  8:*2*  43:*7, 17*
50:*10*  84:*3*  117:*18*
**looking**  17:*23*  43:*8*
44:*4, 14*  50:*1*  60:*5,
13, 23, 24*  61:*6*  67:*6*
74:*16*  75:*3, 21*  84:*4,
10, 11, 22*  86:*22*  87:*4*
111:*22*  113:*17, 24*
**looks**  78:*15*  106:*9*
107:*11*
**lot**  17:*1*  30:*16*
42:*24*  44:*12*  46:*12*
48:*18*  49:*14*  56:*22*
98:*25*  100:*18*
**low**  59:*20*
**lowest**  59:*20*

**< M >**
**MACDONALD**  2:*2*
3:*2*  4:*9, 22, 24*  9:*10,
11*  10:*8*  31:*11, 13*
32:*25*  33:*11*  41:*11,
17*  51:*11*  58:*4*  60:*16*
67:*11*  71:*19*  74:*24*
83:*21*  84:*13*  87:*19*
100:*2, 7, 19*  101:*2*
105:*13*  120:*2, 16*
124:*1*
**mail**  93:*3*  117:*6*
**major**  76:*1, 8*  106:*20,
22*

**making**  26:*25*  37:*21,
23*  60:*14, 18*  61:*20*
111:*18*
**managed**  28:*2*
**management**  49:*12*
57:*18*  77:*5, 8, 13, 15,
21*  78:*4*  82:*3*
**management's**  78:*19*
**manager**  27:*10, 13,
22, 25*  28:*7, 10*  30:*24*
31:*24*  37:*10, 12, 13,
15, 19*  50:*10*  56:*17*
67:*22*  79:*7, 11, 17, 21*
97:*2*  112:*2*
**managers**  16:*15, 19*
**manpower**  26:*11*
**manual**  49:*14*  50:*7*
58:*19*  110:*13, 14*
**manually**  108:*13*
110:*14*
**MARCENO**  1:*5*  4:*5,
12, 25*  124:*1*
**Marcia**  75:*16*  107:*3,
7, 16*
**MARKED**  3:*7*  68:*18*
72:*1*  86:*2*
**Master's**  11:*3*
**matter**  4:*5*  124:*1*
**MBA**  11:*4*
**meal**  100:*25*
**mean**  55:*18*  64:*17*
73:*2*  79:*6*  81:*3*
**means**  119:*15*
**measures**  84:*16*
**medical**  44:*13*  48:*12,
13*  94:*8*  95:*10, 22*
96:*11, 15, 18, 24*  97:*4,
9, 16*  99:*21, 24*
**meet**  24:*7*  29:*20*
**meeting**  47:*6*
**meetings**  24:*16*  47:*8,
9, 10*
**meets**  36:*16, 18*
**mentioned**  9:*13*
12:*25*  13:*2, 23*  16:*14*
17:*16*  18:*22*  20:*2*
34:*22*  38:*2, 4*  39:*9*
40:*4, 19*  46:*10*  48:*12*
49:*5*  53:*4*  54:*20*
79:*23*  95:*21*  96:*8*

**message**  86:*17*  88:*15*
116:*21*
**met**  29:*22*
**Miami**  2:*4*
**MIDDLE**  1:*1*
**migraines**  96:*1*
**military**  12:*13*  14:*12*
**mind**  112:*19*
**minute**  72:*2*  86:*3*
**missed**  21:*2*
**Mm-hm**  75:*17*  86:*18*
107:*9*  115:*3*  116:*11*
**moment**  68:*20*
**Monday**  117:*10*
118:*9*
**money**  17:*14*  24:*21*
42:*4, 10, 12, 17*  44:*11,
24*  45:*15*  47:*20, 23*
48:*5, 22*  59:*15, 24*
60:*25*  81:*2, 3, 13*
100:*8*  113:*23*
**month**  18:*24*
**monthly**  19:*15*
**months**  23:*14*  24:*3*
**morning**  4:*23*
103:*15*  108:*6*  112:*1*
114:*23*  117:*19*
118:*13*
**motivated**  48:*4*
**motivation**  47:*25*
**move**  31:*4*  61:*15*
106:*13*
**moved**  17:*22*  21:*10*
52:*20*  63:*20*  73:*6*
78:*6*  87:*6*
**Munis**  57:*25*  58:*3, 6,
14, 22*  63:*7*  110:*3, 15,
23*  111:*2, 11, 13, 19*
112:*15*
**M-U-N-I-S**  58:*3*
**Myers**  8:*17*

**< N >**
**name**  4:*23*  5:*2*  9:*23,
24*  10:*5*  13:*5*  22:*11*
38:*4, 6*  39:*9, 12, 13*
40:*4, 7, 19*  51:*7, 16*
70:*9*  96:*3*  99:*2*
**names**  38:*8*  108:*1*
**near**  95:*16*

**need**  6:*19*  10:*25*
21:*4*  50:*8*  51:*24*
52:*22*  64:*14*  72:*4*
100:*23*
**needed**  22:*3*  42:*15,
16*  44:*11*  45:*6, 16*
49:*16*  59:*22, 25*
62:*22*  66:*17, 20*  73:*7*
85:*5*  88:*6*  94:*7*
95:*12*  98:*4*  116:*22*
117:*4*  118:*20, 24*
119:*11*
**needs**  36:*17*  120:*9*
**never**  84:*3*  97:*4*
110:*12*
**new**  13:*20, 25*  14:*9,
10*  17:*9, 24*  19:*23*
27:*19*  31:*4*  37:*23*
49:*11, 12*  50:*3, 8*
51:*22, 24*  53:*11*
56:*22*  57:*18*  63:*9*
86:*15*  88:*7*  108:*11,
18*  110:*5*  111:*10*
112:*6*  114:*5*
**normal**  96:*23*
**North**  10:*16, 19*  11:*2*
**Norton**  2:*6*  4:*11*
124:*1*
**Notary**  1:*24*  121:*2,
12*
**note**  109:*11*  124:*1*
**notes**  109:*6*  122:*2*
**notice**  116:*16*
**noticed**  50:*9*
**NOTIFICATION**  3:*7*
92:*22, 25*  93:*11, 19*
**notified**  52:*11*  90:*10,
24*  91:*6, 18*  92:*8, 18*
93:*1*  96:*18*
**notify**  69:*11*  91:*19*
**notifying**  90:*1*
**number**  122:*2*

**< O >**
**O-301**  2:*3*
**OATH**  3:*4*  5:*20*
121:*1*
**object**  67:*3*  74:*20*
**objecting**  74:*22*

Deposition of Annmarie Reno

Jenna Clark v. Carmine Marceno

**Objection** 32:*21*
33:*3* 83:*18* 84:*8*
87:*14*
**obligation** 5:*20*
**occupied** 65:*10*
**occur** 34:*2* 52:*24*
**o'clock** 101:*1, 4*
**October** 1:*9* 4:*2*
18:*7* 103:*11, 22*
121:*2*
**offering** 13:*6*
**Office** 5:*13* 7:*4, 17*
12:*3, 7, 9* 13:*17* 14:*1,*
*16* 15:*16, 21* 16:*10*
21:*21* 23:*1, 4* 26:*5*
27:*7, 22* 28:*10, 13, 24*
29:*8, 18* 30:*8, 11*
34:*8* 39:*24* 41:*19, 23*
42:*6* 66:*23* 73:*15*
74:*4* 75:*10* 78:*12*
85:*11* 89:*12* 92:*5*
93:*8* 94:*14* 101:*18*
**officer** 51:*5* 52:*12*
**officers** 52:*8, 9*
**official** 1:*7* 4:*25*
41:*20* 121:*2*
**oh** 10:*14* 21:*3* 26:*6*
53:*18, 21* 64:*8*
101:*24*
**Okay** 5:*17, 18* 6:*5, 6,*
*11, 12, 17, 18, 22, 23*
19:*6* 36:*3* 37:*16*
52:*6* 53:*14, 21* 61:*21*
64:*18, 22, 25* 68:*21*
72:*5* 79:*16* 86:*7*
87:*9* 95:*14* 102:*17*
104:*9, 14* 106:*4, 14,*
*18* 107:*10, 15* 109:*16*
111:*6, 24* 112:*13*
113:*5, 8* 114:*21*
115:*6, 12, 21* 117:*7*
118:*25* 119:*10*
**old** 19:*11* 23:*7* 35:*5*
87:*6*
**on-board** 14:*10*
**onboarding** 27:*18*
**once** 17:*14* 19:*13*
50:*7* 52:*18* 104:*22*
108:*18* 110:*24*
111:*24* 113:*22* 124:*1*

**ones** 21:*3* 30:*22*
43:*10* 46:*2* 53:*6, 18*
54:*4* 111:*22*
**ongoing** 43:*24* 46:*13*
62:*22* 102:*19*
**online** 15:*5*
**onward** 31:*19*
**open** 19:*19, 20* 42:*15*
85:*3*
**operate** 44:*5* 114:*4*
**operates** 114:*3*
**operating** 42:*4* 113:*2*
**operation** 56:*12*
**operational** 28:*21*
**operations** 22:*24, 25*
26:*11* 29:*2* 44:*11, 14,*
*25* 103:*10*
**opinion** 59:*17*
**opportunity** 85:*3*
**opposed** 57:*13* 58:*22*
87:*25*
**options** 42:*1* 117:*13*
118:*4*
**ORANGE** 121:*2*
122:*2*
**order** 19:*11* 30:*18*
38:*22* 59:*23* 82:*24*
88:*6*
**ordered** 41:*4*
**ordering** 120:*14, 17*
**orders** 30:*17* 37:*21,*
*22* 38:*25* 39:*1* 40:*15*
55:*8* 110:*14*
**ordinance** 28:*4*
**organization** 26:*25*
**organizational** 115:*14*
**organized** 101:*5*
**original** 124:*1*
**outreach** 70:*14*
**outside** 12:*8, 9, 11*
30:*19* 36:*21*
**overcrowded** 35:*21*
86:*14*
**oversaw** 30:*15* 37:*20*
49:*20* 53:*16, 18*
**oversee** 16:*3, 8, 10,*
*15, 16, 22* 21:*7, 8, 9*
55:*21*
**overseeing** 23:*10*

55:*8* 56:*24* 67:*24*
**oversees** 20:*15* 22:*24*
**Oversight** 43:*8*
**overtime** 5:*11* 9:*13,*
*17*

**< P >**
**P.A** 2:*6* 124:*1*
**p.m** 1:*9* 120:*20*
**P.O.'s** 58:*19*
**package** 111:*12*
**page** 5:*17* 86:*5* 87:*4*
122:*2* 123:*3*
**paid** 60:*1*
**paperwork** 49:*15*
113:*10*
**parameters** 104:*16*
**Park** 2:*7*
**parks** 40:*16*
**part** 19:*3* 20:*3*
35:*11* 43:*13* 44:*2, 9*
45:*19* 46:*6, 13, 14*
47:*5* 51:*13, 20* 52:*4,*
*7, 12, 15* 53:*15, 16*
54:*5, 12, 13* 55:*19, 23*
56:*15* 57:*19* 61:*24*
62:*18, 20, 23* 63:*6, 10,*
*19, 22, 25* 64:*4, 5, 6, 9,*
*11, 20, 24* 65:*8, 24*
66:*22* 70:*2* 72:*15, 18*
80:*12, 20* 83:*20*
100:*16* 117:*25*
**participation** 17:*23*
**particular** 21:*22*
48:*21* 69:*25*
**parties** 1:*9* 3:*13*
122:*11, 12*
**part-time** 73:*19, 20*
109:*18, 19*
**party** 9:*2*
**Patrol** 29:*1*
**pay** 59:*10, 14, 20*
79:*9* 111:*9* 119:*8, 12,*
*16*
**Payne** 70:*7, 10*
**P-A-Y-N-E** 70:*10*
**Payne's** 70:*18*
**payroll** 42:*18, 20*
49:*17* 50:*6, 9, 15, 17,*
*19, 20, 21, 22* 51:*1, 5,*

*6, 19, 24* 52:*5, 23*
53:*1, 21* 54:*6, 20*
63:*4, 13, 21* 65:*1, 4, 9,*
*14* 72:*20, 22* 73:*10*
80:*10* 81:*14* 108:*10,*
*17* 109:*2, 21* 110:*18*
**penalties** 123:*22*
**pending** 60:*10*
**pension** 18:*23* 19:*1,*
*4, 14, 15, 16, 21*
**people** 17:*2* 18:*18*
23:*18, 19* 25:*11* 28:*2*
31:*4* 41:*3* 45:*5*
46:*17* 48:*18, 24*
49:*13, 16* 50:*9* 51:*24*
53:*10* 63:*11, 20* 66:*2,*
*18* 81:*7, 8* 98:*1*
**people's** 95:*14*
**percentage** 48:*14*
**perform** 38:*19*
**performance** 30:*24*
31:*6, 9* 32:*10, 13, 17,*
*20* 33:*2* 36:*8, 12, 15,*
*16* 37:*24*
**period** 31:*10* 32:*8*
33:*15* 103:*22* 104:*24*
113:*13, 15* 114:*17*
119:*2, 10*
**perjury** 123:*22*
**perplexed** 80:*14*
**person** 22:*5* 30:*17*
43:*20* 46:*22* 47:*3, 12*
49:*20* 50:*20* 52:*23*
57:*20* 67:*24* 68:*2*
73:*10* 75:*25* 78:*7*
80:*24* 104:*22* 105:*3*
106:*5* 108:*20* 109:*2*
112:*2, 8*
**personal** 94:*18*
**Personnel** 16:*5*
28:*21* 34:*14* 37:*8*
107:*23*
**persons** 108:*8*
**person's** 70:*9*
**peruses** 68:*21* 72:*5*
86:*4*
**ph** 32:*2* 98:*2*
**phone** 116:*19, 20*
117:*13, 22*

Deposition of Annmarie Reno                                    Jenna Clark v. Carmine Marceno

phones 29:*15*
phrased 74:*21, 22*
picked 55:7, *10, 13,*
*14, 16, 23*
picking 41:*3*
PLACE 1:*9* 10:*1*
18:*3* 28:*4* 47:*3*
48:*25* 62:*13* 81:*8*
108:*18* 113:*12* 116:*6*
placed 5:*19* 119:*12*
places 35:*23*
Plaintiff 1:*1, 9* 2:*5*
4:*10*
Plaintiff's 4:*7* 68:*18*
72:*1* 86:*2*
plan 19:*21, 22* 48:*8,*
*11, 13* 102:*19*
planner 11:*9, 18*
Planning 16:*6* 53:*23,*
*24* 54:*1, 8* 63:*4*
plate 56:*22*
play 58:*8* 60:*25*
67:*12, 16, 20* 83:*8, 20*
85:*9, 14* 99:*15, 17, 21,*
*24*
played 59:*1* 61:*3, 10*
83:*15*
please 4:*6, 13* 5:*2*
117:*9, 12* 124:*1*
PLLC 2:*2*
plus 19:*9* 58:*10*
PO 55:*10*
point 6:*19* 90:*14*
91:*21* 101:*15* 108:*10*
116:*16*
policies 14:*11*
policy 33:*24*
portion 14:*8* 17:*24*
20:*11, 14* 28:*21*
portions 16:*17*
position 23:*16* 27:*6,*
*9* 28:*10* 29:*7, 17*
30:*4, 7* 34:*10* 42:*2,*
*15* 43:*15* 45:*24* 46:*1*
49:*18, 23* 50:*5, 14, 25*
51:*12, 14, 19, 23* 52:*3,*
*12* 53:*5, 22* 54:*7, 8,*
*17, 21* 55:*3, 6, 25*
56:*1, 7, 10* 57:*2, 6, 9,*
*13, 14* 58:*9* 60:*7, 18*

61:*9, 11, 16, 19* 62:*15,*
*17, 21, 25* 63:*4, 21*
64:*6, 9, 12, 15* 65:*4, 9,*
*10, 14, 18, 21, 25*
66:*18, 22* 67:*14, 17*
68:*9, 13* 69:*11* 70:*2,*
*11, 18, 23, 24* 71:*14*
72:*10, 21, 22, 24* 73:*1,*
*3, 5, 7, 8, 11, 19* 74:*1,*
*2, 3, 7, 10, 17* 75:*1, 7,*
*12, 15, 19, 22, 24* 76:*2,*
*4, 8, 10, 11, 13, 17, 20,*
*23* 77:*2, 4, 9, 15, 22*
78:*2, 9, 10, 12, 16, 19*
79:*8, 10, 13, 17, 24*
80:*1, 8, 10, 11, 20*
81:*10, 13, 14, 18, 24*
82:*3, 7* 83:*9* 85:*10,*
*23* 89:*7, 11, 15, 22*
90:*2, 11, 25* 91:*6, 18,*
*23* 92:*9, 18* 93:*5, 21*
94:*2* 99:*4, 15, 22, 25*
103:*17* 106:*6, 20*
107:*2, 4* 108:*9, 20*
109:*2, 7, 22* 114:*16*
115:*25* 116:*5* 117:*8*
positions 8:*2, 10*
42:*14, 18, 21* 43:*1, 12*
45:*6, 11, 18, 23* 46:*5,*
*9, 12, 16, 25* 47:*3, 14,*
*17, 21* 48:*1, 23* 53:*7,*
*16, 23, 25* 54:*7, 11, 16,*
*19, 24* 59:*5, 11* 60:*5*
61:*1, 24* 63:*10, 18, 24*
64:*19, 23* 65:*2, 23*
66:*3, 6, 14* 67:*2, 7, 21*
72:*12, 14, 15, 18* 73:*4*
78:*4* 80:*12, 16* 83:*4,*
*13, 16, 22* 84:*2, 14, 17,*
*20* 85:*15, 22* 91:*19*
92:*4* 108:*4* 115:*1*
positive 36:*12, 15*
possible 83:*15*
potential 56:*23*
61:*18* 62:*4, 10, 14*
65:*20*
PowerPoint 15:*2*
PowerPoints 15:*3, 13*
prefer 120:*9*

pregnancy 98:*17*
prepare 7:*10* 105:*23*
prepared 105:*25*
106:*2* 114:*24*
preparing 105:*21*
present 23:*22* 109:*23*
pretty 50:*11* 56:*22*
57:*22* 87:*12* 117:*3*
prevent 6:*24* 84:*16*
previous 63:*3* 89:*14*
previously 5:*7* 9:*9,*
*13* 54:*21* 68:*18* 72:*1*
76:*13* 79:*23* 80:*11*
85:*6* 86:*1* 88:*20*
108:*12*
primary 47:*25*
prior 7:*22* 20:*19*
24:*2* 26:*5* 27:*7, 22*
28:*8, 10, 24* 29:*8*
45:*8, 9* 69:*1* 75:*1, 6*
78:*19* 87:*21* 89:*3*
90:*2, 10* 94:*20, 23*
101:*17* 105:*2* 115:*16*
116:*2*
probably 12:*15* 15:*1*
22:*16* 23:*14* 28:*16*
29:*21, 22* 30:*23* 38:*8,*
*23* 44:*18* 46:*21*
56:*21* 59:*20* 92:*1*
102:*11*
probation 25:*12*
problem 95:*11, 13, 25*
96:*2, 3*
problems 25:*12*
86:*13, 16* 87:*3* 96:*6,*
*7*
procedure 118:*20*
119:*1, 11*
process 17:*7, 8*
102:*18* 112:*20*
115:*13*
P-R-O-C-U-R-E
111:*6*
Procure-It 111:*4, 5*
112:*10*
Procus 111:*2*
producing 26:*10*
professional 11:*7*
76:*1, 8* 106:*20* 121:*2,*

*12* 122:*2, 19*
proficiency 112:*6*
proficient 112:*3*
program 18:*18, 22*
19:*5, 7, 12, 17, 19*
104:*6, 16, 21* 105:*4*
106:*16, 23* 107:*1, 6,*
*17, 21* 110:*5*
Programming 21:*9*
26:*15, 16, 21, 22*
project 73:*6*
projects 70:*25*
promised 101:*10*
prompted 18:*8*
proposal 102:*20*
103:*2, 7, 19* 112:*21*
113:*18, 23*
proposed 91:*3*
103:*10* 113:*3, 14*
114:*6, 25*
Public 1:*24* 10:*22*
113:*6, 11* 121:*2, 12*
pull 38:*25* 60:*21*
61:*22* 62:*2, 7* 65:*14*
75:*5* 113:*24*
pulled 60:*13, 17*
61:*9* 62:*6*
punched 110:*19*
purchase 30:*17, 18*
37:*22* 46:*1* 55:*8*
110:*13*
Purchasing 16:*5*
17:*2* 26:*15, 17, 21*
27:*1* 29:*23* 30:*9, 10,*
*14, 15* 31:*6, 9, 15, 22*
32:*4, 9* 36:*13, 25*
37:*1, 13, 15, 19, 20*
38:*13, 14, 16, 19* 39:*4,*
*7, 18, 20, 21* 40:*2, 12,*
*13, 14, 23, 24, 25* 41:*3,*
*6, 9* 50:*10* 53:*22*
54:*7, 23, 25* 55:*1, 2, 6,*
*19, 22, 25* 56:*7, 10, 11,*
*14, 16* 57:*5, 19* 62:*18*
63:*24* 64:*6, 8, 9, 25*
76:*11, 17, 20* 91:*16*
96:*15* 97:*5, 11, 13, 14*
98:*12* 99:*5, 6, 7, 11*
103:*16* 111:*1, 16*

Deposition of Annmarie Reno

Jenna Clark v. Carmine Marceno

112:*1, 16*  114:*16*
116:*6*
**purposes** 35:*11*  42:*11*
**pursuant** 107:*21*
**put** 19:*16*  28:*4, 20*
33:5  34:9  35:*10*
48:*24*  49:*1*  51:*24*
55:*22*  56:*23*  57:*17*
59:*24*  77:*25*  78:*2, 8,
9, 11*  87:*20, 24*  119:*7*
**puts** 17:*13*
**putting** 58:*11*  81:8
87:*16*  91:*15*

**< Q >**
**question** 6:*14, 16*
60:*10*  67:*4, 5, 10*
74:*21*  84:9  104:*4*
105:*19*  112:*23*  116:9
**questions** 6:*10*  35:*15,
17*  100:*19, 21, 22*
101:6, *12*  105:20
106:5  108:*3, 6*
114:*21, 22*  115:2
120:*4*
**quickly** 91:*13*
**quotes** 30:*19*  55:*7,
11, 12*

**< R >**
**radios** 29:*13*
**raise** 4:*13*
**Ramsey** 79:*13*  82:*15*
**Randy** 51:*2, 7*  108:*17*
**Randy's** 51:*7, 12*
**rate** 59:*10, 14*
**rates** 48:*14*  114:*5*
**rating** 36:*19*
**reach** 31:*1*  98:*2*
**reaction** 36:*1, 4*  91:*5,
8*
**read** 60:*10*  120:*6, 10,
12, 13*  123:*22*
**reading** 3:*14*  106:8
107:*10*  120:*7, 11*
**ready** 31:*3*
**real** 34:6  37:*16*
95:*20*  113:*17*
**realigned** 21:*23*

**realized** 64:*14*
**reallocate** 45:5  49:*3*
**reallocated** 43:*20*
**really** 48:*13*  49:8
52:*14*  57:*22*  59:*25*
64:*13*  66:*17, 22*  67:9
81:*15*  85:4  112:9
**reason** 62:*3*  88:*3*
94:*4*
**reasons** 45:*15*
**reassigned** 78:5
**recall** 12:*24*  15:*12,
17*  36:*11, 18*  37:5
57:*1, 4*  66:6  69:*17*
84:*18*  88:*15, 25*
94:*23*  95:*2, 5*  97:8
98:*19*  109:*10*  112:*25*
117:*23*  118:*18*
**receive** 13:*7*  14:*23*
15:*13*  114:7  117:6
**received** 11:*20*  12:*1,
6, 19*  13:*12, 16*  14:*14,
18*  15:4  36:*18*  70:*3,
5, 12, 15*  71:2  73:*21,
22*  74:*13, 14*  81:*24,
25*  82:*3, 4, 7, 8, 12, 13,
18*
**receiving** 39:*1, 22*
**recess** 41:*15*  60:9
100:5  101:8
**recession** 44:*24*
45:*10*
**recognize** 68:*22*  72:6
86:8
**recollection** 103:*1*
114:*13*
**recommendation**
118:*7*
**recommendations**
26:2
**record** 5:3  41:*12, 14,
16*  100:*3, 4, 6*  101:*7,
9*  120:*10*  122:2
**records** 85:*13*
**recovering** 92:*17*
**redo** 45:*1*
**reduce** 28:*4*  44:*15*
45:5  51:*23*  63:*10, 18*
**reduced** 64:*11*  79:8

119:*23*
**reducing** 63:*10*
**Reduction** 27:*24*
42:5, *12*  43:*16, 22, 24*
44:*1, 2, 7, 17, 22*
45:*12, 19*  49:*19*
50:*23*  51:*13, 21*  52:*4,
7, 13, 15*  53:*15, 17*
54:5, *12*  58:*18*  59:*1*
61:*25*  62:*18, 20, 23*
63:5, *8, 19, 22*  64:*1, 7,
10, 13, 20, 24*  65:*8, 24*
70:2  72:*16, 19*  80:*13,
15, 21*  81:*2, 4*  88:*21*
100:9, *13*
**redundancies** 51:*20*
53:*4, 17*  55:*5*
**redundancy** 42:*24*
49:*1, 5, 10*  50:*13*
52:2  58:*14*  61:6
63:*12*  79:*20*  80:*23*
**redundant** 49:*18, 23*
50:5  53:*9, 12*  56:*1*
59:*18*  64:*12*  67:*2, 14,
18, 21*  68:*13*  77:*16,
22*
**reference** 102:*24*
**referring** 42:5, *17*
**refers** 55:*2*
**reflect** 6:8
**reflected** 113:*16*
**regard** 14:*19*  77:*11*
**regarding** 9:*17*
13:*17*  34:*14, 16, 21*
48:4  62:*14*  63:*3*
75:*18*  77:*7, 15*  79:*20*
88:*11, 16, 21*
**regards** 49:*19*  50:*14*
62:*8*
**regular** 24:7  39:*23*
47:5
**rehired** 99:*13*
**related** 5:*12*  9:*13*
11:*21, 23*  12:2, 7
14:*14, 23*  15:*14*  63:5
96:*9, 25*  97:*4, 9, 16*
**relation** 91:*2*
**relationship** 12:*12*
**relative** 122:*10, 12*

**religious** 33:*25*
**relinquished** 102:*9*
**remained** 109:*24*
**remember** 5:8, *10*
8:*4, 7, 11*  9:*7, 19, 23,
25*  10:2  11:*5, 12, 14*
12:*19*  13:*12, 14, 21*
14:*3, 6, 25*  15:6  18:6
22:*20*  26:*22*  28:*14,
15*  29:*21*  30:4  34:*3,
4, 20*  35:2  36:*3, 23*
37:7  38:8  46:*2, 21*
47:*15*  53:6, *24*  54:*1,
3*  67:*25*  68:*2, 4, 6*
70:8  71:9  78:5, *7, 23,
24, 25*  80:*22*  81:*17,
20*  88:*13, 14*  89:2
95:*19*  96:5  97:*1, 3*
98:*8, 15*  99:*10*
101:*23*  102:7  104:6
108:6  115:*1, 22*
116:*18*  117:*25*  118:*1*
**removed** 18:*1*  20:*3,
10, 11, 22, 23*  21:*3, 12*
**RENO** 1:9  3:2  4:*4,
19, 23*  5:*4, 5*  8:*14, 25*
10:9  11:8  15:*18*
41:*18*  100:8, *20*
101:*15*  105:*17*  121:2
122:2  123:*1, 24*
124:*1*
**Reno's** 124:*1*
**renting** 35:*22*
**reorganization** 42:*3*
**rephrase** 6:*16*  104:*4*
**report** 16:*20*  23:*4*
24:5  30:*10*  31:*25*
39:*3, 6, 8*  40:*1, 17*
41:5  98:*1*  122:2
**reported** 23:*21*
24:*12, 15*  30:*12*  32:2
40:3  46:*19*  65:*3*
71:4  77:*13*  78:8
92:*1*  97:*20*
**Reporter** 1:*24*  3:5
4:2, *13*  6:3, *7*  41:*14,
16*  58:*1*  60:*11*  100:*4,
6*  101:*7, 9*  121:*2, 12*
122:*1, 2, 19*

Deposition of Annmarie Reno

Jenna Clark v. Carmine Marceno

reporting  23:*5, 8, 9,*
*12, 15*  24:*3*  30:*16*
32:*5*  97:*18*  124:*1*
reports  17:*1*
represent  4:*24*
107:*20*
reprimand  33:*22*
request  55:*7, 12*
118:*15, 23*
requested  56:*19*
122:*2*
requests  55:*11*
required  105:*5*
107:*20*
requisition  30:*18*
Research  16:*6*  53:*24*
54:*1, 8*  63:*4*
reserved  3:*15*
resigned  71:*23*
resource  12:*12*  13:*9*
27:*10*  39:*19*
resources  11:*21, 24*
12:*2, 7*  13:*10, 15, 18*
14:*4*  16:*5*  49:*4*
73:*20*
respect  102:*17*
118:*17*
respective  3:*13*
respond  6:*5*
response  116:*8*
117:*21*  118:*7, 22*
responses  6:*4, 8, 9*
responsibilities  16:*13*
17:*16*  30:*13, 21*
101:*17, 21*
responsible  16:*7, 17*
17:*21*  26:*12*  31:*5*
94:*13, 16*  118:*14*
rest  21:*13*  70:*8*
resume  101:*4*
retire  18:*13, 14*
71:*21*  105:*5*
retired  71:*24*  75:*11,*
*25*  107:*6, 21*
retired/position
106:*10*
retired-slash-position
75:*23*

retirement  18:*10, 11,*
*17*  19:*8, 21, 23*  21:*18,*
*21, 25*  105:*4*  114:*3*
retiring  17:*23*
104:*11*  107:*5*
return  44:*24*
reutilize  81:*12*
reutilized  73:*1, 3*
review  7:*22, 25*
68:*20*  86:*3*  122:*2*
124:*1*
reviewed  8:*1, 5*
rid  52:*1*
right  4:*13*  9:*15*
10:*19*  11:*6*  13:*1, 2*
23:*5, 6*  38:*8*  39:*10*
40:*20*  42:*14*  48:*25*
59:*5*  62:*19*  65:*11*
69:*8, 12*  70:*21*  72:*12*
73:*12*  74:*11, 18*
75:*13, 23*  76:*5, 14, 21*
79:*14, 24*  81:*8*  82:*13,*
*19*  83:*1, 6*  84:*24*
85:*7*  86:*17, 20, 23*
88:*14, 17*  89:*4*  90:*14*
96:*9*  100:*2*  104:*16,*
*20*  105:*9*  106:*10*
107:*12, 25*  108:*2, 3,*
*15, 18*  109:*8, 10, 21*
111:*13, 18*  113:*11*
116:*10, 24*  118:*15, 22*
119:*19*  120:*5, 8*
road  49:*2*
role  5:*12*  12:*2*
15:*24*  16:*1*  17:*9*
18:*9*  20:*3*  22:*3, 6*
23:*7*  24:*23, 25*  26:*4,*
*8*  27:*12, 21*  28:*1, 6, 9,*
*18, 23*  58:*8*  59:*1*
61:*1, 3, 10*  65:*15*
67:*12, 16, 20*  68:*11*
73:*17*  83:*16*  85:*10,*
*14*  99:*15, 17, 21, 25*
105:*20*  111:*18*
roll  29:*15*
room  7:*3, 5*  35:*21,*
*22*  86:*15*
roughly  9:*25*  11:*14*
13:*13*  14:*3*  81:*17*

98:*20*
RP  110:*21*
rulings  14:*10*
run  16:*18*  25:*10*
84:*23*
running  35:*22*  57:*23*

< S >
salaries  62:*11*
salary  60:*1, 7*  61:*10,*
*22*  62:*2, 6*  65:*15, 17*
75:*5*  85:*21*  114:*25*
Salva  51:*17*
S-A-L-V-A-G-A  51:*17*
Salvagno  108:*21*
109:*12*
S-A-L-V-A-G-N-O
108:*23*
Salvalor  51:*18*
S-A-N-D  20:*16*
Sands  20:*13, 15, 19*
21:*14, 17*  23:*8, 10, 20*
24:*5, 8*  26:*1*  101:*16*
S-A-N-D-S  20:*17*
Savator  51:*17*
save  24:*21*  42:*12, 17*
44:*11*  45:*15*  47:*20,*
*23*  59:*14, 24*
saved  100:*8, 13*
saving  42:*4, 10*  48:*5,*
*21*  60:*25*
savings  60:*22*  61:*4,*
*12, 14, 18*  62:*4, 10, 14*
65:*20*  81:*2, 3, 14*
85:*20, 24*
saw  69:*3*
saying  52:*21*  58:*1*
63:*9*  81:*16*
says  87:*5*  103:*5*
106:*8, 10*
say-so  111:*23*
scheduled  118:*17*
Scott  31:*16*
Screen  68:*15*  85:*5,*
*25*  92:*7*  105:*12, 14*
scroll  86:*5*
seal  121:*2*
search  113:*20*
second  85:*24*  87:*4*

107:*7*
secretarial  45:*24*
secretary  28:*25*  29:*3,*
*8*  66:*10, 16*  67:*1, 17*
68:*7, 12*  75:*13, 19, 22*
79:*24*  80:*16, 20, 25*
81:*10, 18*  82:*6*  107:*8*
section  79:*2*
secured  39:*22*  41:*2*
see  16:*25*  42:*25*
43:*18*  44:*14*  49:*9, 10*
50:*1, 12*  60:*13, 17, 22*
72:*20*  74:*7*  76:*24*
77:*5*  79:*2*  81:*7*
82:*21*  87:*4, 10*
107:*14*  113:*9*  114:*5*
116:*17*  117:*1*
seeing  89:*2*
seeking  118:*19*
seen  68:*24*  69:*1*
select  61:*5*
selected  50:*25*  60:*2,*
*7*  83:*3, 22*  84:*6*
85:*18*  93:*6, 21*  94:*2*
selecting  61:*1*  84:*17,*
*20*
self-insured  48:*10*
send  30:*18*  86:*25*
sending  71:*4*  88:*15*
93:*10*
senior  45:*22*  66:*8,*
*21*  67:*1, 13, 24*  68:*3*
74:*7, 17, 25*  75:*6*
81:*23*  106:*7*
sense  52:*17*  59:*13*
63:*8*  81:*15*
sent  8:*4, 9, 11*  68:*23*
69:*10*  71:*7*  86:*19*
88:*10*  90:*9, 17*  93:*2*
117:*16, 20*
sentence  87:*5*
separate  16:*9*
September  41:*20, 21*
102:*2, 3, 11, 13*
103:*11, 22*  113:*4, 12,*
*16*  114:*14*
sequencing  112:*19*
serious  32:*19*  33:*1*
service  19:*10, 11*

Deposition of Annmarie Reno

Jenna Clark v. Carmine Marceno

**Services** 15:*20* 16:*2,*
*5* 20:*9, 23* 21:*7, 8*
23:*3* 28:*22* 32:*3*
43:*2* 45:*1, 16, 22*
46:*14* 66:*8, 21, 24*
67:*1, 13, 24* 68:*3*
74:*7, 17* 75:*1, 6* 79:*3*
81:*23* 106:*7* 108:*5*
**set** 37:*23*
**sets** 59:*3, 4*
**severe** 96:*1*
**sexual** 14:*20, 24*
15:*14*
**Shannon** 37:*4, 9*
39:*5* 40:*3, 18* 41:*7*
55:*8, 13, 14, 20* 57:*6,*
*21* 58:*5* 96:*20, 24*
97:*1, 4, 8, 10* 112:*1, 6,*
*8*
**share** 68:*16* 85:*5*
86:*1* 92:*7* 105:*11, 14*
**she'd** 74:*4* 92:*10*
**SHEET** 3:*6* 123:*1*
124:*1*
**Sheriff** 1:*7* 4:*6, 12*
5:*1* 25:*4, 6, 15* 31:*16*
45:*2* 71:*15*
**Sheriffs** 12:*17, 20*
56:*14*
**Sheriff's** 5:*13* 7:*4,*
*17* 12:*3, 7, 9* 13:*17*
14:*1, 16* 15:*16, 21*
16:*10* 21:*21* 23:*1, 4*
26:*5* 27:*7, 22* 28:*9,*
*13, 24* 29:*8, 18* 30:*8,*
*11* 41:*19, 23* 42:*6*
66:*23* 73:*15* 74:*4*
75:*10* 78:*12* 85:*11*
89:*12* 92:*5* 94:*11*
101:*18*
**shot** 101:*11*
**show** 23:*7* 68:*15*
71:*25* 85:*25*
**showed** 73:*22* 81:*25*
87:*7* 88:*20* 105:*11*
**showing** 71:*2* 72:*6*
84:*5* 86:*8* 87:*17*
**shown** 106:*5* 107:*5,*
*19*

**shrug** 6:*4*
**shut** 50:*18*
**sick** 48:*18* 92:*10, 11,*
*12, 15* 93:*9* 94:*18, 20,*
*23, 25* 95:*3, 5* 97:*22,*
*24* 118:*15, 20* 119:*2,*
*18, 22*
**side** 27:*16*
**sign** 55:*15* 124:*1*
**signing** 3:*14*
**similar** 70:*3, 5, 16*
71:*2* 73:*21* 74:*14*
81:*24* 82:*3, 7* 88:*10,*
*15*
**simple** 104:*23*
**simply** 73:*5*
**Sincerely** 124:*1*
**sit** 114:*12*
**sitting** 111:*21*
**situation** 115:*21*
**skill** 59:*3, 4*
**SkillPath** 12:*16* 13:*2,*
*3, 4, 5, 8, 13*
**skills** 58:*6* 59:*1, 8*
85:*17*
**small** 26:*12*
**Smith** 2:*2*
**socialize** 36:*21*
**software** 110:*6, 21*
**solely** 25:*20* 56:*4*
**solemnly** 4:*14*
**somebody** 17:*24*
78:*6* 80:*25* 115:*8*
**Sophie** 5:*4*
**sorry** 9:*21* 10:*13, 16*
11:*1, 5, 11* 18:*6, 12*
21:*4, 23* 26:*6* 28:*8,*
*15, 16* 32:*23, 24* 34:*4*
35:*1* 38:*3, 11* 39:*20*
40:*9* 52:*22* 55:*12, 17*
63:*15, 16* 64:*5, 13, 16*
66:*10* 71:*8, 17, 18*
78:*25* 81:*16, 22*
83:*12* 89:*21* 92:*23*
99:*12* 102:*4, 7* 115:*5*
116:*13* 119:*6*
**sort** 84:*16* 102:*18*
112:*19*
**sound** 52:*22*

**South** 2:*7*
**span** 20:*12*
**speak** 6:*8* 7:*13*
34:*16*
**Special** 29:*2* 70:*25*
**specialist** 79:*8*
**specialist-slash-
position** 79:*4*
**specialized** 11:*20*
**specialty** 40:*15*
**specific** 16:*14* 57:*1*
105:*19* 114:*13*
**specifically** 8:*7*
14:*15* 18:*8* 66:*14*
78:*23* 101:*20*
**speculate** 22:*1*
**spell** 10:*5* 38:*10*
**spelling** 108:*24*
**spending** 17:*1* 24:*20*
**spoke** 34:*20* 41:*25*
58:*23* 91:*17*
**spotted** 80:*23*
**Sprankel** 75:*15, 16*
107:*7, 16*
**Spreadsheet** 72:*10*
107:*25*
**Stacy** 70:*7, 9, 10, 18*
71:*23*
**staff** 46:*18*
**stand** 111:*2*
**standalone** 110:*15, 20*
**stand-alone** 111:*7*
**standards** 36:*17, 19*
76:*1, 8* 106:*20*
**start** 5:*2* 31:*3* 32:*5*
**started** 26:*25* 27:*23*
28:*2, 3* 29:*9* 43:*25*
99:*10, 12* 110:*24*
117:*1*
**state** 4:*6* 48:*9* 103:*5*
105:*4* 114:*2* 121:*2,*
*12* 122:*2*
**STATES** 1:*1* 74:*6*
**stating** 5:*2*
**Statute** 103:*5*
**statutes** 105:*5*
**stay** 18:*15, 16, 20, 25*
22:*4* 101:*25* 102:*10*
104:*4*

**stayed** 19:*2* 20:*12*
108:*17* 109:*3*
**staying** 18:*21*
**STEFANY** 2:*6* 3:*3*
4:*11* 9:*8* 10:*7* 31:*10*
32:*21* 33:*3* 51:*9*
67:*3* 71:*16* 74:*20*
83:*18* 84:*8* 87:*14*
100:*21, 22* 101:*3, 10,*
*14* 105:*10, 14, 16*
108:*23* 109:*1* 119:*25*
120:*5, 13* 124:*1*
**stenographic** 122:*2*
**stenographically**
122:*2*
**step** 22:*3, 6* 31:*11*
53:*13*
**stepped** 57:*21* 112:*9*
**stepping** 100:*16*
**stipulated** 3:*12*
**streamline** 48:*25*
53:*8* 59:*23*
**streamlined** 49:*15*
**streamlining** 42:*4, 10*
**strength** 58:*21*
**strike** 28:*8*
**strong** 87:*12*
**stronger** 58:*5*
**strongest** 57:*17, 20*
**structured** 16:*4*
**stuck** 112:*10*
**studying** 81:*7*
**stuff** 11:*1* 35:*21*
41:*4*
**subject** 123:*22*
**submitted** 17:*12*
103:*3, 6, 7, 23* 114:*9*
**subordinate** 57:*10, 14*
**subordinates** 37:*25*
97:*19*
**subsequent** 103:*2*
**substance** 123:*23*
**suffered** 95:*9* 96:*16*
**suggestion** 23:*25*
**Suite** 2:*3, 7*
**summer** 104:*18*
105:*2*
**supervise** 26:*16, 20*
31:*21* 65:*8* 66:*2*

Deposition of Annmarie Reno

Jenna Clark v. Carmine Marceno

**supervised**  27:5
31:23  32:8  36:13
41:9  54:6  63:1
64:23  65:23
**supervising**  16:14
26:1, 14
**supervision**  20:24
21:17
**supervisor**  31:18
66:10  67:25  68:4, 6
87:8  94:11
**supervisors**  13:20
14:1
**supplies**  39:24
**Support**  15:20  16:2
20:9, 23  21:7, 9, 15
23:3  32:3  101:18
108:5
**supposed**  117:25
**sure**  6:4, 13  10:4
29:22  31:2  34:6
37:16, 21, 23  38:14,
17  54:14  71:12, 13,
23, 24  80:3, 9  82:14
86:6  93:8  94:22, 25
95:20  97:3  107:22
110:1
**surgery**  92:16, 17
94:21  95:17
**surprised**  91:10, 12
116:10
**suspend**  120:2
**swear**  4:14
**sworn**  4:20  121:2
**system**  15:1  16:25
18:17  19:8, 21  49:12,
15  50:3  51:23, 25
53:11  57:18, 20, 24
58:6, 14, 22  63:9
105:4  108:11, 18
110:3, 8, 10, 11, 16, 22
111:1, 9, 10, 13, 19
112:3, 6, 10, 15  114:3
**systems**  50:8

**< T >**
**take**  6:19, 21  12:14
18:3  21:17  23:21
41:12  42:14  47:3
62:13  85:4  92:15

94:8  96:24  97:24
100:23  101:11
118:24  119:11
**take-home**  29:13
**TAKEN**  1:9  4:5
12:4, 11  41:15  60:9
73:5  84:16  92:12
94:20  98:9  100:5
101:8  124:1
**talk**  32:15  34:18
56:23  89:16  95:14
96:22, 23  110:23
111:8  116:22  117:13
**talked**  7:12  22:2
34:18  46:12, 13
47:10  58:10  66:4
85:2  88:5  91:14
96:21  110:16
**talking**  33:24  47:19
56:11  58:11  84:18
110:24, 25
**Tampa**  2:8
**tasks**  67:8
**taxing**  12:12
**Taylor**  70:8  71:10,
12, 23
**Taylor's**  71:14
**Technical**  21:8, 9
60:9
**tell**  7:16  44:9  55:5
78:3  94:7  98:3
106:13  117:4
**telling**  61:4
**ten**  124:1
**ten-minute**  41:12
**tenure**  17:18
**term**  119:13
**terminated**  25:12
120:19
**termination**  25:7
**terminations**  25:5, 9,
10, 14
**terms**  21:25  48:21
59:7  85:20  91:3
**Terri**  70:7  71:10, 12,
14, 22
**testified**  4:20  101:15
105:17  108:16  109:6
116:8  118:13

**testify**  5:20
**testifying**  5:25  6:25
**TESTIMONY**  3:2
4:15  5:24  6:14  63:3
102:25  103:14
104:10, 20  108:6
110:2  111:25  116:3
120:8
**texted**  116:17
**Thank**  5:1  71:18
86:7  100:20  105:14
119:25
**Thankyou**  124:1
**thing**  33:22  44:9
56:21  117:10  118:9
**things**  5:16  12:13
13:10  14:9  24:22
31:3  33:7, 10  39:24
40:16  43:18  45:1, 4
47:10  48:19  85:1, 2
96:22  112:18
**think**  6:15  10:13, 14,
25  11:11  12:23
13:19  21:11, 13
22:16  30:22  33:14
36:23  37:6  38:7, 9,
14  39:15  45:23
47:18  48:11, 16
49:24  52:14  54:4
66:11  68:8  80:7
81:5, 19, 20  84:2, 7,
19, 22, 25  85:1  88:17
95:25  96:2, 21  98:14,
15, 17  100:15, 23
102:1, 4  109:6  110:2
111:25  112:8  116:8
119:25
**thinking**  6:25  8:13
23:13  53:3  98:22
**thought**  10:15  23:17,
18  81:6
**Three**  8:21  18:19
33:15, 16  37:16
**threshold**  55:15
**TIME**  1:9  4:3  6:8
13:11  16:3, 4  19:4,
14  20:1  21:2  23:10
26:17, 19, 20  30:5
31:10, 19  34:13, 23
36:5  37:1  39:3, 6, 17

40:9, 11, 22  44:23
46:8  48:4, 17, 22
50:19  53:25  54:17
56:17  57:1, 9  60:3, 7,
12, 15, 18, 22  68:1
70:11, 23  87:25  88:2
89:6  91:24, 25  92:8,
18  93:21, 25  94:11
98:13  100:21  101:17
108:10  109:21  112:2
113:17  117:14  119:2,
9  120:3
**times**  33:12, 15, 16
96:21
**timesheets**  9:18
110:14, 19
**timing**  91:3  92:22, 25
**title**  15:19  21:14
28:6  37:9  38:12
39:17  40:11, 22  52:6
79:3
**titles**  25:18  38:15
**Today**  4:2  5:1, 21
6:25  7:5, 14, 17, 20,
23  69:2  100:20
102:25  114:12  116:4
120:10
**today's**  7:10
**told**  35:23  69:17
71:3  89:19  91:14
92:1  93:7  94:6
95:12  116:9  117:3,
12  118:2
**top**  82:24  88:14
98:18  106:5
**topics**  13:18  14:6
15:6
**total**  87:7  100:12
**Traci**  106:19
**track**  100:18
**Tracy**  76:4
**traffic**  75:13, 19, 22
107:8
**training**  11:21  12:1,
5, 6, 10  13:6, 7, 13, 16,
20, 22, 25  14:7, 8, 12,
14, 18, 23  15:7, 14
20:6  21:12  27:18
36:17

Deposition of Annmarie Reno

Jenna Clark v. Carmine Marceno

**trainings** 12:19
**transcribe** 6:3 29:16
**transcript** 3:14
120:6, 7 122:2 124:1
**transferred** 109:7
**trends** 24:20
**true** 92:7 102:21
122:2 123:22
**truth** 4:15, 16
**truthfully** 5:21 6:25
**try** 6:16 17:25 19:6,
7 30:20 45:4
**trying** 9:7 10:13, 25
11:5, 11 13:14, 19
14:25 18:6 26:22
28:14, 15 29:21
33:14 34:3 35:19
36:23 37:5, 7 38:7
44:5 45:23 46:2
48:9, 16 49:3 52:14
53:6, 8, 11 54:1
59:14 78:5, 7, 24
80:22 81:19, 20 96:2,
21 97:1 98:8, 14, 15
100:15 101:20, 23, 25
102:4, 7 113:19
115:6, 12 116:18
**Tuesday** 1:9 4:2
**turnover** 56:18 98:25
**twice** 31:23 35:6
88:5
**two** 12:24 20:20
23:19 33:15, 16
50:16, 21, 22 51:24
53:23 54:7, 23 63:24
65:2 66:11, 12 67:21
91:2, 3, 15 96:12
101:1, 4 113:6
**Tyler** 49:12 57:25
58:1, 6, 13, 22 63:7
110:3, 22, 23 111:11,
13, 19 112:15
**type** 11:20 12:1
25:7, 14 47:9 82:18
**types** 25:9 94:16
**typically** 25:14, 23
102:23 112:21

< U >

**ultimately** 104:14
108:9, 21 109:3
114:14
**undersheriff** 22:10,
23 23:6, 23, 24 24:4,
13, 15, 19 25:4, 6, 15,
24 34:19, 21 35:3, 9,
14, 17 36:6 46:18, 20
47:2, 6, 12, 22 56:5, 8,
10 57:3, 12 58:23
62:11, 14 65:18, 21
66:1, 15 69:16, 24
75:2 77:14, 19 78:22
83:11 84:15 86:12,
19, 25 88:11, 16
89:15, 24 90:14, 18,
24 91:5, 17 92:3
100:14 115:11 116:4
**undersheriff's** 22:11
36:1
**understand** 5:19, 23
6:15 21:4, 11 22:7
24:2 34:10 35:19
57:22 67:4 80:9
104:9, 20, 25 108:8,
15 110:9 111:14
115:6 118:2
**understanding** 14:12
73:8 91:22 102:14
103:14 110:2 115:13
116:3
**unforeseen** 44:12
**Unfortunately** 114:2
**uniform** 38:22
**uniforms** 35:5, 24
36:2 38:20 39:25
86:15 88:7
**unit** 27:24 28:3
31:4 58:2
**UNITED** 1:1
**units** 26:12, 14
40:15 91:15
**University** 10:14, 17
**updated** 12:13
113:18
**updates** 13:9
**upset** 117:24 118:1
**use** 58:19 95:2
99:17 113:13 118:15,

20 119:2, 8, 18
**users** 8:13
**Usually** 24:20 25:5
97:25 115:10
**utilized** 73:6 80:15
81:13, 14

< V >

**vacated** 74:1
**vacation** 94:18, 19
**vendors** 30:19 37:23
111:22
**venture** 52:15
**verbal** 34:9, 12 35:8
**verbally** 35:13 90:14
**vests** 38:21
**Victim** 16:6 54:3
**videoconference** 1:9
**virtually** 110:13
111:8

< W >

**wait** 6:9, 10 71:8
102:4
**waive** 120:6, 11
**want** 6:13 8:12
18:4 33:6 34:5 54:2
63:19 70:19 85:4
88:18 98:21 110:1
117:4 119:8
**wanted** 33:8, 9 45:3
49:2 78:9 87:1
108:16 112:9, 18
113:24
**wanting** 52:16
**warehouse** 35:20
38:25 39:23 86:14
87:3 88:6
**warehouse/ordering**
39:23
**watching** 17:2
**water** 6:20
**way** 16:4 33:5, 9
42:4 50:2 56:12
60:24 74:21 84:23
106:25 109:23
**Well** 15:8 16:24
19:9 20:11 22:1
23:5 30:23 31:11
34:5 35:19 42:13

43:5 47:16 50:6, 16
53:2 60:22 71:10
72:3 76:2 77:25
79:21 80:14 81:4
84:23 85:21 93:4
104:4 117:1
**went** 10:18 11:6
17:9 29:5 37:17
44:23 48:13 50:20,
23 51:15, 25 73:10,
19 110:21 118:25
**we're** 5:16 41:14, 16
48:10 100:4 101:7, 9
102:5 104:23 114:1,
11
**west** 29:9
**We've** 37:3 102:24
**window** 41:2, 3
**Windsor** 8:17
**wish** 123:1
**witness** 1:9 4:17
9:5, 17, 18 32:23
33:4 51:10 58:3
60:12 67:6 68:21
71:17 72:5 74:22
83:20 84:10 86:4
87:16 100:24 108:25
120:12, 13 121:2
**words** 118:1
**work** 15:18 17:7
19:18 29:5 36:22
43:7, 18, 19 49:1, 5,
10, 16 50:11 52:2
53:9, 12 73:14 75:9
80:23, 24 84:4 99:7
102:15 111:1 113:18
114:1 116:20 118:18
**worked** 28:3 29:1, 5
30:24 31:1 36:25
37:11 38:12 48:19
56:14 97:11, 13, 14
98:12
**Workers** 12:21
48:19 114:7
**working** 29:23, 25
37:22 44:19 56:12
99:10 119:16
**workload** 42:24, 25
43:3, 9 49:6

Deposition of Annmarie Reno

Jenna Clark v. Carmine Marceno

**works** 73:*19* 104:*21*
**workshops** 113:*6*
**write** 69:*14, 18*
**write-up** 86:*12*
**writing** 35:*10, 13*
  87:*16, 21, 24*
**written** 69:*4* 90:*1*
**wrong** 90:*4*
**wrote** 89:*6*

< Y >
**Yeah** 32:*14* 33:*16*
  34:*18* 51:*10, 18*
  96:*20* 112:*14*
**year** 10:*23* 11:*4*
  18:*23* 26:*10* 64:*3*
  71:*6* 75:*3* 78:*25*
  79:*1* 95:*1* 98:*21*
  102:*1, 10, 19, 24, 25*
  103:*2, 11, 19* 112:*24*
  113:*1, 15* 114:*15, 17*
**years** 5:*8* 8:*21* 10:*3*
  14:*25* 18:*15, 16, 19*
  19:*9, 11* 26:*23* 31:*14*
  34:*3* 37:*16* 54:*1*
  59:*21* 91:*15* 95:*1, 11,*
  *20* 98:*9, 10* 99:*1, 13*
  104:*7, 11, 25* 105:*6*
**yielding** 19:*16*
**younger** 83:*24*

< Z >
**ZOOM** 1:*9* 2:*2, 6*
  3:*2* 4:*4* 5:*24* 72:*3*
  121:*2*

Deposition of Annmarie Reno                                          Jenna Clark v. Carmine Marceno

## WORD LIST

**< 1 >**
**1** *(7)*
**1/21/2024** *(1)*
**1/31/2021** *(1)*
**1:02** *(1)*
**10:14** *(2)*
**101** *(1)*
**11/4/2021** *(2)*
**11:16** *(1)*
**11:26** *(1)*
**120** *(1)*
**121** *(1)*
**122** *(1)*
**123** *(3)*
**124** *(1)*
**15** *(2)*
**19** *(3)*
**1997** *(2)*
**1st** *(1)*

**< 2 >**
**2:22-cv-614-SPC-NPM** *(1)*
**2:27** *(2)*
**20** *(5)*
**2000** *(1)*
**2000-maybe-17** *(1)*
**2001** *(1)*
**2003** *(2)*
**2005** *(2)*
**2007** *(4)*
**2008** *(6)*
**2012** *(6)*
**2017** *(6)*
**2018/2019** *(1)*
**2019** *(12)*
**2020** *(5)*
**2020/2021** *(1)*
**2021** *(61)*
**2022** *(10)*
**20221** *(1)*
**2023** *(10)*
**2024** *(2)*
**2027** *(2)*
**20th** *(1)*
**21** *(1)*
**22** *(3)*

**225** *(1)*
**23** *(1)*
**24** *(5)*
**27** *(1)*
**27th** *(2)*
**28** *(2)*

**< 3 >**
**3** *(1)*
**30** *(4)*
**31** *(3)*
**324** *(1)*
**33131** *(1)*
**33606-4128** *(1)*
**33905** *(1)*

**< 4 >**
**4** *(4)*
**40** *(2)*
**4350** *(1)*
**46** *(1)*
**48** *(1)*

**< 5 >**
**5** *(1)*
**51** *(1)*
**520** *(1)*
**565** *(1)*
**566** *(1)*
**58** *(2)*
**59** *(1)*

**< 6 >**
**62** *(1)*
**66** *(1)*

**< 7 >**
**7** *(2)*

**< 8 >**
**8** *(1)*
**8/15/21** *(1)*
**8/19/21** *(1)*

**< 9 >**
**9/4/2021** *(1)*
**9502** *(1)*
**97** *(1)*

**< A >**
**a.m** *(2)*
**ABA** *(1)*
**ability** *(1)*
**able** *(3)*
**above-referenced** *(1)*
**absence** *(3)*
**absenteeism** *(1)*
**absolutely** *(1)*
**absorb** *(2)*
**absorbed** *(1)*
**accepted** *(3)*
**accommodate** *(2)*
**accomplished** *(1)*
**account** *(2)*
**Accreditation** *(1)*
**accrued** *(2)*
**accumulate** *(1)*
**accurate** *(3)*
**accurately** *(1)*
**action** *(2)*
**actual** *(4)*
**ADA** *(1)*
**adapt** *(1)*
**add** *(2)*
**added** *(5)*
**address** *(4)*
**adjust** *(1)*
**adjustments** *(1)*
**admin** *(2)*
**administration** *(7)*
**administrative** *(1)*
**administrator** *(1)*
**advocate** *(1)*
**Advocates** *(1)*
**Affairs** *(2)*
**affirm** *(1)*
**age** *(9)*
**agency** *(11)*
**agent** *(5)*
**ages** *(2)*
**ago** *(18)*
**agree** *(2)*
**agreed** *(1)*
**ahead** *(8)*
**ahold** *(1)*
**Alarm** *(1)*
**alarms** *(2)*
**align** *(1)*

**Allen** *(3)*
**allocated** *(3)*
**allocating** *(1)*
**allow** *(1)*
**allowed** *(1)*
**alterations** *(1)*
**amount** *(6)*
**amounts** *(1)*
**Amy** *(1)*
**analyses** *(1)*
**analysis** *(4)*
**analyst** *(6)*
**analyzing** *(1)*
**ANNMARIE** *(10)*
**answer** *(7)*
**answered** *(4)*
**answers** *(1)*
**Anthony** *(2)*
**anticipated** *(3)*
**Anticipation** *(2)*
**anybody** *(1)*
**anymore** *(1)*
**anyways** *(1)*
**appear** *(1)*
**appearance** *(1)*
**APPEARANCES** *(1)*
**appeared** *(2)*
**appears** *(6)*
**applied** *(2)*
**approval** *(10)*
**approved** *(12)*
**approving** *(3)*
**approximately** *(1)*
**area** *(1)*
**areas** *(2)*
**arrested** *(1)*
**asked** *(14)*
**asking** *(3)*
**aspects** *(2)*
**assessment** *(2)*
**assessments** *(2)*
**assets** *(2)*
**assign** *(1)*
**assist** *(1)*
**assistant** *(11)*
**assistants** *(2)*
**assisting** *(1)*
**Association** *(2)*
**assume** *(1)*

Deposition of Annmarie Reno

Jenna Clark v. Carmine Marceno

assuming *(1)*
attend *(2)*
attorney *(4)*
attorneys *(1)*
August *(19)*
authorized *(3)*
automate *(1)*
automated *(1)*
available *(1)*
Avenue *(1)*
aviation *(1)*
awarded *(2)*
aware *(11)*

< B >
back *(35)*
back-fill *(2)*
background *(1)*
backwards *(1)*
ballistic *(1)*
Bartz *(5)*
based *(3)*
basis *(1)*
Bates *(4)*
bathroom *(1)*
Bauer *(3)*
B-A-U-E-R *(3)*
B-E-A *(1)*
began *(4)*
beginning *(3)*
BEHALF *(5)*
belief *(1)*
beliefs *(1)*
believe *(29)*
believed *(1)*
benefit *(3)*
benefits *(17)*
Berkowitz *(7)*
best *(6)*
better *(6)*
betterment *(1)*
bias *(2)*
Bill *(9)*
bills *(1)*
bit *(7)*
blindsided *(1)*
Blue *(3)*
board *(2)*
brand *(2)*

break *(5)*
Brenda *(7)*
Brenda's *(2)*
Brickell *(1)*
brief *(5)*
bring *(2)*
bringing *(2)*
brought *(8)*
budget *(53)*
budgetary *(3)*
budgeting *(5)*
budgets *(1)*
bulk *(1)*
bureau *(20)*
bureaus *(1)*
burglar *(1)*
Burkwitz's *(1)*
Business *(4)*

< C >
CAD *(1)*
Caiazza *(2)*
C-A-I-A-Z-Z-A *(1)*
calculates *(1)*
calendar *(7)*
call *(8)*
called *(10)*
calling *(1)*
candidate *(1)*
capacity *(2)*
capital *(2)*
capitol *(1)*
Captain *(11)*
care *(2)*
CARMINE *(4)*
cars *(1)*
CASE *(7)*
Casell *(2)*
cases *(1)*
Cassella *(1)*
causing *(1)*
cell *(1)*
Central *(4)*
certain *(4)*
CERTIFICATE *(4)*
certification *(3)*
certifications *(2)*
Certified *(4)*
certify *(3)*

chance *(1)*
change *(13)*
changed *(9)*
changeover *(1)*
changes *(11)*
changing *(1)*
charge *(1)*
chart *(1)*
check *(2)*
checks *(1)*
chief *(15)*
child *(1)*
choose *(3)*
chose *(1)*
Christine *(4)*
Christine's *(1)*
Circle *(1)*
citizens *(3)*
civil *(1)*
civilian *(1)*
civilians *(1)*
claims *(1)*
clarified *(1)*
clarify *(2)*
CLARK *(81)*
Clark's *(38)*
classes *(3)*
clear *(1)*
clearly *(3)*
clerk *(6)*
clerks *(2)*
client *(1)*
closely *(2)*
closer *(1)*
Club *(1)*
college *(7)*
column *(1)*
come *(10)*
coming *(4)*
command *(2)*
Comment *(2)*
commission *(7)*
committee *(2)*
communicated *(1)*
communicating *(1)*
Communications *(24)*
community *(3)*
Comp *(4)*
company *(1)*

complained *(1)*
complete *(1)*
completed *(1)*
completely *(1)*
comprehending *(1)*
computerized *(2)*
condition *(5)*
conditions *(7)*
conduct *(1)*
conducted *(12)*
conducting *(2)*
conference *(1)*
conferences *(1)*
confident *(1)*
confirm *(1)*
confusing *(1)*
conjunction *(1)*
connected *(2)*
connection *(1)*
consecutively *(1)*
consider *(6)*
consideration *(3)*
considered *(9)*
considering *(1)*
consolidate *(1)*
constituents *(1)*
contact *(2)*
content *(1)*
continuation *(3)*
continue *(1)*
continued *(1)*
continuously *(1)*
contracts *(1)*
control *(1)*
conversation *(9)*
conversations *(5)*
convert *(2)*
cooperation *(1)*
coordinating *(1)*
coordinator *(13)*
copy *(1)*
core *(5)*
correct *(77)*
Correction *(1)*
corrections *(1)*
correctly *(4)*
cost *(1)*
costs *(3)*
counsel *(9)*

Deposition of Annmarie Reno

Jenna Clark v. Carmine Marceno

counseling *(1)*
counsel's *(1)*
Country *(1)*
County *(51)*
couple *(16)*
course *(6)*
courses *(1)*
COURT *(19)*
covered *(2)*
Covid *(1)*
creates *(1)*
criteria *(2)*
CROSS *(3)*
CROSS-EXAMINATION *(1)*
current *(5)*
currently *(2)*
cut *(4)*

< D >
daily *(4)*
Daisy *(7)*
Daisy's *(2)*
Danielle *(8)*
DATE *(25)*
dated *(4)*
dates *(4)*
DAVID *(3)*
Dawn *(19)*
day *(8)*
days *(14)*
deal *(1)*
Dear *(1)*
December *(3)*
decided *(3)*
deciding *(1)*
decision *(32)*
decision-making *(1)*
decisions *(7)*
declare *(1)*
deemed *(2)*
Defendant *(2)*
Defendant's *(1)*
deferred *(1)*
defied *(1)*
degree *(2)*
Delaquilla *(1)*
Department *(13)*
depended *(1)*

depends *(1)*
Deponto *(2)*
D-E-P-O-N-T-O *(1)*
deposed *(4)*
DEPOSITION *(19)*
depositions *(1)*
deputies *(2)*
Derek *(1)*
describe *(1)*
described *(5)*
describing *(1)*
description *(1)*
destroyed *(1)*
detectives *(1)*
determination *(4)*
determine *(1)*
determined *(3)*
determining *(5)*
different *(14)*
differently *(1)*
difficulties *(1)*
diploma *(1)*
DIRECT *(4)*
directed *(1)*
direction *(1)*
directive *(3)*
directly *(4)*
director *(81)*
directors *(3)*
director's *(2)*
disciplinary *(4)*
discipline *(7)*
discrimination *(7)*
discriminatory *(1)*
discuss *(30)*
discussed *(14)*
discussing *(3)*
discussion *(7)*
discussions *(17)*
DISTRICT *(6)*
division *(4)*
divisions *(17)*
document *(24)*
documentation *(1)*
documented *(1)*
documents *(5)*
dog *(1)*
doing *(27)*
dollar *(3)*

Doreen *(10)*
Doreen's *(9)*
Dr *(1)*
driving *(1)*
DROP *(20)*

dstefany@anblaw.com *(1)*
due *(6)*
duly *(2)*
duplicated *(2)*
duplicating *(1)*
duties *(3)*

< E >
earlier *(11)*
earn *(2)*
earned *(1)*
ears *(2)*
effect *(1)*
efficiencies *(1)*
efficiency *(1)*
efficient *(4)*
effort *(1)*
eight *(1)*
either *(6)*
elect *(3)*
elected *(3)*
election *(2)*
eliminate *(19)*
eliminated *(101)*
eliminated-slash-pay *(1)*
eliminated-slash-retired *(1)*
eliminating *(7)*
elimination *(25)*
eliminations *(3)*
email *(13)*
employed *(3)*
employee *(18)*
employees *(34)*
employee's *(3)*
employment *(2)*
Enclosed *(1)*
ended *(3)*
enforcement *(2)*
enter *(3)*
entered *(5)*

entire *(5)*
entity *(1)*
equilibrium *(3)*
equipment *(2)*
ERRATA *(5)*
especially *(3)*
ESQUIRE *(3)*
essentially *(1)*
Estep *(3)*
Ethics *(1)*
evals *(2)*
evaluating *(1)*
evaluations *(4)*
Evans *(6)*
events *(1)*
eventually *(1)*
Everest *(1)*
everybody *(1)*
exact *(6)*
exactly *(10)*
Examination *(4)*
example *(3)*
exception *(1)*
excluded *(1)*
Excuse *(2)*
executive *(14)*
Exhibit *(7)*
EXHIBITS *(1)*
expanded *(1)*
expect *(1)*
expenses *(1)*
experience *(1)*
Expires *(1)*
explain *(2)*
explanation *(1)*
expressly *(1)*
extended *(1)*
extension *(1)*
extent *(2)*
extra *(2)*

< F >
facilitate *(1)*
Facilities *(3)*
fact *(7)*
factor *(2)*
factors *(1)*
fair *(2)*
fall *(1)*

Deposition of Annmarie Reno                                                          Jenna Clark v. Carmine Marceno

**False** *(2)*
**familiar** *(2)*
**far** *(6)*
**FDLE** *(1)*
**February** *(2)*
**feel** *(1)*
**feeling** *(1)*
**fell** *(2)*
**felt** *(2)*
**figure** *(3)*
**file** *(7)*
**fill** *(2)*
**filled** *(6)*
**filling** *(1)*
**final** *(3)*
**finally** *(1)*
**Finance** *(16)*
**financial** *(1)*
**financially** *(1)*
**financials** *(8)*
**find** *(1)*
**fine** *(1)*
**finish** *(3)*
**finishes** *(1)*
**fire** *(2)*
**firing** *(1)*
**first** *(22)*
**first-line** *(1)*
**fiscal** *(10)*
**five** *(8)*
**fleet** *(13)*
**FLORIDA** *(16)*
**Florin** *(1)*
**fluid** *(1)*
**FMLA** *(9)*
**focus** *(2)*
**following** *(2)*
**follows** *(1)*
**follow-up** *(1)*
**food** *(1)*
**force** *(53)*
**foregoing** *(1)*
**Forgive** *(1)*
**form** *(7)*
**formerly** *(1)*
**Fort** *(1)*
**forward** *(2)*
**four** *(5)*
**fresh** *(1)*

**Friday** *(2)*
**front** *(5)*
**frozen** *(1)*
**FRS** *(10)*
**FSA** *(1)*
**full** *(1)*
**function** *(1)*
**funding** *(1)*
**furniture** *(3)*
**further** *(2)*

**< G >**
**gain** *(1)*
**general** *(2)*
**generally** *(1)*
**generated** *(1)*
**gesture** *(1)*
**getting** *(3)*
**GG939756** *(1)*
**give** *(6)*
**given** *(5)*
**glass** *(1)*
**go** *(36)*
**goal** *(2)*
**goals** *(1)*
**God** *(1)*
**going** *(46)*
**Good** *(5)*
**gotten** *(1)*
**government** *(1)*
**graduate** *(1)*
**Group** *(1)*
**growth** *(3)*
**guess** *(10)*
**guessing** *(2)*
**guesstimating** *(2)*
**Gwen** *(8)*
**Gwen's** *(2)*

**< H >**
**hand** *(2)*
**handle** *(1)*
**handled** *(4)*
**handwritten** *(1)*
**happen** *(4)*
**happened** *(2)*
**happening** *(1)*
**happy** *(1)*
**harassment** *(3)*

**harder** *(1)*
**head** *(4)*
**health** *(2)*
**hear** *(1)*
**hearings** *(2)*
**heart** *(2)*
**Hector** *(2)*
**H-E-C-T-O-R** *(1)*
**he'd** *(1)*
**Heikkila** *(14)*
**held** *(4)*
**help** *(6)*
**helped** *(8)*
**helps** *(1)*
**hereto** *(1)*
**herewith** *(1)*
**high** *(1)*
**hire** *(3)*
**hired** *(1)*
**hires** *(1)*
**hiring** *(4)*
**hit** *(1)*
**hold** *(2)*
**holding** *(1)*
**Holloway** *(5)*
**home** *(1)*
**hone** *(1)*
**honest** *(4)*
**hooked** *(1)*
**hope** *(1)*
**hopefully** *(1)*
**HR** *(13)*
**huge** *(2)*
**human** *(15)*
**Hyde** *(1)*

**< I >**
**idea** *(2)*
**identified** *(1)*
**identifying** *(1)*
**immediate** *(1)*
**impact** *(6)*
**implemented** *(3)*
**implicit** *(1)*
**important** *(2)*
**improvements** *(1)*
**inaudible** *(1)*
**include** *(1)*
**included** *(6)*

**includes** *(1)*
**incompetent** *(1)*
**incorrect** *(1)*
**increase** *(5)*
**increases** *(2)*
**INDEX** *(1)*
**individual** *(4)*
**information** *(9)*
**informed** *(1)*
**initially** *(1)*
**initiate** *(3)*
**initiated** *(4)*
**inmate** *(2)*
**Inspections** *(1)*
**instance** *(1)*
**instances** *(2)*
**instituted** *(1)*
**instruct** *(1)*
**instructed** *(1)*
**instructing** *(1)*
**insubordinate** *(3)*
**insubordination** *(9)*
**intel** *(1)*
**interested** *(1)*
**internal** *(4)*
**internally** *(2)*
**International** *(5)*
**interrupt** *(1)*
**inventory** *(1)*
**investigation** *(1)*
**investigations** *(1)*
**investment** *(1)*
**involve** *(1)*
**involved** *(18)*
**involvement** *(1)*
**issue** *(5)*
**issues** *(11)*
**issuing** *(1)*
**items** *(1)*
**its** *(2)*

**< J >**
**Jamie** *(4)*
**Janke** *(2)*
**Janke's** *(1)*
**January** *(5)*
**JENNA** *(48)*
**Jenna's** *(1)*
**Jill** *(3)*

Deposition of Annmarie Reno

Jenna Clark v. Carmine Marceno

**job** *(36)*
**jobs** *(12)*
**John** *(3)*
**Jones** *(3)*
**judge** *(1)*
**Julie** *(9)*
**July** *(3)*
**June** *(5)*
**jury** *(1)*

**< K >**
**K-9** *(1)*
**keep** *(1)*
**keeping** *(1)*
**kept** *(2)*
**Key** *(4)*
**keyed** *(1)*
**kind** *(6)*
**knew** *(5)*
**know** *(82)*
**knowledge** *(2)*
**known** *(2)*
**KYLE** *(6)*

**< L >**
**label** *(2)*
**labeled** *(1)*
**language** *(1)*
**latest** *(1)*
**Law** *(4)*
**laws** *(6)*
**lawsuit** *(7)*
**LCSO** *(2)*
**lead** *(1)*
**leads** *(1)*
**learn** *(6)*
**learned** *(4)*
**learning** *(1)*
**leave** *(38)*
**leaves** *(1)*
**led** *(1)*
**L-E-D-G-L-E-R** *(1)*
**Lee** *(39)*
**left** *(11)*
**legislation** *(2)*
**legislative** *(1)*
**legislature** *(1)*
**Legler** *(2)*
**Lehman** *(15)*

**Lehman's** *(4)*
**LETTER** *(33)*
**letters** *(1)*
**liaison** *(2)*
**limit** *(1)*
**limitation** *(1)*
**line** *(2)*
**list** *(7)*
**listed** *(24)*
**little** *(13)*
**live** *(1)*
**lived** *(1)*
**LLC** *(1)*
**locally** *(1)*
**long** *(7)*
**longer** *(6)*
**look** *(10)*
**looked** *(6)*
**looking** *(23)*
**looks** *(3)*
**lot** *(10)*
**low** *(1)*
**lowest** *(1)*

**< M >**
**MACDONALD** *(32)*
**mail** *(2)*
**major** *(4)*
**making** *(7)*
**managed** *(1)*
**management** *(9)*
**management's** *(1)*
**manager** *(23)*
**managers** *(2)*
**manpower** *(1)*
**manual** *(6)*
**manually** *(2)*
**MARCENO** *(5)*
**Marcia** *(4)*
**MARKED** *(4)*
**Master's** *(1)*
**matter** *(3)*
**MBA** *(1)*
**meal** *(1)*
**mean** *(5)*
**means** *(1)*
**measures** *(1)*
**medical** *(15)*
**meet** *(2)*

**meeting** *(1)*
**meetings** *(4)*
**meets** *(2)*
**mentioned** *(22)*
**message** *(3)*
**met** *(3)*
**Miami** *(1)*
**MIDDLE** *(1)*
**migraines** *(1)*
**military** *(2)*
**mind** *(1)*
**minute** *(2)*
**missed** *(1)*
**Mm-hm** *(5)*
**moment** *(1)*
**Monday** *(2)*
**money** *(23)*
**month** *(1)*
**monthly** *(1)*
**months** *(2)*
**morning** *(7)*
**motivated** *(1)*
**motivation** *(1)*
**move** *(3)*
**moved** *(7)*
**Munis** *(14)*
**M-U-N-I-S** *(1)*
**Myers** *(1)*

**< N >**
**name** *(20)*
**names** *(2)*
**near** *(1)*
**need** *(9)*
**needed** *(25)*
**needs** *(2)*
**never** *(3)*
**new** *(30)*
**normal** *(3)*
**North** *(4)*
**Norton** *(3)*
**Notary** *(3)*
**note** *(2)*
**notes** *(2)*
**notice** *(1)*
**noticed** *(1)*
**NOTIFICATION** *(5)*
**notified** *(9)*
**notify** *(2)*

**notifying** *(1)*
**number** *(1)*

**< O >**
**O-301** *(1)*
**OATH** *(3)*
**object** *(2)*
**objecting** *(1)*
**Objection** *(5)*
**obligation** *(1)*
**occupied** *(1)*
**occur** *(2)*
**o'clock** *(2)*
**October** *(6)*
**offering** *(1)*
**Office** *(42)*
**officer** *(2)*
**officers** *(2)*
**official** *(4)*
**oh** *(7)*
**Okay** *(47)*
**old** *(4)*
**on-board** *(1)*
**onboarding** *(1)*
**once** *(10)*
**ones** *(9)*
**ongoing** *(4)*
**online** *(1)*
**onward** *(1)*
**open** *(4)*
**operate** *(2)*
**operates** *(2)*
**operating** *(2)*
**operation** *(2)*
**operational** *(1)*
**operations** *(8)*
**opinion** *(1)*
**opportunity** *(1)*
**opposed** *(2)*
**options** *(3)*
**ORANGE** *(2)*
**order** *(6)*
**ordered** *(1)*
**ordering** *(2)*
**orders** *(8)*
**ordinance** *(1)*
**organization** *(1)*
**organizational** *(1)*
**organized** *(1)*

Deposition of Annmarie Reno                                            Jenna Clark v. Carmine Marceno

original  *(2)*
outreach  *(1)*
outside  *(5)*
overcrowded  *(2)*
oversaw  *(5)*
oversee  *(10)*
overseeing  *(4)*
oversees  *(2)*
Oversight  *(1)*
overtime  *(3)*

< P >
P.A  *(2)*
p.m  *(2)*
P.O.'s  *(1)*
package  *(1)*
page  *(5)*
paid  *(1)*
paperwork  *(2)*
parameters  *(1)*
Park  *(1)*
parks  *(1)*
part  *(54)*
participation  *(1)*
particular  *(3)*
parties  *(4)*
part-time  *(4)*
party  *(1)*
Patrol  *(1)*
pay  *(9)*
Payne  *(2)*
P-A-Y-N-E  *(1)*
Payne's  *(1)*
payroll  *(40)*
penalties  *(1)*
pending  *(1)*
pension  *(8)*
people  *(24)*
people's  *(1)*
percentage  *(1)*
perform  *(1)*
performance  *(13)*
period  *(10)*
perjury  *(1)*
perplexed  *(1)*
person  *(23)*
personal  *(1)*
Personnel  *(5)*
persons  *(1)*

person's  *(1)*
peruses  *(3)*
ph  *(2)*
phone  *(5)*
phones  *(1)*
phrased  *(2)*
picked  *(7)*
picking  *(1)*
PLACE  *(11)*
placed  *(2)*
places  *(1)*
Plaintiff  *(4)*
Plaintiff's  *(4)*
plan  *(6)*
planner  *(3)*
Planning  *(6)*
plate  *(1)*
play  *(13)*
played  *(4)*
please  *(7)*
PLLC  *(1)*
plus  *(2)*
PO  *(1)*
point  *(6)*
policies  *(1)*
policy  *(1)*
portion  *(5)*
portions  *(1)*
position  *(177)*
positions  *(72)*
positive  *(2)*
possible  *(1)*
potential  *(6)*
PowerPoint  *(1)*
PowerPoints  *(2)*
prefer  *(1)*
pregnancy  *(1)*
prepare  *(1)*
prepared  *(3)*
preparing  *(1)*
present  *(2)*
pretty  *(5)*
prevent  *(2)*
previous  *(2)*
previously  *(13)*
primary  *(1)*
prior  *(26)*
probably  *(16)*
probation  *(1)*

problem  *(5)*
problems  *(6)*
procedure  *(3)*
process  *(5)*
P-R-O-C-U-R-E  *(1)*
Procure-It  *(3)*
Procus  *(1)*
producing  *(1)*
professional  *(8)*
proficiency  *(1)*
proficient  *(1)*
program  *(18)*
Programming  *(5)*
project  *(1)*
projects  *(1)*
promised  *(1)*
prompted  *(1)*
proposal  *(7)*
proposed  *(6)*
Public  *(6)*
pull  *(9)*
pulled  *(4)*
punched  *(1)*
purchase  *(6)*
Purchasing  *(89)*
purposes  *(2)*
pursuant  *(1)*
put  *(21)*
puts  *(1)*
putting  *(4)*

< Q >
question  *(12)*
questions  *(16)*
quickly  *(1)*
quotes  *(4)*

< R >
radios  *(1)*
raise  *(1)*
Ramsey  *(2)*
Randy  *(4)*
Randy's  *(2)*
rate  *(2)*
rates  *(1)*
rating  *(1)*
reach  *(2)*
reaction  *(4)*
read  *(6)*

reading  *(5)*
ready  *(1)*
real  *(4)*
realigned  *(1)*
realized  *(1)*
reallocate  *(2)*
reallocated  *(1)*
really  *(12)*
reason  *(3)*
reasons  *(1)*
reassigned  *(1)*
recall  *(23)*
receive  *(5)*
received  *(28)*
receiving  *(2)*
recess  *(4)*
recession  *(2)*
recognize  *(3)*
recollection  *(2)*
recommendation  *(1)*
recommendations  *(1)*
record  *(11)*
records  *(2)*
recovering  *(1)*
redo  *(1)*
reduce  *(6)*
reduced  *(3)*
reducing  *(1)*
Reduction  *(54)*
redundancies  *(4)*
redundancy  *(11)*
redundant  *(15)*
reference  *(1)*
referring  *(2)*
refers  *(1)*
reflect  *(1)*
reflected  *(1)*
regard  *(2)*
regarding  *(15)*
regards  *(3)*
regular  *(3)*
rehired  *(1)*
related  *(15)*
relation  *(1)*
relationship  *(1)*
relative  *(2)*
religious  *(1)*
relinquished  *(1)*
remained  *(1)*

Deposition of Annmarie Reno                                              Jenna Clark v. Carmine Marceno

remember  *(76)*
removed  *(8)*
**RENO**  *(23)*
**Reno's**  *(1)*
renting  *(1)*
reorganization  *(1)*
rephrase  *(2)*
report  *(13)*
reported  *(13)*
**Reporter**  *(19)*
reporting  *(10)*
reports  *(1)*
represent  *(2)*
reprimand  *(1)*
request  *(4)*
requested  *(2)*
requests  *(1)*
required  *(2)*
requisition  *(1)*
**Research**  *(5)*
reserved  *(1)*
resigned  *(1)*
resource  *(4)*
resources  *(11)*
respect  *(2)*
respective  *(1)*
respond  *(1)*
response  *(4)*
responses  *(3)*
responsibilities  *(6)*
responsible  *(8)*
rest  *(2)*
resume  *(1)*
retire  *(4)*
retired  *(5)*
retired/position  *(1)*
retired-slash-position  *(1)*
retirement  *(11)*
retiring  *(3)*
return  *(1)*
reutilize  *(1)*
reutilized  *(2)*
review  *(6)*
reviewed  *(2)*
rid  *(1)*
right  *(70)*
road  *(1)*
role  *(41)*

roll  *(1)*
room  *(5)*
roughly  *(6)*
**RP**  *(1)*
rulings  *(1)*
run  *(3)*
running  *(2)*

**< S >**
salaries  *(1)*
salary  *(11)*
**Salva**  *(1)*
**S-A-L-V-A-G-A**  *(1)*
**Salvagno**  *(2)*
**S-A-L-V-A-G-N-O**  *(1)*
**Salvalor**  *(1)*
**S-A-N-D**  *(1)*
**Sands**  *(12)*
**S-A-N-D-S**  *(1)*
**Savator**  *(1)*
save  *(9)*
saved  *(2)*
saving  *(5)*
savings  *(14)*
saw  *(1)*
saying  *(4)*
says  *(5)*
say-so  *(1)*
scheduled  *(1)*
**Scott**  *(1)*
**Screen**  *(6)*
scroll  *(1)*
seal  *(1)*
search  *(1)*
second  *(3)*
secretarial  *(1)*
secretary  *(20)*
section  *(1)*
secured  *(2)*
see  *(25)*
seeing  *(1)*
seeking  *(1)*
seen  *(2)*
select  *(1)*
selected  *(10)*
selecting  *(3)*
self-insured  *(1)*
send  *(2)*
sending  *(3)*

senior  *(13)*
sense  *(4)*
sent  *(13)*
sentence  *(1)*
separate  *(1)*
**September**  *(12)*
sequencing  *(1)*
serious  *(2)*
service  *(2)*
**Services**  *(31)*
set  *(1)*
sets  *(2)*
severe  *(1)*
sexual  *(3)*
**Shannon**  *(22)*
share  *(6)*
she'd  *(1)*
**SHEET**  *(5)*
**Sheriff**  *(10)*
**Sheriffs**  *(3)*
**Sheriff's**  *(38)*
shot  *(1)*
show  *(4)*
showed  *(5)*
showing  *(5)*
shown  *(3)*
shrug  *(1)*
shut  *(1)*
sick  *(19)*
side  *(1)*
sign  *(2)*
signing  *(1)*
similar  *(11)*
simple  *(1)*
simply  *(1)*
**Sincerely**  *(1)*
sit  *(1)*
sitting  *(1)*
situation  *(1)*
skill  *(2)*
**SkillPath**  *(7)*
skills  *(4)*
small  *(1)*
**Smith**  *(1)*
socialize  *(1)*
software  *(2)*
solely  *(2)*
solemnly  *(1)*
somebody  *(4)*

**Sophie**  *(1)*
sorry  *(47)*
sort  *(3)*
sound  *(1)*
**South**  *(1)*
span  *(1)*
speak  *(3)*
**Special**  *(2)*
specialist  *(1)*
specialist-slash-
position  *(1)*
specialized  *(1)*
specialty  *(1)*
specific  *(4)*
specifically  *(6)*
speculate  *(1)*
spell  *(2)*
spelling  *(1)*
spending  *(2)*
spoke  *(4)*
spotted  *(1)*
**Sprankel**  *(4)*
**Spreadsheet**  *(2)*
**Stacy**  *(5)*
staff  *(1)*
stand  *(1)*
standalone  *(2)*
stand-alone  *(1)*
standards  *(5)*
start  *(1)*
started  *(10)*
state  *(9)*
**STATES**  *(2)*
stating  *(1)*
**Statute**  *(1)*
statutes  *(1)*
stay  *(9)*
stayed  *(4)*
staying  *(1)*
**STEFANY**  *(31)*
stenographic  *(1)*
stenographically  *(1)*
step  *(4)*
stepped  *(2)*
stepping  *(1)*
stipulated  *(1)*
streamline  *(3)*
streamlined  *(1)*
streamlining  *(2)*

Deposition of Annmarie Reno

Jenna Clark v. Carmine Marceno

strength *(1)*
strike *(1)*
strong *(1)*
stronger *(1)*
strongest *(2)*
structured *(1)*
stuck *(1)*
studying *(1)*
stuff *(3)*
subject *(1)*
submitted *(6)*
subordinate *(2)*
subordinates *(2)*
subsequent *(1)*
substance *(1)*
suffered *(2)*
suggestion *(1)*
Suite *(2)*
summer *(2)*
supervise *(5)*
supervised *(9)*
supervising *(3)*
supervision *(2)*
supervisor *(7)*
supervisors *(2)*
supplies *(1)*
Support *(12)*
supposed *(1)*
sure *(27)*
surgery *(4)*
surprised *(3)*
suspend *(1)*
swear *(1)*
sworn *(2)*
system *(40)*
systems *(1)*

**< T >**
take *(19)*
take-home *(2)*
TAKEN *(16)*
talk *(11)*
talked *(13)*
talking *(7)*
Tampa *(1)*
tasks *(1)*
taxing *(1)*
Taylor *(4)*
Taylor's *(1)*

Technical *(3)*
tell *(8)*
telling *(1)*
ten *(1)*
ten-minute *(1)*
tenure *(1)*
term *(1)*
terminated *(2)*
termination *(1)*
terminations *(4)*
terms *(5)*
Terri *(5)*
testified *(7)*
testify *(1)*
testifying *(2)*
TESTIMONY *(14)*
texted *(1)*
Thank *(6)*
Thankyou *(1)*
thing *(1)*
things *(19)*
think *(57)*
thinking *(5)*
thought *(4)*
Three *(5)*
threshold *(1)*
TIME *(68)*
times *(4)*
timesheets *(3)*
timing *(3)*
title *(10)*
titles *(2)*
Today *(15)*
today's *(1)*
told *(13)*
top *(4)*
topics *(3)*
total *(2)*
Traci *(1)*
track *(1)*
Tracy *(1)*
traffic *(4)*
training *(24)*
trainings *(1)*
transcribe *(2)*
transcript *(7)*
transferred *(1)*
trends *(1)*
true *(4)*

truth *(3)*
truthfully *(2)*
try *(6)*
trying *(55)*
Tuesday *(2)*
turnover *(2)*
twice *(4)*
two *(24)*
Tyler *(14)*
type *(6)*
types *(2)*
typically *(4)*

**< U >**
ultimately *(5)*
undersheriff *(62)*
undersheriff's *(2)*
understand *(21)*
understanding *(8)*
unforeseen *(1)*
Unfortunately *(1)*
uniform *(1)*
uniforms *(7)*
unit *(5)*
UNITED *(1)*
units *(4)*
University *(2)*
updated *(2)*
updates *(1)*
upset *(2)*
use *(9)*
users *(1)*
Usually *(4)*
utilized *(4)*

**< V >**
vacated *(1)*
vacation *(2)*
vendors *(5)*
venture *(1)*
verbal *(3)*
verbally *(2)*
vests *(2)*
Victim *(2)*
videoconference *(1)*
virtually *(2)*

**< W >**
wait *(4)*

waive *(2)*
want *(14)*
wanted *(11)*
wanting *(1)*
warehouse *(6)*
warehouse/ordering
  *(1)*
watching *(1)*
water *(1)*
way *(11)*
Well *(29)*
went *(15)*
we're *(11)*
west *(1)*
We've *(2)*
window *(1)*
Windsor *(1)*
wish *(1)*
witness *(24)*
words *(1)*
work *(29)*
worked *(14)*
Workers *(3)*
working *(7)*
workload *(5)*
works *(2)*
workshops *(1)*
write *(2)*
write-up *(1)*
writing *(5)*
written *(2)*
wrong *(1)*
wrote *(1)*

**< Y >**
Yeah *(7)*
year *(25)*
years *(30)*
yielding *(1)*
younger *(1)*

**< Z >**
ZOOM *(8)*

### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA

**JENNA CLARK,**

      Plaintiff,

                                       Case No. 2:22-cv-614-SPC-NPM

**v.**

**CARMINE MARCENO, in his official capacity as Sheriff of Lee County, Florida,**

      Defendant.

_____/

### PLAINTIFF'S NOTICE OF RULE 30(b)(6) DEPOSITION

**PLEASE TAKE NOTICE** that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Plaintiff, JENNA CLARK ("Plaintiff"), shall take the deposition upon oral examination of Defendant, CARMINE MARCENO, in his official capacity as Sheriff of Lee County, Florida ("Defendant"), through one or more representatives who shall be designated to testify on Defendant's behalf regarding all information known or reasonably available to Defendant with respect to the subject matter identified in Schedule A. This deposition shall commence on the following dates and times:

| DATE/TIME | LOCATION |
|---|---|
| October 4th, 2023, at 11:00 AM | Via Zoom |
| October 10th, 2023, at 10:00 AM | Via Zoom |

| Exhibit |
|---|
| 1 |

1

October 11th, 2023, at 10:00 AM          Via Zoom

October 17th, 2023, at 10:00 AM          Via Zoom

October 18th, 2023, at 10:00 AM          Via Zoom

The deposition will continue from day to day until completed before a notary public or other person authorized by law to administer oaths. The deposition will be conducted remotely through Everest Court Reporting and will be recorded stenographically.

Dated:  Miami, Florida            **DEREK SMITH LAW GROUP, PLLC**
        August 30, 2023,        *Counsel for Plaintiff*

                            /s/ Kyle T. MacDonald
                            Kyle T. MacDonald, Esq.
                            Florida Bar No.: 1038749
                            Derek Smith Law Group, PLLC
                            701 Brickell Ave, Suite 1310
                            Miami, FL 33131
                            Tel: (305) 946-1884
                            Fax: (305) 503-6741
                            Kyle@dereksmithlaw.com

## SCHEDULE A
## LIST OF TOPICS FOR DEFENDANT'S REPRESENTATIVE
### (hereinafter "LCSO" and/or "Defendant")

1. Knowledge of each and every document provided by Defendant in response to Plaintiff's discovery requests.

2. Knowledge related to Jenna Clark's employment with Defendant, including compensation and benefits paid to Jenna Clark from 2018 until the last day of her employment.

3. Knowledge related to all of the benefits Jenna Clark received subject to her employment with Defendant, including pension plan payments, 401k benefits, profit sharing, health benefits, retirement plans, and any other benefit Jenna Clark received from 2018 until the last day of her employment.

4. Knowledge related to benefits that Defendant offered to employees in general, including the cash value of each benefit offered, when Defendant began to offer said benefits, and descriptions of benefit packages that Defendant included as part of the compensation employees received.

5. Knowledge related to the amount of money that Jenna Clark was paid from 2018 until the last day of her employment.

6. Knowledge related to the amount of money that similarly situated employees to Jenna Clark were paid.

7. Knowledge of the policies or procedures provided by and/or maintained by Defendant with regard to the prevention of discrimination and harassment in the workplace.

8. Knowledge of the policies or procedures provided by and/or maintained by Defendant with regard to the prevention of discrimination and harassment in the workplace.

9. Knowledge of the policies or procedures provided by and/or maintained by Defendant with regard to leave benefits, paid-time-off benefits, FMLA benefits, and any other leave of absences.

10.    Knowledge of any employee handbook for Defendant that was in effect at the time of Jenna Clark's employment from 2018 until the last day of her employment.

11.    Knowledge related to reports of discrimination, including but not limited to, reports of discrimination that were presented and/or made during the time period when Jenna Clark was employed with Defendant from 2018 until the last day of her employment.

12.    Knowledge related to Defendant's policies and procedures for preventing discrimination and harassment in the workplace and investigating and engaging in corrective action when discrimination is discovered.

13.    Knowledge related to the agency-wide reduction in force conducted by Defendant in or around 2021, including knowledge of the persons involved in deciding the positions to be eliminated, the criteria used to select positions to be eliminated, and the compensation and leave benefits for the employees/positions ultimately selected to be eliminated.

14.    Knowledge related to Defendant's fiscal budget and Defendant's operations, including revenue, expenses, and any budgetary impacts of the agency-wide reduction in force conducted by Defendant in or around 2021.

15.    Knowledge regarding the following employees, including their dates of hire, job titles, knowledge of the amount of compensation paid to them, the amount of leave benefits available to them, the amount of leave they used for any reason (including FMLA leave, paid time off, or any other leave benefit offered), their age, their termination/resignation dates, and the reason for their termination/resignation:

      a.  James Jones, Director of Fleet Management
      b.  Jenna Clark, Director of Purchasing
      c.  Anthony Ramsey, Communications Manager
      d.  Amy DellAquilla, Community Liason
      e.  Jami Bartz, Senior Services Coordinator
      f.  Marsha Sprankel, Secretary of Traffic

16.    Knowledge related to Annmarie Reno's employment with Defendant, including but not limited to, her entire personnel file, dates of employment, job assignments, job titles, compensation, promotions,

benefits, discipline, and complaints of unlawful employment practices made against her.

17.   Knowledge related to Dawn Heikkila's employment with Defendant, including but not limited to, her entire personnel file, dates of employment, job assignments, job titles, compensation, promotions, benefits, discipline, and complaints of unlawful employment practices made against her.

18.   Knowledge related to John Holloway's employment with Defendant, including but not limited to, his entire personnel file, dates of employment, job assignments, job titles, compensation, promotions, benefits, discipline, and complaints of unlawful employment practices made against him.

19.   Knowledge related to Jenna Clark's employment with Defendant, including but not limited to, dates of employment, job assignments, compensation, promotions, discipline, benefits, job titles, and termination, from 2018 until the last day of her employment.

20.   Knowledge related to the reason for Jenna Clark's termination from her employment with Defendant.

21.   Knowledge related to any communications between Defendant's employees and Jenna Clark regarding Jenna Clark's termination and alternative positions with Defendant offered to Jenna Clark, if any, from 2018 until the last day of Jenna Clark's employment.

22.   Knowledge of all correspondence, writings, and documents sent by Defendant regarding disciplinary action or termination of Jenna Clark, if any, from 2018 until the last day of Jenna Clark's employment.

23.   Knowledge any investigations performed by Defendant regarding Jenna Clark's reports of discrimination and harassment in the workplace or filing of administrative charges.

24.   Knowledge related to any leave requested by Jenna Clark during her employment, including FMLA leave, paid time off, unpaid time off, and any other type of leave of absence offered by Defendant, from 2018 until the last day of Jenna Clark's employment.

25.   Knowledge related to performance reviews and Defendant's performance review policies, procedures, and protocols.

26.   Knowledge as to Defendant's Position Statement filed with the EEOC and the Answer filed in response to Plaintiff's Complaint.

27.   Knowledge as to Defendant's document and record keeping proceed used to record or keep track of communications amongst Defendant's employees, including but not limited to any electronic communication technology used by Defendant's employees.

28.   Knowledge related to performance reviews that Jenna Clark received or underwent during her employment with Defendant including dates of each performance review and the substance of each performance review, from 2018 until the last day of Jenna Clark's employment.

29.   Knowledge of organizational charts and lists identifying the divisions and management structure for Defendant.

30.   Knowledge of charges filed with the Equal Employment Opportunity Commission and the Florida Commission on Human Relations from January of 2016 through December 31, 2022.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document is being served on August 30, 2023, on all counsel of record on the service list below via e-mail transmission.

By: */s/ Kyle T. MacDonald*
Kyle T. MacDonald, Esq.

## SERVICE LIST

**ALLEN, NORTON & BLUE, PA**

David J. Stefany
324 S. Hyde Park Ave
Suite 225
Tampa, FL 33606
813/251-1210
Fax: 813/253-2006
Email: dstefany@anblaw.com

Maelyn Marie Morrison
324 S. Hyde Park Ave., Suite 225
Tampa, FL 33606
813-251-1210
Fax: 813-253-2006
Email: mmorrison@anblaw.com

*Counsel for Defendant*

Supercedes
Chapter 26 – Rev. 01/21

Lee County Sheriff's Office
Operations Manual

Effective: 7/91
Revised: 06/21

**26.1.2.5 (26.3.2)  Job Knowledge and Performance:**

1. **General Proficiency**:  Sheriff's Office members are required to maintain required certifications, job knowledge, and skills required for the performance of official duties. Sheriff's Office members shall maintain and demonstrate their knowledge of the law and criminal procedure. Sheriff's Office members shall maintain and demonstrate proficiency in required interpersonal skills.  Sheriff's Office members shall maintain proficiency in the care and use of vehicles,  equipment, and firearms. Sheriff's Office members shall maintain and demonstrate proficiency in accordance with established standards and firearm qualification requirements.  Sheriff's Office members may be re-tested for proficiency as provided in direct procedures, with each subsequent failure to qualify constituting an additional offense. Failure to maintain job skills shall result in counseling, instruction or training, and may also result in suspension.  Repeated failure to maintain necessary job skills, after counseling and instruction, shall result in increasing the severity of disciplinary actions, up to and including withdrawal of appointment.

2. **Knowledge of Rules and Regulations and Procedures**:  Failure to maintain and demonstrate knowledge of rules and regulations or directive procedures shall result in counseling, suspension, demotion, or withdrawal of appointment. If appointment is not withdrawn, subsequent violation(s) or recurrent failure to maintain and demonstrate knowledge of rules and regulations or directive procedures shall be cause for withdrawal of appointment.

**26.1.2.6   (26.1.3) Harassment / Discrimination:**

**Sexual Harassment** - It is the Sheriff's policy that all members have a right to work in an environment free of discrimination, which includes freedom from sexual harassment.  The Sheriff's Office prohibits all forms of unlawful harassment of its members in any form. All members at all levels of the Office must avoid offensive or inappropriate sexual or sexually harassing behavior at work and will be held responsible for insuring that the workplace is free from sexual harassment.

Harassment or discrimination on the basis of race, color, religion, sex, sexual orientation, national origin, marital status, political affiliation, age, or physical or mental handicap constitutes discrimination.  This type of harassment is therefore strictly prohibited and may subject the perpetrator to appropriate discipline, up to and including discharge.   Additionally, such conduct may expose the perpetrator to personal liability for damages in the event legal action is brought by any person who is the victim of such conduct or behavior.

Any verbal or physical conduct that denigrates or shows hostility or aversion toward an individual because of their race, color, religion, sex, national origin, age or disability, or that of their relatives, friends, or associates, and that:

1. has the purpose or effect of creating an intimidating, hostile or offensive working environment;

**Exhibit**

**2**

26:25

2.      has the purpose or effect of unreasonably interfering with an individual's work performance; or

3.      otherwise adversely affects an individual's employment opportunities is strictly prohibited and may subject the perpetrator to appropriate discipline, up to and including discharge.

Any epithets, slurs, negative stereotyping, threatening, intimidating, or hostile acts that relate to race, color, religion, sex, national origin, age or disability; or any written or graphic material that denigrates or shows hostility or aversion toward an individual or group because of race, color, religion, national origin, age or disability that is placed on walls, bulletin boards, or elsewhere on the work premises, or circulated in the workplace is strictly prohibited and may subject the perpetrator to appropriate discipline, up to and including discharge.

Any unwanted sexual advances, attention or any other offensive sexually based conduct, words or action; or any attempt to make the granting of sexual favors a condition of employment or advancement; or any adverse job retaliation taken for the denial of sexual favors is strictly prohibited and may subject the perpetrator to appropriate discipline, up to and including discharge.

Any rude, insulting, inconsiderate or otherwise offensive behavior including jokes, cartoons, drawings, pictures, video and published documents, as well as physical conduct and words that is based upon race, color, religion, sex, national origin, age or disability, is strictly prohibited and may subject the perpetrator to appropriate discipline, up to and including discharge.

No member will suffer adverse job actions because of their refusal to condone or engage in conduct or behavior prohibited by this rule, or for complaining of its occurrences, regardless of whether or not he or she is the object of such conduct or behavior. Any member who believes that he or she is a victim of such conduct or behavior, or who observes such conduct or behavior directed toward another person, shall report it to the Director/Commander of Human Resources or to the Internal Affairs Division immediately.

Whenever any report regarding harassment or discrimination involves any of the member's supervisors, the member shall report the matter to the next highest level of their Chain of Command or to the Human Resources Director/Commander or to the Internal Affairs Division.

In the event that all persons in the Chain of Command are involved, the member shall report the matter to the Human Resources Director/Commander or to the Internal Affairs Division or to the Sheriff. In the event that the incident is alleged to involve the Sheriff, any person wishing to do so may file a complaint and direct it to the United States Equal Opportunity Commission, Miami District Office. No member will suffer retaliation for making a complaint under this rule.

Upon receipt of a report or complaint of any conduct or behavior prohibited by this rule, an investigation will be conducted. Although the Lee County Sheriff's Office will attempt to maintain the complainant's confidentiality to the extent allowed by law, confidentiality cannot be guaranteed if it interferes with the Lee County Sheriff's Office's ability to investigate the reported incident or take whatever remedial action may be deemed appropriate by the Agency.

26:26

Supercedes
Chapter 26 – Rev. 01/21

Lee County Sheriff's Office
Operations Manual

Effective:  7/91
Revised:  06/21

Each and every member has an obligation to combat all behavior and conduct that is prohibited by this rule.  All supervisors will be expected, as part of their duties, to take the requisite action necessary to prevent harassment or discrimination and/or to remedy its effects.  All members should be open and forthright when informing other members their conduct or behavior violates this rule.  It is the intent of the Lee County Sheriff's Office that any offensive or improper conduct be prevented or, if not prevented, then corrected as quickly as possible.  All members will be expected to work toward those common goals so the Agency may fulfill its mission and provide the best work environment possible.

## 26.2  DRUG TESTING

The purpose of this policy is to promote a drug-free workplace through fair and reasonable drug-testing methods for the protection of the Lee County Sheriff's Office, its members and the public.

### 26.2.1.1 Definitions

1.      Except where the context otherwise requires, as used:

      A.      "Drug" means alcohol, including distilled spirits, wine, malt beverages, and intoxicating liquors; amphetamines; cannabinoids; cocaine; phencyclidine (PCP); hallucinogens; methaqualone; opiates; barbiturates; benzodiazepines; synthetic narcotics; designer drugs; or a metabolite of any of the substances listed herein including any and all drugs illegal under federal law.

      B.      "Drug test" or "test" means any chemical, biological, or physical instrumental analysis administered for the purpose of determining the presence or absence of a drug or its metabolites.

      C.      "Initial drug test" means a sensitive, rapid, and reliable procedure to identify negative and presumptive positive specimens. All initial tests shall use an immunoassay procedure or an equivalent, or shall use a more accurate scientifically accepted method approved by the Agency for Health Care Administration as such more accurate technology becomes available in a cost-effective form.

      D.      "Confirmation test," "confirmed test," or "confirmed drug test" means a second analytical procedure used to identify the presence of a specific drug or metabolite in a specimen. The confirmation test must be different in scientific principle from that of the initial test procedure. This confirmation method must be capable of providing requisite specificity, sensitivity, and quantitative accuracy.

      E.      "Chain of custody" refers to the methodology of tracking specified materials or substances for the purpose of maintaining control and accountability from initial collection to final disposition for all such materials or substances and

**From:** Heikkila, Dawn < ███████████ >
**Sent:** Wednesday, February 05, 2020 10:43 AM EST
**To:** Traurig, Shelley < ███████████ >
**Subject:** FW: memo John.doc
**Attachment(s):** "memo John.doc","ATT00001.txt"

Dawn Heikkila, Director

Lee County Sheriff's Office
Desk: ███████
mailto: ███████
www.sheriffleefl.org
-----Original Message-----
**From:** Holloway, John < ███████ o█ >
**Sent:** Thursday, June 20, 2019 9:42 AM
**To:** Heikkila, Dawn < ███████ >
**Cc:** Smith, Abbi < ███████ >; Hornsby, Antonette < ███████ >
**Subject:** memo John.doc

Good Morning Dawn-

The Sheriff has approved the Reductions in Force recommended by Operations & Legal Services Bureau and other Command Staff members.

The memo does not identify the individuals in the positions to be eliminated, however, I believe you have been provided with that information.  If not, please contact Abbi to review the spreadsheet with also identifies the positions, as well as the five current employees holding those positions.

Please call me with any questions or concerns.

John

John Holloway | Chief Of Operations
Desk: ███████
Legal Services Executive Bureau
Lee County Sheriff's Office
mailto: ███████ | http://www.sheriffleefl.org

***IMPORTANT MESSAGE***
This message is intended for the use of the person or entity to whom it is addressed and may contain information that is privileged and confidential, the disclosure of which is governed by applicable law. If the reader of this email is not the intended recipient or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this information is STRICTLY PROHIBITED. If you have received this email by error, please notify us immediately and destroy the related message. This footnote also confirms that this email message has been swept for the presence of computer viruses, worms, hostile scripts and other email-borne network threats. PLEASE NOTE: Florida has a very broad public records law. Most written communications to or from government officials are public records available to the public and media upon request. Your email communications may be subject to public disclosure per Sec. 119 F.S.

| **Exhibit** |
| :---: |
| **3** |

3

| POSITIONS ELIMINATED | | | | | | |
|---|---|---|---|---|---|---|
| Position | Name | Status | Age | Gender | Supervisor | Comment |
| Senior Services Coordinator | Jami Bartz | Inactive | 58 | Female | Claire Schell | 1/31/2021- Retired/Position Eliminated |
| Secretary of Traffic | Marsha Sprankel | Inactive | 66 | Female | Dennis Petraca | 2/28/21- Retired/Position Eliminated |
| Major of Professional Standards | Tracy Estep | Inactive | 48 | Female | John Holloway | 6/24/21 - Retired/Position Eliminated |
| Director of Purchasing | Jenna Clark | Inactive | 59 | Female | Annmarie Reno | 9/4/2021 - Retired/Position Eliminated |
| Community Liaison | Amy DellAquilla | Inactive | 58 | Female | Michael Truscott | 10/11/2021- Resigned/Position Eliminated |
| Director of Fleet Management | James Jones | Active | 51 | Male | Jeremiah Marcotte | 11/4/2021 - Title Change to Fleet Services Specialist/Position Eliminiated/Pay Cut |
| Communications Manager | Anthony Ramsey | Inactive | 46 | Male | Karen Ciofani | 10/14/21- Resigned/Position Eliminated |

---

**Exhibit**

4



**Carmine Marceno**
**Sheriff**

*"Proud to Serve"*

**State of Florida**
**County of Lee**

August 15, 2021

Dear Mrs. Clark,

The Lee County Sheriff's Office has undergone an evaluation of significant aspects of current operations to determine ways to improve policies, practices and efficiencies. As you know, the Sheriff's Office was forced to absorb additional expenses and obligations as well as other increased costs including but not limited to; substantial increases in FRS employer pension rates, LCSO's self-funded Health Plan costs and inmate medical expenses.

As a result of this evaluation, LCSO is conducting a *Reduction in Force*. Effective September 4, 2021 your position as "Purchasing Director" is being eliminated. You will be placed on Administrative Leave with Pay immediately upon this notice and given the opportunity to retire.

**Deadline for this decision will be September 3, 2021 at 4:00pm**; or your appointment will be withdrawn on September 4, 2021.

Human Resources has included basic information in this packet but contacting the individuals below will be crucial for whatever option you choose. Your contact for HR will be Cari Turner, she can be reached at 239-477-1360; your contact for Health Benefits and FRS is Doreen Salvagno, she can be reached at 239-477-1121.

Thank you for your service to The Lee County Sheriff's Office and I wish you well in future endeavors.

Sincerely,

Dawn Heikkila
Director of Human Resources
Lee County Sheriff's Office

███████████

| Exhibit |
|---|
| 5 |



*"The Lee County Sheriff's Office is an Equal Opportunity Employer"*
**14750 Six Mile Cypress Parkway • Fort Myers, Florida 33912-4406 • (239) 477-1000**

LCSO/Clark
DEF004350

**UNDER SHERIFF MARCENO:**

**<u>Overcame Major Staffing Shortage for deputies</u>**

**A.     For many years, LCSO was unable to hire and retain sworn deputies, and so we were understaffed.**   We have revered the trend and **today, LCSO is fully staffed with sworn deputies**.

We accomplished this by:

1) **Saving money in other areas and transferring those savings to fund deputy positions**.
   a. We utilized state-of-the-art technology and better management practices to **reduce the number of civilian employees, through attrition**, creating more funding for deputy positions;
   b. We **re-evaluated every civilian position** and **transferred employees** to other areas of the agency to assure every employee was allowed to be **as productive as possible**;
   c. We **analyzed every vendor contract to eliminate contract**s;
   d. We retained only those vendor contracts which are absolutely necessary, and analyzed and **renegotiated the cost of those remaining contracts**;
   e. We have more **correctly categorized employees into "non-exempt" and "exempt" status, consistent with current I.R.S. guidelines** allowing employees more freedom to work efficiently, and lowering unnecessary overtime costs;
   f. We began **monitoring and working to release non-violent inmates who require major medical care expenditures,** reducing taxpayer funded medical costs for those who **pose no danger to the community.**

These efforts, and other improvements, some of which are included below, have resulted in millions of dollars in savings, which funded the measures necessary to further improve LCSO's performance as a premier law enforcement agency.

2) **Using the savings created by this common-sense management**.
   a. **We increased pay for starting deputies by $9,000;**
   b. **We increased the pay** for sergeants, lieutenants, and other supervisors;
   c. **We increased the number of applicants we sponsor for both Correctional and law Enforcement Academies;**
   d. We **opened the Academy Sponsorship program to all employees** throughout the agency;
   e. We **fully funded and maintained our highly competitive benefits package** - which had been severely endangered by major current and anticipated cost increases.

3) **We improved and redoubled recruiting efforts** and adjusted the application process to be more competitive with other law enforcement agencies.

**Today – for the first time in over 4 years, due to competitive pay, benefits and extraordinarily high morale, LCSO is fully staffed in all law enforcement positions.**

**Exhibit**

**6**

**LCSO/Clark
DEF001316**

## Vastly Improved Technology

**B**.        Again, using the savings realized by best practices, we are have made **major advancements in state-of-the-art technology, further improving** our ability to **protect our residents and solve crimes.**

1. **We will soon open – at no cost to the taxpayers - the most advanced Real Time Crime Center/Intelligence Unit in Southwest Florida.** This Center, funded by drug money forfeited through LCSO's legal Team, will allow our deputies to be even more proactive and our detectives to solve even more crime.
2. We have acquired and are utilizing:
   a. Additional **Mobile License Plate Readers (LPRs);**
   b. **Additional Fixed LPRs;**
   c. Additional **Surveillance Towers;**
   d. **Mobile Surveillance Units;**
   e. **Facial Recognition Software** which identifies criminal suspects;
   f. **Additional cameras** to monitor public areas;
   g. Additional access to **security cameras** in malls, shopping centers and major institutions;

These technological improvements act as a "force multiplier" allowing LCSO, using current employee levels, to deter and prevent crime, as well as solve crimes even more rapidly and efficiently.


## Management Practices

**C**.        We have **reassigned deputies and detectives** based upon ever-changing crime trends and constantly evolving demographics, and consistent growth.

1. We have assigned more detectives and resources to the **Violent Crime Unit (VCU), improving our ability to identify and arrest the "worst of the worst";**
2. We have **added substantial numbers of School Resource Officers**, improving protection for every public school in Lee County;
3. We have **added substantial numbers of deputies to the Patrol Division;**
4. We have **re-scheduled detectives to include evening, weekend and holidays;**
5. **We have re-scheduled Crime Scene Forensic Technicians to include evening, weekend and holidays;**

This schedule changes increase the number of deputies and detectives in service at any given time, reducing response times; and allows deputies and detectives to operate even more effectively and efficiently.

        We constantly monitor ever-changing public safety demands, and modify assignments and transfer resources to provide Lee County residents the best "bang for the buck" for their law enforcement dollar.

**LCSO/Clark**
**DEF001317**

## Community Response Unit (CRU)

We have created and staffed the **Community Response Unit (CRU)** with sworn deputies and civilians, and combined those resources with our Public Affairs Bureau (PAB) providing:

The ability to highly focus substantial both enforcement and crime prevention resources on targeted areas to rapidly address criminal issues and improve the quality of life for residents.

## Corrections Mental Health and Re-Entry Units

Far too often jail is a revolving door here we re-arrest inmates within days – if not hours – of their release.  To address this problem:

1. **We created and staffed a specialized Mental Health Unit** in Corrections Bureau to provide mental health care for inmates while incarcerated, as well as seamlessly transfer care and counseling for these inmates when released.
2. **We added additional agency staff and resources to the Corrections' Re-Entry Unit** to assist inmates when released with obtaining identification and accessing public and private assistance for housing and employment to improve their ability to avoid re-arrest.

LCSO/Clark
DEF001318

# Lee County Sheriff's Office

# Office of Professional Standards

# Staff Inspection Final Report



# Purchasing

# Workload Assessment and Staff Inspection

# October 2020

7

**Exhibit**

7

1 | P a g e

**LCSO/Clark**
**DEF004386**

# Lee County Sheriff's Office

_____     _____
Sheriff Carmine Marceno                                         Date
Office of the Sheriff

_____     _____
Undersheriff Eric Smith                                          Date
Office of the Sheriff

_____     _____
Chief John Holloway                                              Date
Office of the Sheriff

_____     _____
Annmarie Reno                                                    Date
Support Services Executive Bureau

_____     _____
Jenna Clark                                                      Date
Purchasing Director

_____     _____
Traci Estep                                                      Date
Professional Standards Division

_____     _____
Commander Paul Cummins                                           Date
Professional Standards Division

_____     _____
Captain Matthew Herterick                                        Date
Training Division

_____     _____
Sergeant Diana Cintron                                           Date
Staff Inspector – Professional Standards Division

LCSO/Clark
DEF004387

# Lee County Sheriff's Office

## Table of Contents

Title Page ........................................................................................................................ 1

Signatures Page ............................................................................................................. 2

Table of Contents .......................................................................................................... 3

Executive Summary........................................................................................................ 4

Purchasing Formal Inspection ...................................................................................... 6

Introduction .................................................................................................................. 7

Description of Purchasing………................................................................................... 7

Mission, Objectives, and Methodology of Formal Inspection ....................................... 8

Policy, Procedure, and Accreditation Compliance .........................................................9

Staffing Assessment......................................................................................................11

Personnel Assessment...................................................................................................16

      Member Surveys ...................................................................................................16

      Personal Interviews .............................................................................................22

      Member Self-Assessments ................................................................................... 22

      Inspector Observations........................................................................................ 24

Conclusion.................................................................................................................... 25

References..................................................................................................................... 27

LCSO/Clark
DEF004388

# Lee County Sheriff's Office

## <u>Executive Summary – Purchasing Inspection</u>

In August 2020, Sergeant Diana Cintron of the Lee County Sheriff's Office Professional Standards Division began a formal staff inspection of Purchasing.  The summarized results are below:

## <u>Conclusion</u>

1. Does Purchasing meet the agency's formal expectations?

   *<u>Yes</u>.*

2. Does Purchasing's practices and procedures ensure compliance with LCSO policies, procedures, and professional standards?

   *<u>Yes</u>.*

3. Are there deficiencies in integrity, training, morale, policy, supervision, or personnel at Purchasing?

   *There are no recognizable deficiencies in integrity, training, morale, policy, first line supervision, and personnel.*

4. Are resources adequate for achieving agency goals and objectives?

   *Several Purchasing Agents requested a handheld Barcode scanner and a camera to take pictures of stock items.  The staffing resources are inadequate according to the workload analysis.  The addition of two (2) Purchasing Agent allocations is recommended for Purchasing.*

5. Are internal and external communications effective?

   *<u>Yes.</u>*

6. Is there sufficient safety and security for personnel?

   *<u>Yes</u>.  There is sufficient safety and security for personnel, and the equipment provided meets and exceeds all operational and Accreditation standards.*

7. Are the written directives for this unit adequate?

   *<u>Yes</u>.  Written directives meet all State and Federal laws, and Accreditation Standards.*

LCSO/Clark
DEF004389

# Lee County Sheriff's Office

8. Evaluation of the record keeping practices for organization, completeness, and ability to retrieve information.

   *The record keeping practices of Purchasing are organized, complete, and the software available provides easy retrieval of information.*

9. Other Recommendations
   *There are no other recommendations at this time.*

## Objectives

1. Does Purchasing comply with the law, policy, and CALEA standards?  *Yes.*

2. Is the Purchasing facility safety and security appropriate? *Yes.*

3. Are equipment safety, and equipment needs met? *Yes.*

4. Is adequate supervision assigned to Purchasing? *Yes.*

5. Are adequate personnel assigned to Purchasing? *No.*

   *Recommendation:* The current staffing level is inadequate and it is recommended that two (2) additional Purchasing Agent positions be allocated.

The Purchasing Division of the Lee County Sheriff's Office appears to be running at a high to very high level of productivity according to all of the employees. Most of the personnel appear to be happy to very happy to be assigned there. Supervisors appear extremely qualified, and are well liked by their employees. Nearly all of the staff showed high to very high levels of morale and job satisfaction.

It is difficult to obtain the perfect level of equipment, service, and employee satisfaction in a law enforcement agency. The Purchasing Division is a very small unit with a group of very hard working and dedicated employees. With their expertise in purchasing goods and services for the department, the certified staff can focus on keeping the residents and visitors of Lee County safe.

**LCSO/Clark
DEF004390**

# Lee County Sheriff's Office

# Purchasing
# Formal Staff
# Inspection

LCSO/Clark
DEF004391

# Lee County Sheriff's Office

## Purchasing Formal Staff Inspection

### Introduction

In August 2020, Sergeant Diana Cintron of the Lee County Sheriff's Office Professional Standards Division began a formal staff inspection of the Purchasing Division, commonly referred to as "Purchasing." On August 26, 2020, Sgt. Cintron held a pre-inspection meeting with Purchasing Director Jenna Clark. It was determined that Purchasing Director Clark would be the liaison for the inspection process. The inspection began in October of 2020 and concluded in November 2020.

### Description of Purchasing

**Location**

The Lee County Sheriff's Office Purchasing Division is comprised of Purchasing Director/Management and Purchasing Agents. The strength of the Central Purchasing System is its ability to serve the operating components/divisions without requiring them to maintain their own internal purchasing process. The value of centralized purchasing has long been recognized in both government and private business.

The goal of Purchasing is to obtain items at the lowest reasonable rate and within the time requested, or as soon as possible. The Purchasing Division is also responsible for ensuring proper authorization and recording of all purchase transactions by its personnel.

There are three different purchasing procedures: Standard Purchasing requires an online purchase order; In-House Store Purchasing requires an online requisition; and Software Purchasing requires Technical Support and Facilities Division Director approval prior to submission of an online purchase order.

Purchasing is located in the Lee County Sheriff's Office Main Headquarters at 14750 Six Mile Cypress Parkway, Fort Myers, FL 33912. Lee County Sheriff's Office personnel have access to Purchasing and its employees Monday - Friday, 9:00 a.m. – 4:00 p.m. There is ample parking for personnel. The building provides adequate security with video surveillance. There are no major issues with the location or property.

**Personnel**

As of October 2020, Purchasing contains 7 allotments distributed as follows: 1 Purchasing Director, 1 Purchasing Manager, 5 Purchasing Agents.

**Daily Operations**

LCSO/Clark
DEF004392

# Lee County Sheriff's Office

Purchasing Division personnel work four, 10-hour days. Scheduling is set to cover a workweek of Monday – Friday.

Purchasing Director position involves responsible supervisory, administrative and operational duties specific to the position. The Director researches and prepares various reports, composes and constructs policy, procedure and directives, and the budget for the component. The Purchasing Director Jenna Clark works from 8:00 a.m. – 6:00 p.m., Tuesday - Friday.

The Purchasing Manager position involves administrative and clerical work purchasing a variety of supplies and equipment. Work involves responsibility for research, pricing and negotiation for purchase of quality items at the best price, preparing purchase orders, and keeping an inventory of items ordered and received. Duties include contacting vendors for availability of products and the provision of contracted services. Work is performed under the general supervision of the Purchasing Director. Purchasing Manager Shannon Lehman works 6:30 a.m. – 4:30 p.m., Monday – Thursday.

The Purchasing Agents duties involve responsibility for research, pricing and negotiation for purchase of quality items at the best price, preparing purchase orders, and keeping an inventory of items ordered and received. Duties include contacting vendors for availability of products, preparing bid specifications, and following-up on delivery of products and the provision of contracted services. Additionally, Purchasing agents answer phones, provide customer service to employees at the front counter, and meet vendors at the loading dock and accept delivery of products.

Purchasing Agent Daysi Castillo works 7:00 a.m. – 5:00 p.m., Monday – Friday. Purchasing Agent Christine Cross works 6:00 a.m. – 4:00 p.m., Tuesday – Friday. Purchasing Agent Danielle DePonto works 7:15 a.m. – 5:15 p.m., Monday – Thursday. Purchasing Agent Brenda Hector works 8:00 a.m. – 6:00 p.m., Monday and Friday and 10:00 a.m. – 8:00 p.m. Tuesday and Thursday. Purchasing Agent Gwen Legler works 6:00 a.m. – 4:00 p.m., Tuesday - Friday.

## Mission, Objectives, and Methodology of Formal Inspection

1. **Mission**
   a. To determine if Purchasing meets the agency's formal expectations.
   b. To review practices and procedures to ensure compliance with LCSO policies, procedures, and professional standards.
   c. To detect deficiencies in integrity, training, morale, policy, supervision, or personnel.
   d. To determine if resources are adequate for achieving agency goals and objectives.
   e. To evaluate the effectiveness regarding internal and external communications.
   f. To evaluate the safety and security of personnel.
   g. To evaluate the adequacy of written directives related to this unit.

8 | Page

**LCSO/Clark**
**DEF004393**

# Lee County Sheriff's Office

      h. To review the record keeping practices for organization, completeness, and ability to retrieve information.

2. **Objectives**
   a. Ensure compliance with the law, policy, and CALEA standards.
   b. Ensure facility safety and security is appropriate.
   c. Ensure equipment safety, and equipment needs are met.
   d. Ensure that adequate supervision is assigned.
   e. Ensure that adequate personnel are assigned.

3. **Methodology**
   a. Meetings, email and phone contact with supervisors.
   b. Physical inspection of facilities.
   c. Review of relevant databases (PowerDMS, CAD, etc...)
   d. Surveys, including a component survey and unit member survey.
   e. Personal interviews with personnel.
   f. Analysis of the Division workload.

## Policy, Procedure, and Accreditation Compliance

**Commander's Component Survey**

Purchasing Director Jenna Clark completed a "Component Survey" as part of this formal inspection. The Component Survey noted no concerns.

**Power DMS Inbox Summary**

Sgt. Diana Cintron generated a *Signatures Summary* and a *Student Records* report in the Power DMS system. The report revealed no major issues. This shows that personnel sign all mandatory documents and complete online courses in a timely manner.

**Official Manpower Allotments**

As of October 21, 2020, Purchasing contains 7 allotments distributed as follows: 1 Purchasing Director, 1 Purchasing Manager, 5 Purchasing Agents.

The Purchasing budget and allocations (Budget Account #20302) Manpower Report is provided in the Appendix.

**Current Budget**

Sergeant Cintron obtained a copy of the Purchasing current budget for FY 20/21. Purchasing is allotted $1,665,414.00. No anomalies were noted in their expenditure report and their budget is consistent with that of other similar units at the Sheriff's Office.

**LCSO/Clark**
**DEF004394**

# Lee County Sheriff's Office

**Accreditation Compliance**

Sgt. Cintron received an email from Manager Tanya Tanner in Accreditation on November 5, 2020.  Manager Tanner stated that Purchasing was up-to-date on all of their standards and that there were no concerns or anomalies.  A copy of the Accreditation standards for Purchasing is located in the Appendix.

**Goals and Objectives**

Goals and Objectives are written goals and written objectives that agency components use to measure the success or failure of their unit.  Located on the agency intranet, personnel are able to see and obtain a copy of each goal and objective for their unit.  Unit Commanders update these goals and objectives in January of each calendar year.  The formal Goals and Objectives for Purchasing can be found in the Appendix.

1. **Written Goals and Objectives**

   At the time of the inspection, the 2019 Goals and Objectives were completed.  The 2019 Goals and Objectives revealed the following concerns and notable accomplishments:

   a. Track number of purchase orders processed.
      i. 2019 Baseline:
         Total purchase orders and pick tickets processed:  6,641, a 19% increase from 2018.

         *Recommendations – No recommendations at this time.*

   b. Maintain efficiency in inventory control.
      i. 2019 Baseline:
         During 2019, the NIGP (National Institute for Government Purchasing) Commodity/Service Codes have not been consistently utilized.  The goods and services that we acquire are not enough volume to utilize the codes.  Photo imaging of equipment and supplies is an ongoing process so this would be considered not on target.

         *Recommendations – No Recommendations at this time.  The process is moving forward per Director Jenna Clark.*

**LCSO/Clark
DEF004395**

# Lee County Sheriff's Office

**Job Task Analysis (JTA's)**

Purchasing has the following non-staff level positions: Purchasing Agent. The Job Task Analysis for the above listed job classifications are in the Appendix.

**Facilities and Equipment**

Purchasing is located in the Lee County Sheriff's Office Main Headquarters at 14750 Six Mile Cypress Parkway, Fort Myers, FL 33912. Lee County Sheriff's Office personnel have access to Human Resources and its employees Monday - Friday, 9:00 a.m. – 4:00 p.m. There is ample parking for personnel. The building provides adequate security with video surveillance. There are no major issues with the location or property.

**Facility Safety and Security**

Purchasing has a controlled access system for entry into the secure areas of the building, and all equipment is protected and locked. Purchasing maintains a good combination of security and approachability for members, and the controlled access and provides a higher than normal level of security.

## Staffing Assessment

**Introduction**

The Lee County Sheriff's Office is required to perform periodic workload assessments so that personnel may be appropriately allocated and distributed across the various organizational components.

The Commission on Accreditation for Law Enforcement Agencies (CALEA) standard 16.1.2 states: "The agency allocates personnel to, and distributes them within all organizational components in accordance with documented periodic workload assessments." The purpose of this standards is to encourage the appropriate deployment of personnel by determining service demands through the use of workload assessments and computer-based or manual methods of personnel allocation and distribution. (Shane, 2009, p.99)

The intent of this standard is to encourage the equalization of individual workloads among and within organizational components. The analysis should specify all incidents and factors used in making each workload assessment and indicate any time and location factors necessary to complete a task.

Basing the allocation of personnel on workload demands can have a significant influence on the efficiency and effectiveness of the agency. The agency should attempt to prevent over or under staffing by ensuring that, the personnel strength of an organizational component is consistent with the workload. The nature or number of tasks as well as their complexity, location, and time

**LCSO/Clark**
**DEF004396**

# Lee County Sheriff's Office

required for completion are some of the factors influencing workload demands. The process of allocating personnel to each organizational component also permits the agency to determine the overall number of personnel required to meet its needs and fulfill its objectives.

Assignment of personnel to Purchasing should be based on a thorough analysis of what Purchasing Agents are actually responsible for. The work of Purchasing Agents is much more than answering telephone calls, reading, and returning emails to other personnel within the agency. It is conducting tasks related to research, pricing and negotiation for purchase of quality items at the best price, preparing purchase orders, and keeping an inventory of items ordered and received. Duties include contacting vendors for availability of products, preparing bid specifications, and following-up on delivery of products and the provision of contracted services. Additionally, personnel answer phones, provide customer service to employees at the front counter, and meet vendors at the loading dock and accept delivery of products.

**Workload Assessment Methodology**

The methodology used to perform the Purchasing Agents Workload Assessment is one suggested by CALEA inspectors and is formally presented in the textbook *What Every Chief Executive Should Know; Using Data to Measure Police Performance* by Dr. Jon Shane, who is a professor of criminal justice at the John Jay College of Criminal Justice at the City University of New York. Dr. Shane's model is easy to use, easily taught to others, and accurate in determining staffing needs.

1. **Purchasing Agents**

   **The Explanation of Each Step in the Methodology for Purchasing Agents - Self-Reported Workload Analysis**

   The methodology used to perform the Purchasing Agents Workload Assessment is the same one used by the Lee County Sheriff's Office in previous years to determine staffing needs of various units and it includes workload and actual work on their regular duties.

   **Explanation of Each Step in the Methodology**

   Step 1- Gather existing data on Purchasing Agents activities to determine those tasks completed daily by Purchasing Agents has to create a list of principle modalities.

   Step 2- Develop a list of principle modalities. The Purchasing Agents have reported these tasks as common tasks performed daily. (AKA principle modalities).

   i.   Phone Calls and Emails
   ii.  Checking in Orders, and Receive Orders

LCSO/Clark
DEF004397

# Lee County Sheriff's Office

iii.   Pull Pick Ticket Orders and Send Order Ready Notifications

iv.   Customer Service Front Counter/Back Door, Receive/Process Packages

v.   Process Pick Ticket Orders, Process Purchase Orders and Pull Orders

vi.   Enter In-House Supply Replenishment Order, Enter Requisitions/Orders

vii.   Meeting with Jenna, Shannon or Assist Other Employees

viii.   Receive Purchase Orders

ix.   Enter/Finish Jail Supply Order, Finish Reviewing Supplies for Corrections

x.   Convert Requisitions to Purchase Orders, Finish/Follow-up Pending Requisitions

xi.   Enter/Update JM Todd New Leases

xii.   Follow-up with Vendors Open Orders/Orders Not Delivered

xiii.   Process/Convert Requisitions, Scan Requisitions and Purchase Orders

xiv.   Process New Hire, Size Appointment New Hire, Fill Out Paperwork for New Hires

xv.   Cut Patches Off Used Uniforms and Hang/Dispose of Uniform

xvi.   Process Uniform Request/Returns, Check Used Uniforms, Work in New/Used Uniforms

xvii.   Pull/Restock Uniforms and Equipment for Uniform Request, Restock Inner Belts

xviii.   Add Sizing Labels to Garment Bags for New LE Uniform

xix.   Other Administration Duties

**Step 3-** Total minutes available for work in a typical day, and typical week, were calculated with MS Excel.

**Step 4-** Total minutes used and left unused for work by Purchasing Agents were calculated with MS Excel.

**Step 5-** The percentage of actual available minutes used by the unit was calculated with MS Excel.

**Step 6-** The top five modalities on which Purchasing Agents spend the majority of their time were calculated with MS Excel.

**Step 7-** The relief factor of 1.33 was included in these calculations.

The below chart indicates the results for the time required to fulfill Purchasing Agents demands. The summarized results indicate that there is a requirement of 7 full-time equivalent (FTE) positions to handle the Purchasing Agents workload. This indicates that a total of 5 (five) employees are performing the work of seven (7) FTE positions. The self-reported analysis also indicated that the Purchasing Agents are using 100% of their available time working on Purchasing Agent principal modalities. It would appear

**LCSO/Clark
DEF004398**

# Lee County Sheriff's Office

that the current staffing level is inadequate and it is recommended that two (2) additional Purchasing Agent positions be allocated. The full results can be found in the Appendix.



**Purchasing - Civilian Purchasing Agent - TIME / WORKLOAD ANALYSIS**

(This chart can be viewed in the Appendix)

**Relief Factor Calculations and Tables for Purchasing Agents**

Purchasing Agents are permitted a specified number of Vacation, Sick, Personal, and Training hours that takes them away from their regular duties. Therefore, a relief factor, which accounts for personnel usage of this time, must be factored into the staffing assessment. Using averages, the Relief Factor for Purchasing Agents working 10-hour shifts is 1.33. This means that 1.33 people must be hired to do the work of one full time equivalent position.

LCSO/Clark
DEF004399

# Lee County Sheriff's Office

| | Standard Relief Factor for Civilian Employees 10/Shift | |
|---|---|---|
| | Category | Civilian |
| 1 | Total hours identified by policy (based on a standard 40 hour work week (40 x 52.14 = 2086) | 2086 |
| 2 | Vacation Hours Per Year | 160 |
| 3 | Personal Hours Per Year | 100 |
| 4 | Sick Hours Per Year | 80 |
| 5 | Break Time Hours Per Year | 172 |
| 6 | Total of Lines 2-6 | 512 |
| 7 | Subtract Line 6 from Line 1 | 1574 |
| 8 | Relief Factor (divide line 1 by line 7 and round to 2 decimal places) | 1.33 |

As indicated by the Time/Workload Analysis chart, the shift relief factor was already calculated into the Purchasing Agents workload. Including the shift relief factor, the workload of 7 Purchasing Agents will require two (2) additional allocations. It should be noted that this assessment revealed existing Purchasing Agents are working on principle modalities 100% of the time.

## Results Summary

As of this assessment, there are 7 total allotments in Purchasing with 5 non-supervisory positions. There are five (5) Purchasing Agents doing the work of 7.

*Recommendation* – The addition of two (2) Purchasing Agent allocations.

LCSO/Clark
DEF004400

# Lee County Sheriff's Office

## Personnel Assessment

### 1. Member Surveys

As part of the workload inspection of Purchasing, all members received a "Member Survey" disseminated by Sgt. Diana Cintron consisting of thirty-one (31) questions directly related to the individual worker. Sgt. Cintron provided seven (7) unit members with a hyperlink to the anonymous, confidential, web-based survey and requested it be completed. Seven (7) of the 7 members or 100% of personnel responded. A copy of the thirty-question member survey is included in the appendix.

Below are the survey questions:

1) Do you believe that your unit is performing at an acceptable level?
2) Are you aware of any policies or procedures that are not being followed?
3) If you answered yes to the above question, please specify which policy or procedure is not being followed?
4) Has technology improved your personal work performance?
5) Is your work satisfying?
6) Do you know the goals and objectives of your unit?
7) Do you have the necessary tools and resources to do your job?
8) If you do not have the necessary tools and resources to do your job, please list the tools and resources that you need.
9) Is your equipment periodically inspected as required by policy?
10) Were you given the requisite training upon selection to your unit?
11) Have you received additional unit related training since you started in this unit?
12) Is training available to you in your current assignment?
13) Has the training you have received improved your job performance?
14) Is your supervisor aware of your work performance?
15) Does your supervisor support your actions and decision?
16) Does your supervisor encourage your ideas and opinions?
17) Does your supervisor inform you on matters that affect your job?
18) (Short answer question) What are the positive things about your unit/shift?
19) (Short answer question) What are the negative things about your unit/shift?
20) (Short answer question) Have you taken an active role in finding solutions to unit issues?
21) (Short answer question) What could you or the agency do to help maximize your job performance?
22) (Short answer question) Is there any equipment not provided to you that could help you to perform better?

LCSO/Clark
DEF004401

# Lee County Sheriff's Office

23) (Short answer question) If you answered yes to the above, please list the equipment that could be provided which would help you perform your job better.

24) (Short answer question) Is there any training that you would like to have more frequently?

25) (Short answer question) If you answered yes to the above, please list the type of training you would like to receive.

26) (Short answer question) Are there any procedures that can be modified to save time?

27) (Short answer question) If you answered yes to the above, please list the procedure changes that you would make to save time.

28) Are you aware that all files, spread sheets and/or pertinent information should be uploaded to the proper program or sent to the official custodian within the Lee County Sheriff's Office and not be kept in your own personal files?

29) Do you have any personal files that should be uploaded in Spillman or any other LCSO programs?

30) (Short answer question) Is there anything you would like to add about your work or your unit?  If so, please let us know below.

31) What would you like us to know that would benefit Purchasing or was not covered previously?

***Survey Responses:***

(Duplicate or unassociated written answers have been omitted.  The full responses can be viewed in the Appendix.

1. Do you believe that your unit is performing at an acceptable level?
   i. Yes – 100%
   ii. No – 0%
2. Are you aware of any policies or procedures that are not being followed?
   i. Yes – 0%
   ii. No – 100%
3. If you answered yes to the above question, please specify which policy or procedure is not being followed.  N/A
4. Has technology improved your personal work performance?
   i. Yes – 86%
   ii. No – 14%
5. Is your work satisfying?
   i. Yes – 100%
   ii. No – 0%
6. Do you know the goals and objectives of your unit?
   i. Yes – 100%

**LCSO/Clark
DEF004402**

# Lee County Sheriff's Office

    ii. No – 0%

7. Do you have the necessary tools and resources to do your job?
    i. Yes – 83%
    ii. No – 17%
8. (Short answer question) If you do not have the necessary tools and resources to do your job, please list the tools and resources that you need.
    i. Written Answers:
        a. "Although would like to add a few bar code scanners, along with a good camera to take pictures of stock items."
        b. "The tools they have given us to do the job is very labor intensive and inconsistent when performing certain tasks. Which in turn makes the job very frustrating at times."
        c. "Would be nice to have a handheld scanner to scan items directly into the person's issuance."
9. Is your equipment periodically inspected as required by policy?
    i. Yes – 100%
    ii. No – 0%
10. Were you given the requisite training upon selection to your unit
    i. Yes – 100%
    ii. No – 0%
11. Have you received additional unit related training since you started in this unit?
    i. Yes – 100%
    ii. No – 0%
12. Is training available to you in your current assignment?
    i. Yes – 100%
    ii. No – 0%
13. Has the training you received improved your job performance?
    i. Yes – 100%
    ii. No – 0%
14. Is your supervisor aware of your work performance?
    i. Yes – 100%
    ii. No – 0%
15. Does your supervisor support your actions and decisions?
    i. Yes – 100%
    ii. No – 0%
16. Does your supervisor encourage your ideas and opinions?
    i. Yes – 100%
    ii. No – 0%
17. Does your supervisor inform you on matters that affect your job?
    i. Yes – 100%

LCSO/Clark
DEF004403

# Lee County Sheriff's Office

    ii. No – 0%

18. (Short answer question)   What are the positive things about your unit/shift?

    i. Written Answers:

        a. "I feel everyone tries to work as a team, and I am approachable if they have concerns."

        b. "Management in the unit is very approachable and easy to talk with.  I enjoy the job, just not the Munis program we have switched to, to complete the job."

        c. "Every day is a challenge and in this unit you can't never stop learning."

        d. "We are able to provide customer service and necessities to other employees in the agency."

        e. "I am able to successfully work with my partner/co-workers, have great support from my supervisors, different projects, responsibilities to stay busy, great relationships with other employees in the agency and co-workers."

        f. "Each member has different areas that they handle and excel in. The team has an excellent work ethic and multi-task both individually and as a unit."

        g. "Open door policy.  Both Shannon and Jenna are always willing to help and to also answer any questions or problems I come across."

19. (Short answer question)  What are the negative things about your unit/shift?

    i. Written Answers:

        a. "N/A."

        b. "The glitchy Munis program we are using to do the job."

        c. "In occasions the miscommunication."

        d. "Sometime attitudes can be difficult to deal with."

        e. "Others with low morale, negativity or causing issues with other."

        f. It is a smaller unit, so when it comes to scheduling it can hard to have multiple personnel off?"

20. Have you taken an active role in finding solutions to unit issues?

    i. Yes – 71%

    ii. No – 29%

21. (Short answer question)  What could you or the agency do to help maximize your job performance?

    i. Written Answers:

        a. "N/A."

        b. "Nothing that I can think of at this time.  They already have given us a counter person which has help tremendously with the interruptions in completing tasks in the Munis

LCSO/Clark
DEF004404

# Lee County Sheriff's Office

    system and given us desk top scanners to help with the workload."

    c. "Provide better salary and more trainings in other areas."

    d. "Improve morale."

    e. "Help to update technology so we are not so paper heavy and doing things manually, such as a scanning/inventory system that ties in with our purchasing system (Munis), electronic signatures, etc."

    f. "Would be nice to have a handheld scanner to scan items directly into the person's issuance."

22. Is there any equipment not provided to you that could help you to perform better?
    i. Yes – 43%
    ii. No – 57%

23. If you answered yes to the above, please list the equipment that could be provided which would help you perform your job better.
    i. Written Answers:
      a. "Bar code scanners (handheld)."
      b. "A handheld scanner that would help with scanning uniforms right in to the employee issuance if this was possible based on procurement program we have in place."
      c. "Would be nice to have a handheld scanner to scan items directly into the person's issuance."

24. Is there any training that you would like to have more frequently?
    i. Yes – 43%
    ii. No – 57%

25. If you answered yes to the above, please list the type of training you would like to receive.
    i. Written answers
      a. "Cross training in different areas within the unit."
      b. "Anything relating to effectively dealing with people."
      c. "Anything customer service or dealing with people."

26. Are there any procedures that can be modified to save time?
    i. Yes – 57%
    ii. No – 43%

27. If you answered yes to the above, please list the procedure changes that you would make to save time.
    i. Written answers
      a. "Entering of uniform requests in Munis. Lots of steps to enter each item."

LCSO/Clark
DEF004405

# Lee County Sheriff's Office

    b. "As mentioned above, advanced technology systems in place would help decrease manual issuance/receipts and having to scan paper. Electronic signatures for issued items, scanning system to take inventory and manage receipts/issuance."

    c. "A handheld scanner than would help with scanning uniforms right into the employee issuance if this was possible, based on procurement program we have in place."

    d. "Would be nice to have a handheld scanner to scan items directly into the person's issuance."

28. Are you aware that all files, spread sheets and/or pertinent information should be uploaded to the proper program or sent to the official custodian within the Lee County Sheriff's Office and not be kept in your own personal files? Is there anything you would like to add about your work or your unit?

    i. Yes – 100%

    ii. No – 0%

29. Do you have any personal files that should be uploaded in Spillman or any other LCSO programs?

    i. Yes – 0%

    ii. No – 100%

30. (Short answer question) Is there anything you would like to add about your work or your unit?

    i. Written Answers:

        a. "The girls in Purchasing work very hard, they are team players and very conscientious in the work they do."

        b. "We have a good little unit here with great management."

        c. "Some co-workers should mind their own business."

        d. "We have a hard working group of people that are tasked with a large workload and they handle it."

        e. "I enjoy my job and really like working for Jenna and Shannon."

31. What would you like us to know that would benefit the Human Resources Unit or was not covered previously?

    i. Written answers

        a. "Nothing."

The major issues observed in the member survey are as follows:

1) *Equipment*:

    a. Throughout the survey, it was mentioned by several Purchasing Agents that they would like to have a handheld Barcode scanner that would scan information into the employee issuance.

    b. A good camera to take pictures of stock items.

LCSO/Clark
DEF004406

# Lee County Sheriff's Office

c. Advanced technology systems in place would help decrease manual issuance/receipts and having to scan paper. Electronic signatures for issued items, scanning system to take inventory and manage receipts/issuance.

*Recommendation*: If Director Clark agrees with the suggestions of the additional equipment/technology, it should be investigated to determine cost and effectiveness.

2) *Training*:
   a. Cross training in different areas within the unit.
   b. A class on effectively dealing with people.
   c. A class on customer service.

*Recommendation*: The individual should find out where these classes/courses are being offered and provide the Training Division, Paula Robinson, with the information so it may be uploaded into TMS and apply for the offered course.

## 2. Personal Interviews

Sgt. Cintron made an unannounced visit to speak to the Purchasing Agents in the Purchasing Division. Sgt. Cintron spoke to several people asking them what their job duties were, what their daily tasks comprised of, and their overall job happiness. The only issue brought up was regarding a handheld scanner to make their job tasks quicker and easier. Although, the unit is a small unit, it appears that the Purchasing Agents and Management are a very closely knitted group. Sgt. Cintron was sitting at the break table and one Purchasing Agent was eating her lunch. She appeared to be happy and content with her position in Purchasing. It was very busy and non-stop.

## 3. Member Self-Assessments

An online Member Self-Assessment was distributed to each member in Purchasing. These anonymous assessments asked personnel to answer four questions and state their highest level of formal education. Seven of the seven members (100%) returned the assessment. The possible answers to the questions were Very High, High, Neutral, Low, and Very Low. The questions were as follows:

1) Morale can be described as one's emotional or mental condition with respect to cheerfulness, confidence, zeal, etc., especially in the face of opposition, hardship, etc… Which of these best describes your personal level of morale?

LCSO/Clark
DEF004407

# Lee County Sheriff's Office

2) Job satisfaction can be defined as how content an individual is with his or her job, in other words, whether or not they like the job or individual aspects of their position, such as nature of work. Which one of these best describes your level of job satisfaction?

3) Worker happiness is that happiness that workers feel when they are satisfied with their job and work conditions. Which one of these best describes your level of worker happiness?

4) Productivity can be defined as the quality, state, or fact of being able to generate, create, enhance, or bring forth goods and services. Which of these best describes your personal level of productivity?

5) Which of these describes your highest level of formal education?

The answers were as follows:

1) Which of these best describes your personal level of morale?
   a. Very High – 25%
   b. High – 50%
   c. Neutral – 25%
   d. Low – 0%
   e. Very Low – 0%

2) Which of these best describes your level of job satisfaction?
   a. Very High – 14%
   b. High – 71%
   c. Neutral – 14%
   d. Low – 0%
   e. Very Low – 0%

3) Which of these best describes your level of worker happiness?
   a. Very High – 13%
   b. High – 75%
   c. Neutral – 13%
   d. Low – 0%
   e. Very Low – 0%

4) Which of these best describes your level of productivity?
   a. Very High – 38%
   b. High – 50%
   c. Neutral – 13%
   d. Low – 0%
   e. Very Low – 0%

5) Which of these best describes your current level of education?
   a. Doctorate – 0%
   b. Masters – 25%

LCSO/Clark
DEF004408

# Lee County Sheriff's Office

   c.  Bachelors – 24%
   d.  Associates – 0%
   e.  Some College – 38%
   f.  HS Diploma – 13%
   g.  GED – 0%

This assessment showed that Purchasing employees have levels of morale, job satisfaction, worker happiness, and productivity ranged from neutral to very high. Productivity was noted at very high by 50% and high at 50%. It also showed that several employees had had attained a degree(s) at the level of postsecondary education.

*Note* – Members are encouraged to take advantage of Lee County Sheriff's Office benefits to obtain a low cost, high-quality education.

4. **Inspector Observations**

Sgt. Cintron made an unannounced visit to Purchasing, speaking to random personnel and observing their work habits.  The personnel appeared to be very happy and comfortable in their positions.  Sgt. Cintron observed that the atmosphere was friendly and welcoming. Sgt. Cintron noticed that the telephone was constantly ringing and the Purchasing Agents were working at the front counter assisting fellow employees. Additionally, Purchasing Agents were reviewing purchase orders and picking up COVID-19 supplies to handout to a fellow worker at the front counter.   The employees were very outgoing and very attentive to Sgt. Cintron's questions and needs. Sgt. Cintron felt very comfortable and welcomed by all of the employees.

LCSO/Clark
DEF004409

# Lee County Sheriff's Office

## Conclusion

### Mission Conclusion

1. Does Purchasing meet the agency's formal expectations?

   *Yes.*

2. Does Purchasing practices and procedures ensure compliance with LCSO policies, procedures, and professional standards?

   *Yes.*

3. Are there deficiencies in integrity, training, morale, policy, supervision, or personnel at Purchasing?

   *There are no recognizable deficiencies in integrity, training, morale, policy, first line supervision, and personnel.*

4. Are resources adequate for achieving agency goals and objectives?

   *Several Purchasing Agents requested a handheld Barcode scanner and a camera to take pictures of stock items. The staffing resources are inadequate according to the workload analysis. The addition of two (2) Purchasing Agent allocations is recommended for the Purchasing Division.*

5. Are internal and external communications effective?

   *Yes.*

6. Is there sufficient safety and security for personnel?

   *Yes. There is sufficient safety and security for personnel, and the equipment provided meets and exceeds all operational and Accreditation standards.*

7. Are the written directives for this unit adequate?

   *Yes. Written directives meet all State and Federal laws, and Accreditation Standards.*

8. Evaluation of the record keeping practices for organization, completeness, and ability to retrieve information.

# Lee County Sheriff's Office

*The record keeping practices of Purchasing are organized, complete, and the software available provides easy retrieval of information.*

9. Other Recommendations
   *There are no other recommendations at this time.*

## Objectives

6. Does Purchasing comply with the law, policy, and CALEA standards? *Yes.*

7. Is the Purchasing facility safety and security appropriate? *Yes.*

8. Are equipment safety, and equipment needs met? *Yes.*

9. Is adequate supervision assigned to Purchasing? *Yes.*

10. Are adequate personnel assigned to Purchasing? *No.*

    *Recommendation:* The current staffing level is inadequate and it is recommended that two (2) additional Purchasing Agent positions be allocated.

The Purchasing Division of the Lee County Sheriff's Office appears to be running at a high to very high level of productivity according to all of the employees. Most of the personnel appear to be happy to very happy to be assigned there. Supervisors appear extremely qualified, and are well liked by their employees. Nearly all of the staff showed high to very high levels of morale and job satisfaction.

It is difficult to obtain the perfect level of equipment, service, and employee satisfaction in a law enforcement agency. The Purchasing Division is a very small unit with a group of very hard working and dedicated employees. With their expertise in purchasing goods and services for the department, the certified staff can focus on keeping the residents and visitors of Lee County safe

LCSO/Clark
DEF004411

# Lee County Sheriff's Office

## References

Lee County Sheriff's Office (2020) *Operations Manual: 2020.* Fort Myers, FL: LCSO PowerDMS.

Shane, J.M. (2009). *What every chief executive should know: Using data to measure police performance.* Flushing, NY: Loose-leaf Law Publications Inc.

LCSO/Clark
DEF004412

To:        Undersheriff John Holloway

From:     Executive Director Annmarie Reno

Date:      August 19, 2021

Re:        Purchasing Director Jenna Clark


In July 2021 I held a meeting with both Purchasing Director Clark & Manager Lehman to discuss ordering Civilian Support Unit uniforms and supplies (formerly VOICE).  I instructed them both to start issuing them out to the members (including jackets) as soon as the new polo shirts arrived so that we could start to remove the VOICE items from the shelves and burn them.

I continued to request an update on the status of the new items because I wanted to ensure the that we were going to meet the launch date for the *New Civilian Support Unit.*  Director Clark ensured me that we would meet the date and everything was under control.  Again I reminded her that they needed to remove all the VOICE items from inventory and she told me that she would take care of it.

I also requested that we start discarding all the older uniforms that were no longer being utilized because we were running out of room in Purchasing.

On Thursday, August 12, 2021 @1:30 pm I held a meeting in my office with both Director Clark & Manager Lehman to inform them that we would be moving forward with the implementation of the new bar coding Inventory Management System for our warehouse.  I explained to them that Diana Blewis would be the Project Manager and that they needed to allow her to converse with the members of Purchasing so that they had some input to the setup.  Both Director and Manager were excited about the new system.  After leaving my office I was informed by Manager Blewis that Director Clark was less than receptive to the point that Manager Blewis informed Director Clark that she was asked to complete a project and that if she continued to talk over her while she was explaining the goal that she would walk down to my office and inform me that Director Clark was not being a team player.

On Monday, August 16, 2021 I walked down to Purchasing to inquire how the project was moving along.  I was given a tour by Manager Lehman (since Director Clark is out of the office) to show me around only to see boxes of old uniforms and old stock that was still in the warehouse.  When I inquired as to why all the items were still in our inventory I was informed that Director Clark would not allow them to dispose of it.  There were multiple boxes of old holsters, old civilian and certified uniforms, old time cards, old voice uniforms, and old unusable equipment.  When I asked Purchasing Agent Gwen Legler why we still had old VOICE shirts, jackets, hats and windbreakers I was told that Director Clark would not let her get rid of the items because we might need to use them.  I asked Purchasing Agency Legler to please bag up

<table>
<tr><td align="center"><strong>Exhibit</strong></td></tr>
<tr><td align="center">8</td></tr>
</table>

all the old VOICE items to be burned and any items that the Dominican Republic could use we would drop off on their dock.

As of today all old items have been removed from the Warehouse and we are ready to start the bar code scanning Inventory Management System implementation project.

Director Clark clearly defied my directive to have all the old items removed from LCSO Inventory as instructed and showed total insubordination towards me as her direct supervisor.


Annmarie Reno
Executive Director
Support Services

**From:** Heikkila, Dawn <​████████████​>
**Sent:** Thursday, June 18, 2020 12:47 PM EDT
**To:** Clark, Jenna <JClark@sheriffleefl.org>; Lehman, Shannon <​████████████​>
**Subject:** RE: from policy Chapter 22

Full-time members are required to work a full-time schedule or account for hours missed by using accrued leave time. If a member must be absent from work for whatever reason, they must use the appropriate amount of accrued leave time that would bring their combined work and leave time to the scheduled 80 or 84 hours required for the pay period. The employee may not choose to take time missed from work as "Leave without pay" unless it is approved FMLA. If the member has exhausted all accrued leave time, the missed time then becomes leave without pay. A pattern of abuse may be cause for disciplinary action.



**Dawn Heikkila, Director**
Lee County Sheriff's Office
Desk: ████████
████████
www.sheriffleefl.org

***IMPORTANT MESSAGE***
This message is intended for the use of the person or entity to whom it is addressed and may contain information that is privileged and confidential, the disclosure of which is governed by applicable law. If the reader of this email is not the intended recipient or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this information is STRICTLY PROHIBITED. If you have received this email by error, please notify us immediately and destroy the related message. This footnote also confirms that this email message has been swept for the presence of computer viruses, worms, hostile scripts and other email-borne network threats. PLEASE NOTE: Florida has a very broad public records law. Most written communications to or from government officials are public records available to the public and media upon request. Your email communications may be subject to public disclosure per Sec. 119 F.S.

| **Exhibit** |
|:---:|
| **9** |

9

**LCSO/Clark
DEF004341**

**From:** Heikkila, Dawn <████████████████████████
**Sent:** Thursday, August 12, 2021 1:16 PM EDT
**To:** Clark, Jenna <JClark@sheriffleefl.org>
**Subject:** RE: message

Ok...well we are so busy right now that I am going to hold off on the FMLA...if you end up needing more time that that just let me know and I will have to do the FMLA paperwork.

Thanks and I wish you a speedy recovery!!



**Dawn Heikkila, Director**

Lee County Sheriff's Office
Desk: ████████
DHeikkila@sheriffleefl.org
www.sheriffleefl.org

**From:** Clark, Jenna <JClark@sheriffleefl.org>
**Sent:** Thursday, August 12, 2021 1:06 PM
**To:** Heikkila, Dawn ████
**Subject:** RE: ████████████

18-20
24-27
Total of 7 days.

**Jenna Clark | Purchasing Director**
Desk: 239-477-1313
Purchasing
**Lee County Sheriff's Office**
JClark@sheriffleefl.org | www.sheriffleefl.org

**From:** Heikkila, Dawn ████
**Sent:** Thursday, August 12, 2021 1:04 PM ████████
**To:** Clark, Jenna <JClark@sheriffleefl.org>
**Subject:** RE: message

Ok...if you are out more than a week I will forward it to Amy for FMLA...do you know how long you plan to be out?



**Dawn Heikkila, Director**

Lee County Sheriff's Office
Desk: 239-477-1132
DHeikkila@sheriffleefl.org
www.sheriffleefl.org

**From:** Clark, Jenna <JClark@sheriffleefl.org>
**Sent:** Thursday, August 12, 2021 12:26 PM
**To:** Heikkila, Dawn ████████
**Subject:** message

Hi Dawn –

I called you to let you know I have surgery scheduled on the 18th - Annmarie said to let you know, she already approved my time.

Thanks!
Jenna

**Jenna Clark | Purchasing Director**
Desk: 239-477-1313
Purchasing
**Lee County Sheriff's Office**
JClark@sheriffleefl.org | www.sheriffleefl.org

***IMPORTANT MESSAGE***

10

| Exhibit |
| :-: |
| 10 |

**LCSO/Clark**
**DEF001294**

This message is intended for the use of the person or entity to whom it is addressed and may contain information that is privileged and confidential, the disclosure of which is governed by applicable law. If the reader of this email is not the intended recipient or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this information is STRICTLY PROHIBITED. If you have received this email by error, please notify us immediately and destroy the related message. This footnote also confirms that this email message has been swept for the presence of computer viruses, worms, hostile scripts and other email-borne network threats. PLEASE NOTE: Florida has a very broad public records law. Most written communications to or from government officials are public records available to the public and media upon request. Your email communications may be subject to public disclosure per Sec. 119 F.S.

LCSO/Clark
DEF001295

# Lee County Sheriff's Office

Employee Evaluation Form

**Employee Information**
**Employee** Clark, Jenna D
**ID** 92-072
**Shift**
**Supervisor** RENO, ANNMARIE S
**Department** Purchasing
**Assignment** Director
**Rank** Director
**Position** LCSO Employee

**Evaluation Information**
**Type** Annual
**Review Date** 7/2/2021
**Rating Date** 6/5/2020 to 6/4/2021
**Overall Rating** MS

**Scale: <u>Overall Ratings</u>**
MS = Meets Standard
RI = Requires Improvement

Performance Rating Legend

## Performance Measures

| TypeId | | |
|---|---|---|
| Number | Rating | Performance Statement |
| **Type: Task** | | |
| AL500 | MS | Quality of Reports/Paper Work |
| | | **Jenna completes reports on time and tries to utilize Munis in the best possible way to increase workflow processes.** |
| AL501 | MS | Initiative/Innovation |
| | | **Jenna continues to try to find better processes for Purchasing.** |
| AL502 | MS | Planning and Organization |
| | | **Jenna is a good planner and continues to train those members under her** |
| AL503 | NE | Security/Care of Detainees |
| SP7001a | MS | Conduct/Supervise Employee Performance Evaluations |
| | | **Jenna completes her evaluations in a timely manner.** |
| **Type: Policy** | | |
| PL2 | MS | Grooming and dress |
| | | **Jenna is always professionally dressed for work.** |
| PL4 | MS | Contact with public |
| | | **Jenna is very professional with the public.** |
| PL500 | MS | Attendance |
| | | **Jenna abides by the rules and regulation of the LCSO as it pertains to attendance.** |
| PL501 | MS | Rules and Regulations |
| | | **Jenna follows the rules and regulations set forth by the LCSO.** |
| **Type: Proficiency** | | |
| PR31 | MS | Problem solving |
| | | **Jenna is continuing to find a way to resolve issues between receiving and Finance to streamline the flow of processes.** |
| PR32 | MS | Conflict resolution |
| | | **Jenna continues to work on conflict resolution between purchasing and finance.** |
| PR500 | MS | Work Attitude |
| | | **Jenna has a good work attitude and is always willing to help others.** |

<table>
<tr><td><b>Exhibit</b></td></tr>
<tr><td>11</td></tr>
</table>

Printed On: Tuesday, November 2, 2021
Employee: Clark, Jenna D          ID: 92-072          Eval Period: 6/5/2020 - 6/4/2021          Score: MS

| Number | Rating | Performance Statement |
|--------|--------|-----------------------|
| PRS01 | MS | Understanding/Applying Laws/Rules in applicable career field<br>**Jenna understands and applies rules as they pertain to Purchasing.** |
| PRS02 | MS | Judgment/Decision Making<br>**Jenna is a good decision maker and tries to find ways to streamline Purchasing.** |
| PRS03 | MS | Leadership Qualities<br>**Jenna is a good leader and tries to lead by example.** |
| PRS04 | MS | Interpersonal Relationships<br>**Jenna gets along with everyone; she is always volunteering to help others.** |
| PRS05 | MS | Reliability and Professionalism<br>**Jenna is very reliable and is always available to help others. Jenna is very professional with internal & external customers.** |
| PRS06 | MS | Job Knowledge<br>**Jenna has excellent job knowledge as it pertains to LCSO Purchasing. She is working with her members to pass that knowledge down for the future.** |

| | Type: Career Counseling Plan | |
|--------|--------|-----------------------|
| G1000a | NE | Short Term Goal<br>**Continue to mentor staff, sharing knowledge specifically on unexpected and issues that are uncommon or occasional.**<br><br>**(Hurricane IMT)** |
| G1000b | NE | Long Term Goal (5-10 years)<br>**Next January get ready for the DROP, stay healthy and retire.** |

## Previous Requires Improvement

| Number | Performance Statement | Incident Date | Resolution | Expected Date of Accomplishment | Date Accomplished | Entered By |
|--------|-----------------------|---------------|------------|--------------------------------|-------------------|------------|
| No records to display. | | | | | | |

## Current Requires Improvement

| Number | Rating | Performance Statement | Incident Date | Resolution | Expected Date of Accomplishment | Date Accomplished | Entered By |
|--------|--------|-----------------------|---------------|------------|--------------------------------|-------------------|------------|
| No records to display. | | | | | | | |

## Attachments

| Type | Description | Date | Location | Number |
|------|-------------|------|----------|--------|
| No records to display. | | | | |

## Comments

Printed On: Tuesday, November 2, 2021

Employee: Clark, Jenna D          ID: 92-072          Eval Period: 6/5/2020 - 6/4/2021          Score: MS

## Electronic Signature

This evaluation has been reviewed with the specified employee. Evaluated employee has received a copy of this evaluation. Signature does not mean that the evaluated employee agrees with the evaluator's comments or score.

| Employee | ID | Position | Date Signed |
|---|---|---|---|
| RENO, ANNMARIE S | 97-003 | LCSO Employee | 7/2/2021 |
| | | | |
| | | | |
| Clark, Jenna D | 92-072 | LCSO Employee | 7/2/2021 |
| | | | |
| Holloway, John | 13-148 | LCSO Employee | 7/6/2021 |
| | | | |

Printed On: Tuesday, November 2, 2021

Employee: Clark, Jenna D          ID: 92-072          Eval Period: 6/5/2020 - 6/4/2021          Score: MS

# Lee County Sheriff's Office

Employee Evaluation Form

**Employee Information**
**Employee** Clark, Jenna D
**ID** 92-072
**Shift**
**Supervisor** RENO, ANNMARIE S
**Department** Purchasing
**Assignment** Director
**Rank** Director
**Position** LCSO Employee

**Evaluation Information**
**Type** Annual
**Review Date** 7/15/2020
**Rating Date** 6/5/2019 to 6/4/2020
**Overall Rating** MS

**Scale: <u>Overall Ratings</u>**
MS = Meets Standard
RI = Requires Improvement

Performance Rating Legend

# Performance Measures

| TypeId | | |
|---|---|---|
| Number | Rating | Performance Statement |
| **Type: Task** | | |
| AL500 | MS | Quality of Reports/Paper Work **Jenna's reports are completed on time. Purchasing Division continues to learn how to utilize the Munis System to streamline the purchasing process.** |
| AL501 | MS | Initiative/Innovation **Jenna tries to find new ways to streamline the purchasing process.** |
| AL502 | MS | Planning and Organization **Jenna is a good planner. Recommendation: get other members involved in special purchasing projects for Hazard Plans; also furniture purchasing; Jenna is working with her members to learn how to handle special projects.** |
| AL503 | NE | Security/Care of Detainees |
| SP7001a | MS | Conduct/Supervise Employee Performance Evaluations **Jenna's evaluations are done on time.** |
| **Type: Policy** | | |
| PL2 | MS | Grooming and dress **Jenna is always professionally dressed for work.** |
| PL4 | MS | Contact with public **Jenna is very professional with the public.** |
| PL500 | MS | Attendance **Jenna follows the policy on attendance.** |
| PL501 | MS | Rules and Regulations **Jenna follows the rules and regulations of the LCSO.** |
| **Type: Proficiency** | | |
| PR31 | MS | Problem solving **Jenna still needs to work on problems that exist with POs not having shipping cost, wrong dollar amounts and not being received, which impacts Finance. She will need to find a plan of action to resolve these issues.** |

Printed On: Tuesday, November 2, 2021

| Employee: Clark, Jenna D | ID: 92-072 | Eval Period: 6/5/2019 - 6/4/2020 | Score: MS |

| Number | Rating | Performance Statement |
|--------|--------|------------------------|
| PR32 | MS | Conflict resolution<br>**Jenna is able to keep conflict down within her division and Jenna is continuing to work together on issues between Purchasing & Finance.** |
| PR500 | MS | Work Attitude<br>**Jenna has a very good work attitude.** |
| PR501 | MS | Understanding/Applying Laws/Rules in applicable career field<br>**Jenna understands the rules that apply to her position as Purchasing Director.** |
| PR502 | MS | Judgment/Decision Making<br>**Jenna has good judgment and decision making on Purchasing of items.** |
| PR503 | MS | Leadership Qualities<br>**Jenna has good leadership qualities and is a hard worker.** |
| PR504 | MS | Interpersonal Relationships<br>**Jenna has good interpersonal skills and tries to help and get along with others.** |
| PR505 | MS | Reliability and Professionalism<br>**Jenna is reliable and can be counted on to get things done in her area. Jenna is professional when working with both vendors and members.** |
| PR506 | MS | Job Knowledge<br>**Jenna has a clear working knowledge of Purchasing and keeps a very organized area.** |
| Type: Career Counseling Plan | | |
| G1000a | NE | Short Term Goal<br>**Continue to improve Munis processes and procedures (employee issuances) as it pertains to LCSO Purchasing procedures – train staff as needed.** |
| G1000b | NE | Long Term Goal (5-10 years)<br>**2022 – Reach retirement of 30 years/ stay healthy and possibly go into the DROP** |

## Previous Requires Improvement

| Number | Performance Statement | Incident Date | Resolution | Expected Date of Accomplishment | Date Accomplished | Entered By |
|--------|------------------------|---------------|------------|----------------------------------|-------------------|------------|
| No records to display. | | | | | | |

## Current Requires Improvement

| Number | Rating | Performance Statement | Incident Date | Resolution | Expected Date of Accomplishment | Date Accomplished | Entered By |
|--------|--------|------------------------|---------------|------------|----------------------------------|-------------------|------------|
| No records to display. | | | | | | | |

## Attachments

| Type | Description | Date | Location | Number |
|------|-------------|------|----------|--------|
| No records to display. | | | | |

## Comments

Printed On: Tuesday, November 2, 2021

Employee: Clark, Jenna D          ID: 92-072          Eval Period: 6/5/2019 - 6/4/2020          Score: MS

## Electronic Signature

This evaluation has been reviewed with the specified employee. Evaluated employee has received a copy of this evaluation. Signature does not mean that the evaluated employee agrees with the evaluator's comments or score.

| Employee | ID | Position | Date Signed |
|---|---|---|---|
| Clark, Jenna D | 92-072 | LCSO Employee | 7/15/2020 |
| | | | |
| | | | |
| RENO, ANNMARIE S | 97-003 | LCSO Employee | 7/15/2020 |
| | | | |
| | | | |
| Holloway, John | 13-148 | LCSO Employee | 7/16/2020 |
| | | | |
| | | | |

Printed On: Tuesday, November 2, 2021

Employee: Clark, Jenna D          ID: 92-072          Eval Period: 6/5/2019 - 6/4/2020          Score: MS

# Lee County Sheriff's Office

Employee Evaluation Form

**Employee Information**
**Employee** Clark, Jenna D
**ID** 92-072
**Shift**
**Supervisor** RENO, ANNMARIE S
**Department** Purchasing
**Assignment** Director
**Rank** Director
**Position** LCSO Employee

**Evaluation Information**
**Type** Annual
**Review Date** 7/9/2019
**Rating Date** 6/5/2018 to 6/4/2019
**Overall Rating** MS

**Scale: <u>Overall Ratings</u>**
MS = Meets Standard
RI = Requires Improvement

Performance Rating Legend

## Performance Measures

| TypeId | | |
|---|---|---|
| Number | Rating | Performance Statement |
| **Type: Task** | | |
| AL500 | MS | Quality of Reports/Paper Work |
| | | **Jenna's report are very detailed and completed on time. She continues to try to learn about the new Munis System.** |
| AL501 | MS | Initiative/Innovation |
| | | **Jenna is always trying to find ways to streamline the purchasing process.** |
| AL502 | MS | Planning and Organization |
| | | **Jenna continues to work on Purchasing's plan for the future.** |
| AL503 | NE | Security/Care of Detainees |
| SP7001a | MS | Conduct/Supervise Employee Performance Evaluations |
| | | **Jenna's evaluations are done in a timely manner.** |
| **Type: Policy** | | |
| PL2 | MS | Grooming and dress |
| | | **Jenna is always professionally dressed for work.** |
| PL4 | MS | Contact with public |
| | | **Jenna gets along very well with the public.** |
| PL500 | MS | Attendance |
| | | **Jenna follows the rules on attendance.** |
| PL501 | MS | Rules and Regulations |
| | | **Jenna follows the rules and regulations of the LCSO.** |
| **Type: Proficiency** | | |
| PR31 | MS | Problem solving |
| | | **Jenna is a problem solver and addresses problems before they become issues.** |
| PR32 | MS | Conflict resolution |
| | | **Jenna is good at resolving conflict within her area.** |
| PR500 | MS | Work Attitude |
| | | **Jenna has a great work attitude and is always volunteering to help others.** |

Printed On: Tuesday, November 2, 2021

| Number | Rating | Performance Statement |
|---|---|---|
| PR501 | MS | Understanding/Applying Laws/Rules in applicable career field<br>**Jenna understands the laws and rules as they apply to Purchasing within Government.** |
| PR502 | MS | Judgment/Decision Making<br>**Jenna has good decision making skills.** |
| PR503 | MS | Leadership Qualities<br>**Jenna is a good leader.** |
| PR504 | MS | Interpersonal Relationships<br>**Jenna has improved her interpersonal skills over the last year and gets along with both internal and external customers.** |
| PR505 | MS | Reliability and Professionalism<br>**Jenna is reliable and professional.** |
| PR506 | MS | Job Knowledge<br>**Jenna has very in depth job knowledge that she is trying to pass on to members within her unit.** |
| Type: Career Counseling Plan | | |
| G1000a | NE | Short Term Goal<br>**Oversee/complete the enhancements of Munis employee issuance; continue to learn more in the system as upgrades come out.**<br>**Continue to mentor Purchasing employees to take over my position and duties when I retire** |
| G1000b | NE | Long Term Goal (5-10 years)<br>**Stay healthy – Retire/go into drop at "30" years of service June 2020** |

## Previous Requires Improvement

| Number | Performance Statement | Incident Date | Resolution | Expected Date of Accomplishment | Date Accomplished | Entered By |
|---|---|---|---|---|---|---|
| No records to display. | | | | | | |

## Current Requires Improvement

| Number | Rating | Performance Statement | Incident Date | Resolution | Expected Date of Accomplishment | Date Accomplished | Entered By |
|---|---|---|---|---|---|---|---|
| No records to display. | | | | | | | |

## Attachments

| Type | Description | Date | Location | Number |
|---|---|---|---|---|
| No records to display. | | | | |

## Comments

Printed On: Tuesday, November 2, 2021
Employee: Clark, Jenna D          ID: 92-072          Eval Period: 6/5/2018 - 6/4/2019          Score: MS

**Electronic Signature**

This evaluation has been reviewed with the specified employee. Evaluated employee has received a copy of this evaluation. Signature does not mean that the evaluated employee agrees with the evaluator's comments or score.

| Employee | ID | Position | Date Signed |
|---|---|---|---|
| RENO, ANNMARIE S | 97-003 | LCSO Employee | 7/9/2019 |
| | | | |
| | | | |
| Clark, Jenna D | 92-072 | LCSO Employee | 7/9/2019 |
| | | | |
| | | | |
| Holloway, John | 13-148 | LCSO Employee | 7/16/2019 |
| | | | |
| | | | |

Printed On: Tuesday, November 2, 2021

Employee: Clark, Jenna D          ID: 92-072          Eval Period: 6/5/2018 - 6/4/2019          Score: MS