```
 1              UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF FLORIDA
 2


 3
     JENNA CLARK,
 4
          Plaintiff,
 5                                 CASE NO.: 2:22-cv-614-SPC-NPM
     v.
 6
     CARMINE MARCENO, in
 7   his official capacity
     as Sheriff of Lee
 8   Country, Florida,

 9        Defendant.
     ----------------------/
10
                        ZOOM DEPOSITION OF
11
                         DAWN HEIKKILA
12
                  TAKEN ON BEHALF OF PLAINTIFF
13


14
     DATE TAKEN:    Wednesday, October 11, 2023
15
     TIME:          10 a.m. to 11:15 a.m.
16
     PLACE:         All parties appeared via videoconference
17


18


19


20


21


22
          Examination of the witness taken before:
23
                       Julie S. Evans
24          Court Reporter and Notary Public

25
```

```
 1   APPEARANCES:

 2   KYLE T. MACDONALD, ESQUIRE (via Zoom)
     Derek Smith Law Group, PLLC
 3   520 Brickell Key Dr.
     Suite O-301
 4   Miami, Florida 33131

 5        On behalf of the Plaintiff.

 6   DAVID J. STEFANY, ESQUIRE (via Zoom)
     Allen Norton & Blue, P.A.
 7   324 South Hyde Park Avenue
     Suite 225
 8   Tampa, Florida 33606-4128

 9        On behalf of the Defendant.

10                          - - - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        EXAMINATION INDEX

2    ZOOM TESTIMONY OF DAWN HEIKKILA
            DIRECT BY MR. MACDONALD                          4
3
     CERTIFICATE OF OATH                                     44
4
     CERTIFICATE OF REPORTER                                 45
5

6
                          EXHIBIT INDEX
7
     Plaintiff's
8     1        Notice of Taking Deposition                   7

9
                         - - - - -
10
                 S T I P U L A T I O N S
11
           It is hereby agreed and so stipulated by and
12
     between the parties hereto, through their respective
13
     counsel, that the reading and signing of the transcript
14
     are hereby waived.
15
                         - - - - -
16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1
2       THE COURT REPORTER:  Today is Wednesday,
3   October 11, 2023.  The time is approximately
4   10 a.m. this is the Zoom deposition of Dawn
5   Heikkila, being taken in the matter of Clark v.
6   Carmine Marceno, pending in the United States
7   District Court.  Will counsel please state their
8   appearance, beginning with Plaintiff's counsel.
9       MR. MACDONALD:  This is Kyle Mac Donald for the
10  Plaintiff, Jennifer Clark.
11      MR. STEFANY:  David Stefany, for Sheriff
12  Carmine Marceno.
13    THE COURT REPORTER:  Please raise your right
14  hand.  Do you solemnly swear or affirm your
15  testimony will be the truth, the whole truth,
16  nothing but the truth, so help you God?
17    THE WITNESS:  Yes, I do.
18  THEREUPON:
19                 DAWN HEIKKILA,
20  having first been duly sworn, testified as follows:
21                 DIRECT EXAMINATION
22  BY MR. MACDONALD:
23    Q.   Good morning.  My name is Kyle MacDonald, and I
24  represent Jenna Clark in her lawsuit against Carmine
25  Marceno in his official capacity as Sheriff of Lee

1    County, Florida.  Thank you for being here today.

2         A.    Sure, no problem.

3         Q.    Can you please start by stating your full name,

4    for the record.

5         A.    Dawn Marie Heikkila.

6         Q.    Have you ever been deposed before,

7    Ms. Heikkila?

8         A.    Yes, I have.

9         Q.    And when were you deposed previously?

10        A.    It's been years, years ago.

11        Q.    Okay.  Even though you've been deposed before,

12   I'm just going to go over a few things so we're on the

13   same page.  Okay?

14        A.    Okay.

15        Q.    Do you understand that you've been placed under

16   oath and that you have the obligation to testify

17   truthfully today?

18        A.    Yes, I do.

19        Q.    And do you understand even though we are

20   conducting this deposition via Zoom, you have the same

21   -- sorry -- your testimony has the same force and effect

22   as if you were testifying in a court of law, before a

23   judge and jury?

24        A.    Yes, I do.

25        Q.    Now, the court reporter cannot transcribe

1  inaudible responses like a gesture or a shrug, so please

2  just make sure you respond clearly, just as you have

3  been.  Okay?

4       A.   Yes.

5       Q.   And the court reporter also cannot accurately

6  reflect our responses if we are speaking at the same

7  time, so I will wait until you finish your answer, and

8  I'd just ask that you wait until I finish my questions.

9  Okay?

10      A.   Okay.

11      Q.   Now, we want to ensure we're getting your best

12 testimony, so if you do not understand a question or

13 something seems confusing, just let me know and I can

14 try to rephrase the question for you.  Okay?

15      A.   Okay.

16      Q.   If you need to take a break at any point, to

17 get a glass of water, use the bathroom, anything like

18 that, just let me know, and we can go ahead and take a

19 break.  Okay?

20      A.   Okay.

21      Q.   Do you understand that you are here today to

22 testify on behalf of the Lee County Sheriff's Office?

23      A.   Yes.

24      Q.   And do you understand that your answers are

25 based not only on your personal knowledge but also all

1  knowledge known or reasonably available to the Lee

2  County Sheriff's Office?

3      A.   Yes.

4      Q.   And do you understand that your answers will be

5  binding on the Lee County Sheriff's Office?

6      A.   Yes.

7      Q.   I'm going to share my screen with you.  This

8  has been previously marked as Plaintiff's Exhibit 1.

9  Have you seen this document before?

10     A.   Yes.  (Document was scrolled through.)  Yes.

11     Q.   And are you prepared today to testify regarding

12  the topics listed in paragraphs 3 and 4?

13     A.   Yes.

14     Q.   And are you prepared to testify regarding the

15  topic listed in paragraph 11?

16     A.   Yes.

17     Q.   And are you prepared to testify regarding the

18  topics listed in paragraphs 16 through 24?  And I can

19  scroll.

20     A.   Yes.

21     Q.   And are you prepared to testify regarding the

22  topics listed in paragraphs 26 and 30?

23     A.   Yes.

24     Q.   Where are you conducting this deposition today

25  from?

1    A.   My home.

2    Q.   Is anyone else in the room with you?

3    A.   No.

4    Q.   Do you have any documents in front of you?

5    A.   Yes.

6    Q.   And what documents are those?

7    A.   The one you just showed me.

8    Q.   Any other documents, besides that deposition

9  notice?

10    A.   I have a notebook that I can take notes on, if

11  I need to; I have a couple of other letters that -- I

12  have a couple of other letters that I pulled up, you

13  know, that were pertaining to these numbers that I can

14  reference.

15    Q.   Okay.

16    A.   Or documents, whatever, yeah.

17    Q.   Can you tell me specifically which letters you

18  have?

19    A.   Oh, I have the letter that I sent to Jenna,

20  notifying her that we were -- of the Reduction in Force

21  and I have the subpoena notice and I have the Zoom link

22  notice.

23    Q.   What did you do to prepare for today's

24  deposition?

25    A.   I looked through this packet of questions that

1  you -- or that was sent to me, to familiarize myself in

2  what was going to be asked or what I needed to, you

3  know, be prepared for.

4      Q.   Did you speak with anyone besides the attorney

5  for the Lee County Sheriff's Office about your

6  deposition today?

7      A.   No.

8      Q.   Are you familiar with my client, Jenna Clark?

9      A.   Yes.

10     Q.   Do you know how long Jenna Clark worked at the

11 Lee County Sheriff's Office for?

12     A.   Twenty-plus years; I don't know the exact

13 number, offhand.

14     Q.   What position did Jenna Clark hold when she

15 left the Lee County Sheriff's Office?

16     A.   Director of purchasing.

17     Q.   And what did Ms. Clark do, as the director of

18 purchasing?

19     A.   She managed all the uniforms and all the

20 supplies that the Sheriff's Office needed, everything

21 that we purchased as an agency went through Purchasing;

22 and she held our warehousing, you know, of all the stock

23 that we kept on hand; that was her responsibility.

24     Q.   Any other duties you can think of, besides the

25 ones that you just described?

1    A.   I'm sure there are many, but not that I can

2    think of, in particular.

3    Q.   Did Jenna Clark receive any benefits as part of

4    her employment with Lee County Sheriff's Office?

5    A.   Yes.

6    Q.   What kind of benefits did Ms. Clark receive as

7    part of her employment?

8    A.   Aside from her salary, she would have received

9    sick, vacation, and personal time; health benefits/

10   health insurance; retirement benefits; those were all

11   provided for her.  And then, any other benefits she

12   choose to purchase she could have done that, as well.

13   There were additional things offered; I don't know if

14   she purchased them or not.

15   Q.   What were the different types of leave benefits

16   available to Ms. Clark?  I believe you mentioned a few

17   of those briefly.

18   A.   Paid leaves are sick, vacation, and personal.

19   Q.   You said those are sick, vacation, and

20   personal; correct?

21   A.   Correct.

22   Q.   How much sick leave was afforded to Ms. Clark,

23   as part of her employment?

24   A.   Over her entire career?  Or -- I don't

25   understand your question.

1    Q.    Let me rephrase.  So in the last year of Jenna

2  Clark's employment, how much sick leave was she

3  afforded, as an employee of Lee County Sheriff's Office?

4    A.    Can I look it up?  Because I don't have it in

5  my head.

6    Q.    In terms of looking it up, do you mean like a

7  policy handbook for the Lee County Sheriff's Office?

8    A.    Sure, yeah.  Because, you know, she accrues

9  different amounts of time based on her tenure.  So I

10  don't remember, anymore, the number of hours she would

11  have accrued per pay period for a twenty-year-plus

12  employee.

13    Q.    Okay.  So it depends on the length of service

14  for an employee of Lee County Sheriff's Office?

15    A.    Yes.  It increases as you -- I think it's ten

16  and twenty years, it increases; not personal, but sick

17  and vacation.

18    Q.    And what can the sick leave benefits be used

19  for?

20    A.    For their own personal sickness, for the

21  sickness of an immediate family member, to go to the

22  doctor, things like that.

23    Q.    And I know you said you can't recall the

24  specific amount of sick leave that Jenna Clark was

25  afforded.  But do you have any idea, generally, of what

 1   the scale looks like, in terms of sick leave benefits

 2   afforded to Lee County Sheriff's Office employees?

 3        A.   I know that they accrue per paycheck; so every

 4   time they get paid, they accrue additional hours in both

 5   sick bay and personal time, depending on where they're

 6   at in that tenure.

 7        Q.   Does vacation time accrue in the same manner

 8   that you just described?

 9        A.   It does.

10        Q.   Do you recall how much vacation time Jenna

11   Clark was afforded during her last year of employment

12   with the Lee County Sheriff's Office?

13        A.   I do not.

14        Q.   Do you have any idea what the scale looks like,

15   generally, for vacation time afforded to employees of

16   Lee County Sheriff's Office?

17        A.   I don't understand that question, "scale."

18        Q.   So just speaking generally, in terms of the

19   vacation time that's afforded to Lee County Sheriff's

20   Office employees, do you have any idea what the range is

21   that's afforded to employees, in terms of the leave

22   that's given to them?

23        A.   Everybody accrues the same amount based on

24   their tenure; so every person, it would depend on their

25   years of service and where they fall in that, you know,

1  category.  So but everybody accrues the same, in terms

2  of that.

3      Q.   And what can vacation leave be used for?

4      A.   If it's requested and approved, it can be used

5  for basically anything someone wants to do, away from

6  the office.

7      Q.   How much personal leave time was afforded to

8  Jenna Clark during her last year of employment with Lee

9  County Sheriff's Office?

10      A.   Well, every civilian employee would receive 100

11  hours per year, and most of -- for the -- for most of

12  her career, it would have been 50 hours in January and

13  50 hours in July.  There were a number of years, in

14  between there, that they started doing just 100, you

15  know, all together.  But I don't recall what years those

16  were.  Either way, it would have been -- if she stayed

17  the entire year or if she was there just through July,

18  you know, it would have been 100, just like all the

19  other civilian employees.

20      Q.   And for each of these types of leave -- for the

21  sick leave, vacation leave, and personal leave -- what

22  is the request process, if an employee wants to use

23  those benefits?

24      A.   They would need to speak to their supervisor

25  and enter the request into the time keeping system, VCS.

1      Q.   And that's for each of those three different

2  types of leave?

3      A.   Correct.

4      Q.   Once an employee enters a request into VCS, who

5  does that request go to, for approval?

6      A.   Their immediate supervisor.

7      Q.   Who would have Jenna Clark's requests have gone

8  to, during her last year of employment with Lee County

9  Sheriff's Office, in VCS?

10     A.   Annmarie Reno.

11     Q.   And you said, in addition to submitting the

12  request to VCS, an employee was also required to speak

13  with their supervisor regarding their request?

14     A.   Well, they would -- if they can't enter it,

15  let's say, because you're talking sick, vacation, and

16  personal, sometimes if someone is sick, they're not able

17  to enter in the VCS; that's when they would need to

18  speak to their supervisor.  They could just speak to

19  their supervisor, but it has to be entered in the VCS as

20  well, at some point.

21     Q.   Was Jenna Clark entitled to FMLA benefits, as

22  part of her employment with the Lee County Sheriff's

23  Office?

24     A.   Yes.

25     Q.   What was the process for Jenna Clark to use her

1    FMLA benefits, during the last year of her employment

2    with the Lee County Sheriff's Office?

3        A.    All she had to do was qualify.

4        Q.    And how does an employee qualify?

5        A.    By working 1250 hours in 12 months and having a

6    personal health condition that her doctor would certify

7    as qualifying.

8        Q.    And was Jenna Clark required to submit a

9    request to use her FMLA benefits?

10       A.    She was not required, no.

11       Q.    Did Jenna Clark need to inform anyone, if she

12   wanted to use her FMLA leave benefits?

13       A.    No.

14       Q.    Did Lee County Sheriff's Office have any kind

15   of FMLA policy in place regarding the use of those

16   benefits?

17       A.    Yes.

18       Q.    Can you tell me about those.

19       A.    Just that they exist and explaining to the

20   employees what the regulations are for FMLA, what's a

21   serious health condition, some guidelines on how they

22   can go about, you know, using those benefits.  Yeah,

23   just so they know it exists and that it's there for

24   them; who to contact, you know, your supervisor, HR,

25   Risk Management, things like that, if they want to do

1  that or need to or have questions, what have you.

2      Q.   Did Jenna Clark ever submit any FMLA requests

3  between 2018 and the last date of her employment?

4      A.   I believe she was on FMLA during the last

5  several years.  I don't recall if she actually submitted

6  a request or if she just notified her supervisor that

7  she needed, you know, to be out for a qualifying event.

8      Q.   If Ms. Clark did submit an FMLA leave request,

9  who would that go to in the Lee County Sheriff's Office?

10     A.   It could go to her supervisor; but, ultimately,

11 it would need to go to Risk Management.

12     Q.   And who in Risk Management would handle that

13 request?

14     A.   Well, over the years, there have been many

15 people; but in her last year, it would have been Amy

16 Hurts (ph).

17     Q.   And what was Amy Hurts' title, if you recall,

18 during that last year of Ms. Clark's employment?

19     A.   Risk management analyst, I believe.

20     Q.   Did Jenna Clark ever submit an FMLA leave

21 request to you, personally?

22     A.   No.  Not that I recall an official request, no.

23 We spoke about FMLA but, you know, not a document

24 requesting it.

25     Q.   When did you speak with Ms. Clark regarding

 1    FMLA leave?

 2        A.    Let's see if I have that date in front of me

 3    with this -- I don't think I have that.  But I spoke

 4    with her when she needed to go out for her last

 5    qualifying event; I guess that would have been in 2021.

 6        Q.    And was this a conversation in person, or was

 7    this an email?

 8        A.    It was -- it was not in person; it was over the

 9    phone, and we emailed back and forth some.

10        Q.    And what did you discuss on the phone with

11    Ms. Clark?

12        A.    Well, in -- she had told Annmarie that she

13    needed to be out, and Annmarie had approved her time --

14    you know, her being away from the office; and then

15    Annmarie told her to touch base with me or with Risk

16    Management, to let us know, in case she needed to be out

17    longer than the initial 7 days that they had discussed.

18            And so she did that; she reached out to me, to

19    let me know that she was going to be out.  And I

20    discussed with her the number of days that she would be

21    out, which is what I would always do, to determine what

22    we needed to do on our end.  So that's it; I gave her

23    instructions on that, you know, and that was it.

24        Q.    Why did Annmarie Reno instruct Ms. Clark to

25    discuss with you regarding the FMLA leave?

1     A.   Just to make me aware that she was going to be

2  out and if there was potential -- if she needed to be

3  out longer, then we would have activated an FMLA leave

4  for her.  So I would monitor and, you know, make sure

5  she returned to work basically, within the amount of

6  time she said she was going to.

7     Q.   Now why would Annmarie Reno refer her to you,

8  as opposed to Risk Management?

9     A.   I can't answer that; maybe... I don't know, I'm

10  the director.  You know, it wasn't uncommon to say,

11  "Hey, get with Dawn, let her know; and then Dawn will

12  let her folks know, or Dawn will monitor."  I mean,

13  she's a director, I'm a director.  I can't answer for

14  Annmarie, but that's what I would assume.

15     Q.   Now, you also mentioned the number of days in

16  regards to Ms. Clark's FMLA leave requests.  What did

17  the number of days have to do with the requests?

18     A.   Just an internal practice that we had, that if

19  someone is going to be out 7 days or less, we didn't

20  require them -- you know, if we knew, if we were

21  familiar enough with their situation, they had shared

22  enough information with us that we knew it would be a

23  qualifying event; and/or we were willing to, you know,

24  approve the time away from work, with or without the

25  position certification, we wouldn't require them to do

1  all the paperwork involved in FMLA.  You know, 7 days,

2  by the time you get all that paperwork together, you're

3  back to work, so we didn't -- you know, when they're

4  sick or they're going through something already, we just

5  didn't feel it was necessary.

6          So it became an internal practice of ours, that

7  7 days or less, we felt that was a time that, if we had

8  enough information, we would just approve their leave

9  and let them take care of what they needed to take care

10 of.  And as long as they returned, then we wouldn't

11 require all the additional paperwork that FMLA involves.

12     Q.   And was that always the case if the leave were

13 for less than 7 days, or did it depend on the

14 circumstances of the employee?

15     A.   I mean, it always depends on what the employee

16 shares with you, as an employer.  If they share enough

17 information about their health condition that you have

18 no question about them being out, then -- and about the

19 FMLA, then, you know.  Or if you have -- if the

20 supervisor is just willing to approve the time away

21 because it's such a short amount of time.  Our policy

22 says a supervisor can approve up to three weeks without

23 upper level approval.  So, yeah, it's -- it's common

24 practice for us to do that without additional paperwork.

25     Q.   And for Jenna Clark, would that decision be

1   left up to you, or would it be left up to Annmarie Reno

2   as to whether that paperwork would be required?

3         A.   It was left up to me.

4         Q.   And did you require Ms. Clark to submit the

5   paperwork for that instance when she spoke to you about

6   leave?

7         A.   I did not.

8         Q.   And that was because the leave was for less

9   than 7 days?

10        A.   And because she shared with me enough

11  information about her health condition that I knew it

12  would qualify, and if she needed additional time, then

13  the FMLA would be applied.

14        Q.   If an employee takes leave for less than those

15  7 days, what is it classified as, in terms of leave

16  benefits?

17        A.   It depends on what the employee asks for and

18  what the situation is; you know, according to policy,

19  there are certain leaves that are sick leaves and

20  certain leaves that are other.  So if they shared enough

21  information with the supervisor and they followed

22  policy, that would dictate what kind of leave they were

23  using.

24        Q.   In that instance, when Jenna Clark spoke to you

25  regarding the leave request, what was that leave

 1   classified as, if not FMLA leave?

 2       A.    She spoke to me about her need to be away from

 3   the office; she did not speak to me about what kind of

 4   pay or what kind of leave she would use.  That would

 5   have -- she did not speak to me about that.

 6       Q.    Who would make the determination for Ms. Clark

 7   as to what kind of leave that would be classified as?

 8       A.    I suppose the person doing their time sheet; so

 9   more than likely, that person and their immediate

10   supervisor is who has to approve it.

11       Q.    And in terms of what the leave could be

12   classified as, does it fall into those three categories

13   that we previously discussed: sick leave, vacation, or

14   personal time?

15       A.    If they have available to them those three, one

16   of those three times, then, yes, it could.  Mm-hm.

17       Q.    If an employee was to take leave under the FMLA

18   for less than 7 days, was there a limit on the amount of

19   time, let's say, that an employee could do that, or was

20   that discretionary with the supervisor?

21       A.    Was there a limit?  No.

22       Q.    What is "admin leave with pay"?

23       A.    It's something that the agency uses to pay an

24   employee to be out and where it does not involve using

25   any of their accrued time; paid by the agency,

1    essentially.

2        Q.    And when would admin leave with pay be used for

3    an employee?

4        A.    That could be used for anything that the

5    sheriff wanted to use it for.

6        Q.    And who determines if admin leave with pay

7    could be used for an employee?

8        A.    The sheriff or his designee.

9        Q.    Do you know if Jenna Clark was ever placed on

10   admin leave with pay, from 2018 until the last date of

11   her employment?

12       A.    She was.

13       Q.    And do you recall when that was, roughly, that

14   she was placed on admin leave with pay?

15       A.    It was when we notified her of the Reduction in

16   Force.

17       Q.    And who made the decision to place Ms. Clark on

18   the admin leave with pay, at that time?

19       A.    You know, I'm not sure; I know who told me to

20   do it, but I'm not sure whose decision that would have

21   been.

22       Q.    And who told you to do that?

23       A.    Annmarie Reno.

24       Q.    Was this in person that Annmarie Reno asked you

25   to do that, or was this an email?

1    A.   It would have been over the phone.

2    Q.   Do you remember when that roughly was, that

3   phone call with Ms. Reno?

4    A.    It was the day before or the day of the letter

5   that was written; and so it looks like the letter -- I

6   have the letter here, August 15 of '21.

7    Q.   Is there a limit on the amount of admin leave

8   with pay that an employee can use?

9    A.   Not that I'm aware of.

10    Q.   Are you aware of any other instances where

11   Ms. Clark used admin leave with pay, besides that time

12   before she was sent the letter?

13    A.   No.

14    Q.   When you spoke with Ms. Reno regarding the

15   admin leave with pay, was anything else discussed on

16   that phone call?

17    A.   Just what she wanted me to put in the letter,

18   what was happening, and -- yes, what relevant

19   information I needed for notifying Jenna.

20    Q.   Did Jenna Clark receive any pension benefits,

21   as part of her employment with the Lee County Sheriff's

22   Office?

23    A.   She did.

24    Q.   Can you tell me about the pension benefits.

25    A.   Sure.  What do you need to know?

1    Q.    Well, what are the pension benefits of the Lee

2    County Sheriff's Office?

3    A.    Well, pension benefits are something that, once

4    you -- when you start working for an agency that, you

5    know, in the Florida pension system, you become -- and

6    once you've become -- gosh, the word.  Anyway, after a

7    period of time, like she did, you receive a benefit for

8    your lifetime; that's what the pension is.

9         And so a civilian, you know, there's a

10   multiplier involved, and it involves your salary, your

11   high five years of salary, and your -- and/or your age,

12   your number of years of service, things like that.  And

13   there's a calculation that is done by the Florida

14   Retirement System for -- to determine what your -- what

15   that dollar value would be; it's paid monthly for the

16   rest of your life.

17   Q.    And does the time at which an employee retires

18   impact the amount of pension benefits that are paid to

19   them?

20   A.    Does the what?

21   Q.    Does the amount of time or amount of years of

22   service that an employee has worked at the Lee County

23   Sheriff's Office impact the amount of pension benefits

24   that are paid to them?

25   A.    Yes.  Their years of service is part of the

1    multiplier.

2        Q.    And is there a certain length of time that

3    employees have to reach, to get the full pension

4    benefits?

5        A.    "Vesting" was the term that I was having a hard

6    time with; once they're vested, they own whatever

7    benefits they earn, and so, no.  I mean, once they're

8    vested, it's just, you apply that formula and that's how

9    your pension benefits are determined.

10       Q.    Do the pension benefits continue to increase

11   with years of service, or is there a cap, at some point,

12   in the amount of years of service that an employee has

13   worked?

14       A.    No.  That's part of the multiplier; that's part

15   of the formula, the years of service; so whatever that

16   number is, is applied to the formula.

17       Q.    Were you involved in administering pension

18   benefits at the Lee County Sheriff's Office?

19       A.    Well, involved in administering -- Florida

20   Retirement System is who administers the pension

21   benefits.

22       Q.    Did you have any involvement in employees using

23   the Florida Retirement System?

24       A.    I mean, they go directly to the Florida

25   Retirement System.  They have a log-in; they have a

1   phone number.  So I mean, they go directly to that.

2   They don't have to go through me.

3       Q.   Do you know if Ms. Clark was eligible for her

4   full pension benefits, when she left the Lee County

5   Sheriff's Office?

6           MR. STEFANY:  I'm going to object to the form.

7       You may answer it.

8           THE WITNESS:  She was vested.

9   BY MR. MACDONALD:

10      Q.   Vested, meaning that she was entitled to some

11  pension benefits?

12      A.   Correct.  Yes.

13      Q.   Would Ms. Clark have seen an increase in her

14  pension benefits if she had remained at the Lee County

15  Sheriff's Office?

16      A.   Yes.

17      Q.   Do you know if there are any penalties for

18  early retirement, under the Florida Retirement System?

19      A.   There are penalties for taking your pension,

20  for distribution, if you have not met the years of

21  service or the age requirement.

22      Q.   And do you know what the years of service

23  requirement was for the Lee County Sheriff's Office to

24  not have that penalty when you retire?

25      A.   For Jenna; correct?

 1          Q.    Yes, for Jenna Clark.

 2          A.    For Jenna, 30 years of service would have been

 3    for her class of employee.

 4          Q.    And you said there was an age requirement, as

 5    well?

 6          A.    It's an and/or; 30 years, or age 62, whichever

 7    comes first.

 8          Q.    And do you know what the penalty is if you do

 9    not hit one of those two criteria when you retire?

10          A.    Yes.  The penalty is 5 percent a year -- let me

11    think; let me be sure.  5 percent a year for every year

12    that you leave prior to, yes.

13          Q.    Did Ms. Clark receive -- sorry, strike that.

14          Did Ms. Clark reach 30 years of service with

15    the Lee County Sheriff's Office, as required?

16          A.    She did not.

17          Q.    And Ms. Clark would have received a penalty

18    under the Florida Retirement System, as a result;

19    correct?

20          A.    If she would have separated employment and

21    drawn her pension, taken a distribution, then yes, the

22    formula would have involved a penalty.

23          Q.    Are you able to separate from employment with

24    the Lee County Sheriff's Office and not draw the

25    pension?

```
 1         A.    You are, yes.

 2         Q.    How does eligibility for that 30 years of

 3   service work, if you're separated and don't draw the

 4   pension?

 5         A.    I think what you're asking is, how do you avoid

 6   the penalty?

 7         Q.    Yes.  Let's say you're separated, but you don't

 8   draw the pension.

 9         A.    You wait until you're age 62 to draw the

10   pension, and then there's no penalty.

11         Q.    Under those pension benefits, are you able to

12   work and have employment in, let's say, a different

13   position?

14         A.    What exactly do you mean?

15         Q.    So if an employee of the Lee County Sheriff's

16   Office was to draw their pension, are they able to have

17   employment?

18         A.    Yes.

19         Q.    During Ms. Clark's employment, was she ever

20   disciplined, as far as you're aware?

21         A.    I believe one time she might have -- I don't

22   know that I would call it discipline; I would call it,

23   maybe, counseling.  I'm not aware of any discipline, but

24   I believe it was maybe just a counseling session.

25         Q.    What do you recall about that counseling?
```

1    A.    Well, Annmarie was talking to me about it, and

2    it was just that she had to have a conversation with

3    Jenna regarding something that Jenna had done that had

4    upset one of her subordinates.

5    Q.    Do you remember, roughly, when this was?

6    A.    I do not... like, roughly, you know, last five

7    years.

8    Q.    Do you remember which subordinate was involved

9    in that situation that you just described?

10   A.    I do not know.

11   Q.    Did Annmarie Reno ever speak to you about any

12   other issues with Jenna Clark besides that counseling

13   instance?

14   A.    I don't think so, no.

15   Q.    How did you respond to Annmarie Reno when she

16   told you about that situation?

17   A.    I felt that she handled it correctly.

18   Q.    And how did Ms. Reno handle it?

19   A.    She had a conversation with Jenna and coached

20   her on what's appropriate to say or do, regarding

21   whatever the situation was.

22   Q.    And besides that instance that you described,

23   you're not aware of any other counseling or discipline

24   that was given to Ms. Clark; correct?

25   A.    I'd read a letter in her file, at some point,

1    where she -- where Annmarie counseled her, that had to

2    do with destruct -- getting rid of old uniforms and a

3    directive that Annmarie had given her and Jenna didn't

4    follow.

5        Q.   When did you read that letter or document?

6        A.   When going through the information I had for

7    this -- you know, preparing for this deposition; just

8    recently.

9        Q.   Was that the first time you saw that letter?

10       A.   Yes.

11       Q.   Had Annmarie Reno ever discussed that incident

12   with you, prior to you reading that letter?

13       A.   No.

14       Q.   Do you remember if that letter included the

15   dates of when that incident occurred?

16       A.   It did.

17       Q.   And do you remember, roughly, when it was?

18       A.   Roughly, it would have been -- I think we

19   restructured that unit in, maybe, 2020; so it was when

20   we restructured the voice unit.  So I think it would

21   have been in maybe '19 or '20.  I didn't really pay

22   attention to the date.

23       Q.   Who was responsible for evaluating Ms. Clark's

24   job performance?

25       A.   Her supervisor, Annmarie Reno.

1     Q.   Do you remember when Ms. Clark was notified of

2  her termination from the Lee County Sheriff's Office?

3     A.   Well, I wrote the letter to her, August 15 of

4  2021, and that was when she was instructed that her

5  position was being eliminated.  And so, in that letter,

6  she was given a deadline.

7     Q.   And what was that deadline?

8     A.   It was September 3rd of 2021.

9     Q.   And what did Ms. Clark have to do by that

10  deadline?

11     A.   She had to decide if she was going to retire or

12  if she was going to continue employment, like with

13  another job, by applying for another job.  I should say,

14  if she was going to separate employment; she didn't

15  actually have to take the distribution and retire, but

16  she could.

17     Q.   And you said that you wrote that letter;

18  correct?

19     A.   Yes.

20     Q.   And were you instructed to write that letter?

21     A.   Yes.

22     Q.   Were you instructed by Annmarie Reno?

23     A.   Yes.

24     Q.   What did Annmarie Reno say to you, when she

25  instructed you to write the letter?

1    A.   She told me to notify Jenna, she told me when

2  the dates were going to be, and she told me how she was

3  going to be handled regarding her -- the administrative

4  leave, her pay.

5    Q.   Was that the first time that you learned that

6  Jenna Clark's position was being eliminated?

7    A.   Yes.

8    Q.   What was your reaction when you learned that

9  Jenna Clark's position was being eliminated?

10    A.   I said, okay, and, you know, needed to know the

11  details of the responsibilities of my position.

12    Q.   Did Annmarie Reno tell you why Jenna Clark's

13  position was being eliminated?

14    A.   She said it was part of our Reduction in Force.

15    Q.   Is that the first time that you had learned

16  that a Reduction in Force was being conducted by the Lee

17  County Sheriff's Office?

18    A.   No.

19    Q.   When did you learn that -- first learn that a

20  Reduction in Force was being conducted by the Lee County

21  Sheriff's Office?

22    A.   It was happening for several years, when

23  Sheriff Marceno took over; so I don't know how long

24  after he took over, but it was during his tenure as

25  sheriff.

```
 1        Q.    Did Annmarie Reno ask you to draft a similar

 2   letter for any other employees at the Lee County

 3   Sheriff's Office?

 4        A.    I would have to say, yes.  I didn't always

 5   report to Annmarie Reno, but I was -- I drafted others,

 6   whether Ann -- so whether it was Annmarie that asked or

 7   whoever my supervisor asked; this wasn't the first

 8   letter I'd drafted.

 9        Q.    Did you draft any other letters related to the

10   Reduction in Force in 2021?

11        A.    I believe so.  I believe in 2021, there were

12   others that I did.  I don't recall how many.

13        Q.    Did you ever draft a letter related to the

14   Reduction in Force for Anthony Ramsey?

15        A.    No.  No, I don't recall that name being one of

16   the letters I did.

17        Q.    Did you ever draft a letter related to the

18   Reduction in Force for Amy Delaquilla?

19        A.    No.  I don't recall that one either.

20        Q.    Did you ever write a letter related to a

21   Reduction in Force for Jamie Bartz?

22        A.    No.

23        Q.    Did you ever write a letter related to the

24   Reduction in Force for Marcia Sprankel?

25        A.    No, I don't think so.
```

1    Q.   Did you ever write a letter related to the

2    Reduction in Force for James Jones?

3    A.   James Jones... I think James Jones still works

4    there, so I guess that answer would be no.

5    Q.   So, no, you do not recall writing a letter

6    related to the Reduction in Force for James Jones?

7    A.   No.

8    Q.   Did you send that letter to Ms. Clark?

9    A.   I did, yes.

10   Q.   How did you send it to her?

11   A.   I would have mailed it; I might have even

12   emailed it to her.  Because I remember speaking with her

13   about it, so I might have emailed it to her.  But I know

14   I would have sent it through U.S. Mail.

15   Q.   And you said you spoke with Ms. Clark about the

16   letter, as well?

17   A.   I did.

18   Q.   And when did you speak with Ms. Clark about the

19   letter?

20   A.   When we were talking about other jobs or what

21   her options -- she was asking, you know, what her

22   options were; I remember having a conversation with her

23   about what she was going to do.  She was trying to

24   decide.

25   Q.   And did you initiate that phone call, or did

```
 1    Ms. Clark initiate that phone call?

 2         A.   I don't recall.  I don't want to guess.  I

 3    don't really remember.

 4         Q.   What was the purpose of that phone call with

 5    Ms. Clark after you sent the letter?

 6         A.   Well, I -- I believe that my discussions with

 7    Jenna all -- after Annmarie notified her of what was

 8    happening, all revolved around her -- what her options

 9    were going forward and her benefits and things like

10    that; she was asking questions, and I was answering

11    them.

12         Q.   Did you explain to Ms. Clark what options were

13    available to her?

14         A.   I answered questions for her that she had; I

15    wouldn't say that I went into a full explanation of all

16    her options.  But I was there answering her questions.

17         Q.   Do you remember what specifically Ms. Clark

18    asked you on that call?

19         A.   She was asking about other positions that were

20    open that she could apply for, and she was asking about

21    her health benefits if she chose to separate; I recall

22    her asking about her sick, vacation, and personal -- or

23    accrued time, if she chose to take another -- you know,

24    apply for another job, a different job than what she

25    had.  That's all I really remember talking about.
```

1    Q.    And you said you did not discuss the full

2    options that may be available to her; correct?

3    A.    I discussed how she -- I gave her information

4    as to how she would get that information; you know, I

5    gave her -- I instructed her to contact Florida

6    Retirement System; I would have given her the

7    information on who to call to gather the information.  I

8    did that.  I did not provide the details to her,

9    directly.  I wanted her to educate herself on all of her

10   options, so she could make the best choice.

11   Q.    If Ms. Clark did not choose to retire early,

12   what would happen to her position at the Lee County

13   Sheriff's Office, based on the letter that you wrote?

14        MR. STEFANY:  Object to the form of the

15        question.  You may answer it.

16        THE WITNESS:  Well, her position was being

17        eliminated, and that didn't have anything to do

18        with what she chose to do later.

19   BY MR. MACDONALD:

20   Q.    What do you mean by that?

21   A.    You know, it was being eliminated, whether --

22   and then, after that, what Jenna chooses to do, whether

23   she decides to take another job or to separate

24   employment, whether she chooses to take a distribution

25   with her pension; those all were things that Jenna had

 1  to decide.  But the position, itself, was being

 2  eliminated, regardless of that.

 3      Q.   Meaning that Ms. Clark's current position would

 4  no longer be available, regardless of what she chose;

 5  correct?

 6      A.   Correct.

 7      Q.   Did Ms. Clark discuss potential penalties for

 8  early retirement with you, on that phone call?

 9      A.   I remember discussing that, her asking about

10  penalties, yes.  And that's when I was referring her to

11  the Florida Retirement System and -- but, yes, she did

12  mention penalties.

13      Q.   And on that phone call with Jenna Clark, she

14  also asked you about other positions at the Lee County

15  Sheriff's Office that she could apply for?

16      A.   Yes.  I don't know if it was the phone call or

17  the in-person but, yes, we had that conversation.

18      Q.   And what did you say, when she asked you about

19  that?

20      A.   I told her the positions that were open at that

21  time.  I recall there being one or two; communications

22  operator was one that we talked about that she would

23  have been able to do.  There might have been an auto

24  mechanic, if I remember correctly.

25      Q.   Do you remember if you spoke to Ms. Clark

 1    regarding the pay rates for those positions?

 2        A.   I did speak to her about the pay rates for

 3    communications operator.

 4        Q.   Do you remember what that pay rate was?

 5        A.   I don't remember the exact amount, no.

 6        Q.   Was it more or less than Jenna Clark was making

 7    in her last role with the Lee County Sheriff's Office?

 8        A.   It was less.

 9        Q.   Was that also true for the auto mechanic

10    position?

11        A.   You know, I don't know that we discussed the

12    auto mechanic that far.  You had to qualify for the

13    position so, you know, it wouldn't have been one that we

14    pursued that far.

15        Q.   What were the qualifications for the auto

16    mechanic position?

17        A.   I mean, you had to know how to work on cars and

18    have experience working on cars.  I don't recall the

19    details, but I do know that that was one that -- the

20    only one Jenna thought that she would have shown any

21    interest in was the communications, so that's the one we

22    talked about.

23        Q.   What is an academy position?

24        A.   Academy?  It's a schooling for law enforcement

25    and corrections officers.

1   Q.   Was Ms. Clark eligible to apply for any academy

2   positions, at the time of her position being eliminated?

3   A.   She could have, yeah.

4   Q.   And you said you have to be certified to have

5   an academy position; is that correct?

6   A.   No.  That's how you get certified; you have to

7   go to the academy, in order to obtain -- in order to sit

8   for the state exam, you have to successfully complete

9   the academy, and then sit for a state exam to become

10  certified.

11  Q.   Was Ms. Clark certified, at the time her

12  position was eliminated?

13  A.   No.

14  Q.   So unless Ms. Clark obtained additional

15  education and training, she was not eligible to apply

16  for any academy positions?

17  A.   She was eligible to apply for academy; she

18  wasn't eligible to actually do a law enforcement

19  officer's job, until she graduated and passed the state

20  exam.  That's what the purpose of an academy was for.

21  Q.   Did you discuss the responsibilities of a

22  communications call taker with Ms. Clark, when you spoke

23  with her?

24  A.   No.

25  Q.   Did you discuss any of the specifics regarding

1   that position with Ms. Clark?

2        A.   Other than pay, no.

3        Q.   Did you tell Ms. Clark that any of the

4   positions required memory or attention to detail?

5        A.   No.

6        Q.   Are you familiar with the position of

7   communications call taker, generally?

8        A.   Yes.

9        Q.   And what does that position do with the Lee

10  County Sheriff's Office?

11       A.   They answer the phones and talk to people;

12  9-1-1 calls, general calls to the Sheriff's Office,

13  things like that.

14       Q.   At the time of your phone call with Ms. Clark,

15  did you believe that she was qualified for the position

16  of communications call taker?

17       A.   Yes.

18       Q.   And at the time of your phone call with

19  Ms. Clark, did you believe that she was qualified for

20  the position of automotive mechanic?

21       A.   No.

22       Q.   Did you encourage Ms. Clark to apply to either

23  position, the communications call taker or automotive

24  mechanic?

25       A.   I did encourage her to apply for the call taker

1  position, yes.

2      Q.   If Ms. Clark chose to apply for the

3  communications call taker position, what would that

4  process have entailed?

5      A.   She would have had an interview with the

6  management team over in Communications, and they would

7  have evaluated her for her ability to perform that job

8  and determine if she was a good fit for that job; they

9  would have made her an offer for that position, and we

10  would have hired her for that position.

11      Q.   Would Ms. Clark's accrued vacation or sick

12  leave time have been affected if she had taken the role

13  of communications call taker?

14      A.   She would have still had it; she would have

15  still had all that time, yeah.

16      Q.   So it would not be impacted, if she had taken

17  the communications call taker role?

18      A.   Her accrual ranks would have remained the same,

19  regardless of her position; they follow you as a person,

20  whatever position you're in.

21      Q.   Besides your conversation with Ms. Clark via

22  phone, were there any other communications with

23  Ms. Clark regarding the positions that were available

24  for her to apply to?

25      A.   Like I said, she sat in my office, at some

1  point, and we had a face-to-face conversation; other

2  than that, I think, no, that's it.

3      Q.   Did you discuss anything else with Ms. Clark,

4  when you spoke to her in person on that occasion?

5      A.   Not that I recall.

6      Q.   If Ms. Clark chose to apply and received the

7  position for communications call taker, would that

8  impact her pension benefits?

9      A.   Yes.

10     Q.   How would they be impacted?

11     A.   Well, she would have continued to earn years of

12  service, so they would have gone up; the multiplier

13  would have been affected by the years of service.

14     Q.   Do you know what Ms. Clark ultimately decided

15  to do in terms of her options for employment, after you

16  spoke with her?

17     A.   I do.

18     Q.   And what did Ms. Clark do?

19     A.   She chose to separate employment.

20     Q.   And how do you know that?

21     A.   She told me, and I saw the paperwork come

22  through for her to do that.

23     Q.   When did she tell you that she was choosing to

24  retire early?

25     A.   In that in-person -- in that face-to-face

1  conversation, she indicated that that was what she was

2  going to do.  She wasn't -- she wasn't really interested

3  in doing the communications job; she indicated that that

4  was not something she wanted to do.

5      Q.   Did she tell you why she did not want that

6  position, communications call taker?

7      A.   No, I don't believe she did.  I don't think she

8  elaborated on that; she just said no.

9      Q.   Did you speak with Ms. Clark after that

10  conversation in person with her?

11      A.   I don't -- I don't recall any specific

12  conversations or the time frames.  I really don't

13  remember if I talked to her again.

14          MR. MACDONALD:  So those are all the questions

15      I have for you in your capacity representing the

16      Lee County Sheriff's Office.  Mr. Stefany may have

17      some questions for you.

18          MR. STEFANY:  I don't have any questions for

19      the witness at this time.

20          MR. MACDONALD:  We will suspend the deposition

21      at 11:15.

22          (Thereupon, the deposition was terminated at

23  11:15 a.m.)

24

25

```
 1                    CERTIFICATE OF OATH

 2    STATE OF FLORIDA   )
      COUNTY OF ORANGE   )
 3
              I, Julie S. Evans, Professional Court Reporter,
 4
      Notary Public, State of Florida, certify that DAWN
 5
      HEIKKILA appeared before me via Zoom on October 11,
 6
      2023, and was duly sworn.
 7
              Witness my hand and official seal this 28th day
 8
      of December 2023.
 9

10

11

12        Julie Evans

13        JULIE S. EVANS
          Professional Court Reporter
14        Notary Public, State of Florida
          My Commission No. GG939756
15        Expires:  1/21/2024

16

17

18

19

20

21

22

23

24

25
```

Notary Public State of Florida
Julie Evans
My Commission GG 939756
Expires 01/21/2024

1                    CERTIFICATE OF REPORTER

2      STATE OF FLORIDA   )
       COUNTY OF ORANGE   )
3
                I, Julie S. Evans, Professional Court Reporter,
4
       do hereby certify that I was authorized to and did
5
       stenographically report the deposition of DAWN HEIKKILA;
6
       that a review of the transcript was not requested; and
7
       that the foregoing transcript, page number 1 through 43,
8
       is a true and complete record of my stenographic notes.
9

10              I further certify that I am not a relative,

11     employee, attorney, or counsel of any of the parties,

12     nor am I a relative or employee of any of the parties'

13     attorneys or counsel connected with the action, nor am I

14     financially interested in the action.

15              Dated this 28th day of December 2023.

16

17

18     _____
       Julie S. Evans
19     Professional Court Reporter

20

21

22

23

24

25

## WORD INDEX

**< 1 >**
**1**  3:8  7:8  45:2
**1/21/2024**  44:13
**10**  1:9  4:4
**100**  13:10, 14, 18
**11**  1:9  4:3  7:15
44:2
**11:15**  1:9  43:21, 23
**12**  15:5
**1250**  15:5
**15**  23:6  31:3
**16**  7:18
**19**  30:21

**< 2 >**
**2:22-cv-614-SPC-**
**NPM**  1:5
**20**  30:21
**2018**  16:3  22:10
**2020**  30:19
**2021**  17:5  31:4, 8
33:10, 11
**2023**  1:9  4:3  44:2
45:14
**21**  23:6
**225**  2:7
**24**  7:18
**26**  7:22
**28th**  44:2  45:14

**< 3 >**
**3**  7:12
**30**  7:22  27:2, 6, 14
28:2
**324**  2:7
**33131**  2:4
**33606-4128**  2:8
**3rd**  31:8

**< 4 >**
**4**  3:2  7:12
**43**  45:2
**44**  3:2
**45**  3:2

**< 5 >**
**5**  27:10, 11

**50**  13:12, 13
**520**  2:3

**< 6 >**
**62**  27:6  28:9

**< 7 >**
**7**  3:8  17:17  18:19
19:1, 7, 13  20:9, 15
21:18

**< 9 >**
**9-1-1**  40:12

**< A >**
**a.m**  1:9  4:4  43:23
**ability**  41:7
**able**  14:16  27:23
28:11, 16  37:23
**academy**  38:23, 24
39:1, 5, 7, 9, 16, 17, 20
**accrual**  41:18
**accrue**  12:3, 4, 7
**accrued**  11:11  21:25
35:23  41:11
**accrues**  11:8  12:23
13:1
**accurately**  6:5
**action**  45:13, 14
**activated**  18:3
**addition**  14:11
**additional**  10:13
12:4  19:11, 24  20:12
39:14
**admin**  21:22  22:2, 6,
10, 14, 18  23:7, 11, 15
**administering**  25:17,
19
**administers**  25:20
**administrative**  32:3
**affirm**  4:14
**afforded**  10:22  11:3,
25  12:2, 11, 15, 19, 21
13:7
**age**  24:11  26:21
27:4, 6  28:9
**agency**  9:21  21:23,
25  24:4
**ago**  5:10

**agreed**  3:8
**ahead**  6:18
**Allen**  2:6
**amount**  11:24  12:23
18:5  19:21  21:18
23:7  24:18, 21, 23
25:12  38:5
**amounts**  11:9
**Amy**  16:15, 17  33:18
**analyst**  16:19
**and/or**  18:23  24:11
27:6
**Ann**  33:6
**Annmarie**  14:10
17:12, 13, 15, 24  18:7,
14  20:1  22:23, 24
29:1, 11, 15  30:1, 3,
11, 25  31:22, 24
32:12  33:1, 5, 6  35:7
**answer**  6:7  18:9, 13
26:7  34:4  36:15
40:11
**answered**  35:14
**answering**  35:10, 16
**answers**  6:24  7:4
**Anthony**  33:14
**anymore**  11:10
**Anyway**  24:6
**appearance**  4:8
**APPEARANCES**  2:1
**appeared**  1:9  44:2
**applied**  20:13  25:16
**apply**  25:8  35:20, 24
37:15  39:1, 15, 17
40:22, 25  41:2, 24
42:6
**applying**  31:13
**appropriate**  29:20
**approval**  14:5  19:23
**approve**  18:24  19:8,
20, 22  21:10
**approved**  13:4  17:13
**approximately**  4:3
**Aside**  10:8
**asked**  9:2  22:24
33:6, 7  35:18  37:14,
18
**asking**  28:5  34:21
35:10, 19, 20, 22  37:9

**asks**  20:17
**assume**  18:14
**attention**  30:22  40:4
**attorney**  9:4  45:11
**attorneys**  45:13
**August**  23:6  31:3
**authorized**  45:2
**auto**  37:23  38:9, 12,
15
**automotive**  40:20, 23
**available**  7:1  10:16
21:15  35:13  36:2
37:4  41:23
**Avenue**  2:7
**avoid**  28:5
**aware**  18:1  23:9, 10
28:20, 23  29:23

**< B >**
**back**  17:9  19:3
**Bartz**  33:21
**base**  17:15
**based**  6:25  11:9
12:23  36:13
**basically**  13:5  18:5
**bathroom**  6:17
**bay**  12:5
**beginning**  4:8
**BEHALF**  1:9  2:5, 9
6:22
**believe**  10:16  16:4,
19  28:21, 24  33:11
35:6  40:15, 19  43:7
**benefit**  24:7
**benefits**  10:3, 6, 9, 10,
11, 15  11:18  12:1
13:23  14:21  15:1, 9,
12, 16, 22  20:16
23:20, 24  24:1, 3, 18,
23  25:4, 7, 9, 10, 18,
21  26:4, 11, 14  28:11
35:9, 21  42:8
**best**  6:11  36:10
**binding**  7:5
**Blue**  2:6
**break**  6:16, 19
**Brickell**  2:3
**briefly**  10:17

< C >
calculation   24:13
call   23:3, 16   28:22
  34:25   35:1, 4, 18
  36:7   37:8, 13, 16
  39:22   40:7, 14, 16, 18,
  23, 25   41:3, 13, 17
  42:7   43:6
calls   40:12
cap   25:11
capacity   1:7   4:25
  43:15
care   19:9
career   10:24   13:12
CARMINE   1:5   4:6,
  12, 24
cars   38:17, 18
CASE   1:5   17:16
  19:12
categories   21:12
category   13:1
certain   20:19, 20
  25:2
CERTIFICATE   3:2
  44:1   45:1
certification   18:25
certified   39:4, 6, 10,
  11
certify   15:6   44:2
  45:2, 10
choice   36:10
choose   10:12   36:11
chooses   36:22, 24
choosing   42:23
chose   35:21, 23
  36:18   37:4   41:2
  42:6, 19
circumstances   19:14
civilian   13:10, 19
  24:9
CLARK   1:1   4:5, 10,
  24   9:8, 10, 14, 17
  10:3, 6, 16, 22   11:24
  12:11   13:8   14:21, 25
  15:8, 11   16:2, 8, 20,
  25   17:11, 24   19:25
  20:4, 24   21:6   22:9,
  17   23:11, 20   26:3, 13
  27:1, 13, 14, 17   29:12,
  24   31:1, 9   34:8, 15,

18   35:1, 5, 12, 17
  36:11   37:7, 13, 25
  38:6   39:1, 11, 14, 22
  40:1, 3, 14, 19, 22
  41:2, 21, 23   42:3, 6,
  14, 18   43:9
Clark's   11:2   14:7
  16:18   18:16   28:19
  30:23   32:6, 9, 12
  37:3   41:11
class   27:3
classified   20:15   21:1,
  7, 12
clearly   6:2
client   9:8
coached   29:19
come   42:21
comes   27:7
Commission   44:13
common   19:23
communications
  37:21   38:3, 21   39:22
  40:7, 16, 23   41:3, 6,
  13, 17, 22   42:7   43:3,
  6
complete   39:8   45:2
condition   15:6, 21
  19:17   20:11
conducted   32:16, 20
conducting   5:20   7:24
confusing   6:13
connected   45:13
contact   15:24   36:5
continue   25:10   31:12
continued   42:11
conversation   17:6
  29:2, 19   34:22   37:17
  41:21   42:1   43:1, 10
conversations   43:12
correct   10:20, 21
  14:3   26:12, 25   27:19
  29:24   31:18   36:2
  37:5, 6   39:5
corrections   38:25
correctly   29:17   37:24
counsel   3:8   4:7, 8
  45:11, 13
counseled   30:1
counseling   28:23, 24,

25   29:12, 23
Country   1:8
County   5:1   6:22
  7:2, 5   9:5, 11, 15
  10:4   11:3, 7, 14   12:2,
  12, 16, 19   13:9   14:8,
  22   15:2, 14   16:9
  23:21   24:2, 22   25:18
  26:4, 14, 23   27:15, 24
  28:15   31:2   32:17, 20
  33:2   36:12   37:14
  38:7   40:10   43:16
  44:2   45:2
couple   8:11, 12
COURT   1:1, 24   4:2,
  7, 13   5:22, 25   6:5
  44:2, 12   45:2, 19
criteria   27:9
current   37:3

< D >
DATE   1:9   16:3
  17:2   22:10   30:22
Dated   45:14
dates   30:15   32:2
DAVID   2:6   4:11
DAWN   1:9   3:2   4:4,
  19   5:5   18:11, 12
  44:2   45:2
day   23:4   44:2   45:14
days   17:17, 20   18:15,
  17, 19   19:1, 7, 13
  20:9, 15   21:18
deadline   31:6, 7, 10
December   44:2   45:14
decide   31:11   34:24
  37:1
decided   42:14
decides   36:23
decision   19:25   22:17,
  20
Defendant   1:9   2:9
Delaquilla   33:18
depend   12:24   19:13
depending   12:5
depends   11:13   19:15
  20:17
deposed   5:6, 9, 11
DEPOSITION   1:9
  3:8   4:4   5:20   7:24

8:8, 24   9:6   30:7
  43:20, 22   45:2
Derek   2:2
described   9:25   12:8
  29:9, 22
designee   22:8
destruct   30:2
detail   40:4
details   32:11   36:8
  38:19
determination   21:6
determine   17:21
  24:14   41:8
determined   25:9
determines   22:6
dictate   20:22
different   10:15   11:9
  14:1   28:12   35:24
DIRECT   3:2   4:21
directive   30:3
directly   25:24   26:1
  36:9
Director   9:16, 17
  18:10, 13
discipline   28:22, 23
  29:23
disciplined   28:20
discretionary   21:20
discuss   17:10, 25
  36:1   37:7   39:21, 25
  42:3
discussed   17:17, 20
  21:13   23:15   30:11
  36:3   38:11
discussing   37:9
discussions   35:6
distribution   26:20
  27:21   31:15   36:24
DISTRICT   1:1   4:7
doctor   11:22   15:6
document   7:9, 10
  16:23   30:5
documents   8:4, 6, 8,
  16
doing   13:14   21:8
  43:3
dollar   24:15
Donald   4:9
Dr   2:3

**draft** 33:*1, 9, 13, 17*
**drafted** 33:*5, 8*
**draw** 27:*24* 28:*3, 8, 9, 16*
**drawn** 27:*21*
**duly** 4:*20* 44:*2*
**duties** 9:*24*

**< E >**
**early** 26:*18* 36:*11* 37:*8* 42:*24*
**earn** 25:*7* 42:*11*
**educate** 36:*9*
**education** 39:*15*
**effect** 5:*21*
**Either** 13:*16* 33:*19* 40:*22*
**elaborated** 43:*8*
**eligibility** 28:2
**eligible** 26:*3* 39:*1, 15, 17, 18*
**eliminated** 31:*5* 32:*6, 9, 13* 36:*17, 21* 37:*2* 39:*2, 12*
**email** 17:*7* 22:*25*
**emailed** 17:*9* 34:*12, 13*
**employee** 11:*3, 12, 14* 13:*10, 22* 14:*4, 12* 15:*4* 19:*14, 15* 20:*14, 17* 21:*17, 19, 24* 22:*3, 7* 23:*8* 24:*17, 22* 25:*12* 27:*3* 28:*15* 45:*11, 12*
**employees** 12:*2, 15, 20, 21* 13:*19* 15:*20* 25:*3, 22* 33:*2*
**employer** 19:*16*
**employment** 10:*4, 7, 23* 11:*2* 12:*11* 13:*8* 14:*8, 22* 15:*1* 16:*3, 18* 22:*11* 23:*21* 27:*20, 23* 28:*12, 17, 19* 31:*12, 14* 36:*24* 42:*15, 19*
**encourage** 40:*22, 25*
**enforcement** 38:*24* 39:*18*
**ensure** 6:*11*

**entailed** 41:*4*
**enter** 13:*25* 14:*14, 17*
**entered** 14:*19*
**enters** 14:*4*
**entire** 10:*24* 13:*17*
**entitled** 14:*21* 26:*10*
**ESQUIRE** 2:*2, 6*
**essentially** 22:*1*
**evaluated** 41:*7*
**evaluating** 30:*23*
**Evans** 1:*9* 44:*2, 11* 45:*2, 18*
**event** 16:*7* 17:*5* 18:*23*
**Everybody** 12:*23* 13:*1*
**exact** 9:*12* 38:*5*
**exactly** 28:*14*
**exam** 39:*8, 9, 20*
**Examination** 1:*9* 3:*1* 4:*21*
**EXHIBIT** 3:*2* 7:*8*
**exist** 15:*19*
**exists** 15:*23*
**experience** 38:*18*
**Expires** 44:*13*
**explain** 35:*12*
**explaining** 15:*19*
**explanation** 35:*15*

**< F >**
**face-to-face** 42:*1, 25*
**fall** 12:*25* 21:*12*
**familiar** 9:*8* 18:*21* 40:*6*
**familiarize** 9:*1*
**family** 11:*21*
**far** 28:*20* 38:*12, 14*
**feel** 19:*5*
**felt** 19:*7* 29:*17*
**file** 29:*25*
**financially** 45:*14*
**finish** 6:*7, 8*
**first** 4:*20* 27:*7* 30:*9* 32:*5, 15, 19* 33:*7*
**fit** 41:*8*
**five** 24:*11* 29:*6*
**FLORIDA** 1:*1, 8* 2:*4, 8* 5:*1* 24:*5, 13* 25:*19, 23, 24* 26:*18*

27:*18* 36:*5* 37:*11* 44:*2, 12* 45:*2*
**FMLA** 14:*21* 15:*1, 9, 12, 15, 20* 16:*2, 4, 8, 20, 23* 17:*1, 25* 18:*3, 16* 19:*1, 11, 19* 20:*13* 21:*1, 17*
**folks** 18:*12*
**follow** 30:*4* 41:*19*
**followed** 20:*21*
**follows** 4:*20*
**force** 5:*21* 8:*20* 22:*16* 32:*14, 16, 20* 33:*10, 14, 18, 21, 24* 34:*2, 6*
**foregoing** 45:*2*
**form** 26:*6* 36:*14*
**formula** 25:*8, 15, 16* 27:*22*
**forth** 17:*9*
**forward** 35:*9*
**frames** 43:*12*
**front** 8:*4* 17:*2*
**full** 5:*3* 25:*3* 26:*4* 35:*15* 36:*1*
**further** 45:*10*

**< G >**
**gather** 36:*7*
**general** 40:*12*
**generally** 11:*25* 12:*15, 18* 40:*7*
**gesture** 6:*1*
**getting** 6:*11* 30:*2*
**GG939756** 44:*13*
**given** 12:*22* 29:*24* 30:*3* 31:*6* 36:*6*
**glass** 6:*17*
**go** 5:*12* 6:*18* 11:*21* 14:*5* 15:*22* 16:*9, 10, 11* 17:*4* 25:*24* 26:*1, 2* 39:*7*
**God** 4:*16*
**going** 5:*12* 7:*7* 9:*2* 17:*19* 18:*1, 6, 19* 19:*4* 26:*6* 30:*6* 31:*11, 12, 14* 32:*2, 3* 34:*23* 35:*9* 43:*2*
**Good** 4:*23* 41:*8*

**gosh** 24:*6*
**graduated** 39:*19*
**Group** 2:*2*
**guess** 17:*5* 34:*4* 35:*2*
**guidelines** 15:*21*

**< H >**
**hand** 4:*14* 9:*23* 44:*2*
**handbook** 11:*7*
**handle** 16:*12* 29:*18*
**handled** 29:*17* 32:*3*
**happen** 36:*12*
**happening** 23:*18* 32:*22* 35:*8*
**hard** 25:*5*
**head** 11:*5*
**health** 10:*9, 10* 15:*6, 21* 19:*17* 20:*11* 35:*21*
**HEIKKILA** 1:*9* 3:*2* 4:*5, 19* 5:*5, 7* 44:*2* 45:*2*
**held** 9:*22*
**help** 4:*16*
**hereto** 3:*8*
**Hey** 18:*11*
**high** 24:*11*
**hired** 41:*10*
**hit** 27:*9*
**hold** 9:*14*
**home** 8:*1*
**hours** 11:*10* 12:*4* 13:*11, 12, 13* 15:*5*
**HR** 15:*24*
**Hurts** 16:*16, 17*
**Hyde** 2:*7*

**< I >**
**idea** 11:*25* 12:*14, 20*
**immediate** 11:*21* 14:*6* 21:*9*
**impact** 24:*18, 23* 42:*8*
**impacted** 41:*16* 42:*10*
**inaudible** 6:*1*
**incident** 30:*11, 15*
**included** 30:*14*
**increase** 25:*10* 26:*13*

**increases**  11:*15*, *16*
**INDEX**  3:*1*, *2*
**indicated**  43:*1*, *3*
**inform**  15:*11*
**information**  18:*22*
  19:*8*, *17*  20:*11*, *21*
  23:*19*  30:6  36:*3*, *4*, 7
**initial**  17:*17*
**initiate**  34:*25*  35:*1*
**in-person**  37:*17*
  42:*25*
**instance**  20:*5*, *24*
  29:*13*, *22*
**instances**  23:*10*
**instruct**  17:*24*
**instructed**  31:*4*, *20*,
  22, 25  36:*5*
**instructions**  17:*23*
**insurance**  10:*10*
**interest**  38:*21*
**interested**  43:2  45:*14*
**internal**  18:*18*  19:*6*
**interview**  41:*5*
**involve**  21:*24*
**involved**  19:*1*  24:*10*
  25:*17*, *19*  27:*22*  29:*8*
**involvement**  25:*22*
**involves**  19:*11*  24:*10*
**issues**  29:*12*

**< J >**
**James**  34:2, *3*, *6*
**Jamie**  33:*21*
**January**  13:*12*
**JENNA**  1:*1*  4:*24*
  8:*19*  9:*8*, *10*, *14*  10:*3*
  11:*1*, *24*  12:*10*  13:*8*
  14:*7*, *21*, *25*  15:*8*, *11*
  16:*2*, *20*  19:*25*  20:*24*
  22:*9*  23:*19*, *20*  26:*25*
  27:*1*, *2*  29:*3*, *12*, *19*
  30:*3*  32:*1*, 6, *9*, *12*
  35:*7*  36:*22*, *25*  37:*13*
  38:*6*, *20*
**Jennifer**  4:*10*
**job**  30:*24*  31:*13*
  35:*24*  36:*23*  39:*19*
  41:*7*, *8*  43:*3*
**jobs**  34:*20*

**Jones**  34:2, *3*, *6*
**judge**  5:*23*
**Julie**  1:*9*  44:2, *11*
  45:2, *18*
**July**  13:*13*, *17*
**jury**  5:*23*

**< K >**
**keeping**  13:*25*
**kept**  9:*23*
**Key**  2:*3*
**kind**  10:*6*  15:*14*
  20:*22*  21:*3*, *4*, 7
**knew**  18:*20*, 22  20:*11*
**know**  6:*13*, *18*  8:*13*
  9:*3*, *10*, *12*, *22*  10:*13*
  11:*8*, *23*  12:*3*, *25*
  13:*15*, *18*  15:*22*, *23*,
  *24*  16:7, *23*  17:*14*, *16*,
  *19*, *23*  18:*4*, *9*, *10*, *11*,
  *12*, *20*, *23*  19:*1*, *3*, *19*
  20:*18*  22:*9*, *19*  23:*25*
  24:*5*, *9*  26:*3*, *17*, *22*
  27:*8*  28:*22*  29:*6*, *10*
  30:7  32:*10*, *23*  34:*13*,
  *21*  35:*23*  36:*4*, *21*
  37:*16*  38:*11*, *13*, *17*,
  *19*  42:*14*, *20*
**knowledge**  6:*25*  7:*1*
**known**  7:*1*
**KYLE**  2:2  4:*9*, *23*

**< L >**
**Law**  2:2  5:*22*  38:*24*
  39:*18*
**lawsuit**  4:*24*
**learn**  32:*19*
**learned**  32:*5*, *8*, *15*
**leave**  10:*15*, *22*  11:*2*,
  *18*, *24*  12:*1*, *21*  13:*3*,
  7, *20*, *21*  14:2  15:*12*
  16:*8*, *20*  17:*1*, *25*
  18:*3*, *16*  19:*8*, *12*
  20:6, *8*, *14*, *15*, *22*, *25*
  21:*1*, *4*, 7, *11*, *13*, *17*,
  *22*  22:*2*, 6, *10*, *14*, *18*
  23:7, *11*, *15*  27:*12*
  32:4  41:*12*
**leaves**  10:*18*  20:*19*,
  20

**Lee**  1:7  4:*25*  6:*22*
  7:*1*, 5  9:*5*, *11*, *15*
  10:*4*  11:*3*, 7, *14*  12:*2*,
  *12*, *16*, *19*  13:8  14:*8*,
  22  15:*2*, *14*  16:*9*
  23:*21*  24:*1*, *22*  25:*18*
  26:*4*, *14*, *23*  27:*15*, *24*
  28:*15*  31:2  32:*16*, *20*
  33:2  36:*12*  37:*14*
  38:7  40:*9*  43:*16*
**left**  9:*15*  20:*1*, *3*
  26:*4*
**length**  11:*13*  25:2
**letter**  8:*19*  23:*4*, 5, 6,
  *12*, *17*  29:*25*  30:5, *9*,
  *12*, *14*  31:*3*, 5, *17*, *20*,
  25  33:2, *8*, *13*, *17*, *20*,
  23  34:*1*, 5, *8*, *16*, *19*
  35:5  36:*13*
**letters**  8:*11*, *12*, *17*
  33:*9*, *16*
**level**  19:*23*
**life**  24:*16*
**lifetime**  24:*8*
**limit**  21:*18*, *21*  23:7
**link**  8:*21*
**listed**  7:*12*, *15*, *18*, *22*
**log-in**  25:*25*
**long**  9:*10*  19:*10*
  32:*23*
**longer**  17:*17*  18:*3*
  37:*4*
**look**  11:*4*
**looked**  8:*25*
**looking**  11:6
**looks**  12:*1*, *14*  23:*5*

**< M >**
**Mac**  4:*9*
**MACDONALD**  2:2
  3:2  4:*9*, *22*, *23*  26:*9*
  36:*19*  43:*14*, *20*
**Mail**  34:*14*
**mailed**  34:*11*
**making**  38:6
**managed**  9:*19*
**Management**  15:*25*
  16:*11*, *12*, *19*  17:*16*
  18:8  41:6
**manner**  12:7

**MARCENO**  1:5  4:*6*,
  *12*, 25  32:*23*
**Marcia**  33:*24*
**Marie**  5:5
**marked**  7:*8*
**matter**  4:*5*
**mean**  11:6  18:*12*
  19:*15*  25:*7*, *24*  26:*1*
  28:*14*  36:*20*  38:*17*
**meaning**  26:*10*  37:*3*
**mechanic**  37:*24*  38:*9*,
  *12*, *16*  40:*20*, *24*
**member**  11:*21*
**memory**  40:*4*
**mention**  37:*12*
**mentioned**  10:*16*
  18:*15*
**met**  26:*20*
**Miami**  2:*4*
**MIDDLE**  1:*1*
**Mm-hm**  21:*16*
**monitor**  18:*4*, *12*
**monthly**  24:*15*
**months**  15:*5*
**morning**  4:*23*
**multiplier**  24:*10*
  25:*1*, *14*  42:*12*

**< N >**
**name**  4:*23*  5:*3*
  33:*15*
**necessary**  19:*5*
**need**  6:*16*  8:*11*
  13:*24*  14:*17*  15:*11*
  16:*1*, *11*  21:2  23:*25*
**needed**  9:2, *20*  16:7
  17:*4*, *13*, *16*, *22*  18:2
  19:*9*  20:*12*  23:*19*
  32:*10*
**Norton**  2:6
**Notary**  1:*24*  44:2, *12*
**notebook**  8:*10*
**notes**  8:*10*  45:2
**Notice**  3:8  8:*9*, *21*, *22*
**notified**  16:6  22:*15*
  31:*1*  35:7
**notify**  32:*1*
**notifying**  8:*20*  23:*19*
**number**  9:*13*  11:*10*
  13:*13*  17:*20*  18:*15*,

*17* 24:*12* 25:*16* 26:*1*
45:*2*
**numbers** 8:*13*

**< O >**
**O-301** 2:*3*
**OATH** 3:*2* 5:*16*
44:*1*
**object** 26:*6* 36:*14*
**obligation** 5:*16*
**obtain** 39:*7*
**obtained** 39:*14*
**occasion** 42:*4*
**occurred** 30:*15*
**October** 1:*9* 4:*3*
44:*2*
**offer** 41:*9*
**offered** 10:*13*
**offhand** 9:*13*
**Office** 6:*22* 7:*2, 5*
9:*5, 11, 15, 20* 10:*4*
11:*3, 7, 14* 12:*2, 12,*
*16, 20* 13:*6, 9* 14:*9,*
*23* 15:*2, 14* 16:*9*
17:*14* 21:*3* 23:*22*
24:*2, 23* 25:*18* 26:*5,*
*15, 23* 27:*15, 24*
28:*16* 31:*2* 32:*17, 21*
33:*3* 36:*13* 37:*15*
38:*7* 40:*10, 12* 41:*25*
43:*16*
**officers** 38:*25*
**officer's** 39:*19*
**official** 1:*7* 4:*25*
16:*22* 44:*2*
**Oh** 8:*19*
**Okay** 5:*11, 13, 14*
6:*3, 9, 10, 14, 15, 19,*
*20* 8:*15* 11:*13* 32:*10*
**old** 30:*2*
**Once** 14:*4* 24:*3, 6*
25:*6, 7*
**ones** 9:*25*
**open** 35:*20* 37:*20*
**operator** 37:*22* 38:*3*
**opposed** 18:*8*
**options** 34:*21, 22*
35:*8, 12, 16* 36:*2, 10*
42:*15*

**ORANGE** 44:*2* 45:*2*
**order** 39:*7*

**< P >**
**P.A** 2:*6*
**packet** 8:*25*
**page** 5:*13* 45:*2*
**Paid** 10:*18* 12:*4*
21:*25* 24:*15, 18, 24*
**paperwork** 19:*1, 2,*
*11, 24* 20:*2, 5* 42:*21*
**paragraph** 7:*15*
**paragraphs** 7:*12, 18,*
*22*
**Park** 2:*7*
**part** 10:*3, 7, 23*
14:*22* 23:*21* 24:*25*
25:*14* 32:*14*
**particular** 10:*2*
**parties** 1:*9* 3:*8*
45:*11, 12*
**passed** 39:*19*
**pay** 11:*11* 21:*4, 22,*
*23* 22:*2, 6, 10, 14, 18*
23:*8, 11, 15* 30:*21*
32:*4* 38:*1, 2, 4* 40:*2*
**paycheck** 12:*3*
**penalties** 26:*17, 19*
37:*7, 10, 12*
**penalty** 26:*24* 27:*8,*
*10, 17, 22* 28:*6, 10*
**pending** 4:*6*
**pension** 23:*20, 24*
24:*1, 3, 5, 8, 18, 23*
25:*3, 9, 10, 17, 20*
26:*4, 11, 14, 19* 27:*21,*
*25* 28:*4, 8, 10, 11, 16*
36:*25* 42:*8*
**people** 16:*15* 40:*11*
**percent** 27:*10, 11*
**perform** 41:*7*
**performance** 30:*24*
**period** 11:*11* 24:*7*
**person** 12:*24* 17:*6, 8*
21:*8, 9* 22:*24* 41:*19*
42:*4* 43:*10*
**personal** 6:*25* 10:*9,*
*18, 20* 11:*16, 20* 12:*5*
13:*7, 21* 14:*16* 15:*6*

21:*14* 35:*22*
**personally** 16:*21*
**pertaining** 8:*13*
**ph** 16:*16*
**phone** 17:*9, 10* 23:*1,*
*3, 16* 26:*1* 34:*25*
35:*1, 4* 37:*8, 13, 16*
40:*14, 18* 41:*22*
**phones** 40:*11*
**PLACE** 1:*9* 15:*15*
22:*17*
**placed** 5:*15* 22:*9, 14*
**Plaintiff** 1:*1, 9* 2:*5*
4:*10*
**Plaintiff's** 3:*2* 4:*8*
7:*8*
**please** 4:*7, 13* 5:*3*
6:*1*
**PLLC** 2:*2*
**point** 6:*16* 14:*20*
25:*11* 29:*25* 42:*1*
**policy** 11:*7* 15:*15*
19:*21* 20:*18, 22*
**position** 9:*14* 18:*25*
28:*13* 31:*5* 32:*6, 9,*
*11, 13* 36:*12, 16* 37:*1,*
*3* 38:*10, 13, 16, 23*
39:*2, 5, 12* 40:*1, 6, 9,*
*15, 20, 23* 41:*1, 3, 9,*
*10, 19, 20* 42:*7* 43:*6*
**positions** 35:*19*
37:*14, 20* 38:*1* 39:*2,*
*16* 40:*4* 41:*23*
**potential** 18:*2* 37:*7*
**practice** 18:*18* 19:*6,*
*24*
**prepare** 8:*23*
**prepared** 7:*11, 14, 17,*
*21* 9:*3*
**preparing** 30:*7*
**previously** 5:*9* 7:*8*
21:*13*
**prior** 27:*12* 30:*12*
**problem** 5:*2*
**process** 13:*22* 14:*25*
41:*4*
**Professional** 44:*2, 12*
45:*2, 19*
**provide** 36:*8*

**provided** 10:*11*
**Public** 1:*24* 44:*2, 12*
**pulled** 8:*12*
**purchase** 10:*12*
**purchased** 9:*21*
10:*14*
**purchasing** 9:*16, 18,*
*21*
**purpose** 35:*4* 39:*20*
**pursued** 38:*14*
**put** 23:*17*

**< Q >**
**qualifications** 38:*15*
**qualified** 40:*15, 19*
**qualify** 15:*3, 4* 20:*12*
38:*12*
**qualifying** 15:*7* 16:*7*
17:*5* 18:*23*
**question** 6:*12, 14*
10:*25* 12:*17* 19:*18*
36:*15*
**questions** 6:*8* 8:*25*
16:*1* 35:*10, 14, 16*
43:*14, 17, 18*

**< R >**
**raise** 4:*13*
**Ramsey** 33:*14*
**range** 12:*20*
**ranks** 41:*18*
**rate** 38:*4*
**rates** 38:*1, 2*
**reach** 25:*3* 27:*14*
**reached** 17:*18*
**reaction** 32:*8*
**read** 29:*25* 30:*5*
**reading** 3:*8* 30:*12*
**really** 30:*21* 35:*3, 25*
43:*2, 12*
**reasonably** 7:*1*
**recall** 11:*23* 12:*10*
13:*15* 16:*5, 17, 22*
22:*13* 28:*25* 33:*12,*
*15, 19* 34:*5* 35:*2, 21*
37:*21* 38:*18* 42:*5*
43:*11*
**receive** 10:*3, 6* 13:*10*
23:*20* 24:*7* 27:*13*

received  10:*8*  27:*17*
42:*6*
record  5:*4*  45:2
**Reduction**  8:*20*
22:*15*  32:*14, 16, 20*
33:*10, 14, 18, 21, 24*
34:*2, 6*
refer  18:*7*
reference  8:*14*
referring  37:*10*
reflect  6:*6*
regarding  7:*11, 14,*
*17, 21*  14:*13*  15:*15*
16:*25*  17:*25*  20:*25*
23:*14*  29:*3, 20*  32:*3*
38:*1*  39:*25*  41:*23*
regardless  37:2, *4*
41:*19*
regards  18:*16*
regulations  15:*20*
related  33:*9, 13, 17,*
*20, 23*  34:*1, 6*
relative  45:*10, 12*
relevant  23:*18*
remained  26:*14*
41:*18*
remember  11:*10*
23:2  29:*5, 8*  30:*14,*
*17*  31:*1*  34:*12, 22*
35:*3, 17, 25*  37:*9, 24,*
*25*  38:*4, 5*  43:*13*
**Reno**  14:*10*  17:*24*
18:*7*  20:*1*  22:*23, 24*
23:*3, 14*  29:*11, 15, 18*
30:*11, 25*  31:*22, 24*
32:*12*  33:*1, 5*
rephrase  6:*14*  11:*1*
report  33:*5*  45:2
**Reporter**  1:*24*  3:2
4:2, *13*  5:*25*  6:*5*
44:*2, 12*  45:*1, 2, 19*
represent  4:*24*
representing  43:*15*
request  13:*22, 25*
14:*4, 5, 12, 13*  15:*9*
16:*6, 8, 13, 21, 22*
20:*25*
requested  13:*4*  45:2
requesting  16:*24*

requests  14:*7*  16:2
18:*16, 17*
require  18:*20, 25*
19:*11*  20:*4*
required  14:*12*  15:*8,*
*10*  20:2  27:*15*  40:*4*
requirement  26:*21,*
*23*  27:*4*
respective  3:*8*
respond  6:2  29:*15*
responses  6:*1, 6*
responsibilities  32:*11*
39:*21*
responsibility  9:*23*
responsible  30:*23*
rest  24:*16*
restructured  30:*19, 20*
result  27:*18*
retire  26:*24*  27:*9*
31:*11, 15*  36:*11*
42:*24*
retirement  10:*10*
24:*14*  25:*20, 23, 25*
26:*18*  27:*18*  36:*6*
37:*8, 11*
retires  24:*17*
returned  18:*5*  19:*10*
review  45:2
revolved  35:*8*
rid  30:2
right  4:*13*
**Risk**  15:*25*  16:*11, 12,*
*19*  17:*15*  18:*8*
role  38:*7*  41:*12, 17*
room  8:2
roughly  22:*13*  23:2
29:*5, 6*  30:*17, 18*

**< S >**
salary  10:*8*  24:*10, 11*
sat  41:*25*
saw  30:*9*  42:*21*
says  19:*22*
scale  12:*1, 14, 17*
schooling  38:*24*
screen  7:*7*
scroll  7:*19*
scrolled  7:*10*
seal  44:2

see  17:2
seen  7:*9*  26:*13*
send  34:*8, 10*
sent  8:*19*  9:*1*  23:*12*
34:*14*  35:*5*
separate  27:*23*  31:*14*
35:*21*  36:*23*  42:*19*
separated  27:*20*
28:*3, 7*
**September**  31:*8*
serious  15:*21*
service  11:*13*  12:*25*
24:*12, 22, 25*  25:*11,*
*12, 15*  26:*21, 22*  27:2,
*14*  28:*3*  42:*12, 13*
session  28:*24*
share  7:*7*  19:*16*
shared  18:*21*  20:*10,*
*20*
shares  19:*16*
sheet  21:*8*
**Sheriff**  1:*7*  4:*11, 25*
22:*5, 8*  32:*23, 25*
**Sheriff's**  6:*22*  7:2, *5*
9:*5, 11, 15, 20*  10:*4*
11:*3, 7, 14*  12:2, *12,*
*16, 19*  13:*9*  14:*9, 22*
15:2, *14*  16:*9*  23:*21*
24:*2, 23*  25:*18*  26:*5,*
*15, 23*  27:*15, 24*
28:*15*  31:2  32:*17, 21*
33:*3*  36:*13*  37:*15*
38:*7*  40:*10, 12*  43:*16*
short  19:*21*
showed  8:*7*
shown  38:*20*
shrug  6:*1*
sick  10:*9, 18, 19, 22*
11:2, *16, 18, 24*  12:*1,*
*5*  13:*21*  14:*15, 16*
19:*4*  20:*19*  21:*13*
35:*22*  41:*11*
sickness  11:*20, 21*
signing  3:*8*
similar  33:*1*
sit  39:*7, 9*
situation  18:*21*
20:*18*  29:*9, 16, 21*
**Smith**  2:2

solemnly  4:*14*
sorry  5:*21*  27:*13*
**South**  2:*7*
speak  9:*4*  13:*24*
14:*12, 18*  16:*25*  21:*3,*
*5*  29:*11*  34:*18*  38:2
43:*9*
speaking  6:*6*  12:*18*
34:*12*
specific  11:*24*  43:*11*
specifically  8:*17*
35:*17*
specifics  39:*25*
spoke  16:*23*  17:*3*
20:*5, 24*  21:2  23:*14*
34:*15*  37:*25*  39:*22*
42:*4, 16*
**Sprankel**  33:*24*
start  5:*3*  24:*4*
started  13:*14*
state  4:*7*  39:*8, 9, 19*
44:2, *12*  45:2
**STATES**  1:*1*  4:*6*
stating  5:*3*
stayed  13:*16*
**STEFANY**  2:6  4:*11*
26:6  36:*14*  43:*16, 18*
stenographic  45:2
stenographically  45:2
stipulated  3:*8*
stock  9:*22*
strike  27:*13*
submit  15:*8*  16:2, *8,*
*20*  20:*4*
submitted  16:*5*
submitting  14:*11*
subordinate  29:*8*
subordinates  29:*4*
subpoena  8:*21*
successfully  39:*8*
**Suite**  2:*3, 7*
supervisor  13:*24*
14:6, *13, 18, 19*  15:*24*
16:6, *10*  19:*20, 22*
20:*21*  21:*10, 20*
30:*25*  33:*7*
supplies  9:*20*
suppose  21:*8*

**Sure**  5:*2*  6:*2*  10:*1*
11:*8*  18:*4*  22:*19*, *20*
23:*25*  27:*11*
**suspend**  43:*20*
**swear**  4:*14*
**sworn**  4:*20*  44:*2*
**system**  13:*25*  24:*5*,
*14*  25:*20*, *23*, *25*
26:*18*  27:*18*  36:*6*
37:*11*

< T >
**take**  6:*16*, *18*  8:*10*
19:*9*  21:*17*  31:*15*
35:*23*  36:*23*, *24*
**TAKEN**  1:*9*  4:*5*
27:*21*  41:*12*, *16*
**taker**  39:*22*  40:*7*, *16*,
*23*, *25*  41:*3*, *13*, *17*
42:*7*  43:*6*
**takes**  20:*14*
**talk**  40:*11*
**talked**  37:*22*  38:*22*
43:*13*
**talking**  14:*15*  29:*1*
34:*20*  35:*25*
**Tampa**  2:*8*
**team**  41:*6*
**tell**  8:*17*  15:*18*
23:*24*  32:*12*  40:*3*
42:*23*  43:*5*
**ten**  11:*15*
**tenure**  11:*9*  12:*6*, *24*
32:*24*
**term**  25:*5*
**terminated**  43:*22*
**termination**  31:*2*
**terms**  11:*6*  12:*1*, *18*,
*21*  13:*1*  20:*15*  21:*11*
42:*15*
**testified**  4:*20*
**testify**  5:*16*  6:*22*
7:*11*, *14*, *17*, *21*
**testifying**  5:*22*
**TESTIMONY**  3:*2*
4:*15*  5:*21*  6:*12*
**Thank**  5:*1*
**things**  5:*12*  10:*13*
11:*22*  15:*25*  24:*12*
35:*9*  36:*25*  40:*13*

**think**  9:*24*  10:*2*
11:*15*  17:*3*  27:*11*
28:*5*  29:*14*  30:*18*, *20*
33:*25*  34:*3*  42:*2*
43:*7*
**thought**  38:*20*
**three**  14:*1*  19:*22*
21:*12*, *15*, *16*
**TIME**  1:*9*  4:*3*  6:*7*
10:*9*  11:*9*  12:*4*, *5*, *7*,
*10*, *15*, *19*  13:*7*, *25*
17:*13*  18:*6*, *24*  19:*2*,
*7*, *20*, *21*  20:*12*  21:*8*,
*14*, *19*, *25*  22:*18*
23:*11*  24:*7*, *17*, *21*
25:*2*, *6*  28:*21*  30:*9*
32:*5*, *15*  35:*23*  37:*21*
39:*2*, *11*  40:*14*, *18*
41:*12*, *15*  43:*12*, *19*
**times**  21:*16*
**title**  16:*17*
**Today**  4:*2*  5:*1*, *17*
6:*21*  7:*11*, *24*  9:*6*
**today's**  8:*23*
**told**  17:*12*, *15*  22:*19*,
*22*  29:*16*  32:*1*, *2*
37:*20*  42:*21*
**topic**  7:*15*
**topics**  7:*12*, *18*, *22*
**touch**  17:*15*
**training**  39:*15*
**transcribe**  5:*25*
**transcript**  3:*8*  45:*2*
**true**  38:*9*  45:*2*
**truth**  4:*15*, *16*
**truthfully**  5:*17*
**try**  6:*14*
**trying**  34:*23*
**twenty**  11:*16*
**Twenty-plus**  9:*12*
**twenty-year-plus**
11:*11*
**two**  27:*9*  37:*21*
**types**  10:*15*  13:*20*
14:*2*

< U >
**U.S**  34:*14*
**ultimately**  16:*10*

42:*14*
**uncommon**  18:*10*
**understand**  5:*15*, *19*
6:*12*, *21*, *24*  7:*4*
10:*25*  12:*17*
**uniforms**  9:*19*  30:*2*
**unit**  30:*19*, *20*
**UNITED**  1:*1*  4:*6*
**upper**  19:*23*
**upset**  29:*4*
**use**  6:*17*  13:*22*
14:*25*  15:*9*, *12*, *15*
21:*4*  22:*5*  23:*8*
**uses**  21:*23*

< V >
**vacation**  10:*9*, *18*, *19*
11:*17*  12:*7*, *10*, *15*, *19*
13:*3*, *21*  14:*15*  21:*13*
35:*22*  41:*11*
**value**  24:*15*
**VCS**  13:*25*  14:*4*, *9*,
*12*, *17*, *19*
**vested**  25:*6*, *8*  26:*8*,
*10*
**Vesting**  25:*5*
**videoconference**  1:*9*
**voice**  30:*20*

< W >
**wait**  6:*7*, *8*  28:*9*
**waived**  3:*8*
**want**  6:*11*  15:*25*
35:*2*  43:*5*
**wanted**  15:*12*  22:*5*
23:*17*  36:*9*  43:*4*
**wants**  13:*5*, *22*
**warehousing**  9:*22*
**water**  6:*17*
**way**  13:*16*
**Wednesday**  1:*9*  4:*2*
**weeks**  19:*22*
**well**  10:*12*  13:*10*
14:*14*, *20*  16:*14*
17:*12*  24:*1*, *3*  25:*19*
27:*5*  29:*1*  31:*3*
34:*16*  35:*6*  36:*16*
42:*11*
**went**  9:*21*  35:*15*

**we're**  5:*12*  6:*11*
**whichever**  27:*6*
**willing**  18:*23*  19:*20*
**witness**  1:*9*  4:*17*
26:*8*  36:*16*  43:*19*
44:*2*
**word**  24:*6*
**work**  18:*5*, *24*  19:*3*
28:*3*, *12*  38:*17*
**worked**  9:*10*  24:*22*
25:*13*
**working**  15:*5*  24:*4*
38:*18*
**works**  34:*3*
**write**  31:*20*, *25*
33:*20*, *23*  34:*1*
**writing**  34:*5*
**written**  23:*5*
**wrote**  31:*3*, *17*  36:*13*

< Y >
**yeah**  8:*16*  11:*8*
15:*22*  19:*23*  39:*3*
41:*15*
**year**  11:*1*  12:*11*
13:*8*, *11*, *17*  14:*8*
15:*1*  16:*15*, *18*  27:*10*,
*11*
**years**  5:*10*  9:*12*
11:*16*  12:*25*  13:*13*,
*15*  16:*5*, *14*  24:*11*, *12*,
*21*, *25*  25:*11*, *12*, *15*
26:*20*, *22*  27:*2*, *6*, *14*
28:*2*  29:*7*  32:*22*
42:*11*, *13*

< Z >
**ZOOM**  1:*9*  2:*2*, *6*
3:*2*  4:*4*  5:*20*  8:*21*
44:*2*

## WORD LIST

**< 1 >**
**1** *(3)*
**1/21/2024** *(1)*
**10** *(2)*
**100** *(3)*
**11** *(4)*
**11:15** *(3)*
**12** *(1)*
**1250** *(1)*
**15** *(2)*
**16** *(1)*
**19** *(1)*

**< 2 >**
**2:22-cv-614-SPC-NPM** *(1)*
**20** *(1)*
**2018** *(2)*
**2020** *(1)*
**2021** *(5)*
**2023** *(5)*
**21** *(1)*
**225** *(1)*
**24** *(1)*
**26** *(1)*
**28th** *(2)*

**< 3 >**
**3** *(1)*
**30** *(5)*
**324** *(1)*
**33131** *(1)*
**33606-4128** *(1)*
**3rd** *(1)*

**< 4 >**
**4** *(2)*
**43** *(1)*
**44** *(1)*
**45** *(1)*

**< 5 >**
**5** *(2)*
**50** *(2)*
**520** *(1)*

**< 6 >**

**62** *(2)*

**< 7 >**
**7** *(9)*

**< 9 >**
**9-1-1** *(1)*

**< A >**
**a.m** *(4)*
**ability** *(1)*
**able** *(5)*
**academy** *(9)*
**accrual** *(1)*
**accrue** *(3)*
**accrued** *(4)*
**accrues** *(3)*
**accurately** *(1)*
**action** *(2)*
**activated** *(1)*
**addition** *(1)*
**additional** *(6)*
**admin** *(9)*
**administering** *(2)*
**administers** *(1)*
**administrative** *(1)*
**affirm** *(1)*
**afforded** *(9)*
**age** *(5)*
**agency** *(4)*
**ago** *(1)*
**agreed** *(1)*
**ahead** *(1)*
**Allen** *(1)*
**amount** *(12)*
**amounts** *(1)*
**Amy** *(3)*
**analyst** *(1)*
**and/or** *(3)*
**Ann** *(1)*
**Annmarie** *(24)*
**answer** *(7)*
**answered** *(1)*
**answering** *(2)*
**answers** *(2)*
**Anthony** *(1)*
**anymore** *(1)*
**Anyway** *(1)*
**appearance** *(1)*

**APPEARANCES** *(1)*
**appeared** *(2)*
**applied** *(2)*
**apply** *(12)*
**applying** *(1)*
**appropriate** *(1)*
**approval** *(2)*
**approve** *(5)*
**approved** *(2)*
**approximately** *(1)*
**Aside** *(1)*
**asked** *(7)*
**asking** *(7)*
**asks** *(1)*
**assume** *(1)*
**attention** *(2)*
**attorney** *(2)*
**attorneys** *(1)*
**August** *(1)*
**authorized** *(1)*
**auto** *(4)*
**automotive** *(2)*
**available** *(7)*
**Avenue** *(1)*
**avoid** *(1)*
**aware** *(6)*

**< B >**
**back** *(2)*
**Bartz** *(1)*
**base** *(1)*
**based** *(4)*
**basically** *(2)*
**bathroom** *(1)*
**bay** *(1)*
**beginning** *(1)*
**BEHALF** *(4)*
**believe** *(11)*
**benefit** *(1)*
**benefits** *(35)*
**best** *(2)*
**binding** *(1)*
**Blue** *(1)*
**break** *(2)*
**Brickell** *(1)*
**briefly** *(1)*

**< C >**
**calculation** *(1)*

**call** *(24)*
**calls** *(2)*
**cap** *(1)*
**capacity** *(3)*
**care** *(2)*
**career** *(1)*
**CARMINE** *(4)*
**cars** *(2)*
**CASE** *(3)*
**categories** *(1)*
**category** *(1)*
**certain** *(3)*
**CERTIFICATE** *(4)*
**certification** *(1)*
**certified** *(4)*
**certify** *(4)*
**choice** *(1)*
**choose** *(2)*
**chooses** *(2)*
**choosing** *(1)*
**chose** *(7)*
**circumstances** *(1)*
**civilian** *(3)*
**CLARK** *(72)*
**Clark's** *(11)*
**class** *(1)*
**classified** *(4)*
**clearly** *(1)*
**client** *(1)*
**coached** *(1)*
**come** *(1)*
**comes** *(1)*
**Commission** *(1)*
**common** *(1)*
**communications** *(15)*
**complete** *(2)*
**condition** *(4)*
**conducted** *(2)*
**conducting** *(2)*
**confusing** *(1)*
**connected** *(1)*
**contact** *(2)*
**continue** *(2)*
**continued** *(2)*
**conversation** *(9)*
**conversations** *(1)*
**correct** *(12)*
**corrections** *(1)*
**correctly** *(2)*

Deposition of Dawn Heikkila 30(b)(6)                                    Jenna Clark v. Carmine Marceno

**counsel** *(5)*
**counseled** *(1)*
**counseling** *(5)*
**Country** *(1)*
**County** *(42)*
**couple** *(2)*
**COURT** *(12)*
**criteria** *(1)*
**current** *(1)*

**< D >**
**DATE** *(5)*
**Dated** *(1)*
**dates** *(2)*
**DAVID** *(2)*
**DAWN** *(10)*
**day** *(4)*
**days** *(11)*
**deadline** *(3)*
**December** *(2)*
**decide** *(3)*
**decided** *(1)*
**decides** *(1)*
**decision** *(3)*
**Defendant** *(2)*
**Delaquilla** *(1)*
**depend** *(2)*
**depending** *(1)*
**depends** *(3)*
**deposed** *(3)*
**DEPOSITION** *(12)*
**Derek** *(1)*
**described** *(4)*
**designee** *(1)*
**destruct** *(1)*
**detail** *(1)*
**details** *(3)*
**determination** *(1)*
**determine** *(3)*
**determined** *(1)*
**determines** *(1)*
**dictate** *(1)*
**different** *(5)*
**DIRECT** *(2)*
**directive** *(1)*
**directly** *(3)*
**Director** *(5)*
**discipline** *(3)*
**disciplined** *(1)*

**discretionary** *(1)*
**discuss** *(7)*
**discussed** *(7)*
**discussing** *(1)*
**discussions** *(1)*
**distribution** *(4)*
**DISTRICT** *(3)*
**doctor** *(2)*
**document** *(4)*
**documents** *(4)*
**doing** *(3)*
**dollar** *(1)*
**Donald** *(1)*
**Dr** *(1)*
**draft** *(4)*
**drafted** *(2)*
**draw** *(5)*
**drawn** *(1)*
**duly** *(2)*
**duties** *(1)*

**< E >**
**early** *(4)*
**earn** *(2)*
**educate** *(1)*
**education** *(1)*
**effect** *(1)*
**Either** *(3)*
**elaborated** *(1)*
**eligibility** *(1)*
**eligible** *(5)*
**eliminated** *(9)*
**email** *(2)*
**emailed** *(3)*
**employee** *(25)*
**employees** *(9)*
**employer** *(1)*
**employment** *(23)*
**encourage** *(2)*
**enforcement** *(2)*
**ensure** *(1)*
**entailed** *(1)*
**enter** *(3)*
**entered** *(1)*
**enters** *(1)*
**entire** *(2)*
**entitled** *(2)*
**ESQUIRE** *(2)*
**essentially** *(1)*

**evaluated** *(1)*
**evaluating** *(1)*
**Evans** *(5)*
**event** *(3)*
**Everybody** *(2)*
**exact** *(1)*
**exactly** *(1)*
**exam** *(3)*
**Examination** *(3)*
**EXHIBIT** *(2)*
**exist** *(1)*
**exists** *(1)*
**experience** *(1)*
**Expires** *(1)*
**explain** *(1)*
**explaining** *(1)*
**explanation** *(1)*

**< F >**
**face-to-face** *(2)*
**fall** *(2)*
**familiar** *(3)*
**familiarize** *(1)*
**family** *(1)*
**far** *(3)*
**feel** *(1)*
**felt** *(2)*
**file** *(1)*
**financially** *(1)*
**finish** *(2)*
**first** *(7)*
**fit** *(1)*
**five** *(2)*
**FLORIDA** *(18)*
**FMLA** *(21)*
**folks** *(1)*
**follow** *(2)*
**followed** *(1)*
**follows** *(1)*
**force** *(13)*
**foregoing** *(1)*
**form** *(2)*
**formula** *(4)*
**forth** *(1)*
**forward** *(1)*
**frames** *(1)*
**front** *(2)*
**full** *(5)*
**further** *(1)*

**< G >**
**gather** *(1)*
**general** *(1)*
**generally** *(4)*
**gesture** *(1)*
**getting** *(2)*
**GG939756** *(1)*
**given** *(5)*
**glass** *(1)*
**go** *(13)*
**God** *(1)*
**going** *(18)*
**Good** *(2)*
**gosh** *(1)*
**graduated** *(1)*
**Group** *(1)*
**guess** *(3)*
**guidelines** *(1)*

**< H >**
**hand** *(3)*
**handbook** *(1)*
**handle** *(2)*
**handled** *(2)*
**happen** *(1)*
**happening** *(3)*
**hard** *(1)*
**head** *(1)*
**health** *(7)*
**HEIKKILA** *(8)*
**held** *(1)*
**help** *(1)*
**hereto** *(1)*
**Hey** *(1)*
**high** *(1)*
**hired** *(1)*
**hit** *(1)*
**hold** *(1)*
**home** *(1)*
**hours** *(6)*
**HR** *(1)*
**Hurts** *(2)*
**Hyde** *(1)*

**< I >**
**idea** *(3)*
**immediate** *(3)*
**impact** *(3)*

impacted  (2)
inaudible  (1)
incident  (2)
included  (1)
increase  (2)
increases  (2)
INDEX  (2)
indicated  (2)
inform  (1)
information  (11)
initial  (1)
initiate  (2)
in-person  (2)
instance  (4)
instances  (1)
instruct  (1)
instructed  (5)
instructions  (1)
insurance  (1)
interest  (1)
interested  (2)
internal  (2)
interview  (1)
involve  (1)
involved  (6)
involvement  (1)
involves  (2)
issues  (1)

< J >
James  (4)
Jamie  (1)
January  (1)
JENNA  (41)
Jennifer  (1)
job  (10)
jobs  (1)
Jones  (4)
judge  (1)
Julie  (5)
July  (2)
jury  (1)

< K >
keeping  (1)
kept  (1)
Key  (1)
kind  (6)
knew  (3)

know  (64)
knowledge  (2)
known  (1)
KYLE  (3)

< L >
Law  (4)
lawsuit  (1)
learn  (2)
learned  (3)
leave  (48)
leaves  (4)
Lee  (41)
left  (5)
length  (2)
letter  (29)
letters  (5)
level  (1)
life  (1)
lifetime  (1)
limit  (3)
link  (1)
listed  (4)
log-in  (1)
long  (3)
longer  (3)
look  (1)
looked  (1)
looking  (1)
looks  (3)

< M >
Mac  (1)
MACDONALD  (9)
Mail  (1)
mailed  (1)
making  (1)
managed  (1)
Management  (7)
manner  (1)
MARCENO  (5)
Marcia  (1)
Marie  (1)
marked  (1)
matter  (1)
mean  (9)
meaning  (2)
mechanic  (6)
member  (1)

memory  (1)
mention  (1)
mentioned  (2)
met  (1)
Miami  (1)
MIDDLE  (1)
Mm-hm  (1)
monitor  (2)
monthly  (1)
months  (1)
morning  (1)
multiplier  (4)

< N >
name  (3)
necessary  (1)
need  (9)
needed  (12)
Norton  (1)
Notary  (3)
notebook  (1)
notes  (2)
Notice  (4)
notified  (2)
notify  (1)
notifying  (2)
number  (10)
numbers  (1)

< O >
O-301  (1)
OATH  (3)
object  (2)
obligation  (1)
obtain  (1)
obtained  (1)
occasion  (1)
occurred  (1)
October  (3)
offer  (1)
offered  (1)
offhand  (1)
Office  (45)
officers  (1)
officer's  (1)
official  (4)
Oh  (1)
Okay  (13)
old  (1)

Once  (5)
ones  (1)
open  (2)
operator  (2)
opposed  (1)
options  (8)
ORANGE  (2)
order  (2)

< P >
P.A  (1)
packet  (1)
page  (2)
Paid  (1)
paperwork  (7)
paragraph  (1)
paragraphs  (3)
Park  (1)
part  (9)
particular  (1)
parties  (4)
passed  (1)
pay  (18)
paycheck  (1)
penalties  (5)
penalty  (7)
pending  (1)
pension  (26)
people  (2)
percent  (2)
perform  (1)
performance  (1)
period  (2)
person  (9)
personal  (13)
personally  (1)
pertaining  (1)
ph  (1)
phone  (15)
phones  (1)
PLACE  (3)
placed  (3)
Plaintiff  (4)
Plaintiff's  (3)
please  (4)
PLLC  (1)
point  (5)
policy  (5)
position  (33)

positions *(8)*
potential *(2)*
practice *(3)*
prepare *(1)*
prepared *(5)*
preparing *(1)*
previously *(3)*
prior *(2)*
problem *(1)*
process *(3)*
Professional *(4)*
provide *(1)*
provided *(1)*
Public *(3)*
pulled *(1)*
purchase *(1)*
purchased *(2)*
purchasing *(3)*
purpose *(2)*
pursued *(1)*
put *(1)*

< Q >
qualifications *(1)*
qualified *(2)*
qualify *(4)*
qualifying *(4)*
question *(6)*
questions *(9)*

< R >
raise *(1)*
Ramsey *(1)*
range *(1)*
ranks *(1)*
rate *(1)*
rates *(2)*
reach *(2)*
reached *(1)*
reaction *(1)*
read *(2)*
reading *(2)*
really *(5)*
reasonably *(1)*
recall *(18)*
receive *(6)*
received *(3)*
record *(2)*
Reduction *(12)*

refer *(1)*
reference *(1)*
referring *(1)*
reflect *(1)*
regarding *(16)*
regardless *(3)*
regards *(1)*
regulations *(1)*
related *(7)*
relative *(2)*
relevant *(1)*
remained *(2)*
remember *(18)*
Reno *(18)*
rephrase *(2)*
report *(2)*
Reporter *(11)*
represent *(1)*
representing *(1)*
request *(13)*
requested *(2)*
requesting *(1)*
requests *(4)*
require *(4)*
required *(6)*
requirement *(3)*
respective *(1)*
respond *(2)*
responses *(2)*
responsibilities *(2)*
responsibility *(1)*
responsible *(1)*
rest *(1)*
restructured *(2)*
result *(1)*
retire *(6)*
retirement *(11)*
retires *(1)*
returned *(2)*
review *(1)*
revolved *(1)*
rid *(1)*
right *(1)*
Risk *(6)*
role *(3)*
room *(1)*
roughly *(6)*

< S >

salary *(3)*
sat *(1)*
saw *(2)*
says *(1)*
scale *(3)*
schooling *(1)*
screen *(1)*
scroll *(1)*
scrolled *(1)*
seal *(1)*
see *(1)*
seen *(2)*
send *(2)*
sent *(5)*
separate *(5)*
separated *(3)*
September *(1)*
serious *(1)*
service *(15)*
session *(1)*
share *(2)*
shared *(3)*
shares *(1)*
sheet *(1)*
Sheriff *(7)*
Sheriff's *(41)*
short *(1)*
showed *(1)*
shown *(1)*
shrug *(1)*
sick *(18)*
sickness *(2)*
signing *(1)*
similar *(1)*
sit *(2)*
situation *(5)*
Smith *(1)*
solemnly *(1)*
sorry *(2)*
South *(1)*
speak *(12)*
speaking *(3)*
specific *(2)*
specifically *(2)*
specifics *(1)*
spoke *(11)*
Sprankel *(1)*
start *(2)*
started *(1)*

state *(8)*
STATES *(2)*
stating *(1)*
stayed *(1)*
STEFANY *(7)*
stenographic *(1)*
stenographically *(1)*
stipulated *(1)*
stock *(1)*
strike *(1)*
submit *(5)*
submitted *(1)*
submitting *(1)*
subordinate *(1)*
subordinates *(1)*
subpoena *(1)*
successfully *(1)*
Suite *(2)*
supervisor *(15)*
supplies *(1)*
suppose *(1)*
Sure *(9)*
suspend *(1)*
swear *(1)*
sworn *(2)*
system *(10)*

< T >
take *(10)*
TAKEN *(7)*
taker *(10)*
takes *(1)*
talk *(1)*
talked *(3)*
talking *(4)*
Tampa *(1)*
team *(1)*
tell *(7)*
ten *(1)*
tenure *(4)*
term *(1)*
terminated *(1)*
termination *(1)*
terms *(8)*
testified *(1)*
testify *(6)*
testifying *(1)*
TESTIMONY *(4)*
Thank *(1)*

things  *(8)*
think  *(13)*
thought  *(1)*
three  *(5)*
TIME  *(46)*
times  *(1)*
title  *(1)*
Today  *(7)*
today's  *(1)*
told  *(10)*
topic  *(1)*
topics  *(3)*
touch  *(1)*
training  *(1)*
transcribe  *(1)*
transcript  *(3)*
true  *(2)*
truth  *(3)*
truthfully  *(1)*
try  *(1)*
trying  *(1)*
twenty  *(1)*
Twenty-plus  *(1)*
twenty-year-plus  *(1)*
two  *(2)*
types  *(3)*

**< U >**
U.S  *(1)*
ultimately  *(2)*
uncommon  *(1)*
understand  *(8)*
uniforms  *(2)*
unit  *(2)*
UNITED  *(2)*
upper  *(1)*
upset  *(1)*
use  *(9)*
uses  *(1)*

**< V >**
vacation  *(14)*
value  *(1)*
VCS  *(6)*
vested  *(4)*
Vesting  *(1)*
videoconference  *(1)*
voice  *(1)*

**< W >**
wait  *(3)*
waived  *(1)*
want  *(4)*
wanted  *(5)*
wants  *(2)*
warehousing  *(1)*
water  *(1)*
way  *(1)*
Wednesday  *(2)*
weeks  *(1)*
well  *(16)*
went  *(2)*
we're  *(2)*
whichever  *(1)*
willing  *(2)*
witness  *(6)*
word  *(1)*
work  *(6)*
worked  *(3)*
working  *(3)*
works  *(1)*
write  *(5)*
writing  *(1)*
written  *(1)*
wrote  *(3)*

**< Y >**
yeah  *(6)*
year  *(12)*
years  *(26)*

**< Z >**
ZOOM  *(8)*

1              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
2

3

   JENNA CLARK,
4
        Plaintiff,
5                              CASE NO.: 2:22-cv-614-SPC-NPM
   v.
6
   CARMINE MARCENO, in
7  his official capacity
   as Sheriff of Lee
8  Country, Florida,

9       Defendant.
   ----------------------/
10
                      ZOOM DEPOSITION OF
11
                      DAWN HEIKKILA
12
              TAKEN ON BEHALF OF PLAINTIFF
13

14
   DATE TAKEN:     Wednesday, October 11, 2023
15
   TIME:           11:24 a.m. to 12:42 p.m.
16
   PLACE:          All parties appeared via videoconference
17

18

19

20

21

22
        Examination of the witness taken before:
23
                      Julie S. Evans
24         Court Reporter and Notary Public

25

```
 1    APPEARANCES:

 2    KYLE T. MACDONALD, ESQUIRE (via Zoom)
      Derek Smith Law Group, PLLC
 3    520 Brickell Key Dr.
      Suite O-301
 4    Miami, Florida 33131

 5        On behalf of the Plaintiff.

 6    DAVID J. STEFANY, ESQUIRE (via Zoom)
      Allen Norton & Blue, P.A.
 7    324 South Hyde Park Avenue
      Suite 225
 8    Tampa, Florida 33606-4128

 9        On behalf of the Defendant.

10                         - - - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    EXAMINATION INDEX

 2   ZOOM TESTIMONY OF DAWN HEIKKILA
          DIRECT BY MR. MACDONALD                    4
 3        CROSS BY MR. STEFANY                       35

 4   CERTIFICATE OF OATH                             43

 5   CERTIFICATE OF REPORTER                         44

 6
                      EXHIBIT INDEX
 7
     Plaintiff's
 8    9      Bates 3431: Excerpt from LCSO employee   15
             policy
 9
     10      Bates 1294-1295: 8/12/21 email between   17
10           Jenna Clark and Dawn Heikilla

11
                      - - - - -
12
                S T I P U L A T I O N S
13
             It is hereby agreed and so stipulated by and
14
     between the parties hereto, through their respective
15
     counsel, that the reading and signing of the transcript
16
     are hereby waived.
17
                      - - - - -
18

19

20

21

22

23

24

25
```

```
 1                  P R O C E E D I N G S

 2          THE COURT REPORTER:  This is the Zoom

 3     deposition of Dawn Heikkila, being taken in the

 4     matter of Clark v. Marceno as Sheriff of Lee

 5     County, Florida.

 6          Please raise your right hand.  Do you solemnly

 7     swear or affirm your testimony will be the truth,

 8     the whole truth, nothing but the truth, so help you

 9     God?

10       THE WITNESS:  I do.

11  THEREUPON:

12                     DAWN HEIKKILA,

13  having first been duly sworn, testified as follows:

14                    DIRECT EXAMINATION

15  BY MR. MACDONALD:

16      Q.    Could you please state your full name for the

17  purposes of the record, please.

18      A.    Dawn Marie Heikkila.

19      Q.    And do you understand that you've been placed

20  under oath and that you have an obligation to testify

21  truthfully?

22      A.    I do.

23      Q.    And do you understand that, even though we are

24  conducting this deposition through Zoom, your testimony

25  has the same force and effect as if you were testifying
```

1   in a court of law, before a judge and jury?

2       A.   Yes.

3       Q.   Is there anything that would prevent you from

4   thinking clearly and testifying truthfully today?

5       A.   No.

6       Q.   Where do you currently work?

7       A.   At the Forsyth County Government, in Winston

8   Salem, North Carolina.

9       Q.   And when did you start that position?

10      A.   I started in July of 2023.

11      Q.   And where did you work, prior to that?

12      A.   For Lee County Sheriff's Office.

13      Q.   How long did you work with the Lee County

14  Sheriff's Office for?

15      A.   24 years and a couple of months.

16      Q.   What was the last position you held at the Lee

17  County Sheriff's Office?

18      A.   Director of human resources.

19      Q.   And what did you do, as the director of human

20  resources?

21      A.   I hired people; I administered -- I was

22  supervisor of the Risk Management Unit and of the

23  Benefits Unit and Human Resources, hiring, and things

24  like that.

25      Q.   Who did you report to, as director of human

 1    resources?

 2         A.    Before I left, Annmarie Reno.

 3         Q.    Did you hold any other positions during your

 4    employment at the Lee County Sheriff's Office?

 5         A.    I did, yes.

 6         Q.    What positions did you hold?

 7         A.    Risk manager, and I started as a human resource

 8    assistant, I believe.

 9         Q.    Do you have any training in human resources?

10         A.    I do.

11         Q.    And what training have you received related to

12    human resources?

13         A.    Wow, a lot; I've gone to many, many conferences

14    and formal training and, you know, I have a bachelor's

15    degree.  Through the years, every year, I went to -- you

16    know, just about every year, we went to various

17    trainings.  I could not possibly recall all of them for

18    you, but lots of training.

19         Q.    Are you a member of the Society of Human

20    Resources Management, also known as SHRM?

21         A.    Yes.

22         Q.    How long have you been a member for?

23         A.    Oh, gosh, probably since 2005 or -- a long time.

24         Q.    When you were director of human resources at

25    the Lee County Sheriff's Office, did any employees

 1   report directly to you?

 2        A.   Yes.

 3        Q.   And which employees were those?

 4        A.   Carrie Turner, Cindy Jinx (ph); those were two

 5   of my direct reports, at the end.  Right before I

 6   retired, those were the two.

 7        Q.   In your role as director of human resources,

 8   were you involved in decisions to hire or fire employees?

 9        A.   Yes.

10        Q.   What was your role in terminating employees at

11   the Lee County Sheriff's Office?

12        A.   Terminating employees was notice; I did the

13   notifications most of the time.

14        Q.   How did you typically notify employees that

15   they were being terminated?

16        A.   Sometimes, just in writing; other times, in

17   person and in writing; sometimes just in person,

18   depending on the situation.

19        Q.   In your role as director of human resources,

20   did you receive any training related to discrimination?

21        A.   Yes.

22        Q.   What training did you receive?

23        A.   Many, many times through the years, it was part

24   of -- it was part of my training; I couldn't tell you

25   how many times or specifically.  The Florida Sheriff's

1  Association does a lot of that; that's the only one I

2  could probably recall specifically.

3      Q.   Did you ever give any trainings related to

4  discrimination to employees of the Lee County Sheriff's

5  Office?

6      A.   I'm sorry, could you repeat that.

7      Q.   Did you ever give any training related to

8  discrimination, in your role as director of human

9  resources?

10     A.   Yes.

11     Q.   What trainings did you give to employees?

12     A.   There was a time when we -- when I participated

13 in supervisor training, and that included a

14 discrimination piece.  Many, many years ago, we did

15 that; not recently.

16     Q.   Do you recall what that training covered?

17     A.   Well, you know, it was from a supervisor

18 standpoint, so it was, you know, basically -- I mean, I

19 trained out of a manual that we purchased from a

20 discrimination -- you know, a whole program; so I didn't

21 make it up, myself.  It would have been formalized.

22     Q.   In your role as director of human resources,

23 were you involved in receiving complaints of

24 discrimination or harassment?

25     A.   Yes.

 1      Q.    What was your role in receiving complaints of

 2   discrimination or harassment?

 3      A.    Employees could come to me and report or

 4   discuss, if they had a situation where they felt they

 5   were being discriminated against or harassed; they could

 6   report it to me, I would gather the information, and I

 7   would basically get the appropriate parties involved to

 8   do the investigation.

 9      Q.    Did you conduct the investigation into --

10   strike that.  Did you conduct an investigation into

11   every complaint of discrimination that you received?

12      A.    I did not conduct the investigations, no.

13      Q.    Who conducted those investigations?

14      A.    That's a broad question, but so I don't know

15   exactly the answer to that.  I can tell you that

16   Internal Affairs was a division in the Sheriff's Office

17   that was tasked with completing -- you know, with

18   conducting investigations, and that's who I would have

19   referred any complaints, along with my chain of command.

20      Q.    What was the last time you received a complaint

21   of discrimination in your role as director of human

22   resources?

23      A.    That would have been Christian Mojica.

24            THE COURT REPORTER:  Could you repeat that

25      name?

```
 1              THE WITNESS:   Christian Mojica.   M-O-J-I-C-A, I
 2         believe.
 3    BY MR. MACDONALD:
 4         Q.    And who is Christian Mojica?
 5         A.    He was a corrections officer at the Sheriff's
 6    Office.   I think his whole -- I he was a corrections
 7    officer the whole time he worked there.   I'm not
 8    positive, but that's what he was doing when I took the
 9    complaint.
10         Q.    What did Christian Mojica complain to you
11    about?
12         A.    Several things; he had numerous complaints
13    throughout the years.   He didn't want to work night
14    shift, so he was complaining when other people got
15    transferred from the night shift, you know, if it wasn't
16    him.   He -- I think he complained -- he did complain one
17    time because he thought someone poisoned his coffee.   He
18    complained when he didn't get promoted to sergeant;
19    although he eventually did get promoted to sergeant, but
20    at one time, that was one of his complaints.   I think
21    that's all the formal complaints he made.   I think;
22    that's what I remember, in terms of formal complaints
23    from him.
24         Q.    When was the most recent formal complaint that
25    Christian Mojica made to you?
```

1    A.    When?  I want to say it was probably around --

2  hold on, I have it here in my notes.  Can I check my

3  notes?  I might have it.  If you want -- it was probably

4  in the last year or two that I worked there, but I don't

5  know.  I don't know exactly.

6    Q.    What specifically did Christian Mojica report

7  to you in the last time that he made a formal complaint

8  to you?

9    A.    That would have been, he wanted transferred to

10 days; he was having health issues, and he wanted

11 transferred to days.  He was bringing in doctor's notes

12 that suggested he work the days.  And there was no day

13 shift open, so he wasn't getting transferred and that's

14 why he complained to me, because he felt that he should

15 be transferred to days, regardless if there was a

16 position open.

17   Q.    And what did you do in response to this

18 complaint?

19   A.    I notified my chain of command that he had a

20 complaint, so that it could be investigated.

21   Q.    And was it investigated?

22   A.    Yes, it was.

23   Q.    Who conducted that investigation?

24   A.    I believe it was a chief -- I don't know what

25 his title was at the time; I think it was Matthew Sands.

```
1   I think it was Chief Sands, at the time, in accordance
2   probably with IA.  But I believe that's who I got the
3   information back from, that the investigation was
4   completed.  There could have been other people involved;
5   I'm not aware.
6        Q.   Did Christian Mojica ever complain to you
7   regarding FMLA leave?
8        A.   I talked to him about FMLA leave; he took a lot
9   of FMLA leave, I think; I don't know that there was ever
10  a real complaint on his part, regarding that.  But I
11  mean, he did take FMLA leave quite a few times.
12       Q.   What was the outcome of the investigation with
13  Christian Mojica?
14       A.   It was that there were no positions available
15  on the day shift, and so he didn't get -- he wasn't
16  getting transferred because there were just no positions
17  available; and we couldn't create a position for him,
18  just because he wanted to be on days.  So I believe it
19  was just found that, you know, that there was just
20  wasn't a position available for him, and that's why he
21  wasn't being transferred.
22       Q.   When did you first meet Jenna Clark?
23       A.   I have no idea.  I started work there in 1999,
24  so probably -- maybe -- I don't know.  Sometime.  A long
25  time ago.
```

1    Q.    How often did you interact with Jenna Clark

2    when she was director of purchasing?

3    A.    Well, I mean, not frequently.  You know, I

4    mean, there was a time when we had meetings in our

5    bureau, and I would have seen her at those meetings.

6    But towards -- you know, that was early on in my career.

7    So I mean, if I stopped in there or if she stopped into

8    HR.  Most of the time, it would have been over the

9    phone, you know, if she had a question or I had a

10   question.  But it was not frequent.

11   Q.    And who was Ms. Clark's supervisor, as director

12   of purchasing?

13   A.    Annmarie Reno would have been, you know, in the

14   most recent years.

15   Q.    How often did you interact with Annmarie Reno?

16   A.    A lot.  She was my supervisor, as well.

17   Q.    What was Annmarie Reno's title?

18   A.    Executive director of person -- support

19   services.

20   Q.    Did Annmarie Reno ever talk to you about Jenna

21   Clark, during your employment?

22   A.    Yes.

23   Q.    What would Annmarie Reno discuss with you

24   regarding Jenna Clark?

25   A.    She discussed one time when Jenna -- when she

1   had to have a coaching session with Jenna; she discussed

2   that with me, briefly, you know.  And I mean, other than

3   that, she discussed when Jenna was needing to be out for

4   a medical condition that she was having and to put --

5   about FMLA.  I mean, that's probably about it, that I

6   can recall anyway.  And then, obviously, about the

7   Reduction in Force, yeah.

8       Q.   Did Annmarie Reno ever complain to you about

9   Jenna Clark or her job performance to you?

10      A.   No.

11      Q.   Did Annmarie Reno and Jenna Clark get along

12  well, as far as you understand?

13      A.   I believe so, yes.

14      Q.   Do you know if Annmarie Reno still works for

15  the Lee County Sheriff's Office?

16      A.   I believe she does.

17      Q.   Did you ever interact with Annmarie Reno --

18  sorry, strike that.  Did you ever discuss the handling

19  of FMLA leave requests with Annmarie Reno?

20      A.   I don't think so, no.  I mean, you'd have to

21  give me a specific for that.  Not in general, no.  I

22  knew what to do, how to handle those.

23      Q.   Did you ever discuss any leave requests made by

24  Jenna Clark with Annmarie Reno?

25      A.   Well, Annmarie told me that Jenna was going to

1    be out for a surgery and I know that -- and Jenna told

2    me too; but, yeah, Annmarie told me.  And then there was

3    a time when Annmarie told me Jenna was going out on FMLA

4    also.  That's about it, I think.

5        Q.   I'm going to show you a document.  (Screen

6    share began.)  We will mark this as Plaintiff's Exhibit

7    9, and it's defendant's Bates label 3431.  I'll have you

8    read through this.

9        A.   (Witness peruses the document.) okay.

10        Q.   Do you recognize this document?

11        A.   Yes.

12        Q.   And what is it?

13        A.   It's an excerpt from our policy.

14        Q.   Is this an email message sent by you?

15        A.   Yes.

16        Q.   And is this a message sent to Jenna Clark and

17    Shannon Lehman?

18        A.   Yes.

19        Q.   And this message appears to be dated June 18,

20    2020, at 12:47 p.m.; correct?

21        A.   Correct.

22        Q.   Why did you send this message to Jenna Clark

23    and Shannon Lehman?

24        A.   I don't remember.

25        Q.   Is this the FMLA leave policy for the Lee

1    County Sheriff's Office?

2         A.    No.

3         Q.    How would you describe that, then?

4         A.    This is part of a policy that talks about --

5    really, it's more like leave without pay.  Basically,

6    the reason for this is so that employees know that they

7    have to -- if they have accrued time, they have to use

8    it, if they're going to be away from work, rather than

9    going without pay, unless -- the only part of that for

10   FMLA is, FMLA is an unpaid entitlement; so there's an

11   excerpt in here that talks about, you konw, unless it's

12   FMLA.  But that's what that's for.

13        Q.    You do not recall why you sent this message to

14   Jenna Clark and Shannon Lehman?

15        A.    I don't.

16        Q.    Who is Shannon Lehman?

17        A.    Shannon is the manager in Purchasing; she

18   worked for Jenna.

19        Q.    Do you see the sentence where it says, "A

20   pattern of abuse may be cause for disciplinary action"?

21        A.    Yes.

22        Q.    Do you know what it's referring to, by "a

23   pattern of abuse"?

24        A.    Leave, some type of leave.

25        Q.    As the director of human resources, did you

1   ever have any employees engage in a pattern of abuse in

2   using leave?

3       A.   Employees that reported to me, or in general?

4       Q.   In general, in your role as director of human

5   resources, are you aware of any employees that engaged

6   in a pattern of abuse as it relates to leave?

7       A.   I'm sure I was.  I'm sure I heard of issues, at

8   some point in time throughout my career.  But this type

9   of situation would be investigated through Internal

10  Affairs.

11      Q.   Are you aware of any employees that were

12  disciplined for engaging in a pattern of abuse as it

13  relates to leave, during your time at the Lee County

14  Sheriff's Office?

15      A.   I know -- I know it occurred, but I can't

16  recall any specific names.

17      Q.   I'll show you another document.  We'll mark

18  this as Plaintiff's No. 10.  It's Bates labeled 1294 and

19  1295.  I'll give you a moment to review this.  Just let

20  me know when to scroll.

21      A.   Yes, I'm familiar with this.  Go ahead.

22      Q.   I'm going to scroll down, just to give you an

23  opportunity to review it.

24      A.   Yes.  Got it.

25      Q.   Do you recognize this document?

1      A.    Yes.

2      Q.    And what is it?

3      A.    This is an email trail from Jenna and I, where

4  Jenna was going out for a surgery; she told Annmarie,

5  Annmarie approved it, and told her to make sure that she

6  let me know, in case we needed to apply FMLA.  So this

7  is me going back and forth with Jenna, asking her how

8  long she was going to be out, so I could establish

9  whether that 7 days -- you know, whether it was going to

10  be a lot more or if it was not.  And this is where she

11  told me that, and then I instructed her on what to do if

12  it was going to be longer.

13      Q.    In this first message, dated August 12, 2021,

14  at 12:26 p.m., this is a message from Jenna Clark;

15  correct?

16      A.    Correct.

17      Q.    And it's directed towards you; correct?

18      A.    Correct.

19      Q.    And in this message, Ms. Clark is notifying you

20  that she has a surgery scheduled on the 18th of August;

21  correct?

22      A.    Correct.

23      Q.    When Annmarie Reno approved Ms. Clark's time,

24  would she have decided the type of leave that Ms. Clark

25  would take?

1        MR. STEFANY:  Objection as to form.  You may

2    answer.

3        THE WITNESS:  Policy would have indicated what

4    kind of leave she had and whatever she had in her

5    accrual bank.

6  BY MR. MACDONALD:

7    Q.    Let me ask you this.  Did Annmarie Reno ever

8  communicate the type of leave that Jenna Clark should

9  take for her surgery?

10    A.    No.

11    Q.    Did Annmarie Reno discuss this specific leave

12  request with you?

13    A.    Just to say, did -- I think I remember her

14  saying or, you know, "Jenna got with you; she's going to

15  be out; I approved it; I told her to get with you."  And

16  I said, "She did."

17    Q.    When you received this message from Jenna

18  Clark, did you understand it to be a request to use FMLA

19  leave?

20    A.    Well, I understood it to be a qualifying event

21  for FMLA, sure.  Yeah.

22    Q.    At the time you received this message, did you

23  believe that Jenna Clark was eligible to take FMLA

24  leave?

25    A.    I did, yes.

1     Q.    And do you see the next message dated August

2   12, 2021, at 1:04 p.m.?

3     A.    Yes.

4     Q.    And this is a message from you, to Jenna Clark;

5   correct?

6     A.    Correct.

7     Q.    Who is the Amy that you reference in this

8   email?

9     A.    Amy is the person I mentioned who handles FMLA,

10   in Risk Management.

11    Q.    And why did you mention whether Ms. Clark would

12   be out for more than a week, in that email?

13    A.    Because it was our practice to not require the

14   employee to go through all the paperwork requirements

15   and certifications for an FMLA, if they gave us enough

16   information to know it was a qualifying event; and if

17   they said it was only going to be a short amount of

18   time, we would not make them go through all the process

19   of the paperwork for just 7 days.  Because by the time

20   they would -- if we did, by the time they got the

21   paperwork, you know, they would be back to work.

22         So there was no need for us to do that.  It was

23   approved time; we had no issue with her being out; we

24   knew it was a qualifying event.  And, yeah, that's why I

25   said, let me know if it's going to be longer, and we'll

1  activate the FMLA for you.  But for just 7 days, she was

2  already getting approval.

3      Q.   Did you have to document this request anywhere?

4      A.   I mean, I made a note of it for myself, so that

5  I would follow up and make sure that she came back, but,

6  no.  Annmarie would have taken care of that

7  documentation that was required.

8      Q.   And what documentation would be required?

9      A.   Just her time sheet.  You know, just making

10 sure she completed her time sheet so that she would get

11 her pay.

12     Q.   And do you see the message dated August 12,

13 2021, at 1:06 p.m.?

14     A.   Yes.

15     Q.   And this is a message from Jenna Clark to you;

16 correct?

17     A.   Correct.

18     Q.   And in it, it appears that Jenna Clark is

19 telling you the amount of days that she'll be out; is

20 that correct?

21     A.   Correct.

22     Q.   And she said, "a total of 7 days"; is that

23 right?

24     A.   Yes.

25     Q.   She also tells you the dates that she's going

1    to be out; is that right?

2         A.   Yes.

3         Q.   And do you see the message dated August 12,

4    2021, at 1:16 p.m.?

5         A.   Yes.

6         Q.   And this is a message from you, to Jenna Clark;

7    correct?

8         A.   Correct.

9         Q.   And in this message, you tell Jenna Clark that,

10   "While we are so busy right now, then I am going to hold

11   off on the FMLA"; is that correct?

12        A.   Correct.

13        Q.   What do you mean, "we are so busy right now"?

14        A.   Oh, well, during that time, it was during Covid

15   and our Risk Management unit was just slammed.  And so I

16   was indicating that, that I wasn't going to refer her to

17   Amy, unless she was going to be out more than the 7 days

18   that we normally allow people to be out before we

19   require the FMLA documentation.

20        Q.   And when you say "we," who is that referring

21   to?

22        A.   Management and Human Resources; people who

23   administer the FMLA and are responsible for it.

24        Q.   What documentation was required for an FMLA

25   request?

```
 1      A.   Well, there's a certification of physician;

 2 it's a document that the doctor has to fill out,

 3 indicating, you know, what he's doing, documenting that

 4 it's a serious health condition, that it makes someone

 5 eligible for FMLA entitlement; and it indicates, you

 6 know, the length of duration of the event, so that we

 7 would know the expected duration.

 8      Q.   And that's a medical certification form that

 9 you described; is that correct?

10      A.   It is.

11      Q.   Is there any other FMLA documentation that's

12 required, besides the medical certification form that

13 you described?

14      A.   Required?  No.  There are other forms, but the

15 piece that qualifies someone, that's required, is that

16 certification.

17      Q.   What are the other forms?

18      A.   I mean, there's forms that Risk Management

19 fills out, to designate the leave; there's a return to

20 work form that can be filled out by a doctor, if they

21 don't already do that, that we can ask them to fill out;

22 you know, there's different pieces to the FMLA,

23 depending on what information the doctor gives.  There's

24 a request for FMLA that can be filled out, if somebody

25 wants to use that, but we don't require it.
```

1    Q.    When you said, "I will have to do the FMLA

2    paperwork," was that referring to the medical

3    certification form, or some other documentation?

4    A.    Wait a minute, let me see.  "If you end up

5    needing more time than that, just let me know, and I

6    will have to do the FMLA paperwork."  That means that

7    Amy would send a packet to Jenna that included -- it

8    included information on FMLA, how it works, the

9    certification of physician that Jenna would need to get

10   her doctor to fill out; it includes return to work, you

11   know, the duration, a return to work form that the

12   doctor can use to fill out.  It's really just a

13   designation packet; Amy would do that.

14   Q.    Those forms would be required to be completed

15   by Ms. Clark and her physician; correct?

16   A.    They're completed by the doctor.

17   Q.    Would you have to complete any of those forms?

18   A.    No.

19   Q.    So then, what did you mean when you said that,

20   "I will have to do the FMLA paperwork"?

21   A.    My people; I was meaning my people, my Risk

22   Management folks; Amy or whoever was, you know, filling

23   in for Amy at the time.

24   Q.    You meant that she would have to send it to

25   Ms. Clark?

1      A.    We send it -- we can email it too.  But, either

2  way, we have to initiate that process, if we're

3  requiring it, yes.  Again, with this one, Jenna was

4  already approved and she thought it was only going to be

5  7 days; I wasn't going to put everybody through all of

6  the need to do that, knowing that it was very short and

7  she gave us enough information to know that it was

8  approved and it was a qualifying event.  So, yeah, it

9  was just really the comment that I made and the

10  information I put there was letting her know, you know,

11  "You're covered, you're approved, and let me know if

12  it's going to be longer, and I'll take care of it."

13      Q.    What happens when an employee at the Lee County

14  Sheriff's Office wants to use FMLA leave for less than 7

15  days?

16      A.    They can.  They can.  I mean, FMLA is an

17  entitlement, you know.  We would go back -- we would go

18  back and designate it.  With Jenna, we would have gone

19  back and designated that first 7 days as FMLA, if she

20  had been out long enough, you know, to need us to

21  actually do that.  But when you're giving someone the

22  time off, you're giving them the entitlement, regardless

23  of the paperwork.  So again, what's the purpose of doing

24  the paperwork when you're going above the requirement,

25  in the beginning.

```
 1        Q.    How is the -- or -- sorry.  When you say "we,"
 2   you say that you were referring to you and the remainder
 3   of your department; is that correct?
 4        A.    Yes.  Yes, I was speaking for my department.
 5        Q.    And what was your department referred to as?
 6        A.    Human Resources/Risk Management/benefits.
 7        Q.    Did how busy, you know, Human Resources was,
 8   impact how you would handle an FMLA leave request?
 9        A.    Only that I didn't -- I didn't notify Amy that
10   Jenna was out, because I wasn't requiring her to do
11   anything with it yet and it was being approved and
12   handled, you know, by her supervisor.  So there was no
13   need for Amy to get involved and do anything, when I
14   didn't believe, at that point, that it was ever going to
15   turn into a leave beyond the 7 days.
16        Q.    And at the time that you exchanged these
17   messages with Ms. Clark, you believe she had a
18   qualifying health condition; is that right?
19        A.    That is correct.
20        Q.    What health condition did you believe Ms. Clark
21   had?
22        A.    She indicated she was having surgery.
23        Q.    Did you know what the surgery was for?
24        A.    I did not.  I did not, no.  I don't think I
25   still know.
```

1    Q.   Did Ms. Clark ever make you aware of any health

2  conditions that she suffered from, prior to this request?

3    A.   Yes, she did.

4    Q.   What health conditions did she make you aware

5  of?

6    A.   Oh, I know I'm under deposition, but is it

7  fair, under HIPAA, for me to discuss things that Jenna

8  disclosed to me about her health, to people other than

9  her, without her approving that?  I feel like --

10   Q.   Yes, you can disclose her health condition.

11        THE WITNESS:  David?

12        MR. STEFANY:  You can disclose what

13     communications the Plaintiff gave you concerning

14     her health.

15        THE WITNESS:  She told me that she had a heart

16     condition, and she told me that she had a breast

17     surgery.

18  BY MR. MACDONALD:

19   Q.   And when did she tell you about those?

20   A.   She told me that she had breast implants years

21  ago and that she believed that those breast implants

22  were causing her to have all kinds of health issues and

23  that she was considering having them removed.

24   Q.   And when did she tell you about the heart

25  condition?

1    A.   Well, that was when she was -- she had open

2  heart surgery.  I didn't know anything about that until

3  after she was already back from FMLA and all that.

4  Yeah.  I mean, we didn't really have very many talks

5  about the heart surgery.

6    Q.   Was Ms. Clark the person who told you about the

7  heart surgery?

8    A.   No.  No.  I would have -- I learned that she

9  was out by the FMLA paperwork, I believe, from Risk

10  Management.  But I know I talked to Annmarie about it.

11    Q.   What did you discuss with Annmarie Reno, in

12  regards to the surgery that Ms. Clark underwent?

13    A.   Just that Jenna was really sick and that she

14  was going to be out for a while, that she was having

15  open heart surgery; Annmarie let me know that.  And I

16  let the girls in Risk know that.  And then, when Jenna

17  came back, of course, you know, I talked to her about

18  that; just, you know, "how are you doing, how are you

19  feeling," things like that.  But that surgery, I think

20  that happened -- I don't think I found out about that

21  until, you know, after it was already happening.

22    Q.   And when did that surgery for Ms. Clark occur?

23    A.   Unless I look at documents, I honestly don't

24  recall what year or, you know.

25    Q.   Do you recall if it was more than five years

1  ago?

2      A.   I don't think so.  I think it was probably

3  within the last five years.

4      Q.   And you said that Ms. Clark used FMLA leave for

5  that surgery; is that correct?

6      A.   Yes, I believe she did.  She was out a while.

7      Q.   Besides the surgery, do you remember any other

8  instances of Ms. Clark using FMLA leave benefits?

9      A.   I don't remember any.

10     Q.   Was Ms. Clark on leave when she was notified of

11  her termination?

12     A.   She was.  She was not working; she was out.

13     Q.   What type of leave was Ms. Clark on, when she

14  was notified that she was being terminated?

15     A.   She was out with that surgery, I think -- yeah,

16  the one that's discussed in that email.

17     Q.   Do you know what type of leave that was

18  classified as, internally, with the Lee County Sheriff's

19  Office?

20     A.   Sick leave, is what I would -- I don't know how

21  her time sheet was completed.  But I knew she was having

22  surgery, you know, and I knew she was out; so really,

23  sick leave would have been how I would have described it.

24     Q.   And you wrote the letter letting Ms. Clark know

25  her position was being terminated; is that correct?

1    A.    Yes.

2    Q.    And when was that letter written?

3    A.    August 15 of 2021.

4    Q.    And is that the date that you wrote the letter

5  to Ms. Clark?

6    A.    Yes.

7    Q.    So you wrote the letter to Ms. Clark notifying

8  her that her position was being eliminated roughly three

9  days after this email exchange; is that correct?

10   A.    Correct.

11   Q.    Did the fact that Ms. Clark was on leave have

12  any impact on the timing of that notification of her

13  position being eliminated?

14   A.    No.  No.  No, I didn't even know about it.  I

15  wrote the letter when I was told about the Reduction in

16  Force.

17   Q.    Did you know that Ms. Clark was on leave, when

18  you wrote that letter about the Reduction in Force?

19   A.    I did, yes.

20   Q.    Did that raise any concerns for you?

21   A.    How -- I mean, I had talked to Annmarie about

22  it.  Yeah, when she told me about it, I asked a couple

23  of questions.  But the answers were sufficient, and so I

24  sent the letter.

25   Q.    When you spoke with Annmarie Reno about writing

1    this letter, did you discuss the fact that Ms. Clark was

2    on leave at the time?

3         A.    I did.

4         Q.    And what did you discuss in that regard?

5         A.    I told Annmarie that Jenna was on leave and

6    asked -- I said, "I'm just concerned, because we are

7    eliminating a position while she's on leave."  I said,

8    you know, "Should we wait until she returns in notifying

9    her?"

10         And Annmarie said, no, that she needed to be

11   notified right away, because it was happening and it was

12   happening that day and that they didn't want her to hear

13   about it from someone else; that they needed to her

14   about it first, before other people did.  So I agreed

15   with that, and we went ahead and got Jenna involved and

16   let her know, so that she could, you know, be -- not be

17   blindsided by someone else.  Because it was happening.

18         Q.    Why were you concerned about the fact that

19   Ms. Clark was on leave?

20         A.    Because she needed to be told, and I didn't

21   know what her condition was, in order to be able to

22   notify her.  I knew that she'd had surgery; I didn't

23   know if I could call her up or, you know, how Annmarie

24   was planning to do the notice.  I didn't want this

25   information getting out and, you know, someone telling

 1    her and her not knowing what was happening.  So I was

 2    discussing with Annmarie, what is the plan for executing

 3    this Reduction in Force, because Jenna is not in the

 4    office.

 5        Q.   Were you concerned because Ms. Clark may still

 6    be recovering from her surgery?

 7        A.   Well, I was -- I was concerned how we were

 8    going to tell her.  Annmarie had been in contact with

 9    her, I hadn't.  So, yeah, I had no idea; like, "Have you

10    talked to her?  Have you told her?  Is this letter the

11    first notice?"  You know, that kind of thing.

12             I was trying to -- I mean, Jenna is a human

13    being; I wanted to make sure that we were treating her

14    the way that I would want to be treated and she needs to

15    know that from us, not from her co-workers, that we'd

16    eliminated her position.  So that was the conversation

17    that I was having with Annmarie is, what is the plan to

18    execute this Reduction in Force.

19             And at that point, Annmarie told me she had

20    texted with Jenna and talked to Jenna.  So I knew that

21    there had been some conversation and Jenna was okay to

22    -- you know, I sent the notification letter; it was okay

23    to send it.

24        Q.   And in response, Annmarie Reno instructed you

25    to send the letter, even though the fact that Ms. Clark

1    was on leave; correct?

2         A.    Correct.

3         Q.    During your time as director of human

4    resources, are you aware of any other employees of the

5    Lee County Sheriff's Office that were terminated while

6    they were out on leave?

7         A.    I know a lot of people have not returned to

8    work from a leave, whatever -- you know, whatever the

9    situation was, whether it was a termination or a

10   retirement or.  I do know that other people have done

11   that.

12        Q.    And you're referring to an employee not

13   returning from leave?

14        A.    Yes.  Correct.

15        Q.    Are you aware of any employees that were

16   notified that their position was being eliminated, while

17   they were out on leave, during your time as director of

18   human resources?

19        A.    No.  I don't recall for sure if there was

20   anyone else that was out on leave.

21        Q.    If Ms. Clark's leave had been designated using

22   that FMLA paperwork, would that have impacted the timing

23   of the notification that her position was being

24   eliminated?

25        A.    No, it wouldn't have.  That was my reasoning

 1   with talking to Annmarie.  And it was happening

 2   regardless; it had nothing to do with the fact that she

 3   was out.  The Reduction in Force was happening, and that

 4   was my concern is, because Jenna wasn't at work, how we

 5   were going to notify her.  But it was happening,

 6   regardless of her status.  It's my understanding this

 7   had been in the works for -- again, I told you, I think

 8   earlier, that the Reduction in Force had been happening

 9   for years.

10       Q.   And how did you learn that those reductions in

11   force had been in the works?

12       A.   I was told when I needed to send the notices; I

13   was told when it was time to -- you know, when it was

14   happening, because I was the one who sent the notices.

15       Q.   During your time as director of human

16   resources, did the Lee County Sheriff's Office have any

17   policies against terminating employees while they're

18   recovering from surgery?

19       A.   No.

20       Q.   While you were the director of human resources,

21   did the Lee County Sheriff's Office have any policies

22   against terminating employees while they were on FMLA

23   leave?

24       A.   No.  I mean, there are FMLA policies and FMLA

25   rules, but there was no policy stating it can't be done,

```
 1    no.

 2        Q.   Well, those are all the questions I have for

 3    you today.  I want to thank you for your time.  And

 4    Mr. Stefany may have some questions for you.

 5        A.   Okay.

 6             MR. STEFANY:  Let's take a five-minute break,

 7        and then I'll be back and see if I have any

 8        questions.

 9             THE COURT REPORTER:  We're off the record.

10             (A brief recess was taken.)

11             THE COURT REPORTER:  We are back on the record.

12             MR. STEFANY:  Ms. Heikkila, I just have a few

13        questions for you.  Kyle, can you put back up

14        Exhibit 10 on the share screen.

15             MR. MACDONALD:  Yes.  (Screen share began and

16        said document was displayed.)

17                     CROSS-EXAMINATION

18    BY MR. STEFANY:

19        Q.   Ms. Heikkila, can you see this document?

20        A.   Yes.

21        Q.   I just want to be clear, for my understanding.

22    As of August of 2021, do you by chance recall what work

23    schedule Jenna Clark worked, from week to week?

24        A.   Well, she was a director, so she would have

25    either been on a four-day or a five-day work week; I
```

1  don't know that I ever knew her schedule, other than

2  that.

3      Q.   Okay.  So if her timesheets reflected that she

4  only worked Monday through Thursday in August of 2021,

5  that would seem to me to indicate that she was on a

6  four-day work schedule, with four 10-hour workdays; is

7  that right?

8      A.   Yes.

9      Q.   Okay.  So as I review this email trail which

10 was previously marked and identified as Exhibit 10, if I

11 go to Jenna Clark's email to you, which is dated August

12 12, 2021, at 1:06 p.m., it seems to me she's telling you

13 what days she's going to need to be out, which begins on

14 August 18 through the 20th, and then she's out again on

15 the 24th through the 27th; correct?

16     A.   Correct.

17     Q.   All right.  So in identifying the days that she

18 expected to be out from her scheduled work, when you

19 provided the letter that you have identified of notice

20 of her job's elimination, dated August 15, she would not

21 have -- she would not yet have been on leave; correct?

22     A.   Not according to this email.

23     Q.   Okay.  So I believe your testimony earlier was

24 that at the time Annmarie Reno asked you to compose and

25 send a letter to Jenna Clark, notifying her of her job

1    elimination, she said to you at the same conversation or

2    she indicated to you at the same conversation that she

3    was going to authorize administrative leave with pay for

4    Ms. Clark; did I understand your testimony correctly?

5         A.    No.  She told me that we were eliminating

6    Jenna's job immediately and that the undersheriff had

7    approved her to be paid administrative leave with pay

8    for the period included in this letter, like, for

9    additional time for her to decide if she -- what she

10   wanted to do.  Essentially, that's what Annmarie told

11   me.

12        Q.    Okay.  So and that was all during the same

13   conversation where you were asked to provide the letter

14   of August 15, 2021?

15        A.    Correct.

16        Q.    All right.  So did you prepare that letter and

17   send it out to Ms. Clark on the same day you had the

18   conversation with Annmarie Reno, or were they on

19   different days?

20        A.    I believe it was the same day, but I said -- it

21   was possible that she told me one day and that the

22   letter didn't go out until the next day; but it was

23   definitely within a day.

24        Q.    Okay.  And is it your recollection -- and my

25   notes just are not clear.  Is it your recollection that

1  the letter went out via mail and email, or just mail?

2      A.   I did not know for sure if it went out both; I

3  know that it would have gone out via regular mail, for

4  sure.

5      Q.   Okay.  So a quick look at the calendar confirms

6  to me that August 15, 2021 was actually a Sunday.  So if

7  a letter was drafted on a Sunday, would it have gone out

8  that Sunday, or would it have gone out on the next day,

9  the Monday, if you recall?

10     A.   Yes.  It was drafted on the 15th, which to me

11 tells me that they were eliminating the position with

12 the beginning of a new week, a new payroll week.  For

13 action sheets, we do that at the beginning of a pay

14 period.  So it tells me that that was the effective date

15 of the action, which was the Reduction in Force; and I

16 would not have been there on a Sunday to mail that

17 letter, so I would say it went out the day after, in the

18 mail.

19     Q.   All right.  And it reflects -- the

20 documentation that I'm familiar with reflects that for

21 the period beginning, it looks like beginning the 17th

22 of August, which would have been a Tuesday, August 17,

23 2021, that that was the first -- that was the first day

24 that Jenna Clark began administrative leave with pay,

25 and she remained in that status until her retirement

1  date of September 3rd of 2021.  Is that consistent with

2  your recollection?

3      A.   Yes.  And it makes sense.  She was probably on

4  a Tuesday-through-Friday work week.

5      Q.   Okay.  And if she was actually on a Monday --

6  was it possible that she could have been on a Monday-

7  through-Thursday work week, at that time?

8      A.   Well, it's possible if she worked Monday.  You

9  know, according -- if she was --

10     Q.   I'm looking at some documentation, which you

11  don't have the benefit of, that reflects that she worked

12  10 hours on August 16, 2021.

13     A.   Okay.  Well, yeah.  I guess what I can't

14  explain then -- it's possible, obviously, if that's the

15  case.  I didn't expect you to say that because I wrote

16  the letter for August 15.  So that's where I'm thrown

17  off a little, that I wrote the letter on the 15th and

18  you say she worked on the 16th and the leave started on

19  the 17th; that's kind of weird to me.

20     Q.   Well, I'm just looking at the time sheet.

21          MR. STEFANY:  And, Counsel, just for the

22      record, it's Defense Bates 000421, is the time

23      sheet that I'm referring to, for purposes of

24      clarity.

25          MR. MACDONALD:  Thank you.

1    BY MR. STEFANY:

2        Q.    With respect to your earlier testimony, you

3    also mentioned that there was a concern discussed

4    between you and Annmarie Reno about needing to get the

5    notification to Jenna Clark before she found out some

6    other way -- that's my paraphrase.   Did I understand

7    your testimony correctly?

8        A.    Yes.

9        Q.    Was there any conversation during that

10   discussion with Annmarie Reno, as to how it would be

11   that Jenna Clark might otherwise find out about her job

12   elimination, if the notice wasn't promptly given to her?

13       A.    Well, because it was going to become -- there

14   was a notification to employees that there was a

15   Reduction in Force and that we were reducing/eliminating

16   positions; and if -- so if one of her co-workers, you

17   know, Shannon, or somebody that worked with her -- you

18   know, they were friends; they called, they talked to

19   each other on the phone.   Once it becomes common

20   knowledge, she would have heard it from somewhere.

21       Q.    Okay.

22       A.    So, yes, that was my concern, how we would do

23   it.

24       Q.    And what role, if any, would you have had in

25   effectuating that communication about the RIF, if at

1    all?

2        A.    Well, I wanted to know, am I telling her, am I

3    calling her, or are you?  Because normally, a supervisor

4    would have that conversation, and I would be a part of

5    it.  But Annmarie said that she was taking care of

6    letting Jenna know; and then it was up to me to formally

7    do the letter and talk to her about what her decisions

8    were, going forward.  She was basically turning it over

9    to me.

10       Q.    Okay.  And did you ever have a communication

11   with Annmarie Reno that confirmed when, in fact, Ann

12   Marie's notice to Jenna Clark took place?

13       A.    I remember Annmarie saying that she had -- that

14   she had talked to her, so it was okay for me to send the

15   letter.

16       Q.    So by that communication and recollection, do I

17   understand that the communication between Annmarie Reno

18   and Jenna Clark took place sometime prior to August 15

19   when you drafted the letter?

20       A.    That's what I would have said, except for you

21   just told me she worked on the 16th; so, no, it must not

22   have happened that way.  She must have told her after

23   the 16th, and I must have just dated the letter based on

24   the pay period that the position was eliminated.  That's

25   all I can conclude, based on the information I have

1    today.  I don't recall any of that; you know, that

2    particular time frame, I don't recall that right now.

3        Q.   Okay.  And I understand your testimony from

4    earlier is that with respect to the heart surgery that

5    Jenna Clark had and missed some time with FMLA leave as

6    a consequence, you don't recall when that took place?

7        A.   No.  I think it was -- I don't recall exactly.

8    I mean, it was probably within like a year or so.  It

9    was within her last couple of years of employment; I'm

10   pretty sure of that, yes.

11            MR. STEFANY:  That's all I have, thank you.

12            Any redirect, Kyle?

13            MR. MACDONALD:  No, no redirect.

14            MR. STEFANY:  Ms. Heikkila, you have the right

15       to review a transcript of your deposition testimony

16       if one is made, or you can waive the reading of the

17       transcript.  The court reporter just needs to know

18       which you would prefer to do before she closes the

19       record.  And I would say that pertains to both

20       transcripts, your 30(b)(6) transcript, as well as

21       your individual transcript, if ordered.

22            THE WITNESS:  I'll waive the reading.

23            THE COURT REPORTER:  We're off the record.

24            (Thereupon the deposition was terminated at

25   12:42 p.m.

```
 1                   CERTIFICATE OF OATH

 2   STATE OF FLORIDA   )
     COUNTY OF ORANGE   )
 3
            I, Julie S. Evans, Professional Court Reporter,
 4
     Notary Public, State of Florida, certify that DAWN
 5
     HEIKKILA appeared before me via Zoom on October 11,
 6
     2023, and was duly sworn.
 7
            Witness my hand and official seal this 28th day
 8
     of December 2023.
 9

10

11

12        Julie Evans
          JULIE S. EVANS
13        Professional Court Reporter
          Notary Public, State of Florida
14        My Commission No. GG939756
          Expires:  1/21/2024
15

16

17

18

19

20

21

22

23

24

25
```

Notary Public State of Florida
Julie Evans
My Commission GG 939756
Expires 01/21/2024

```
 1                      CERTIFICATE OF REPORTER

 2    STATE OF FLORIDA   )
      COUNTY OF ORANGE   )
 3

 4            I, Julie S. Evans, Professional Court Reporter,

 5    do hereby certify that I was authorized to and did

 6    stenographically report the deposition of DAWN HEIKKILA;

 7    that a review of the transcript was not requested; and

 8    that the foregoing transcript, page number 1 through 42,

 9    is a true and complete record of my stenographic notes.

10            I further certify that I am not a relative,

11    employee, attorney, or counsel of any of the parties,

12    nor am I a relative or employee of any of the parties'

13    attorneys or counsel connected with the action, nor am I

14    financially interested in the action.

15            Dated this 28th day of December 2023.

16

17

18    _____

19    Julie S. Evans
      Professional Court Reporter

20

21

22

23

24

25
```

## WORD INDEX

**< 0 >**
**000421** 39:*22*

**< 1 >**
**1** 44:*2*
**1/21/2024** 43:*13*
**1:04** 20:*2*
**1:06** 21:*13* 36:*12*
**1:16** 22:*4*
**10** 3:*8* 17:*18* 35:*14*
36:*10* 39:*12*
**10-hour** 36:*6*
**11** 1:*9* 43:*2*
**11:24** 1:*9*
**12** 18:*13* 20:*2* 21:*12*
22:*3* 36:*12*
**12:26** 18:*14*
**12:42** 1:*9* 42:*25*
**12:47** 15:*20*
**1294** 17:*18*
**1294-1295** 3:*8*
**1295** 17:*19*
**15** 3:*8* 30:*3* 36:*20*
37:*14* 38:*6* 39:*16*
41:*18*
**15th** 38:*10* 39:*17*
**16** 39:*12*
**16th** 39:*18* 41:*21, 23*
**17** 3:*8* 38:*22*
**17th** 38:*21* 39:*19*
**18** 15:*19* 36:*14*
**18th** 18:*20*
**1999** 12:*23*

**< 2 >**
**2:22-cv-614-SPC-
NPM** 1:*5*
**2005** 6:*23*
**2020** 15:*20*
**2021** 18:*13* 20:*2*
21:*13* 22:*4* 30:*3*
35:*22* 36:*4, 12* 37:*14*
38:*6, 23* 39:*1, 12*
**2023** 1:*9* 5:*10* 43:*2*
44:*14*
**20th** 36:*14*
**225** 2:*7*

**24** 5:*15*
**24th** 36:*15*
**27th** 36:*15*
**28th** 43:*2* 44:*14*

**< 3 >**
**30(b)(6** 42:*20*
**324** 2:*7*
**33131** 2:*4*
**33606-4128** 2:*8*
**3431** 3:*8* 15:*7*
**35** 3:*3*
**3rd** 39:*1*

**< 4 >**
**4** 3:*2*
**42** 44:*2*
**43** 3:*4*
**44** 3:*5*

**< 5 >**
**520** 2:*3*

**< 7 >**
**7** 18:*9* 20:*19* 21:*1,
22* 22:*17* 25:*5, 14, 19*
26:*15*

**< 8 >**
**8/12/21** 3:*8*

**< 9 >**
**9** 3:*8* 15:*7*

**< A >**
**a.m** 1:*9*
**able** 31:*21*
**abuse** 16:*20, 23* 17:*1,
6, 12*
**accrual** 19:*5*
**accrued** 16:*7*
**action** 16:*20* 38:*13,
15* 44:*13, 14*
**activate** 21:*1*
**additional** 37:*9*
**administer** 22:*23*
**administered** 5:*21*
**administrative** 37:*3,
7* 38:*24*

**Affairs** 9:*16* 17:*10*
**affirm** 4:*7*
**ago** 8:*14* 12:*25*
27:*21* 29:*1*
**agreed** 3:*10* 31:*14*
**ahead** 17:*21* 31:*15*
**Allen** 2:*6*
**allow** 22:*18*
**amount** 20:*17* 21:*19*
**Amy** 20:*7, 9* 22:*17*
24:*7, 13, 22, 23* 26:*9,
13*
**Ann** 41:*11*
**Annmarie** 6:*2* 13:*13,
15, 17, 20, 23* 14:*8, 11,
14, 17, 19, 24, 25* 15:*2,
3* 18:*4, 5, 23* 19:*7, 11*
21:*6* 28:*10, 11, 15*
30:*21, 25* 31:*5, 10, 23*
32:*2, 8, 17, 19, 24*
34:*1* 36:*24* 37:*10, 18*
40:*4, 10* 41:*5, 11, 13,
17*
**answer** 9:*15* 19:*2*
**answers** 30:*23*
**anyway** 14:*6*
**APPEARANCES** 2:*1*
**appeared** 1:*9* 43:*2*
**appears** 15:*19* 21:*18*
**apply** 18:*6*
**appropriate** 9:*7*
**approval** 21:*2*
**approved** 18:*5, 23*
19:*15* 20:*23* 25:*4, 8,
11* 26:*11* 37:*7*
**approving** 27:*9*
**asked** 30:*22* 31:*6*
36:*24* 37:*13*
**asking** 18:*7*
**assistant** 6:*8*
**Association** 8:*1*
**attorney** 44:*11*
**attorneys** 44:*13*
**August** 18:*13, 20*
20:*1* 21:*12* 22:*3*
30:*3* 35:*22* 36:*4, 11,
14, 20* 37:*14* 38:*6, 22*
39:*12, 16* 41:*18*
**authorize** 37:*3*

**authorized** 44:*2*
**available** 12:*14, 17, 20*
**Avenue** 2:*7*
**aware** 12:*5* 17:*5, 11*
27:*1, 4* 33:*4, 15*

**< B >**
**bachelor's** 6:*14*
**back** 12:*3* 18:*7*
20:*21* 21:*5* 25:*17, 18,
19* 28:*3, 17* 35:*7, 11,
13*
**bank** 19:*5*
**based** 41:*23, 25*
**basically** 8:*18* 9:*7*
16:*5* 41:*8*
**Bates** 3:*8* 15:*7*
17:*18* 39:*22*
**began** 15:*6* 35:*15*
38:*24*
**beginning** 25:*25*
38:*12, 13, 21*
**begins** 36:*13*
**BEHALF** 1:*9* 2:*5, 9*
**believe** 6:*8* 10:*2*
11:*24* 12:*2, 18* 14:*13,
16* 19:*23* 26:*14, 17,
20* 28:*9* 29:*6* 36:*23*
37:*20*
**believed** 27:*21*
**benefit** 39:*11*
**Benefits** 5:*23* 29:*8*
**beyond** 26:*15*
**blindsided** 31:*17*
**Blue** 2:*6*
**break** 35:*6*
**breast** 27:*16, 20, 21*
**Brickell** 2:*3*
**brief** 35:*10*
**briefly** 14:*2*
**bringing** 11:*11*
**broad** 9:*14*
**bureau** 13:*5*
**busy** 22:*10, 13* 26:*7*

**< C >**
**calendar** 38:*5*
**call** 31:*23*
**called** 40:*18*

**calling** 41:*3*
**capacity** 1:*7*
**care** 21:6 25:*12* 41:*5*
**career** 13:*6* 17:*8*
**CARMINE** 1:*5*
**Carolina** 5:*8*
**Carrie** 7:*4*
**CASE** 1:*5* 18:*6* 39:*15*
**cause** 16:*20*
**causing** 27:*22*
**CERTIFICATE** 3:*4, 5* 43:*1* 44:*1*
**certification** 23:*1, 8, 12, 16* 24:*3, 9*
**certifications** 20:*15*
**certify** 43:2 44:2, *10*
**chain** 9:*19* 11:*19*
**chance** 35:*22*
**check** 11:*2*
**chief** 11:*24* 12:*1*
**Christian** 9:*23* 10:*1, 4, 10, 25* 11:6 12:*6, 13*
**Cindy** 7:*4*
**clarity** 39:*24*
**CLARK** 1:*1* 3:*10* 4:4 12:22 13:*1, 21, 24* 14:*9, 11, 24* 15:*16, 22* 16:*14* 18:*14, 19, 24* 19:*8, 18, 23* 20:*4, 11* 21:*15, 18* 22:*6, 9* 24:*15, 25* 26:*17, 20* 27:1 28:*6, 12, 22* 29:*4, 8, 10, 13, 24* 30:*5, 7, 11, 17* 31:*1, 19* 32:*5, 25* 35:*23* 36:25 37:*4, 17* 38:*24* 40:*5, 11* 41:*12, 18* 42:*5*
**Clark's** 13:*11* 18:*23* 33:*21* 36:*11*
**classified** 29:*18*
**clear** 35:*21* 37:*25*
**clearly** 5:*4*
**closes** 42:*18*
**coaching** 14:*1*
**coffee** 10:*17*
**come** 9:*3*

**command** 9:*19* 11:*19*
**comment** 25:*9*
**Commission** 43:*13*
**common** 40:*19*
**communicate** 19:*8*
**communication** 40:*25* 41:*10, 16, 17*
**communications** 27:*13*
**complain** 10:*10, 16* 12:6 14:*8*
**complained** 10:*16, 18* 11:*14*
**complaining** 10:*14*
**complaint** 9:*11, 20* 10:*9, 24* 11:*7, 18, 20* 12:*10*
**complaints** 8:*23* 9:*1, 19* 10:*12, 20, 21, 22*
**complete** 24:*17* 44:*2*
**completed** 12:*4* 21:*10* 24:*14, 16* 29:*21*
**completing** 9:*17*
**compose** 36:*24*
**concern** 34:4 40:*3, 22*
**concerned** 31:*6, 18* 32:*5, 7*
**concerning** 27:*13*
**concerns** 30:*20*
**conclude** 41:*25*
**condition** 14:4 23:*4* 26:*18, 20* 27:*10, 16, 25* 31:*21*
**conditions** 27:*2, 4*
**conduct** 9:*9, 10, 12*
**conducted** 9:*13* 11:*23*
**conducting** 4:*24* 9:*18*
**conferences** 6:*13*
**confirmed** 41:*11*
**confirms** 38:*5*
**connected** 44:*13*
**consequence** 42:*6*
**considering** 27:*23*
**consistent** 39:*1*
**contact** 32:*8*

**conversation** 32:*16, 21* 37:*1, 2, 13, 18* 40:9 41:*4*
**correct** 15:*20, 21* 18:*15, 16, 17, 18, 21, 22* 20:*5, 6* 21:*16, 17, 20, 21* 22:*7, 8, 11, 12* 23:9 24:*15* 26:*3, 19* 29:*5, 25* 30:*9, 10* 33:*1, 2, 14* 36:*15, 16, 21* 37:*15*
**corrections** 10:*5, 6*
**correctly** 37:4 40:*7*
**counsel** 3:*10* 39:*21* 44:*11, 13*
**Country** 1:*8*
**County** 4:*5* 5:*7, 12, 13, 17* 6:*4, 25* 7:*11* 8:4 14:*15* 16:*1* 17:*13* 25:*13* 29:*18* 33:5 34:*16, 21* 43:*2* 44:*2*
**couple** 5:*15* 30:*22* 42:*9*
**course** 28:*17*
**COURT** 1:*1, 24* 4:*2* 5:*1* 9:24 35:*9, 11* 42:*17, 23* 43:*2, 12* 44:*2, 19*
**covered** 8:*16* 25:*11*
**Covid** 22:*14*
**co-workers** 32:*15* 40:*16*
**create** 12:*17*
**CROSS** 3:*3*
**CROSS-EXAMINATION** 35:*17*
**currently** 5:*6*

**< D >**
**DATE** 1:*9* 30:*4* 38:*14* 39:*1*
**dated** 15:*19* 18:*13* 20:*1* 21:*12* 22:*3* 36:*11, 20* 41:*23* 44:*14*
**dates** 21:*25*
**DAVID** 2:*6* 27:*11*

**DAWN** 1:*9* 3:*2, 10* 4:*3, 12, 18* 43:2 44:*2*
**day** 11:*12* 12:*15* 31:*12* 37:*17, 20, 21, 22, 23* 38:*8, 17, 23* 43:2 44:*14*
**days** 11:*10, 11, 12, 15* 12:*18* 18:9 20:*19* 21:*1, 19, 22* 22:*17* 25:*5, 15, 19* 26:*15* 30:9 36:*13, 17* 37:*19*
**December** 43:2 44:*14*
**decide** 37:*9*
**decided** 18:*24*
**decisions** 7:8 41:*7*
**Defendant** 1:*9* 2:*9*
**defendant's** 15:*7*
**Defense** 39:*22*
**definitely** 37:*23*
**degree** 6:*15*
**department** 26:*3, 4, 5*
**depending** 7:*18* 23:*23*
**DEPOSITION** 1:*9* 4:*3, 24* 27:6 42:*15, 24* 44:*2*
**Derek** 2:*2*
**describe** 16:*3*
**described** 23:*9, 13* 29:*23*
**designate** 23:*19* 25:*18*
**designated** 25:*19* 33:*21*
**designation** 24:*13*
**different** 23:*22* 37:*19*
**DIRECT** 3:*2* 4:*14* 7:*5*
**directed** 18:*17*
**directly** 7:*1*
**Director** 5:*18, 19, 25* 6:*24* 7:*7, 19* 8:*8, 22* 9:*21* 13:*2, 11, 18* 16:*25* 17:*4* 33:*3, 17* 34:*15, 20* 35:*24*
**disciplinary** 16:*20*
**disciplined** 17:*12*
**disclose** 27:*10, 12*
**disclosed** 27:*8*
**discriminated** 9:*5*

discrimination   7:20
  8:4, 8, 14, 20, 24   9:2,
  11, 21
discuss   9:4   13:23
  14:18, 23   19:11   27:7
  28:11   31:1, 4
discussed   13:25   14:1,
  3   29:16   40:3
discussing   32:2
discussion   40:10
displayed   35:16
DISTRICT   1:1
division   9:16
doctor   23:2, 20, 23
  24:10, 12, 16
doctor's   11:11
document   15:5, 9, 10
  17:17, 25   21:3   23:2
  35:16, 19
documentation   21:7,
  8   22:19, 24   23:11
  24:3   38:20   39:10
documenting   23:3
documents   28:23
doing   10:8   23:3
  25:23   28:18
Dr   2:3
drafted   38:7, 10
  41:19
duly   4:13   43:2
duration   23:6, 7
  24:11

< E >
earlier   34:8   36:23
  40:2   42:4
early   13:6
effect   4:25
effective   38:14
effectuating   40:25
either   25:1   35:25
eligible   19:23   23:5
eliminated   30:8, 13
  32:16   33:16, 24
  41:24
eliminating   31:7
  37:5   38:11
elimination   36:20
  37:1   40:12

email   3:8   15:14
  18:3   20:8, 12   25:1
  29:16   30:9   36:9, 11,
  22   38:1
employee   3:8   20:14
  25:13   33:12   44:11,
  12
employees   6:25   7:3,
  8, 10, 12, 14   8:4, 11
  9:3   16:6   17:1, 3, 5,
  11   33:4, 15   34:17, 22
  40:14
employment   6:4
  13:21   42:9
engage   17:1
engaged   17:5
engaging   17:12
entitlement   16:10
  23:5   25:17, 22
ESQUIRE   2:2, 6
Essentially   37:10
establish   18:8
Evans   1:9   43:2, 11
  44:2, 18
event   19:20   20:16,
  24   23:6   25:8
eventually   10:19
everybody   25:5
exactly   9:15   11:5
  42:7
Examination   1:9   3:1
  4:14
Excerpt   3:8   15:13
  16:11
exchange   30:9
exchanged   26:16
execute   32:18
executing   32:2
Executive   13:18
EXHIBIT   3:5   15:6
  35:14   36:10
expect   39:15
expected   23:7   36:18
Expires   43:13
explain   39:14

< F >
fact   30:11   31:1, 18
  32:25   34:2   41:11

fair   27:7
familiar   17:21   38:20
far   14:12
feel   27:9
feeling   28:19
felt   9:4   11:14
fill   23:2, 21   24:10, 12
filled   23:20, 24
filling   24:22
fills   23:19
financially   44:14
find   40:11
fire   7:8
first   4:13   12:22
  18:13   25:19   31:14
  32:11   38:23
five   28:25   29:3
five-day   35:25
five-minute   35:6
FLORIDA   1:1, 8
  2:4, 8   4:5   7:25   43:2,
  12   44:2
FMLA   12:7, 8, 9, 11
  14:5, 19   15:3, 25
  16:10, 12   18:6   19:18,
  21, 23   20:9, 15   21:1
  22:11, 19, 23, 24   23:5,
  11, 22, 24   24:1, 6, 8,
  20   25:14, 16, 19   26:8
  28:3, 9   29:4, 8   33:22
  34:22, 24   42:5
folks   24:22
follow   21:5
follows   4:13
force   4:25   14:7
  30:16, 18   32:3, 18
  34:3, 8, 11   38:15
  40:15
foregoing   44:2
form   19:1   23:8, 12,
  20   24:3, 11
formal   6:14   10:21,
  22, 24   11:7
formalized   8:21
formally   41:6
forms   23:14, 17, 18
  24:14, 17
Forsyth   5:7
forth   18:7
forward   41:8

found   12:19   28:20
  40:5
four   36:6
four-day   35:25   36:6
frame   42:2
frequent   13:10
frequently   13:3
friends   40:18
full   4:16
further   44:10

< G >
gather   9:6
general   14:21   17:3, 4
getting   11:13   12:16
  21:2   31:25
GG939756   43:13
girls   28:16
give   8:3, 7, 11   14:21
  17:19, 22
given   40:12
gives   23:23
giving   25:21, 22
Go   17:21   20:14, 18
  25:17   36:11   37:22
God   4:9
going   14:25   15:3, 5
  16:8, 9   17:22   18:4, 7,
  8, 9, 12   19:14   20:17,
  25   21:25   22:10, 16,
  17   25:4, 5, 12, 24
  26:14   28:14   32:8
  34:5   36:13   37:3
  40:13   41:8
gosh   6:23
Government   5:7
Group   2:2
guess   39:13

< H >
hand   4:6   43:2
handle   14:22   26:8
handled   26:12
handles   20:9
handling   14:18
happened   28:20
  41:22
happening   28:21
  31:11, 12, 17   32:1

34:*1*, *3*, 5, 8, *14*
**happens** 25:*13*
**harassed** 9:*5*
**harassment** 8:*24* 9:2
**health** 11:*10* 23:*4*
26:*18*, 20 27:*1*, *4*, 8,
10, *14*, 22
**hear** 31:*12*
**heard** 17:7 40:2*0*
**heart** 27:*15*, *24* 28:2,
5, 7, 15 42:*4*
**Heikkila** 3:*10*
**HEIKKILA** 1:*9* 3:2
4:*3*, *12*, *18* 35:*12*, *19*
42:*14* 43:2 44:2
**held** 5:*16*
**help** 4:*8*
**hereto** 3:*10*
**HIPAA** 27:7
**hire** 7:8
**hired** 5:2*1*
**hiring** 5:*23*
**hold** 6:*3*, *6* 11:2
22:*10*
**honestly** 28:*23*
**hours** 39:*12*
**HR** 13:*8*
**human** 5:*18*, *19*, *23*,
25 6:7, *9*, *12*, *19*, *24*
7:7, *19* 8:8, 22 9:2*1*
16:2*5* 17:*4* 22:22
26:*6*, 7 32:*12* 33:*3*,
*18* 34:*15*, *20*
**Hyde** 2:7

**< I >**
**IA** 12:2
**idea** 12:2*3* 32:*9*
**identified** 36:*10*, *19*
**identifying** 36:*17*
**immediately** 37:6
**impact** 26:8 30:*12*
**impacted** 33:22
**implants** 27:*20*, *21*
**included** 8:*13* 24:7,
8 37:*8*
**includes** 24:*10*
**INDEX** 3:*1*, 5
**indicate** 36:5

**indicated** 19:*3* 26:22
37:2
**indicates** 23:*5*
**indicating** 22:*16* 23:*3*
**individual** 42:2*1*
**information** 9:6
12:*3* 20:*16* 23:*23*
24:8 25:7, *10* 31:*25*
41:*25*
**initiate** 25:2
**instances** 29:*8*
**instructed** 18:*11*
32:*24*
**interact** 13:*1*, *15*
14:*17*
**interested** 44:*14*
**Internal** 9:*16* 17:*9*
**internally** 29:*18*
**investigated** 11:*20*, *21*
17:*9*
**investigation** 9:*8*, *9*,
*10* 11:*23* 12:*3*, *12*
**investigations** 9:*12*,
*13*, *18*
**involved** 7:*8* 8:*23*
9:7 12:*4* 26:*13*
31:*15*
**issue** 20:*23*
**issues** 11:*10* 17:7
27:22

**< J >**
**JENNA** 1:*1* 3:*10*
12:22 13:*1*, *20*, *24*, *25*
14:*1*, *3*, 9, *11*, *24*, *25*
15:*1*, *3*, *16*, 22 16:*14*,
*18* 18:*3*, *4*, 7, *14* 19:*8*,
*14*, *17*, *23* 20:*4* 21:*15*,
*18* 22:*6*, 9 24:7, 9
25:*3*, *18* 26:*10* 27:7
28:*13*, *16* 31:*5*, *15*
32:*3*, *12*, *20*, *21* 34:*4*
35:*23* 36:*11*, *25*
38:2*4* 40:5, *11* 41:*6*,
*12*, *18* 42:*5*
**Jenna's** 37:6
**Jinx** 7:*4*
**job** 14:9 36:2*5* 37:6
40:*11*

**job's** 36:2*0*
**judge** 5:*1*
**Julie** 1:*9* 43:2, *11*
44:2, *18*
**July** 5:*10*
**June** 15:*19*
**jury** 5:*1*

**< K >**
**Key** 2:*3*
**kind** 19:*4* 32:*11*
39:*19*
**kinds** 27:22
**knew** 14:22 20:2*4*
29:2*1*, 22 31:22
32:2*0* 36:*1*
**knonw** 16:*11*
**know** 6:*14*, *16* 8:*17*,
*18*, 20 9:*14*, *17* 10:*15*
11:*5*, *24* 12:*9*, *19*, *24*
13:*3*, *6*, *9*, *13* 14:2, *14*
15:*1* 16:*6*, 22 17:*15*,
*20* 18:*6*, 9 19:*14*
20:*16*, *21*, *25* 21:9
23:*3*, *6*, 7, 22 24:5, *11*,
22 25:7, *10*, *11*, *17*, *20*
26:7, *12*, *23*, 25 27:6
28:2, *10*, *15*, *16*, *17*, *18*,
*21*, *24* 29:*17*, *20*, 22,
*24* 30:*14*, *17* 31:*8*, *16*,
*21*, *23*, *25* 33:*11*, *15*,
22 33:7, *8*, *10* 34:*13*
36:*1* 38:2, *3* 39:9
40:*17*, *18* 41:2, *6*
42:*1*, *17*
**knowing** 25:*6* 32:*1*
**knowledge** 40:2*0*
**known** 6:2*0*
**KYLE** 2:2 35:*13*
42:*12*

**< L >**
**label** 15:7
**labeled** 17:*18*
**Law** 2:2 5:*1*
**LCSO** 3:*8*
**learn** 34:*10*
**learned** 28:*8*
**leave** 12:7, *8*, *9*, *11*
14:*19*, *23* 15:25 16:*5*,

*24* 17:2, *6*, *13* 18:2*4*
19:*4*, 8, *11*, *19*, *24*
23:*19* 25:*14* 26:*8*, *15*
29:*4*, *8*, *10*, *13*, *17*, *20*,
*23* 30:*11*, *17* 31:2, 5,
7, *19* 33:*1*, *6*, *8*, *13*, *17*,
*20*, *21* 34:*23* 36:2*1*
37:*3*, 7 38:2*4* 39:*18*
42:*5*
**Lee** 1:7 4:*4* 5:*12*, *13*,
*16* 6:*4*, 25 7:*11* 8:*4*
14:*15* 15:2*5* 17:*13*
25:*13* 29:*18* 33:*5*
34:*16*, 21
**left** 6:2
**Lehman** 15:*17*, *23*
16:*14*, *16*
**length** 23:*6*
**letter** 29:*24* 30:2, *4*,
7, *15*, *18*, *24* 31:*1*
32:*10*, 22, *25* 36:*19*,
25 37:*8*, *13*, *16*, 22
38:*1*, 7, *17* 39:*16*, *17*
41:7, *15*, *19*, *23*
**letting** 25:*10* 29:*24*
41:6
**little** 39:*17*
**long** 5:*13* 6:22, *23*
12:2*4* 18:*8* 25:2*0*
**longer** 18:*12* 20:2*5*
25:*12*
**look** 28:2*3* 38:*5*
**looking** 39:*10*, *20*
**looks** 38:2*1*
**lot** 6:*13* 8:*1* 12:*8*
13:*16* 18:*10* 33:7
**lots** 6:*18*

**< M >**
**MACDONALD** 2:2
3:2 4:*15* 10:*3* 19:6
27:*18* 35:*15* 39:2*5*
42:*13*
**mail** 38:*1*, *3*, *16*, *18*
**making** 21:9
**Management** 5:22
6:2*0* 20:*10* 22:*15*, 22
23:*18* 24:22 28:*10*
**Management/benefits**

26:6
**manager**  6:*7*  16:*17*
**manual**  8:*19*
**MARCENO**  1:*5*  4:*4*
**Marie**  4:*18*
**Marie's**  41:*12*
**mark**  15:*6*  17:*17*
**marked**  36:*10*
**matter**  4:*4*
**Matthew**  11:*25*
**mean**  8:*18*  12:*11*
  13:*3*, *4*, *7*  14:*2*, *5*, *20*
  21:*4*  22:*13*  23:*18*
  24:*19*  25:*16*  28:*4*
  30:*21*  32:*12*  34:*24*
  42:*8*
**meaning**  24:*21*
**means**  24:*6*
**meant**  24:*24*
**medical**  14:*4*  23:*8*,
  *12*  24:*2*
**meet**  12:*22*
**meetings**  13:*4*, *5*
**member**  6:*19*, *22*
**mention**  20:*11*
**mentioned**  20:*9*  40:*3*
**message**  15:*14*, *16*, *19*,
  *22*  16:*13*  18:*13*, *14*,
  *19*  19:*17*, *22*  20:*1*, *4*
  21:*12*, *15*  22:*3*, *6*, *9*
**messages**  26:*17*
**Miami**  2:*4*
**MIDDLE**  1:*1*
**minute**  24:*4*
**missed**  42:*5*
**Mojica**  9:*23*  10:*1*, *4*,
  *10*, *25*  11:*6*  12:*6*, *13*
**M-O-J-I-C-A**  10:*1*
**moment**  17:*19*
**Monday**  36:*4*  38:*9*
  39:*5*, *6*, *8*
**months**  5:*15*

< N >
**name**  4:*16*  9:*25*
**names**  17:*16*
**need**  20:*22*  24:*9*
  25:*6*, *20*  26:*13*  36:*13*
**needed**  18:*6*  31:*10*,
  *13*, *20*  34:*12*

**needing**  14:*3*  24:*5*
  40:*4*
**needs**  32:*14*  42:*17*
**new**  38:*12*
**night**  10:*13*, *15*
**normally**  22:*18*  41:*3*
**North**  5:*8*
**Norton**  2:*6*
**Notary**  1:*24*  43:*2*, *12*
**note**  21:*4*
**notes**  11:*2*, *3*, *11*
  37:*25*  44:*2*
**notice**  7:*12*  31:*24*
  32:*11*  36:*19*  40:*12*
  41:*12*
**notices**  34:*12*, *14*
**notification**  30:*12*
  32:*22*  33:*23*  40:*5*, *14*
**notifications**  7:*13*
**notified**  11:*19*  29:*10*,
  *14*  31:*11*  33:*16*
**notify**  7:*14*  26:*9*
  31:*22*  34:*5*
**notifying**  18:*19*  30:*7*
  31:*8*  36:*25*
**number**  44:*2*
**numerous**  10:*12*

< O >
**O-301**  2:*3*
**OATH**  3:*4*  4:*20*
  43:*1*
**Objection**  19:*1*
**obligation**  4:*20*
**obviously**  14:*6*  39:*14*
**occur**  28:*22*
**occurred**  17:*15*
**October**  1:*9*  43:*2*
**Office**  5:*12*, *14*, *17*
  6:*4*, *25*  7:*11*  8:*5*
  9:*16*  10:*6*  14:*15*
  16:*1*  17:*14*  25:*14*
  29:*19*  32:*4*  33:*5*
  34:*16*, *21*
**officer**  10:*5*, *7*
**official**  1:*7*  43:*2*
**Oh**  6:*23*  22:*14*  27:*6*
**okay**  15:*9*  32:*21*, *22*
  35:*5*  36:*3*, *9*, *23*
  37:*12*, *24*  38:*5*  39:*5*,

*13*  40:*21*  41:*10*, *14*
  42:*3*
**Once**  40:*19*
**open**  11:*13*, *16*  28:*1*,
  *15*
**opportunity**  17:*23*
**ORANGE**  43:*2*  44:*2*
**order**  31:*21*
**ordered**  42:*21*
**outcome**  12:*12*

< P >
**P.A**  2:*6*
**p.m**  1:*9*  15:*20*
  18:*14*  20:*2*  21:*13*
  22:*4*  36:*12*  42:*25*
**packet**  24:*7*, *13*
**page**  44:*2*
**paid**  37:*7*
**paperwork**  20:*14*, *19*,
  *21*  24:*2*, *6*, *20*  25:*23*,
  *24*  28:*9*  33:*22*
**paraphrase**  40:*6*
**Park**  2:*7*
**part**  7:*23*, *24*  12:*10*
  16:*4*, *9*  41:*4*
**participated**  8:*12*
**particular**  42:*2*
**parties**  1:*9*  3:*10*  9:*7*
  44:*11*, *12*
**pattern**  16:*20*, *23*
  17:*1*, *6*, *12*
**pay**  16:*5*, *9*  21:*11*
  37:*3*, *7*  38:*13*, *24*
  41:*24*
**payroll**  38:*12*
**people**  5:*21*  10:*14*
  12:*4*  22:*18*, *22*  24:*21*
  27:*8*  31:*14*  33:*7*, *10*
**performance**  14:*9*
**period**  37:*8*  38:*14*,
  *21*  41:*24*
**person**  7:*17*  13:*18*
  20:*9*  28:*6*
**pertains**  42:*19*
**peruses**  15:*9*
**ph**  7:*4*
**phone**  13:*9*  40:*19*
**physician**  23:*1*  24:*9*,

*15*
**piece**  8:*14*  23:*15*
**pieces**  23:*22*
**PLACE**  1:*9*  41:*12*,
  *18*  42:*6*
**placed**  4:*19*
**Plaintiff**  1:*1*, *9*  2:*5*
  27:*13*
**Plaintiff's**  3:*5*  15:*6*
  17:*18*
**plan**  32:*2*, *17*
**planning**  31:*24*
**Please**  4:*6*, *16*, *17*
**PLLC**  2:*2*
**point**  17:*8*  26:*14*
  32:*19*
**poisoned**  10:*17*
**policies**  34:*17*, *21*, *24*
**policy**  3:*8*  15:*13*, *25*
  16:*4*  19:*3*  34:*25*
**position**  5:*9*, *16*
  11:*16*  12:*17*, *20*
  29:*25*  30:*8*, *13*  31:*7*
  32:*16*  33:*16*, *23*
  38:*11*  41:*24*
**positions**  6:*3*, *6*
  12:*14*, *16*  40:*16*
**positive**  10:*8*
**possible**  37:*21*  39:*6*,
  *8*, *14*
**possibly**  6:*17*
**practice**  20:*13*
**prefer**  42:*18*
**prepare**  37:*16*
**pretty**  42:*10*
**prevent**  5:*3*
**previously**  36:*10*
**prior**  5:*11*  27:*2*
  41:*18*
**probably**  6:*23*  8:*2*
  11:*1*, *3*  12:*2*, *24*  14:*5*
  29:*2*  39:*3*  42:*8*
**process**  20:*18*  25:*2*
**Professional**  43:*2*, *12*
  44:*2*, *19*
**program**  8:*20*
**promoted**  10:*18*, *19*
**promptly**  40:*12*
**provide**  37:*13*

provided  36:*19*
**Public**  1:*24*  43:2, *12*
**purchased**  8:*19*
**purchasing**  13:2, *12*
16:*17*
**purpose**  25:*23*
**purposes**  4:*17*  39:*23*
**put**  14:*4*  25:5, *10*
35:*13*

**< Q >**
**qualifies**  23:*15*
**qualifying**  19:*20*
20:*16*, *24*  25:*8*  26:*18*
**question**  9:*14*  13:*9*,
*10*
**questions**  30:*23*  35:2,
*4*, *8*, *13*
**quick**  38:*5*
**quite**  12:*11*

**< R >**
**raise**  4:*6*  30:*20*
**read**  15:*8*
**reading**  3:*10*  42:*16*,
*22*
**real**  12:*10*
**really**  16:*5*  24:*12*
25:*9*  28:4, *13*  29:*22*
**reason**  16:*6*
**reasoning**  33:*25*
**recall**  6:*17*  8:2, *16*
14:*6*  16:*13*  17:*16*
28:*24*, *25*  33:*19*
35:*22*  38:*9*  42:*1*, *2*, *6*,
*7*
**receive**  7:*20*, *22*
**received**  6:*11*  9:*11*,
*20*  19:*17*, *22*
**receiving**  8:*23*  9:*1*
**recess**  35:*10*
**recognize**  15:*10*
17:*25*
**recollection**  37:*24*, *25*
39:2  41:*16*
**record**  4:*17*  35:9, *11*
39:*22*  42:*19*, *23*  44:2
**recovering**  32:*6*
34:*18*
**redirect**  42:*12*, *13*

**reducing/eliminating**
40:*15*
**Reduction**  14:7
30:*15*, *18*  32:3, *18*
34:*3*, *8*  38:*15*  40:*15*
**reductions**  34:*10*
**refer**  22:*16*
**reference**  20:7
**referred**  9:*19*  26:*5*
**referring**  16:*22*
22:*20*  24:2  26:2
33:*12*  39:*23*
**reflected**  36:*3*
**reflects**  38:*19*, *20*
39:*11*
**regard**  31:*4*
**regarding**  12:7, *10*
13:*24*
**regardless**  11:*15*
25:*22*  34:2, *6*
**regards**  28:*12*
**regular**  38:*3*
**related**  6:*11*  7:*20*
8:*3*, *7*
**relates**  17:6, *13*
**relative**  44:*10*, *12*
**remainder**  26:2
**remained**  38:*25*
**remember**  10:*22*
15:*24*  19:*13*  29:7, *9*
41:*13*
**removed**  27:*23*
**Reno**  6:2  13:*13*, *15*,
*20*, *23*  14:8, *11*, *14*, *17*,
*19*, *24*  18:*23*  19:7, *11*
28:*11*  30:*25*  32:*24*
36:*24*  37:*18*  40:*4*, *10*
41:*11*, *17*
**Reno's**  13:*17*
**repeat**  8:*6*  9:*24*
**report**  5:*25*  7:*1*  9:*3*,
*6*  11:*6*  44:2
**reported**  17:*3*
**Reporter**  1:*24*  3:5
4:2  9:*24*  35:9, *11*
42:*17*, *23*  43:2, *12*
44:*1*, *2*, *19*
**reports**  7:*5*

**request**  19:*12*, *18*
21:*3*  22:*25*  23:*24*
26:*8*  27:2
**requested**  44:2
**requests**  14:*19*, *23*
**require**  20:*13*  22:*19*
23:*25*
**required**  21:*7*, *8*
22:*24*  23:*12*, *14*, *15*
24:*14*
**requirement**  25:*24*
**requirements**  20:*14*
**requiring**  25:*3*  26:*10*
**resource**  6:7
**resources**  5:*18*, *20*, *23*
6:*1*, *9*, *12*, *20*, *24*  7:7,
*19*  8:*9*, *22*  9:*22*
16:*25*  17:*5*  22:*22*
26:*7*  33:*4*, *18*  34:*16*,
*20*
**Resources/Risk**  26:*6*
**respect**  40:*2*  42:*4*
**respective**  3:*10*
**response**  11:*17*  32:*24*
**responsible**  22:*23*
**retired**  7:*6*
**retirement**  33:*10*
38:*25*
**return**  23:*19*  24:*10*,
*11*
**returned**  33:*7*
**returning**  33:*13*
**returns**  31:*8*
**review**  17:*19*, *23*
36:*9*  42:*15*  44:2
**RIF**  40:*25*
**right**  4:*6*  7:*5*  21:*23*
22:*1*, *10*, *13*  26:*18*
31:*11*  36:7, *17*  37:*16*
38:*19*  42:2, *14*
**Risk**  5:*22*  6:7  20:*10*
22:*15*  23:*18*  24:*21*
28:*9*, *16*
**role**  7:7, *10*, *19*  8:*8*,
*22*  9:*1*, *21*  17:*4*
40:*24*
**roughly**  30:*8*
**rules**  34:*25*

**< S >**
**Salem**  5:*8*
**Sands**  11:*25*  12:*1*
**saying**  19:*14*  41:*13*
**says**  16:*19*
**schedule**  35:*23*  36:*1*,
*6*
**scheduled**  18:*20*
36:*18*
**Screen**  15:*5*  35:*14*,
*15*
**scroll**  17:*20*, *22*
**seal**  43:*2*
**see**  16:*19*  20:*1*
21:*12*  22:*3*  24:*4*
35:*7*, *19*
**seen**  13:*5*
**send**  15:*22*  24:7, *24*
25:*1*  32:*23*, *25*  34:*12*
36:*25*  37:*17*  41:*14*
**sense**  39:*3*
**sent**  15:*14*, *16*  16:*13*
30:*24*  32:*22*  34:*14*
**sentence**  16:*19*
**September**  39:*1*
**sergeant**  10:*18*, *19*
**serious**  23:*4*
**services**  13:*19*
**session**  14:*1*
**Shannon**  15:*17*, *23*
16:*14*, *16*, *17*  40:*17*
**share**  15:*6*  35:*14*, *15*
**she'd**  31:*22*
**sheet**  21:9, *10*  29:*21*
39:*20*, *23*
**sheets**  38:*13*
**she'll**  21:*19*
**Sheriff**  1:*7*  4:*4*
**Sheriff's**  5:*12*, *14*, *17*
6:*4*, *25*  7:*11*, *25*  8:*4*
9:*16*  10:*5*  14:*15*
16:*1*  17:*14*  25:*14*
29:*18*  33:*5*  34:*16*, *21*
**shift**  10:*14*, *15*  11:*13*
12:*15*
**short**  20:*17*  25:*6*
**show**  15:*5*  17:*17*
**SHRM**  6:*20*
**sick**  28:*13*  29:*20*, *23*
**signing**  3:*10*

**situation** 7:*18* 9:*4* 17:*9* 33:*9*
**slammed** 22:*15*
**Smith** 2:*2*
**Society** 6:*19*
**solemnly** 4:*6*
**somebody** 23:*24* 40:*17*
**sorry** 8:*6* 14:*18* 26:*1*
**South** 2:*7*
**speaking** 26:*4*
**specific** 14:*21* 17:*16* 19:*11*
**specifically** 7:*25* 8:*2* 11:*6*
**spoke** 30:*25*
**standpoint** 8:*18*
**start** 5:*9*
**started** 5:*10* 6:*7* 12:*23* 39:*18*
**state** 4:*16* 43:*2*, *12* 44:*2*
**STATES** 1:*1*
**stating** 34:*25*
**status** 34:*6* 38:*25*
**STEFANY** 2:*6* 3:*3* 19:*1* 27:*12* 35:*4*, *6*, *12*, *18* 39:*21* 40:*1* 42:*11*, *14*
**stenographic** 44:*2*
**stenographically** 44:*2*
**stipulated** 3:*10*
**stopped** 13:*7*
**strike** 9:*10* 14:*18*
**suffered** 27:*2*
**sufficient** 30:*23*
**suggested** 11:*12*
**Suite** 2:*3*, *7*
**Sunday** 38:*6*, *7*, *8*, *16*
**supervisor** 5:*22* 8:*13*, *17* 13:*11*, *16* 26:*12* 41:*3*
**support** 13:*18*
**sure** 17:*7* 18:*5* 19:*21* 21:*5*, *10* 32:*13* 33:*19* 38:*2*, *4* 42:*10*
**surgery** 15:*1* 18:*4*, *20* 19:*9* 26:*22*, *23* 27:*17* 28:*2*, *5*, *7*, *12*, *15*, *19*, *22* 29:*5*, *7*, *15*,

*22* 31:*22* 32:*6* 34:*18* 42:*4*
**swear** 4:*7*
**sworn** 4:*13* 43:*2*

**< T >**
**take** 12:*11* 18:*25* 19:*9*, *23* 25:*12* 35:*6*
**TAKEN** 1:*9* 4:*3* 21:*6* 35:*10*
**talk** 13:*20* 41:*7*
**talked** 12:*8* 28:*10*, *17* 30:*21* 32:*10*, *20* 40:*18* 41:*14*
**talking** 34:*1*
**talks** 16:*4*, *11* 28:*4*
**Tampa** 2:*8*
**tasked** 9:*17*
**tell** 7:*24* 9:*15* 22:*9* 27:*19*, *24* 32:*8*
**telling** 21:*19* 31:*25* 36:*12* 41:*2*
**tells** 21:*25* 38:*11*, *14*
**terminated** 7:*15* 29:*14*, *25* 33:*5* 42:*24*
**terminating** 7:*10*, *12* 34:*17*, *22*
**termination** 29:*11* 33:*9*
**terms** 10:*22*
**testified** 4:*13*
**testify** 4:*20*
**testifying** 4:*25* 5:*4*
**TESTIMONY** 3:*2* 4:*7*, *24* 36:*23* 37:*4* 40:*2*, *7* 42:*3*, *15*
**texted** 32:*20*
**thank** 35:*3* 39:*25* 42:*11*
**thing** 32:*11*
**things** 5:*23* 10:*12* 27:*7* 28:*19*
**think** 10:*6*, *16*, *20*, *21* 11:*25* 12:*1*, *9* 14:*20* 15:*4* 19:*13* 26:*24* 28:*19*, *20* 29:*2*, *15* 34:*7* 42:*7*
**thinking** 5:*4*
**thought** 10:*17* 25:*4*
**three** 30:*8*

**through-Thursday** 39:*7*
**thrown** 39:*16*
**Thursday** 36:*4*
**TIME** 1:*9* 6:*23* 7:*13* 8:*12* 9:*20* 10:*7*, *17*, *20* 11:*7*, *25* 12:*1*, *25* 13:*4*, *8*, *25* 15:*3* 16:*7* 17:*8*, *13* 18:*23* 19:*22* 20:*18*, *19*, *20*, *23* 21:*9*, *10* 22:*14* 24:*5*, *23* 25:*22* 26:*16* 29:*21* 31:*2* 33:*3*, *17* 34:*13*, *15* 35:*3* 36:*24* 37:*9* 39:*7*, *20*, *22* 42:*2*, *5*
**times** 7:*16*, *23*, *25* 12:*11*
**timesheets** 36:*3*
**timing** 30:*12* 33:*22*
**title** 11:*25* 13:*17*
**today** 5:*4* 35:*3* 42:*1*
**told** 14:*25* 15:*1*, *2*, *3* 18:*4*, *5*, *11* 19:*15* 27:*15*, *16*, *20* 28:*6* 30:*15*, *22* 31:*5*, *20* 32:*10*, *19* 34:*7*, *12*, *13* 37:*5*, *10*, *21* 41:*21*, *22*
**total** 21:*22*
**trail** 18:*3* 36:*9*
**trained** 8:*19*
**training** 6:*9*, *11*, *14*, *18* 7:*20*, *22*, *24* 8:*7*, *13*, *16*
**trainings** 6:*17* 8:*3*, *11*
**transcript** 3:*10* 42:*15*, *17*, *20*, *21* 44:*2*
**transcripts** 42:*20*
**transferred** 10:*15* 11:*9*, *11*, *13*, *15* 12:*16*, *21*
**treated** 32:*14*
**treating** 32:*13*
**true** 44:*2*
**truth** 4:*7*, *8*
**truthfully** 4:*21* 5:*4*
**trying** 32:*12*
**Tuesday** 38:*22*
**Tuesday-through-**

**Friday** 39:*4*
**turn** 26:*15*
**Turner** 7:*4*
**turning** 41:*8*
**two** 7:*4*, *6* 11:*4*
**type** 16:*24* 17:*8* 18:*24* 19:*8* 29:*13*, *17*
**typically** 7:*14*

**< U >**
**undersheriff** 37:*6*
**understand** 4:*19*, *23* 14:*12* 19:*18* 37:*4* 40:*6* 41:*17* 42:*3*
**understanding** 34:*6* 35:*21*
**understood** 19:*20*
**underwent** 28:*12*
**Unit** 5:*22*, *23* 22:*15*
**UNITED** 1:*1*
**unpaid** 16:*10*
**use** 16:*7* 19:*18* 23:*25* 24:*12* 25:*14*

**< V >**
**various** 6:*16*
**videoconference** 1:*9*

**< W >**
**Wait** 24:*4* 31:*8*
**waive** 42:*16*, *22*
**waived** 3:*10*
**want** 10:*13* 11:*1*, *3* 31:*12*, *24* 32:*14* 35:*3*, *21*
**wanted** 11:*9*, *10* 12:*18* 32:*13* 37:*10* 41:*2*
**wants** 23:*25* 25:*14*
**way** 25:*2* 32:*14* 40:*6* 41:*22*
**Wednesday** 1:*9*
**week** 20:*12* 35:*23*, *25* 38:*12* 39:*4*, *7*
**weird** 39:*19*
**Well** 8:*17* 13:*3*, *16* 14:*12*, *25* 19:*20* 22:*14* 23:*1* 28:*1* 32:*7* 35:*2*, *24* 39:*8*,

*13*, *20*   40:*13*   41:2
42:*20*
**went**   6:*15*, *16*   31:*15*
38:*1*, *2*, *17*
**we're**   25:2   35:*9*
42:*23*
**Winston**   5:*7*
**witness**   1:*9*   4:*10*
10:*1*   15:*9*   19:*3*
27:*11*, *15*   42:22   43:2
**work**   5:*6*, *11*, *13*
10:*13*   11:*12*   12:*23*
16:*8*   20:*21*   23:*20*
24:*10*, *11*   33:8   34:4
35:*22*, *25*   36:*6*, *18*
39:*4*, *7*
**workdays**   36:*6*
**worked**   10:7   11:4
16:*18*   35:*23*   36:4
39:*8*, *11*, *18*   40:*17*
41:*21*
**working**   29:*12*
**works**   14:*14*   24:*8*
34:*7*, *11*
**Wow**   6:*13*
**writing**   7:*16*, *17*
30:*25*
**written**   30:2
**wrote**   29:*24*   30:*4*, *7*,
*15*, *18*   39:*15*, *17*

**< Y >**
**yeah**   14:*7*   15:2
19:*21*   20:*24*   25:*8*
28:*4*   29:*15*   30:*22*
32:*9*   39:*13*
**year**   6:*15*, *16*   11:*4*
28:*24*   42:*8*
**years**   5:*15*   6:*15*
7:*23*   8:*14*   10:*13*
13:*14*   27:*20*   28:*25*
29:*3*   34:*9*   42:*9*

**< Z >**
**ZOOM**   1:*9*   2:2, *6*
3:*2*   4:*2*, *24*   43:2

## WORD LIST

**< 0 >**
**000421** *(1)*

**< 1 >**
**1** *(1)*
**1/21/2024** *(1)*
**1:04** *(1)*
**1:06** *(2)*
**1:16** *(1)*
**10** *(5)*
**10-hour** *(1)*
**11** *(2)*
**11:24** *(1)*
**12** *(5)*
**12:26** *(1)*
**12:42** *(2)*
**12:47** *(1)*
**1294** *(1)*
**1294-1295** *(1)*
**1295** *(1)*
**15** *(7)*
**15th** *(2)*
**16** *(1)*
**16th** *(3)*
**17** *(2)*
**17th** *(2)*
**18** *(2)*
**18th** *(1)*
**1999** *(1)*

**< 2 >**
**2:22-cv-614-SPC-NPM** *(1)*
**2005** *(1)*
**2020** *(1)*
**2021** *(13)*
**2023** *(5)*
**20th** *(1)*
**225** *(1)*
**24** *(1)*
**24th** *(1)*
**27th** *(1)*
**28th** *(2)*

**< 3 >**
**30(b)(6** *(1)*
**324** *(1)*

**33131** *(1)*
**33606-4128** *(1)*
**3431** *(2)*
**35** *(1)*
**3rd** *(1)*

**< 4 >**
**4** *(1)*
**42** *(1)*
**43** *(1)*
**44** *(1)*

**< 5 >**
**520** *(1)*

**< 7 >**
**7** *(9)*

**< 8 >**
**8/12/21** *(1)*

**< 9 >**
**9** *(2)*

**< A >**
**a.m** *(1)*
**able** *(1)*
**abuse** *(5)*
**accrual** *(1)*
**accrued** *(1)*
**action** *(5)*
**activate** *(1)*
**additional** *(1)*
**administer** *(1)*
**administered** *(1)*
**administrative** *(3)*
**Affairs** *(2)*
**affirm** *(1)*
**ago** *(4)*
**agreed** *(2)*
**ahead** *(2)*
**Allen** *(1)*
**allow** *(1)*
**amount** *(2)*
**Amy** *(9)*
**Ann** *(1)*
**Annmarie** *(44)*
**answer** *(2)*
**answers** *(1)*

**anyway** *(1)*
**APPEARANCES** *(1)*
**appeared** *(2)*
**appears** *(2)*
**apply** *(1)*
**appropriate** *(1)*
**approval** *(1)*
**approved** *(9)*
**approving** *(1)*
**asked** *(4)*
**asking** *(1)*
**assistant** *(1)*
**Association** *(1)*
**attorney** *(1)*
**attorneys** *(1)*
**August** *(18)*
**authorize** *(1)*
**authorized** *(1)*
**available** *(3)*
**Avenue** *(1)*
**aware** *(7)*

**< B >**
**bachelor's** *(1)*
**back** *(12)*
**bank** *(1)*
**based** *(2)*
**basically** *(4)*
**Bates** *(5)*
**began** *(3)*
**beginning** *(5)*
**begins** *(1)*
**BEHALF** *(3)*
**believe** *(15)*
**believed** *(1)*
**benefit** *(1)*
**Benefits** *(2)*
**beyond** *(1)*
**blindsided** *(1)*
**Blue** *(1)*
**break** *(1)*
**breast** *(3)*
**Brickell** *(1)*
**brief** *(1)*
**briefly** *(1)*
**bringing** *(1)*
**broad** *(1)*
**bureau** *(1)*
**busy** *(3)*

**< C >**
**calendar** *(1)*
**call** *(1)*
**called** *(1)*
**calling** *(1)*
**capacity** *(1)*
**care** *(3)*
**career** *(2)*
**CARMINE** *(1)*
**Carolina** *(1)*
**Carrie** *(1)*
**CASE** *(3)*
**cause** *(1)*
**causing** *(1)*
**CERTIFICATE** *(4)*
**certification** *(6)*
**certifications** *(1)*
**certify** *(3)*
**chain** *(2)*
**chance** *(1)*
**check** *(1)*
**chief** *(2)*
**Christian** *(8)*
**Cindy** *(1)*
**clarity** *(1)*
**CLARK** *(56)*
**Clark's** *(4)*
**classified** *(1)*
**clear** *(2)*
**clearly** *(1)*
**closes** *(1)*
**coaching** *(1)*
**coffee** *(1)*
**come** *(1)*
**command** *(2)*
**comment** *(1)*
**Commission** *(1)*
**common** *(1)*
**communicate** *(1)*
**communication** *(4)*
**communications** *(1)*
**complain** *(4)*
**complained** *(3)*
**complaining** *(1)*
**complaint** *(8)*
**complaints** *(7)*
**complete** *(2)*
**completed** *(5)*

completing *(1)*
compose *(1)*
concern *(3)*
concerned *(4)*
concerning *(1)*
concerns *(1)*
conclude *(1)*
condition *(8)*
conditions *(2)*
conduct *(3)*
conducted *(2)*
conducting *(2)*
conferences *(1)*
confirmed *(1)*
confirms *(1)*
connected *(1)*
consequence *(1)*
considering *(1)*
consistent *(1)*
contact *(1)*
conversation *(8)*
correct *(33)*
corrections *(2)*
correctly *(2)*
counsel *(4)*
Country *(1)*
County *(19)*
couple *(3)*
course *(1)*
COURT *(13)*
covered *(2)*
Covid *(1)*
co-workers *(2)*
create *(1)*
CROSS *(1)*
CROSS-
EXAMINATION *(1)*
currently *(1)*

**< D >**
DATE *(4)*
dated *(9)*
dates *(1)*
DAVID *(2)*
DAWN *(8)*
day *(13)*
days *(19)*
December *(2)*
decide *(1)*

decided *(1)*
decisions *(2)*
Defendant *(2)*
defendant's *(1)*
Defense *(1)*
definitely *(1)*
degree *(1)*
department *(3)*
depending *(2)*
DEPOSITION *(7)*
Derek *(1)*
describe *(1)*
described *(3)*
designate *(2)*
designated *(2)*
designation *(1)*
different *(2)*
DIRECT *(3)*
directed *(1)*
directly *(1)*
Director *(19)*
disciplinary *(1)*
disciplined *(1)*
disclose *(2)*
disclosed *(1)*
discriminated *(1)*
discrimination *(9)*
discuss *(9)*
discussed *(5)*
discussing *(1)*
discussion *(1)*
displayed *(1)*
DISTRICT *(2)*
division *(1)*
doctor *(6)*
doctor's *(1)*
document *(9)*
documentation *(8)*
documenting *(1)*
documents *(1)*
doing *(4)*
Dr *(1)*
drafted *(3)*
duly *(2)*
duration *(3)*

**< E >**
earlier *(4)*
early *(1)*

effect *(1)*
effective *(1)*
effectuating *(1)*
either *(2)*
eligible *(2)*
eliminated *(6)*
eliminating *(3)*
elimination *(3)*
email *(12)*
employee *(6)*
employees *(19)*
employment *(3)*
engage *(1)*
engaged *(1)*
engaging *(1)*
entitlement *(4)*
ESQUIRE *(2)*
Essentially *(1)*
establish *(1)*
Evans *(5)*
event *(5)*
eventually *(1)*
everybody *(1)*
exactly *(3)*
Examination *(3)*
Excerpt *(3)*
exchange *(1)*
exchanged *(1)*
execute *(1)*
executing *(1)*
Executive *(1)*
EXHIBIT *(4)*
expect *(1)*
expected *(2)*
Expires *(1)*
explain *(1)*

**< F >**
fact *(6)*
fair *(1)*
familiar *(2)*
far *(1)*
feel *(1)*
feeling *(1)*
felt *(2)*
fill *(4)*
filled *(2)*
filling *(1)*
fills *(1)*

financially *(1)*
find *(1)*
fire *(1)*
first *(8)*
five *(2)*
five-day *(1)*
five-minute *(1)*
FLORIDA *(10)*
FMLA *(43)*
folks *(1)*
follow *(1)*
follows *(1)*
force *(11)*
foregoing *(1)*
form *(6)*
formal *(5)*
formalized *(1)*
formally *(1)*
forms *(5)*
Forsyth *(1)*
forth *(1)*
forward *(1)*
found *(3)*
four *(1)*
four-day *(2)*
frame *(1)*
frequent *(1)*
frequently *(1)*
friends *(1)*
full *(1)*
further *(1)*

**< G >**
gather *(1)*
general *(3)*
getting *(4)*
GG939756 *(1)*
girls *(1)*
give *(6)*
given *(1)*
gives *(1)*
giving *(2)*
Go *(7)*
God *(1)*
going *(30)*
gosh *(1)*
Government *(1)*
Group *(1)*
guess *(1)*

Deposition of Dawn Heikkila                                    Jenna Clark v. Carmine Marceno

**< H >**
hand  *(2)*
handle  *(2)*
handled  *(1)*
handles  *(1)*
handling  *(1)*
happened  *(2)*
happening  *(10)*
happens  *(1)*
harassed  *(1)*
harassment  *(2)*
health  *(10)*
hear  *(1)*
heard  *(2)*
heart  *(7)*
Heikkila  *(1)*
HEIKKILA  *(10)*
held  *(1)*
help  *(1)*
hereto  *(1)*
HIPAA  *(1)*
hire  *(1)*
hired  *(1)*
hiring  *(1)*
hold  *(4)*
honestly  *(1)*
hours  *(1)*
HR  *(1)*
human  *(24)*
Hyde  *(1)*

**< I >**
IA  *(1)*
idea  *(2)*
identified  *(2)*
identifying  *(1)*
immediately  *(1)*
impact  *(2)*
impacted  *(1)*
implants  *(2)*
included  *(4)*
includes  *(1)*
INDEX  *(1)*
indicate  *(1)*
indicated  *(3)*
indicates  *(1)*
indicating  *(2)*
individual  *(1)*

information  *(9)*
initiate  *(1)*
instances  *(1)*
instructed  *(2)*
interact  *(3)*
interested  *(1)*
Internal  *(2)*
internally  *(1)*
investigated  *(3)*
investigation  *(6)*
investigations  *(3)*
involved  *(6)*
issue  *(1)*
issues  *(3)*

**< J >**
JENNA  *(58)*
Jenna's  *(1)*
Jinx  *(1)*
job  *(4)*
job's  *(1)*
judge  *(1)*
Julie  *(5)*
July  *(1)*
June  *(1)*
jury  *(1)*

**< K >**
Key  *(1)*
kind  *(3)*
kinds  *(1)*
knew  *(7)*
knonw  *(1)*
know  *(89)*
knowing  *(2)*
knowledge  *(1)*
known  *(1)*
KYLE  *(3)*

**< L >**
label  *(1)*
labeled  *(1)*
Law  *(2)*
LCSO  *(1)*
learn  *(1)*
learned  *(1)*
leave  *(50)*
Lee  *(17)*
left  *(1)*

Lehman  *(4)*
length  *(1)*
letter  *(26)*
letting  *(3)*
little  *(1)*
long  *(6)*
longer  *(3)*
look  *(2)*
looking  *(2)*
looks  *(1)*
lot  *(6)*
lots  *(1)*

**< M >**
MACDONALD  *(9)*
mail  *(5)*
making  *(1)*
Management  *(8)*
Management/benefits
 *(1)*
manager  *(2)*
manual  *(1)*
MARCENO  *(2)*
Marie  *(1)*
Marie's  *(1)*
mark  *(2)*
marked  *(1)*
matter  *(1)*
Matthew  *(1)*
mean  *(18)*
meaning  *(1)*
means  *(1)*
meant  *(1)*
medical  *(4)*
meet  *(1)*
meetings  *(2)*
member  *(2)*
mention  *(1)*
mentioned  *(2)*
message  *(17)*
messages  *(1)*
Miami  *(1)*
MIDDLE  *(1)*
minute  *(1)*
missed  *(1)*
Mojica  *(8)*
M-O-J-I-C-A  *(1)*
moment  *(1)*
Monday  *(5)*

months  *(1)*

**< N >**
name  *(2)*
names  *(1)*
need  *(6)*
needed  *(5)*
needing  *(3)*
needs  *(2)*
new  *(2)*
night  *(2)*
normally  *(2)*
North  *(1)*
Norton  *(1)*
Notary  *(3)*
note  *(1)*
notes  *(5)*
notice  *(6)*
notices  *(2)*
notification  *(5)*
notifications  *(1)*
notified  *(5)*
notify  *(4)*
notifying  *(4)*
number  *(1)*
numerous  *(1)*

**< O >**
O-301  *(1)*
OATH  *(3)*
Objection  *(1)*
obligation  *(1)*
obviously  *(2)*
occur  *(1)*
occurred  *(1)*
October  *(2)*
Office  *(18)*
officer  *(2)*
official  *(2)*
Oh  *(3)*
okay  *(16)*
Once  *(1)*
open  *(4)*
opportunity  *(1)*
ORANGE  *(2)*
order  *(1)*
ordered  *(1)*
outcome  *(1)*

Deposition of Dawn Heikkila                                           Jenna Clark v. Carmine Marceno

**< P >**
**P.A** *(1)*
**p.m** *(8)*
**packet** *(2)*
**page** *(1)*
**paid** *(1)*
**paperwork** *(10)*
**paraphrase** *(1)*
**Park** *(1)*
**part** *(6)*
**participated** *(1)*
**particular** *(1)*
**parties** *(5)*
**pattern** *(5)*
**pay** *(8)*
**payroll** *(1)*
**people** *(11)*
**performance** *(1)*
**period** *(4)*
**person** *(5)*
**pertains** *(1)*
**peruses** *(1)*
**ph** *(1)*
**phone** *(2)*
**physician** *(3)*
**piece** *(2)*
**pieces** *(1)*
**PLACE** *(4)*
**placed** *(1)*
**Plaintiff** *(4)*
**Plaintiff's** *(3)*
**plan** *(2)*
**planning** *(1)*
**Please** *(3)*
**PLLC** *(1)*
**point** *(3)*
**poisoned** *(1)*
**policies** *(3)*
**policy** *(6)*
**position** *(14)*
**positions** *(5)*
**positive** *(1)*
**possible** *(4)*
**possibly** *(1)*
**practice** *(1)*
**prefer** *(1)*
**prepare** *(1)*
**pretty** *(1)*
**prevent** *(1)*

**previously** *(1)*
**prior** *(3)*
**probably** *(10)*
**process** *(2)*
**Professional** *(4)*
**program** *(1)*
**promoted** *(2)*
**promptly** *(1)*
**provide** *(1)*
**provided** *(1)*
**Public** *(3)*
**purchased** *(1)*
**purchasing** *(3)*
**purpose** *(1)*
**purposes** *(2)*
**put** *(4)*

**< Q >**
**qualifies** *(1)*
**qualifying** *(5)*
**question** *(3)*
**questions** *(5)*
**quick** *(1)*
**quite** *(1)*

**< R >**
**raise** *(2)*
**read** *(1)*
**reading** *(3)*
**real** *(1)*
**really** *(6)*
**reason** *(1)*
**reasoning** *(1)*
**recall** *(15)*
**receive** *(2)*
**received** *(5)*
**receiving** *(2)*
**recess** *(1)*
**recognize** *(2)*
**recollection** *(4)*
**record** *(7)*
**recovering** *(2)*
**redirect** *(2)*
**reducing/eliminating** *(1)*
**Reduction** *(9)*
**reductions** *(1)*
**refer** *(1)*
**reference** *(1)*

**referred** *(2)*
**referring** *(6)*
**reflected** *(1)*
**reflects** *(3)*
**regard** *(1)*
**regarding** *(3)*
**regardless** *(4)*
**regards** *(1)*
**regular** *(1)*
**related** *(4)*
**relates** *(2)*
**relative** *(2)*
**remainder** *(1)*
**remained** *(1)*
**remember** *(6)*
**removed** *(1)*
**Reno** *(23)*
**Reno's** *(1)*
**repeat** *(2)*
**report** *(6)*
**reported** *(1)*
**Reporter** *(13)*
**reports** *(1)*
**request** *(7)*
**requested** *(1)*
**requests** *(2)*
**require** *(3)*
**required** *(7)*
**requirement** *(1)*
**requirements** *(1)*
**requiring** *(2)*
**resource** *(1)*
**resources** *(21)*
**Resources/Risk** *(1)*
**respect** *(2)*
**respective** *(1)*
**response** *(2)*
**responsible** *(1)*
**retired** *(1)*
**retirement** *(2)*
**return** *(3)*
**returned** *(1)*
**returning** *(1)*
**returns** *(1)*
**review** *(5)*
**RIF** *(1)*
**right** *(14)*
**Risk** *(8)*
**role** *(9)*

**roughly** *(1)*
**rules** *(1)*

**< S >**
**Salem** *(1)*
**Sands** *(2)*
**saying** *(2)*
**says** *(1)*
**schedule** *(3)*
**scheduled** *(2)*
**Screen** *(1)*
**scroll** *(2)*
**seal** *(1)*
**see** *(7)*
**seen** *(1)*
**send** *(10)*
**sense** *(1)*
**sent** *(6)*
**sentence** *(1)*
**September** *(1)*
**sergeant** *(2)*
**serious** *(1)*
**services** *(1)*
**session** *(1)*
**Shannon** *(6)*
**share** *(3)*
**she'd** *(1)*
**sheet** *(5)*
**sheets** *(1)*
**she'll** *(1)*
**Sheriff** *(2)*
**Sheriff's** *(18)*
**shift** *(4)*
**short** *(2)*
**show** *(2)*
**SHRM** *(1)*
**sick** *(3)*
**signing** *(1)*
**situation** *(4)*
**slammed** *(1)*
**Smith** *(1)*
**Society** *(1)*
**solemnly** *(1)*
**somebody** *(2)*
**sorry** *(3)*
**South** *(1)*
**speaking** *(1)*
**specific** *(3)*
**specifically** *(3)*

Deposition of Dawn Heikkila                                                                Jenna Clark v. Carmine Marceno

spoke  *(1)*
standpoint  *(1)*
start  *(1)*
started  *(4)*
state  *(5)*
STATES  *(1)*
stating  *(1)*
status  *(2)*
STEFANY  *(12)*
stenographic  *(1)*
stenographically  *(1)*
stipulated  *(1)*
stopped  *(2)*
strike  *(2)*
suffered  *(1)*
sufficient  *(1)*
suggested  *(1)*
Suite  *(2)*
Sunday  *(4)*
supervisor  *(7)*
support  *(1)*
sure  *(11)*
surgery  *(22)*
swear  *(1)*
sworn  *(2)*

< T >
take  *(6)*
TAKEN  *(6)*
talk  *(2)*
talked  *(8)*
talking  *(1)*
talks  *(3)*
Tampa  *(1)*
tasked  *(1)*
tell  *(6)*
telling  *(4)*
tells  *(3)*
terminated  *(5)*
terminating  *(4)*
termination  *(2)*
terms  *(1)*
testified  *(1)*
testify  *(1)*
testifying  *(2)*
TESTIMONY  *(9)*
texted  *(1)*
thank  *(3)*
thing  *(1)*

things  *(4)*
think  *(18)*
thinking  *(1)*
thought  *(2)*
three  *(1)*
through-Thursday  *(1)*
thrown  *(1)*
Thursday  *(1)*
TIME  *(46)*
times  *(4)*
timesheets  *(1)*
timing  *(2)*
title  *(2)*
today  *(3)*
told  *(26)*
total  *(1)*
trail  *(2)*
trained  *(1)*
training  *(10)*
trainings  *(3)*
transcript  *(7)*
transcripts  *(1)*
transferred  *(7)*
treated  *(1)*
treating  *(1)*
true  *(3)*
truth  *(3)*
truthfully  *(2)*
trying  *(1)*
Tuesday  *(1)*
Tuesday-through-
Friday  *(1)*
turn  *(1)*
Turner  *(1)*
turning  *(1)*
two  *(3)*
type  *(6)*
typically  *(1)*

< U >
undersheriff  *(1)*
understand  *(8)*
understanding  *(2)*
understood  *(1)*
underwent  *(1)*
Unit  *(3)*
UNITED  *(1)*
unpaid  *(1)*
use  *(5)*

< V >
various  *(1)*
videoconference  *(1)*

< W >
Wait  *(2)*
waive  *(2)*
waived  *(1)*
want  *(8)*
wanted  *(6)*
wants  *(2)*
way  *(4)*
Wednesday  *(1)*
week  *(8)*
weird  *(1)*
Well  *(18)*
went  *(6)*
we're  *(3)*
Winston  *(1)*
witness  *(9)*
work  *(19)*
workdays  *(1)*
worked  *(10)*
working  *(1)*
works  *(4)*
Wow  *(1)*
writing  *(3)*
written  *(1)*
wrote  *(7)*

< Y >
yeah  *(10)*
year  *(5)*
years  *(11)*

< Z >
ZOOM  *(7)*

Plaintiff's Exhibit

**9**

10/11/2023 J.E.

**From:** Heikkila, Dawn <​██████████████​>
**Sent:** Thursday, June 18, 2020 12:47 PM EDT
**To:** Clark, Jenna <JClark@sherifffleefl.org>; Lehman, Shannon <​██████████████​>
**Subject:** RE: from policy Chapter 22

Full-time members are required to work a full-time schedule or account for hours missed by using accrued leave time. If a member must be absent from work for whatever reason, they must use the appropriate amount of accrued leave time that would bring their combined work and leave time to the scheduled 80 or 84 hours required for the pay period. The employee may not choose to take time missed from work as "Leave without pay" unless it is approved FMLA. If the member has exhausted all accrued leave time, the missed time then becomes leave without pay. A pattern of abuse may be cause for disciplinary action.



**Dawn Heikkila, Director**

Lee County Sheriff's Office
Desk: █████████
█████████
www.sherifffleefl.org

***IMPORTANT MESSAGE***
This message is intended for the use of the person or entity to whom it is addressed and may contain information that is privileged and confidential, the disclosure of which is governed by applicable law. If the reader of this email is not the intended recipient or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this information is STRICTLY PROHIBITED. If you have received this email by error, please notify us immediately and destroy the related message. This footnote also confirms that this email message has been swept for the presence of computer viruses, worms, hostile scripts and other email-borne network threats. PLEASE NOTE: Florida has a very broad public records law. Most written communications to or from government officials are public records available to the public and media upon request. Your email communications may be subject to public disclosure per Sec. 119 F.S.

**LCSO/Clark
DEF004341**

Plaintiff's Exhibit

**10**

10/11/2023 J.E.

**From:** Heikkila, Dawn < ███████████
**Sent:** Thursday, August 12, 2021 1:16 PM EDT
**To:** Clark, Jenna <JClark@sheriffleefl.org>
**Subject:** RE: message

Ok…well we are so busy right now that I am going to hold off on the FMLA…if you end up needing more time that that just let me know and I will have to do the FMLA paperwork.

Thanks and I wish you a speedy recovery!!



**Dawn Heikkila, Director**

Lee County Sheriff's Office
Desk: ███████
DHeikkila@sheriffleefl.org
www.sheriffleefl.org

**From:** Clark, Jenna <JClark@sheriffleefl.org>
**Sent:** Thursday, August 12, 2021 1:06 PM
**To:** Heikkila, Dawn ███████████
**Subject:** RE: message

18-20
24-27
Total of 7 days.

Jenna Clark | Purchasing Director
Desk: 239-477-1313
**Purchasing**
**Lee County Sheriff's Office**
JClark@sheriffleefl.org | www.sheriffleefl.org

**From:** Heikkila, Dawn ███████████
**Sent:** Thursday, August 12, 2021 1:04 PM
**To:** Clark, Jenna <JClark@sheriffleefl.org>
**Subject:** RE: message

Ok…if you are out more than a week I will forward it to Amy for FMLA…do you know how long you plan to be out?



**Dawn Heikkila, Director**

Lee County Sheriff's Office
Desk: 239-477-1132
DHeikkila@sheriffleefl.org
www.sheriffleefl.org

**From:** Clark, Jenna <JClark@sheriffleefl.org>
**Sent:** Thursday, August 12, 2021 12:26 PM
**To:** Heikkila, Dawn ███████████
**Subject:** message

Hi Dawn –

I called you to let you know I have surgery scheduled on the 18th - Annmarie said to let you know, she already approved my time.

Thanks!
Jenna

Jenna Clark | Purchasing Director
Desk: 239-477-1313
**Purchasing**
**Lee County Sheriff's Office**
JClark@sheriffleefl.org | www.sheriffleefl.org

***IMPORTANT MESSAGE***

**LCSO/Clark**
**DEF001294**

This message is intended for the use of the person or entity to whom it is addressed and may contain information that is privileged and confidential, the disclosure of which is governed by applicable law. If the reader of this email is not the intended recipient or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this information is STRICTLY PROHIBITED. If you have received this email by error, please notify us immediately and destroy the related message. This footnote also confirms that this email message has been swept for the presence of computer viruses, worms, hostile scripts and other email-borne network threats. PLEASE NOTE: Florida has a very broad public records law. Most written communications to or from government officials are public records available to the public and media upon request. Your email communications may be subject to public disclosure per Sec. 119 F.S.

LCSO/Clark
DEF001295