UNITED STATES DISTRICT COURT
                         MIDDLE DISTRICT OF FLORIDA


JENNA CLARK,

        Plaintiff,                        22-002723-CI

vs.

CARMINE MARCENO, in his
official capacity as Sheriff of Lee
County, Florida,

        Defendant.

_____

DEPOSITION OF:    TRAVIS LAMAR HICKS

DATE TAKEN:       October 4, 2023

TIME:             11 a.m. - 11:42 a.m.

PLACE:            Everyone appeared remotely
                  via Zoom

REPORTED BY:      MELISSA FERNANDEZ
                  Court Stenographer


_____

```
 1    APPEARANCES:

 2         KYLE T. MACDONALD, ESQUIRE
           Derek Smith Law Group, PLLC
 3         Suite 1310
           701 Brickell Avenue
 4         Miami, Florida  33131
           (305) 946-1884
 5         kyle@dereksmithlaw.com
           (Appeared via Zoom)
 6
           APPEARED ON BEHALF OF THE PLAINTIFF
 7
           DAVID J. STEFANY, ESQUIRE
 8         Allen, Norton & Blue, PA
           Suite 225
 9         324 South Hyde Park Avenue
           Tampa, Florida  33606
10         (813) 251-1210
           dstefany@anblaw.com
11         (Appeared via Zoom)

12         APPEARED ON BEHALF OF THE DEFENDANT

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1   TESTIMONY OF TRAVIS LAMAR HICKS

2        Direct Examination by Mr. MacDonald              4

3        Cross-Examination by Mr. Stefany                26

4   CERTIFICATE OF OATH                                  29

5   CERTIFICATE OF REPORTER                              30

6                          - - - -

7                  S T I P U L A T I O N S

8   It is hereby agreed and so stipulated by and between

9   the parties hereto, through their respective counsel,

10  that the reading and signing of the transcript is

11  expressly waived by the Deponent.

12                       - - - - -

13                     E X H I B I T S

14  Plaintiff's Exhibit 1
         Plaintiff's Notice of Rule 30(b)(6) Deposition   7
15  Plaintiff's Exhibit 2
         Defendant's Bates label 762-764                  8

16

17

18

19

20

21

22

23

24

25

```
 1        The deposition of TRAVIS LAMAR HICKS, was taken pursuant

 2   to notice by counsel for the Plaintiff on the 4th day of

 3   October, 2023, commencing at 11 a.m.  Said deposition was

 4   reported by Melissa Fernandez, Court Reporter, Notary Public,

 5   State of Florida at Large.

 6                          *   *   *   *   *

 7                       TRAVIS LAMAR HICKS,

 8     having been duly sworn, was examined and testified upon his

 9                        oath as follows:

10                  THE WITNESS:  I do.

11                       DIRECT EXAMINATION

12   BY MR. MACDONALD:

13        Q    Good morning, Captain Hicks.  My name is Kyle

14   McDonald and I represent and Jenna Clark in her lawsuit against

15   Carmine Marceno in its official capacity as Sheriff of Lee

16   County, Florida.  Thank you for being here today.

17        A    Good morning, sir.  Thank you.

18        Q    Can you please start by stating your full name for

19   the record, please?

20        A    Travis Lamar Hicks.

21        Q    Have you ever been deposed before?

22        A    Yes, sir.

23        Q    And when were you deposed previously?

24        A    It's been a while.  I've been in an administrative

25   role for a while.  I don't even remember.  It's been a while.
```

1    Q     Would you say several years ago, longer than that?

2    A     That's about right.  Several years ago I would say.

3    Q     And have you only been deposed before once or

4    multiple times?

5    A     Multiple.

6    Q     And were those depositions related to your position

7    with the Sheriff's Office?

8    A     Yes, sir.

9    Q     So even though you have been deposed before I'm just

10   going to go over a few things just so we're on the same page.

11   A     Yes, sir.

12   Q     You understand that you've been placed under oath and

13   you have an obligation to testify truthfully today?

14   A     Yes, sir.

15   Q     And do you understand that even though we are

16   conducting this deposition via Zoom your testimony has the same

17   force and effect as if you were testifying before a judge and

18   jury?

19   A     Yes, sir.

20   Q     Now, the court reporter cannot transcribe any

21   inaudible responses like gestures or shrugs so just please make

22   sure you respond clearly just like you have been so far.  Okay?

23   A     Yes, sir.

24   Q     And the court reporter also cannot accurately reflect

25   your responses if we're speaking at the same time, so I'll wait

 1   for you to finish your response and I just ask that you wait

 2   until I finish my questions.  Okay?

 3        A    Yes, sir.

 4        Q    Now, we want to make sure that we get your best

 5   testimony so if there's a question that you don't understand or

 6   you'd like me to rephrase it, just let me know and I can try

 7   and do that for you.  Okay?

 8        A    Yes, sir.

 9        Q    Now, I don't think we'll be here for too long

10   hopefully, but if you need to take a break or anything to go to

11   the bathroom, get a glass of water, just let me know and we can

12   go ahead and do that.  Okay?

13        A    There's some construction going on in my neighboring

14   office here so if I need to do anything to readjust for anybody

15   please let me know.

16        Q    Okay.  Noted.  Thank you.

17        A    Yes, sir.

18        Q    Do you understand that you are here today to testify

19   on behalf of the Lee County Sheriff's Office?

20        A    Yes, sir.

21        Q    And do you understand that your answers today are

22   based not only on your personal knowledge but also all

23   knowledge known or reasonably available to the Lee County

24   Sheriff's Office?

25        A    Yes, sir.

1       Q      And do you understand that your answers will be

2    binding on the Lee County Sheriff's Office?

3       A      Yes, sir.

4              MR. MACDONALD:   I'll go ahead and share my screen and

5         we'll mark this as Plaintiff's Exhibit 1.

6              (Whereupon, Plaintiff's Exhibit 1 was marked for

7         identification.)

8    BY MR. MACDONALD:

9       Q      Have you seen this before?

10      A      Yes, sir.

11      Q      I'm going to draw your attention specifically to

12   Paragraph No. 12.  Do you see that?

13      A      I do.

14      Q      Are you prepared to give testimony regarding the

15   topic listed in paragraph 12 there?

16      A      Yes, sir.

17      Q      Where are you conducting this deposition today from?

18      A      My office at the Lee County Sheriff's Office.

19      Q      Is anyone else in the room with you?

20      A      No one, sir.

21      Q      And do you have any documents in front of you?

22      A      I do have our policy up on my screen.

23      Q      And which policy is that?

24      A      Chapter 26.

25      Q      And may I ask which version of that policy you have

```
 1    in front of you, when it was last revised?

 2         A    February '23 -- I'm sorry, looks like August '23.

 3         Q    Anything else besides that policy in front of you?

 4         A    No, sir.

 5         Q    What did you do to prepare for today's deposition?

 6         A    Just reviewed that policy.

 7         Q    Did you speak with anyone besides the attorney for

 8    the Lee County Sheriff's Office about your deposition today?

 9         A    No, sir.

10         Q    Did you review any documents prior to your deposition

11    today?

12         A    No, sir.  Just the one actually that you had on the

13    screen, I apologize.

14         Q    Does the Lee County Sheriff's Office have policies

15    against discrimination and harassment?

16         A    Yes, sir.

17         Q    And what are those policies?

18         A    We basically don't allow it, whether it's sexual

19    harassment, racial, sexual orientation.  There's a various

20    breakdown of different things.  Sex, national origin,

21    disability.  It's not allowed.

22         Q    I'm going to show you another exhibit.

23         MR. MACDONALD:  We will mark this as Plaintiff's

24    Exhibit 2.  That is Defendant's Bates label 762 to 764.

25         (Whereupon, Plaintiff's Exhibit 2 was marked for
```

```
 1        identification.)

 2   BY MR. MACDONALD:

 3        Q    I'll give you a minute to review this.  Just let me

 4   know when you'd like me to scroll down to make sure you get a

 5   chance to review it in full.

 6        A    Okay.  Okay.  Okay.  Yes, sir.  Continue with the

 7   drug testing?

 8        Q    I just want to give you a chance to look at that.  I

 9   won't be asking you any questions about that specific policy; I

10   just want to make sure to give you a chance to review it.

11        A    Yes, sir.

12        Q    Do you recognize this document that I'm showing you?

13        A    Yes, sir.

14        Q    And what is it?

15        A    It starts with the job knowledge and performance.  It

16   comes from our policy in Chapter 26.

17        Q    And do you see this date at the top where it says

18   revised 6/21?

19        A    Yes, sir.

20        Q    And would you agree that this document accurately

21   represents the Lee County Sheriff's Office policy regarding

22   discrimination and harassment that were revised in June of

23   2021?

24        A    Yes, sir.

25        Q    Now, I'm going back to this section on harassment and
```

1   discrimination.  After reviewing it is it accurate to say that

2   the Lee County Sheriff's Office prohibits discrimination on the

3   basis of age?

4        A    Yes, sir.

5        Q    And based on this policy if an employee is found to

6   have engaged in discriminatory conduct they may be subject to

7   discipline; is that right?

8        A    Yes, sir.

9        Q    And is it your understanding that this policy

10  prohibits termination based on an employee's age as well?

11       A    Yes, sir.

12       Q    Now, looking at this third page here labeled 764, do

13  you see where it says that it is the intent of the Lee County

14  Sheriff's Office that any offensive or improper conduct be

15  prevented, or if not prevented, then corrected as quickly as

16  possible?

17       A    Yes, sir.

18       Q    What actions does the Lee County Sheriff's Office

19  take to ensure that this kind of conduct is prevented?

20       A    Well, actually, put it in policy for starters, I

21  guess would be the initial action.  As well as it outlines a

22  manner of how to report if there is something going on and

23  every member is expected to report that, not just the ones that

24  are involved.  And there's a process that outlines how to do

25  that as well.

1    Q    Does the Lee County Sheriff's Office train employees

2    on anti-discrimination policies like this?

3    A    Yes, sir.  Part of the pre-deployment training

4    includes this and there's also continuous updates that are sent

5    out through our training division through what is called Power

6    DMS system.  It's like a training system.

7    Q    What was that called, Power DMS you said?

8    A    I believe it's -- I'm sorry, maybe I'm mixing up

9    programs here, but it's -- mandatory readings, I apologize.

10   Power DMS is another program.  It's through our mandatory

11   readings.

12   Q    And what are the mandatory readings?

13   A    They are frequently sent out updating on various

14   policies and procedures.

15   Q    So they're e-mail messages sent to employees

16   instructing them to read updates?

17   A    Correct.  And after you read you have to sign off

18   saying you understand them.

19   Q    And how often are those sent to employees would you

20   say?

21   A    Frequently.  Specifically more so now post-COVID when

22   a lot of the I guess face-to-face trainings were kind of halted

23   for a while.

24   Q    Now, you also said pre-deployment.  What did you mean

25   by that?

1      A     During like the training portion once people are

2  either in their training phase or in, I guess, their

3  probationary time period.

4      Q     Now, pre-deployment, does that apply to civilian

5  employees as well?

6      A     They should have their own version of training, but

7  predominantly pre-deployment is tour certified.

8      Q     And can you tell me what certified means?

9      A     I'm sorry.  Certified being like the law enforcement

10  side, the certified officers.

11      Q     So the law enforcement employees, we'll start with

12  them, they undergo training on anti-discrimination policies

13  before they go out into the field, I guess?

14      A     Right.  Everyone who comes in has to complete through

15  the mandatory readings.  So you generally start with a large

16  amount of readings and that's included.  And both sides, law

17  enforcement as well as the civilian side, the civilian being

18  the noncertified members.

19      Q     So the civilian employees as well also have to do

20  those mandatory readings as well?

21      A     Yes, sir.

22      Q     Now, besides the mandatory readings do new employees

23  have to undergo any other kind of anti-discrimination training?

24      A     Besides the mandatory readings?

25      Q     Yeah.  Are new employees required to watch any kind

1    of instructional video, undergo any training programs related

2    to discrimination or harassment?

3        A    I'm unaware of that.

4        Q    So to the best of your knowledge the only training on

5    anti-discrimination policies given to new employees is the

6    reading of those mandatory policy; is that correct?

7        A    Yes, sir.

8        Q    And the same is true for civilian employees as well

9    to the best of your knowledge?

10       A    Yes, sir.

11       Q    Now, when -- or strike that.  When a new employee

12   starts are they given a copy of these policies?

13       A    They're able to print them out.  They can print them

14   out as they review them, but it's saved kind of under their

15   training file.  They can access them at any point.

16       Q    And where would an employee be able to view these

17   policies?

18       A    It's on what's called the home page of our Intranet.

19   They can go to the training section and look up all of their

20   signed-off mandatory readings as well as they can do keyword

21   searches to search policy and procedure.

22       Q    And what is that Intranet called?  Is there a name

23   for it?  Is it a program?

24       A    It's the Lee County Sheriff's Office Intranet.  It's

25   commonly referred as our home page and has like a various

1   amount of like at-a-glance topics and usually focuses on stuff

2   that people are commonly searching.

3        Q    Now, in the policy that we just looked at it also

4   says that supervisors will be expected as part of their duties

5   to take the requisite action necessary to prevent harassment or

6   discrimination and/or to remedy its effects.  Do you see that?

7        A    I don't see it on the screen, but, yes, I know that

8   that is.

9        Q    Okay.  I'm looking here at the top of the page.  Can

10  you see that?

11       A    Okay.  Yes, sir.

12       Q    Okay.  Do you see that sentence that I just referred

13  to?

14       A    Yes, I do, sir.

15       Q    How does the Lee County Sheriff's Office ensure that

16  supervisors specifically are trained on preventing harassment,

17  discrimination?

18       A    Because all supervisors undergo training during

19  their -- at the point they become a supervisor, what's expected

20  of them.

21       Q    And how does that training differ at all from the

22  training that we just discussed given to a new civilian and law

23  enforcement employee?

24       A    It doesn't.  It would be more of like a refresher

25  from whoever is performing their training, or like a field

1    training.  FTO is what we refer to it as.

2         Q     You said FTO?

3         A     Yeah, field training officer.

4         Q     And what is the field training that you just

5    referenced?

6         A     I'm sorry?

7         Q     What is the field training that you just referenced?

8    Can you tell me about that?

9         A     Yeah.  That would be just whoever is assigned to them

10   while they're going through their process, while they're going

11   through their supervisor training when they're transitioning to

12   that role.

13        Q     How long is the supervisor training?

14        A     It depends.  It could be upwards of like two weeks to

15   a month depending on where they're at.

16        Q     And civilian employees, they also have to undergo

17   that same supervisor training if they are supervisor?

18        A     Yes, sir.  They shadow someone and obviously have

19   someone that they can refer to when needed.

20        Q     And what was the training officer you referred to?

21   I'm sorry, what was that acronym?

22        A     Like a field training officer.

23        Q     So when the field training officer does a refresher

24   is it typically reviewing the written policies?

25        A     Yes, just making sure they're aware of what's

1    expected from their position, yes, sir.

2         Q    And do the supervisors have to sign an

3    acknowledgement as well after they undergo that training?

4         A    I'm not sure if it's listed just specifically by

5    that, but there's portions of the training that that would be

6    included in.  Not having it in front of me I can't reference

7    what it would be titled.

8         Q    And just to clarify, do supervisors undergo any other

9    anti-discrimination training besides reviewing the policies in

10   the manner you described?

11        A    Outside of mandatory readings, I'm unaware of any.

12        Q    How do Lee County Sheriff's Office employees report

13   discrimination?

14        A    They can either make the complaint to their

15   supervisor.  If, in fact, it is the supervisor that they feel

16   is the concern, they can go to that person's supervisor.  They

17   can go directly to the Human Resources unit, or they can come

18   directly to the Internal Affairs, or they can even make an

19   anonymous complaint as well.

20        Q    So you said they could go to their supervisor, or

21   alternatively they could also go to Human Resources, Internal

22   Affairs, or make an anonymous complaint; is that right?

23        A    Yes, sir.  And, again, if the supervisor is the

24   person of concern they can go a step higher.  But at any point

25   they can go directly to Internal Affairs or Human Resources.

1      Q     Who in Human Resources is an employee supposed to

2   report discrimination to?

3      A     I'm sorry?

4      Q     Who in Human Resources is an employee designated to

5   report discrimination to?  Is there a particular person?

6      A     No, they can just address it to Human Resources.

7      Q     So anyone in the Human Resources department?

8      A     Yes.  It would certainly go to a supervisor.  There's

9   a Human Resources Director as well as an assistant director.

10      Q     And you also mentioned Internal Affairs; is that

11   correct?

12      A     Yes, sir.

13      Q     What is the Internal Affairs Department?

14      A     What is it?

15      Q     Yes.

16      A     We basically maintain policy and procedure and we

17   deal with member misconduct for not following policy and

18   procedure.  In a nutshell that's what we do.

19      Q     And is there a particular person in Internal Affairs

20   that an employee can report discrimination to?

21      A     No, sir.  Generally, if there's a concern grievances

22   are sent to Internal Affairs.  That's how it's usually

23   addressed.  Now, there's people who they choose to deal with a

24   certain member within Internal Affairs over another member and

25   they just directly send them to that person, but, no, sir,

 1    there's not a direct person.

 2         Q    And how does an employee make an anonymous report?

 3         A    In the past we've received them through e-mail,

 4    through the public.  They've utilized the public website to

 5    make a complaint.  They've left letters in our mailbox

 6    unsigned.

 7         Q    So there's not a particular mechanism for the

 8    anonymous complaint, it could just be through e-mail or a

 9    letter?

10         A    Or however they choose, yes, sir.

11         Q    Now, once an employee reports discrimination in one

12    of the manners that you just described, what happens?

13         A    It depends, I guess, where they report it.  If they

14    report it through the chain of command and it's worked as a

15    grievance within the bureau that they reported it in, it can go

16    all the way up to that chief of that bureau to make a remedy.

17    Then that remedy is discussed with the employee and if they're

18    okay with it, it ceases there.  And if they have any concerns

19    they have a rebuttal period where they can then have it

20    readdressed again.  If it's something that comes through

21    Internal Affairs we obviously forward it to our bureau chief,

22    and same thing, it's decided whether it goes back to the bureau

23    for remedy or if it's something that needs to be an internal

24    investigation.

25         Q    And what's the difference between the grievance

1   procedure and the Internal Affairs procedure that you

2   described?

3        A    The grievance procedure is a matter that's handled

4   within the bureau.  It has like a 30-day window to be able to

5   be addressed.  The matter has to have happened within 30 days.

6   If it's after 30 days, depending on the nature of that

7   grievance, it could, in fact, become an Internal Affairs report

8   because, obviously, just because something is past the 30-day

9   window may not make it right to be able to just say I'm sorry

10  for your luck.  With that being said, the Internal Affairs

11  investigation obviously is a full-blown investigation without I

12  guess limits on time.  Time as far as when the incident

13  happened, I should say.

14       Q    And does the procedure differ in investigating a

15  complaint of discrimination between the grievance procedure and

16  the Internal Affairs procedure?

17       A    Not really.  I mean, an investigation is an

18  investigation.  I would say the only thing that differs is

19  probably like a full-blown investigation would be like taking

20  sworn statements, whereas a grievance may just be more of a

21  discussion, I guess, trying to figure out a remedy more than

22  discipline, because if it, however, escalates to discipline,

23  then it may very well end up back in Internal Affairs for a

24  full-blown investigation.

25       Q    So if there is a complaint of discrimination that's

 1  found to warrant discipline that has to go to Internal Affairs

 2  to be handled?

 3       A    Yes, sir.  Yes, sir.

 4       Q    And you said the grievance procedure offers a remedy

 5  of some kind instead of a disciplinary?

 6       A    Right.  Obviously, depending on what that grievance

 7  is.  If it's something that the bureau or persons within the

 8  bureau can sit down and come to an agreement on, and again, the

 9  complainant being okay with that, then, yes.  Otherwise, if

10  it's something that's a bit more egregious then coming to a

11  remedy like that, then it requires a full investigation.  And

12  if there is discipline the Sheriff has to play a part in that.

13       Q    Now, when you say the Sheriff has to play a part in

14  that, what do you mean?

15       A    Because the Sheriff determines discipline.

16       Q    The Sheriff is involved in all forms of employee

17  discipline related to discrimination?

18       A    He has the final say so.  When it comes to Internal

19  Affairs, I should say.  For a grievance, I believe that's

20  handled at the chief level.  The chief can make that

21  determination.

22       Q    When you say chief, do you mean the chief of that

23  bureau --

24       A    That particular bureau, yes, sir.  I apologize for

25  talking over you.

1    Q    No, no worries at all.  Can you tell me about the

2    Internal Affairs investigation procedure if discrimination is

3    reported?

4    A    If it's coming to us as a full-blown investigation,

5    once it's determined to be an investigation we would -- we

6    don't make the determination if that person is put on leave,

7    but if it's determined that person is then put on leave of

8    absence and then we initiate investigation depending on -- not

9    depending on, but deciding which witnesses are involved,

10   obviously meeting with the complainant, talking to anyone who

11   is identified as a witness to be able to just find out the

12   facts.  That's strictly all we are, fact finders.

13   Q    And who determines if a complaint warrants full-blown

14   investigation like you described?

15   A    That would be either Chief Legal or the Undersheriff

16   and/or the Sheriff.

17   Q    And who is Chief Legal?  Is that one or multiple

18   persons?

19   A    No, the legal Chief is Abbi Smith.

20   Q    So either the legal Chief, the Undersheriff, or the

21   Sheriff would have to decide that an investigation is

22   warranted?

23   A    Yes, sir.

24   Q    And if one of those three individuals does not find

25   that an investigation is warranted for a complaint of

 1    discrimination it would be handled under the grievance

 2    procedure; is that correct?

 3         A     No, because the person -- I'm sorry, I guess let me

 4    back up.  The grievance procedure has to be done in writing,

 5    has to be within 30 days of an offense.  It has to follow what

 6    we establish in policy as a grievance.  So if it comes in as an

 7    actual grievance, then, yes, it's worked as a grievance.  If

 8    it's sent in as like I guess if someone is notifying their

 9    chain of an incident or an act that they believe is relating to

10    a discrimination or harassment type matter, then at that point,

11    again, it's going up to those reviewing persons to see if it

12    rises to the level of an Internal Affairs investigation.

13         Q     And what if -- sorry, go ahead.

14         A     Okay.  Sorry.  And if at that point it's determined

15    to be a grievance, the person that wrote the original complaint

16    would have to make sure that it basically follows the

17    procedures of a grievance.  So if need be they may have to be

18    contacted to make sure they include all the steps in the

19    grievance which basically outlines what they'd like to see as a

20    remedy, to kind of like play part in that so that they have

21    their say.

22         Q     And if the Legal Chief, Undersheriff, or Sheriff

23    determine that an Internal Affairs is not warranted, is there

24    any alternative?

25         A     Then I imagine it would be under a grievance at that

1   point because there wouldn't be any other -- the person still

2   has a concern.   I mean, that concern is still valid until

3   otherwise determined.

4          Q     Who is responsible for handling the grievance

5   procedure?

6          A     The bureau.   It goes up to the Bureau Chief.   It

7   usually involves whoever they address it to.   We usually tell

8   people you address it through your chain of command up to the

9   bureau Chief.

10         Q     So it would depend on that employee-- the bureau that

11  that employee works for?

12         A     Yes, sir.

13         Q     If an employee chooses to go through that grievance

14  procedure are interviews conducted of employees?

15         A     Yes, sir.   They're done through the chain of command,

16  yes, sir.

17         Q     And interviews are also held if an Internal Affairs

18  investigation is conducted; is that accurate?

19         A     That's correct.

20         Q     What happens at the conclusion of an investigation --

21         A     At the conclusion of a grievance a remedy is decided

22  upon and again is provided to the complainant to ensure that

23  they are okay with that outcome.   If they're okay, then that

24  would be the outcome.   If they're not okay, then, basically,

25  they have two weeks to make a rebuttal and then the bureau

 1    relooks at it again to see if anything is different or if

 2    there's another deciding factor that can change the outcome.

 3    From the Internal Affairs side of things, again, we are

 4    strictly fact finders so we speak to everyone involved, all

 5    identifiable witnesses.  We formulate all the facts into a

 6    document and we provide that to what is called our Review

 7    Committee and that committee is apprised of all the Chiefs who

 8    review whatever that case information is and then make a

 9    determination on the findings.

10         Q     That Review Committee would be responsible for

11    deciding if disciplinary action is warranted in response to a

12    complaint of discrimination?

13         A     Correct.

14         Q     And what kind of disciplinary actions are available

15    to that committee if they find an act of discrimination has

16    occurred?

17         A     It can be anything from, I guess, written reprimand

18    up to and including termination.

19         Q     What kind of remedies are available in the grievance

20    procedure if an act of discrimination is alleged by an

21    employee?

22         A     There's been anything from either relocating, making

23    sure someone is not around someone if they have a major concern

24    with them, or a particular concern, I should say.  There's --

25    again, it could also be referred to Internal Affairs if there's

 1   a need to have this person, say, demoted from a position if

 2   there's some weight to it that could lead to discipline.  I

 3   guess I'm not sure if I'm answering the question correctly or

 4   not.

 5        Q    Let me ask you this:  Can an employee be disciplined

 6   in the grievance procedure?

 7        A    Normally, no.  That's usually like a remedy.  That's

 8   a -- how we move past this, how can we fix this without this

 9   becoming, I guess, a major investigation.  That's -- a lot of

10   times our grievances are the, I've got conflict with this

11   coworker or, you know, different type of personality concerns

12   or conflict, because, again, once it rises to levels of actual

13   policy violations, then, obviously, there's an issue that needs

14   to be addressed by Internal Affairs.

15        Q    So an employee could only be disciplined in response

16   to an act of discrimination if it was handled by an Internal

17   Affairs investigation; is that accurate?

18        A    That's correct.

19        Q    And you said that in terms of -- strike that.  In

20   terms of corrective action at the conclusion of an Internal

21   Affairs investigation, you said that can lead up to

22   termination; is that fair?

23        A    That's correct.

24             MR. MACDONALD:  What we'll do is we'll go ahead and

25        go off the record.  I'm just going to take a quick five

 1            minute break, make sure that's all I have for you.

 2                  THE WITNESS:  Yes.

 3                  MR. MACDONALD:  We'll come back at 11:40.

 4                  (A recess was taken.)

 5                  MR. MACDONALD:  Back on the record.  That is all I

 6       have for you today, Captain Hicks.  Mr. Stefany may have

 7       some questions for you, but I thank you for your time.

 8                  THE WITNESS:  Yes, sir, thank you.

 9                          CROSS-EXAMINATION

10  BY MR. STEFANY:

11       Q    I've got a couple of questions, Captain.  If I could

12  just follow up on a couple of things you said.

13       A    Yes, sir.

14       Q    With respect to the grievance procedure policy of the

15  Lee County Sheriff's Office, is it possible that a member of

16  the agency could be disciplined as a product of that bureau

17  investigation that was initiated by a grievance?

18       A    The grievance would have to be turned over into an

19  Internal Affairs complaint.  So it would just be transferred to

20  Internal Affairs to work as like what we call a full-blown IA

21  rather than looked at within the bureau for a remedy.

22       Q    Okay.

23       A    But it is possible to have to go through the IA,

24  through the Internal Affairs portion.

25       Q    And if you remember does the grievance policy itself

 1  make reference to the fact that complaints of workplace

 2  discrimination should be directed to Internal Affairs rather

 3  than under the grievance procedure?

 4      A    Yes, sir, or at Human Resources, yes, sir.

 5      Q    Okay.  All right.  And just by way of clarification,

 6  you've been asked a lot about the procedures that pertain to an

 7  individual member, and by member I mean either a civilian or

 8  certified of the Sheriff's Office, you were asked a lot about

 9  the internal policies and procedures, but what you've described

10  here today does not pertain to a potential complaint of

11  discrimination that a member may make to a third party,

12  correct?

13      A    That's correct.

14      Q    Right.  So what you've been talking about is

15  essentially the complaint procedure within the agency and how

16  those complaints are analyzed and investigated and resolved,

17  correct?

18      A    That's correct, sir.

19          MR. STEFANY:  That's all I have.  Thank you.

20          THE WITNESS:  Yes, sir.

21          MR. MACDONALD:  Okay.  We will go ahead and suspend

22      the deposition at this time at 11:42.

23          MR. STEFANY:  Captain, you have the right to read the

24      transcript of this deposition if one is ordered or you can

25      waive reading of the transcript.  The decision is up to

Deposition of Travis Lamar HIcks                    Jenna Clark v. Carmine Marceno

1        you.  The court reporter just needs to know your

2        preference.

3               THE WITNESS:  I'll waive.

4               MR. STEFANY:  Very good.  Thank you for your time.

5               (At 11:42 a.m., no further questions were propounded

6        to this witness.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     CERTIFICATE OF OATH

2      STATE OF FLORIDA

3      COUNTY OF HILLSBOROUGH

4           I, the undersigned authority, certify that TRAVIS LAMAR

5      HICKS remotely appeared before me and was duly sworn.

6           WITNESS my hand and official seal this 4th day of

7      October, 2023.

8

9

10     _____

       MELISSA FERNANDEZ
11     Notary Public - State of Florida
       Commission No.:  HH 278990
12     My Commission Expires:  6/21/2026

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              REPORTER'S DEPOSITION CERTIFICATE

 2   STATE OF FLORIDA

 3   COUNTY OF HILLSBOROUGH

 4        I, MELISSA FERNANDEZ, Court Reporter, certify

 5   that I was authorized to and did stenographically report

 6   the foregoing deposition, and that the transcript is

 7   a true record of the stenographic notes.

 8        I further certify that I am not a relative,

 9   employee, attorney, or counsel of any of the parties,

10   nor am I a relative or employee of any of the parties'

11   attorney or counsel connected with the action, nor am

12   I financially interested in the action.

13        Dated this 23rd day of December, 2023.

14

15

16        _____

17        MELISSA FERNANDEZ
          Court Stenographer

18

19

20

21

22

23

24

25
```

## WORD INDEX

**< 1 >**
**1**  3:*14*  7:*5, 6*
**11**  1:*12*  4:*3*
**11:40**  26:*3*
**11:42**  1:*12*  27:*22*
  28:*5*
**12**  7:*12, 15*
**1310**  2:*3*

**< 2 >**
**2**  3:*15*  8:*24, 25*
**2021**  9:*23*
**2023**  1:*11*  4:*3*  29:*7*
  30:*13*
**22-002723-CI**  1:*4*
**225**  2:*8*
**23**  8:*2*
**23rd**  30:*13*
**251-1210**  2:*10*
**26**  3:*3*  7:*24*  9:*16*
**278990**  29:*11*
**29**  3:*4*

**< 3 >**
**30**  3:*5*  19:*5, 6*  22:*5*
**30(b)(6**  3:*14*
**305**  2:*4*
**30-day**  19:*4, 8*
**324**  2:*9*
**33131**  2:*4*
**33606**  2:*9*

**< 4 >**
**4**  1:*11*  3:*2*
**4th**  4:*2*  29:*6*

**< 6 >**
**6/21**  9:*18*
**6/21/2026**  29:*12*

**< 7 >**
**7**  3:*14*
**701**  2:*3*
**762**  8:*24*
**762-764**  3:*15*
**764**  8:*24*  10:*12*

**< 8 >**
**8**  3:*15*
**813**  2:*10*

**< 9 >**
**946-1884**  2:*4*

**< A >**
**a.m**  1:*12*  4:*3*  28:*5*
**Abbi**  21:*19*
**able**  13:*13, 16*  19:*4,*
  *9*  21:*11*
**absence**  21:*8*
**access**  13:*15*
**accurate**  10:*1*  23:*18*
  25:*17*
**accurately**  5:*24*  9:*20*
**acknowledgement**
  16:*3*
**acronym**  15:*21*
**act**  22:*9*  24:*15, 20*
  25:*16*
**action**  10:*21*  14:*5*
  24:*11*  25:*20*  30:*11,*
  *12*
**actions**  10:*18*  24:*14*
**actual**  22:*7*  25:*12*
**address**  17:*6*  23:*7, 8*
**addressed**  17:*23*
  19:*5*  25:*14*
**administrative**  4:*24*
**Affairs**  16:*18*, 22, 25
  17:*10, 13, 19, 22, 24*
  18:*21*  19:*1, 7, 10, 16,*
  *23*  20:*1, 19*  21:*2*
  22:*12, 23*  23:*17*  24:*3,*
  *25*  25:*14, 17, 21*
  26:*19, 20, 24*  27:*2*
**age**  10:*3, 10*
**agency**  26:*16*  27:*15*
**ago**  5:*1, 2*
**agree**  9:*20*
**agreed**  3:*8*
**agreement**  20:*8*
**ahead**  6:*12*  7:*4*
  22:*13*  25:*24*  27:*21*
**alleged**  24:*20*
**Allen**  2:*8*
**allow**  8:*18*

**allowed**  8:*21*
**alternative**  22:*24*
**alternatively**  16:*21*
**amount**  12:*16*  14:*1*
**analyzed**  27:*16*
**and/or**  14:*6*  21:*16*
**anonymous**  16:*19, 22*
  18:*2, 8*
**answering**  25:*3*
**answers**  6:*21*  7:*1*
**anti-discrimination**
  11:*2*  12:*12, 23*  13:*5*
  16:*9*
**anybody**  6:*14*
**apologize**  8:*13*  11:*9*
  20:*24*
**APPEARANCES**  2:*1*
**appeared**  1:*13*  2:*5,*
  *11, 12*  29:*5*
**apply**  12:*4*
**apprised**  24:*7*
**asked**  27:*6, 8*
**asking**  9:*9*
**assigned**  15:*9*
**assistant**  17:*9*
**at-a-glance**  14:*1*
**attention**  7:*11*
**attorney**  8:*7*  30:*9, 11*
**August**  8:*2*
**authority**  29:*4*
**authorized**  30:*5*
**available**  6:*23*  24:*14,*
  *19*
**Avenue**  2:*3, 9*
**aware**  15:*25*

**< B >**
**back**  9:*25*  18:*22*
  19:*23*  22:*4*  26:*3, 5*
**based**  6:*22*  10:*5, 10*
**basically**  8:*18*  17:*16*
  22:*16, 19*  23:*24*
**basis**  10:*3*
**Bates**  3:*15*  8:*24*
**bathroom**  6:*11*
**becoming**  25:*9*
**BEHALF**  2:*5, 12*
  6:*19*
**believe**  11:*8*  20:*19*

  22:*9*
**best**  6:*4*  13:*4, 9*
**binding**  7:*2*
**bit**  20:*10*
**Blue**  2:*8*
**break**  6:*10*  26:*1*
**breakdown**  8:*20*
**Brickell**  2:*3*
**bureau**  18:*15, 16, 21,*
  *22*  19:*4*  20:*7, 8, 23,*
  *24*  23:*6, 9, 10, 25*
  26:*16, 21*

**< C >**
**call**  26:*20*
**called**  11:*5, 7*  13:*18,*
  *22*  24:*6*
**capacity**  1:*6*  4:*15*
**Captain**  4:*13*  26:*6,*
  *11*  27:*23*
**CARMINE**  1:*6*  4:*15*
**case**  24:*8*
**ceases**  18:*18*
**certain**  17:*24*
**certainly**  17:*8*
**CERTIFICATE**  3:*4,*
  *5*  29:*1*  30:*1*
**certified**  12:*7, 8, 9, 10*
  27:*8*
**certify**  29:*4*  30:*4, 8*
**chain**  18:*14*  22:*9*
  23:*8, 15*
**chance**  9:*5, 8, 10*
**change**  24:*2*
**Chapter**  7:*24*  9:*16*
**chief**  18:*16, 21*  20:*20,*
  *22*  21:*15, 17, 19, 20*
  22:*22*  23:*6, 9*
**Chiefs**  24:*7*
**choose**  17:*23*  18:*10*
**chooses**  23:*13*
**civilian**  12:*4, 17, 19*
  13:*8*  14:*22*  15:*16*
  27:*7*
**clarification**  27:*5*
**clarify**  16:*8*
**CLARK**  1:*3*  4:*14*
**clearly**  5:*22*
**come**  16:*17*  20:*8*
  26:*3*

comes 9:*16* 12:*14*
18:*20* 20:*18* 22:*6*
coming 20:*10* 21:*4*
command 18:*14*
23:*8, 15*
commencing 4:*3*
Commission 29:*11, 12*
Committee 24:*7, 10,*
*15*
commonly 13:*25*
14:*2*
complainant 20:*9*
21:*10* 23:*22*
complaint 16:*14, 19,*
*22* 18:*5, 8* 19:*15, 25*
21:*13, 25* 22:*15*
24:*12* 26:*19* 27:*10,*
*15*
complaints 27:*1, 16*
complete 12:*14*
concern 16:*16, 24*
17:*21* 23:*2* 24:*23, 24*
concerns 18:*18* 25:*11*
conclusion 23:*20, 21*
25:*20*
conduct 10:*6, 14, 19*
conducted 23:*14, 18*
conducting 5:*16* 7:*17*
conflict 25:*10, 12*
connected 30:*11*
construction 6:*13*
contacted 22:*18*
Continue 9:*6*
continuous 11:*4*
copy 13:*12*
Correct 11:*17* 13:*6*
17:*11* 22:*2* 23:*19*
24:*13* 25:*18, 23*
27:*12, 13, 17, 18*
corrected 10:*15*
corrective 25:*20*
correctly 25:*3*
counsel 3:*9* 4:*2*
30:*9, 11*
County 1:*7* 4:*16*
6:*19, 23* 7:*2, 18* 8:*8,*
*14* 9:*21* 10:*2, 13, 18*
11:*1* 13:*24* 14:*15*
16:*12* 26:*15* 29:*3*

30:*3*
couple 26:*11, 12*
COURT 1:*1, 15* 4:*4*
5:*20, 24* 28:*1* 30:*4,*
*17*
coworker 25:*11*
Cross-Examination
3:*3* 26:*9*

< D >
DATE 1:*11* 9:*17*
Dated 30:*13*
DAVID 2:*5*
day 4:*2* 29:*6* 30:*13*
days 19:*5, 6* 22:*5*
deal 17:*17, 23*
December 30:*13*
decide 21:*21*
decided 18:*22* 23:*21*
deciding 21:*9* 24:*2,*
*11*
decision 27:*25*
Defendant 1:*8* 2:*12*
Defendant's 3:*15*
8:*24*
demoted 25:*1*
department 17:*7, 13*
depend 23:*10*
depending 15:*15*
19:*6* 20:*6* 21:*8, 9*
depends 15:*14* 18:*13*
Deponent 3:*11*
deposed 4:*21, 23* 5:*3,*
*9*
DEPOSITION 1:*10*
3:*14* 4:*1, 3* 5:*16*
7:*17* 8:*5, 8, 10* 27:*22,*
*24* 30:*1, 6*
depositions 5:*6*
Derek 2:*2*
described 16:*10*
18:*12* 19:*2* 21:*14*
27:*9*
designated 17:*4*
determination 20:*21*
21:*6* 24:*9*
determine 22:*23*
determined 21:*5, 7*
22:*14* 23:*3*

determines 20:*15*
21:*13*
differ 14:*21* 19:*14*
difference 18:*25*
different 8:*20* 24:*1*
25:*11*
differs 19:*18*
Direct 3:*2* 4:*11* 18:*1*
directed 27:*2*
directly 16:*17, 18, 25*
17:*25*
Director 17:*9*
disability 8:*21*
disciplinary 20:*5*
24:*11, 14*
discipline 10:*7* 19:*22*
20:*1, 12, 15, 17* 25:*2*
disciplined 25:*5, 15*
26:*16*
discrimination 8:*15*
9:*22* 10:*1, 2* 13:*2*
14:*6, 17* 16:*13* 17:*2,*
*5, 20* 18:*11* 19:*15, 25*
20:*17* 21:*2* 22:*1, 10*
24:*12, 15, 20* 25:*16*
27:*2, 11*
discriminatory 10:*6*
discussed 14:*22*
18:*17*
discussion 19:*21*
DISTRICT 1:*1*
division 11:*5*
DMS 11:*6, 7, 10*
document 9:*12, 20*
24:*6*
documents 7:*21* 8:*10*
draw 7:*11*
drug 9:*7*

dstefany@anblaw.com
2:*10*
duly 4:*8* 29:*5*
duties 14:*4*

< E >
effect 5:*17*
effects 14:*6*
egregious 20:*10*
either 12:*2* 16:*14*

21:*15, 20* 24:*22* 27:*7*
e-mail 11:*15* 18:*3, 8*
employee 10:*5* 13:*11,*
*16* 14:*23* 17:*1, 4, 20*
18:*2, 11, 17* 20:*16*
23:*10, 11, 13* 24:*21*
25:*5, 15* 30:*9, 10*
employees 11:*1, 15,*
*19* 12:*5, 11, 19, 22, 25*
13:*5, 8* 15:*16* 16:*12*
23:*14*
employee's 10:*10*
enforcement 12:*9, 11,*
*17* 14:*23*
engaged 10:*6*
ensure 10:*19* 14:*15*
23:*22*
escalates 19:*22*
ESQUIRE 2:*2, 5*
essentially 27:*15*
establish 22:*6*
Examination 3:*2*
4:*11*
examined 4:*8*
Exhibit 3:*14, 15* 7:*5,*
*6* 8:*22, 24, 25*
expected 10:*23* 14:*4,*
*19* 16:*1*
Expires 29:*12*
expressly 3:*11*

< F >
face-to-face 11:*22*
fact 16:*15* 19:*7*
21:*12* 24:*4* 27:*1*
factor 24:*2*
facts 21:*12* 24:*5*
fair 25:*22*
far 5:*22* 19:*12*
February 8:*2*
feel 16:*15*
FERNANDEZ 1:*13*
4:*4* 29:*10* 30:*4, 16*
field 12:*13* 14:*25*
15:*3, 4, 7, 22, 23*
figure 19:*21*
file 13:*15*
final 20:*18*
financially 30:*12*

**find** 21:*11, 24* 24:*15*
**finders** 21:*12* 24:*4*
**findings** 24:*9*
**finish** 6:*1, 2*
**five** 25:*25*
**fix** 25:*8*
**FLORIDA** 1:*1, 7*
  2:*4, 9* 4:*5, 16* 29:*2,*
  *11* 30:*2*
**focuses** 14:*1*
**follow** 22:*5* 26:*12*
**following** 17:*17*
**follows** 4:*9* 22:*16*
**force** 5:*17*
**foregoing** 30:*6*
**forms** 20:*16*
**formulate** 24:*5*
**forward** 18:*2l*
**found** 10:*5* 20:*1*
**frequently** 11:*13, 21*
**front** 7:*21* 8:*1, 3*
  16:*6*
**FTO** 15:*1, 2*
**full** 4:*18* 9:*5* 20:*11*
**full-blown** 19:*11, 19,*
  *24* 21:*4, 13* 26:*20*
**further** 28:*5* 30:*8*

**< G >**
**generally** 12:*15*
  17:*21*
**gestures** 5:*2l*
**give** 7:*14* 9:*3, 8, 10*
**given** 13:*5, 12* 14:*22*
**glass** 6:*11*
**go** 5:*10* 6:*10, 12* 7:*4*
  12:*13* 13:*19* 16:*16,*
  *17, 20, 21, 24, 25* 17:*8*
  18:*15* 20:*1* 22:*13*
  23:*13* 25:*24, 25*
  26:*23* 27:*21*
**goes** 18:*22* 23:*6*
**going** 5:*10* 6:*13*
  7:*11* 8:*22* 9:*25*
  10:*22* 15:*10* 22:*11*
  25:*25*
**Good** 4:*13, 17* 28:*4*
**grievance** 18:*15, 25*
  19:*3, 7, 15, 20* 20:*4, 6,*
  *19* 22:*1, 4, 6, 7, 15, 17,*

*19, 25* 23:*4, 13, 21*
  24:*19* 25:*6* 26:*14, 17,*
  *18, 25* 27:*3*
**grievances** 17:*21*
  25:*10*
**Group** 2:*2*
**guess** 10:*2l* 11:*22*
  12:*2, 13* 18:*13* 19:*12,*
  *21* 22:*3, 8* 24:*17*
  25:*3, 9*

**< H >**
**halted** 11:*22*
**hand** 29:*6*
**handled** 19:*3* 20:*2,*
  *20* 22:*1* 25:*16*
**handling** 23:*4*
**happened** 19:*5, 13*
**happens** 18:*12* 23:*20*
**harassment** 8:*15, 19*
  9:*22, 25* 13:*2* 14:*5,*
  *16* 22:*10*
**held** 23:*17*
**hereto** 3:*9*
**HH** 29:*11*
**HICKS** 1:*10* 3:*1*
  4:*1, 7, 13, 20* 26:*6*
  29:*5*
**higher** 16:*24*
**HILLSBOROUGH**
  29:*3* 30:*3*
**home** 13:*18, 25*
**hopefully** 6:*10*
**Human** 16:*17, 21, 25*
  17:*1, 4, 6, 7, 9* 27:*4*
**Hyde** 2:*9*

**< I >**
**IA** 26:*20, 23*
**identifiable** 24:*5*
**identification** 7:*7* 9:*1*
**identified** 21:*11*
**imagine** 22:*25*
**improper** 10:*14*
**inaudible** 5:*2l*
**incident** 19:*12* 22:*9*
**include** 22:*18*
**included** 12:*16* 16:*6*
**includes** 11:*4*

**including** 24:*18*
**individual** 27:*7*
**individuals** 21:*24*
**information** 24:*8*
**initial** 10:*2l*
**initiate** 21:*8*
**initiated** 26:*17*
**instructing** 11:*16*
**instructional** 13:*1*
**intent** 10:*13*
**interested** 30:*12*
**Internal** 16:*18, 21, 25*
  17:*10, 13, 19, 22, 24*
  18:*21, 23* 19:*1, 7, 10,*
  *16, 23* 20:*1, 18* 21:*2*
  22:*12, 23* 23:*17* 24:*3,*
  *25* 25:*14, 16, 20*
  26:*19, 20, 24* 27:*2, 9*
**interviews** 23:*14, 17*
**Intranet** 13:*18, 22, 24*
**investigated** 27:*16*
**investigating** 19:*14*
**investigation** 18:*24*
  19:*11, 17, 18, 19, 24*
  20:*11* 21:*2, 4, 5, 8, 14,*
  *21, 25* 22:*12* 23:*18,*
  *20* 25:*9, 17, 21* 26:*17*
**involved** 10:*24*
  20:*16* 21:*9* 24:*4*
**involves** 23:*7*
**issue** 25:*13*
**its** 4:*15* 14:*6*

**< J >**
**JENNA** 1:*3* 4:*14*
**job** 9:*15*
**judge** 5:*17*
**June** 9:*22*
**jury** 5:*18*

**< K >**
**keyword** 13:*20*
**kind** 10:*19* 11:*22*
  12:*23, 25* 13:*14* 20:*5*
  22:*20* 24:*14, 19*
**know** 6:*6, 11, 15* 9:*4*
  14:*7* 25:*11* 28:*1*
**knowledge** 6:*22, 23*
  9:*15* 13:*4, 9*

**known** 6:*23*
**KYLE** 2:*2* 4:*13*
**kyle@dereksmithlaw.c
om** 2:*5*

**< L >**
**label** 3:*15* 8:*24*
**labeled** 10:*12*
**LAMAR** 1:*10* 3:*1*
  4:*1, 7, 20* 29:*4*
**Large** 4:*5* 12:*15*
**Law** 2:*2* 12:*9, 11, 16*
  14:*22*
**lawsuit** 4:*14*
**lead** 25:*2, 21*
**leave** 21:*6, 7*
**Lee** 1:*6* 4:*15* 6:*19,*
  *23* 7:*2, 18* 8:*8, 14*
  9:*21* 10:*2, 13, 18*
  11:*1* 13:*24* 14:*15*
  16:*12* 26:*15*
**left** 18:*5*
**Legal** 21:*15, 17, 19,*
  *20* 22:*22*
**letter** 18:*9*
**letters** 18:*5*
**level** 20:*20* 22:*12*
**levels** 25:*12*
**limits** 19:*12*
**listed** 7:*15* 16:*4*
**long** 6:*9* 15:*13*
**longer** 5:*1*
**look** 9:*8* 13:*19*
**looked** 14:*3* 26:*21*
**looking** 10:*12* 14:*9*
**looks** 8:*2*
**lot** 11:*22* 25:*9* 27:*6,*
  *8*
**luck** 19:*10*

**< M >**
**MACDONALD** 2:*9*
  3:*2* 4:*12* 7:*4, 8* 8:*23*
  9:*2* 25:*24* 26:*3, 5*
  27:*21*
**mailbox** 18:*5*
**maintain** 17:*16*
**major** 24:*23* 25:*9*
**making** 15:*25* 24:*22*

mandatory  11:*9*, *10*, *12*  12:*15*, *20*, *22*, *24*  13:*6*, *20*  16:*11*
manner  10:*22*  16:*10*
manners  18:*12*
MARCENO  1:*6*  4:*15*
mark  7:*5*  8:*23*
marked  7:*6*  8:*25*
matter  19:*3*, *5*  22:*10*
McDonald  4:*14*
mean  11:*24*  19:*17*  20:*14*, *22*  23:*2*  27:*7*
means  12:*8*
mechanism  18:*7*
meeting  21:*10*
MELISSA  1:*13*  4:*4*  29:*10*  30:*4*, *16*
member  10:*23*  17:*17*, *24*  26:*15*  27:*7*, *11*
members  12:*18*
mentioned  17:*10*
messages  11:*15*
Miami  2:*4*
MIDDLE  1:*1*
minute  9:*3*  26:*1*
misconduct  17:*17*
mixing  11:*8*
month  15:*15*
morning  4:*13*, *17*
move  25:*8*
multiple  5:*4*, *5*  21:*17*

< N >
name  4:*13*, *18*  13:*22*
national  8:*20*
nature  19:*6*
necessary  14:*5*
need  6:*10*, *14*  22:*17*  25:*1*
needed  15:*19*
needs  18:*23*  25:*13*  28:*1*
neighboring  6:*13*
new  12:*22*, *25*  13:*5*, *11*  14:*22*
noncertified  12:*18*
Normally  25:*7*
Norton  2:*8*
Notary  4:*4*  29:*11*

Noted  6:*16*
notes  30:*7*
Notice  3:*14*  4:*2*
notifying  22:*8*
nutshell  17:*18*

< O >
OATH  3:*4*  4:*9*  5:*12*  29:*1*
obligation  5:*13*
obviously  15:*18*  18:*21*  19:*8*, *11*  20:*6*  21:*10*  25:*13*
occurred  24:*16*
October  1:*11*  4:*3*  29:*7*
offense  22:*5*
offensive  10:*14*
offers  20:*4*
Office  5:*7*  6:*14*, *19*, *24*  7:*2*, *18*  8:*8*, *14*  9:*21*  10:*2*, *14*, *18*  11:*1*  13:*24*  14:*15*  16:*12*  26:*15*  27:*8*
officer  15:*3*, *20*, *22*, *23*
officers  12:*10*
official  1:*6*  4:*15*  29:*6*
Okay  5:*22*  6:*2*, *7*, *12*, *16*  9:*6*  14:*9*, *11*, *12*  18:*18*  20:*9*  22:*14*  23:*23*, *24*  26:*22*  27:*5*, *21*
once  5:*3*  12:*1*  18:*11*  21:*5*  25:*12*
ones  10:*23*
ordered  27:*24*
orientation  8:*19*
origin  8:*20*
original  22:*15*
outcome  23:*23*, *24*  24:*2*
outlines  10:*21*, *24*  22:*19*
Outside  16:*11*

< P >
PA  2:*8*
page  5:*10*  10:*12*

13:*18*, *25*  14:*9*
Paragraph  7:*12*, *15*
Park  2:*9*
Part  11:*3*  14:*4*  20:*12*, *13*  22:*20*
particular  17:*5*, *19*  18:*7*  20:*24*  24:*24*
parties  3:*9*  30:*9*, *10*
party  27:*11*
people  12:*14*2  17:*23*  23:*8*
performance  9:*15*
performing  14:*25*
period  12:*3*  18:*19*
person  16:*24*  17:*5*, *19*, *25*  18:*1*  21:*6*, *7*  22:*3*, *15*  23:*1*  25:*1*
personal  6:*22*
personality  25:*11*
persons  20:*7*  21:*18*  22:*11*
person's  16:*16*
pertain  27:*6*, *10*
phase  12:*2*
PLACE  1:*13*
placed  5:*12*
Plaintiff  1:*4*  2:*5*  4:*2*
Plaintiff's  3:*14*, *15*  7:*5*, *6*  8:*23*, *25*
play  20:*12*, *13*  22:*20*
please  4:*18*, *19*  5:*21*  6:*15*
PLLC  2:*2*
point  13:*15*  14:*19*  16:*24*  22:*10*, *14*  23:*1*
policies  8:*14*, *17*  11:*2*, *14*  12:*12*  13:*5*, *12*, *17*  15:*24*  16:*9*  27:*9*
policy  7:*22*, *23*, *25*  8:*3*, *6*  9:*9*, *16*, *21*  10:*5*, *9*, *20*  13:*6*, *21*  14:*3*  17:*16*, *17*  22:*6*  25:*13*  26:*14*, *25*
portion  12:*1*  26:*24*
portions  16:*5*
position  5:*6*  16:*1*  25:*1*
possible  10:*16*  26:*15*,

23
post-COVID  11:*21*
potential  27:*10*
Power  11:*5*, *7*, *10*
pre-deployment  11:*3*, *24*  12:*4*, *7*
predominantly  12:*7*
preference  28:*2*
prepare  8:*5*
prepared  7:*14*
prevent  14:*5*
prevented  10:*15*, *19*
preventing  14:*16*
previously  4:*23*
print  13:*13*
prior  8:*10*
probably  19:*19*
probationary  12:*3*
procedure  13:*21*  17:*16*, *18*  19:*1*, *3*, *14*, *15*, *16*  20:*4*  21:*2*  22:*2*, *4*  23:*5*, *14*  24:*20*  25:*6*  26:*14*  27:*3*, *15*
procedures  11:*14*  22:*17*  27:*6*, *9*
process  10:*24*  15:*10*
product  26:*16*
program  11:*10*  13:*23*
programs  11:*9*  13:*1*
prohibits  10:*2*, *10*
propounded  28:*5*
provide  24:*6*
provided  23:*22*
Public  4:*4*  18:*4*  29:*11*
pursuant  4:*1*
put  10:*20*  21:*6*, *7*

< Q >
question  6:*5*  25:*3*
questions  6:*2*  9:*9*  26:*7*, *11*  28:*5*
quick  25:*25*
quickly  10:*15*

< R >
racial  8:*19*
read  11:*16*, *17*  27:*23*
readdressed  18:*20*

**reading**  3:*10*  13:*6*
27:*25*
**readings**  11:*9, 11, 12*
12:*15, 16, 20, 22, 24*
13:*20*  16:*11*
**readjust**  6:*14*
**really**  19:*17*
**reasonably**  6:*23*
**rebuttal**  18:*19*  23:*25*
**received**  18:*3*
**recess**  26:*4*
**recognize**  9:*12*
**record**  4:*19*  25:*25*
26:*5*  30:*7*
**refer**  15:*1, 19*
**reference**  16:*6*  27:*1*
**referenced**  15:*5, 7*
**referred**  13:*25*  14:*12*
15:*20*  24:*25*
**reflect**  5:*24*
**refresher**  14:*24*
15:*23*
**regarding**  7:*14*  9:*21*
**related**  5:*6*  13:*1*
20:*17*
**relating**  22:*9*
**relative**  30:*8, 10*
**relocating**  24:*22*
**relooks**  24:*1*
**remedies**  24:*19*
**remedy**  14:*6*  18:*16,*
*17, 23*  19:*21*  20:*4, 11*
22:*20*  23:*21*  25:*7*
26:*21*
**remember**  4:*25*
26:*25*
**remotely**  1:*13*  29:*5*
**rephrase**  6:*6*
**report**  10:*22, 23*
16:*12*  17:*2, 5, 20*
18:*2, 13, 14*  19:*7*
30:*5*
**REPORTED**  1:*13*
4:*4*  18:*15*  21:*3*
**REPORTER**  3:*5*  4:*4*
5:*20, 24*  28:*1*  30:*4*
**REPORTER'S**  30:*1*
**reports**  18:*11*
**represent**  4:*14*

**represents**  9:*21*
**reprimand**  24:*17*
**required**  12:*25*
**requires**  20:*11*
**requisite**  14:*5*
**resolved**  27:*16*
**Resources**  16:*17, 21,*
*25*  17:*1, 4, 6, 7, 9*
*27:4*
**respect**  26:*14*
**respective**  3:*9*
**respond**  5:*22*
**response**  6:*1*  24:*11*
25:*15*
**responses**  5:*21, 25*
**responsible**  23:*4*
24:*10*
**review**  8:*10*  9:*3, 5,*
*10*  13:*14*  24:*6, 8, 10*
**reviewed**  8:*6*
**reviewing**  10:*1*
15:*24*  16:*9*  22:*11*
**revised**  8:*1*  9:*18, 22*
**right**  5:*2*  10:*7*
12:*14*  16:*22*  19:*9*
20:*6*  27:*5, 14, 23*
**rises**  22:*12*  25:*12*
**role**  4:*25*  15:*12*
**room**  7:*19*
**Rule**  3:*14*

< S >
**saved**  13:*14*
**saying**  11:*18*
**says**  9:*17*  10:*13*  14:*4*
**screen**  7:*4, 22*  8:*13*
14:*7*
**scroll**  9:*4*
**seal**  29:*6*
**search**  13:*21*
**searches**  13:*21*
**searching**  14:*2*
**section**  9:*25*  13:*19*
**see**  7:*12*  9:*17*  10:*13*
14:*6, 7, 10, 12*  22:*11,*
*19*  24:*1*
**seen**  7:*9*
**send**  17:*25*
**sent**  11:*4, 13, 15, 19*

17:*22*  22:*8*
**sentence**  14:*12*
**Sex**  8:*20*
**sexual**  8:*18, 19*
**shadow**  15:*18*
**share**  7:*4*
**Sheriff**  1:*6*  4:*15*
20:*12, 13, 15, 16*
21:*16, 21*  22:*22*
**Sheriff's**  5:*7*  6:*19,*
*24*  7:*2, 18*  8:*8, 14*
9:*21*  10:*2, 14, 18*
11:*1*  13:*24*  14:*15*
16:*12*  26:*15*  27:*8*
**show**  8:*22*
**showing**  9:*12*
**shrugs**  5:*21*
**side**  12:*10, 17*  24:*3*
**sides**  12:*16*
**sign**  11:*17*  16:*2*
**signed-off**  13:*20*
**signing**  3:*10*
**sir**  4:*17, 22*  5:*8, 11,*
*14, 19, 23*  6:*3, 8, 17,*
*20, 25*  7:*3, 10, 16, 20*
8:*4, 9, 12, 16*  9:*6, 11,*
*13, 19, 24*  10:*4, 8, 11,*
*17*  11:*3*  12:*21*  13:*7,*
*10*  14:*11, 14*  15:*18*
16:*1, 23*  17:*12, 21, 25*
18:*10*  20:*3, 24*  21:*23*
23:*12, 15, 16*  26:*8, 13*
27:*4, 18, 20*
**sit**  20:*8*
**Smith**  2:*2*  21:*19*
**sorry**  8:*2*  11:*8*  12:*9*
15:*6, 21*  17:*3*  19:*9*
22:*3, 13, 14*
**South**  2:*9*
**speak**  8:*7*  24:*4*
**speaking**  5:*25*
**specific**  9:*9*
**specifically**  7:*11*
11:*21*  14:*16*  16:*4*
**start**  4:*18*  12:*11, 15*
**starters**  10:*20*
**starts**  9:*15*  13:*12*
**State**  4:*5*  29:*2, 11*
30:*2*

**statements**  19:*20*
**STATES**  1:*1*
**stating**  4:*18*
**STEFANY**  2:*5*  3:*3*
26:*6, 10*  27:*19, 23*
28:*4*
**Stenographer**  1:*15*
30:*17*
**stenographic**  30:*7*
**stenographically**  30:*5*
**step**  16:*24*
**steps**  22:*18*
**stipulated**  3:*8*
**strictly**  21:*12*  24:*4*
**strike**  13:*11*  25:*19*
**stuff**  14:*1*
**subject**  10:*6*
**Suite**  2:*3, 8*
**supervisor**  14:*19*
15:*11, 13, 17*  16:*15,*
*16, 20, 23*  17:*8*
**supervisors**  14:*4, 16,*
*18*  16:*2, 8*
**supposed**  17:*1*
**sure**  5:*22*  6:*4*  9:*4,*
*10*  15:*25*  16:*4*  22:*16,*
*18*  24:*23*  25:*3*  26:*1*
**suspend**  27:*21*
**sworn**  4:*8*  19:*20*
29:*5*
**system**  11:*6*

< T >
**take**  6:*10*  10:*19*
14:*5*  25:*25*
**TAKEN**  1:*11*  4:*1*
26:*4*
**talking**  20:*25*  21:*10*
27:*14*
**Tampa**  2:*9*
**tell**  12:*8*  15:*8*  21:*1*
23:*7*
**termination**  10:*10*
24:*18*  25:*22*
**terms**  25:*19, 20*
**testified**  4:*8*
**testify**  5:*13*  6:*18*
**testifying**  5:*17*
**TESTIMONY**  3:*1*

5:*16*   6:*5*   7:*14*
**testing**   9:*7*
**Thank**   4:*16, 17*   6:*16*
  26:*7, 8*   27:*19*   28:*4*
**thing**   18:*22*   19:*18*
**things**   5:*10*   8:*20*
  24:*3*   26:*12*
**think**   6:*9*
**third**   10:*12*   27:*11*
**three**   21:*24*
**TIME**   1:*12*   5:*25*
  12:*3*   19:*12*   26:*7*
  27:*22*   28:*4*
**times**   5:*4*   25:*10*
**titled**   16:*7*
**today**   4:*16*   5:*13*
  6:*18, 21*   7:*17*   8:*8, 11*
  26:*6*   27:*10*
**today's**   8:*5*
**top**   9:*17*   14:*9*
**topic**   7:*15*
**topics**   14:*1*
**tour**   12:*7*
**train**   11:*1*
**trained**   14:*16*
**training**   11:*3, 5, 6*
  12:*1, 2, 6, 12, 23*   13:*1,
  4, 15, 19*   14:*18, 21, 22,
  25*   15:*1, 3, 4, 7, 11, 13,
  17, 20, 22, 23*   16:*3, 5,
  9*
**trainings**   11:*22*
**transcribe**   5:*20*
**transcript**   3:*10*
  27:*24, 25*   30:*6*
**transferred**   26:*19*
**transitioning**   15:*11*
**TRAVIS**   1:*10*   3:*1*
  4:*1, 7, 20*   29:*4*
**true**   13:*8*   30:*7*
**truthfully**   5:*13*
**try**   6:*6*
**trying**   19:*21*
**turned**   26:*18*
**two**   15:*14*   23:*25*
**type**   22:*10*   25:*11*
**typically**   15:*24*

**< U >**
**unaware**   13:*3*   16:*11*

**undergo**   12:*12, 23*
  13:*1*   14:*18*   15:*16*
  16:*3, 8*
**Undersheriff**   21:*15,
  20*   22:*22*
**undersigned**   29:*4*
**understand**   5:*12, 15*
  6:*5, 18, 21*   7:*1*   11:*18*
**understanding**   10:*9*
**unit**   16:*17*
**UNITED**   1:*1*
**unsigned**   18:*6*
**updates**   11:*4, 16*
**updating**   11:*13*
**upwards**   15:*14*
**usually**   14:*1*   17:*22*
  23:*7*   25:*7*
**utilized**   18:*4*

**< V >**
**valid**   23:*2*
**various**   8:*19*   11:*13*
  13:*25*
**version**   7:*25*   12:*6*
**video**   13:*1*
**view**   13:*16*
**violations**   25:*13*
**vs**   1:*5*

**< W >**
**wait**   5:*25*   6:*1*
**waive**   27:*25*   28:*3*
**waived**   3:*11*
**want**   6:*4*   9:*8, 10*
**warrant**   20:*1*
**warranted**   21:*22, 25*
  22:*23*   24:*11*
**warrants**   21:*13*
**watch**   12:*25*
**water**   6:*11*
**way**   18:*16*   27:*5*
**website**   18:*4*
**weeks**   15:*14*   23:*25*
**weight**   25:*2*
**well**   10:*10, 20, 21, 25*
  12:*5, 17, 19, 20*   13:*8,
  20*   16:*3, 19*   17:*9*
  19:*23*
**we're**   5:*10, 25*

**we've**   18:*3*
**window**   19:*4, 9*
**WITNESS**   4:*10*
  21:*11*   26:*2, 8*   27:*20*
  28:*3, 6*   29:*6*
**witnesses**   21:*9*   24:*5*
**work**   26:*20*
**worked**   18:*14*   22:*7*
**workplace**   27:*1*
**works**   23:*11*
**worries**   21:*1*
**writing**   22:*4*
**written**   15:*24*   24:*17*
**wrote**   22:*15*

**< Y >**
**Yeah**   12:*25*   15:*3, 9*
**years**   5:*1, 2*

**< Z >**
**Zoom**   1:*13*   2:*5, 11*
  5:*16*

Deposition of Travis Lamar Hicks                                                    Jenna Clark v. Carmine Marceno

## **WORD LIST**

**813**  *(1)*

**< 1 >**
**1**  *(3)*
**11**  *(2)*
**11:40**  *(1)*
**11:42**  *(3)*
**12**  *(2)*
**1310**  *(1)*

**< 2 >**
**2**  *(3)*
**2021**  *(1)*
**2023**  *(4)*
**22-002723-CI**  *(1)*
**225**  *(1)*
**23**  *(2)*
**23rd**  *(1)*
**251-1210**  *(1)*
**26**  *(3)*
**278990**  *(1)*
**29**  *(1)*

**< 3 >**
**30**  *(4)*
**30(b)(6**  *(1)*
**305**  *(1)*
**30-day**  *(2)*
**324**  *(1)*
**33131**  *(1)*
**33606**  *(1)*

**< 4 >**
**4**  *(2)*
**4th**  *(2)*

**< 6 >**
**6/21**  *(1)*
**6/21/2026**  *(1)*

**< 7 >**
**7**  *(1)*
**701**  *(1)*
**762**  *(1)*
**762-764**  *(1)*
**764**  *(2)*

**< 8 >**
**8**  *(1)*

**< 9 >**
**946-1884**  *(1)*

**< A >**
**a.m**  *(4)*
**Abbi**  *(1)*
**able**  *(5)*
**absence**  *(1)*
**access**  *(1)*
**accurate**  *(3)*
**accurately**  *(2)*
**acknowledgement**  *(1)*
**acronym**  *(1)*
**act**  *(4)*
**action**  *(6)*
**actions**  *(2)*
**actual**  *(1)*
**address**  *(3)*
**addressed**  *(3)*
**administrative**  *(1)*
**Affairs**  *(29)*
**age**  *(2)*
**agency**  *(2)*
**ago**  *(2)*
**agree**  *(1)*
**agreed**  *(1)*
**agreement**  *(1)*
**ahead**  *(5)*
**alleged**  *(1)*
**Allen**  *(1)*
**allow**  *(1)*
**allowed**  *(1)*
**alternative**  *(1)*
**alternatively**  *(1)*
**amount**  *(2)*
**analyzed**  *(1)*
**and/or**  *(2)*
**anonymous**  *(4)*
**answering**  *(1)*
**answers**  *(2)*
**anti-discrimination**
 *(5)*
**anybody**  *(1)*
**apologize**  *(3)*
**APPEARANCES**  *(1)*
**appeared**  *(6)*
**apply**  *(1)*

**apprised**  *(1)*
**asked**  *(2)*
**asking**  *(1)*
**assigned**  *(1)*
**assistant**  *(1)*
**at-a-glance**  *(1)*
**attention**  *(1)*
**attorney**  *(3)*
**August**  *(1)*
**authority**  *(1)*
**authorized**  *(1)*
**available**  *(3)*
**Avenue**  *(2)*
**aware**  *(1)*

**< B >**
**back**  *(6)*
**based**  *(3)*
**basically**  *(5)*
**basis**  *(1)*
**Bates**  *(2)*
**bathroom**  *(1)*
**becoming**  *(1)*
**BEHALF**  *(1)*
**believe**  *(3)*
**best**  *(3)*
**binding**  *(1)*
**bit**  *(1)*
**Blue**  *(1)*
**break**  *(2)*
**breakdown**  *(1)*
**Brickell**  *(1)*
**bureau**  *(16)*

**< C >**
**call**  *(1)*
**called**  *(5)*
**capacity**  *(2)*
**Captain**  *(4)*
**CARMINE**  *(2)*
**case**  *(1)*
**ceases**  *(1)*
**certain**  *(1)*
**certainly**  *(1)*
**CERTIFICATE**  *(4)*
**certified**  *(5)*
**certify**  *(3)*
**chain**  *(4)*
**chance**  *(3)*

**change**  *(1)*
**Chapter**  *(2)*
**chief**  *(13)*
**Chiefs**  *(1)*
**choose**  *(2)*
**chooses**  *(1)*
**civilian**  *(8)*
**clarification**  *(1)*
**clarify**  *(1)*
**CLARK**  *(2)*
**clearly**  *(1)*
**come**  *(3)*
**comes**  *(5)*
**coming**  *(2)*
**command**  *(3)*
**commencing**  *(1)*
**Commission**  *(2)*
**Committee**  *(4)*
**commonly**  *(2)*
**complainant**  *(3)*
**complaint**  *(14)*
**complaints**  *(2)*
**complete**  *(1)*
**concern**  *(7)*
**concerns**  *(2)*
**conclusion**  *(3)*
**conduct**  *(3)*
**conducted**  *(2)*
**conducting**  *(2)*
**conflict**  *(2)*
**connected**  *(1)*
**construction**  *(1)*
**contacted**  *(1)*
**Continue**  *(1)*
**continuous**  *(1)*
**copy**  *(1)*
**Correct**  *(12)*
**corrected**  *(1)*
**corrective**  *(1)*
**correctly**  *(1)*
**counsel**  *(4)*
**County**  *(19)*
**couple**  *(2)*
**COURT**  *(8)*
**coworker**  *(1)*
**Cross-Examination**
 *(2)*

**< D >**

**DATE**  (2)
**Dated**  (1)
**DAVID**  (1)
**day**  (3)
**days**  (3)
**deal**  (2)
**December**  (1)
**decide**  (1)
**decided**  (2)
**deciding**  (3)
**decision**  (1)
**Defendant**  (2)
**Defendant's**  (2)
**demoted**  (1)
**department**  (2)
**depend**  (1)
**depending**  (5)
**depends**  (2)
**Deponent**  (1)
**deposed**  (4)
**DEPOSITION**  (13)
**depositions**  (1)
**Derek**  (1)
**described**  (5)
**designated**  (1)
**determination**  (3)
**determine**  (1)
**determined**  (4)
**determines**  (2)
**differ**  (2)
**difference**  (1)
**different**  (3)
**differs**  (1)
**Direct**  (3)
**directed**  (1)
**directly**  (4)
**Director**  (2)
**disability**  (1)
**disciplinary**  (3)
**discipline**  (8)
**disciplined**  (3)
**discrimination**  (24)
**discriminatory**  (1)
**discussed**  (2)
**discussion**  (1)
**DISTRICT**  (2)
**division**  (1)
**DMS**  (3)
**document**  (3)

**documents**  (2)
**draw**  (1)
**drug**  (1)

**dstefany@anblaw.com**
  (1)
**duly**  (2)
**duties**  (1)

**< E >**
**effect**  (1)
**effects**  (1)
**egregious**  (1)
**either**  (6)
**e-mail**  (3)
**employee**  (19)
**employees**  (13)
**employee's**  (1)
**enforcement**  (4)
**engaged**  (3)
**ensure**  (3)
**escalates**  (1)
**ESQUIRE**  (2)
**essentially**  (1)
**establish**  (1)
**Examination**  (2)
**examined**  (1)
**Exhibit**  (7)
**expected**  (4)
**Expires**  (1)
**expressly**  (1)

**< F >**
**face-to-face**  (1)
**fact**  (5)
**factor**  (1)
**facts**  (2)
**fair**  (1)
**far**  (2)
**February**  (1)
**feel**  (1)
**FERNANDEZ**  (5)
**field**  (7)
**figure**  (1)
**file**  (1)
**final**  (1)
**financially**  (1)
**find**  (3)
**finders**  (2)

**findings**  (1)
**finish**  (2)
**five**  (1)
**fix**  (1)
**FLORIDA**  (9)
**focuses**  (1)
**follow**  (2)
**following**  (1)
**follows**  (2)
**force**  (1)
**foregoing**  (1)
**forms**  (1)
**formulate**  (1)
**forward**  (1)
**found**  (2)
**frequently**  (2)
**front**  (4)
**FTO**  (2)
**full**  (3)
**full-blown**  (6)
**further**  (2)

**< G >**
**generally**  (2)
**gestures**  (1)
**give**  (4)
**given**  (3)
**glass**  (1)
**go**  (21)
**goes**  (2)
**going**  (10)
**Good**  (3)
**grievance**  (28)
**grievances**  (2)
**Group**  (1)
**guess**  (12)

**< H >**
**halted**  (1)
**hand**  (1)
**handled**  (5)
**handling**  (1)
**happened**  (2)
**happens**  (2)
**harassment**  (8)
**held**  (1)
**hereto**  (1)
**HH**  (1)
**HICKS**  (8)
**higher**  (1)

**HILLSBOROUGH**
  (2)
**home**  (2)
**hopefully**  (1)
**Human**  (9)
**Hyde**  (1)

**< I >**
**IA**  (1)
**identifiable**  (1)
**identification**  (2)
**identified**  (1)
**imagine**  (1)
**improper**  (1)
**inaudible**  (1)
**incident**  (2)
**include**  (1)
**included**  (2)
**includes**  (1)
**including**  (1)
**individual**  (1)
**individuals**  (1)
**information**  (1)
**initial**  (1)
**initiate**  (1)
**initiated**  (1)
**instructing**  (1)
**instructional**  (1)
**intent**  (1)
**interested**  (1)
**Internal**  (31)
**interviews**  (2)
**Intranet**  (3)
**investigated**  (1)
**investigating**  (1)
**investigation**  (22)
**involved**  (4)
**involves**  (1)
**issue**  (1)
**its**  (2)

**< J >**
**JENNA**  (2)
**job**  (1)
**judge**  (1)
**June**  (1)
**jury**  (1)

**< K >**

Deposition of Travis Lamar Hicks

Jenna Clark v. Carmine Marceno

keyword  *(1)*
kind  *(9)*
know  *(7)*
knowledge  *(5)*
known  *(1)*
KYLE  *(2)*
kyle@dereksmithlaw.c
om  *(1)*

< L >
label  *(2)*
labeled  *(1)*
LAMAR  *(6)*
Large  *(2)*
Law  *(5)*
lawsuit  *(1)*
lead  *(2)*
leave  *(2)*
Lee  *(17)*
left  *(1)*
Legal  *(5)*
letter  *(1)*
letters  *(1)*
level  *(2)*
levels  *(1)*
limits  *(1)*
listed  *(2)*
long  *(2)*
longer  *(1)*
look  *(2)*
looked  *(2)*
looking  *(2)*
looks  *(1)*
lot  *(4)*
luck  *(1)*

< M >
MACDONALD  *(11)*
mailbox  *(1)*
maintain  *(1)*
major  *(2)*
making  *(2)*
mandatory  *(10)*
manner  *(2)*
manners  *(1)*
MARCENO  *(2)*
mark  *(2)*
marked  *(2)*
matter  *(3)*

McDonald  *(1)*
mean  *(6)*
means  *(1)*
mechanism  *(1)*
meeting  *(1)*
MELISSA  *(5)*
member  *(8)*
members  *(1)*
mentioned  *(1)*
messages  *(1)*
Miami  *(1)*
MIDDLE  *(1)*
minute  *(2)*
misconduct  *(1)*
mixing  *(1)*
month  *(1)*
morning  *(2)*
move  *(1)*
multiple  *(3)*

< N >
name  *(3)*
national  *(1)*
nature  *(1)*
necessary  *(1)*
need  *(4)*
needed  *(1)*
needs  *(3)*
neighboring  *(1)*
new  *(5)*
noncertified  *(1)*
Normally  *(1)*
Norton  *(1)*
Notary  *(2)*
Noted  *(1)*
notes  *(1)*
Notice  *(2)*
notifying  *(1)*
nutshell  *(1)*

< O >
OATH  *(4)*
obligation  *(1)*
obviously  *(7)*
occurred  *(1)*
October  *(3)*
offense  *(1)*
offensive  *(1)*
offers  *(1)*

Office  *(19)*
officer  *(4)*
officers  *(1)*
official  *(3)*
Okay  *(20)*
once  *(5)*
ones  *(1)*
ordered  *(1)*
orientation  *(1)*
origin  *(1)*
original  *(1)*
outcome  *(3)*
outlines  *(3)*
Outside  *(1)*

< P >
PA  *(1)*
page  *(5)*
Paragraph  *(2)*
Park  *(1)*
Part  *(5)*
particular  *(5)*
parties  *(3)*
party  *(1)*
people  *(4)*
performance  *(1)*
performing  *(1)*
period  *(1)*
person  *(11)*
personal  *(1)*
personality  *(1)*
persons  *(1)*
person's  *(1)*
pertain  *(2)*
phase  *(1)*
PLACE  *(1)*
placed  *(1)*
Plaintiff  *(3)*
Plaintiff's  *(7)*
play  *(3)*
please  *(4)*
PLLC  *(1)*
point  *(6)*
policies  *(11)*
policy  *(20)*
portion  *(2)*
portions  *(1)*
position  *(3)*
possible  *(3)*

post-COVID  *(1)*
potential  *(1)*
Power  *(3)*
pre-deployment  *(4)*
predominantly  *(1)*
preference  *(1)*
prepare  *(1)*
prepared  *(1)*
prevent  *(1)*
prevented  *(3)*
preventing  *(1)*
previously  *(1)*
print  *(2)*
prior  *(1)*
probably  *(1)*
probationary  *(1)*
procedure  *(20)*
procedures  *(4)*
process  *(2)*
product  *(1)*
program  *(2)*
programs  *(2)*
prohibits  *(1)*
propounded  *(1)*
provide  *(1)*
provided  *(1)*
Public  *(4)*
pursuant  *(1)*
put  *(3)*

< Q >
question  *(2)*
questions  *(5)*
quick  *(1)*
quickly  *(1)*

< R >
racial  *(1)*
read  *(3)*
readdressed  *(1)*
reading  *(3)*
readings  *(10)*
readjust  *(1)*
really  *(1)*
reasonably  *(1)*
rebuttal  *(2)*
received  *(1)*
recess  *(1)*
recognize  *(1)*

record  (4)
refer  (2)
reference  (2)
referenced  (2)
referred  (4)
reflect  (1)
refresher  (2)
regarding  (2)
related  (3)
relating  (1)
relative  (2)
relocating  (1)
relooks  (1)
remedies  (1)
remedy  (11)
remember  (2)
remotely  (2)
rephrase  (1)
report  (11)
REPORTED  (4)
REPORTER  (6)
REPORTER'S  (1)
reports  (1)
represent  (1)
represents  (1)
reprimand  (1)
required  (1)
requires  (1)
requisite  (1)
resolved  (1)
Resources  (9)
respect  (1)
respective  (1)
respond  (1)
response  (3)
responses  (2)
responsible  (2)
review  (8)
reviewed  (1)
reviewing  (4)
revised  (3)
right  (9)
rises  (2)
role  (2)
room  (1)
Rule  (1)

< S >
saved  (1)

saying  (1)
says  (3)
screen  (4)
scroll  (1)
seal  (1)
search  (1)
searches  (1)
searching  (1)
section  (2)
see  (10)
seen  (1)
send  (1)
sent  (6)
sentence  (1)
Sex  (1)
sexual  (2)
shadow  (1)
share  (1)
Sheriff  (9)
Sheriff's  (17)
show  (1)
showing  (1)
shrugs  (1)
side  (3)
sides  (1)
sign  (2)
signed-off  (1)
signing  (1)
sir  (55)
sit  (1)
Smith  (2)
sorry  (10)
South  (1)
speak  (2)
speaking  (1)
specific  (1)
specifically  (4)
start  (3)
starters  (1)
starts  (2)
State  (4)
statements  (1)
STATES  (1)
stating  (1)
STEFANY  (7)
Stenographer  (2)
stenographic  (1)
stenographically  (1)
step  (1)

steps  (1)
stipulated  (1)
strictly  (2)
strike  (2)
stuff  (1)
subject  (1)
Suite  (2)
supervisor  (11)
supervisors  (5)
supposed  (1)
sure  (11)
suspend  (1)
sworn  (3)
system  (2)

< T >
take  (4)
TAKEN  (3)
talking  (3)
Tampa  (1)
tell  (4)
termination  (3)
terms  (2)
testified  (1)
testify  (2)
testifying  (1)
TESTIMONY  (4)
testing  (1)
Thank  (7)
thing  (2)
things  (4)
think  (1)
third  (2)
three  (1)
TIME  (8)
times  (2)
titled  (1)
today  (9)
today's  (1)
top  (2)
topic  (1)
topics  (1)
tour  (1)
train  (1)
trained  (1)
training  (29)
trainings  (1)
transcribe  (1)
transcript  (4)

transferred  (1)
transitioning  (1)
TRAVIS  (6)
true  (2)
truthfully  (1)
try  (1)
trying  (1)
turned  (1)
two  (2)
type  (2)
typically  (1)

< U >
unaware  (2)
undergo  (7)
Undersheriff  (3)
undersigned  (1)
understand  (7)
understanding  (1)
unit  (1)
UNITED  (1)
unsigned  (1)
updates  (2)
updating  (1)
upwards  (1)
usually  (5)
utilized  (1)

< V >
valid  (1)
various  (3)
version  (2)
video  (1)
view  (1)
violations  (1)
vs  (1)

< W >
wait  (2)
waive  (1)
waived  (1)
want  (3)
warrant  (1)
warranted  (4)
warrants  (1)
watch  (1)
water  (1)
way  (2)
website  (1)

**weeks**  *(2)*
**weight**  *(1)*
**well**  *(14)*
**we're**  *(2)*
**we've**  *(1)*
**window**  *(2)*
**WITNESS**  *(8)*
**witnesses**  *(2)*
**work**  *(1)*
**worked**  *(2)*
**workplace**  *(1)*
**works**  *(1)*
**worries**  *(1)*
**writing**  *(1)*
**written**  *(2)*
**wrote**  *(1)*

**< Y >**
**Yeah**  *(3)*
**years**  *(2)*

**< Z >**
**Zoom**  *(4)*

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

**JENNA CLARK,**

     Plaintiff,

                                    Case No. 2:22-cv-614-SPC-NPM

**v.**

**CARMINE MARCENO, in his official capacity as Sheriff of Lee County, Florida,**

     Defendant.

_____/

### PLAINTIFF'S NOTICE OF RULE 30(b)(6) DEPOSITION

**PLEASE TAKE NOTICE** that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Plaintiff, JENNA CLARK ("Plaintiff"), shall take the deposition upon oral examination of Defendant, CARMINE MARCENO, in his official capacity as Sheriff of Lee County, Florida ("Defendant"), through one or more representatives who shall be designated to testify on Defendant's behalf regarding all information known or reasonably available to Defendant with respect to the subject matter identified in Schedule A. This deposition shall commence on the following dates and times:

| DATE/TIME | LOCATION |
|---|---|
| October 4th, 2023, at 11:00 AM | Via Zoom |
| October 10th, 2023, at 10:00 AM | Via Zoom |



Plaintiff's
Exhibit
**1**
_____
10/4/2023 M.F.

1

|  |  |
|---|---|
| October 11th, 2023, at 10:00 AM | Via Zoom |
| October 17th, 2023, at 10:00 AM | Via Zoom |
| October 18th, 2023, at 10:00 AM | Via Zoom |

The deposition will continue from day to day until completed before a notary public or other person authorized by law to administer oaths. The deposition will be conducted remotely through Everest Court Reporting and will be recorded stenographically.

Dated:  Miami, Florida
        August 30, 2023,

**DEREK SMITH LAW GROUP, PLLC**
*Counsel for Plaintiff*

/s/ Kyle T. MacDonald
Kyle T. MacDonald, Esq.
Florida Bar No.: 1038749
Derek Smith Law Group, PLLC
701 Brickell Ave, Suite 1310
Miami, FL 33131
Tel: (305) 946-1884
Fax: (305) 503-6741
Kyle@dereksmithlaw.com

## <u>SCHEDULE A</u>
## LIST OF TOPICS FOR DEFENDANT'S REPRESENTATIVE
### (hereinafter "LCSO" and/or "Defendant")

1. Knowledge of each and every document provided by Defendant in response to Plaintiff's discovery requests.

2. Knowledge related to Jenna Clark's employment with Defendant, including compensation and benefits paid to Jenna Clark from 2018 until the last day of her employment.

3. Knowledge related to all of the benefits Jenna Clark received subject to her employment with Defendant, including pension plan payments, 401k benefits, profit sharing, health benefits, retirement plans, and any other benefit Jenna Clark received from 2018 until the last day of her employment.

4. Knowledge related to benefits that Defendant offered to employees in general, including the cash value of each benefit offered, when Defendant began to offer said benefits, and descriptions of benefit packages that Defendant included as part of the compensation employees received.

5. Knowledge related to the amount of money that Jenna Clark was paid from 2018 until the last day of her employment.

6. Knowledge related to the amount of money that similarly situated employees to Jenna Clark were paid.

7. Knowledge of the policies or procedures provided by and/or maintained by Defendant with regard to the prevention of discrimination and harassment in the workplace.

8. Knowledge of the policies or procedures provided by and/or maintained by Defendant with regard to the prevention of discrimination and harassment in the workplace.

9. Knowledge of the policies or procedures provided by and/or maintained by Defendant with regard to leave benefits, paid-time-off benefits, FMLA benefits, and any other leave of absences.

10. Knowledge of any employee handbook for Defendant that was in effect at the time of Jenna Clark's employment from 2018 until the last day of her employment.

11. Knowledge related to reports of discrimination, including but not limited to, reports of discrimination that were presented and/or made during the time period when Jenna Clark was employed with Defendant from 2018 until the last day of her employment.

12. Knowledge related to Defendant's policies and procedures for preventing discrimination and harassment in the workplace and investigating and engaging in corrective action when discrimination is discovered.

13. Knowledge related to the agency-wide reduction in force conducted by Defendant in or around 2021, including knowledge of the persons involved in deciding the positions to be eliminated, the criteria used to select positions to be eliminated, and the compensation and leave benefits for the employees/positions ultimately selected to be eliminated.

14. Knowledge related to Defendant's fiscal budget and Defendant's operations, including revenue, expenses, and any budgetary impacts of the agency-wide reduction in force conducted by Defendant in or around 2021.

15. Knowledge regarding the following employees, including their dates of hire, job titles, knowledge of the amount of compensation paid to them, the amount of leave benefits available to them, the amount of leave they used for any reason (including FMLA leave, paid time off, or any other leave benefit offered), their age, their termination/resignation dates, and the reason for their termination/resignation:

    a. James Jones, Director of Fleet Management
    b. Jenna Clark, Director of Purchasing
    c. Anthony Ramsey, Communications Manager
    d. Amy DellAquilla, Community Liason
    e. Jami Bartz, Senior Services Coordinator
    f. Marsha Sprankel, Secretary of Traffic

16. Knowledge related to Annmarie Reno's employment with Defendant, including but not limited to, her entire personnel file, dates of employment, job assignments, job titles, compensation, promotions,

benefits, discipline, and complaints of unlawful employment practices made against her.

17. Knowledge related to Dawn Heikkila's employment with Defendant, including but not limited to, her entire personnel file, dates of employment, job assignments, job titles, compensation, promotions, benefits, discipline, and complaints of unlawful employment practices made against her.

18. Knowledge related to John Holloway's employment with Defendant, including but not limited to, his entire personnel file, dates of employment, job assignments, job titles, compensation, promotions, benefits, discipline, and complaints of unlawful employment practices made against him.

19. Knowledge related to Jenna Clark's employment with Defendant, including but not limited to, dates of employment, job assignments, compensation, promotions, discipline, benefits, job titles, and termination, from 2018 until the last day of her employment.

20. Knowledge related to the reason for Jenna Clark's termination from her employment with Defendant.

21. Knowledge related to any communications between Defendant's employees and Jenna Clark regarding Jenna Clark's termination and alternative positions with Defendant offered to Jenna Clark, if any, from 2018 until the last day of Jenna Clark's employment.

22. Knowledge of all correspondence, writings, and documents sent by Defendant regarding disciplinary action or termination of Jenna Clark, if any, from 2018 until the last day of Jenna Clark's employment.

23. Knowledge any investigations performed by Defendant regarding Jenna Clark's reports of discrimination and harassment in the workplace or filing of administrative charges.

24. Knowledge related to any leave requested by Jenna Clark during her employment, including FMLA leave, paid time off, unpaid time off, and any other type of leave of absence offered by Defendant, from 2018 until the last day of Jenna Clark's employment.

25.    Knowledge related to performance reviews and Defendant's performance review policies, procedures, and protocols.

26.    Knowledge as to Defendant's Position Statement filed with the EEOC and the Answer filed in response to Plaintiff's Complaint.

27.    Knowledge as to Defendant's document and record keeping proceed used to record or keep track of communications amongst Defendant's employees, including but not limited to any electronic communication technology used by Defendant's employees.

28.    Knowledge related to performance reviews that Jenna Clark received or underwent during her employment with Defendant including dates of each performance review and the substance of each performance review, from 2018 until the last day of Jenna Clark's employment.

29.    Knowledge of organizational charts and lists identifying the divisions and management structure for Defendant.

30.    Knowledge of charges filed with the Equal Employment Opportunity Commission and the Florida Commission on Human Relations from January of 2016 through December 31, 2022.

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document is being served on August 30, 2023, on all counsel of record on the service list below via e-mail transmission.

By: <u>*/s/ Kyle T. MacDonald*</u>
Kyle T. MacDonald, Esq.

## <u>SERVICE LIST</u>

**ALLEN, NORTON & BLUE, PA**

David J. Stefany
324 S. Hyde Park Ave
Suite 225
Tampa, FL 33606
813/251-1210
Fax: 813/253-2006
Email: dstefany@anblaw.com

Maelyn Marie Morrison
324 S. Hyde Park Ave., Suite 225
Tampa, FL 33606
813-251-1210
Fax: 813-253-2006
Email: mmorrison@anblaw.com

*Counsel for Defendant*

**26.1.2.5 (26.3.2)  Job Knowledge and Performance:**

1.  **General Proficiency**:  Sheriff's Office members are required to maintain required certifications, job knowledge, and skills required for the performance of official duties. Sheriff's Office members shall maintain and demonstrate their knowledge of the law and criminal procedure.  Sheriff's Office members shall maintain and demonstrate proficiency in required interpersonal skills.  Sheriff's Office members shall maintain proficiency in the care and use of vehicles,  equipment, and firearms. Sheriff's Office members shall maintain and demonstrate proficiency in accordance with established standards and firearm qualification requirements.  Sheriff's Office members may be re-tested for proficiency as provided in direct procedures, with each subsequent failure to qualify constituting an additional offense. Failure to maintain job skills shall result in counseling, instruction or training, and may also result in suspension.  Repeated failure to maintain necessary job skills, after counseling and instruction, shall result in increasing the severity of disciplinary actions, up to and including withdrawal of appointment.

2.  **Knowledge of Rules and Regulations and Procedures**:  Failure to maintain and demonstrate knowledge of rules and regulations or directive procedures shall result in counseling, suspension, demotion, or withdrawal of appointment. If appointment is not withdrawn, subsequent violation(s) or recurrent failure to maintain and demonstrate knowledge of rules and regulations or directive procedures shall be cause for withdrawal of appointment.

**26.1.2.6   (26.1.3) Harassment / Discrimination:**

**Sexual Harassment** - It is the Sheriff's policy that all members have a right to work in an environment free of discrimination, which includes freedom from sexual harassment.  The Sheriff's Office prohibits all forms of unlawful harassment of its members in any form. All members at all levels of the Office must avoid offensive or inappropriate sexual or sexually harassing behavior at work and will be held responsible for insuring that the workplace is free from sexual harassment.

Harassment or discrimination on the basis of race, color, religion, sex, sexual orientation, national origin, marital status, political affiliation, age, or physical or mental handicap constitutes discrimination.  This type of harassment is therefore strictly prohibited and may subject the perpetrator to appropriate discipline, up to and including discharge.   Additionally, such conduct may expose the perpetrator to personal liability for damages in the event legal action is brought by any person who is the victim of such conduct or behavior.

Any verbal or physical conduct that denigrates or shows hostility or aversion toward an individual because of their race, color, religion, sex, national origin, age or disability, or that of their relatives, friends, or associates, and that:

1.  has the purpose or effect of creating an intimidating, hostile or offensive working environment;

Plaintiff's
Exhibit
**2**
10/4/2023 M.F.

26:25

2.      has the purpose or effect of unreasonably interfering with an individual's work performance; or

3.      otherwise adversely affects an individual's employment opportunities is strictly prohibited and may subject the perpetrator to appropriate discipline, up to and including discharge.

Any epithets, slurs, negative stereotyping, threatening, intimidating, or hostile acts that relate to race, color, religion, sex, national origin, age or disability; or any written or graphic material that denigrates or shows hostility or aversion toward an individual or group because of race, color, religion, national origin, age or disability that is placed on walls, bulletin boards, or elsewhere on the work premises, or circulated in the workplace is strictly prohibited and may subject the perpetrator to appropriate discipline, up to and including discharge.

Any unwanted sexual advances, attention or any other offensive sexually based conduct, words or action; or any attempt to make the granting of sexual favors a condition of employment or advancement; or any adverse job retaliation taken for the denial of sexual favors is strictly prohibited and may subject the perpetrator to appropriate discipline, up to and including discharge.

Any rude, insulting, inconsiderate or otherwise offensive behavior including jokes, cartoons, drawings, pictures, video and published documents, as well as physical conduct and words that is based upon race, color, religion, sex, national origin, age or disability, is strictly prohibited and may subject the perpetrator to appropriate discipline, up to and including discharge.

No member will suffer adverse job actions because of their refusal to condone or engage in conduct or behavior prohibited by this rule, or for complaining of its occurrences, regardless of whether or not he or she is the object of such conduct or behavior.  Any member who believes that he or she is a victim of such conduct or behavior, or who observes such conduct or behavior directed toward another person, shall report it to the Director/Commander of Human Resources or to the Internal Affairs Division immediately.

Whenever any report regarding harassment or discrimination involves any of the member's supervisors, the member shall report the matter to the next highest level of their Chain of Command or to the Human Resources Director/Commander or to the Internal Affairs Division.

In the event that all persons in the Chain of Command are involved, the member shall report the matter to the Human Resources Director/Commander or to the Internal Affairs Division or to the Sheriff.  In the event that the incident is alleged to involve the Sheriff, any person wishing to do so may file a complaint and direct it to the United States Equal Opportunity Commission, Miami District Office.  No member will suffer retaliation for making a complaint under this rule.

Upon receipt of a report or complaint of any conduct or behavior prohibited by this rule, an investigation will be conducted.  Although the Lee County Sheriff's Office will attempt to maintain the complainant's confidentiality to the extent allowed by law, confidentiality cannot be guaranteed if it interferes with the Lee County Sheriff's Office's ability to investigate the reported incident or take whatever remedial action may be deemed appropriate by the Agency.

LCSO/ Clark
DEF000763

Each and every member has an obligation to combat all behavior and conduct that is prohibited by this rule. All supervisors will be expected, as part of their duties, to take the requisite action necessary to prevent harassment or discrimination and/or to remedy its effects. All members should be open and forthright when informing other members their conduct or behavior violates this rule. It is the intent of the Lee County Sheriff's Office that any offensive or improper conduct be prevented or, if not prevented, then corrected as quickly as possible. All members will be expected to work toward those common goals so the Agency may fulfill its mission and provide the best work environment possible.

## 26.2  DRUG TESTING

The purpose of this policy is to promote a drug-free workplace through fair and reasonable drug-testing methods for the protection of the Lee County Sheriff's Office, its members and the public.

### 26.2.1.1 Definitions

1. Except where the context otherwise requires, as used:

    A. "Drug" means alcohol, including distilled spirits, wine, malt beverages, and intoxicating liquors; amphetamines; cannabinoids; cocaine; phencyclidine (PCP); hallucinogens; methaqualone; opiates; barbiturates; benzodiazepines; synthetic narcotics; designer drugs; or a metabolite of any of the substances listed herein including any and all drugs illegal under federal law.

    B. "Drug test" or "test" means any chemical, biological, or physical instrumental analysis administered for the purpose of determining the presence or absence of a drug or its metabolites.

    C. "Initial drug test" means a sensitive, rapid, and reliable procedure to identify negative and presumptive positive specimens. All initial tests shall use an immunoassay procedure or an equivalent, or shall use a more accurate scientifically accepted method approved by the Agency for Health Care Administration as such more accurate technology becomes available in a cost-effective form.

    D. "Confirmation test," "confirmed test," or "confirmed drug test" means a second analytical procedure used to identify the presence of a specific drug or metabolite in a specimen. The confirmation test must be different in scientific principle from that of the initial test procedure. This confirmation method must be capable of providing requisite specificity, sensitivity, and quantitative accuracy.

    E. "Chain of custody" refers to the methodology of tracking specified materials or substances for the purpose of maintaining control and accountability from initial collection to final disposition for all such materials or substances and

LCSO/ Clark
DEF000764

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

**JENNA CLARK,**

     Plaintiff,

                                        Case No. 2:22-cv-614-SPC-NPM

**v.**

**CARMINE MARCENO, in his official capacity as Sheriff of Lee County, Florida,**

     Defendant.

_____/

## PLAINTIFF'S NOTICE OF RULE 30(b)(6) DEPOSITION

**PLEASE TAKE NOTICE** that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Plaintiff, JENNA CLARK ("Plaintiff"), shall take the deposition upon oral examination of Defendant, CARMINE MARCENO, in his official capacity as Sheriff of Lee County, Florida ("Defendant"), through one or more representatives who shall be designated to testify on Defendant's behalf regarding all information known or reasonably available to Defendant with respect to the subject matter identified in Schedule A. This deposition shall commence on the following dates and times:

| DATE/TIME | LOCATION |
|---|---|
| October 4th, 2023, at 11:00 AM | Via Zoom |
| October 10th, 2023, at 10:00 AM | Via Zoom |



Plaintiff's
Exhibit
**1**
10/4/2023 M.F.

1

| | |
|---|---|
| October 11th, 2023, at 10:00 AM | Via Zoom |
| October 17th, 2023, at 10:00 AM | Via Zoom |
| October 18th, 2023, at 10:00 AM | Via Zoom |

The deposition will continue from day to day until completed before a notary public or other person authorized by law to administer oaths. The deposition will be conducted remotely through Everest Court Reporting and will be recorded stenographically.

Dated: Miami, Florida
     August 30, 2023,

**DEREK SMITH LAW GROUP, PLLC**
*Counsel for Plaintiff*

/s/ Kyle T. MacDonald
Kyle T. MacDonald, Esq.
Florida Bar No.: 1038749
Derek Smith Law Group, PLLC
701 Brickell Ave, Suite 1310
Miami, FL 33131
Tel: (305) 946-1884
Fax: (305) 503-6741
Kyle@dereksmithlaw.com

2

<u>**SCHEDULE A**</u>
**LIST OF TOPICS FOR DEFENDANT'S REPRESENTATIVE**
**(hereinafter "LCSO" and/or "Defendant")**

1.     Knowledge of each and every document provided by Defendant in response to Plaintiff's discovery requests.

2.     Knowledge related to Jenna Clark's employment with Defendant, including compensation and benefits paid to Jenna Clark from 2018 until the last day of her employment.

3.     Knowledge related to all of the benefits Jenna Clark received subject to her employment with Defendant, including pension plan payments, 401k benefits, profit sharing, health benefits, retirement plans, and any other benefit Jenna Clark received from 2018 until the last day of her employment.

4.     Knowledge related to benefits that Defendant offered to employees in general, including the cash value of each benefit offered, when Defendant began to offer said benefits, and descriptions of benefit packages that Defendant included as part of the compensation employees received.

5.     Knowledge related to the amount of money that Jenna Clark was paid from 2018 until the last day of her employment.

6.     Knowledge related to the amount of money that similarly situated employees to Jenna Clark were paid.

7.     Knowledge of the policies or procedures provided by and/or maintained by Defendant with regard to the prevention of discrimination and harassment in the workplace.

8.     Knowledge of the policies or procedures provided by and/or maintained by Defendant with regard to the prevention of discrimination and harassment in the workplace.

9.     Knowledge of the policies or procedures provided by and/or maintained by Defendant with regard to leave benefits, paid-time-off benefits, FMLA benefits, and any other leave of absences.

10.   Knowledge of any employee handbook for Defendant that was in effect at the time of Jenna Clark's employment from 2018 until the last day of her employment.

11.   Knowledge related to reports of discrimination, including but not limited to, reports of discrimination that were presented and/or made during the time period when Jenna Clark was employed with Defendant from 2018 until the last day of her employment.

12.   Knowledge related to Defendant's policies and procedures for preventing discrimination and harassment in the workplace and investigating and engaging in corrective action when discrimination is discovered.

13.   Knowledge related to the agency-wide reduction in force conducted by Defendant in or around 2021, including knowledge of the persons involved in deciding the positions to be eliminated, the criteria used to select positions to be eliminated, and the compensation and leave benefits for the employees/positions ultimately selected to be eliminated.

14.   Knowledge related to Defendant's fiscal budget and Defendant's operations, including revenue, expenses, and any budgetary impacts of the agency-wide reduction in force conducted by Defendant in or around 2021.

15.   Knowledge regarding the following employees, including their dates of hire, job titles, knowledge of the amount of compensation paid to them, the amount of leave benefits available to them, the amount of leave they used for any reason (including FMLA leave, paid time off, or any other leave benefit offered), their age, their termination/resignation dates, and the reason for their termination/resignation:

   a.  James Jones, Director of Fleet Management
   b.  Jenna Clark, Director of Purchasing
   c.  Anthony Ramsey, Communications Manager
   d.  Amy DellAquilla, Community Liason
   e.  Jami Bartz, Senior Services Coordinator
   f.  Marsha Sprankel, Secretary of Traffic

16.   Knowledge related to Annmarie Reno's employment with Defendant, including but not limited to, her entire personnel file, dates of employment, job assignments, job titles, compensation, promotions,

benefits, discipline, and complaints of unlawful employment practices made against her.

17.   Knowledge related to Dawn Heikkila's employment with Defendant, including but not limited to, her entire personnel file, dates of employment, job assignments, job titles, compensation, promotions, benefits, discipline, and complaints of unlawful employment practices made against her.

18.   Knowledge related to John Holloway's employment with Defendant, including but not limited to, his entire personnel file, dates of employment, job assignments, job titles, compensation, promotions, benefits, discipline, and complaints of unlawful employment practices made against him.

19.   Knowledge related to Jenna Clark's employment with Defendant, including but not limited to, dates of employment, job assignments, compensation, promotions, discipline, benefits, job titles, and termination, from 2018 until the last day of her employment.

20.   Knowledge related to the reason for Jenna Clark's termination from her employment with Defendant.

21.   Knowledge related to any communications between Defendant's employees and Jenna Clark regarding Jenna Clark's termination and alternative positions with Defendant offered to Jenna Clark, if any, from 2018 until the last day of Jenna Clark's employment.

22.   Knowledge of all correspondence, writings, and documents sent by Defendant regarding disciplinary action or termination of Jenna Clark, if any, from 2018 until the last day of Jenna Clark's employment.

23.   Knowledge any investigations performed by Defendant regarding Jenna Clark's reports of discrimination and harassment in the workplace or filing of administrative charges.

24.   Knowledge related to any leave requested by Jenna Clark during her employment, including FMLA leave, paid time off, unpaid time off, and any other type of leave of absence offered by Defendant, from 2018 until the last day of Jenna Clark's employment.

25.     Knowledge related to performance reviews and Defendant's performance review policies, procedures, and protocols.

26.     Knowledge as to Defendant's Position Statement filed with the EEOC and the Answer filed in response to Plaintiff's Complaint.

27.     Knowledge as to Defendant's document and record keeping proceed used to record or keep track of communications amongst Defendant's employees, including but not limited to any electronic communication technology used by Defendant's employees.

28.     Knowledge related to performance reviews that Jenna Clark received or underwent during her employment with Defendant including dates of each performance review and the substance of each performance review, from 2018 until the last day of Jenna Clark's employment.

29.     Knowledge of organizational charts and lists identifying the divisions and management structure for Defendant.

30.     Knowledge of charges filed with the Equal Employment Opportunity Commission and the Florida Commission on Human Relations from January of 2016 through December 31, 2022.

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document is being served on August 30, 2023, on all counsel of record on the service list below via e-mail transmission.

By: *<u>/s/ Kyle T. MacDonald</u>*
Kyle T. MacDonald, Esq.

## <u>SERVICE LIST</u>

**ALLEN, NORTON & BLUE, PA**

David J. Stefany
324 S. Hyde Park Ave
Suite 225
Tampa, FL 33606
813/251-1210
Fax: 813/253-2006
Email: dstefany@anblaw.com

Maelyn Marie Morrison
324 S. Hyde Park Ave., Suite 225
Tampa, FL 33606
813-251-1210
Fax: 813-253-2006
Email: mmorrison@anblaw.com

*Counsel for Defendant*

Supercedes             Lee County Sheriff's Office          Effective:  7/91
Chapter 26 – Rev. 01/21          Operations Manual          Revised:  06/21

## 26.1.2.5 (26.3.2)  Job Knowledge and Performance:

1. **General Proficiency**:  Sheriff's Office members are required to maintain required certifications, job knowledge, and skills required for the performance of official duties.  Sheriff's Office members shall maintain and demonstrate their knowledge of the law and criminal procedure.  Sheriff's Office members shall maintain and demonstrate proficiency in required interpersonal skills.  Sheriff's Office members shall maintain proficiency in the care and use of vehicles,  equipment, and firearms.  Sheriff's Office members shall maintain and demonstrate proficiency in accordance with established standards and firearm qualification requirements.  Sheriff's Office members may be re-tested for proficiency as provided in direct procedures, with each subsequent failure to qualify constituting an additional offense. Failure to maintain job skills shall result in counseling, instruction or training, and may also result in suspension.  Repeated failure to maintain necessary job skills, after counseling and instruction, shall result in increasing the severity of disciplinary actions, up to and including withdrawal of appointment.

2. **Knowledge of Rules and Regulations and Procedures**:  Failure to maintain and demonstrate knowledge of rules and regulations or directive procedures shall result in counseling, suspension, demotion, or withdrawal of appointment. If appointment is not withdrawn, subsequent violation(s) or recurrent failure to maintain and demonstrate knowledge of rules and regulations or directive procedures shall be cause for withdrawal of appointment.

## 26.1.2.6   (26.1.3) Harassment / Discrimination:

**Sexual Harassment** - It is the Sheriff's policy that all members have a right to work in an environment free of discrimination, which includes freedom from sexual harassment.  The Sheriff's Office prohibits all forms of unlawful harassment of its members in any form. All members at all levels of the Office must avoid offensive or inappropriate sexual or sexually harassing behavior at work and will be held responsible for insuring that the workplace is free from sexual harassment.

Harassment or discrimination on the basis of race, color, religion, sex, sexual orientation, national origin, marital status, political affiliation, age, or physical or mental handicap constitutes discrimination.  This type of harassment is therefore strictly prohibited and may subject the perpetrator to appropriate discipline, up to and including discharge.   Additionally, such conduct may expose the perpetrator to personal liability for damages in the event legal action is brought by any person who is the victim of such conduct or behavior.

Any verbal or physical conduct that denigrates or shows hostility or aversion toward an individual because of their race, color, religion, sex, national origin, age or disability, or that of their relatives, friends, or associates, and that:

1. has the purpose or effect of creating an intimidating, hostile or offensive working environment;

Plaintiff's
Exhibit
**2**
10/4/2023 M.F.

26:25

2.    has the purpose or effect of unreasonably interfering with an individual's work performance; or

3.    otherwise adversely affects an individual's employment opportunities is strictly prohibited and may subject the perpetrator to appropriate discipline, up to and including discharge.

Any epithets, slurs, negative stereotyping, threatening, intimidating, or hostile acts that relate to race, color, religion, sex, national origin, age or disability; or any written or graphic material that denigrates or shows hostility or aversion toward an individual or group because of race, color, religion, national origin, age or disability that is placed on walls, bulletin boards, or elsewhere on the work premises, or circulated in the workplace is strictly prohibited and may subject the perpetrator to appropriate discipline, up to and including discharge.

Any unwanted sexual advances, attention or any other offensive sexually based conduct, words or action; or any attempt to make the granting of sexual favors a condition of employment or advancement; or any adverse job retaliation taken for the denial of sexual favors is strictly prohibited and may subject the perpetrator to appropriate discipline, up to and including discharge.

Any rude, insulting, inconsiderate or otherwise offensive behavior including jokes, cartoons, drawings, pictures, video and published documents, as well as physical conduct and words that is based upon race, color, religion, sex, national origin, age or disability, is strictly prohibited and may subject the perpetrator to appropriate discipline, up to and including discharge.

No member will suffer adverse job actions because of their refusal to condone or engage in conduct or behavior prohibited by this rule, or for complaining of its occurrences, regardless of whether or not he or she is the object of such conduct or behavior.  Any member who believes that he or she is a victim of such conduct or behavior, or who observes such conduct or behavior directed toward another person, shall report it to the Director/Commander of Human Resources or to the Internal Affairs Division immediately.

Whenever any report regarding harassment or discrimination involves any of the member's supervisors, the member shall report the matter to the next highest level of their Chain of Command or to the Human Resources Director/Commander or to the Internal Affairs Division.

In the event that all persons in the Chain of Command are involved, the member shall report the matter to the Human Resources Director/Commander or to the Internal Affairs Division or to the Sheriff.  In the event that the incident is alleged to involve the Sheriff, any person wishing to do so may file a complaint and direct it to the United States Equal Opportunity Commission, Miami District Office.  No member will suffer retaliation for making a complaint under this rule.

Upon receipt of a report or complaint of any conduct or behavior prohibited by this rule, an investigation will be conducted.  Although the Lee County Sheriff's Office will attempt to maintain the complainant's confidentiality to the extent allowed by law, confidentiality cannot be guaranteed if it interferes with the Lee County Sheriff's Office's ability to investigate the reported incident or take whatever remedial action may be deemed appropriate by the Agency.

Each and every member has an obligation to combat all behavior and conduct that is prohibited by this rule.  All supervisors will be expected, as part of their duties, to take the requisite action necessary to prevent harassment or discrimination and/or to remedy its effects.  All members should be open and forthright when informing other members their conduct or behavior violates this rule.  It is the intent of the Lee County Sheriff's Office that any offensive or improper conduct be prevented or, if not prevented, then corrected as quickly as possible.  All members will be expected to work toward those common goals so the Agency may fulfill its mission and provide the best work environment possible.

## 26.2  DRUG TESTING

The purpose of this policy is to promote a drug-free workplace through fair and reasonable drug-testing methods for the protection of the Lee County Sheriff's Office, its members and the public.

### 26.2.1.1 Definitions

1.  Except where the context otherwise requires, as used:

    A.  "Drug" means alcohol, including distilled spirits, wine, malt beverages, and intoxicating liquors; amphetamines; cannabinoids; cocaine; phencyclidine (PCP); hallucinogens; methaqualone; opiates; barbiturates; benzodiazepines; synthetic narcotics; designer drugs; or a metabolite of any of the substances listed herein including any and all drugs illegal under federal law.

    B.  "Drug test" or "test" means any chemical, biological, or physical instrumental analysis administered for the purpose of determining the presence or absence of a drug or its metabolites.

    C.  "Initial drug test" means a sensitive, rapid, and reliable procedure to identify negative and presumptive positive specimens. All initial tests shall use an immunoassay procedure or an equivalent, or shall use a more accurate scientifically accepted method approved by the Agency for Health Care Administration as such more accurate technology becomes available in a cost-effective form.

    D.  "Confirmation test," "confirmed test," or "confirmed drug test" means a second analytical procedure used to identify the presence of a specific drug or metabolite in a specimen. The confirmation test must be different in scientific principle from that of the initial test procedure. This confirmation method must be capable of providing requisite specificity, sensitivity, and quantitative accuracy.

    E.  "Chain of custody" refers to the methodology of tracking specified materials or substances for the purpose of maintaining control and accountability from initial collection to final disposition for all such materials or substances and

LCSO/ Clark
DEF000764