```
 1                UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
 2


 3
     JENNA CLARK,
 4
          Plaintiff,
 5                              CASE NO.: 2:22-cv-614-SPC-NPM
     v.
 6
     CARMINE MARCENO, in
 7   his official capacity
     as Sheriff of Lee
 8   Country, Florida,

 9        Defendant.
     ----------------------/
10
                        ZOOM DEPOSITION OF
11
                           JILL JONES
12
                 TAKEN ON BEHALF OF PLAINTIFF
13


14
     DATE TAKEN:    Wednesday, October 25, 2023
15
     TIME:          11:30 a.m. to 1:29 p.m.
16
     PLACE:         All parties appeared via videoconference
17


18


19


20


21


22
          Examination of the witness taken before:
23
                       Julie S. Evans
24          Court Reporter and Notary Public

25
```

```
 1   APPEARANCES:

 2   KYLE T. MACDONALD, ESQUIRE (via Zoom)
     Derek Smith Law Group, PLLC
 3   520 Brickell Key Dr.
     Suite O-301
 4   Miami, Florida 33131

 5        On behalf of the Plaintiff.

 6   DAVID J. STEFANY, ESQUIRE (via Zoom)
     Allen Norton & Blue, P.A.
 7   324 South Hyde Park Avenue
     Suite 225
 8   Tampa, Florida 33606-4128

 9        On behalf of the Defendant.

10                           - - - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    EXAMINATION INDEX

 2   ZOOM TESTIMONY OF JILL JONES
          DIRECT BY MR. MACDONALD                        4
 3        CROSS BY MR. STEFANY                           61

 4   CERTIFICATE OF OATH                                66

 5   CERTIFICATE OF REPORTER                            67

 6   ERRATA SHEET                                       68

 7   NOTIFICATION LETTER                                69

 8
                      EXHIBIT INDEX
 9
     Plaintiff's
10     1       Notice of Taking Deposition               7

11

12                     - - - - -

13            S T I P U L A T I O N S

14        It is hereby agreed and so stipulated by and

15   between the parties hereto, through their respective

16   counsel, that the reading and signing of the transcript

17   are expressly reserved.

18                     - - - - -

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2              THE COURT REPORTER:  Today is Wednesday,

3         October 25, 2023.  The time is approximately

4         11:30 a.m.  This is the Zoom deposition of Jill

5         Jones, being taken in the matter of Clark v.

6         Carmine Marceno, as Sheriff of Lee County.  Will

7         counsel please state their appearance, beginning

8         with Plaintiff's counsel.

9              MR. MACDONALD:  Kyle MacDonald, for the

10        Plaintiff, Jenna Clark.

11             MR. STEFANY:  David Stefany, for Sheriff

12        Carmine Marceno.

13             THE COURT REPORTER:  Please raise your right

14        hand.  Do you solemnly swear or affirm your

15        testimony will be the truth, the whole truth,

16        nothing but the truth, so help you God?

17             THE WITNESS:  I do.

18   THEREUPON:

19                      JILL JONES,

20   having first been duly sworn, testified as follows:

21                  DIRECT EXAMINATION

22   BY MR. MACDONALD:

23        Q.   Good morning, Ms. Jones.  My name is Kyle

24   MacDonald, and I represent Jenna Clark in her lawsuit

25   against Carmine Marceno, in his official capacity as

 1    Sheriff of Lee County Florida.

 2             Thank you for being here today.

 3        A.    Absolutely.

 4        Q.    Could you please start by stating your name,

 5    for the record, please.

 6        A.    Jill Jones.

 7        Q.    Have you ever been deposed before, Ms. Jones?

 8        A.    I have not.

 9        Q.    Since this is your first deposition, I'm just

10    going to go over a few things, so we're on the same

11    page.  Okay?

12        A.    Okay.

13        Q.    Do you understand that you have been placed

14    under oath and that you have an obligation to testify

15    truthfully today?

16        A.    Yes, sir.

17        Q.    And do you understand that, even though we are

18    conducting this deposition via Zoom, your testimony has

19    the same force and effect, as if you were testifying in

20    a court of law before a judge and jury?

21        A.    Yes, sir.

22        Q.    Now, the court reporter cannot transcribe

23    inaudible responses like a gesture or a shrug, so just

24    please make sure you respond just as you have been.

25    Okay?

1    A.    Okay.

2    Q.    The court reporter also cannot accurately

3    reflect your responses if we speak at the same time.  So

4    I'll wait for you to finish your answers, and I'd just

5    ask that you wait until I finish my questions.  Is that

6    fair?

7    A.    That's fair.

8    Q.    Now, we want to make sure that we get your best

9    testimony regarding this lawsuit.  So if there's

10   anything that you don't understand or that seems

11   confusing to you, just let me know and I can try to

12   rephrase the question for you.  Okay?

13   A.    Perfect.

14   Q.    If you need to take a break at any point, to go

15   to the bathroom, get a glass of water, anything like

16   that, just let me know and we can take a break.  Okay?

17   A.    Sounds good.

18   Q.    Is there anything that would prevent you from

19   thinking clearly and testifying truthfully today?

20   A.    No.

21   Q.    Do you understand that you are here today to

22   testify on behalf of the Lee County Sheriff's Office?

23   A.    Yes.

24   Q.    And do you understand that your answers are

25   based, not only on your personal knowledge, but also all

```
 1   knowledge known or reasonably known or reasonably

 2   available to the Lee County Sheriff's Office?

 3        A.   Yes.

 4        Q.   And do you understand that your answers will be

 5   binding on the Lee County Sheriff's Office?

 6        A.   Yes.

 7        Q.   I'm going to go ahead and show you a document.

 8   (Screen share began.)  This has been previously marked

 9   as Plaintiff's Exhibit 1.  Have you ever seen this

10   document before?

11        A.   I've seen the first page of it, yes.

12        Q.   I'm going draw your attention here to this

13   third page.  Are you prepared to give testimony today

14   regarding the topics listed in paragraphs 2, 5, and 6?

15        A.   Yes.

16        Q.   And are you prepared to give testimony today

17   regarding the topics listed in paragraphs 14 and 15?

18        A.   Yes.

19        Q.   And are you prepared to give testimony

20   regarding the topic listed in paragraph 29?

21        A.   Yes.

22        Q.   Where are you conducting this deposition today

23   from?

24        A.   The Sheriff's Office headquarters.

25        Q.   Is anyone else in the room with you?
```

1      A.    No, sir.

2      Q.    Do you have any documents in front of you?

3      A.    I do.

4      Q.    And what documents do you have in front of you?

5      A.    Do you want me to just show them?  I don't know

6    if you can see them; if you want me to come closer, I

7    can.

8      Q.    That's okay.

9      A.    In reference to one of the questions

10   highlighted in this document, I pulled the adopted

11   budget report for fiscals '17, 18, through '21-'22,

12   showing our authorized budget.

13          In reference to one of your questions in the

14   document you already showed, I pulled action history

15   reports for each one of the people listed in paragraph

16   15, from our HR database.  And then in reference to

17   salaries related to those same individuals, I pulled our

18   year-to-date accumulator report, that shows payments

19   made and which payment types were made to each one of

20   these individuals, in the event that you had questions.

21   2018 was not something I had an accumulator report for,

22   so I also pulled a paycheck stub.  And I believe the

23   reference number on this was a document that was already

24   provided to you; it has a Bates number 317.  And it's

25   just the final paycheck stub for Jenna, for 2018.

1    Q.   Are those all the documents that you have in

2    front of you?

3    A.   Yes, sir.

4    Q.   What did you do to prepare for today's

5    deposition?

6    A.   I went through this document that you showed

7    previously and my highlighted -- or the paragraphs that

8    you mentioned were highlighted, so I read through each

9    one of those; and in my prep meeting with our local

10   counsel, we went over the questions that I had in

11   relationship to my understanding of those questions; and

12   then I followed up, to pull reports that I thought would

13   be the best reference material to answer any anticipated

14   questions.

15   Q.   Did you speak with anyone besides your

16   attorneys regarding your deposition today?

17   A.   My supervisor, I let him know that I was

18   scheduled to meet; and then our legal counsel.  They

19   were the ones communicating the information and the

20   dates; I requested a date change, so they coordinated

21   that for me as well.

22   Q.   Are you familiar with the amount of money that

23   Jenna Clark was paid during her employment with the Lee

24   County Sheriff's Office?

25   A.   I have that information, yes.

1    Q.    How much was Jenna Clark paid during her last

2    year of employment with the Lee County Sheriff's Office?

3    A.    So I'm referring to the pay rate accumulator

4    report for 2021.  And this particular report has

5    different pay rates of which includes some non-salaried

6    benefits, like the gross term life taxable; she was

7    issued a vehicle, so there's a vehicle lease; IRS value,

8    that's a taxable benefit; and then the taxation amount

9    for fuel as well.  I'm showing her at $94,960.57 for

10   that year, including those non-salary benefits.

11   Q.    So that number would include the salary that

12   was paid to Ms. Clark as well as those benefits, as

13   well; is that right?

14   A.    Yes, sir.

15   Q.    Could you tell me the amount that Jenna Clark

16   was paid excluding those benefits?

17   A.    Can I use a calculator?  There's 1, 2, 3, 4, 5,

18   6, 7 --

19   Q.    Here's what might make it easier.  Let's go

20   through the categories of the compensation that you have

21   for those benefits for her compensation?

22   A.    So regular wages was $51,069.96; vacation was

23   $3,191.16; sick leave was $2,131.24; personal time taken

24   was $4,558.80; admin leave with pay was $4,695.56; the

25   sick buy-back was $4,558.80; the vacation payout was

1    $18,440.80; and then the vacation buy-back was

2    $3,647.04.

3        Q.   And those are all the categories that you have

4    listed there?

5        A.   Those are all the compensatable ones; the

6    taxable ones include group, term life insurance, the

7    lease value, and a fuel value; so those are taxable

8    benefits.

9        Q.   And what are the amounts of those categories,

10   please?

11       A.   The term life is 443.36; the lease value was

12   $1,863.54; and the fuel value was $360.31.

13       Q.   And those numbers that you just described to

14   me, those were for the compensation and benefits paid in

15   2021 to Jenna Clark; is that right?

16       A.   2021, yes, sir.

17       Q.   Now, in those categories, some of those you

18   mentioned buyout; what does that mean?

19       A.   So once a year our agency will list a buy-back

20   of vacation, and then -- and that's once per year, we

21   offer employees the opportunity to buy back sick; so

22   that happens twice a year, once for vacation and once

23   for sick; and employees can either elect or not elect to

24   take advantage of that opportunity.

25       Q.   So an employee can elect to be paid for their

1   unused vacation time; is that right?

2       A.    Correct.

3       Q.    And that applies to sick leave, as well?

4       A.    Sick and vacation.

5       Q.    Does that apply to the admin leave that you

6   mentioned?

7       A.    No.  Admin leave is a time sheet category.  So

8   if someone was put on admin leave or requested admin

9   leave, then they would put that on as a time-off reason

10  code in their time sheet, in our time and attendance

11  software.

12      Q.    And those categories for the different types of

13  leaves, are those amounts based on leave that was

14  actually taken by the employee, or is that just the

15  amount of money that was allocated for those benefits?

16      A.    That would have been time taken.  This

17  particular report, the year-to-date accumulator report,

18  is actually pulling from our payroll system, so this is

19  time actually paid.

20      Q.    So looking at those numbers, you get an idea of

21  how much leave an employee used during that time period;

22  is that fair to say?

23      A.    That would be fair to say.

24      Q.    Do any of those categories that we discussed

25  include pension benefits, or benefits paid in the

 1    Florida Retirement System, specifically?

 2         A.    This report does not.

 3         Q.    Are you familiar with the Florida Retirement

 4    System and the pension benefits paid by the Lee County

 5    Sheriff's Office?

 6         A.    I'm familiar with the employer contributions.

 7         Q.    How did the employer contributions work?

 8         A.    FRS will submit to us, once per year, what the

 9    rates are going to be for the Sheriff's Office, and then

10    we import those rates into our payroll -- into our Munis

11    database; and then that rate is applied as a deduction

12    code to the employee record, based on the type of FRS

13    enrollment that they're signed up for.

14         Q.    And do those rates fluctuate that are given by

15    the Florida Retirement System?

16         A.    They fluctuate year by year; but once the rates

17    are established, they're established for a full year.

18         Q.    In terms of employees' salary, was there a

19    standardized increase that would apply to Ms. Clark if

20    she stayed with her employment at the Lee County

21    Sheriff's Office?

22         A.    There -- yes.  We have a generalized increase

23    that happens in October every year.  And as long as she

24    would have met the criteria, based on the directive that

25    was provided for that new year, she would have been

1   included in that.

2        Q.   And that increase is applied to all employees

3   that are eligible; is that correct?

4        A.   Yes.  Based on eligibility, yes.

5        Q.   What does the eligibility criteria look like?

6        A.   So a decision is made year by year; but

7   generally speaking, the criteria is for full-time

8   employees, what we're doing for full-time employees,

9   we're doing for part-time employees; and then we look at

10  -- for the last several years, we've looked at whether

11  or not the employee was over their payroll pay plan

12  maximum; and if they were, what to do with them in the

13  event that they were already over their last salary.

14       Q.   And that happens in October of every year?

15       A.   Correct.

16       Q.   Are you familiar with the Lee County Sheriff's

17  Office budgetary impact for the Reduction in Force that

18  was conducted in 2021?

19       A.   Sorry, can you repeat the question?

20       Q.   Yes.  Are you familiar with the budgetary

21  impact of the Reduction in Force that was conducted in

22  2021 by the Lee County Sheriff's Office?

23       A.   I am not.

24       Q.   One of the items that I had showed you in that

25  notice, in Exhibit 1, related to the budgetary impacts

1   of the Reduction in Force; do you recall reviewing that

2   paragraph?

3           MR. STEFANY:  Which paragraph, Counsel?  What

4       number?

5   BY MR. MACDONALD:

6       Q.   No. 14.

7       A.   So if the question was, did I read No. 14; yes,

8   I did.  Whether or not there was a study done or a

9   report generated, I am not aware of that, in 2021.

10      Q.   So you do not believe that there is any data

11  related to the budgetary impact of the Reduction in

12  Force, to the best of your knowledge?

13      A.   No, I'm just not aware.  You asked me if I was

14  aware of a budgetary impact report, and I'm not.

15      Q.   Speaking generally, are you familiar with the

16  Lee County Sheriff's Office budget in 2021?

17      A.   Yes.

18      Q.   What was the state of the Lee County Sheriff's

19  Office budget for the year 2021?

20          MR. STEFANY:  Did you say "state," Counsel?  I

21      don't understand that, so I'm going to object to

22      form.  But if you would clarify that, it would

23      probably help the witness.

24  BY MR. MACDONALD:

25      Q.   Was the Lee County Sheriff's Office running a

1    deficit for the year of 2021?

2         A.    No.

3         Q.    And how do you know that?

4         A.    So part of my responsibilities in 2021 was to

5    monitor accounts; so one of the routine assignments that

6    I had was to look at the state of our account.  So

7    individual accounts, you know, may have run a deficit;

8    and then it's my job to go in and find areas that are

9    over-budgeted or not going to be used for something and

10   then reallocate those onto accounts that had

11   expenditures that exceeded our original budget, that was

12   an overall budget in 2021.  I have not experienced a

13   deficit to our entire budget, to date.

14        Q.    Was there any individual accounts that you

15   recall in 2021 that may have been over-budgeted?

16        A.    No.  We have accounts that go over budget on a

17   routine basis, for one reason or another.  New

18   expenditures come through; new projects will throw an

19   account over.  But we have a number of accounts that

20   exceed their budget, for a number of different reasons,

21   on a regular basis.

22        Q.    Are you familiar with the Reduction in Force

23   that was conducted in 2021?

24        A.    I am now.

25        Q.    When you say you are now, what do you mean by

 1   that?

 2        A.   I was not responsible at that time for -- so

 3   part of my role as the budget director is to provide

 4   report to command staff, to make decisions, whether it's

 5   eliminating positions, whether it's adding new personnel

 6   to different areas; they generally will come to me and

 7   ask me for documentation/reports on various factors.

 8   And in this case, I was not involved with that; in 2021,

 9   that was not something that I was asked to do.

10        Q.   And you said that you're involved in creating

11   or receiving documentation or reports related to

12   staffing changes; is that right?

13        A.   I'm sorry, can you repeat the question?

14        Q.   You described having a role, sometimes, in

15   assisting command staff with preparing budgetary impact

16   of staffing changes; is that accurate?

17        A.   Budgetary impact?  I have not been asked to do

18   that, to date.  But pulling reports that would help them

19   make decisions on whatever.  You know, so for example,

20   if we were pulling salaries for a particular employee or

21   we were pulling budgetary information for a particular

22   department, they would come to me and I would generate

23   those reports for their review and consideration.

24        Q.   And forgive me for not using the correct

25   terminology.  So you would pull reports for salaries of

1    employees, if command staff may be considering changes

2    in salary?

3         A.   Sure.

4         Q.   When have you done that, in the past?

5         A.   So specific examples?  I'm not thinking of a

6    particular; on a routine basis, we are constantly

7    looking -- you know, if someone were promoted, for

8    example, they might come to me and ask me for a salary

9    comparison for a particular job title, for a particular

10   comparison set.  So if I'm looking at, you know, a

11   particular job title, I would find people who are within

12   that same years-of-service range -- how long have you

13   been with us, what are you making currently -- and I

14   would provide that information.

15        Budgetary, as far as departments go, the same

16   thing would be true.  I pull reports that would show

17   where we are currently, what our expenses are,

18   anticipated expenses on things that, you know, I have

19   been given information on; and then I would provide

20   forecasts on where -- what the needs are for that

21   department or entity, moving forward.  And for various

22   reasons, that happens on a routine basis.

23        Q.   Do you also make recommendations based on the

24   information that you provide to command staff?

25        A.   Generally speaking, no.  Recommendations would

1   generally speaking come if there's some kind of spending

2   trend that I feel like they would have some control

3   over; I might point out that the trend is going in one

4   way or another.

5          Over time, as an example of something that I've

6   done recently, where I was looking at the overtime

7   totals that are coming through our payroll reporting; I

8   would make a recommendation, or I would show them, you

9   know, where that trend is heading and kind of where

10  we're seeing the most expenses in the overtime, and then

11  they would take a look at that and make operating

12  decisions, based on their review.

13      Q.    And who would make those decisions based on

14  that review?

15      A.    My chain of command is currently to Stan (ph),

16  and then he reports to Undersheriff Holloway.

17      Q.    So those would be the individuals that would

18  receive those reports that you pull or create?

19      A.    Correct.

20      Q.    Have you ever created any reports when the

21  command staff was considering the elimination of a

22  position?

23      A.    So typically, I am not aware of the reasons

24  that they'll ask me for reports.  Typically, they'll

25  come to me, like I said, with a particular job title,

1  and they'll say, "Can you pull me a report based on this

2  job title"; and then that would give them information

3  based on that, such as their job title regardless of

4  where they work.  And then, typically, I don't know,

5  again, until after a decision is made.

6          And then I have directed documents that I have

7  to provide to our finance team or our HR team; for

8  example, to remove a title from our pay plan.  So I

9  would let HR know that title had been removed from the

10 pay plan and provide them updated documents so they're

11 aware of the change.  But, typically, I may or may not

12 know that those decisions are even being discussed until

13 after the fact.

14     Q.    Have you ever given a report and learned after

15 the fact that it was used to consider the elimination of

16 a position?

17     A.    Yes.

18     Q.    When has that occurred?

19     A.    So we've -- so recently, we've had -- and I

20 don't know what the time frame was; I'd have to go back

21 and look -- but we had issues in our Fleet Department

22 where they were considering changes in the

23 administrative staff in our fleet; so I was asked to

24 pull information related to the Fleet Department.

25     Q.    When were you asked to pull that information

1   for the Fleet Department?

2        A.   I don't know the exact date.

3        Q.   Do you know what year it was, roughly?

4        A.   I don't.  I don't.  I mean, I believe that --

5        Q.   Could you -- mm-hm?

6        A.   In 2021, the end of 2021, where, again, I

7   didn't know, you know, what they were considering

8   before, you know, the decision was made to make some

9   changes, administrative changes, over there; but the end

10  of 2021 was when we took away the fleet director

11  position.

12       Q.   So you were asked to create reports related to

13  the fleet director position, in 2021?

14       A.   You asked me if I was ever -- you know, if I

15  ever provided reports, but then later found out that,

16  you know, those could have been used, and that would

17  have been something where they were -- we were providing

18  information about salary information or department-

19  related information about the costs and evaluation of

20  that department and their expenses and where we were

21  spending our money, our budget, for the Fleet division;

22  and then, later, changes were made.

23       Q.   And after you provided information related to

24  the Fleet division, you believe it may have been related

25  to the elimination of positions?

1    A.   I believe that was part of the assessment that

2  was provided, yes.

3    Q.   Who did you provide that information to,

4  specifically?

5    A.   That would be a guess; again, my chain of

6  command at that time was Annmarie Reno, so typically my

7  requests would have come from Annmarie.

8    Q.   Annmarie Reno would have requested that report

9  from you?

10   A.   And it wouldn't have been all at once; it would

11 have been bits and pieces, you know; "pull me the

12 information related to X"; you know, "Pull me

13 information on XY," as an example of information that

14 are requested when they come through.  It's not like a

15 full assessment that's created.

16   Q.   What kind of information is included in these

17 reports that you may give to command staff?

18   A.   So typically, one of the examples that I used

19 was, you know, "Pull me up the salary information for

20 all directors," for example; or "Pull me the budget

21 report for this particular department and their related

22 expenditures in those areas."

23   Q.   Do you recall, in 2021, providing any reports

24 related to any positions related to salary specifically?

25   A.   I don't recall.

1    Q.    If command staff wants to find out that salary

2    information related to expenses, are you typically the

3    employee that they would go to, as budget director?

4    A.    I am.

5    Q.    Is there anyone else that pulls that

6    information related to salary expenditures at the Lee

7    County Sheriff's Office?

8    A.    So our Finance team has access to the same

9    salary information and payroll reporting, and our HR

10   team would have access and the ability to pull similar

11   reporting for HR information, and then our department

12   heads would have access to pull specific budget-related

13   numbers and budget-related -- or approved budget and the

14   related expenditures for the departments under their

15   span of control.

16   Q.    Do you recall, in 2021, ever creating these

17   reports relating to salary expenditures for Annmarie

18   Reno, in particular?

19   A.    Again, if you're looking for specific examples,

20   I do not.  But it's part of what I do on a routine

21   basis.

22   Q.    Even if you don't recall the individual, you do

23   recall, generally, having pulled salary expense reports

24   in 2021?

25   A.    Correct.

1    Q.   Do you recall, in 2021, ever creating a salary

2    expenditure report for Undersheriff Holloway?

3    A.   No, not particularly with one individual.

4    Q.   You said, no --

5    A.   No.

6    Q.   -- you don't?  Okay.  In 2021, were there any

7    budget constraints in particular that required

8    expenditures to be cut, just in terms of the budget

9    trends for the year 2021?

10   A.   So there's always considerations/indicators

11   that effect our budget, so the ones that we are

12   continually kind of monitoring.  2021 was definitely a

13   budget year that had unique challenges coming kind of

14   through and out of Covid; so there were a lot of

15   challenges, you know, budget challenges, in terms of

16   getting, you know, the orders, manpower issues across

17   the board, increases in prices for a number of -- you

18   know, all of our different areas.  So that's kind of

19   when we started seeing that increase in pretty much

20   every category, for a lot of different reasons.

21   Q.   Was salary expenditures an issue for the budget

22   year 2021?

23   A.   Could you define "an issue"?

24   Q.   Well, based on your experience and in your role

25   as a budget director, do you recall there being any

1  discussions about salary expenditures being a

2  significant issue in terms of the Lee County Sheriff's

3  Office budgets and operations?

4      A.   So in 2021, I was still working with Annmarie

5  Reno, so my role now has changed a little bit, compared

6  to what I was directly responsible for then.  But

7  manpower is something that we monitor routinely.  So

8  from my role, I kind of think of it as tactical versus

9  strategic.

10          So there's tactical decisions that have to take

11  place on a regular basis, where we're shuffling manpower

12  from place to place and more meeting the needs that

13  arise for various reasons throughout the agency.  So

14  manpower is always something that we're closely

15  monitoring; and then the related personnel costs

16  associated with that.

17      Q.   And when you refer to "manpower," does that

18  include civilian positions too?

19      A.   It does.  Any authorized positions.

20      Q.   Now, I understand you said that the Lee County

21  Sheriff's Office always monitors manpower and the

22  associated expenses.  But were there any particular

23  budget issues related to manpower expenses in 2021 that

24  would be out of the norm for the Lee County Sheriff's

25  Office?

```
 1        A.    So I'm not exactly sure if this was in 2021, so
 2   I'm just -- in general, for example, one of the
 3   departments that we created in 2021 would have been the
 4   School Threat Enforcement Team, for example; so that was
 5   something that was a recognized need for the Sheriff's
 6   Office.  And we had to staff a new department or a unit,
 7   where we had to allocate positions over to that, in the
 8   middle of the budget year, where we then had to figure
 9   out how to fund that; so, you know, another robbing
10   Peter to pay Paul.
11             It was something that happened that wasn't a
12   planned increase to our budget, and we either -- we have
13   options to either go back to the county and describe the
14   need and ask for additional funding, or we have to
15   absorb those costs in our current budget.  And for that
16   particular -- for that particular expansion of
17   department, we absorbed that into our budget, versus a
18   narcotics expansion.
19             And, again, I'm sorry, but I don't know the
20   dates, the specific dates; but there was also an
21   increase in manpower where we needed to meet a specific
22   need for our Criminal Investigations Bureau, and they
23   needed an additional manpower assessment; and in that
24   case, because the need was greater than we could absorb
25   in our budget, we went back to the county and asked for
```

1   additional funding for that.

2       Q.    In terms of the budgeting process, are the

3   salaries for individual positions allocated in advance

4   of the fiscal year?

5       A.    So part of our budget process is to look at the

6   current salary for all positions, individual positions

7   and individual people, whatever projected increase that

8   we are thinking in terms of at the time of our budgeting

9   process -- at the time of our budgeting process; and

10  then, open positions as well, where we look at the

11  anticipated positions that we're going to be adding to

12  the budget; and that's all part of our budget packet and

13  proposal to the county commission.

14      Q.    So in the fiscal year 2021, for example, the

15  expenses associated with employment positions would have

16  been allocated in the year prior?

17      A.    Correct.

18      Q.    When are those allocations or estimates

19  specifically created in that year prior?

20      A.    So we start the budgetary process in February

21  of every year and then, typically, my goal is to have my

22  budget prepared by May 1; but we are required, by

23  Florida State Statute, to have that to the board of

24  county commissioners June 1 of every year.  So typically

25  by May, I have a pretty good understanding of what our

1   requests are going to be and what we're going to be

2   submitting to the county, and then command staff kind of

3   takes over from there and makes changes as needed.

4        But once our budget is submitted in June, then

5   that kicks off the county process for budget approval,

6   budget assessment; then that's when we stop with

7   changes.  And then our budget is awarded at the end of

8   September every year, for an October 1 start date for

9   our new fiscal year.

10       Q.   So by September, are the funds for positions

11  typically set aside or at least estimated and allocated

12  for the next year?

13       A.   Yes.  Personnel is a category.  We have three

14  categories of our budget: personnel, operating, and

15  capital.  So personnel and salaries related to the

16  authorized positions are categories of personnel.  So

17  October 1, the personnel expenditures are set for the

18  new fiscal year.

19       Q.   Now, in 2021, Ms. Clark was employed as the

20  director of purchasing for the Lee County Sheriff's

21  Office; correct?

22       A.   That's correct.

23       Q.   Would the funds for Ms. Clark's position have

24  been allocated in September of 2020 for the following

25  year 2021?

1    A.   Yes, they would have.

2    Q.   And that would include the full funding of

3  Ms. Clark's position for the calendar year 2021, from

4  January to the end of December; is that right?

5    A.   No.  So our fiscal year runs October 1 through

6  September 30.  So October 1 of 2020, the budget would

7  have been set through September 30 of 2021 and allocated

8  to the personnel lines within the purchasing budget.

9    Q.   Okay.  So Ms. Clark's position would have been

10  allocated up until September 30, 2021?

11    A.   Correct.

12    Q.   Do you recall ever pulling any salary

13  expenditure reports for Jenna Clark's position,

14  specifically?

15    A.   I do.  But it was after Jenna separated from

16  the agency.

17    Q.   Why did you pull a report about that position

18  after she was separated from the agency?

19    A.   It was a request that came from our legal

20  division.  I'm assuming now that it was related to this

21  case.

22    Q.   But prior to then -- or I should say, prior to

23  Ms. Clark's departure from the Lee County Sheriff's

24  Office, you do not recall pulling a salary expenditure

25  report related to her position?

1    A.   So a specific request to asking about Jenna in

2  particular, no, I do not.  I have specific reports that

3  I pull on a regular basis that include all employees

4  that she would have been on.

5    Q.   Do you recall pulling any reports related to

6  the Purchasing Department, specifically, prior to Jenna

7  Clark's departure from the Lee County Sheriff's Office?

8    A.   In 2021, I do not.

9    Q.   Were you ever consulted by the undersheriff or

10 Annmarie Reno regarding the Reduction in Force that was

11 conducted in 2021?

12   A.   I was not.

13   Q.   Do you know why you wouldn't have been

14 consulted regarding that, as the budget director?

15        MR. STEFANY:  I'm going to object to the form.

16   You may answer the question.

17        THE WITNESS:  So I'm trying to remember if it

18   was January... January 2021 was when I got promoted

19   to budget director.  Annmarie and I shared

20   responsibilities, but most of our workload was

21   still coming through her, at the time; so if she

22   elected to take a project, take an assignment, then

23   she wouldn't pass it on to me.

24        So there was a period of time between the time

25   that I came over to the Budget Department that I

1          was accepting more and more primary responsibility;

2          and at that time, that was not something that was

3          given to me.

4     BY MR. MACDONALD:

5          Q.   Are you familiar with the employees that had

6     their positions eliminated at the Lee County Sheriff's

7     Office, as part of the Reduction in Force in 2021?

8          A.   Define "familiar."

9          Q.   Are you aware of the employment positions that

10    were eliminated as part of the Reduction in Force, in

11    2021?

12         A.   So as part of the reports that I generate and

13    the notes that I keep as part of the pay plan, is to

14    document whenever we are taking a position off the pay

15    plan; so once the decision is made that we're no longer

16    going to be using a particular job title, that

17    information comes to me, and then I update those reports

18    for distribution out to that department.  So for every

19    position that has been eliminated off of our pay plan,

20    I'm familiar with those.

21         Q.   Did the elimination of those positions, as part

22    of the Reduction in Force in 2021, impact the budget in

23    any way?

24         A.   It created opportunities for those funds to be

25    used elsewhere.

1    Q.   In your experience as budget director, were

2    those funds needed elsewhere in the agency in 2021?

3    A.   Absolutely; you can always use funds elsewhere.

4    You know, tactical versus strategic, those divisions

5    that weren't accounted for in the budget planning

6    process happen every year, all yearlong.  So how we meet

7    those needs and absorb those into our budget is by

8    utilizing cost savings that are created through open

9    positions, through attrition, through the money that we

10   thought we were going to spend and are no longer

11   spending.  That's how we absorb the costs that are then

12   new to our budget that weren't accounted for in the

13   planning process.

14   Q.   Now, previously, we had discussed the amounts

15   of money that are accounted for, for an employee's

16   leave; do you recall that?

17   A.   (No response.)

18   Q.   For example, the numbers that we looked at for

19   Mrs. Clark -- or Ms. Clark, rather, and the leave that

20   she was afforded.

21   A.   So, yes.  Our leave is taken out of our regular

22   wages; so if we budgeted for her position, then we also

23   budgeted for the payments that would have been made to

24   her leave requests.

25   Q.   If an employee is selected to have their

1    position eliminated and they used more leave than other

2    employees, would that result in more savings, in terms

3    of the budget?

4        A.    Sorry, can you repeat the question?

5        Q.    If an employee's position is selected to be

6    eliminated and they used a higher amount of leave time,

7    would that result in more savings, in terms of the

8    budget?

9        A.    That would result in less savings.  If they

10   used more leave time than someone else, then they would

11   have been paid more, out of the budgeted amount; and so

12   that would have resulted in less available savings.

13       Q.    I see.  And you're familiar with salary amounts

14   generally that are paid to employees, as part of your

15   role as a budget director; is that right?

16       A.    That's correct.

17       Q.    How does the amount of Ms. Clark's salary as

18   purchasing director compare to other employees in the

19   Lee County Sheriff's Office?

20       A.    So I don't have a comparison report that would

21   tell me now.

22       Q.    But even just in your opinion?

23       A.    She was comparable.  Because of her life of

24   service, she might have been even on the high side,

25   because she had been here for quite a while.  I do not

1   remember it being over the pay range maximum.

2        Q.    What is that pay range maximum?

3        A.    So part of our pay plan has, if you were to

4   move into that particular role, we have a minimum that

5   you would be paid; so if they moved into that role and

6   they weren't making the minimum, they would be brought

7   to that minimum as part of that reassignment.  And then

8   we have a pay grade maximum; and sometimes, if an

9   employee has been here long enough, they will actually

10  exceed that maximum threshold.

11       Q.    And that typically happens if an employee is

12  there for a certain length of time at the Lee County

13  Sheriff's Office?

14       A.    Correct.

15       Q.    And is the employee actually paid that amount

16  over the maximum?

17       A.    Correct.

18       Q.    How often does that occur, that an employee

19  receives higher than the maximum?

20       A.    So in the most recent budget cycle -- I don't

21  want to throw out a number, but can I give a range, and

22  say less that 30, in the entire agency, both certified

23  and civilian.

24       Q.    How does an employee reach that number that's

25  higher than the allocated maximum; is it just based on a

1    calculation of years of service?

2         A.    So it's, you know, if an employee was given pay

3    raises, for example, and then moved into a different

4    position, they would keep their same salary, even though

5    they were in, you know, a lower pay grade, for example.

6    They -- there were periods of time where the increases

7    were higher than what we made the change to the maximum

8    pay plan.  So if we kept the pay plan exactly the same,

9    but then gave everybody a 5 percent increase on October

10   1, then those maximums would not have kept up with the

11   increases that we were giving.

12        So like I said, it doesn't happen very often.

13   But when it does, there's usually some kind of unique

14   circumstance that puts them into a separate category.

15        Q.    And that can happen when an employee transfers

16   positions at the Lee County Sheriff's Office?

17        A.    It's possible that it would create a long-term.

18   So I'm not saying that they wouldn't transfer and make

19   over the maximum at that time; if they transferred 10

20   years ago into a different position and then, over time,

21   they ended up in a position where they were making more

22   than their current assignment.

23        Q.    Does the Lee County Sheriff's Office try to

24   avoid that situation, where an employee is paid over

25   that maximum?

1        A.    Yes.

2        Q.    Can you think of any specific positions,

3   civilian positions, that are paid over that maximum?

4        A.    I mean, I could provide -- I could provide it;

5   but I don't know any particular person, right off the

6   top of my head.

7        Q.    And you said Ms. Clark was not being paid over

8   that maximum amount for her position; is that correct?

9        A.    That's correct.  I don't recollect her being in

10  that category, correct, in 2021.

11       Q.    And Ms. Clark may have been on that higher

12  range of salary, due to her years of service?

13       A.    It's possible.

14       Q.    Well, in your role as budget director, you're

15  privy to salary information; right?

16       A.    Correct.

17       Q.    And looking at the salary information that we

18  reviewed for Ms. Clark, is it your understanding that

19  her salary would be tied to those years of service?

20       A.    Yeah, that would be correct; her salary would

21  be tied to her years of service in every increase that

22  she's gotten along the way.

23       Q.    Are you aware that Ms. Clark's position was

24  eliminated in 2021, as part of that Reduction in Force?

25       A.    I am.

1    Q.   Do you know how much Ms. Clark's salary would

2   have increased if she had stayed in her role in 2021,

3   rather than having the position eliminated?

4    A.   I do not.

5    Q.   Would that be based on a standardized rate?

6    A.   It would have been based on the increases that

7   were awarded to full-time employees since the time that

8   she left.  So for example, it was an 8 percent increase

9   this year, on October 1.

10    Q.   So if Ms. Clark had been working this year, in

11   October she would have received an 8 percent increase in

12   her pay rate?

13    A.   Correct.

14    Q.   And that was for this year, 2023; is that

15   right?

16    A.   Yes.  Fiscal year 2024; so, yes, October 1 of

17   2023.

18    Q.   Do you recall what the increase was in 2022?

19    A.   I believe it was 5 percent.

20    Q.   And then, in 2021, if Ms. Clark left her

21   position in September, she would have received the

22   standardized increase in October of 2021 as well; is

23   that right?

24    A.   That's correct.

25    Q.   Do you recall what that rate was that was

 1   increased in 2021, by any chance?

 2        A.    I don't recall.

 3        Q.    Is it safe to say it would have been an amount

 4   similar to the 2022 and 2023 percentage increases?

 5        A.    It's likely that it would have been closer to

 6   the 2022, so 4 or 5 percent it would have been, I guess.

 7        Q.    And that standardized increase, is that for the

 8   salary alone, or does that include any other benefit or

 9   anything like that?

10        A.    Base salary.

11        Q.    Would Ms. Clark's retirement benefits have

12   increased if she'd stayed rather than leaving in 2021?

13        A.    So I'm not familiar with how the retirement

14   pension plan payouts work.  So that would be,

15   unfortunately, a question for HR or our benefits team.

16        Q.    When the Lee County Sheriff's Office has faced

17   budget constraints, how do they typically find ways to

18   obtain those funds, if they don't go to the county,

19   let's say, to request more money?

20             MR. STEFANY:  Counsel, are you talking about

21        since she's become budget director or before; what

22        time period?

23             MR. MACDONALD:  Let me step back a little.

24   BY MR. MACDONALD:

25        Q.    When did you become budget director, again?

1       A.    2021.

2       Q.    And that was in January of 2021; is that right?

3       A.    I believe so.

4       Q.    So let's say from January of 2021, in your role

5   as budget director, how has the Lee County Sheriff's

6   Office handled budget constraints, from what you've

7   seen?

8       A.    So typically, it's a matter of prioritizing

9   requests.  So we have requests that came through during

10  the budget planning process and then we have budget

11  requests that come through after the budget has been

12  awarded after the new year has started and, typically,

13  when a new request comes through, then an old request is

14  reprioritized.

15      Q.    What do you mean, in terms of prioritizing

16  requests?  Forgive me if I'm not familiar with the

17  processes.

18      A.    No, that's okay.  So for example, if there's a

19  project that is on the proposal report saying this is

20  what we want to do in the next fiscal year and a new

21  request comes through that may prioritize over that,

22  then we will delay it, deny it, take it off of the list

23  so that it doesn't move forward.

24      Q.    And what kind of things might those priorities

25  be; would it be an initiative? is it maybe a department?

 1    Help me understand.

 2         A.    So recently, there was an upgrade that was

 3    scheduled for one of our departments to upgrade their

 4    software, so it would have been a new implementation

 5    project; when a new priority request came through, then

 6    the implementation of that new upgrade got delayed.

 7         Q.    Since you've been budget director, had the Lee

 8    County Sheriff's Office eliminated any positions to meet

 9    a budget constraint?

10         A.    Say it again.   Since I've been budget

11    director...

12         Q.    Since you've been budget director, has the Lee

13    County Sheriff's Office eliminated any positions to meet

14    a budget constraint?

15         A.    So I can't tell you why, necessarily, the

16    positions were eliminated and what decision factors were

17    going into the elimination; generally speaking, like I

18    said, I'm notified after those decisions are made.   So

19    if they were meeting a budget constraint or otherwise,

20    that's an operational decision outside of my

21    responsibilities.

22         Q.    And that decision wouldn't include anyone

23    that's a part of the budget or financial stuff?

24         A.    So again, I would provide information, and then

25    the operational decisions and pros and cons and whatever

```
 1   it is that they do in order to make those decisions is

 2   outside of the Budget Department.

 3        Q.   Are you ever consulted about recommendation?

 4   Have you ever been asked?

 5        A.   Typically, no.

 6        Q.   When did you find out that Jenna Clark's

 7   position was eliminated?

 8        A.   When Annmarie told me that we were taking the

 9   position off the pay plan.

10        Q.   Do you remember when that was?

11        A.   I don't have a date.

12        Q.   Would that have been in 2021?

13        A.   Sure.

14        Q.   What was your reaction?

15        A.   It's like -- I mean, every day, it's always

16   something; you know, you just do, mentally, what you

17   have to do to process.  You know, I can say I was

18   surprised by that decision.

19        Q.   Why were you surprised?

20        A.   Because I didn't know about it.

21        Q.   When you learned that Ms. Clark's position was

22   eliminated, were you aware that a Reduction in Force was

23   being conducted?

24        A.   I was not.

25        Q.   After learning of Ms. Clark's position
```

1  elimination, did you ever learn of a Reduction in Force

2  being conducted?

3     A.   Well, the Reduction in Force comes again from

4  those pay plan changes and when we're between the pay

5  plan changes where we're removing a position title from

6  the pay plan or the manpower changes where we're moving

7  people from one area and taking those positions to

8  another area and reallocating the positions themselves,

9  that information comes to me; the directive comes to me,

10 to move positions from one area and move them to

11 another.

12    Q.   But outside of you just being notified of those

13 positions being removed, did anyone discuss the

14 Reduction in Force specifically, after Ms. Clark's

15 position was eliminated?

16    A.   No.

17    Q.   Have you ever discussed the term "Reduction in

18 Force" in a budget context?

19    A.   No.  Well, no, I take it back.  I mean, it's a

20 topic of conversation in general, specific to any

21 specific action; but a Reduction in Force, open

22 positions, yeah, reallocation of positions; it's just

23 something that's kind of typical language.  But specific

24 into the decisions that were made, no.

25    Q.   Do you understand the term "Reduction in

```
 1   Force," from a budget perspective, to refer to something
 2   that's always ongoing?
 3        A.    I do.
 4        Q.    So you do not understand the term "Reduction in
 5   Force" in the budget context, to be a one-time event?
 6        A.    So it can -- I mean, it can be a one-time
 7   event, but it's something that is looked at;
 8   streamlining operations, again, a Reduction in Force in
 9   one area that reallocates positions to other areas that
10   are needed is something that's a routine type of
11   consideration.
12        Q.    And you said that Annmarie Reno was the one who
13   notified you that Ms. Clark's position had been
14   eliminated?
15        A.    Correct.
16        Q.    Did she say anything else when she told you
17   that?
18        A.    If I remember correctly, there might have been
19   some discussion about what the future plan was, in terms
20   of once that position was -- so when I was told Jenna
21   hadn't left yet, so she was going to be staying on for
22   just a little bit, so we weren't going to remove it from
23   the -- if I remember correctly, we weren't going to
24   remove it from the pay plan until she separated from the
25   agency and there was some discussion about consolidating
```

 1   the Purchasing and Finance divisions.

 2        Q.    What consolidation was being discussed?

 3        A.    We have -- the finance director would have

 4   assumed that responsibility.

 5        Q.    And who was the finance director, at the time

 6   of this discussion?

 7        A.    Crystal Gambino.

 8        Q.    You said Crystal Gambino?

 9        A.    Correct.

10        Q.    Do you know if Crystal Gambino assumed those

11   responsibilities?

12        A.    She did not.

13        Q.    Do you know why?

14        A.    I do not.  I could assume, but I do not know.

15        Q.    What do you mean by, you could assume?

16        A.    So as part of my role and responsibility, like

17   I said, was to take on as much of the responsibility as

18   I could from Annmarie Reno; and the more that I took on,

19   the more time she had, then, to allocate to her bureau.

20   And as a bureau commander, she was over both areas, and

21   I know that she was working to streamline operations in

22   all of her areas, specifically with Purchasing; and so

23   she assumed oversight of the Purchasing division, so

24   whether it still happened or not is left to be

25   determined.

1    Q.   What do you mean, if it still happens?

2    A.   If they still decide that that's still in the

3  best interests to put our Purchasing team underneath the

4  umbrella of Finance, that decision still could be made;

5  but as of right now, Annmarie is still providing

6  oversight to that department.

7    Q.   So you're saying that consolidation never

8  occurs?

9    A.   Correct.

10   Q.   And that's the consolidation that she discussed

11 with you as part of Ms. Clark's position elimination; is

12 that right?

13   A.   I don't know if it was the exact time.  But you

14 asked me if she ever said anything else in relationship

15 to Purchasing and Jenna's separation from the agency;

16 and that was the topic of conversation, of what happens

17 next.

18   Q.   Was it your understanding, at the time, that

19 Ms. Clark's position elimination was part of that

20 consolidation?

21   A.   I did not know.  It was not an assumption I

22 made.

23   Q.   Is that how it was conveyed to you by Ms. Reno?

24   A.   No.

25   Q.   So then, what made you think that the

 1   consolidation and Ms. Clark's position elimination were

 2   related?

 3       A.    I think you asked me about the conversation

 4   that we had in relationship to her separating.  Almost

 5   immediately the other conversation moved into -- whether

 6   it was the same day or after the fact, moved into what

 7   happens next and what's our game plan moving forward; so

 8   that was a forward planning, you know, conversation, and

 9   not representative, in my opinion, of how they came to

10   the decision.

11       Q.    Was the consolidation discussed in the same

12   conversation as you were notified of Ms. Clark's --

13       A.    I don't recollect; I think it was the same

14   conversation.

15       Q.    And what position does Crystal Gambino hold?

16       A.    She's the finance manager.

17       Q.    Do you know if any person assumed those

18   responsibilities of Ms. Clark?

19       A.    Her day-to-day --

20            MR. STEFANY:  Other than Annmarie Reno, which

21       she's already testified to, Counsel?

22   BY MR. MACDONALD:

23       Q.    Well, let me ask you this.  Did Annmarie Reno

24   take over any of Ms. Clark's responsibilities?

25       A.    So day-to-day and what Jenna's responsibilities

1    were and what Ann Marie's responsibilities were, I guess

2    I can't answer that.  She was, before Jenna's separation

3    and after, overseeing the Purchasing Department; so if

4    she picked up additional responsibilities, I don't know

5    the answer to that.

6         Q.   Did you agree with the decision to eliminate

7    Ms. Clark's position, when Ms. Reno told you about it?

8         A.   I don't typically have an opinion on the

9    decisions that are made.  It's my job to execute the

10   decisions that are made and to make that communication

11   as clear as possible with the other areas of

12   responsibility.  So I take the directive, and I move

13   forward.

14        Q.   So you had no opinion, at the time?

15        A.   Other than curiosity, no.

16        Q.   Curiosity, in what regard?

17        A.   As to, you know, why the decision was made or

18   when the decision was made.  You know, curiosity.

19        Q.   All right.  I'm going to show you a document.

20   (Screen share began of Positions Eliminated

21   spreadsheet.)  It's Defendant's Bates labeled 123.

22        I'll give you a moment to review this; just let

23   me know when you're ready.

24        A.   I'm going to move closer.

25        Q.   Of course.

1    A.    (Witness peruses the document.)  All right.

2    Q.    Have you seen this document before?

3    A.    I have.

4    Q.    Do you know what it is?

5    A.    I do.

6    Q.    What is it?

7    A.    It's a report that was requested by our legal

8  team.  They gave me a very specific list of names and

9  asked me to pull this information for them.

10   Q.    So you created this report?

11   A.    I believe so, yes.

12   Q.    When you created this report, you were given a

13  list of names to generate this report for?

14   A.    Yes.

15   Q.    Were you asked to create a report with the

16  employees who had their positions eliminated as part of

17  the Reduction in Force in 2021?

18   A.    No.

19   Q.    Was there an existing report that included the

20  names of the employees that had their positions

21  eliminated as part of the Reduction in Force in 2021?

22   A.    So I don't know that in 2021.  So this list

23  comes from information that I keep on a routine basis

24  for position changes.  So if you're asking if I would

25  have had information, then yes.  That's where I pull the

1   information from.

2       Q.   How did you put this report together; was this

3   taken from a database, or how was it created?

4       A.   So it's a combination of things; so the

5   age-related information I would have had to pull from

6   our HR database, and then the comments would have been

7   from the action sheet.

8       Q.   What is an action sheet?

9       A.   Any position -- excuse me.   Any employee

10  changes are processed through an action sheet, which is

11  just a work flow-generated data entry record that is

12  associated with the employee file and it goes through an

13  approval process and then it goes into the employee

14  record.

15      Q.   And you said that the comment section here,

16  that was pulled from the action sheets for the

17  respective employee?

18      A.   Correct.   So it's not verbatim.   So this is

19  clearly something that -- "retired" is a category of the

20  action sheet; and then "position eliminated" would have

21  been a note or a comment that would have been added.

22      Q.   Who would have added it?

23      A.   I would have.

24      Q.   Were you instructed to add that comment,

25  "position eliminated," for any of these?

1    A.   No.  They were asking for positions that were

2  eliminated.  So I would have looked at the pay plan and

3  then notes that were generated any time we're making

4  changes to the pay plan; and that report would have

5  indicated that the position was removed from the pay

6  plan or the position was eliminated.

7    Q.   Is there a difference between "removed from the

8  pay plan" versus "position eliminated"?

9    A.   No.  it's the same thing.  "Removed from the

10 pay plan" means we're no longer using that position

11 title.

12   Q.   Were there any positions that were eliminated

13 in 2021 that are not included on this list that you

14 generated?

15   A.   Were there any positions -- so there would have

16 been -- it's possible that there were titles that were

17 removed, where the position was replaced with a

18 different title, if that -- I'm sorry, if that makes

19 sense.

20        So the secretary of traffic, for example,

21 became a supervisor; and that supervisor was not going

22 to be the secretary of traffic any longer, and we were

23 not going to replace the secretary of traffic; they were

24 just going to take on additional responsibilities in

25 addition to what they were doing already; then that

 1   would be a position that would have been taken off of

 2   the pay plan, but the position wasn't eliminated because

 3   they were still doing that same workload.

 4       Q.   Help me understand the distinction between

 5   someone continuing to do that workload versus the

 6   position being eliminated; what's the difference?

 7       A.   So it's the replacement of the position.  So

 8   for example, if I had three people in the traffic unit

 9   for me, authorized manpower -- if I had three positions

10   in the traffic unit, and we changed the title of the

11   secretary but we did not change the three allocations,

12   then that would be a replacement.

13           Versus a "position is eliminated" means that

14   we've made a change to the title, we're removing it from

15   the pay plan, and we're also going to remove that

16   allocation.  So we would go from three to two.

17       Q.   Were there any positions that had the title

18   removed and the allocation removed that are not included

19   on this list here, in 2021 specifically?

20       A.   Without -- without looking the -- those

21   specific -- that specific set of pay plans, I can't

22   answer that; it is possible.

23       Q.   And in what circumstance would it be possible

24   that a position -- that the allocation and title would

25   not be on this report?

1    A.   If the position was -- if we reassigned a unit,

2   for example, and we called them something different.

3   I'm trying to think of an example... a clerk, for

4   example.  If we decided that we were no longer going to

5   use the "clerk" position title and we were going to call

6   them a "district clerk," it is possible that we would

7   remove the clerk position, we would add a district clerk

8   position.  And then if those people were reassigned to a

9   different budget code, then we would also remove them --

10   we would reduce the number of positions allocated to

11   where they were, to where they were going.

12         Those are two separate things.  The pay plan

13   itself would be a removal and an add, at the same time;

14   a removal of the clerk and an add of the district clerk.

15   And then the manpower report would be a reassignment of

16   those positions to a different budget code.

17    Q.   When you created this report, did you add these

18   names specifically, or was this the result of running

19   some kind of report or analysis?

20    A.   If I remember correctly, this was a follow-up

21   to the elimination, a larger list of position titles;

22   and then this was follow-up to that list.

23    Q.   What was the larger list?

24    A.   I don't remember what it was called.

25    Q.   Well, what was it?

1    A.   It was a similar report to this, and it was a

2  change order report.

3    Q.   And what was on that report?

4    A.   Similar information.  I don't think that we had

5  age; I don't think that we had gender.  But it was also

6  listing out the eliminated/removed/replaced positions,

7  within that time frame.

8    Q.   So the larger list had other names that had

9  positions eliminated in this same time period?

10   A.   Correct -- well, the change report; so whether

11 they were eliminated on the change report.

12   Q.   What specifically is included on the change

13 report that you're describing?

14   A.   I don't have it in front of me, so.

15   Q.   But I'm just asking you, from your experience,

16 what's the change report?

17   A.   Exactly what we've been talking about; so it's

18 a administrative note that I kind of keep, to keep track

19 of the changes that are made to the pay plan.  So it's

20 an administrative note that I kind of keep and then,

21 when information like this is added, that will be called

22 a change report; so changes made to the pay plan

23 specifically related to removals.

24   Q.   And there were other positions listed on this

25 larger list that you just referenced?

1       A.    Again, without the report in front of me, I

2   have a hard time answering exactly what was on that.

3       Q.    But you said it was a larger list; correct?

4       A.    Correct.

5       Q.    And so if it's a larger list, it would have

6   included more positions than what we're looking at; is

7   that right?

8       A.    Correct.

9             MR. STEFANY:  And, Counsel, let me just suggest

10       to you, if you want -- I think it will help your

11       questions, so I'm happy to give you a bit of a

12       hint.  If you would pull up Document 122, I think

13       that's the larger list that the witness is

14       referring to; it may help your questions.

15             MR. MACDONALD:  I see.

16             MR. STEFANY:  Because we kind of seem to be

17       stuck here.

18             MR. MACDONALD:  And, forgive me, it may just be

19       me not understanding properly.

20   BY MR. MACDONALD:

21       Q.    So forgive me, Ms. Jones.  So looking at this

22   list, do you see the positions that are listed on that

23   left-hand side?

24       A.    Correct.  Yes.

25       Q.    Going through the positions, starting with the

1  senior services coordinator, can you tell me how much

2  that position was paid at the time of its elimination in

3  2021?

4          MR. STEFANY:  While she's looking that up,

5      Kyle, is your question what amount was paid to that

6      person in 2021, or what was her salary as of the

7      time?

8  BY MR. MACDONALD:

9      Q.   What was the annual salary for the senior

10  services coordinator position in 2021?

11         MR. STEFANY:  Okay.  That clarifies it, thanks.

12         THE WITNESS:  $79,823.57.

13  BY MR. MACDONALD:

14     Q.   And that's the base salary alone, not including

15  any benefits; correct?

16     A.   Correct.

17     Q.   And how much was allocated for the sick pay?

18     A.   How much was allocated for sick pay?  We don't

19  allocate additional budget amounts for time off; that

20  comes from their salary.  So they're either going to get

21  paid regular wages or they get paid salary compensation

22  -- excuse me, sick pay compensation, if they take time

23  off.  So that would have been included in the budget for

24  $79,000.

25     Q.   I see.  And do you recall ever pulling a report

 1  specifically for the senior services coordinator

 2  position?

 3      A.   I ran one for this conversation.

 4      Q.   But not prior to that?

 5      A.   No.

 6      Q.   And then the secretary of traffic position; how

 7  much was that position paid annually for the year 2021?

 8      A.   Okay.  So that's a separate question.  Do you

 9  want annual salary, or do you want --

10      Q.   Yes.  Similar to that same number that you gave

11  me for the senior services coordinator position.

12      A.   The secretary of traffic, in 2021, was

13  $62,432.32.

14      Q.   And that was the annual pay for that position;

15  correct?

16      A.   Correct.

17      Q.   And did you generate a report for that position

18  prior to running a report related to this case?

19      A.   Not that I recollect.

20      Q.   And then going to the next position, major of

21  professional standards; what is the pay for that

22  position?

23          MR. STEFANY:  Counsel, that's not on your

24      paragraph 15, so I'm not sure the witness has a

25      report on that person.

```
 1              THE WITNESS:  I actually do not.

 2   BY MR. MACDONALD:

 3       Q.    Okay.  No worries.

 4       A.    That's a certified position, not a civilian

 5   position.

 6       Q.    So the secretary or, sorry, the major of

 7   professional standards was not a civilian position?

 8       A.    That was a certified position.

 9       Q.    Meaning, it's a law enforcement position;

10   correct?

11       A.    Correct.

12       Q.    And for the director of purchasing position,

13   that was the number we had looked at earlier; correct?

14   Can you tell me that number one more time, for the

15   annual pay.

16       A.    So the annual pay is different; $94,823.03 is

17   the annual salary, base compensation only.

18       Q.    And the number we discussed previously, that

19   was the amount that was actually paid to Ms. Clark in

20   that director of purchasing position that year?

21       A.    In calendar year 2021, correct.

22       Q.    Understood.  And going to the next position,

23   community liaison; what was the annual pay for that

24   position?

25       A.    In 2021, she was paid 52,000.
```

1    Q.    And that's 52,000 for the entire year?

2    A.    That was her annual salary.

3    Q.    And that's 52,000, even; correct?

4    A.    $52,000 even.   Actually, she went from 50,000

5    to 52,000 on 10/3/2021; so depending on when you were

6    looking at in 2021.

7    Q.    Do you know why that increase took place on

8    10/3/2021?

9    A.    That was from a general increase on 10/3, the

10   beginning of a new fiscal year.

11   Q.    And then, going to the next position, how much

12   was the director of fleet management position paid

13   annually?

14   A.    So if I use the same 2021/10/3, $91,330.60.

15   Q.    Do you recall generating a report related to

16   the director of fleet management position?

17   A.    We discussed this earlier.   I didn't; you know,

18   before or after any decision was made, I don't know the

19   answer to that.   But I remember pulling position and

20   data for Fleet, and I don't recollect if it was in 2021.

21   Q.    And that information was provided to Annmarie

22   Reno; is that right?

23   A.    That was my guess.   But, generally speaking,

24   most of my requests came from Annmarie at the time.

25   Q.    And going to the next position, communications

1  manager; what was the annual pay for that position?

2      A.  $74,012.90.

3      Q.  And do you recall generating a report related

4  to the communications manager position, in 2021?

5      A.  Not specifically, no.

6      Q.  And in generating this report that we're

7  looking at here, for the ages, you received that

8  information from the HR file of respective employees; is

9  that correct?

10      A.  Correct.

11      Q.  In your experience as budget director, looking

12  at the salaries for each position that we just went

13  through, would you say that they're on the higher end of

14  the pay scale for the Lee County Sheriff's Office?

15      A.  Without comparing them to either the pay plan

16  or other positions similarly, you know, I don't know the

17  answer to that.  They were in line with what I would

18  expect.

19      Q.  Expect, based on what?

20      A.  Based on the title; you know, the title, the

21  they're managers, they make in the neighborhood of

22  $70,000.

23      Q.  You said managers are in the range of $70,000?

24      A.  Yeah.  If I was looking at a manager in the

25  range of $70,000, that's what I would expect.  Again,

 1  you know, without being able to reference the actual pay

 2  range information from the pay plan in 2021.

 3          MR. MACDONALD:  Let me go off the record at

 4      1:09 p.m.

 5          THE WITNESS:  (Inaudible) that seems a little

 6      high to me.  I would flag that to take a look at

 7      that.

 8  BY MR. MACDONALD:

 9      Q.  Sorry, I didn't hear what you said.

10      A.  Sorry.  Jamie Bartz seems a little high to me

11  as senior services coordinator, at 79,000.  I'd said I

12  might take another look at that one, to see how she got

13  there.  Years of service; she was here a long time.

14          MR. MACDONALD:  We'll go ahead and go off the

15      record.

16          THE COURT REPORTER:  We're off the record.

17          (A brief recess was taken.)

18          THE COURT REPORTER:  We're back on the record.

19          MR. MACDONALD:  Those are all of the questions

20      I have for you today, Ms. Jones.  I just want to

21      thank you for your time.

22          THE WITNESS:  Absolutely.

23          MR. STEFANY:  Ms. Jones, let me just look real

24      quick at my notes and see if I've got any

25      follow-up, real quick.

1              CROSS-EXAMINATION

2    BY MR. STEFANY:

3        Q.   At least my notes were not clear from your

4    answers earlier, to questions regarding the vacation and

5    sick leave buy-back that happens once a year, as I

6    understand your testimony.  Do you remember those

7    questions?

8        A.   Sure.

9        Q.   So let me just take it one at a time.  For the

10   sick leave buy-back, just define what that is, based

11   upon the benefits plan that's offered to employees at

12   the Lee County Sheriff's Office.

13       A.   So the sick leave is offered once a year; the

14   employees are eligible to -- at the sheriff's

15   discretion, up to 80 hours, which is the allotment for

16   sick leave for a given fiscal year; and it's a buy-back

17   at a percentage up to 100 percent.  So the last couple

18   of years, I think including 2021, the sheriff elected to

19   offer the sick buy-back plan to all employees, as long

20   as they were meet the minimum threshold, to sell back up

21   to 80 hours, and then employees could either elect to do

22   so or not.

23       Q.   Okay.  And when you're referring to "sell back

24   sick leave hours," is that essentially cashing out on an

25   accrued benefit so that they would have gotten an

```
 1    additional payout?

 2        A.   Correct.  So if the employee -- I believe the

 3    threshold is 200 hours; so you have to have a bank of

 4    200 hours at a minimum; if you have accrued hours that

 5    are over 200 hours, then you're allowed to sell back, up

 6    to 80 hours.  And then based on another report, it says

 7    you're eligible to sell back up to X number of hours;

 8    there's a form you fill out; you submit it to payroll;

 9    and that's issued out as a payment and a liability

10    reduction for the agency.

11        Q.   And I think I know the answer, based upon that

12    explanation.  But the vacation buy-back, does it work

13    the same way or similar?

14        A.   It does.

15        Q.   And what is the maximum accrued vacation that

16    an employee can carry, if you know?

17        A.   It's 500 -- I don't know.  It's either 500 or

18    600 hours.

19        Q.   Okay.  And so how much is the vacation buy-back

20    or sell or however -- whatever verb applies?

21        A.   It goes up to 80 hours.

22        Q.   Up to 80, as well?

23        A.   Correct.

24        Q.   And is that also discretionary, to allow that

25    by the sheriff?
```

1    A.    Correct.

2    Q.    And what percentage?

3    A.    The percentage is -- yes, the election is

4  either offered or not, based on budget constraints; and

5  then the percentage based on budget constraints, would

6  be at whatever percentage that he approved.

7    Q.    Okay.  And then whether or not an employee

8  elects, once the sheriff offers it, whether the employee

9  at the Sheriff's Office elects to sell back some of

10 those either sick leave or vacation leave accrued

11 benefits, it's up to them; correct?

12   A.    Correct.

13   Q.    Thank you.  I think you were asked a question

14 concerning the number of individuals employed as of the

15 last budget cycle who were paid over the maximum amount

16 shown in the pay plan for their job classification.  I

17 think you estimated the number to be 30; is that right?

18   A.    That's correct.

19   Q.    And just to put that in context, as of the last

20 budget cycle, that would be 30 people out of how many

21 employees at the agency?

22   A.    Roughly 1650.

23   Q.    1,650?

24   A.    Correct.

25   Q.    Okay.  And I think, just to put it back on the

```
 1    screen --
 2            MR. STEFANY:  Kyle, can you put back up Exhibit
 3        4, just for a second.
 4            MR. MACDONALD:  I'll put it up.  (Positions
 5        Eliminated was displayed through screen share.)
 6    BY MR. STEFANY:
 7        Q.    Do you remember seeing this Exhibit 4,
 8    Ms. Jones?
 9        A.    Yes.
10        Q.    You testified you created this at the request
11    of the legal team.  Do you remember when you created
12    this document, approximately?
13        A.    Unfortunately, I don't.
14        Q.    Was it this year, or last year?
15        A.    Yeah, I mean, it definitely was within the last
16    year or so.
17        Q.    Okay.
18        A.    I mean, it's recent.
19            MR. STEFANY:  That's all I have.  Thank you.
20        Anything to follow up, Kyle?
21            MR. MACDONALD:  No follow-ups.  We can go ahead
22        and suspend the deposition at 1:28.
23            MR. STEFANY:  The court reporter would probably
24        want to know if you want to read the transcript of
25        your testimony if one is ordered and the testimony
```

1    is transcribed, or you actually have the right to

2    waive reading of that.  It's up to you to decide

3    what you want to do so she can make a note of it

4    before she closes the record.

5        THE WITNESS:  Because this is my first

6    deposition, I would prefer to read it.

7        MR. STEFANY:  Witness will read.

8        (Thereupon, the deposition was terminated at

9    1:29 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                   CERTIFICATE OF OATH

 2   STATE OF FLORIDA    )
     COUNTY OF ORANGE    )
 3

 4           I, Julie S. Evans, Professional Court Reporter,

     Notary Public, State of Florida, certify that JILL JONES
 5
     personally before me via Zoom on October 25, 2023, and
 6
     was duly sworn.
 7
             Witness my hand and official seal this 28th day
 8
     of December 2023.
 9

10

11

12        Julie Evans
          JULIE S. EVANS
13        Professional Court Reporter
          Notary Public, State of Florida
14        My Commission No. GG939756
          Expires:  1/21/2024
15

16

17

18

19

20

21

22

23

24

25
```

1                        CERTIFICATE OF REPORTER

2     STATE OF FLORIDA   )
      COUNTY OF ORANGE   )
3
               I, Julie S. Evans, Professional Court Reporter,
4
      do hereby certify that I was authorized to and did
5
      stenographically report the deposition of JILL JONES;
6
      that a review of the transcript was requested; and that
7
      the foregoing transcript, page number 1 through 65, is a
8
      true and complete record of my stenographic notes.
9

10             I further certify that I am not a relative,

11    employee, attorney, or counsel of any of the parties,

12    nor am I a relative or employee of any of the parties'

13    attorneys or counsel connected with the action, nor am I

14    financially interested in the action.

15
               Dated this 28th day of December 2023.
16

17

18    _____
      Julie S. Evans
19    Professional Court Reporter

20

21

22

23

24

25

Deposition of Jill Jones                                    Jenna Clark v. Carmine Marceno

1                          ERRATA SHEET

2

3          I, JILL JONES, wish to make the following
   alterations:

4

Page              Line              Correction

5

6   Page 14  Line 13   Replace <last> with max

    Page 19  Line 15   Replace <Stan (Ph)> with Matt Sands

7

8   Page 32  Line 6    Replace <yearlong> with Year long

    Page 32  Line 11   Replace <cost> with Projects

9

    Page 33  Line 23   Replace <life> with years

10

    Page 34  Line 22   Replace <that> with than

11

    Page 46  Line 16   Replace <Manager> with Director

12

    Page 61  Line 20   Replace <were met> with met

13

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  Under penalties of perjury, I declare that I have read
    my deposition and that it is true and correct subject to
23  any changes in form or substance entered here.

24  __1/25/24_____        ____Jill Jones_____
         Date                        JILL JONES

25

December 28, 2023


David Stefany, Esquire
Allen Norton & Blue, P.A.
dstefany@anblaw.com

RE.:   Clark v. Marceno, LCSO
       Deposition of Jill JOnes

Dear Mr. Stefany:

Enclosed herewith is a copy of the transcript of
Ms. Jones' deposition taken in the above-referenced
matter, together with the original Errata Sheet.  Please
have Ms. Jones review the transcript within the next ten
days, note any corrections on the Errata Sheet, and then
sign it.

Once that has been accomplished, please forward the
original Errata Sheet to Mr. MacDonald.

Thank you for your cooperation in this matter.

Sincerely,


Julie Evans
Everest Court Reporting, LLC.

## WORD INDEX

**< $ >**
**$1,863.54** 11:*12*
**$18,440.80** 11:*1*
**$2,131.24** 10:*23*
**$3,191.16** 10:*23*
**$3,647.04** 11:*2*
**$360.31** 11:*12*
**$4,558.80** 10:*24, 25*
**$4,695.56** 10:*24*
**$51,069.96** 10:*22*
**$52,000** 58:*4*
**$62,432.32** 56:*13*
**$70,000** 59:*22, 23, 25*
**$74,012.90** 59:*2*
**$79,000** 55:*24*
**$79,823.57** 55:*12*
**$91,330.60** 58:*14*
**$94,823.03** 57:*16*
**$94,960.57** 10:*9*

**< 1 >**
**1** 3:*10* 7:*9* 10:*17*
 14:*25* 27:*22, 24* 28:*8,*
 *17* 29:*5, 6* 35:*10*
 37:*9, 16* 67:*2*
**1,650** 63:*23*
**1/21/2024** 66:*13*
**1:09** 60:*4*
**1:28** 64:*22*
**1:29** 1:*9* 65:*9*
**10** 35:*19*
**10/3** 58:*9*
**10/3/2021** 58:*5, 8*
**100** 61:*17*
**11:30** 1:*9* 4:*4*
**122** 54:*12*
**123** 47:*21*
**14** 7:*17* 15:*6, 7*
**15** 7:*17* 8:*16* 56:*24*
**1650** 63:*22*
**17** 8:*11*
**18** 8:*11*

**< 2 >**
**2** 7:*14* 10:*17*
**2:22-cv-614-SPC-
NPM** 1:*5*

**200** 62:*3, 4, 5*
**2018** 8:*21, 25*
**2020** 28:*24* 29:*6*
**2021** 10:*4* 11:*15, 16*
 14:*18, 22* 15:*9, 16, 19*
 16:*1, 4, 12, 15, 23*
 17:*8* 21:*6, 10, 13*
 22:*23* 23:*16, 24* 24:*1,*
 *6, 9, 12, 22* 25:*4, 23*
 26:*1, 3* 27:*14* 28:*19,*
 *25* 29:*3, 7, 10* 30:*8,*
 *11, 18* 31:*7, 11, 22*
 32:*2* 36:*10, 24* 37:*2,*
 *20, 22* 38:*1, 12* 39:*1,*
 *2, 4* 41:*12* 48:*17, 21,*
 *22* 50:*13* 51:*19* 55:*3,*
 *6, 10* 56:*7, 12* 57:*21,*
 *25* 58:*6, 20* 59:*4*
 60:*2* 61:*18*
**2021/10/3** 58:*14*
**2022** 37:*18* 38:*4, 6*
**2023** 1:*9* 4:*3* 37:*14,*
 *17* 38:*4* 66:*2* 67:*14*
 69:*1*
**2024** 37:*16*
**21-'22** 8:*11*
**225** 2:*7*
**25** 1:*9* 4:*3* 66:*2*
**28** 69:*1*
**28th** 66:*2* 67:*14*
**29** 7:*20*

**< 3 >**
**3** 10:*17*
**30** 29:*6, 7, 10* 34:*22*
 63:*17, 20*
**317** 8:*24*
**324** 2:*7*
**33131** 2:*4*
**33606-4128** 2:*8*

**< 4 >**
**4** 3:*2* 10:*17* 38:*6*
 64:*3, 7*
**443.36** 11:*11*

**< 5 >**
**5** 7:*14* 10:*17* 35:*9*
 37:*19* 38:*6*

**50,000** 58:*4*
**500** 62:*17*
**52,000** 57:*25* 58:*1, 3,*
 *5*
**520** 2:*3*

**< 6 >**
**6** 7:*14* 10:*18*
**600** 62:*18*
**61** 3:*3*
**65** 67:*2*
**66** 3:*4*
**67** 3:*5*
**68** 3:*6*
**69** 3:*7*

**< 7 >**
**7** 3:*10* 10:*18*
**79,000** 60:*11*

**< 8 >**
**8** 37:*8, 11*
**80** 61:*15, 21* 62:*6, 21,*
 *22*

**< A >**
**a.m** 1:*9* 4:*4*
**ability** 23:*10*
**able** 60:*1*
**above-referenced** 69:*1*
**Absolutely** 5:*3* 32:*3*
 60:*22*
**absorb** 26:*15, 24*
 32:*7, 11*
**absorbed** 26:*17*
**accepting** 31:*1*
**access** 23:*8, 10, 12*
**accomplished** 69:*1*
**account** 16:*6, 19*
**accounted** 32:*5, 12, 15*
**accounts** 16:*5, 7, 10,*
 *14, 16, 19*
**accrued** 61:*25* 62:*4,*
 *15* 63:*10*
**accumulator** 8:*18, 21*
 10:*3* 12:*17*
**accurate** 17:*16*
**accurately** 6:*2*

**action** 8:*14* 42:*21*
 49:*7, 8, 10, 16, 20*
 67:*13, 14*
**actual** 60:*1*
**add** 49:*24* 52:*7, 13,*
 *14, 17*
**added** 49:*21, 22*
 53:*21*
**adding** 17:*5* 27:*11*
**addition** 50:*25*
**additional** 26:*14, 23*
 27:*1* 47:*4* 50:*24*
 55:*19* 62:*1*
**admin** 10:*24* 12:*5, 7,*
 *8*
**administrative** 20:*23*
 21:*9* 53:*18, 20*
**adopted** 8:*10*
**advance** 27:*3*
**advantage** 11:*24*
**affirm** 4:*14*
**afforded** 32:*20*
**age** 53:*5*
**agency** 11:*19* 25:*13*
 29:*16, 18* 32:*2* 34:*22*
 43:*25* 45:*15* 62:*10*
 63:*21*
**age-related** 49:*5*
**ages** 59:*7*
**ago** 35:*20*
**agree** 47:*6*
**agreed** 47:*14*
**ahead** 7:*7* 60:*14*
 64:*21*
**Allen** 2:*6* 69:*1*
**allocate** 26:*7* 44:*19*
 55:*19*
**allocated** 12:*15* 27:*3,*
 *16* 28:*11, 24* 29:*7, 10*
 34:*25* 52:*10* 55:*17,*
 *18*
**allocation** 51:*16, 18,*
 *24*
**allocations** 27:*18*
 51:*11*
**allotment** 61:*15*
**allow** 62:*24*
**allowed** 62:*5*
**alterations** 68:*3*

**amount** 9:*22* 10:*8,*
*15* 12:*15* 33:*6*, *11*, *17*
34:*15* 36:*8* 38:*3*
55:*5* 57:*19* 63:*15*
**amounts** 11:*9* 12:*13*
32:*14* 33:*13* 55:*19*
**analysis** 52:*19*
**Ann** 47:*1*
**Annmarie** 22:*6, 7, 8*
23:*17* 25:*4* 30:*10, 19*
41:*8* 43:*12* 44:*18*
45:*5* 46:*20, 23* 58:*21,*
*24*
**annual** 55:*9* 56:*9, 14*
57:*15, 16, 17, 23* 58:*2*
59:*1*
**annually** 56:*7* 58:*13*
**answer** 9:*13* 30:*16*
47:*2, 5* 51:*22* 58:*19*
59:*17* 62:*11*
**answering** 54:*2*
**answers** 6:*4, 24* 7:*4*
61:*4*
**anticipated** 9:*13*
18:*18* 27:*11*
**appearance** 4:*7*
**APPEARANCES** 2:*1*
**appeared** 1:*9*
**applied** 13:*11* 14:*2*
**applies** 12:*3* 62:*20*
**apply** 12:*5* 13:*19*
**approval** 28:*5* 49:*13*
**approved** 23:*13* 63:*6*
**approximately** 4:*3*
64:*12*
**area** 42:*7, 8, 10* 43:*9*
**areas** 16:*8* 17:*6*
22:*22* 24:*18* 43:*9*
44:*20, 22* 47:*11*
**aside** 28:*11*
**asked** 15:*13* 17:*9, 17*
20:*23, 25* 21:*12, 14*
26:*25* 41:*4* 45:*14*
46:*3* 48:*9, 15* 63:*13*
**asking** 30:*1* 48:*24*
50:*1* 53:*15*
**assessment** 22:*1, 15*
26:*23* 28:*6*
**assignment** 30:*22*

35:*22*
**assignments** 16:*5*
**assisting** 17:*15*
**associated** 25:*16, 22*
27:*15* 49:*12*
**assume** 44:*14, 15*
**assumed** 44:*4, 10, 23*
46:*17*
**assuming** 29:*20*
**assumption** 45:*21*
**attendance** 12:*10*
**attention** 7:*12*
**attorney** 67:*11*
**attorneys** 9:*16* 67:*13*
**attrition** 32:*9*
**authorized** 8:*12*
25:*19* 28:*16* 51:*9*
67:*2*
**available** 7:*2* 33:*12*
**Avenue** 2:*7*
**avoid** 35:*24*
**awarded** 28:*7* 37:*7*
39:*12*
**aware** 15:*9, 13, 14*
19:*23* 20:*11* 31:*9*
36:*23* 41:*22*

**< B >**
**back** 11:*21* 20:*20*
26:*13, 25* 38:*23*
42:*19* 60:*18* 61:*20,*
*23* 62:*5, 7* 63:*9, 25*
64:*2*
**bank** 62:*3*
**Bartz** 60:*10*
**Base** 38:*10* 55:*14*
57:*17*
**based** 6:*25* 12:*13*
13:*12, 24* 14:*4* 18:*23*
19:*12, 13* 20:*1, 3*
24:*24* 34:*25* 37:*5, 6*
59:*19, 20* 61:*10* 62:*6,*
*11* 63:*4, 5*
**basis** 16:*17, 21* 18:*6,*
*22* 23:*21* 25:*11* 30:*3*
48:*23*
**Bates** 8:*24* 47:*21*
**bathroom** 6:*15*
**began** 7:*8* 47:*20*
**beginning** 4:*7* 58:*10*

**BEHALF** 1:*9* 2:*5, 9*
6:*22*
**believe** 8:*22* 15:*10*
21:*4, 24* 22:*1* 37:*19*
39:*3* 48:*11* 62:*2*
**benefit** 10:*8* 38:*8*
61:*25*
**benefits** 10:*6, 10, 12,*
*16, 21* 11:*8, 14* 12:*15,*
*25* 13:*4* 38:*11, 15*
55:*15* 61:*11* 63:*11*
**best** 6:*8* 9:*13* 15:*12*
45:*3*
**binding** 7:*5*
**bit** 25:*5* 43:*22* 54:*11*
**bits** 22:*11*
**Blue** 2:*6* 69:*1*
**board** 24:*17* 27:*23*
**break** 6:*14, 16*
**Brickell** 2:*3*
**brief** 60:*17*
**brought** 34:*6*
**budget** 8:*11, 12*
15:*16, 19* 16:*11, 12,*
*13, 16, 20* 17:*3* 21:*21*
22:*20* 23:*3, 13* 24:*7,*
*8, 11, 13, 15, 21, 25*
25:*23* 26:*8, 12, 15, 17,*
*25* 27:*5, 12, 22* 28:*4,*
*5, 6, 7, 14* 29:*6, 8*
30:*14, 19, 25* 31:*22*
32:*1, 5, 7, 12* 33:*3, 8,*
*15* 34:*20* 36:*14*
38:*17, 21, 25* 39:*5, 6,*
*10, 11* 40:*7, 9, 10, 12,*
*14, 19, 23* 41:*2* 42:*18*
43:*1, 5* 52:*9, 16*
55:*19, 23* 59:*11* 63:*4,*
*5, 15, 20*
**budgetary** 14:*17, 20,*
*25* 15:*11, 14* 17:*15,*
*17, 21* 18:*15* 27:*20*
**budgeted** 32:*22, 23*
33:*11*
**budgeting** 27:*2, 8, 9*
**budget-related** 23:*12,*
*13*
**budgets** 25:*3*
**Bureau** 26:*22* 44:*19,*

*20*
**buy** 11:*21*
**buy-back** 10:*25* 11:*1,*
*19* 61:*5, 10, 16, 19*
62:*12, 19*
**buyout** 11:*18*

**< C >**
**calculation** 35:*1*
**calculator** 10:*17*
**calendar** 29:*3* 57:*21*
**call** 52:*5*
**called** 52:*2, 24* 53:*21*
**capacity** 1:*7* 4:*25*
**capital** 28:*15*
**CARMINE** 1:*5* 4:*6,*
*12, 25*
**carry** 62:*16*
**CASE** 1:*5* 17:*8*
26:*24* 29:*21* 56:*18*
**cashing** 61:*24*
**categories** 10:*20*
11:*3, 9, 17* 12:*12, 24*
28:*14, 16*
**category** 12:*7* 24:*20*
28:*13* 35:*14* 36:*10*
49:*19*
**certain** 34:*12*
**CERTIFICATE** 3:*4,*
*5* 66:*1* 67:*1*
**certified** 34:*22* 57:*4,*
*8*
**certify** 66:*2* 67:*2, 10*
**chain** 19:*15* 22:*5*
**challenges** 24:*13, 15*
**chance** 38:*1*
**change** 9:*20* 20:*11*
35:*7* 51:*11, 14* 53:*2,*
*10, 11, 12, 16, 22*
**changed** 25:*5* 51:*10*
**changes** 17:*12, 16*
18:*1* 20:*22* 21:*9, 22*
28:*3, 7* 42:*4, 5, 6*
48:*24* 49:*10* 50:*4*
53:*19, 22* 68:*23*
**circumstance** 35:*14*
51:*23*
**civilian** 25:*18* 34:*23*
36:*3* 57:*4, 7*

clarifies  55:*11*
clarify  15:*22*
**CLARK**  1:*1*  4:*5, 10, 24*  9:*23*  10:*1, 12, 15*  11:*15*  13:*19*  28:*19*  32:*19*  36:*7, 11, 18*  37:*10, 20*  46:*18*  57:*19*  69:*1*
**Clark's**  28:*23*  29:*3, 9, 13, 23*  30:*7*  33:*17*  36:*23*  37:*1*  38:*11*  41:*6, 21, 25*  42:*14*  43:*13*  45:*11, 19*  46:*1, 12, 24*  47:*7*
classification  63:*16*
clear  47:*11*  61:*3*
clearly  6:*19*  49:*19*
clerk  52:*3, 5, 6, 7, 14*
closely  25:*14*
closer  8:*6*  38:*5*  47:*24*
closes  65:*4*
code  12:*10*  13:*12*  52:*9, 16*
combination  49:*4*
come  8:*6*  16:*18*  17:*6, 22*  18:*8*  19:*1, 25*  22:*7, 14*  39:*11*
comes  31:*17*  39:*13, 21*  42:*3, 9*  48:*23*  55:*20*
coming  19:*7*  24:*13*  30:*21*
command  17:*4, 15*  18:*1, 24*  19:*15, 21*  22:*6, 17*  23:*1*  28:*2*
commander  44:*20*
comment  49:*15, 21, 24*
comments  49:*6*
commission  27:*13*  66:*13*
commissioners  27:*24*
communicating  9:*19*
communication  47:*10*
communications  58:*25*  59:*4*
community  57:*23*
comparable  33:*23*

compare  33:*18*
compared  25:*5*
comparing  59:*15*
comparison  18:*9, 10*  33:*20*
compensatable  11:*5*
compensation  10:*20, 21*  11:*14*  55:*21, 22*  57:*17*
complete  67:*2*
concerning  63:*14*
conducted  14:*18, 21*  16:*23*  30:*11*  41:*23*  42:*2*
conducting  5:*18*  7:*22*
confusing  6:*11*
connected  67:*13*
cons  40:*25*
consider  20:*15*
consideration  17:*23*  43:*11*
considerations/indicators  24:*10*
considering  18:*1*  19:*21*  20:*22*  21:*7*
consolidating  43:*25*
consolidation  44:*2*  45:*7, 10, 20*  46:*1, 11*
constantly  18:*6*
constraint  40:*9, 14, 19*
constraints  24:*7*  38:*17*  39:*6*  63:*4, 5*
consulted  30:*9, 14*  41:*3*
context  42:*18*  43:*5*  63:*19*
continually  24:*12*
continuing  51:*5*
contributions  13:*6, 7*
control  19:*2*  23:*15*
conversation  42:*20*  45:*16*  46:*3, 5, 8, 12, 14*  56:*3*
conveyed  45:*23*
cooperation  69:*1*
coordinated  9:*20*
coordinator  55:*1, 10*  56:*1, 11*  60:*11*
copy  69:*1*

**Correct**  12:*2*  14:*3, 15*  17:*24*  19:*19*  23:*25*  27:*17*  28:*21, 22*  29:*11*  33:*16*  34:*14, 17*  36:*8, 9, 10, 16, 20*  37:*13, 24*  43:*15*  44:*9*  45:*9*  49:*18*  53:*10*  54:*3, 4, 8, 24*  55:*15, 16*  56:*15, 16*  57:*10, 11, 13, 21*  58:*3*  59:*9, 10*  62:*2, 23*  63:*1, 11, 12, 18, 24*  68:*22*
**Correction**  68:*3*
corrections  69:*1*
correctly  43:*18, 23*  52:*20*
cost  32:*8*
costs  21:*19*  25:*15*  26:*15*  32:*11*
counsel  3:*16*  4:*7, 8*  9:*10, 18*  15:*3, 20*  38:*20*  46:*21*  54:*9*  56:*23*  67:*11, 13*
**Country**  1:*8*
**County**  4:*6*  5:*1*  6:*22*  7:*2, 5*  9:*24*  10:*2*  13:*4, 20*  14:*16, 22*  15:*16, 18, 25*  23:*7*  25:*2, 20, 24*  26:*13, 25*  27:*13, 24*  28:*2, 5, 20*  29:*23*  30:*7*  31:*6*  33:*19*  34:*12*  35:*16, 23*  38:*16, 18*  39:*5*  40:*8, 13*  59:*14*  61:*12*  66:*2*  67:*2*
couple  61:*17*
course  47:*25*
**COURT**  1:*1, 24*  4:*2, 13*  5:*20, 22*  6:*2*  60:*16, 18*  64:*23*  66:*2, 12*  67:*2, 19*  69:*1*
**Covid**  24:*14*
create  19:*18*  21:*12*  35:*17*  48:*15*
created  19:*20*  22:*15*  26:*3*  27:*19*  31:*24*  32:*8*  48:*10, 12*  49:*3*  52:*17*  64:*10, 11*

creating  17:*10*  23:*16*  24:*1*
**Criminal**  26:*22*
criteria  13:*24*  14:*5, 7*
**CROSS**  3:*3*
**CROSS-EXAMINATION**  61:*1*
**Crystal**  44:*7, 8, 10*  46:*15*
curiosity  47:*15, 16, 18*
current  26:*15*  27:*6*  35:*22*
currently  18:*13, 17*  19:*15*
cut  24:*8*
cycle  34:*20*  63:*15, 20*

**< D >**
data  15:*10*  49:*11*  58:*20*
database  8:*16*  13:*11*  49:*3, 6*
**DATE**  1:*9*  9:*20*  16:*13*  17:*18*  21:*2*  28:*8*  41:*11*  68:*24*
**Dated**  67:*14*
dates  9:*20*  26:*20*
**DAVID**  2:*6*  4:*11*  69:*1*
day  41:*15*  46:*6*  66:*2*  67:*14*
days  69:*1*
day-to-day  46:*19, 25*
**Dear**  69:*1*
**December**  29:*4*  66:*67:*14*  69:*1*
decide  45:*2*  65:*2*
decided  52:*4*
decision  14:*6*  20:*5*  21:*8*  31:*15*  40:*16, 20, 22*  41:*18*  45:*4*  46:*10*  47:*6, 17, 18*  58:*18*
decisions  17:*4, 19*  19:*12, 13*  20:*12*  25:*10*  40:*18, 25*  41:*1*  42:*24*  47:*9, 10*
declare  68:*22*
deduction  13:*11*

**Defendant** 1:*9* 2:*9*
**Defendant's** 47:*21*
**deficit** 16:*1, 7, 13*
**define** 24:*23* 31:*8*
  61:*10*
**definitely** 24:*12*
  64:*15*
**delay** 39:*22*
**delayed** 40:*6*
**deny** 39:*22*
**department** 17:*22*
  18:*21* 20:*21, 24* 21:*1,*
  *18, 20* 22:*21* 23:*11*
  26:*6, 17* 30:*6, 25*
  31:*18* 39:*25* 41:*2*
  45:*6* 47:*3*
**departments** 18:*15*
  23:*14* 26:*3* 40:*3*
**departure** 29:*23* 30:*7*
**depending** 58:*5*
**deposed** 5:*7*
**DEPOSITION** 1:*9*
  3:*10* 4:*4* 5:*9, 18*
  7:*22* 9:*5, 16* 64:*22*
  65:*6, 8* 67:*2* 68:*22*
  69:*1*
**Derek** 2:*2*
**describe** 26:*13*
**described** 11:*13*
  17:*14*
**describing** 53:*13*
**determined** 44:*25*
**difference** 50:*7* 51:*6*
**different** 10:*5* 12:*12*
  16:*20* 17:*6* 24:*18, 20*
  35:*3, 20* 50:*18* 52:*2,*
  *9, 16* 57:*16*
**DIRECT** 3:*2* 4:*21*
**directed** 20:*6*
**directive** 13:*24* 42:*9*
  47:*12*
**directly** 25:*6*
**director** 17:*3* 21:*10,*
  *13* 23:*3* 24:*25* 28:*20*
  30:*14, 19* 32:*1* 33:*15,*
  *18* 36:*14* 38:*21, 25*
  39:*5* 40:*7, 11, 12*
  44:*3, 5* 57:*12, 20*
  58:*12, 16* 59:*11*

**directors** 22:*20*
**discretion** 61:*15*
**discretionary** 62:*24*
**discuss** 42:*13*
**discussed** 12:*24*
  20:*12* 32:*14* 42:*17*
  44:*2* 45:*10* 46:*11*
  57:*18* 58:*17*
**discussion** 43:*19, 25*
  44:*6*
**discussions** 25:*1*
**displayed** 64:*5*
**distinction** 51:*4*
**distribution** 31:*18*
**DISTRICT** 1:*1* 52:*6,*
  *7, 14*
**division** 21:*21, 24*
  29:*20* 44:*23*
**divisions** 32:*4* 44:*1*
**document** 7:*7, 10*
  8:*10, 14, 23* 9:*6*
  31:*14* 47:*19* 48:*1, 2*
  54:*12* 64:*12*
**documentation** 17:*11*

**documentation/reports**
  17:*7*
**documents** 8:*2, 4*
  9:*1* 20:*6, 10*
**doing** 14:*8, 9* 50:*25*
  51:*3*
**Dr** 2:*3*
**draw** 7:*12*

**dstefany@anblaw.com**
  69:*1*
**due** 36:*12*
**duly** 4:*20* 66:*2*

**< E >**
**earlier** 57:*13* 58:*17*
  61:*4*
**easier** 10:*19*
**effect** 5:*19* 24:*11*
**either** 11:*23* 26:*12,*
  *13* 55:*20* 59:*15*
  61:*21* 62:*17* 63:*4, 10*
**elect** 11:*23, 25* 61:*21*
**elected** 30:*22* 61:*18*

**election** 63:*3*
**elects** 63:*8, 9*
**eligibility** 14:*4, 5*
**eligible** 14:*3* 61:*14*
  62:*7*
**eliminate** 47:*6*
**eliminated** 31:*6, 10,*
  *19* 33:*1, 6* 36:*24*
  37:*3* 40:*8, 13, 16*
  41:*7, 22* 42:*15* 43:*14*
  47:*20* 48:*16, 21*
  49:*20, 25* 50:*2, 6, 8,*
  *12* 51:*2, 6, 13* 53:*9,*
  *11* 64:*5*
**eliminated/removed/re**
**placed** 53:*6*
**eliminating** 17:*5*
**elimination** 19:*21*
  20:*15* 21:*25* 31:*21*
  40:*17* 42:*1* 45:*11, 19*
  46:*1* 52:*21* 55:*2*
**employed** 28:*19*
  63:*14*
**employee** 11:*25*
  12:*14, 21* 13:*12*
  14:*11* 17:*20* 23:*3*
  32:*25* 34:*9, 11, 15, 18,*
  *24* 35:*2, 15, 24* 49:*9,*
  *12, 13, 17* 62:*2, 16*
  63:*7, 8* 67:*11, 12*
**employees** 11:*21, 23*
  13:*18* 14:*2, 8, 9* 18:*1*
  30:*3* 31:*5* 33:*2, 14,*
  *18* 37:*7* 48:*16, 20*
  59:*8* 61:*11, 14, 19, 21*
  63:*21*
**employee's** 32:*15*
  33:*5*
**employer** 13:*6, 7*
**employment** 9:*23*
  10:*2* 13:*20* 27:*15*
  31:*9*
**Enclosed** 69:*1*
**ended** 35:*21*
**Enforcement** 26:*4*
  57:*9*
**enrollment** 13:*13*
**entered** 68:*23*
**entire** 16:*13* 34:*22*

  58:*1*
**entity** 18:*21*
**entry** 49:*11*
**ERRATA** 3:*6* 68:*1*
  69:*1*
**ESQUIRE** 2:*2, 6*
  69:*1*
**essentially** 61:*24*
**established** 13:*17*
**estimated** 28:*11*
  63:*17*
**estimates** 27:*18*
**evaluation** 21:*19*
**Evans** 1:*9* 66:*2, 11*
  67:*2, 18* 69:*1*
**event** 8:*20* 14:*13*
  43:*5, 7*
**Everest** 69:*1*
**everybody** 35:*9*
**exact** 21:*2* 45:*13*
**exactly** 26:*1* 35:*8*
  53:*17* 54:*2*
**Examination** 1:*9* 3:*1*
  4:*21*
**example** 17:*19* 18:*8*
  19:*5* 20:*8* 22:*13, 20*
  26:*2, 4* 27:*14* 32:*18*
  35:*3, 5* 37:*8* 39:*18*
  50:*20* 51:*8* 52:*2, 3, 4*
**examples** 18:*5* 22:*18*
  23:*19*
**exceed** 16:*20* 34:*10*
**exceeded** 16:*11*
**excluding** 10:*16*
**excuse** 49:*9* 55:*22*
**execute** 47:*9*
**EXHIBIT** 3:*7* 7:*9*
  14:*25* 64:*2, 7*
**existing** 48:*19*
**expansion** 26:*16, 18*
**expect** 59:*18, 19, 25*
**expenditure** 24:*2*
  29:*13, 24*
**expenditures** 16:*11,*
  *18* 22:*22* 23:*6, 14, 17*
  24:*8, 21* 25:*1* 28:*17*
**expense** 23:*23*
**expenses** 18:*17, 18*
  19:*10* 21:*20* 23:*2*
  25:*22, 23* 27:*15*

experience   24:24
32:1   53:15   59:11
experienced   16:12
Expires   66:13
explanation   62:12
expressly   3:17

< F >
faced   38:16
fact   20:13, 15   46:6
factors   17:7   40:16
fair   6:6, 7   12:22, 23
familiar   9:22   13:3, 6
14:16, 20   15:15
16:22   31:5, 8, 20
33:13   38:13   39:16
far   18:15
February   27:20
feel   19:2
figure   26:8
file   49:12   59:8
fill   62:8
final   8:25
finance   20:7   23:8
44:1, 3, 5   45:4   46:16
financial   40:23
financially   67:14
find   16:8   18:11
23:1   38:17   41:6
finish   6:4, 5
first   4:20   5:9   7:11
65:5
fiscal   27:4, 14   28:9,
18   29:5   37:16   39:20
58:10   61:16
fiscals   8:11
flag   60:6
Fleet   20:21, 23, 24
21:1, 10, 13, 21, 24
58:12, 16, 20
FLORIDA   1:1, 8
2:4, 8   5:1   13:1, 3, 15
27:23   66:2, 12   67:2
flow-generated   49:11
fluctuate   13:14, 16
follow   64:20
followed   9:12
following   28:24   68:1
follows   4:20

follow-up   52:20, 22
60:25
follow-ups   64:21
force   5:19   14:17, 21
15:1, 12   16:22   30:10
31:7, 10, 22   36:24
41:22   42:1, 3, 14, 18,
21   43:1, 5, 8   48:17,
21
forecasts   18:20
foregoing   67:2
forgive   17:24   39:16
54:18, 21
form   15:22   30:15
62:8   68:23
forward   18:21   39:23
46:7, 8   47:13   69:1
found   21:15
frame   20:20   53:7
front   8:2, 4   9:2
53:14   54:1
FRS   13:8, 12
fuel   10:9   11:7, 12
full   13:17   22:15
29:2
full-time   14:7, 8   37:7
fund   26:9
funding   26:14   27:1
29:2
funds   28:10, 23
31:24   32:2, 3   38:18
further   67:10
future   43:19

< G >
Gambino   44:7, 8, 10
46:15
game   46:7
gender   53:5
general   26:2   42:20
58:9
generalized   13:22
generally   14:7   15:15
17:6   18:25   19:1
23:23   33:14   40:17
58:23
generate   17:22
31:12   48:13   56:17
generated   15:9   50:3,
14

generating   58:15
59:3, 6
gesture   5:23
getting   24:16
GG939756   66:13
give   7:13, 16, 19
20:2   22:17   34:21
47:22   54:11
given   13:14   18:19
20:14   31:3   35:2
48:12   61:16
giving   35:11
glass   6:15
go   5:10   6:14   7:7
10:19   16:8, 16   18:15
20:20   23:3   26:13
38:18   51:16   60:3, 14
64:21
goal   27:21
God   4:16
goes   49:12, 13   62:21
going   5:10   7:7, 12
13:9   15:21   16:9
19:3   27:11   28:1
30:15   31:16   32:10
40:17   43:21, 22, 23
47:19, 24   50:21, 23,
24   51:15   52:4, 5, 11
54:25   55:20   56:20
57:22   58:11, 25
Good   4:23   6:17
27:25
gotten   36:22   61:25
grade   34:8   35:5
greater   26:24
gross   10:6
Group   2:2   11:6
guess   22:5   38:6
47:1   58:23

< H >
hand   4:14   66:2
handled   39:6
happen   32:6   35:12,
15
happened   26:11
44:24
happens   11:22   13:23
14:14   18:22   34:11

45:1, 16   46:7   61:5
happy   54:11
hard   54:2
head   36:6
heading   19:9
headquarters   7:24
heads   23:12
hear   60:9
help   4:16   15:23
17:18   40:1   51:4
54:10, 14
hereto   3:15
herewith   69:1
high   33:24   60:6, 10
higher   33:6   34:19,
25   35:7   36:11   59:13
highlighted   8:10   9:7,
8
hint   54:12
history   8:14
hold   46:15
Holloway   19:16   24:2
hours   61:15, 21, 24
62:3, 4, 5, 6, 7, 18, 21
HR   8:16   20:7, 9
23:9, 11   38:15   49:6
59:8
Hyde   2:7

< I >
idea   12:20
immediately   46:5
impact   14:17, 21
15:11, 14   17:15, 17
31:22
impacts   14:25
implementation   40:4,
6
import   13:10
inaudible   5:23   60:5
include   10:11   11:6
12:25   25:18   29:2
30:3   38:8   40:22
included   14:1   22:16
48:19   50:13   51:18
53:12   54:6   55:23
includes   10:5
including   10:10
55:14   61:18

**increase** 13:*19*, *22* 14:*2* 24:*19* 26:*12*, *21* 27:*7* 35:*9* 36:*21* 37:*8*, *11*, *18*, *22* 38:*7* 58:*7*, *9*

**increased** 37:*2* 38:*1*, *12*

**increases** 24:*17* 35:*6*, *11* 37:*6* 38:*4*

**INDEX** 3:*1*, *7*

**indicated** 50:*5*

**individual** 16:*7*, *14* 23:*22* 24:*3* 27:*3*, *6*, *7*

**individuals** 8:*17*, *20* 19:*17* 63:*14*

**information** 9:*19*, *25* 17:*21* 18:*14*, *19*, *24* 20:*2*, *24*, *25* 21:*18*, *19*, *23* 22:*3*, *12*, *13*, *16*, *19* 23:*2*, *6*, *9*, *11* 31:*17* 36:*15*, *17* 40:*24* 42:*9* 48:*9*, *23*, *25* 49:*1*, *5* 53:*4*, *21* 58:*21* 59:*8* 60:*2*

**initiative** 39:*25*

**instructed** 49:*24*

**insurance** 11:*6*

**interested** 67:*14*

**interests** 45:*3*

**Investigations** 26:*22*

**involved** 17:*8*, *10*

**IRS** 10:*7*

**issue** 24:*21*, *23* 25:*2*

**issued** 10:*7* 62:*9*

**issues** 20:*21* 24:*16* 25:*23*

**items** 14:*24*

**its** 55:*2*

**< J >**

**Jamie** 60:*10*

**January** 29:*4* 30:*18* 39:*2*, *4*

**JENNA** 1:*1* 4:*10*, *24* 8:*25* 9:*23* 10:*1*, *15* 11:*15* 29:*13*, *15* 30:*1*, *6* 41:*6* 43:*20*

**Jenna's** 45:*15* 46:*25* 47:*2*

**JILL** 1:*9* 3:*2* 4:*4*, *19* 5:*6* 66:*2* 67:*2* 68:*1*, *24* 69:*1*

**job** 16:*8* 18:*9*, *11* 19:*25* 20:*2*, *3* 31:*16* 47:*9* 63:*16*

**JONES** 1:*9* 3:*2* 4:*5*, *19*, *23* 5:*6*, *7* 54:*21* 60:*20*, *23* 64:*8* 66:*2* 67:*2* 68:*1*, *24* 69:*1*

**judge** 5:*20*

**Julie** 1:*9* 66:*2*, *11* 67:*2*, *18* 69:*1*

**June** 27:*24* 28:*4*

**jury** 5:*20*

**< K >**

**keep** 31:*13* 35:*4* 48:*23* 53:*18*, *20*

**kept** 35:*8*, *10*

**Key** 2:*3*

**kicks** 28:*5*

**kind** 19:*1*, *9* 22:*16* 24:*12*, *13*, *18* 25:*8* 28:*2* 35:*13* 39:*24* 42:*23* 52:*19* 53:*18*, *20* 54:*16*

**know** 6:*11*, *16* 8:*5* 9:*17* 16:*3*, *7* 17:*19* 18:*7*, *10*, *18* 19:*9* 20:*4*, *9*, *12*, *20* 21:*2*, *3*, *7*, *8*, *14*, *16* 22:*11*, *12*, *19* 24:*15*, *16*, *18* 26:*9*, *19* 30:*13* 32:*4* 35:*2*, *5* 36:*5* 37:*1* 41:*16*, *17*, *20* 44:*10*, *13*, *14*, *21* 45:*13*, *21* 46:*8*, *17* 47:*4*, *17*, *18*, *23* 48:*4*, *22* 58:*7*, *17*, *18* 59:*16*, *20* 60:*1* 62:*11*, *16*, *17* 64:*24*

**knowledge** 6:*25* 7:*1* 15:*12*

**known** 7:*1*

**KYLE** 2:*2* 4:*9*, *23* 55:*5* 64:*2*, *20*

**< L >**

**labeled** 47:*21*

**language** 42:*23*

**larger** 52:*21*, *23* 53:*8*, *25* 54:*3*, *5*, *13*

**Law** 2:*2* 5:*20* 57:*9*

**lawsuit** 4:*24* 6:*9*

**LCSO** 69:*1*

**learn** 42:*1*

**learned** 20:*14* 41:*21*

**learning** 41:*25*

**lease** 10:*7* 11:*7*, *11*

**leave** 10:*23*, *24* 12:*3*, *5*, *7*, *8*, *9*, *13*, *21* 32:*16*, *19*, *21*, *24* 33:*1*, *6*, *10* 61:*5*, *10*, *13*, *16*, *24* 63:*10*

**leaves** 12:*13*

**leaving** 38:*12*

**Lee** 1:*7* 4:*6* 5:*1* 6:*22* 7:*2*, *5* 9:*23* 10:*2* 13:*4*, *20* 14:*16*, *22* 15:*16*, *18*, *25* 23:*6* 25:*2*, *20*, *24* 28:*20* 29:*23* 30:*7* 31:*6* 33:*19* 34:*12* 35:*16*, *23* 38:*16* 39:*5* 40:*7*, *12* 59:*14* 61:*12*

**left** 37:*8*, *20* 43:*21* 44:*24*

**left-hand** 54:*23*

**legal** 9:*18* 29:*19* 48:*7* 64:*11*

**length** 34:*12*

**LETTER** 3:*7*

**liability** 62:*9*

**liaison** 57:*23*

**life** 10:*6* 11:*6*, *11* 33:*23*

**line** 59:*17* 68:*3*

**lines** 29:*8*

**list** 11:*19* 39:*22* 48:*8*, *13*, *22* 50:*13* 51:*19* 52:*21*, *22*, *23* 53:*8*, *25* 54:*3*, *5*, *13*, *22*

**listed** 7:*14*, *17*, *20* 8:*15* 11:*4* 53:*24* 54:*22*

**listing** 53:*6*

**little** 25:*5* 38:*23* 43:*22* 60:*5*, *10*

**LLC** 69:*1*

**local** 9:*9*

**long** 13:*23* 18:*12* 34:*9* 60:*13* 61:*19*

**longer** 31:*15* 32:*10* 50:*10*, *22* 52:*4*

**long-term** 35:*17*

**look** 14:*5*, *9* 16:*6* 19:*11* 20:*21* 27:*5*, *10* 60:*6*, *12*, *23*

**looked** 14:*10* 32:*18* 43:*7* 50:*2* 57:*13*

**looking** 12:*20* 18:*7*, *10* 19:*6* 23:*19* 36:*17* 51:*20* 54:*6*, *21* 55:*4* 58:*6* 59:*7*, *11*, *24*

**lot** 24:*14*, *20*

**lower** 35:*5*

**< M >**

**MACDONALD** 2:*2* 3:*2* 4:*9*, *22*, *24* 15:*5*, *24* 31:*4* 38:*23*, *24* 46:*22* 54:*15*, *18*, *20* 55:*8*, *13* 57:*2* 60:*3*, *8*, *14*, *19* 64:*4*, *21* 69:*1*

**major** 56:*20* 57:*6*

**making** 18:*13* 34:*6* 35:*21* 50:*3*

**management** 58:*12*, *16*

**manager** 46:*16* 59:*1*, *4*, *24*

**managers** 59:*21*, *23*

**manpower** 24:*16* 25:*7*, *11*, *14*, *17*, *21*, *23* 26:*21*, *23* 42:*6* 51:*9* 52:*15*

**MARCENO** 1:*5* 4:*6*, *12*, *25* 69:*1*

**Marie's** 47:*1*

**marked** 7:*8*

**material** 9:*13*

**matter** 4:*5* 39:*8* 69:*1*

**maximum** 14:*12* 34:*1*, *2*, *8*, *10*, *16*, *19*, *25* 35:*7*, *19*, *25* 36:*3*, *8* 62:*15* 63:*15*

**maximums** 35:*10*

**mean** 11:*18* 16:*25*
21:*4* 36:*4* 39:*15*
41:*15* 42:*19* 43:*6*
44:*15* 45:*1* 64:*15*, *18*
**Meaning** 57:*9*
**means** 50:*10* 51:*13*
**meet** 9:*18* 26:*21*
32:*6* 40:*8*, *13* 61:*20*
**meeting** 9:*9* 25:*12*
40:*19*
**mentally** 41:*16*
**mentioned** 9:*8* 11:*18*
12:*6*
**met** 13:*24*
**Miami** 2:*4*
**MIDDLE** 1:*1* 26:*8*
**minimum** 34:*4*, *6*, *7*
61:*20* 62:*4*
**mm-hm** 21:*5*
**moment** 47:*22*
**money** 9:*22* 12:*15*
21:*21* 32:*9*, *15* 38:*19*
**monitor** 16:*5* 25:*7*
**monitoring** 24:*12*
25:*15*
**monitors** 25:*21*
**morning** 4:*23*
**move** 34:*4* 39:*23*
42:*10* 47:*12*, *24*
**moved** 34:*5* 35:*3*
46:*5*, *6*
**moving** 18:*21* 42:*6*
46:*7*
**Munis** 13:*10*

**< N >**
**name** 4:*23* 5:*4*
**names** 48:*8*, *13*, *20*
52:*18* 53:*8*
**narcotics** 26:*18*
**necessarily** 40:*15*
**need** 6:*14* 26:*5*, *14*,
*22*, *24*
**needed** 26:*21*, *23*
28:*3* 32:*2* 43:*10*
**needs** 18:*20* 25:*12*
32:*7*
**neighborhood** 59:*21*
**never** 45:*7*

**new** 13:*25* 16:*17*, *18*
17:*5* 26:*6* 28:*9*, *18*
32:*12* 39:*12*, *13*, *20*
40:*4*, *5*, *6* 58:*10*
**non-salaried** 10:*5*
**non-salary** 10:*10*
**norm** 25:*24*
**Norton** 2:*6* 69:*1*
**Notary** 1:*24* 66:*2*, *12*
**note** 49:*21* 53:*18*, *20*
65:*3* 69:*1*
**notes** 31:*13* 50:*3*
60:*24* 61:*3* 67:*2*
**Notice** 3:*10* 14:*25*
**NOTIFICATION** 3:*7*
**notified** 40:*18* 42:*12*
43:*13* 46:*12*
**number** 8:*23*, *24*
10:*11* 15:*4* 16:*19*, *20*
24:*17* 34:*21*, *24*
52:*10* 56:*10* 57:*13*,
*14*, *18* 62:*7* 63:*14*, *17*
67:*2*
**numbers** 11:*13*
12:*20* 23:*13* 32:*18*

**< O >**
**O-301** 2:*3*
**OATH** 3:*4* 5:*14*
66:*1*
**object** 15:*21* 30:*15*
**obligation** 5:*14*
**obtain** 38:*18*
**occur** 34:*18*
**occurred** 20:*18*
**occurs** 45:*8*
**October** 1:*9* 4:*3*
13:*23* 14:*14* 28:*8*, *17*
29:*5*, *6* 35:*9* 37:*9*, *11*,
*16*, *22* 66:*2*
**offer** 11:*21* 61:*19*
**offered** 61:*11*, *13*
63:*4*
**offers** 63:*8*
**Office** 6:*22* 7:*2*, *5*, *24*
9:*24* 10:*2* 13:*5*, *9*, *21*
14:*17*, *22* 15:*16*, *19*,
*25* 23:*7* 25:*3*, *21*, *25*
26:*6* 28:*21* 29:*24*
30:*7* 31:*7* 33:*19*

34:*13* 35:*16*, *23*
38:*16* 39:*6* 40:*8*, *13*
59:*14* 61:*12* 63:*9*
**official** 1:*7* 4:*25*
66:*2*
**Okay** 5:*11*, *12*, *25*
6:*1*, *12*, *16* 8:*8* 24:*6*
29:*9* 39:*18* 55:*11*
56:*8* 57:*3* 61:*23*
62:*19* 63:*7*, *25* 64:*17*
**old** 39:*13*
**once** 11:*19*, *20*, *22*
13:*8*, *16* 22:*10* 28:*4*
31:*15* 43:*20* 61:*5*, *13*
63:*8* 69:*1*
**ones** 9:*19* 11:*5*, *6*
24:*11*
**one-time** 43:*5*, *6*
**ongoing** 43:*2*
**open** 27:*10* 32:*8*
42:*21*
**operating** 19:*11*
28:*14*
**operational** 40:*20*, *25*
**operations** 25:*3* 43:*8*
44:*21*
**opinion** 33:*22* 46:*9*
47:*8*, *14*
**opportunities** 31:*24*
**opportunity** 11:*21*, *24*
**options** 26:*13*
**ORANGE** 66:*2* 67:*2*
**order** 41:*1* 53:*2*
**ordered** 64:*25*
**orders** 24:*16*
**original** 16:*11* 69:*1*
**outside** 40:*20* 41:*2*
42:*12*
**overall** 16:*12*
**over-budgeted** 16:*9*,
*15*
**overseeing** 47:*3*
**oversight** 44:*23* 45:*6*
**overtime** 19:*6*, *10*

**< P >**
**P.A** 2:*6* 69:*1*
**p.m** 1:*9* 60:*4* 65:*9*
**packet** 27:*12*

**page** 5:*11* 7:*11*, *13*
67:*2* 68:*3*
**paid** 9:*23* 10:*1*, *12*,
*16* 11:*14*, *25* 12:*19*,
*25* 13:*4* 33:*11*, *14*
34:*5*, *15* 35:*24* 36:*3*,
*7* 55:*2*, *5*, *21* 56:*7*
57:*19*, *25* 58:*12*
63:*15*
**paragraph** 7:*20* 8:*15*
15:*2*, *3* 56:*24*
**paragraphs** 7:*14*, *17*
9:*7*
**Park** 2:*7*
**part** 16:*4* 17:*3* 22:*1*
23:*20* 27:*5*, *12* 31:*7*,
*10*, *12*, *13*, *21* 33:*14*
34:*3*, *7* 36:*24* 40:*23*
44:*16* 45:*11*, *19*
48:*16*, *21*
**particular** 10:*4*
12:*17* 17:*20*, *21* 18:*6*,
*9*, *11* 19:*25* 22:*21*
23:*18* 24:*7* 25:*22*
26:*16* 30:*2* 31:*16*
34:*4* 36:*5*
**particularly** 24:*3*
**parties** 1:*9* 3:*15*
67:*11*, *12*
**part-time** 14:*9*
**pass** 30:*23*
**Paul** 26:*10*
**pay** 10:*3*, *5*, *24* 14:*11*
20:*8*, *10* 26:*10* 31:*13*,
*14*, *19* 34:*1*, *2*, *3*, *8*
35:*2*, *5*, *8* 37:*12* 41:*9*
42:*4*, *6* 43:*24* 50:*2*, *4*,
*5*, *8*, *10* 51:*2*, *15*, *21*
52:*12* 53:*19*, *22*
55:*17*, *18*, *22* 56:*14*,
*21* 57:*15*, *16*, *23* 59:*1*,
*14*, *15* 60:*1*, *2* 63:*16*
**paycheck** 8:*22*, *25*
**payment** 8:*19* 62:*9*
**payments** 8:*18* 32:*23*
**payout** 10:*25* 62:*1*
**payouts** 38:*14*
**payroll** 12:*18* 13:*10*
14:*11* 19:*7* 23:*9*

62:*8*
**penalties** 68:*22*
**pension** 12:*25* 13:*4*
38:*14*
**people** 8:*15* 18:*11*
27:*7* 42:*7* 51:*8* 52:*8*
63:*20*
**percent** 35:*9* 37:*8,*
*11, 19* 38:*6* 61:*17*
**percentage** 38:*4*
61:*17* 63:*2, 3, 5, 6*
**Perfect** 6:*13*
**period** 12:*21* 30:*24*
38:*22* 53:*9*
**periods** 35:*6*
**perjury** 68:*22*
**person** 36:*5* 46:*17*
55:*6* 56:*25*
**personal** 6:*25* 10:*23*
**personally** 66:*2*
**personnel** 17:*5*
25:*15* 28:*13, 14, 15,*
*16, 17* 29:*8*
**perspective** 43:*1*
**peruses** 48:*1*
**Peter** 26:*10*
**ph** 19:*15*
**picked** 47:*4*
**pieces** 22:*11*
**PLACE** 1:*9* 25:*11,*
*12* 58:*7*
**placed** 5:*13*
**Plaintiff** 1:*1, 9* 2:*5*
4:*10*
**Plaintiff's** 3:*7* 4:*8*
7:*9*
**plan** 14:*11* 20:*8, 10*
31:*13, 15, 19* 34:*3*
35:*8* 38:*14* 41:*9*
42:*4, 5, 6* 43:*19, 24*
46:*7* 50:*2, 4, 6, 8, 10*
51:*2, 15* 52:*12* 53:*19,*
*22* 59:*15* 60:*2* 61:*11,*
*19* 63:*16*
**planned** 26:*12*
**planning** 32:*5, 13*
39:*10* 46:*8*
**plans** 51:*21*
**please** 4:*7, 13* 5:*4, 5,*

*24* 11:*10* 69:*1*
**PLLC** 2:*2*
**point** 6:*14* 19:*3*
**position** 19:*22* 20:*16*
21:*11, 13* 28:*23* 29:*3,*
*9, 13, 17, 25* 31:*14, 19*
32:*22* 33:*1, 5* 35:*4,*
*20, 21* 36:*8, 23* 37:*3,*
*21* 41:*7, 9, 21, 25*
42:*5, 15* 43:*13, 20*
45:*11, 19* 46:*1, 15*
47:*7* 48:*24* 49:*9, 20,*
*25* 50:*5, 6, 8, 10, 17*
51:*1, 2, 6, 7, 13, 24*
52:*1, 5, 7, 8, 21* 55:*2,*
*10* 56:*2, 6, 7, 11, 14,*
*17, 20, 22* 57:*4, 5, 7, 8,*
*9, 12, 20, 22, 24* 58:*11,*
*12, 16, 19, 25* 59:*1, 4,*
*12*
**positions** 17:*5* 21:*25*
22:*24* 25:*18, 19* 26:*7*
27:*3, 6, 10, 11, 15*
28:*10, 16* 31:*6, 9, 21*
32:*9* 35:*16* 36:*2, 3*
40:*8, 13, 16* 42:*7, 8,*
*10, 13, 22* 43:*9* 47:*20*
48:*16, 20* 50:*1, 12, 15*
51:*9, 17* 52:*10, 16*
53:*6, 9, 24* 54:*6, 22,*
*25* 59:*16* 64:*4*
**possible** 35:*17* 36:*13*
47:*11* 50:*16* 51:*22,*
*23* 52:*6*
**prefer** 65:*6*
**prep** 9:*9*
**prepare** 9:*4*
**prepared** 7:*13, 16, 19*
27:*22*
**preparing** 17:*15*
**pretty** 24:*19* 27:*25*
**prevent** 6:*18*
**previously** 7:*8* 9:*7*
32:*14* 57:*18*
**prices** 24:*17*
**primary** 31:*1*
**prior** 27:*16, 19*
29:*22* 30:*6* 56:*4, 18*
**priorities** 39:*24*

**prioritize** 39:*21*
**prioritizing** 39:*8, 15*
**priority** 40:*5*
**privy** 36:*15*
**probably** 15:*23*
64:*23*
**process** 27:*2, 5, 9, 20*
28:*5* 32:*6, 13* 39:*10*
41:*17* 49:*13*
**processed** 49:*10*
**processes** 39:*17*
**professional** 56:*21*
57:*7* 66:*2, 12* 67:*2,*
*19*
**project** 30:*22* 39:*19*
40:*5*
**projected** 27:*7*
**projects** 16:*18*
**promoted** 18:*7* 30:*18*
**properly** 54:*19*
**proposal** 27:*13* 39:*19*
**pros** 40:*25*
**provide** 17:*3* 18:*14,*
*19, 24* 20:*7, 10* 22:*3*
36:*4* 40:*24*
**provided** 8:*24* 13:*25*
21:*15, 23* 22:*2* 58:*21*
**providing** 21:*17*
22:*23* 45:*5*
**Public** 1:*24* 66:*2, 12*
**pull** 9:*12* 17:*25*
18:*16* 19:*18* 20:*1, 24,*
*25* 22:*11, 12, 19, 20*
23:*10, 12* 29:*17* 30:*3*
48:*9, 25* 49:*5* 54:*12*
**pulled** 8:*10, 14, 17,*
*22* 23:*23* 49:*16*
**pulling** 12:*18* 17:*18,*
*20, 21* 29:*12, 24* 30:*5*
55:*25* 58:*19*
**pulls** 23:*5*
**purchasing** 28:*20*
29:*8* 30:*6* 33:*18*
44:*1, 22, 23* 45:*3, 15*
47:*3* 57:*12, 20*
**put** 12:*8, 9* 45:*3*
49:*2* 63:*19, 25* 64:*2,*
*4*
**puts** 35:*14*

< Q >
**question** 6:*12* 14:*19*
15:*7* 17:*13* 30:*16*
33:*4* 38:*15* 55:*5*
56:*8* 63:*13*
**questions** 6:*5* 8:*9, 13,*
*20* 9:*10, 11, 14* 54:*11,*
*14* 60:*19* 61:*4, 7*
**quick** 60:*24, 25*
**quite** 33:*25*

< R >
**raise** 4:*13*
**raises** 35:*3*
**ran** 56:*3*
**range** 18:*12* 34:*1, 2,*
*21* 36:*12* 59:*23, 25*
60:*2*
**rate** 10:*3* 13:*11*
37:*5, 12, 25*
**rates** 10:*5* 13:*9, 10,*
*14, 16*
**reach** 34:*24*
**reaction** 41:*14*
**read** 9:*8* 15:*7* 64:*24*
65:*6, 7* 68:*22*
**reading** 3:*16* 65:*2*
**ready** 47:*23*
**real** 60:*23, 25*
**reallocate** 16:*10*
**reallocates** 43:*9*
**reallocating** 42:*8*
**reallocation** 42:*22*
**reason** 12:*9* 16:*17*
**reasonably** 7:*1*
**reasons** 16:*20* 18:*22*
19:*23* 24:*20* 25:*13*
**reassigned** 52:*1, 8*
**reassignment** 34:*7*
52:*15*
**recall** 15:*1* 16:*15*
22:*23, 25* 23:*16, 22,*
*23* 24:*1, 25* 29:*12, 24*
30:*5* 32:*16* 37:*18, 25*
38:*2* 55:*25* 58:*15*
59:*3*
**receive** 19:*18*
**received** 37:*11, 21*

59:7
**receives** 34:*19*
**receiving** 17:*11*
**recess** 60:*17*
**recognized** 26:*5*
**recollect** 36:*9* 46:*13*
  56:*19* 58:*20*
**recommendation**
  19:*8* 41:*3*
**recommendations**
  18:*23, 25*
**record** 5:*5* 13:*12*
  49:*11, 14* 60:*3, 15, 16,*
  *18* 65:*4* 67:*2*
**reduce** 52:*10*
**Reduction** 14:*17, 21*
  15:*1, 11* 16:*22* 30:*10*
  31:*7, 10, 22* 36:*24*
  41:*22* 42:*1, 3, 14, 17,*
  *21, 25* 43:*4, 8* 48:*17,*
  *21* 62:*10*
**refer** 25:*17* 43:*1*
**reference** 8:*9, 13, 16,*
  *23* 9:*13* 60:*1*
**referenced** 53:*25*
**referring** 10:*3* 54:*14*
  61:*23*
**reflect** 6:*3*
**regard** 47:*16*
**regarding** 6:*9* 7:*14,*
  *17, 20* 9:*16* 30:*10, 14*
  61:*4*
**regardless** 20:*3*
**regular** 10:*22* 16:*21*
  25:*11* 30:*3* 32:*21*
  55:*21*
**related** 8:*17* 14:*25*
  15:*11* 17:*11* 20:*24*
  21:*12, 19, 23, 24*
  22:*12, 21, 24* 23:*2, 6,*
  *14* 25:*15, 23* 28:*15*
  29:*20, 25* 30:*5* 46:*2*
  53:*23* 56:*18* 58:*15*
  59:*3*
**relating** 23:*17*
**relationship** 9:*11*
  45:*14* 46:*4*
**relative** 67:*10, 12*
**remember** 30:*17*
  34:*1* 41:*10* 43:*18, 23*

52:*20, 24* 58:*19* 61:*6*
  64:*7, 11*
**removal** 52:*13, 14*
**removals** 53:*23*
**remove** 20:*8* 43:*22,*
  *24* 51:*15* 52:*7, 9*
**removed** 20:*9* 42:*13*
  50:*5, 7, 9, 17* 51:*18*
**removing** 42:*5* 51:*14*
**Reno** 22:*6, 8* 23:*18*
  25:*5* 30:*10* 43:*12*
  44:*18* 45:*23* 46:*20,*
  *23* 47:*7* 58:*22*
**repeat** 14:*19* 17:*13*
  33:*4*
**rephrase** 6:*12*
**replace** 50:*23*
**replaced** 50:*17*
**replacement** 51:*7, 12*
**report** 8:*11, 18, 21*
  10:*4* 12:*17* 13:*2*
  15:*9, 14* 17:*4* 20:*1,*
  *14* 22:*8, 21* 24:*2*
  29:*17, 25* 33:*20*
  39:*19* 48:*7, 10, 12, 13,*
  *15, 19* 49:*2* 50:*4*
  51:*25* 52:*15, 17, 19*
  53:*1, 2, 3, 10, 11, 13,*
  *16, 22* 54:*1* 55:*25*
  56:*17, 18, 25* 58:*15*
  59:*3, 6* 62:*6* 67:*2*
**Reporter** 1:*24* 3:*5*
  4:*2, 13* 5:*22* 6:*2*
  60:*16, 18* 64:*23* 66:*2,*
  *12* 67:*1, 2, 19*
**reporting** 19:*7* 23:*9,*
  *11* 69:*1*
**reports** 8:*15* 9:*12*
  17:*11, 18, 23, 25*
  18:*16* 19:*16, 18, 20,*
  *24* 21:*12, 15* 22:*17,*
  *23* 23:*17, 23* 29:*13*
  30:*2, 5* 31:*12, 17*
**represent** 4:*24*
**representative** 46:*9*
**reprioritized** 39:*14*
**request** 29:*19* 30:*1*
  38:*19* 39:*13, 21* 40:*5*
  64:*10*

**requested** 9:*20* 12:*8*
  22:*8, 14* 48:*7* 67:*2*
**requests** 22:*7* 28:*1*
  32:*24* 39:*9, 11, 16*
  58:*24*
**required** 24:*7* 27:*22*
**reserved** 3:*17*
**respective** 3:*15*
  49:*17* 59:*8*
**respond** 5:*24*
**response** 32:*17*
**responses** 5:*23* 6:*3*
**responsibilities** 16:*4*
  30:*20* 40:*21* 44:*11*
  46:*18, 24, 25* 47:*1, 4*
  50:*24*
**responsibility** 31:*1*
  44:*4, 16, 17* 47:*12*
**responsible** 17:*2* 25:*6*
**result** 33:*2, 7, 9*
  52:*18*
**resulted** 33:*12*
**retired** 49:*19*
**Retirement** 13:*1, 3,*
  *15* 38:*11, 13*
**review** 17:*23* 19:*12,*
  *14* 47:*22* 67:*2* 69:*1*
**reviewed** 36:*18*
**reviewing** 15:*1*
**right** 4:*13* 10:*13*
  11:*15* 12:*1* 17:*12*
  29:*4* 33:*15* 36:*5, 15*
  37:*15, 23* 39:*2* 45:*5,*
  *12* 47:*19* 48:*1* 54:*7*
  58:*22* 63:*17* 65:*1*
**robbing** 26:*9*
**role** 17:*3, 14* 24:*24*
  25:*5, 8* 33:*15* 34:*4, 5*
  36:*14* 37:*2* 39:*4*
  44:*16*
**room** 7:*25*
**roughly** 21:*3* 63:*22*
**routine** 16:*5, 17*
  18:*6, 22* 23:*20* 43:*10*
  48:*23*
**routinely** 25:*7*
**run** 16:*7*
**running** 15:*25* 52:*18*
  56:*18*

**runs** 29:*5*

**< S >**
**safe** 38:*3*
**salaries** 8:*17* 17:*20,*
  *25* 27:*3* 28:*15* 59:*12*
**salary** 10:*11* 13:*18*
  14:*13* 18:*2, 8* 21:*18*
  22:*19, 24* 23:*1, 6, 9,*
  *17, 23* 24:*1, 21* 25:*1*
  27:*6* 29:*12, 24* 33:*13,*
  *17* 35:*4* 36:*12, 15, 17,*
  *19, 20* 37:*1* 38:*8, 10*
  55:*6, 9, 14, 20, 21*
  56:*9* 57:*17* 58:*2*
**savings** 32:*8* 33:*2, 7,*
  *9, 12*
**saying** 35:*18* 39:*19*
  45:*7*
**says** 62:*6*
**scale** 59:*14*
**scheduled** 9:*18* 40:*3*
**School** 26:*4*
**Screen** 7:*8* 47:*20*
  64:*1, 5*
**seal** 66:*2*
**second** 64:*3*
**secretary** 50:*20, 22,*
  *23* 51:*11* 56:*6, 12*
  57:*6*
**section** 49:*15*
**see** 8:*6* 33:*13* 54:*15,*
  *22* 55:*25* 60:*12, 24*
**seeing** 19:*10* 24:*19*
  64:*7*
**seen** 7:*9, 11* 39:*7*
  48:*2*
**selected** 32:*25* 33:*5*
**sell** 61:*20, 23* 62:*5, 7,*
  *20* 63:*9*
**senior** 55:*1, 9* 56:*1,*
  *11* 60:*11*
**sense** 50:*19*
**separate** 35:*14* 52:*12*
  56:*8*
**separated** 29:*15, 18*
  43:*24*
**separating** 46:*4*
**separation** 45:*15*
  47:*2*

**September** 28:*8*, *10*, *24* 29:*6*, *7*, *10* 37:*21*
**service** 33:2*4* 35:*1* 36:*12*, *19*, *21* 60:*13*
**services** 55:*1*, *10* 56:*1*, *11* 60:*11*
**set** 18:*10* 28:*11*, *17* 29:*7* 51:*21*
**share** 7:*8* 47:*20* 64:*5*
**shared** 30:*19*
**she'd** 38:*12*
**SHEET** 3:*6* 12:*7*, *10* 49:*7*, *8*, *10*, *20* 68:*1* 69:*1*
**sheets** 49:*16*
**Sheriff** 1:*7* 4:*6*, *11* 5:*1* 61:*18* 62:*25* 63:*8*
**Sheriff's** 6:*22* 7:*2*, *5*, *24* 9:*24* 10:*2* 13:*5*, *9*, *21* 14:*16*, *22* 15:*16*, *18*, *25* 23:*7* 25:*2*, *21*, *24* 26:*5* 28:*20* 29:*23* 30:*7* 31:*6* 33:*19* 34:*13* 35:*16*, *23* 38:*16* 39:*5* 40:*8*, *13* 59:*14* 61:*12*, *14* 63:*9*
**show** 7:*7* 8:*5* 18:*16* 19:*8* 47:*19*
**showed** 8:*14* 9:*6* 14:*24*
**showing** 8:*12* 10:*9*
**shown** 63:*16*
**shows** 8:*18*
**shrug** 5:*23*
**shuffling** 25:*11*
**sick** 10:2*3*, *25* 11:*21*, *23* 12:*3*, *4* 55:*17*, *18*, *22* 61:*5*, *10*, *13*, *16*, *19*, *24* 63:*10*
**side** 33:2*4* 54:*23*
**sign** 69:*1*
**signed** 13:*13*
**significant** 25:*2*
**signing** 3:*16*
**similar** 23:*10* 38:*4* 53:*1*, *4* 56:*10* 62:*13*
**similarly** 59:*16*
**Sincerely** 69:*1*

**sir** 5:*16*, *21* 8:*1* 9:*3* 10:*14* 11:*16*
**situation** 35:2*4*
**Smith** 2:*2*
**software** 12:*11* 40:*4*
**solemnly** 4:*14*
**Sorry** 14:*19* 17:*13* 26:*19* 33:*4* 50:*18* 57:*6* 60:*9*, *10*
**Sounds** 6:*17*
**South** 2:*7*
**span** 23:*15*
**speak** 6:*3* 9:*15*
**speaking** 14:*7* 15:*15* 18:*25* 19:*1* 40:*17* 58:*23*
**specific** 18:*5* 23:*12*, *19* 26:*20*, *21* 30:*1*, *2* 36:*2* 42:*20*, *21*, *23* 48:*8* 51:*21*
**specifically** 13:*1* 22:*4*, *24* 27:*19* 29:*14* 30:*6* 42:*14* 44:*22* 51:*19* 52:*18* 53:*12*, *23* 56:*1* 59:*5*
**spend** 32:*10*
**spending** 19:*1* 21:*21* 32:*11*
**spreadsheet** 47:2*1*
**staff** 17:*4*, *15* 18:*1*, *24* 19:*21* 20:*23* 22:*17* 23:*1* 26:*6* 28:*2*
**staffing** 17:*12*, *16*
**Stan** 19:*15*
**standardized** 13:*19* 37:*5*, *22* 38:*7*
**standards** 56:*21* 57:*7*
**start** 5:*4* 27:*20* 28:*8*
**started** 24:*19* 39:*12*
**starting** 54:*25*
**state** 4:*7* 15:*18*, *20* 16:*6* 27:*23* 66:*2*, *12* 67:*2*
**STATES** 1:*1*
**stating** 5:*4*
**Statute** 27:*23*
**stayed** 13:*20* 37:*2* 38:*12*
**staying** 43:*21*

**STEFANY** 2:*6* 3:*3* 4:*11* 15:*3*, *20* 30:*15* 38:*20* 46:*20* 54:*9*, *16* 55:*4*, *11* 56:*23* 60:*23* 61:*2* 64:*2*, *6*, *19*, *23* 65:*7* 69:*1*
**stenographic** 67:*2*
**stenographically** 67:*2*
**step** 38:*23*
**stipulated** 3:*14*
**stop** 28:*6*
**strategic** 25:*9* 32:*4*
**streamline** 44:*21*
**streamlining** 43:*8*
**stub** 8:*22*, *25*
**stuck** 54:*17*
**study** 15:*8*
**stuff** 40:*23*
**subject** 68:*22*
**submit** 13:*8* 62:*8*
**submitted** 28:*4*
**submitting** 28:*2*
**substance** 68:*23*
**suggest** 54:*9*
**Suite** 2:*3*, *7*
**supervisor** 9:*17* 50:*21*
**sure** 5:*24* 6:*8* 18:*3* 26:*1* 41:*13* 56:*24* 61:*8*
**surprised** 41:*18*, *19*
**suspend** 64:*22*
**swear** 4:*14*
**sworn** 4:*20* 66:*2*
**system** 12:*18* 13:*1*, *4*, *15*

**< T >**
**tactical** 25:*8*, *10* 32:*4*
**take** 6:*14*, *16* 11:*24* 19:*11* 25:*10* 30:*22* 39:*22* 42:*19* 44:*17* 46:*24* 47:*12* 50:*24* 55:*22* 60:*6*, *12* 61:*9*
**TAKEN** 1:*9* 4:*5* 10:*23* 12:*14*, *16* 32:*21* 49:*3* 51:*1* 60:*17* 69:*1*
**takes** 28:*3*

**talking** 38:2*0* 53:*17*
**Tampa** 2:*8*
**taxable** 10:*6*, *8* 11:*6*, *7*
**taxation** 10:*8*
**team** 20:*7* 23:*8*, *10* 26:*4* 38:*15* 45:*3* 48:*8* 64:*11*
**tell** 10:*15* 33:2*1* 40:*15* 55:*1* 57:*14*
**ten** 69:*1*
**term** 10:*6* 11:*6*, *11* 42:*17*, *25* 43:*4*
**terminated** 65:*8*
**terminology** 17:*25*
**terms** 13:*18* 24:*8*, *15* 25:*2* 27:*2*, *8* 33:*2*, *7* 39:*15* 43:*19*
**testified** 4:*20* 46:*21* 64:*10*
**testify** 5:*14* 6:*22*
**testifying** 5:*19* 6:*19*
**TESTIMONY** 3:*2* 4:*15* 5:*18* 6:*9* 7:*13*, *16*, *19* 61:*6* 64:*25*
**Thank** 5:*2* 60:*21* 63:*13* 64:*19* 69:*1*
**thanks** 55:*11*
**thing** 18:*16* 50:*9*
**things** 5:*10* 18:*18* 39:*24* 49:*4* 52:*12*
**think** 25:*8* 36:*2* 45:*25* 46:*3*, *13* 52:*3* 53:*4*, *5* 54:*10*, *12* 61:*18* 62:*11* 63:*13*, *17*, *25*
**thinking** 6:*19* 18:*5* 27:*8*
**third** 7:*13*
**thought** 9:*12* 32:*10*
**Threat** 26:*4*
**three** 28:*13* 51:*8*, *9*, *11*, *16*
**threshold** 34:*10* 61:*20* 62:*3*
**throw** 16:*18* 34:*21*
**tied** 36:*19*, *21*
**TIME** 1:*9* 4:*3* 6:*3* 10:*23* 12:*1*, *7*, *10*, *16*, *19*, *21* 17:*2* 19:*5*

20:*20*  22:6  27:8, *9*
30:*21, 24*  31:2  33:6,
*10*  34:*12*  35:6, *19, 20*
37:7  38:22  44:5, *19*
45:*13, 18*  47:*14*  50:*3*
52:*13*  53:7, *9*  54:2
55:2, *7, 19, 22*  57:*14*
58:24  60:*13, 21*  61:9
**time-off**  12:*9*
**title**  18:*9, 11*  19:*25*
20:2, *3, 8, 9*  31:*16*
42:5  50:*11, 18*  51:*10,
14, 17, 24*  52:5  59:20
**titles**  50:*16*  52:21
**Today**  4:2  5:2, *15*
6:*19, 21*  7:*13, 16, 22*
9:*16*  60:20
**today's**  9:*4*
**told**  41:8  43:*16, 20*
47:7
**top**  36:6
**topic**  7:*20*  42:*20*
45:*16*
**topics**  7:*14, 17*
**totals**  19:7
**track**  53:*18*
**traffic**  50:*20, 22, 23*
51:*8, 10*  56:6, *12*
**transcribe**  5:22
**transcribed**  65:*1*
**transcript**  3:*16*
64:*24*  67:2  69:*1*
**transfer**  35:*18*
**transferred**  35:*19*
**transfers**  35:*15*
**trend**  19:2, *3, 9*
**trends**  24:9
**true**  18:*16*  67:2
68:22
**truth**  4:*15, 16*
**truthfully**  5:*15*  6:*19*
**try**  6:*11*  35:23
**trying**  30:*17*  52:3
**twice**  11:22
**two**  51:*16*  52:12
**type**  13:*12*  43:*10*
**types**  8:*19*  12:12
**typical**  42:*23*
**typically**  19:*23, 24*
20:*4, 11*  22:6, *18*

23:2  27:*21, 24*  28:*11*
34:*11*  38:*17*  39:8, *12*
41:5  47:8

**< U >**
**umbrella**  45:*4*
**underneath**  45:*3*
**Undersheriff**  19:*16*
24:2  30:9
**understand**  5:*13, 17*
6:*10, 21, 24*  7:*4*
15:*21*  25:20  40:*1*
42:25  43:*4*  51:*4*
61:6
**understanding**  9:*11*
27:25  36:*18*  45:*18*
54:*19*
**Understood**  57:22
**unfortunately**  38:*15*
64:*13*
**unique**  24:*13*  35:*13*
**unit**  26:6  51:*8, 10*
52:*1*
**UNITED**  1:*1*
**unused**  12:*1*
**update**  31:*17*
**updated**  20:*10*
**upgrade**  40:2, *3, 6*
**use**  10:*17*  32:3  52:5
58:*14*
**usually**  35:*13*
**utilizing**  32:8

**< V >**
**vacation**  10:22, *25*
11:*1, 20, 22*  12:*1, 4*
61:*4*  62:*12, 15, 19*
63:*10*
**value**  10:7  11:7, *11,
12*
**various**  17:7  18:*21*
25:*13*
**vehicle**  10:7
**verb**  62:*20*
**verbatim**  49:*18*
**versus**  25:8  26:*17*
32:*4*  50:8  51:*5, 13*
**videoconference**  1:*9*

**< W >**

**wages**  10:22  32:22
55:*21*
**wait**  6:4, *5*
**waive**  65:*2*
**want**  6:8  8:5, *6*
34:*21*  39:20  54:*10*
56:9  60:20  64:*24*
65:*3*
**wants**  23:*1*
**water**  6:*15*
**way**  19:*4*  31:*23*
36:22  62:*13*
**ways**  38:*17*
**Wednesday**  1:*9*  4:2
**well**  9:*21*  10:9, *12,
13*  12:*3*  24:24  27:*10*
36:*14*  37:22  42:3, *19*
46:*23*  52:25  53:*10*
62:22
**went**  9:6, *10*  26:25
58:*4*  59:*12*
**we're**  5:*10*  14:8, *9*
19:*10*  25:*11, 14*
27:*11*  28:*1*  31:*15*
42:*4, 5, 6*  50:3, *10*
51:*14, 15*  54:6  59:6
60:*16, 18*
**we've**  14:*10*  20:*19*
51:*14*  53:*17*
**wish**  68:*1*
**witness**  1:*9*  4:*17*
15:*23*  30:*17*  48:*1*
54:*13*  55:*12*  56:24
57:*1*  60:5, *22*  65:5, *7*
66:2
**work**  13:7  20:*4*
38:*14*  49:*11*  62:*12*
**working**  25:4  37:*10*
44:*21*
**workload**  30:*20*  51:*3,
5*
**worries**  57:*3*

**< X >**
**XY**  22:*13*

**< Y >**
**Yeah**  36:*20*  42:22
59:*24*  64:*15*

**year**  10:2, *10*  11:*19,
20, 22*  13:*8, 16, 17, 23,
25*  14:6, *14*  15:*19*
16:*1*  21:3  24:9, *13,
22*  26:8  27:*4, 14, 16,
19, 21, 24*  28:8, *9, 12,
18, 25*  29:*3, 5*  32:6
37:9, *10, 14, 16*  39:*12,
20*  56:7  57:*20, 21*
58:*1, 10*  61:5, *13, 16*
64:*14, 16*
**yearlong**  32:6
**years**  14:*10*  35:*1, 20*
36:*12, 19, 21*  60:*13*
61:*18*
**years-of-service**  18:*12*
**year-to-date**  8:*18*
12:*17*

**< Z >**
**ZOOM**  1:*9*  2:2, *6*
3:2  4:*4*  5:*18*  66:2

Deposition of Jill Jones                                                                 Jenna Clark v. Carmine Marceno

### WORD LIST

**< $ >**
**$1,863.54** *(1)*
**$18,440.80** *(1)*
**$2,131.24** *(1)*
**$3,191.16** *(1)*
**$3,647.04** *(1)*
**$360.31** *(1)*
**$4,558.80** *(2)*
**$4,695.56** *(1)*
**$51,069.96** *(1)*
**$52,000** *(1)*
**$62,432.32** *(1)*
**$70,000** *(3)*
**$74,012.90** *(1)*
**$79,000** *(1)*
**$79,823.57** *(1)*
**$91,330.60** *(1)*
**$94,823.03** *(1)*
**$94,960.57** *(1)*

**< 1 >**
**1** *(14)*
**1,650** *(1)*
**1/21/2024** *(1)*
**1:09** *(1)*
**1:28** *(1)*
**1:29** *(2)*
**10** *(1)*
**10/3** *(1)*
**10/3/2021** *(2)*
**100** *(1)*
**11:30** *(2)*
**122** *(1)*
**123** *(1)*
**14** *(3)*
**15** *(3)*
**1650** *(1)*
**17** *(1)*
**18** *(1)*

**< 2 >**
**2** *(2)*
**2:22-cv-614-SPC-NPM** *(1)*
**200** *(3)*
**2018** *(2)*
**2020** *(2)*

**2021** *(71)*
**2021/10/3** *(1)*
**2022** *(3)*
**2023** *(9)*
**2024** *(3)*
**21-'22** *(1)*
**225** *(1)*
**25** *(3)*
**28** *(1)*
**28th** *(2)*
**29** *(1)*

**< 3 >**
**3** *(1)*
**30** *(6)*
**317** *(1)*
**324** *(1)*
**33131** *(1)*
**33606-4128** *(1)*

**< 4 >**
**4** *(5)*
**443.36** *(1)*

**< 5 >**
**5** *(5)*
**50,000** *(1)*
**500** *(2)*
**52,000** *(4)*
**520** *(1)*

**< 6 >**
**6** *(2)*
**600** *(1)*
**61** *(1)*
**65** *(1)*
**66** *(1)*
**67** *(1)*
**68** *(1)*
**69** *(1)*

**< 7 >**
**7** *(2)*
**79,000** *(1)*

**< 8 >**
**8** *(2)*
**80** *(5)*

**< A >**
**a.m** *(2)*
**ability** *(1)*
**able** *(1)*
**above-referenced** *(1)*
**Absolutely** *(3)*
**absorb** *(4)*
**absorbed** *(1)*
**accepting** *(1)*
**access** *(3)*
**accomplished** *(1)*
**account** *(2)*
**accounted** *(3)*
**accounts** *(6)*
**accrued** *(1)*
**accumulator** *(4)*
**accurate** *(1)*
**accurately** *(1)*
**action** *(9)*
**actual** *(1)*
**add** *(5)*
**added** *(3)*
**adding** *(2)*
**addition** *(1)*
**additional** *(7)*
**admin** *(5)*
**administrative** *(4)*
**adopted** *(1)*
**advance** *(1)*
**advantage** *(1)*
**affirm** *(1)*
**afforded** *(1)*
**age** *(1)*
**agency** *(10)*
**age-related** *(1)*
**ages** *(1)*
**ago** *(1)*
**agree** *(1)*
**agreed** *(1)*
**ahead** *(3)*
**Allen** *(2)*
**allocate** *(3)*
**allocated** *(11)*
**allocation** *(3)*
**allocations** *(2)*
**allotment** *(1)*
**allow** *(1)*
**allowed** *(1)*
**alterations** *(1)*

**amount** *(13)*
**amounts** *(5)*
**analysis** *(1)*
**Ann** *(1)*
**Annmarie** *(15)*
**annual** *(9)*
**annually** *(2)*
**answer** *(8)*
**answering** *(1)*
**answers** *(2)*
**anticipated** *(3)*
**appearance** *(1)*
**APPEARANCES** *(1)*
**appeared** *(1)*
**applied** *(1)*
**applies** *(2)*
**apply** *(2)*
**approval** *(2)*
**approved** *(2)*
**approximately** *(2)*
**area** *(4)*
**areas** *(8)*
**aside** *(1)*
**asked** *(14)*
**asking** *(4)*
**assessment** *(4)*
**assignment** *(2)*
**assignments** *(1)*
**assisting** *(1)*
**associated** *(4)*
**assume** *(2)*
**assumed** *(4)*
**assuming** *(1)*
**assumption** *(1)*
**attendance** *(1)*
**attention** *(1)*
**attorney** *(1)*
**attorneys** *(2)*
**attrition** *(1)*
**authorized** *(5)*
**available** *(2)*
**Avenue** *(1)*
**avoid** *(1)*
**awarded** *(3)*
**aware** *(8)*

**< B >**
**back** *(14)*
**bank** *(1)*

Bartz  (1)
Base  (3)
based  (21)
basis  (8)
Bates  (2)
bathroom  (1)
began  (2)
beginning  (2)
BEHALF  (4)
believe  (9)
benefit  (3)
benefits  (16)
best  (4)
binding  (1)
bit  (3)
bits  (1)
Blue  (2)
board  (2)
break  (2)
Brickell  (1)
brief  (1)
brought  (1)
budget  (79)
budgetary  (10)
budgeted  (3)
budgeting  (3)
budget-related  (2)
budgets  (1)
Bureau  (3)
buy  (1)
buy-back  (9)
buyout  (1)

< C >
calculation  (1)
calculator  (1)
calendar  (2)
call  (1)
called  (3)
capacity  (2)
capital  (1)
CARMINE  (4)
carry  (1)
CASE  (5)
cashing  (1)
categories  (8)
category  (6)
certain  (1)
CERTIFICATE  (4)

certified  (3)
certify  (3)
chain  (2)
challenges  (3)
chance  (1)
change  (11)
changed  (2)
changes  (18)
circumstance  (2)
civilian  (5)
clarifies  (1)
clarify  (1)
CLARK  (21)
Clark's  (21)
classification  (1)
clear  (2)
clearly  (2)
clerk  (7)
closely  (1)
closer  (3)
closes  (1)
code  (4)
combination  (1)
come  (10)
comes  (8)
coming  (3)
command  (10)
commander  (1)
comment  (3)
comments  (1)
commission  (2)
commissioners  (1)
communicating  (1)
communication  (1)
communications  (2)
community  (1)
comparable  (1)
compare  (1)
compared  (1)
comparing  (1)
comparison  (3)
compensable  (1)
compensation  (6)
complete  (1)
concerning  (1)
conducted  (6)
conducting  (2)
confusing  (1)
connected  (1)

cons  (1)
consider  (1)
consideration  (2)
considerations/indicato rs  (1)
considering  (4)
consolidating  (1)
consolidation  (6)
constantly  (1)
constraint  (3)
constraints  (5)
consulted  (3)
context  (3)
continually  (1)
continuing  (1)
contributions  (2)
control  (2)
conversation  (8)
conveyed  (1)
cooperation  (1)
coordinated  (1)
coordinator  (5)
copy  (1)
Correct  (48)
Correction  (1)
corrections  (1)
correctly  (3)
cost  (1)
costs  (4)
counsel  (13)
Country  (1)
County  (41)
couple  (1)
course  (1)
COURT  (15)
Covid  (1)
create  (4)
created  (12)
creating  (3)
Criminal  (1)
criteria  (3)
CROSS  (1)
CROSS-EXAMINATION  (1)
Crystal  (4)
curiosity  (3)
current  (3)
currently  (3)
cut  (1)

cycle  (3)

< D >
data  (3)
database  (4)
DATE  (8)
Dated  (1)
dates  (3)
DAVID  (3)
day  (4)
days  (3)
day-to-day  (2)
Dear  (1)
December  (4)
decide  (2)
decided  (1)
decision  (14)
decisions  (12)
declare  (1)
deduction  (1)
Defendant  (2)
Defendant's  (1)
deficit  (3)
define  (3)
definitely  (2)
delay  (1)
delayed  (1)
deny  (1)
department  (18)
departments  (4)
departure  (2)
depending  (1)
deposed  (1)
DEPOSITION  (15)
Derek  (1)
describe  (1)
described  (2)
describing  (1)
determined  (1)
difference  (2)
different  (13)
DIRECT  (2)
directed  (1)
directive  (3)
directly  (1)
director  (25)
directors  (1)
discretion  (1)
discretionary  (1)

discuss  *(1)*
discussed  *(9)*
discussion  *(3)*
discussions  *(1)*
displayed  *(1)*
distinction  *(1)*
distribution  *(1)*
DISTRICT  *(5)*
division  *(4)*
divisions  *(2)*
document  *(12)*
documentation  *(1)*

documentation/reports
 *(1)*
documents  *(5)*
doing  *(4)*
Dr  *(1)*
draw  *(1)*

dstefany@anblaw.com
 *(1)*
due  *(1)*
duly  *(2)*

< E >
earlier  *(3)*
easier  *(1)*
effect  *(2)*
either  *(9)*
elect  *(4)*
elected  *(2)*
election  *(1)*
elects  *(2)*
eligibility  *(2)*
eligible  *(3)*
eliminate  *(1)*
eliminated  *(29)*
eliminated/removed/re
placed  *(1)*
eliminating  *(1)*
elimination  *(11)*
employed  *(2)*
employee  *(26)*
employees  *(22)*
employee's  *(2)*
employer  *(2)*
employment  *(5)*
Enclosed  *(1)*

ended  *(1)*
Enforcement  *(2)*
enrollment  *(1)*
entered  *(1)*
entire  *(3)*
entity  *(1)*
entry  *(1)*
ERRATA  *(5)*
ESQUIRE  *(3)*
essentially  *(1)*
established  *(2)*
estimated  *(2)*
estimates  *(1)*
evaluation  *(1)*
Evans  *(6)*
event  *(4)*
Everest  *(1)*
everybody  *(1)*
exact  *(2)*
exactly  *(4)*
Examination  *(3)*
example  *(19)*
examples  *(3)*
exceed  *(2)*
exceeded  *(1)*
excluding  *(1)*
excuse  *(2)*
execute  *(1)*
EXHIBIT  *(5)*
existing  *(1)*
expansion  *(2)*
expect  *(3)*
expenditure  *(3)*
expenditures  *(10)*
expense  *(1)*
expenses  *(8)*
experience  *(4)*
experienced  *(1)*
Expires  *(1)*
explanation  *(1)*
expressly  *(1)*

< F >
faced  *(1)*
fact  *(3)*
factors  *(2)*
fair  *(4)*
familiar  *(13)*
far  *(1)*

February  *(1)*
feel  *(1)*
figure  *(1)*
file  *(2)*
fill  *(1)*
final  *(1)*
finance  *(7)*
financial  *(1)*
financially  *(1)*
find  *(5)*
finish  *(2)*
first  *(4)*
fiscal  *(9)*
fiscals  *(1)*
flag  *(1)*
Fleet  *(11)*
FLORIDA  *(13)*
flow-generated  *(1)*
fluctuate  *(2)*
follow  *(1)*
followed  *(1)*
following  *(2)*
follows  *(1)*
follow-up  *(3)*
follow-ups  *(1)*
force  *(22)*
forecasts  *(1)*
foregoing  *(1)*
forgive  *(4)*
form  *(4)*
forward  *(6)*
found  *(1)*
frame  *(2)*
front  *(5)*
FRS  *(2)*
fuel  *(3)*
full  *(3)*
full-time  *(3)*
fund  *(1)*
funding  *(3)*
funds  *(6)*
further  *(1)*
future  *(1)*

< G >
Gambino  *(4)*
game  *(1)*
gender  *(1)*
general  *(3)*

generalized  *(1)*
generally  *(9)*
generate  *(4)*
generated  *(3)*
generating  *(3)*
gesture  *(1)*
getting  *(1)*
GG939756  *(1)*
give  *(8)*
given  *(7)*
giving  *(1)*
glass  *(1)*
go  *(16)*
goal  *(1)*
God  *(1)*
goes  *(3)*
going  *(32)*
Good  *(3)*
gotten  *(2)*
grade  *(2)*
greater  *(1)*
gross  *(1)*
Group  *(2)*
guess  *(4)*

< H >
hand  *(2)*
handled  *(1)*
happen  *(3)*
happened  *(2)*
happens  *(9)*
happy  *(1)*
hard  *(1)*
head  *(1)*
heading  *(1)*
headquarters  *(1)*
heads  *(1)*
hear  *(1)*
help  *(7)*
hereto  *(1)*
herewith  *(1)*
high  *(3)*
higher  *(6)*
highlighted  *(3)*
hint  *(1)*
history  *(1)*
hold  *(1)*
Holloway  *(2)*
hours  *(11)*

**HR**  *(8)*
**Hyde**  *(1)*

**< I >**
**idea**  *(1)*
**immediately**  *(1)*
**impact**  *(7)*
**impacts**  *(1)*
**implementation**  *(2)*
**import**  *(1)*
**inaudible**  *(2)*
**include**  *(8)*
**included**  *(8)*
**includes**  *(1)*
**including**  *(3)*
**increase**  *(16)*
**increased**  *(3)*
**increases**  *(5)*
**INDEX**  *(2)*
**indicated**  *(1)*
**individual**  *(7)*
**individuals**  *(4)*
**information**  *(38)*
**initiative**  *(1)*
**instructed**  *(1)*
**insurance**  *(1)*
**interested**  *(1)*
**interests**  *(1)*
**Investigations**  *(1)*
**involved**  *(2)*
**IRS**  *(1)*
**issue**  *(3)*
**issued**  *(2)*
**issues**  *(3)*
**items**  *(1)*
**its**  *(1)*

**< J >**
**Jamie**  *(1)*
**January**  *(5)*
**JENNA**  *(14)*
**Jenna's**  *(3)*
**JILL**  *(10)*
**job**  *(9)*
**JONES**  *(18)*
**judge**  *(1)*
**Julie**  *(6)*
**June**  *(2)*
**jury**  *(1)*

**< K >**
**keep**  *(6)*
**kept**  *(2)*
**Key**  *(1)*
**kicks**  *(1)*
**kind**  *(15)*
**know**  *(64)*
**knowledge**  *(3)*
**known**  *(2)*
**KYLE**  *(6)*

**< L >**
**labeled**  *(1)*
**language**  *(1)*
**larger**  *(7)*
**Law**  *(3)*
**lawsuit**  *(2)*
**LCSO**  *(1)*
**learn**  *(1)*
**learned**  *(2)*
**learning**  *(1)*
**lease**  *(3)*
**leave**  *(23)*
**leaves**  *(1)*
**leaving**  *(3)*
**Lee**  *(33)*
**left**  *(4)*
**left-hand**  *(1)*
**legal**  *(4)*
**length**  *(1)*
**LETTER**  *(1)*
**liability**  *(1)*
**liaison**  *(1)*
**life**  *(4)*
**line**  *(2)*
**lines**  *(1)*
**list**  *(16)*
**listed**  *(7)*
**listing**  *(1)*
**little**  *(5)*
**LLC**  *(1)*
**local**  *(1)*
**long**  *(5)*
**longer**  *(5)*
**long-term**  *(1)*
**look**  *(10)*
**looked**  *(5)*
**looking**  *(14)*

**lot**  *(2)*
**lower**  *(1)*

**< M >**
**MACDONALD**  *(25)*
**major**  *(2)*
**making**  *(4)*
**management**  *(2)*
**manager**  *(4)*
**managers**  *(2)*
**manpower**  *(12)*
**MARCENO**  *(5)*
**Marie's**  *(1)*
**marked**  *(1)*
**material**  *(1)*
**matter**  *(4)*
**maximum**  *(15)*
**maximums**  *(1)*
**mean**  *(12)*
**Meaning**  *(1)*
**means**  *(2)*
**meet**  *(6)*
**meeting**  *(3)*
**mentally**  *(1)*
**mentioned**  *(3)*
**met**  *(1)*
**Miami**  *(1)*
**MIDDLE**  *(2)*
**minimum**  *(5)*
**mm-hm**  *(1)*
**moment**  *(1)*
**money**  *(6)*
**monitor**  *(2)*
**monitoring**  *(2)*
**monitors**  *(1)*
**morning**  *(1)*
**move**  *(6)*
**moved**  *(4)*
**moving**  *(3)*
**Munis**  *(1)*

**< N >**
**name**  *(2)*
**names**  *(5)*
**narcotics**  *(1)*
**necessarily**  *(1)*
**need**  *(5)*
**needed**  *(5)*
**needs**  *(3)*

**neighborhood**  *(1)*
**never**  *(1)*
**new**  *(15)*
**non-salaried**  *(1)*
**non-salary**  *(1)*
**norm**  *(1)*
**Norton**  *(2)*
**Notary**  *(3)*
**note**  *(5)*
**notes**  *(5)*
**Notice**  *(2)*
**NOTIFICATION**  *(1)*
**notified**  *(4)*
**number**  *(18)*
**numbers**  *(4)*

**< O >**
**O-301**  *(1)*
**OATH**  *(3)*
**object**  *(2)*
**obligation**  *(1)*
**obtain**  *(1)*
**occur**  *(1)*
**occurred**  *(1)*
**occurs**  *(1)*
**October**  *(14)*
**offer**  *(2)*
**offered**  *(3)*
**offers**  *(1)*
**Office**  *(34)*
**official**  *(3)*
**Okay**  *(18)*
**old**  *(1)*
**once**  *(14)*
**ones**  *(2)*
**one-time**  *(2)*
**ongoing**  *(1)*
**open**  *(3)*
**operating**  *(2)*
**operational**  *(2)*
**operations**  *(3)*
**opinion**  *(4)*
**opportunities**  *(1)*
**opportunity**  *(2)*
**options**  *(1)*
**ORANGE**  *(2)*
**order**  *(2)*
**ordered**  *(1)*
**orders**  *(1)*

original  *(3)*
outside  *(3)*
overall  *(1)*
over-budgeted  *(2)*
overseeing  *(1)*
oversight  *(2)*
overtime  *(2)*

**< P >**
P.A  *(2)*
p.m  *(3)*
packet  *(1)*
page  *(5)*
paid  *(25)*
paragraph  *(5)*
paragraphs  *(3)*
Park  *(1)*
part  *(21)*
particular  *(19)*
particularly  *(1)*
parties  *(4)*
part-time  *(1)*
pass  *(1)*
Paul  *(1)*
pay  *(49)*
paycheck  *(2)*
payment  *(2)*
payments  *(2)*
payout  *(2)*
payouts  *(1)*
payroll  *(6)*
penalties  *(1)*
pension  *(3)*
people  *(7)*
percent  *(6)*
percentage  *(6)*
Perfect  *(1)*
period  *(4)*
periods  *(1)*
perjury  *(1)*
person  *(4)*
personal  *(2)*
personally  *(1)*
personnel  *(8)*
perspective  *(1)*
peruses  *(1)*
Peter  *(1)*
ph  *(1)*
picked  *(1)*

pieces  *(1)*
PLACE  *(5)*
placed  *(1)*
Plaintiff  *(4)*
Plaintiff's  *(3)*
plan  *(32)*
planned  *(1)*
planning  *(4)*
plans  *(1)*
please  *(8)*
PLLC  *(1)*
point  *(2)*
position  *(82)*
positions  *(49)*
possible  *(7)*
prefer  *(1)*
prep  *(1)*
prepare  *(1)*
prepared  *(4)*
preparing  *(1)*
pretty  *(2)*
prevent  *(1)*
previously  *(4)*
prices  *(1)*
primary  *(1)*
prior  *(7)*
priorities  *(1)*
prioritize  *(1)*
prioritizing  *(2)*
priority  *(1)*
privy  *(1)*
probably  *(2)*
process  *(11)*
processed  *(1)*
processes  *(1)*
professional  *(6)*
project  *(3)*
projected  *(1)*
projects  *(1)*
promoted  *(2)*
properly  *(1)*
proposal  *(2)*
pros  *(1)*
provide  *(10)*
provided  *(6)*
providing  *(3)*
Public  *(3)*
pull  *(19)*
pulled  *(6)*

pulling  *(9)*
pulls  *(1)*
purchasing  *(12)*
put  *(8)*
puts  *(1)*

**< Q >**
question  *(10)*
questions  *(12)*
quick  *(2)*
quite  *(1)*

**< R >**
raise  *(1)*
raises  *(1)*
ran  *(1)*
range  *(8)*
rate  *(5)*
rates  *(5)*
reach  *(1)*
reaction  *(1)*
read  *(6)*
reading  *(2)*
ready  *(1)*
real  *(2)*
reallocate  *(1)*
reallocates  *(1)*
reallocating  *(1)*
reallocation  *(1)*
reason  *(2)*
reasonably  *(1)*
reasons  *(5)*
reassigned  *(2)*
reassignment  *(2)*
recall  *(19)*
receive  *(1)*
received  *(3)*
receives  *(1)*
receiving  *(1)*
recess  *(1)*
recognized  *(1)*
recollect  *(4)*
recommendation  *(2)*
recommendations  *(2)*
record  *(10)*
reduce  *(1)*
Reduction  *(22)*
refer  *(2)*
reference  *(6)*

referenced  *(1)*
referring  *(3)*
reflect  *(1)*
regard  *(1)*
regarding  *(8)*
regardless  *(1)*
regular  *(6)*
related  *(27)*
relating  *(1)*
relationship  *(3)*
relative  *(2)*
remember  *(11)*
removal  *(2)*
removals  *(1)*
remove  *(6)*
removed  *(8)*
removing  *(2)*
Reno  *(12)*
repeat  *(3)*
rephrase  *(1)*
replace  *(1)*
replaced  *(1)*
replacement  *(2)*
report  *(50)*
Reporter  *(14)*
reporting  *(4)*
reports  *(22)*
represent  *(1)*
representative  *(1)*
reprioritized  *(1)*
request  *(3)*
requested  *(6)*
requests  *(8)*
required  *(2)*
reserved  *(1)*
respective  *(3)*
respond  *(1)*
response  *(1)*
responses  *(2)*
responsibilities  *(10)*
responsibility  *(5)*
responsible  *(2)*
result  *(4)*
resulted  *(1)*
retired  *(1)*
Retirement  *(5)*
review  *(6)*
reviewed  *(1)*
reviewing  *(1)*

Deposition of Jill Jones                                                    Jenna Clark v. Carmine Marceno

**right** (20)
**robbing** (1)
**role** (12)
**room** (1)
**roughly** (2)
**routine** (7)
**routinely** (1)
**run** (1)
**running** (3)
**runs** (1)

< S >
**safe** (1)
**salaries** (6)
**salary** (38)
**savings** (5)
**saying** (3)
**says** (1)
**scale** (1)
**scheduled** (2)
**School** (1)
**Screen** (4)
**seal** (1)
**second** (1)
**secretary** (7)
**section** (1)
**see** (7)
**seeing** (3)
**seen** (4)
**selected** (2)
**sell** (6)
**senior** (5)
**sense** (1)
**separate** (3)
**separated** (3)
**separating** (1)
**separation** (2)
**September** (7)
**service** (6)
**services** (5)
**set** (5)
**share** (3)
**shared** (1)
**she'd** (1)
**SHEET** (11)
**sheets** (1)
**Sheriff** (7)
**Sheriff's** (35)
**show** (5)

**showed** (3)
**showing** (2)
**shown** (1)
**shows** (1)
**shrug** (1)
**shuffling** (1)
**sick** (16)
**side** (2)
**sign** (1)
**signed** (1)
**significant** (1)
**signing** (1)
**similar** (6)
**similarly** (1)
**Sincerely** (1)
**sir** (6)
**situation** (1)
**Smith** (1)
**software** (2)
**solemnly** (1)
**Sorry** (8)
**Sounds** (1)
**South** (1)
**span** (1)
**speak** (2)
**speaking** (6)
**specific** (14)
**specifically** (14)
**spend** (1)
**spending** (3)
**spreadsheet** (1)
**staff** (10)
**staffing** (2)
**Stan** (1)
**standardized** (4)
**standards** (2)
**start** (3)
**started** (2)
**starting** (1)
**state** (9)
**STATES** (1)
**stating** (1)
**Statute** (1)
**stayed** (3)
**staying** (1)
**STEFANY** (23)
**stenographic** (1)
**stenographically** (1)
**step** (1)

**stipulated** (1)
**stop** (1)
**strategic** (2)
**streamline** (1)
**streamlining** (1)
**stub** (2)
**stuck** (1)
**study** (1)
**stuff** (1)
**subject** (1)
**submit** (2)
**submitted** (1)
**submitting** (1)
**substance** (1)
**suggest** (1)
**Suite** (2)
**supervisor** (3)
**sure** (7)
**surprised** (2)
**suspend** (1)
**swear** (1)
**sworn** (2)
**system** (4)

< T >
**tactical** (3)
**take** (17)
**TAKEN** (12)
**takes** (1)
**talking** (2)
**Tampa** (1)
**taxable** (4)
**taxation** (1)
**team** (9)
**tell** (5)
**ten** (1)
**term** (6)
**terminated** (1)
**terminology** (1)
**terms** (10)
**testified** (3)
**testify** (2)
**testifying** (2)
**TESTIMONY** (10)
**Thank** (5)
**thanks** (1)
**thing** (2)
**things** (5)
**think** (15)

**thinking** (3)
**third** (1)
**thought** (2)
**Threat** (1)
**three** (5)
**threshold** (1)
**throw** (2)
**tied** (2)
**TIME** (48)
**time-off** (1)
**title** (18)
**titles** (2)
**Today** (10)
**today's** (1)
**told** (4)
**top** (1)
**topic** (3)
**topics** (2)
**totals** (1)
**track** (1)
**traffic** (7)
**transcribe** (1)
**transcribed** (1)
**transcript** (6)
**transfer** (1)
**transferred** (1)
**transfers** (1)
**trend** (3)
**trends** (1)
**true** (3)
**truth** (3)
**truthfully** (1)
**try** (2)
**trying** (2)
**twice** (1)
**two** (2)
**type** (2)
**types** (2)
**typical** (1)
**typically** (16)

< U >
**umbrella** (1)
**underneath** (1)
**Undersheriff** (3)
**understand** (13)
**understanding** (5)
**Understood** (1)
**unfortunately** (2)

Deposition of Jill Jones                                          Jenna Clark v. Carmine Marceno

**unique**  *(2)*
**unit**  *(4)*
**UNITED**  *(1)*
**unused**  *(1)*
**update**  *(1)*
**updated**  *(1)*
**upgrade**  *(3)*
**use**  *(4)*
**usually**  *(1)*
**utilizing**  *(1)*

**< V >**
**vacation**  *(12)*
**value**  *(5)*
**various**  *(3)*
**vehicle**  *(2)*
**verb**  *(1)*
**verbatim**  *(1)*
**versus**  *(6)*
**videoconference**  *(1)*

**< W >**
**wages**  *(3)*
**wait**  *(2)*
**waive**  *(1)*
**want**  *(12)*
**wants**  *(1)*
**water**  *(1)*
**way**  *(4)*
**ways**  *(1)*
**Wednesday**  *(2)*
**well**  *(15)*
**went**  *(5)*
**we're**  *(20)*
**we've**  *(5)*
**wish**  *(1)*
**witness**  *(14)*
**work**  *(5)*
**working**  *(3)*
**workload**  *(3)*
**worries**  *(1)*

**< X >**
**XY**  *(1)*

**< Y >**
**Yeah**  *(4)*
**year**  *(52)*
**yearlong**  *(1)*

**years**  *(8)*
**years-of-service**  *(1)*
**year-to-date**  *(2)*

**< Z >**
**ZOOM**  *(7)*