1               UNITED STATES DISTRICT COURT

                MIDDLE DISTRICT OF FLORIDA

2                 FORT MYERS DIVISION

3

4  JENNA CLARK,

5         Plaintiff,

6  vs.                          Case No.:

                             2:22-cv-614-SPC-NPM

7  CARMINE MARCENO, in his official

    capacity as Sheriff of Lee

8  County, Florida,

9         Defendant.

  _____/

10

11

12           DEPOSITION OF JENNA CLARK

13          APPEARING REMOTELY FROM

14            MIAMI, FLORIDA

15

            DECEMBER 7, 2023

16

             10:02 A.M.

17

18

19

20

21

22

23

24          Stenographically Reported by:

25         Michelle L. Deliman, FPR

      APPEARING REMOTELY FROM VALRICO, FLORIDA

```
 1   REMOTE APPEARANCES:

 2
     Counsel for Plaintiff:
 3
         KYLE MACDONALD, ESQUIRE
 4       Derek Clark Law Group
         520 Brickell Key Drive
 5       Suite O-301
         Miami, FL  33131
 6       kyle@derekclarklaw.com

 7
     Counsel for Defendant:
 8
         DAVID STEFANY, ESQUIRE
 9       Allen, Norton & Blue
         324 South Hyde Park Avenue
10       225
         Tampa, FL  33606
11       dstefany@anblaw.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    I N D E X

2  WITNESS                                    PAGE

3  Called on behalf of Defendant

4  JENNA CLARK

5     Direct Examination by Mr. Stefany        5

6  Certificate of Reporter Oath               151

7  Reporter's Deposition Certificate          152

8  Witness Letter                             153

9  Errata Sheet                               154

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    E X H I B I T S

 2    NO.   DESCRIPTION                          PAGE

 3    1    Disclosures                            6

 4    2    Email                                  6

 5    3    Screenshot of Jobs                     6

 6    4    Open Positions                         6

 7    5    Job Class Positions                    6

 8    6    Phone Log                              6

 9    7    EEOC                                   6

10    8    Letter                                 6

11    9    Email                                  6

12    10   Annual Review                          6

13    11   Annual Review                          6

14    12   Annual Review                          6

15    13   Attendance Report                      6

16

17

18

19

20

21

22

23

24

25
```

Jenna Clark
December 07, 2023                    5

1               E X H I B I T S (CONT'D)

2

3    NO.   DESCRIPTION                          PAGE

4    14  Memo                                    6

5    15  Application                             6

6    16  Operations Manual Chapter 22            6

7    17  Termination Letter                      6

8    18  Email                                   6

9    19  Email                                   6

10   20  Staff Inspection Final Report           6

11   21  Text Messages                           6

12   22  Checks                                  6

13   23  Receipt of Property                     6

14   24  Retirement System Pension Plan          6

15   25  Complaint                               6

16   26  Plaintiff's Responses                   6

17   27  Plaintiff's Responses                   6

18

19

20

21

22

23

24

25

```
 1              REPORTED REMOTELY FROM VALRICO, FLORIDA

 2               THURSDAY, DECEMBER 7, 2023, 10:02 A.M.

 3     (Witness presents government issued identification and

 4                identity verified.)

 5

 6                   P-R-O-C-E-E-D-I-N-G-S

 7                    JENNA CLARK,

 8     a witness herein, having been first duly sworn, was

 9     examined and testified as follows:

10         Defendant's Exhibit Nos. 1-27 were marked for

11     identification)

12                   DIRECT EXAMINATION

13     BY MR. STEFANY:

14         Q.   Please state your full name for the record.

15         A.   Jenna Diane Clark.

16         Q.   Ms. Clark, what is your date of birth?

17         A.   1/12/1962.

18         Q.   Have you ever given a deposition before today's

19     proceeding?

20         A.   A deposition one time at the sheriff's office

21     for -- I was a witness for court.

22         Q.   For what?  I didn't --

23         A.   It was for a case of somebody that was trying

24     to impersonate an officer, and I was a witness.  And,

25     yes, I gave a deposition, and also for when I got
```

1   divorced.

2       Q.   So how long ago was the deposition you gave in

3   the criminal case, approximate?

4       A.   Probably five years.

5       Q.   And your family law proceeding, when did you

6   give a deposition?  How long ago was that?

7       A.   1991, '92, something like that.  I don't know

8   exactly.

9       Q.   So let me take a few minutes at the beginning

10  of this deposition to give you a few rules for things

11  that will help us I think have a more efficient

12  question-and-answer session here today.  Okay?

13      A.   Okay.

14      Q.   So you've just taken an oath to tell the truth,

15  and you understand that the oath is under penalty of

16  perjury, correct?

17      A.   Correct.

18      Q.   So what's important is that you provide

19  truthful answers to the best of your knowledge to all of

20  the questions, and I'm going to do my best to make sure

21  that the questions I ask are clear and understandable;

22  but if for some reason you don't understand what I'm

23  asking or perhaps you didn't hear me, the audio blips or

24  something, feel free to tell me you didn't get the

25  question.  I'll rephrase it or I'll restate it because I

Jenna Clark
December 07, 2023                                    8

```
 1   want to make sure we are accurately communicating this
 2   morning.  Okay?
 3        A.   Okay.
 4        Q.   If you know the answer to my question based
 5   upon your personal knowledge, please answer it to the
 6   best of your ability accurately.  And I just don't want
 7   to encourage you in any way to speculate about an answer
 8   because that doesn't really help me or your attorney.
 9   If you don't know something, it's perfectly fine, once
10   you've exhausted your memory bank, to tell me that you
11   don't recall or don't remember.  Okay?
12        A.   Okay.
13        Q.   If you answer my question without asking to be
14   restated, I'm going to assume that you have understood
15   my question based upon your proceeding to provide me a
16   substantive answer.  Okay?
17        A.   Okay.
18        Q.   And since we're doing this deposition here
19   today via Zoom, we've got little rectangles that we're
20   all appearing in, so I'll do my best to allow you to
21   complete your answer to my questions this morning, and
22   as we proceed, please do me the same courtesy of waiting
23   until I'm finished with my question before you start to
24   answer.  That'll help our court reporter.  Okay?
25        A.   Okay.
```

1      Q.   Your attorney may object or interpose an

2  objection to a question that I ask.  Unless directed

3  otherwise by your counsel, even if there is an objection

4  stated, you will answer the question as best you

5  understand it so that that doesn't become a process that

6  is confusing in any way.  Okay?

7      A.   Okay.

8      Q.   When I get done with my questions, your

9  attorney may have the opportunity -- or would have the

10  opportunity to ask any follow-up questions he would like

11  to ask you today.  If at any time you want to take a

12  break, this is not a marathon or an endurance contest.

13  Just let me know.  As long as we don't have a question

14  pending, we'll give the courtesy of breaks when needed.

15  Okay?

16      A.   Okay.

17      Q.   So you identified at the beginning that you're

18  located in Miami, Florida today personally giving this

19  testimony.  Where specifically in Miami are you located?

20      A.   The address, you want the address?

21      Q.   Yes, ma'am, if you know it.

22      A.   Brickell Key Drive at their law firm, Derek

23  Smith.

24      Q.   Okay.

25      A.   I don't know the exact number.

Jenna Clark
December 07, 2023                                    10

1      Q.    All right.  And are you in the room by yourself

2  or is your attorney in the same room with you?

3      A.    He's in the room.

4      Q.    Is anyone else in the room other than your

5  attorney, Mr. MacDonald?

6      A.    No, sir.

7      Q.    Do you have any documents in front of you?

8      A.    No, sir.

9      Q.    As I understand, you are represented by

10  Mr. MacDonald in this litigation; is that correct?

11     A.    Correct.

12     Q.    Are you still represented by Attorney Lauren

13  Wilson?

14     A.    No.

15     Q.    Why not, if you know?

16     A.    She took another position in a different law

17  firm, as far as I know.

18          (Discussion was held off the record)

19  BY MR. STEFANY:

20     Q.    Ms. Clark, the reason I asked you about your

21  attorney is I want to -- as part of my introductory kind

22  of instructions to you as part of the deposition

23  process, at no time today am I intending to ask you

24  anything about communications you may have had prior to

25  this date with your attorney, Kyle MacDonald, or with

1    your prior attorney, Lauren Wilson.  Okay?

2        A.   Okay.

3        Q.   And I have several questions today concerning

4    your prior employment with the Lee County Sheriff's

5    Office.  For the sake of the court reporter having to

6    type, I would like to refer to the Lee County Sheriff's

7    Office as the LCSO, just the initials.  So if I ask

8    LCSO, is that acceptable to you to refer to the

9    sheriff's office?

10       A.   Yes.

11       Q.   Okay.  So what, if anything, did you do in

12   preparation to coming to your deposition today about

13   this case?

14       A.   Like give me an example of what you're talking

15   about.

16       Q.   Well, did you speak with your lawyer prior to

17   today's deposition about the deposition?

18       A.   Yes.

19       Q.   And when did you speak with him?

20       A.   Exact date?

21       Q.   Yeah.

22       A.   I don't recall.

23       Q.   In the last month?

24       A.   Yes.

25       Q.   Okay.  And do you recall how long that meeting

Jenna Clark
December 07, 2023                          12

1  with your lawyer lasted?

2      A.  An hour.

3      Q.  Okay.  So since meeting with your attorney and

4  in preparation for appearing at your deposition today,

5  have you reviewed any documentation of any kind?

6      A.  Yes.

7      Q.  Tell me what documentation you have reviewed in

8  preparing to come to your deposition today?

9      A.  The actual lawsuit and the interrogatories.

10     Q.  Other than those two documents, have you

11 reviewed anything else?

12     A.  I reviewed today the phone list that was sent

13 over to him.

14     Q.  The list of your agency-issued cell phone?

15     A.  Yes.

16     Q.  Anything else?

17     A.  Nope.

18     Q.  Okay.  And other than speaking to your

19 attorney, have you spoken to anyone else about your

20 deposition here today?

21     A.  Yes.

22     Q.  Who?

23     A.  My husband and my two daughters.

24     Q.  When did you speak with them about that?

25     A.  Several times, and I can't tell you exactly

1  what day, but today as well.

2      Q.   Other than talking to them about the fact that

3  you are having your deposition today, did you talk with

4  them at all about any of the allegations you've made in

5  your lawsuit?

6      A.   Yes.

7      Q.   Okay.  So let's start with your husband.

8  That's William Paul Clark?

9      A.   Yes.

10     Q.   What did you speak with your husband about

11 concerning the allegations you've made in this lawsuit?

12     A.   I read the whole thing, and I -- anything that

13 I gave to my attorney, I also shared with him.

14     Q.   So I imagine from that answer, you're referring

15 to perhaps many conversations you've had with your

16 husband about the allegations of this lawsuit?

17     A.   That's correct.

18     Q.   Okay.  So let me try to get more focus in my

19 question just so that we're walking step by step

20 together here.  Specifically, I'm looking for

21 communications you've had with individuals, in this case

22 your husband, about today's deposition itself.  So with

23 respect to conversations with your husband about today's

24 deposition and the allegations brought in your lawsuit,

25 when is the last time you've talked with him about that

1  specific matter?

2      A.   This morning.

3      Q.   Okay.  And did you talk about allegations of

4  your lawsuit this morning?

5      A.   Yes.

6      Q.   Okay.  Tell me what you talked about.

7      A.   I went over things that were in the lawsuit and

8  explained what happened.  And, you know, I'm not saying

9  the details, but we talked about quite a few things.

10     Q.   What is your husband's current status by way of

11 his employment?

12     A.   He's self-employed.

13     Q.   What does he do?

14     A.   A pool contractor.

15     Q.   And how long has he operated that business?

16     A.   Since 1998, I believe.  I'm not sure of the

17 exact month, but we got married in '96, and a couple

18 years later, we started a swimming pool business.

19     Q.   Has he been fully employed and gainfully

20 employed earning compensation from that business in the

21 last several years?

22     A.   The business has been up and down.

23     Q.   So how long was your conversation this morning

24 with your husband about the allegations in this lawsuit?

25     A.   I'm not really sure, but around a half an hour

Jenna Clark
December 07, 2023                                    15

 1  to an hour.

 2      Q.   Was anyone else part of the call other than you

 3  and your husband?

 4      A.   It wasn't a call.  It was face to face.

 5      Q.   Okay.  So was anyone else in the room when you

 6  had this discussion with your husband this morning?

 7      A.   No, sir.

 8      Q.   Did you review any documentation when you were

 9  having this discussion with your husband this morning?

10      A.   I read over some of the lawsuit.

11      Q.   The things that you already identified?

12      A.   Yes.

13      Q.   Okay.  And when is the last time you talked

14  with -- it's my understanding you have two daughters,

15  correct?

16      A.   That's correct.

17      Q.   Jami Najarro, is that how you say it?

18      A.   Yes.

19      Q.   So Jami Najarro --

20           MR. STEFANY:  Jami is J-a-m-i, Michelle.

21  BY MR. STEFANY:

22      Q.   When did you last talk with Jami Najarro about

23  the allegations in your lawsuit?

24      A.   Earlier in the week.

25      Q.   And did she call you or did you call her to

1  discuss the allegations in the lawsuit?

2      A.   I don't recall.

3      Q.   Did you talk about the substantive allegations

4  in your lawsuit with this discussion with your daughter,

5  Jami Najarro, earlier this week?

6      A.   I don't really know what we talked about, but

7  we did talk about the deposition and being nervous and

8  that kind of stuff.  It wasn't really any particular

9  conversation about the lawsuit that I can remember.

10     Q.   Okay.  Your other daughter is named Julianna

11 DiBenedetto-Wilson -- hyphen Wilson?

12     A.   Yes.

13     Q.   When is the last time you spoke with her about

14 the allegations in your lawsuit?

15     A.   At least two weeks ago or longer.

16     Q.   Julianna DiBenedetto-Wilson currently resides

17 in North Carolina; is that right?

18     A.   Correct.

19     Q.   And has she resided in North Carolina since you

20 were employed at the LCSO?

21     A.   She moved there about eight years ago.

22     Q.   Okay.  Your daughter, Jami Najarro, is still

23 employed by the LCSO, correct?

24     A.   Correct.

25     Q.   What does she do there?

 1     A.    She's a sergeant for the SRO position, school

 2   resource officer.

 3     Q.    So other than talking with your attorney, your

 4   daughters, and your husband, have you talked with anyone

 5   else about your claims in this litigation since leaving

 6   your employment with the LCSO?

 7     A.    No.

 8     Q.    My understanding is that you currently reside

 9   in Lee County, correct?

10     A.    That's correct.

11     Q.    In Lehigh Acres specifically?

12     A.    Yes.

13     Q.    How long have you lived at that address?

14     A.    Forty years.

15     Q.    How many?

16     A.    Forty.  Wait a minute.  I take that back.  I

17   live in Lehigh for 40 years, but not at that residence.

18   I was there for about 33 -- about 33 years, 33, 34.

19     Q.    You currently live there with your husband,

20   William Paul Clark, correct?

21     A.    Correct.

22     Q.    You said you all got married what year?

23     A.    1996.

24     Q.    Since 1996, has anyone else lived at your

25   current Lehigh Acres address other than you and your

Jenna Clark
December 07, 2023                                    18

```
 1   husband?
 2       A.   My kids.
 3       Q.   Pardon me?
 4       A.   My kids and his kids.
 5       Q.   My understanding is you were initially employed
 6   by the LCSO on June 5, 1992, correct?
 7       A.   Correct.
 8       Q.   And the last day that you worked for the LCSO
 9   was September 3, 2021; is that correct?
10       A.   That was my last day of, you could say,
11   employment.
12       Q.   Let me add one other point since we've
13   mentioned September 3, 2021.  I'm going to refer to that
14   date as the separation date for purposes of this
15   deposition.  So when I talk about separation date, that
16   refers to September 3, 2021.  Okay?
17       A.   Okay.
18       Q.   So as of September 3, 2021, who had been your
19   most immediate supervisor at the LCSO?
20       A.   AnnMarie Reno.
21           MR. STEFANY:  Michelle, for the record,
22       AnnMarie is one word, A-n-n-M-a-r-i-e, and Reno is
23       R-e-n-o.
24           THE COURT REPORTER:  Thank you.
25   BY MR. STEFANY:
```

Jenna Clark
December 07, 2023                                    19

1       Q.   So, Ms. Clark, how long had AnnMarie Reno been

2  your immediate supervisor as of your separation date,

3  approximately?

4       A.   It was a little before 2018, I believe.

5       Q.   Tell me what happened a little bit before 2018

6  where there apparently was some sort of change in your

7  immediate supervision?

8       A.   Right.  She worked for, Bill Bergquist, and he

9  was my supervisor at that time.  And then she replaced

10  him.  She was his assistant, and then she later had his

11  job, and he was transferred to another position.

12      Q.   Do you remember what position Mr. Bergquist was

13  transferred to at that time?

14      A.   Special projects or something.  He was still a

15  director, but he just didn't have anybody to direct.

16      Q.   What was AnnMarie Reno's job position when she

17  was your immediate supervisor, if you recall?

18      A.   Her title was executive director of support

19  services division.  It's been called a couple of

20  different names, but I'm not sure what it's called now.

21  But it was at one point called support services

22  division.

23      Q.   Let me show you -- or let me ask you to pull --

24           MR. STEFANY:  Procedurally, Kyle, did you print

25      out a copy of these exhibits that I sent you

Jenna Clark
December 07, 2023                              20

```
1    earlier?

2          MR. MACDONALD:  I did not, but I can do that

3    certainly.  I can work on getting those printed if

4    you would like.

5          MR. STEFANY:  Well, I don't know if the witness

6    is easily able to see the exhibits.  I can share my

7    screen or you can print them out, whichever is

8    easier.  I'm just trying to make it simple.

9          MR. MACDONALD:  Yeah, we can try doing the --

10   sharing your screen, but I can work on printing them

11   in the interim, so if there's any issues, we'll have

12   them.

13         MR. STEFANY:  Why don't you get somebody to

14   print them, and then when they're available, I'll

15   just let her go through them as we're talking about

16   the various exhibits.

17         MR. MACDONALD:  Okay, you got it.

18         MR. STEFANY:  Do we need to take a two-minute

19   break to let you do that?

20         MR. MACDONALD:  Yeah, that'll work.

21         MR. STEFANY:  Let's just take a two-minute

22   break real quick and let you get those.

23         MR. MACDONALD:  Thank you.

24                     (Recess)

25   BY MR. STEFANY:
```

 1     Q.   So, Ms. Clark, while I show you what I have

 2   marked as Exhibit 1 to your deposition, do you have that

 3   in front of you or do you want me to put it on the

 4   screen?

 5     A.   I have it in front of me.

 6          MR. STEFANY:  Kyle, do you have access to see

 7     it?

 8          MR. MACDONALD:  Yes.  I can pull it up on my

 9     computer.

10          MR. STEFANY:  Well, I can share it.  I'm not --

11     I'm happy to share it, if needed.

12          MR. MACDONALD:  I got it.  We're good.

13          MR. STEFANY:  Okay.

14   BY MR. STEFANY:

15     Q.   Ms. Clark, do you recognize Exhibit 1?

16     A.   I guess.  This is the disclosures.

17     Q.   Yeah.

18     A.   I haven't seen this before but...

19     Q.   Well, let me just go through the process.  Do

20   you recognize what's been marked as Exhibit 1?

21     A.   Yes.

22          MR. STEFANY:  Are you seeing this on my screen,

23     Kyle?

24          MR. MACDONALD:  Yes.

25          MR. STEFANY:  Exhibit 1?

1         MR. MACDONALD:   Yep.

2    BY MR. STEFANY:

3         Q.   Let me just scroll down, and I'll talk to you

4    as I'm looking at it myself.  So, Ms. Clark, I think you

5    already offered, but I was going to say, you recognize

6    this as your initial disclosures in this litigation?

7         A.   Yes.

8         Q.   And I think I heard you say you had not seen

9    this before, which was going to be one of my questions.

10   So is this the first time you've seen this document or

11   did you see it back in January when it was submitted as

12   part of your lawsuit?

13        A.   Well, if I did, I don't recall.

14        Q.   All right.  Let me just, for the sake of the

15   record, let me identify it as Plaintiff's Initial

16   Disclosures in this lawsuit which were served under date

17   of January 19, 2023 to me as counsel of record for

18   Sheriff Carmine Marceno.

19        So let me just ask you a couple questions about

20   this particular document.  Ms. Clark, the first part of

21   the -- or one of the sections here of the document asks

22   you to identify the name of any individual to have

23   discoverable information that you may use to support

24   your claims in this case, and you have identified

25   specifically yourself, AnnMarie Reno, Dawn Heikkila,

1  Carmine Marceno, your husband and your two daughters?

2      A.   Correct.

3      Q.   Is that still the accurate list of people that

4  you believe have discoverable information about your

5  claims in this case?

6      A.   Yes.

7      Q.   So there's nobody else other than those that

8  you already listed, right?

9      A.   Correct.

10      Q.   And prior to today's deposition, but after your

11  separation date from the LCSO, have you had an

12  opportunity to discuss anything about your case or your

13  claims in this case with AnnMarie Reno?

14      A.   No.

15      Q.   Have you had, in the same temporal period, any

16  opportunity to discuss anything about your claims in

17  this case with Dawn Heikkila?

18      A.   No.

19      Q.   And have you had any opportunity to discuss the

20  claims in your case with Sheriff Carmine Marceno?

21      A.   No, sir.

22      Q.   And then, Section III of your disclosures, you

23  make reference to documentation that you may use to

24  support your claims in this case, and I just direct you

25  to the second bullet entry.  It says:  All discovery

Jenna Clark
December 07, 2023                                    24

1    which has or will be produced by plaintiff and defendant

2    in this action including -- specifically subsection a,

3    correspondence and emails between you, the plaintiff,

4    and the defendant, and the defendant in this case is

5    Sheriff Carmine Marceno.  So specifically, are you aware

6    of any written communication or emails between you and

7    Sheriff Carmine Marceno regarding your claims in this

8    case?

9        A.    No.

10       Q.    Do you specifically have an understanding of

11   what's referenced here by the statement of

12   correspondence and emails between you and the defendant?

13       A.    You just mean me contacting them?

14       Q.    Yes, or them contacting you, whichever

15   direction the correspondence or emails went.

16       A.    But not through my attorney, correct?

17       Q.    Correct.

18       A.    Okay, yes.  I understand.

19       Q.    So are you aware of any of the specific

20   documents that you're referring to there?

21       A.    Can you rephrase that or just -- I'm not sure

22   what you're asking me.

23       Q.    Well, I'm just trying to get clarification of

24   what you're stating in your initial disclosures when

25   you're making reference to correspondence and emails

Jenna Clark
December 07, 2023                           25

1   between you -- and it says:  To defendant.  So in

2   referring to that statement in your disclosures, can you

3   identify any correspondence or emails that you're

4   referring to?

5       A.   No.

6       Q.   Okay.

7       A.   I'm still confused on what you're asking me

8   though.

9       Q.   Let me turn your attention to subparagraph F of

10  that same section of your disclosures.  There's a

11  reference made to comparator evidence and records of

12  comparator employees.

13           Do you have any information about what those

14  records are?

15      A.   That, how I understand it, is the job

16  description that was supplied from the LCSO under the

17  EEOC claim.

18      Q.   Okay.  So job description supplied by the LCSO

19  in response to your charge of discrimination?

20      A.   Correct.

21      Q.   Anything else?

22      A.   Well, all of that basically would be supplied

23  in the EEOC claim.

24      Q.   Okay.  The final section of your initial

25  disclosures from January 19, 2023 is the section on

1  damages.  You assert your lost wages to be a claim in

2  the amount of ten times your annual salary as of the

3  date --

4       A.   Any damages, you can just consult with my

5  attorney.

6       Q.   Well, I certainly will take that under

7  advisement.  I appreciate that.  But with respect to

8  your assertion of damages of lost wages in the amount of

9  ten times your annual salary at the date of your

10 termination, is that still the damages claim that you

11 are asserting for lost wages in this litigation, or has

12 it changed?

13          MR. MACDONALD:  I'm going to object to the

14      form.

15          You can answer.

16 BY MR. STEFANY:

17      A.   I don't know.

18      Q.   The emotional distress damages that you assert

19 as stated in Section 4 of your initial disclosures is in

20 the amount of $2 million.

21          Do you see that?

22      A.   Yes.

23      Q.   Is that still your emotional damages claim in

24 this case?

25          MR. MACDONALD:  Objection; form.

Jenna Clark
December 07, 2023                              27

1  BY MR. STEFANY:

2      A.    I don't know.

3      Q.    Let me focus your attention to the relevant

4  period of time, say beginning of 2018 through the

5  separation date -- your separation date with the LCSO.

6  During that period of time, did you become aware that

7  the agency was making decisions about reorganization of

8  its operations and staff?

9      A.    Yes, in 2018.

10     Q.    How did you become aware of that?

11     A.    It was a lot of people that were let go or

12 allowed to apply for other positions within the agency.

13     Q.    Do you recall how you first learned that that

14 was happening sometime in the 2018 through 2021 time

15 frame?

16     A.    The people were notified -- how should I say

17 it?  They couldn't get in the building or their

18 computers and were told to see Dawn, which was, at that

19 time, the HR director.  And they were given a letter

20 along with a package stating that they were -- which

21 included to be -- to apply for another position or

22 retire.  And they got a package and a severance plan.

23     Q.    So is this something that you personally

24 observed by seeing the communications to the individuals

25 affected or is this something that you heard about from

Jenna Clark
December 07, 2023                                28

1  others?

2      A.   Both.

3      Q.   Okay.  And what is your recollection of the

4  circumstances for the reorganizations and the staffing

5  changes that you're making reference to, if you have an

6  understanding of why it was done?

7      A.   Well, positions were reinstated for the people

8  that ended up being let go that didn't apply for another

9  position, and I don't know if -- why they did it.  That

10  was the question?

11      Q.   Yes.  So are these reorganizations and staffing

12  changes that you're referring to, did they occur in 2018

13  or in 2019 or in both years, if you know?

14      A.   I'm not sure which year.  One or the other.

15      Q.   Okay.  At the time this -- these

16  reorganizations that you're referring to and staffing

17  changes you're referring to came about, Sheriff Marceno

18  was the sheriff of the LCSO?

19      A.   That's correct.

20      Q.   All right.  Let me show you what we've marked

21  as Exhibit 2, if you've got that in front of you.  I can

22  share my screen if you need me to.  Just tell me which

23  you prefer.

24      A.   I can see it.

25      Q.   So do you recognize this document?

Jenna Clark
December 07, 2023                                          29

1      A.    Yes.

2      Q.    Have you seen it before?

3      A.    Obviously.  It says:  All Users.  So I'm sure I

4  did at the time that it was put out.  I just didn't

5  remember it.

6      Q.    So this is -- for the record, this is an email

7  dated June 21, 2019 from Dawn Heikkila to All Users at

8  the LCSO.  The subject is regarding recent developments,

9  and it's addressed to all LCSO employees.  So if I could

10  get you to turn down to the third paragraph of this,

11  take a minute just to refresh your memory and read that

12  paragraph silently to yourself and tell me when you're

13  done.

14      A.    Okay.

15      Q.    So this paragraph that I've just asked you to

16  specifically review makes reference to 22 civilian

17  positions with duties that could be transferred

18  elsewhere in the agency when the member in the position

19  retired or transferred.  It goes on to say 17 of these

20  empty positions were eliminated.

21           With respect to those referenced positions, did

22  any of those positions impact the purchasing department

23  that you were the director of at the time?

24      A.    No.

25      Q.    What role, if any, did you have in analyzing

1   the civilian positions referenced in this particular

2   paragraph of the email, if any?

3        A.    What position did I have at analyzing?

4        Q.    Yeah.  Were you involved in any way in

5   analyzing positions as part of this reorganization?

6        A.    No.  I didn't know about it until it happened.

7        Q.    All right.  All right.  Do you have any

8   recollection in 2019 when you received this email of

9   communicating with anyone at the LCSO about these

10  decisions or about the process used?

11       A.    No.

12       Q.    In less than a year after this particular email

13  was sent out to all LCSO employees, the COVID pandemic

14  became a factor in most people's lives.  What

15  recollection do you have of how the COVID pandemic

16  impacted the LCSO, and particularly the purchasing

17  department, if at all?

18       A.    Well, we were classified as essential, so we

19  basically didn't have anything to do with like staying

20  home, all that.  We weren't allowed to stay home.  But

21  as far as having to buy our supplies, we were definitely

22  impacted because it was a lot of work to keep everybody

23  safe.  It was a new challenge for my department and

24  keeping everybody -- especially all of the deputies --

25  everybody safe with all of the supplies that I had to

1  buy for them.

2      Q.   Okay.  I don't know if you have it in front of

3  you, but do you have Exhibit 19 in your stack of

4  material yet?

5          MR. MACDONALD:  She does not yet, but I can see

6      if it's ready if you would like me to.

7          MR. STEFANY:  I'll just show it on the screen.

8          MR. MACDONALD:  Okay.

9  BY MR. STEFANY:

10     Q.   Ms. Clark, I'll back up just a little bit on my

11 screen and show you what's been tabbed as Exhibit 19 to

12 your deposition today.  I'm just going to show it on the

13 screen.  Can you see this all right?

14         MR. MACDONALD:  We don't see it yet.

15 BY MR. STEFANY:

16     Q.   Can you see it now?

17     A.   Yes.

18     Q.   Take a second to review this, then I'll ask you

19 questions once you've had a chance to look at it.

20     A.   Okay.

21     Q.   Let me scroll so you can see the rest of it.

22 It's pretty short on the next page.

23     A.   Okay.

24     Q.   Have you seen this before?

25     A.   A long time ago, it's a possibility, but I

1  don't -- I remember around this time, but if my name was

2  on there, then I would have said yes, but it's blacked

3  out, then I don't know.  I don't --

4      Q.   I think for the record, the only thing blacked

5  out are the actual email addresses of the individuals

6  listed, and I don't see your name.

7      A.   That means I wasn't on the -- no.

8      Q.   I can see that your name is not on it.

9      A.   Correct.

10      Q.   For the record, let me identify that this is an

11  email from Chief John Holloway at the Legal Services

12  Executive Bureau to a number of individuals that are

13  identified as command staff concerning generally

14  information regarding the LCSO budget with the

15  discussion points being COVID.  Let me just scroll down

16  to the -- towards the end of this.  And if I didn't say

17  the date, the date of this email is April 3, 2020.  So

18  since it doesn't appear on its surface or on its face

19  that you received this specific email, Ms. Clark, I just

20  want to identify a couple things on here.  Towards the

21  bottom of this email, I begin where it says:  To protect

22  our employees and assure LCSO is able to continue to

23  provide the highest quality law enforcement services

24  possible, we are immediately taking the following

25  actions.

Jenna Clark
December 07, 2023                                    33

1          There's a couple of things that I wanted to

2     highlight to you.  Paragraph 2, it says:  Removing funds

3     from budget lines and reallocating those funds towards

4     expenses and purchases which will reduce future costs.

5          Do you recall being given any of those types of

6     instructions from either Mr. Bergquist or from AnnMarie

7     Reno in 2020?

8          A.   No.

9          Q.   Paragraph 3 of this document or of that

10    subparagraph says:  Freezing all significant purchases

11    except those purchases specifically approved by the

12    Support Services Executive Bureau.

13         Do you recall anything about a -- essentially a

14    spending freeze on -- on -- or limitations on purchasing

15    that took place in or about April of 2020?

16         A.   I don't recall at this time.  I would have to

17    really go back and think about a lot of that stuff, but

18    I can't recall because we spent a lot of money on

19    supplies, a lot, when COVID hit.

20         Q.   So Item 4 is:  Collecting most agency credit

21    cards to avoid confusion and assure Purchasing and

22    Finance maintain a tight grip on spending.

23         Was -- do you recall being given any

24    instruction or direction from either Mr. Bergquist or

25    AnnMarie Reno about keeping a tight grip on spending on

1   or about April of 2020?

2       A.   That could have happened, but I don't recall

3   because at the end of the fiscal year, it could happen.

4   And I don't know if it might have happened around this

5   time.  It's a possibility, but I don't know -- I don't

6   know for sure.  I don't really remember.

7       Q.   Okay.  So as you do remember sort of the

8   timeframe of April 2020 on and the COVID-19 pandemic's

9   impact, with respect to the purchasing department

10  itself, is it true that your recollection is that you

11  guys were required to spend a significant amount of

12  resources on COVID-related materials or other things to

13  help keep the agency's employees safe?

14      A.   Yes.  But it really wasn't the budget that it

15  came from because we had several grants that we were

16  spending that money.  That was like a five-year grant

17  and maybe a three-year grant, so we were spending, and

18  that's where most of the supplies probably came from.

19      Q.   Okay.  And when we talked earlier concerning

20  your awareness of some reorganizational decisions and

21  some staffing changes there at the LCSO beginning at

22  least in 2019 as shown by the earlier exhibit, did you

23  have an understanding of whether the assessment of the

24  organization and staffing changes was continuing during

25  the pandemic years in 2020 and 2021?

Jenna Clark
December 07, 2023                                    35

1      A.    Continuing as far as letting people go or not?

2      Q.    Just the assessment of the organization and the

3  possible reorganization and additional staffing changes.

4  Were you aware in either 2020 or 2021 that that was

5  still an ongoing consideration or analysis that was

6  being conducted?

7      A.    No.

8      Q.    And during the period -- if you recall, during

9  the period of 2019 through 2021 until the time you were

10 notified of the elimination of your position, were there

11 any personnel changes in the purchasing department that

12 you recall?

13     A.    My section was the same.

14     Q.    Okay.  So in this period of time -- let's just

15 again use the general time frame of January 1, 2018

16 through the separation date -- from -- from your

17 separation date with the LCSO, what -- what -- my

18 understanding is you used a couple of different email

19 addresses, and let me just go over those.  Your email

20 address at the sheriff's office was

21 jclark@sheriffleefl.org, correct?

22     A.    Correct.

23     Q.    And did your use of that work email address

24 cease as of the date of your separation or separation

25 date?

1        A.    Yes, as far as I know.  I don't know what they
2   did over there.

3        Q.    You didn't use it any further?

4        A.    No, not to my knowledge.  I did one time, was
5   writing an email, and that email came up.  And I hope I
6   didn't send something to that by mistake, but it was not
7   intentional if I did send something from my personal
8   email to that one.

9        Q.    All right.  And, again, during the time frame
10  of January 1, 2018 through the separation date, your
11  personal email was ███████████@gmail.com?

12        A.    Yes, and Yahoo.  I didn't use that one though.

13        Q.    What was the yahoo address?

14        A.    The same thing.

15        Q.    ███████████@yahoo?

16        A.    Correct.

17        Q.    .com?

18        A.    Yes.

19        Q.    And you say you didn't use that yahoo.com
20  address much?

21        A.    I said I -- I couldn't remember the password.

22        Q.    I can relate.  I forget my passwords all the
23  time.  All right.

24              Have you -- during the period of January --
25  January 1, 2018 through the separation date of your

1  employment with the LCSO, were you able to use an

2  agency-issued cell phone?

3      A.   Yes.

4      Q.   And was that cell phone number (239) 950-0188

5  [sic]?

6      A.   Nope.

7      Q.   No?

8      A.   You said the number wrong.

9      Q.   I'm sorry.  What was that number?

10      A.   (239) 850-0188.

11      Q.   Did your use of that agency phone cease as of

12  your separation date with the LCSO?

13      A.   Correct.

14      Q.   And in addition to the agency-issued phone that

15  you used during the period just discussed, did you also

16  have your own personal cell phone?

17      A.   Yes.

18      Q.   Let me try numbers again.  Was that number

19  ████████████████

20      A.   Yes.

21      Q.   Is that still your personal cell phone number?

22      A.   Yes.

23      Q.   My understanding is that your separation from

24  employment with the LCSO was predicated on your decision

25  to retire with the FRS as of September 3, 2021; is that

1  right?

2       A.   Yes.

3       Q.   Although I'll get to it later, my understanding

4  is you've done a little bit of work with some

5  residential painting since your retirement with the

6  LCSO; is that right?

7       A.   Yes.

8       Q.   Other than that work with residential painting,

9  have you had any earned compensation from any

10 employer --

11      A.   No.

12      Q.   -- other than whoever the residential painting

13 contractor is?

14      A.   Uh-huh.

15      Q.   No other income?

16      A.   No, sir.

17      Q.   Ms. Clark, can I just get you to briefly

18 describe what formal educational background you have?

19      A.   Some college.  I had the required classes while

20 at the sheriff's office for management and business

21 administration, but I did not have a -- I did not have a

22 college degree.

23      Q.   Where did you do your studies in college to the

24 extent you had classes in college?

25      A.   Accounting.

Jenna Clark
December 07, 2023                                    39

```
 1       Q.   I said where.
 2       A.   Oh.  Edison Community College in Fort Myers and
 3  FGCU also in Fort Myers.
 4       Q.   FGCU is Florida Gulf Coast University?
 5       A.   Yes, sir.
 6       Q.   And do you recall when you last had
 7  college-related class work that you took, what year?
 8       A.   I don't recall.
 9       Q.   So I'm certainly aware that you were employed
10  for quite a number of years with the LCSO, so I would
11  like to focus the next set of questions with you on the
12  specific period of your employment during August of 2021
13  and early September of 2021.  Okay?
14       A.   Okay.
15       Q.   So my understanding that at least as of August
16  of 2021, your typical work schedule was to work four
17  10-hour shifts a week?
18       A.   Correct.
19       Q.   As purchasing director for the LCSO?
20       A.   Yes.
21       Q.   That meant your normal schedule was working
22  Monday through Friday?
23       A.   Correct.
24       Q.   Do you have any recollection of how long that
25  schedule had been in place as of August 2021, that work
```

Jenna Clark
December 07, 2023                                    40

1    schedule?

2        A.    I don't recall.

3        Q.    In August of 2021, Shannon Lehman was the

4    manager of purchasing?

5        A.    Correct.

6        Q.    You were her immediate supervisor?

7        A.    Correct.

8        Q.    And as of August of 2021, did you supervise

9    anyone directly other than Shannon Lehman?

10       A.    I supervised the whole group, but she also --

11   it was a team that we had.

12       Q.    When you say "whole group," are you referring

13   to the purchasing agents that were employed in the

14   purchasing department?

15       A.    That's correct.

16       Q.    As of August of 2021, who was responsible for

17   performing annual evaluations for the purchasing agents

18   at the LCSO?

19       A.    That was Shannon, but I always reviewed or sat

20   in.  Not every single one, but some.  Most, some.  I

21   don't know.

22       Q.    Other than you and Shannon and the various

23   purchasing agents employed as of August of 2021, were

24   there any other job titles of individuals working in the

25   purchasing department?

1     A.   We only had volunteers that would help out, and

2  those were random people from the VOICE unit.

3     Q.   How many volunteers would help out?

4     A.   Just depended on what we had going on.  A lot

5  of times, they would do errands, so they would pick up

6  stuff from us and drop it off at a vendor or take

7  something to the other locations of LCSO district or the

8  corrections facility, and sometimes help discard

9  uniforms or -- I'm trying to think what else they did.

10  Like they would have stuffed like packets of domestic

11  violence, for example, brochures, and then distribute.

12     Q.   And what was the process if -- assuming there

13  was a process, what was the process for getting

14  assistance from volunteers into the purchasing

15  department during 2021, just to pick a time frame while

16  you were there?  Is it something that you would initiate

17  or somebody would call and ask if you needed any help?

18  How would that work?

19     A.   It would be one of the girls, if they needed

20  help with something or something picked up, they would

21  contact usually the VOICE secretary, or if they had

22  their cell phone, another VOICE person's cell phone, but

23  not call them direct, but probably mostly everything was

24  a schedule from the secretary or whoever was operating

25  the office in the VOICE unit.

1      Q.    When you say one of the girls would contact,

2   are you referring to Shannon and the purchasing agents

3   or --

4      A.    That's correct, yes.

5      Q.    Getting back to a focus on August of 2021,

6   Ms. Clark, my understanding that at some point in August

7   of 2021, you notified AnnMarie Reno that you needed to

8   take a leave of absence for a personal health condition;

9   is that right?

10     A.    Yes, but I think it was July when I requested

11  the time off.

12     Q.    So you think you talked with Ms. Reno in July

13  of 2021 about the need for time off in August?

14     A.    Well, it's a request.  When we needed time off,

15  you put in for vacation.  The system that they had, we

16  went in and then we requested it.  Normally, I would

17  call her or tell her about it if we had something

18  planned.  I talked to her almost on a daily basis

19  usually anyway, so she knew a lot that was going on in

20  our area.

21     Q.    So the communication that you had with AnnMarie

22  Reno in July of 2021 about your need to take some time

23  off for a medical matter, that was a communication you

24  had face to face with her?

25     A.    Like I said, I put the request in, and she had

1  to approve it on her computer so I could -- so it could

2  be -- the approval had to be for the scheduling.

3      Q.   And in submitting that request to AnnMarie

4  Reno, what was her response to your request question?

5      A.   She approved it.

6      Q.   Okay.  And did you communicate to anyone else

7  at the LCSO about your need to take that leave?

8      A.   Yes.

9      Q.   Who?

10     A.   My staff and also Dawn Heikkila.

11     Q.   So in communicating to the staff, did you just

12 tell them face to face that you were going to be taking

13 that leave?

14     A.   Yes.

15     Q.   And in talking and communicating with Dawn

16 Heikkila regarding that leave, did you speak with her

17 face to face or via email, if you recall?

18     A.   It was both, but talking about my surgery was

19 prior to that -- prior to the approval, prior before I

20 had it scheduled as a friend.  And later on the 12th, I

21 emailed Dawn and told her that AnnMarie told me -- she

22 notified her about FMLA, that I would probably need

23 that, and she said:  Okay.  I don't have time right now,

24 but if you need time, then I will get you the paperwork.

25     Q.   Okay.  And just for clarity, you said earlier

1  you had a communication with someone as a friend.  Is

2  this someone you are referring to AnnMarie or Dawn?

3      A.   Dawn.

4      Q.   Okay.

5      A.   But it could have been six months, eight months

6  prior to.

7      Q.   Okay.  So just again to make sure I'm clear on

8  what you're saying, your testimony is that prior to

9  asking or requesting an approved leave of absence from

10  AnnMarie Reno, you had talked with Dawn about the need

11  for surgery; is that what you're saying?

12      A.   Yes.

13      Q.   Okay.  Do you have Exhibit 18 in front of you?

14  Please review Exhibit 18 and tell me when you're done

15  looking at it.

16      A.   I'm done.

17      Q.   Do you recognize these -- this document?

18      A.   Yes.

19      Q.   So for the record, I'll just identify it as a

20  series of emails between -- appears to be between you

21  and Dawn Heikkila on August 12, 2021 concerning your

22  leave of absence in August of 2021; is that right?

23      A.   That's right.

24      Q.   If I go from the bottom of Exhibit 18 and kind

25  of scroll up from there, it looks like 12:26 p.m., you

Jenna Clark
December 07, 2023                                    45

1   emailed Dawn Heikkila, and you're telling her:  I called

2   you to let you know I have surgery scheduled on the

3   18th.  AnnMarie said to let you know, she already

4   approved my time; is that right?

5       A.   That's correct.

6       Q.   So the emails that follow that communication as

7   I'm reading this is Dawn Heikkila says, okay, if you're

8   out more than a week, I will forward it to Amy for FMLA.

9   Do you know how long you plan to be out?

10           And you respond about 1:06 p.m., looks like 18

11  to 20, 24 to 27, total of seven days.

12           Is that right?

13      A.   Correct.

14      Q.   And then as I think you commented earlier, Dawn

15  responds to you, okay, well, we are so busy right now

16  that I'm going to hold off on the FMLA.  If you end up

17  needing more time than that, just let me know and I will

18  have to do the FMLA paperwork.  Thanks, and I wish you a

19  speedy recovery.

20           Correct?

21      A.   Correct.

22      Q.   And basically you respond thank you to that

23  email; is that right?

24      A.   Yes.  As you can see, it says it in the email

25  that we talked about that, but she never gave me any

1  FMLA paperwork to start with anything.

2      Q.   So my understanding from the records your

3  attorney has provided is surgery took place on the East

4  Coast of Florida, correct?

5      A.   Correct.

6      Q.   And the time sheet, as I recall reviewing

7  pertaining to your employment in August of 2021,

8  reflects that you left your scheduled work three hours

9  early on August 17.  Was that related to going over to

10 the East Coast for the surgery?

11     A.   That's correct.

12     Q.   And prior to starting that or traveling over to

13 the East Coast for the surgery, it was your intention

14 and expectation that you would be out or away from

15 scheduled work for seven days; is that right?

16     A.   That's what I put in for.

17     Q.   And at the time you commenced the leave of

18 absence that AnnMarie Reno had approved in August of

19 2021, did you have an understanding of what type of

20 leave had been approved for you?

21     A.   The leave was sick.  She changed it to leave

22 with pay, admin leave.  I put in -- because you can't

23 put in admin leave.  We can't put that in.  You can only

24 put in sick or vacation or personal.

25     Q.   All right.  So you thought it was sick leave or

Jenna Clark
December 07, 2023                                    47

1  you understood it was going to be sick leave, and that

2  was something you put in the system yourself?

3     A.   That's the request.  The request was put in in

4  July, and I requested sick time for those days that are

5  listed.  She approved them.  She changed them --

6     Q.   Okay.  So in putting the request for sick

7  leave, that was so that you would be paid or compensated

8  for the absences that you needed for the surgery and the

9  recovery, correct?

10    A.   Because that was sick time.

11    Q.   So I think you've already started to explain,

12 but at some point, you learned that the sick leave which

13 had been approved had been changed to administrative

14 leave with pay, correct?

15    A.   That's correct.

16    Q.   And who is it that you understand changed your

17 request to use sick leave to administrative leave with

18 pay?

19    A.   AnnMarie.

20    Q.   Did you ever discuss that with her?

21    A.   I tried.

22    Q.   When did you try to discuss that with her?

23    A.   On August 21, 2021.

24    Q.   And is that as a part of a product of a

25 discussion you guys had on the phone that day?

Jenna Clark
December 07, 2023                                      48

1    A.   How it started, she told me -- she texted me
2  and told me to call her, she needed to talk to me.
3    Q.   Okay.
4    A.   I called her on Friday, if that's the day.  I
5  could be a day off.
6    Q.   Well, let me stop you there.  August 21, 2021
7  was a Saturday.
8    A.   She didn't call me back until Saturday.  I
9  called her the day before, and then I told her she could
10 call me on my personal cell phone.  She called me back
11 on Saturday because I did respond to her text.  When she
12 called me, the question -- she said that my position has
13 been eliminated due to reorganizing.  I said:  AnnMarie,
14 I only have nine months.  What is going on?  What did I
15 do?  Am I NIA?  I didn't notice that my time was changed
16 before because I asked her about it.  I see my time was
17 changed from sick time to admin leave.  She repeated:
18 Your job has been eliminated due to reorganizing.
19 Contact Dawn on Monday.
20   Q.   Okay.  Was anything else discussed during that
21 conference with AnnMarie on the 21st?
22   A.   She said that she wanted to tell me over the
23 phone instead of getting the letter and finding out
24 without her telling me.
25   Q.   Okay.  What did you say, if anything, in

Jenna Clark
December 07, 2023                                49

1  response to that?

2      A.   I just didn't understand why, what happened,

3  what was going on.  And she just repeated.  She repeated

4  it twice.

5      Q.   And was anything else said that you haven't

6  already talked about with respect to that call with

7  AnnMarie Reno?

8      A.   Not that I recall.

9      Q.   So it sounds like the communication or the call

10 was relatively short, a couple minutes?

11     A.   Yes.  She told me how upset she was.  Her voice

12 was quivering.  She said she just got through with going

13 to an officer's funeral that had died from COVID.

14     Q.   Okay.  And you started to say her voice was

15 quivering during this call that she had with you?

16     A.   Yes.  But that's what she said, but I know that

17 didn't upset her.  In my opinion, I felt she was just

18 nervous to tell me that my job was eliminated.

19     Q.   And did you ask her during this conversation --

20 as brief as it was, did you ask her why your job was

21 eliminated?

22     A.   Of course.

23     Q.   And what did she say?

24     A.   She repeated:  You need to contact -- or didn't

25 repeat that part, but she said:  Your job is -- due to

Jenna Clark
December 07, 2023                                    50

1  reorganizing, she just said, contact Dawn.  She wouldn't

2  answer any of my questions.

3      Q.   All right.  And so did you have the opportunity

4  to talk with AnnMarie Reno any time after that call?

5      A.   No.

6      Q.   So that's the last time you talked with her?

7      A.   Yep, because I said to her, I said:  I'm out

8  sick.  I said, I mean, how cruel it is to terminate

9  somebody on sick leave.  She never looked at me.  I went

10 into the office later on, but I called Dawn like I was

11 supposed to on Monday.

12     Q.   All right.  So let me jump ahead then.  So on

13 Monday, which would have been, I think, if I have it

14 correctly, August 23rd?

15     A.   Yes.

16     Q.   You contacted Dawn Heikkila, as AnnMarie Reno

17 had suggested that you do, and the contact was via

18 phone; is that right?

19     A.   That's correct.

20     Q.   And how long did the phone conference take with

21 Dawn Heikkila on August 23rd approximately, if you

22 remember?

23     A.   Forty minutes.

24     Q.   And what was -- what was -- generally, do you

25 recall what was discussed during that 40-minute

1   conference with Dawn on August 23rd?

2        A.   Yes.  I called her and told her that AnnMarie

3   told me to call her and to find out what I was supposed

4   -- let me back up.

5            The other group that was, due to reorganizing,

6   were laid off, they had the opportunity in their packet

7   to apply for other positions.  Okay?  That was in there.

8   That was in their --

9        Q.   When you're referring to the other group, what

10  group are you referring to?

11       A.   The other group in 2018, '19 that you saw the

12  letter that you showed me that these people were -- all

13  of these things happened, some people left, some people

14  stayed, they eliminated 17 positions.

15       Q.   Okay.

16       A.   That letter.

17       Q.   Okay.

18       A.   Those people were given a packet for the VOICE,

19  join in the volunteer group, and also an opportunity to

20  apply for another position.  Okay?  So I figured that's

21  happened to me, I'm going to go ahead -- I had nine

22  months to go.  I'm going to go ahead and look up what

23  jobs are available on the website.  So when I called

24  Dawn, I already knew what was available.

25       Q.   All right.  Let me stop you there for a second.

1   So as I understand it, there was a website address where

2   you could go and look up current posted openings at the

3   LCSO as of any particular date and see what was

4   available in case you had an interest in applying for an

5   open position, correct?

6       A.   It was a public website where anybody can go.

7   You don't have to be an employee to apply there.

8       Q.   Right.  So let me ask you to -- can you pull

9   out Exhibit 3 that you should have in front of you?

10      A.   I can't read it.

11      Q.   I may be able to show it to you and enlarge it.

12  Hold on.

13      A.   Yeah, I can't read it.

14      Q.   Let me show you it a bit enlarged, which

15  hopefully will help.  Bear with me while I move it

16  around.  All right.  Can you see this document?  It's

17  just enlarged from what should be in front of you.

18      A.   Yes.

19      Q.   Are you able to read my screen?

20      A.   Yes.

21      Q.   So my first question is:  Does the format of

22  this particular document and the information shown in

23  any way look familiar to you?

24      A.   Nope.

25      Q.   My understanding of this particular document is

1  it's sort of a screenshot of available openings at the

2  Lee County Sheriff's Office as of August 15, 2021 as

3  shown in its publicly accessible website for such

4  openings.

5      A.   Okay.

6      Q.   So let me just direct your attention, because I

7  can scroll down to the second line of this particular

8  Exhibit 3.  It says:  From February 15 -- and you look

9  over right, it says:  Communications call taker.

10         Do you recall if that was a position that was

11 an available opening at the LCSO at or about the time

12 you were speaking with Dawn Heikkila on August 23rd?

13     A.   Yes.

14     Q.   The next line -- well, before I go -- it may be

15 more efficient to ask this:  As of August 23 up through

16 the time of your separation date, did you have any

17 interest in applying for the position of communications

18 call taker as shown here?

19     A.   Before August 23rd?

20     Q.   Prior to September 3, 2021, which was your

21 separation date, prior to that, did you have any

22 interest in transferring or applying to a position as

23 communications call taker in lieu of retiring?

24     A.   I was not given the option to apply.

25     Q.   Are you saying someone prevented you from

Jenna Clark
December 07, 2023                              54

1  applying?

2      A.    Correct.

3      Q.    Who is that?

4      A.    That was in the letter, but I never received

5  the letter until the 23rd, the day I talked to Dawn.  I

6  think she emailed it to me because I didn't get the

7  certified letter from the sheriff's office that they

8  gave the 15th.

9      Q.    All right.  We'll get back to those -- to the

10  letter you received in a minute.  So let me just go --

11  before I leave the opening of communications call taker,

12  it's your testimony that you did not apply for that open

13  position because you did not think it was available to

14  you; is that right?

15      A.    I inquired about it because I did look it up,

16  and I saw that, and I asked Dawn about it.  She told me:

17  Jenna, they did not give you an option to apply to

18  anything.

19            And I said --

20      Q.    They didn't give you an option to what?  I'm

21  sorry, I didn't hear you.

22      A.    An option to apply to anything.  She told me

23  that.  But we continued our conversation as a

24  hypothetical conversation, and then she continued along

25  the lines of this requires memory, this requires

Jenna Clark
December 07, 2023                          55

1   attention to detail, this -- and another comment was:

2   You will lose all of your benefits at your director's

3   pay.  They will not pay you that.  It will be reduced to

4   communications or call taker, which was considerably a

5   lot lower than what I was making.

6       Q.   Okay.  And what interest, if any, did you have

7   in still seeking to apply for a communications call

8   taker position despite the fact that it would be at a

9   lesser rate of pay?

10      A.   I was trying to finish out my nine months.

11      Q.   Okay.  Just to be clear on the record, you were

12  trying to finish out your nine months so that at the

13  time you retired, you would be fully entitled to your

14  full benefits under FRS; is that right?

15      A.   That's correct, because I wasn't 62.  I was

16  29.3 years, which I had to be 62 if I didn't have

17  30 years.

18      Q.   So with respect to the communications call

19  taker opening, was it no longer of interest to you once

20  you learned that that pay for that position would be

21  substantially less than that which you were making as

22  purchasing director?

23      A.   Essentially, yes.

24      Q.   And did you have any other discussions, other

25  than what you've already communicated to me in answering

1  my questions this morning, with Dawn about the

2  communications call taker position other than what

3  you've already talked about?

4       A.   There might be more.  I would have to refresh

5  my memory.

6       Q.   But that's all you can think of right now?

7       A.   Right now, yes.

8       Q.   All right.  So getting back to Exhibit 3, the

9  next line is from it looks like June 13, Florida

10 corrections deputy, certified and sponsored.

11           That was a certified position, correct?

12      A.   Correct.

13      Q.   And was that of any interest to you as of

14 August 23, 2021?

15      A.   (No response.)

16      Q.   Did you hear my question?

17      A.   I answered it.  I said no.

18      Q.   Oh, I'm sorry.  I didn't hear you say no.

19      A.   It was of no interest to me.

20      Q.   Okay.  Exhibit 3, the next line says, it looks

21 like from June 24th, a Florida law enforcement deputy,

22 certified and sponsorship.

23           Was that of any interest to you as of

24 August 23?

25      A.   No, sir.

Jenna Clark
December 07, 2023                          57

1      Q.    The next one is a certified law enforcement

2   deputy, school resource officer from July 22nd.

3            Was that of any interest to you?

4      A.    No, sir.

5      Q.    It looks like -- it's not real clear even on my

6   blown-up screen, but it looks like from August 5 of

7   2021, it was an opening for an automotive mechanic.  Was

8   that a position of any interest to you as of August 23?

9      A.    No, sir.

10     Q.    Okay.  So were -- I think you've already

11  testified that during your telephone conversation of

12  approximately 40 minutes with Dawn Heikkila on

13  August 23rd that you had some discussions with her

14  regarding this communications call taker position.  Did

15  you have any specific communications with her about any

16  of these other openings that we just reviewed on

17  Exhibit 3?

18     A.    Not that I recall.

19     Q.    So other than what you've already testified to,

20  do you have any further recollection of what was

21  discussed during your 40-minute conversation with Dawn

22  Heikkila on August 23, 2021?

23     A.    Well, she put me on hold, which she had to

24  check with finance to verify for sure that my director's

25  approved sick time/vacation would be at the lesser rate

1   of a call taker if I was allowed to apply.

2        Q.    Okay.  And did that answer come back while you

3   were on hold or after you were on hold?

4        A.    Yes.

5        Q.    What was the answer?

6        A.    It would be the call taker's salary.

7        Q.    Okay.  All right.  So did that make a

8   difference as to whether you were interested in applying

9   for the communications call taker position once you got

10  that answer or confirmation?

11       A.    Again, I was not allowed to apply.  They did

12  not want me there.

13       Q.    All right.  For the sake of argument, I want to

14  get by what you were allowed to do or not allowed to do

15  and focus on had you been allowed, under your

16  explanation, would you have made an application for the

17  communications call taker position on August 23, 2021 --

18            MR. MACDONALD:  Object.

19  BY MR. STEFANY:

20       Q.    -- or any date thereafter up until your

21  separation date?

22            MR. MACDONALD:  Same objection.

23            You can answer.

24            THE DEPONENT:  Okay.  I'm confused on who I can

25       answer to.

1   BY MR. STEFANY:

2       Q.   Let me try to rephrase it, Ms. Clark, so that

3   you understand my question.

4       A.   Okay.

5       Q.   When you learned that your accrued vacation and

6   sick leave benefits would be paid at the lesser rate

7   applicable to a communications call taker, what

8   difference did that make as of August 23, 2021 as to

9   your interest in applying for that job?

10      A.   Well, I was waiting for the letter to come that

11  she was going to send me along with a packet to see if I

12  had severance, if I had longer to apply for another

13  sheriff's office in my field because I felt I could not

14  go anywhere and apply for anything since I was in a lot

15  of pain.  And I couldn't stop what I was doing at home

16  and apply for something immediately.  If I had had a

17  couple of months like the other group that was given the

18  opportunity to apply and also -- and a longer time

19  period to find something else, I may not have retired.

20  Does that make sense?  I was waiting to see what my

21  options were.

22      Q.   Okay.

23      A.   I couldn't say for sure.  I don't know.  That's

24  for sure.  I don't know.

25      Q.   So as of August 23, 2021 when you're talking

Jenna Clark
December 07, 2023                        60

1  with Dawn Heikkila, you had not yet received her letter

2  notifying you of your termination -- notifying you of

3  the job elimination effective I think it was

4  September 4, 2021, correct?

5       A.   That's correct.

6       Q.   So you receiving the information about what

7  your sick leave and accrued vacation would be paid out

8  at if you applied and received the call taker --

9  communications call taker position, as of that date,

10  August 23rd, you were going to wait and see what else

11  you got in paperwork.  Is that your testimony?

12      A.   Yes, because she said she didn't even get the

13  paperwork until Friday.  She didn't know that they were

14  eliminating my position on the 15th, which the letter

15  was dated.  She did not know about it until Friday, the

16  20th.

17      Q.   Okay.

18      A.   And then that's when she told me over the phone

19  I was not allowed, and then the hypothetical questions

20  kept continuing.  And that's when she told me it was

21  attention to detail and memory, and it was a -- this is

22  what it was -- an academy position, and a call taker 911

23  was the same job.

24      Q.   And can I get you to pull out Exhibit 17 in

25  front of you?

1      A.    (Witness complies.)

2      Q.    Tell me when you have it.

3      A.    Yeah, I have it.

4      Q.    I'm going to show you what we've marked as

5   Exhibit 17 to this deposition, Ms. Clark.  Can you

6   identify this document?

7      A.    Yes.

8      Q.    Would you agree that it's the letter from Dawn

9   Heikkila notifying you that your job had been

10  eliminated?

11     A.    That's correct.

12     Q.    And I think we -- you've made reference to

13  this, but is it your testimony that you received this

14  document via registered mail; is that right?

15     A.    On the 24th.

16     Q.    24th of 2021?

17     A.    Yes, or that's the postmark date.  I don't

18  know.  I still have the envelope.

19     Q.    I'm sorry?

20     A.    I still have it in the envelope.

21     Q.    Have you produced a copy of the envelope to us,

22  if you know?

23     A.    I don't know.

24           MR. STEFANY:  Counsel, can I just request that

25      you double-check that, and if it's not been

Jenna Clark
December 07, 2023                                    62

1    produced, would you add it to your production,

2    please?

3         MR. MACDONALD:  Yes, we can do that certainly.

4   BY MR. STEFANY:

5    Q.   So other than this particular -- this letter is

6   a one-page letter as I look at it, Ms. Clark, was there

7   anything else in the registered mailing that was sent to

8   you that you received on August 24, 2021?

9    A.   No, sir.  I did not receive a packet.

10    Q.   So just this -- what you received was just this

11   letter in an envelope, right?

12    A.   Yes.

13    Q.   This letter being marked as Exhibit 17; is that

14   right?

15    A.   Yes.  Yes, sir.

16    Q.   Okay.  Can you pull out Exhibit 21 from the

17   stack in front of you?

18    A.   (Witness complies.)

19    Q.   Tell me when you have it.

20    A.   I have it.

21    Q.   So this is a three-page set of documents which

22   we previously marked as Exhibit 21.  Do you recognize

23   these three pages?

24    A.   Yes, sir.

25    Q.   So let me get you to identify -- I think the

Jenna Clark
December 07, 2023                                          63

1  first two specifically go together, which looks like a

2  screenshot of your -- possibly of something that you got

3  up on your phone; is that right?

4      A.   Yes.

5      Q.   So identify specifically the first two pages of

6  Exhibit 21 which are marked as Bates -- Plaintiff's

7  Bates Nos. 1 and 2.

8      A.   Okay.

9      Q.   What are those two pages?

10     A.   Those two pages are a screenshot of my phone

11 when I received the DCS, which is the employee software

12 that had generated when you change times or enter time,

13 anything that -- to put in for a sick time, a time off,

14 a day off.  That's what this looks like.

15     Q.   And so as I look at this screenshot, it looks

16 like it's dated August 27, 2021?

17     A.   Yes.

18     Q.   So I gather -- is that the date you obtained

19 this screenshot through this software or did you obtain

20 this screenshot on another date than the 27th?

21     A.   No.  That's what's changed.  She changed it.

22 That's not where that screenshot is.  That's the copy of

23 my phone that's explaining what time was changed.

24 That's the shift on that date I would have been off.

25     Q.   I understand that as of August 27, you had

Jenna Clark
December 07, 2023                                    64

1   originally requested, as I understand your testimony, to

2   take sick leave, correct?

3       A.   Yes.

4       Q.   And you saw through this software that instead

5   of sick leave, that it had been marked as administrative

6   leave with pay or code AWPAY, correct?

7       A.   Correct.

8       Q.   And so I guess I'm trying to figure out when is

9   it that you made a picture of this screenshot to confirm

10  that you were being paid through the use of

11  administrative leave with pay benefits rather than sick

12  leave?

13      A.   It was -- when I talked to AnnMarie, it was

14  that week.  It was the 20th or 21st I was getting these

15  emails, or they would come through through emails, and

16  then they would be -- that's what -- you would get a

17  copy of the change.  I could get a copy.

18      Q.   Okay.  So are you saying that you got an email

19  from this VCSS software -- VCSA -- or VCSApps software

20  on a daily basis while you were out for your surgery and

21  recuperation?  Is that what you're saying?

22      A.   No.  That was originally -- you see the time --

23  it's purchasing, then it's 8 to 18:00.  It's the time

24  period that I worked that day.

25      Q.   That was your normal scheduled shift?

Jenna Clark
December 07, 2023                                    65

1    A.   Yes, but the 27th is the day that I had

2  requested sick.  She changed it, the reason being, admin

3  leave with pay.

4    Q.   Okay.

5    A.   As you can see the original -- I don't know

6  what that was.  Original time 4/30/2021, that could have

7  been when I stopped.  I don't know.  And then approved

8  stamp would be a couple days later.  And my employee

9  number is 1992072.  AnnMarie's approved time stamp --

10  stamped time, excuse me, is 1999062, is her

11  identification.

12    Q.   Okay.  So are you suggesting that this VCSApps

13  screenshot suggests or shows that the approval for -- or

14  the approval was made by AnnMarie on May 4, 2021?

15    A.   That's what it says.

16    Q.   Or do you not know?

17    A.   I don't recall my original approval for this

18  sick time off.

19    Q.   Let me ask it this way.  This may be helpful.

20  Do you recall when you visited your surgeon and

21  confirmed whatever procedure you were going to have in

22  August of 2021?

23    A.   It was probably around May.  I don't remember

24  the exact date, but that's probably around the time,

25  May.

Jenna Clark
December 07, 2023                                66

1      Q.   All right.  So is it possible from your

2   recollection -- let me not ask if it is possible.  Do

3   you have a specific recollection of whether you

4   initially communicated the need to have the surgery and

5   have an absence to AnnMarie as early as May of 2021?

6      A.   It could be --

7      Q.   Okay.

8      A.   -- yes.

9      Q.   All right.  So then let's proceed to the third

10   page of Exhibit 21, and tell me what this particular

11   page is, which is Plaintiff's Bates No. 3?

12      A.   I sent her the text -- I can see that -- Hi

13   there, I left you a message, drains are still in --

14   obviously, that's a Saturday -- and I'm resting.

15         And I told her she could call me on my cell

16   phone, and then she said, call me.

17      Q.   All right.  So if --

18      A.   My dates are -- I'm thinking they're a little

19   off because now that I'm looking at this -- but I know

20   when I talked to her, I just didn't recall the time of

21   when she contacted me.

22      Q.   All right.  So if -- just specifically looking

23   at Plaintiff's Bates No. 3, which is the third page of

24   Exhibit 21, so this is a screenshot photo of your cell

25   phone --

Jenna Clark
December 07, 2023                          67

1      A.    Correct.

2      Q.    -- which includes a text message from AnnMarie

3    Reno that says:  Can you call me.  I have to talk to

4    you.

5           Correct?

6      A.    That's correct.

7      Q.    It doesn't appear to me that it's clear what

8    day that was or what day of the week it was that text

9    was made to you, but do you think that was on the 21st

10   of August 2021?

11     A.    No, I think it was before, but it doesn't

12   change the message.

13     Q.    Sure.  So whenever it was sent, right above

14   that it says:  Read Saturday?

15     A.    Right.

16     Q.    And then there's -- it looks to me like in the

17   blue writing there's a response from you on Saturday at

18   9:09 a.m.  It starts with:  Hi there, I left you

19   message, I'm doing fine -- blah, blah, blah.

20           So you responded Saturday, August 21, 2021 to

21   this text message; is that right?

22     A.    Yes.

23     Q.    At the top of this particular sheet is, it

24   looks to me, like a text message you may have sent to

25   AnnMarie way back on August 10th of 2021; is that right?

Jenna Clark
December 07, 2023                                    68

1     A.   That's correct.

2     Q.   Something about backpacks donation?

3     A.   Yes.

4     Q.   So I think you had already talked about this

5  before, but after this exchange of text messages on this

6  Saturday, which, as I understand it, appears to be at

7  least a reply to you -- replied by you to AnnMarie

8  Reno's text on Saturday, August 21, 2021, correct?

9     A.   Yes.

10    Q.   Then you guys had a brief phone conversation,

11 which we've already talked about?

12    A.   Yes.

13    Q.   And that phone conversation is the first you

14 learned that your job had been eliminated as part of

15 this reorganization, correct?

16    A.   That's correct.

17    Q.   All right.  After talking with AnnMarie Reno,

18 as you've previously testified, on that Saturday, the

19 next person you spoke with at the LCSO was Dawn Heikkila

20 on the following Monday?

21    A.   Concerning her --

22    Q.   Concerning the job situation --

23    A.   But I also made a phone conversation -- I

24 called my staff, and I called Shannon, and I, you know,

25 texted or called the other girls, too.  I don't know if

1  I called all of them.  I don't even remember who I

2  called, but I know I talked to Shannon.  And I texted

3  Jill Jones.  Those are the only people I talked to at

4  the sheriff's office.

5      Q.   Let me just be clear about what you just said.

6  So after talking with AnnMarie Reno on the phone on that

7  Saturday, you recall calling some of your staff members?

8      A.   Correct.

9      Q.   And the purpose of those calls was what?

10     A.   To let them know that she had called me --

11     Q.   Okay.

12     A.   -- while I was off, and I told them, and they

13  were just in shock.

14     Q.   So you mentioned in addition to some of your

15  staff -- in addition to your calling some of your staff

16  including Shannon, you also called Jill Jones or texted

17  her?

18     A.   That's correct.

19     Q.   And what was Jill Jones's title with LCSO at

20  the time; do you remember?

21     A.   Budget.  She was already promoted to budget

22  director.

23     Q.   Why did you contact Jill Jones after talking

24  with AnnMarie Reno?

25     A.   Because it was her birthday, and I -- I told

Jenna Clark
December 07, 2023                    70

1  her -- I didn't talk to her.  I just left her a message

2  and said:  I think they weren't done with reorganizing.

3      Q.   The message you left her, Jill Jones, was a

4  voicemail message or a text message?

5      A.   I don't remember.

6      Q.   The substance of the message you left for Jill

7  Jones was, in part, a happy birthday greeting?

8      A.   Correct.

9      Q.   And, in part, was something about the

10  reorganization?

11      A.   Well, I said -- I don't remember the exact

12  words.  I just said to her that they weren't either done

13  with the reorganizing because we thought -- she's the

14  one that told me:  I think they're all done with that.

15          So I was like -- that's why I made the comment

16  to her.

17      Q.   Okay.

18      A.   I can't tell you when we had the conversation

19  about staffing or anything like that.

20      Q.   Okay.  So as I understand your testimony, you

21  had had some conversation with Jill Jones that dealt

22  with her communicating to you that she thought or it was

23  her -- she was under the impression that the

24  reorganization was no longer continuing or had finished

25  or something to that effect?

Jenna Clark
December 07, 2023                                    71

1      A.   Correct.

2      Q.   And you don't remember specifically when that

3   conversation took place, but it was sometime prior to

4   the time you went out for your surgery in August of

5   2021?

6      A.   Correct.

7      Q.   And so part of your message that you left with

8   Jill Jones other than the birthday greeting was to sort

9   of say the reorganization isn't finished.  Did you

10   indicate that you had just received notification that

11   your job had been eliminated?

12      A.   Yes.

13      Q.   All right.

14      A.   Yes, that Ann --

15      Q.   Go ahead.

16      A.   -- that AnnMarie called me and told me my job

17   was eliminated.

18      Q.   And did you leave anything -- did you say

19   anything else in this message that you left Jill Jones

20   other than what you said?

21      A.   I don't recall.

22      Q.   And just to be clear, this communication with

23   Jill Jones took place before you then talked with Dawn

24   Heikkila on August 23?

25      A.   Yes, because it was her birthday.

Jenna Clark
December 07, 2023                                          72

1      Q.   Okay.  Is her birthday actually the 21st?

2      A.   Yes, because my granddaughter's is the same

3 day.  I always remember.

4      Q.   Okay.  Thanks.  And the conversation you had

5 with the staff members that you've identified as well as

6 Shannon Lehman, was that also on the 21st?

7      A.   Yes.

8      Q.   So let me make sure that -- you've given me

9 some indication of the scope of the communications you

10 had in your telephone conference with Dawn Heikkila on

11 August 23, 2021.  After you were discussing the

12 communications call taker position and you got the

13 information or confirmation about at what rate the

14 accrued sick leave and accrued vacation would be paid

15 out if you took that position, was there anything else

16 discussed with her that we haven't already talked about

17 during that call on August 23rd?

18      A.   Just that she asked me to contact Doreen Sal --

19 I forget how to say her last name.  She's benefit, and

20 she --

21      Q.   Salvagno?

22      A.   Yes, yes.  I asked her -- or she told me to

23 contact Doreen and set up an appointment to come and see

24 her, so that's what I did.  I don't recall if I talked

25 to her that day, like she transferred me to her or not,

1   or if I just called her back on my own and then set up a

2   meeting.

3       Q.   All right.  And then how many meetings with

4   Doreen Salvagno did you have?  Just one or were there

5   multiple meetings with her?

6       A.   I had one in the office and then probably

7   talked to her on the phone a couple of times after --

8   before and after maybe.

9       Q.   Okay.

10          MR. MACDONALD:  David, do you think we could

11      take a quick break soon?

12          MR. STEFANY:  Yeah.  We can take it right now.

13          MR. MACDONALD:  Perfect.

14          MR. STEFANY:  It's also -- I see that it's also

15      12:15 or so.  We also could take a meal break at

16      this point if you wanted to go ahead and do that,

17      and then we can reconvene at whatever time everybody

18      is agreeable to.

19          MR. MACDONALD:  Yeah, that would be great.

20      Could we take like an hour?  Would that work?  Come

21      back at like 1:15?

22          MR. STEFANY:  That's fine with me.

23          Michelle, does that work with you?

24          THE COURT REPORTER:  Yes, that's fine with me.

25          MR. STEFANY:  All right.  We'll be back at

Jenna Clark
December 07, 2023                              74

```
 1      1:15.

 2             MR. MACDONALD:  Perfect.

 3                      (Lunch Recess)

 4        A F T E R N O O N   S E S S I O N

 5   BY MR. STEFANY:

 6      Q.   Ms. Clark, I'm reminding you you're still under

 7   oath.

 8      A.   Okay.

 9      Q.   Make sure -- test your microphone to make sure

10   we're hearing you.

11      A.   Can you hear me?

12      Q.   Yes.  Thank you.  I just want to make sure

13   we're hearing you.  So, Ms. Clark, you mentioned earlier

14   before we took our meal break that you had had a message

15   you left with Jill Jones sometime after receiving or

16   having a discussion on the morning of August 21, 2021

17   with AnnMarie Reno, and I just wanted to ask you a

18   question.  It referenced -- or you referenced in

19   describing that message you left to Jill Jones that

20   there had been some sort of meeting that you had had

21   with her or a discussion you had had with her about

22   whether or not the sheriff's office reorganization was

23   completed or over or was finished or something to that

24   effect.  Do you recall that testimony?

25      A.   Yes, it was months before, and people were
```

Jenna Clark
December 07, 2023                                        75

1   always nervous that they were still going to get rid of

2   people.  So we had a conversation, and she said, yeah, I

3   believe they're all done with all that.

4        Q.   So was that a conversation that -- I know you

5   don't recall specifically when it took place.  That's

6   fine.  But is that a conversation that you believe took

7   place sometime in early 2021?

8        A.   It could have been in 2021.

9        Q.   Okay.

10       A.   But I don't know positively.  I don't know if

11  it was or wasn't.  I just had a conversation with her.

12       Q.   And was that conversation something where you

13  initiated the discussion about getting that assurance

14  from Jill Jones or was it something that just kind of

15  came up random, if you know what I mean?

16       A.   Just random.  I don't know who started it.

17       Q.   So the other thing I wanted to do is between

18  the time that you talked with AnnMarie Reno on the

19  morning of August 21st and contacting Dawn Heikkila on

20  the morning of August 23rd of 2021, what -- other than

21  looking at what open positions there were, which I

22  understand you did, did you do any sort of research

23  about what the positions entailed, how much they paid,

24  those kinds of things?

25       A.   No.  I asked her about it.

Jenna Clark
December 07, 2023                               76

1      Q.    Okay.  So let me get you to look at Exhibit 4

2   that you should have in front of you somewhere.

3      A.    Okay.

4      Q.    Have you seen this document before?  It's a

5   four-page document.

6      A.    No.

7      Q.    So let me identify it for the record.  It

8   appears to be a copy of a job opening for communications

9   call taker closing on September 30, 2021.  The date of

10  this particular image is August 2nd of 2021, and the

11  second page sort of is an advertisement or a graphic of

12  the type of hiring that this position was seeking.  It

13  says:  Communications 911 call taker, full time, $36,500

14  a year, with a various description beneath that of -- it

15  says:  What we offer, with various bullet points.

16          Did you ever understand or come to have any

17  kind of understanding of what the full-time salary and

18  available benefits would be for this position that was

19  open as of August of 2021?

20     A.    No.  I asked Dawn on Monday.

21     Q.    When you say Monday, that refers to

22  August 23rd, 2021?

23     A.    Yes.

24     Q.    If you know, did Dawn have any relative or

25  family member who was working as a communications call

1   taker at that time?

2       A.   Yes.  I don't know -- I think it was her

3   stepson.

4       Q.   Okay.  And do you know how long her stepson had

5   been working as a communications call taker at that

6   time?

7       A.   No.

8       Q.   At any point during the communication on the

9   23rd of August 2021 with Dawn Heikkila, did you ask any

10  of the specifics, salary or benefits, that went with

11  this particular position of a communications call taker?

12      A.   We all have the same benefits, so that wouldn't

13  change.  It was just the salary.  All she basically told

14  me was quite a bit lower than what I was making.

15      Q.   Yeah, well, 36,500 a year was the salary being

16  offered in this open position.  You were making over

17  93,000 a year at that time; is that right?

18      A.   Around that.  I'm not sure of the exact amount.

19      Q.   Did you understand from the discussions you had

20  with Dawn on the morning or -- on August 21 -- no --

21  August 23, 2021 -- I'm sorry for the confusion -- did

22  you come to have an understanding that the salary was

23  actually that low, 36,500, or was it you just knew that

24  it was way lower than what you were making?

25      A.   I just knew it was more than half.  I was

Jenna Clark
December 07, 2023                              78

1   making more than -- half more than the salary.

2        Q.    And it was your understanding, and I was

3   saying, the significant drop in salary for that position

4   that the benefits would have been the same as a

5   full-time employee of the LCSO, correct?

6        A.    Benefits are the same.

7        Q.    And then a lot of the benefits, as you

8   understood them, pertained to how long you had been

9   employed, what seniority you had and those kinds of --

10  tenure you had with the agency, correct?

11       A.    Well, I don't really know.  We didn't get into

12  the -- to see if I would have had my four weeks vacation

13  taken from me, too.  Who knows?  But like I said, I was

14  never offered an opportunity to apply anyway.

15       Q.    Do you have any recollection of whether Dawn

16  Heikkila said to you during this telephone conference

17  with her on August 23, 2021 whether you should consider

18  it or look into it or anything along those lines, like a

19  recommendation one way or the other?

20       A.    She recommended that I take my retirement and

21  call Doreen.

22       Q.    And did she explain why she recommended that

23  you take the retirement or did she just make that

24  recommendation?

25       A.    She said to look into the penalty, I believe,

Jenna Clark
December 07, 2023                    79

1  and she was stating that I had no choice.

2      Q.    Okay.

3      A.    That I was not given the opportunity to apply

4  for another position.  So she's telling me, you have to

5  do this or you're going to be terminated.

6      Q.    Let me get you to turn to Exhibit 13.  Do you

7  have that in front of you?

8      A.    Yes.

9      Q.    Have you seen these pages before?

10      A.    Yes.

11      Q.    So for purposes of identification, Exhibit 13

12  is a copy of the attendance report for you as the

13  purchasing director for the LCSO for the period of time

14  between July 25, 2021 and your separation date.  On the

15  second page of Exhibit 13, if you refer to the date

16  beginning August 17, 2021, it shows that you were

17  provided with three hours of administrative leave with

18  pay.  Do you see that?

19      A.    Yes.

20      Q.    It looks like from that point forward until and

21  including your separation date of September 3, 2021, you

22  were provided ten hours of administrative leave with

23  pay.  Do you recall that that was the pay that you

24  received for the rest of the tenure of your employment?

25      A.    Yeah.  For the attendance report, yes.

Jenna Clark
December 07, 2023                                    80

1    Q.   Okay.  And then if you look to Exhibit 16 to

2   the multiple-page exhibit, can you pull that out and

3   open it up for a second?

4    A.   (Witness complies.)

5    Q.   Do you have that in front of you?

6    A.   Yes.

7    Q.   So from a view from 5,000 feet, so to say, this

8   is a copy of a section of the LCSO's operations manual,

9   and it's a part of Chapter 22, which is the chapter on

10  Compensation and Benefits.  Are you familiar with the

11  operations manual of the LCSO --

12   A.   Yes.

13   Q.   And with respect to the section which is

14  essentially Chapter 22.2 entitled Benefits, is this

15  consistent with your understanding of what benefits and

16  leave policies the LCSO had in effect in and around your

17  separation date in 2021?

18   A.   Yes, it looks like it.

19   Q.   So when you got the call from AnnMarie Reno on

20  the 21st of August 2021, did at any time thereafter did

21  you go and pull up this particular chapter of the

22  operations manual to research or try to get a better

23  understanding of what types of separation benefits you

24  would be entitled to as part of a decision you may make

25  to retire and leave the employment of the sheriff's

Jenna Clark
December 07, 2023                                    81

```
 1  office?
 2      A.    No.
 3      Q.    I think you testified earlier that you were put
 4  on hold for some period of time when you were speaking
 5  with Dawn Heikkila on the morning of August 23, 2021
 6  where she was verifying something with respect to how
 7  your vacation -- accrued vacation and accrued sick leave
 8  would be paid out upon separation if you went further
 9  with a potential interest in the communications call
10  taker position.  At any time did the confirmation
11  information about the answer to that inquiry, did it
12  reference part of this Exhibit 16 or section of this
13  exhibit, or did it not get that granular, so to speak?
14      A.    Did she talk about 22?
15      Q.    Yeah.
16      A.    No, no.
17      Q.    Can I get you to pull up Exhibit 7.  Tell me
18  when you have it.
19      A.    I have it.
20      Q.    Have you seen this document before?
21      A.    Yes.
22      Q.    Do you recognize it as the EEOC charge of
23  discrimination statement, which you executed on
24  November 16, 2021?
25      A.    Yes.
```

Jenna Clark
December 07, 2023                                        82

1      Q.    So is that your signature on the bottom of the

2    first page of Exhibit 7?

3      A.    Yes.

4      Q.    You, in fact, signed this document on the 16th

5    of November 2021?

6      A.    Yes.

7      Q.    And the next several pages after that first

8    page is a typewritten document.  Did you prepare this

9    typewritten document, or did somebody else prepare it

10   for you?

11     A.    Somebody else.

12     Q.    Did you view or review this statement before

13   you signed the first page of Exhibit 7?

14     A.    Yes.

15     Q.    And did you confirm in reviewing the

16   typewritten part of Exhibit 7 that all the statements

17   made therein were accurate and correct to the best of

18   your knowledge?

19     A.    At that time, yes.

20     Q.    Let me ask you a couple questions about some of

21   the statements made in this attachment to your charge,

22   Exhibit 7.  So in paragraph 5 of the statement, it says

23   you began working for the LCSO as a financial assistant.

24   Was that your initial title?

25     A.    That's correct.  That's what I started off in,

1    finance.

2        Q.   So at some point after you had been in finance,

3    you went to a new department or broke out to a new

4    department, if that's the better language.  How far into

5    your many years of employment with the LCSO did you

6    leave the finance department and go to a new department?

7        A.    Under a year.  It was probably more than six

8    months, but it was under a year.

9        Q.   Okay.

10       A.    Approximately.

11       Q.   So as I understand your testimony, you were

12   only in the finance division for -- or department for

13   less than a year or approximately --

14       A.   Well, technically working in finance, but at

15   one point in my career, purchasing fell under finance's

16   department.

17       Q.   Okay.  And did it become its own separate

18   division or department approximately 2012?

19       A.   I don't know.

20       Q.   Okay.  My recollection is you were promoted to

21   the position of director of purchasing in 2012; is that

22   right?

23       A.   I was -- I probably had eight years, so

24   probably.  I don't know the exact date.  I'd have to

25   count back.

Jenna Clark
December 07, 2023                                    84

1    Q.    Let me ask it this way:  Did the creation of

2    the purchasing department becoming its own standalone

3    department, did that coincide with your promotion to the

4    position of director?

5    A.    No, because it happened when I was a manager in

6    purchasing.

7    Q.    Okay.

8    A.    We were separate from them, and I fell under

9    budget services.

10   Q.    Okay.

11   A.    I can tell you by who was the director or the

12   manager in finance who I did not work for.

13   Q.    All right.  Well, I can get that from the

14   various reports.

15   A.    Okay.

16   Q.    Let me ask you this:  Can I draw your attention

17   to paragraph 8 of the typewritten supporting statement,

18   which is part of Exhibit 7?  It says:  On or around

19   August 12, 2021, claimant took approved sick leave for a

20   scheduled surgery.

21         That date is actually the 17th of August,

22   correct, to be accurate?

23   A.    I think she's going by the letter that was from

24   the August 12th meeting when I wrote the letter to Dawn,

25   and that's where the 12th came in.  But, yes, my actual

Jenna Clark
December 07, 2023                                           85

1   scheduled surgery was the 18th.  I took three hours off

2   on the 17th for the drive over here.

3       Q.   Okay.  So directing your attention further in

4   the document to paragraph No. 12, it says:  Claimant

5   then noticed on the system database, quote, email

6   workflow, close quote, that her previously approved sick

7   leave had been changed to, quote, admin leave with pay,

8   close quote.

9            Do you see that?

10      A.   Yes.

11      Q.   When did you notice that particular change in

12  the system database?  Do you remember?

13      A.   It was before I talked to AnnMarie because I

14  asked her about it in my conversation.  So this is a

15  little bit off.

16      Q.   So when you asked her about it in the

17  conversation you had with AnnMarie Reno on the morning

18  of August 21, 2021, what did AnnMarie say in response,

19  if anything?

20      A.   She didn't.  She didn't.  She just told me,

21  repeated again, and said:  Your job has been -- your

22  position has been eliminated due to reorganizing, and I

23  needed to notify Dawn on Monday, 8/23.

24      Q.   So then going to paragraph 14 of the attachment

25  to Exhibit 7, or part of Exhibit 7, it says:  On or

Jenna Clark
December 07, 2023                              86

1   around August 23, 2021, claimant met with Heikkila to

2   discuss the status of her position and see what other

3   options would be available to her.

4         In fact, you didn't meet with Heikkila, you

5   talked with her over the phone; isn't that true?

6       A.   That's correct.

7       Q.   And that's that 40-minute conversation you've

8   already talked about, right?

9       A.   Correct.

10      Q.   Okay.  In paragraph 15, what you're referencing

11  that Dawn Heikkila told you was all part of the same

12  40-minute meeting -- or excuse me -- 40-minute

13  conference over the phone?

14      A.   That's correct.

15      Q.   So it looks like in paragraph 16, the second

16  sentence of paragraph 16 says:  Claimant expressed to

17  Heikkila that she was interested in applying so that she

18  could continue her employment at least until her

19  retirement date matured, and that is something that you

20  expressed to Dawn Heikkila during the meeting on

21  August 23 -- not the meeting, the conference -- on

22  August 23, 2021?

23      A.   That's correct, before I got the letter and

24  before she told me that I did not have that option.

25      Q.   Paragraph 17 goes on to say:  When claimant

Jenna Clark
December 07, 2023                                                87

1  expressed her interest in applying, Heikkila told

2  claimant that the jobs posted were academy positions

3  which required strict testing to even be considered.

4          This reference to academy positions, are those

5  certified positions that we discussed earlier?

6      A.   No.  They're academy positions.  They have to

7  go through a training prior to being able to work those

8  jobs.

9      Q.   And this was all part of the same telephone

10 conference you had with Dawn on the 23rd of August 2021?

11     A.   Yes.

12     Q.   Paragraph 18 goes on to say:  Heikkila also

13 advised that even if you were to get one of the

14 available positions, you would likely not be able to

15 receive your accrued sick leave or vacation time earned

16 at the rate of your current position as purchasing

17 director.

18         Did Dawn Heikkila say that to you in the

19 meeting -- in the conference on August 23rd?

20     A.   Yes.  Then she put me on hold and checked with

21 finance to make sure she was correct in telling me that.

22     Q.   So when is it, if you recall, when is it

23 between the period of August 23, 2021 when you met with

24 Dawn -- when you talked with Dawn Heikkila over the

25 telephone and your separation date of September 3, 2021,

1   when during that gap of time did you make the decision

2   to resign and retire with FRS?  Do you remember?

3       A.   Maybe a week later.  I'm not sure.

4       Q.   Let me to get you to pull out Exhibit 6, and

5   that's --

6            MR. STEFANY:  That was initially, Kyle, that

7       one that my staff left out of the stacks of -- I

8       assume it got in the right space for the witness.

9            MR. MACDONALD:  Yes, we should be good.

10  BY MR. STEFANY:

11      Q.   Tell me when you have Exhibit 6 in front of

12  you, Ms. Clark.

13      A.   I have it.

14      Q.   So do you recognize Exhibit 6 as a copy of your

15  call detail on your agency-issued phone?

16      A.   Yes.

17      Q.   And this particular call detail is for the

18  period beginning August 2, 2021 and ending August 23,

19  2021; is that right?

20      A.   Yes.

21      Q.   So let me just direct your attention to the

22  second page of this particular exhibit.  If you scroll

23  down to the date in the far left-hand column, the date

24  of August 21, it looks like there's a communication at

25  7:59 a.m. to (239) -- or from ████████████.  Is that

1    AnnMarie Reno's number; do you know?

2        A.    Yes.

3        Q.    And a follow-up communication to the same

4    number at 9:10 a.m.

5            Do you see that?

6        A.    On the same day, yes.

7        Q.    So those two calls are two communications on

8    August 21.  Do you understand those communications sort

9    of coincide with a text message and then your

10   communication over the phone with AnnMarie Reno?

11       A.    You're telling me one at 7:59, that that was in

12   a text message?

13       Q.    I'm assuming, but I'm asking you.  I don't want

14   to make the assumption.

15       A.    I don't know.  I can see it -- it just says

16   Fort Myers, so I would say --

17       Q.    So you're not sure.  That's okay.  If you're

18   not sure --

19       A.    I can't tell because I was looking at what was

20   incoming because she called me back.  I don't know.  I

21   don't know if that's a text or if that's a call.

22       Q.    That's fair.  If you scroll down a couple other

23   spots to the communications using your agency phone on

24   August 23, the very first one is at 8:09 a.m. to a

25   number that's (239) 850-5927.  Do you know whose number

Jenna Clark
December 07, 2023                                    90

1   that is?

2       A.   I don't.

3       Q.   The next number at 10:09 a.m. is (239)

4   477-1000.  Was that your call to Dawn Heikkila?

5       A.   I would say so.

6       Q.   And the next call is to area code (713)

7   623-1433.  Do you know what number that is?

8       A.   It's an incoming, so it could have been a spam

9   call.  I don't know.

10      Q.   Fair enough.  Thank you.  Can you pull out

11  Exhibit 22 in front of you, please?  Tell me when you're

12  there.

13      A.   I have it.

14      Q.   So for the record, Exhibit 22 are Plaintiff's

15  Bates No. 8, 9 and 10.  Have you seen these documents

16  before, Ms. Clark?

17      A.   Yes.

18      Q.   So by page number as referenced by the red

19  printing in the bottom right-hand corner, can you

20  identify each sheet of these -- of Exhibit 22 for me,

21  tell me what they are?

22      A.   They are my final checks.

23      Q.   So the very first document of Exhibit 22, which

24  is Plaintiff's Bates No. 8, that's your final paycheck

25  for the final pay period that you were employed by the

1   LCSO?

2       A.   You're talking about 8, the first one?

3       Q.   Yeah.

4       A.   I think so.

5       Q.   And if I look in the top left-hand corner of

6   the printout of the check stub, it looks like you're

7   being paid 80 hours of administrative leave with pay?

8       A.   Okay.

9       Q.   In that pay of 2,525.48; is that right?

10      A.   Yes.

11      Q.   So then the next page, which is Plaintiff Bates

12  No. 9, slightly cut off in the top right-hand corner,

13  but do you know what this particular document reflects,

14  this particular page?

15      A.   Sort of.

16      Q.   Yeah, the way we got it is it's slightly cut

17  off.

18      A.   It's one of my final checks.

19      Q.   If I look in the top left-hand corner, it looks

20  like to me like it may reflect the payout of accrued

21  sick leave for 100 hours.

22      A.   That's what it looks like.

23      Q.   Do you recall receiving a payout of 100 hours

24  of sick leave at the time you were --

25      A.   Yeah, these are my pay stubs.

Jenna Clark
December 07, 2023                                    92

1      Q.    Okay.  And the third page, Bates No. 10,

2  appears to be a separate stub for the payout of vacation

3  -- accrued vacation; is that correct?

4      A.    Yes.

5      Q.    Okay.

6      A.    That's correct.

7      Q.    And that's for 404.51 hours?

8      A.    Yes.

9      Q.    So is it a true statement, Ms. Clark, that upon

10  your separation from employment with the LCSO that you

11  received a payout of all accrued benefits that you were

12  -- that you believe you were entitled to under the

13  sheriff's policy's benefits?

14      A.    Under the policy's, yes.  Did I get all of my

15  sick pay, no.

16      Q.    Okay.  So explain that distinction that you

17  just made.  You did not get all of your sick leave?

18      A.    Things were changed, and I'm not sure what my

19  sick pay was, but you've only got half of the sick pay.

20  But that's like I said, that was per policy out of so

21  much.  If you were there a certain amount of time, you

22  got more than you did when you were a new employee.

23  They wouldn't have paid you the same amount of money.

24      Q.    So if I understand your testimony, you're

25  saying you got the -- you got the accrued sick leave

Jenna Clark
December 07, 2023                                        93

1  payout that you were entitled to under the policy, and

2  that amount was 100 hours; is that right?

3      A.    I don't remember.  It could have been 200 and

4  then they pay you 100 because they cut it in half.

5      Q.    By policy, correct?

6      A.    Correct.

7      Q.    Okay.  Can you pull out Exhibit 8.  Tell me

8  when you're there.

9      A.    Okay, I have it.

10     Q.    Exhibit 8 is a several page document dated

11 August 2, 2022 to you from the U.S. Equal Employment

12 Opportunity Commission.  Have you seen this before?

13     A.    Yes.

14     Q.    This reports to be the dismissal of your charge

15 of discrimination and the notice of your right to sue

16 concerning the charge of discrimination that you filed

17 against the sheriff's office; is that right?

18     A.    That's correct.

19     Q.    And during the course of the EEOC's

20 investigation into your charge of discrimination, did

21 you actively stay in touch with the EEOC and review the

22 documentation in your investigative file?

23     A.    I tried to.  It took a long time for this

24 investigation.

25     Q.    Can you pull up Exhibit No. 9?

1    A.    I have it.

2    Q.    Do you recognize this document?

3    A.    Yes.

4    Q.    It purports to be communications via email to

5    various individuals, including myself, including

6    lauren@dereksmithlaw.com, and including yourself at

7    ██████████@gmail.com.

8          Do you see that?

9    A.    Yes.

10   Q.    So the only real question I have is if you go

11   to the second -- these are not consecutively numbered,

12   but it's the second sheet of Exhibit 9, which is an

13   email, which was -- looked like it was sent on the 29th

14   of April 2022 to kia@dereksmithlaw.com and to you at

15   your email address that you've identified earlier today.

16   Do you see where I'm referring to?

17   A.    Yes.

18   Q.    So do you remember receiving this email?

19   A.    What is body of message could not be extracted?

20   Q.    Where are you referring to?  I'm sorry.

21   A.    The last page, body of message could not be

22   extracted.

23   Q.    I don't know what that means, Ms. Clark, to

24   answer your question, but that appears to be an email to

25   kia@dereksmithlaw.com dated December 29, 2021.  I was

1  referring to the email specifically on the second page

2  of Exhibit 9 that was sent to you and

3  kia@dereksmithlaw.com on April 29, 2022.  My question

4  was do you remember receiving this April 29, 2022 email?

5      A.   It says I received it.  I must have received

6  it, but I don't recall it.

7      Q.   Okay.  That's fair.  Just ask you two -- very

8  first paragraph -- first two paragraphs of this

9  particular email, it says, and I quote, EEOC has

10  provided the position statement that Lee County Sheriff

11  Office submitted on your charge -- referencing the

12  charge number.  To review the position statement and any

13  relevant attachments or supplements, please go to the

14  EEOC public portal as soon as possible, choose the,

15  quote, my cases, close quote, option, and log in to

16  review your charge.

17          Do you see that?

18      A.   Yes.

19      Q.   Did you do that when you received that email or

20  do you have any recollection of doing that?

21      A.   I may have, but I don't recall if I did or not.

22      Q.   That's fine.  Next paragraph says:  It will be

23  helpful to EEOC's investigation if you provide a

24  response to the respondent's position statement by

25  May 19, 2022.

Jenna Clark
December 07, 2023                                          96

1          Do you see that?

2     A.   Yes.

3     Q.   Do you recall whether you or your

4  representative ever submitted a response to the position

5  statement?

6     A.   I did not, and it would have been her, but I

7  don't know.

8     Q.   Okay.  Fair enough.  Can you jump ahead to

9  Exhibit 15 and tell me when you've pulled it from the

10  pile?

11     A.   I have it.

12     Q.   Okay.  Let me represent to you that the

13  documents contained in Exhibit 15 are similar to the

14  documents that are set forth in Exhibit 24, which have

15  been generally described to me as your FRS file.  So

16  with that introduction, I just have some specific

17  questions about Exhibit 15.  Just take a minute to flip

18  through that and see if you recognize the documents

19  which comprise Exhibit 15.  Tell me when you're done.

20     A.   I did, and I -- there's pages on here that

21  Randy Bauer signed.  I did not see these before.  So

22  those are all -- I don't have copies of that.  Looks

23  like everything else I've seen.

24     Q.   All right.  So let me just identify -- let's

25  just go by it from the top forward.  The first page of

1    Exhibit 15, you've seen that before, correct?

2        A.    Yes.

3        Q.    In the middle of the section, there's a space

4    that says:  Member signature, sign in the presence of a

5    notary.

6              That's your signature; isn't it?

7        A.    That's correct.

8        Q.    And the notary that notarized your signature is

9    Doreen Salvagno who was -- she was the FRS specialist at

10   the LCSO, correct?

11       A.    Correct.

12       Q.    The date she's notarizing your signature is

13   August 27, 2021.  Did you sign this document as part of

14   your meeting with her on August 27th?

15       A.    There's the date, yes.

16       Q.    The next page, the second page of Exhibit 15,

17   is another form notarized by Doreen Salvagno on the 27th

18   of August.  Again, in the section called member

19   signature, that's your signature, correct?

20       A.    That's correct.

21       Q.    The third page of Exhibit 15 is another form

22   notarized by Doreen Salvagno on August 27, 2021, and the

23   signature next to the field entitled Member Signature,

24   that's also your signature, correct?

25       A.    That's correct, and that was revised after

Jenna Clark
December 07, 2023                                    98

1    this.

2        Q.    This Option 1 was --

3        A.    Correct.  I switched to Option 2.

4        Q.    Okay.  That may be in Exhibit 24.  We'll get to

5    that.  The next page of Exhibit 15 is a spousal

6    acknowledgment form.  At the top of the page in the

7    field notarized signature of member, that's your

8    signature again, correct?

9        A.    Yes.

10       Q.    With Doreen Salvagno notarizing your signature

11   on August 27, 2021?

12       A.    Correct.

13       Q.    And it looks a couple days later, three days

14   later, your husband signed on this acknowledgment form

15   as well?

16       A.    Yes.

17       Q.    Were you present when he did that?

18       A.    No.  I think he went there.

19       Q.    Okay.

20       A.    Because she signed it, so she -- I didn't go

21   with him.

22       Q.    So I'm going to skip the next several pages.

23   If you go to the document part of Exhibit 15, which in

24   the bottom right-hand corner is identified as

25   Defendant's Bates No. 700.  Can you get to that page?

1    A.   I'm there.

2    Q.   Is that the page you said you haven't seen

3 before?

4    A.   That's correct.

5    Q.   All right.  And the rest of these appear to be

6 copies of some faxes.  Can you go to page 703?

7    A.   Okay.

8    Q.   Have you seen that document before?

9    A.   Yes.

10   Q.   When did you first see this particular page

11 703 -- Defendant's Bates No. 703?

12   A.   Well, it says at the top, created on the 23rd.

13   Q.   Okay.  Is that when you --

14   A.   She must have given it to me on the 27th, I

15 would say.

16   Q.   Okay.

17   A.   But I'm not a hundred percent, so I'm pretty

18 sure.

19   Q.   When you say "she," are you referring to

20 Doreen?

21   A.   Yes.  Doreen would have printed that.

22   Q.   Okay.

23   A.   I think it could have been Dawn.  I don't know.

24 But I do have a copy.

25   Q.   As I understand, Defendant's Bates No. 703,

Jenna Clark
December 07, 2023                          100

1   this is a statement of what your -- essentially your

2   retirement benefit is going to be based upon your

3   anticipated separation date of September 3, 2021,

4   correct?

5       A.   Yes.  I got this before I actually retired.

6       Q.   Okay.  Then continuing on with the pages to the

7   next page, Defendant's Bates No. 704, the top of that

8   sheet in the field called Signature of Payee.  That's

9   your signature again dated October 1, 2021?

10      A.   Yes.

11      Q.   Is this another document that you had to go

12  back in to sign with Doreen at the beginning of October,

13  or did you sign it on that day in August when you

14  visited her office, if you know?

15      A.   Originally, I was going to have the option for

16  my husband to be under the insurance of the sheriff's

17  office so I wouldn't have to pay, but I later changed it

18  so I would have a higher option in No. 2 without paying

19  for it.

20      Q.   Okay.  Can you pull out Exhibit 24?  And for

21  the record, while you're pulling it out, I'll reference

22  that Exhibit 24 is Plaintiff's Bates Nos. 15 through 28.

23      A.   Yes, I have it.

24      Q.   All right.  I'm going to try to skip over what

25  I've already asked you about which are replicated here.

Jenna Clark
December 07, 2023                                    101

1   Can you turn to what is referenced as Plaintiff's Bates

2   No. 18?

3       A.   Yes.

4       Q.   So this particular page that was not part of

5   the other packet that I had -- so what is happening with

6   this particular page?  Can you explain it?

7       A.   This is what I was talking about.  That was my

8   insurance for my husband, I think is what that is.

9       Q.   Okay, which shows a coverage period of 9/5/2021

10  through 9/30/2021 and life insurance -- or retiree life

11  insurance through December 31, 2021 for an amount due of

12  $480.85; is that right?

13      A.   Yes.

14      Q.   And is that something that you reviewed with

15  Doreen Salvagno when you met with her on August 27,

16  2021?

17      A.   Yes.

18      Q.   All right.

19      A.   This is the health insurance for my husband,

20  and I couldn't afford it.

21      Q.   Okay.  The next page, Bates -- Plaintiff's

22  Bates Nos. 19 and 20, that's just a summary of the

23  benefits of life insurance.  Is this for your husband or

24  for you?

25      A.   I think that's me.

Jenna Clark
December 07, 2023                                        102

1     Q.   Okay.  Shows effective date of October 1, 2013

2  in the amount of $5,000, correct?

3     A.   Correct.

4     Q.   And then the next page, which is Plaintiff's

5  Bates 21, is another statement to you for Retiree &

6  Dependents - Medical, Dental, Vision, Month of October

7  2021 in the amount of $551.26; is that right?

8     A.   That's correct.

9     Q.   There is no check attached to this, so did you

10 stop and is that when you made the change not to pay

11 this amount?

12    A.   Yes.  When I saw how much it was going to be, I

13 said, I can't afford this, so I just took him off the

14 insurance.

15    Q.   Okay.  The next page, Plaintiff's Bates No. 22

16 says:  Retiree -- is entitled:  Retiree worksheet for

17 medical benefits information only, October 2020 through

18 September 2021.  It's got your name with a date of

19 August 23, 2021 with a retire date of September 4, 2021.

20 Did you review this document with Doreen Salvagno when

21 you met with her on August 27th?

22    A.   Yes.

23    Q.   For lack of a better description, does this

24 summarize sort of the cost of additional medical

25 benefits and what amount you would have to pay for your

Jenna Clark
December 07, 2023                    103

1  continued coverages once you retired?

2      A.   Yes.

3      Q.   The very last page of Exhibit No. 24, which is

4  Plaintiff's Bates page 28, is an individual life

5  conversion Request for Information Form.  Do you know

6  what this is?

7      A.   I think this is when I was employed, if you

8  were in the Caesar class, you received double your

9  salary as a life policy.  I'm thinking that's what this

10 is.

11     Q.   Okay.

12     A.   Because I'm not sure -- this is like a

13 termination of that policy.

14     Q.   And is the -- if you recall, what opportunity,

15 if any, did you have to continue this policy in effect

16 at your own cost after you retired?

17     A.   I don't recall.

18     Q.   Okay.  So for what period of time do you

19 recall, Ms. Clark, did AnnMarie Reno assess or give you

20 an annual performance evaluation for your role as

21 purchasing director of the LCSO?

22     A.   Once a year.  It wasn't always on my

23 anniversary date, but normally, I got them every year.

24     Q.   And how long -- I mean, if I look back to

25 almost 2011 or 2012, it looks like it was AnnMarie

Jenna Clark
December 07, 2023                                    104

1    Reno who evaluated your performance on an annual basis,

2    and I think that there was one year that William

3    Bergquist evaluated your performance; is that right?

4        A.    If that's what you have.  I don't recall, but

5    it sounds right.

6        Q.    And did you have any issues working under the

7    supervision of William Bergquist for the period he

8    supervised you?

9        A.    No, sir, I did not.

10       Q.    Did you have any issues working under the

11   supervision of AnnMarie Reno during the period she

12   supervised your employment?

13       A.    No.  No, sir, I did not.

14       Q.    Let me quickly look at some of the

15   documentation concerning those evaluations.  Can you

16   pull up Exhibit 10?

17       A.    Okay.  I have it.

18       Q.    So Exhibit 10 is Defendant's Bates pages 597

19   through 599.  It appears to be an annual evaluation form

20   for you as purchasing manager for the rating period of

21   June 5, 2011 to June 4, 2012 with an overall rating by

22   AnnMarie Reno of exemplary performance.

23            Do you see that?

24       A.    Yes.

25       Q.    And was it typical when AnnMarie Reno gave you

Jenna Clark
December 07, 2023                                    105

1   your annual performance evaluation as purchasing

2   director, would she actually meet with you and discuss

3   the evaluation or was it more something that was

4   exchanged say via email?

5       A.   No.  We had all of them like this.

6       Q.   I'm sorry?

7       A.   They were all -- are you talking about a form?

8       Q.   No.  I'm talking about when it was delivered to

9   you, was it something she would sit down and talk to you

10  about and give it to you and talk about it, or was it

11  something she would email to you and then you would

12  review it separately?

13      A.   No.  We would sit down in her office.

14      Q.   Okay.  So with respect to Exhibit 10, I'll

15  direct you to the final page.  Is the final page that's

16  entitled:  Official career and counseling plan, is the

17  final page of Exhibit 10, is that something that you

18  completed yourself?

19      A.   Yes.

20      Q.   All right.  So that was something that you

21  would have prepared and then attached to your annual

22  evaluation for that period?

23      A.   Yeah.  It looks like the rating period is a

24  little off; isn't it?

25      Q.   Yeah, maybe a typo.  I've made a few of those

Jenna Clark
December 07, 2023                                    106

1   myself.

2       A.   Yes.  You had to -- because she would attach

3   them, and then our system changed on our evaluations, so

4   she would like them to be emailed so then she could

5   attach them, but I guess there was a time though that we

6   would have to sign into her computer to proof it, and

7   then they would print it, and then she'd get a copy.

8       Q.   Okay.

9       A.   Normally, she always -- she always -- I always

10  did when I evaluated.  I always sat down with the

11  person, talked about it, then evaluated; but she usually

12  evaluated ahead of time.  It's like pushing a button

13  like to file it, and then the number pops up.

14      Q.   Let me get you to turn to Exhibit 11.  Can you

15  pull that out and get it in front of you and tell me

16  when you've got it?

17      A.   Okay.

18      Q.   Exhibit 11 is Defendant's Bates page 591, pages

19  591 to 596, which purport to be your annual evaluations

20  for the rating period June 5, 2012 to June 4, 2013.  And

21  this appears to have been done by William Bergquist with

22  an overall rating of exemplary performance.

23           Do you see that?

24      A.   Yes.

25      Q.   Do you recall why it is that William Bergquist

Jenna Clark
December 07, 2023                              107

1   is doing your annual evaluation for this rating period,

2   and the prior period, AnnMarie Reno did it?

3       A.   I think she might have asked him because she

4   didn't have time.  I don't know.

5       Q.   And the final page of Exhibit 11, which is

6   Defendant's Bates No. 596, it looks like a handwritten

7   official career and counseling plan.  Is all the

8   handwriting on that document yours?

9       A.   Yes.

10      Q.   Okay.  Can you turn to Exhibit No. 12.  Tell me

11  when you're there.

12      A.   I'm there.

13      Q.   So for the record, this is Defendant's Bates

14  pages 567 through 590.  Tell me when you're done looking

15  it over.  I don't want to ask you questions while you're

16  still looking at it.

17      A.   Okay.  I'm not completely done, but go ahead.

18      Q.   All right.  Well, I want to start with the back

19  of that document because it kind of goes

20  backwards/forward to more recent evaluations.  So if you

21  turn to Defendant's Bates pages 588 through 590, would

22  you agree that this is your annual evaluation for the

23  rating period of 2013 to 2014?

24      A.   That's what it says.

25      Q.   So it appears that the evaluation form has

1  changed from the ones we looked at earlier, and the

2  second page of this particular 2013-2014 evaluation

3  looks like it has got a field for career counseling

4  plan.  Do you see it in the second page about -- towards

5  the top half.  It has got short-term goals and long-term

6  goals.

7      A.   Yes.

8      Q.   Is that information in the short-term goal and

9  long-term goal information that you would have inserted

10 into this form?

11     A.   Yes.

12     Q.   Okay.  And then going to the next evaluation,

13 which are Bates pages 585 through 587 for the rating

14 period of 2014 to 2015 with the same question, is the

15 career counseling plan information as inserted into the

16 second page of this evaluation information you would

17 have inserted into that form?

18     A.   Yes.

19     Q.   If you go to the next evaluation, which is

20 Defendant's Bates pages 582, 584, rating period for the

21 period of 2015-16, the second page of that form again

22 has career counseling plan with some comments inserted.

23 Are those comments inserted by you?

24     A.   Yes.

25     Q.   Can I ask you a question on the second comment

1   that you've got there on the short-term goal?  It says:

2   See the new Tyler System implemented.

3           What's the Tyler System?

4       A.   That was a whole new software that entitled --

5   incorporating finance, purchasing, benefits, HR.  I'm

6   trying to think what else.

7       Q.   So that was an agency-wide software program

8   that was new --

9       A.   Yes.

10      Q.   -- as of that period?

11      A.   Uh-huh.  It was -- it took about two, two and a

12  half years to implement it from start to finish.

13      Q.   Okay.  All right.  Let's go to the evaluation

14  for 2016-2017, which is Defendant's Bates 579 through

15  581.  On the second page of that form, which is Bates

16  page 580, the career counseling plan comments, those are

17  comments that you inserted into the rating form,

18  correct?

19      A.   Yes.

20      Q.   Going to the next evaluation, which is for the

21  rating period of 2017 to 2018, is Defendant's --

22      A.   Wait.  Let me add one thing.  I believe around

23  this time period, they changed the rating scale from

24  either these standards or required improvement.  I don't

25  think that it's both.  I mean, I don't think it was all

Jenna Clark
December 07, 2023                                   110

1  the other ones anymore, EP.  I think this might have

2  been the year that it started.

3     Q.   Yeah, I believe you're right.  I think that was

4  the change.

5     A.   I think that's what started the change, so it

6  makes it look like I'm not getting EPs anymore, but I

7  think it's -- they're almost the same.

8     Q.   Yeah.  I think beginning in 2016-2017, MS, or

9  meets standards, was the highest rating you could get.

10    A.   Correct.

11    Q.   I agree with you.

12    A.   I wanted to point that out.

13    Q.   Thank you.  So the next evaluation for '17-'18

14  is Bates pages Defendant's 576 through 578.  Again, the

15  second page, the career counseling plan comments, those

16  are comments that you inserted into the form, correct?

17    A.   Yes.

18    Q.   And then continuing with this particular

19  exhibit, Bates pages 573 to 575, is your annual

20  evaluation for the period 2018 to 2019.  And my only

21  question is, again, the comments inserted into the form

22  in the section of career counseling plan, those are

23  comments that you inputted into the form, correct?

24    A.   Yes.

25    Q.   The next --

Jenna Clark
December 07, 2023                                    111

1        A.    By the way, the Tyler is a Munis.   That was

2   what was implemented, the one that you were asking me

3   about.

4        Q.    Oh, yeah.   Okay.

5        A.    The system.

6        Q.    So the next evaluation in this Exhibit 12 is

7   Bates pages 570 to 572, which is your annual evaluation

8   for the period of 2019 to 2020.   My only question again

9   is to confirm that the comments inserted in the career

10  counseling plan on the second page of the form is -- are

11  comments that you added to the form, correct?

12       A.    It looks almost identical to the other one.

13       Q.    Is it?

14       A.    So I don't know, but probably because it kind

15  of looks the same.

16       Q.    Certainly is similar.

17       A.    Yeah, I was going to say that.

18       Q.    All right.   I think the final one is for the

19  period of June 5, 2020 to June 4, 2021, Bates No. 567 to

20  569.   The specific comments in the second page of the

21  form in the section entitled career counseling plan,

22  those are comments that you inserted into the form?

23       A.    Yes.

24       Q.    The short-term goal section, in a

25  parenthetical, you've got (Hurricane IMT).   What does

Jenna Clark
December 07, 2023                          112

1  that stand for?

2      A.   To train the other people to do what I did.

3  That is -- emergency management team is what that is.

4      Q.   Does that IMT

5   stand for emergency management team?

6      A.   No, not emergency.  It's -- dang, what's the I

7  stand for?  Anyway, it's the team that gets together --

8  it's a class you have to take for anything that's

9  emergency or hurricane or anything devastating.  In the

10  role that I was as director, I needed to train Shannon

11  to make sure -- and AnnMarie was so adamant about get

12  these -- train them on everything, train them on

13  everything, especially hurricane stuff.  So I did a

14  whole book before I left, and I had everything for them.

15  And that was probably a month before I left, I had

16  everything there for them.

17      Q.   Okay.

18      A.   So they would know what to do.

19      Q.   So you did complete that before you left?

20      A.   Oh, yes, absolutely.

21      Q.   Thank you.  Can you pull out Exhibit 14?  Do

22  you have it?

23      A.   I do.

24      Q.   Have you seen this before?

25      A.   Only like very recent.

Jenna Clark
December 07, 2023                                    113

1    Q.   So you did not see it while you were
2    employed --
3    A.   Absolutely not, no.  You see the date?  I
4    wasn't even there.
5    Q.   I understand.  Do you have any recollection of
6    interactions with AnnMarie Reno concerning the subject
7    matter of this memo?
8    A.   Yeah, but not the way that it's currently
9    worded.
10   Q.   Just tell me what you remember about your
11   communications with AnnMarie Reno about this subject
12   matter.
13   A.   I don't remember anything about most of it, but
14   she's talking about -- how do I want to say -- the VOICE
15   volunteer turning into the civilian support unit, we've
16   talked about that, yes.  But I don't recall any kind of
17   insubordination about anything like this.  I didn't act
18   like that.  I wasn't that way.  And the thing that she
19   has got in there, I do recall that, but I didn't --
20   she's more of a different personality than me.  She's a
21   bit overbearing, so I have to argue with that, that I
22   did not try to intimidate or do anything with her, talk
23   over her.  I might have had questions for her because
24   she was taking that project, and I think I wanted to be
25   involved more than I was.  But I was very excited.  That

1   was a long-term goal that I wanted done for many, many

2   years, and I was very happy that it was going to get

3   done, even if it was her doing it.

4        Q.   So what do you remember, if anything, about the

5   inventory or the request to get the inventory reduced on

6   certain of these I guess shirts and other things related

7   to VOICE, I guess?

8        A.   It was my responsibility and Shannon's

9   responsibility to clean out the old storage room because

10  the new stuff had come in.  We were still utilizing

11  those clothes for the existing people in addition to

12  before -- well, they were getting the old stuff before

13  we got the new in.  So there wasn't any reason to get

14  rid of them as -- get rid of them now.  I mean, she made

15  it out to be a big deal.  It wasn't that big a deal.  I

16  think she just had to write something up about me when I

17  left.  This is crazy.  I never saw anything about it.

18       Q.   So other than just daily sort of what I would

19  call normal interactions with AnnMarie Reno, you don't

20  recall having a specific communication with her about

21  the topic of this memo, correct?

22       A.   She never showed me this memo.  I was there on

23  the 16th.  When she says on Monday, she walked down to

24  purchasing to inquire about the project moving along, I

25  was there.  I might have been at lunch, but I was in the

1    office.  I worked on the 16th and the 17th.  So for her

2    to say that I wasn't there -- and she talks to everybody

3    else -- is just kind of a -- trying to get a bad comment

4    on me as to terminate me.

5        Q.   All right.  Let me ask you to turn to

6    Exhibit 20, which for the record, is Defendant's Bates

7    pages 4386 to 4412, tell me when you're there.

8        A.   I'm here.  Did you give me the page number?

9        Q.   I was just identifying for the record the pages

10   of Exhibit 20.

11       A.   Okay.

12       Q.   So do you recognize Exhibit 20?

13       A.   It's an old inspection, it looks like.

14       Q.   Yeah.  My understanding is this was a workload

15   assessment and staff inspection conducted on the

16   purchasing department in October of 2020, correct?

17       A.   Correct.

18       Q.   And it's my further understanding that you were

19   the principal liaison with the person conducting the

20   analysis and inspection for the purchasing --

21       A.   Correct.

22       Q.   And it's my further understanding that while

23   recommendations were made to hire two additional

24   purchasing agents, that that recommendation was not

25   approved, so no additional hires were made, correct?

Jenna Clark
December 07, 2023                                116

1     A.    Correct.

2     Q.    Okay.

3     A.    But it wasn't my recommendation.  I gave that

4  to the budget director for her to see that we needed

5  more people.

6     Q.    Understand.  And that -- back in October of

7  2020 when the analysis was being conducted and the

8  recommendations were being made, were you still using

9  VOICE volunteers at that time in your department --

10    A.    I'm sure we were.

11    Q.    -- when needed?

12    A.    Yes.

13    Q.    Okay.  Can you look at Exhibit 23?  For the

14  record, this is Plaintiff's Bates pages 13 and 14.  Do

15  you recognize this?

16    A.    I have it.  Yes.

17    Q.    What is it?

18    A.    It's a bunch of junk that was in my desk that

19  the girls bagged up and forgot to give it to me when I

20  picked up my stuff.

21    Q.    Oh, okay.

22    A.    It's nothing in here.  It's just -- like in a

23  junk drawer.

24    Q.    Did you get these documents returned to you?

25    A.    Yes.

Jenna Clark
December 07, 2023                                              117

1      Q.   And Julianna Wilson, that's your daughter?

2      A.   Yes.   That is the wrong daughter though because

3  she's in North Carolina.   It was Jami that brought it to

4  me.

5      Q.   Okay.  All right.  I just wanted to ask you

6  about the list because it was given to us as part of

7  your documentation.

8      A.   Okay.

9      Q.   I've got a couple more documents I want to

10 review with you, but this is a good time for a break.

11          MR. STEFANY:  So let's take ten minutes.

12          THE DEPONENT:  Okay.

13          MR. MACDONALD:  Sounds good.

14          MR. STEFANY:  I'll finish up with about three

15     more documents.

16          THE DEPONENT:  Thank you.

17                    (Recess)

18 BY MR. STEFANY:

19     Q.   Ms. Clark, can you pull out Exhibit 25?

20     A.   Okay.

21     Q.   Do you recognize this document?

22     A.   Yes.

23     Q.   For the record, this is a copy of the amended

24 complaint that is pending before the federal court in

25 your lawsuit against Sheriff Marceno.  Did you review

1  this amended complaint before it was filed with the

2  court?

3      A.   Yes.

4      Q.   And in reviewing the complaint, did you check

5  to confirm that the statements made in the document as

6  far as you knew were accurate and correct?

7      A.   Yes.

8      Q.   Let me go to page 4 of Exhibit 25, specifically

9  paragraph 21.  So you assert that AnnMarie Reno had held

10 supervisory authority over you, including but not

11 limited to the power to hire, fire, demote and promote

12 you and the ability to direct your work, correct?

13     A.   Yes.

14     Q.   So what period of time are you referring to

15 there?  I know when it ended.  So it ended when you left

16 your employment with the LCSO.  When did it begin?

17     A.   I don't recall.  Ever since she was over my

18 department.  She was always under the bureau, and then

19 when she took over in Bill's position, I think that

20 that's when she was -- I don't know, whatever it was,

21 2012?  It was probably before that.

22     Q.   So in making this statement in paragraph 21 of

23 your amended complaint, is it your understanding that

24 Ms. Reno was the decisionmaker in eliminating your

25 position as purchasing director?

Jenna Clark
December 07, 2023                                            119

1           MR. MACDONALD:  Objection; form.

2    BY MR. STEFANY:

3        A.   No.

4        Q.   Whose decision was it as best you understand?

5           MR. MACDONALD:  Objection; form.

6    BY MR. STEFANY:

7        A.   I would have said it's the sheriff in -- the

8    undersheriff, Holloway.

9        Q.   Okay.  And what is that understanding based on?

10       A.   Because I know how -- what goes on over there.

11   She has always said if we were asked to do something and

12   I didn't agree with something, she said he's the

13   sheriff, and if that's what the sheriff wants, that's

14   what we're doing.  So if the sheriff wanted that done,

15   if -- it would have been told to her that she would

16   eliminate my position.

17       Q.   And what role -- or what's your understanding

18   of the basis that the undersheriff was involved in

19   making the decision to eliminate or recommend

20   eliminating your position?

21       A.   He pretty much makes all the decisions.

22       Q.   Decisions or recommendations; is that your

23   testimony?

24       A.   Okay.  You could say recommendations or

25   decisions, yes.

Jenna Clark
December 07, 2023                                    120

1      Q.    Let me refer you to paragraph 22 through 24 of

2   your complaint, which is on page 5 of Exhibit 25.

3   Review those comments to yourself just a second, and

4   tell me when you're done.

5      A.    Okay.

6      Q.    So with respect to paragraphs 22 and 23, my

7   understanding is back in 2019, you had to undergo a

8   certain surgical procedure and recuperate from that

9   surgery, so you sought leave from your scheduled work as

10  purchasing director for that purpose?

11     A.    Correct.

12     Q.    You sought leave from AnnMarie Reno, and it was

13  approved, correct?

14     A.    Correct.

15     Q.    And do you remember how long approximately you

16  were out before you returned?

17     A.    It was five weeks.

18     Q.    And in paragraph 24, you say:  After you

19  returned from surgery, Ms. Reno began to make comments

20  which included, quote, you should look into going on

21  disability, close quote.

22          Can you describe for me when or the context

23  within which that comment was allegedly made?

24     A.    It was one of the times that I went down to her

25  office either to discuss work or just going to have

Jenna Clark
December 07, 2023                                              121

1   conversations with her about job duties or whatever.

2   And she just -- we're sitting face to face, like you and

3   I, and she said this to me.  And she said -- and I

4   looked at her because her words were:  You should look

5   into going on disability.  In other words, like I will

6   help you with that.  And I was confused.  And I said,

7   for what, I'm not disabled.  She looked at me and she

8   gestured, for all of that, and she waved it over my

9   chest.

10      Q.   Okay.  So at the time she allegedly made this

11  comment to you, it was still 2019?

12      A.   Yes.

13      Q.   And what did you say in response, if anything?

14      A.   I said, for what?  I'm not -- I just looked at

15  her.  I don't even remember if I had a comment.

16      Q.   Okay.  And was anything else said at that time

17  or during that conversation other than what you've got

18  alleged here?

19      A.   That's all I recall, but if I could back up, I

20  can tell you what happened after when I was on leave,

21  and she was trying to help me come back, and she was

22  doing an intermittent.  She said:  I'll get you back in,

23  and if you're tired, you can go home, and you can work

24  so many hours and do that.  So she was going to get with

25  Dawn.  So she tried getting with Dawn, and they went

1   back and forth, and then it was kind of like happening.

2   And then she called me back and said:  No, we can't do

3   that.  You just have to either come back or not come

4   back.  Basically, we can't have you working part of the

5   day and not part of the day.  Well, I know other people

6   have done that as far as people that have been employed.

7   It has been done, but they did not let me do that.

8            And the other comment that was very offensive

9   was at the time, there was a scan project going on in

10  records.  And anybody that was on -- on sick time or

11  modified duty because they had a certified position

12  where they had to be -- they couldn't fulfill their

13  duties, but they were able to work -- they were

14  scanning.  She was going to put me in the scan room.

15           I said:  Why are you putting me in the scan

16  room?

17           I was so upset.  I said:  I have a perfectly

18  good desk.  I can sit at my desk.  I'm not doing

19  anything physical.

20           And that's why I came back in five weeks.  My

21  doctor signed off on it, and I came back in five weeks

22  because she was trying to target me as not the same as

23  the other directors or other executive employees to go

24  in the scan room and scan all day.  That was a big waste

25  of my time and the department's time.

Jenna Clark
December 07, 2023                                      123

1      Q.   So when you were making comments or references

2  to this discussion with AnnMarie about intermittent

3  leave, is that something that occurred prior to your

4  surgery or after your surgery?

5      A.   No, this was after my surgery.

6      Q.   But prior to you returning full time, whenever

7  it was you did?

8      A.   Yes.

9      Q.   And then the possibility of doing the scanning

10  job that you're referencing, that's the job in

11  records --

12      A.   Correct.

13      Q.   -- that is conducted to preserve records needed

14  by the agency?

15      A.   Yes.

16      Q.   And that's a job, as I'm understanding your

17  testimony, that's a job that a lot of times certified

18  members of the agency that need light duty are assigned

19  to do to get them contributing something on a light-duty

20  fashion, right?

21      A.   Correct.

22      Q.   Okay.

23      A.   Being productive, not taking all of their sick

24  time, and then also helping the scan room out.

25      Q.   In paragraph 26, you say:  Soon thereafter,

1  Reno began making comments about Ms. Clark's salary and

2  retirement benefits.  These comments included but were

3  not limited to, quote, you know, we pay 30 percent of

4  your salary to the FRS, right, close quote, and comments

5  of a similar nature.

6           Do you see that?

7      A.   Yep.

8      Q.   So can you give me the context of any of the

9  comments that you're referencing in paragraph 26 when

10 Ms. Reno allegedly made those comments to you?

11     A.   The same situation where I was in an office and

12 we were talking about business, and it would come out of

13 the blue.  She said that to me a couple of times.  And I

14 was like, well, everybody else gets -- I don't think I

15 said it to her, but I may have -- everybody else that's

16 on the -- as the directors, they all -- they pay

17 everybody 30 percent, not just me.

18     Q.   Okay.  And when -- do you have any idea

19 temporally when those alleged comments were made to you

20 by Ms. Reno?

21     A.   2020.  That's all I can recall.

22     Q.   Okay.

23     A.   I had actually came back to the office, and I

24 told the manager that.  I said, do you believe this is

25 what she told me?

Jenna Clark
December 07, 2023                          125

```
 1            I couldn't believe it.
 2      Q.    When you say the manager, that's Shannon
 3   Lehman?
 4      A.    Correct.
 5      Q.    Paragraph 27 of your amended complaint says,
 6   and I quote, Reno made these discriminatory comments
 7   towards Ms. Clark with the implication that Ms. Clark
 8   was being overcompensated or somehow was not deserving
 9   of her retirement benefits.  I think of is misspelled.
10            Is that your belief or is that just argument?
11   I'm just trying to figure out --
12      A.    That is what I felt like.
13      Q.    Okay.  Paragraph 30, you're referencing a sick
14   leave request.  That's the request to have the surgery
15   in August of 2021, correct?
16      A.    Correct.
17      Q.    You reference -- in paragraph 30, you reference
18   Dawn Heikkila.  And as of -- let me just say the date --
19   in August of 2021, and let's use a specific day,
20   August 23, 2021, when you met with her, did you consider
21   Dawn Heikkila a friend?
22      A.    Well, we've known each other a long time.  I
23   mean, we are work acquaintances, but yeah, I considered
24   her a friend.
25      Q.    Okay.
```

Jenna Clark
December 07, 2023                                    126

1      A.   I mean, when you work with people a long

2  time -- you don't hang out.

3      Q.   In paragraph 33, paragraphs 32, 33, you're

4  stating Ms. Clark -- excuse me.  You're stating that

5  Ms. Heikkila advised you to hold off on submitting any

6  FMLA paperwork essentially suggesting in paragraph 33

7  that they get back to it if necessary, but it ended up

8  being it wasn't necessary to get back to the FMLA

9  paperwork; isn't that right?

10          MR. MACDONALD:  Objection; form.

11  BY MR. STEFANY:

12     A.   No, that's not true.

13     Q.   How is that not right or how is that not true?

14  Explain that to me.

15          MR. MACDONALD:  Same objection.

16  BY MR. STEFANY:

17     A.   It's not true because she was going to do the

18  paperwork if I needed that extra time, but she never did

19  any paperwork.

20     Q.   Okay.

21     A.   Because I wasn't there.

22     Q.   All right.  So this jumps ahead a little bit in

23  Exhibit 25, but you asserted in Exhibit 25 a claim under

24  the Family and Medical Leave Act.  And I know you're not

25  a lawyer, so I'm not asking you a legal question.  I'm

Jenna Clark
December 07, 2023                                              127

1  trying to understand the basis that you understand that

2  you have an FMLA claim arising out of the way

3  Ms. Heikkila and the agency, in this case the LCSO,

4  handled your request for sick leave.  So how --

5           MR. MACDONALD:  Object to form.

6  BY MR. STEFANY:

7      Q.   Tell me your understanding of how -- what they

8  did was different than what they were supposed to do

9  under the law, if you understand that.  If you don't,

10 tell me you don't understand it.

11          MR. MACDONALD:  Same objection.

12 BY MR. STEFANY:

13     A.   Well, she should have done the paperwork when I

14 sent it to her, but if she wasn't too busy, she would

15 have done the paperwork.

16     Q.   Were you aware of a practice at the LCSO that

17 for exempt employees seeking FMLA leave of less than

18 seven days, that the FMLA paperwork was typically not

19 required?

20     A.   It was actually three days.  After three days,

21 she told me that's when they do the FMLA paperwork.  I

22 don't know about the exempt part, but I know that was

23 for regular employees, because I did it.

24     Q.   When you say "she told me," is that Dawn that

25 told you?

Jenna Clark
December 07, 2023                                      128

```
1        A.    Correct.

2        Q.    When did she tell you that?

3        A.    When I had other people out that were going to

4   be longer than three days.

5        Q.    People you supervised in purchasing?

6        A.    Yes, in my staff.

7        Q.    In paragraph 33, you say that your request for

8   sick leave was nonetheless approved by both AnnMarie

9   Reno and Dawn Heikkila, correct?

10       A.    Yes.

11       Q.    And it not only says that in your complaint,

12  but that's the truth, that's what happened, right?

13       A.    Yeah.

14       Q.    Okay.  In paragraph 40 of your amended

15  complaint, Exhibit 25, again, just to make sure I'm

16  clear, the reference to academy positions that are being

17  discussed there, that's reference to the communications

18  call taker position?

19       A.    Yes, sir.

20       Q.    In paragraph 59 of your complaint, if you turn

21  over a couple pages.

22       A.    (Witness complies.)

23       Q.    Are you on that page?

24       A.    Yes.

25       Q.    It says in part beginning with the second
```

Jenna Clark
December 07, 2023                    129

1  sentence in paragraph 59:  The defendant's [sic]

2  discriminatory treatment included, but was not limited

3  to, making age-related disparaging remarks to plaintiff.

4          When is the last age-related disparaging remark

5  that a member of the LCSO made to you?

6      A.   Well, I would say when Dawn said that it -- I

7  took it as I couldn't retain memory, and attention to

8  detail.  Like I couldn't learn anything because I was

9  too old.

10     Q.   Well, she didn't say you were too old; did she?

11     A.   No, but it's the way it makes it sound.  That's

12  how I took it.

13     Q.   Let me just be clear to make sure you and I are

14  communicating effectively.  I asked you specifically

15  when was the last time someone at the LCSO made a

16  disparaging age-related remark to you.  And you've

17  identified your meeting with Dawn on August 23rd and

18  about attention to detail.  I hear that.  Anything other

19  than that?

20     A.   I don't recall right now, but I might think of

21  something later.

22     Q.   Okay.  Are there any documents or notes that

23  would reference or help you reference or remember any

24  other age-related disparaging remarks?

25     A.   Possibly, but I don't remember right now.

1    Q.   The next sentence -- or the next phrase is

2    pressuring the plaintiff to go on disability or

3    otherwise retire.

4          What comments were made to pressure you to go

5    on disability other than what you referenced earlier

6    about what AnnMarie Reno said after you came back from

7    your 2019 absence?

8    A.   Only pressuring about retiring was when she

9    would say to me:  Make sure if you train everybody, make

10   sure everybody knows all of your work.  It's your job --

11   train her on everything that you do.

12   Q.   The next phrase says in paragraph 59:

13   Preventing you from using your leave benefits.

14          What are you referencing there?  Is that the

15   August 2021 absence?

16   A.   Yes.

17   Q.   Anything else?

18   A.   Not that I can recall right now.

19   Q.   And the final part of that paragraph 59 says:

20   Preventing you from applying for other employment

21   positions with defendant.

22          I understand your earlier testimony that on

23   August 23, 2021, you allege that Dawn Heikkila indicated

24   that there was no other position you could apply for; is

25   that right?

Jenna Clark
December 07, 2023                    131

1       A.    That is correct.

2       Q.    Other than that, are you referring to anything

3   other than what Dawn Heikkila allegedly told you on

4   August 23rd?

5       A.    And the letter that I received.

6       Q.    Skipping over to paragraph 68 of your amended

7   complaint, Exhibit 25, it states, and I quote, plaintiff

8   engaged in a protected activity when she opposed the

9   defendant's unlawful discriminatory conduct on the basis

10  of her age.

11          What are you referring to by way of your

12  opposition to the defendant's unlawful discriminatory

13  conduct on the basis of your age?

14          MR. MACDONALD:   Objection; form.

15  BY MR. STEFANY:

16      A.    FMLA.

17      Q.    I'm sorry?

18      A.    FMLA.

19      Q.    That's the FMLA request for your absence in

20  August of 2021?

21          MR. MACDONALD:   Objection; form.

22  BY MR. STEFANY:

23      A.    Protected activity is FMLA.

24      Q.    I hear you say that.  I'm referring to is that

25  the FMLA request that you made for your surgery in

1    August of 2021?

2        A.    Yes.

3        Q.    Anything else other than that?

4        A.    I can't think of anything right now.

5        Q.    In paragraph 83, you assert, and I quote,

6    defendant violated the FMLA by unlawfully interfering,

7    restraining, and denying plaintiff's use and/or

8    attempted use of her leave benefit under the FMLA,

9    specifically defendant instructed plaintiff not to

10   submit FMLA leave requests and denied plaintiff's

11   request to use her FMLA leave benefits in or around

12   August of 2021, close quote.

13           Is that an accurate description of what you

14   alleged defendants did with respect to your August 2021

15   leave request?

16           MR. MACDONALD:   Objection; form.

17   BY MR. STEFANY:

18       A.   I didn't get any forms from them that they were

19   going to do -- or any paperwork for FMLA at all.

20       Q.   I understand that you did not get the forms,

21   and we've already talked about that and some email

22   communications that you had with Dawn Heikkila.  So in

23   support of the accuracy of paragraph 83, who at the Lee

24   County Sheriff's Office instructed you not to submit

25   FMLA leave requests as you're referencing there?

Jenna Clark
December 07, 2023                        133

```
1            MR. MACDONALD:  Objection; form.
2   BY MR. STEFANY:
3        A.   I'm confused.
4        Q.   Can you identify a person who instructed you
5   not to submit FMLA leave requests in August of 2021; yes
6   or no?
7        A.   I sent an email to Dawn, which is what we
8   already talked about.  So what else was I supposed to
9   do?
10       Q.   Isn't it true, Ms. Clark, that Dawn Heikkila
11  communicated to you that she would send you the forms if
12  your leave of absence turned out to be needed for more
13  than seven days?
14       A.   Correct.
15       Q.   Paragraph 84, you assert that you suffered or
16  would continue to suffer financial and economic damages
17  in the form of lost wages and lost benefits in light of
18  the FMLA interference that you're complaining about.
19            Can you identify for me what financial and
20  economic damages you suffered because in this particular
21  case you were put on paid administrative leave for your
22  entire absence instead of FMLA?
23            MR. MACDONALD:  Objection; form.
24  BY MR. STEFANY:
25       A.   I was terminated.
```

Jenna Clark
December 07, 2023                          134

1      Q.   My question, Ms. Clark, is that you were put on

2   paid administrative leave with pay or administrative

3   leave with pay, whatever the phrase is, for the entire

4   period of your requested absence; isn't that true?

5      A.   Of my requested absence.  I didn't request to

6   leave the department.

7      Q.   Well, leave is a type of absence that's

8   permitted, right?

9      A.   Correct.

10      Q.   I mean, you're familiar with that?

11      A.   Yes.

12      Q.   So you asked for sick leave for seven days to

13   have your surgery and to recuperate from the surgery,

14   correct?

15      A.   Yes.

16      Q.   And instead of using sick leave, you were given

17   paid administrative leave for the entire period of your

18   absence; isn't that right?

19      A.   Yes.

20           MR. MACDONALD:  Objection; form.

21   BY MR. STEFANY:

22      Q.   So can you identify for me what financial or

23   economic damages you suffered due to the fact you were

24   put on administrative leave with pay rather than on sick

25   leave or FMLA?

Jenna Clark
December 07, 2023                                        135

```
 1      A.   I can't answer that question.

 2           MR. MACDONALD:  Objection; form.

 3   BY MR. STEFANY:

 4      Q.   I can't hear you.  What was your answer?

 5      A.   I can't answer that question.

 6      Q.   The answer is none, isn't it?

 7           MR. MACDONALD:  Objection; form.

 8   BY MR. STEFANY:

 9      A.   (No response.)

10      Q.   Let me ask it differently.  How would you have

11   been better off if you had been put on sick leave and

12   had to use sick leave out of your accrued leave bank?

13   How does that make you economically better off?

14           MR. MACDONALD:  Objection; form.

15   BY MR. STEFANY:

16      Q.   Can you answer that question, ma'am?

17           MR. MACDONALD:  Same objection.

18   BY MR. STEFANY:

19      A.   No, I can't answer.

20      Q.   In paragraph 93 of Exhibit 25, it states, and I

21   quote, plaintiff engaged in a protected activity when

22   she exercised and/or attempted to exercise her right to

23   leave benefits under the FMLA and when she opposed the

24   defendant's unlawful conduct and violation of the FMLA.

25           My understanding from your complaint is that's
```

Jenna Clark
December 07, 2023                           136

1  referencing again your leave request in August of 2021,

2  correct?

3      A.   Yes.

4      Q.   Paragraph 95 says the defendant retaliated

5  against you by engaging in conduct which includes

6  eliminating your position.

7           Is it your belief, Ms. Clark, that your

8  position was eliminated because you requested a leave of

9  absence to have surgery in August of 2021?

10     A.   I don't know.

11          MR. MACDONALD:  Objection; form.

12 BY MR. STEFANY:

13     Q.   Your answer is I don't know?

14     A.   I don't know.

15          THE DEPONENT:  Can I take a break?

16          MR. STEFANY:  Yeah.  You need five minutes, ten

17     minutes?  What do you need?

18          THE DEPONENT:  Ten.

19          MR. STEFANY:  So we'll return at 3:36.

20          MR. MACDONALD:  Okay.  Perfect.

21                       (Recess)

22 BY MR. STEFANY:

23     Q.   Ms. Clark, let me get you to turn to

24 Exhibit 27.  Tell me when you're there.

25     A.   Okay.

1    Q.   For the record, Exhibit 27 is your response to

2    defendant's first request for production of documents in

3    the litigation against Sheriff Marceno.  Did you have a

4    chance to review this response before it was served upon

5    the sheriff's counsel?

6    A.   Yes.  Not in this format, but, yes.

7    Q.   So the documents that your attorney has

8    produced identifying the initial disclosures that you

9    generally described in Exhibit 1 to this deposition

10   today constitutes 283 pages of documents as identified

11   in your response to request No. 1.  Do you agree with

12   that?

13   A.   How many documents?

14   Q.   283 documents.

15   A.   Oh, I don't know the exact number.

16   Q.   Okay.  Let me ask the question this way:  Are

17   there any documents related to your claims that you have

18   asserted against the sheriff in this case other than the

19   documents which you and your attorney have produced in

20   response to this request for production which appears as

21   Exhibit 27?

22   A.   I don't believe so.

23   Q.   Can you pull out Exhibit 26?

24   A.   Okay.

25   Q.   For the record, this is your responses to the

Jenna Clark
December 07, 2023                                    138

1  sheriff's interrogatories which were served upon me as

2  the sheriff's counsel of record in this case under

3  certificate of service dated November 20, 2023.  Do you

4  remember reviewing these responses to the

5  interrogatories and signing them electronically on or

6  about November 2023?

7       A.   Yes.

8       Q.   Let me just ask a couple of questions about

9  some of the responses that you've given.  In response to

10  Interrogatory No. 4, which appears as part of Exhibit

11  26, can you get to that answer?  These are not numbered

12  pages, unfortunately.

13       A.   Yes.

14       Q.   Basically it's asking you about efforts to

15  obtain employment with any employer since August 15,

16  2021 to the present.  In partial response, you say you

17  began working with Works of Mimi, LLC in February of

18  2023; is that right?

19       A.   Yes.

20       Q.   So was that the first compensable earnings that

21  you've had since retiring with the FRS on September 3,

22  2021?

23       A.   No.

24       Q.   What was the initial earnings that you had or

25  what additional earnings have you had?

Jenna Clark
December 07, 2023                         139

1       A.   My retirement.

2       Q.   Okay.  Other than your retirement benefits.

3       A.   Okay.  Nope.  That's -- I started a little

4    business.

5       Q.   Okay.  And how often since you started this

6    residential painting business, how often -- well, I

7    assume you started it.  You started it; is that true?

8       A.   Yes.

9       Q.   So since starting this residential painting

10   business, is there any kind of regular hours that you

11   are devoting to that effort since February of 2023 or is

12   it sort of up and down?

13      A.   Right, up and down, and I haven't made any

14   money yet.

15      Q.   Okay.

16      A.   It's more like cost.

17      Q.   Okay.  In response to Interrogatory No. 6, a

18   couple pages later in Exhibit 26, can you get to that

19   response and then I'll ask you a question?

20      A.   That was the internal complaint.

21      Q.   I'm sorry?

22      A.   That was the internal complaint.

23      Q.   Correct.  That's the topic of the

24   interrogatory.

25           So in your response there, you say in relevant

Jenna Clark
December 07, 2023                    140

1   part, quote, plaintiff states that on or around

2   August 23, 2021, you verbally opposed defendant's

3   unlawful termination --

4          That's referring to your job elimination,

5   correct?

6      A.   Yes.

7      Q.   -- and Dawn Heikkila's assertion that there

8   were no job opportunities available to you, as you've

9   previously testified.

10         You go on to say:  Plaintiff further opposed

11  defendant's decision to deny her the opportunity to

12  apply to known job openings and defendant's failure to

13  afford you a grievance hearing prior to your

14  termination?

15         Tell me about this alleged failure to afford

16  you a grievance hearing prior to your termination?  What

17  is that about?

18     A.   Well, I don't know a whole lot about it, but

19  the Florida statute, you're supposed to be able to have

20  a grievance for why you were terminated or why something

21  happened.  I don't know the Florida statute, and I don't

22  know that it isn't a grievance.

23     Q.   Who did you speak with at the LCSO about

24  wanting to file a grievance regarding your job

25  elimination?

Jenna Clark
December 07, 2023                              141

1        A.   Well, it's just that we had -- I didn't talk to

2    anybody, but I know they're supposed to allow that.

3        Q.   Okay.

4        A.   If I was able to stay on like the other people,

5    I could have applied in another state job like, you

6    know, for as far as retirement, if I had the time to

7    stay there and apply.  But since I had to retire, I

8    couldn't -- it would have been pointless for me to go to

9    another state job because I have already taken my

10   retirement, plus the insurance.  I couldn't be without

11   insurance.  I would have lost it.

12       Q.   In interrogatory No. 12, the sheriff asked when

13   you first communicated your request to take sick leave

14   in August of 2021, and your answer is:  On August 12,

15   2021, you requested sick leave verbally from AnnMarie

16   Reno and via email from Dawn Heikkila.

17            But if I understand your testimony from earlier

18   today, you may well have mentioned the need for leave to

19   AnnMarie Reno as early as May of 2021; is that right?

20       A.   That was for leave.  That's kind of for the

21   FMLA was on the 12th.

22       Q.   Okay.

23       A.   But, yes, the request -- the initial -- the

24   original request was way back.

25       Q.   In May?  Way back meaning May of 2021?

1    A.   I'm not exactly sure of the date, but it was

2  around the time of the scheduling of the surgery.

3    Q.   Okay.  And it's your recollection that you

4  scheduled the surgery when you visited with your doctor

5  on the East Coast in May of 2021, correct?

6    A.   Yes, scheduled it, and I had to go to our

7  clinic to get all of the pretest done, and they had to

8  be a month before the surgery.

9    Q.   Ms. Clark, can I get to you look at Exhibit 5

10  real quick?  It's a single sheet of paper.

11    A.   Okay.

12    Q.   There are a number of job class title positions

13  that are shown on this summary, and this document is

14  entitled:  Job class position control change orders.

15         Have you seen this document before today?

16    A.   No.

17    Q.   All right.  Let me just direct you to the job

18  class titles adjacent to the dates reflected in 2021.

19  It starts with the replacement of the fleet director in

20  November of 2021 going all the way back to the

21  replacement of the SS&D administrator on January 10,

22  2021.

23         Do you see that packet of job titles?

24    A.   Yes.

25    Q.   You made reference a couple of times today to

Jenna Clark
December 07, 2023                                    143

1  others who had more time than you did to make a decision

2  to retire or not with the FRS.  Are there any

3  individuals listed in 2021 that -- whose job title was a

4  position held at the time where they were given more

5  time than you were or they were treated more fairly than

6  you in making that kind of decision?

7      A.   Bill Bergquist is in that group.  I don't know

8  about Lehman.  She might have been.  They're in that

9  group.  It's all the ones down -- the bottom ones.  They

10 are the ones that had two months.

11     Q.   I'm just trying to make sure you're done.  I'm

12 sorry.  I wasn't looking at you.

13          So you are referring to people whose jobs were

14 eliminated back in 2019 as being those that had longer

15 to decide whether to retire or not; is that what you're

16 saying?

17     A.   Well, they actually had time to either get

18 another job within the agency or they had the two

19 months -- well, both.  They had the two months, a month

20 severance, and a month of -- two months.  And then

21 they -- some of them were in that group, and I don't

22 know -- you know, some of them were after that.  I'm

23 talking about the 2019 people.  But some people that you

24 have that you got rid of these jobs, they remained in

25 the sheriff's office and they were put in other

 1  positions.

 2      Q.   I understand, and from a purposes of comparing

 3  what happened to you and what happened to them, I'm

 4  aware that they retained their employment and you

 5  didn't.  So if we looked at the folks you're referring

 6  to at the bottom of Exhibit 5 back in 2019, so there's

 7  this individual named JSchroth, retired.  Do you know

 8  who that is?

 9      A.   Yes.

10      Q.   What's his first name?

11      A.   John.

12      Q.   So he was a senior trainer?

13      A.   Yes, he was an older guy, too.

14      Q.   Well, what do you personally know, if anything,

15  about the specific circumstances of the sheriff's

16  reorganization and the elimination of his job as senior

17  trainer?

18      A.   Can you say that again.

19      Q.   Yeah.  What personal information do you have

20  about the circumstances of his job elimination as senior

21  trainer and his ultimate retirement, whenever that may

22  have occurred, back in 2019?

23      A.   Well, I can tell you that senior trainer is

24  probably back now, so he's not in the job, but somebody

25  else is.  Just because they say they get eliminated,

Jenna Clark
December 07, 2023                                    145

1   those positions, a lot of them came back.  Like all the

2   clerks that they originally got rid of, they're all back

3   in the system.  They brought them back.  They just got

4   rid of the older people.

5        Q.   So you're now talking about district clerks in

6   July 31 of 2020?  Is that what you're talking about?

7        A.   Yes, the clerks.  They have them back in there

8   now.  Every district has a clerk.

9        Q.   So what individual was any better as a district

10  clerk than you claim you were treated with respect to

11  your job elimination?

12       A.   Well, it wasn't the same people.  They brought

13  somebody else in those positions.  Those people are

14  gone.

15       Q.   Can you name one?

16       A.   Name one that's gone?

17       Q.   Yes.

18       A.   Yes, I can name.  The clerk in each district,

19  now they have clerks there.  I can't remember her name

20  right this second, but I can probably get a list.

21       Q.   So let me go back to John Schroth,

22  S-c-h-r-o-t-h.  What information can you provide about

23  his retirement or his job elimination, if anything?

24       A.   He was an older guy.  That's all I know.  He

25  was a nice guy, and I don't know why he didn't -- why

Jenna Clark
December 07, 2023                                     146

1   they eliminated his position, but I'm sure there's a

2   senior trainer in something.

3        Q.   The community outreach director that you're

4   referring to, was that somebody that you claim was

5   treated more favorably than you?

6        A.   Let me think of the --

7        Q.   This summary doesn't show that person's name.

8        A.   I don't know what you're looking at.  Are you

9   looking at this (indicating), the same paper you just

10  gave me?

11       Q.   Exhibit 5, yes.  Four up from the bottom.

12       A.   That is Stacy Payne, and how she was replaced

13  was a certified deputy hired as a captain, he's not

14  there now though.  He's retired since.  But he -- they

15  didn't -- they didn't take those positions and just

16  eliminate them.  They called them something else and

17  made the group bigger.  It's called CRUT, Community

18  Response Unit.  So that's what was done.  Things where

19  changed.  People, civilians, were eliminated, and then

20  certified people took these positions which they could

21  be done by as civilian, so it's cheaper, so I don't

22  know.  The same with Andrew Presco.  He replaced her.

23       Q.   Stacy Payne's packet or information concerning

24  the elimination of her position, do you have any

25  personal information about the circumstances of her

1  leaving the LCSO back in July of 2019?

2      A.   She was in that whole big group.  That's the

3  first initial people that they eliminated for

4  reorganizing.

5      Q.   Okay.  So let's just go down them.  You said

6  the community outreach director is Stacy Payne.

7      A.   Yes.

8      Q.   The executive administrative assistant looks

9  like a T. Taylor?

10     A.   Yes, Terry Taylor.

11     Q.   That was Sheriff Scott's assistant, right?

12     A.   Correct.  And she was replaced by a captain,

13 which is now a commander or a major, and he drives the

14 sheriff around.  That's what he does.  He takes his

15 calendar and he drives him to his appointments.

16     Q.   The next person is the project director whose

17 name was William Bergquist, correct?

18     A.   Yes.  That was my job -- my boss.  Then

19 AnnMarie took his job.  That's why she's my boss.  And

20 then he went and did special projects, but he was still

21 a director until he retired.  They didn't take him.

22 They just moved him, but he was in that whole bunch, the

23 22 or so people.

24     Q.   What information do you have with respect to

25 the terms or packet that Mr. Bergquist was provided back

1  in 2019, if anything?

2       A.   All of them, they all got that same package.

3  They got --

4       Q.   How do you know that, is what I'm trying to get

5  you to answer.  Is it because you talked to them?

6  You've seen the packets they got?  How do you know that?

7       A.   Yes, talked to people.  If you're there at the

8  same time, they offered them all the same package,

9  either --

10      Q.   Were you there to hear the offer made to those

11  people you are describing?

12      A.   I was not in the room.  Each one was called in

13  by Dawn individually, and they got their packet.

14      Q.   So what is your belief about what happened to

15  these people whose date is reflected in 2019 is based

16  upon what either one of them or more than one of them

17  told you; is that right?

18      A.   Yes.

19      Q.   And that would include the reorganization that

20  affected the planner position in April of 2019 as well?

21      A.   No.  She went from the planner to records, and

22  they took her out of records at that time because -- I'm

23  sorry to say, because she was old.  They said they

24  eliminated her as a planner, but they put her in

25  records.

Jenna Clark
December 07, 2023                                149

1     Q.   What's her first name?

2     A.   Lola, L-o-l-a.

3     Q.   Loda Bodemann [sic]?

4     A.   Lola, L-o-l-a.

5     Q.   All right.  So she was transferred to records,

6  and in records, what did she do, if you know?

7     A.   She was a clerk as far as I know.  I don't know

8  what else she did.

9     Q.   Is she still employed by the agency, if you

10 know?

11    A.   No.  She was in that group that they picked up.

12    Q.   Okay.

13    A.   But she originally was in planning, and they

14 took her out of planning and put her in there.

15    Q.   Okay.

16         MR. STEFANY:  All right.  Give me two more

17    minutes.  I have to check some notes.  I'm about

18    done.  Be right back.

19         MR. MACDONALD:  Okay.

20                    (Recess)

21         MR. STEFANY:  Ms. Clark, I appreciate your

22    patience.  I have no further questions of you this

23    afternoon.  Thank you.

24         THE DEPONENT:  Thank you.

25         MR. MACDONALD:  I have no questions.  The

Jenna Clark
December 07, 2023                          150

1      witness will reserve the right to read and sign.

2           THE COURT REPORTER:  David, do you want to

3      order or hold?

4           MR. STEFANY:  Yeah, Michelle, print it up for

5      me.

6           THE COURT REPORTER:  Kyle, do you want a copy?

7           MR. MACDONALD:  We will hold off for now.

8           THEREUPON, the deposition of Jenna Clark, taken

9   at the instance of the defendant, was concluded at

10  4:10 p.m.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              CERTIFICATE OF REPORTER OATH

2

3    STATE OF FLORIDA

4    COUNTY OF HILLSBOROUGH

5

6          I, the undersigned authority, hereby certify

7    that the witness named herein remotely appeared before

8    me and was duly sworn on December 7, 2023.

9          WITNESS my hand and official seal this 19th day

10   of December, 2023.

11

12

13

14

15   _____

16         MICHELLE L. DELIMAN, FPR

17         NOTARY PUBLIC - STATE OF FLORIDA

18         MY COMMISSION NO. HH 110064

19         EXPIRES:  June 20, 2025

20

21

22

23

24

25

1              REPORTER'S DEPOSITION CERTIFICATE

2

3   STATE OF FLORIDA

4   COUNTY OF HILLSBOROUGH

5

6          I, Michelle L. Deliman, FPR, Notary Public in

7   and for the State of Florida at large, hereby certify

8   that the witness appeared remotely before me for the

9   taking of the foregoing deposition, and that I was

10  authorized to and did stenographically and

11  electronically report the deposition, and that the

12  transcript is a true and complete record of my

13  stenographic notes and recordings thereof.

14         I FURTHER CERTIFY that I am neither an

15  attorney, nor counsel for the parties to this cause, nor

16  a relative or employee of any attorney or party

17  connected with this litigation, nor am I financially

18  interested in the outcome of this action.

19         DATED THIS 19th day of December, 2023,

20  Hillsborough County, Florida.

21

22

23  _____

24       MICHELLE L. DELIMAN, FPR

25

1                WITNESS NOTIFICATION LETTER

2

3

4   December 19, 2023

5

    KYLE MACDONALD, ESQUIRE
6   Derek Clark Law Group
    520 Brickell Key Drive
7   Suite O-301
    Miami, FL  33131
8   kyle@derekclarklaw.com

9

    In Re:  Clark vs Marceno
10          Deposition taken on December 7, 2023
            U.S. Legal Support Job No: 6475467-001
11

12

    The transcript of the above proceeding is now available
13  for your review.

14

    Please call 813-876-4722 to schedule an appointment
15  between the hours of 9:00 a.m. and 4:00 p.m., Monday
    through Friday, at U.S. Legal Support office located
16  nearest you.

17  Please complete your review within 30 days.

18

19  Sincerely,

20

    Michelle Deliman, FPR
21  U.S. Legal Support, Inc.
    16825 Northchase Drive, Suite 900
22  Houston, TX  77060

23

24
    CC via transcript:
25  David Stefany, Esquire

```
1              ERRATA SHEET

2        DO NOT WRITE ON THIS TRANSCRIPT
            ENTER CHANGE ON THIS PAGE
3
            IN RE: Clark vs Marceno
4                 Jenna Clark
                   12/7/23
5        U.S. Legal Job No: 6475467-001

6  Page No.     Line No.      Change            Reason
   _____
7  _____
   _____
8  _____
   _____
9  _____
   _____
10 _____
   _____
11 _____
   _____
12 _____
   _____
13 _____
   _____
14 _____
   _____
15 _____
   _____
16 _____
   _____
17 _____
   _____
18 _____
   _____
19 _____
   _____
20 _____

21
   Under penalties of perjury, I declare that I have read
22 the foregoing document and that the facts stated in it
   are true.
23

   _____            _____
24 Date                            Jenna Clark

25
```

---

**Exhibits**

---

**EX 0001 Jenna Clark 120723**
  21:2,15,20,25
  137:9
**EX 0002 Jenna Clark 120723**
  28:21
**EX 0003 Jenna Clark 120723**
  52:9 53:8
  56:8,20 57:17
**EX 0004 Jenna Clark 120723**
  76:1
**EX 0005 Jenna Clark 120723**
  142:9 144:6
  146:11
**EX 0006 Jenna Clark 120723**
  88:4,11,14
**EX 0007 Jenna Clark 120723**
  81:17 82:2,
  13,16,22
  84:18 85:25
**EX 0008 Jenna Clark 120723**
  93:7,10
**EX 0009 Jenna Clark 120723**
  93:25 94:12
  95:2
**EX 0010 Jenna Clark 120723**
  104:16,18
  105:14,17
**EX 0011 Jenna Clark 120723**
  106:14,18
  107:5
**EX 0012 Jenna Clark 120723**
  107:10 111:6

**EX 0013 Jenna Clark 120723**
  79:6,11,15
**EX 0014 Jenna Clark 120723**
  112:21
**EX 0015 Jenna Clark 120723**
  96:9,13,17,19
  97:1,16,21
  98:5,23
**EX 0016 Jenna Clark 120723**
  80:1 81:12
**EX 0017 Jenna Clark 120723**
  60:24 61:5
  62:13
**EX 0018 Jenna Clark 120723**
  44:13,14,24
**EX 0019 Jenna Clark 120723**
  31:3,11
**EX 0020 Jenna Clark 120723**
  115:6,10,12
**EX 0021 Jenna Clark 120723**
  62:16,22 63:6
  66:10,24
**EX 0022 Jenna Clark 120723**
  90:11,14,20,
  23
**EX 0023 Jenna Clark 120723**
  116:13
**EX 0024 Jenna Clark 120723**
  96:14 98:4
  100:20,22
  103:3
**EX 0025 Jenna Clark 120723**
  117:19 118:8
  120:2 126:23
  128:15 131:7

  135:20
**EX 0026 Jenna Clark 120723**
  137:23
  138:10,11
  139:18
**EX 0027 Jenna Clark 120723**
  136:24 137:1,
  21

---

**$**

---

**$2**  26:20
**$36,500**  76:13
**$480.85**
  101:12
**$5,000**  102:2
**$551.26**  102:7

---

**(**

---

**(239)**  88:25
  90:3
**(713)**  90:6

---

**1**

---

**1**  21:2,15,20,
  25 35:15
  36:10,25 63:7
  98:2 100:9
  102:1 137:9,
  11
**1-27**  6:10
**1/12/1962**
  6:17
**10**  90:15 92:1
  104:16,18
  105:14,17
  142:21
**10-hour**  39:17
**100**  91:21,23
  93:2,4
**10:02**  6:2
**10:09**  90:3

**10th**  67:25
**11**  106:14,18
  107:5
**12**  44:21
  84:19 85:4
  107:10 111:6
  141:12,14
**12:15**  73:15
**12:26**  44:25
**12th**  43:20
  84:24,25
  141:21
**13**  56:9 79:6,
  11,15 116:14
**14**  85:24
  112:21 116:14
**15**  53:2,8
  86:10 96:9,
  13,17,19
  97:1,16,21
  98:5,23
  100:22 138:15
**15th**  54:8
  60:14
**16**  80:1
  81:12,24
  86:15,16
**16th**  82:4
  114:23 115:1
**17**  29:19 46:9
  51:14 60:24
  61:5 62:13
  79:16 86:25
**17-'18**  110:13
**17th**  84:21
  85:2 115:1
**18**  44:13,14,
  24 45:10
  87:12 101:2
**18:00**  64:23
**18th**  45:3
  85:1
**19**  22:17
  25:25 31:3,11
  51:11 95:25
  101:22

**1991** 7:7
**1992** 18:6
**1992072** 65:9
**1996** 17:23,24
**1998** 14:16
**1999062** 65:10
**1:06** 45:10
**1:15** 73:21
74:1

---

**2**

**2** 28:21 33:2
63:7 88:18
93:11 98:3
100:18
**2,525.48** 91:9
**20** 45:11
101:22 115:6,
10,12 138:3
**200** 93:3
**2011** 103:25
104:21
**2012** 83:18,21
103:25 104:21
106:20 118:21
**2013** 102:1
106:20 107:23
**2013-2014**
108:2
**2014** 107:23
108:14
**2015** 108:14
**2015-16**
108:21
**2016-2017**
109:14 110:8
**2017** 109:21
**2018** 19:4,5
27:4,9,14
28:12 35:15
36:10,25
51:11 109:21
110:20
**2019** 28:13
29:7 30:8
34:22 35:9

110:20 111:8
120:7 121:11
130:7 143:14,
23 144:6,22
147:1 148:1,
15,20
**2020** 32:17
33:7,15 34:1,
8,25 35:4
102:17 111:8,
19 115:16
116:7 124:21
145:6
**2021** 18:9,13,
16,18 27:14
34:25 35:4,9
37:25 39:12,
13,16,25
40:3,8,16,23
41:15 42:5,7,
13,22 44:21,
22 46:7,19
47:23 48:6
53:2,20 56:14
57:7,22 58:17
59:8,25 60:4
61:16 62:8
63:16 65:14,
22 66:5
67:10,20,25
68:8 71:5
72:11 74:16
75:7,8,20
76:9,10,19,22
77:9,21 78:17
79:14,16,21
80:17,20
81:5,24 82:5
84:19 85:18
86:1,22
87:10,23,25
88:18,19
94:25 97:13,
22 98:11
100:3,9
101:11,16
102:7,18,19
111:19
125:15,19,20

130:15,23
131:20 132:1,
12,14 133:5
136:1,9
138:16,22
140:2 141:14,
15,19,25
142:5,18,20,
22 143:3
**2022** 93:11
94:14 95:3,4,
25
**2023** 6:2
22:17 25:25
138:3,6,18
139:11
**20th** 60:16
64:14
**21** 29:7 47:23
48:6 62:16,22
63:6 66:10,24
67:20 68:8
74:16 77:20
85:18 88:24
89:8 102:5
118:9,22
**21st** 48:21
64:14 67:9
72:1,6 75:19
80:20
**22** 29:16 80:9
81:14 90:11,
14,20,23
102:15 120:1,
6 147:23
**22.2** 80:14
**22nd** 57:2
**23** 53:15
56:14,24
57:8,22 58:17
59:8,25 71:24
72:11 77:21
78:17 81:5
86:1,21,22
87:23 88:18
89:24 102:19
116:13 120:6
125:20 130:23

140:2
**239 313-3578**
37:19
**239 848-0403**
88:25
**239 850-0188**
37:10
**239 850-5927**
89:25
**239 950-0188**
37:4
**23rd** 50:14,21
51:1 53:12,19
54:5 57:13
60:10 72:17
75:20 76:22
77:9 87:10,19
99:12 129:17
131:4
**24** 45:11 62:8
96:14 98:4
100:20,22
103:3 120:1,
18
**24th** 56:21
61:15,16
**25** 79:14
117:19 118:8
120:2 126:23
128:15 131:7
135:20
**26** 123:25
124:9 137:23
138:11 139:18
**27** 45:11
63:16,25
97:13,22
98:11 101:15
125:5 136:24
137:1,21
**27th** 63:20
65:1 97:14,17
99:14 102:21
**28** 100:22
103:4
**283** 137:10,14
**29** 94:25
95:3,4

**29.3**  55:16
**29th**  94:13
**2nd**  76:10

---

**3**

**3**  18:9,13,16,
  18 32:17 33:9
  37:25 52:9
  53:8,20 56:8,
  20 57:17
  66:11,23
  79:21 87:25
  100:3 138:21
**30**  55:17 76:9
  124:3,17
  125:13,17
**31**  101:11
  145:6
**32**  126:3
**33**  17:18
  126:3,6 128:7
**34**  17:18
**36,500**  77:15,
  23
**3:36**  136:19

---

**4**

**4**  26:19 33:20
  60:4 65:14
  76:1 102:19
  104:21 106:20
  111:19 118:8
  138:10
**4/30/2021**
  65:6
**40**  17:17
  57:12 128:14
**40-minute**
  50:25 57:21
  86:7,12
**404.51**  92:7
**4386**  115:7
**4412**  115:7
**477-1000**  90:4

**4:10**  150:10

---

**5**

**5**  18:6 57:6
  82:22 104:21
  106:20 111:19
  120:2 142:9
  144:6 146:11
**5,000**  80:7
**567**  107:14
  111:19
**569**  111:20
**570**  111:7
**572**  111:7
**573**  110:19
**575**  110:19
**576**  110:14
**578**  110:14
**579**  109:14
**580**  109:16
**581**  109:15
**582**  108:20
**584**  108:20
**585**  108:13
**587**  108:13
**588**  107:21
**59**  128:20
  129:1 130:12,
  19
**590**  107:14,21
**591**  106:18,19
**596**  106:19
  107:6
**597**  104:18
**599**  104:19

---

**6**

**6**  88:4,11,14
  139:17
**62**  55:15,16
**623-1433**  90:7
**68**  131:6

**7**

**7**  6:2 81:17
  82:2,13,16,22
  84:18 85:25
**700**  98:25
**703**  99:6,11,
  25
**704**  100:7
**7:59**  88:25
  89:11

---

**8**

**8**  64:23 84:17
  90:15,24 91:2
  93:7,10
**8/23**  85:23
**80**  91:7
**83**  132:5,23
**84**  133:15
**8:09**  89:24

---

**9**

**9**  90:15 91:12
  93:25 94:12
  95:2
**9/30/2021**
  101:10
**9/5/2021**
  101:9
**911**  60:22
  76:13
**92**  7:7
**93**  135:20
**93,000**  77:17
**95**  136:4
**96**  14:17
**9:09**  67:18
**9:10**  89:4

**A**

**A-N-N-M-A-R-I-
E**  18:22
**a.m.**  6:2
  67:18 88:25
  89:4,24 90:3
**ability**  8:6
  118:12
**able**  20:6
  32:22 37:1
  52:11,19
  87:7,14
  122:13 140:19
  141:4
**above**  67:13
**absence**  42:8
  44:9,22 46:18
  66:5 130:7,15
  131:19
  133:12,22
  134:4,5,7,18
  136:9
**absences**  47:8
**absolutely**
  112:20 113:3
**academy**  60:22
  87:2,4,6
  128:16
**acceptable**
  11:8
**access**  21:6
**accessible**
  53:3
**Accounting**
  38:25
**accrued**  59:5
  60:7 72:14
  81:7 87:15
  91:20 92:3,
  11,25 135:12
**accuracy**
  132:23
**accurate**  23:3
  82:17 84:22
  118:6 132:13

accurately
   8:1,6
acknowledgment
   98:6,14
acquaintances
   125:23
Acres   17:11,
   25
act   113:17
   126:24
action   24:2
actions   32:25
actively
   93:21
activity
   131:8,23
   135:21
actual   12:9
   32:5 84:25
adamant
   112:11
add   18:12
   62:1 109:22
added   111:11
addition
   37:14 69:14,
   15 114:11
additional
   35:3 102:24
   115:23,25
   138:25
address   9:20
   17:13,25
   35:20,23
   36:13,20 52:1
   94:15
addressed
   29:9
addresses
   32:5 35:19
adjacent
   142:18
admin   46:22,
   23 48:17 65:2
   85:7
administration
   38:21

administrative
   47:13,17
   64:5,11
   79:17,22 91:7
   133:21 134:2,
   17,24 147:8
administrator
   142:21
advertisement
   76:11
advised   87:13
   126:5
advisement
   26:7
affected
   27:25 148:20
afford   101:20
   102:13
   140:13,15
afternoon
   149:23
age   131:10,13
age-related
   129:3,4,16,24
agency   27:7,
   12 29:18
   33:20 37:11
   78:10 89:23
   123:14,18
   127:3 143:18
   149:9
agency's
   34:13
agency-issued
   12:14 37:2,14
   88:15
agency-wide
   109:7
agents   40:13,
   17,23 42:2
   115:24
ago   7:2,6
   16:15,21
   31:25
agree   61:8
   107:22 110:11
   119:12 137:11

agreeable
   73:18
ahead   50:12
   51:21,22
   71:15 73:16
   96:8 106:12
   107:17 126:22
allegations
   13:4,11,16,24
   14:3,24 15:23
   16:1,3,14
allege   130:23
alleged
   121:18 124:19
   132:14 140:15
allegedly
   120:23 121:10
   124:10 131:3
allow   8:20
   141:2
allowed   27:12
   30:20 58:1,
   11,14,15
   60:19
amended
   117:23 118:1,
   23 125:5
   128:14 131:6
amount   26:2,
   8,20 34:11
   77:18 92:21,
   23 93:2
   101:11 102:2,
   7,11,25
Amy   45:8
analysis   35:5
   115:20 116:7
analyzing
   29:25 30:3,5
and/or   132:7
   135:22
Andrew   146:22
Ann   71:14
anniversary
   103:23
Annmarie
   18:20,22
   19:1,16 22:25

23:13 33:6,25
42:7,21 43:3,
21 44:2,10
45:3 46:18
47:19 48:13,
21 49:7 50:4,
16 51:2 64:13
65:14 66:5
67:2,25 68:7,
17 69:6,24
71:16 74:17
75:18 80:19
85:13,17,18
89:1,10
103:19,25
104:11,22,25
107:2 112:11
113:6,11
114:19 118:9
120:12 123:2
128:8 130:6
141:15,19
147:19
Annmarie's
   65:9
annual   26:2,9
   40:17 103:20
   104:1,19
   105:1,21
   106:19 107:1,
   22 110:19
   111:7
answer   8:4,5,
   7,13,16,21,24
   9:4 13:14
   26:15 50:2
   58:2,5,10,23,
   25 81:11
   94:24 135:1,
   4,5,6,16,19
   136:13 138:11
   141:14 148:5
answered
   56:17
answering
   55:25
answers   7:19
anticipated
   100:3

anybody 19:15
52:6 122:10
141:2
anymore
110:1,6
anyone 10:4
12:19 15:2,5
17:4,24 30:9
40:9 43:6
apparently
19:6
appearing
8:20 12:4
appears 44:20
68:6 76:8
92:2 94:24
104:19 106:21
107:25 137:20
138:10
applicable
59:7
application
58:16
applied 60:8
141:5
apply 27:12,
21 28:8 51:7,
20 52:7 53:24
54:12,17,22
55:7 58:1,11
59:12,14,16,
18 78:14 79:3
130:24 140:12
141:7
applying 52:4
53:17,22 54:1
58:8 59:9
86:17 87:1
130:20
appointment
72:23
appointments
147:15
appreciate
26:7 149:21
approval
43:2,19
65:13,14,17

approve 43:1
approved
33:11 43:5
44:9 45:4
46:18,20
47:5,13 57:25
65:7,9 84:19
85:6 115:25
120:13 128:8
approximate
7:3
approximately
19:3 50:21
57:12 83:10,
13,18 120:15
April 32:17
33:15 34:1,8
94:14 95:3,4
148:20
area 42:20
90:6
argue 113:21
argument
58:13 125:10
arising 127:2
around 14:25
32:1 34:4
52:16 65:23,
24 77:18
80:16 84:18
86:1 109:22
132:11 140:1
142:2 147:14
asked 10:20
29:15 48:16
54:16 72:18,
22 75:25
76:20 85:14,
16 100:25
107:3 119:11
129:14 134:12
141:12
asking 7:23
8:13 24:22
25:7 44:9
89:13 111:2
126:25 138:14

asks 22:21
assert 26:1,
18 118:9
132:5 133:15
asserted
126:23 137:18
asserting
26:11
assertion
26:8 140:7
assess 103:19
assessment
34:23 35:2
115:15
assigned
123:18
assistance
41:14
assistant
19:10 82:23
147:8,11
assume 8:14
88:8 139:7
assuming
41:12 89:13
assumption
89:14
assurance
75:13
assure 32:22
33:21
attach 106:2,
5
attached
102:9 105:21
attachment
82:21 85:24
attachments
95:13
attempted
132:8 135:22
attendance
79:12,25
attention
25:9 27:3
53:6 55:1
60:21 84:16

85:3 88:21
129:7,18
attorney 8:8
9:1,9 10:2,5,
12,21,25 11:1
12:3,19 13:13
17:3 24:16
26:5 46:3
137:7,19
audio 7:23
August 39:12,
15,25 40:3,8,
16,23 42:5,6,
13 44:21,22
46:7,9,18
47:23 48:6
50:14,21 51:1
53:2,12,15,19
56:14,24
57:6,8,13,22
58:17 59:8,25
60:10 62:8
63:16,25
65:22 67:10,
20,25 68:8
71:4,24
72:11,17
74:16 75:19,
20 76:10,19,
22 77:9,20,21
78:17 79:16
80:20 81:5
84:19,21,24
85:18 86:1,
21,22 87:10,
19,23 88:18,
24 89:8,24
93:11 97:13,
14,18,22
98:11 100:13
101:15
102:19,21
125:15,19,20
129:17
130:15,23
131:4,20
132:1,12,14
133:5 136:1,9
138:15 140:2

141:14
**authority**
118:10
**automotive**
57:7
**available**
20:14 51:23,
24 52:4 53:1,
11 54:13
76:18 86:3
87:14 140:8
**avoid** 33:21
**aware** 24:5,19
27:6,10 35:4
39:9 127:16
144:4
**awareness**
34:20
**AWPAY** 64:6

———————

**B**

**back** 17:16
22:11 31:10
33:17 42:5
48:8,10 51:4
54:9 56:8
58:2 67:25
73:1,21,25
83:25 89:20
100:12 103:24
107:18 116:6
120:7 121:19,
21,22 122:1,
2,3,4,20,21
124:23 126:7,
8 130:6
141:24,25
142:20 143:14
144:6,22,24
145:1,2,3,7,
21 147:1,25
149:18
**background**
38:18
**backpacks**
68:2

**backwards/**
**forward**
107:20
**bad** 115:3
**bagged** 116:19
**bank** 8:10
135:12
**based** 8:4,15
100:2 119:9
148:15
**basically**
25:22 30:19
45:22 77:13
122:4 138:14
**basis** 42:18
64:20 104:1
119:18 127:1
131:9,13
**Bates** 63:6,7
66:11,23
90:15,24
91:11 92:1
98:25 99:11,
25 100:7,22
101:1,21,22
102:5,15
103:4 104:18
106:18 107:6,
13,21 108:13,
20 109:14,15
110:14,19
111:7,19
115:6 116:14
**Bauer** 96:21
**Bear** 52:15
**began** 82:23
120:19 124:1
138:17
**begin** 32:21
118:16
**beginning** 7:9
9:17 27:4
34:21 79:16
88:18 100:12
110:8 128:25
**belief** 125:10
136:7 148:14

**believe** 14:16
19:4 23:4
75:3,6 78:25
92:12 109:22
110:3 124:24
125:1 137:22
**beneath** 76:14
**benefit** 72:19
100:2 132:8
**benefits**
55:2,14 59:6
64:11 76:18
77:10,12
78:4,6,7
80:10,14,15,
23 92:11,13
101:23
102:17,25
109:5 124:2
125:9 130:13
132:11 133:17
135:23 139:2
**Bergquist**
19:8,12 33:6,
24 104:3,7
106:21,25
143:7 147:17,
25
**best** 7:19,20
8:6,20 9:4
82:17 119:4
**better** 80:22
83:4 102:23
135:11,13
145:9
**big** 114:15
122:24 147:2
**bigger** 146:17
**Bill** 19:8
143:7
**Bill's** 118:19
**birth** 6:16
**birthday**
69:25 70:7
71:8,25 72:1
**bit** 19:5
31:10 38:4
52:14 77:14

85:15 113:21
126:22
**blacked** 32:2,
4
**blah** 67:19
**blips** 7:23
**blown-up** 57:6
**blue** 67:17
124:13
**Bodemann**
149:3
**body** 94:19,21
**book** 112:14
**boss** 147:18,
19
**bottom** 32:21
44:24 82:1
90:19 98:24
143:9 144:6
146:11
**break** 9:12
20:19,22
73:11,15
74:14 117:10
136:15
**breaks** 9:14
**Brickell** 9:22
**brief** 49:20
68:10
**briefly** 38:17
**brochures**
41:11
**broke** 83:3
**brought** 13:24
117:3 145:3,
12
**budget** 32:14
33:3 34:14
69:21 84:9
116:4
**building**
27:17
**bullet** 23:25
76:15
**bunch** 116:18
147:22

bureau 32:12
  33:12 118:18
business
  14:15,18,20,
  22 38:20
  124:12 139:4,
  6,10
busy 45:15
  127:14
button 106:12
buy 30:21
  31:1

---

C

Caesar 103:8
calendar
  147:15
call 15:2,4,
  25 41:17,23
  42:17 48:2,8,
  10 49:6,9,15
  50:4 51:3
  53:9,18,23
  54:11 55:4,7,
  18 56:2 57:14
  58:1,6,9,17
  59:7 60:8,9,
  22 66:15,16
  67:3 72:12,17
  76:9,13,25
  77:5,11 78:21
  80:19 81:9
  88:15,17
  89:21 90:4,6,
  9 114:19
  128:18
called 19:19,
  20,21 45:1
  48:4,9,10,12
  50:10 51:2,23
  68:24,25
  69:1,2,10,16
  71:16 73:1
  89:20 97:18
  100:8 122:2
  146:16,17
  148:12

calling 69:7,
  15
calls 69:9
  89:7
captain
  146:13 147:12
cards 33:21
career 83:15
  105:16 107:7
  108:3,15,22
  109:16
  110:15,22
  111:9,21
Carmine 22:18
  23:1,20 24:5,
  7
Carolina
  16:17,19
  117:3
case 6:23 7:3
  11:13 13:21
  22:24 23:5,
  12,13,17,20,
  24 24:4,8
  26:24 52:4
  127:3 133:21
  137:18 138:2
cases 95:15
cease 35:24
  37:11
cell 12:14
  37:2,4,16,21
  41:22 48:10
  66:15,24
certain 92:21
  114:6 120:8
certainly
  20:3 26:6
  39:9 62:3
  111:16
certificate
  138:3
certified
  54:7 56:10,
  11,22 57:1
  87:5 122:11
  123:17
  146:13,20

challenge
  30:23
chance 31:19
  137:4
change 19:6
  63:12 64:17
  67:12 77:13
  85:11 102:10
  110:4,5
  142:14
changed 26:12
  46:21 47:5,
  13,16 48:15,
  17 63:21,23
  65:2 85:7
  92:18 100:17
  106:3 108:1
  109:23 146:19
changes 28:5,
  12,17 34:21,
  24 35:3,11
chapter 80:9,
  14,21
charge 25:19
  81:22 82:21
  93:14,16,20
  95:11,12,16
cheaper
  146:21
check 57:24
  91:6 102:9
  118:4 149:17
checked 87:20
checks 90:22
  91:18
chest 121:9
Chief 32:11
choice 79:1
choose 95:14
circumstances
  28:4 144:15,
  20 146:25
civilian
  29:16 30:1
  113:15 146:21
civilians
  146:19

claim 25:17,
  23 26:1,10,23
  126:23 127:2
  145:10 146:4
claimant
  84:19 85:4
  86:1,16,25
  87:2
claims 17:5
  22:24 23:5,
  13,16,20,24
  24:7 137:17
clarification
  24:23
clarity 43:25
Clark 6:7,15,
  16 10:20 13:8
  17:20 19:1
  21:1,15 22:4,
  20 31:10
  32:19 38:17
  42:6 59:2
  61:5 62:6
  74:6,13 88:12
  90:16 92:9
  94:23 103:19
  117:19 125:7
  126:4 133:10
  134:1 136:7,
  23 142:9
  149:21 150:8
Clark's 124:1
class 39:7
  103:8 112:8
  142:12,14,18
classes
  38:19,24
classified
  30:18
clean 114:9
clear 7:21
  44:7 55:11
  57:5 67:7
  69:5 71:22
  128:16 129:13
clerk 145:8,
  10,18 149:7

clerks 145:2,
  5,7,19
clinic 142:7
close 85:6,8
  95:15 120:21
  124:4 132:12
closing 76:9
clothes
  114:11
Coast 39:4
  46:4,10,13
  142:5
code 64:6
  90:6
coincide 84:3
  89:9
Collecting
  33:20
college
  38:19,22,23,
  24 39:2
college-
related 39:7
column 88:23
come 12:8
  58:2 59:10
  64:15 72:23
  73:20 76:16
  77:22 114:10
  121:21 122:3
  124:12
command 32:13
commander
  147:13
commenced
  46:17
comment 55:1
  70:15 108:25
  115:3 120:23
  121:11,15
  122:8
commented
  45:14
comments
  108:22,23
  109:16,17
  110:15,16,21,

23 111:9,11,
  20,22 120:3,
  19 123:1
  124:1,2,4,9,
  10,19 125:6
  130:4
Commission
  93:12
communicate
  43:6
communicated
  55:25 66:4
  133:11 141:13
communicating
  8:1 30:9
  43:11,15
  70:22 129:14
communication
  24:6 42:21,23
  44:1 45:6
  49:9 71:22
  77:8 88:24
  89:3,10
  114:20
communications
  10:24 13:21
  27:24 53:9,
  17,23 54:11
  55:4,7,18
  56:2 57:14,15
  58:9,17 59:7
  60:9 72:9,12
  76:8,13,25
  77:5,11 81:9
  89:7,8,23
  94:4 113:11
  128:17 132:22
community
  39:2 146:3,17
  147:6
comparator
  25:11,12
comparing
  144:2
compensable
  138:20
compensated
  47:7

compensation
  14:20 38:9
  80:10
complaining
  133:18
complaint
  117:24 118:1,
  4,23 120:2
  125:5 128:11,
  15,20 131:7
  135:25
  139:20,22
complete 8:21
  112:19
completed
  74:23 105:18
completely
  107:17
complies 61:1
  62:18 80:4
  128:22
comprise
  96:19
computer 21:9
  43:1 106:6
computers
  27:18
concluded
  150:9
condition
  42:8
conduct
  131:9,13
  135:24 136:5
conducted
  35:6 115:15
  116:7 123:13
conducting
  115:19
conference
  48:21 50:20
  51:1 72:10
  78:16 86:13,
  21 87:10,19
confirm 64:9
  82:15 111:9
  118:5

confirmation
  58:10 72:13
  81:10
confirmed
  65:21
confused 25:7
  58:24 121:6
  133:3
confusing 9:6
confusion
  33:21 77:21
consecutively
  94:11
consider
  78:17 125:20
considerably
  55:4
consideration
  35:5
considered
  87:3 125:23
consistent
  80:15
constitutes
  137:10
consult 26:4
contact 41:21
  42:1 48:19
  49:24 50:1,17
  69:23 72:18,
  23
contacted
  50:16 66:21
contacting
  24:13,14
  75:19
contained
  96:13
contest 9:12
context
  120:22 124:8
continue
  32:22 86:18
  103:15 133:16
continued
  54:23,24
  103:1

continuing
  34:24 35:1
  60:20 70:24
  100:6 110:18
contractor
  14:14 38:13
contributing
  123:19
control
  142:14
conversation
  14:23 16:9
  49:19 54:23,
  24 57:11,21
  68:10,13,23
  70:18,21 71:3
  72:4 75:2,4,
  6,11,12
  85:14,17 86:7
  121:17
conversations
  13:15,23
  121:1
conversion
  103:5
copies  96:22
  99:6
copy  19:25
  61:21 63:22
  64:17 76:8
  79:12 80:8
  88:14 99:24
  106:7 117:23
  150:6
corner  90:19
  91:5,12,19
  98:24
correct  7:16,
  17 10:10,11
  13:17 15:15,
  16 16:18,23,
  24 17:9,10,
  20,21 18:6,7,
  9 23:2,9
  24:16,17
  25:20 28:19
  32:9 35:21,22
  36:16 37:13

39:18,23
  40:5,7,15
  42:4 45:5,13,
  20,21 46:4,5,
  11 47:9,14,15
  50:19 52:5
  54:2 55:15
  56:11,12
  60:4,5 61:11
  64:2,6,7
  67:1,5,6
  68:1,8,15,16
  69:8,18 70:8
  71:1,6 78:5,
  10 82:17,25
  84:22 86:6,9,
  14,23 87:21
  92:3,6 93:5,
  6,18 97:1,7,
  10,11,19,20,
  24,25 98:3,8,
  12 99:4 100:4
  102:2,3,8
  109:18
  110:10,16,23
  111:11 114:21
  115:16,17,21,
  25 116:1
  118:6,12
  120:11,13,14
  123:12,21
  125:4,15,16
  128:1,9 131:1
  133:14 134:9,
  14 136:2
  139:23 140:5
  142:5 147:12,
  17
corrections
  41:8 56:10
correctly
  50:14
correspondence
  24:3,12,15,25
  25:3
cost  102:24
  103:16 139:16
costs  33:4

counsel  9:3
  22:17 61:24
  137:5 138:2
counseling
  105:16 107:7
  108:3,15,22
  109:16
  110:15,22
  111:10,21
count  83:25
County  11:4,6
  17:9 53:2
  95:10 132:24
couple  14:17
  19:19 22:19
  32:20 33:1
  35:18 49:10
  59:17 65:8
  73:7 82:20
  89:22 98:13
  117:9 124:13
  128:21 138:8
  139:18 142:25
course  49:22
  93:19
court  6:21
  8:24 11:5
  18:24 73:24
  117:24 118:2
  150:2,6
courtesy  8:22
  9:14
coverage
  101:9
coverages
  103:1
COVID  30:13,
  15 32:15
  33:19 49:13
COVID-19  34:8
COVID-RELATED
  34:12
crazy  114:17
created  99:12
creation  84:1
credit  33:20
criminal  7:3

cruel  50:8
CRUT  146:17
current  14:10
  17:25 52:2
  87:16
cut  91:12,16
  93:4

D

daily  42:18
  64:20 114:18
damages  26:1,
  4,8,10,18,23
  133:16,20
  134:23
dang  112:6
database
  85:5,12
date  6:16
  10:25 11:20
  18:14,15 19:2
  22:16 23:11
  26:3,9 27:5
  32:17 35:16,
  17,24,25
  36:10,25
  37:12 52:3
  53:16,21
  58:20,21 60:9
  61:17 63:18,
  20,24 65:24
  76:9 79:14,
  15,21 80:17
  83:24 84:21
  86:19 87:25
  88:23 97:12,
  15 100:3
  102:1,18,19
  103:23 113:3
  125:18 142:1
  148:15
dated  29:7
  60:15 63:16
  93:10 94:25
  100:9 138:3
dates  66:18
  142:18

daughter
  16:4,10,22
  117:1,2
daughters
  12:23 15:14
  17:4 23:1
David  73:10
  150:2
Dawn  22:25
  23:17 27:18
  29:7 43:10,
  15,21 44:2,3,
  10,21 45:1,7,
  14 48:19
  50:1,10,16,21
  51:1,24 53:12
  54:5,16 56:1
  57:12,21 60:1
  61:8 68:19
  71:23 72:10
  75:19 76:20,
  24 77:9,20
  78:15 81:5
  84:24 85:23
  86:11,20
  87:10,18,24
  90:4 99:23
  121:25
  125:18,21
  127:24 128:9
  129:6,17
  130:23 131:3
  132:22 133:7,
  10 140:7
  141:16 148:13
day  13:1
  18:8,10 47:25
  48:4,5,9 54:5
  63:14 64:24
  65:1 67:8
  72:3,25 89:6
  100:13 122:5,
  24 125:19
days  45:11
  46:15 47:4
  65:8 98:13
  127:18,20
  128:4 133:13
  134:12

DCS  63:11
deal  114:15
dealt  70:21
December  6:2
  94:25 101:11
decide  143:15
decision
  37:24 80:24
  88:1 119:4,19
  140:11 143:1,
  6
decisionmaker
  118:24
decisions
  27:7 30:10
  34:20 119:21,
  22,25
defendant
  24:1,4,12
  25:1 130:21
  132:6,9 136:4
  150:9
defendant's
  6:10 98:25
  99:11,25
  100:7 104:18
  106:18 107:6,
  13,21 108:20
  109:14,21
  110:14 115:6
  129:1 131:9,
  12 135:24
  137:2 140:2,
  11,12
defendants
  132:14
definitely
  30:21
degree  38:22
delivered
  105:8
demote  118:11
denied  132:10
Dental  102:6
deny  140:11
denying  132:7

department
  29:22 30:17,
  23 34:9 35:11
  40:14,25
  41:15 83:3,4,
  6,12,16,18
  84:2,3 115:16
  116:9 118:18
  134:6
department's
  122:25
depended  41:4
Dependents
  102:6
DEPONENT
  58:24 117:12,
  16 136:15,18
  149:24
deposition
  6:18,20,25
  7:2,6,10 8:18
  10:22 11:12,
  17 12:4,8,20
  13:3,22,24
  16:7 18:15
  21:2 23:10
  31:12 61:5
  137:9 150:8
deputies
  30:24
deputy  56:10,
  21 57:2
  146:13
Derek  9:22
describe
  38:18 120:22
described
  96:15 137:9
describing
  74:19 148:11
description
  25:16,18
  76:14 102:23
  132:13
deserving
  125:8
desk  116:18
  122:18

detail  55:1
  60:21 88:15,
  17 129:8,18
details  14:9
devastating
  112:9
developments
  29:8
devoting
  139:11
Diane  6:15
Dibenedetto-
  wilson  16:11,
  16
died  49:13
difference
  58:8 59:8
different
  10:16 19:20
  35:18 113:20
  127:8
differently
  135:10
direct  6:12
  19:15 23:24
  41:23 53:6
  88:21 105:15
  118:12 142:17
directed  9:2
directing
  85:3
direction
  24:15 33:24
directly  40:9
director
  19:15,18
  27:19 29:23
  39:19 55:22
  69:22 79:13
  83:21 84:4,11
  87:17 103:21
  105:2 112:10
  116:4 118:25
  120:10 142:19
  146:3 147:6,
  16,21
director's
  55:2 57:24

directors
  122:23 124:16
disability
  120:21 121:5
  130:2,5
disabled
  121:7
discard  41:8
disclosures
  21:16 22:6,16
  23:22 24:24
  25:2,10,25
  26:19 137:8
discoverable
  22:23 23:4
discovery
  23:25
discrimination
  25:19 81:23
  93:15,16,20
discriminatory
  125:6 129:2
  131:9,12
discuss  16:1
  23:12,16,19
  47:20,22 86:2
  105:2 120:25
discussed
  37:15 48:20
  50:25 57:21
  72:16 87:5
  128:17
discussing
  72:11
discussion
  10:18 15:6,9
  16:4 32:15
  47:25 74:16,
  21 75:13
  123:2
discussions
  55:24 57:13
  77:19
dismissal
  93:14
disparaging
  129:3,4,16,24

distinction
  92:16
distress
  26:18
distribute
  41:11
district  41:7
  145:5,8,9,18
division
  19:19,22
  83:12,18
divorced  7:1
doctor  122:21
  142:4
document
  22:10,20,21
  28:25 33:9
  44:17 52:16,
  22,25 61:6,14
  76:4,5 81:20
  82:4,8,9 85:4
  90:23 91:13
  93:10 94:2
  97:13 98:23
  99:8 100:11
  102:20 107:8,
  19 117:21
  118:5 142:13,
  15
documentation
  12:5,7 15:8
  23:23 93:22
  104:15 117:7
documents
  10:7 12:10
  24:20 62:21
  90:15 96:13,
  14,18 116:24
  117:9,15
  129:22 137:2,
  7,10,13,14,
  17,19
doing  8:18
  20:9 59:15
  67:19 95:20
  107:1 114:3
  119:14 121:22
  122:18 123:9

domestic
  41:10
donation  68:2
Doreen  72:18,
  23 73:4 78:21
  97:9,17,22
  98:10 99:20,
  21 100:12
  101:15 102:20
double  103:8
double-check
  61:25
drains  66:13
draw  84:16
drawer  116:23
drive  9:22
  85:2
drives
  147:13,15
drop  41:6
  78:3
due  48:13,18
  49:25 51:5
  85:22 101:11
  134:23
duly  6:8
duties  29:17
  121:1 122:13
duty  122:11
  123:18

_____

        E

earlier  15:24
  16:5 20:1
  34:19,22
  43:25 45:14
  74:13 81:3
  87:5 94:15
  108:1 130:5,
  22 141:17
early  39:13
  46:9 66:5
  75:7 141:19
earned  38:9
  87:15

earning  14:20
earnings
  138:20,24,25
easier  20:8
easily  20:6
East  46:3,10,
  13 142:5
economic
  133:16,20
  134:23
economically
  135:13
Edison  39:2
educational
  38:18
EEOC  25:17,23
  81:22 93:21
  95:9,14
EEOC's  93:19
  95:23
effect  70:25
  74:24 80:16
  103:15
effective
  60:3 102:1
effectively
  129:14
efficient
  7:11 53:15
effort  139:11
efforts
  138:14
eight  16:21
  44:5 83:23
either  33:6,
  24 35:4 70:12
  109:24 120:25
  122:3 143:17
  148:9,16
electronically
  138:5
eliminate
  119:16,19
  146:16
eliminated
  29:20 48:13,
  18 49:18,21

51:14 61:10
68:14 71:11,
17 85:22
136:8 143:14
144:25 146:1,
19 147:3
148:24

**eliminating**
60:14 118:24
119:20 136:6

**elimination**
35:10 60:3
140:4,25
144:16,20
145:11,23
146:24

**email**  29:6
30:2,8,12
32:5,11,17,
19,21 35:18,
19,23 36:5,8,
11 43:17
45:23,24
64:18 85:5
94:4,13,15,
18,24 95:1,4,
9,19 105:4,11
132:21 133:7
141:16

**emailed**  43:21
45:1 54:6
106:4

**emails**  24:3,
6,12,15,25
25:3 44:20
45:6 64:15

**emergency**
112:3,5,6,9

**emotional**
26:18,23

**employed**
14:19,20
16:20,23 18:5
39:9 40:13,23
78:9 90:25
103:7 113:2
122:6 149:9

**employee**  52:7

63:11 65:8
78:5 92:22

**employees**
25:12 29:9
30:13 32:22
34:13 122:23
127:17,23

**employer**
38:10 138:15

**employment**
11:4 14:11
17:6 18:11
37:1,24 39:12
46:7 79:24
80:25 83:5
86:18 92:10
93:11 104:12
118:16 130:20
138:15 144:4

**empty**  29:20

**encourage**  8:7

**end**  32:16
34:3 45:16

**ended**  28:8
118:15 126:7

**ending**  88:18

**endurance**
9:12

**enforcement**
32:23 56:21
57:1

**engaged**  131:8
135:21

**engaging**
136:5

**enlarge**  52:11

**enlarged**
52:14,17

**entailed**
75:23

**enter**  63:12

**entire**  133:22
134:3,17

**entitled**
55:13 80:14,
24 92:12 93:1
97:23 102:16

105:16 109:4
111:21 142:14

**entry**  23:25

**envelope**
61:18,20,21
62:11

**EP**  110:1

**EPS**  110:6

**Equal**  93:11

**errands**  41:5

**essential**
30:18

**essentially**
33:13 55:23
80:14 100:1
126:6

**evaluated**
104:1,3
106:10,11,12

**evaluation**
103:20 104:19
105:1,3,22
107:1,22,25
108:2,12,16,
19 109:13,20
110:13,20
111:6,7

**evaluations**
40:17 104:15
106:3,19
107:20

**everybody**
30:22,24,25
73:17 115:2
124:14,15,17
130:9,10

**evidence**
25:11

**exact**  9:25
11:20 14:17
65:24 70:11
77:18 83:24
137:15

**exactly**  7:8
12:25 142:1

**EXAMINATION**
6:12

**examined**  6:9

**exchange**  68:5

**exchanged**
105:4

**excited**
113:25

**excuse**  65:10
86:12 126:4

**executed**
81:23

**executive**
19:18 32:12
33:12 122:23
147:8

**exemplary**
104:22 106:22

**exempt**
127:17,22

**exercise**
135:22

**exercised**
135:22

**exhausted**
8:10

**exhibit**  6:10
21:2,15,20,25
28:21 31:3,11
34:22 44:13,
14,24 52:9
53:8 56:8,20
57:17 60:24
61:5 62:13,
16,22 63:6
66:10,24 76:1
79:6,11,15
80:1,2 81:12,
13,17 82:2,
13,16,22
84:18 85:25
88:4,11,14,22
90:11,14,20,
23 93:7,10,25
94:12 95:2
96:9,13,14,
17,19 97:1,
16,21 98:4,5,
23 100:20,22
103:3 104:16,

18 105:14,17
106:14,18
107:5,10
110:19 111:6
112:21 115:6,
10,12 116:13
117:19 118:8
120:2 126:23
128:15 131:7
135:20 136:24
137:1,9,21,23
138:10 139:18
142:9 144:6
146:11
**exhibits**
19:25 20:6,16
**existing**
114:11
**expectation**
46:14
**expenses**  33:4
**explain**  47:11
78:22 92:16
101:6 126:14
**explained**
14:8
**explaining**
63:23
**explanation**
58:16
**expressed**
86:16,20 87:1
**extent**  38:24
**extra**  126:18
**extracted**
94:19,22

—————————

**F**

—————————

**face**  15:4
32:18 42:24
43:12,17
121:2
**facility**  41:8
**fact**  13:2
55:8 82:4
86:4 134:23

**factor**  30:14
**failure**
140:12,15
**fair**  89:22
90:10 95:7
96:8
**fairly**  143:5
**familiar**
52:23 80:10
134:10
**family**  7:5
76:25 126:24
**far**  10:17
30:21 35:1
36:1 83:4
88:23 118:6
122:6 141:6
149:7
**fashion**
123:20
**favorably**
146:5
**faxes**  99:6
**February**  53:8
138:17 139:11
**federal**
117:24
**feel**  7:24
**feet**  80:7
**fell**  83:15
84:8
**felt**  49:17
59:13 125:12
**FGCU**  39:3,4
**field**  59:13
97:23 98:7
100:8 108:3
**figure**  64:8
125:11
**figured**  51:20
**file**  93:22
96:15 106:13
140:24
**filed**  93:16
118:1
**final**  25:24
90:22,24,25

91:18 105:15,
17 107:5
111:18 130:19
**finance**  33:22
57:24 83:1,2,
6,12,14 84:12
87:21 109:5
**finance's**
83:15
**financial**
82:23 133:16,
19 134:22
**find**  51:3
59:19
**finding**  48:23
**fine**  8:9
67:19 73:22,
24 75:6 95:22
**finish**  55:10,
12 109:12
117:14
**finished**  8:23
70:24 71:9
74:23
**fire**  118:11
**firm**  9:22
10:17
**first**  6:8
22:10,20
27:13 52:21
63:1,5 68:13
82:2,7,13
89:24 90:23
91:2 95:8
96:25 99:10
137:2 138:20
141:13 144:10
147:3 149:1
**fiscal**  34:3
**five**  7:4
120:17
122:20,21
136:16
**five-year**
34:16
**fleet**  142:19
**flip**  96:17

**Florida**  6:1
9:18 39:4
46:4 56:9,21
140:19,21
**FMLA**  43:22
45:8,16,18
46:1 126:6,8
127:2,17,18,
21 131:16,18,
19,23,25
132:6,8,10,
11,19,25
133:5,18,22
134:25
135:23,24
141:21
**focus**  13:18
27:3 39:11
42:5 58:15
**folks**  144:5
**follow**  45:6
**follow-up**
9:10 89:3
**following**
32:24 68:20
**follows**  6:9
**forget**  36:22
72:19
**forgot**  116:19
**form**  26:14,25
97:17,21
98:6,14 103:5
104:19 105:7
107:25
108:10,17,21
109:15,17
110:16,21,23
111:10,11,21,
22 119:1,5
126:10 127:5
131:14,21
132:16 133:1,
17,23 134:20
135:2,7,14
136:11
**formal**  38:18
**format**  52:21
137:6

forms  132:18,
  20 133:11
Fort  39:2,3
  89:16
forth  96:14
  122:1
Forty  17:14,
  16 50:23
forward  45:8
  79:20 96:25
four  39:16
  78:12 146:11
four-page
  76:5
frame  27:15
  35:15 36:9
  41:15
free  7:24
freeze  33:14
Freezing
  33:10
Friday  39:22
  48:4 60:13,15
friend  43:20
  44:1 125:21,
  24
front  10:7
  21:3,5 28:21
  31:2 44:13
  52:9,17 60:25
  62:17 76:2
  79:7 80:5
  88:11 90:11
  106:15
FRS  37:25
  55:14 88:2
  96:15 97:9
  124:4 138:21
  143:2
fulfill
  122:12
full  6:14
  55:14 76:13
  123:6
full-time
  76:17 78:5
fully  14:19

55:13
funds  33:2,3
funeral  49:13
future  33:4

## G

gainfully
  14:19
gap  88:1
gather  63:18
gave  6:25 7:2
  13:13 45:25
  54:8 104:25
  116:3 146:10
general  35:15
generally
  32:13 50:24
  96:15 137:9
generated
  63:12
gestured
  121:8
get all
  92:14,17
  142:7
getting  20:3
  41:13 42:5
  48:23 56:8
  64:14 75:13
  110:6 114:12
  121:25
girls  41:19
  42:1 68:25
  116:19
give  7:6,10
  9:14 11:14
  54:17,20
  103:19 105:10
  115:8 116:19
  124:8 149:16
given  6:18
  27:19 33:5,23
  51:18 53:24
  59:17 72:8
  79:3 99:14
  117:6 134:16

138:9 143:4
giving  9:18
goal  108:8,9
  109:1 111:24
  114:1
goals  108:5,6
goes  29:19
  86:25 87:12
  107:19 119:10
going  7:20
  8:14 18:13
  22:5,9 26:13
  31:12 41:4
  42:19 43:12
  45:16 46:9
  47:1 48:14
  49:3,12
  51:21,22
  59:11 60:10
  61:4 65:21
  75:1 79:5
  84:23 85:24
  98:22 100:2,
  15,24 102:12
  108:12 109:20
  111:17 114:2
  120:20,25
  121:5,24
  122:9,14
  126:17 128:3
  132:19 142:20
good  21:12
  88:9 117:10,
  13 122:18
government
  6:3
granddaughter'
s  72:2
grant  34:16,
  17
grants  34:15
granular
  81:13
graphic  76:11
great  73:19
greeting  70:7
  71:8

grievance
  140:13,16,20,
  22,24
grip  33:22,25
group  40:10,
  12 51:5,9,10,
  11,19 59:17
  143:7,9,21
  146:17 147:2
  149:11
guess  21:16
  64:8 106:5
  114:6,7
Gulf  39:4
guy  144:13
  145:24,25
guys  34:11
  47:25 68:10

## H

half  14:25
  77:25 78:1
  92:19 93:4
  108:5 109:12
handled  127:4
handwriting
  107:8
handwritten
  107:6
hang  126:2
happen  34:3
happened  14:8
  19:5 30:6
  34:2,4 49:2
  51:13,21 84:5
  121:20 128:12
  140:21 144:3
  148:14
happening
  27:14 101:5
  122:1
happy  21:11
  70:7 114:2
health  42:8
  101:19

hear   7:23
  54:21 56:16,
  18 74:11
  129:18 131:24
  135:4 148:10
heard   22:8
  27:25
hearing
  74:10,13
  140:13,16
Heikkila
  22:25 23:17
  29:7 43:10,16
  44:21 45:1,7
  50:16,21
  53:12 57:12,
  22 60:1 61:9
  68:19 71:24
  72:10 75:19
  77:9 78:16
  81:5 86:1,4,
  11,17,20
  87:1,12,18,24
  90:4 125:18,
  21 126:5
  127:3 128:9
  130:23 131:3
  132:22 133:10
  141:16
Heikkila's
  140:7
held   10:18
  118:9 143:4
help   7:11
  8:8,24 34:13
  41:1,3,8,17,
  20 52:15
  121:6,21
  129:23
helpful   65:19
  95:23
helping
  123:24
higher   100:18
highest   32:23
  110:9
highlight
  33:2

hire   115:23
  118:11
hired   146:13
hires   115:25
hiring   76:12
hit   33:19
hold   45:16
  52:12 57:23
  58:3 81:4
  87:20 126:5
  150:3,7
Holloway
  32:11 119:8
home   30:20
  59:15 121:23
hope   36:5
hour   12:2
  14:25 15:1
  73:20
hours   46:8
  79:17,22 85:1
  91:7,21,23
  92:7 93:2
  121:24 139:10
HR   27:19
  109:5
hundred   99:17
hurricane
  111:25 112:9,
  13
husband   12:23
  13:7,10,16,
  22,23 14:24
  15:3,6,9
  17:4,19 18:1
  23:1 98:14
  100:16 101:8,
  19,23
husband's
  14:10
hyphen   16:11
hypothetical
  54:24 60:19

                I

idea   124:18

identical
  111:12
identification
  6:3,11 65:11
  79:11
identified
  9:17 15:11
  22:24 32:13
  72:5 94:15
  98:24 129:17
  137:10
identify
  22:15,22 25:3
  32:10,20
  44:19 61:6
  62:25 63:5
  76:7 90:20
  96:24 133:4,
  19 134:22
identifying
  115:9 137:8
identity   6:4
III   23:22
image   76:10
imagine   13:14
immediate
  18:19 19:2,7,
  17 40:6
immediately
  32:24 59:16
impact   29:22
  34:9
impacted
  30:16,22
impersonate
  6:24
implement
  109:12
implemented
  109:2 111:2
implication
  125:7
important
  7:18
impression
  70:23

improvement
  109:24
IMT   111:25
  112:4
include
  148:19
included
  27:21 120:20
  124:2 129:2
includes   67:2
  136:5
including
  24:2 69:16
  79:21 94:5,6
  118:10
income   38:15
incoming
  89:20 90:8
incorporating
  109:5
indicate
  71:10
indicated
  130:23
indicating
  146:9
indication
  72:9
individual
  22:22 103:4
  144:7 145:9
individually
  148:13
individuals
  13:21 27:24
  32:5,12 40:24
  94:5 143:3
information
  22:23 23:4
  25:13 32:14
  52:22 60:6
  72:13 81:11
  102:17 103:5
  108:8,9,15,16
  144:19 145:22
  146:23,25
  147:24

initial  22:6,
  15 24:24
  25:24 26:19
  82:24 137:8
  138:24 141:23
  147:3
initially
  18:5 66:4
  88:6
initials  11:7
initiate
  41:16
initiated
  75:13
inputted
  110:23
inquire
  114:24
inquired
  54:15
inquiry  81:11
inserted
  108:9,15,17,
  22,23 109:17
  110:16,21
  111:9,22
inspection
  115:13,15,20
instance
  150:9
instructed
  132:9,24
  133:4
instruction
  33:24
instructions
  10:22 33:6
insubordinatio
  n  113:17
insurance
  100:16 101:8,
  10,11,19,23
  102:14
  141:10,11
intending
  10:23
intention

46:13
intentional
  36:7
interactions
  113:6 114:19
interest  52:4
  53:17,22
  55:6,19
  56:13,19,23
  57:3,8 59:9
  81:9 87:1
interested
  58:8 86:17
interference
  133:18
interfering
  132:6
interim  20:11
intermittent
  121:22 123:2
internal
  139:20,22
interpose  9:1
interrogatorie
  s  12:9 138:1,
  5
interrogatory
  138:10
  139:17,24
  141:12
intimidate
  113:22
introduction
  96:16
introductory
  10:21
inventory
  114:5
investigation
  93:20,24
  95:23
investigative
  93:22
involved  30:4
  113:25 119:18
issued  6:3

issues  20:11
  104:6,10
Item  33:20

_____

**J**

J-A-M-I  15:20
Jami  15:17,
  19,20,22
  16:5,22 117:3
January
  22:11,17
  25:25 35:15
  36:10,24,25
  142:21
jclark@
sheriffleefl.
org  35:21
Jenna  6:7,15
  54:17 150:8
jennaclark1962
@gmail.com
  36:11
jennaclark1962
@gmail.com.
  94:7
jennaclark1962
@yahoo  36:15
Jill  69:3,16,
  19,23 70:3,6,
  21 71:8,19,23
  74:15,19
  75:14
job  19:11,16
  25:15,18
  40:24 48:18
  49:18,20,25
  59:9 60:3,23
  61:9 68:14,22
  71:11,16 76:8
  85:21 121:1
  123:10,16,17
  130:10 140:4,
  8,12,24
  141:5,9
  142:12,14,17,
  23 143:3,18
  144:16,20,24

145:11,23
  147:18,19
jobs  51:23
  87:2,8
  143:13,24
John  32:11
  144:11 145:21
join  51:19
Jones  69:3,
  16,23 70:3,7,
  21 71:8,19,23
  74:15,19
  75:14
Jones's  69:19
JSCHROTH
  144:7
Julianna
  16:10,16
  117:1
July  42:10,
  12,22 47:4
  57:2 79:14
  145:6 147:1
jump  50:12
  96:8
jumps  126:22
June  18:6
  29:7 56:9,21
  104:21 106:20
  111:19
junk  116:18,
  23

_____

**K**

keep  30:22
  34:13
keeping  30:24
  33:25
kept  60:20
Key  9:22
kia@
dereksmithlaw.
com  94:14,25
  95:3
kids  18:2,4

kind 10:21
  12:5 16:8
  44:24 75:14
  76:17 107:19
  111:14 113:16
  115:3 122:1
  139:10 141:20
  143:6
kinds 75:24
  78:9
knew 42:19
  51:24 77:23,
  25 118:6
know 7:7 8:4,
  9 9:13,21,25
  10:15,17 14:8
  16:6 20:5
  26:17 27:2
  28:9,13 30:6
  31:2 32:3
  34:4,5,6 36:1
  40:21 45:2,3,
  9,17 49:16
  59:23,24
  60:13,15
  61:18,22,23
  65:5,7,16
  66:19 68:24,
  25 69:2,10
  75:4,10,15,16
  76:24 77:2,4
  78:11 83:19,
  24 89:1,15,
  20,21,25
  90:7,9 91:13
  94:23 96:7
  99:23 100:14
  103:5 107:4
  111:14 112:18
  118:15,20
  119:10 122:5
  124:3 126:24
  127:22
  136:10,13,14
  137:15
  140:18,21,22
  141:2,6
  143:7,22
  144:7,14

  145:24,25
  146:8,22
  148:4,6
  149:6,7,10
knowledge
  7:19 8:5 36:4
  82:18
known 125:22
  140:12
Kyle 10:25
  19:24 21:6,23
  88:6 150:6

___

L

L-O-L-A
  149:2,4
lack 102:23
laid 51:6
language 83:4
lasted 12:1
Lauren 10:12
  11:1
lauren@
dereksmithlaw.
com 94:6
law 7:5 9:22
  10:16 32:23
  56:21 57:1
  127:9
lawsuit 12:9
  13:5,11,16,24
  14:4,7,24
  15:10,23
  16:1,4,9,14
  22:12,16
  117:25
lawyer 11:16
  12:1 126:25
LCSO 11:7,8
  16:20,23 17:6
  18:6,8,19
  23:11 25:16,
  18 27:5 28:18
  29:8,9 30:9,
  13,16 32:14,
  22 34:21
  35:17 37:1,

  12,24 38:6
  39:10,19
  40:18 41:7
  43:7 52:3
  53:11 68:19
  69:19 78:5
  79:13 80:11,
  16 82:23 83:5
  91:1 92:10
  97:10 103:21
  118:16 127:3,
  16 129:5,15
  140:23 147:1
LCSO's 80:8
learn 129:8
learned 27:13
  47:12 55:20
  59:5 68:14
leave 42:8
  43:7,13,16
  44:9,22
  46:17,20,21,
  22,23,25
  47:1,7,12,14,
  17 48:17 50:9
  54:11 59:6
  60:7 64:2,5,
  6,11,12 65:3
  71:18 72:14
  79:17,22
  80:16,25 81:7
  83:6 84:19
  85:7 87:15
  91:7,21,24
  92:17,25
  120:9,12
  121:20 123:3
  125:14 126:24
  127:4,17
  128:8 130:13
  132:8,10,11,
  15,25 133:5,
  12,21 134:2,
  3,6,7,12,16,
  17,24,25
  135:11,12,23
  136:1,8
  141:13,15,18,
  20

leaving 17:5
  147:1
Lee 11:4,6
  17:9 53:2
  95:10 132:23
left 46:8
  51:13 66:13
  67:18 70:1,3,
  6 71:7,19
  74:15,19 88:7
  112:14,15,19
  114:17 118:15
left-hand
  88:23 91:5,19
legal 32:11
  126:25
Lehigh 17:11,
  17,25
Lehman 40:3,9
  72:6 125:3
  143:8
lesser 55:9
  57:25 59:6
letter 27:19
  48:23 51:12,
  16 54:4,5,7,
  10 59:10
  60:1,14 61:8
  62:5,6,11,13
  84:23,24
  86:23 131:5
letting 35:1
liaison
  115:19
lieu 53:23
life 101:10,
  23 103:4,9
light 123:18
  133:17
light-duty
  123:19
limitations
  33:14
limited
  118:11 124:3
  129:2
line 53:7,14
  56:9,20

lines  33:3
 54:25 78:18
list  12:12,14
 23:3 117:6
 145:20
listed  23:8
 32:6 47:5
 143:3
litigation
 10:10 17:5
 22:6 26:11
 137:3
little  8:19
 19:4,5 31:10
 38:4 66:18
 85:15 105:24
 126:22 139:3
live  17:17,19
lived  17:13,
 24
lives  30:14
LLC  138:17
located  9:18,
 19
locations
 41:7
Loda  149:3
log  95:15
Lola  149:2,4
long  7:2,6
 9:13 11:25
 14:15,23
 17:13 19:1
 31:25 39:24
 45:9 50:20
 77:4 78:8
 93:23 103:24
 120:15 125:22
 126:1
long-term
 108:5,9 114:1
longer  16:15
 55:19 59:12,
 18 70:24
 128:4 143:14
look  31:19
 51:22 52:2,23
 53:8 54:15

62:6 63:15
 76:1 78:18,25
 80:1 91:5,19
 103:24 104:14
 110:6 116:13
 120:20 121:4
 142:9
looked  50:9
 94:13 108:1
 121:4,7,14
 144:5
looking  13:20
 22:4 44:15
 66:19,22
 75:21 89:19
 107:14,16
 143:12 146:8,
 9
looks  44:25
 45:10 56:9,20
 57:5,6 63:1,
 14,15 67:16,
 24 79:20
 80:18 86:15
 88:24 91:6,
 19,22 96:22
 98:13 103:25
 105:23 107:6
 108:3 111:12,
 15 115:13
 147:8
lose  55:2
lost  26:1,8,
 11 133:17
 141:11
lot  27:11
 30:22 33:17,
 18,19 41:4
 42:19 55:5
 59:14 78:7
 123:17 140:18
 145:1
low  77:23
lower  55:5
 77:14,24
lunch  74:3
 114:25

**M**

Macdonald
 10:5,10,25
 20:2,9,17,20,
 23 21:8,12,24
 22:1 26:13,25
 31:5,8,14
 58:18,22 62:3
 73:10,13,19
 74:2 88:9
 117:13 119:1,
 5 126:10,15
 127:5,11
 131:14,21
 132:16 133:1,
 23 134:20
 135:2,7,14,17
 136:11,20
 149:19,25
 150:7
made  13:4,11
 25:11 58:16
 61:12 64:9
 65:14 67:9
 68:23 70:15
 82:17,21
 92:17 102:10
 105:25 114:14
 115:23,25
 116:8 118:5
 120:23 121:10
 124:10,19
 125:6 129:5,
 15 130:4
 131:25 139:13
 142:25 146:17
 148:10
mail  61:14
mailing  62:7
maintain
 33:22
major  147:13
make  7:20 8:1
 20:8 23:23
 44:7 58:7
 59:8,20 72:8

74:9,12 78:23
 80:24 87:21
 88:1 89:14
 112:11 120:19
 128:15 129:13
 130:9 135:13
 143:1,11
makes  29:16
 110:6 119:21
 129:11
making  24:25
 27:7 28:5
 55:5,21
 77:14,16,24
 78:1 118:22
 119:19 123:1
 124:1 129:3
 143:6
management
 38:20 112:3,5
manager  40:4
 84:5,12
 104:20 124:24
 125:2
manual  80:8,
 11,22
marathon  9:12
Marceno  22:18
 23:1,20 24:5,
 7 28:17
 117:25 137:3
marked  6:10
 21:2,20 28:20
 61:4 62:13,22
 63:6 64:5
married  14:17
 17:22
material  31:4
materials
 34:12
matter  14:1
 42:23 113:7,
 12
matured  86:19
meal  73:15
 74:14
mean  24:13
 50:8 75:15

103:24 109:25
114:14 125:23
126:1 134:10
**meaning**
141:25
**means** 32:7
94:23
**meant** 39:21
**mechanic** 57:7
**medical** 42:23
102:6,17,24
126:24
**meet** 86:4
105:2
**meeting** 11:25
12:3 73:2
74:20 84:24
86:12,20,21
87:19 97:14
129:17
**meetings**
73:3,5
**meets** 110:9
**member** 29:18
76:25 97:4,
18,23 98:7
129:5
**members** 69:7
72:5 123:18
**memo** 113:7
114:21,22
**memory** 8:10
29:11 54:25
56:5 60:21
129:7
**mentioned**
18:13 69:14
74:13 141:18
**message** 66:13
67:2,12,19,
21,24 70:1,3,
4,6 71:7,19
74:14,19
89:9,12
94:19,21
**messages** 68:5
**met** 86:1
87:23 101:15

**Miami** 9:18,19
**Michelle**
15:20 18:21
73:23 150:4
**microphone**
74:9
**middle** 97:3
**million** 26:20
**Mimi** 138:17
**minute** 17:16
29:11 54:10
96:17
**minutes** 7:9
49:10 50:23
57:12 117:11
136:16,17
149:17
**misspelled**
125:9
**mistake** 36:6
**modified**
122:11
**Monday** 39:22
48:19 50:11,
13 68:20
76:20,21
85:23 114:23
**money** 33:18
34:16 92:23
139:14
**month** 11:23
14:17 102:6
112:15 142:8
143:19,20
**months** 44:5
48:14 51:22
55:10,12
59:17 74:25
83:8 143:10,
19,20
**morning** 8:2,
21 14:2,4,23
15:6,9 56:1
74:16 75:19,
20 77:20 81:5
85:17

**move** 52:15
**moved** 16:21
147:22
**moving** 114:24
**multiple** 73:5
**multiple-page**
80:2
**Munis** 111:1
**Myers** 39:2,3
89:16

---

**N**

**Najarro**
15:17,19,22
16:5,22
**name** 6:14
22:22 32:1,6,
8 72:19
102:18 144:10
145:15,16,18,
19 146:7
147:17 149:1
**named** 16:10
144:7
**names** 19:20
**nature** 124:5
**necessary**
126:7,8
**need** 20:18
28:22 42:13,
22 43:7,22,24
44:10 49:24
66:4 123:18
136:16,17
141:18
**needed** 9:14
21:11 41:17,
19 42:7,14
47:8 48:2
85:23 112:10
116:4,11
123:13 126:18
133:12
**needing** 45:17
**nervous** 16:7
49:18 75:1

**never** 45:25
50:9 54:4
78:14 114:17,
22 126:18
**NIA** 48:15
**nice** 145:25
**nine** 48:14
51:21 55:10,
12
**nonetheless**
128:8
**normal** 39:21
64:25 114:19
**North** 16:17,
19 117:3
**Nos** 6:10 63:7
100:22 101:22
**notarized**
97:8,17,22
98:7
**notarizing**
97:12 98:10
**notary** 97:5,8
**notes** 129:22
149:17
**notice** 48:15
85:11 93:15
**noticed** 85:5
**notification**
71:10
**notified**
27:16 35:10
42:7 43:22
**notify** 85:23
**notifying**
60:2 61:9
**November**
81:24 82:5
138:3,6
142:20
**number** 9:25
32:12 37:4,8,
9,18,21 39:10
65:9 89:1,4,
25 90:3,7,18
95:12 106:13
115:8 137:15

142:12
**numbered**
94:11 138:11
**numbers** 37:18

O

**oath** 7:14,15
74:7
**object** 9:1
26:13 58:18
127:5
**objection**
9:2,3 26:25
58:22 119:1,5
126:10,15
127:11
131:14,21
132:16 133:1,
23 134:20
135:2,7,14,17
136:11
**observed**
27:24
**obtain** 63:19
138:15
**obtained**
63:18
**obviously**
29:3 66:14
**occur** 28:12
**occurred**
123:3 144:22
**October**
100:9,12
102:1,6,17
115:16 116:6
**offensive**
122:8
**offer** 76:15
148:10
**offered** 22:5
77:16 78:14
148:8
**office** 6:20
11:5,7,9
35:20 38:20

41:25 50:10
53:2 54:7
59:13 69:4
73:6 74:22
81:1 93:17
95:11 100:14,
17 105:13
115:1 120:25
124:11,23
132:24 143:25
**officer** 6:24
17:2 57:2
**officer's**
49:13
**official**
105:16 107:7
**okay** 7:12,13
8:2,3,11,12,
16,17,24,25
9:6,7,15,16,
24 11:1,2,11,
25 12:3,18
13:7,18 14:3,
6 15:5,13
16:10,22
18:16,17
20:17 21:13
24:18 25:6,
18,24 28:3,15
29:14 31:2,8,
20,23 34:7,19
35:14 39:13,
14 43:6,23,25
44:4,7,13
45:7,15 47:6
48:3,20,25
49:14 51:7,
15,17,20 53:5
55:6,11 56:20
57:10 58:2,7,
24 59:4,22
60:17 62:16
63:8 64:18
65:4,12 66:7
69:11 70:17,
20 72:1,4
73:9 74:8
75:9 76:1,3
77:4 79:2

80:1 83:9,17,
20 84:7,10,15
85:3 86:10
89:17 91:8
92:1,5,16
93:7,9 95:7
96:8,12 98:4,
19 99:7,13,
16,22 100:6,
20 101:9,21
102:1,15
103:11,18
104:17 105:14
106:8,17
107:10,17
108:12 109:13
111:4 112:17
115:11 116:2,
13,21 117:5,
8,12,20
119:9,24
120:5 121:10,
16 123:22
124:18,22
125:13,25
126:20 128:14
129:22
136:20,25
137:16,24
139:2,3,5,15,
17 141:3,22
142:3,11
147:5 149:12,
15,19
**older** 144:13
145:4,24
**once** 8:9
31:19 55:19
58:9 103:1,22
**one** 6:20
18:12,22
19:21 22:9,21
28:14 36:4,8,
12 40:20
41:19 42:1
57:1 70:14
73:4,6 78:19
83:15 87:13
88:7 89:11,24

91:2,18 104:2
109:22 111:2,
12,18 120:24
145:15,16
148:12,16
**one-page** 62:6
**ones** 108:1
110:1 143:9,
10
**ongoing** 35:5
**open** 52:5
54:12 75:21
76:19 77:16
80:3
**opening** 53:11
54:11 55:19
57:7 76:8
**openings** 52:2
53:1,4 57:16
140:12
**operated**
14:15
**operating**
41:24
**operations**
27:8 80:8,11,
22
**opinion** 49:17
**opportunities**
140:8
**opportunity**
9:9,10 23:12,
16,19 50:3
51:6,19 59:18
78:14 79:3
93:12 103:14
140:11
**opposed** 131:8
135:23 140:2,
10
**opposition**
131:12
**option** 53:24
54:17,20,22
86:24 95:15
98:2,3
100:15,18

options   59:21
  86:3
order   150:3
orders   142:14
organization
  34:24 35:2
original
  65:5,6,17
  141:24
originally
  64:1,22
  100:15 145:2
  149:13
outreach
  146:3 147:6
overbearing
  113:21
overcompensate
d   125:8

_____

P

P-R-O-C-E-E-D-
I-N-G-S   6:6
p.m.   44:25
  45:10 150:10
package
  27:20,22
  148:2,8
packet   51:6,
  18 59:11 62:9
  101:5 142:23
  146:23 147:25
  148:13
packets   41:10
  148:6
page   31:22
  66:10,11,23
  76:11 79:15
  82:2,8,13
  88:22 90:18
  91:11,14 92:1
  93:10 94:21
  95:1 96:25
  97:16,21
  98:5,6,25
  99:2,6,10
  100:7 101:4,

6,21 102:4,15
  103:3,4
  105:15,17
  106:18 107:5
  108:2,4,16,21
  109:15,16
  110:15
  111:10,20
  115:8 118:8
  120:2 128:23
pages   62:23
  63:5,9,10
  79:9 82:7
  96:20 98:22
  100:6 104:18
  106:18
  107:14,21
  108:13,20
  110:14,19
  111:7 115:7,9
  116:14 128:21
  137:10 138:12
  139:18
paid   47:7
  59:6 60:7
  64:10 72:14
  75:23 81:8
  91:7 92:23
  133:21 134:2,
  17
pain   59:15
painting
  38:5,8,12
  139:6,9
pandemic
  30:13,15
  34:25
pandemic's
  34:8
paper   142:10
  146:9
paperwork
  43:24 45:18
  46:1 60:11,13
  126:6,9,18,19
  127:13,15,18,
  21 132:19
paragraph

29:10,12,15
  30:2 33:2,9
  82:22 84:17
  85:4,24
  86:10,15,16,
  25 87:12
  95:8,22
  118:9,22
  120:1,18
  123:25 124:9
  125:5,13,17
  126:3,6
  128:7,14,20
  129:1 130:12,
  19 131:6
  132:5,23
  133:15 135:20
  136:4
paragraphs
  95:8 120:6
  126:3
Pardon   18:3
parenthetical
  111:25
part   10:21,22
  15:2 22:12,20
  30:5 47:24
  49:25 68:14
  70:7,9 71:7
  80:9,24 81:12
  82:16 84:18
  85:25 86:11
  87:9 97:13
  98:23 101:4
  117:6 122:4,5
  127:22 128:25
  130:19 138:10
  140:1
partial
  138:16
particular
  16:8 22:20
  30:1,12 52:3,
  22,25 53:7
  62:5 66:10
  67:23 76:10
  77:11 80:21
  85:11 88:17,
  22 91:13,14

95:9 99:10
  101:4,6 108:2
  110:18 133:20
password
  36:21
passwords
  36:22
patience
  149:22
Paul   13:8
  17:20
pay   46:22
  47:14,18
  55:3,9,20
  64:6,11 65:3
  79:18,23 85:7
  90:25 91:7,9,
  25 92:15,19
  93:4 100:17
  102:10,25
  124:3,16
  134:2,3,24
paycheck
  90:24
Payee   100:8
paying   100:18
Payne   146:12
  147:6
Payne's
  146:23
payout   91:20,
  23 92:2,11
  93:1
penalty   7:15
  78:25
pending   9:14
  117:24
people   23:3
  27:11,16 28:7
  35:1 41:2
  51:12,13,18
  69:3 74:25
  75:2 112:2
  114:11 116:5
  122:5,6 126:1
  128:3,5 141:4
  143:13,23
  145:4,12,13

146:19,20
147:3,23
148:7,11,15
**people's**
30:14
**percent**  99:17
124:3,17
**Perfect**  73:13
74:2 136:20
**perfectly**  8:9
122:17
**performance**
103:20 104:1,
3,22 105:1
106:22
**performing**
40:17
**period**  23:15
27:4,6 35:8,
9,14 36:24
37:15 39:12
59:19 64:24
79:13 81:4
87:23 88:18
90:25 101:9
103:18 104:7,
11,20 105:22,
23 106:20
107:1,2,23
108:14,20,21
109:10,21,23
110:20 111:8,
19 118:14
134:4,17
**perjury**  7:16
**permitted**
134:8
**person**  68:19
106:11 115:19
133:4 147:16
**person's**
41:22 146:7
**personal**  8:5
36:7,11
37:16,21 42:8
46:24 48:10
144:19 146:25

**personality**
113:20
**personally**
9:18 27:23
144:14
**personnel**
35:11
**pertained**
78:8
**pertaining**
46:7
**phone**  12:12,
14 37:2,4,11,
14,16,21
41:22 47:25
48:10,23
50:18,20
60:18 63:3,
10,23 66:16,
25 68:10,13,
23 69:6 73:7
86:5,13 88:15
89:10,23
**photo**  66:24
**phrase**  130:1,
12 134:3
**physical**
122:19
**pick**  41:5,15
**picked**  41:20
116:20 149:11
**picture**  64:9
**pile**  96:10
**place**  33:15
39:25 46:3
71:3,23 75:5,
7
**plaintiff**
24:1,3 91:11
129:3 130:2
131:7 132:9
135:21 140:1,
10
**plaintiff's**
22:15 63:6
66:11,23
90:14,24
100:22 101:1,

21 102:4,15
103:4 116:14
132:7,10
**plan**  27:22
45:9 105:16
107:7 108:4,
15,22 109:16
110:15,22
111:10,21
**planned**  42:18
**planner**
148:20,21,24
**planning**
149:13,14
**please**  6:14
8:5,22 44:14
62:2 90:11
95:13
**point**  18:12
19:21 42:6
47:12 73:16
77:8 79:20
83:2,15
110:12
**pointless**
141:8
**points**  32:15
76:15
**policies**
80:16
**policy**  92:20
93:1,5 103:9,
13,15
**policy's**
92:13,14
**pool**  14:14,18
**pops**  106:13
**portal**  95:14
**position**
10:16 17:1
19:11,12,16
27:21 28:9
29:18 30:3
35:10 48:12
51:20 52:5
53:10,17,22
54:13 55:8,20
56:2,11 57:8,

14 58:9,17
60:9,14,22
72:12,15
76:12,18
77:11,16 78:3
79:4 81:10
83:21 84:4
85:22 86:2
87:16 95:10,
12,24 96:4
118:19,25
119:16,20
122:11 128:18
130:24 136:6,
8 142:14
143:4 146:1,
24 148:20
**positions**
27:12 28:7
29:17,20,21,
22 30:1,5
51:7,14
75:21,23
87:2,4,5,6,14
128:16 130:21
142:12 144:1
145:1,13
146:15,20
**positively**
75:10
**possibility**
31:25 34:5
123:9
**possible**
32:24 35:3
66:1,2 95:14
**possibly**  63:2
129:25
**posted**  52:2
87:2
**postmark**
61:17
**potential**
81:9
**power**  118:11
**practice**
127:16

predicated
  37:24
prefer  28:23
preparation
  11:12 12:4
prepare  82:8,
  9
prepared
  105:21
preparing
  12:8
Presco  146:22
presence  97:4
present  98:17
  138:16
presents  6:3
preserve
  123:13
pressure
  130:4
pressuring
  130:2,8
pretest  142:7
pretty  31:22
  99:17 119:21
prevented
  53:25
Preventing
  130:13,20
previously
  62:22 68:18
  85:6 140:9
principal
  115:19
print  19:24
  20:7,14 106:7
  150:4
printed  20:3
  99:21
printing
  20:10 90:19
printout  91:6
prior  10:24
  11:1,4,16
  23:10 43:19
  44:6,8 46:12
  53:20,21 71:3

87:7 107:2
123:3,6
140:13,16
probably  7:4
  34:18 41:23
  43:22 65:23,
  24 73:6 83:7,
  23,24 111:14
  112:15 118:21
  144:24 145:20
Procedurally
  19:24
procedure
  65:21 120:8
proceed  8:22
  66:9
proceeding
  6:19 7:5 8:15
process  9:5
  10:23 21:19
  30:10 41:12,
  13
produced  24:1
  61:21 62:1
  137:8,19
product  47:24
production
  62:1 137:2,20
productive
  123:23
program  109:7
project
  113:24 114:24
  122:9 147:16
projects
  19:14 147:20
promote
  118:11
promoted
  69:21 83:20
promotion
  84:3
proof  106:6
protect  32:21
protected
  131:8,23
  135:21

provide  7:18
  8:15 32:23
  95:23 145:22
provided  46:3
  79:17,22
  95:10 147:25
public  52:6
  95:14
publicly  53:3
pull  19:23
  21:8 52:8
  60:24 62:16
  80:2,21 81:17
  88:4 90:10
  93:7,25
  100:20 104:16
  106:15 112:21
  117:19 137:23
pulled  96:9
pulling
  100:21
purchases
  33:4,10,11
purchasing
  29:22 30:16
  33:14,21 34:9
  35:11 39:19
  40:4,13,14,
  17,23,25
  41:14 42:2
  55:22 64:23
  79:13 83:15,
  21 84:2,6
  87:16 103:21
  104:20 105:1
  109:5 114:24
  115:16,20,24
  118:25 120:10
  128:5
purport
  106:19
purports  94:4
purpose  69:9
  120:10
purposes
  18:14 79:11
  144:2

pushing
  106:12
put  21:3 29:4
  42:15,25
  46:16,22,23,
  24 47:2,3
  57:23 63:13
  81:3 87:20
  122:14 133:21
  134:1,24
  135:11 143:25
  148:24 149:14
putting  47:6
  122:15

_____

Q

quality  32:23
question  7:25
  8:4,13,15,23
  9:2,4,13
  13:19 28:10
  43:4 48:12
  52:21 56:16
  59:3 74:18
  94:10,24 95:3
  108:14,25
  110:21 111:8
  126:25 134:1
  135:1,5,16
  137:16 139:19
question-and-
answer  7:12
questions
  7:20,21 8:21
  9:8,10 11:3
  22:9,19 31:19
  39:11 50:2
  56:1 60:19
  82:20 96:17
  107:15 113:23
  138:8 149:22,
  25
quick  20:22
  73:11 142:10
quickly
  104:14

**quite** 14:9
39:10 77:14
**quivering**
49:12,15
**quote** 85:5,6,
7,8 95:9,15
120:20,21
124:3,4 125:6
131:7 132:5,
12 135:21
140:1

**R**

R-E-N-O 18:23
**random** 41:2
75:15,16
**Randy** 96:21
**rate** 55:9
57:25 59:6
72:13 87:16
**rating**
104:20,21
105:23
106:20,22
107:1,23
108:13,20
109:17,21,23
110:9
**read** 13:12
15:10 29:11
52:10,13,19
67:14 150:1
**reading** 45:7
**ready** 31:6
**real** 20:22
57:5 94:10
142:10
**reallocating**
33:3
**reason** 7:22
10:20 65:2
114:13
**recall** 8:11
11:22,25 16:2
19:17 22:13
27:13 33:5,
13,16,18,23

34:2 35:8,12
39:6,8 40:2
43:17 46:6
49:8 50:25
53:10 57:18
65:17,20
66:20 69:7
71:21 72:24
74:24 75:5
79:23 87:22
91:23 95:6,21
96:3 103:14,
17,19 104:4
106:25
113:16,19
114:20 118:17
121:19 124:21
129:20 130:18
**receive** 62:9
87:15
**received** 30:8
32:19 54:4,10
60:1,8 61:13
62:8,10 63:11
71:10 79:24
92:11 95:5,19
103:8 131:5
**receiving**
60:6 74:15
91:23 94:18
95:4
**recent** 29:8
107:20 112:25
**Recess** 20:24
74:3 117:17
136:21 149:20
**recognize**
21:15,20 22:5
28:25 44:17
62:22 81:22
88:14 94:2
96:18 115:12
116:15 117:21
**recollection**
28:3 30:8,15
34:10 39:24
57:20 66:2,3
78:15 83:20
95:20 113:5

142:3
**recommend**
119:19
**recommendation**
78:19,24
115:24 116:3
**recommendation**
**s** 115:23
116:8 119:22,
24
**recommended**
78:20,22
**reconvene**
73:17
**record** 6:14
10:18 18:21
22:15,17 29:6
32:4,10 44:19
55:11 76:7
90:14 100:21
107:13 115:6,
9 116:14
117:23 137:1,
25 138:2
**records**
25:11,14 46:2
122:10
123:11,13
148:21,22,25
149:5,6
**recovery**
45:19 47:9
**rectangles**
8:19
**recuperate**
120:8 134:13
**recuperation**
64:21
**red** 90:18
**reduce** 33:4
**reduced** 55:3
114:5
**refer** 11:6,8
18:13 79:15
120:1
**reference**
23:23 24:25
25:11 28:5

29:16 61:12
81:12 87:4
100:21 125:17
128:16,17
129:23 142:25
**referenced**
24:11 29:21
30:1 74:18
90:18 101:1
130:5
**references**
123:1
**referencing**
86:10 95:11
123:10 124:9
125:13 130:14
132:25 136:1
**referring**
13:14 24:20
25:2,4 28:12,
16,17 40:12
42:2 44:2
51:9,10
94:16,20 95:1
99:19 118:14
131:2,11,24
140:4 143:13
144:5 146:4
**refers** 18:16
76:21
**reflect** 91:20
**reflected**
142:18 148:15
**reflects** 46:8
91:13
**refresh** 29:11
56:4
**regarding**
24:7 29:8
32:14 43:16
57:14 140:24
**registered**
61:14 62:7
**regular**
127:23 139:10
**reinstated**
28:7

relate 36:22
related 46:9
114:6 137:17
relative
76:24
relevant 27:3
95:13 139:25
remained
143:24
remark 129:4,
16
remarks
129:3,24
remember 8:11
16:9 19:12
29:5 32:1
34:6,7 36:21
50:22 65:23
69:1,20 70:5,
11 71:2 72:3
85:12 88:2
93:3 94:18
95:4 113:10,
13 114:4
120:15 121:15
129:23,25
138:4 145:19
reminding
74:6
REMOTELY 6:1
Removing 33:2
Reno 18:20,22
19:1 22:25
23:13 33:7,25
42:7,12,22
43:4 44:10
46:18 49:7
50:4,16 67:3
68:17 69:6,24
74:17 75:18
80:19 85:17
89:10 103:19
104:1,11,22,
25 107:2
113:6,11
114:19 118:9,
24 120:12,19
124:1,10,20

125:6 128:9
130:6 141:16,
19
Reno's 19:16
68:8 89:1
reorganization
27:7 30:5
35:3 68:15
70:10,24 71:9
74:22 144:16
148:19
reorganization
al 34:20
reorganization
s 28:4,11,16
reorganizing
48:13,18 50:1
51:5 70:2,13
85:22 147:4
repeat 49:25
repeated
48:17 49:3,24
85:21
rephrase 7:25
24:21 59:2
replaced 19:9
146:12,22
147:12
replacement
142:19,21
replicated
100:25
replied 68:7
reply 68:7
report 79:12,
25
REPORTED 6:1
reporter 8:24
11:5 18:24
73:24 150:2,6
reports 84:14
93:14
represent
96:12
representative
96:4

represented
10:9,12
request
42:14,25
43:3,4 47:3,
6,17 61:24
103:5 114:5
125:14 127:4
128:7 131:19,
25 132:11,15
134:5 136:1
137:2,11,20
141:13,23,24
requested
42:10,16 47:4
64:1 65:2
134:4,5 136:8
141:15
requesting
44:9
requests
132:10,25
133:5
required
34:11 38:19
87:3 109:24
127:19
requires
54:25
research
75:22 80:22
reserve 150:1
reside 17:8
resided 16:19
residence
17:17
residential
38:5,8,12
139:6,9
resides 16:16
resign 88:2
resource 17:2
57:2
resources
34:12
respect 13:23
26:7 29:21
34:9 49:6

55:18 80:13
81:6 105:14
120:6 132:14
145:10 147:24
respond
45:10,22
48:11
responded
67:20
respondent's
95:24
responds
45:15
response
25:19 43:4
49:1 56:15
67:17 85:18
95:24 96:4
121:13 135:9
137:1,4,11,20
138:9,16
139:17,19,25
146:18
responses
137:25 138:4,
9
responsibility
114:8,9
responsible
40:16
rest 31:21
79:24 99:5
restate 7:25
restated 8:14
resting 66:14
restraining
132:7
retain 129:7
retained
144:4
retaliated
136:4
retire 27:22
37:25 80:25
88:2 102:19
130:3 141:7
143:2,15

retired   29:19
   55:13 59:19
   100:5 103:1,
   16 144:7
   146:14 147:21
retiree
   101:10 102:5,
   16
retirement
   38:5 78:20,23
   86:19 100:2
   124:2 125:9
   139:1,2
   141:6,10
   144:21 145:23
retiring
   53:23 130:8
   138:21
return   136:19
returned
   116:24
   120:16,19
returning
   123:6
review   15:8
   29:16 31:18
   44:14 82:12
   93:21 95:12,
   16 102:20
   105:12
   117:10,25
   120:3 137:4
reviewed
   12:5,7,11,12
   40:19 57:16
   101:14
reviewing
   46:6 82:15
   118:4 138:4
revised   97:25
rid   75:1
   114:14 143:24
   145:2,4
right   10:1
   16:17 19:8
   22:14 23:8
   28:20 30:7
   31:13 36:9,23

38:1,6 42:9
43:23 44:22,
23 45:4,12,
15,23 46:15,
25 50:3,12,18
51:25 52:8,16
53:9 54:9,14
55:14 56:6,7,
8 58:7,13
61:14 62:11,
14 63:3 66:1,
9,17,22
67:13,15,21,
25 68:17
71:13 73:3,
12,25 77:17
83:22 84:13
86:8 88:8,19
91:9 93:2,15,
17 96:24 99:5
100:24
101:12,18
102:7 104:3,5
105:20 107:18
109:13 110:3
111:18 115:5
117:5 123:20
124:4 126:9,
13,22 128:12
129:20,25
130:18,25
132:4 134:8,
18 135:22
138:18 139:13
141:19 142:17
145:20 147:11
148:17 149:5,
16,18 150:1
right-hand
   90:19 91:12
   98:24
role   29:25
   103:20 112:10
   119:17
room   10:1,2,
   3,4 15:5
   114:9 122:14,
   16,24 123:24
   148:12

rules   7:10

_____

**S**

_____

S-C-H-R-O-T-H
   145:22
safe   30:23,25
   34:13
sake   11:5
   22:14 58:13
Sal   72:18
salary   26:2,9
   58:6 76:17
   77:10,13,15,
   22 78:1,3
   103:9 124:1,4
Salvagno
   72:21 73:4
   97:9,17,22
   98:10 101:15
   102:20
sat   40:19
   106:10
Saturday
   48:7,8,11
   66:14 67:14,
   17,20 68:6,8,
   18 69:7
saying   14:8
   44:8,11 53:25
   64:18,21 78:3
   92:25 143:16
says   23:25
   25:1 29:3
   32:21 33:2,10
   45:7,24 53:8,
   9 56:20 65:15
   67:3,14
   76:13,15
   82:22 84:18
   85:4,25 86:16
   89:15 95:5,9,
   22 97:4 99:12
   102:16 107:24
   109:1 114:23
   125:5 128:11,
   25 130:12,19
   136:4

scale   109:23
scan   122:9,
   14,15,24
   123:24
scanning
   122:14 123:9
schedule
   39:16,21,25
   40:1 41:24
scheduled
   43:20 45:2
   46:8,15 64:25
   84:20 85:1
   120:9 142:4,6
scheduling
   43:2 142:2
school   17:1
   57:2
Schroth
   145:21
scope   72:9
Scott's
   147:11
screen   20:7,
   10 21:4,22
   28:22 31:7,
   11,13 52:19
   57:6
screenshot
   53:1 63:2,10,
   15,19,20,22
   64:9 65:13
   66:24
scroll   22:3
   31:21 32:15
   44:25 53:7
   88:22 89:22
second   23:25
   31:18 51:25
   53:7 76:11
   79:15 80:3
   86:15 88:22
   94:11,12 95:1
   97:16 108:2,
   4,16,21,25
   109:15 110:15
   111:10,20
   120:3 128:25

145:20

**secretary**
41:21,24

**section** 23:22
25:10,24,25
26:19 35:13
80:8,13 81:12
97:3,18
110:22
111:21,24

**sections**
22:21

**see** 20:6 21:6
22:11 26:21
27:18 28:24
31:5,13,14,
16,21 32:6,8
45:24 48:16
52:3,16
59:11,20
60:10 64:22
65:5 66:12
72:23 73:14
78:12 79:18
85:9 86:2
89:5,15 94:8,
16 95:17
96:1,18,21
99:10 104:23
106:23 108:4
109:2 113:1,3
116:4 124:6
142:23

**seeing** 21:22
27:24

**seeking** 55:7
76:12 127:17

**self-employed**
14:12

**send** 36:6,7
59:11 133:11

**senior**
144:12,16,20,
23 146:2

**seniority**
78:9

**sense** 59:20

**sentence**
86:16 129:1
130:1

**separate**
83:17 84:8
92:2

**separately**
105:12

**separation**
18:14,15 19:2
23:11 27:5
35:16,17,24
36:10,25
37:12,23
53:16,21
58:21 79:14,
21 80:17,23
81:8 87:25
92:10 100:3

**September**
18:9,13,16,18
37:25 39:13
53:20 60:4
76:9 79:21
87:25 100:3
102:18,19
138:21

**sergeant** 17:1

**series** 44:20

**served** 22:16
137:4 138:1

**service** 138:3

**services**
19:19,21
32:11,23
33:12 84:9

**session** 7:12

**set** 39:11
62:21 72:23
73:1 96:14

**seven** 45:11
46:15 127:18
133:13 134:12

**several** 11:3
12:25 14:21
34:15 82:7
93:10 98:22

**severance**
27:22 59:12
143:20

**Shannon** 40:3,
9,19,22 42:2
68:24 69:2,16
72:6 112:10
125:2

**Shannon's**
114:8

**share** 20:6
21:10,11
28:22

**shared** 13:13

**sharing** 20:10

**she'd** 106:7

**sheet** 46:6
67:23 90:20
94:12 100:8
142:10

**sheriff** 22:18
23:20 24:5,7
28:17,18
95:10 117:25
119:7,13,14
137:3,18
141:12
147:11,14

**sheriff's**
6:20 11:4,6,9
35:20 38:20
53:2 54:7
59:13 69:4
74:22 80:25
92:13 93:17
100:16 132:24
137:5 138:1,2
143:25 144:15

**shift** 63:24
64:25

**shifts** 39:17

**shirts** 114:6

**shock** 69:13

**short** 31:22
49:10

**short-term**
108:5,8 109:1
111:24

**show** 19:23
21:1 28:20
31:7,11,12
52:11,14 61:4
146:7

**showed** 51:12
114:22

**shown** 34:22
52:22 53:3,18
142:13

**shows** 65:13
79:16 101:9
102:1

**sic** 37:5
129:1 149:3

**sick** 46:21,
24,25 47:1,4,
6,10,12,17
48:17 50:8,9
57:25 59:6
60:7 63:13
64:2,5,11
65:2,18 72:14
81:7 84:19
85:6 87:15
91:21,24
92:15,17,19,
25 122:10
123:23 125:13
127:4 128:8
134:12,16,24
135:11,12
141:13,15

**sign** 97:4,13
100:12,13
106:6 150:1

**signature**
82:1 97:4,6,
8,12,19,23,24
98:7,8,10
100:8,9

**signed** 82:4,
13 96:21
98:14,20
122:21

**significant**
33:10 34:11
78:3

signing   138:5
silently
29:12
similar   96:13
111:16 124:5
simple   20:8
single   40:20
142:10
sir   10:6,8
15:7 23:21
38:16 39:5
56:25 57:4,9
62:9,15,24
104:9,13
128:19
sit   105:9,13
122:18
sitting   121:2
situation
68:22 124:11
skip   98:22
100:24
Skipping
131:6
slightly
91:12,16
Smith   9:23
software
63:11,19
64:4,19
109:4,7
sort   19:6
34:7 53:1
71:8 74:20
75:22 76:11
89:8 91:15
102:24 114:18
139:12
sought   120:9,
12
sound   129:11
sounds   49:9
104:5 117:13
space   88:8
97:3
spam   90:8

speak   11:16,
19 12:24
13:10 43:16
81:13 140:23
speaking
12:18 53:12
81:4
special   19:14
147:20
specialist
97:9
specific   14:1
24:19 32:19
39:12 57:15
66:3 96:16
111:20 114:20
125:19 144:15
specifically
9:19 13:20
17:11 22:25
24:2,5,10
29:16 33:11
63:1,5 66:22
71:2 75:5
95:1 118:8
129:14 132:9
specifics
77:10
speculate   8:7
speedy   45:19
spend   34:11
spending
33:14,22,25
34:16,17
spent   33:18
spoke   16:13
68:19
spoken   12:19
sponsored
56:10
sponsorship
56:22
spots   89:23
spousal   98:5
SRO   17:1
SS&D   142:21

stack   31:3
62:17
stacks   88:7
Stacy   146:12,
23 147:6
staff   27:8
32:13 43:10,
11 68:24
69:7,15 72:5
88:7 115:15
128:6
staffing
28:4,11,16
34:21,24 35:3
70:19
stamp   65:8,9
stamped   65:10
stand   112:1,
5,7
standalone
84:2
standards
109:24 110:9
start   8:23
13:7 46:1
107:18 109:12
started   14:18
47:11 48:1
49:14 75:16
82:25 110:2,5
139:3,5,7
starting
46:12 139:9
starts   67:18
142:19
state   6:14
141:5,9
stated   9:4
26:19
statement
24:11 25:2
81:23 82:12,
22 84:17 92:9
95:10,12,24
96:5 100:1
102:5 118:22
statements
82:16,21

118:5
states   131:7
135:20 140:1
stating   24:24
27:20 79:1
126:4
status   14:10
86:2
statute
140:19,21
stay   30:20
93:21 141:4,7
stayed   51:14
staying   30:19
STEFANY   6:13
10:19 15:20,
21 18:21,25
19:24 20:5,
13,18,21,25
21:6,10,13,
14,22,25 22:2
26:16 27:1
31:7,9,15
58:19 59:1
61:24 62:4
73:12,14,22,
25 74:5 88:6,
10 117:11,14,
18 119:2,6
126:11,16
127:6,12
131:15,22
132:17 133:2,
24 134:21
135:3,8,15,18
136:12,16,19,
22 149:16,21
150:4
step   13:19
stepson   77:3,
4
stop   48:6
51:25 59:15
102:10
stopped   65:7
storage   114:9
strict   87:3

stub 91:6
92:2
stubs 91:25
studies 38:23
stuff 16:8
33:17 41:6
112:13
114:10,12
116:20
stuffed 41:10
subject 29:8
113:6,11
submit
132:10,24
133:5
submitted
22:11 95:11
96:4
submitting
43:3 126:5
subparagraph
25:9 33:10
subsection
24:2
substance
70:6
substantially
55:21
substantive
8:16 16:3
sue 93:15
suffer 133:16
suffered
133:15,20
134:23
suggested
50:17
suggesting
65:12 126:6
suggests
65:13
summarize
102:24
summary
101:22 142:13
146:7

supervise
40:8
supervised
40:10 104:8,
12 128:5
supervision
19:7 104:7,11
supervisor
18:19 19:2,9,
17 40:6
supervisory
118:10
supplements
95:13
supplied
25:16,18,22
supplies
30:21,25
33:19 34:18
support
19:18,21
22:23 23:24
33:12 113:15
132:23
supporting
84:17
supposed
50:11 51:3
127:8 133:8
140:19 141:2
sure 7:20 8:1
14:16,25
19:20 24:21
28:14 29:3
34:6 44:7
57:24 59:23,
24 67:13 72:8
74:9,12 77:18
87:21 88:3
89:17,18
92:18 99:18
103:12 112:11
116:10 128:15
129:13 130:9,
10 142:1
143:11 146:1
surface 32:18

surgeon 65:20
surgery 43:18
44:11 45:2
46:3,10,13
47:8 64:20
66:4 71:4
84:20 85:1
120:9,19
123:4,5
125:14 131:25
134:13 136:9
142:2,4,8
surgical
120:8
swimming
14:18
switched 98:3
sworn 6:8
system 42:15
47:2 85:5,12
106:3 109:2,3
111:5 145:3

---

**T**

tabbed 31:11
take 7:9 9:11
17:16 20:18,
21 26:6 29:11
31:18 41:6
42:8,22 43:7
50:20 64:2
73:11,12,15,
20 78:20,23
96:17 112:8
117:11 136:15
141:13 146:15
147:21
taken 7:14
78:13 141:9
150:8
taker 53:9,
18,23 54:11
55:4,8,19
56:2 57:14
58:1,9,17
59:7 60:8,9,
22 72:12

76:9,13 77:1,
5,11 81:10
128:18
taker's 58:6
takes 147:14
taking 32:24
43:12 113:24
123:23
talk 13:3
14:3 15:22
16:3,7 18:15
22:3 48:2
50:4 67:3
70:1 81:14
105:9,10
113:22 141:1
talked 13:25
14:6,9 15:13
16:6 17:4
34:19 42:12,
18 44:10
45:25 49:6
50:6 54:5
56:3 64:13
66:20 68:4,11
69:2,3 71:23
72:16,24 73:7
75:18 85:13
86:5,8 87:24
106:11 113:16
132:21 133:8
148:5,7
talking 11:14
13:2 17:3
20:15 43:15,
18 59:25
68:17 69:6,23
91:2 101:7
105:7,8
113:14 124:12
143:23 145:5,
6
talks 115:2
target 122:22
Taylor 147:9,
10
team 40:11
112:3,5,7

technically
83:14
telephone
57:11 72:10
78:16 87:9,25
tell 7:14,24
8:10 12:7,25
14:6 19:5
28:22 29:12
42:17 43:12
44:14 48:22
49:18 61:2
62:19 66:10
70:18 81:17
84:11 88:11
89:19 90:11,
21 93:7 96:9,
19 106:15
107:10,14
113:10 115:7
120:4 121:20
127:7,10
128:2 136:24
140:15 144:23
telling 45:1
48:24 79:4
87:21 89:11
temporal
23:15
temporally
124:19
ten 26:2,9
79:22 117:11
136:16,18
tenure 78:10
79:24
terminate
50:8 115:4
terminated
79:5 133:25
140:20
termination
26:10 60:2
103:13 140:3,
14,16
terms 147:25
Terry 147:10

test 74:9
testified 6:9
57:11,19
68:18 81:3
140:9
testimony
9:19 44:8
54:12 60:11
61:13 64:1
70:20 74:24
83:11 92:24
119:23 123:17
130:22 141:17
testing 87:3
text 48:11
66:12 67:2,8,
21,24 68:5,8
70:4 89:9,12,
21
texted 48:1
68:25 69:2,16
thank 18:24
20:23 45:22
74:12 90:10
110:13 112:21
117:16
149:23,24
Thanks 45:18
72:4
that'll 8:24
20:20
thing 13:12
32:4 36:14
75:17 109:22
113:18
things 7:10
14:7,9 15:11
32:20 33:1
34:12 51:13
75:24 92:18
114:6 146:18
think 7:11
22:4,8 32:4
33:17 41:9
42:10,12
45:14 47:11
50:13 54:6,13
56:6 57:10

60:3 61:12
62:25 67:9,11
68:4 70:2,14
73:10 77:2
81:3 84:23
91:4 98:18
99:23 101:8,
25 103:7
104:2 107:3
109:6,25
110:1,3,5,7,8
111:18 113:24
114:16 118:19
124:14 125:9
129:20 132:4
146:6
thinking
66:18 103:9
third 29:10
66:9,23 92:1
97:21
thought 46:25
70:13,22
three 46:8
62:23 79:17
85:1 98:13
117:14 127:20
128:4
three-page
62:21
three-year
34:17
THURSDAY 6:2
tight 33:22,
25
time 6:20
9:11 10:23
13:25 15:13
16:13 19:9,13
22:10 27:4,6,
14,19 28:15
29:4,23 31:25
32:1 33:16
34:5 35:9,14,
15 36:4,9,23
41:15 42:11,
13,14,22
43:23,24

45:4,17 46:6,
17 47:4,10
48:15,16,17
50:4,6 53:11,
16 55:13
59:18 63:12,
13,23 64:22,
23 65:6,9,10,
18,24 66:20
69:20 71:4
73:17 75:18
76:13 77:1,6,
17 79:13
80:20 81:4,10
82:19 87:15
88:1 91:24
92:21 93:23
103:18 106:5,
12 107:4
109:23 116:9
117:10 118:14
121:10,16
122:9,10,25
123:6,24
125:22 126:2,
18 129:15
141:6 142:2
143:1,4,5,17
148:8,22
time/vacation
57:25
timeframe
34:8
times 12:25
26:2,9 41:5
63:12 73:7
120:24 123:17
124:13 142:25
tired 121:23
title 19:18
69:19 82:24
142:12 143:3
titles 40:24
142:18,23
today 7:12
8:19 9:11,18
10:23 11:3,12
12:4,8,12,20
13:1,3 31:12

94:15 137:10
141:18
142:15,25
**today's**  6:18
11:17 13:22,
23 23:10
**told**  27:18
43:21 48:1,2,
9 49:11 51:2,
3 54:16,22
60:18,20
66:15 69:12,
25 70:14
71:16 72:22
77:13 85:20
86:11,24 87:1
119:15
124:24,25
127:21,24,25
131:3 148:17
**top**  67:23
91:5,12,19
96:25 98:6
99:12 100:7
108:5
**topic**  114:21
139:23
**total**  45:11
**touch**  93:21
**train**  112:2,
10,12 130:9,
11
**trainer**
144:12,17,21,
23 146:2
**training**  87:7
**transferred**
19:11,13
29:17,19
72:25 149:5
**transferring**
53:22
**traveling**
46:12
**treated**  143:5
145:10 146:5
**treatment**
129:2

**true**  34:10
86:5 92:9
126:12,13,17
133:10 134:4
139:7
**truth**  7:14
128:12
**truthful**  7:19
**try**  13:18
20:9 37:18
47:22 59:2
80:22 100:24
113:22
**trying**  6:23
20:8 24:23
41:9 55:10,12
64:8 109:6
115:3 121:21
122:22 125:11
127:1 143:11
148:4
**turn**  25:9
29:10 79:6
101:1 106:14
107:10,21
115:5 128:20
136:23
**turned**  133:12
**turning**
113:15
**twice**  49:4
**two**  12:10,23
15:14 16:15
23:1 63:1,5,
9,10 89:7
95:7,8 109:11
115:23
143:10,18,19,
20 149:16
**two-minute**
20:18,21
**Tyler**  109:2,3
111:1
**type**  11:6
46:19 76:12
134:7
**types**  33:5
80:23

**typewritten**
82:8,9,16
84:17
**typical**  39:16
104:25
**typically**
127:18
**typo**  105:25

---

**U**

**U.S.**  93:11
**Uh-huh**  38:14
109:11
**ultimate**
144:21
**undergo**  120:7
**undersheriff**
119:8,18
**understand**
7:15,22 9:5
10:9 24:18
25:15 47:16
49:2 52:1
59:3 63:25
64:1 68:6
70:20 75:22
76:16 77:19
83:11 89:8
92:24 99:25
113:5 116:6
119:4 127:1,
9,10 130:22
132:20 141:17
144:2
**understandable**
7:21
**understanding**
15:14 17:8
18:5 24:10
28:6 34:23
35:18 37:23
38:3 39:15
42:6 46:2,19
52:25 76:17
77:22 78:2
80:15,23
115:14,18,22

118:23 119:9,
17 120:7
123:16 127:7
135:25
**understood**
8:14 47:1
78:8
**uniforms**  41:9
**unit**  41:2,25
113:15 146:18
**University**
39:4
**unlawful**
131:9,12
135:24 140:3
**unlawfully**
132:6
**upset**  49:11,
17 122:17
**Users**  29:3,7
**utilizing**
114:10

---

**V**

**vacation**
42:15 46:24
59:5 60:7
72:14 78:12
81:7 87:15
92:2,3
**VALRICO**  6:1
**various**  20:16
40:22 76:14,
15 84:14 94:5
**VCSA**  64:19
**VCSAPPS**  64:19
65:12
**VCSS**  64:19
**vendor**  41:6
**verbally**
140:2 141:15
**verified**  6:4
**verify**  57:24
**verifying**
81:6

view  80:7
  82:12
violated
  132:6
violation
  135:24
violence
  41:11
Vision  102:6
visited  65:20
  100:14 142:4
voice  41:2,
  21,22,25
  49:11,14
  51:18 113:14
  114:7 116:9
voicemail
  70:4
volunteer
  51:19 113:15
volunteers
  41:1,3,14
  116:9

———————

**W**

wages  26:1,8,
  11 133:17
wait  17:16
  60:10 109:22
waiting  8:22
  59:10,20
walked  114:23
walking  13:19
want  8:1,6
  9:11,20 10:21
  21:3 32:20
  58:12,13
  74:12 89:13
  107:15,18
  113:14 117:9
  150:2,6
wanted  33:1
  48:22 73:16
  74:17 75:17
  110:12 113:24
  114:1 117:5

119:14
wanting
  140:24
waste  122:24
waved  121:8
way  8:7 9:6
  14:10 30:4
  52:23 65:19
  67:25 77:24
  78:19 84:1
  91:16 111:1
  113:8,18
  127:2 129:11
  131:11 137:16
  141:24,25
  142:20
website  51:23
  52:1,6 53:3
week  15:24
  16:5 39:17
  45:8 64:14
  67:8 88:3
weeks  16:15
  78:12 120:17
  122:20,21
went  14:7
  24:15 42:16
  50:9 71:4
  77:10 81:8
  83:3 98:18
  120:24 121:25
  147:20 148:21
whichever
  20:7 24:14
William  13:8
  17:20 104:2,7
  106:21,25
  147:17
Wilson  10:13
  11:1 16:11
  117:1
witness  6:3,
  8,21,24 20:5
  61:1 62:18
  80:4 88:8
  128:22 150:1
word  18:22

worded  113:9
words  70:12
  121:4,5
work  20:3,10,
  20 30:22
  35:23 38:4,8
  39:7,16,25
  41:18 46:8,15
  73:20,23
  84:12 87:7
  118:12 120:9,
  25 121:23
  122:13 125:23
  126:1 130:10
worked  18:8
  19:8 64:24
  115:1
workflow  85:6
working  39:21
  40:24 76:25
  77:5 82:23
  83:14 104:6,
  10 122:4
  138:17
workload
  115:14
Works  138:17
worksheet
  102:16
write  114:16
writing  36:5
  67:17
written  24:6
wrong  37:8
  117:2
wrote  84:24

———————

**Y**

yahoo  36:12,
  13
yahoo.com
  36:19
yeah  11:21
  20:9,20 21:17
  30:4 52:13
  61:3 73:12,19

75:2 77:15
79:25 81:15
91:3,16,25
105:23,25
110:3,8
111:4,17
113:8 115:14
125:23 128:13
136:16 144:19
150:4
year  17:22
  28:14 30:12
  34:3 39:7
  76:14 77:15,
  17 83:7,8,13
  103:22,23
  104:2 110:2
years  7:4
  14:18,21
  16:21 17:14,
  17,18 28:13
  34:25 39:10
  55:16,17
  83:5,23
  109:12 114:2

———————

**Z**

Zoom  8:19

# EXHIBIT 1



## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

**JENNA CLARK,**

  Plaintiff,

v.

           Case No. 2:22-cv-614-SPC-NPM

**CARMINE MARCENO, in his official capacity as Sheriff of Lee County, Florida,**

  Defendant.

_____/

## PLAINTIFF'S INITIAL DISCLOSURES

Pursuant to Rule 26(a) of the Federal Rules of Civil Procedure, Plaintiff, Jenna Clark ("Clark" and/or "Plaintiff"), by and through her undersigned counsel, hereby makes the following initial disclosures:

### I. Preliminary Statement

1.  This disclosure statement is submitted without waiver of any applicable privilege or protection from disclosure, such as the attorney-client and/or work-product privileges.

2.  Plaintiff reserves the right to object to discovery and/or admissibility at trial of any information contained in or derived from this disclosure statement.

3.  Plaintiff does not concede the relevancy of any information contained in or derived from this disclosure statement.

4.  Plaintiff reserves the right to rely upon the individuals identified in this disclosure statement for subjects other than those identified herein for any reason, including, but not limited to, responding to Defendant's disclosures, discovery requests, evidence, and testimony.

5.  Plaintiff reserves the right to supplement these disclosures if and when additional responsive information becomes available.

6.  Plaintiff reserves her right to rely upon those individuals and documents identified in Defendant's disclosure statement.

## II. Name and Address of Persons Likely to Have Discoverable Information Relating to Claims or Defenses

The name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment, identifying the subjects of the information;

Where the address is not listed, Plaintiff does not know the address of the individual, but this information should be in the possession of the Defendant.

| Ms. Jenna Clark, *Plaintiff* c/o Derek Smith Law Group, PLLC 701 Brickell Ave., Suite 1310 Miami, Florida 33131 | Ms. Clark has knowledge regarding her employment with Defendant, her claims alleged in the Complaint and throughout the agency proceeding, the events surrounding her employment since the time of filing her agency charge and subsequent federal complaint, and the emotional toll the ongoing discriminatory treatment took on Ms. Clark. |

| | |
|---|---|
| Ms. AnnMarie Reno, *Executive Director for Defendant* c/o Allen, Norton & Blue, PA 324 S. Hyde Park Ave Suite 225 Tampa, Florida 33606 | Ms. Reno likely has knowledge regarding Plaintiff's employment, Plaintiff's claims alleged in the Complaint, and treatment of other employees at Lee County Sheriff Office. |
| Ms. Dawn Heikkila, *Director of Human Resources for Defendant* c/o Allen, Norton & Blue, PA 324 S. Hyde Park Ave Suite 225 Tampa, Florida 33606 | Ms. Heikkila likely has knowledge regarding Plaintiff's employment, Plaintiff's claims alleged in the Complaint, and treatment of other employees at Lee County Sheriff Office. |
| Mr. Carmine Marceno, *Defendant* c/o Allen, Norton & Blue, PA 324 S. Hyde Park Ave Suite 225 Tampa, Florida 33606 | Mr. Marceno likely has knowledge regarding Plaintiff's employment, Plaintiff's claims alleged in the Complaint, and treatment of other employees at Lee County Sheriff Office. |
| Mr. Clark, *Plaintiff's Husband* 9 Jackson Ave Lehigh Acres, Florida 33936 | Mr. Clark likely has knowledge regarding Plaintiff's employment, the claims alleged in the Complaint, and Plaintiff's emotional distress and damages incurred. |
| Juliann DiBenedetto-Wilson, *Plaintiff's Daughter* 806 Chadbourne Ave NW Concord, NC 28027 | Ms. Wilson likely has knowledge regarding Plaintiff's employment, the claims alleged in the Complaint, and Plaintiff's emotional distress and damages incurred. |

| | |
|---|---|
| Jami Najarro, *Plaintiff's Daughter* 156 Fremont Ave S Lehigh Acres, Florida 33974 | Ms. Najarro likely has knowledge regarding Plaintiff's employment, the claims alleged in the Complaint, and Plaintiff's emotional distress and damages incurred. |
| All witnesses identified by Plaintiff and/or Defendants throughout the course of discovery in this matter. | |

Plaintiff reserves the right to supplement/amend this response as more information becomes available and as may be appropriate and necessary.


## III. Documents

A copy of, or a description by category and location of, all documents, electronically stored information, and tangible things that are in the possession, custody, or control of the party and that the disclosing party may use to support its claims or defenses, unless solely for impeachment:

- All pleadings on file with the Court and/or exchanged between parties in this action.
- All discovery which has or will be produced by Plaintiff and Defendant in this action, including:
  a. Correspondence and Emails between Plaintiff to Defendant
  b. Employment documents given to Plaintiff by Defendant
  c. Documents obtained during the investigation by any administrative agency including the Equal Employment Opportunity Commission and Florida Human Relations Commission.
  d. Job application materials and mitigation records
  e. Promotion applications and related records
  f. Comparator evidence and records of comparator employees
- Plaintiff's expert psychological report, in the event Plaintiff decides to timely secure and utilize an expert.

Plaintiff reserves the right to supplement/amend this response as more information becomes available and as may be appropriate and necessary.

## IV.  Damages

At this early juncture, Plaintiff is claiming the following damages:

Lost Wages: Plaintiff claims lost wages in the amount of ten times the Plaintiff's annual salary at the date of termination, plus bonuses, commissions, health insurance benefits, retirement benefits, and expected raises.

Emotional Distress: Plaintiff claims emotional distress damages of $2,000,000.00.  This amount reflects damages that a jury might award based on the severe emotional distress Plaintiff has suffered as a result of working for the Defendant.

Plaintiff will also seek attorney's fees as a prevailing party.

## V.   INSURANCE

N/A

Dated:  Miami, Florida
        January 19, 2023,

**DEREK SMITH LAW GROUP, PLLC**
*Counsel for Plaintiff*

/s/ Kyle T. MacDonald
Kyle T. MacDonald, Esq.
Florida Bar No.: 1038749
Derek Smith Law Group, PLLC
701 Brickell Ave, Suite 1310
Miami, FL 33131
Tel: (305) 946-1884
Fax: (305) 503-6741
Kyle@dereksmithlaw.com

*[Certificate of service on the following page]*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document is being served on January 19, 2023, on all counsel of record on the service list below via e-mail transmission.

By: */s/ Kyle T. MacDonald*
Kyle T. MacDonald, Esq.

## SERVICE LIST

**ALLEN, NORTON & BLUE, PA**

David J. Stefany
324 S. Hyde Park Ave
Suite 225
Tampa, FL 33606
813/251-1210
Fax: 813-253-2006
Email: dstefany@anblaw.com

Maelyn Marie Morrison
324 S. Hyde Park Ave., Suite 225
Tampa, FL 33606
813-251-1210
Fax: 813-253-2006
Email: mmorrison@anblaw.com

*Counsel for Defendant*

# EXHIBIT 2



**From:** Heikkila, Dawn < ▬▬▬▬▬▬ >
**Sent:** Friday, June 21, 2019 1:10 PM EDT
**To:** All Users <AllUsers@sheriffleefl.org>
**Subject:** Re: Recent Developments

Good Afternoon LCSO Employees,

As you know, the Lee County Sheriff's Office has recently absorbed substantial additional expenses and obligations, resulting from burdens placed on the agency by statute and state administrative actions.  Unlike expenses the agency incurred through increases in members' pay and benefits, these additional expenses are for the most part outside the agency's control.  A few of these significant increased expenses are:

•     Additional SROs in schools (required by state legislation);
•     Increased employer pension rates (set by FRS);
•     Increased LCSO Health Plan costs (caused by the ever increasing number of covered retirees, employees and dependents, and healthcare cost inflation);
•     Increased inmate medical expenses (caused by the increased rate of illness and increased age of the inmate population, and healthcare cost inflation).

The agency reviewed every aspect of its operations with the goals of continuing to improve pay and benefits for agency members; providing additional deputies on the streets and in the schools; and updating and acquiring modern technological capabilities necessary for deputies' safety and agency effectiveness.  This review identified twenty-two civilian positions with duties that could be transferred elsewhere in the agency when the member in the position retired or transferred. Seventeen of these empty positions were eliminated. Five of these positions were occupied and when the decision was made to do away with the position, the members were offered employment opportunities elsewhere in the agency. Additionally, the Public Services and Community Outreach Divisions have been eliminated and those duties have been absorbed in the new Community Response Unit and Public Information Office.

Absorbing the duties of these positions elsewhere in the agency – along with other improvements in our policies and practices - have saved the Sheriff's office over $2.7 million. There are no further changes in staffing expected - these savings will allow the Sheriff to continue to increase salaries and benefits, while meeting the additional demands placed on the agency that are outside our control.

Respectfully,
Dawn



**Dawn Heikkila, Director**

Lee County Sheriff's Office
Desk: ▬▬▬▬▬▬
▬▬▬▬▬▬
www.sheriffleefl.org

[illegible fine print disclaimer text]

# EXHIBIT 3



August 15, 2021



LCSO/Clark
DEF000114

# EXHIBIT 4





# Communications Call Taker

## Communications Call Taker

**Closing on:** Sep 30, 2021

8/2/2021
LCSO/Clark
DEF000115



## Role and Responsibilities

Communications Call Takers respond to emergency and non-emergency calls for service, using a computer aided dispatch terminal (CAD) for entering call data.

- Training consists of 3 weeks of classroom training at the Lee County Sheriff's Office and 460 hours of hands on training working directly with a Certified Trainer, after which the Call Taker must take and pass a state certification exam
- Upon successful completion of the classroom training, hands-on training phases (phases 1-4), and passing the state certification exam, candidates are placed on a shift and begin their work as Call Takers. Work schedule will be 12 hour rotating shifts.
- Communications Call Takers will continue to evolve in their positions and will be trained as Dispatchers. Dispatchers are responsible for receiving information and calls for service from Communications Call Takers, Deputies and other law enforcement agencies, assessing and prioritizing complaints and dispatching deputies in response to calls. Work involves maintaining contact with patrols, monitoring deputy responses, conducting inquiries and entries and relaying information to ensure that prompt, safe and effective response is made.
- Call Takers and Dispatchers are the connection between our citizens and deputies

## Physical Demands

- Sit or stand and work on the computer for long periods of time
- Talk, hear with both ears while wearing a headset on one ear and also listening to coworkers/trainers/supervisors with the other ear

- Use hands to handle or feel, reach with hands and arms
- Repetitive motion using coordination and dexterity abilities
- Occasionally lift and or move up to 10 pounds
- Specific vision abilities required by this job include close vision, ability to adjust focus and peripheral vision

## Minimum Qualifications and Education Requirements

- Must be 18 years old, or older
- Must have obtained a high school or GED diploma
- Must be a US Citizen or possess a current permanent resident card
- Must not have been convicted of a felony
- Must not have used illegal drugs in the last 12 months
- Must not have received a dishonorable discharge from the United States Armed Forces
- Must be able to work various shifts with rotating days off, as well as weekends, holidays and emergency events such as hurricanes
- Must be able to speak, write and understand the English language
- Must successfully complete a job related "CritiCall" test – computer literacy and good typing skills necessary

## Preferred Skills

- Computer literacy
- Good typing skills (approximately 30 wpm)
- Knowledge of Lee County geography
- Polite, courteous, and professional demeanor
- Bilingual

## Application Processing Required

All candidates must participate in the following tests to be eligible for employment:

- CritiCall testing – this is a computerized technical test that measures the following abilities; typing speed, data entry, memory recall, map reading, spelling, multitasking and reading comprehension
- Interview
- Polygraph
- Background Investigation
- Medical exam and drug screen (after conditional job offer)

**The Lee County Sheriff's Office is an Equal Opportunity Employer.**

**We proudly recognize Veterans' Preference and are committed to a drug-free workplace.**

**All conditions of this posting are subject to the Sheriff's discretion.**

Service members, veterans and the spouse and family members of such, may be entitled to preference, priority and waivers for postsecondary educational requirements and are encouraged to apply.

Application   Download

CritiCall Testing Requirements

**Job Category:** Civilian Regular Class
**Job Type:** Full Time
**Job Location:** Fort Myers

LCSO/Clark
DEF000117

Communications Call Taker – Lee County Sheriff's Office                    Page 4 of 4



**Contact Us**

**Phone Directory**

**Locations**

**Headquarters**
14750 Six Mile Cypress, Fort Myers, FL 33912

**Main Jail**
2115 Martin Luther King Blvd, Fort Myers, FL 33901

**Quick Links**

Privacy Policy

Careers

FAQs

Locations

**Follow Us**

Follow the latest news and updates on our social media platforms.

**Lee County Sheriff's Office**
Copyright © 2021 Lee County Sheriff's Office. All rights reserved.

8/2/2021

LCSO/Clark
DEF000118

# EXHIBIT 5



**JOB CLASS POSITION CONTROL CHANGE ORDERS**

| ACTION | JOB CLASS TITLE | DATE | COMMENT |
|---|---|---|---|
| Reinstate | Purchasing Supervisor | 8/21/2022 | Promote D. Deponto to Purchasing Supervisor |
| Reinstate | Fleet Manager | 8/7/2022 | Xfr M. Gastro to Fleet Manager |
| Reduce | Fleet Mechanics | 6/1/2022 | Reduce the number of Fleet Mechanics by XX ( Sarmiento moved to Call Taker; Creech to MJ Clerical) |
| Eliminate | Alarm Unit Manager | 1/23/2022 | DDenning XFR to Fleet Specialist |
| Replace | Fleet Director | 11/14/2021 | Fleet Reorg- Restructure administrative staffing levels- JaJones to Specialist, Marcotte to Captain |
| Eliminate | Radio/Podcast Coordinator | 10/28/2021 | Sheriff Reorg- Outside hire brought in as temporary consultant |
| Reduce | Communications Supervisor | 10/17/2021 | Communications Re-Org - Restructure administrative staffing levels- Griffin/Risch transferred to Dispatch |
| Reduce | Communications Manager | 10/14/2021 | Communications Re-Org - Restructure administrative staffing levels-Tony Ramsey Retired |
| Eliminate | Community Liaison | 10/11/2021 | ADellAquilla Xfr to temporary contract employee |
| Replace | Deputy General Counsel | 9/23/2021 | ASmithPromoted to Chief Legal Counsel; Deputy Gen Counsel not replaced |
| Replace | Tech Services Supervisor | 9/19/2021 | Sheriff Reorg- Tech Supervisors promoted to Managers |
| Eliminate | Purchasing Director | 9/4/2021 | Sheriff Reorg Duties Reallocated- Jenna Clark retired |
| Eliminate | Communications Secretary | 8/22/2021 | Communications Re-Org - Restructure Administrative staffing level- Tammy Rhodes XFR to Administrative Assistant |
| Replace | Communications Director | 8/22/2021 | Communications Re-Org - Restructure administrative staffing levels- Kclofani to Administrator /Fjanke to Captain |
| Replace | Records Training Officer | 8/22/2021 | Sheriff Reorg- Promoted to supervisors |
| Replace | Clinical Associate | 8/2/2021 | NGreiner Promoted to Director; Associate not replaced |
| Eliminate | Colonel | 7/24/2021 | Sheriff Reorg after Retirements - Eberhardt, Hall, Eliegood- duties reassigned to Chief of LE and CO |
| Replace | Legal Manager | 7/11/2021 | Straurig Promoted to Litigation Services Director; Manager not replaced |
| Eliminate | Inspections Director | 3/16/2021 | Sheriff Reorg- Outside hire never materialized |
| Eliminate | Senior Services Coordinator | 1/31/2021 | Sheriff Reorg partner with United Way- Jaime Bartz Retired |
| Replace | Budget Manager | 1/10/2021 | JCJones Promoted to Director; Manager not replaced |
| Eliminate | Corrections Records Administrator | 1/10/2021 | JSoudatt Promoted to Director; Administrator not replaced |
| Eliminate | Fleet Administrator | 1/10/2021 | JAJones Promoted to Director; Administrator not replaced |
| Replace | SS&D Administrator | 1/10/2021 | MVellela Promoted to Director; Administrator not replaced |
| Reduce | District Clerks | 7/31/2020 | Sheriff Reorg- End 24 hour coverage for front desk clerks - remove clerk from Gulf District (Pickering) |
| Eliminate | Senior Trainer | 8/30/2019 | Sheriff Reorg- JSchroth Retired |
| Eliminate | Community Outreach Director | 7/31/2019 | Sheriff Reorg Certified Community Response Team |
| Eliminate | Executive Administrative Assistant | 7/31/2019 | Sheriff Reorg TTaylor Retirement duties reassigned |
| Eliminate | Project Director | 7/31/2019 | Sheriff Reorg Duties Reallocated- WBergquist retired |
| Eliminate | Planner | 4/20/2019 | Sheriff Reorg- Restructure Grant Processing- LBodemann Xfr to Records |

LCSO/Clark
DEF000122

# EXHIBIT 6



## Detail for Jenna Clark: 239–850–0188

## Voice, continued

| Date | Time | Number | Rate | Usage Type | Origination | Destination | Min. | Airtime Chrgs | LD/Other Chrgs | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 8/02 | 10:21A | 239–848–0403 | Peak | M2MAllow,CallWait | Felda FL | Incoming CL | 5 | — | — | — |
| 8/02 | 10:26A | 239–477–1314 | Peak | PlanAllow | Felda FL | Fort Myers FL | 2 | — | — | — |
| 8/02 | 11:24A | 239–477–1440 | Peak | PlanAllow | Felda FL | Fort Myers FL | 11 | — | — | — |
| 8/02 | 11:52A | 239–896–0222 | Peak | PlanAllow | Felda FL | Incoming CL | 17 | — | — | — |
| 8/02 | 3:01P | 239–477–1318 | Peak | PlanAllow | Felda FL | Fort Myers FL | 1 | — | — | — |
| 8/02 | 3:02P | 239–477–1314 | Peak | PlanAllow | Felda FL | Fort Myers FL | 1 | — | — | — |
| 8/04 | 7:57A | 239–839–9839 | Peak | M2MAllow | Fort Myers FL | Incoming CL | 1 | — | — | — |
| 8/04 | 6:37P | 239–848–0403 | Peak | M2MAllow | Fort Myers FL | Fort Myers FL | 1 | — | — | — |
| 8/04 | 6:56P | 239–848–0403 | Peak | M2MAllow | Lehigh Acr FL | Incoming CL | 16 | — | — | — |
| 8/06 | 10:29A | 239–785–0411 | Peak | M2MAllow | Ft Myers FL | Fort Myers FL | 2 | — | — | — |
| 8/06 | 1:56P | 239–848–0403 | Peak | M2MAllow | Ft Myers FL | Incoming CL | 4 | — | — | — |
| 8/06 | 5:21P | 239–850–7000 | Peak | M2MAllow | Ft Myers FL | Incoming CL | 4 | — | — | — |
| 8/07 | 7:25P | 239–839–9839 | Off–Peak | M2MAllow | Alva FL | Fort Myers FL | 9 | — | — | — |
| 8/09 | 1:09P | 863–880–4768 | Peak | PlanAllow | Ft Myers FL | Poinciana FL | 1 | — | — | — |
| 8/12 | 11:52A | 239–893–0311 | Peak | PlanAllow | Ft Myers FL | Incoming CL | 1 | — | — | — |
| 8/18 | 9:47A | 904–344–1609 | Peak | PlanAllow | Palm Beach FL | Incoming CL | 1 | — | — | — |
| 8/20 | 8:42A | 239–839–8634 | Peak | M2MAllow | Felda FL | Fort Myers FL | 1 | — | — | — |
| 8/21 | 7:59A | 239–848–0403 | Off–Peak | M2MAllow | Felda FL | Fort Myers FL | 2 | — | — | — |
| 8/21 | 9:10A | 239–848–0403 | Off–Peak | M2MAllow | Felda FL | Fort Myers FL | 3 | — | — | — |
| 8/23 | 8:09A | 239–850–5927 | Peak | M2MAllow | Felda FL | Incoming CL | 6 | — | — | — |
| 8/23 | 10:09A | 239–477–1000 | Peak | PlanAllow | Felda FL | Fort Myers FL | 40 | — | — | — |
| 8/23 | 4:40P | 713–623–1433 | Peak | PlanAllow | Felda FL | Incoming CL | 2 | — | — | — |

**LCSO/Clark**
**DEF004523**

**verizon**

## Summary for Jenna Clark: 239–850–0188
**IPHONE ADMIN**

### Your Plan

**Public Safety 1st Resp SP UNL**
$39.99 monthly charge
Unlimited monthly minutes

**UNL Text Messaging**
Unlimited  M2M Text
Unlimited  Text Message

**Email & Data Unlimited**
Unlimited monthly gigabyte

**M2M National Unlimited**
Unlimited monthly Mobile to Mobile

**UNL Night & Weekend Min**
Unlimited monthly OFFPEAK

**UNL Picture/Video MSG**
Unlimited monthly Picture & Video

Have more questions about your charges?
Get details for usage charges at
b2b.verizonwireless.com.

### Monthly Charges

| | | |
|---|---|---|
| Public Safety 1st Resp SP UNL | 09/02 – 10/01 | 39.99 |
| | | **$39.99** |

### Usage and Purchase Charges

| Voice | | Allowance | Used | Billable | Cost |
|---|---|---|---|---|---|
| Calling Plan | minutes | unlimited | 86 | –– | –– |
| Mobile to Mobile | minutes | unlimited | 58 | –– | –– |
| Total Voice | | | | | $.00 |

| Messaging | | Allowance | Used | Billable | Cost |
|---|---|---|---|---|---|
| Text | messages | unlimited | 7 | –– | –– |
| Unlimited M2M Text | messages | unlimited | 8 | –– | –– |
| Total Messaging | | | | | $.00 |

| Data | | Allowance | Used | Billable | Cost |
|---|---|---|---|---|---|
| Gigabyte Usage | gigabytes | unlimited | .199 | –– | –– |
| Total Data | | | | | $.00 |
| **Total Usage and Purchase Charges** | | | | | **$.00** |

| Surcharges | |
|---|---|
| Fed Universal Service Charge | .27 |
| Regulatory Charge | .16 |
| | **$.43** |

| **Total Current Charges for 239–850–0188** | **$40.42** |
|---|---|

## Detail for Jenna Clark: 239–850–0188

### Voice

| Date | Time | Number | Rate | Usage Type | Origination | Destination | Min. | Airtime Chrgs | LD/Other Chrgs | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 8/02 | 10:03A | 239–848–0403 | Peak | M2MAllow | Felda FL | Fort Myers FL | 2 | –– | –– | –– |
| 8/02 | 10:08A | 239–980–0192 | Peak | M2MAllow | Felda FL | Fort Myers FL | 2 | –– | –– | –– |
| 8/02 | 10:13A | 239–477–1332 | Peak | PlanAllow | Felda FL | Fort Myers FL | 1 | –– | –– | –– |
| 8/02 | 10:14A | 239–477–1318 | Peak | PlanAllow | Felda FL | Fort Myers FL | 1 | –– | –– | –– |
| 8/02 | 10:14A | 239–477–1314 | Peak | PlanAllow | Felda FL | Fort Myers FL | 7 | –– | –– | –– |

LCSO/Clark
DEF004522

# EXHIBIT 7



**EEOC MIAMI DISTRICT OFFICE**
**RECEIVED 11-30-2021**

CHARGE OF DISCRIMINATION

510-2022-01352N

| | FEPA |
|---|---|
| X | EEOC |

Ms. Jenna Clark (jennaclark1962@gmail.com)   (239) 313 3578

9 Jackson Ave                      Lehigh, Florida 33936

Lee County Sheriff Office          15+        (239) 477 1000

14750 6 Mile Cypress Parkway       Fort Myers Florida 33912

| | RACE | | COLOR | | SEX | | RELIGION | | NATIONAL ORIGIN |
|---|---|---|---|---|---|---|---|---|---|
| X | RETALIATION | X | AGE | | DISABILITY | | GENETIC INFORMATION | | |
| X | Other (Specify) FMLA Interference; FMLA Retaliation | | | | | | | | |

**See Charge Attached

11-16-21

LCSO/Clark
DEF000130

EEOC MIAMI DISTRICT OFFICE
RECEIVED 11-30-2021

The name and address of the business against whom the charge is made is:

Lee County Sheriff Office
14750 Six Mile Cypress Parkway,
Fort Myers, FL 33912
239-477-1000

The exact number of employees at the above entity is unknown, but upon information and belief, there are well more than the statutory minimum.

**A Statement of Facts is as follows:** Upon information and belief, Complainant alleges as follows:

1. Claimant JENNA CLARK (hereinafter "Claimant" and/or "Clark") is an individual woman residing in the State of Florida, Lee County.

2. At all times material, Claimant CLARK was an employee of Respondent, Lee County Sheriff Office (hereinafter "Respondent" or "LCSO").

3. At all times material, Respondent LCSO was and still is a government agency authorized to do business in the State of Florida, with their headquarters located at 14750 Six Mile Cypress Parkway, Fort Myers, FL 33912 in Lee County.

4. At all times material, Respondent LCSO employed Claimant to work out of its headquarters, 14750 Six Mile Cypress Parkway, Fort Myers, FL.

5. In or around 1992, Claimant began working for Respondent LCSO as a Financial Assistant.

6. Claimant has worked for Respondent for 29 years and worked her way up to Director of Purchasing.

7. At all times material, Claimant would be eligible for retirement benefits after 30 years of employment within the agency or at the age of 62, whichever came first.

8. On or around August 12, 2021, Claimant took approved sick leave for a scheduled surgery that

2

LCSO/Clark
DEF000131

EEOC MIAMI DISTRICT OFFICE
RECEIVED 11-30-2021

required a recovery period of seven days.

9. Claimant's leave was approved by her supervisor, ANNMARIE RENO ("RENO") and was also communicated via email to the Human Resources Director, DAWN HEIKKILA ("HEIKKILA").

10. When Claimant inquired about using FMLA, HEIKKILA advised to Claimant to hold off on submitting the FMLA paperwork as she was too busy to process it.

11. On or around August 21, 2021, while on sick leave, RENO texted Claimant "Can you call me. I have to talk to you." Claimant immediately called RENO who advised her that her position as Purchasing Director was being eliminated due to reorganizing. RENO also advised her that she needed to contact HEIKKILA on August 23rd for further instruction.

12. Claimant then noticed on the system database ("Email Workflow") that her previously approved sick leave had been changed to "admin leave with pay."

13. Claimant was utterly shocked and angry by the news that her position was being terminated as she had devoted her entire career to the agency and was only nine months away from retirement.

14. On or around August 23, 2021, Claimant met with HEIKKILA to discuss the status of her position and see what other options would be available to her.

15. HEIKKILA told Claimant that there were no other positions within the agency that were available to her and that her only options would be to initiate her retirement early or be terminated.

16. Claimant knew that there were other available positions because she saw them posted on the

LCSO/Clark
DEF000132

EEOC MIAMI DISTRICT OFFICE
RECEIVED 11-30-2021

website. Claimant expressed to HEIKKILA that she was interested in applying so that she could continue her employment at least until her retirement date matured.

17. When Claimant expressed her interest in applying, HEIKKILA told Claimant that the jobs posted were academy positions, which required "strict testing' to even be considered. She further reiterated that those positions required memory and attention to detail, insinuating that Claimant was too old to perform the tasks of those positions.

18. HEIKKILA also advised that even if Claimant were to get one of the available positions, Claimant would likely not be able to receive her accrued sick leave or vacation time earned at the rate of her current position as Purchasing Director. Instead, she said it would be at the lower rate of those positions even though she earned it while being Purchasing Director.

19. On or around August 24, 2021, Claimant received the formal termination letter from LCSO notifying her that her position would be eliminated effective September 4, 2021. The letter, dated August 15, 2021, indicated that her position was being eliminated as a result of LCSO conducting a "Reduction in Force."

20. The letter further stated that Claimant will be placed on Administrative Leave with Pay and given the opportunity to retire. The deadline for Claimant's decision was September 3, 2021 at 4pm.

21. On or around September 3, 2021, Claimant resigned from LCSO and initiated the process of early retirement.

22. As a result of Claimant being forced into early retirement and not reaching the age of 62 or being employed with the agency for 30 years, she is being penalized over 13% of her retirement pension.

LCSO/Clark
DEF000133

EEOC MIAMI DISTRICT OFFICE
RECEIVED 11-30-2021

23. As a result of Respondents' actions, Claimant has experienced severe sleep deprivation, anxiety and stress.

24. As a result of the acts and conduct complained of herein, Claimant has suffered and will continue to suffer the loss of income, the loss of salary, bonuses, benefits and other compensation which such employment entails, and Claimant also suffered future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Claimant has further experienced severe emotional and physical distress.

25. As Respondents' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Claimant demands compensatory damages against the Respondent.

26. The above are just some examples of some of the unlawful discrimination, hostile work environment and retaliation to which Respondent subjected Claimant.

27. Claimant seeks to pursue her rights under Title VII, FCRA, ADEA and FMLA.


Thank you for your courtesy and cooperation in this matter. Please contact me if you have any questions or require any additional information.


Dated: November 23, 2021
       Miami, Florida

                                        *Respectfully submitted,*

                                        **DEREK SMITH LAW GROUP, PLLC**

                                        */s/ Kia J. Love*
                                        Kia J. Love, Esq.
                                        Florida Bar Number 99532
                                        701 Brickell Ave., Suite 1310
                                        Miami, Florida 33131
                                        Ph: 305-946-1884
                                        E-mail: kia@dereksmithlaw.com

5

LCSO/Clark
DEF000134

# EXHIBIT 8



 **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

Miami District Office
100 SE 2nd St, Suite 1500
Miami, FL 33131
(800) 669-4000
Website: www.eeoc.gov

## DISMISSAL AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161 & 161-A)

Issued On: 08/02/2022

**To:** Ms. Jenna Clark
9 Jackson Ave
Lehigh Acres, FL 33936
Charge No: 510-2022-01352

EEOC Representative and email:    Jose Delarosa
Federal Investigator
Jose.Delarosa@eeoc.gov

### DISMISSAL OF CHARGE

The EEOC has granted your request for a Notice of Right to Sue, and more than 180 days have passed since the filing of this charge.

The EEOC is terminating its processing of this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 510-2022-01352.

On behalf of the Commission,

Digitally Signed By:Roberto Chavez
08/02/2022
Roberto Chavez
Acting Director

LCSO/Clark
DEF000199

Cc:
David J Stefany
Allen Norton & Blue, P.A.
324 S HYDE PARK AVE STE 225
Tampa, FL 33606

Maelyn M Morrison
Allen Norton & Blue, P.A.
324 S HYDE PARK AVE STE 225
Tampa, FL 33606

Lauren Wilson
14750 Six Mile Cypress Parkway
Saint Petersburg, FL 33712

Lindsay Purdy
Allen Norton & Blue, P.A.
324 S HYDE PARK AVE STE 225
Tampa, FL 33606

Kia Love
DEREK SMITH LAW GROUP, PLLC.
701 Brickell Ave. Suite 1310
Miami, FL 33131

Lauren Wilson
Derek Smith Law Group, PLLC
701 Brickell Ave Suite 1310
MIAMI, FL 33131

Please retain this notice for your records.

Enclosure with EEOC Notice of Closure and Rights (01/22)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice.** Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice.** Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a FOIA Request or 2) a Section 83 request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your request for the charge file promptly to allow sufficient time for EEOC to respond and for your review. Submit a signed written request stating it is a "FOIA Request" or a "Section 83 Request" for Charge Number 510-2022-01352 to the District Director at Roberto Chavez, 100 SE 2nd St Suite 1500

Miami, FL 33131.

You can also make a FOIA request online at https://eeoc.arkcase.com/foia/portal/login.

**LCSO/Clark**
**DEF000201**

Enclosure with EEOC Notice of Closure and Rights (01/22)

You may request the charge file up to 90 days after receiving this Notice of Right to Sue.  After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA Requests and Section 83 Requests, go to: https://www.eeoc.gov/eeoc-foia-index.cfm.

LCSO/Clark
DEF000202

# EXHIBIT 9



**Email To:** dstefany@anblaw.com,mmorrison@anblaw.com,lpurdy@anblaw.com,lauren@dereksmithlaw.com
  **Subject:** Document Added to EEOC Charge 510-2022-01352
  **Sent On:** 2022-08-02T17:16:41.817520



### U.S. Equal Employment Opportunity Commission

A new document was added to EEOC Charge No. 510-2022-01352, Ms. Jenna Clark v. LEE COUNTY SHERIFF OFFICE. To view it, sign-in to the EEOC Respondent Portal.

*Notice of Confidentiality: This email may contain privileged and confidential information, including information protected by federal and state privacy laws. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited and may be unlawful. If you are not the intended recipient, please contact (800) 669-4000 and destroy all copies of the original message and attachments.*

**Email To:** kia@dereksmithlaw.com,jennaclark1962@gmail.com
  **Subject:** Document Added to EEOC Charge 510-2022-01352
  **Sent On:** 2022-08-02T17:16:41.472390



### U.S. Equal Employment Opportunity Commission

A new document was added to EEOC Charge No. 510-2022-01352, Ms. Jenna Clark v. LEE COUNTY SHERIFF OFFICE. To view it, sign-in to the EEOC Public Portal.

*Notice of Confidentiality: This email may contain privileged and confidential information, including information protected by federal and state privacy laws. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited and may be unlawful. If you are not the intended recipient, please contact (800) 669-4000 and destroy all copies of the original message and attachments.*

**Email To:** kia@dereksmithlaw.com,jennaclark1962@gmail.com
  **Subject:** Document Added to EEOC Charge 510-2022-01352
  **Sent On:** 2022-04-29T14:01:57.443802



### U.S. Equal Employment Opportunity Commission

A new document was added to EEOC Charge No. 510-2022-01352, Ms. Jenna Clark v. LEE COUNTY SHERIFF OFFICE. To view it, sign-in to the EEOC Public Portal.

*Notice of Confidentiality: This email may contain privileged and confidential information, including information protected by federal and state privacy laws. It is intended only for the use of the person(s) named above. If you are not*

*the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited and may be unlawful. If you are not the intended recipient, please contact (800) 669-4000 and destroy all copies of the original message and attachments.*

**Email To:** kia@dereksmithlaw.com,jennaclark1962@gmail.com

   **Subject:** Position Statement Provided for your Charge 510-2022-01352

   **Sent On:** 2022-04-29T14:01:50.698314



### U.S. Equal Employment Opportunity Commission

EEOC has provided the Position Statement that LEE COUNTY SHERIFF OFFICE submitted on your charge, 510-2022-01352. To review the Position Statement and any relevant attachments or supplements, please go to the EEOC Public Portal as soon as possible, choose the "My Cases" option, and log-in to view your charge.

It will be helpful to EEOC's investigation if you provide a response to the Respondent's Position Statement by 05/19/2022.

Any information you provide will be taken into consideration when the EEOC reviews your case. Please upload your response through the Public Portal. Be sure to identify any further witnesses, their contact information, and a brief synopsis of what they will say.

There is no specific format for your response; however, be sure to point out discrepancies in the employer's information and explain what you believe to have happened. This is your opportunity to provide any additional information you feel is relevant to support your case.

Please be aware that by receiving these documents before you have filed a lawsuit based upon your charge, you agree that you will only share them with persons in a privileged relationship, such as a spouse, clergy, or medical, financial, or legal advisor.

*Notice of Confidentiality: The information contained in this transmission may contain privileged and confidential information, including information protected by federal and state privacy laws. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited and may be unlawful. If you are not the intended recipient, please contact us at digital-support@eeoc.gov and destroy all copies of the original message and attachments.*

**Email To:** jennaclark1962@gmail.com

   **Subject:** Position Statement Request for EEOC Charge 510-2022-01352

   **Sent On:** 2022-04-28T20:46:45.675742



### U.S. Equal Employment Opportunity Commission

The EEOC has received your request for a copy of the Position Statement submitted by LEE COUNTY SHERIFF OFFICE on your charge, 510-2022-01352 and will notify you by email when the Position Statement is available for you to review.

Before we provide the Position Statement and attachments to you, the EEOC investigator reviews the documents to ensure they do not contain protected and/or confidential information. We ask you to be patient as we receive many

requests for Position Statements and it may take several weeks to review and release the Position Statement and attachments related to your charge.

*Notice of Confidentiality: The information contained in this transmission may contain privileged and confidential information, including information protected by federal and state privacy laws. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited and may be unlawful. If you are not the intended recipient, please contact us at digital-support@eeoc.gov and destroy all copies of the original message and attachments.*

**Email To:** kia@dcreksmithlaw.com,jennaclark1962@gmail.com

  **Subject:** Position Statement Requested for Your Charge 510-2022-01352

  **Sent On:** 2022-04-28T14:25:41.314125

 **U.S. Equal Employment Opportunity Commission**

We have asked LEE COUNTY SHERIFF OFFICE to submit a Position Statement on your charge, 510-2022-01352. To request it, please go to the EEOC Public Portal, choose the "My EEOC Cases" option, and log-in to view your charge and submit your request to EEOC. Once we have received the Position Statement and reviewed it, we will post it to the Public Portal where you can view or download it.

*Notice of Confidentiality: The information contained in this transmission may contain privileged and confidential information, including information protected by federal and state privacy laws. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited and may be unlawful. If you are not the intended recipient, please contact us digital-support@eeoc.gov and destroy all copies of the original message and attachments.*

**Email To:** lauren@dcreksmithlaw.com,cmarceno@sheriffleefl.org

  **Subject:** Sent Password change to 510-2022-01352

  **Sent On:** 2022-04-06T09:33:00.192129

*No Message found*

**Email To:** Kia@dereksmithlaw.com

  **Subject:** Please Confirm Your Representation of Jenna Clark

  **Sent On:** 2021-12-29T17:10:24.297

Body of message could not be extracted

**Email To:** jennaclark1962@gmail.com

  **Subject:** Online Access to Charge Information

  **Sent On:** 2021-12-08T14:59:24.978

Body of message could not be extracted

**Email To:** kia@dereksmithlaw.com

  **Subject:** Online Access to Charge Information

# EXHIBIT 10



# Lee County Sheriff's Office
## Member Evaluation Form



## Member Information

| | |
|---|---|
| Member | Clark, Jenna D |
| ID: | 92-072 |
| Supervisor: | RENO, ANNMARIE S |
| Shift: | |
| Department: | Purchasing |
| Assignment: | Manager |
| Rank: | PURM |
| Position: | LCSO Employee |

## Evaluation Information

| | |
|---|---|
| Type: | Annual |
| Review Date: | 7/10/2012 |
| Rating Period | 6/5/2011 to 6/4/2012 |
| Overall Rating | EP |

**Scale:** Overall Ratings

EP = Exemplary Performance
AS = Above Standard
MS = Meets Standard
CD = Conditionally Meets Standard
BS = Below Standard

## Performance Measures

**Type     Number          Rating     Performance Statement**

**Task**

Task Ratings

EP - Exemplary Performance
AS - Above Standard
MS - Meets Standard
RI - Requires Improvement
NA - Not Applicable
NE - Not Evaluated
CP - Continue Probation
RP - Remove Probation
TERM - Terminate

RECEIVED
Accreditation Department
JUL 2 0 2012
Office of the Sheriff
Lee County, FL

| AL500 | AS | Quality of Reports/Paper Work |
|---|---|---|

Jenna is very meticulous with her documentation.

| AL501 | EP | Initiative/Innovation |
|---|---|---|

Jenna is very innovated and has found various ways to save our agency money through purchasing.

| AL502 | EP | Planning and Organization |
|---|---|---|

Jenna always has a plan on how to carry out exception task and he department is very organized.

| AL503 | NA | Security/Care of Detainees |
|---|---|---|

| SP7001a | AS | Conduct/Supervise Employee Performance Evaluations |
|---|---|---|

Jenna continues to keep up with her employee evaluations and tries to help her employees accomplish their goals and objectives.

**Policy**

Policy Ratings

Printed on: 7-10-2012 11:45 AM

Page   1 of 5

Employee: Clark, Jenna D        ID: 92-072        Period: 6/5/2011 to 6/4/2012        Score: EP

LCSO/ Clark
DEF000597

EP - Exemplary Performance
AS - Above Standard
MS - Meets Standard
RI - Requires Improvement
NA - Not Applicable
NE - Not Evaluated
CP - Continue Probation
RP - Remove Probation
TERM - Terminate

| PL2 | EP | Grooming and dress |
| | | Jenna is always professionally dressed. |
| PL4 | EP | Contact with public |
| | | Jenna is a professional and works well with both external and internal customers. |
| PL500 | EP | Attendance |
| | | Jenna's attendance is excellent and she is always available via computer or phone. |
| PL501 | EP | Rules and Regulations |
| | | Jenna follows all rules and regulations set forth by LCSO. |

## Proficiency

### Proficiency Ratings

EP - Exemplary Performance
AS - Above Standard
MS - Meets Standard
RI - Requires Improvement
NA - Not Applicable
NE - Not Evaluated
CP - Continue Probation
RP - Remove Probation
TERM - Terminate

| PR31 | EP | Problem solving |
| | | Jenna is a problem solver and does not give up until she has a clear understanding of what created a problem and how to resolve the problem so that it does not happen again. |
| PR32 | EP | Conflict resolution |
| | | Jenna always tries to resolve any type of conflict within her department. |
| PR500 | EP | Work Attitude |
| | | Jenna has an great work attitude. |
| PR501 | EP | Understanding/Applying Laws/Rules in applicable career field |
| | | Jenna understands policies and procedures for the procurement of supplies, capital equipment and uniforms for our agency. |
| PR502 | EP | Judgment/Decision Making |
| | | Jenna has excellent judgment and decision making skills; she is always accepting tasks to help make our agency run smoother. |
| PR503 | EP | Leadership Qualities |
| | | Jenna is a true leader; when a job must be done, Jenna takes charge (example Narcotics move) and gets the job done. |
| PR504 | EP | Interpersonal Relationships |
| | | Jenna has good interpersonal relationships with both external and internal members. |
| PR505 | EP | Reliability and Professionalism |
| | | Jenna is very reliable and ensures that her unit is productive and that her members are customer service orientated. |
| PR506 | EP | Job Knowledge |
| | | Jenna's 20+ years of knowledge has been instrumental in taking the purchase order system from manual to an automated purchasing order system. |

LCSO/ Clark
DEF000598



*Lee County Sheriff's Office*

## OFFICIAL CAREER & COUNSELING PLAN

Rating Period:  June 6, 2011   to June 5, 2011

NAME: Jenna Clark

TITLE: Purchasing Manager

SHORT TERM
GOAL: Continue to seek out "local" vendors for products and services at the best possible price keeping the tax payers money local.  Service our customer the deputy in their everyday needs

ACTION
PLAN: Continue to network, search and monitor pricing from new and existing contracts/proposals

LONG TERM GOAL (5-10 YEARS)
After hitting a milestone of twenty (20) years at LCSO my goal is to keep a positive attitude mentor those beneath me remain healthy and retire in ten (10) years

LCSO Form 199 (revised August 28, 2008)

LCSO/ Clark
DEF000599

# EXHIBIT 11



# Lee County Sheriff's Office
# Member Evaluation Form

## Member Information

| | |
|---|---|
| Member | Clark, Jenna D |
| Supervisor: | Bergquist, William C |
| Department: | Purchasing |
| Assignment: | Director |
| Rank: | Director |
| Position: | LCSO Employee |

**ID:** 92-072
**Shift:**

## Evaluation Information

| | |
|---|---|
| Type: | Annual |
| Review Date: | 6/10/2013 |
| Rating Period | 6/5/2012 to 6/4/2013 |
| Overall Rating | EP |

**Scale:** Overall Ratings
EP = Exemplary Performance
AS = Above Standard
MS = Meets Standard
CD = Conditionally Meets Standard
BS = Below Standard

## Performance Measures

| Type | Number | Rating | Performance Statement |
|---|---|---|---|

**Task**

Task Ratings
EP - Exemplary Performance
AS - Above Standard
MS - Meets Standard
RI - Requires Improvement
NA - Not Applicable
NE - Not Evaluated
CP - Continue Probation
RP - Remove Probation
TERM - Terminate

RECEIVED
Accreditation Department
JUN 13 2013
Office of the Sheriff
Lee County, FL

| Type | Number | Rating | Performance Statement |
|---|---|---|---|
| | AL500 | AS | Quality of Reports/Paper Work |
| | | | Jenna is very detailed and meticulous with her documentation. |
| | AL501 | EP | Initiative/Innovation |
| | | | Jenna is always seeking new ways to save our agency money. |
| | AL502 | EP | Planning and Organization |
| | | | Jenna plans for the future and is very organized. |
| | AL503 | NA | Security/Care of Detainees |
| | SP7001a | AS | Conduct/Supervise Employee Performance Evaluations |
| | | | Jenna continues to keep up with all documentation. |

**Policy**

Policy Ratings
EP - Exemplary Performance
AS - Above Standard

LCSO/ Clark
DEF000591

DEF000592
LCSO/ Clark

MS - Meets Standard
RI - Requires Improvement
NA - Not Applicable
NE - Not Evaluated
CP - Continue Probation
RP - Remove Probation
TERM - Terminate

| PL2 | AS | Grooming and dress |
| | | Jenna is always professionally dressed. |
| PL4 | EP | Contact with public |
| | | Jenna is professional and works well with both external and internal customers. |
| PL500 | EP | Attendance |
| | | Jenna's attendance is excellent and she is always available when needed. |
| PL501 | EP | Rules and Regulations |
| | | Jenna follows all rules and regulations set forth by LCSO. |

## Proficiency

Proficiency Ratings

EP - Exemplary Performance
AS - Above Standard
MS - Meets Standard
RI - Requires Improvement
NA - Not Applicable
NE - Not Evaluated
CP - Continue Probation
RP - Remove Probation
TERM - Terminate

| PR31 | EP | Problem solving |
| | | Jenna tries to solve problems before they get out of hand. |
| PR32 | AS | Conflict resolution |
| | | Jenna always tries to resolve any type of conflict within her department. |
| PR500 | AS | Work Attitude |
| | | Jenna has a great work attitude. |
| PR501 | EP | Understanding/Applying Laws/Rules in applicable career field |
| | | Jenna understands policies and procedures for procurement. |
| PR502 | EP | Judgment/Decision Making |
| | | Jenna has excellent judgment and decision making skills. |
| PR503 | AS | Leadership Qualities |
| | | Jenna is a good leader who takes charge and finishes what she starts. |
| PR504 | AS | Interpersonal Relationships |
| | | Jenna works hard to keep positive relationships. |
| PR505 | EP | Reliability and Professionalism |
| | | Jenna is professional and reliable. |
| PR506 | EP | Job Knowledge |
| | | Jenna has a vast knowledge of Purchasing and continues to come up with ways to make it better. |

## Current Requires improvement

| Number | Performance Statement | Incident Date | Expected Date of Accomplishment | Date Accomplished | Entered By |
|---|---|---|---|---|---|

Employee:  Clark, Jenna D        ID: 92-072        Period: 6/5/2012 to 6/4/2013        Score: EP

## Exemplary Performance

| Number | | Performance Statement | Date | Entered By |
|---|---|---|---|---|
| AL501 | | Initiative/Innovation | | Bergquist, William C |
| | Notes: | Jenna is always seeking new ways to save our agency money. | | |
| AL502 | | Planning and Organization | | Bergquist, William C |
| | Notes: | Jenna plans for the future and is very organized. | | |
| PL4 | | Contact with public | | Bergquist, William C |
| | Notes: | Jenna is professional and works well with both external and internal customers. | | |
| PL500 | | Attendance | | Bergquist, William C |
| | Notes: | Jenna's attendance is excellent and she is always available when needed. | | |
| PL501 | | Rules and Regulations | | Bergquist, William C |
| | Notes: | Jenna follows all rules and regulations set forth by LCSO. | | |
| PR31 | | Problem solving | | Bergquist, William C |
| | Notes: | Jenna tries to solve problems before they get out of hand. | | |
| PR501 | | Understanding/Applying Laws/Rules in applicable career field | | Bergquist, William C |
| | Notes: | Jenna understands policies and procedures for procurement. | | |
| PR502 | | Judgment/Decision Making | | Bergquist, William C |
| | Notes: | Jenna has excellent judgment and decision making skills. | | |
| PR505 | | Reliability and Professionalism | | Bergquist, William C |
| | Notes: | Jenna is professional and reliable. | | |
| PR506 | | Job Knowledge | | Bergquist, William C |
| | Notes: | Jenna has a vast knowledge of Purchasing and continues to come up with ways to make it better. | | |

## Attachments

## Comments

LCSO/ Clark
DEF000593

LCSO/ Clark
DEF000594

SUPERVISOR / EMPLOYEE AGREEMENT

Rating period signatures:

I certify that this review has been discussed with me and a copy of my performance evaluation has been provided to me.

_____ 6-12-13
Employee                                                           Date

I certify that performance measure requirements have been discussed with the employee and that this evaluation is based upon documented work performance.

_____ 6/12/13
Supervisor                                                         Date

_____ 6/12/13
Reviewed by (Next Level Mgmt.)                                     Date

Reviewer Comments

Employee Comments

Printed on: 6-10-2013 10:16 AM                                          Page   5 of 5
            Employee: Clark, Jenna D      ID: 92-072    Period: 6/5/2012 to 6/4/2013    Score: EP

LCSO/ Clark
DEF000595



### *Lee County Sheriff's Office*

### OFFICIAL CAREER & COUNSELING PLAN

Rating Period: 6-6-12 to 6-5-13

NAME: Jenna Clark

TITLE: Purchasing Director

SHORT TERM
GOAL:
Continue to monitor products/svcs-new and [search]
existing Network with Agency members on needs
Find new and creative ways of team building - Purchasing
Listen more

ACTION
PLAN:
Stay organized within the Division/Communicate
Learn more technology

* Try one (1) new thing per year; And take one
(1) meaningful vacation *

LONG TERM GOAL (5-10 YEARS) [9]
Mentor Purchasing girls so one can take over
Heidi's job in 4 year as Manager - And mine
in nine (9) years * exercise more

LCSO Form 199 (revised August 28, 2008)

**LCSO/ Clark
DEF000596**

# EXHIBIT 12



# Lee County Sheriff's Office

Employee Evaluation Form

**Employee Information**
**Employee** Clark, Jenna D
**ID** 92-072
**Shift**
**Supervisor** RENO, ANNMARIE S
**Department** Purchasing
**Assignment** Director
**Rank** Director
**Position** LCSO Employee

**Evaluation Information**
**Type** Annual
**Review Date** 7/2/2021
**Rating Date** 6/5/2020 to 6/4/2021
**Overall Rating** MS

**Scale: Overall Ratings**
MS = Meets Standard
RI = Requires Improvement

Performance Rating Legend

## Performance Measures

TypeId

| Number | Rating | Performance Statement |
|---|---|---|
| **Type: Task** | | |
| AL500 | MS | Quality of Reports/Paper Work<br>Jenna completes reports on time and tries to utilize Munis in the best possible way to increase workflow processes. |
| AL501 | MS | Initiative/Innovation<br>Jenna continues to try to find better processes for Purchasing. |
| AL502 | MS | Planning and Organization<br>Jenna is a good planner and continues to train those members under her |
| AL503 | NE | Security/Care of Detainees |
| SP7001a | MS | Conduct/Supervise Employee Performance Evaluations<br>Jenna completes her evaluations in a timely manner. |
| **Type: Policy** | | |
| PL2 | MS | Grooming and dress<br>Jenna is always professionally dressed for work. |
| PL4 | MS | Contact with public<br>Jenna is very professional with the public. |
| PL500 | MS | Attendance<br>Jenna abides by the rules and regulation of the LCSO as it pertains to attendance. |
| PL501 | MS | Rules and Regulations<br>Jenna follows the rules and regulations set forth by the LCSO. |
| **Type: Proficiency** | | |
| PR31 | MS | Problem solving<br>Jenna is continuing to find a way to resolve issues between receiving and Finance to streamline the flow of processes. |
| PR32 | MS | Conflict resolution<br>Jenna continues to work on conflict resolution between purchasing and finance. |
| PR500 | MS | Work Attitude<br>Jenna has a good work attitude and is always willing to help others. |

Printed On: Tuesday, November 2, 2021

Employee: Clark, Jenna D            ID: 92-072        Eval Period: 6/5/2020 - 6/4/2021              Score: MS

**LCSO/ Clark
DEF000567**

| Number | Rating | Performance Statement |
|--------|--------|----------------------|
| PR501 | MS | Understanding/Applying Laws/Rules in applicable career field<br>**Jenna understands and applies rules as they pertain to Purchasing.** |
| PR502 | MS | Judgment/Decision Making<br>**Jenna is a good decision maker and tries to find ways to streamline Purchasing.** |
| PR503 | MS | Leadership Qualities<br>**Jenna is a good leader and tries to lead by example.** |
| PR504 | MS | Interpersonal Relationships<br>**Jenna gets along with everyone; she is always volunteering to help others.** |
| PR505 | MS | Reliability and Professionalism<br>**Jenna is very reliable and is always available to help others. Jenna is very professional with internal & external customers.** |
| PR506 | MS | Job Knowledge<br>**Jenna has excellent job knowledge as it pertains to LCSO Purchasing. She is working with her members to pass that knowledge down for the future.** |

**Type: Career Counseling Plan**

| | | |
|--------|--------|----------------------|
| G1000a | NE | Short Term Goal<br>**Continue to mentor staff, sharing knowledge specifically on unexpected and issues that are uncommon or occasional.**<br><br>**(Hurricane IMT)** |
| G1000b | NE | Long Term Goal (5-10 years)<br>**Next January get ready for the DROP, stay healthy and retire.** |

## Previous Requires Improvement

| Number | Performance Statement | Incident Date | Resolution | Expected Date of Accomplishment | Date Accomplished | Entered By |
|--------|----------------------|---------------|------------|--------------------------------|-------------------|------------|
| No records to display. | | | | | | |

## Current Requires Improvement

| Number | Rating | Performance Statement | Incident Date | Resolution | Expected Date of Accomplishment | Date Accomplished | Entered By |
|--------|--------|----------------------|---------------|------------|--------------------------------|-------------------|------------|
| No records to display. | | | | | | | |

## Attachments

| Type | Description | Date | Location | Number |
|------|-------------|------|----------|--------|
| No records to display | | | | |

## Comments

Printed On: Tuesday, November 2, 2021
Employee: Clark, Jenna D          ID: 92-072          Eval Period: 6/5/2020 - 6/4/2021          Score: MS

**LCSO/ Clark**
**DEF000568**

## Electronic Signature

This evaluation has been reviewed with the specified employee. Evaluated employee has received a copy of this evaluation. Signature does not mean that the evaluated employee agrees with the evaluator's comments or score.

| Employee | ID | Position | Date Signed |
|---|---|---|---|
| RENO, ANNMARIE S | 97-003 | LCSO Employee | 7/2/2021 |
| Clark, Jenna D | 92-072 | LCSO Employee | 7/2/2021 |
| Holloway, John | 13-148 | LCSO Employee | 7/6/2021 |

Printed On: Tuesday, November 2, 2021

Employee: Clark, Jenna D          ID: 92-072          Eval Period: 6/5/2020 - 6/4/2021          Score: MS

LCSO/ Clark
DEF000569

# EXHIBIT 13



2/17/23, 3:41 PM
https://newui.vcssoftware.com/PrintTimesheetses?archived=true&enddate=08-07-2021

## Attendance Report

Name: PD Jenna D Clark
Pay Period: 07/25/2021 - 08/07/2021

Department No. PURCHASING
Employee No. 1992072
Payroll No. 941

| Date | In | Out | Total | Explanation |
|------|-----|------|-------|-------------|
| 07/25/2021 | | Off | 0.00 | Reg Day Off |
| 07/26/2021 | | Off | 0.00 | Reg Day Off |
| 07/27/2021 | 08:00 | 18:00 | 10.00 | |
| 07/28/2021 | 08:00 | 18:00 | 10.00 | |
| 07/29/2021 | 08:00 | 18:00 | 10.00 | |
| 07/30/2021 | 08:00 | 18:00 | 10.00 | |
| 07/31/2021 | | Off | 0.00 | Reg Day Off |
| 08/01/2021 | | Off | 0.00 | Reg Day Off |
| 08/02/2021 | | Off | 0.00 | Reg Day Off |
| 08/03/2021 | 08:00 | 18:00 | 10.00 | |
| 08/04/2021 | 08:00 | 18:00 | 10.00 | |
| 08/05/2021 | 08:00 | 18:00 | 10.00 | |
| 08/06/2021 | 08:00 | 18:00 | 10.00 | |
| 08/07/2021 | | Off | 0.00 | Reg Day Off |

### Details

| Date | Start | End | Total | Explanation |
|------|-------|-----|-------|-------------|

| Type Of Day / Post | Hours | Hours Worked | Hours Scheduled | Overtime | Punch Hours |
|--------------------|-------|--------------|-----------------|----------|-------------|
| | 80.00 | 80.00 | 0.00 | 0.00 | |

### Prior Period

| Date | Start | End | Total | Explanation |
|------|-------|-----|-------|-------------|

### Closed Period Adjustments

| Date | Start | End | Total | Explanation |
|------|-------|-----|-------|-------------|

This is to certify that the above report is a true statement of attendance.

This is to certify that I have reviewed the above report and find it to be in order.

This is to certify that I have reviewed the above report and find it to be in order.

Jenna D Clark

_____
Signature of Employee

_____
Signature of Supervisor (08/09/2021 08:26:13
1992072)

_____
Signature of Dept Head

LCSO/Clark
DEF000420

2/17/23, 3:41 PM                                    https://newui.vcssoftware.com/PrintTimesheetses?archived=true&enddate=08-21-2021

## Attendance Report

Name: PD Jenna D Clark                                              Department No. PURCHASING
Pay Period: 08/08/2021 - 08/21/2021                                 Employee No. 1992072
                                                                   Payroll No. 941

| Date | In | Out | Total | Explanation |
|------|-----|------|-------|-------------|
| 08/08/2021 | | Off | 0.00 | Reg Day Off |
| 08/09/2021 | 08:00 | 18:00 | 10.00 | |
| 08/10/2021 | 08:00 | 18:00 | 10.00 | |
| 08/11/2021 | 08:00 | 18:00 | 10.00 | |
| 08/12/2021 | 08:00 | 18:00 | 10.00 | |
| 08/13/2021 | | Off | 0.00 | Reg Day Off |
| 08/14/2021 | | Off | 0.00 | Reg Day Off |
| 08/15/2021 | | Off | 0.00 | Reg Day Off |
| 08/16/2021 | 08:00 | 18:00 | 10.00 | |
| 08/17/2021 | 08:00 | 15:00 | 7.00 | 3 Admin Leave With Pay |
| 08/18/2021 | | Off | 0.00 | 10 Admin Leave With Pay |
| 08/19/2021 | | Off | 0.00 | 10 Admin Leave With Pay |
| 08/20/2021 | | Off | 0.00 | Reg Day Off |
| 08/21/2021 | | Off | 0.00 | Reg Day Off |

### Details

| Date | Start | End | Total | Explanation |
|------|-------|-----|-------|-------------|
| 08/17/2021 | 15:00 | 18:00 | 3.00 | Admin Leave With Pay |
| 08/18/2021 | 08:00 | 18:00 | 10.00 | Admin Leave With Pay |
| 08/19/2021 | 08:00 | 18:00 | 10.00 | Admin Leave With Pay |

| Type Of Day / Post | Hours | Hours Worked | Hours Scheduled | Overtime | Punch Hours |
|--------------------|-------|--------------|-----------------|----------|-------------|
| | 57.00 | 80.00 | 0.00 | 0.00 | |

### Prior Period

| Date | Start | End | Total | Explanation |
|------|-------|-----|-------|-------------|
| | | | | |

### Closed Period Adjustments

| Date | Start | End | Total | Explanation |
|------|-------|-----|-------|-------------|
| | | | | |

This is to certify that the above report is a true          This is to certify that I have reviewed the above          This is to certify that I have reviewed the above
statement of attendance.                                     report and find it to be in order.                         report and find it to be in order.

                                                             Dawn M Heikkila

_____                                    _____                                  _____
Signature of Employee                                        Signature of Supervisor (08/20/2021 12:15:27              Signature of Dept Head
                                                             1999062)

LCSO/Clark
DEF000421

## Attendance Report

Name: PD Jenna D Clark                                  Department No. PURCHASING
Pay Period: 08/22/2021 - 09/04/2021                     Employee No. 1992072
                                                        Payroll No. 941

| Date | In | Out | Total | Explanation |
|------|----|-----|-------|-------------|
| 08/22/2021 | | Off | 0.00 | Reg Day Off |
| 08/23/2021 | | Off | 0.00 | Reg Day Off |
| 08/24/2021 | | Off | 0.00 | 10 Admin Leave With Pay |
| 08/25/2021 | | Off | 0.00 | 10 Admin Leave With Pay |
| 08/26/2021 | | Off | 0.00 | 10 Admin Leave With Pay |
| 08/27/2021 | | Off | 0.00 | 10 Admin Leave With Pay |
| 08/28/2021 | | Off | 0.00 | Reg Day Off |
| 08/29/2021 | | Off | 0.00 | Reg Day Off |
| 08/30/2021 | | Off | 0.00 | Reg Day Off |
| 08/31/2021 | | Off | 0.00 | 10 Admin Leave With Pay |
| 09/01/2021 | | Off | 0.00 | 10 Admin Leave With Pay |
| 09/02/2021 | | Off | 0.00 | 10 Admin Leave With Pay |
| 09/03/2021 | | Off | 0.00 | 10 Admin Leave With Pay |
| 09/04/2021 | | Off | 0.00 | Reg Day Off |

### Details

| Date | Start | End | Total | Explanation |
|------|-------|-----|-------|-------------|
| 08/24/2021 | 08:00 | 18:00 | 10.00 | Admin Leave With Pay |
| 08/25/2021 | 08:00 | 18:00 | 10.00 | Admin Leave With Pay |
| 08/26/2021 | 08:00 | 18:00 | 10.00 | Admin Leave With Pay |
| 08/26/2021 | 08:00 | 18:00 | 10.00 | Admin Leave With Pay |
| 08/27/2021 | 08:00 | 18:00 | 10.00 | Admin Leave With Pay |
| 08/27/2021 | 08:00 | 18:00 | 10.00 | Admin Leave With Pay |
| 08/31/2021 | 08:00 | 18:00 | 10.00 | Admin Leave With Pay |
| 08/31/2021 | 08:00 | 18:00 | 10.00 | Admin Leave With Pay |
| 09/01/2021 | 08:00 | 18:00 | 10.00 | Admin Leave With Pay |
| 09/01/2021 | 08:00 | 18:00 | 10.00 | Admin Leave With Pay |
| 09/02/2021 | 08:00 | 18:00 | 10.00 | Admin Leave With Pay |
| 09/02/2021 | 08:00 | 18:00 | 10.00 | Admin Leave With Pay |
| 09/03/2021 | 08:00 | 18:00 | 10.00 | Admin Leave With Pay |
| 09/03/2021 | 08:00 | 18:00 | 10.00 | Admin Leave With Pay |

| Type Of Day / Post | Hours | Hours Worked | Hours Scheduled | Overtime | Punch Hours |
|--------------------|-------|--------------|-----------------|----------|-------------|
| | 0.00 | 80.00 | 0.00 | 0.00 | |
| | 0.00 | 80.00 | 0.00 | 0.00 | |

### Prior Period

| Date | Start | End | Total | Explanation |
|------|-------|-----|-------|-------------|

### Closed Period Adjustments

| Date | Start | End | Total | Explanation |
|------|-------|-----|-------|-------------|

LCSO/Clark
DEF000422

2/17/23, 3:41 PM                              https://newui.vcssoftware.com/PrintTimesheetses?archived=true&enddate=09-04-2021

This is to certify that the above report is a true          This is to certify that I have reviewed the above          This is to certify that I have reviewed the above
statement of attendance.                                    report and find it to be in order.                          report and find it to be in order.

_____                  _____                  _____

*Signature of Employee*                          *Signature of Supervisor*                          *Signature of Dept Head*

LCSO/Clark
DEF000423

# Lee County Sheriff's Office

Employee Evaluation Form

**Employee Information**
**Employee** Clark, Jenna D
**ID** 92-072
**Shift**
**Supervisor** RENO, ANNMARIE S
**Department** Purchasing
**Assignment** Director
**Rank** Director
**Position** LCSO Employee

**Evaluation Information**
**Type** Annual
**Review Date** 7/15/2020
**Rating Date** 6/5/2019 to 6/4/2020
**Overall Rating** MS

**Scale:** Overall Ratings
MS = Meets Standard
RI = Requires Improvement

Performance Rating Legend

## Performance Measures

TypeId

| Number | Rating | Performance Statement |
|---|---|---|
| Type: Task | | |
| AL500 | MS | Quality of Reports/Paper Work<br>**Jenna's reports are completed on time. Purchasing Division continues to learn how to utilize the Munis System to streamline the purchasing process.** |
| AL501 | MS | Initiative/Innovation<br>**Jenna tries to find new ways to streamline the purchasing process.** |
| AL502 | MS | Planning and Organization<br>**Jenna is a good planner. Recommendation: get other members involved in special purchasing projects for Hazard Plans; also furniture purchasing; Jenna is working with her members to learn how to handle special projects.** |
| AL503 | NE | Security/Care of Detainees |
| SP7001a | MS | Conduct/Supervise Employee Performance Evaluations<br>**Jenna's evaluations are done on time.** |
| Type: Policy | | |
| PL2 | MS | Grooming and dress<br>**Jenna is always professionally dressed for work.** |
| PL4 | MS | Contact with public<br>**Jenna is very professional with the public.** |
| PL500 | MS | Attendance<br>**Jenna follows the policy on attendance.** |
| PL501 | MS | Rules and Regulations<br>**Jenna follows the rules and regulations of the LCSO.** |
| Type: Proficiency | | |
| PR31 | MS | Problem solving<br>**Jenna still needs to work on problems that exist with POs not having shipping cost, wrong dollar amounts and not being received, which impacts Finance. She will need to find a plan of action to resolve these issues.** |

Printed On: Tuesday, November 2, 2021

Employee: Clark, Jenna D          ID: 92-072          Eval Period: 6/5/2019 - 6/4/2020          Score: MS

LCSO/ Clark
DEF000570

# EXHIBIT 14



To:         Undersheriff John Holloway

From:       Executive Director Annmarie Reno

Date:       August 19, 2021

Re:         Purchasing Director Jenna Clark


In July 2021 I held a meeting with both Purchasing Director Clark & Manager Lehman to discuss ordering Civilian Support Unit uniforms and supplies (formerly VOICE).  I instructed them both to start issuing them out to the members (including jackets) as soon as the new polo shirts arrived so that we could start to remove the VOICE items from the shelves and burn them.

I continued to request an update on the status of the new items because I wanted to ensure the that we were going to meet the launch date for the *New Civilian Support Unit*.  Director Clark ensured me that we would meet the date and everything was under control.  Again I reminded her that they needed to remove all the VOICE items from inventory and she told me that she would take care of it.

I also requested that we start discarding all the older uniforms that were no longer being utilized because we were running out of room in Purchasing.

On Thursday, August 12, 2021 @1:30 pm I held a meeting in my office with both Director Clark & Manager Lehman to inform them that we would be moving forward with the implementation of the new bar coding Inventory Management System for our warehouse.  I explained to them that Diana Blewis would be the Project Manager and that they needed to allow her to converse with the members of Purchasing so that they had some input to the setup.  Both Director and Manager were excited about the new system.  After leaving my office I was informed by Manager Blewis that Director Clark was less than receptive to the point that Manager Blewis informed Director Clark that she was asked to complete a project and that if she continued to talk over her while she was explaining the goal that she would walk down to my office and inform me that Director Clark was not being a team player.

On Monday, August 16, 2021 I walked down to Purchasing to inquire how the project was moving along.  I was given a tour by Manager Lehman (since Director Clark is out of the office) to show me around only to see boxes of old uniforms and old stock that was still in the warehouse.  When I inquired as to why all the items were still in our inventory I was informed that Director Clark would not allow them to dispose of it.  There were multiple boxes of old holsters, old civilian and certified uniforms, old time cards, old voice uniforms, and old unusable equipment.  When I asked Purchasing Agent Gwen Legler why we still had old VOICE shirts, jackets, hats and windbreakers I was told that Director Clark would not let her get rid of the items because we might need to use them.  I asked Purchasing Agency Legler to please bag up

all the old VOICE items to be burned and any items that the Dominican Republic could use we would drop off on their dock.

As of today all old items have been removed from the Warehouse and we are ready to start the bar code scanning Inventory Management System implementation project.

Director Clark clearly defied my directive to have all the old items removed from LCSO Inventory as instructed and showed total insubordination towards me as her direct supervisor.

Annmarie Reno
Executive Director
Support Services

LCSO/ Clark
DEF000566

9/3/2021                                            Approval

## Munis Self Service

**Employee Action**

**Effective Date:**       09/04/2021

**Action:**               40 - SEPARATION

**Reason:**               40B - RETIRED

**Supp Action:**

**On-Boarding:**

**Category:**             T - TERMINATE

**Comment:**             RETIRE EFF 09/04/2021

**Entry User:**           CTurner

**Employee Description:**  941 CLARK, JENNA D

**Job:**                 PD - PURCHASING DIRECTOR

**Location:**            PURC - PURCHASING

**Group/BU:**            CIV - CIVILIAN

**Org/Obj/Proj:**        00120302 - 412000 -

**Account Description:**  SALARIES/WAGES-REGULAR

©2021 Tyler Technologies, Inc.

LCSO/ Clark
DEF000692

# EXHIBIT 15



EXHIBIT
MW 12 7/23
Dfs. 15
J. Clark

FR-11
Effective 09/18
Calculations

### Florida Retirement System Pension Plan
### Application for Service Retirement



PO BOX 9000  Tallahassee, FL  32315-9000
Local Phone: 850-907-6500  Toll Free: 844-377-1888  FAX: 850-410-2010

| | | | |
|---|---|---|---|
| Member Name | Jenna D. Clark | Member SSN | 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 |
| Position Title | Purchasing Director | Birth Date | 01/12/1962 |
| Home Phone | (239) 313-3578 | Work Phone | |
| Home Mailing Address | 9 Jackson Ave | Present FRS Employer(s) | Lee County Sheriff's Office |
| | Lehigh Acres, FL 33936 | | 14750 Six Mile Cypress Pkwy |
| | | | Fort Myers, FL 33936 |
| Email Address | jennaclark1962@gmail.com | | |

My services terminated, or will terminate, on ___09/04/2021___ . Your retirement date is determined by the
Division of Retirement.

**Beneficiary Designation:** All previous beneficiary designations are null and void unless you are applying for a second career retirement benefit. In the case of a second career benefit, this application does not affect your original benefit in any way. To designate more than one primary beneficiary, attach a Beneficiary Designation Form, FST-12.

|  | Primary | | | Contingent | |
|---|---|---|---|---|---|
| Name | see attached FST-12 | Relation | Name | | Relation |
| SSN | | DOB | SSN | | DOB |
| Phone | | | Phone | | |
| Address | | | Address | | |

I understand I must terminate all employment with FRS employers to receive a retirement benefit under Chapter 121, Florida Statutes. This includes but is not limited to: part-time work, other personal services(OPS), substitute teaching, adjunct professor or non-Division approved contractual services. I also understand that I cannot add service, change options, change my type of retirement (Regular, Disability, and Early) or elect the Investment Plan once my retirement becomes final. My retirement becomes final when any benefit payment is cashed or deposited.

Member Signature: (sign in the presence of a Notary) _____

Notary: State of _FL_ , County of _Lee_ . The above named person who has sworn to and subscribed

before me this _27_ day of _August_ 20 _21_ and is personally known ✓ or has produced

_____ as identification.

DOREEN SALVAGNO
Commission # GG 925139
Expires November 24, 2023
Bonded Thru Troy Fain Insurance 800-385-7019

_Doreen Salvagno_
Signature of Notary Public

Print, Type or Stamp Commissioned Name of Notary Public

**Employer Certification:** This is to certify that the above named member was employed by this agency and will terminate, or has terminated on _09/04/2021_ with the last day worked on _09/04/2021_ .

Authorized Personnel Signature: _Doreen Salvagno_        Agency Number: 46006

Agency Phone: (239) 477-1121        Date: 08/27/2021

Rule 60S-4.0035, F.A.C.
Page 1 of 1

LCSO/ Clark
DEF000693

FST-12
Effective 07/16
Survivor Benefits

**Florida Retirement System Pension Plan**
**Retired Member and DROP Participant Beneficiary Designation Form**
PO Box 9000 Tallahassee, FL 32315-9000
Local Phone: 850-907-6500 Toll Free: 844-377-1888 Fax: 850-410-2010

Member Name: Jenna D. Clark                    Member SSN: 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

Please list (type or print) your beneficiaries' information below. To designate more than two primary or contingent beneficiaries, use additional copies of this form as needed. If additional forms are required, the total percentage between all forms must equal 100 percent. Write the sequence of multiple pages at the top of each form. For example: Page 1 of 2.

1. **Primary Beneficiary(s)** - Indicate percentages if naming more than one primary beneficiary. Percentages should total 100 percent. After the death of all primary beneficiaries, any remaining benefits are paid to the contingent beneficiary(s).

A. William P. Clark                    09/29/1962  Male   Spouse              100 %
   Name of Primary              Birthdate  Gender   Relationship   Percentage

   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  9 Jackson Ave  Lehigh Acres, FL 33936   (239) 707-6983
   SSN of Primary        Primary Address                      Primary Phone

B. _____              _____ _____  _____     ____ %
   Name of Primary              Birthdate  Gender   Relationship   Percentage

   _____  _____      _____
   SSN of Primary        Primary Address                      Primary Phone

2. **Contingent Beneficiary(s)** - Indicate percentages if naming more than one contingent beneficiary. Percentages should total 100 percent. After the death of all primary beneficiaries and contingent beneficiaries, any remaining benefits are paid to the last beneficiary's estate.

A. Jami R. Najarro                      ▆▆▆▆▆  Female  Child              50 %
   Name of Contingent           Birthdate  Gender   Relationship   Percentage

   ▆▆▆▆▆▆▆▆          ▆▆▆▆▆▆▆▆▆▆                   ▆▆▆▆▆▆▆▆▆
   SSN of Contingent     Contingent Address                    Contingent Phone

B. Juliann C. Wilson                    ▆▆▆▆▆  Female  Child              50 %
   Name of Contingent           Birthdate  Gender   Relationship   Percentage

   ▆▆▆▆▆▆▆▆          ▆▆▆▆▆▆▆▆▆▆                   ▆▆▆▆▆▆▆▆▆
   SSN of Contingent     Contingent Address                    Contingent Phone

Member Signature (sign in the presence of a Notary) _____

Notary:
State of ____FL____ , County of __Lee__           The above named person who has

sworn to and subscribed before me this 27 day of August              20 21 and who is

personally known ✓ or produced _____ identification.

_Doreen Salvagno_                    [seal: DOREEN SALVAGNO
Signature of Notary Public            Commission # GG 925139
Rule 60S-4.011, F.A.C                  Expires November 24, 2023
Page 1 of 1                            Bonded Thru Troy Fain Insurance 800-385-7019]

                                      Print, Type or Stamp Commissioned Name of Notary Public

LCSO/ Clark
DEF000694

FRS-11o
Effective 12/15
Calculations

**Florida Retirement System Pension Plan**
**Option Selection for FRS Members**

PO BOX 9000  Tallahassee, FL  32315-9000
Local Phone: 850-907-6500  Toll Free: 844-377-1888  FAX: 850-410-2010

Member Name  Jenna D. Clark                    Member SSN  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

A member must select one of the following retirement options prior to receipt of their first monthly retirement benefit.

I select:

_____✓_____ Option 1:  A monthly benefit payable for my lifetime. Upon my death the monthly benefit will stop and my beneficiary
will receive only a refund of any contributions I have paid which are in excess of the amount I have received
in benefits. This option does not provide a continuing benefit to my beneficiary.

_____ Option 2:  A reduced monthly benefit payable for my lifetime. If I die within a period of ten years after my retirement
date, my designated beneficiary will receive a monthly benefit in the same amount as I was receiving for the
balance of the 10-year period. No further benefits are then payable.

_____ Option 3:  A reduced monthly benefit payable for my lifetime. Upon my death, my joint annuitant, if living, will receive
a lifetime monthly benefit payment in the same amount as I was receiving. (Exception: The benefit paid to a
joint annuitant under age 25, who is not your spouse, will be your option one benefit amount. The benefit will
stop when your joint annuitant reaches age 25, unless disabled and incapable of self-support, in which case
the benefit will continue for the duration of the disability.) No further benefits are payable after both my joint
annuitant and I are deceased.

**The social security number of my joint annuitant is** _____.

_____ Option 4:  An adjusted monthly benefit payable to me while both my joint annuitant and I are living. Upon the death of
**either my joint annuitant or me**, the monthly benefit payable to the surviving person (my joint annuitant or
me) **is reduced to two-thirds** of the monthly benefit payable while we were both living. (Exception: The
benefit paid to a joint annuitant under age 25, who is not your spouse, will be your option one benefit
amount. The benefit will stop when your joint annuitant reaches age 25, unless disabled and incapable of
self-support, in which case the benefit will continue for the duration of the disability.) No further benefits are
payable after both my joint annuitant and I are deceased.

**The social security number of my joint annuitant is** _____.

| **COMPLETE AND RETURN FORM SA-1** |
|---|

I understand I must terminate all employment with FRS employers to receive a retirement benefit under Chapter 121, Florida
Statutes. I also understand that I **cannot** add service, change options or change my type of retirement (Regular, Disability or Early)
once my retirement becomes final. My retirement becomes final when any benefit payment is cashed, deposited or when my
Deferred Retirement Option Program (DROP) participation begins.

**Member Signature:** (sign in the presence of a Notary) _____

**Notary:** State of Florida, County of _Lee_                    . The above named person who has sworn to and subscribed

before me this _27_ day of _August_    20_21_  and is personally known ____✓____ or has produced

_____ as identification.

_____
Signature of Notary Public

DOREEN SALVAGNO
Commission # GG 925139
Expires November 24, 2023
Bonded Thru Troy Fain Insurance 800-385-7019

Print, Type or Stamp Commissioned Name of Notary Public

Rule 60S-4.010, F.A.C.
Page 1 of 1

**LCSO/ Clark**
**DEF000695**

SA-1
Rev. 01/10
Calculations

**Florida Retirement System Pension Plan**
**Spousal Acknowledgment Form**

PO BOX 9000  Tallahassee, FL  32315-9000
Local Phone: 850-907-6500   Toll Free: 844-377-1888   FAX: 850-410-2010

Member Name: Jenna D. Clark                    Member SSN: 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

---

CHECK ONE OF THE FOLLOWING:

MARRIED: ✓ YES _____ NO     IF YES AND YOU SELECTED OPTION 1 OR 2,
                                YOUR SPOUSE MUST ALSO COMPLETE BOX 2.

Notarized Signature of Member: _____

**1** Notary: State of Florida, County of _Lee_ . The above named person who has sworn to and

subscribed before me this 27 day of August 20 21 and is personally known _____ or

produced _____ as identification.

DOREEN SALVAGNO
Commission # GG 925139
Expires November 24, 2023
Bonded Thru Troy Fain Insurance 800-385-7?

_Doreen Salvagno_
Signature of Notary Public - State of Florida        Print, Type or Stamp Commissioned Name of Notary Public

---

SPOUSAL ACKNOWLEDGMENT:  I, William P. Clark                being the spouse of the above named

member, acknowledge that the member has selected either Option 1 or 2.

Notarized Signature of Spouse: _____

**2** Notary: State of Florida, County of _Lee_ . The above named person who has sworn to and

subscribed before me this 30 day of August 20 21 and is personally known _____ or

produced FL Driver License as identification.

DOREEN SALVAGNO
Commission # GG 925139
Expires November 24, 2023
Bonded Thru Troy Fain Insurance 800-385-7019

_Doreen Salvagno_
Signature of Notary Public - State of Florida        Print, Type or Stamp Commissioned Name of Notary Public

---

The following is an explanation of all four Florida Retirement System Options:

Option 1: A monthly benefit payable for my lifetime. Upon my death, the monthly benefit will stop and my beneficiary will
receive only a refund of any contributions I have paid which are in excess of the amount I have received in benefits.
This option does not provide a continuing benefit to my beneficiary.

Option 2: A reduced monthly benefit payable for my lifetime. If I die within a period of ten years after my retirement date, my
designated beneficiary will receive a monthly benefit in the same amount as I was receiving for the balance of the
10-year period. No further benefits are then payable.

Option 3: A reduced monthly benefit payable for my lifetime. Upon my death, my joint annuitant, if living, will receive a lifetime
monthly benefit payable in the same amount as I was receiving. (Exception: The benefit paid to a joint annuitant
under age 25, who is not your spouse, will be your option one benefit amount. The benefit will stop when your joint
annuitant reaches age 25, unless disabled and incapable of self-support, in which case the benefit will continue for
the duration of the disability.) No further benefits are payable after both my joint annuitant and I are deceased.

Option 4: An adjusted monthly benefit payable to me while both my joint annuitant and I are living. Upon the death of either my
joint annuitant or me, the monthly benefit payable to the survivor is reduced to two-thirds of the monthly benefit
received when both were living. (Exception: The benefit paid to the joint annuitant under age 25, who is not your
spouse, will be your option one benefit amount. The benefit will stop when your joint annuitant reaches age 25,
unless disabled and incapable of self-support, in which case the benefit will continue for the duration of the
disability.) No further benefits are payable after both my joint annuitant and I are deceased.

Rule 60S-4.010, F.A.C.
Page 1 of 1

LCSO/ Clark
DEF000696

Jenna D. Clark SS# 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
Service Retirement
Agency 46006

LCSO/ Clark
DEF000697

**BIRTH REGISTRATION CARD**

LEE COUNTY HEALTH DEPARTMENT
VITAL STATISTICS
DIVISION

Name ............ Jenna Diane Givens ............ Sex ... F

Date of Birth ... Jan. 12, 1962 ... Birth No. 40

Birth Place ... Fort Myers ............ Florida

Record Filed ... January 16, 1962

Date Issued ... August 26, 1981

This is a true certification of name and birth facts as recorded in this office
(Not valid without seal).

_Lulu E. Hopkins_                JOSÉPH W. LAWRENCE
DEPUTY REGISTRAR                        M. D.



LCSO/ Clark
DEF000698

P. 1

✻ ✻ ✻ Communication Result Report ( Aug. 27. 2021  9:16AM ) ✻ ✻ ✻

1)
2)

Date/Time: Aug. 27. 2021  9:14AM

| File<br>No. Mode | Destination | Pg(s) | Result | Page<br>Not Sent |
|---|---|---|---|---|
| 9163 Memory TX | 918504102010 | P.  5 | OK | |

Reason for error
E. 1) Hang up or line fail
E. 3) No answer
E. 5) Exceeded max. E-mail size

E. 2) Busy
E. 4) No facsimile connection
E. 6) Destination does not support IP Fax



**Carmine Marceno**
Sheriff

*"Proud to Serve"*

State of Florida
County of Lee

**FACSIMILE COVER SHEET**

DATE     88 / 27 / 2021

TO:       FRS

FAX NO.  1-850-410-2010

FROM:   Dorien Sabeggru – PRS Retirement Coordinator
                         Agency # 46006

Transmitting a total of 5 page(s), including this cover sheet. If you do not receive all pages, please call me.

COMMENTS:  James D. Clark, xxx-xx-7714

Service Retirement - FR-11, FST-12, FR-11o, Birth Cert

NA-1 to be submitted once spouse signs

Please do not hesitate to contact me if you need anything else.

☆☆☆☆☆

This message is intended only for use by the addressee(s) named herein and may contain confidential information including Protected Health Information. If you are not the intended recipient of this email message, you are hereby notified that any dissemination, distribution or copying of this fax, and any attachments hereto, is strictly prohibited. If you receive this fax in error, you must immediately notify this office at (239) 477-1121 and permanently destroy the original message, attachments and any copies thereof.

 *"The Lee County Sheriff's Office is an Equal Opportunity Employer"*
14750 Six Mile Cypress Parkway • Fort Myers, Florida 33912-4406 • (239) 477-1000

LCSO/ Clark
DEF000699

FC-1
Rev. 04/20
Calculations

**Florida Retirement System Pension Plan**
**Salary Certification**



PO Box 9000
Tallahassee FL 32315-9000
Phone 850-907-6500

✓ Final Salary Certification _____ Amended Salary Certification

*9 241*

Agency Number 46006    Member Name **Jenna D. Clark**    Member SSN 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

1. For **Service Retirement**, certify all salaries earned in the last four months. Certification not needed if member terminated more than four months ago.
2. For **DROP Retirement**, certify all salaries earned in the last four months prior to the DROP begin date. Indicate the salary paid during the member's first month of DROP in the designated box below.
3. Certify salary by check/warrant date. List all regular salary payments, including overtime. **Certify the lump sum annual leave and special comp payments in designated area below. (See employer handbook, Chapter 9.)**
4. If a salary adjustment or correction is made after this form is submitted, submit an amended salary certification.
5. Only certify payments for which retirement contributions are required (See next page for additional information.)
6. Do not complete FC-1 if member is not applying for retirement or is an Investment Plan member.

**Fax form to the Division of Retirement [850-410-2010], no later than the 8th business day of the month following termination or DROP begin date. If you fax this form, do not mail the original.**

| EMPLOYEE PAY PERIOD: | | | RETIREMENT TYPE: Service ☑   DROP ☐ |
| --- | --- | --- | --- |
| Biweekly ✓  Monthly ____  Semimonthly ____  Other, specify ____ | | | Termination Date or the Day Prior to the DROP Begin Date 09/04/2021 |
| Check/Warrant Date | Salary Paid | Comments | Lump Sum Annual Leave Payment (if none, enter zeroes) |
| 09/10/2021 | 3647.04 | | 404.51 × 45.588 = 18440.80 |
| 08/27/2021 | 3647.04 | | Hours Paid    Hourly Rate    Lump sum Payment |
| 08/13/2021 | 3647.04 | | (Do not include this payment in the salary paid column.) |
| 07/30/2021 | 3647.04 | | |
| 07/16/2021 | 3647.04 | | Lump Sum Special Comp Earned in the last 11 months |
| 07/02/2021 | 3647.04 | | ____ X ____ = $0.00 |
| 06/18/2021 | 3647.04 | | Hours Paid    Hourly Rate    Lump sum Payment |
| 06/04/2021 | 3647.04 | | (Do not include this payment in the salary paid column.) |
| 05/21/2021 | 3647.04 | | |
| 05/07/2021 | 3647.04 | | |
| Check/Warrant Date for DROP Participants Only | Salary Earned **Prior to** the 1st Day of DROP Participation but Paid in the 1st Month of DROP $ | | To be completed only by School Boards, Community Colleges and State Universities This member is employed on a ____ 9 ____ 10 ____ 11 ____ 12 month basis. Contract Salary $ |
| ____ | Salary Earned **After** the 1st Day of DROP Participation and Paid in the 1st Month of DROP $ ____ | | Certified by: *[signature]* Date: 9/8/21   Title: Fiscal Officer Agency Phone: (239 ) 477-1025 E-mail Address: RLBauer@sheriffleefl.org |
| ____ | $ ____ | | |

Page 1 of 1

LCSO/ Clark
DEF000700

P. 1

✱ ✱ ✱ Communication Result Report ( Sep. 8. 2021  3:25PM) ✱ ✱ ✱

Date/Time: Sep. 8. 2021  3:24PM

| File No. | Mode | Destination | Pg(s) | Result | Page Not Sent |
|---|---|---|---|---|---|
| 9210 | Memory TX | 918504102010 | P. 1 | OK | |

Reason for error
E. 1) Hang up or line fail.
E. 3) No answer
E. 5) Exceeded max. E-mail size
E. 2) Busy
E. 4) No facsimile connection
E. 6) Destination does not support IP-Fax

LCSO/ Clark
DEF000701

P. 1

* * * Communication Result Report ( Aug. 30, 2021  9:47AM ) * * *

Date/Time: Aug. 30. 2021  9:47AM

| File No. | Mode | Destination | Pg(s) | Result | Page Not Sent |
|---|---|---|---|---|---|
| 9170 | Memory TX | 918504102010 | P. 1 | OK | |

Reason for error
E. 1) Hang up or line fail
E. 3) No answer
E. 5) Exceeded max. E-mail size
E. 2) Busy
E. 4) No facsimile connection
E. 6) Destination does not support IP-Fax

---

SA-1
Rev. 01/10
Calculations

**Florida Retirement System Pension Plan**
Spousal Acknowledgment Form

PO BOX 0000, Tallahassee, FL  32315-9000
Local Phone: 850-907-6500   Toll Free: 844-377-1888   FAX: 850-410-2010

Member Name: Jenna D. Clark                     Member SSN: 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

CHECK ONE OF THE FOLLOWING:

MARRIED ✓ YES ___ NO   IF YES AND YOU SELECTED OPTION 1 OR 2,
                        YOUR SPOUSE MUST ALSO COMPLETE BOX 2.

Notarized Signature of Member.

Notary: State of Florida, County of ___ Lee ___   The above named person who has sworn to and
subscribed before me this 27 day of August 20 21 and is personally known to me ___ or
produced ___

Signature of Notary Public - State of Florida   Print, Type or Stamp Commissioned Name of Notary Public

SPOUSAL ACKNOWLEDGMENT:  I, William P. Clark   being the spouse of the above named
member, acknowledge that the member has selected either Option 1 or 2.

Notarized Signature of Spouse.

Notary: State of Florida, County of ___ Lee ___   The above named person who has sworn to and
subscribed before me this 30 day of August 20 21 and is personally known
produced FL Driver License   as identified

Signature of Notary Public - State of Florida   Print, Type or Stamp Commissioned Name of Notary Public

The following is an explanation of all four Florida Retirement System Options:

Option 1:  A monthly benefit payable for my lifetime. Upon my death, the monthly benefit will stop and my beneficiary will receive only a refund of any contributions I have paid which are in excess of the amount I have received in benefits. This option does not provide a continuing benefit to my beneficiary.

Option 2:  A reduced monthly benefit payable for my lifetime. If I die within a period of ten years after my retirement date, my designated beneficiary will receive a monthly benefit in the same amount as I was receiving for the balance of the 10-year period. No further benefits are then payable.

Option 3:  A reduced monthly benefit payable for my lifetime. Upon my death, my joint annuitant, if living, will receive a lifetime monthly benefit payable in the same amount as I was receiving. (Exception: The benefit paid to a joint annuitant under age 25, who is not your spouse, will be your option one benefit amount. This benefit will stop when your joint annuitant reaches age 25, unless disabled and incapable of self-support, in which case the benefit will continue for the duration of the disability.) No further benefits are payable after both my joint annuitant and I are deceased.

Option 4:  An adjusted monthly benefit payable to me while both my joint annuitant and I are living. Upon the death of either my joint annuitant or me, the monthly benefit payable to the survivor is reduced to two-thirds of the monthly benefit received when both were living. (Exception: The benefit paid to the joint annuitant under age 25, who is not your spouse, will be your option one benefit amount. The benefit will stop when your joint annuitant reaches age 25, and is disabled and incapable of self-support, in which case it is not a benefit will continue for the duration of the disability.) No further benefits are payable after both my joint annuitant and I are deceased.

Rule 60S-4.010, F.A.C.
Page 1 of 1

LCSO/ Clark
DEF000702

**Florida Division of Retirement**
**Retirement Online Estimate of Retirement Benefit**
**(Member created estimate only, subject to final verification of all factors)**

Date Created: August 23, 2021

JENNA D CLARK                                      SSN: XXX-XX-7718

**Member Information:**

| | |
|---|---|
| Retirement Date: | 10/2021 |
| Birthdate: | 01/1962 |
| Age @ Retirement: | 59 Years 9 Months |

Need Birthdate Verification:          Yes

**Joint Annuitant Information** (a beneficiary who meets criteria to receive an option 3 or 4 continuing benefit upon member's death):

| Name | Birthdate | Age @ Retirement | Need Birthdate Verification |
|---|---|---|---|
| Paul | 09/29/1962 | 59 Years 1 Months | Yes |

The FRS Pension Plan is a defined benefit plan, your benefit is calculated based upon the defined benefit formula. The formula at normal retirement is as follows:

| Years of Service | X | Percent Value per Year | = | Accrued Percent Value | X | Average Final Compensation(AFC) | = | Option 1 Annual Benefit at Normal Retirement |
|---|---|---|---|---|---|---|---|---|

Normal Retirement: When a member is first eligible to receive an unreduced retirement benefit based on age or years of service.

Early Retirement Factor (If applicable): When a member of the FRS Pension Plan elects to take an early service retirement, the benefit is *reduced by 5 percent for each year remaining until the member would attain the normal retirement age for the membership class. For less than a full year, the reduction is prorated on a month-by-month basis.*

Average Final Compensation (AFC): Average of the 5, 8, or 10 (based on enrollment date) highest fiscal year salaries.

Option Factor: Options 2, 3, or 4 are reductions of the Option 1 benefit and are derived from it by applying equivalency factors. These options are designed to provide a continuing benefit to a beneficiary or joint annuitant in varying amounts depending on the option chosen.

For detailed information regarding your retirement, visit the Division of Retirement's Publications Page. The following guides and articles are located on the publications tab of our site and should be reviewed prior to retirement: "Ready. Set. Retire.", "What Retirement Option Should You Choose?"; "FRS Member Handbook".

| Plan Code | Membership Class | Years of Creditable Service | Percent Value Per Year | Accrued Percent Value |
|---|---|---|---|---|
| HA | FRS-REGULAR CLASS | 20.42 | 1.60 | 32.67 |
| HM | SENIOR MANAGEMENT | 8.91 | 2.00 | 17.82 |
| | Totals | **29.33** | | **50.49** |

| | |
|---|---|
| Average Final Compensation (AFC) | 88,662.78 |
| Normal Annual Benefit | 44,765.84 |
| Early Retirement Factor | 0.8875 |
| Early Annual Benefit | 39,729.68 |
| Annual COLA for this estimate | 1.95% |

| Option | Factor | Monthly Benefit | Survivor's Benefit |
|---|---|---|---|
| 1 | 1.00000 | 3,310.81 | |
| 2 | 0.98090 | 3,247.57 | |
| 3 | 0.86940 | 2,878.42 | 2,878.42 |
| 4 | 0.94730 | 3,136.33 | 2,090.89 |

This estimate was created by the member using FRS Online, all information used in the estimate is based on unverified data entered by the member and the results are not validated by the Division of Retirement.

**LCSO/ Clark**
**DEF000703**

HIS-1
Rev 07/05
Retired Payroll

**Florida Retirement System Pension Plan**
**Health Insurance Subsidy Certification Form**
Retired Payroll Section
PO BOX 9000  Tallahassee, FL  32315-9000
Local Phone: 850-907-6500   Toll Free: 844-377-1888

PAYEE SSN:        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        PAYEE NAME:  Jenna D. Clark

I hereby make application for the Health Insurance Subsidy (HIS). I have read the instructions on the enclosed sheet and checked one of the four boxes below. **I have checked the one box below that provides the earliest insurance coverage date.**

| | | | For FRS processing only |
|---|---|---|---|
| SIGNATURE OF PAYEE | 10/01/2021 <br> DATE | 239-313-3578 <br> TELEPHONE NUMBER | |

---

**SECTION A: To be completed by Payee who will have health premiums deducted from pension payment**

☐ This is to certify that I have already completed the required paperwork to have payroll deduction of my health insurance premium from my Florida Retirement System (FRS) monthly benefit. I understand the subsidy will be added AFTER the insurance deduction begins. **Please check with your former employer (local agencies) or the People First Service Center (state agencies) if you have questions about premium deductions from your retirement benefit.*

---

**SECTION B: To be completed by former FRS (non-state) employer or People First Service Center (1-866-663-4735) for state agencies**

☑ This is to certify that the above named payee had health insurance coverage effective  08|01|1992  and is currently covered through our agency.

Signature: FRS Agency Representative    10|01|2021    Lee County Sheriff Office  239-477-1121
or People First Representative    Date    FRS Agency Name    Phone #

---

**SECTION C: To be completed by Insurance Company - (insurance cards are not accepted.)**

☐ This is to certify that the above named payee has health coverage with _____
(Company Name)

with an effective policy date of _____ . (Please use the earliest possible coverage date).
(Date)

Company Representative Signature    Date    Company Address    Phone #

---

**SECTION D: Payee provides MEDICARE or Military Insurance information**

☐ I have attached a photocopy of either a MEDICARE or Military ID/TRICARE card.

**PLEASE DO NOT SEND YOUR ORIGINAL CARD.**
**It will not be returned.**

NOTE: We will use your Medicare effective date to determine your HIS effective date. Your HIS effective date cannot be earlier than your Medicare effective date.

**ATTACH COPY OF CARD HERE (MEDICARE OR MILITARY ID/TRICARE CARD**

---

Please return completed form to the Retired Payroll Section. (See address above)
**Other contact information:**
Fax: 850- 410-2010
Email:Retirement@dms.myflorida.com

Rule 60S-4.020, F.A.C.
Application, Page 1 of 1

**LCSO/ Clark**
**DEF000704**

# EXHIBIT 16



| Supercedes | Lee County Sheriff's Office | Effective: 7/91 |
| Chapter 22 – Rev. 01/21 | Operations Manual | Revised: 03/21 |

employee should be considered if warranted.  Part-time employees receive no employee benefits. On-call and temporary employees receive no FRS or other employment benefits.

### 22.1.1.10    Employment Rights of Personnel Assigned Under a Written Agreement for LE Services

Employment rights of personnel assigned to work under a written agreement are not denied the right to employee benefits, appropriate training when available, and the opportunity to test for promotional positions or specialized assignments when other qualifications are met.

## 22.2   BENEFITS

## 22.2.1   (22.1.2) LEAVE PROGRAM

The granting of leave shall be in writing and shall be approved by the Sheriff, or designee, prior to the leave being taken, except in the case of an emergency.  Said leave shall be granted if the member has sufficient time accrued, unless this would create undue hardship on the remaining scheduled personnel, as in the case of too many other personnel already scheduled for leave time.  When prior approval for leave cannot be obtained by the member due to an emergency, the Watch Commander will be notified, and a leave request filed immediately. It will be the Watch Commander's responsibility to forward the information to the member's supervisor.

If a request for a leave of absence is disapproved by the Office, and the employee takes unauthorized leave, the Sheriff or designee, will place the person on leave without pay.  After three-(3) consecutive work-days missed, the Office shall consider the person to have abandoned their position and have resigned from the Sheriff's Office.  The following is an overview of leave benefits:

Full-time members are required to work a full-time schedule or account for hours missed by using accrued leave time.  If a member must be absent from work for whatever reason, they must use the appropriate amount of accrued leave time that would bring their combined work and leave time to the scheduled 80 or 84 hours required for the pay period.  The employee may not choose to take time missed from work as "Leave without pay" unless it is approved FMLA. If the member has exhausted all accrued leave time, the missed time then becomes leave without pay. A pattern of abuse may be cause for disciplinary action.

### 22.2.1.1    (22.1.2-a) Administrative Leave:

1.    Court Leave: Members subpoenaed as prospective jurors or witnesses in any matter before the Court will be granted leave with pay under the following conditions:

   A.    Non-sworn personnel who must attend Court as a juror or witness during designated duty hours will merely be excused from assigned duties.

22:12

B. Sworn personnel appearing before any judicial agency of the criminal justice system as a witness or arresting deputy during designated duty hours will merely be excused from their assigned duties.

C. Personnel, while extra-duty, who are required to attend court as a witness in connection with official duties will be compensated in accordance with overtime rules.

D. Whenever a member is a defendant or litigant in a personal suit, administrative leave with pay will be denied unless such litigation is the result of an act performed by the member as part of official duties with the Office.

2. Voting Privileges: Members residing at such distances from their assigned work locations which may prevent exercising their voting privileges, may be authorized a maximum of two hours leave with pay for the purpose.

3. Attending Meetings and Conferences: The Sheriff may grant leave with pay to permit members to attend professional meetings or conferences designed to improve the professionalism of the Office. Members granted a leave of absence for this purpose will submit an official transcript of record or official grade card signifying successful participation in any meeting, workshop, seminar, or conference attended.

4. Examinations or Promotional Testing: A member may be granted leave with pay in order to participate in promotional examinations, or other matters, as determined by the Sheriff.

5. Administrative Leave from Duty (non-disciplinary): In every instance in which a deputy's actions or use of deadly force and where such use of force results in death or serious bodily injury to another person, the deputy shall be immediately relieved of duties or be given administrative duties. (Additional information regarding the use of deadly force and administrative leave may be found in Chapter 1.)

## 22.2.1.2 (22.1.2-b) Personal Hours:

The Lee County Sheriff's Office does not grant formal holiday leave, as described by the Lee County Board of County Commissioners, such as; New Year's Day, Washington's Birthday, Good Friday, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, Christmas Day, etc. However, personal hours are given in order to provide equitable time off for all full-time personnel. These hours may be utilized on such holidays if workload/manpower allows, and your supervisor has authorized the use of the hours. Certified personnel receive 100 hours per year of personal hours, which may be taken upon supervisory approval of the immediate commander. Non-certified personnel receive one hundred (100) hours per year of personal

LCSO/Clark
DEF001055

Supercedes
Chapter 22 – Rev. 01/21

Lee County Sheriff's Office
Operations Manual

Effective: 7/91
Revised: 03/21

hours. Personal hours are automatically credited to the members leave records, half of the total amount in January. Personal hours begin to accrue from the date of employment. Personal hours utilized during a pay period do not count as hours worked for purposes of determining whether any overtime premiums are due pursuant to Federal Law. Proper form is to be signed and submitted by each member to their commander when personal hours are taken. Personal hours not utilized by midnight December 31st of each year are forfeited. Personal hours may not be used as terminal leave. Unused personal hours are not compensable at the time of termination, resignation or retirement.

### 22.2.1.3      (22.1.2-c) Sick leave:

All full time personnel of the Sheriff's Office shall be entitled to sick leave. Personnel are not entitled to use sick leave until it is earned Sick Leave. Sick Leave begins accruing on the first day of full-time employment and accrues at the rate of eighty (80) hours per year for non-certified personnel and eighty-four (84) hours per year for certified personnel. Sick leave may not be exchanged for any other benefits. The proper form is to be completed, signed and submitted when sick leave is taken. Sick leave may be taken in 30 minute increments for approved purposes. The only approved purposes are actual illness of the member or serious illness of a spouse or dependent child. Sick leave may be used to care for a parent with a serious illness ONLY when the employee is on approved FMLA for that purpose. Doctor and dentist visits for treatment or diagnosis will be considered illness for purposes of this policy. This means you may utilize sick leave hours to get a checkup or physical if the doctor or dentist's availability conflicts with your duty schedule. You are required to coordinate this type of use with your commander if it is not an emergency situation. If an employee calls in sick for three consecutive shifts or days, they may be required to present a note from the treating physician excusing them from work for the days missed and authorizing their return with or without restrictions. The note shall then be forwarded to Risk Management for filing. Supervisors shall also notify Risk Management concerning any employee who misses more than three sick days of work for potential FMLA purposes.

### 22.2.1.4      Transfer of Sick Leave:

The Sheriff's Office has a very liberal leave policy to accommodate vacations, holidays, unanticipated needs and illnesses. Occasionally members exhaust all of their leave time resulting in the loss of steady income while recuperating from their illness. At the same time other members have, over a period of time, accumulated excess sick hours that they do not need to draw upon. The Sheriff has approved the transfer of sick hour credits from one agency member to another under certain circumstances. Members may donate any sick hours they have accumulated that are above 200 hours. Personal/Vacation hours accrued may not be donated. If a member is terminating from the Lee County Sheriff's Office, they may not donate any accumulated excess time within their sick bank.

### DEFINITIONS:

LCSO/Clark
DEF001056

1. **Sick time**: Time that a member accrues bi-weekly or that is given bi-annually, as indicated in official payroll records, is intended to be used for personal illness or to care for immediate family members when they are ill.

2. **Member in good standing:** Full time employee of the agency that has completed their probationary period and has no pending disciplinary action, especially as it relates to the abuse of leave time.

3. **Donation of sick time:** Voluntary, permanent and irrevocable transfer of accrued sick time hours from one member to another. When an agency member wishes to donate accumulated sick time to another agency member they must fill out the "Sick Time Transfer Authorization Form" (LCSO form #86) indicating the exact number of hours being transferred and who the receiving party is (maximum per year donation is 40 hours). Sick leave hours may be transferred to a member that has exhausted all forms of accumulated leave time during a serious, extended illness. The transfer of sick time is NOT intended to be used for a single day's minor illness or for an employee who has failed to properly manage their accrued time for a foreseeable absence. These requests will be reviewed and approved every 30 days. The member receiving the sick time transfer must be a member in good standing and the time must actually be used for personal illness or caring for a seriously ill immediate family member of the employee. Use of donated hours will not be permitted for those employees on Intermittent FMLA. When time is donated from one person to another it is permanently donated, not loaned, and cannot be replaced when the receiving member accumulates new time. Time cannot be given to supplement workman's compensation leave. This policy will not have any adverse effect on the Family Medical Leave Act. Requests for donation of time will be submitted to the Sheriff for approval, via a To/From letter from the employee through their appropriate chain of command. Once the use of donated time has begun, the status of the leave will be reviewed at the regular duty status meeting of Bureau Commanders to evaluate the future need. A member should seriously consider the ramifications of giving up their accrued sick time. You should consider any time you might need for future illness or injury. You should not give up any time that you may later want to cash-in at the time of your separation or retirement or under the guidelines that may allow you to participate in the annual sick leave buy-back program.

**22.2.1.5      Annual Buy Back of Sick Leave:**

Full-time non-probationary employees are eligible to sell 80/84 hours under the Annual Buy Back if they have more than 200 hours of unsold and unused sick leave as of the last pay check of the fiscal year. Members may sell all, any or none of the unused hours above 200 hours. Election forms will be sent out mid-October. If Finance does not receive the members Annual Buy Back election form by the due date specified on the form the member will not receive a

**LCSO/Clark
DEF001057**

Supercedes
Chapter 22 – Rev. 01/21

Lee County Sheriff's Office
Operations Manual

Effective: 7/91
Revised: 03/21

payment. Unsold hours may be used to receive a paycheck if the member needs to take sick leave or leave under the Family Leave Act ("FMLA").

1.   Members who leave Lee County Sheriff's Office before the Annual Buy Back will be paid for any unused hours (above 200) accrued during the current fiscal year.

     Payment for sold hours will be at the following rate:

     A.   50% of your current pay rate if you are a full-time Lee County Sheriff's Office member.

2.   **Unsold (banked) hours accrued prior to 8/22/98**: Upon separation from Lee County Sheriff's Office members employed prior to 8/22/98 will be paid for half of any <u>unused</u> hours that were banked during the August 1998 one time buy back.

     Effective 10/1/07 members employed after 8/22/98 who separate from the agency will be paid for their unused banked hours up to bank limit of 200 hours at the below listed rate

     A.   50% of your current pay rate if you are a full-time Lee County Sheriff's Office member.

     If a member ceases to be employed by the Office of the Sheriff and is due any payment for accrued benefits, the Sheriff retains the right to make payments either in a lump sum amount or in normal payroll amounts until the obligation is fully paid.

## 22.2.1.6       (22.1.2-d) Vacation Leave:

The Lee County Sheriff's Office recognizes that some duties are monotonous and repetitious while other duties, especially law enforcement, create stress, both of which contribute to low productivity and error. The primary purpose of vacation leave is to provide periodic vacations away from Office duties.

The Office acknowledges and meets management's responsibility to provide good working conditions to maintain a healthy work force by providing paid vacation leave as a period of release from daily requirements.

The policy and procedure in which vacation leave is acquired is as follows:

Begins accruing on the first day of full time employment.

**Accrues at the rate of 120 hours per year (3 weeks) for non-certified personnel and 126 hours per year (3 weeks) for certified personnel.**

**LCSO/Clark**
**DEF001058**

Supercedes
Chapter 22 – Rev. 01/21

Lee County Sheriff's Office
Operations Manual

Effective:  7/91
Revised: 03/21

**Increases to 160 hours (4 weeks) for non-certified personnel, and 168 hours (4 weeks) for certified personnel after 10 years of continuous full time employment.**

**Increases to 200 hours (5 weeks) for non-certified personnel, and 210 hours (5 weeks) for certified personnel after 20 years of continuous full time employment.**

Each member must schedule vacation leave with the approval of their immediate commander.

Unused accrued vacation leave may only be taken upon supervisory approval.  A supervisor is not obligated to allow more than 3 weeks leave during any consecutive 12 month period (4 weeks for 10 year members or 5 weeks for 20 year members).

Annual leave is paid at an employee's current rate, and, the hours are not counted as worked hours for determining any overtime which might be due to an employee during payroll period.

**22.2.1.7        Annual Buy Back of Vacation leave:**

Full-time non-probationary employees are eligible to sell hours under the Annual Buy Back if they have more than 200 hours of unsold and unused vacation leave as of the last pay check of the fiscal year.  Members may sell Lee County Sheriff's Office all, any or none of the unused hours which they have accrued during the fiscal year and that are above 200 hours. Full-time non-probationary employees are eligible to sell up to 80/84 hours under the Annual Buy Back of Vacation Leave Policy. Buy back can occur as long as the member has the vacation time accrued and not scheduled to be utilized as of the last pay check of the calendar year.  Election forms will be sent out at the end of January.  If Finance does not receive the members Annual Buy Back election form by the due date specified on the form all unused hours accrued during the calendar year will be banked (as long as the accrued hours are under the vacation cap of 600 hour) and the member will not receive a paycheck for use of vacation time off as policy.  The Annual Buy Back of Vacation Leave will be paid out in the first quarter of the new year.

If a member ceases to be employed by the Office of the Sheriff and is due any payment for accrued benefits, the Sheriff retains the right to make payments either in a lump sum amount or in normal payroll amounts until the obligation is fully paid.

**22.2.1.8        Vacation Leave Cap:**

Maximum accrued vacation leave is set at 600 hours. Effective January 1, 2018, members of the Lee County Sheriff's Office may only carry over a maximum of 600 hours of vacation leave into the next calendar year. Members currently having 500 hours or more of accrued leave, and all members when they reach 600 hours, must use all annual accrued leave in the calendar year it is accrued, or they will lose it.

**Leave requests – member's responsibilities**

22:17

Supercedes
Chapter 22 – Rev. 01/21

Lee County Sheriff's Office
Operations Manual

Effective:  7/91
Revised: 03/21

**Increases to 160 hours (4 weeks) for non-certified personnel, and 168 hours (4 weeks) for certified personnel after 10 years of continuous full time employment.**

**Increases to 200 hours (5 weeks) for non-certified personnel, and 210 hours (5 weeks) for certified personnel after 20 years of continuous full time employment.**

Each member must schedule vacation leave with the approval of their immediate commander.

Unused accrued vacation leave may only be taken upon supervisory approval.  A supervisor is not obligated to allow more than 3 weeks leave during any consecutive 12 month period (4 weeks for 10 year members or 5 weeks for 20 year members).

Annual leave is paid at an employee's current rate, and, the hours are not counted as worked hours for determining any overtime which might be due to an employee during payroll period.

**22.2.1.7       Annual Buy Back of Vacation leave:**

Full-time non-probationary employees are eligible to sell hours under the Annual Buy Back if they have more than 200 hours of unsold and unused vacation leave as of the last pay check of the fiscal year.  Members may sell Lee County Sheriff's Office all, any or none of the unused hours which they have accrued during the fiscal year and that are above 200 hours. Full-time non-probationary employees are eligible to sell up to 80/84 hours under the Annual Buy Back of Vacation Leave Policy. Buy back can occur as long as the member has the vacation time accrued and not scheduled to be utilized as of the last pay check of the calendar year.  Election forms will be sent out at the end of January.  If Finance does not receive the members Annual Buy Back election form by the due date specified on the form all unused hours accrued during the calendar year will be banked (as long as the accrued hours are under the vacation cap of 600 hour) and the member will not receive a paycheck for use of vacation time off as policy.  The Annual Buy Back of Vacation Leave will be paid out in the first quarter of the new year.

If a member ceases to be employed by the Office of the Sheriff and is due any payment for accrued benefits, the Sheriff retains the right to make payments either in a lump sum amount or in normal payroll amounts until the obligation is fully paid.

**22.2.1.8       Vacation Leave Cap:**

Maximum accrued vacation leave is set at 600 hours. Effective January 1, 2018, members of the Lee County Sheriff's Office may only carry over a maximum of 600 hours of vacation leave into the next calendar year. Members currently having 500 hours or more of accrued leave, and all members when they reach 600 hours, must use all annual accrued leave in the calendar year it is accrued, or they will lose it.

**Leave requests – member's responsibilities**

LCSO/Clark
DEF001059

Supercedes
Chapter 22 – Rev. 01/21

Lee County Sheriff's Office
Operations Manual

Effective:  7/91
Revised: 03/21

1.     It is the responsibility of each member to submit annual vacation leave requests before February 28th.  If requests are submitted later in the year and cannot be met due to scheduling conflicts (e.g., too many personnel already approved for leave) the member will request alternate leave or they will be assigned leave time conducive to operational needs.  If accrued vacation hours at the end of the year exceed the maximum 600 hour cap, or the member's individual cap established on February 1, 2000, these hour shall be forfeited.  *Exception:*  if a previously approved leave is canceled by the agency due to extreme circumstances, is not able to be rescheduled in the current year, (e.g., natural disaster, emergency, non-changeable trial date, etc.), then the hours will be carried over to the following year for use during that year.

**Mandatory assignment of leave** - If scheduling conflicts arise, the component supervisor will assign vacation leave based on seniority (date of rank / date of submission).  Because of the complexity of scheduling and to avoid any member losing hours due to the limit on annual leave carryover, there will be instances when the component supervisor will assign vacation leave *at* non-peak times even though the member is not seeking leave at that time.

2.     **Final compensation for accrued leave** - When members separate from the Lee County Sheriff's Office they will receive a payment for any unused vacation leave (up to a maximum of 500 accrued leave hours) at their separation hourly rate of pay. Per Florida Retirement System (FRS) guidelines, up to 500 hours may be included in the final compensation calculation for retirement.  These hours are not counted as worked hours for determining any overtime, which might be due an employee during a payroll period.  Members may only sell these 500 hours at 100% once in their career at Lee County Sheriff's Office. Leave hours in excess of 500 hours will be compensated at ½ separation hourly rate. An employee may choose to have their 500 hours paid up to 6 months prior to their DROP date. At this time, any hours in excess of the 500 will be paid at ½ separation hourly rate. Per FRS any hours paid in excess of 500 hours are *not* included in the final compensation calculation for retirement.  Those members who are currently in the FRS Pension Plan and are contemplating a one-time change to the FRS Investment Plan prior to leaving the agency should adhere to the following instructions:

A.     It is imperative that the member submit in writing 90 days prior to their retirement/separation date a letter through the chain of command requesting that the Sheriff approve their request to separate from the LCSO.  Once the Sheriff officially accepts and approves the request, the member will be considered retired/separated from the LCSO effective upon the agreed separation date.

LCSO/Clark
DEF001060

Supercedes
Chapter 22 – Rev. 01/21

Lee County Sheriff's Office
Operations Manual

Effective: 7/91
Revised: 03/21

B.  A letter should accompany the above, to the Finance Director requesting that their accrued vacation hours be paid out in advance of their leave date so that the hours are counted towards the member's final compensation.

C.  This amount must be reported to FRS one month prior to the employee's separation with LCSO.

D.  In order to calculate these hours in the conversion, the member cannot change to the Investment Plan prior to the reporting of these funds, but must do so before separating with LCSO. If FRS does not receive this amount reported one month prior to the separation date, than it will not be counted towards the member's final compensation and LCSO will not be able to make adjustments.

**22.2.1.9     (22.1.2-e) Maternity Leave:  Please refer to the information regarding the Family/Medical Leave Act within this Chapter.**

**22.2.1.10     Bereavement Leave:**

In the event of a death in the immediate family, a member may be granted administrative absence with pay to grieve the loss of a close family member, prepare for and attend a funeral, and/or to any other immediate post-death matters. The maximum time allowed is three (3) consecutive days. If travel out-of-state is requires a total of 4 days will be allowed.   Immediate family is defined as:  mother, father, brother, sister, child, stepchild, husband or wife, grandchild and grandparent.  An in-law is considered the same as a blood relative.

**22.2.1.11     Military Leave:**

1.  Lee County Sheriff's Office is committed to protecting the job rights of employees/members absent on military leave. In accordance with federal and state law, it is the Agency's policy that no employee or prospective employee will be subjected to any form of discrimination on the basis of that person's membership in or obligation to perform service for any of the Uniformed Services of the United States. Specifically, no person will be denied employment, reemployment, promotion, or other benefit of employment on the basis of such membership. Furthermore, no person will be subjected to retaliation or adverse employment action because such person has exercised his or her rights under this policy. If any employee believes that he or she has been subjected to discrimination in violation of this policy, the employee should follow their chain of command, and immediately contact their Bureau Commander or Human Resources. "Employee" is used interchangeably with "Member" throughout this policy.

2.  Military Leave - It shall be the policy of the Lee County Sheriff's Office to adhere to the following guidelines set forth for Military Leave for active duty military service if Military Leave for military training purposes. Any employee who is a

LCSO/Clark
DEF001061

Supercedes
Chapter 22 – Rev. 01/21

Lee County Sheriff's Office
Operations Manual

Effective: 7/91
Revised: 03/21

member of any reserve component of the armed forces of the United States or of the Florida National Guard shall be entitled to leave of absence from their duties for all periods of military service during which they are engaged in the performance of active duty or military training in the service of this State, or of the United States.

3. **Procedures for All Military Leave**

    A.    The employee will provide his or her immediate supervisor and the Human Resources Division with notice that the employee will be engaging in military service, including, where feasible, a copy of the orders directing the military service, unless the employee is prevented from doing so by military necessity. Employees are required to provide such notice within 30 days of being called up for military service regardless of the type of service (i.e. training, active duty military service call up); unless the orders were issued with, less than 30 days notice.

        1)    If the military leave is for leave without pay for military service the employee must complete a memo through his/her chain of command to the Bureau Commander with a copy of his/her military orders. The Bureau Commander will review and sign the request for leave without pay for military service and forward documents to Human Resources and Finance for processing.

            a)    Employees on military leave may, at their option, use any or all accrued paid vacation or personal leave during their military service.

            b)    When the employee intends to return to work, he or she must notify their immediate supervisor and Human Resources within the application period set forth below. (Ordinarily 90 days from date of discharge)

            c)    If the employee does not return to work, the supervisor must notify their Bureau Commander and Human Resources so that appropriate action may be taken.

        2)    Human Resources shall be the point of contact for members on military deployment. The member must provide Human Resources with a contact name and phone number on behalf of them while on military leave. (22.1.9a)

        3)    Out-processing will be completed, including an exit interview with the Sheriff or designee, if deployment will be longer than 180 days. (22.1.9c)

LCSO/Clark
DEF001062

Supercedes
Chapter 22 – Rev. 01/21

Lee County Sheriff's Office
Operations Manual

Effective: 7/91
Revised: 03/21

4)     Depending on the length of leave, Human Resources may require that the agency owned firearms and vehicles be returned to the appropriate custodian for storage or reissue. (22.1.9d)

5)     When the member returns from military service, Human Resources will complete any necessary paperwork for the member's re-activation and may schedule an interview with the Sheriff or designee. (22.1.9e)

6)     The member's Bureau will complete an action sheet placing them on military leave.

7)     The member will provide Human Resources a copy of his/her DD214 when appropriate, after they return.

8)     Upon return, the member will complete any needed initial and/or refresher training, and weapons qualification as appropriate. The member's Bureau will complete an action sheet removing them from military leave. (22.1.9f)

9)     Human Resources will communicate as necessary with the deployed member. (22.1.9g)

4.    **Military Leave with Pay for Military Training -** Pursuant to Sect. 115.07, Fla. Stat., each employee who is on military leave for military training shall be paid his or her regular salary or compensation for a period, or periods, not exceeding 240 working hours in any one (1) annual period. Scheduled off duty days do not count toward the 240 working hours allowed. The employee continues to earn service credit, and applicable annual and/or sick leave accruals while on Military Leave with Pay. All other rights and benefits continue to which the employee is otherwise entitled. A regular employee who has exhausted the 240 working hours of paid leave in any one annual period may elect to use accrued annual leave. In addition, a regular employee may use accrued sick leave if the employee provides proof to the Agency that he/she was sick while called to military service for training.

A.    In accordance with federal law and state law, employees are not required to use vacation leave for military service. However, employees may elect to use their vacation leave. Employees must request in writing to use unused vacation leave balances or take leave without pay for the entire military leave period.

B.    If an employee decides not to use their accrued vacation/flex leave, and elects to be on military leave without pay for their military service, the

LCSO/Clark
DEF001063

Supercedes
Chapter 22 – Rev. 01/21

Lee County Sheriff's Office
Operations Manual

Effective:  7/91
Revised: 03/21

member will not earn annual or sick leave during any of those military service periods in which the member is on leave without pay.

5. **Military Leave without Pay -** shall be granted to all members for periods training activity with the armed forces of the United States, its reserve components or the Florida National Guard for periods beyond the 240 working hours of paid leave in any one annual period. Military leave without pay shall be granted to employees voluntarily entering the regular components of the Armed Forces of the United States. Members called up for active duty military service should refer to the section below regarding when they will be placed on leave without pay status.

    A.    During a period of unpaid military leave, a regular employee may retain all accrued accumulated annual and/or sick leave.

    B.    Annual and/or sick leave will not accrue during an unpaid leave status.

    C.    Leave accrual rates will be adjudicated as if the person had never been absent from our agency for this military leave.

6. **Active Duty Military Service Call Ups**

    A.    Active Duty Military service means a call up for active military service not otherwise qualifying as a reserve or guard training.

    B.    During the first 30 calendar days of active duty military service, members will be paid full regular pay by LCSO. Employee will be paid according to their regular work schedule beginning with the first day of their long-term military leave. Deductions will continue to be deducted/taken from the employee's paycheck.

    C.    Active Duty Military Service Call Ups that Exceed 1 month but less than 6 months:

        1)    For active duty military service call ups that exceed 1 month but less than 6 months, LCSO will provide the individual a monthly pay differential equal to the difference between the current gross monthly wage or salary and the sum of the gross military pay and allowances beginning with the 31st calendar day of activation for up to 181 days/6 months of call up.

        2)    Following the first 30 calendar days and up to 181 days/6 months of call up, individuals are entitled to continue LCSO medical, dental, and vision coverage and the cost of coverage will be as if the individual were not on military leave. Employee/member must

Supercedes
Chapter 22 – Rev. 01/21

Lee County Sheriff's Office
Operations Manual

Effective: 7/91
Revised: 03/21

contact the Insurance Benefit Coordinator to discuss options regarding insurance coverage while on military leave. If the member chooses to continue or cancel coverage they must notify the Insurance Benefit Coordinator within 30 days of the beginning date of military leave.

D.   Active Duty Military Service Call Ups that Exceed 6 Months:

   1)   If a member receives Military orders extending their active duty military service for a length of period exceeding 6 months then the member will be placed on Military Leave Without Pay status beginning on the 181st day of their extended active duty military service time. The member will be afforded the right of re-employment in the job that they left for the purpose of the active duty call up or in a substantially equivalent job, (refer to policy on separation from office) provided they:

   2)   Present a certificate of satisfactory completion of service, DD214

   3)   Apply for reinstatement within the time limits specified by law, ordinarily 90 days from the date of discharge from the service, and;

   4)   Would not have been laid off if employment had not been interrupted by military service.

   5)   A determination of the terms and conditions of re-instatement (rate of pay, seniority status where appropriate, length of service for benefits eligibility purposes, etc.) will be discussed with the Bureau Commander upon their return.

E.   The member will be sent a letter informing the member that he/she may choose to continue medical coverage for him/herself and/or any covered family members under COBRA for up to 24 months or until discharge, whichever is less, by paying up to 100% of the full contribution of the premium. The military provides health insurance free to military members and their families when they have been activated for military service. In addition, when the employee returns to active employment, upon receipt of military form DD214 with honorable discharge, the agency will submit missed contributions to the Florida Retirement System for this period of military service.

7.   **Continuation of Benefits -**

A.   Insurance

LCSO/Clark
DEF001065

Supercedes
Chapter 22 – Rev. 01/21

Lee County Sheriff's Office
Operations Manual

Effective: 7/91
Revised: 03/21

    1)    If elected, medical insurance coverage may be continued during a period of military service for the lesser of:

        a)    24 months following the beginning of the military leave without pay status; or

        b)    The day after the date on which the employee fails to report to work or apply for employment as determined in Re-employment Rights.

B.    If coverage is continued, the employee will be required to pay premiums as follows:

    1)    30 or less days of service – no cost of health, dental, vision premium for employee and dependents if status Military Leave with Pay or

    2)    For Active Duty call up(s) continuation of coverage of health, vision, dental coverage's will be up to 6 months at no cost for the employee if coverage is elected within first 30 days of military activation.

    3)    The group term life/AD&D insurance provided by the Agency will terminate the day the employee is on Military Leave without Pay.

    4)    Voluntary supplemental life/AD&D and other insurance and pay roll deductions will terminate the day the employee is on Military leave without pay.

C.    If the employee elects to discontinue insurance coverage, a waiting period may or may not be imposed for reinstatement of coverage upon reemployment. Continuation of plans will be in accordance with the provisions of the plan(s).

D.    **Pension -** With respect to the FRS retirement plan, upon reemployment, employees who have taken military leave will be credited for purposes of vesting with the time spent in military service and will be treated as not having incurred a break in service. Immediately upon reemployment, the employee must provide a copy of their DD214, to Finance showing honorable discharge, the agency will then submit missed contributions for the military service time.

E.    A returning employee is entitled to the same seniority, rights and benefits; he/she would have had if employment had been continuous. Except as

Supercedes
Chapter 22 – Rev. 01/21

Lee County Sheriff's Office
Operations Manual

Effective:  7/91
Revised: 03/21

listed in E.2. in this policy, annual and/or sick leave will not accrue during an unpaid leave status.

## 22.2.1.12    Educational Leave:

If it is determined that further education will benefit the Office, the Sheriff may grant a leave of absence without pay to any member requesting the same, in writing, through the chain-of-command, with the recommendation of the member's Bureau Commander that such leave of absence be granted.  Educational Leaves will not exceed twelve (12) months UNLESS the Sheriff deems it justified and reasonable to extend, on an individual basis.  Members who have been granted a leave of absence for educational purposes will submit an official transcript of record or official grade card from the school or institution attended at the end of each term or grade period. An official transcript of record of all courses taken, grade attainment in each and credits received, will be submitted by the member, through the chain-of-command, to the Sheriff immediately upon return to active duty.

## 22.2.2   THE FAMILY AND MEDICAL LEAVE ACT OF 1993 (22.1.2 E):

The U.S. Department of Labor's Employment Standards Administration, Wage and Hour Division, administers and enforces the Family and Medical Leave Act (FMLA) for all private, state and local government employee and some federal employees. Most federal and certain congressional employees are also covered by the law and are subject to jurisdiction of the U.S. Office of Personnel Management or the Congress.

The FMLA entitles eligible employees to take up to 12 weeks of unpaid, job-protected leave in a 12-month period for specified family and medical reasons. Amendments to the FMLA by the National Defense Authorization Act for FY 2008 (NDAA), Public Law 110-181, expanded the FMLA to allow eligible employees to take up to 12 weeks of job-protected leave in the applicable 12-month period for any "qualifying exigency" arising out of the fact that a covered military member is on active duty, or has been notified of an impending call or order to active duty, in support of a contingency operation. The NDAA also amended the FMLA to allow eligible employees to take up to 26 weeks of job-protected leave in a "single 12-month period" to care for a covered service member with a serious injury or illness

Amendments to the FMLA by the NDAA for Fiscal Year 2010 (2010 NDAA), Public Law 111-84, Section 565, expand coverage for military exigency leave and military caregiver leave.  The changes in the 2010 NDAA provide exigency leave coverage to the spouse, parent, son, or daughter of a service member in the Regular Armed Forces who is deployed to a foreign country. Provisions also expand caregiver coverage to family members of veterans receiving treatment, recuperation, or therapy for a serious injury or illness incurred in the line of duty if the injury or illness was within a five-year period before the leave commences.  The coverage applies even if the injury or illness manifested itself after the service member's discharge from military service. For detailed information on the 2010 amendments, visit http://www.dol.gov/whd/fmla/.

22:25

#### 22.2.2.1        Employer Coverage

FMLA applies to all public agencies, including state, local and federal employers, local education agencies (schools), **and** private-sector employers who employed 50 or more employees in 20 or more workweeks in the current or preceding calendar year, including joint employers and successors of covered employers.

#### 22.2.2.2        Employee Eligibility

To be eligible for FMLA benefits, an employee **must**:

1. Work for a covered employer;

2. Have worked for the employer for a total of 12 months;

3. Have worked at least 1,250 hours over the previous 12 months; and

4. Work at a location in the United States or in any territory or possession of the United States where at least 50 employees are employed by the employer within 75 miles.

While the 12 months of employment need not be consecutive, employment periods prior to a break in service of **seven** years or more need not be counted unless the break is occasioned by the employee's fulfillment of his or her National Guard or Reserve military obligation (as protected under the Uniformed Services Employment and Reemployment Rights Act (USERRA)), or a written agreement, including a collective bargaining agreement, exists concerning the employer's intention to rehire the employee after the break in service. *See*, FMLA Special Rules for Returning Reservists.

#### 22.2.2.3        Leave Entitlement

A covered employer must grant an eligible employee up to a total of **12 work weeks** of **unpaid** leave during any 12-month period for one or more of the following reasons:

1. For the birth and care of a newborn child of the employee;

2. For placement with the employee of a son or daughter for adoption or foster care;

3. To care for a spouse, son, daughter, or parent with a serious health condition;

4. To take medical leave when the employee is unable to work because of a serious health condition; **or**

5. For qualifying exigencies arising out of the fact that the employee's spouse, son, daughter, or parent is on active duty or call to active duty status as a member of the Regular Armed Forces and who is deployed to a foreign country.

LCSO/Clark
DEF001068

A covered employer also must grant an eligible employee who is a spouse, son, daughter, parent, or next of kin of a current member of the Armed Forces, including a member of the National Guard or Reserves, with a serious injury or illness up to a total of **26 workweeks** of **unpaid** leave during a "single 12-month period" to care for the service member. Under the 2010 NDAA amendments, the definition of "covered service member" is expanded to include a veteran "who is undergoing medical treatment, recuperation, or therapy for a serious injury or illness" if the veteran was a member of the Armed Forces "at any time during the period of 5 years preceding the date on which the veteran undergoes that medical treatment, recuperation, or therapy." *See* Fact Sheet 28A for specific information regarding military family leave.

Spouses employed by the same employer are limited in the **amount of** family leave they may take for the birth and care of a newborn child, placement of a child for adoption or foster care, or to care for a parent who has a serious health condition **to a combined total of 12 weeks** (or 26 weeks if leave to care for a covered service member with a serious injury or illness is also used). Leave for birth and care, or placement for adoption or foster care, must conclude within 12 months of the birth or placement.

Under some circumstances, employees may take FMLA leave intermittently – taking leave in separate blocks of time for a single qualifying reason – or on a reduced leave schedule – reducing the employee's usual weekly or daily work schedule. When leave is needed for planned medical treatment, the employee must make a reasonable effort to schedule treatment so as not to unduly disrupt the employer's operation. If FMLA leave is for birth and care, or placement for adoption or foster care, use of intermittent leave is subject to the employer's approval.

Under certain conditions, employees **or** employers may choose to "substitute" (run concurrently) accrued **paid** leave (such as sick or vacation leave) to cover some or all of the FMLA leave. An employee's ability to substitute accrued paid leave is determined by the terms and conditions of the employer's normal leave policy. Lee County Sheriff Office's policy requires an employee on FMLA to utilize all available accruals (sick, personal, vacation) while on leave.

Any leave taken as part of a worker's compensation claim will be designated as FMLA leave and will run concurrently with the FMLA leave entitlement.

6.  **"Serious health condition"** means an illness, injury, impairment, or physical or mental condition that involves either:

   A.  Inpatient care (*i.e.*, an overnight stay) in a hospital, hospice, or residential medical-care facility, including any period of incapacity (*i.e.*, inability to work, attend school, or perform other regular daily activities) or subsequent treatment in connection with such inpatient care; **or**

   B.  Continuing treatment by a health care provider, which includes:

LCSO/Clark
DEF001069

Supercedes
Chapter 22 – Rev. 01/21

Lee County Sheriff's Office
Operations Manual

Effective: 7/91
Revised: 03/21

1) A period of incapacity lasting more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that **also** includes:

   a) treatment two or more times by or under the supervision of a health care provider (*i.e.*, in-person visits, the first within 7 days and both within 30 days of the first day of incapacity); **or**

   b) one treatment by a health care provider (*i.e.*, an in-person visit within 7 days of the first day of incapacity) with a continuing regimen of treatment (*e.g.*, prescription medication, physical therapy); **or**

2) Any period of incapacity related to pregnancy or for prenatal care. A visit to the health care provider is not necessary for each absence; **or**

3) Any period of incapacity or treatment for a chronic serious health condition which continues over an extended period of time, requires periodic visits (at least twice a year) to a health care provider, and may involve occasional episodes of incapacity. A visit to a health care provider is not necessary for each absence; **or**

4) A period of incapacity that is permanent or long-term due to a condition for which treatment may not be effective. Only supervision by a health care provider is required, rather than active treatment; **or**

5) Any absences to receive multiple treatments for restorative surgery or for a condition that would likely result in a period of incapacity of more than three days if not treated.

## 22.2.2.4    Benefits Coverage During Leave

A covered employer is required to maintain group health insurance coverage for an employee on FMLA leave whenever such insurance was provided before the leave was taken and on the same terms as if the employee had continued to work. If applicable, arrangements will need to be made for employees to pay their share of health insurance premiums while on leave. In some instances, the employer may recover premiums it paid to maintain health coverage for an employee who fails to return to work from FMLA leave.

**LCSO/Clark**
**DEF001070**

### 22.2.2.5    Job Restoration

A member eligible for family and/or medical leave – with the exception of those members designated by law as "highly compensated members" – will be restored to their original position or to a position with equivalent pay, benefits, and other terms and conditions of appointment (including shift and location).  The Sheriff cannot guarantee that a member will be returned to their original assignment. An employee's use of FMLA leave cannot result in the loss of any employment benefit that the employee earned or was entitled to **before** using FMLA leave, nor be counted against the employee under a "no fault" attendance policy. A member is not entitled to the accrual of any seniority or appointment benefits that would have occurred if leave was not taken.  A member who takes family or medical leave will not lose any appointment benefits that accrued before the date leave began. If a bonus or other payment, however, is based on the achievement of a specified goal such as hours worked, products sold, or perfect attendance, and the employee has not met the goal due to FMLA leave, payment may be denied unless it is paid to an employee on equivalent leave status for a reason that does not qualify as FMLA leave.

An employee has no greater right to restoration or to other benefits and conditions of employment than if the employee had been continuously employed.  An employee on FMLA leave is not protected from actions that would have affected him or her if the employee was not on FMLA leave. For example, if a shift has been eliminated, or overtime has been decreased, an employee would not be entitled to return to work, that shift, or the original overtime hours.

Additional restrictions and conditions may be obtained from the Human Resources Director, as part of the Federal Legislation.

### 22.2.2.6    Notice and Certification

1.    **Employee Notice**

Employees seeking to use FMLA leave are required to provide 30-day advance notice of the need to take FMLA leave when the need is foreseeable and such notice is practicable. If leave is foreseeable less than 30 days in advance, the employee must provide notice as soon as practicable – generally, either the same or next business day. When the need for leave is not foreseeable, the employee must provide notice to the employer as soon as practicable under the facts and circumstances of the particular case. Absent unusual circumstances, employees must comply with the employer's usual and customary notice and procedural requirements for requesting leave.

Employees must provide sufficient information for an employer reasonably to determine whether the FMLA may apply to the leave request. Depending on the situation, such information may include that the employee is incapacitated due to pregnancy, has been hospitalized overnight, is unable to perform the functions of the job, and/or that the employee or employee's qualifying family member is under the continuing care of a health care provider.

LCSO/Clark
DEF001071

Supercedes
Chapter 22 – Rev. 01/21

Lee County Sheriff's Office
Operations Manual

Effective: 7/91
Revised: 03/21

When an employee seeks leave for a FMLA-qualifying reason for the first time, the employee need not expressly assert FMLA rights or even mention the FMLA. When an employee seeks leave, however, due to a FMLA-qualifying reason for which the employer has previously provided the employee FMLA-protected leave, the employee must specifically reference either the qualifying reason for leave or the need for FMLA leave.

2.     **Employer Notice**

Covered employers must post a notice approved by the Secretary of Labor explaining rights and responsibilities under FMLA. At the LCSO this notice is placed on the Intranet and is part of the DOL poster series posted through the agency. An employer that willfully violates this posting requirement may be subject to a fine of up to $110 for each separate offense. Additionally, employers must either include this general notice in employee handbooks or other written guidance to employees concerning benefits, or must distribute a copy of the notice to each new employee upon hiring.

When an employee requests FMLA leave or the employer acquires knowledge that leave may be for a FMLA purpose, the employer must notify the employee of his or her eligibility to take leave, and inform the employee of his/her rights and responsibilities under FMLA. When the employer has enough information to determine that leave is being taken for a FMLA-qualifying reason, the employer must notify the employee that the leave is designated and will be counted as FMLA leave. The employer's decision to designate leave as FMLA-qualifying must be based only on information received from the employee or the employee's spokesperson (e.g., if the employee is incapacitated, the employee's spouse, adult child, parent, doctor, etc., may provide notice to the employer of the need to take FMLA leave). Sheriff's Office policy does not allow an employee to "waive" their rights under FMLA.

3.     **Certification**

Employers may require that an employee's request for leave due to a serious health condition affecting the employee or a covered family member be supported by a certification from a health care provider. The certification must state the date on which the health condition commenced, the probable duration of the condition, and a brief, appropriate description of the medical condition. If the member is needed to care for a spouse, child or parent, the certification must state this, along with an estimate of the amount of time the member will be needed. If the member has a serious health condition, the certification must state that the member cannot perform the functions of his or her job. In the case of a foreseeable leave, if an employee fails to provide certification in a timely manner as required by F.S.825.313, then an employer may deny FMLA coverage until the required certification is provided. In the case of unforeseeable leave, an employer may deny FMLA coverage for the requested leave if the employee fails to provide a certification within 15 calendar days from receipt of the request for certification

**LCSO/Clark**
**DEF001072**

Supercedes
Chapter 22 – Rev. 01/21

Lee County Sheriff's Office
Operations Manual

Effective: 7/91
Revised: 03/21

unless not practicable due to extenuating circumstances. i.e. a medical emergency. If the employee never produces the certification, the leave is not FMLA leave, and the employer can deny FMLA protections.

An employer may require second or third medical opinions (at the employer's expense) and periodic recertification of a serious health condition. An employer may use a health care provider, a human resource professional, a leave administrator, or a management official – but not the employee's direct supervisor – to authenticate or clarify a medical certification of a serious health condition. An employer may have a uniformly-applied policy requiring employees returning from leave for their own serious health condition to submit a certification that they are able to resume work. If reasonable safety concerns exist, an employer may, under certain circumstances, require such a certification for employees returning from intermittent FMLA leave.

### 22.2.2.7    Unlawful Acts

It is unlawful for any employer to interfere with, restrain, or deny the exercise of any right provided by FMLA. It is also unlawful for an employer to discharge or discriminate against any individual for opposing any practice, or because of involvement in any proceeding, related to FMLA.

### 22.2.2.8    Enforcement

The Wage and Hour Division investigates complaints. If violations cannot be satisfactorily resolved, the U.S. Department of Labor may bring action in court to compel compliance. Individuals may also be able to bring a private civil action against an employer for violations.

### 22.2.2.9    Other Provisions

Salaried executive, administrative, and professional employees of covered employers who meet the Fair Labor Standards Act (FLSA) criteria for exemption from minimum wage and overtime under Regulations, 29 CFR Part 541, do not lose their FLSA-exempt status by using any unpaid FMLA leave. This special exception to the "salary basis" requirements for FLSA's exemption extends only to an "eligible" employee's use of leave required by FMLA.

### 22.2.2.10    Military Family Leave:

The 2008 National Defense Authorization Act, Public Law 110-181, section 585(a) amended the FMLA to provide eligible employees working for covered employers two important new leave rights related to military service:

1.    Eligible employees are entitled to up to 12 weeks of leave because of "any qualifying exigency" arising out of the fact that the spouse, son, daughter or parent of the employee is on active duty, or has been notified of an impending call to active duty status, in support of a contingency operation.

22:31

LCSO/Clark
DEF001073

Supercedes
Chapter 22 – Rev. 01/21

Lee County Sheriff's Office
Operations Manual

Effective:  7/91
Revised: 03/21

2.     An eligible employee who is the spouse, son, daughter, parent, or next of kin of a
covered service member who is recovering from a serious illness or injury
sustained in the line of duty on active duty shall be entitled to up to 26 weeks of
leave during a single 12-month period to care for the service member. This
military caregiver leave is available during a single 12-month period during which
an eligible employee is entitled to a combined total of 26 weeks of all types of
FMLA leave.

On October 28, 2009, the President signed into law the National Defense Authorization Act for
Fiscal Year 2010 (2010 NDAA), Public Law 111-84. Section 565 of the 2010 NDAA amends
the Family and Medical Leave Act (FMLA). These amendments expand the military family
leave provisions added to the FMLA in 2008, which provide qualifying exigency and military
caregiver leave for employees with family members who are covered military members.

The 2010 NDAA amendments to the FMLA provide that an eligible employee may take FMLA
leave for any qualifying exigency arising out of the fact that the employee's spouse, son,
daughter, or parent is on (or has been notified of an impending call to) "covered active duty" in
the Armed Forces. "Covered active duty" for members of a **regular** component of the Armed
Forces means duty during deployment of the member with the Armed Forces to a foreign
country. "Covered active duty" for members of the **reserve** components of the Armed Forces
(members of the U.S. National Guard and Reserves) means duty during deployment of the
member with the Armed Forces to a foreign country under a call or order to active duty in a
contingency operation as defined in section 101(a)(13)(B) of title 10, United States Code. (Prior
to the 2010 NDAA amendments, qualifying exigency leave did not apply to employees with
family members serving in a regular component of the Armed Forces and there was no
requirement that members of the National Guard and Reserves be deployed with the Armed
Forces to a foreign country.)

The 2010 NDAA also expands the military caregiver leave provisions of the FMLA. Military
caregiver leave entitles an eligible employee who is the spouse, son, daughter, parent, or next of
kin of a "covered service member" to take up to 26 workweeks of FMLA leave in a single 12-
month period to care for a "covered service member" with a "serious injury or illness". Under
the 2010 NDAA amendments, the definition of "covered service member" is expanded to include
a **veteran** "who is undergoing medical treatment, recuperation, or therapy for a serious injury or
illness" if the veteran was a member of the Armed Forces "at any time during the period of 5
years preceding the date on which the veteran undergoes that medical treatment, recuperation, or
therapy." (Prior to the 2010 NDAA amendments, military caregiver leave was limited to care for
current members of the Armed Forces, including regular components and National Guard and
Reserves.)

In addition, the 2010 NDAA amends the FMLA's definition of a "serious injury or illness". For a
current member of the Armed Forces the definition is amended to include not only a serious
injury or illness that was incurred by the member in line of duty on active duty but also a serious
injury or illness that "existed before the beginning of the member's active duty and was
aggravated by service in line of duty on active duty in the Armed Forces" that may render the

22:32

Supercedes
Chapter 22 – Rev. 01/21

Lee County Sheriff's Office
Operations Manual

Effective:  7/91
Revised: 03/21

member medically unfit to perform the duties of the member's office, grade, rank, or rating. For a veteran, a serious injury or illness is defined as "a qualifying injury or illness that was incurred by the member in line of duty on active duty in the Armed Forces (or existed before the beginning of the member's active duty and was aggravated by service in line of duty on active duty in the Armed Forces) and that manifested itself before or after the member became a veteran."

### 22.2.2.11    Procedures for Requesting Leave:

A member requesting leave shall submit a "To-From", via chain-of-command, to Risk Management.  A member intending to take family or medical leave because of an expected birth or placement, or because of a planned medical treatment, must submit the request for leave at least thirty (30) days before the leave is to begin (excluding exigent circumstances).  If, due to exigent circumstances, leave is to begin within thirty (30) days or less, a member must give notice to their supervisor and Risk Management as soon as the necessity for the leave arises.

### 22.2.2.12    Use of Agency Vehicles While on FMLA:

No Sheriff's Office member will be allowed to maintain possession of an agency vehicle for any leave of absence that exceeds fourteen days.  Vehicles shall be turned in to the Fleet Division as soon as possible at or near the time of leave commencement.

### 22.2.2.13    Retroactive Designation of Leave:

The agency may designate leave retroactively when the leave was taken for an FMLA-qualifying reason but the agency was initially unaware of the reason, or when the agency knows the reason for the leave, but needs time to confirm that the leave qualifies under FMLA. If an absence is at first not FMLA leave, but later becomes such, only that portion of the leave is designated as FMLA.

### 22.2.2.14    Domestic Violence/Employee Leave

Employees with at least three months service time are eligible to request up to three working days of leave within a 12-month period if the employee is a victim of domestic violence and the leave is sought for:

1.    Seek an injunction for protection against domestic violence;

2.    Obtain medical care or mental health counseling;

3.    Obtain services from a victim-services organization;

4.    Make the employee's home secure or to seek new housing; or

22:33

LCSO/Clark
DEF001075

5.    To seek legal assistance to address issues arising from the act of domestic violence and to attend and prepare for court-related proceedings arising from the act of domestic violence.

The employee is required to provide advance notice of the leave (except in cases of imminent danger) and use all available annual or vacation leave, personal leave and sick leave available prior to using the leave provided for in House Bill 55.

Employers are required to document the act of domestic violence, and keep the information relating to the employee's leave confidential.

### 22.2.2.15    Leave of Absence Without Pay:

The Sheriff's Office recognizes that, on occasion, a member may have need of some time off from work when they do not have sufficient credits accumulated to cover this time and/or the available FMLA has been exhausted for the current eligibility period. The Sheriff may grant a member of the Sheriff's Office a leave of absence without pay, with good and sufficient reasons, within the confines of the law. Said leave of absence will be no longer than SIX (6) months and must be applied for in writing to the Sheriff via the chain-of-command.

Status upon return from leave without pay: A member who takes such leave waives their right to be reinstated at the same rank, pay and/or job assignment, although at the Sheriff's discretion the member may be allowed to retain seniority.

### 22.2.2.16    Fringe Benefits and Wage Increase Restrictions:

1.    Members will not earn annual or sick leave benefits while on leave of absence without pay.

2.    No credit towards retirement time will be earned by a member while on leave of absence without pay or **unpaid** FMLA leave.

3.    The Office of the Sheriff will not provide group insurance benefits for members on leave of absence without pay, except as defined in the Family/Medical Leave Act.

### 22.2.2.17    (22.1.3-c) Disability leave – worker's compensation, disability Status, modified duty:

### 22.2.2.18    Worker's Compensation:

Effective June 1, 2008, NORTH AMERICAN RISK SERVICES (NARS), began handling all workers' compensation claims for the Florida Sheriff's Worker's Compensation Self-Insurance Fund (FSWCSIF), which includes the Lee County Sheriff's Office. The following is a summary of the Worker's Compensation Policy for this agency and Florida Statute 440:

22:34

LCSO/Clark
DEF001076

Supercedes
Chapter 22 – Rev. 01/21

Lee County Sheriff's Office
Operations Manual

Effective: 7/91
Revised: 03/21

1.     **Law Enforcement Personnel Maliciously or Intentionally Injured.** Any certified law enforcement officer who, while acting within the course of employment, is maliciously or intentionally injured, shall be carried at full pay.

2.     **Injured - But NOT Malicious or Intentional.** The day of the accident or injury, the Lee County Sheriff's Office will pay the employee full pay and charge regular hours or salary; this follows Chapter 440, Florida Statutes.

       If the worker's comp physician places the employee on a no work status, starting on day 2 of the absence, the employee shall be carried at full pay status (100% of **gross pay**) for a period not to exceed six (6) months from date of injury without being required to use accrued leave time. Full pay status shall be based on the member's salary at the time of the accident.

       In the event the Worker's Compensation leave becomes an unpaid leave, or Worker's Compensation benefits have been exhausted, the substitution provision becomes applicable and the Lee County Sheriff's Office will require the use of accrued paid leave by the member.

       Any and all leave associated with an on-the-job injury or illness (paid or unpaid), where the injury or illness is a "serious health condition," as defined in the Family and Medical Leave Act, shall be designated as FMLA and run concurrently with Worker's Compensation.

**NOTE:  *Any injury that occurs as the result of the employee's failure to use a safety device or equipment, as required by state law and/or agency policy, shall result in a 25% reduction of the employee's work comp benefits, as stated in Florida Statutes 440.09.***

## 22.2.2.19     Reporting Guidelines for Personnel Injuries (22.2.2 D)

The purpose of this general order is to define specific guidelines for the reporting and handling of line of duty (Workers Compensation) injuries involving employees of the Lee County Sheriff's Office. This procedure is designed to facilitate the prompt and accurate completion of all reports and other documents required by the State of Florida, the Sheriff's Workers Compensation insurance carrier, and the Sheriff's Office, for personnel who are injured while working or while on duty and acting on behalf of the Sheriff's Office.

1.     Definitions:

       A.     Injury – Bodily injury or death by accident, arising out of and in the course of employment, and such disease or infection as naturally or unavoidably results from such injury.

**LCSO/Clark
DEF001077**

Supercedes
Chapter 22 – Rev. 01/21

Lee County Sheriff's Office
Operations Manual

Effective: 7/91
Revised: 03/21

B.   Carrier – At the time the injury occurs, the insurance company that approves and provides payment for Workers Compensation claims.

C.   Line of Duty Disability (Workers Compensation) – As defined by Chapter 440, F.S.S., an injury or illness that renders Sheriff's Office personnel unable to perform the required duties of their job classification and occurs as a direct result of performing authorized duties or while engaged in employment. The determination as to whether the injury or illness qualifies as "in the line of duty" requires case by case review, with the insurance carrier making the final decision.

D.   Risk Management Unit – Administers workers compensation and light duty. Monitors all disabled statuses for the Office. Telephone 239-258-3275, 258-3274, or 258-3273. Fax 239-574-3141.

E.   North American Risk Services (formerly Unisource Administrators), Altamonte Springs, FL – The workers compensation insurance company administrating all work related injuries and illnesses sustained after 00:01 hours on June 1, 2008.

F.   Supervisor's and Employee's First Notice of Injury Form – A Sheriff's Office form that is used to document line of duty accidents/injuries, even if no medical evaluation/treatment is required. The form shall be completed by the employee and a supervisor and forwarded to Risk Management as soon as possible upon completion.

G.   Notice of Injury Form  (DWC-1) – A Florida Department of Labor form that is used to document line of duty injuries requiring medical evaluation/treatment. The Risk Management Coordinator will complete this document and report directly to the Worker's Compensation carrier.

H.   Incident Exposure Report – A Sheriff's Office form that is used to document incidents of exposure to bio-hazardous materials and/or blood-borne pathogens.

I.   Appointment – Includes not only appointments with medical personnel involved in the Workers Compensation process, but also any appointments involving therapy, rehabilitation, vocational assessment, etc. Workers comp appointments must be made during non-duty hours when possible. If it is necessary for the member to miss work for an appointment, the member must use any portion of their accrued time to cover the missed period of work.

J.   Express Scripts – The workers compensation prescription provider. The Express Scripts Help Desk telephone number is 1-800-676-5774.

LCSO/Clark
DEF001078

| Supercedes | Lee County Sheriff's Office | Effective: 7/91 |
|---|---|---|
| Chapter 22 – Rev. 01/21 | Operations Manual | Revised: 03/21 |

2.      Reporting Procedure:

    A.      Injuries to Sheriff's Office personnel that occur during the course of employment must be reported to the employer and, under specified circumstances, to the Florida Division of Workers Compensation. The Notice of Injury form must be received by the insurance carrier no later than seven days after knowledge of the injury or accident.

        Per F.S.S. 440.092(2), "an injury to a law enforcement officer as defined in Section 943.10(1), Florida Statutes, during the officer's work period or while going to or coming from work in an official law enforcement vehicle, shall be presumed to be an injury arising out of and in the course of employment unless the injury occurred during a distinct deviation for a non-essential personal errand."

    B.      Supervisors shall ensure that all forms and requirements of this policy are completed and emailed to the Risk Management Unit immediately or no later than 24 hours after the injury. The original copies must be sent to Risk Management before 9:00 am the following day. Failure to properly report work related injuries or accidents or failure to complete and forward to the Florida Division of Workers Compensation required reporting forms can result in a levy of a civil penalty of $500.00.

**22.2.2.20      Disability Status and Modified Duty**

Effective management dictates that this agency maintains a proficient mechanism for the use of personnel resources that are limited by disability. Given the demands placed on the Sheriff's Office by the community, each employee is essential to the Office's successful operation. In the absence of an extension of leave, failure to return to work without restrictions, within the authorized time constraints, shall result in dismissal for failure to return to duty at the end of an authorized leave. In the event such action is necessary, it shall not be disciplinary in nature, but shall be for the good of the organization and enable the Sheriff's Office to hire replacement personnel. Members who are placed on disability status or modified duty and were assigned to a specialty unit receiving incentive pay may have their incentive suspended until they return to full duty status within that unit.

1.      DEFINITIONS:

    A.      **Disability:**      A medical condition that renders a Sheriff's Office employee unable to perform the essential duties of their job classification.

    B.      **Workers' Compensation (WC):**      A duty related injury that is covered by the Sheriff's Office Workers Compensation insurance company.

    C.      **Accruals:**      The below listed paid leaves:

22:37

**LCSO/Clark**
**DEF001079**

Supercedes
Chapter 22 – Rev. 01/21

Lee County Sheriff's Office
Operations Manual

Effective: 7/91
Revised: 03/21

1)    Sick leave

2)    Vacation leave

3)    Personal leave

D.    **Modified Duty (M/D):** A status in which an employee is, not medically capable of working their normal job assignment, but may work at their full salary in alternate position within the agency. A modified duty assignment is not the right of the employee and can be denied by the Sheriff or designee.

    1)    The LCSO does not designate any position as modified duty. If an accommodation is granted, this status will only be accommodated if a position that matches the employee's restrictions is available.

    2)    Modified duty assignments shall be for a period not to exceed 90 calendar days. Extension may be granted on specific individual cases only when a doctor determines a specific return to full duty date, not to exceed 60 days beyond the original 90 days. If the employee cannot return to full duty within the above time frames the matter shall be submitted to the Sheriff who may determine the employee's future assignment. Calculations shall be measured on a rolling calendar year, which shall be calculated by measuring backwards twelve (12) months from the date the employee is approved for modified duty.

    3)    Work-related disabilities take priority over non-work related disabilities.

    4)    Modified duty assignments and schedules are based on the needs of the agency and will not necessarily coincide with the normal duties and schedule of the employee. Likewise, duty hours and duty days will be established based on LCSO needs and availability.

        a)    Personnel on modified duty assignment may work beyond their normally scheduled hours if required due to operational necessity and only if medically unrestricted.

    5)    They shall not perform sworn duties, wear Sheriff's Office uniforms, or drive Sheriff's Office vehicles that are readily identifiable as belonging to the Sheriff's Office (i.e. must be unmarked) if an unmarked vehicle is available to be exchanged out

**LCSO/Clark**
**DEF001080**

Supercedes
Chapter 22 – Rev. 01/21

Lee County Sheriff's Office
Operations Manual

Effective: 7/91
Revised: 03/21

for a marked vehicle. Any employee on modified duty shall not be authorized for assignment to paid overtime details.

6) Corrections deputies working inside the jail may wear Sheriff's Office uniforms for identification purposes, as authorized by their division commanders. They may only work in non-inmate contact positions.

7) Civilian attire for modified duty personnel shall be in accordance with existing LCSO policy.

E. **Restricted Duty (RD)** – A status in which an employee is precluded from working their normal job assignment because of a response to resistance investigation. On R/D employee may perform administrative tasks at their full salary. The work shall be in any bureau as deemed appropriate by executive command staff. Employees on restricted duty status may only drive unmarked agency vehicles with no yellow tags. The LCSO does not designate any position as R/D therefore this status will only be accommodated if an appropriate position is available.

F. **Fitness for Duty** – A status in which an employee is precluded from working their normal job functions because of psychological unfitness for duty. A mandatory fitness for duty evaluation will be required for any employee wishing to return to work from this status.

1) Suspension of Authority

   a) Arrest and concealed weapons authority shall be suspended for deputies unable to perform their normal duties due to psychological unfitness for duty.

   b) Notification of psychological unfitness for duty of a deputy shall be made to the respective district/division commander. The commander shall take direct recovery of the badge, ID cards, access cards, issued firearms, vehicle and commission cards from the deputy, advising the deputy that their commission, arrest powers, and right to carry a firearm, has been temporarily suspended by the Sheriff.

   c) Suspension of arrest and concealed weapon authority shall not apply to deputies assigned to disability leave as a result of a physical medical impairment, and is not disciplinary in nature.

LCSO/Clark
DEF001081

Supercedes                     Lee County Sheriff's Office            Effective: 7/91
Chapter 22 – Rev. 01/21              Operations Manual                Revised: 03/21

    G.    **Medical Leave of Absence (MLOA)** – A Civil Service status for non-paid leave of absence from employment for medical reasons.

    H.    **Family and Medical Leave Act (FMLA)** – A federal law allowing paid and/or non paid leave for personal or family medical conditions, or the birth or adoption of a child.

    I.    **Maximum Medical Improvement (MMI)** – A medical diagnosis that determines the percentage and completion of recovery for a medical incident.

    J.    **Ability to Work Form (ATW)** – A document that includes the Job Task Analysis description that is completed by the doctor to advise if an employee is able to fulfill their duties.

    K.    **Return to Work Form (RTW)** – A (green in color) Sheriff's Office memorandum that an employee must obtain to return to duty upon completion of a disability leave. **This form may only be completed by the Risk Management Unit.** "Green sheets" are to be maintained in the employee's file, NOT returned to Risk Management or Human Resources.

    L.    **Disability Status** - A disability status is considered:

        1)  Workers Compensation (WC)

        2)  Medical Leave of absence (MLOA)

        3)  Leave without pay Disability Leave Calendar

        4)  Modified Duty (MD)

        5)  Family and Medical Leave Act (FMLA)

**22.2.2.21    Return to Duty**

    1.    Ability to Work (ATW) form must be completed by a physician stating that the employee may return to full duty, without any restrictions.

    2.    If the Sheriff's Office questions the ATW of the employee, the Office reserves the right to request second opinions from other doctors. The employee shall not return to duty until a resolution regarding other requested medical opinions is obtained.

    3.    Once the ATW is approved, the employee must receive a Return to Work (RTW) "green sheet "form from the Risk Management Unit.

Supercedes
Chapter 22 – Rev. 01/21

Lee County Sheriff's Office
Operations Manual

Effective: 7/91
Revised: 03/21

4.   No supervisor shall allow an employee, under the previously described circumstances, to return to duty without a RTW "green sheet". Supervisors are required to maintain green form documents in the specific units and these files will move with the employee when transfers occur. These green forms will NOT contain PHI (protected health information), only duty status.

### 22.2.2.22     Modified Duty Review

The Duty Status Review Board shall periodically review employee's files that are in a disability and/or a Modified Duty status. Duty Status Review Board: The Board may occur if a review of an employee's work history determines that a review is warranted or if an ill/injured employee has reached MMI and cannot return to full duty.

Factors that may be considered by the Board include the sum of aggregate calendar days measured on a rolling calendar year in which an employee is on a disability leave or modified duty status excluding FMLA and Worker's Compensation. On a case by case basis, time spent in disabled status or modified duty status throughout the employee's career may be considered.

A.   A Rolling Calendar Year shall be calculated by measuring backward twelve (12) months from the date the employee is approved for modified duty, which shall include each day of disability or modified duty through the use of accruals, excluding FMLA, and every day of no paid leave for illness reasons that have been granted.

B.   If the employee is on a leave the day prior and the day after a day off, the days off are included in the count of days.

C.   Use of Accruals: Accruals may be used to supplement the salary payments of worker's compensation or any authorized leave that does not provide 100% of the daily salary. A day is considered part of the 180 day count when accruals are used for a partial work day to supplement a disability leave.

If the Duty Status Review Board feels the employee's condition is not progressing toward recovery, they may require the employee to attend a status review with a physician.

2.   Employee Notification: Risk Management shall provide affected employees a status notification, on approximately the 90th day and the 150th day count of disability leave.

LCSO/Clark
DEF001083

**22.2.2.23**      **Resolution of Disability Leave**

On a case by case basis, Workers Compensation Laws, Florida State Retirement rules, Standard Operating Procedures, Rules and Regulations, Civil Service rules, Family and Medical Leave Act, Americans with Disabilities Act, Fair Labor and Standards Act, along with any and all other appropriate State and/or Federal Laws shall be used to evaluate each disability to provide the best benefit for the employee and the Sheriff's Office.

**22.2.2.24**      **Sheriff's Authority**

The Sheriff, as the appointing authority, may allow an extension of any of the dates provided herein. Such consideration shall be granted at the discretion of the Sheriff, and it is intended this apply only in situations in which an individual has been seriously or permanently injured in the line of duty under extraordinary circumstances, or under situations in which the Sheriff deems that a defined extension would be exceptionally beneficial to the Sheriff's Office. The determination by the Sheriff of what circumstances warrant such an extension to be granted shall be final and binding. Once granted, any extension shall be subject to continuance or curtailment, at the discretion of the Sheriff.

## 22.2.3   (22.1.3-B) HEALTH INSURANCE:

After 60 days of employment, all full-time employees and their dependents receive health insurance.  The Sheriff's Office pays 100% for member's medical, dental, vision and life insurance (policy will pay one times your yearly salary at the time of your death, or twice that amount if the death is accidental). The Sheriff's Office also pays 100% for your dependent's medical, dental and vision insurance coverage. Current benefits can be obtained from the Personnel Services Division.

Under the Lee County Sheriff's Health Plan Document/Policy, the employee must notify Personnel Services (Benefits Unit) of an event change within **60 days** of the event. The events listed below require this type of notification:

1.      Marriage of an employee

2.      Divorce or legal Separation of an employee

3.      Birth or adoption of a child.

4.      Court appointed legal guardian of a child

5.      Dependent ceases to be a "dependent child"

6.      Loss of health coverage from another employer

22:42

# EXHIBIT 17





*Carmine Marceno*
**Sheriff**

*"Proud to Serve"*

**State of Florida**
**County of Lee**

August 15, 2021

Dear Mrs. Clark,

The Lee County Sheriff's Office has undergone an evaluation of significant aspects of current operations to determine ways to improve policies, practices and efficiencies. As you know, the Sheriff's Office was forced to absorb additional expenses and obligations as well as other increased costs including but not limited to; substantial increases in FRS employer pension rates, LCSO's self-funded Health Plan costs and inmate medical expenses.

As a result of this evaluation, LCSO is conducting a *Reduction in Force*. Effective September 4, 2021 your position as "Purchasing Director" is being eliminated. You will be placed on Administrative Leave with Pay immediately upon this notice and given the opportunity to retire.

**Deadline for this decision will be September 3, 2021 at 4:00pm**; or your appointment will be withdrawn on September 4, 2021.

Human Resources has included basic information in this packet but contacting the individuals below will be crucial for whatever option you choose. Your contact for HR will be Cari Turner, she can be reached at 239-477-1360; your contact for Health Benefits and FRS is Doreen Salvagno, she can be reached at 239-477-1121.

Thank you for your service to The Lee County Sheriff's Office and I wish you well in future endeavors.

Sincerely,

Dawn Heikkila
Director of Human Resources
Lee County Sheriff's Office



*"The Lee County Sheriff's Office is an Equal Opportunity Employer"*
**14750 Six Mile Cypress Parkway • Fort Myers, Florida 33912-4406 • (239) 477-1000**

LCSO/Clark
DEF004350

P. 1

* * * Communication Result Report ( Oct. 1. 2021  2:06PM ) * * *

1)
2)

Date/Time: Oct. 1. 2021  2:05PM

| File No. Mode | Destination | Pg(s) | Result | Page Not Sent |
|---|---|---|---|---|
| 4198 Memory TX | 918504102010 | P.  1 | OK | |

Reason for error
E. 1) Hang up or line fail       E. 2) Busy
E. 3) No answer                  E. 4) No facsimile connection
E. 5) Exceeded max. E-mail size  E. 6) Destination does not support IP-Fax

---

HS-1
Rev 01/03
Retiree Payroll

**Florida Retirement System Pension Plan**
Health Insurance Subsidy Certification Form
Retiree Payroll Section
PO BOX 9000  Tallahassee, FL  32316-9000
Local Phone: 850-907-6500  Toll Free: 844-377-1888

PAYEE SSN: ___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___     PAYEE NAME: ___Jenna D. Clark___

I hereby make application for the Health Insurance Subsidy (HIS). I have read the instructions on the enclosed sheet and checked one of the four boxes below. I have checked the one box below that provides the earliest insurance coverage date.

| | | | For HIS processing only |
|---|---|---|---|
| SIGNATURE OF PAYEE | 10/01/2021 DATE | 239-313-3578 TELEPHONE NUMBER | |

SECTION A: To be completed by Payee who will have health premiums deducted from pension payment
☐ This is to certify that I have already completed the required paperwork to have payroll deduction of my health insurance premium from my Florida Retirement System (FRS) monthly benefit. I understand the subsidy will be added AFTER the insurance deduction begins. **Please check with your former employer (local agencies) or the People First Service Center (state agencies) if you have questions about premium deductions from your retirement benefit.

SECTION B: To be completed by former FRS (non-state) employer or People First Service Center (1-866-663-4735) for state agencies
☐ This is to certify that the above named payee had health insurance coverage effective 08/01/1992.
☑ and is currently covered through our agency.

| Signature FRS Agency Representative or People First Representative | 10/01/2021 Date | Lee County Sheriff Office FRS Agency Name | 239-477-1121 Phone # |
|---|---|---|---|

SECTION C: To be completed by Insurance Company - (Insurance cards are not accepted.)
☐ This is to certify that the above named payee has health coverage with _____ (Company Name)
with an effective policy date of _____ - (Please use the earliest possible coverage date).

| Company Representative Signature | Date | Company Address | Phone # |
|---|---|---|---|

SECTION D: Payee provides MEDICARE or Military Insurance information
☐ I have attached a photocopy of either a MEDICARE or Military IDITRICARE card.
PLEASE DO NOT SEND YOUR ORIGINAL CARD. It will not be returned.
NOTE: We will use your Medicare effective date to determine your HIS effective date. Your HIS effective date cannot be earlier than your Medicare effective date.

ATTACH COPY OF CARD HERE (MEDICARE OR MILITARY IDITRICARE CARD

Please return completed form to the Retired Payroll Section. (See address above)
Other contact information:
Fax: 850-410-2010
EmailRetiree.mail@rrsa.myflorida.com

Rule 60S-4.020, F.A.C.
Application, Page 1 of 1

# EXHIBIT 18



**From:** Clark, Jenna <JClark@sheriffleefl.org>
**Sent:** Thursday, August 12, 2021 1:18 PM EDT
**To:** Heikkila, Dawn <​ ████████████ ​>
**Subject:** RE: message

Thank you...this was the surgery you and I spoke about once or twice before . Explant
jc

**Jenna Clark** | **Purchasing Director**
Desk: 239-477-1313
Purchasing
**LeeCounty Sheriff's Office**
JClark@sheriffleefl.org | www.sheriffleefl.org

**From:** Heikkila, Dawn <​ ████████████ ​>
**Sent:** Thursday, August 12, 2021 1:17 PM
**To:** Clark, Jenna <JClark@sheriffleefl.org>
**Subject:** RE: message

Ok...well we are so busy right now that I am going to hold off on the FMLA...if you end up needing more time that that just let me know and I will have to do the FMLA paperwork.

Thanks and I wish you a speedy recovery!!



**Dawn Heikkila, Director**

Lee County Sheriff's Office
Desk: ████████████
DHeikkila@sheriffleefl.org
www.sheriffleefl.org

**From:** Clark, Jenna <JClark@sheriffleefl.org>
**Sent:** Thursday, August 12, 2021 1:06 PM
**To:** Heikkila, Dawn <​ ████████████ ​>
**Subject:** RE: message

18-20
24-27
Total of 7 days.

**Jenna Clark** | **Purchasing Director**
Desk: 239-477-1313
**Purchasing**
**Lee County Sheriff's Office**
JClark@sheriffleefl.org | www.sheriffleefl.org

**From:** Heikkila, Dawn <​ ████████████ ​>
**Sent:** Thursday, August 12, 2021 1:04 PM
**To:** Clark, Jenna <JClark@sheriffleefl.org>
**Subject:** RE: message

Ok...if you are out more than a week I will forward it to Amy for FMLA...do you know how long you plan to be out?



**Dawn Heikkila, Director**

Lee County Sheriff's Office
Desk: ████████████
DHeikkila@sheriffleefl.org
www.sheriffleefl.org

**From:** Clark, Jenna <JClark@sheriffleefl.org>
**Sent:** Thursday, August 12, 2021 12:26 PM
**To:** Heikkila, Dawn <​ ████████████ ​>
**Subject:** message

Hi Dawn –

**LCSO/Clark**
**DEF001303**

I called you to let you know I have surgery scheduled on the 18th - Annmarie said to let you know, she already approved my time.

Thanks!
Jenna

**Jenna Clark** | Purchasing Director
Desk: 239-477-1313
**Purchasing**
**Lee County Sheriff's Office**
JClark@sherifflcefl.org | www.sherifflcefl.org

LCSO/Clark
DEF001304

# EXHIBIT 19



**From:** Holloway, John <⬛⬛⬛⬛⬛>
**Sent:** Friday, April 03, 2020 2:19 PM EDT
**To:** Marceno, Carmine <⬛⬛⬛⬛>
**Subject:** FW: Information regarding LCSO budget

**John Holloway** |Chief
Desk: ⬛⬛⬛⬛
**Legal Services Executive Bureau**
**LeeCounty Sheriff's Office**
⬛⬛⬛⬛ | www.sheriffleefl.org

**From:** Holloway, John
**Sent:** Friday, April 3, 2020 2:19 PM
**To:** Smith, Eric ⬛⬛⬛; Rankine, James ⬛⬛⬛; Lalor, Christopher
⬛⬛⬛; Prisco, Andrew ⬛⬛⬛  Reno, Annmarie ⬛⬛⬛; Estep, Traci
⬛⬛⬛; Sands, Matthew ⬛⬛; Reeves, Chris ⬛⬛⬛; Amrich, James
⬛⬛⬛; Snyder, Richard ⬛⬛; Eberhardt, Thomas ⬛⬛⬛; Hall,
Scott ⬛⬛; Christiano, Holly ⬛⬛ Ciresi, Scott J. ⬛⬛⬛; Rodgers,
Mia ⬛⬛
**Subject:** Information regarding LCSO budget

To All Command Staff:

As we have all discussed, the COVID crisis has changed all our predictions and plans related to the current 19/20 budget and the 20/21 budget - which we are preparing now. In addition to creating unanticipated and significant costs, it is generally accepted that, (despite the governments intervention efforts), the COVID crisis will cause a recession. How serious that recession will be is up for debate, but the consensus is that we will experience a major economic downturn lasting one to five years. Obviously, recessions result in dramatic drops in tax revenue to local governments, and consequently our budget.

The biggest impact of recession should be felt during fiscal year 21/22; however, the County intends to take major action to reduce spending in fiscal year 20/21 in hopes they can avoid more severe budget cuts in fiscal year 21/22. In preparation for the expected drop in tax revenue, the County has placed LCSO on notice that we may see a zero increase in our 20/21 budget, or perhaps our budget will be cut.

The County has identified the following items to its management team as non-essential or subject to increased scrutiny:
- Operating costs (other than salaries)
- Reduced costs based on significant reductions in demand (spend rates)
- Contracted and temporary labor
- Non-contractual expenses
- Office equipment/supplies/furniture
- Seminars/training/travel
- Replacement vehicles/equipment
- New vehicles/equipment
- Non-essential major maintenance
- Reduced commodities due to reduced service demand
- Maintenance at closed facilities
- Procurement of supplies
- Consultants
- Gas

To make sure we have the resources available to meet our future expenses and obligations, (especially salaries and benefits costs), we are taking immediate steps to even more carefully manage our current funds, and prepare for the uncertain future.

To protect our employees, and assure LCSO is able to continue to provide the highest quality law enforcement services possible, we are immediately taking the following actions:

1) Freezing hiring, except for new employees with skills and training essential to the agency's operations;
2) Removing funds from budget lines and reallocating those funds toward expenses and purchases which will reduce future costs;
3) Freezing all significant purchases, except those purchases specifically approved by the Support Services Executive

LCSO/Clark
DEF001313

4) Collecting most agency credit cards, to avoid confusion and assure Purchasing and Finance maintain a tight grip on spending. Bureau;

These steps should help cushion any negative impact a potential economic downtown would have on our members.

Please let me know if you have any questions or suggestions -- we'll prepare for the worst and hopefully find we'll find the federal stimulus packages, and other factors, prevent or mitigate the expected economic downturn.

Thanks for your help.

LCSO/Clark
DEF001314

# EXHIBIT 20



# Lee County Sheriff's Office

## Office of Professional Standards

## Staff Inspection Final Report



## Purchasing

## Workload Assessment and Staff Inspection

## October 2020

LCSO/Clark
DEF004386

# Lee County Sheriff's Office

Sheriff Carmine Marceno
Office of the Sheriff

Date

Undersheriff Eric Smith
Office of the Sheriff

Date

Chief John Holloway
Office of the Sheriff

Date

Annmarie Reno
Support Services Executive Bureau

Date

Jenna Clark
Purchasing Director

Date

Traci Estep
Professional Standards Division

Date

Commander Paul Cummins
Professional Standards Division

Date

Captain Matthew Herterick
Training Division

Date

Sergeant Diana Cintron
Staff Inspector – Professional Standards Division

Date

LCSO/Clark
DEF004387

# Lee County Sheriff's Office

## Table of Contents

Title Page ..................................................................................................................... 1

Signatures Page ............................................................................................................ 2

Table of Contents ......................................................................................................... 3

Executive Summary....................................................................................................... 4

Purchasing Formal Inspection ...................................................................................... 6

Introduction .................................................................................................................. 7

Description of Purchasing............................................................................................. 7

Mission, Objectives, and Methodology of Formal Inspection ......................................... 8

Policy, Procedure, and Accreditation Compliance .........................................................9

Staffing Assessment.....................................................................................................11

Personnel Assessment.................................................................................................. 16

      Member Surveys ................................................................................................ 16

      Personal Interviews ........................................................................................... 22

      Member Self-Assessments ................................................................................. 22

      Inspector Observations....................................................................................... 24

Conclusion................................................................................................................... 25

References.................................................................................................................... 27

LCSO/Clark
DEF004388

# Lee County Sheriff's Office

## Executive Summary – Purchasing Inspection

In August 2020, Sergeant Diana Cintron of the Lee County Sheriff's Office Professional Standards Division began a formal staff inspection of Purchasing. The summarized results are below:

### Conclusion

1. Does Purchasing meet the agency's formal expectations?

   *Yes.*

2. Does Purchasing's practices and procedures ensure compliance with LCSO policies, procedures, and professional standards?

   *Yes.*

3. Are there deficiencies in integrity, training, morale, policy, supervision, or personnel at Purchasing?

   *There are no recognizable deficiencies in integrity, training, morale, policy, first line supervision, and personnel.*

4. Are resources adequate for achieving agency goals and objectives?

   *Several Purchasing Agents requested a handheld Barcode scanner and a camera to take pictures of stock items. The staffing resources are inadequate according to the workload analysis. The addition of two (2) Purchasing Agent allocations is recommended for Purchasing.*

5. Are internal and external communications effective?

   *Yes.*

6. Is there sufficient safety and security for personnel?

   *Yes. There is sufficient safety and security for personnel, and the equipment provided meets and exceeds all operational and Accreditation standards.*

7. Are the written directives for this unit adequate?

   *Yes. Written directives meet all State and Federal laws, and Accreditation Standards.*

LCSO/Clark
DEF004389

# Lee County Sheriff's Office

8. Evaluation of the record keeping practices for organization, completeness, and ability to retrieve information.

   *The record keeping practices of Purchasing are organized, complete, and the software available provides easy retrieval of information.*

9. Other Recommendations
   *There are no other recommendations at this time.*

## Objectives

1. Does Purchasing comply with the law, policy, and CALEA standards? *Yes.*

2. Is the Purchasing facility safety and security appropriate? *Yes.*

3. Are equipment safety, and equipment needs met? *Yes.*

4. Is adequate supervision assigned to Purchasing? *Yes.*

5. Are adequate personnel assigned to Purchasing? *No.*

   *Recommendation:* The current staffing level is inadequate and it is recommended that two (2) additional Purchasing Agent positions be allocated.

The Purchasing Division of the Lee County Sheriff's Office appears to be running at a high to very high level of productivity according to all of the employees. Most of the personnel appear to be happy to very happy to be assigned there. Supervisors appear extremely qualified, and are well liked by their employees. Nearly all of the staff showed high to very high levels of morale and job satisfaction.

It is difficult to obtain the perfect level of equipment, service, and employee satisfaction in a law enforcement agency. The Purchasing Division is a very small unit with a group of very hard working and dedicated employees. With their expertise in purchasing goods and services for the department, the certified staff can focus on keeping the residents and visitors of Lee County safe.

LCSO/Clark
DEF004390

# Lee County Sheriff's Office

# Purchasing
# Formal Staff
# Inspection

LCSO/Clark
DEF004391

# Lee County Sheriff's Office

## Purchasing Formal Staff Inspection

### Introduction

In August 2020, Sergeant Diana Cintron of the Lee County Sheriff's Office Professional Standards Division began a formal staff inspection of the Purchasing Division, commonly referred to as "Purchasing." On August 26, 2020, Sgt. Cintron held a pre-inspection meeting with Purchasing Director Jenna Clark. It was determined that Purchasing Director Clark would be the liaison for the inspection process. The inspection began in October of 2020 and concluded in November 2020.

### Description of Purchasing

#### Location

The Lee County Sheriff's Office Purchasing Division is comprised of Purchasing Director/Management and Purchasing Agents. The strength of the Central Purchasing System is its ability to serve the operating components/divisions without requiring them to maintain their own internal purchasing process. The value of centralized purchasing has long been recognized in both government and private business.

The goal of Purchasing is to obtain items at the lowest reasonable rate and within the time requested, or as soon as possible. The Purchasing Division is also responsible for ensuring proper authorization and recording of all purchase transactions by its personnel.

There are three different purchasing procedures: Standard Purchasing requires an online purchase order; In-House Store Purchasing requires an online requisition; and Software Purchasing requires Technical Support and Facilities Division Director approval prior to submission of an online purchase order.

Purchasing is located in the Lee County Sheriff's Office Main Headquarters at 14750 Six Mile Cypress Parkway, Fort Myers, FL 33912. Lee County Sheriff's Office personnel have access to Purchasing and its employees Monday - Friday, 9:00 a.m. – 4:00 p.m. There is ample parking for personnel. The building provides adequate security with video surveillance. There are no major issues with the location or property.

#### Personnel

As of October 2020, Purchasing contains 7 allotments distributed as follows: 1 Purchasing Director, 1 Purchasing Manager, 5 Purchasing Agents.

#### Daily Operations

LCSO/Clark
DEF004392

# Lee County Sheriff's Office

Purchasing Division personnel work four, 10-hour days.  Scheduling is set to cover a workweek of Monday – Friday.

Purchasing Director position involves responsible supervisory, administrative and operational duties specific to the position.  The Director researches and prepares various reports, composes and constructs policy, procedure and directives, and the budget for the component. The Purchasing Director Jenna Clark works from 8:00 a.m. – 6:00 p.m., Tuesday - Friday.

The Purchasing Manager position involves administrative and clerical work purchasing a variety of supplies and equipment.  Work involves responsibility for research, pricing and negotiation for purchase of quality items at the best price, preparing purchase orders, and keeping an inventory of items ordered and received.  Duties include contacting vendors for availability of products and the provision of contracted services.  Work is performed under the general supervision of the Purchasing Director.  Purchasing Manager Shannon Lehman works 6:30 a.m. – 4:30 p.m., Monday – Thursday.

The Purchasing Agents duties involve responsibility for research, pricing and negotiation for purchase of quality items at the best price, preparing purchase orders, and keeping an inventory of items ordered and received.  Duties include contacting vendors for availability of products, preparing bid specifications, and following-up on delivery of products and the provision of contracted services.  Additionally, Purchasing agents answer phones, provide customer service to employees at the front counter, and meet vendors at the loading dock and accept delivery of products.

Purchasing Agent Daysi Castillo works 7:00 a.m. – 5:00 p.m., Monday – Friday.  Purchasing Agent Christine Cross works 6:00 a.m. – 4:00 p.m., Tuesday – Friday.  Purchasing Agent Danielle DePonto works 7:15 a.m. – 5:15 p.m., Monday – Thursday.  Purchasing Agent Brenda Hector works 8:00 a.m. – 6:00 p.m., Monday and Friday and 10:00 a.m. – 8:00 p.m. Tuesday and Thursday.  Purchasing Agent Gwen Legler works 6:00 a.m. – 4:00 p.m., Tuesday - Friday.

## Mission, Objectives, and Methodology of Formal Inspection

1.  **Mission**
    a.  To determine if Purchasing meets the agency's formal expectations.
    b.  To review practices and procedures to ensure compliance with LCSO policies, procedures, and professional standards.
    c.  To detect deficiencies in integrity, training, morale, policy, supervision, or personnel.
    d.  To determine if resources are adequate for achieving agency goals and objectives.
    e.  To evaluate the effectiveness regarding internal and external communications.
    f.  To evaluate the safety and security of personnel.
    g.  To evaluate the adequacy of written directives related to this unit.

8 | P a g e

**LCSO/Clark**
**DEF004393**

# Lee County Sheriff's Office

    h. To review the record keeping practices for organization, completeness, and ability to retrieve information.

## 2. Objectives

    a. Ensure compliance with the law, policy, and CALEA standards.

    b. Ensure facility safety and security is appropriate.

    c. Ensure equipment safety, and equipment needs are met.

    d. Ensure that adequate supervision is assigned.

    e. Ensure that adequate personnel are assigned.

## 3. Methodology

    a. Meetings, email and phone contact with supervisors.

    b. Physical inspection of facilities.

    c. Review of relevant databases (PowerDMS, CAD, etc...)

    d. Surveys, including a component survey and unit member survey.

    e. Personal interviews with personnel.

    f. Analysis of the Division workload.

## Policy, Procedure, and Accreditation Compliance

### Commander's Component Survey

Purchasing Director Jenna Clark completed a "Component Survey" as part of this formal inspection. The Component Survey noted no concerns.

### Power DMS Inbox Summary

Sgt. Diana Cintron generated a *Signatures Summary* and a *Student Records* report in the Power DMS system. The report revealed no major issues. This shows that personnel sign all mandatory documents and complete online courses in a timely manner.

### Official Manpower Allotments

As of October 21, 2020, Purchasing contains 7 allotments distributed as follows: 1 Purchasing Director, 1 Purchasing Manager, 5 Purchasing Agents.

The Purchasing budget and allocations (Budget Account #20302) Manpower Report is provided in the Appendix.

### Current Budget

Sergeant Cintron obtained a copy of the Purchasing current budget for FY 20/21. Purchasing is allotted $1,665,414.00. No anomalies were noted in their expenditure report and their budget is consistent with that of other similar units at the Sheriff's Office.

LCSO/Clark
DEF004394

# Lee County Sheriff's Office

**Accreditation Compliance**

Sgt. Cintron received an email from Manager Tanya Tanner in Accreditation on November 5, 2020. Manager Tanner stated that Purchasing was up-to-date on all of their standards and that there were no concerns or anomalies. A copy of the Accreditation standards for Purchasing is located in the Appendix.

**Goals and Objectives**

Goals and Objectives are written goals and written objectives that agency components use to measure the success or failure of their unit. Located on the agency intranet, personnel are able to see and obtain a copy of each goal and objective for their unit. Unit Commanders update these goals and objectives in January of each calendar year. The formal Goals and Objectives for Purchasing can be found in the Appendix.

1. **Written Goals and Objectives**

    At the time of the inspection, the 2019 Goals and Objectives were completed. The 2019 Goals and Objectives revealed the following concerns and notable accomplishments:

    a. Track number of purchase orders processed.
        i. 2019 Baseline:
           Total purchase orders and pick tickets processed: 6,641, a 19% increase from 2018.

           *Recommendations – No recommendations at this time.*

    b. Maintain efficiency in inventory control.
        i. 2019 Baseline:
           During 2019, the NIGP (National Institute for Government Purchasing) Commodity/Service Codes have not been consistently utilized. The goods and services that we acquire are not enough volume to utilize the codes. Photo imaging of equipment and supplies is an ongoing process so this would be considered not on target.

           *Recommendations – No Recommendations at this time. The process is moving forward per Director Jenna Clark.*

**LCSO/Clark**
**DEF004395**

# Lee County Sheriff's Office

**Job Task Analysis (JTA's)**

Purchasing has the following non-staff level positions: Purchasing Agent. The Job Task Analysis for the above listed job classifications are in the Appendix.

**Facilities and Equipment**

Purchasing is located in the Lee County Sheriff's Office Main Headquarters at 14750 Six Mile Cypress Parkway, Fort Myers, FL 33912. Lee County Sheriff's Office personnel have access to Human Resources and its employees Monday - Friday, 9:00 a.m. – 4:00 p.m. There is ample parking for personnel. The building provides adequate security with video surveillance. There are no major issues with the location or property.

**Facility Safety and Security**

Purchasing has a controlled access system for entry into the secure areas of the building, and all equipment is protected and locked. Purchasing maintains a good combination of security and approachability for members, and the controlled access and provides a higher than normal level of security.

## Staffing Assessment

**Introduction**

The Lee County Sheriff's Office is required to perform periodic workload assessments so that personnel may be appropriately allocated and distributed across the various organizational components.

The Commission on Accreditation for Law Enforcement Agencies (CALEA) standard 16.1.2 states: "The agency allocates personnel to, and distributes them within all organizational components in accordance with documented periodic workload assessments." The purpose of this standards is to encourage the appropriate deployment of personnel by determining service demands through the use of workload assessments and computer-based or manual methods of personnel allocation and distribution. (Shane, 2009, p.99)

The intent of this standard is to encourage the equalization of individual workloads among and within organizational components. The analysis should specify all incidents and factors used in making each workload assessment and indicate any time and location factors necessary to complete a task.

Basing the allocation of personnel on workload demands can have a significant influence on the efficiency and effectiveness of the agency. The agency should attempt to prevent over or under staffing by ensuring that, the personnel strength of an organizational component is consistent with the workload. The nature or number of tasks as well as their complexity, location, and time

LCSO/Clark
DEF004396

# Lee County Sheriff's Office

required for completion are some of the factors influencing workload demands. The process of allocating personnel to each organizational component also permits the agency to determine the overall number of personnel required to meet its needs and fulfill its objectives.

Assignment of personnel to Purchasing should be based on a thorough analysis of what Purchasing Agents are actually responsible for. The work of Purchasing Agents is much more than answering telephone calls, reading, and returning emails to other personnel within the agency. It is conducting tasks related to research, pricing and negotiation for purchase of quality items at the best price, preparing purchase orders, and keeping an inventory of items ordered and received. Duties include contacting vendors for availability of products, preparing bid specifications, and following-up on delivery of products and the provision of contracted services. Additionally, personnel answer phones, provide customer service to employees at the front counter, and meet vendors at the loading dock and accept delivery of products.

**Workload Assessment Methodology**

The methodology used to perform the Purchasing Agents Workload Assessment is one suggested by CALEA inspectors and is formally presented in the textbook *What Every Chief Executive Should Know; Using Data to Measure Police Performance* by Dr. Jon Shane, who is a professor of criminal justice at the John Jay College of Criminal Justice at the City University of New York. Dr. Shane's model is easy to use, easily taught to others, and accurate in determining staffing needs.

1. **Purchasing Agents**

   **The Explanation of Each Step in the Methodology for Purchasing Agents - Self-Reported Workload Analysis**

   The methodology used to perform the Purchasing Agents Workload Assessment is the same one used by the Lee County Sheriff's Office in previous years to determine staffing needs of various units and it includes workload and actual work on their regular duties.

   **Explanation of Each Step in the Methodology**

   > **Step 1-** Gather existing data on Purchasing Agents activities to determine those tasks completed daily by Purchasing Agents has to create a list of principle modalities.
   >
   > **Step 2-** Develop a list of principle modalities. The Purchasing Agents have reported these tasks as common tasks performed daily. (AKA principle modalities).
   >
   > i.    Phone Calls and Emails
   > ii.   Checking in Orders, and Receive Orders

LCSO/Clark
DEF004397

# Lee County Sheriff's Office

 iii. Pull Pick Ticket Orders and Send Order Ready Notifications
 iv. Customer Service Front Counter/Back Door, Receive/Process Packages
 v. Process Pick Ticket Orders, Process Purchase Orders and Pull Orders
 vi. Enter In-House Supply Replenishment Order, Enter Requisitions/Orders
 vii. Meeting with Jenna, Shannon or Assist Other Employees
 viii. Receive Purchase Orders
 ix. Enter/Finish Jail Supply Order, Finish Reviewing Supplies for Corrections
 x. Convert Requisitions to Purchase Orders, Finish/Follow-up Pending Requisitions
 xi. Enter/Update JM Todd New Leases
 xii. Follow-up with Vendors Open Orders/Orders Not Delivered
 xiii. Process/Convert Requisitions, Scan Requisitions and Purchase Orders
 xiv. Process New Hire, Size Appointment New Hire, Fill Out Paperwork for New Hires
 xv. Cut Patches Off Used Uniforms and Hang/Dispose of Uniform
 xvi. Process Uniform Request/Returns, Check Used Uniforms, Work in New/Used Uniforms
 xvii. Pull/Restock Uniforms and Equipment for Uniform Request, Restock Inner Belts
 xviii. Add Sizing Labels to Garment Bags for New LE Uniform
 xix. Other Administration Duties

**Step 3-** Total minutes available for work in a typical day, and typical week, were calculated with MS Excel.

**Step 4-** Total minutes used and left unused for work by Purchasing Agents were calculated with MS Excel.

**Step 5-** The percentage of actual available minutes used by the unit was calculated with MS Excel.

**Step 6-** The top five modalities on which Purchasing Agents spend the majority of their time were calculated with MS Excel.

**Step 7-** The relief factor of 1.33 was included in these calculations.

The below chart indicates the results for the time required to fulfill Purchasing Agents demands. The summarized results indicate that there is a requirement of 7 full-time equivalent (FTE) positions to handle the Purchasing Agents workload. This indicates that a total of 5 (five) employees are performing the work of seven (7) FTE positions. The self-reported analysis also indicated that the Purchasing Agents are using 100% of their available time working on Purchasing Agent principal modalities. It would appear

**LCSO/Clark**
**DEF004398**

# Lee County Sheriff's Office

that the current staffing level is inadequate and it is recommended that two (2) additional Purchasing Agent positions be allocated. The full results can be found in the Appendix.

## Purchasing - Civilian Purchasing Agent - TIME / WORKLOAD ANALYSIS

| Tasks Routinely Performed by The Detectives | Day 1 | Day 2 | Day 3 | Day 4 | Weekly Minutes | Weekly Hours | Monthly Hours | Annual Hours | % Of Weekly Minutes |
|---|---|---|---|---|---|---|---|---|---|
| Phone calls and Emails | 693 | 579 | 692 | 652 | 2526 | 42.10 | 182.29 | 2187.516 | 20.83% |
| Checking In Orders, Receive Orders | 14 | 179 | 89 | 140 | 421 | 7.02 | 30.38 | 364.596 | 3.47% |
| Pull Pick Ticket Orders and Send Order Ready Notifications | 153 | 42 | 19 | 6 | 220 | 3.67 | 15.88 | 190.52 | 1.81% |
| Customer Service Front Counter/Back Door, Receive/Process Packages | 449 | 426 | 983 | 567 | 2024 | 33.73 | 146.07 | 1752.754 | 16.69% |
| Process Pick Ticket Orders, Process Purchase Orders and Pull Orders | 412 | 135 | 381 | 195 | 1043 | 17.38 | 75.27 | 903.234 | 8.60% |
| Entered In House Supply Replenishment Order, Enter Requisitions/Orders | 111 | 239 | 62 | 98 | 410 | 8.17 | 35.36 | 424.34 | 4.04% |
| Meeting with Jenna, Shannon or Assist other Employees | 73 | 137 | 140 | 45 | 255 | 6.58 | 20.51 | 342.07 | 3.26% |
| Receiving Purchase Orders | 29 | 0 | 0 | 0 | 23 | 0.38 | 1.66 | 19.913 | 0.19% |
| Enter Finish Jail Supply Order, Finish Reviewing Supplies For Corrections | 61 | 0 | 0 | 0 | 61 | 1.02 | 4.40 | 53.326 | 0.50% |
| Convert Requisitions to Purchase Orders, Finish Follow-up Pending Requestions | 0 | 39 | 46 | 159 | 244 | 4.07 | 17.64 | 211.304 | 2.01% |
| Enter Update JM Todd New Leases | 0 | 0 | 274 | 0 | 274 | 4.57 | 19.77 | 237.164 | 3.26% |
| Follow-up with Vendors Open Orders/Orders Not Delivered | 0 | 0 | 0 | 33 | 33 | 0.55 | 2.38 | 28.578 | 0.27% |
| Process/Convert Requisitions, Scan Requisitions and Purchase Orders | 279 | 295 | 414 | 331 | 1269 | 21.15 | 91.58 | 1098.954 | 10.46% |
| Process New Hire, Size Appointment New Hire, Fill Out Paperwork for New Hires | 27 | 42 | 60 | 7 | 135 | 2.25 | 9.74 | 116.91 | 1.11% |
| Cut Patches Off Used Uniforms and Hang/Dispose Uniform | 21 | 77 | 0 | 0 | 98 | 1.63 | 7.07 | 84.868 | 0.81% |
| Process Uniform Request/ Returns, Check Used Uniforms, Work in New/Used Uniforms | 239 | 349 | 345 | 295 | 1025 | 17.13 | 74.15 | 890.265 | 8.45% |
| Pulled Restocked Uniforms & Equipment for Uniform Request, Restock Inner Belts | 7 | 35 | 0 | 0 | 42 | 0.70 | 3.03 | 36.372 | 0.35% |
| Add Sizing Labels to Garment Bags For New GI Uniform | 0 | 0 | 0 | 29 | 29 | 0.33 | 1.44 | 17.32 | 0.16% |
| Other Administrative Duties | 442 | 579 | 221 | 420 | 1661 | 27.68 | 119.87 | 1438.426 | 13.69% |
| **Total =** | 3001 | 3001 | 3025 | 2968 | 12987 | 208.12 | 906.51 | 10359.062 | 90.99% |

| Total Available Minutes / Includes ALL Time With No Deductions | | |
|---|---|---|
| Total Daily Minutes Actually Available For Work   600 x 4 = 2400 | 2400 | 600 available work minutes in one shift times 4 shifts each week. (break's are part of relief factor included in calculations below) |
| Total Weekly Minutes Actually Available For Work 600 x 4 x 5 = 12000 | 12000 | 600 available minutes in one shift times 4 Shifts times 5 unit members |
| Total Weekly Minutes Actually Used For Work By This Unit | 12987 | Actual documented time worked by the Unit during a regular four day work week |
| Unused Work Minutes | -7 | Actual available time not taken advantage of |
| Percentage Of Actual Available Minutes Used By This Unit | 100% | Percentage of the actual available time used by the entire unit as a whole |

| Top Five Categories This Unit Is Spending Time On Weekly | | |
|---|---|---|
| Tasks Related to New Hire - Scan, Start Action Sheet, Prep New File | 20.83% | |
| Tasks Related to Other Administrative Duties | 16.69% | |
| Tasks Related to Phone calls and Emails | 13.69% | |
| Tasks Related to Applications, Applicants, Employment Verification | 10.46% | |
| Tasks Related to MUNIS- Management, Repair, Requests, Documentation | 8.60% | |
| 70% of their work week is spent on these five categories | 70% | |

| Full Time Equivalency Evaluation | | |
|---|---|---|
| One Full Time Equivalent / Actual Work Time With Deductions | 1374 | 1 FTE = 1374 hours = 10 hrs Daily x 4 Days Weekly x 40 hrs Weekly x 52.14 Weeks Yearly = 2085 hrs Relief Factor of 512 hours  = 13/14 hrs |
| Total Annual Hours | 10398.062 | Total FTE hours worked by the unit annually |
| **Full Time Equivalency** | 7 | This number indicates that 5 Purchasing Agents are doing the work of 7 Purchasing Agents during an average work week |

(This chart can be viewed in the Appendix)

**Relief Factor Calculations and Tables for Purchasing Agents**

Purchasing Agents are permitted a specified number of Vacation, Sick, Personal, and Training hours that takes them away from their regular duties. Therefore, a relief factor, which accounts for personnel usage of this time, must be factored into the staffing assessment. Using averages, the Relief Factor for Purchasing Agents working 10-hour shifts is 1.33. This means that 1.33 people must be hired to do the work of one full time equivalent position.

LCSO/Clark
DEF004399

# Lee County Sheriff's Office

| | Standard Relief Factor for Civilian Employees 10/Shift | |
|---|---|---|
| | Category | Civilian |
| 1 | Total hours identified by policy (based on a standard 40 hour work week (40 x 52.14 = 2086) | 2086 |
| 2 | Vacation Hours Per Year | 160 |
| 3 | Personal Hours Per Year | 100 |
| 4 | Sick Hours Per Year | 80 |
| 5 | Break Time Hours Per Year | 172 |
| 6 | Total of Lines 2-6 | 512 |
| 7 | Subtract Line 6 from Line 1 | 1574 |
| 8 | Relief Factor (divide line 1 by line 7 and round to 2 decimal places) | 1.33 |

As indicated by the Time/Workload Analysis chart, the shift relief factor was already calculated into the Purchasing Agents workload. Including the shift relief factor, the workload of 7 Purchasing Agents will require two (2) additional allocations. It should be noted that this assessment revealed existing Purchasing Agents are working on principle modalities 100% of the time.

## Results Summary

As of this assessment, there are 7 total allotments in Purchasing with 5 non-supervisory positions. There are five (5) Purchasing Agents doing the work of 7.

*Recommendation* – The addition of two (2) Purchasing Agent allocations.

LCSO/Clark
DEF004400

# Lee County Sheriff's Office

## Personnel Assessment

### 1. Member Surveys

As part of the workload inspection of Purchasing, all members received a "Member Survey" disseminated by Sgt. Diana Cintron consisting of thirty-one (31) questions directly related to the individual worker. Sgt. Cintron provided seven (7) unit members with a hyperlink to the anonymous, confidential, web-based survey and requested it be completed.  Seven (7) of the 7 members or 100% of personnel responded.  A copy of the thirty-question member survey is included in the appendix.

Below are the survey questions:

1) Do you believe that your unit is performing at an acceptable level?
2) Are you aware of any policies or procedures that are not being followed?
3) If you answered yes to the above question, please specify which policy or procedure is not being followed?
4) Has technology improved your personal work performance?
5) Is your work satisfying?
6) Do you know the goals and objectives of your unit?
7) Do you have the necessary tools and resources to do your job?
8) If you do not have the necessary tools and resources to do your job, please list the tools and resources that you need.
9) Is your equipment periodically inspected as required by policy?
10) Were you given the requisite training upon selection to your unit?
11) Have you received additional unit related training since you started in this unit?
12) Is training available to you in your current assignment?
13) Has the training you have received improved your job performance?
14) Is your supervisor aware of your work performance?
15) Does your supervisor support your actions and decision?
16) Does your supervisor encourage your ideas and opinions?
17) Does your supervisor inform you on matters that affect your job?
18) (Short answer question)  What are the positive things about your unit/shift?
19) (Short answer question)  What are the negative things about your unit/shift?
20) (Short answer question)  Have you taken an active role in finding solutions to unit issues?
21) (Short answer question)  What could you or the agency do to help maximize your job performance?
22) (Short answer question) Is there any equipment not provided to you that could help you to perform better?

LCSO/Clark
DEF004401

# Lee County Sheriff's Office

23) (Short answer question) If you answered yes to the above, please list the equipment that could be provided which would help you perform your job better.

24) (Short answer question) Is there any training that you would like to have more frequently?

25) (Short answer question) If you answered yes to the above, please list the type of training you would like to receive.

26) (Short answer question) Are there any procedures that can be modified to save time?

27) (Short answer question) If you answered yes to the above, please list the procedure changes that you would make to save time.

28) Are you aware that all files, spread sheets and/or pertinent information should be uploaded to the proper program or sent to the official custodian within the Lee County Sheriff's Office and not be kept in your own personal files?

29) Do you have any personal files that should be uploaded in Spillman or any other LCSO programs?

30) (Short answer question) Is there anything you would like to add about your work or your unit?  If so, please let us know below.

31) What would you like us to know that would benefit Purchasing or was not covered previously?

### *Survey Responses:*

(Duplicate or unassociated written answers have been omitted.  The full responses can be viewed in the Appendix.

1.  Do you believe that your unit is performing at an acceptable level?
    i.  Yes – 100%
    ii.  No – 0%
2.  Are you aware of any policies or procedures that are not being followed?
    i.  Yes – 0%
    ii.  No – 100%
3.  If you answered yes to the above question, please specify which policy or procedure is not being followed.  N/A
4.  Has technology improved your personal work performance?
    i.  Yes – 86%
    ii.  No – 14%
5.  Is your work satisfying?
    i.  Yes – 100%
    ii.  No – 0%
6.  Do you know the goals and objectives of your unit?
    i.  Yes – 100%

LCSO/Clark
DEF004402

# Lee County Sheriff's Office

    ii.  No – 0%

7.  Do you have the necessary tools and resources to do your job?

    i.  Yes – 83%

    ii.  No – 17%

8.  (Short answer question) If you do not have the necessary tools and resources to do your job, please list the tools and resources that you need.

    i.  Written Answers:

        a.  "Although would like to add a few bar code scanners, along with a good camera to take pictures of stock items."

        b.  "The tools they have given us to do the job is very labor intensive and inconsistent when performing certain tasks. Which in turn makes the job very frustrating at times."

        c.  "Would be nice to have a handheld scanner to scan items directly into the person's issuance."

9.  Is your equipment periodically inspected as required by policy?

    i.  Yes – 100%

    ii.  No – 0%

10.  Were you given the requisite training upon selection to your unit

    i.  Yes – 100%

    ii.  No – 0%

11.  Have you received additional unit related training since you started in this unit?

    i.  Yes – 100%

    ii.  No – 0%

12.  Is training available to you in your current assignment?

    i.  Yes – 100%

    ii.  No – 0%

13.  Has the training you received improved your job performance?

    i.  Yes – 100%

    ii.  No – 0%

14.  Is your supervisor aware of your work performance?

    i.  Yes – 100%

    ii.  No – 0%

15.  Does your supervisor support your actions and decisions?

    i.  Yes – 100%

    ii.  No – 0%

16.  Does your supervisor encourage your ideas and opinions?

    i.  Yes – 100%

    ii.  No – 0%

17.  Does your supervisor inform you on matters that affect your job?

    i.  Yes – 100%

LCSO/Clark
DEF004403

# Lee County Sheriff's Office

    ii.  No – 0%

18. (Short answer question)   What are the positive things about your unit/shift?
    i.  Written Answers:
        a.  "I feel everyone tries to work as a team, and I am approachable if they have concerns."
        b.  "Management in the unit is very approachable and easy to talk with.  I enjoy the job, just not the Munis program we have switched to, to complete the job."
        c.  "Every day is a challenge and in this unit you can't never stop learning."
        d.  "We are able to provide customer service and necessities to other employees in the agency."
        e.  "I am able to successfully work with my partner/co-workers, have great support from my supervisors, different projects, responsibilities to stay busy, great relationships with other employees in the agency and co-workers."
        f.  "Each member has different areas that they handle and excel in. The team has an excellent work ethic and multi-task both individually and as a unit."
        g.  "Open door policy.  Both Shannon and Jenna are always willing to help and to also answer any questions or problems I come across."

19. (Short answer question)  What are the negative things about your unit/shift?
    i.  Written Answers:
        a.  "N/A."
        b.  "The glitchy Munis program we are using to do the job."
        c.  "In occasions the miscommunication."
        d.  "Sometime attitudes can be difficult to deal with."
        e.  "Others with low morale, negativity or causing issues with other."
        f.  It is a smaller unit, so when it comes to scheduling it can hard to have multiple personnel off?"

20. Have you taken an active role in finding solutions to unit issues?
    i.  Yes – 71%
    ii.  No – 29%

21. (Short answer question)  What could you or the agency do to help maximize your job performance?
    i.  Written Answers:
        a.  "N/A."
        b.  "Nothing that I can think of at this time.  They already have given us a counter person which has help tremendously with the interruptions in completing tasks in the Munis

LCSO/Clark
DEF004404

# Lee County Sheriff's Office

           system and given us desk top scanners to help with the workload."

      c. "Provide better salary and more trainings in other areas."

      d. "Improve morale."

      e. "Help to update technology so we are not so paper heavy and doing things manually, such as a scanning/inventory system that ties in with our purchasing system (Munis), electronic signatures, etc."

      f. "Would be nice to have a handheld scanner to scan items directly into the person's issuance."

22. Is there any equipment not provided to you that could help you to perform better?

    i. Yes – 43%

    ii. No – 57%

23. If you answered yes to the above, please list the equipment that could be provided which would help you perform your job better.

    i. Written Answers:

      a. "Bar code scanners (handheld)."

      b. "A handheld scanner that would help with scanning uniforms right in to the employee issuance if this was possible based on procurement program we have in place."

      c. "Would be nice to have a handheld scanner to scan items directly into the person's issuance."

24. Is there any training that you would like to have more frequently?

    i. Yes – 43%

    ii. No – 57%

25. If you answered yes to the above, please list the type of training you would like to receive.

    i. Written answers

      a. "Cross training in different areas within the unit."

      b. "Anything relating to effectively dealing with people."

      c. "Anything customer service or dealing with people."

26. Are there any procedures that can be modified to save time?

    i. Yes – 57%

    ii. No – 43%

27. If you answered yes to the above, please list the procedure changes that you would make to save time.

    i. Written answers

      a. "Entering of uniform requests in Munis.  Lots of steps to enter each item."

LCSO/Clark
DEF004405

# Lee County Sheriff's Office

  b. "As mentioned above, advanced technology systems in place would help decrease manual issuance/receipts and having to scan paper. Electronic signatures for issued items, scanning system to take inventory and manage receipts/issuance."

  c. "A handheld scanner than would help with scanning uniforms right into the employee issuance if this was possible, based on procurement program we have in place."

  d. "Would be nice to have a handheld scanner to scan items directly into the person's issuance."

28. Are you aware that all files, spread sheets and/or pertinent information should be uploaded to the proper program or sent to the official custodian within the Lee County Sheriff's Office and not be kept in your own personal files? Is there anything you would like to add about your work or your unit?

  i. Yes – 100%

  ii. No – 0%

29. Do you have any personal files that should be uploaded in Spillman or any other LCSO programs?

  i. Yes – 0%

  ii. No – 100%

30. (Short answer question) Is there anything you would like to add about your work or your unit?

  i. Written Answers:

    a. "The girls in Purchasing work very hard, they are team players and very conscientious in the work they do."

    b. "We have a good little unit here with great management."

    c. "Some co-workers should mind their own business."

    d. "We have a hard working group of people that are tasked with a large workload and they handle it."

    e. "I enjoy my job and really like working for Jenna and Shannon."

31. What would you like us to know that would benefit the Human Resources Unit or was not covered previously?

  i. Written answers

    a. "Nothing."

The major issues observed in the member survey are as follows:

  1) _Equipment_:

    a. Throughout the survey, it was mentioned by several Purchasing Agents that they would like to have a handheld Barcode scanner that would scan information into the employee issuance.

    b. A good camera to take pictures of stock items.

LCSO/Clark
DEF004406

# Lee County Sheriff's Office

    c.  Advanced technology systems in place would help decrease manual issuance/receipts and having to scan paper. Electronic signatures for issued items, scanning system to take inventory and manage receipts/issuance.

*Recommendation*: If Director Clark agrees with the suggestions of the additional equipment/technology, it should be investigated to determine cost and effectiveness.

2) *Training*:
    a.  Cross training in different areas within the unit.
    b.  A class on effectively dealing with people.
    c.  A class on customer service.

*Recommendation*: The individual should find out where these classes/courses are being offered and provide the Training Division, Paula Robinson, with the information so it may be uploaded into TMS and apply for the offered course.

## 2. Personal Interviews

Sgt. Cintron made an unannounced visit to speak to the Purchasing Agents in the Purchasing Division. Sgt. Cintron spoke to several people asking them what their job duties were, what their daily tasks comprised of, and their overall job happiness. The only issue brought up was regarding a handheld scanner to make their job tasks quicker and easier. Although, the unit is a small unit, it appears that the Purchasing Agents and Management are a very closely knitted group. Sgt. Cintron was sitting at the break table and one Purchasing Agent was eating her lunch. She appeared to be happy and content with her position in Purchasing. It was very busy and non-stop.

## 3. Member Self-Assessments

An online Member Self-Assessment was distributed to each member in Purchasing. These anonymous assessments asked personnel to answer four questions and state their highest level of formal education. Seven of the seven members (100%) returned the assessment. The possible answers to the questions were Very High, High, Neutral, Low, and Very Low. The questions were as follows:

1) Morale can be described as one's emotional or mental condition with respect to cheerfulness, confidence, zeal, etc., especially in the face of opposition, hardship, etc… Which of these best describes your personal level of morale?

LCSO/Clark
DEF004407

# Lee County Sheriff's Office

2) Job satisfaction can be defined as how content an individual is with his or her job, in other words, whether or not they like the job or individual aspects of their position, such as nature of work. Which one of these best describes your level of job satisfaction?

3) Worker happiness is that happiness that workers feel when they are satisfied with their job and work conditions. Which one of these best describes your level of worker happiness?

4) Productivity can be defined as the quality, state, or fact of being able to generate, create, enhance, or bring forth goods and services. Which of these best describes your personal level of productivity?

5) Which of these describes your highest level of formal education?

The answers were as follows:

1) Which of these best describes your personal level of morale?
   a. Very High – 25%
   b. High – 50%
   c. Neutral – 25%
   d. Low – 0%
   e. Very Low – 0%

2) Which of these best describes your level of job satisfaction?
   a. Very High – 14%
   b. High – 71%
   c. Neutral – 14%
   d. Low – 0%
   e. Very Low – 0%

3) Which of these best describes your level of worker happiness?
   a. Very High – 13%
   b. High – 75%
   c. Neutral – 13%
   d. Low – 0%
   e. Very Low – 0%

4) Which of these best describes your level of productivity?
   a. Very High – 38%
   b. High – 50%
   c. Neutral – 13%
   d. Low – 0%
   e. Very Low – 0%

5) Which of these best describes your current level of education?
   a. Doctorate – 0%
   b. Masters – 25%

LCSO/Clark
DEF004408

# Lee County Sheriff's Office

   c.  Bachelors – 24%
   d.  Associates – 0%
   e.  Some College – 38%
   f.  HS Diploma – 13%
   g.  GED – 0%

This assessment showed that Purchasing employees have levels of morale, job satisfaction, worker happiness, and productivity ranged from neutral to very high. Productivity was noted at very high by 50% and high at 50%. It also showed that several employees had had attained a degree(s) at the level of postsecondary education.

*Note* – Members are encouraged to take advantage of Lee County Sheriff's Office benefits to obtain a low cost, high-quality education.

**4.  Inspector Observations**

Sgt. Cintron made an unannounced visit to Purchasing, speaking to random personnel and observing their work habits.   The personnel appeared to be very happy and comfortable in their positions.  Sgt. Cintron observed that the atmosphere was friendly and welcoming. Sgt. Cintron noticed that the telephone was constantly ringing and the Purchasing Agents were working at the front counter assisting fellow employees. Additionally, Purchasing Agents were reviewing purchase orders and picking up COVID-19 supplies to handout to a fellow worker at the front counter.   The employees were very outgoing and very attentive to Sgt. Cintron's questions and needs. Sgt. Cintron felt very comfortable and welcomed by all of the employees.

LCSO/Clark
DEF004409

# Lee County Sheriff's Office

## Conclusion

### Mission Conclusion

1. Does Purchasing meet the agency's formal expectations?

   *Yes.*

2. Does Purchasing practices and procedures ensure compliance with LCSO policies, procedures, and professional standards?

   *Yes.*

3. Are there deficiencies in integrity, training, morale, policy, supervision, or personnel at Purchasing?

   *There are no recognizable deficiencies in integrity, training, morale, policy, first line supervision, and personnel.*

4. Are resources adequate for achieving agency goals and objectives?

   *Several Purchasing Agents requested a handheld Barcode scanner and a camera to take pictures of stock items. The staffing resources are inadequate according to the workload analysis. The addition of two (2) Purchasing Agent allocations is recommended for the Purchasing Division.*

5. Are internal and external communications effective?

   *Yes.*

6. Is there sufficient safety and security for personnel?

   *Yes. There is sufficient safety and security for personnel, and the equipment provided meets and exceeds all operational and Accreditation standards.*

7. Are the written directives for this unit adequate?

   *Yes. Written directives meet all State and Federal laws, and Accreditation Standards.*

8. Evaluation of the record keeping practices for organization, completeness, and ability to retrieve information.

LCSO/Clark
DEF004410

# Lee County Sheriff's Office

*The record keeping practices of Purchasing are organized, complete, and the software available provides easy retrieval of information.*

9. Other Recommendations
   *There are no other recommendations at this time.*

### Objectives

6. Does Purchasing comply with the law, policy, and CALEA standards? *Yes.*

7. Is the Purchasing facility safety and security appropriate? *Yes.*

8. Are equipment safety, and equipment needs met? *Yes.*

9. Is adequate supervision assigned to Purchasing? *Yes.*

10. Are adequate personnel assigned to Purchasing? *No.*

   *Recommendation:* The current staffing level is inadequate and it is recommended that two (2) additional Purchasing Agent positions be allocated.

The Purchasing Division of the Lee County Sheriff's Office appears to be running at a high to very high level of productivity according to all of the employees. Most of the personnel appear to be happy to very happy to be assigned there. Supervisors appear extremely qualified, and are well liked by their employees. Nearly all of the staff showed high to very high levels of morale and job satisfaction.

It is difficult to obtain the perfect level of equipment, service, and employee satisfaction in a law enforcement agency. The Purchasing Division is a very small unit with a group of very hard working and dedicated employees. With their expertise in purchasing goods and services for the department, the certified staff can focus on keeping the residents and visitors of Lee County safe

LCSO/Clark
DEF004411

# Lee County Sheriff's Office

## References

Lee County Sheriff's Office (2020) *Operations Manual: 2020.* Fort Myers, FL: LCSO PowerDMS.

Shane, J.M. (2009). *What every chief executive should know: Using data to measure police performance.* Flushing, NY: Loose-leaf Law Publications Inc.

LCSO/Clark
DEF004412

# EXHIBIT 21





3:41

< 97

**VCSApps@vcss...** Yesterday
To: Jenna Clark >

## VCSApps@vcssoftware.com: Time Off Entry

CAUTION: This email originated from outside of the Lee County Sheriff's Office. Do not click links or open attachments unless you recognize the sender and know the content is safe.

TIME OFF:
Employee: Clark, Jenna D(1992072)
Date: 08/27/2021 Shift: SS
PURCHASING (SS PURCHASE)
Times: 0800-1800  Hours: 10.000
Reason: Admin Leave With Pay

Plaintiff Bates No. JC000001



3:41

‹ 97

CAUTION: This email originated from outside of the Lee County Sheriff's Office. Do not click li[nks] or open attachments unless yo[u] recognize the sender and know the content is safe.

TIME OFF:
Employee: Clark, Jenna
D(1992072)
Date: 08/27/2021 Shift: SS
PURCHASING (SS PURCHASE)
Times: 0800-1800 Hours:
10.000
Reason: Admin Leave With Pay
(AWPAY)
Bank Balance: -63
Status: Approved
Request Time Stamp: 1992072
04/30/2021 10:35:27
Approved Time Stamp: 1999062
05/04/2021 12:02:35

Plaintiff Bates No. JC000002



**Annmarie** ›



**New name and photo available**
Annmarie Reno Update Contact... 

**Tue, Aug 10**, 2:49 PM

> Can I give (10) backpacks to needy families at Gulf Elementary??

**Saturday** 9:09 AM

> Hi there I left you a message I'm doing fine. Drains are still in, I have to go back to the dr to have them removed hopefully Tuesday. I'm resting, trying to do what my instructions are. You can call me on my personal phone 239-313-3578

**Read** Saturday

Can you call me. I have to talk to you.

  iMessage

Plaintiff Bates No. JC000003


# EXHIBIT 22





Office of the Sheriff - Lee County, Fort Myers, FL 33912

| Emp No | Employee Name | | | Dept. | Advice Date | Week Starting | Week Ending | Type | Advice No. |
|---|---|---|---|---|---|---|---|---|---|
| 941 | JENNA CLARK | | | 00120302 | 09/10/2021 | 08/22/2021 | 09/04/2021 | REG B/W | 484383 |
| Earnings | Rate | Days/Hrs. | Current | YTD | Deductions | | Current | YTD | Employer | Employer YTD |
| REG WAGE | | | | 51069.96 | FICA | | 229.20 | 5856.31 | 229.20 | 5856.31 |
| VACATION | | | | 3191.16 | MEDICARE | | 53.60 | 1369.62 | 53.60 | 1369.62 |
| SICK LEAVE | | | | 2131.24 | MED INS | | | | | 13147.92 |
| PERSONAL | | | | 4558.80 | DENTAL | | | | | 1005.52 |
| ADM,VWP | | 80.00 | 3647.04 | 4695.56 | VISION | | | | | 25.52 |
| SICKPAYOUT | | | | 4558.80 | AFLAC-PRE | | | 595.79 | | |
| VACPAYOUT | | | | 18440.80 | AFLAC-ADJ | | | -91.66 | | |
| VACBBKC | | | | 3647.04 | FED INCOME | | 669.49 | 17926.90 | | |
| GTL | | | | 443.36 | FRS-HM | | 109.41 | 2632.01 | 1058.01 | 24636.36 |
| LEASE | | | 49.66 | 1863.54 | COL-AT | | 59.86 | 1077.48 | | |
| FUEL | | | | 360.31 | | | | | | |
| | | | | | DEPOSITS: | | | | | |
| | | | | | DIRDEPNET | | 2075.48 | 53476.91 | | |
| | | | | | SUNTRUST | | | | | |
| | | | | | DIRDEPS1 | | 450.00 | 9450.00 | | |
| | | | | | SUNCOAST CREDIT UNION | | | | | |

| Leave | Beginning | Earned | Used | Balance | YTD Earned | YTD Used | Withholding Allowances | | |
|---|---|---|---|---|---|---|---|---|---|
| VACATION | 396.82 | 7.69 | 404.51 | | 138.42 | 554.51 | Filing Status | Exemptions | Extra Amount |
| SICK | 260.15 | 3.08 | 100.00 | 163.23 | 55.44 | 196.75 | Federal | S | 2 | 150.00 |
| PERSONAL | | | 100.00 | | 100.00 | 100.00 | Advice Totals | | |

| Type | Current | YTD |
|---|---|---|
| Taxable Pay | 3,587.29 | 89,378.05 |
| Gross Pay | 3,696.70 | 94,980.57 |
| Deductions | 1,121.56 | 29,366.45 |
| Net Pay | 2,525.48 | 62,926.91 |

**Advice Amount $2,525.48**

Office of the Sheriff - Lee County
Payroll Advice
14750 Six Mile Cypress Pkwy.
Fort Myers, FL 33912-4406
239-477-1025

Advice Date 09/10/2021        Advice Number 484383

JENNA D CLARK
9 JACKSON AVENUE
LEHIGH ACRES, FL  33936

## DIRECT DEPOSIT
## NON-NEGOTIABLE

Plaintiff Bates No. JC000008



Office of the Sheriff - Lee County, Fort Myers, FL 33912

| | | | Dept | Advice Date | Week Starting | Week Ending | Type | Advice No |
|---|---|---|---|---|---|---|---|---|
| Employee Name | | | 00120302 | 09/10/2021 | 08/22/2021 | 09/04/2021 | REG B/W | 484384 |
| JENNA CLARK | | | | | | | Employer | Employer YTD |
| Emp No | | | YTD | Deductions | Current | YTD | 282.65 | 5856.31 |
| 941 | Rate | Days/Hrs. | Current | FICA | 282.65 | 5856.31 | 66.10 | 1369.62 |
| Earnings | | | 51069.96 | MEDICARE | 66.10 | 1369.62 | | 13147.92 |
| REG WAGE | | | 3191.16 | MED INS | | | | 1005.52 |
| VACATION | | | 2131.24 | DENTAL | | | | 25.52 |
| SICK LEAVE | | | 4558.80 | VISION | | | | |
| PERSONAL | | | 4695.56 | AFLAC-PRE | | 595.79 | | |
| ADM.VWP | 100.00 | 4558.80 | 4558.80 | AFLAC-ADJ | | -91.66 | | |
| SICKPAYOUT | | | 18440.80 | FED INCOME | 1002.94 | 17926.90 | | 24636.38 |
| VACPAYOUT | | | 3647.04 | FRS-HM | | 2632.01 | | |
| VACBBKC | | | 443.36 | COL-AT | | 1077.48 | | |
| GTL | | | 1863.54 | | | | | |
| LEASE | | | 360.31 | DEPOSITS: | | | | |
| FUEL | | | | DIRDEPNET | 2757.11 | 53476.91 | | |
| | | | | SUNTRUST | | | | |
| | | | | DIRDEPS1 | 450.00 | 9450.00 | | |
| | | | | SUNCOAST CREDIT UNION | | | | |

| Leave | Beginning | Earned | Used | Balance | YTD Earned | YTD Used | Withholding Allowances | | |
|---|---|---|---|---|---|---|---|---|---|
| VACATION | 396.82 | 7.69 | 404.51 | | 138.42 | 554.51 | Filing Status | Exemptions | Extra Amount |
| SICK | 260.15 | 3.08 | 100.00 | 163.23 | 55.44 | 196.75 | Federal   S | 2 | 150.00 |
| PERSONAL | | | | | 100.00 | 100.00 | | | |

| Advice Totals | | |
|---|---|---|
| Type | Current | YTD |
| Taxable Pay | 4,558.80 | 73,936.85 |
| Gross Pay | 4,558.80 | 94,960.57 |
| Deductions | 1,351.69 | 29,366.45 |
| Net Pay | 3,207.11 | 62,926.91 |



**Office of the Sheriff - Lee County**
Payroll Advice
14750 Six Mile Cypress Pkwy.
Fort Myers, FL 33912-4406
239-477-1025

| Advice Date | Advice Number |
|---|---|
| 09/10/2021 | 484384 |

JENNA D CLARK
9 JACKSON AVENUE
LEHIGH ACRES, FL 33936

# DIRECT DEPOSIT
# NON-NEGOTIABLE

Plaintiff Bates No. JC000009



Office of the Sheriff - Lee County, Fort Myers, FL 33912

| | | | Advice Amount | | $12,541.59 |
|---|---|---|---|---|---|

| Emp No | Employee Name | | | Dept. | Advice Date | Week Starting | Week Ending | Type | Advice No. |
|---|---|---|---|---|---|---|---|---|---|
| 941 | JENNA CLARK | | | 00120302 | 09/10/2021 | 08/22/2021 | 09/04/2021 | REG B/W | 484385 |

| Earnings | Rate | Days/Hrs | Current | YTD | Deductions | Current | YTD | Employer | Employer YTD |
|---|---|---|---|---|---|---|---|---|---|
| REG WAGE | | | | 51069.96 | FICA | 1143.33 | 5856.31 | 1143.33 | 5856.31 |
| VACATION | | | | 3191.16 | MEDICARE | 267.39 | 1369.62 | 267.39 | 1369.62 |
| SICK LEAVE | | | | 2131.24 | MED INS | | | | 13147.92 |
| PERSONAL | | | | 4558.80 | DENTAL | | | | 1005.52 |
| ADM-LVWP | | | | 4695.56 | VISION | | | | 25.52 |
| SICKPAYOUT | | | | 4558.80 | AFLAC-PRE | | 595.79 | | |
| VACPAYOUT | | 404.51 | 18440.80 | 18440.80 | AFLAC-ADJ | | -91.66 | | |
| VAC8BKC | | | | 3647.04 | FED INCOME | 3935.27 | 17926.90 | | |
| GTL | | | | 443.36 | FRS-HM | 553.22 | 2632.01 | 5349.68 | 24638.38 |
| LEASE | | | | 1863.54 | COL-AT | | 1077.48 | | |
| FUEL | | | | 360.31 | | | | | |
| | | | | | DEPOSITS: | | | | |
| | | | | | DIRDEPNET | 12091.59 | 53476.91 | | |
| | | | | | SUNTRUST | | | | |
| | | | | | DIRDEP$1 | 450.00 | 9450.00 | | |
| | | | | | SUNCOAST CREDIT UNION | | | | |

| Leave | Beginning | Earned | Used | Balance | YTD Earned | YTD Used |
|---|---|---|---|---|---|---|
| VACATION | 396.82 | 7.69 | 404.51 | | 138.42 | 554.51 |
| SICK | 260.15 | 3.08 | 100.00 | 163.23 | 55.44 | 196.75 |
| PERSONAL | | | 100.00 | | 100.00 | 100.00 |

| Withholding Allowances | | | |
|---|---|---|---|
| Filing Status | Exemptions | | Extra Amount |
| Federal | S | 2 | 150.00 |

| Advice Totals | | |
|---|---|---|
| Type | Current | YTD |
| Taxable Pay | 17,887.58 | 91,824.43 |
| Gross Pay | 18,440.80 | 94,960.57 |
| Deductions | 5,899.21 | 29,366.45 |
| Net Pay | 12,541.59 | 82,926.91 |

Office of the Sheriff - Lee County
Payroll Advice
14750 Six Mile Cypress Pkwy.
Fort Myers, FL 33912-4406
239-477-1025

Advice Date       Advice Number
09/10/2021        484385

JENNA D CLARK
9 JACKSON AVENUE
LEHIGH ACRES, FL  33936

**DIRECT DEPOSIT
NON-NEGOTIABLE**

Plaintiff Bates No. JC000010

# EXHIBIT 23



LEE COUNTY SHERIFF'S OFFICE
RECEIPT OF PROPERTY ON BEHALF OF JENNA CLARK

| ITEM | QTY | DESCRIPTION |
|------|-----|-------------|
| 1 | 1 | Coffee mug |
| 2 | 1 | Floppy disk |
| 3 | 1 | Home Depot gift card ($38.14) |
| 4 | 1 | Lanyard |
| 5 | 2 | pouches |
| 6 | 1 | Small leather wallet |
| 7 | 1 | Personal photo of Jenna |
| 8 | 1 | Picture calendar |
| 9 | 1 | Small picture of a girl |
| 10 | 2 | Certificates of training |
| 11 | 2 | Packs of photo paper |
| 12 | 2 | Packs of tissue paper |
| 13 | 2 | Scripture print outs |
| 14 | 2 | St. Patrick's Day decorations |
| 15 | 3 | Christmas decorations |
| 16 | 3 | Covid masks |
| 17 | 10 | Newspapers |
| 18 | 3 | Small books |
| 19 | 4 | Leather guide booklets |
| 20 | 4 | Small booklets |
| 21 | 5 | Business cards or appointment cards |
| 22 | 5 | Personal photos |
| 23 | 6 | Magnets or stickers |
| 24 | 6 | Personal photos |
| 25 | 6 | Suncoast Credit Union deposit slips |
| 26 | 12 | Sticky notes with contacts and phone numbers |
| 27 | 1 | 23rd anniversary decoration |
| 28 | 1 | Bag of pens |
| 29 | 1 | Birthday dinner invitation |
| 30 | 1 | Personal note |
| 31 | 1 | Holy Ghost booklet |
| 32 | 1 | Psalm scripture |
| 33 | | Several bookmarks |
| 34 | | Various desk supplies |
| 35 | 1 | Sheet of flag stamps |
| 36 | 1 | Box of shoe strings |
| 37 | 3 | Different types of pills |
| 38 | 1 | Necklace or bracelet charm |

Plaintiff Bates No. JC000013

| 39 | 1 | Key chain charm |
|----|---|-----------------|
| 40 | 1 | Framed sunflower picture |
| 41 | 3 | LCSO pins for shirt/jacket |
| 42 | 2 | Pairs of socks |
| 43 |   | Random personal belongings (nail file, sewing kit, toothbrush, puffy paint, band aids) |
| 44 | 1 | Swiffer mop pad |
| 45 | 1 | Extension cord |
| 46 |   | Various holiday decorations (Halloween, Christmas, Valentines, flowers, garland) |

I, Juliann Wilson, have permission to take possession of Jenna Clark's personal items that were at the Lee County Sheriff's Office and acknowledge receipt of the above property labeled 1-46 into my possession.

_____          _____
Signature                            Date

Plaintiff Bates No. JC000014

Bureau;

4) Collecting most agency credit cards, to avoid confusion and assure Purchasing and Finance maintain a tight grip on spending.

These steps should help cushion any negative impact a potential economic downtown would have on our members.

Please let me know if you have any questions or suggestions – we'll prepare for the worst and hopefully find we'll find the federal stimulus packages, and other factors, prevent or mitigate the expected economic downturn.

Thanks for your help.

LCSO/Clark
DEF001314

# EXHIBIT 24



HIS-1
Rev 07/05
Retired Payroll

**Florida Retirement System Pension Plan**
**Health Insurance Subsidy Certification Form**
Retired Payroll Section
PO BOX 9000 Tallahassee, FL 32315-9000
Local Phone: 850-907-6500  Toll Free: 844-377-1888

PAYEE SSN:  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        PAYEE NAME:  Jenna D. Clark

I hereby make application for the Health Insurance Subsidy (HIS). I have read the instructions on the enclosed sheet and checked one of the four boxes below. **I have checked the <u>one</u> box below that provides the earliest insurance coverage date.**

| SIGNATURE OF PAYEE | 10/01/2021 DATE | 239-313-3578 TELEPHONE NUMBER | For FRS processing only |
|---|---|---|---|

**SECTION A: To be completed by Payee who will have health premiums deducted from pension payment**

[ ] This is to certify that I have already completed the required paperwork to have payroll deduction of my health insurance premium from my Florida Retirement System (FRS) monthly benefit. I understand the subsidy will be added AFTER the insurance deduction begins. **\*\*Please check with your former employer (local agencies) or the People First Service Center (state agencies) if you have questions about premium deductions from your retirement benefit.**

**SECTION B: To be completed by former FRS (non-state) employer or People First Service Center (1-866-663-4735) for state agencies**

[✓] This is to certify that the above named payee had health insurance coverage effective 08|01|1992 and is currently covered through our agency.

Signature: FRS Agency Representative or People First Representative: Doreen M. Calugan    Date: 10/01/2021    FRS Agency Name: Lee County Sheriff Office    Phone #: 239-477-1121

**SECTION C: To be completed by Insurance Company - (insurance cards are not accepted.)**

[ ] This is to certify that the above named payee has health coverage with _____ (Company Name)

with an effective policy date of _____ (Date) . (Please use the earliest possible coverage date).

| Company Representative Signature | Date | Company Address | Phone # |
|---|---|---|---|

**SECTION D: Payee provides MEDICARE or Military Insurance information**

[ ] I have attached a photocopy of either a MEDICARE or Military ID/TRICARE card.

**PLEASE DO NOT SEND YOUR ORIGINAL CARD.**
   **It will not be returned.**

NOTE: We will use your Medicare effective date to determine your HIS effective date. Your HIS effective date cannot be earlier than your Medicare effective date.

**ATTACH COPY OF CARD HERE (MEDICARE OR MILITARY ID/TRICARE CARD**

Please return completed form to the Retired Payroll Section. (See address above)
**Other contact information:**
Fax: 850- 410-2010
Email:Retirement@dms.myflorida.com

Rule 60S-4.020, F.A.C.
Application, Page 1 of 1

Plaintiff Bates No. JC000015

HIS-1
Rev. 07/05
Retired Payroll

**Florida Retirement System Pension Plan**
**Health Insurance Subsidy Certification Form**

PO BOX 9000  Tallahassee, FL  32315-9000
Local Phone: 850-907-6500   Toll Free: 844-377-1888

The Health Insurance Subsidy (HIS) is additional money added to your monthly retirement benefit to help offset the cost of your health insurance. **The HIS is not a health insurance policy.** Refer to Section 112.363, Florida Statutes.

**APPLICATION PROCESS:**
The payee or their legal representative:

1. Must sign and date the top portion of Form HIS-1.
2. Is responsible for having one section (A, B, C or D) of Form HIS-1 completed with appropriate signatures or photocopies attached.
3. Is responsible for submitting by mail or fax the completed Form HIS-1 in a timely manner to the Division of Retirement OR following up with the private insurance company or FRS agency representative that submits the form on their behalf.

**ELIGIBILITY:**
HIS applications are sent to those people that are most likely to be eligible for the HIS. To be eligible, the retiree (or their surviving beneficiary receiving monthly benefits) must certify that they have one of the following types of insurance listed below. (Coverage with any company or coverage through any employer):

- Health
- Cancer
- Accident
- Disability
- Dental
- Vision
- Medicare Part A and/or Part B
- Tricare
- Military health coverage

NOTE: A spouse or other family member may pay for the single or family coverage insurance.

**NOT ELIGIBLE:**
Retirees who receive the following types of payments are not eligible for the HIS:

- Recipients of Medicaid, Medically Needy Programs and Health of the Brotherhood
- Florida Institute of Food and Agricultural Sciences (IFAS) Supplemental Retirement Program Benefits
- Florida National Guard Benefits
- Florida Special Pensions or Relief Acts
- Florida Senior Management Services Optional Annuity Programs
- Florida State University System Optional Retirement Programs
- Florida State Community College System Optional Retirement Programs
- Florida Teachers' Retirement System Survivors' Benefits
- Retirees already receiving health insurance at no cost through the State of Florida (Section 110.1232, F.S.)

**HIS PAYMENTS:**
Eligible retirees (or their surviving beneficiary receiving monthly benefits) will receive $5 per month for each year of creditable service used to calculate the retirement benefit. Years of employment in the Deferred Retirement Option Program (DROP) do not count towards your total years of service for the HIS calculation. Effective July 1, 2001, the HIS payment increased to at least $30, but not more than $150 per month. This subsidy is contingent upon continued approval by the Florida Legislature.

**RETROACTIVE HIS PAYMENTS:**
The completed application must be returned to the Division of Retirement within six months of the date retirement benefits started in order to receive the subsidy retroactive to the effective retirement date (or the month following DROP termination if applicable). If the completed form is not received within six months, retroactive subsidy payments will be limited to a maximum of six months. DROP participants cannot apply for the HIS until they have terminated employment and participation in the DROP.

Rule 60S-4.020, F.A.C.
Instructions Page 1 of 1

**Plaintiff Bates No. JC000016**

Rev. 3/06
INS DOC

## FLORIDA RETIREMENT SYSTEM PENSION PLAN
Insurance Payroll Deduction Authorization Form

### LEE COUNTY SHERIFF OFFICE
Approved Deduction Name

Doreen M. Salvagno

Retiree Contact Person

239-477-1121

Retiree Contact Person's Telephone No

---

The payee must authorize new insurance deductions OR the restart of a previously closed deduction.   The payee is the person receiving the FRS pension payment.

PAYEE SSN: 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         **DEDUCTION CODE :** **081**(Health)

PAYEE NAME: Jenna D. Clark      **DEDUCTION CODE :**

---

I hereby authorize the Division of Retirement to deduct my insurance premiums from my monthly Florida Retirement System (FRS) benefit check and make any subsequent premium changes as directed by my insurance provider. I understand that my insurance provider is responsible for notifying me of premium changes as they occur and for any refunds (if applicable).   If I am changing insurance companies I will notify the existing company of the cancellation or changes.

Payee's Signature:
Signature required if no premium deduction (for above deduction code) from previous month's pension payment.

Address:   9 Jackson Ave  Lehigh Acres, FL  33936

Date:   10/01/2021              Telephone No:  239-313-3578

Date of Birth: 01/12/1962         Date Member Retired: 09/04/2021

Insurance office use only.  The Division of Retirement will not use this information.

Insurance provider staff must fax or mail a completed authorization form for all new deductions (or restarted deductions) to the Division of Retirement. MAIL: Division of Retirement, Retired Payroll Section, PO Box 3090, Tallahassee, FL 32315-3090; **FAX: 850-410-2193**

Plaintiff Bates No. JC000017



**Lee County Sheriff's Office**

STATEMENT

MAKE CHECKS PAYABLE / REMIT TO:
Lee County Sheriff's Office
Attn: Benefits Unit
14750 Six Mile Cypress Parkway
Fort Myers, FL 33912
Phone: (239) 477-1121
Fax: (239) 477-1197
E-mail: dsalvagno@sheriffleefl.org

DATE 08/23/2021

TO Jenna Clark

COMMENTS due by 9/3/2021

| DESCRIPTION | AMOUNT |
|---|---|
| Retiree & Dependents - Medical, Dental, Vision<br>09/05/21 - 09/30/21 | $477.75 |
| Retiree Life Ins thru 12/31/2021 | $3.10 |
| AMOUNT DUE | $480.85 |

REMITTANCE

Date    8/27/2021
Amount Due    $480.85
C#    6351

---

W PAUL CLARK OR
JENNA D CLARK
9 JACKSON AVE
LEHIGH ACRES, FL  33936

63-215/631          6351

Date 8-27-21

Pay to the order of  LCSO          $ 480.85

four hundred eighty + 85/100 Dollars

**SunTrust**    ACH RT 061000104

Memo

⑆063102152⑆ 1000020261102⑆ 6351

LOOK FOR FRAUD-DETERRING FEATURES INCLUDING THE SECURITY SQUARE AND HEAT REACTIVE INK. DETAILS ON BACK.

Plaintiff Bates No. JC000018



**SYMETRA**
RETIREMENT | BENEFITS | LIFE

**Group Life Insurance**

**Basic Life and Accidental Death & Dismemberment**

## SUMMARY OF BENEFITS

**Class 5**

| | |
|---|---|
| **Sponsored By:** | **Lee County Sheriff's Office** |
| **Effective Date:** | **October 1, 2013** |
| **Policy Number:** | **01-016300-00** |

The information in this summary may be replaced by any subsequently issued summary or policy amendment.

| Employee | Life Benefit |
|---|---|
| Amount | $5,000 |
| Maximum Amount | $5,000 |
| Guarantee Issue | $5,000 |

### Eligibility

All Eligible Retirees who are citizens or legal residents of the United States, excluding temporary, leased or seasonal employees.

### Contact Information for Claims

Phone: 1-877-377-6773
Fax: 1-877-737-3650

Symetra Life Insurance Company
Life and Absence Management Center
P.O. Box 1230
Enfield, CT 06083-1230

Symetra® is a registered service mark of Symetra Life Insurance Company

Plaintiff Bates No. JC000019

This summary provides only a brief description of the Life Insurance coverage insured by Symetra Life Insurance Company under the LGC-13000 8/06 series Group Life Insurance policy. For a complete description, including all definitions, exclusions, limitations, and reductions in coverage, as well as information on termination of benefits, please contact your benefit administrator or refer to the Group Insurance Certificate you will receive when you become insured. Coverage will be offered under Group Policy number 01-017812-00. All benefits are subject to the terms and conditions of the Group Policy. If there is a difference between the information in this summary and the information contained in the Group Insurance Certificate, the terms of the Group Insurance Certificate will prevail. The terms of coverage may change over time, always refer to your current Group Insurance Certificate for information regarding your insurance benefits.

**Insured by Symetra Life Insurance Company**

Symetra® is a registered service mark of Symetra Life Insurance Company

Plaintiff Bates No. JC000020

 **Lee County Sheriff's Office**

STATEMENT

**MAKE CHECKS PAYABLE / REMIT TO:**
Lee County Sheriff's Office
Attn: Benefits Unit
14750 Six Mile Cypress Parkway
Fort Myers, FL 33912
Phone: (239) 477-1121
Fax: (239) 477-1197
E-mail: dsalvagno@sherifflee.fl.org

DATE 08/23/2021

TO Jenna Clark

COMMENTS due by 9/30/2021

| DESCRIPTION | AMOUNT |
|---|---|
| Retiree & Dependents - Medical, Dental, Vision Month of October 2021 | $551.26 |

AMOUNT DUE
**$551.26**

**REMITTANCE**

Date
Amount Due     $551.26
E.Un

*LCSO*

*** IF ANY OF THE FOLLOWING HAS CHANGED, PLEASE INDICATE BELOW:

| Retiree Information | | | |
|---|---|---|---|
| Address: | | | |
| City: | State: | Zip: | |
| Home Phone: (     ) | Cell Phone: (     ) | | |
| Email: | | | |

Plaintiff Bates No. JC000021

RETIREE WORKSHEET FOR MEDICAL BENEFITS
(INFORMATION ONLY)
PENSION PLAN

October 2020 through September 2021

| Name: | CLARK, JENNA | | Date: | 08/23/2021 | |
|---|---|---|---|---|---|
| Retired: | 09/04/21 | | | Plan Year: | 2021 |
| **Years of Service:** | | | | | |
| Retired with FRS? | | | | Yes | |
| Additional Years Not Calculated in LCSO Years of Service: | | | | | |
| Previous Years of Service with FRS: | | | | | |
| LCSO Years of Service: | | | | 29.330 yrs | |
| Total Years of Service with FRS: | | | | 29.330 yrs | |
| (Not Eligible For Drop): | | | | | |
| Total Years of Service with LCSO: | | | | 29.330 yrs | |
| FRS Subsidy: | | | | $100.00 | |
| **Retiree Coverage:** | | | | | |
| 01--Gross Premium for Medical: | | | | $798.73 | ← |
| 02--Medicare discount (proof of Medicare A&B = -$80): | | | | $0.00 | |
| 03--Adjusted Premium: | | | | $798.73 | |
| 04--FRS Subsidy (Based on Years of Service): | | | | $100.00 | |
|    LCSO Subtotal: | | | | $0.00 | |
|    Employee Subtotal: | | | | $798.73 | |
| 05-Total Subsidy LCSO Pays | | | | $698.73 | |
| 06--Balance of Premium Payable by Retiree: | | | | $100.00 | |
| 07--% Paid by LCSO for Years of Service: | | | | 100.00% | |
| 08--% Paid by Retiree: | | | | 0.00% | ← |
| **Retiree Premium Payment:** | | | | | |
| 09--Balance of Premium Payable by Retiree (06 Above): | | | | $100.00 | |
| 10--Medicare Discount (20+ Years): | | | | $0.00 | |
| 11--Adjusted Premium Payable By Retiree: | | | | $100.00 | |
| **Family Coverage:** | | | | | |
| 12--Gross Premium for Family Medical: | | | | $844.76 | ← |
| 13--Medicare Discount: | | | | $0.00 | |
| 14--Adjusted Premium Payable by Retiree: | | | | $844.76 | |
| 15--% Paid by LCSO for Years of Service: | | | | 50.00% | |
| 16--% Paid by Retiree Due to Years of Service: | | | | 50.00% | |
| 17--Balance of Premium Payable by Retiree: | | | | $422.38 | ← |
| 18--Dental Coverage: Single 47.13 | | | | $125.69 | |
| 19--Vision Coverage: Single 1.27 | | | | $3.19 | |
| **20--Total Retiree Monthly Premium Deduction:** | | | | $651.26 | ← |
| 21--Life Insurance: Yes | | | | $9.60 | ← |

* All items in Blue Entered by Benefits Coordinator

Plaintiff Bates No. JC000022

# APPROVED VENDORS FOR
# VOLUNTARY BENEFITS

**DEFERRED COMPENSATION** – You may prepare for retirement by contributing to a retirement fund through payroll deduction. Representatives from the following deferred compensation companies are available:

- **Equitable** – James Reddington  (239) 560-4618
- **Nationwide** – Jessica Rosen  (239) 821-4779
- **VALIC** – Steve Mindbreeze  (239) 284-7857

**SUPPLEMENTAL BENEFITS** – May be purchased on a voluntary basis and paid through payroll deduction. Representatives are available from the following companies:

- **AFLAC** – Amber Peterson (520) 508-9662
- **Colonial** – Cindy Rubin  (813) 503-6884 cindy.rubin@coloniallife.com

**VOLUNTARY LIFE INSURANCE** – May be purchased through payroll deduction from the following companies:

- **AFLAC** – Amber Peterson  (520) 508-9662
- **Colonial** –Cindy Rubin  (813) 503-6884 cindy.rubin@coloniallife.com
- **Nationwide** – Jessica Rosen  (239)  821-4779
- **VALIC** – Steve Mindbreeze (239) 284-7857

**LEGAL SERVICES** – provide legal service plans through payroll deduction on a pre-paid bases i.e. identify theft, family law, estate planning, adoption, bankruptcy and more from the following:

- **LegalShield** – Rebecca Smith – (800) 729-7998

## Non Payroll Related Services – Financial and Insurance
- **First Command Financial Services** - Daniel Smith (239) 322-5470
- **PAMG  Advisors @ Ameriprise Financial** –  Carl F. Nicolosi, CFP (239) 768-7007
- **Source Brokerage** – (888) 543-3634

Plaintiff Bates No. JC000023

FRS-TAR

# FLORIDA RETIREMENT SYSTEM PENSION PLAN
# TERMINATION AND REEMPLOYMENT AFTER RETIREMENT

Toll Free: 844-377-1888     Locally: 850-907-6500     Email: Retirement@dms.fl.gov

To begin receiving a retirement benefit, including the Deferred Retirement Option Program (DROP) payout, you must terminate all employment relationships with all FRS-participating employers. If you are dually employed with one or more FRS-participating employers, you must terminate from all positions, even if one of those positions is not an FRS-covered position. You must terminate from all positions that include, but are not limited to:

- full time work
- part time work
- other personal services (OPS)
- election poll work
- substitute teaching
- adjunct instructing
- contractual services
- third-party companies providing services to FRS-participating employers

**You are subject to the following termination requirement and reemployment restriction in the first 12 calendar months from your service retirement effective date or following your DROP termination date:**

## TERMINATION REQUIREMENT: 1st through 6th calendar months

During the first six calendar months from your service retirement effective date or following your DROP termination date, you cannot provide services (through paid or unpaid arrangements) in any capacity to an FRS-participating employer. Providing services to an FRS-participating employer in any capacity during this six-calendar month period will cancel your retirement and you and your FRS-participating employer will be held jointly and severally liable for repayment of all retirement benefits received, which include any DROP accumulation or payout. This means that each party can be held fully responsible for the repayment of the total amount of retirement benefits. **There are no exceptions to the six-calendar month termination requirement.**

**Examples of violations:**

- You terminate from all FRS-participating employment on June 10 and apply to begin receiving your monthly retirement benefit in July. Your service retirement effective date is July 1, and your six-calendar month termination requirement is from July through December. You become employed part-time with an FRS-participating employer in September. This employment voids your retirement. Your retirement will be cancelled, and you and your employer will be held jointly and severally liable for repayment of any retirement benefits paid to you during that time.

- You are dually employed with two FRS-participating employers and are in DROP. You work for your primary employer in a regularly established position, and with your other employer as an adjunct, a non-reported position. You terminate employment with your primary employer and exit DROP on August 31. You receive your DROP payout and begin receiving your monthly retirement benefit in September. Your six-calendar month termination requirement is from September through February. You never terminated your other position, an adjunct with an FRS-participating employer. This employment voids your DROP. Your retirement will be cancelled, and you and your employer will be held jointly and severally liable for repayment of any retirement benefits paid to you, including your entire DROP payout.

Plaintiff Bates No. JC000024

FRS-TAR

# FLORIDA RETIREMENT SYSTEM PENSION PLAN
## TERMINATION AND REEMPLOYMENT AFTER RETIREMENT

Toll Free: 844-377-1888     Locally: 850-907-6500     Email: Retirement@dms.fl.gov

---

**REEMPLOYMENT RESTRICTION: 7th through 12th calendar months**

**During the 7th through 12th calendar months** from your service retirement effective date or following your DROP termination date, you may provide services to an FRS-participating employer if, and only if, you suspend your monthly retirement benefits. If your benefits are not suspended, you and your employer will be held jointly and severally liable for repayment of all retirement benefits received during the months in which you provided services. An exception to the reemployment restriction is provided for retired law enforcement officers reemployed as school resource officers in accordance with section 121.091(9)(f), Florida Statutes.

**Example of a suspension of benefits:**

- You terminate from all FRS-participating employers on February 15 and apply to begin receiving your monthly retirement benefit in March. Your service retirement effective date is March 1. Your 7th calendar month of retirement is September and your 12th calendar month is February. You become reemployed with an FRS-participating employer in October. You notify the division of your reemployment in October and the division suspends your monthly retirement benefits from October through February. Your retirement benefits will resume in March.

---

**If you provide services to an FRS-participating employer during the 7th through 12th calendar months from your service retirement effective date or following your DROP termination date, you must notify the division by submitting a** Form FR-23, Florida Retirement System Pension Plan Notification of Reemployment for Suspension of Retirement Benefits. You can obtain this form from our website, frs.myflorida.com, or by contacting the division using the information provided above.

Beginning with the 13th calendar month from your service retirement effective date or following your DROP termination date, there are no restrictions on working for an FRS-participating employer.

If you retired under the disability provisions of the FRS and become employed with any employer, whether public or private, your disability benefit will be discontinued. There are no reemployment exceptions for disability retirees.

For more information about the effects of reemployment on your retirement benefits, visit our website, frs.myflorida.com, where you can view our "READY.SET.RETIRE." guide that further explains the FRS reemployment provisions.

If you have any further questions about reemployment after retirement, you may contact the division using the information provided above. When emailing the division, include your full name, the last four digits of your Social Security number, your date of birth, and contact information.

Plaintiff Bates No. JC000025

SA-1
Rev. 01/10
Calculations

**Florida Retirement System Pension Plan**
**Spousal Acknowledgment Form**

PO BOX 9000 Tallahassee, FL 32315-9000
Local Phone: 850-907-6500  Toll Free: 844-377-1888  FAX: 850-410-2010

Member Name: Jenna D. Clark                Member SSN: 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

---

**CHECK ONE OF THE FOLLOWING:**

MARRIED: ✓ YES _____ NO    IF YES AND YOU SELECTED OPTION 1 OR 2,
YOUR SPOUSE MUST ALSO COMPLETE BOX 2.

Notarized Signature of Member: _____

1

Notary: State of Florida, County of _Lee_ . The above named person who has sworn to and subscribed before me this 27 day of August 20 21 and is personally known _____ or produced _____ as identification

DOREEN SALVAGNO
Commission # GG 925139
Expires November 24, 2023
Bonded Thru Troy Fain Insurance 800-385-7

Signature of Notary Public - State of Florida

Print, Type or Stamp Commissioned Name of Notary Public

---

SPOUSAL ACKNOWLEDGMENT: I, William P. Clark being the spouse of the above named member, acknowledge that the member has selected either Option 1 or 2.

Notarized Signature of Spouse: _____

2

Notary: State of Florida, County of _Lee_ The above named person who has sworn to and subscribed before me this 30 day of August 20 21 and is personally known _____ or produced FL Driver License. as identification

DOREEN SALVAGNO
Commission # GG 925139
Expires November 24, 2023
Bonded Thru Troy Fain Insurance 800-385-7019

Signature of Notary Public - State of Florida

Print, Type or Stamp Commissioned Name of Notary Public

---

**The following is an explanation of all four Florida Retirement System Options:**

Option 1: A monthly benefit payable for my lifetime. Upon my death, the monthly benefit will stop and my beneficiary will receive only a refund of any contributions I have paid which are in excess of the amount I have received in benefits. This option does not provide a continuing benefit to my beneficiary.

Option 2: A reduced monthly benefit payable for my lifetime. If I die within a period of ten years after my retirement date, my designated beneficiary will receive a monthly benefit in the same amount as I was receiving for the balance of the 10-year period. No further benefits are then payable.

Option 3: A reduced monthly benefit payable for my lifetime. Upon my death, my joint annuitant, if living, will receive a lifetime monthly benefit payable in the same amount as I was receiving. (Exception: The benefit paid to a joint annuitant under age 25, who is not your spouse, will be your option one benefit amount. The benefit will stop when your joint annuitant reaches age 25, unless disabled and incapable of self-support, in which case the benefit will continue for the duration of the disability.) No further benefits are payable after both my joint annuitant and I are deceased.

Option 4: An adjusted monthly benefit payable to me while both my joint annuitant and I are living. Upon the death of either my joint annuitant or me, the monthly benefit payable to the survivor is reduced to two-thirds of the monthly benefit received when both were living. (Exception: The benefit paid to the joint annuitant under age 25, who is not your spouse, will be your option one benefit amount. The benefit will stop when your joint annuitant reaches age 25, unless disabled and incapable of self-support, in which case the benefit will continue for the duration of the disability.) No further benefits are payable after both my joint annuitant and I are deceased.

Rule 60S-4.010, F.A.C.
Page 1 of 1

Plaintiff Bates No. JC000026

x x x Communication Result Report ( Aug. 30. 2021   9:47AM ) x x x

1)
2)

Date/Time: Aug. 30. 2021   9:47AM

| File No. Mode | Destination | Pg(s) | Result | Page Not Sent |
|---|---|---|---|---|
| 9170 Memory TX | 918504102010 | P. 1 | OK | |

Reason for error
E. 1) Hang up or line fail
E. 3) No answer
E. 5) Exceeded max. E-mail size

E. 2) Busy
E. 4) No facsimile connection
E. 6) Destination does not support IP-Fax



Plaintiff Bates No. JC000027

# EXHIBIT 25



## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

**JENNA CLARK,**

      Plaintiff,

v.

                            Case No. 2:22-cv-614-SPC-NPM

**CARMINE MARCENO, in his**      **JURY TRIAL DEMANDED**
**official capacity as Sherriff of**
**Lee County, Florida,**

      Defendant.

_____/

## FIRST AMENDED COMPLAINT AND
## DEMAND FOR JURY TRIAL

Plaintiff, JENNA CLARK (hereinafter referred to as "Plaintiff" and/or "Ms. Clark"), through her counsel, Derek Smith Law Group, PLLC, hereby complains of Defendant, CARMINE MARCENO, in his official capacity as Sheriff of Lee County, Florida (hereinafter referred to as "Defendant" and/or "Marceno"), and alleges as follows:

### INTRODUCTION

1.    Plaintiff Jenna Clark brings this action against Defendant pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 623 *et seq.* ("ADEA") and the Family Medical Leave Act, 29 U.S.C. § 2612 *et seq.* ("FMLA").

2.    Ms. Clark seeks monetary relief to redress the Defendant's unlawful discrimination and retaliation in violation of the ADEA and the

1

FMLA. Additionally, this action seeks to redress the Defendant's deprivation of Ms. Clark's personal dignity and her right to pursue equal employment opportunities.

## PARTIES

3.　　At all times material, Plaintiff was an individual woman over the age of 40 (YOB: 1962) residing in the State of Florida.

4.　　At all times material, Defendant was and continues to be, Sherriff of Lee County, Florida.

5.　　At all times material, Plaintiff was employed by Defendant at their headquarters located at 14750 Six Mile Cypress Parkway, Fort Myers, FL 33912.

6.　　Defendant held supervisory authority over the Plaintiff, controlling various aspects of her employment, including but not limited to the power to hire, fire, demote, and promote the Plaintiff and the ability to direct her work.

7.　　The exact number of Defendant's employees is unknown, but upon information and belief, there are well more than the statutory minimum under the ADEA and the FMLA.

8.　　At all times material, Defendant was an "employer" within the meaning of 29 U.S.C. § 2611(4)(a) and within the meaning of 29 U.S.C. § 630(b).

9.    At all times material, Plaintiff was an "employee" of Defendant within the meaning of 29 U.S.C. § 630(f).

10.    At all times material, Plaintiff was an "eligible employee" of Defendant within the meaning of 29 U.S.C. § 2611(2).

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331. This action is authorized and instituted pursuant to 29 U.S.C. § 626(c) and 29 U.S.C. § 2617(a).

12.    Venue is proper in this district pursuant to 28 U.S.C. §1391(b) because the unlawful employment practices alleged below were committed within the jurisdiction of the United States District Court for the Middle District of Florida. The Defendant was and is still located in this judicial district and a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## ADMINISTRATIVE PREREQUISITES

13.    Plaintiff has complied with all administrative requirements to file this action.

14.    On or around November 30, 2021, Plaintiff timely dual-filed a charge of discrimination (Charge No. 510-2022-01352) against Defendant with

the Equal Employment Opportunity Commission ("EEOC") and the Florida Commission on Human Relations ("FCHR").

15.    On or around August 2, 2022, the EEOC issued Plaintiff's Right to Sue Notice against Defendant.

16.    Plaintiff is timely commencing this action within ninety (90) days of receipt of the EEOC's Right to Sue Notice.

## FACTUAL ALLEGATIONS

17.    In or around 1992, Ms. Clark began working for Defendant as a Financial Assistant.

18.    At all times material, Ms. Clark was considered to be an exemplary employee. So much so, that during Ms. Clark's employment with Defendant she was promoted up to Director of Purchasing for Defendant.

19.    As an employee of Defendant, Ms. Clark would have been eligible for retirement benefits after 30 years of employment within the agency or at the age of 62, whichever came first.

20.    ANNMARIE RENO ("Reno"), an individual female who was employed as Defendant's Executive Director and Ms. Clark's direct supervisor.

21.    At all times material, Reno held supervisory authority over Ms. Clark, including but not limited to the power to hire, fire, demote, and promote the Plaintiff and the ability to direct her work.

4

22.     In or around 2019, Ms. Clark was experiencing health problems and needed to undergo open heart surgery.

23.     Ms. Clark took approved sick leave to undergo surgery and was able to return to work several weeks later.

24.     Upon her return from surgery, Reno began to make comments targeting Ms. Clark for her age and her medical leave. These comments included, but were not limited to, "you should look into going on disability." When Ms. Clark asked Reno why she would go on disability, Reno replied, "for all of *that*" and gestured towards Ms. Clark's body.

25.     Ms. Clark knew the offensive comments from her supervisor were discriminatory in nature because Ms. Clark never made any indication she was disabled and never exhibited any difficulty performing her job. In fact, Ms. Clark went out of her way to make herself available to answer the phone and assist with work-related tasks during her time-off.

26.     Soon thereafter, Reno began making comments about Ms. Clark's salary and retirement benefits. These comments included, but were not limited to, "you know we pay 30% of your salary to the Florida Retirement System, right?" and comments of a similar nature.

27.     Reno made these discriminatory comments towards Ms. Clark with the implication that Ms. Clark was being over-compensated or somehow was not deserving or her retirement benefits.

28.     In or around 2021, Ms. Clark was informed by her medical doctor that she needed to undergo additional surgery.

29.     Accordingly, in or around July/August of 2021, Ms. Clark requested sick leave for the scheduled surgery, which required a recovery period of seven days.

30.     Ms. Clark's sick leave request was communicated to Defendant, through Ms. Clark's supervisor, Reno, and was also communicated via email to DAWN HEIKKILA ("Heikkila"), an individual female who was employed as Defendant's Human Resources Director.

31.     Heikkila held supervisory authority over Plaintiff, controlling various aspects of her employment, including but not limited to the power to hire, fire, demote, and promote the Plaintiff and the ability to direct her work.

32.     When Ms. Clark inquired about using her leave benefits under the FMLA, Heikkila advised Ms. Clark to hold off on submitting any FMLA paperwork, as Heikkila was too busy to process it at the time.

33.     Ms. Clark took no issue with the Heikkila's instruction, as Ms. Clark's request for sick leave was nonetheless approved by Reno and Heikkila.

34.     On or around August 21, 2021, while Ms. Clark was out on sick leave, Reno texted Ms. Clark "Can you call me. I have to talk to you."  Ms. Clark immediately called Reno, who advised Ms. Clark that her position as Purchasing Director was being eliminated due to "reorganizing." Reno further

6

advised Ms. Clark that she needed to contact Heikkila on August 23rd for further instruction.

35.    Ms. Clark was shocked and upset upon hearing the news that her position was being eliminated, as she had devoted her entire career to working for Defendant and was just nine months away from retirement.

36.    Shortly after speaking with Reno, Ms. Clark noticed on the system database, also known as Email Workflow, that her previously approved sick leave had been changed to "admin leave with pay."

37.    On or around August 23, 2021, Ms. Clark met with Heikkila over the phone to discuss the status of her position, and to see what other options may be available to her.

38.    Heikkila told Ms. Clark that Defendant had no other positions available for her to apply to, and that her only options would be to (1) initiate her retirement early or (2) be terminated.

39.    Despite Heikkila's assertion, Ms. Clark knew that there were other positions available with Defendant because she had previously seen them posted on the website. Accordingly, Ms. Clark opposed Heikkila's remarks and expressed that she was interested in applying for other positions, so that she could continue her employment with Defendant.

40.    When Ms. Clark expressed her interest in applying, Heikkila told Ms. Clark that the positions posted were academy positions, which required

"strict testing" to even be considered. Heikkila further remarked that those positions required "memory" and "attention to detail," insinuating that Ms. Clark was too old to perform the tasks required of those positions.

41.    Heikkila also stated that even if Ms. Clark was able to secure one of the available positions, Ms. Clark would likely not be able to receive her accrued sick leave or vacation time earned at the rate of her current position as Purchasing Director and instead, would be at a lower rate.

42.    On or around August 24, 2021, Ms. Clark received the formal termination letter from Defendant notifying her that her position would be eliminated effective September 4, 2021. The letter, dated August 15, 2021, indicated that her position was being eliminated as a result of Defendant's "Reduction in Force."

43.    The letter further stated that Ms. Clark would be placed on Administrative Leave with Pay and given the opportunity to retire. The deadline for Ms. Clark's decision to retire was September 3, 2021, at 4:00 PM.

44.    Faced with little choice, on or around September 3, 2021, Ms. Clark resigned from her position with Defendant and initiated the process of early retirement.

45.    As a result of being forced into early retirement by Defendant, Ms. Clark was penalized and lost over 13% of her retirement pension benefits.

46.    The events described above are just some of the examples of unlawful discrimination, retaliation, and interference Defendant subjected Ms. Clark to throughout her employment.

47.    Defendant unlawfully discrimination against Ms. Clark on the basis of her age and retaliated against Ms. Clark for opposing Defendant's unlawful employment practices.

48.    Defendant interfered with Ms. Clark's rights under the FMLA.

49.    At all relevant times, Defendant's employees were acting as agents of Defendant in their unlawful treatment of Ms. Clark.

50.    At all relevant times, Defendant acted with deliberate indifference to the unlawful treatment complained of herein.

51.    As a result of Defendant's actions, Ms. Clark felt extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

52.    As a result of Defendant's actions, Ms. Clark has experienced severe sleep deprivation, anxiety, and stress.

53.    As a result of the acts and conduct complained of herein, Ms. Clark has suffered and will continue to suffer the loss of income, the loss of salary, bonuses, benefits and other compensation which such employment entails, and Ms. Clark has also suffered future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

54. Defendant is either directly or vicariously liable for the unlawful conduct complained of herein.

## CAUSES OF ACTION
### COUNT I
### 29 U.S.C. § 623
### *Age Discrimination*

55. Plaintiff reincorporates the factual allegations in paragraphs 17-54.

56. The ADEA provides, in relevant part, that "it shall be unlawful for an employer... to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, and privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

57. At all times material, Plaintiff was over 40 years of age, and was therefore a protected class member under the ADEA.

58. The elements of a prima facie case of disparate treatment are flexible and tailored on a case-by-case basis to differing factual circumstances.

59. Defendant subjected Plaintiff to discriminatory treatment on the basis of her age. The Defendant's discriminatory treatment included, but was not limited to, making age-related disparaging remarks to Plaintiff, pressuring Plaintiff to go on disability or otherwise retire, preventing Plaintiff from using her leave benefits, eliminating Plaintiff's position, forcing Plaintiff into early

retirement to impede Plaintiff from obtaining her full retirement benefits, and preventing Plaintiff from applying for other employment positions with Defendant.

60.   Defendant targeted Plaintiff because of her age and because of her age-related health problems. No similarly situated employees under the age of 40 were subjected to the same discriminatory treatment that Plaintiff was subjected to.

61.   The discriminatory actions of Defendant against Plaintiff, as described and set forth above, constitute an adverse employment action for the purposes of the ADEA. In subjecting Plaintiff to adverse employment actions, the Defendant intentionally discriminated against Plaintiff with respect to the compensation, terms, conditions, or privileges of her employment.

62.   As a direct and proximate result of Defendant's intentional discriminatory conduct in violation of the ADEA, Plaintiff has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Plaintiff has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages. Plaintiff accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

63.    The conduct of the Defendant deprived Plaintiff of her statutory rights guaranteed under the ADEA.

64.    Plaintiff further requests that her attorney's fees and costs be awarded as permitted by law.

### COUNT II
### 29 U.S.C. § 623
### *ADEA RETALIATION*

65.    Plaintiff reincorporates the factual allegations in paragraphs 17-54.

66.    The ADEA prohibits retaliation in any manner against a person who has opposed a discriminatory practice or who has participated in any investigation, proceeding, or litigation related to an unlawful discriminatory practice. 29 U.S.C. § 623(d).

67.    At all times material, Plaintiff was over 40 years of age, and was therefore a protected class member under the ADEA.

68.    Plaintiff engaged in a protected activity when she opposed the Defendant's unlawful discriminatory conduct on the basis of her age.

69.    Plaintiff acted in good faith and with the objective and subjective belief that Defendant had committed violations of the ADEA.

70.    In response to Plaintiff opposing the discriminatory conduct and asserting her right to enjoy the same employment benefits as every other employee, the Defendant retaliated against Plaintiff.

71.   Defendant retaliated against Plaintiff by engaging in conduct, including but not limited to pressuring Plaintiff to go on disability or otherwise retire, preventing Plaintiff from using her leave benefits, eliminating Plaintiff's position, forcing Plaintiff into early retirement to impede Plaintiff from obtaining her full retirement benefits, and preventing Plaintiff from applying for other employment positions with Defendant.

72.   Defendant took the above-mentioned materially adverse actions, among others, against Plaintiff because of her protected activities.

73.   Any reasonable employee in Plaintiff's position would be dissuaded from opposing discriminatory conduct if they knew they would be subjected to the same kind of treatment that Plaintiff was subjected to.

74.   Defendant's alleged bases for its adverse employment actions against Plaintiff are pretextual and have been asserted only to cover up the retaliatory nature of the Defendant's conduct.

75.   As a direct and proximate result of Defendant's retaliatory conduct in violation of the ADEA, Plaintiff has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Plaintiff has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages. Plaintiff accordingly demands lost economic damages, lost wages,

back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

76.     The conduct of the Defendant deprived Plaintiff of her statutory rights guaranteed under the ADEA.

77.     Plaintiff further requests that her attorney's fees and costs be awarded as permitted by law.

**COUNT III**
**29 U.S.C. § 2615**
***FMLA INTERFERENCE***

78.     Plaintiff reincorporates the factual allegations in paragraphs 17-54.

79.     Employers are prohibited from interfering with, restraining, or denying the exercise or attempted exercise of any right protected by the FMLA. 29 U.S.C. § 2615.

80.     By nature of Plaintiff's employment with Defendant, Plaintiff was an eligible employee and was entitled to leave benefits under the FMLA.

81.     In or around August of 2021, Defendant was on notice of Plaintiff's entitlement to FMLA leave

82.     Plaintiff suffered from a serious health condition as defined in 29 U.S.C. § 2611(11).

83.     Defendant violated the FMLA by unlawfully interfering, restraining, and denying Plaintiff's use and/or attempted use of her leave

14

benefits under the FMLA. Specifically, Defendant instructed Plaintiff not to submit FMLA leave requests and denied Plaintiff's request to use her FMLA leave benefits in or around August of 2021.

84.     As a result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Plaintiff has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages. Plaintiff accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

85.     The conduct of the Defendant deprived Plaintiff of her statutory rights guaranteed under the FMLA.

86.     Plaintiff further requests that her attorney's fees and costs be awarded as permitted by law.

## COUNT IV
### 29 U.S.C. § 2615
### *FMLA RETALIATION*

87.     Plaintiff reincorporates the factual allegations in paragraphs 17-54.

88.     Employers are prohibited from retaliating against an employee in any manner for having exercised or attempted to exercise protected rights

under the FMLA or using the taking of FMLA leave as a negative factor in employment actions. 29 C.F.R. § 825.220(c).

89.    Employers are prohibited from retaliating against an employee in any manner for opposing or complaining about any unlawful practice under the FMLA. 29 C.F.R. § 825.220(a)(2).

90.    By nature of Plaintiff's employment with Defendant, Plaintiff was an eligible employee and was entitled to leave benefits under the FMLA.

91.    In or around August of 2021, Defendant was on notice of Plaintiff's entitlement to FMLA leave.

92.    Plaintiff suffered from a serious health condition as defined in 29 U.S.C. § 2611(11).

93.    Plaintiff engaged in a protected activity when she exercised and/or attempted to exercise her right to leave benefits under the FMLA and when she opposed the Defendant's unlawful conduct in violation of the FMLA.

94.    Plaintiff acted in good faith and with the objective and subjective belief that she was entitled to leave benefits under the FMLA and that Defendant had committed violations of the FMLA.

95.    Defendant retaliated against Plaintiff by engaging in conduct, including but not limited to, eliminating the Plaintiff's position, forcing the Plaintiff from obtaining her full retirement benefits, and preventing the Plaintiff from applying for other employment positions with Defendant.

96.     Defendant took the above-mentioned materially adverse actions, among others, against Plaintiff because of her protected activities.

97.     Any reasonable employee in Plaintiff's position would be dissuaded from opposing unlawful conduct if they knew they would be subjected to the same kind of treatment that Plaintiff was subjected to.

98.     Defendant's alleged bases for its adverse employment actions against Plaintiff are pretextual and have been asserted only to cover up the retaliatory nature of the Defendant's conduct.

99.     As a result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Plaintiff has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages. Plaintiff accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

100.    The conduct of the Defendant deprived Plaintiff of her statutory rights guaranteed under the FMLA.

101.    Plaintiff further requests that her attorney's fees and costs be awarded as permitted by law.

## **JURY DEMAND**

Plaintiff requests a jury trial on all issues to be tried.

17

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff respectfully requests this Court enter judgment against the Defendant for all damages suffered by the Plaintiff, including economic damages, lost wages (back pay and front pay) and benefits, liquidated damages, statutory damages, compensatory damages, emotional distress damages, interest, attorney's fees and costs, disbursements of action, and any other remedies (monetary and/or equitable) allowable by law as a result of the Defendant's conduct in violation of the ADEA and the FMLA.

Dated:  Miami, Florida
        December 14, 2022,

**DEREK SMITH LAW GROUP, PLLC**
*Counsel for Plaintiff*

/s/ Kyle T. MacDonald
Kyle T. MacDonald, Esq.
Florida Bar No.: 1038749
Derek Smith Law Group, PLLC
701 Brickell Ave, Suite 1310
Miami, FL 33131
Tel: (305) 946-1884
Fax: (305) 503-6741
Kyle@dereksmithlaw.com

**INDIVIDUAL LIFE CONVERSION**
Request for Information Form





This form enables you and your insured dependents to obtain information on any right you may have to purchase an individual life insurance policy within **31 days** after your Symetra Group Life coverage ends or is reduced because of termination of employment or change in your classification or status in the eligible member group Please complete the information below, if you are interested, and an application and premium costs will be sent  Your Request for Information Form needs to be submitted to this office within **31 days** after the date of your Symetra Group Life Insurance ending  Please review the Conversion Right provision in your existing Certificate (or if unavailable contact the Policyholder/Plan Administrator) to ensure an understanding of your conversion rights, responsibilities and any extension to convert that may be available in your state.

**PART A - POLICYHOLDER OR ADMINISTRATOR TO CERTIFY**

| Name of Employee/Member | Symetra Life Insurance Company |
|---|---|
| Jenna D. Clark | |

| Name of Policyholder (use name shown in group policy or booklet) | Policy# |
|---|---|
| Lee County Sheriff's Office | 01-016300-00 |

| Policyholder's address | Contact name |
|---|---|
| 14750 Six Mile Cypress Pkwy   Fort Myers, FL 33912 | Doreen M. Salvagno |

| DATE OF GROUP LIFE INSURANCE TERMINATION | LAST DATE WORKED | TOTAL AMOUNT OF GROUP LIFE INSURANCE ON TERMINATION DATE |
|---|---|---|
| 09 / 04 / 21 | 09 / 04 / 21 | Basic $ 190,000.00        Supplemental $ .00 |

Employee/Member's Occupation Purchasing Director _____   Class 2-Exec Civilian   Annual Salary $94,823.03

Employee/Member's Hire Date 06 / 05 / 1992  Employee/Member's effective date of Symetra Group Life Insurance Coverage under the Group Policy 01 / 01 / 2013

Did Employee/Member have Dependent Life Insurance on Group Plan? ☐ Yes   ☑ No
Amount of Spouse Life Insurance $ .00                    Amount of Child Life Insurance $ .00

**REASON FOR TERMINATION:**
**EMPLOYEE/MEMBER**
☐ Termination of Policy
☑ Termination of Employment
☐ Disability
☐ Other (please explain) _____

**DEPENDENT**
☐ Termination of Policy
☐ Divorce
☐ Marriage of a child
☐ A surviving spouse or child of deceased employee/member
☐ Other (please explain) _____

Is Employee/Member Disabled? ☐ Yes   ☑ No

Is Employee/Member on Disability? ☐ Yes   ☑ No   If Yes, did he/she become disabled prior to age 60? ☐ Yes   ☐ No

Has the insured Employee/Member made an Absolute Assignment of the group life insurance to be converted? ☐ Yes   ☑ No
If yes, please attach a copy of the Absolute Assignment form.

Date on which this Notice was given to Employee/Member   08 / 27 / 2021

| Date Notice completed | Signature of Policyholder/Plan Administrator | Title | Phone number |
|---|---|---|---|
| 08 / 27 / 2021 | Doreen M Salvagno | Human Resources / Benefits | ( 239 )477-1121 |

**PART B - TO BE COMPLETED BY EMPLOYEE/MEMBER REQUESTING CONVERSION INFORMATION**

| Name | | Soc Sec # | Date of birth | Age | Sex |
|---|---|---|---|---|---|
| | | | / / | | |

| Home address | Street | | City | | State | Zip code |
|---|---|---|---|---|---|---|
| | | | | | | |

| Phone # | ( ) | | Email | |
|---|---|---|---|---|

If Spouse or Children are checked above, provide information below:

| Name of dependent(s) | Age | Date of birth | Soc Sec # | Sex | Relationship to you |
|---|---|---|---|---|---|
| | | / / | | | |
| | | / / | | | |
| | | / / | | | |

Employee/Member's signature _____      Date completed and mailed _____

Mail to: HRMP Life Conversion Facility, 300 Rosewood Drive, Suite 250, Danvers, MA 01923
Toll Free: 1-888-999-4767 Phone: (978) 762-0661 Fax: (978) 762-4767 Email: Conversions@HRMP.com

LG-12204 3/15

Symetra® is a registered service mark of Symetra Life Insurance Company

**Plaintiff Bates No. JC000028**

# EXHIBIT 26



**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA**

JENNA CLARK,

        Plaintiff,                         CASE NO.: 2:22-cv-614-SPC-NPM

    v.

CARMINE MARCENO, in his official
capacity as Sheriff of Lee County,
Florida,

        Defendant.

_____/

## PLAINTIFF'S RESPONSES TO DEFENDANT'S INTERROGATORIES TO PLAINTIFF JENNA CLARK

    Plaintiff, JENNA CLARK ("Plaintiff" and/or "Ms. Clark"), by and through her undersigned counsel, and pursuant to Rule 33 of the Federal Rules of Civil Procedure, hereby serves the following responses to Defendant CARMINE MARCENO's Interrogatories to Plaintiff Jenna Clark.

Dated:  Miami, Florida              **DEREK SMITH LAW GROUP, PLLC**
           November 20, 2023,        *Counsel for Plaintiff*

                                  /s/ Kyle T. MacDonald
                                  Kyle T. MacDonald, Esq.
                                  Florida Bar No.: 1038749
                                  Derek Smith Law Group, PLLC
                                  520 Brickell Key Drive, Suite O-301
                                  Miami, FL 33131
                                  Tel: (305) 946-1884
                                  Fax: (305) 503-6741
                                  Kyle@dereksmithlaw.com

## QUALIFICATIONS AND GENERAL OBJECTIONS

1.      Plaintiff objects to the Interrogatories to the extent that they are vague, ambiguous, over broad, unduly burdensome and oppressive, seek information that is not relevant or reasonably calculated to lead to the discovery or admissible evidence, and seek information beyond that permitted by the Federal Rules of Civil Procedure.

2.      Plaintiff objects to the Interrogatories to the extent that they contain words or phrases that are confusing or lacking in sufficient certainty to permit a response. In her responses below, Plaintiff responds to the extent that she understands the Interrogatories.

3.      Plaintiff objects to the Interrogatories to the extent that they seek information that is protected by attorney-client privilege, attorney work product privilege, or any other protected privilege.

4.      Plaintiff objects to the Interrogatories to the extent that they request information that has not been fully developed at this stage of the litigation. Plaintiff's responses to the Interrogatories are limited because, among other reasons, (1) she has not had time to discover adequately factual information upon which to answer the Interrogatories; and (2) discovery is not yet complete.

5.      Plaintiff has not yet completed discovery or preparation for trial in this action and therefore will supplement these responses and objections to the extent required by the Rules of Civil Procedure.

6.      Plaintiff has made a good faith effort to respond to the Interrogatories, but reserves the right to object to, and to move to have vacated Defendant's Interrogatories.

7.      Plaintiff reserves the right to modify, amend and/or supplement her responses.

8.      All responses made herein are subject to the objections stated above and any further objections specifically stated.

9.      The following responses and objections are based upon information now known.

Without waiving these objections and by way of response, the Plaintiff provides the following responses.

## SPECIFIC ANSWERS TO DEFENDANT'S INTERROGATORIES TO PLAINTIFF JENNA CLARK

**INTERROGATORY NO. 1**
Identify each person who answered, was consulted, or supplied information concerning the answers to these Interrogatories and provide the last known address and telephone number for each person identified.

**ANSWER: None other than Plaintiff and Plaintiff's counsel, whose addresses and telephone numbers are set forth herein as follows:**

- **Plaintiff Jenna Clark**
  **c/o Kyle T. MacDonald, Esq.**
  **Derek Smith Law Group, PLLC**
  **520 Brickell Key Drive, Suite O-301**
  **Miami, FL 33131**
  **Telephone: (305) 946-1884**

- **Kyle T. MacDonald, Esq.**
  **Derek Smith Law Group, PLLC**
  **520 Brickell Key Drive, Suite O-301**
  **Miami, FL 33131**
  **Telephone: (305) 946-1884.**

**INTERROGATORY NO. 2**
For each individual identified in Plaintiff's Rule 26 Initial Disclosures dated January 19, 2023 and any supplemental disclosures made thereafter, identify: (a) the substance of the facts known by each person including the times, dates, and places of the incident(s) each person listed has knowledge of; (b) the home address and telephone number(s) (work, home, and cell) of each person identified; and (c) a description of all documents and records in the individual's possession, or in your possession, that pertains to the facts and circumstances within that individual's knowledge.

<u>ANSWER</u>: Plaintiff objects to this interrogatory on the grounds that it is overbroad and unduly burdensome in requesting "the substance of the facts known by each person including the times, dates, and places of the incident(s) each person listed has knowledge of" and "a description of all documents and records in the individual's possession, or in your possession." Notwithstanding these objections and without waiving them, Plaintiff states as follows:

- **Ms. Jenna Clark,** *Plaintiff*
  **c/o Derek Smith Law Group, PLLC**
  **701 Brickell Ave., Suite 1310**
  **Miami, Florida 33131**

  Ms. Clark has knowledge regarding her employment with Defendant, her claims alleged in the Complaint and throughout the agency proceeding, the events surrounding her employment since the time of filing her agency charge and subsequent federal complaint, and the emotional toll the ongoing discriminatory treatment took on Ms. Clark.

- **Ms. AnnMarie Reno,** *Executive Director for Defendant*
  **c/o Allen, Norton & Blue, PA**
  **324 S. Hyde Park Ave**
  **Suite 225**
  **Tampa, Florida 33606**

  Ms. Reno likely has knowledge regarding Plaintiff's employment, Plaintiff's claims alleged in the Complaint, and treatment of other employees at Lee County Sheriff Office.

- **Ms. Dawn Heikkila,** *Director of Human Resources for Defendant*
  **c/o Allen, Norton & Blue, PA**
  **324 S. Hyde Park Ave**
  **Suite 225**
  **Tampa, Florida 33606**

  Ms. Heikkila likely has knowledge regarding Plaintiff's employment, Plaintiff's claims alleged in the Complaint, and treatment of other employees at Lee County Sheriff Office.

- **Mr. Carmine Marceno,** *Defendant*
  **c/o Allen, Norton & Blue, PA**
  **324 S. Hyde Park Ave**
  **Suite 225**
  **Tampa, Florida 33606**

**Mr. Marceno likely has knowledge regarding Plaintiff's employment, Plaintiff's claims alleged in the Complaint, and treatment of other employees at Lee County Sheriff Office.**

- **Mr. William Paul Clark,** *Plaintiff's Husband*
  **9 Jackson Ave**
  **Lehigh Acres, Florida 33936**

  **Mr. Clark likely has knowledge regarding Plaintiff's employment, the claims alleged in the Complaint, and Plaintiff's emotional distress and damages incurred.**

- **Juliann DiBenedetto-Wilson,** *Plaintiff's Daughter*
  **806 Chadbourne Ave NW**
  **Concord, North Caroline 28027**

  **Ms. Wilson likely has knowledge regarding Plaintiff's employment, the claims alleged in the Complaint, and Plaintiff's emotional distress and damages incurred.**

- **Jami Najarro,** *Plaintiff's Daughter*
  **156 Fremont Ave S**
  **Lehigh Acres, Florida 33974**

  **Ms. Najarro likely has knowledge regarding Plaintiff's employment, the claims alleged in the Complaint, and Plaintiff's emotional distress and damages incurred.**

**INTERROGATORY NO. 3**

State if you have ever been a party, either as a plaintiff or a defendant, in a lawsuit other than in the Clark Litigation, and if so, specify whether you were a plaintiff or a defendant, the nature of the action, the date the lawsuit was filed, the court in which the lawsuit was filed, and the disposition of the matter, if any.

**ANSWER: To the best of Plaintiff's recollection, Plaintiff states as follows: Plaintiff was a party in a divorce proceeding, which took place in approximately 1992; and (2) Plaintiff also made a claim related to a car accident in approximately 1990. Plaintiff is unable to recall if the car accident claim resulted in a lawsuit or was resolved pre-suit.**

**INTERROGATORY NO. 4**

Describe any and all efforts you have made to obtain employment with any employer other than the Defendant from August 15, 2021 to the present. In responding to this Interrogatory, please identify: (a) each prospective employer you contacted; (b) the individual(s) with whom you communicated about prospective employment, if any; (c) the date(s) you sought employment; (d) your efforts to obtain the employment, including but not limited to any applications, resumes, cover letters submitted for purposes of obtaining the employment; (e) whether you were offered a

position; and (f) if you were offered a position and turned it down, the reason you rejected the offered position.

**ANSWER: Plaintiff was forced into retirement by Defendant and, to date, has not been able to secure comparable employment. In or around February 2023, Plaintiff started a residential painting business, Works of Mimi, LLC. Plaintiff has been employed by Works of Mimi, LLC from February of 2023 to present.**

### INTERROGATORY NO. 5

Provide the names, addresses, and telephone numbers of any doctor or other medical provider (including hospitals, diagnostic facilities, psychiatrists, psychologists, therapists, counselors, or other health care providers) (individually, "provider") you have visited from September 1, 2019, to the present, including any provider with whom you sought treatment for "emotional distress" as identified in your Rule 26 Initial Disclosures and in your Prayer for Relief in the Amended Complaint filed in the Clark Litigation. In responding to this Interrogatory, please specify: (a) the dates of treatment, (b) reasons for visit, (c) the provider's diagnosis, and (d) any treatment or medication(s) prescribed.

**ANSWER: Plaintiff objects to subparts (a)-(d) on the grounds that they are overbroad and unduly burdensome in requesting that Plaintiff detail every visit to her medical providers from September 1, 2019, to the present. Plaintiff further objects on the grounds that this request is improperly duplicative of Plaintiff's medical records, as Plaintiff has provided Defendant with a HIPAA authorization for her medical providers. Notwithstanding these objections and without waiving them, Plaintiff has provided the names, addresses, and telephone numbers of her medical providers from September 1, 2019, to the present, to the best of her recollection, as follows:**

- **Provider: Dr. Frederick Barr / Palm Beach Plastic & Cosmetic Surgery**
  **Address: 1411 N. Flagler Dr., Suite 5800, West Palm Beach, FL 33401**
  **Telephone: (561) 833-4122**

- **Provider: Dr. Michael DeFrain**
  **Address: 9981 S. Healthpark Dr., #156, Ft. Myers, FL 33908**
  **Telephone: (239) 343-6341**

- **Provider: Dr. Thomas Raymond Mitchell / Star Care Clinic (PCP)**
  **Address: 14311 Metropolis Ave. Unit #102, Ft. Myers, FL 33912**

  **Provider: Lynn Hunt PA / Star Care Clinic**
  **Address: 14311 Metropolis Ave. Unit #102, Ft. Myers, FL 33912**

- **Provider: All Saints Eye Center (Opthalmologist)**
  **Address: 6150 Diamond Crt. Bldg. #900, Ft Myers, FL 33912**
  **Telephone: (239) 768-7022**

- **Provider: Radiology Regional**
  **Address: 1110 Lee Blvd, Lehigh, FL 33936**
  **Telephone: (239) 936-2316**

- **Provider: GI Associates United**
  **Address: 4790 Barkley Cir. Bldg. A, Ft Myers, FL 33907**
  **Telephone: (239) 936-2316**

- **Provider: Dr. Anthony C. Brown – Florida Neurology Group**
  **Address: 12670 Whitehall Dr, Ft Myers FL 33907**
  **Telephone: (239) 936-3554**

- **Provider: Samaris Corona, MD – Premier Women's Care (Gynecologist)**
  **Address: 3230 Forum Blvd., Ft Myers, FL 33905**
  **Telephone: (239) 432-5858**

- **Provider: Cynthia Feagan (Dermatologist)**
  **Address: 14071 Metropolis Ave., Fort Myers, FL 33912**
  **Telephone: (239) 694-7546**

**Pursuant to Federal Rule of Civil Procedure 33(d), Plaintiff refers Defendant to the medical records produced in response to Defendant's First Request for Production for subparts (a)-(d). Plaintiff further directs Defendant to the medical records release form produced in response to Defendant's First Request for Production.**

**Plaintiff reserves the right to amend, supplement, or modify this response, as additional investigation and discovery is ongoing.**

**INTERROGATORY NO. 6**

Identify all internal complaint(s) that you allege you made during your employment with Defendant which you asserted to be grounds for your allegations of "ADEA Retaliation" as stated in Count II of the Amended Complaint in the Clark Litigation. In responding to this Interrogatory, please specify separately: (a) the date of each complaint or other activity; (b) the format of the complaint (i.e., written or verbal); (c) who you reported and/or submitted the complaint to; (d) the substance of the complaint; and (e) the names of any witnesses present when you reported and/or submitted the complaint.

**ANSWER: Plaintiff objects to this interrogatory on the grounds that it improperly assumes that Plaintiff must assert an "internal complaint" to establish a claim for ADEA retaliation.[1]**

---

[1] *See* ENFORCEMENT GUIDANCE ON RETALIATION AND RELATED ISSUES, EEOC (last visited Nov. 20, 2022), https://www.eeoc.gov/laws/guidance/enforcement-guidance-retaliation-and-related-issues., ("The opposition clause applies if an individual explicitly or implicitly communicates his or her belief that the matter complained of is, or could become, harassment or other discrimination. The communication itself may be informal and need not include the words "harassment," "discrimination," or any other legal terminology, as long as circumstances show that the individual is conveying opposition or resistance to a perceived potential EEO violation.").

Notwithstanding this objection and without waiving it, Plaintiff states that on or around August 23, 2021, Plaintiff verbally opposed Defendant's unlawful termination and Dawn Heikilla's assertion that there were no job opportunities available to Plaintiff. Plaintiff further opposed Defendant's decision to deny her the opportunity to apply to known job openings and Defendant's failure to afford Plaintiff a grievance hearing prior to her termination.

## INTERROGATORY NO. 7

Identify with specificity all acts or comments that you allege constitute discriminatory conduct based on your age. In responding to this Interrogatory, please specify separately: (a) the date of each act or comment; (b) the act or comment you allege was discriminatory; (c) the individual that allegedly performed the act or comment; and (d) any witnesses present that observed the act or comment.

**ANSWER: Plaintiff objects to this interrogatory on the grounds that that it is unduly burdensome and represents an improper contention interrogatory. *See* Middle District of Florida Discovery Handbook IV(C)(2). Notwithstanding this objection and without waiving it, Plaintiff refers Defendant to the factual allegations contained in Plaintiff's Amended Complaint.**

## INTERROGATORY NO. 8

Identify each and every person (other than your attorney or his agents), including any current or former employee of Defendant, with whom you have spoken or communicated regarding the allegations contained in your EEOC Charge, Complaint, or Amended Complaint filed in the Clark Litigation, including the date(s) and substance of each communication. Your response to this Interrogatory should include any communications made via email, text message, or social networking sites, including but not limited to communications made via Facebook, Instagram, Twitter, LinkedIn, Snapchat, TikTok, and/or MySpace.

**ANSWER: Plaintiff objects to this interrogatory on the grounds that it is overbroad and unduly burdensome in requesting that Plaintiff list any communication she may have had regarding Plaintiff's allegations and in requesting "the date and substance of each communication." Notwithstanding these objections and without waiving them, to the best of her recollection Plaintiff spoke to her husband, Mr. William Paul Clark, and her daughters Ms. Juliann DiBenedetto-Wilson and Ms. Jami Najarro about the allegations contained in the EEOC Charge, Complaint, or Amended Complaint relevant to this action. Plaintiff reserves the right to amend, supplement, or modify this response, as additional investigation and discovery is ongoing.**

## INTERROGATORY NO. 9

Identify with specificity all sources of income, including from any subsequent or current employer that you have received or are currently receiving since your separation from employment with

Defendant on September 3, 2021. Include in your response the source of such income, the amount of such income, and the frequency of the payment of the income.

**ANSWER: Plaintiff objects to this interrogatory on the grounds that it is overbroad to the extent it seeks information unrelated to the Plaintiff's efforts to mitigate and/or Plaintiff's actual mitigation. Notwithstanding this objection and without waiving it, none other than Plaintiff's Florida Retirement System (FRS) pension benefit, which Plaintiff began receiving around October 29, 2021. Plaintiff is currently self-employed with Works of Mimi, LLC, but has not derived any income from her self-employment. Plaintiff refers to the documents produced in response to Defendant's First Request for Production and marked Plaintiff Bates Nos. JC000050-JC000054 and JC000087-JC000095 for additional responsive information.**

### INTERROGATORY NO. 10

In Counts III and IV of your Amended Complaint in the Clark Litigation, you assert that you had a "serious health condition." Please identify: (a) what "serious health condition" you refer to in Paragraphs 82 and 92 of your Amended Complaint in the Clark Litigation; (b) the name(s) and the office address(es) of the physician who treated you for this asserted condition; (c) the dates which you sought treatment from your treating physician for your asserted health condition; and (d) the specific dates that your health condition caused you to be absent from work.

**ANSWER: Plaintiff objects to subpart (d) on the grounds that it is overly broad and not properly limited in time and scope. Notwithstanding this objection and without waiving it, Plaintiff states she suffered from an aberrant right subclavian artery and chronic hypertension. Plaintiff further states that she underwent surgery in or around 2021 to have her breast implants removed due to health concerns. Pursuant to Federal Rule of Civil Procedure 33(d), Plaintiff refers Defendant to the medical records produced in response to Defendant's First Request for Production for information responsive of subparts (b) and (c).**

### INTERROGATORY NO. 11

Identify any and all email accounts and/or addresses you have used from September 3, 2016, to the present, as well as any and all accounts on Facebook.com, Instagram.com, Twitter.com, LinkedIn.com, MySpace.com, or any other social or professional network site from September 3, 2016, to the present (whether or not that account is currently active or has been closed), and identify any information contained therein or posted thereto which is related in any way to your employment with the Lee County Sheriff's Office.

**ANSWER: Plaintiff objects to this interrogatory on the grounds that it is not properly limited in time and scope. Plaintiff further objects to this interrogatory on the grounds that it is overbroad and unduly burdensome in requesting Plaintiff "identify any information contained therein or posted thereto." Plaintiff further objects to this interrogatory on the grounds that any requests related to websites, blogs, or social media, if any, that Plaintiff has used or uses are unduly invasive and solely intended to embarrass, and/or harass Plaintiff, and are not related to the claims or defenses of the parties. Notwithstanding these objections**

and without waiving them, none other than the email accounts jennaclark1962@gmail.com, jennaclark1962@yahoo.com, and jclark@sheriffleefl.org and the LinkedIn profile accessible at www.linkedin.com/in/jenna-clark-78572398. Plaintiff further responds that there is no information contained in or posted to her LinkedIn profile related in any way to her employment with Lee County Sheriff's Office.

## INTERROGATORY NO. 12

Identify when you first communicated your request to take sick leave in August 2021 as you assert in Paragraphs 29, 30, 33, and 36 of your Amended Complaint in the Clark Litigation. In responding to this interrogatory, please identify: (a) whether the communication was oral or written; (b) the individuals present for the communication; (c) the location the communication took place; and (d) the substance of the communication or conversation.

**ANSWER: On August 12, 2021, Plaintiff requested sick leave verbally from Annmarie Reno ("Ms. Reno") and via email from Dawn Heikkila. The substance of both communications or conversations consisted of a request for leave under the Family and Medical Leave Act for forthcoming postoperative recovery. To the best of Plaintiff's recollection, no one was present for Plaintiff's conversation with Ms. Reno other than Plaintiff and Ms. Reno.**

## INTERROGATORY NO. 13

For each category of damages sought by you in your Amended Complaint in the Clark Litigation, please list the amount of damages claimed for each category, and the basis for how you calculated the amount of asserted damages.

**ANSWER: Plaintiff objects to interrogatory on the grounds that it improperly requests a calculation of damages, as damages are a question to be determined by a jury. Notwithstanding this objection and without waiving it, at this early juncture, Plaintiff states her damages as follows:**

1. **Lost Wages**
   **Plaintiff is claiming lost wages in the amount of $357,605.17, based on the following:**
   a. **Lost Wages Post-Termination in 2021**
      - **Annual Salary at Termination: $94,923.02**
      - **Daily Salary Pre-Raise: Calculated based on a 365-day year: $94,923.02 / 365 = $260.06**
      - **Days Worked Post-Termination Pre-Raise (September 5, 2021, to September 30, 2021): 26 days**
      - **Earnings Post-Termination Pre-Raise: $260.06 * 26 days = $6,761.56**
      - **Scheduled Raise Effective: October 1, 2021 (5% increase)**
      - **New Daily Salary Post-Raise: $260.06 * 1.05 = $273.06**
      - **Days Worked Post-Raise (October 1, 2021, to December 31, 2021): 92 days**
      - **Earnings Post-Termination Post-Raise: $273.06 * 92 days = $25,122.17**

- **Total Lost Wages for 2021: $6,761.56 (pre-raise) + $25,122.17 (post-raise) = $31,883.73**
b. **Projected Lost Wages for 2022**
    - **Projected Annual Salary with 5% Raise: $100,915.04**
c. **Projected Lost Wages for 2023**
    - **Projected Annual Salary with Cumulative Raises: $108,080.00**
d. **Projected Lost Wages for 2024**
    - **Projected Annual Salary with Cumulative Raises: $116,726.40**

**Total Lost Wages (2021 - 2024): $357,605.17**

**The above calculations are based on the assumption that the Plaintiff would have continued to be employed and received scheduled raises. These figures do not include any other compensatory damages, benefits, or interest that may be claimed.**

**Plaintiff reserves the right to seek lost wages up until the date of trial. Plaintiff also reserves the right to seek reinstatement and/or front pay, as well as any other equitable remedy available.**

2. <u>Liquidated Damages</u>
**Plaintiff claims liquidated damages for the Defendant's willful conduct, in the amount of $357,605.17.**

3. <u>Lost Benefits</u>
**Plaintiff is seeking the value of her lost benefits due to the Defendant's conduct, including but not limited to the lost value of her pension benefits under the Florida Retirement System. Plaintiff is in the process of calculating this amount and will supplement her response as necessary.**

**Plaintiff reserves the right to amend, supplement, or modify this response, as additional investigation and discovery is ongoing.**

**INTERROGATORY NO. 14**
In Paragraph 50 of the Amended Complaint in the Clark Litigation, you assert that Defendant acted with "deliberate indifference to the unlawful treatment complained of herein." Please identify with specificity, all facts and/or allegations that you contend support this allegation.

**<u>ANSWER</u>: Plaintiff objects to this interrogatory on the grounds that that it is unduly burdensome and represents an improper contention interrogatory.** *See* **Middle District of Florida Discovery Handbook IV(C)(2). Notwithstanding this objection and without waiving it, Plaintiff refers Defendant to the factual allegations contained in Plaintiff's Amended Complaint.**

**INTERROGATORY NO. 15**

Please identify by name and address each person whom you intend to call as a witness in a trial of your claims as asserted in your Amended Complaint in the Clark Litigation and describe the nature of the testimony they are expected to offer.

**ANSWER: Plaintiff objects to this interrogatory on the grounds that it seeks information protected by the work product doctrine and attorney-client privilege in requesting information about the mental impressions of counsel regarding trial strategy. Notwithstanding these objections and without waiving them, Plaintiff directs the Defendant to Plaintiff's answer to Interrogatory No. 2 for a list of potential fact witnesses known at this time.**

**INTERROGATORY NO. 16**

Identify all documents you reviewed, relied upon, referred to, or that in any way assisted you in answering any of the interrogatories contained herein.

**ANSWER: Pursuant to Federal Rule of Civil Procedure 33(d), Plaintiff has produced all non-privileged documents Plaintiff has relied on in response to Defendant's First Request for Production.**

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I, JENNA CLARK, declare under penalty of perjury

that the foregoing answers to Defendants' First Set of Interrogatories are true and correct.

Executed on _____11 / 20 / 2023_____.

_____

JENNA CLARK

Doc ID: 0c45a0c427125142822da6f7e1881fbacf6d69ad

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document is being served on November 20, 2023, on David J. Stefany, Esq., of Allen Norton & Blue P.A., Counsel for Defendant, 324 South Hyde Park Avenue, Tampa, FL 33606, email: dstefany@anblaw.com, via email transmission.

By: /s/ Kyle T. MacDonald
     Kyle T. MacDonald, Esq.

**Dropbox Sign**                                                    Audit trail

| | |
|---|---|
| **Title** | Responses to Defendant's Interrogatories |
| **File name** | Plaintiff's Respo...terrogatories.pdf |
| **Document ID** | 0c45a0c427125142822da6f7e1881fbacf6d69ad |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | • Signed |

## Document History

| | | |
|---|---|---|
| SENT | **11 / 20 / 2023**<br>20:04:23 UTC | Sent for signature to Jenna Clark (jennaclark1962@gmail.com)<br>from sign@dereksmithlaw.com<br>IP: 136.28.84.43 |
| VIEWED | **11 / 20 / 2023**<br>20:26:45 UTC | Viewed by Jenna Clark (jennaclark1962@gmail.com)<br>IP: 73.156.142.132 |
| SIGNED | **11 / 20 / 2023**<br>20:31:08 UTC | Signed by Jenna Clark (jennaclark1962@gmail.com)<br>IP: 73.156.142.132 |
| COMPLETED | **11 / 20 / 2023**<br>20:31:08 UTC | The document has been completed. |

Powered by **Dropbox Sign**

# EXHIBIT 27



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**

JENNA CLARK,

      Plaintiff,                          CASE NO.: 2:22-cv-614-SPC-NPM

    v.

CARMINE MARCENO, in his official
capacity as Sheriff of Lee County,
Florida,

      Defendant.

_____/

**PLAINTIFF'S RESPONSES TO DEFENDANT'S FIRST REQUEST FOR**
**PRODUCTION OF DOCUMENTS TO PLAINTIFF**

Plaintiff, JENNA CLARK ("Plaintiff" and/or "Ms. Clark"), by and through her undersigned

counsel, and pursuant to Rule 34 of the Federal Rules of Civil Procedure, hereby serves the

following responses to Defendant CARMINE MARCENO's First Request for Production of

Documents to Plaintiff Jenna Clark.

Dated:  Miami, Florida             **DEREK SMITH LAW GROUP, PLLC**
         November 20, 2023,         *Counsel for Plaintiff*

                             /s/ Kyle T. MacDonald
                             Kyle T. MacDonald, Esq.
                             Florida Bar No.: 1038749
                             Derek Smith Law Group, PLLC
                             520 Brickell Key Drive, Suite O-301
                             Miami, FL 33131
                             Tel: (305) 946-1884
                             Fax: (305) 503-6741
                             Kyle@dereksmithlaw.com

## QUALIFICATIONS AND GENERAL OBJECTIONS

1.     The objections set forth in this section apply to each of the Document Requests as if such objections were set forth in full in response to each of the Document Requests and are not necessarily repeated in response to each individual Document Request. The assertion of the same, similar, or additional objections in Plaintiff's specific objections to individual Document Requests, or the failure to assert any additional objection, shall not waive any of Plaintiff's objections set forth in this section.

2.     By responding to these Requests for Production of Documents, Plaintiff does not in any way adopt Defendants' purported definitions of words and phrases contained in Defendants' requests. Plaintiff objects to those definitions to the extent they are inconsistent with either (a) the definitions set forth by Plaintiff in her answers, or (b) the ordinary and customary meaning of such words and phrases. Similarly, Plaintiff objects to Defendants' purported definitions to the extent they attempt to impose upon Plaintiff any obligations broader than, or inconsistent with, applicable discovery rules or common law.

3.     Plaintiff further objects to the use of the term "all" in requesting documents or information on a given subject. Such a request is inherently vague and imprecise, lacks specificity and cannot be reasonably responded to. While the material provided in response to any request is intended to be complete, Plaintiff in no way represents that there might not exist other documents which might bear more or less directly on the issue.

4.     Plaintiff objects to the Definitions and Instructions contained in the Document Requests to the extent they purport to obligate Plaintiff to furnish documents not required by the State or Local Civil Rules, and/or impose obligations on Plaintiff beyond those required by the State or Local Civil Rules.

5.      Plaintiff objects to these Requests for Production of Documents to the extent they seek information protected by the attorney–client privilege, the work product doctrine or any other applicable privilege. Any inadvertent disclosure of material protected by any such applicable privilege or discovery immunity is not intended to and should not be construed to constitute a waiver of such privilege or immunity.

6.      Plaintiff objects to the Document Requests to the extent they seek personal, private, confidential or proprietary business information, documents, or things of Plaintiff or of third parties.

7.      Plaintiff objects to these Requests for Production of Documents insofar as they seek discovery of any material that constitutes the mental impressions, conclusions, opinions or legal theories of Plaintiff's counsel.

8.      Plaintiff objects to these Requests for Production of Documents insofar as they seek discovery of opinions of law which are beyond the scope of permissible discovery.

9.      Plaintiff does not hereby admit, adopt or acquiesce to any factual or legal contention, presumption, assertion or characterization contained in these Requests for Production of Documents.

10.     Plaintiff objects to these Requests for Production of Documents to the extent they are unreasonably cumulative or duplicative, vague, ambiguous, overly broad, unduly burdensome, or do not specify the information sought with sufficient particularity.

11.     Plaintiff submits these answers without conceding the relevancy or materiality of the subject matter of any Request for Production of Documents, and without prejudice to Plaintiff's right to object to future discovery or to object to the admissibility of any answer at the time of hearing or trial.

12.     Plaintiff objects to the Document Requests to the extent that they seek documents that are not in the possession, custody or control of Plaintiff.

13.     Plaintiff objects to the Document Requests to the extent they seek information gathered or assembled in anticipation of litigation or for trial, or documents or information otherwise subject to: (a) the work–product doctrine; (b) the attorney–client privilege; and/or (c) any other evidentiary privilege or immunity, including the self–critical analysis privilege. If any document protected from disclosure pursuant to any of these privileges or immunities is produced or made available inadvertently, such production or disclosure shall not be construed as a waiver of any of the Plaintiff's privileges or immunities.

14.     Plaintiff reserves the right to amend or supplement these answers and objections.

15.     These general objections are incorporated by reference into each specific answer made by Plaintiff to Defendants' Requests for Production of Documents. Without waiver of its general objections, Plaintiff responds, as follows:

## SPECIFIC RESPONSES TO DEFENDANT'S FIRST REQUEST FOR PRODUCTION

### REQUEST NO. 1
Any and all documents described or referenced in Plaintiff's Rule 26 Initial Disclosures in the Clark Litigation.

**RESPONSE: Plaintiff will produce responsive documents marked as Plaintiff Bates Nos. JC000001 – JC000283.**

### REQUEST NO. 2
Any and all documents that support, or relate in any way to the affirmative factual allegations made in Paragraphs 24-27, 29, 34 and 38-39 your Amended Complaint in the Clark Litigation.

**RESPONSE: Plaintiff will produce responsive documents marked as Plaintiff Bates Nos. JC000001 – JC000003.**

<u>REQUEST NO. 3</u>
Any and all documents, emails, and correspondence between Plaintiff and any current or former employee of the Defendant that relate in any manner to the legal claims asserted by you in the Amended Complaint in the Clark Litigation.

<u>RESPONSE</u>: **Plaintiff objects to this request on the grounds that it is overbroad and not properly limited in time and scope. Plaintiff further objects to the extent this request seeks documents already in the possession and/or maintained by the Defendant in this matter. Notwithstanding this objection and without waiver, Plaintiff will produce responsive documents marked as Plaintiff Bates Nos. JC000003 – JC000004.**

<u>REQUEST NO. 4</u>
Any and all documents that relate to your assertion that Defendant engaged in prohibited Interference and Retaliation in violation of the Family and Medical Leave Act ("FMLA"), as alleged in Counts III and IV of the Amended Complaint in the Clark Litigation.

<u>RESPONSE</u>: **Plaintiff will produce responsive documents marked as Plaintiff Bates Nos. JC000001-JC000002, JC000005-000007, and JC000012.**

<u>REQUEST NO. 5</u>
Any and all documents reflecting, concerning, or relating to the damages you allege you have suffered including, but not limited to any and all past and future wage losses, loss of benefits, tangible benefits, tangible or intangible damages, or medical records reflecting or otherwise memorializing Plaintiff's physical, emotional, or mental pain and suffering as set forth in the Amended Complaint.

<u>RESPONSE</u>: **Plaintiff objects to this request on the grounds that it is impermissibly vague and ambiguous in its use of the phrase "all documents … relating to the damages you allege you have suffered." This request, for example, could reasonably be interpreted to seek all documents related to the Plaintiff's employment. Notwithstanding this objection and without waiving it, Plaintiff will produce responsive documents marked as Plaintiff Bates Nos. JC000008-JC000011, JC000015-JC000048, JC000050-JC000095.**

<u>REQUEST NO. 6</u>
Any and all documents that relate to your assertion in Paragraphs 9, 21 and/or 95 of your Amended Complaint in the Clark Litigation that Defendant allegedly engaged in retaliation against you for opposing unlawful employment practices.

<u>RESPONSE</u>: **Plaintiff will produce responsive documents marked as Plaintiff Bates No. JC000012.**

**REQUEST NO. 7**

All documents reviewed or relied upon in developing responses to Defendant's First Set of Interrogatories in the Clark Litigation.

**RESPONSE: Plaintiff objects to this request on the grounds that it seeks information protected by the work product doctrine and attorney-client privilege. The preparation of a privilege log is not required for written and oral communications between a party and its counsel after commencement of this action and work product material created after commencement of the action. Notwithstanding these objections and without waiving them, Plaintiff is not in possession of any such documents other than those provided herein.**

**REQUEST NO. 8**

All exhibits Plaintiff intends to introduce at trial in the Clark Litigation.

**RESPONSE: Plaintiff objects to this request on the grounds that it invades the attorney client privilege and the attorney work product privilege because it seeks the mental impressions, ideas, and strategies of Plaintiff's counsel with respect to trial preparation. The preparation of a privilege log is not required for written and oral communications between a party and its counsel after commencement of this action and work product material created after commencement of the action. At this time, Plaintiff cannot determine which documents would be used at trial, and Plaintiff therefore directs Defendant to the responsive documents produced herein. Plaintiff will supplement this response to the extent further documentation is obtained that would be utilized during a trial, in a timely matter in accordance with the Federal Rules of Civil Procedure.**

**REQUEST NO. 9**

Any and all documents reflecting, concerning, or evidencing medical treatment or care, including without limitation, psychiatric, or psychological treatment or counseling, as a result of the incidents which are the subject of your asserted claims for damages the Clark Litigation.

**RESPONSE: Plaintiff directs Defendant to her medical records and a medical records release marked, respectively as Plaintiff Bates No. JC000096 – JC000214 and JC000215 - JC000216.**

**REQUEST NO. 10**

Any and all documents received from, filed with or submitted to the Equal Employment Opportunity Commission and/or the Florida Commission on Human Relations for any claims of discrimination made against Defendant, including all documents you submitted in support of your EEOC Charge, all documents sent to or provided to you by the EEOC during its investigation of your EEOC Charge, and all documents relating to the findings or determinations regarding your EEOC Charge.

**RESPONSE: Plaintiff will produce responsive documents marked as Plaintiff Bates No. JC000217-JC000283.**

**REQUEST NO. 11**
Any and all affidavits you have received, prepared, and/or obtained related in any way to your asserted claims in the Clark Litigation.

**RESPONSE: Plaintiff objects to this request on the grounds that it is overbroad and not properly limited in time and scope. Plaintiff further objects to this request on the grounds that it seeks information protected by the work product doctrine and attorney-client privilege. The preparation of a privilege log is not required for written and oral communications between a party and its counsel after commencement of this action and work product material created after commencement of the action. Notwithstanding these objections and without waiving them, none in Plaintiff's possession, custody, or control.**

**REQUEST NO. 12**
Any and all documents received as a result of any public records requests made in connection with the allegations you have raised in your Amended Complaint in the Clark Litigation.

**RESPONSE: None in Plaintiff's possession, custody, or control.**

**REQUEST NO. 13**
All documents reflecting your efforts to obtain alternative employment for the period of September 4, 2021, to the present, including but not limited to any resumes, cover letters, job applications, offer letters, emails, and/or online job postings which you have relied upon in making application for employment.

**RESPONSE: None in Plaintiff's possession, custody, or control.**

**REQUEST NO. 14**
All documents reflecting your interim income or earnings since your separation from employment with Defendant on September 3, 2021, including but not limited to all paystubs, W-2s, 1099s, social security payments, retirement account payments, and any documents pertaining to any reemployment assistance benefits you may have applied for or received under Florida law.

**RESPONSE: Plaintiff will produce responsive documents marked as Plaintiff Bates Nos. JC000050-JC000054 and JC000087-JC000095.**

**REQUEST NO. 15**

Complete copies of your Federal Income Tax returns with all supporting documents, including but not limited to W-2s, 1099s, etc., for tax years 2019, 2020, and 2021.

**RESPONSE: Plaintiff will produce responsive documents marked as Plaintiff Bates Nos. JC000055 – JC000086.**

**REQUEST NO. 16**

All diaries, logs, journals, calendars, notations, recordings, social media postings, electronic mail, social media messages, etc., created by you or at your direction related to the factual allegations of your Amended Complaint in the Clark Litigation, whether recorded at the time such events occurred or at any time thereafter.

**RESPONSE: Plaintiff is not in possession of any such documents other than those provided herein.**

**REQUEST NO. 17**

All reports, studies, and/or commentaries, whether formal or informal, of any expert witness, consultant, advisor, and/or investigator who you have retained to provide expert testimony or opinions in the Clark Litigation.

**RESPONSE: Plaintiff objects to this request to the extent that it seeks information protected by the work product doctrine and attorney-client privilege. Notwithstanding this objection and without waiving it, Plaintiff has not engaged an expert witness at this time. If one is engaged, Plaintiff will supplement her response in accordance with the Federal Rules of Civil Procedure and any applicable local rules.**

**REQUEST NO. 18**

All non-privileged documents containing, describing, expressing, embodying, or otherwise reflecting any communications or correspondence between you and any third-party concerning Defendant and/or the factual allegations raised in your EEOC Charge or your Amended Complaint in the Clark Litigation, including but not limited to emails, letters, text messages, written statements, pictures, communications made via social media accounts, copies of voice memos/voice mail messages, and/or other similar documents.

**RESPONSE: None in Plaintiff's possession, custody, or control other than the responsive document marked as Plaintiff Bates No. JC000217-JC000283.**

**REQUEST NO. 19**

Please execute the attached medical release for each and every physician, psychiatrist, mental health counselors, and/or health care providers you have visited and/or sought treatment from regarding the damages asserted in the Amended Complaint in the Clark Litigation.

**RESPONSE: Plaintiff will produce the responsive document marked as Plaintiff Bates No. JC000215 - JC000216.**

**CERTIFICATE OF SERVICE**

I **HEREBY CERTIFY** that a true and correct copy of the foregoing document is being served on November 20, 2023, on David J. Stefany, Esq., of Allen Norton & Blue P.A., Counsel for Defendant, 324 South Hyde Park Avenue, Tampa, FL 33606, email: dstefany@anblaw.com, via email transmission.

By: /s/ Kyle T. MacDonald
Kyle T. MacDonald, Esq.