```
 1               UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
 2   JENNA CLARK,

 3        Plaintiff,                    22-002723-CI

 4   vs.

 5   CARMINE MARCENO, in his
     official capacity as Sheriff of Lee
 6   County, Florida,

 7        Defendant.

 8   _____

 9   DEPOSITION OF:   JOHN HOLLOWAY

10   DATE TAKEN:      October 10, 2023

11   TIME:            10 a.m. - 1:01 p.m.

12   PLACE:           Everyone appeared remotely
                      via Zoom
13
     REPORTED BY:     MELISSA FERNANDEZ
14                    Court Stenographer

15

16   _____

17

18

19

20

21

22

23

24

25
```

```
 1   APPEARANCES:

 2        KYLE T. MACDONALD, ESQUIRE
          Derek Smith Law Group, PLLC
 3        Suite 1310
          701 Brickell Avenue
 4        Miami, Florida  33131
          (305) 946-1884
 5        kyle@dereksmithlaw.com
          (Appeared via Zoom)
 6
          APPEARED ON BEHALF OF THE PLAINTIFF
 7
          DAVID J. STEFANY, ESQUIRE
 8        Allen, Norton & Blue, PA
          Suite 225
 9        324 South Hyde Park Avenue
          Tampa, Florida  33606
10        (813) 251-1210
          dstefany@anblaw.com
11        (Appeared via Zoom)

12        APPEARED ON BEHALF OF THE DEFENDANT

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   TESTIMONY OF JOHN HOLLOWAY

 2        Direct Examination by Mr. MacDonald          4

 3   CERTIFICATE OF OATH                              70

 4   CERTIFICATE OF REPORTER                          71

 5   ERRATA SHEET                                     72

 6   READ & SIGN COVER PAGE                           73

 7                      - - - -

 8                S T I P U L A T I O N S

 9   It is hereby agreed and so stipulated by and between

10   the parties hereto, through their respective counsel,

11   that the reading and signing of the transcript is

12   expressly reserved by the Deponent.

13                    - - - - -

14                E X H I B I T S

15   Plaintiff's Exhibit 3
          Defendant's Bates label 4492                24
16   Plaintiff's Exhibit 4
          Defendant's Bates label 123                 27
17   Plaintiff's Exhibit 5
          Defendant's Bates label 4350                36
18   Plaintiff's Exhibit 6
          Defendant's Bates label 1316 through 1318   63
19   Plaintiff's Exhibit 7
          Defendant's Bates label 4386 through 4412   66
20

21

22

23

24

25
```

```
 1        The deposition of JOHN HOLLOWAY, was taken pursuant to

 2   notice by counsel for the Plaintiff on the 10th day of October,

 3   2023, commencing at 10 a.m.  Said deposition was reported by

 4   Melissa Fernandez, Court Reporter, Notary Public, State of

 5   Florida at Large.

 6                          *   *   *   *   *

 7                          JOHN HOLLOWAY,

 8    having been duly sworn, was examined and testified upon his

 9                         oath as follows:

10                   THE WITNESS:  I do.

11                      DIRECT EXAMINATION

12   BY MR. MACDONALD:

13        Q    Good morning, Mr. Holloway.  My name is Kyle

14   MacDonald and I represent Jenna Clark in her lawsuit against

15   Carmine Marceno in its official capacity as Sheriff of Lee

16   County, Florida.  Thank you for being here today.

17        A    Good morning.

18        Q    Can you please start by stating your full name for

19   the record, please?

20        A    John Holloway, H-O-L-L-O-W-A-Y.

21        Q    Have you ever been deposed before, Mr. Holloway?

22        A    Yes, but probably 30 years ago, 20 years ago maybe.

23        Q    Okay.  So even though you've been deposed before, I'm

24   just going to go over a few things just so we're on the same

25   page.  Okay?
```

 1       A     Yes, sir.

 2       Q     Do you understand that you've been placed under oath

 3  and that you have an obligation to testify truthfully today?

 4       A     Yes.

 5       Q     Do you understand that even though we are conducting

 6  this deposition via Zoom your testimony has the same force and

 7  effect as if you were testifying in a court of law before a

 8  judge and jury?

 9       A     Yes.

10       Q     Now, the court reporter cannot transcribe any

11  inaudible responses like a gesture or a shrug so just please

12  make sure you respond clearly just as you have been.  Okay?

13       A     Yes, sir.

14       Q     Now, the court reporter also cannot actively

15  transcribe responses if we speak at the same time, so I'll wait

16  for you to finish your responses and I just ask that you wait

17  until I finish my questions.  Is that fair?

18       A     Yes, sir.

19       Q     Now, we want to ensure that we get your best

20  testimony regarding this lawsuit so if there's a question that

21  you don't understand or is confusing, if you'd like me to

22  reword it, just let me know and I can try to rephrase it.

23  Okay?

24       A     Yes.

25       Q     And in that same regard, if you do not say anything

1    I'm going to assume that you understand the question as asked.

2    Okay?

3         A    Yes.

4         Q    If you need to go to the bathroom, take a break, get

5    a glass of water, anything like that, just let me know and we

6    can stop.  Okay?

7         A    Yes.

8         Q    And is there anything that will prevent you from

9    thinking clearly and testifying truthfully today?

10        A    No.

11        Q    Do you understand that you are here testifying on

12   behalf of the Lee County Sheriff's Office?

13        A    Yes.

14        Q    And do you understand that your answers are based not

15   only on your own personal knowledge but also all knowledge

16   known or reasonably available to the Lee County Sheriff's

17   Office?

18        A    Yes.

19        Q    And do you understand that your answers will be

20   binding on the Lee County Sheriff's Office?

21        A    Yes.

22        Q    I'm going to share my screen with you.  Can you see

23   the document that I'm showing?

24        A    Yes.

25        Q    Have you ever seen this document before?

```
 1        A     Yes.

 2        Q     And are you prepared to give testimony regarding the

 3   topic described in Paragraph No. 1?

 4        A     No.  I don't -- I'm not sure what -- each and every

 5   document provided by Defendant -- if it was provided by us I'm

 6   ready to acknowledge it.

 7        Q     So just so I understand your response clearly, you

 8   are prepared to testify regarding the topic in Paragraph

 9   No. 1, correct?

10        A     I am prepared -- I'm prepared to identify them and

11   to -- identify them.  There may be items on every document

12   provided.  I don't know if we provided thousands of documents,

13   but I should recognize them.  I should be able to authenticate

14   and identify them.

15        Q     Okay.  And are you prepared to testify regarding the

16   topic listed in Paragraph No. 13?

17        A     Yes.

18        Q     Okay.  Where are you conducting this deposition today

19   from?

20        A     From the Lee County Sheriff's Office headquarters at

21   14750 Six Mile Cypress Parkway in Fort Myers.

22        Q     And is anyone else in the room with you?

23        A     Yes, a technician is here to make sure that the

24   Team -- or Zoom works.  I'm technologically very challenged.

25        Q     Understood.  Do you have any documents in front of
```

Deposition of John Holloway                                    Jenna Clark v. Carmine Marceno

1   you today?

2        A    No, sir.

3        Q    What did you do to prepare for today's deposition?

4        A    I scanned the Amended Complaint and I believe I

5   scanned the Answers And Affirmative Defenses.

6        Q    Did you review any other documents besides those two

7   documents that you just described?

8        A    No.

9        Q    Did you speak with anyone about your deposition

10  besides the attorney for the Lee County Sheriff's Office?

11       A    Only to the extent of advising the Sheriff that I was

12  out-of-pocket during the deposition.

13       Q    Did Lee County Sheriff's Office conduct a reduction

14  in force in 2021?

15       A    Yes, sir.

16       Q    And can you describe to me what a reduction in force

17  is?

18       A    My understanding is a reduction in force consist of a

19  review of the positions and funding and expenses for the agency

20  and making determination -- determinations as to what

21  positions, if any, are necessary for the mission of the agency.

22  And then if there are positions that are not necessary for that

23  mission of the agency, to eliminate those positions.

24       Q    Why was a reduction in force conducted in 2021?

25       A    Because having been here at that time for I think

1    approximately eight years and having seen our operations and

2    having discussed operations with management and employees

3    alike, it became apparent that we needed to take action and

4    review more seriously whether or not all the positions that we

5    were funding were necessary.

6         Q    Who requested that reduction in force be conducted?

7         A    That's basically a two-part response.  One

8    initiative -- that's the wrong word.  One impetus came from me

9    because my job -- one of my jobs is to make sure that we

10   operate as efficiently and effectively as possible.  The

11   Sheriff has a vision and part of our mission is to operate as

12   businesslike as possible because we're dealing with taxpayers'

13   money.  The other was the Sheriff's instructions to me to

14   always be looking for opportunities to operate more efficiently

15   and effectively and if I find opportunities for that to bring

16   that to him for final approval.

17        Q    Who was the first person to propose the idea of a

18   reduction in force, you or the Sheriff?

19             MR. STEFANY:  In 2021, Counsel?

20             MR. MACDONALD:   Yes, in 2021.

21        A    That would have been me, sir.

22   BY MR. MACDONALD:

23        Q    And do you remember when you first proposed the idea

24   of a reduction in force in 2021?

25        A    Probably in -- it would have been in early 2021.

```
 1    Roughly, probably February or March getting more serious about
 2    it.
 3        Q    What do you mean when you say getting more serious
 4    about it?
 5        A    I mean, it's a continual obligation that I hold to
 6    constantly review agency operations and proposed transfers,
 7    promotions, demotions, proposed elimination when appropriate
 8    for positions as facts and circumstances change the needs and
 9    the funding available to meet those needs constantly change.
10    So we are always looking for opportunities to be better than
11    we've been before, even better than we've been before.  But at
12    that point I had proposed to the Sheriff that I be allowed to
13    research and make proposals for the elimination of positions
14    that would become evident as we spent more time and effort
15    looking at that.
16        Q    And was the Sheriff the first person that you
17    proposed that idea to?
18        A    Yes.
19        Q    When you first spoke with the Sheriff regarding the
20    reduction in force did you discuss the scope of positions to be
21    eliminated?
22        A    No.
23        Q    Did you discuss any specific items regarding the
24    reduction in force with the Sheriff?
25        A    No.
```

1    Q    What was the Sheriff's response when you brought this

2    idea to him?

3    A    Go ahead and bring me what you suggest when you're

4    ready to propose it, if and when, you're ready to propose it.

5    Q    And you said this was roughly in February or March?

6    A    Yeah, I would -- that's my recollection.

7    Q    What was the next step that you took in regard to the

8    reduction in force after that conversation with the Sheriff?

9    A    I devoted more of my time to personally walking

10   through and talking to employees throughout the agency with

11   more questions about who does what, who physically does what,

12   how are procedures done, what do we do, why do we do it, and

13   then I would talk, in addition to the people in the various

14   units in the agency, I talk to the managers and the directors

15   about what the workloads were, why were their workloads what

16   they were, why were we doing certain things, why didn't we do

17   other things, and then I would run with that information.  I

18   would talk to the command staff and ask them if they had other

19   ideas, other thoughts about areas that we were looking at on an

20   agency-wide basis, and eventually reached a determination as to

21   certain positions that weren't justified or couldn't be

22   justified in August of 2021.

23   Q    When did you first make the determinations as to what

24   positions could be eliminated?

25   A    Probably in July, I would say.  June or July.  It

```
 1   wasn't a certain date where you made the final determination as

 2   to those -- all of those that could be eliminated.  Some of

 3   them were relatively obvious and some of those required more

 4   observation, more research, more discussion.  So I think the

 5   final -- the final determination for moving forward with more

 6   than just one or two was probably in July or early August.  It

 7   was probably a week or two before that notifications were made,

 8   whenever that was.

 9        Q    Was that determination made solely by you or in

10   conjunction with any other employees of the Lee County

11   Sheriff's Office?

12        A    I had the final say, except for the Sheriff, of

13   course.  I had input from, as I said, almost everybody with

14   information, relevant information, I saw it, but at the end it

15   was my decision as to what individuals to include into the

16   proposal to the Sheriff.

17        Q    And when did you bring that proposal to the Sheriff

18   with the finalized positions to be eliminated?

19        A    I couldn't give you a specific date.  It would have

20   been a week or two before notifications were implemented.

21        Q    And did you speak to the Sheriff about this proposal

22   in person?

23        A    Yes.

24        Q    And what was included in that proposal that you

25   shared with the Sheriff?
```

1       A    Without having it in front of me, I believe it was

2    the number of positions, which positions, what the costs were

3    incurred to maintain those positions, discussion as to whether

4    the responsibilities assigned to that position warranted the

5    level of management for that position, how those

6    responsibilities would be absorbed elsewhere, whether or not

7    there was a need to make additional reductions in force.  And

8    it was -- those conversations are basically very business

9    oriented along with the desire to be accurate and to act

10   appropriately when you implement that decision.  To act

11   appropriately, I should say.  I'm sorry.

12       Q    How many positions did you propose to be eliminated

13   when you spoke to the Sheriff?

14       A    I believe it was six.

15       Q    What was the Sheriff's response when you shared this

16   proposal with him?

17       A    He agreed with making the proposal to implement the

18   proposal.

19       Q    Did the Sheriff discuss any of the specific positions

20   that were selected to be eliminated in your proposal?

21       A    Only to the extent of inquiring whether I had thought

22   about what responsibilities those positions held, whether those

23   responsibilities needed to exist, or those responsibilities

24   that did need to exist, whether they would be absorbed

25   internally within a department of a unit or would they be

1   transferred to another department or unit.  He made sure that I

2   had done my homework in that it was a reasonable and wise

3   business decision to make.

4        Q     Did the Sheriff approve your recommendations at the

5   conclusion of your conversation with him?

6        A     Yes.  I'm trying to think whether or not he -- I

7   believe he asked for some time to think about it.  I don't

8   recall how long that was, whether that was a day or whether

9   that was, you know, a day and a half, but I believe he took

10  some time to think about it.  And then he told me he agreed, go

11  ahead and implement that change.

12       Q     Did the Sheriff alter any aspects of your proposal or

13  did he approve it as you presented it?

14       A     Approved as presented.

15       Q     And you said that you consulted with other employees

16  of the Lee County Sheriff's Office before you finalized this

17  proposal; is that correct?

18       A     On a continuing basis.  At least one day a week I

19  leave my office and I tour the agency, and during that time

20  frame for that specific reduction in force that was the focus

21  of what my tours throughout the agency were, what my

22  discussions were, as opposed to discussing equipment or our

23  planes or discussing our helicopters.  I was looking

24  specifically what did people do, how did they do it, and was

25  there a way to do it more efficiently and effectively.

1    Q    Which employees of the Lee County Sheriff's Office

2    did you seek input on regarding this specific reduction in

3    force?

4    A    I could try to identify them all, but I didn't go to

5    the people and say I'm looking at a reduction in force.  I went

6    to -- for instance, I'd go to aviation and I would talk to the

7    unit heads of aviation, or in more generic sense, I talked to

8    almost every manager of every major unit in the agency.  I

9    talked to their folks that actually did the work, which is not

10   unusual.  Like I said, I do that every week anyway.  And so I

11   would say I sought input and obtained input as to the

12   operations and the staffing required for those operations from

13   dozens of people.  And then I would specifically --

14   specifically, I went to all of the command row and told them

15   what I was looking at proposing and did they have any input or

16   objections or thoughts that they wanted to offer.

17       So all upper management and pretty much all management of

18   any management that was relevant to those -- to the positions

19   that we were looking at because there were some areas that we

20   looked at that you just instantly knew they were already

21   understaffed and there was no opportunity -- they were already

22   operating effectively and efficiently.  Those that were of

23   interest you'd spend more time on.

24   Q    Do you recall which areas of the Lee County Sheriff's

25   Office were operating efficiently right off the bat from

```
 1   your --
 2        A     Certainly.  I guess I would say aviation, records.
 3   Those we are constantly adding more duties and responsibilities
 4   and obligations to those units without increasing their staff
 5   significantly it seems.  We have CRU.  I believe CRU was in
 6   effect back then, I'm not sure.  But the outreach efforts of
 7   the Sheriff, they are always very, very busy, and so there were
 8   a number of areas that when you looked and talked to the people
 9   you knew that they were running -- every second they were on
10   duty they were running accomplishing something that benefited
11   the agency.
12        Q     Do you recall which departments in the Lee County
13   Sheriff's Office you believed needed a closer look?
14        A     I believe, for instance, I remember traffic I think
15   had a secretary and when I spoke to the people in traffic and I
16   looked at what the traffic unit actually did, it was very
17   difficult for the people who ran the traffic unit to justify
18   why they needed a secretary when we had other people already
19   assigned to that unit that could easily absorb the limited
20   workload that person had.
21        I remember there was a, I think we called it a senior
22   specialist, something like that.  And as you looked into --
23   that was part of either CRU or Public Services.  I don't know
24   which it was called then.  But when you looked into that you
25   saw that the senior services folks were actually duplicating
```

1    work that was the responsibility of the county, I believe.   I

2    believe they had -- they were providing social work kind of

3    services that were already provided elsewhere by county

4    government and it didn't seem reasonable for the county

5    taxpayers to pay for that to be provided from two different

6    sources.   And if I remember right, a lot of the work of that

7    person was referring people to the county sources that already

8    existed and those referrals could be made easily by others who

9    encountered folks in need.

10        I remember there was a -- I remember the lady's name, Amy

11   Dell Aquila, I think it was.   I don't remember what role she

12   had, but I remember that role was one that had value, brought

13   value to the agency but better be done under a contract basis

14   because those needs appeared to me to be transitory in nature

15   and by having a contractor handle that if those needs came up

16   we could contract to have that done and when those needs went

17   away we could just simply not renew the contract or terminate

18   the contract.

19        I remember purchasing because purchasing we had a lot of

20   things happening in purchasing that were -- that had been

21   unnecessarily complicated and that took on a load of burden

22   that the agency really didn't need.   And I also noticed that

23   the workload in purchasing didn't seem to warrant all of the

24   employees at the time and the workload was not so complicated

25   and complex as to require a director.   And then I think there

 1   was another one, if you can refresh my recollection.  I know

 2   there were one or two others.

 3       Q    Was there any specific criteria that you used to

 4   select the positions to be eliminated for this reduction in

 5   force?

 6       A    Specific in that we were looking for effective,

 7   efficient operations.  And to the extent it became obvious that

 8   some positions weren't necessary for that goal to be met, that

 9   those positions either through, I guess you would call it

10   management inflation, we had reached a point where they

11   had -- management had outgrown its needs and we had directors

12   or other high management levels that just weren't doing any

13   director or high-level management work.  That was the decision.

14   There was no point system assigned.  There was no scientific

15   basis.  It was just ordinary management principles that work.

16       I remember the other one now, make sure I get you a

17   complete answer.  Fleet.  I think Fleet we had a management

18   position or a director position that at that time didn't

19   justify itself.  So I remember at Fleet we also made a change.

20       Q    In selecting positions to be eliminated you wanted to

21   make the agency more effective and efficient; is that correct?

22       A    Yes, sir.

23       Q    How did you specifically determine which positions or

24   departments could be run more efficiently besides your opinions

25   or thoughts from a management perspective?

```
 1        A    I wouldn't refer to it as opinions or thoughts.  It

 2   was simply applying common sense business experience to the

 3   facts and circumstances of the units as you look through them.

 4   Everything -- the decisions I reached to include into the

 5   positions in my proposal to the Sheriff were not borderline.

 6   They weren't marginal.  They were simply obvious areas where

 7   the taxpayer was paying more to provide public safety to the

 8   residents than it needed to pay because we had positions that

 9   didn't warrant or couldn't be reasonably justified.  But there

10   wasn't any point system assigned or any calculation of points

11   or money or anything like that.

12        Q    Was there any positions that were suggested by other

13   employees of the Lee County Sheriff's Office to be included in

14   the reduction in force?

15        A    Not that I recall.

16        Q    Did you ever consider using a more objective approach

17   like a point system or some kind of data analysis like you

18   described?

19        A    I think I did use data analysis.  I reviewed

20   workloads and observations and anecdotal comments and a variety

21   of factors at play, but I did not consider it as some kind of

22   mechanistic calculation.

23        Q    What factors did you consider?

24        A    The first was what did each unit do and were they

25   doing it in a way that was efficient.  Was it reasonable.  Were
```

1    units doing things that didn't need to be done because they had

2    done them that way for the last 20 years and they just do that

3    because it's habit to do it that way.  And then after you

4    determined from a few discussions and conversations, and I

5    should have mentioned looking at policies that existed at the

6    time, after you looked at that, ask, okay, these are what we

7    need to do, let's separate out what we don't need to do and now

8    that we have those out of the way, let's look at what we need

9    to do and who's in the best position to do it and what's the

10   best way to get it done.

11        And so as you went through unit by unit you could see

12   things that were baggage that had been added on throughout the

13   years, or procedures that had been implemented through the

14   years that were no longer valid or appropriate, and you simply

15   said, okay, we don't need to do those things, let's do these

16   things, and then who has to be there to make that happen.

17        Q    And you mentioned that you also reviewed the

18   workloads of positions; is that correct?

19        A    Yes.

20        Q    How did you review the workloads of the positions?

21        A    I would look at purchasing data, what did we buy for

22   units, what were the units -- what was the cost to maintain the

23   units, what were we getting out of the units.  And by units I

24   mean departments or divisions.  What resources were they

25   consuming.  And then I would talk to the employees.  I talked

 1   to many, many employees.  I talked to supervisors.  I talked to

 2   managers and asked them why do you do this, what's the purpose

 3   of what you're doing, do you have any ideas on how we can do

 4   this better.  And it was hands-on research talking to the

 5   people who actually performed or were responsible for the

 6   operation of the agency.

 7        Q    Did you give any consideration to the employees who

 8   were in those positions in selecting the positions to be

 9   eliminated?

10        A    From a human standpoint, of course; from a decisional

11   standpoint, no.

12        Q    Did you consider the performance of the employees

13   that were in those positions when you made the decisions as to

14   which positions to eliminate?

15        A    I don't believe so, no.

16        Q    Now, you said you looked at the resources that that

17   particular department or position was utilizing; is that

18   correct?

19        A    Yes.

20        Q    When you say "resources," do you mean money?

21        A    Money, time, friction, the business friction that's

22   created when you have unnecessary procedures and unnecessary

23   steps.  I looked at how -- what do you get from that unit, what

24   does it cost the taxpayers to fund that unit.  So it was an

25   apparent thing.  This wasn't something that was very on the

1   edge one way or the other.  The decisions to eliminate

2   positions were made -- the proposal was made based on clear and

3   convincing facts and circumstances that made those positions

4   unnecessary or untenable.

5       Q    What to you mean by untenable?

6       A    Unjustifiable.

7       Q    Unjustifiable in what sense?

8       A    Well, in the sense that we're spending other people's

9   money and the Sheriff's goal is always to provide the best

10  highest level of protection to the residents.  Money that is

11  diverted from deputies in the field from better equipment, from

12  the ability to provide the finest law enforcement that we can

13  provide, that's where you have to make the decisions, is this

14  position helping that goal or is this position harming that

15  goal because it's diverting money, time, effort, resources of

16  all kinds to a position that's not necessary.

17      Q    Did you give any consideration to the payroll costs

18  of the positions to be eliminated?

19      A    Not in making the decisions, no.

20      Q    Did the salaries of the individuals that were in the

21  positions to be eliminated have any bearing on the decision as

22  to which positions would be eliminated?

23      A    No.

24      Q    Wouldn't the salaries of these positions have an

25  impact on the resources the departments use?

```
 1        A     Yes.

 2        Q     But you did not consider the salaries of these

 3   positions?

 4        A     Not in making the decision.  If we had a secretary

 5   position that was unnecessary, how much the individual who

 6   happened to be occupying that position made would influence the

 7   end result of how much money was being diverted, for lack of a

 8   better word, wasted, but that -- if I could not waste $30,000,

 9   I'm happy not to waste that or divert it as well as if it's

10   $150,000.  At the end we added all up the numbers, but those

11   numbers didn't influence my proposal as to which positions were

12   unnecessary because this was about the position, not the

13   person.

14        Q     Did you look at the pay scale of those positions?

15        A     Eventually I would and I did.  I'm sure at some point

16   I would have to get those numbers so I could quantify for the

17   Sheriff how much the proposal would either save or if in the

18   event we reached the decision that no positions could be

19   eliminated, how much, it became irrelevant.  So, yeah, at some

20   point in time I gathered that information.

21        Q     Did you ever consider eliminating higher paying

22   positions as opposed to lower paying positions?

23        A     No.  We looked at positions and whether they were

24   high or low just for the decision-making of which positions

25   were not needed, we didn't look at the salaries or any other
```

```
 1   factor other than is that position something that we need or

 2   not.

 3       Q    Did the seniority of the individuals in those

 4   positions play any role in your decision-making?

 5       A    No.

 6       Q    I'm going to show you a document.

 7            MR. MACDONALD:  We will mark this as Plaintiff's

 8       Exhibit 3 and it is Defendant's Bates label 4492.

 9            (Whereupon, Plaintiff's Exhibit 3 was marked for

10       identification.)

11   BY MR. MACDONALD:

12       Q    I'll zoom in here.  Can you see what I'm showing you?

13       A    Yeah.  Yes, I can.

14       Q    I'll give you a minute to review it.

15            MR. STEFANY:  Kyle, what was the Bates number?

16            MR. MACDONALD:  It is 4492.

17            MR. STEFANY:  Thank you.

18       A    Yes, sir, I reviewed it.

19   BY MR. MACDONALD:

20       Q    Do you see the message -- or sorry, strike that.  Do

21   you recognize this document I'm showing you?

22       A    Yes.

23       Q    What is it?

24       A    It appears to be an e-mail from me to Dawn Heikkila

25   copied in Abbi Smith and Antoinette about the reduction in
```

```
 1   force -- about a reduction in force.

 2        Q    And do you see this message dated June 20th, 2019 at

 3   9:42 a.m.?

 4        A    Yes.

 5        Q    And was this message written by you?

 6        A    Yes.

 7        Q    Is the reduction in force that you mentioned in this

 8   message the same one that we have discussed in 2021?

 9        A    I believe so, yes.

10        Q    And this message is addressed to Dawn Heikkila you

11   said, correct?

12        A    Yes.

13        Q    And in the message you're informing Ms. Heikkila that

14   the Sheriff has approved the reduction in force that were

15   recommended; is that right?

16        A    Yes.

17        Q    Do you know what specifically was recommended to the

18   Sheriff in this message that you're referencing?

19        A    I believe it was the eventual reduction in force that

20   took place.

21        Q    So you were discussing the positions to be eliminated

22   in 2021 in this message in 2019?

23        A    No, I'm sorry, I got confused.  I did not read the

24   2019.  That's my mistake.  I apologize.  I believe we had a

25   reduction in force in 2019.  If it's dated 2019, it's probably
```

1   about the reduction in force that occurred in 2019.  I

2   apologize.  I'll be more careful.  I saw the June 20th and

3   thought I was a month early on my -- or a month late on my

4   earlier answer.  But in 2019 I thought we also had a reduction

5   in force.

6        Q    So to the best of your recollection this is

7   referencing a different reduction in force than the one in 2021

8   that we discussed?

9        A    Yes.

10       Q    Who is the Operations and Legal Services Bureau?

11       A    That was a bureau that I was Chief of Legal and

12  Operations.  I came to the agency as the Chief of Legal

13  Services and the Sheriff added operations to my

14  responsibilities.  So back then, June of 2019, I was still

15  Chief of Operations and Legal Services dealing with the same

16  issues from a different position.  At some point I got moved

17  over to Undersheriff.

18       Q    So this was before you were in your current role at

19  the Lee County Sheriff's Office?

20       A    Yes, sir.

21       Q    How many reductions in force has the Lee County

22  Sheriff's Office conducted while you have been working at the

23  Lee County Sheriff's Office?

24       A    We've had two of significance, but we have constantly

25  created and eliminated positions.  Much of the time those

 1    positions are not occupied at the time we eliminate them.  So

 2    it's a constant -- we're constantly trying to operate as

 3    efficiently as possible, but on at least two occasions, one in

 4    2019 and one in 2021, we encountered positions that had folks

 5    occupying them, several positions that had folks occupying

 6    them.

 7         Q    Do you recall how many positions were eliminated in

 8    2019?

 9         A    I am -- my recollection is about the same number,

10    five or six.

11         Q    And to the best of your recollection the two

12    reductions in force that took place while you've been at the

13    Lee County Sheriff's Office was one in 2019 and then one in

14    2021; is that correct?

15         A    That's my recollection.

16         Q    I'm going to show you another document.

17         MR. MACDONALD:  We're going to mark this as

18         Plaintiff's Exhibit 4 and it's Defendant's Bates label

19         123.

20    BY MR. MACDONALD:

21         Q    And I'll give you a minute to review this.

22         A    Yes.  Yes, sir, I reviewed it.

23         Q    Do you recognize the document that I'm showing you?

24         A    Yes.

25         Q    What is it?

1    A    I believe it's a document that was created by LCSO by

2    our HR folks.  I believe I've seen it, but, you know, it

3    didn't -- I think it's one of the documents we generated.

4    Q    And do you see that there is -- sorry, strike that.

5    Do you see that there is a list of positions on the left-hand

6    side here?

7    A    Yes, sir.

8    Q    Were these the positions that you selected to be

9    eliminated as part of the reduction in force in 2021?

10   A    Yes, sir.

11   Q    Were there any positions that were eliminated as part

12   of the reduction in force that are not on this list that you

13   see?

14   A    The difficulty is referring to it as a reduction in

15   force.  We eliminate positions routinely, but as far as this

16   particular event, those are the only ones that I am aware of.

17   Q    And these positions listed weren't eliminated as part

18   of routine operations, they were eliminated as part of a

19   reduction in force; is that correct?

20   A    To the extent that the reduction in force is not

21   considered routine, yes, sir.  I just -- it's very possible

22   that there were other positions eliminated.  I don't want to

23   say at that time, but at some point before or after, but this

24   was the specific reduction in force that I proposed to the

25   Sheriff.

1    Q    In the year 2021 did you propose any other positions

2    be eliminated for any reason other than the individuals -- or

3    sorry, other than the positions listed here?

4    A    I would assume so.

5    Q    Do you recall any positions that were eliminated in

6    2021 that are not listed here?

7    A    Not specifically, but anytime somebody retires,

8    resigns, or a position becomes open, or it comes to our

9    attention, one of my first questions to that management unit

10   is, do you need it.  So, for instance, if somebody resigns or

11   retires out of any unit, I'm going to ask the manager of that

12   unit do you need that position, can you reassign those duties,

13   do we have to fill that, because it's an opportunity.  If

14   something is brought to your attention, it's kind of in your

15   face, that's a good time to ask yourself how you're operating

16   and whether or not you can make savings and be more effective.

17   Any time something pops up that brings something to your

18   attention, our management philosophy is you look at it.  But

19   off the top of my head I can't recall which ones.

20   Q    But you do recall that other positions were

21   eliminated in the year 2021 besides those listed here?

22   A    No.  I'm making that assumption simply that we have

23   1700 employees and if it turns out that we can relocate

24   somebody or we can take affirmative steps to operate more

25   efficiently, we'll do that.  And sometimes I have to believe

```
 1   that in the past that's resulted in eliminating a position here
 2   or there in the agency.
 3        Q    And that sometimes happens in the context of someone
 4   retiring; is that correct?
 5        A    Or somebody requesting a transfer or a need in an
 6   agency to TDY somebody from this location to another location.
 7   Just this morning I TDY'd a captain from point A to point B and
 8   I asked that manager let me know whether you can operate
 9   without that person on a permanent basis -- without that
10   position on a permanent basis.  That may turn out to be true
11   and if so then we will eliminate that position because it will
12   give us a chance, give us the opportunity.
13        Q    Did you say TTY?  Is that --
14        A    Temporary duty.  I'm sorry, TDY, Thomas, Delta,
15   Yankee.  I apologize for using nomenclature like that.
16        Q    No worries.
17        A    We're just moving that captain temporarily to fill a
18   need in the agency.  And I ask that captain's supervisor, he's
19   not going to be here for the next several months, let me know
20   whether or not you can operate without that slot.  It wouldn't
21   ordinarily occur to me to do that, but if the facts present
22   themselves, it's an opportunity to examine the needs.
23        Q    When you consider eliminating a position in that
24   context of retirement or otherwise, do those have to be
25   approved by the Sheriff as well?
```

1     A     If they are significant roles that will impact on the

2   agency as a whole I will bring that to the Sheriff's attention

3   and ask for his approval.   If it's a mid-level change that

4   won't impact the agency as a whole, won't have a significant

5   impact, he trusts me to make those day-to-day business

6   decisions.

7     Q     So you're not required to necessarily get the

8   Sheriff's approval to eliminate a position; is that correct?

9     A     I'd say that's fair.   Now, if the Sheriff disagrees

10   with me, because he has a good finger on the agency, he knows

11   what goes on, he won't hesitate to come to me and ask me to

12   justify that decision.

13     Q     Now, looking at the list of positions on the document

14   that I'm showing you, what is the first position listed?

15     A     Senior Services Coordinator.

16     Q     Was this one of the positions that you recommended to

17   be eliminated as part of the reduction in force?

18     A     Yes.

19     Q     Why did you think this position should be eliminated?

20     A     That's the position where we were employing -- that

21   position is for basically a social worker to work with folks

22   and help guide them to services that are being provided by the

23   county and the state, and to, as I understood it, to kind of

24   facilitate those referrals.   The problem being is, the county

25   already provided the majority of those services.   The state

1   provides those services.  And my recollection was that the

2   county already had a large outreach program to reach people who

3   can utilize those services so that position was somewhat

4   redundant to the services already provided elsewhere.  And the

5   referrals that were mentioned were already being made by

6   detectives and patrol officers and our outreach program were

7   already doing that.  It was a position that didn't seem to have

8   a need.  It was a solution in search of a need, I should say,

9   is how it seemed to be at the time.

10       Q    And you said you felt that this position was

11  redundant?

12       A    It was redundant in the sense that the services were

13  already provided elsewhere and as a law enforcement agency we

14  want to focus on keeping people safe and while it doubtless was

15  a good thing to do if you had unlimited funds and unlimited

16  financing, it was not the best utilization of limited

17  resources.

18       Q    So just to make sure I understood you correctly, you

19  believe that this position was redundant only in the sense that

20  outside organizations provided those services, not that another

21  position in the Lee County Sheriff's Office was performing

22  those same job duties, correct?

23       A    No, I think -- as I understood that coordinator's

24  role, they would contact seniors who had issues with a variety

25  of things, many of which were unrelated to crime or law

1   enforcement, and they would work with that person to try to

2   direct them toward programs that could possibly help them deal

3   with whatever challenges life was placing in their path.

4   That's obviously a wonderful thing, but it's not the focus of a

5   Sheriff's Office.  And when our detectives and/or patrol

6   deputies encounter people who are encountering those problems,

7   they also hand out brochures and provide information as to what

8   programs are available at the county and state level and

9   sometimes federal level to help those individuals.  It was a

10  social worker program.  And there's nothing wrong with that,

11  it's just that that need was being filled internally and

12  externally.

13      Q    Which positions internally were performing those job

14  duties?

15      A    The deputies and the detectives as they encountered

16  people who had issues.  For instance, somebody would make a

17  phone call that said their mother or father was being

18  financially abused by some caretaker or such.  If the

19  investigation revealed that there wasn't a crime involved, they

20  would refer these people over to the county or the state

21  programs that helped and were specifically designed to assist

22  senior citizens with those issues.

23      Q    Are there any positions besides the deputies and

24  detectives that you believe perform similar job functions to

25  the Senior Services Coordinator?

1        A    I believe almost every member of the agency if they

2   become aware of a senior citizen with any kind of issue,

3   whether it be criminal or noncriminal, will assist that

4   individual by referring them to our agency if it's a criminal

5   matter and referring them to the appropriate county, state, or

6   federal program.  We constantly throughout the agency encounter

7   people who have problems that law enforcement can't solve and

8   my belief is that every member of the agency would make those

9   referrals unhesitantly.

10       Q    And the person that was in that role at the time of

11  the position elimination was Jamie Bartz; is that correct?

12       A    Yes.

13       Q    And Jamie Bartz was 58 years old at the time her

14  position was eliminated; is that correct?

15       A    Yes.

16       Q    And which department is the Senior Services

17  Coordinator a part of at the Lee County Sheriff's Office?

18       A    Back in '21 I think that would have been CRU,

19  Community Resource Unit.  It's our outreach program.

20       Q    And you said that's called Crew, C-R-E-W?

21       A    C-R-U.

22       Q    And under that comment section of the document I'm

23  showing you it says, retired/position eliminated, correct?

24       A    Yes, sir.

25       Q    What does retired/position eliminated mean?

1    A    It means that that position was eliminated and the

2    individual who occupied that position had retired.

3    Q    And if it says retired/position eliminated, does that

4    mean that the person filling that role was asked to retire?

5    A    No.

6    Q    Does it mean that the person voluntarily chose to

7    retire from their job and then the position was eliminated?

8    A    It could mean either that the position was eliminated

9    and rather than take another position with the agency the

10   individual retired, or it could mean that they retired and as a

11   result we were not going to keep that position in any event.

12   Q    For the Senior Services Coordinator specifically, do

13   you know if Jamie Bartz was asked to retire?

14   A    I know that we never ask anybody to retire.

15   Q    What do you mean by that?

16   A    We never ask anyone to retire.  We never ask anyone

17   to resign.  Retirement is a voluntary source of whoever is

18   involved.  If they choose to retire we'll help them as best we

19   can, and if they chose not to retire, they choose not to

20   retire.  I don't mean to be flippant.  It's not in our control

21   whether someone retires or not.

22   Q    What happens if a person's position is being

23   eliminated and they choose not to retire?

24   A    Then they are offered the opportunity to apply for

25   any other open position in the agency that he or she is

1   qualified for.

2       Q    What if they don't apply for a position?

3       A    That's a personal decision on their part.

4       Q    They would lose their job, though, correct?

5       A    They would choose to retire or to resign.

6       Q    I'll come back to that in a moment.  I want to show

7   you a document.

8            MR. MACDONALD:  We'll mark this as Plaintiff's 5 and

9       it's Defendant's Bates label 4350.

10           (Whereupon, Plaintiff's Exhibit 5 was marked for

11       identification.)

12  BY MR. MACDONALD:

13       Q    And I'll give you a minute to review this.

14           MR. STEFANY:  And, Kyle, while he's looking at that,

15       what was Exhibit 2?

16           MR. MACDONALD:  Exhibit 2 was the policies from the

17       last deposition so they're numbered consecutively.

18           MR. STEFANY:  Okay.  So you skipped in this

19       deposition and went from 1 to 3?

20           MR. MACDONALD:  Correct, yes.

21           MR. STEFANY:  That's what I missed.  Thank you.

22       A    I've read that, sir.

23  BY MR. MACDONALD:

24       Q    Do you recognize the document that I'm showing you?

25       A    Yes, sir.

1    Q    What is it?

2    A    It's a letter from Dawn Heikkila, the Human Resources

3   Director to Ms. Clark, Jenna Clark, I'm sure.

4    Q    And in this letter Ms. Clark is given the decision to

5   retire or her appointment will be withdrawn; is that correct?

6    A    It says she's going to be given an opportunity to

7   retire and then it says if she hasn't reached a decision her

8   appointment will be withdrawn.

9    Q    So what are her choices in regards to that decision

10   in this letter?

11    A    The letter is giving her an opportunity to retire and

12   if she doesn't, if she doesn't make a decision as to her future

13   by September 3rd, her appointment will be withdrawn.

14    Q    What does it mean for someone's appointment to be

15   withdrawn?

16    A    They'll be terminated.

17    Q    So based on this letter Ms. Clark was given the

18   decision to retire or be terminated, correct?

19    A    Based only on this letter.  This letter does not

20   include the option to seek employment elsewhere in the agency.

21   Why this letter says that, I couldn't tell you, other than it

22   appears that Ms. Clark has indicated the desire to retire.

23    Q    You believe that Ms. Clark had indicated that she

24   wanted to retire?

25    A    Reading the letter I think that's a possibility.

```
 1        Q     Did you ever review this letter before it was sent

 2   out?

 3        A     No, I don't recall reviewing it.  If I did, I don't

 4   recall it.

 5        Q     And do you know if the reduction in force referenced

 6   in this letter is the reduction in force that you conducted on

 7   behalf of the Lee County Sheriff's Office?

 8        A     Yes.

 9        Q     Do you know if this letter was sent to the other

10   individuals that had their positions eliminated as part of the

11   reduction in force?

12        A     I don't know if they received individual letters or

13   whether this was a standard letter.

14        Q     Besides Jenna Clark were any of the other positions

15   that were eliminated given the choice to either retire or have

16   their appointment withdrawn like the letter states?

17        A     I think everyone whose positions were eliminated had

18   the opportunity to retire if they had the time in FRS or seek

19   employment elsewhere in the agency.  Retirement to me is an FRS

20   issue.  People use it liberally.  But you can retire from the

21   agency but not retire from FRS.  But as far as I understand it,

22   retirement is an FRS issue.

23        Q     And what does FRS stand for?

24        A     Florida Retirement System.

25        Q     And what's the difference between the FRS retirement
```

1   that you referenced and retirement from the agency?

2        A    Retirement from the agency is more -- I can't think

3   of the right word.  People bandy that word around, but it

4   really doesn't have any meaning other than you left after a

5   long time under good circumstances or you chose to leave.

6   Whether somebody is retired for what I deal with on a

7   day-to-day basis is whether or not they have filled out an

8   application with the Florida Retirement System asking to start

9   receiving benefits.  And so we use that term around here, but

10  it's both.  You can talk about retirement from the agency or

11  you can talk about actually retiring with FRS and starting to

12  collect your pension.

13       Q    In this letter do you know if they're referencing

14  retiring with the FRS system or retiring from the agency?

15       A    I believe they're referring to the FRS system because

16  they refer to the FRS and that's why I think it must have had

17  something to do with her indicating a desire to retire because

18  she could obvious continue working with the agency if there was

19  a position that she wanted that she was capable of and was

20  open.

21       Q    Do you know if Ms. Clark ever expressed an interest

22  in retiring from the agency?

23       A    I know she in conversations with her she oftentimes

24  referred to retirement.  As a government employee in an FRS

25  pension plan, that becomes the topic of a lot of conversation

1   around the agency as people come closer and closer to being

2   able to draw checks.

3       Q    Did you ever discuss retirement specifically with

4   Ms. Clark?

5       A    No.

6       Q    And there are certain eligibility requirements for

7   retiring in the FRS system, I imagine, correct?

8       A    Yes, sir.

9       Q    And you have to meet some set of requirements to

10  begin drawing checks as you described it, correct?

11      A    Yes.

12      Q    So going back to Exhibit 4, do you know if Jamie

13  Bartz we eligible to begin drawing checks in the FRS system?

14      A    No, sir, I do not know.

15      Q    And on this list under Jenna Clark's employment

16  position it also says retired/position eliminated; is that

17  right?

18      A    Yes.

19      Q    Now, moving to the second position listed here, what

20  position is that?

21      A    Secretary of Traffic.

22      Q    And that position at the time of its elimination was

23  filled by Marsha Sprankel; is that correct?

24      A    I don't know if it was occupied at the time, but

25  she's listed as working in that position.  I believe she was

 1   still working in that position when the position was

 2   eliminated.

 3        Q    Does Marsha Sprankel still work for the Lee County

 4   Sheriff's Office?

 5        A    I don't believe so because the last column says

 6   retired/position eliminated.  I don't believe she works for us

 7   now.

 8        Q    And the document list Marsha Sprankel's age as 66

 9   years old; is that correct?

10        A    Yes, sir.

11        Q    And what department is Secretary of Traffic in?

12        A    That was administrative assistant/secretary for the

13   Traffic Unit.  We have -- it varies on the number of deputies

14   assigned to the Traffic Unit that they operate the motorcycles

15   and they are specifically assigned to deal with traffic issues,

16   traffic crashes, and traffic homicide.  They're a specialized

17   patrol unit.

18        Q    And why did you select the Secretary of Traffic

19   position to be eliminated?

20        A    Because in conversations with, I think it's

21   Lieutenant Petracca and others, it became apparent that there

22   was -- the duties that the Secretary of Traffic had were easily

23   absorbed by the other members who were already in traffic and

24   those that couldn't be absorbed would be handled by records or

25   some other unit.

1      Q     Were the duties of the Secretary of Traffic absorbed

2   by another position in the Lee County Sheriff's Office?

3      A     They were absorbed internal and in the traffic unit,

4   and my recollection is some of them were also assumed by the

5   records folks.

6      Q     And do you see the date next to the retired/position

7   eliminated comment?

8      A     Yes, sir.

9      Q     What's that date?

10     A     February 28th, '21.

11     Q     And it looks like the date for the Senior Services

12  Coordinator is 1/31/2021; is that correct?

13     A     Yes, sir.

14     Q     These two positions, the Secretary of Traffic and

15  Senior Services Coordinator, how were they eliminated in

16  January and February if you had spoken to the Sheriff about

17  eliminating these positions in roughly July or August?

18     A     They were eliminated with the reduction in force in

19  that we did not fill them.  As I said, some of these slots --

20  every time there is an opportunity to reexamine we try to

21  reexamine, and these positions apparently were already empty

22  and so we didn't fill those positions.  We eliminated them.

23     Q     So did you discuss the Secretary of Traffic position

24  and the Senior Services Coordinator position with the Sheriff

25  in July or August of 2021?

1    A    Yes.  That would have been part of the package.

2    Q    Those two positions were part of the proposal that

3  you shared with the Sheriff?

4    A    The proposal I shared with the Sheriff was what was

5  implemented and if -- and I believe they were.  If these were

6  included I would have simply gone through them and identified

7  these are not -- those that weren't filled at the time, I would

8  have mentioned them.  They wouldn't have been the source of a

9  lot of discussion.  You know, a traffic secretary is probably

10  something that wouldn't get a lot of discussion, especially if

11  they didn't have one at the time.

12    Q    So when you had shared those two positions as part of

13  the reduction in force with the Sheriff they had already been

14  eliminated?

15    A    If they were part of the package, because this list

16  seven, I think this list seven of these, and I thought we

17  eliminated six in the reduction in force that we're talking

18  about.  So if they were part of that packet they would have

19  been part of the discussion.  Whether or not somebody occupied

20  the position or not was not a basis for the decision.  It would

21  have simply been a factor that needed to be acknowledged but it

22  wouldn't be part of the decision.

23    Q    Did the Sheriff approve the decision to eliminate the

24  Senior Services Coordinator and the Secretary of Traffic when

25  you spoke with him in July or August of 2021?

1      A    He would have approved them if they were part of the

2  package.  I recall the Senior Services Coordinator and the

3  Secretary of Traffic I believe were part of the original six in

4  the first document you showed me, the six that you said those

5  were eliminated.

6      Q    So when you spoke to the Sheriff in July or August of

7  2021 to get his approval regarding the six positions, some of

8  them had already been eliminated when you spoke with him?

9      A    Yes, I believe so.

10      Q    Which positions had not been eliminated when you

11  spoke with the Sheriff in July or August of 2021?

12      A    It looks like according to those notes Amy, the

13  Community Liaison position, the director of Fleet Management,

14  and the Communications Manager.

15      Q    Now, you weren't proposing that the Secretary of

16  Traffic or Senior Services Coordinator position be eliminated

17  when you spoke with the Sheriff because they had already been

18  eliminated; is that correct?

19      A    They hadn't been filled.  They were -- the position

20  itself, the slot was what was eliminated, not the individual

21  just the slot.

22      Q    But the position, the Senior Services Coordinator and

23  the Secretary of Traffic, those positions were not a part of

24  the proposal because they had already been eliminated; is that

25  correct?

1       A     No, I believe they were part of the proposal.   I

2   think the earlier document you showed me said that there were

3   six positions that were eliminated.

4       Q     Let me ask it a different way.   For the Senior

5   Services Coordinator and Secretary of Traffic there was no

6   approval because the positions had already been eliminated?

7       A     No.   They hadn't been filled.   The slot -- the

8   position can't exist without a person filling the position.   We

9   have at any one time many positions in the agency that exist

10  without people in them and sometimes we go ahead and eliminate

11  the position if it turns out that we're operating well without

12  that position being filled.

13      Q     So it's your understanding that when you spoke to the

14  Sheriff in July or August 2021 that the Senior Services

15  Coordinator and Secretary of Traffic were vacant and that the

16  positions hadn't been eliminated?

17      A     My understanding and my recollection is there were

18  six positions that were eliminated according to the documents

19  I've seen, and I ran those positions by the Sheriff who agreed

20  to eliminate those positions that were identified in that

21  letter that you showed me or that document you showed me.

22      Q     Regardless of whether the position was vacant, what

23  was the date the Senior Services Coordinator position was

24  eliminated?

25      A     My recollection is it was eliminated at the time all

Deposition of John Holloway                                    Jenna Clark v. Carmine Marceno

```
 1   of the other positions were eliminated.  That's my

 2   recollection.

 3        Q    Okay.  That would have been in July or August of

 4   2021?

 5        A    Yes.  Now, it could be -- no, I think that's when it

 6   happened.  Like I said, when you talk about positions being

 7   eliminated, it's -- I understand I gave this to the Sheriff, we

 8   talked about it, and he approved eliminating those positions.

 9   If he had said don't eliminate those positions or any

10   particular position, we would have tried our best to fill it.

11        Q    And regardless of whether it was vacant, the

12   Secretary of Traffic position, when was that position

13   eliminated?

14        A    My recollection is it was part of -- the official

15   approval from the Sheriff came as part of this package.

16        Q    And that would have been in July or August of 2021?

17        A    That would have been when the Sheriff approved it and

18   when I would anticipate that would be officially, and I'm

19   making air quotes here, officially eliminated.  (Witness

20   indicating.)

21        Q    Do you know if the Senior Services Coordinator

22   position or Secretary of Traffic position received a letter

23   similar to the one Jenna Clark received at any point?

24        A    I believe they received a letter.  Whether it was the

25   same letter or one that was individualized for them, I don't
```

1   know that.  I don't recall that.

2       Q    Now, what is the third position on the list here?

3       A    Major of Professional Standards.

4       Q    Why did you decide to eliminate the position for the

5   Major of Professional Standards?

6       A    Because we didn't need a major in that role.  What we

7   did was we moved the responsibility of Professional Standards.

8   I believe we assigned that to Legal, and we moved training over

9   to another unit to oversee.  And I believe that unit also for

10  some reason was responsible for records and records was

11  absorbed by I believe Legal.  So we just reassigned the

12  responsibilities and didn't fill that position and eliminated

13  it as unnecessary.

14      Q    Were the duties of the Major Professional Standards

15  absorbed by any other positions in the Lee County Sheriff's

16  Office?

17      A    I apologize.  I didn't hear that, sir.  Could you say

18  that again?

19      Q    Yeah, no problem.  Were the duties of the Major of

20  Professional Standards absorbed by any other positions in the

21  Lee County Sheriff's Office?

22      A    Yes, sir.

23      Q    And which positions absorbed the duties of the Major

24  of Professional Standards position?

25      A    My recollection is Internal Affairs was absorbed by

1    Legal, our Legal Services.  Records I think was also absorbed

2    by Legal Services, and training was transferred to, it might

3    have been Patrol.  It was transferred somewhere else.  And

4    there was nothing -- there was nothing for a major somebody at

5    the level.  We didn't need another major at that time at that

6    level.

7        Q    At the time this position was eliminated Traci Estep

8    filled that role?

9        A    She either filled that role or she had retired on

10   June of '21.  So it looks like it's contemporaneous with the

11   discussions.

12       Q    What would have been contemporaneous with the

13   discussions?

14       A    If as the comment notes she retired on 6/24 of '21,

15   that would have been contemporaneous with the review we were

16   taking of all the agency to see where we could operate more

17   effectively.  So based on that date I'm guilty of the

18   assumption that that was contemporaneous to what we were doing.

19       Q    And Traci Estep was 48 years old at the time her

20   position was eliminated; is that correct?

21       A    Yes, sir.

22       Q    And in the comment box next to Traci Estep it says:

23   retired/position eliminated; is that right?

24       A    Yes, sir.

25       Q    And the date says June 24, 2021, or 6/24/2021, I

1   should say?

2        A    Yes, sir.

3        Q    Now, the next position on the list is Director of

4   Purchasing, correct?

5        A    Yes, sir.

6        Q    Why did you choose to eliminate the Director of

7   Purchasing position?

8        A    Because Purchasing was one of the units that appeared

9   to have more management than it needed and had grown in a way

10  that wasn't necessary and Purchasing needed to have

11  streamlining that would further reduce its obligations.  And

12  Jenna was a director and that role didn't warrant a director.

13  It had more than enough management at lower levels.

14       Q    What do you mean it didn't warrant a director?

15       A    Well, the decisions being made in Purchasing were

16  supervisory or maybe lower-management level decisions.

17  Purchasing was asked to purchase something and inventory it and

18  distribute it.  They didn't make policy decisions.  They didn't

19  make policy directives.  The work was more or less very

20  routine, very standardized.  And, in addition, we were, I

21  believe at the time or had previously, reduced the workload in

22  Purchasing by streamlining and ceasing activities that just

23  didn't make a lot of sense and reduced the workload

24  significantly by doing that.

25       Q    Were the Director of Purchasing roles absorbed by any

1   other positions in the Lee County Sheriff's Office?

2       A   To the extent that the Director of Purchasing had

3   obligations other than what lower management did in that unit,

4   lower management absorbed them.

5       Q   Who specifically in lower management absorbed the

6   duties?

7       A   I don't recall who was like next in line in

8   Purchasing.  I'm sorry, I just don't recall.

9       Q   Did you determine who would take over the Director of

10  Purchasing roles before you decided to eliminate the position?

11      A   To the extent they existed, yes.

12      Q   What do you mean to the extent they existed?

13      A   Well, as I said, a directorship generally has

14  policy-making issues and decision-making at a level that far

15  exceeds the routine day-to-day operations of purchasing.  So to

16  the extent there were any decisions that the director was

17  making that the lower management level hadn't been making, the

18  lower management level was to make those decisions.  It's, you

19  know, my observations and research into Purchasing indicated

20  that they were all good people doing good things, that they

21  just simply had made it a very complex organization by doing a

22  lot of things they didn't need to do, but even at that there

23  wasn't a need for a director to tell them how to manage

24  Purchasing on a day-to-day basis.

25      Q   Was the Purchasing Department adequately staffed in

```
 1   July or August of 2021?

 2        A     Yes.

 3        Q     Was the Purchasing Department adequately staffed in

 4   2020?

 5        A     Yes.  As far as my opinion, yes.

 6        Q     In the Purchasing Department there is a Purchasing

 7   Manager position as well; is that right?

 8        A     I believe so, yes.

 9        Q     Do you know if the Purchasing Manager position took

10   over any of the duties of the Director of Purchasing?

11        A     I believe that manager took over all the duties that

12   the directorship would have maintained.

13        Q     And before the position elimination, the Director of

14   Purchasing position was higher in rank than the Purchasing

15   Manager position, correct?

16        A     Yes, sir, that's my understanding.

17        Q     When you were selecting positions to be eliminated

18   did you ever consider having the Purchasing managers' roles

19   absorbed by the Director of Purchasing?

20        A     No, sir.

21        Q     And why is that?

22        A     Because there were no roles that required a director

23   in Purchasing.  The roles in Purchasing were more than

24   adequately satisfied by a supervisor or a manager.

25        Q     Do you know who was in the Purchasing Manager role at
```

```
 1    the time that the Director of Purchasing position was

 2    eliminated?

 3         A    I don't recall now, sir.

 4         Q    And Jenna Clark was 59 years old at the time her

 5    position was selected to be eliminated; is that correct?

 6         A    Yes, sir.

 7         Q    And the date of her retirement/position being

 8    eliminated is 9/4/2021; is that right?

 9         A    Yes, sir.

10         Q    And the next position on that list is the Community

11    Liaison position, correct?

12         A    Yes, sir.

13         Q    Why was the Community Liaison position selected to be

14    eliminated?

15         A    Because that was part of the outreach program CRU and

16    in looking at the obligations and the duties that had been

17    assigned to that position I didn't -- it couldn't be justified

18    on a full-time basis on a permanent basis.  That individual's

19    job was to visit and collect information and data for the

20    Sheriff's Office by participating and attending public

21    functions like school board meetings, city council meetings,

22    and other public meetings, and it seemed at the time, it still

23    does, that we could send members of CRU to those locations

24    and/or we could enter into a contract and handle that

25    contractually, and so that's what I proposed to the Sheriff and
```

 1   he approved it.

 2       Q    And did you contract the duties of Community Liaison

 3   out to a contracted individual or company?

 4       A    Yes, sir.

 5       Q    And who was that contracted to?

 6       A    That was a contract with that individual Amy Dell

 7   Aquila for, I believe it was a six-month contract.  It's since

 8   expired.

 9       Q    And she has not contracted, she being Amy Dell

10   Aquila, she has not contracted with the Lee County Sheriff's

11   Office since the expiration of that contract?

12       A    That's correct, sir.

13       Q    And Amy Dell Aquila was 58 at the time her position

14   was eliminated; is that correct?

15       A    Yes, sir.

16       Q    And on the document it says resigned/position

17   eliminated for Amy Dell Aquila; is that correct?

18       A    That's correct.

19       Q    And the date listed for Amy Dell Aquila is October

20   11, 2021; is that right?

21       A    That's correct.

22       Q    And the next position listed is Director of Fleet

23   Management, correct?

24       A    Yes.

25       Q    Why was the Director of Fleet Management eliminated?

1       A   Because it became apparent that the more you visited

2   Fleet, spoke with the employees, spoke with management and

3   examined how we did business, it became apparent that we didn't

4   need that role to be filled.  They didn't need a director.

5   Much similar to Purchasing we changed policies and procedures

6   out there significantly to reduce some of the work that was not

7   being efficiently performed.  For instance, you know, our Fleet

8   has 1,200, 1,400 cars.  Instead of us doing oil changes and

9   routine maintenance we contracted with the Ford dealership

10  because they're Ford vehicles and we contracted those out

11  greatly reducing the workload.  But, in addition to that, there

12  was simply no policy or grave decision-making being done at

13  Fleet.  Fleet was maintaining the vehicles and we didn't need a

14  director out there.

15      Q   And when the position for the Director of Fleet

16  Manager was selected to be eliminated James Jones filled that

17  role?

18      A   Yes.

19      Q   And James Jones was 51 years old at the time the

20  decision was made, correct?

21      A   Yes.

22      Q   Does James Jones still work for the Lee County

23  Sheriff's Office?

24      A   Yes.

25      Q   What is James Jones' current position with the Lee

1   County Sheriff's Office?

2        A    I believe he's a mechanic.

3        Q    How did Mr. Jones' position change come about?

4        A    We eliminated the directorship at Fleet and offered

5   him, as I understand it, a position that was available in the

6   agency, and he chose to take it.   And subsequently I think he

7   had some problems and is now a mechanic with the agency.

8        Q    Do you know if Mr. Jones took a pay cut when he

9   changed positions at the Lee County Sheriff's Office?

10       A    Yes, sir.

11       Q    Yes, he did receive a pay cut when he switched

12  positions?

13       A    Yes, sir.

14       Q    And the date that position was eliminated is listed

15  as November 4th, 2021; is that correct?

16       A    That should be accurate, yes.

17       Q    Do you have any reason to believe it's not accurate?

18       A    No.

19       Q    And the last position on this list is Communications

20  Manager, correct?

21       A    Correct.

22       Q    Why was the Communications Manager position selected

23  to be eliminated?

24       A    Because like the others, some of the other areas we

25  talked about, when you reviewed Communications and the workload

1    and the management that existed for that workload, it became

2    apparent that we had more management that was necessary.  We

3    could certainly use more employees.  We could use more call

4    takers and more dispatchers, but we had grown management to the

5    point where it outweighed its need and so we eliminated that

6    management position.

7         Q    And were the duties of the Communications Manager

8    position absorbed by any other employees at the Lee County

9    Sheriff's Office?

10        A    They were absorbed internally by the remaining

11   management.  I believe he had two supervisors.  So the

12   supervisors absorbed what he had been doing.

13        Q    And at the time the Communications Manager position

14   was selected to be eliminated Anthony Ramsey was in that role,

15   correct?

16        A    Yes, sir.

17        Q    And Anthony Ramsey was 46 years old at the time the

18   position was selected to be eliminated; is that right?

19        A    Yes, sir.

20        Q    And the date that the Communications Manager position

21   was eliminated is listed as October 14th, 2021; is that

22   correct?

23        A    Yes, sir.

24        Q    Is there anyone on this document -- or sorry, strike

25   that.  Is there any positions not listed on this document that

 1   were eliminated as part of the reduction in force in 2021?

 2        A    I'm sorry, you didn't speak unclearly.  For some

 3   reason I blanked out.

 4        Q    Yeah, no worries.  Are there any positions that are

 5   not listed on this document that were eliminated as part of the

 6   reduction in force in 2021 at the Lee County Sheriff's Office?

 7        A    No, sir.

 8        Q    And these positions were selected to be eliminated

 9   based on the efficiencies that you had described previously

10   that you were looking to obtain through the Lee County

11   Sheriff's Office; is that right?

12        A    Yes, sir.

13        MR. STEFANY:  Kyle, can we go off the record for a

14   second?

15        MR. MACDONALD:  Sure.  We can go off the record.

16        (A recess was taken.)

17        MR. MACDONALD:  Back on the record at 12:03 p.m.

18   BY MR. MACDONALD:

19        Q    When these positions were selected to be eliminated

20   by the Lee County Sheriff's Office was any consideration given

21   to the length of time that these individuals had worked in

22   these positions at the Lee County Sheriff's Office for?

23        A    No, sir.

24        Q    And earlier you described looking at the use of

25   resources for each department in deciding which positions to be

1    eliminated; is that fair to say?

2        A    Yes, sir.

3        Q    Is it fair to say that eliminating a position with a

4    higher salary would save more resources than eliminating a

5    position with a lower salary?

6        A    Yes, sir.

7        Q    And did you consider that when you selected positions

8    to be eliminated?

9        A    Not in making the decision to eliminate.

10       Q    How did you determine which resources were being used

11   efficiently if you did not consider the pay that was being

12   given to these positions?

13       A    The resources that were going to be available, made

14   available, were whatever those resources were.  I didn't go

15   into it with a specific number in mind.  I didn't go into it

16   with a desire to maximize the number.  Simply went in as we do

17   continuously as an agency, are we doing everything that we can

18   to operate efficiently and effectively and do we have positions

19   that we don't need.

20       Q    When selecting positions to be eliminated as part of

21   a reduction in force did you give any consideration as to

22   whether these individuals were eligible for retirement?

23       A    No.

24       Q    Were you aware that any of these positions selected

25   to be eliminated had employees that were eligible for

Deposition of John Holloway                                    Jenna Clark v. Carmine Marceno

```
 1    retirement?

 2         A    I assumed that those that had been here for a

 3    significant amount of time either could retire instantly or

 4    could retire at some point in the future or may elect to stay

 5    with us in another position until they could retire because FRS

 6    you get your pension based on your top five, eight years,

 7    something like that.  So I assumed that there would be some who

 8    would retire, some who would take other positions, and some who

 9    would just move on and do other things.

10         Q    When you say that you assumed that some of these

11    employees would be eligible for retirement, was that based on

12    the length of their experience with the Lee County Sheriff's

13    Office?

14         A    Just my general understanding that some of them had

15    been around for a very significant number of years.

16         Q    So you gave some consideration to the fact that some

17    of these employees had been in the Lee County Sheriff's Office

18    for a significant number of years?

19              MR. STEFANY:  Object to the form.  You may answer.

20         A    Not in the decision-making.

21    BY MR. MACDONALD:

22         Q    In what sense did you give consideration to that

23    fact?

24         A    I don't think I said I gave it consideration.  I said

25    I acknowledged it existed.
```

Deposition of John Holloway                                                   Jenna Clark v. Carmine Marceno

1        Q     When did you acknowledge it existed?

2        A     I think I acknowledged it existed, and I still

3    acknowledge it to exist.  It was just simply a fact that that

4    was there but it didn't affect my decision-making, just as I

5    know where Fleet is and I acknowledge where it is, but it

6    didn't affect my decision.

7        Q     Well, stepping back a little bit.  I believe you said

8    something to the effect that you assumed that some of these

9    individuals would be eligible for retirement or they could

10   apply for another position; is that fair to say?

11       A     I knew they could -- anyone whose position was being

12   eliminated could apply for another position with the agency

13   they were qualified for.  I assumed that someone who had been

14   here and had qualified for retirement may elect to retire with

15   FRS.  I viewed that as a total personal choice, but at no point

16   did I propose to the Sheriff anything based on how long they

17   had been here or who -- because I still don't know who was

18   eligible for FRS retirement.  I have no idea how long these

19   individuals have specifically served in the Sheriff's Office.

20   I don't know that.

21       Q     Were you aware of the individual employees' age that

22   were selected to be eliminated?

23       A     Not at the time.

24       Q     You were not aware of any of these employees' listed

25   age when you made the decision to eliminate positions as part

 1   of the reduction in force?

 2        A    No.  I had the ordinary knowledge that somebody looks

 3   older and somebody looks younger, but how long they had been

 4   with the agency, somebody may have mentioned that, but that

 5   wasn't part of my decision-making.  I was looking at positions.

 6        Q    Are all of the individual employees listed on these

 7   documents over the age of 40?

 8        A    Yes, sir.

 9        Q    Did you give any consideration to that fact when you

10   selected positions to be eliminated as part of the reduction in

11   force?

12        A    No, sir.

13        Q    At any point did you consider eliminating the

14   positions of any employees that were younger than 40 years of

15   age?

16        A    I'm sure I did, but it would have been looking at the

17   position, not the age of the person.

18        Q    Is there any positions that you specifically recall

19   having considered to be eliminated?

20             MR. STEFANY:  Objection to form.  You may answer.

21        A    I'm not sure what you mean by that.

22   BY MR. MACDONALD:

23        Q    All right.  Let me be more specific.  Do you recall

24   any position specifically that you considered to be eliminated

25   as part of the reduction in force that were not ultimately

 1   selected?

 2       A    I'm sure there were many, but I don't recall

 3   specifically which because the facts and circumstances led me

 4   to believe that position didn't need to be eliminated.

 5       Q    Did anyone at the Lee County Sheriff's Office review

 6   the list of positions to be eliminated besides the Sheriff

 7   before it was finalized?

 8       A    I believe -- I believe most -- I'm sorry.  Human

 9   resources would have looked at it because I would have needed

10   data from them to provide to the Sheriff in my proposal.  Legal

11   looked at it.  Those two entities I'm sure would have looked at

12   it, but in terms of critiquing it at that point, I'm not aware

13   of anybody else that critiqued it.

14       Q    When you say Human Resources, which employees

15   reviewed the list of positions to be eliminated?

16       A    That would have been Dawn Heikkila what.  I don't

17   recall speaking with anyone else in Human Resources about the

18   final list that we had determined were appropriate for

19   eliminating.

20       Q    And when you said Legal, which employees from Legal

21   review the positions to be eliminated?

22       A    Abbi Smith, A-B-B-I.

23       Q    Do you recall any other employees that would have

24   reviewed the list of positions besides Dawn Heikkila and Abbi

25   Smith?

```
 1        A    I don't think -- my recollection is there wouldn't

 2   have been any because, I don't want to say this was a secret,

 3   but it was something I didn't want to have rumors floating

 4   about so I would have kept it somewhat to those needing to look

 5   at it which would have included our Legal and our Human

 6   Resources people.

 7             MR. MACDONALD:  We can go ahead and go off the record

 8        at 12:15.

 9             (A recess was taken.)

10             MR. MACDONALD:  Back on record at 12:47 p.m.

11   BY MR. MACDONALD:

12        Q    I'm going to show you a document.

13             MR. MACDONALD:  We are going to mark this as

14        Plaintiff's Exhibit 6.  And it's Defendant's Bates label

15        1316 through 1318.

16             (Whereupon, Plaintiff's Exhibit 6 was marked for

17        identification.)

18   BY MR. MACDONALD:

19        Q    I'll give you a minute to review this.

20        A    Yes, sir, I've read that.

21        Q    Okay.  And there's two more pages.  I'll just give

22   you second to review it.  Let me know when to scroll.

23        A    Yes, sir, I've read that.

24        Q    Okay.  Last page.

25        A    Yes, sir, I've read that.
```

Deposition of John Holloway                                    Jenna Clark v. Carmine Marceno

```
 1        Q    Do you recognize this document?

 2        A    Yes, sir.

 3        Q    And what is it?

 4        A    It's a policy or a State of the Agency document or

 5   report that the Sheriff used to identify the status of the

 6   agency and the improvements that were able to have been made

 7   during his tenure.

 8        Q    Do you know who wrote this document?

 9        A    I know I had input in it and I believe the Sheriff

10   had a great deal of input in it, and he eventually, the

11   Sheriff, was -- approved it.

12        Q    And was this a document that was shared internally?

13        A    I believe -- I believe it was shared externally and

14   internally.

15        Q    Do you recall who it was shared with externally from

16   the Lee County Sheriff's Office?

17        A    No, sir, I don't.

18        Q    Do you know when this document was written?

19        A    No, sir.  Based on the items identified, I would

20   think it would have been in around 2021, 2022, in that area.

21        Q    Do you know if this document was written before the

22   reduction in force in 2021?

23        A    I believe it was after.  I believe.

24        Q    And you said that you assisted in drafting this?

25        A    Yes.  I probably was the primary person who put those
```

```
 1   together who made the list and identified the things, but that

 2   would have been by asking other people throughout the agency

 3   for their input as to what they noted and observed and recalled

 4   having occurred.

 5       Q    And do you see under section, Section 1, paragraph A,

 6   where it says:  "Agency reduced the number of civilian

 7   employees through attrition."?

 8       A    Yes.

 9       Q    Do you know if that's referring to the reduction in

10   force in 2021?

11       A    That sentence would lead me to believe that that was

12   done before the reduction in force by the mention of through

13   attrition, because I do recall there were employees who elected

14   not, I think you're client is one, not to remain with the

15   agency, but through attrition is still an inaccurate statement

16   because we didn't -- we didn't not offer people the opportunity

17   to not stay with the agency.

18       Q    And do you see where it says:  "Creating more funding

19   for deputy positions."?  Right here under same paragraph A.

20       A    Yes.

21       Q    Based on that paragraph was funding that resulted

22   from the reduction in force used to fund deputy positions?

23       A    Among other things.  You know, money is spongible, so

24   among other things one of the priorities for the agency was to

25   increase the number of deputies that we actually employed and
```

 1   to increase the salaries for deputies so that we could retain

 2   them.  So, yes, funding went to the deputy positions.

 3        Q    Okay.  I'm going to show you another document.

 4             MR. MACDONALD:  This will be marked as Plaintiff's

 5        Exhibit 7 and it's Defendant Bates label 4386 through

 6        4412.  It's about 27 pages.

 7             (Whereupon, Plaintiff's Exhibit 7 was marked for

 8        identification.)

 9   BY MR. MACDONALD:

10        Q    I want to give you a chance to review it.  So let me

11   know if you'd like me to scroll.

12        A    It might be faster if you just go to the parts that

13   you want to ask me about because I'm sure that most of those

14   aren't of interest to you.

15        Q    Well, let me ask you this:  Are you familiar with

16   this document generally, the Office of Professional Standards

17   Staff Inspection Final Report, Purchasing Workload Assessment

18   and Staff Inspection in October 2020?

19        A    I'm aware of the Professional Standards Inspections

20   Report.  They're done on every unit in the agency, and I'm sure

21   at one point I read this one.  I read them all so I'm sure I

22   read this one.

23        Q    And what are these reports?

24        A    There's a requirement under accreditation that we do

25   inspections on every unit or division I believe once every

1    three years so these are the reports that are generated that

2    satisfy that accreditation standard.  And I believe, like I

3    say, every three years -- once every three years every unit or

4    division goes through an inspection.

5         Q    And what is the workload -- sorry, what is the

6    workload assessment?

7         A    That was an inspection that was required by

8    accreditation and we assigned that to our inspectors -- at the

9    time we assigned that to our inspectors.  They no longer do

10   that workload and staff inspections.  That's been transferred

11   to another unit.

12        Q    And who performs those assessments now?

13        A    Now it's done by Planning and Research.  I'm not sure

14   that's exactly what we call it but a gentleman by the name of

15   Stan Nelson does those things now.

16        Q    Is the workload assessment designed to look at

17   efficiency of departments in Lee County Sheriff's Office?

18        A    It was -- I can't answer that yes or no.  I can tell

19   you that's one of the factors they're supposed to look at.

20   Generally, they look to see what is the workload and using some

21   formula that they had back then tell you how many employees

22   they needed.

23        Q    Do you recall what the conclusions were regarding the

24   staffing of the Purchasing Department for this report?

25        A    No.

1    Q    I'm going to draw your attention to page 25.  I'll

2  give you a second to review this.

3    A    I've read that, sir.

4    Q    And do you see the conclusion for Number 4 which ask,

5  are resources adequate for achieving agency goals and

6  objectives?

7    A    Yes, I do.

8    Q    And do you see where it says:  "The staffing

9  resources are inadequate according to the workload analysis.

10  The addition of two purchasing agent allocations is recommended

11  for the purchasing division."?

12    A    Yes, sir, I do.

13    Q    Do you agree with that conclusion that was reached in

14  October of 2020?

15    A    No, sir.

16    Q    And why is that?

17    A    Because in all the years I've been reviewing these

18  items I have never seen a single report that ever said anybody

19  had too much staffing.  And I think the average was every unit

20  seemed to need two more people or need at least one more person

21  and that's why we eventually took that responsibility away from

22  this unit, because common sense tells you that if everybody in

23  the world needs two more people, the procedure used to reach

24  that conclusion is questionable.

25    Q    So you did not believe that that conclusion was

Deposition of John Holloway                                    Jenna Clark v. Carmine Marceno

1  accurate for the Purchasing Department in October of 2020,

2  correct?

3       A    No.  As I said, I spoke with the people who did the

4  analysis and when their analysis was attempted to be explained

5  to me it didn't make sense to me.  And as I said, you would

6  think out of all those years somebody would be overstaffed and

7  at no point in time so I came to believe that the analysis

8  itself was faulty and we reassigned that responsibility to, as

9  I said, I think it's Planning and Research that does it now.

10      Q    Planning and Research.

11           MR. MACDONALD:  All right.  Mr. Holloway, that is all

12      the questions I have in your capacity as the corporate

13      representative for the Lee County Sheriff's Office.

14      Mr. Stefany, do you have any questions that you'd like

15      to ask?

16           MR. STEFANY:  Not at this time.

17           MR. MACDONALD:  So we will go ahead and suspend the

18      deposition at 1:01 p.m.

19           (At 1:01 p.m., no further questions were propounded

20      to this witness.)

21

22

23

24

25

```
 1                CERTIFICATE OF OATH

 2   STATE OF FLORIDA

 3   COUNTY OF HILLSBOROUGH

 4        I, the undersigned authority, certify that JOHN HOLLOWAY

 5   remotely appeared before me and was duly sworn.

 6        WITNESS my hand and official seal this 10th day of

 7   October, 2023.

 8

 9

10        _____

11        MELISSA FERNANDEZ
          Notary Public - State of Florida
          Commission No.:  HH 278990
12        My Commission Expires:  6/21/2026

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    REPORTER'S DEPOSITION CERTIFICATE

2    STATE OF FLORIDA

3    COUNTY OF HILLSBOROUGH

4         I, MELISSA FERNANDEZ, Court Reporter, certify

5    that I was authorized to and did stenographically report

6    the foregoing deposition, and that the transcript is

7    a true record of the stenographic notes.

8         I further certify that I am not a relative,

9    employee, attorney, or counsel of any of the parties,

10   nor am I a relative or employee of any of the parties'

11   attorney or counsel connected with the action, nor am

12   I financially interested in the action.

13        Dated this 26th day of December, 2023.

14

15

16   _____

17   MELISSA FERNANDEZ
     Court Stenographer

18

19

20

21

22

23

24

25

```
 1            DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES

 2   IN THE CASE OF:   JENNA CLARK v. CARMINE MARCENO, in his
                       official capacity as Sheriff of Lee County,
 3                     Florida

 4   DEPOSITION OF:  JOHN HOLLOWAY       DATE:  10/10/2023

 5   PLEASE READ THE TRANSCRIPT OF YOUR DEPOSITION.  If YOU FEEL YOU
     NEED TO MAKE CORRECTIONS, PLEASE NOTE ON THIS PAGE.  DO NOT
 6   MARK ON THE TRANSCRIPT ITSELF.  SIGN AND DATE THE COVER PAGE
     AND RETURN BOTH ERRATA SHEET AND COVER PAGE AS DIRECTED.

 7   PAGE    LINE            ERROR OR AMENDMENT
 8
 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____
                        (Melissa Fernandez)

21   PLEASE DISTRIBUTE TO:  Kyle T. MacDonald, Esquire
                           kyle@dereksmithlaw.com
22

23

24

25
```

Deposition of John Holloway                                      Jenna Clark v. Carmine Marceno

```
 1                           READ AND SIGN
                              COVER PAGE
 2

 3              I have read the foregoing pages, and,
          except for the corrections or amendments
 4        I have indicated on the sheet attached
          for such purposes, I hereby subscribe to
 5        the accuracy of this transcript.

 6                    _____
          SIGNATURE OF DEPONENT
 7

 8                    _____
          DATE          01/08/2024
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    December 26, 2023

2    JOHN HOLLOWAY
     David Stefany, Esquire
3    Allen, Norton & Blue, PA
     Suite225
4    324 South Hyde Park Avenue
     Tampa, Florida  33606

5
     RE:   JENNA CLARK v. CARMINE MARCENO, in his official capacity
6          as Sheriff of Lee County, Florida

7    Dear Mr. Stefany:

8    The deposition of JOHN HOLLOWAY taken on the 10th day of
     October, 2023, in the above-styled case has been transcribed.
9    Please follow the Options below coinciding with your transcript
     copy choice:

10
     OPTION 1:  If you have ordered a transcript copy, please use
11   the original Errata Sheet attached to your transcript copy for
     your client to note any changes/corrections.  When reading is
12   complete, please promptly (within 30 days) send a copy of the
     signed errata sheet to opposing counsel, Mr. MacDonald.

13
     OPTION 2:  If you have NOT ordered a transcript copy, please
14   notify your client that a copy of said transcript, along with
     the original Errata Sheet, will be made available at one of our
15   office locations for him/her to Read & Sign and note any
     corrections/changes.

16
     Please note:  Your client MUST CALL TO MAKE AN APPOINTMENT,
17   (215) 341-3616.  Please instruct your client to call our office
     during normal business hours to make an appointment within
18   thirty (30) business days.

19   Thank you,

20


21   _____
     Melissa Fernandez, Court Reporter
22
     cc:  Kyle T. MacDonald, Esquire
23


24


25

## WORD INDEX

**< $ >**
**$150,000**  23:*10*
**$30,000**  23:*8*

**< 1 >**
**1**  7:*3, 9*  36:*19*  65:*5*  74:*9*
**1,200**  54:*8*
**1,400**  54:*8*
**1/31/2021**  42:*12*
**1:01**  1:*11*  69:*18, 19*
**10**  1:*10, 11*  4:*3*
**10/10/2023**  72:*4*
**10th**  4:*2*  70:*6*  74:*8*
**11**  53:*20*
**12:03**  57:*17*
**12:15**  63:*8*
**12:47**  63:*10*
**123**  3:*16*  27:*19*
**13**  7:*16*
**1310**  2:*3*
**1316**  3:*18*  63:*15*
**1318**  3:*18*  63:*15*
**14750**  7:*21*
**14th**  56:*21*
**1700**  29:*23*

**< 2 >**
**2**  36:*15, 16*  74:*12*
**20**  4:*22*  20:*2*
**2019**  25:*2, 22, 24, 25*  26:*1, 4, 14*  27:*4, 8, 13*
**2020**  51:*4*  66:*18*  68:*14*  69:*1*
**2021**  8:*14, 24*  9:*19, 20, 24, 25*  11:*22*  25:*8, 22*  26:*7*  27:*4, 14*  28:*9*  29:*1, 6, 21*  42:*25*  43:*25*  44:*7, 11*  45:*14*  46:*4, 16*  48:*25*  51:*1*  53:*20*  55:*15*  56:*21*  57:*1, 6*  64:*20, 22*  65:*10*
**2022**  64:*20*
**2023**  1:*10*  4:*3*  70:*7*  71:*13*  74:*1, 8*
**20th**  25:*2*  26:*2*

**21**  34:*18*  42:*10*  48:*10, 14*
**215**  74:*17*
**22-002723-CI**  1:*3*
**225**  2:*8*
**24**  3:*15*  48:*25*
**25**  68:*1*
**251-1210**  2:*10*
**26**  74:*1*
**26th**  71:*13*
**27**  3:*16*  66:*6*
**278990**  70:*11*
**28th**  42:*10*

**< 3 >**
**3**  3:*15*  24:*8, 9*  36:*19*
**30**  4:*22*  74:*12, 18*
**305**  2:*4*
**324**  2:*9*  74:*4*
**33131**  2:*4*
**33606**  2:*9*  74:*4*
**341-3616**  74:*17*
**36**  3:*17*
**3rd**  37:*13*

**< 4 >**
**4**  3:*2, 16*  27:*18*  40:*12*  68:*4*
**40**  61:*7, 14*
**4350**  3:*17*  36:*9*
**4386**  3:*19*  66:*5*
**4412**  3:*19*  66:*6*
**4492**  3:*15*  24:*8, 16*
**46**  56:*17*
**48**  48:*19*
**4th**  55:*15*

**< 5 >**
**5**  3:*17*  36:*8, 10*
**51**  54:*19*
**58**  34:*13*  53:*13*
**59**  52:*4*

**< 6 >**
**6**  3:*18*  63:*14, 16*
**6/21/2026**  70:*12*
**6/24**  48:*14*
**6/24/2021**  48:*25*
**63**  3:*18*

**66**  3:*19*  41:*8*

**< 7 >**
**7**  3:*19*  66:*5, 7*
**70**  3:*3*
**701**  2:*3*
**71**  3:*4*
**72**  3:*5*
**73**  3:*6*

**< 8 >**
**813**  2:*10*

**< 9 >**
**9/4/2021**  52:*8*
**9:42**  25:*3*
**946-1884**  2:*4*

**< A >**
**a.m**  1:*11*  4:*3*  25:*3*
**Abbi**  24:*25*  62:*22, 24*
**A-B-B-I**  62:*22*
**ability**  22:*12*
**able**  7:*13*  40:*2*  64:*6*
**above-styled**  74:*8*
**absorb**  16:*19*
**absorbed**  13:*6, 24*  41:*23, 24*  42:*1, 3*  47:*11, 15, 20, 23, 25*  48:*1*  49:*25*  50:*4, 5*  51:*19*  56:*8, 10, 12*
**abused**  33:*18*
**accomplishing**  16:*10*
**accreditation**  66:*24*  67:*2, 8*
**accuracy**  73:*4*
**accurate**  13:*9*  55:*16, 17*  69:*1*
**achieving**  68:*5*
**acknowledge**  7:*6*  60:*1, 3, 5*
**acknowledged**  43:*21*  59:*25*  60:*2*
**act**  13:*9, 10*
**action**  9:*3*  71:*11, 12*
**actively**  5:*14*
**activities**  49:*22*
**added**  20:*12*  23:*10*  26:*13*
**adding**  16:*3*

**addition**  11:*13*  49:*20*  54:*11*  68:*10*
**additional**  13:*7*
**addressed**  25:*10*
**adequate**  68:*5*
**adequately**  50:*25*  51:*3, 24*
**administrative**  41:*12*
**advising**  8:*11*
**Affairs**  47:*25*
**affect**  60:*4, 6*
**Affirmative**  8:*5*  29:*24*
**age**  41:*8*  60:*21, 25*  61:*7, 15, 17*
**agency**  8:*19, 21, 23*  10:*6*  11:*10, 14*  14:*19, 21*  15:*8*  16:*11*  17:*13, 22*  18:*21*  21:*6*  26:*12*  30:*2, 6, 18*  31:*2, 4, 10*  32:*13*  34:*1, 4, 6, 8*  35:*9, 25*  37:*20*  38:*19, 21*  39:*1, 2, 10, 14, 18, 22*  40:*1*  45:*9*  48:*16*  55:*6, 7*  58:*17*  60:*12*  61:*4*  64:*4, 6*  65:*2, 6, 15, 17, 24*  66:*20*  68:*5*
**agency-wide**  11:*20*
**agent**  68:*10*
**ago**  4:*22*
**agree**  68:*13*
**agreed**  3:*9*  13:*17*  14:*10*  45:*19*
**ahead**  11:*3*  14:*11*  45:*10*  63:*7*  69:*17*
**air**  46:*19*
**alike**  9:*3*
**Allen**  2:*8*  74:*3*
**allocations**  68:*10*
**allowed**  10:*12*
**alter**  14:*12*
**Amended**  8:*4*
**AMENDMENT**  72:*6*
**amendments**  73:*3*
**amount**  59:*3*
**Amy**  17:*10*  44:*12*  53:*6, 9, 13, 17, 19*
**analysis**  19:*17, 19*  68:*9*  69:*4, 7*

and/or 33:5 52:24
anecdotal 19:20
answer 18:17 26:4
  59:19 61:20 67:18
answers 6:14, 19 8:5
Anthony 56:14, 17
anticipate 46:18
Antoinette 24:25
anybody 35:14
  62:13 68:18
anytime 29:7
anyway 15:10
apologize 25:24 26:2
  30:15 47:17
apparent 9:3 21:25
  41:21 54:1, 3 56:2
apparently 42:21
APPEARANCES 2:1
appeared 1:12 2:5,
  11, 12 17:14 49:8
  70:5
appears 24:24 37:22
application 39:8
apply 35:24 36:2
  60:10, 12
applying 19:2
appointment 37:5, 8,
  13, 14 38:16 74:15,
  17
approach 19:16
appropriate 10:7
  20:14 34:5 62:18
appropriately 13:10,
  11
approval 9:16 31:3,
  8 44:7 45:6 46:15
approve 14:4, 13
  43:23
Approved 14:14
  25:14 30:25 44:1
  46:8, 17 53:1 64:11
approximately 9:1
Aquila 17:11 53:7,
  10, 13, 17, 19
area 64:20
areas 11:19 15:19,
  24 16:8 19:6 55:24
asked 6:1 14:7 21:2
  30:8 35:4, 13 49:17

asking 39:8 65:2
aspects 14:12
Assessment 66:17
  67:6, 16
assessments 67:12
assigned 13:4 16:19
  18:14 19:10 41:14,
  15 47:8 52:17 67:8,
  9
assist 33:21 34:3
assistant/secretary
  41:12
assisted 64:24
assume 6:1 29:4
assumed 42:4 59:2,
  7, 10 60:8, 13
assumption 29:22
  48:18
attached 73:3 74:11
attempted 69:4
attending 52:20
attention 29:9, 14, 18
  31:2 68:1
attorney 8:10 71:9,
  11
attrition 65:7, 13, 15
August 11:22 12:6
  42:17, 25 43:25 44:6,
  11 45:14 46:3, 16
  51:1
authenticate 7:13
authority 70:4
authorized 71:5
available 6:16 10:9
  33:8 55:5 58:13, 14
  74:14
Avenue 2:3, 9 74:4
average 68:19
aviation 15:6, 7 16:2
aware 28:16 34:2
  58:24 60:21, 24
  62:12 66:19

< B >
back 16:6 26:14
  34:18 36:6 40:12
  57:17 60:7 63:10
  67:21
baggage 20:12
bandy 39:3

Bartz 34:11, 13
  35:13 40:13
based 6:14 22:2
  37:17, 19 48:17 57:9
  59:6, 11 60:16 64:19
  65:21
basically 9:7 13:8
  31:21
basis 11:20 14:18
  17:13 18:15 30:9, 10
  39:7 43:20 50:24
  52:18
bat 15:25
Bates 3:15, 16, 17, 18,
  19 24:8, 15 27:18
  36:9 63:14 66:5
bathroom 6:4
bearing 22:21
BEHALF 2:5, 12
  6:12 38:7
belief 34:8
believe 8:4 13:1, 14
  14:7, 9 16:5, 14 17:1,
  2 21:15 25:9, 19, 24
  28:1, 2 29:25 32:19
  33:24 34:1 37:23
  39:15 40:25 41:5, 6
  43:5 44:3, 9 45:1
  46:24 47:8, 9, 11
  49:21 51:8, 11 53:7
  55:2, 17 56:11 60:7
  62:4, 8 64:9, 13, 23
  65:11 66:25 67:2
  68:25 69:7
believed 16:13
benefited 16:10
benefits 39:9
best 5:19 20:9, 10
  22:9 26:6 27:11
  32:16 35:18 46:10
better 10:10, 11
  17:13 21:4 22:11
  23:8
binding 6:20
bit 60:7
blanked 57:3
Blue 2:8 74:3
board 52:21
borderline 19:5

box 48:22
break 6:4
Brickell 2:3
bring 9:15 11:3
  12:17 31:2
brings 29:17
brochures 33:7
brought 11:1 17:12
  29:14
burden 17:21
Bureau 26:10, 11
business 13:8 14:3
  19:2 21:21 31:5
  54:3 74:17, 18
businesslike 9:12
busy 16:7
buy 20:21

< C >
calculation 19:10, 22
call 18:9 33:17 56:3
  67:14 74:15, 17
called 16:21, 24
  34:20
capable 39:19
capacity 1:5 4:15
  69:12 72:2 74:4
captain 30:7, 17
captain's 30:18
careful 26:2
caretaker 33:18
CARMINE 1:5 4:15
  72:2 74:4
cars 54:8
CASE 72:2 74:8
cc 74:21
ceasing 49:22
certain 11:16, 21
  12:1 40:6
Certainly 16:2 56:3
CERTIFICATE 3:3,
  4 70:1 71:1
certify 70:4 71:4, 8
challenged 7:24
challenges 33:3
chance 30:12 66:10
change 10:8, 9 14:11
  18:19 31:3 55:3
changed 54:5 55:9
changes 54:8 72:1

changes/corrections 74:*11*
checks 40:*2, 10, 13*
Chief 26:*11, 12, 15*
choice 38:*15* 60:*15* 74:*9*
choices 37:*9*
choose 35:*18, 19, 23* 36:*5* 49:*6*
chose 35:*6, 19* 39:*5* 55:*6*
circumstances 10:*8* 19:*3* 22:*3* 39:*5* 62:*3*
citizen 34:*2*
citizens 33:*22*
city 52:*21*
civilian 65:*6*
CLARK 1:*2* 4:*14* 37:*3, 4, 17, 22, 23* 38:*14* 39:*21* 40:*4* 46:*23* 52:*4* 72:*2* 74:*4*
Clark's 40:*15*
clear 22:*2*
clearly 5:*12* 6:*9* 7:*7*
client 65:*14* 74:*11, 14, 15, 17*
closer 16:*13* 40:*1*
coinciding 74:*9*
collect 39:*12* 52:*19*
column 41:*5*
come 31:*11* 36:*6* 40:*1* 55:*3*
comes 29:*8*
command 11:*18* 15:*14*
commencing 4:*3*
comment 34:*22* 42:*7* 48:*14, 22*
comments 19:*20*
Commission 70:*11, 12*
common 19:*2* 68:*22*
Communications 44:*14* 55:*19, 22, 25* 56:*7, 13, 20*
Community 34:*19* 44:*13* 52:*10, 13* 53:*2*
company 53:*3*
Complaint 8:*4*

complete 18:*17* 74:*12*
complex 17:*25* 50:*21*
complicated 17:*21, 24*
conclusion 14:*5* 68:*4, 13, 24, 25*
conclusions 67:*23*
conduct 8:*13*
conducted 8:*24* 9:*6* 26:*22* 38:*6*
conducting 5:*5* 7:*18*
confused 25:*23*
confusing 5:*21*
conjunction 12:*10*
connected 71:*11*
consecutively 36:*17*
consider 19:*16, 21, 23* 21:*12* 23:*2, 21* 30:*23* 51:*18* 58:*7, 11* 61:*13*
consideration 21:*7* 22:*17* 57:*20* 58:*21* 59:*16, 22, 24* 61:*9*
considered 28:*21* 61:*19, 24*
consist 8:*18*
constant 27:*2*
constantly 10:*6, 9* 16:*3* 26:*24* 27:*2* 34:*6*
consulted 14:*15*
consuming 20:*25*
contact 32:*24*
contemporaneous 48:*10, 12, 15, 18*
context 30:*3, 24*
continual 10:*5*
continue 39:*18*
continuing 14:*18*
continuously 58:*17*
contract 17:*13, 16, 17, 18* 52:*24* 53:*2, 6, 7, 11*
contracted 53:*3, 5, 9, 10* 54:*9, 10*
contractor 17:*15*
contractually 52:*25*
control 35:*20*
conversation 11:*8* 14:*5* 39:*25*
conversations 13:*8*

20:*4* 39:*23* 41:*20*
convincing 22:*3*
Coordinator 31:*15* 33:*25* 34:*17* 35:*12* 42:*12, 15, 24* 43:*24* 44:*2, 16, 22* 45:*5, 15, 23* 46:*21*
coordinator's 32:*23*
copied 24:*25*
copy 74:*9, 11, 12, 14*
corporate 69:*12*
correct 7:*9* 14:*17* 18:*21* 20:*18* 21:*18* 25:*11* 27:*14* 28:*19* 30:*4* 31:*8* 32:*22* 34:*11, 14, 23* 36:*4, 20* 37:*5, 18* 40:*7, 10, 23* 41:*9* 42:*12* 44:*18, 25* 48:*20* 49:*4* 51:*15* 52:*5, 11* 53:*12, 14, 17, 18, 21, 23* 54:*20* 55:*15, 20, 21* 56:*15, 22* 69:*2*
**CORRECTIONS** 72:*5* 73:*3*
corrections/changes 74:*15*
correctly 32:*18*
cost 20:*22* 21:*24*
costs 13:*2* 22:*17*
council 52:*21*
counsel 3:*10* 4:*2* 9:*19* 71:*9, 11* 74:*12*
County 1:*6* 4:*16* 6:*12, 16, 20* 7:*20* 8:*10, 13* 12:*10* 14:*16* 15:*1, 24* 16:*12* 17:*1, 3, 4, 7* 19:*13* 26:*19, 21, 23* 27:*13* 31:*23, 24* 32:*2, 21* 33:*8, 20* 34:*5, 17* 38:*7* 41:*3* 42:*2* 47:*15, 21* 50:*1* 53:*10* 54:*22* 55:*1, 9* 56:*8* 57:*6, 10, 20, 22* 59:*12, 17* 62:*5* 64:*16* 67:*17* 69:*13* 70:*3* 71:*3* 72:*2* 74:*6*
course 12:*13* 21:*10*

COURT 1:*1, 14* 4:*4* 5:*7, 10, 14* 71:*4, 17* 74:*21*
COVER 3:*6* 72:*6* 73:*1*
crashes 41:*16*
created 21:*22* 26:*25* 28:*1*
Creating 65:*18*
Crew 34:*20*
C-R-E-W 34:*20*
crime 32:*25* 33:*19*
criminal 34:*3, 4*
criteria 18:*3*
critiqued 62:*13*
critiquing 62:*12*
CRU 16:*5, 23* 34:*18* 52:*15, 23*
C-R-U 34:*21*
current 26:*18* 54:*25*
cut 55:*8, 11*
Cypress 7:*21*

**< D >**
data 19:*17, 19* 20:*21* 52:*19* 62:*10*
DATE 1:*10* 12:*1, 19* 42:*6, 9, 11* 45:*23* 48:*17, 25* 52:*7* 53:*19* 55:*14* 56:*20* 72:*4, 6* 73:*8*
dated 25:*2, 25* 71:*13*
DAVID 2:*5* 74:*2*
Dawn 24:*24* 25:*10* 37:*2* 62:*16, 24*
day 4:*2* 14:*8, 9, 18* 70:*6* 71:*13* 74:*8*
days 74:*12, 18*
day-to-day 31:*5* 39:*7* 50:*15, 24*
deal 33:*2* 39:*6* 41:*15* 64:*10*
dealership 54:*9*
dealing 9:*12* 26:*15*
Dear 74:*7*
December 71:*13* 74:*1*
decide 47:*4*
decided 50:*10*
deciding 57:*25*

decision  12:*15*  13:*10*
14:*3*  18:*13*  22:*21*
23:*4, 18*  31:*12*  36:*3*
37:*4, 7, 9, 12, 18*
43:*20, 22, 23*  54:*20*
58:*9*  60:*6, 25*
decisional  21:*10*
decision-making
23:*24*  24:*4*  50:*14*
54:*12*  59:*20*  60:*4*
61:*5*
decisions  19:*4*  21:*13*
22:*1, 13, 19*  31:*6*
49:*15, 16, 18*  50:*16,
18*
**Defendant**  1:*7*  2:*12*
7:*5*  66:*5*
**Defendant's**  3:*15, 16,
17, 18, 19*  24:*8*  27:*18*
36:*9*  63:*14*
**Defenses**  8:*5*
**Dell**  17:*11*  53:*6, 9,
13, 17, 19*
**Delta**  30:*14*
demotions  10:*7*
department  13:*25*
14:*1*  21:*17*  34:*16*
41:*11*  50:*25*  51:*3, 6*
57:*25*  67:*24*  69:*1*
departments  16:*12*
18:*24*  20:*24*  22:*25*
67:*17*
**Deponent**  3:*12*  73:*6*
deposed  4:*21, 23*
**DEPOSITION**  1:*9*
4:*1, 3*  5:*6*  7:*18*  8:*3,
9, 12*  36:*17, 19*  69:*18*
71:*1, 6*  72:*4, 5*  74:*8*
deputies  22:*11*  33:*6,
15, 23*  41:*13*  65:*25*
66:*1*
deputy  65:*19, 22*
66:*2*
**Derek**  2:*2*
describe  8:*16*
described  7:*3*  8:*7*
19:*18*  40:*10*  57:*9, 24*
designed  33:*21*  67:*16*
desire  13:*9*  37:*22*
39:*17*  58:*16*

detectives  32:*6*  33:*5,
15, 24*
determination  8:*20*
11:*20*  12:*1, 5, 9*
determinations  8:*20*
11:*23*
determine  18:*23*
50:*9*  58:*10*
determined  20:*4*
62:*18*
devoted  11:*9*
difference  38:*25*
different  17:*5*  26:*7,
16*  45:*4*
difficult  16:*17*
difficulty  28:*14*
**Direct**  3:*2*  4:*11*  33:*2*
**DIRECTED**  72:*6*
directives  49:*19*
director  17:*25*  18:*13,
18*  37:*3*  44:*13*  49:*3,
6, 12, 14, 25*  50:*2, 9,
16, 23*  51:*10, 13, 19,
22*  52:*1*  53:*22, 25*
54:*4, 14, 15*
directors  11:*14*  18:*11*
directorship  50:*13*
51:*12*  55:*4*
disagrees  31:*9*
discuss  10:*20, 23*
13:*19*  40:*3*  42:*23*
discussed  9:*2*  25:*8*
26:*8*
discussing  14:*22, 23*
25:*21*
discussion  12:*4*  13:*3*
43:*9, 10, 19*
discussions  14:*22*
20:*4*  48:*11, 13*
dispatchers  56:*4*
distribute  49:*18*
72:*21*
**DISTRICT**  1:*1*
divert  23:*9*
diverted  22:*11*  23:*7*
diverting  22:*15*
division  66:*25*  67:*4*
68:*11*
divisions  20:*24*

document  6:*23, 25*
7:*5, 11*  24:*6, 21*
27:*16, 23*  28:*1*  31:*13*
34:*22*  36:*7, 24*  41:*8*
44:*4*  45:*2, 21*  53:*16*
56:*24, 25*  57:*5*  63:*12*
64:*1, 4, 8, 12, 18, 21*
66:*3, 16*
documents  7:*12, 25*
8:*6, 7*  28:*3*  45:*18*
61:*7*
doing  11:*16*  18:*12*
19:*25*  20:*1*  21:*3*
32:*7*  48:*18*  49:*24*
50:*20, 21*  54:*8*  56:*12*
58:*17*
doubtless  32:*14*
dozens  15:*13*
drafting  64:*24*
draw  40:*2*  68:*1*
drawing  40:*10, 13*

dstefany@anblaw.com
2:*10*
duly  4:*8*  70:*5*
duplicating  16:*25*
duties  16:*3*  29:*12*
32:*22*  33:*14*  41:*22*
42:*1*  47:*14, 19, 23*
50:*6*  51:*10, 11*  52:*16*
53:*2*  56:*7*
duty  16:*10*  30:*14*

< E >
earlier  26:*4*  45:*2*
57:*24*
early  9:*25*  12:*6*  26:*3*
easily  16:*19*  17:*8*
41:*22*
edge  22:*1*
effect  5:*7*  16:*6*  60:*8*
effective  18:*6, 21*
29:*16*
effectively  9:*10, 15*
14:*25*  15:*22*  48:*17*
58:*18*
efficiencies  57:*9*
efficiency  67:*17*
efficient  18:*7, 21*
19:*25*

efficiently  9:*10, 14*
14:*25*  15:*22, 25*
18:*24*  27:*3*  29:*25*
54:*7*  58:*11, 18*
effort  10:*14*  22:*15*
efforts  16:*6*
eight  9:*1*  59:*6*
either  16:*23*  18:*9*
23:*17*  35:*8*  38:*15*
48:*9*  59:*3*
elect  59:*4*  60:*14*
elected  65:*13*
eligibility  40:*6*
eligible  40:*13*  58:*22,
25*  59:*11*  60:*9, 18*
eliminate  8:*23*  21:*14*
22:*1*  27:*1*  28:*15*
30:*11*  31:*8*  43:*23*
45:*10, 20*  46:*9*  47:*4*
49:*6*  50:*10*  58:*9*
60:*25*
eliminated  10:*21*
11:*24*  12:*2, 18*  13:*12,
20*  18:*4, 20*  21:*9*
22:*18, 21, 22*  23:*19*
25:*21*  26:*25*  27:*7*
28:*9, 11, 17, 18, 22*
29:*2, 5, 21*  31:*17, 19*
34:*14, 23, 25*  35:*1, 3,
7, 8, 23*  38:*10, 15, 17*
40:*16*  41:*2, 6, 19*
42:*7, 15, 18, 22*  43:*14,
17*  44:*5, 8, 10, 16, 18,
20, 24*  45:*3, 6, 16, 18,
24, 25*  46:*1, 7, 13, 19*
47:*12*  48:*7, 20, 23*
51:*17*  52:*2, 5, 8, 14*
53:*14, 17, 25*  54:*16*
55:*4, 14, 23*  56:*5, 14,
18, 21*  57:*1, 5, 8, 19*
58:*1, 8, 20, 25*  60:*12,
22*  61:*10, 19, 24*  62:*4,
6, 15, 21*
eliminating  23:*21*
30:*1, 23*  42:*17*  46:*8*
58:*3, 4*  61:*13*  62:*19*
elimination  10:*7, 13*
34:*11*  40:*22*  51:*13*
e-mail  24:*24*
employed  65:*25*

Deposition of John Holloway                                                    Jenna Clark v. Carmine Marceno

**employee** 39:*24* 71:*9,
10*
**employees** 9:*2* 11:*10*
12:*10* 14:*15* 15:*1*
17:*24* 19:*13* 20:*25*
21:*1, 7, 12* 29:*23*
54:*2* 56:*3, 8* 58:*25*
59:*11, 17* 60:*21, 24*
61:*6, 14* 62:*14, 20, 23*
65:*7, 13* 67:*21*
**employing** 31:*20*
**employment** 37:*20*
38:*19* 40:*15*
**empty** 42:*21*
**encounter** 33:*6* 34:*6*
**encountered** 17:*9*
27:*4* 33:*15*
**encountering** 33:*6*
**enforcement** 22:*12*
32:*13* 33:*1* 34:*7*
**ensure** 5:*19*
**enter** 52:*24* 72:*1*
**entities** 62:*11*
**equipment** 14:*22*
22:*11*
**ERRATA** 3:*5* 72:*6*
74:*11, 12, 14*
**ERROR** 72:*6*
**especially** 43:*10*
**ESQUIRE** 2:*2, 5*
72:*21* 74:*2, 21*
**Estep** 48:*7, 19, 22*
**event** 23:*18* 28:*16*
35:*11*
**eventual** 25:*19*
**eventually** 11:*20*
23:*15* 64:*10* 68:*21*
**everybody** 12:*13*
68:*22*
**evident** 10:*14*
**exactly** 67:*14*
**Examination** 3:*2*
4:*11*
**examine** 30:*22*
**examined** 4:*8* 54:*3*
**exceeds** 50:*15*
**Exhibit** 3:*15, 16, 17,
18, 19* 24:*8, 9* 27:*18*
36:*10, 15, 16* 40:*12*
63:*14, 16* 66:*5, 7*

**exist** 13:*23, 24* 45:*8,
9* 60:*3*
**existed** 17:*8* 20:*5*
50:*11, 12* 56:*1* 59:*25*
60:*1, 2*
**expenses** 8:*19*
**experience** 19:*2*
59:*12*
**expiration** 53:*11*
**expired** 53:*8*
**Expires** 70:*12*
**explained** 69:*4*
**expressed** 39:*21*
**expressly** 3:*12*
**extent** 8:*11* 13:*21*
18:*7* 28:*20* 50:*2, 11,
12, 16*
**externally** 33:*12*
64:*13, 15*

**< F >**
**face** 29:*15*
**facilitate** 31:*24*
**fact** 59:*16, 23* 60:*3*
61:*9*
**factor** 24:*1* 43:*21*
**factors** 19:*21, 23*
67:*19*
**facts** 10:*8* 19:*3* 22:*3*
30:*21* 62:*3*
**fair** 5:*17* 31:*9* 58:*1,
3* 60:*10*
**familiar** 66:*15*
**far** 28:*15* 38:*21*
50:*14* 51:*5*
**faster** 66:*12*
**father** 33:*17*
**faulty** 69:*8*
**February** 10:*1* 11:*5*
42:*10, 16*
**federal** 33:*9* 34:*6*
**FEEL** 72:*5*
**felt** 32:*10*
**FERNANDEZ** 1:*12*
4:*4* 70:*10* 71:*4, 16*
72:*20* 74:*21*
**field** 22:*11*
**fill** 29:*13* 30:*17*
42:*19, 22* 46:*10*
47:*12*

**filled** 33:*11* 39:*7*
40:*23* 43:*7* 44:*19*
45:*7, 12* 48:*8, 9* 54:*4,
16*
**filling** 35:*4* 45:*8*
**final** 9:*16* 12:*1, 5, 12*
62:*18* 66:*17*
**finalized** 12:*18*
14:*16* 62:*7*
**financially** 33:*18*
71:*12*
**financing** 32:*16*
**find** 9:*15*
**finest** 22:*12*
**finger** 31:*10*
**finish** 5:*16, 17*
**first** 9:*17, 23* 10:*16,
19* 11:*23* 19:*24* 29:*9*
31:*14* 44:*4*
**five** 27:*10* 59:*6*
**Fleet** 18:*17, 19* 44:*13*
53:*22, 25* 54:*2, 7, 13,
15* 55:*4* 60:*5*
**flippant** 35:*20*
**floating** 63:*3*
**FLORIDA** 1:*1, 6*
2:*4, 9* 4:*5, 16* 38:*24*
39:*8* 70:*2, 11* 71:*2*
72:*3* 74:*4, 6*
**focus** 14:*20* 32:*14*
33:*4*
**folks** 15:*9* 16:*25*
17:*9* 27:*4, 5* 28:*2*
31:*21* 42:*5*
**follow** 74:*9*
**follows** 4:*9*
**force** 5:*6* 8:*14, 16,
18, 24* 9:*6, 18, 24*
10:*20, 24* 11:*8* 13:*7*
14:*20* 15:*3, 5* 18:*5*
19:*14* 25:*1, 7, 14, 19,
25* 26:*1, 5, 7, 21*
27:*12* 28:*9, 12, 15, 19,
20, 24* 31:*17* 38:*5, 6,
11* 42:*18* 43:*13, 17*
57:*1, 6* 58:*21* 61:*1,
11, 25* 64:*22* 65:*10,
12, 22*
**Ford** 54:*9, 10*

**foregoing** 71:*6* 73:*1*
**form** 59:*19* 61:*20*
**formula** 67:*21*
**Fort** 7:*21*
**forward** 12:*5*
**frame** 14:*20*
**friction** 21:*21*
**front** 7:*25* 13:*1*
**FRS** 38:*18, 19, 21, 22,
23, 25* 39:*11, 14, 15,
16, 24* 40:*7, 13* 59:*5*
60:*15, 18*
**full** 4:*18*
**full-time** 52:*18*
**functions** 33:*24*
52:*21*
**fund** 21:*24* 65:*22*
**funding** 8:*19* 9:*5*
10:*9* 65:*18, 21* 66:*2*
**funds** 32:*15*
**further** 49:*11* 69:*19*
71:*8*
**future** 37:*12* 59:*4*

**< G >**
**gathered** 23:*20*
**general** 59:*14*
**generally** 50:*13*
66:*16* 67:*20*
**generated** 28:*3* 67:*1*
**generic** 15:*7*
**gentleman** 67:*14*
**gesture** 5:*11*
**getting** 10:*1, 3* 20:*23*
**give** 7:*2* 12:*19* 21:*7*
22:*17* 24:*14* 27:*21*
30:*12* 36:*13* 58:*21*
59:*22* 61:*9* 63:*19, 21*
66:*10* 68:*2*
**given** 37:*4, 6, 17*
38:*15* 57:*20* 58:*12*
**giving** 37:*11*
**glass** 6:*5*
**go** 4:*24* 6:*4* 11:*3*
14:*10* 15:*4, 6* 45:*10*
57:*13, 15* 58:*14, 15*
63:*7* 66:*12* 69:*17*
**goal** 18:*8* 22:*9, 14, 15*
**goals** 68:*5*
**goes** 31:*11* 67:*4*

**going** 4:24 6:1, 22
24:6 27:16, 17 29:11
30:19 35:11 37:6
40:12 58:13 63:12,
13 66:3 68:1
**Good** 4:13, 17 29:15
31:10 32:15 39:5
50:20
**government** 17:4
39:24
**grave** 54:12
**great** 64:10
**greatly** 54:11
**Group** 2:2
**grown** 49:9 56:4
**guess** 16:2 18:9
**guide** 31:22
**guilty** 48:17

**< H >**
**habit** 20:3
**half** 14:9
**hand** 33:7 70:6
**handle** 17:15 52:24
**handled** 41:24
**hands-on** 21:4
**happen** 20:16
**happened** 23:6 46:6
**happening** 17:20
**happens** 30:3 35:22
**happy** 23:9
**harming** 22:14
**head** 29:19
**headquarters** 7:20
**heads** 15:7
**hear** 47:17
**Heikkila** 24:24
25:10, 13 37:2 62:16,
24
**held** 13:22
**helicopters** 14:23
**help** 31:22 33:2, 9
35:18
**helped** 33:21
**helping** 22:14
**hereto** 3:10
**hesitate** 31:11
**HH** 70:11
**high** 18:12 23:24

**higher** 23:21 51:14
58:4
**highest** 22:10
**high-level** 18:13
**HILLSBOROUGH**
70:3 71:3
**him/her** 74:15
**hold** 10:5
**HOLLOWAY** 1:9
3:1 4:1, 7, 13, 20, 21
69:11 70:4 72:4
74:2, 8
**H-O-L-L-O-W-A-Y**
4:20
**homework** 14:2
**homicide** 41:16
**hours** 74:17
**HR** 28:2
**human** 21:10 37:2
62:8, 14, 17 63:5
**Hyde** 2:9 74:4

**< I >**
**idea** 9:17, 23 10:17
11:2 60:18
**ideas** 11:19 21:3
**identification** 24:10
36:11 63:17 66:8
**identified** 43:6 45:20
64:19 65:1
**identify** 7:10, 11, 14
15:4 64:5
**imagine** 40:7
**impact** 22:25 31:1, 4,
5
**impetus** 9:8
**implement** 13:10, 17
14:11
**implemented** 12:20
20:13 43:5
**improvements** 64:6
**inaccurate** 65:15
**inadequate** 68:9
**inaudible** 5:11
**include** 12:15 19:4
37:20
**included** 12:24
19:13 43:6 63:5
**increase** 65:25 66:1

**increasing** 16:4
**incurred** 13:3
**indicated** 37:22, 23
50:19 73:3
**indicating** 39:17
46:20
**individual** 23:5 34:4
35:2, 10 38:12 44:20
53:3, 6 60:21 61:6
**individualized** 46:25
**individuals** 12:15
22:20 24:3 29:2
33:9 38:10 57:21
58:22 60:9, 19
**individual's** 52:18
**inflation** 18:10
**influence** 23:6, 11
**information** 11:17
12:14 23:20 33:7
52:19
**informing** 25:13
**initiative** 9:8
**input** 12:13 15:2, 11,
15 64:9, 10 65:3
**inquiring** 13:21
**Inspection** 66:17, 18
67:4, 7
**Inspections** 66:19, 25
67:10
**inspectors** 67:8, 9
**instance** 15:6 16:14
29:10 33:16 54:7
**instantly** 15:20 59:3
**instruct** 74:17
**instructions** 9:13
**interest** 15:23 39:21
66:14
**interested** 71:12
**internal** 42:3 47:25
**internally** 13:25
33:11, 13 56:10
64:12, 14
**inventory** 49:17
**investigation** 33:19
**involved** 33:19 35:18
**irrelevant** 23:19
**issue** 34:2 38:20, 22
**issues** 26:16 32:24
33:16, 22 41:15
50:14

**items** 7:11 10:23
64:19 68:18
**its** 4:15 18:11 40:22
49:11 56:5

**< J >**
**James** 54:16, 19, 22,
25
**Jamie** 34:11, 13
35:13 40:12
**January** 42:16
**JENNA** 1:2 4:14
37:3 38:14 40:15
46:23 49:12 52:4
72:2 74:4
**job** 9:9 32:22 33:13,
24 35:7 36:4 52:19
**jobs** 9:9
**JOHN** 1:9 3:1 4:1,
7, 20 70:4 72:4 74:2,
8
**Jones** 54:16, 19, 22,
25 55:3, 8
**judge** 5:8
**July** 11:25 12:6
42:17, 25 43:25 44:6,
11 45:14 46:3, 16
51:1
**June** 11:25 25:2
26:2, 14 48:10, 25
**jury** 5:8
**justified** 11:21, 22
19:9 52:17
**justify** 16:17 18:19
31:12

**< K >**
**keep** 35:11
**keeping** 32:14
**kept** 63:4
**kind** 17:2 19:17, 21
29:14 31:23 34:2
**kinds** 22:16
**knew** 15:20 16:9
60:11
**know** 5:22 6:5 7:12
14:9 16:23 18:1
25:17 28:2 30:8, 19
35:13, 14 38:5, 9, 12
39:13, 21, 23 40:12,

14, 24  43:9  46:21
47:1  50:19  51:9, 25
54:7  55:8  60:5, 17,
20  63:22  64:8, 9, 18,
21  65:9, 23  66:11
**knowledge**  6:15  61:2
**known**  6:16
**knows**  31:10
**KYLE**  2:2  4:13
24:15  36:14  57:13
72:21  74:21
**kyle@dereksmithlaw.c
om**  2:5  72:21

**< L >**
**label**  3:15, 16, 17, 18,
19  24:8  27:18  36:9
63:14  66:5
**lack**  23:7
**lady's**  17:10
**Large**  4:5  32:2
**late**  26:3
**Law**  2:5  5:7  22:12
32:13, 25  34:7
**lawsuit**  4:14  5:20
**LCSO**  28:1
**lead**  65:11
**leave**  14:19  39:5
**led**  62:3
**Lee**  1:5  4:15  6:12,
16, 20  7:20  8:10, 13
12:10  14:16  15:1, 24
16:12  19:13  26:19,
21, 23  27:13  32:21
34:17  38:7  41:3
42:2  47:15, 21  50:1
53:10  54:22, 25  55:9
56:8  57:6, 10, 20, 22
59:12, 17  62:5  64:16
67:17  69:13  72:2
74:6
**left**  39:4
**left-hand**  28:5
**Legal**  26:10, 11, 12,
15  47:8, 11  48:1, 2
62:10, 20  63:5
**length**  57:21  59:12
**letter**  37:2, 4, 10, 11,
17, 19, 21, 25  38:1, 6,

9, 13, 16  39:13  45:21
46:22, 24, 25
**letters**  38:12
**level**  13:5  22:10
33:8, 9  48:5, 6  49:16
50:14, 17, 18
**levels**  18:12  49:13
**Liaison**  44:13  52:11,
13  53:2
**liberally**  38:20
**Lieutenant**  41:21
**life**  33:3
**limited**  16:19  32:16
**line**  50:7  72:6
**list**  28:5, 12  31:13
40:15  41:8  43:15, 16
47:2  49:3  52:10
55:19  62:6, 15, 18, 24
65:1
**listed**  7:16  28:17
29:3, 6, 21  31:14
40:19, 25  53:19, 22
55:14  56:21, 25  57:5
60:24  61:6
**little**  60:7
**load**  17:21
**location**  30:6
**locations**  52:23  74:15
**long**  14:8  39:5
60:16, 18  61:3
**longer**  20:14  67:9
**look**  16:13  19:3
20:8, 21  23:14, 25
29:18  63:4  67:16, 19,
20
**looked**  15:20  16:8,
16, 22, 24  20:6  21:16,
23  23:23  62:9, 11
**looking**  9:14  10:10,
15  11:19  14:23  15:5,
15, 19  18:6  20:5
31:13  36:14  52:16
57:10, 24  61:5, 16
**looks**  42:11  44:12
48:10  61:2, 3
**lose**  36:4
**lot**  17:6, 19  39:25
43:9, 10  49:23  50:22
**low**  23:24

**lower**  23:22  49:13
50:3, 4, 5, 17, 18  58:5
**lower-management**
49:16

**< M >**
**MACDONALD**  2:2
3:2  4:12, 14  9:20, 22
24:7, 11, 16, 19  27:17,
20  36:8, 12, 16, 20, 23
57:15, 17, 18  59:21
61:22  63:7, 10, 11, 13,
18  66:4, 9  69:11, 17
72:21  74:12, 21
**maintain**  13:3  20:22
**maintained**  51:12
**maintaining**  54:13
**maintenance**  54:9
**major**  15:8  47:3, 5, 6,
14, 19, 23  48:4, 5
**majority**  31:25
**making**  8:20  13:17
22:19  23:4  29:22
46:19  50:17  58:9
**manage**  50:23
**management**  9:2
13:5  15:17, 18  18:10,
11, 12, 13, 15, 17, 25
29:9, 18  44:13  49:9,
13  50:3, 4, 5, 17, 18
53:23, 25  54:2  56:1,
2, 4, 6, 11
**manager**  15:8  29:11
30:8  44:14  51:7, 9,
11, 15, 24, 25  54:16
55:20, 22  56:7, 13, 20
**managers**  11:14
21:2  51:18
**MARCENO**  1:5
4:15  72:2  74:4
**March**  10:1  11:5
**marginal**  19:6
**mark**  24:7  27:17
36:8  63:13  72:6
**marked**  24:9  36:10
63:16  66:4, 7
**Marsha**  40:23  41:3, 8
**matter**  34:5
**maximize**  58:16

**mean**  10:3, 5  20:24
21:20  22:5  34:25
35:4, 6, 8, 10, 15, 20
37:14  49:14  50:12
61:21
**meaning**  39:4
**means**  35:1
**mechanic**  55:2, 7
**mechanistic**  19:22
**meet**  10:9  40:9
**meetings**  52:21, 22
**MELISSA**  1:12  4:4
70:10  71:4, 16  72:20
74:21
**member**  34:1, 8
**members**  41:23
52:23
**mention**  65:12
**mentioned**  20:5, 17
25:7  32:5  43:8  61:4
**message**  24:20  25:2,
5, 8, 10, 13, 18, 22
**met**  18:8
**Miami**  2:4
**MIDDLE**  1:1
**mid-level**  31:3
**Mile**  7:21
**mind**  58:15
**minute**  24:14  27:21
36:13  63:19
**missed**  36:21
**mission**  8:21, 23  9:11
**mistake**  25:24
**moment**  36:6
**money**  9:13  19:11
21:20, 21  22:9, 10, 15
23:7  65:23
**month**  26:3
**months**  30:19
**morning**  4:13, 17
30:7
**mother**  33:17
**motorcycles**  41:14
**move**  59:9
**moved**  26:16  47:7, 8
**moving**  12:5  30:17
40:19
**Myers**  7:21

**< N >**

**name** 4:*13*, *18*  17:*10*
  67:*14*
**nature** 17:*14*
**necessarily** 31:*7*
**necessary** 8:*21*, *22*
  9:*5*  18:*8*  22:*16*
  49:*10*  56:*2*
**need** 6:*4*  13:*7*, *24*
  17:*9*, *22*  20:*1*, *7*, *8*, *15*
  24:*1*  29:*10*, *12*  30:*5*,
  *18*  32:*8*  33:*11*  47:*6*
  48:*5*  50:*22*, *23*  54:*4*,
  *13*  56:*5*  58:*19*  62:*4*
  68:*20*  72:*5*
**needed** 9:*3*  13:*23*
  16:*13*, *18*  19:*8*  23:*25*
  43:*21*  49:*9*, *10*  62:*9*
  67:*22*
**needing** 63:*4*
**needs** 10:*8*, *9*  17:*14*,
  *15*, *16*  18:*11*  30:*22*
  68:*23*
**Nelson** 67:*15*
**never** 35:*14*, *16*
  68:*18*
**nomenclature** 30:*15*
**noncriminal** 34:*3*
**normal** 74:*17*
**Norton** 2:*8*  74:*3*
**Notary** 4:*4*  70:*11*
**NOTE** 72:*5*  74:*11*, *15*
**noted** 65:*3*
**notes** 44:*12*  48:*14*
  71:*7*
**notice** 4:*2*
**noticed** 17:*22*
**notifications** 12:*7*, *20*
**notify** 74:*14*
**November** 55:*15*
**number** 13:*2*  16:*8*
  24:*15*  27:*9*  41:*13*
  58:*15*, *16*  59:*15*, *18*
  65:*6*, *25*  68:*4*
**numbered** 36:*17*
**numbers** 23:*10*, *11*, *16*

**< O >**
**OATH** 3:*3*  4:*9*  5:*2*
  70:*1*

**Object** 59:*19*
**Objection** 61:*20*
**objections** 15:*16*
**objective** 19:*16*
**objectives** 68:*6*
**obligation** 5:*3*  10:*5*
**obligations** 16:*4*
  49:*11*  50:*3*  52:*16*
**observation** 12:*4*
**observations** 19:*20*
  50:*19*
**observed** 65:*3*
**obtain** 57:*10*
**obtained** 15:*11*
**obvious** 12:*3*  18:*7*
  19:*6*  39:*18*
**obviously** 33:*4*
**occasions** 27:*3*
**occupied** 27:*1*  35:*2*
  40:*24*  43:*19*
**occupying** 23:*6*  27:*5*
**occur** 30:*21*
**occurred** 26:*1*  65:*4*
**October** 1:*10*  4:*2*
  53:*19*  56:*21*  66:*18*
  68:*14*  69:*1*  70:*7*
  74:*8*
**offer** 15:*16*  65:*16*
**offered** 35:*24*  55:*4*
**Office** 6:*12*, *17*, *20*
  7:*20*  8:*10*, *13*  12:*11*
  14:*16*, *19*  15:*1*, *25*
  16:*13*  19:*13*  26:*19*,
  *22*, *23*  27:*13*  32:*21*
  33:*5*  34:*17*  38:*7*
  41:*4*  42:*2*  47:*16*, *21*
  50:*1*  52:*20*  53:*11*
  54:*23*  55:*1*, *9*  56:*9*
  57:*6*, *11*, *20*, *22*  59:*13*,
  *17*  60:*19*  62:*5*  64:*16*
  66:*16*  67:*17*  69:*13*
  74:*15*, *17*
**officers** 32:*6*
**official** 1:*5*  4:*15*
  46:*14*  70:*6*  72:*2*
  74:*4*
**officially** 46:*18*, *19*
**oftentimes** 39:*23*
**oil** 54:*8*

**Okay** 4:*23*, *25*  5:*12*,
  *23*  6:*2*, *6*  7:*15*, *18*
  20:*6*, *15*  36:*18*  46:*3*
  63:*21*, *24*  66:*3*
**old** 34:*13*  41:*9*
  48:*19*  52:*4*  54:*19*
  56:*17*
**older** 61:*3*
**once** 66:*25*  67:*3*
**ones** 28:*16*  29:*19*
**open** 29:*8*  35:*25*
  39:*20*
**operate** 9:*10*, *11*, *14*
  27:*2*  29:*24*  30:*8*, *20*
  41:*14*  48:*16*  58:*18*
**operating** 15:*22*, *25*
  29:*15*  45:*11*
**operation** 21:*6*
**operations** 9:*1*, *2*
  10:*6*  15:*12*  18:*7*
  26:*10*, *12*, *13*, *15*
  28:*18*  50:*15*
**opinion** 51:*5*
**opinions** 18:*24*  19:*1*
**opportunities** 9:*14*,
  *15*  10:*10*
**opportunity** 15:*21*
  29:*13*  30:*12*, *22*
  35:*24*  37:*6*, *11*  38:*18*
  42:*20*  65:*16*
**opposed** 14:*22*  23:*22*
**opposing** 74:*12*
**option** 37:*20*  74:*9*, *12*
**Options** 74:*9*
**ordered** 74:*9*, *12*
**ordinarily** 30:*21*
**ordinary** 18:*15*  61:*2*
**organization** 50:*21*
**organizations** 32:*20*
**oriented** 13:*9*
**original** 44:*3*  74:*11*,
  *14*
**outgrown** 18:*11*
**out-of-pocket** 8:*12*
**outreach** 16:*6*  32:*2*,
  *6*  34:*19*  52:*15*
**outside** 32:*20*
**outweighed** 56:*5*
**oversee** 47:*9*

**overstaffed** 69:*6*

**< P >**
**p.m** 1:*11*  57:*17*
  63:*10*  69:*18*, *19*
**PA** 2:*8*  74:*3*
**package** 43:*1*, *15*
  44:*2*  46:*15*
**packet** 43:*18*
**PAGE** 3:*6*  4:*25*
  63:*24*  68:*1*  72:*5*, *6*
  73:*1*
**pages** 63:*21*  66:*6*
  73:*1*
**Paragraph** 7:*3*, *8*, *16*
  65:*5*, *19*, *21*
**Park** 2:*9*  74:*4*
**Parkway** 7:*21*
**part** 9:*11*  16:*23*
  28:*9*, *11*, *17*, *18*  31:*17*
  34:*17*  36:*3*  38:*10*
  43:*1*, *2*, *12*, *15*, *18*, *19*,
  *22*  44:*1*, *3*, *23*  45:*1*
  46:*14*, *15*  52:*15*  57:*1*,
  *5*  58:*20*  60:*25*  61:*5*,
  *10*, *25*
**participating** 52:*20*
**particular** 21:*17*
  28:*16*  46:*10*
**parties** 3:*10*  71:*9*, *10*
**parts** 66:*12*
**path** 33:*3*
**patrol** 32:*6*  33:*5*
  41:*17*  48:*3*
**pay** 17:*5*  19:*8*  23:*14*
  55:*8*, *11*  58:*11*
**paying** 19:*7*  23:*21*,
  *22*
**payroll** 22:*17*
**pension** 39:*12*, *25*
  59:*6*
**people** 11:*13*  14:*24*
  15:*5*, *13*  16:*8*, *15*, *17*,
  *18*  17:*7*  21:*5*  32:*2*,
  *14*  33:*6*, *16*, *20*  34:*7*
  38:*20*  39:*3*  40:*1*
  45:*10*  50:*20*  63:*6*
  65:*2*, *16*  68:*20*, *23*
  69:*3*

Deposition of John Holloway                                                      Jenna Clark v. Carmine Marceno

people's 22:8
perform 33:24
performance 21:12
performed 21:5 54:7
performing 32:21
33:13
performs 67:12
permanent 30:9, 10
52:18
person 9:17 10:16
12:22 16:20 17:7
23:13 30:9 33:1
34:10 35:4, 6 45:8
61:17 64:25 68:20
personal 6:15 36:3
60:15
personally 11:9
person's 35:22
perspective 18:25
Petracca 41:21
philosophy 29:18
phone 33:17
physically 11:11
PLACE 1:12 25:20
27:12
placed 5:2
placing 33:3
Plaintiff 1:3 2:5 4:2
Plaintiff's 3:15, 16,
17, 18, 19 24:7, 9
27:18 36:8, 10 63:14,
16 66:4, 7
plan 39:25
planes 14:23
Planning 67:13 69:9,
10
play 19:21 24:4
please 4:18, 19 5:11
72:5, 21 74:9, 12, 15,
17
PLLC 2:2
point 10:12 18:10,
14 19:10, 17 23:15,
20 26:16 28:23 30:7
46:23 56:5 59:4
60:15 61:13 62:12
66:21 69:7
points 19:10
policies 20:5 36:16
54:5

policy 49:18, 19
54:12 64:4
policy-making 50:14
pops 29:17
position 13:4, 5
18:18 20:9 21:17
22:14, 16 23:5, 6, 12
24:1 26:16 29:8, 12
30:1, 10, 11, 23 31:8,
14, 19, 20, 21 32:3, 7,
10, 19, 21 34:11, 14
35:1, 2, 7, 8, 9, 11, 22,
25 36:2 39:19 40:16,
19, 20, 22, 25 41:1, 19
42:2, 23, 24 43:20
44:13, 16, 19, 22 45:8,
11, 12, 22, 23 46:10,
12, 22 47:2, 4, 12, 24
48:7, 20 49:3, 7
50:10 51:7, 9, 13, 14,
15 52:1, 5, 10, 11, 13,
17 53:13, 22 54:15,
25 55:3, 5, 14, 19, 22
56:6, 8, 13, 18, 20
58:3, 5 59:5 60:10,
11, 12 61:17, 24 62:4
positions 8:19, 21, 22,
23 9:4 10:8, 13, 20
11:21, 24 12:18 13:2,
3, 12, 19, 22 15:18
18:4, 8, 9, 20, 23 19:5,
8, 12 20:18, 20 21:8,
13, 14 22:2, 3, 18, 21,
22, 24 23:3, 11, 14, 18,
22, 23, 24 24:4 25:21
26:25 27:1, 4, 5, 7
28:5, 8, 11, 15, 17, 22
29:1, 3, 5, 20 31:13,
16 33:13, 23 38:10,
14, 17 42:14, 17, 21,
22 43:2, 12 44:7, 10,
23 45:3, 6, 9, 16, 18,
19, 20 46:1, 6, 8, 9
47:15, 20, 23 50:1
51:17 55:9, 12 56:25
57:4, 8, 19, 22, 25
58:7, 12, 18, 20, 24
59:8 60:25 61:5, 10,
14, 18 62:6, 15, 21, 24

65:19, 22 66:2
possibility 37:25
possible 9:10, 12
27:3 28:21
possibly 33:2
prepare 8:3
prepared 7:2, 8, 10,
15
present 30:21
presented 14:13, 14
pretty 15:17
prevent 6:8
previously 49:21
57:9
primary 64:25
principles 18:15
priorities 65:24
probably 4:22 9:25
10:1 11:25 12:6, 7
25:25 43:9 64:25
problem 31:24 47:19
problems 33:6 34:7
55:7
procedure 68:23
procedures 11:12
20:13 21:22 54:5
Professional 47:3, 5,
7, 14, 20, 24 66:16, 19
program 32:2, 6
33:10 34:6, 19 52:15
programs 33:2, 8, 21
promotions 10:7
promptly 74:12
proposal 12:16, 17,
21, 24 13:16, 17, 18,
20 14:12, 17 19:5
22:2 23:11, 17 43:2,
4 44:24 45:1 62:10
proposals 10:13
propose 9:17 11:4
13:12 29:1 60:16
proposed 9:23 10:6,
7, 12, 17 28:24 52:25
proposing 15:15
44:15
propounded 69:19
protection 22:10
provide 19:7 22:9,
12, 13 33:7 62:10

provided 7:5, 12
17:3, 5 31:22, 25
32:4, 13, 20
provides 32:1
providing 17:2
Public 4:4 16:23
19:7 52:20, 22 70:11
purchase 49:17
purchasing 17:19, 20,
23 20:21 49:4, 7, 8,
10, 15, 17, 22, 25 50:2,
8, 10, 15, 19, 24, 25
51:3, 6, 9, 10, 14, 18,
19, 23, 25 52:1 54:5
66:17 67:24 68:10,
11 69:1
purpose 21:2
purposes 73:4
pursuant 4:1
put 64:25

< Q >
qualified 36:1 60:13,
14
quantify 23:16
question 5:20 6:1
questionable 68:24
questions 5:17 11:11
29:9 69:12, 14, 19
quotes 46:19

< R >
Ramsey 56:14, 17
ran 16:17 45:19
rank 51:14
reach 32:2 68:23
reached 11:20 18:10
19:4 23:18 37:7
68:13
READ 3:6 25:23
36:22 63:20, 23, 25
66:21, 22 68:3 72:5
73:1 74:15
reading 3:11 37:25
74:11
ready 7:6 11:4
really 17:22 39:4
reason 29:2 47:10
55:17 57:3

Deposition of John Holloway                                                      Jenna Clark v. Carmine Marceno

**reasonable** 14:*2*
17:*4* 19:*25*
**reasonably** 6:*16* 19:*9*
**reassign** 29:*12*
**reassigned** 47:*11*
69:*8*
**recall** 14:*8* 15:*24*
16:*12* 19:*15* 27:*7*
29:*5, 19, 20* 38:*3, 4*
44:*2* 47:*1* 50:*7, 8*
52:*3* 61:*18, 23* 62:*2,*
*17, 23* 64:*15* 65:*13*
67:*23*
**recalled** 65:*3*
**receive** 55:*11*
**received** 38:*12* 46:*22,*
*23, 24*
**receiving** 39:*9*
**recess** 57:*16* 63:*9*
**recognize** 7:*13* 24:*21*
27:*23* 36:*24* 64:*1*
**recollection** 11:*6*
18:*1* 26:*6* 27:*9, 11,*
*15* 32:*1* 42:*4* 45:*17,*
*25* 46:*2, 14* 47:*25*
63:*1*
**recommendations**
14:*4*
**recommended** 25:*15,*
*17* 31:*16* 68:*10*
**record** 4:*19* 57:*13,*
*15, 17* 63:*7, 10* 71:*7*
**records** 16:*2* 41:*24*
42:*5* 47:*10* 48:*1*
**reduce** 49:*11* 54:*6*
**reduced** 49:*21, 23*
65:*6*
**reducing** 54:*11*
**reduction** 8:*13, 16, 18,*
*24* 9:*6, 18, 24* 10:*20,*
*24* 11:*8* 14:*20* 15:*2,*
*5* 18:*4* 19:*14* 24:*25*
25:*1, 7, 14, 19, 25*
26:*1, 4, 7* 28:*9, 12, 14,*
*19, 20, 24* 31:*17* 38:*5,*
*6, 11* 42:*18* 43:*13, 17*
57:*1, 6* 58:*21* 61:*1,*
*10, 25* 64:*22* 65:*9, 12,*
*22*

**reductions** 13:*7*
26:*21* 27:*12*
**redundant** 32:*4, 11,*
*12, 19*
**reexamine** 42:*20, 21*
**refer** 19:*1* 33:*20*
39:*16*
**referenced** 38:*5* 39:*1*
**referencing** 25:*18*
26:*7* 39:*13*
**referrals** 17:*8* 31:*24*
32:*5* 34:*9*
**referred** 39:*24*
**referring** 17:*7* 28:*14*
34:*4, 5* 39:*15* 65:*9*
**refresh** 18:*1*
**regard** 5:*25* 11:*7*
**regarding** 5:*20* 7:*2,*
*8, 15* 10:*19, 23* 15:*2*
44:*7* 67:*23*
**Regardless** 45:*22*
46:*11*
**regards** 37:*9*
**relative** 71:*8, 10*
**relatively** 12:*3*
**relevant** 12:*14* 15:*18*
**relocate** 29:*23*
**remain** 65:*14*
**remaining** 56:*10*
**remember** 9:*23*
16:*14, 21* 17:*6, 10, 11,*
*12, 19* 18:*16, 19*
**remotely** 1:*12* 70:*5*
**renew** 17:*17*
**rephrase** 5:*22*
**report** 64:*5* 66:*17,*
*20* 67:*24* 68:*18* 71:*5*
**REPORTED** 1:*12*
4:*3*
**REPORTER** 3:*4* 4:*4*
5:*10, 14* 71:*4* 74:*21*
**REPORTER'S** 71:*1*
**reports** 66:*23* 67:*1*
**represent** 4:*14*
**representative** 69:*13*
**requested** 9:*6*
**requesting** 30:*5*
**require** 17:*25*
**required** 12:*3* 15:*12*

31:*7* 51:*22* 67:*7*
**requirement** 66:*24*
**requirements** 40:*6, 9*
**research** 10:*13* 12:*4*
21:*4* 50:*19* 67:*13*
69:*9, 10*
**reserved** 3:*12*
**residents** 19:*8* 22:*10*
**resign** 35:*17* 36:*5*
**resigned/position**
53:*16*
**resigns** 29:*8, 10*
**Resource** 34:*19*
**resources** 20:*24*
21:*16, 20* 22:*15, 25*
32:*17* 37:*2* 57:*25*
58:*4, 10, 13, 14* 62:*9,*
*14, 17* 63:*6* 68:*5, 9*
**respective** 3:*10*
**respond** 5:*12*
**response** 7:*7* 9:*7*
11:*1* 13:*15*
**responses** 5:*11, 15, 16*
**responsibilities** 13:*4,*
*6, 22, 23* 16:*3* 26:*14*
47:*12*
**responsibility** 17:*1*
47:*7* 68:*21* 69:*8*
**responsible** 21:*5*
47:*10*
**result** 23:*7* 35:*11*
**resulted** 30:*1* 65:*21*
**retain** 66:*1*
**retire** 35:*4, 7, 13, 14,*
*16, 18, 19, 20, 23* 36:*5*
37:*5, 7, 11, 18, 22, 24*
38:*15, 18, 20, 21*
39:*17* 59:*3, 4, 5, 8*
60:*14*
**retired** 35:*2, 10* 39:*6*
48:*9, 14*
**retired/position** 34:*23,*
*25* 35:*3* 40:*16* 41:*6*
42:*6* 48:*23*
**retirement** 30:*24*
35:*17* 38:*19, 22, 24,*
*25* 39:*1, 2, 8, 10, 24*
40:*3* 58:*22* 59:*1, 11*
60:*9, 14, 18*

**retirement/position**
52:*7*
**retires** 29:*7, 11* 35:*21*
**retiring** 30:*4* 39:*11,*
*14, 22* 40:*7*
**RETURN** 72:*6*
**revealed** 33:*19*
**review** 8:*6, 19* 9:*4*
10:*6* 20:*20* 24:*14*
27:*21* 36:*13* 38:*1*
48:*15* 62:*5, 21* 63:*19,*
*22* 66:*10* 68:*2*
**reviewed** 19:*19*
20:*17* 24:*18* 27:*22*
55:*25* 62:*15, 24*
**reviewing** 38:*3* 68:*17*
**reword** 5:*22*
**right** 15:*25* 17:*6*
25:*15* 39:*3* 40:*17*
48:*23* 51:*7* 52:*8*
53:*20* 56:*18* 57:*11*
61:*23* 65:*19* 66:*11*
**role** 17:*11, 12* 24:*4*
26:*18* 32:*24* 34:*10*
35:*4* 47:*6* 48:*8, 9*
49:*12* 51:*25* 54:*4, 17*
56:*14*
**roles** 31:*1* 49:*25*
50:*10* 51:*18, 22, 23*
**room** 7:*22*
**Roughly** 10:*1* 11:*5*
42:*17*
**routine** 28:*18, 21*
49:*20* 50:*15* 54:*9*
**routinely** 28:*15*
**row** 15:*14*
**rumors** 63:*3*
**run** 11:*17* 18:*24*
**running** 16:*9, 10*

**< S >**
**safe** 32:*14*
**safety** 19:*7*
**salaries** 22:*20, 24*
23:*2, 25* 66:*1*
**salary** 58:*4, 5*
**satisfied** 51:*24*
**satisfy** 67:*2*
**save** 23:*17* 58:*4*
**savings** 29:*16*

**saw** 12:*14* 16:*25* 26:*2*

**says** 34:*23* 35:*3* 37:*6, 7, 21* 40:*16* 41:*5* 48:*22, 25* 53:*16* 65:*6, 18* 68:*8*

**scale** 23:*14*

**scanned** 8:*4, 5*

**school** 52:*21*

**scientific** 18:*14*

**scope** 10:*20*

**screen** 6:*22*

**scroll** 63:*22* 66:*11*

**seal** 70:*6*

**search** 32:*8*

**second** 16:*9* 40:*19* 57:*14* 63:*22* 68:*2*

**secret** 63:*2*

**secretary** 16:*15, 18* 23:*4* 40:*21* 41:*11, 18, 22* 42:*1, 14, 23* 43:*9, 24* 44:*3, 15, 23* 45:*5, 15* 46:*12, 22*

**section** 34:*22* 65:*5*

**see** 6:*22* 20:*11* 24:*12, 20* 25:*2* 28:*4, 5, 13* 42:*6* 48:*16* 65:*5, 18* 67:*20* 68:*4, 8*

**seek** 15:*2* 37:*20* 38:*18*

**seen** 6:*25* 9:*1* 28:*2* 45:*19* 68:*18*

**select** 18:*4* 41:*18*

**selected** 13:*20* 28:*8* 52:*5, 13* 54:*16* 55:*22* 56:*14, 18* 57:*8, 19* 58:*7, 24* 60:*22* 61:*10* 62:*1*

**selecting** 18:*20* 21:*8* 51:*17* 58:*20*

**send** 52:*23* 74:*12*

**senior** 16:*21, 25* 31:*15* 33:*22, 25* 34:*2, 16* 35:*12* 42:*11, 15, 24* 43:*24* 44:*2, 16, 22* 45:*4, 14, 23* 46:*21*

**seniority** 24:*3*

**seniors** 32:*24*

**sense** 15:*7* 19:*2* 22:*7, 8* 32:*12, 19* 49:*23* 59:*22* 68:*22* 69:*5*

**sent** 38:*1, 9*

**sentence** 65:*11*

**separate** 20:*7*

**September** 37:*13*

**serious** 10:*1, 3*

**seriously** 9:*4*

**served** 60:*19*

**Services** 16:*23, 25* 17:*3* 26:*10, 13, 15* 31:*15, 22, 25* 32:*1, 3, 4, 12, 20* 33:*25* 34:*16* 35:*12* 42:*11, 15, 24* 43:*24* 44:*2, 16, 22* 45:*5, 14, 23* 46:*21* 48:*1, 2*

**set** 40:*9*

**seven** 43:*16*

**share** 6:*22*

**shared** 12:*25* 13:*15* 43:*3, 4, 12* 64:*12, 13, 15*

**SHEET** 3:*5* 72:*6* 73:*3* 74:*11, 12, 14*

**Sheriff** 1:*5* 4:*15* 8:*11* 9:*11, 18* 10:*12, 16, 19, 24* 11:*8* 12:*12, 16, 17, 21, 25* 13:*13, 19* 14:*4, 12* 16:*7* 19:*5* 23:*17* 25:*14, 18* 26:*13* 28:*25* 30:*25* 31:*9* 42:*16, 24* 43:*3, 4, 13, 23* 44:*6, 11, 17* 45:*14, 19* 46:*7, 15, 17* 52:*25* 60:*16* 62:*6, 10* 64:*5, 9, 11* 72:*2* 74:*6*

**Sheriff's** 6:*12, 16, 20* 7:*20* 8:*10, 13* 9:*13* 11:*1* 12:*11* 13:*15* 14:*16* 15:*1, 24* 16:*13* 19:*13* 22:*9* 26:*19, 22, 23* 27:*13* 31:*2, 8* 32:*21* 33:*5* 34:*17* 38:*7* 41:*4* 42:*2* 47:*15, 21* 50:*1* 52:*20* 53:*10* 54:*23* 55:*1, 9* 56:*9* 57:*6, 11, 20, 22*

**59:*12, 17*** 60:*19* 62:*5* 64:*16* 67:*17* 69:*13*

**show** 24:*6* 27:*16* 36:*6* 63:*12* 66:*3*

**showed** 44:*4* 45:*2, 21*

**showing** 6:*23* 24:*12, 21* 27:*23* 31:*14* 34:*23* 36:*24*

**shrug** 5:*11*

**side** 28:*6*

**SIGN** 3:*6* 72:*6* 73:*1* 74:*15*

**SIGNATURE** 73:*6*

**signed** 74:*12*

**significance** 26:*24*

**significant** 31:*1, 4* 59:*3, 15, 18*

**significantly** 16:*5* 49:*24* 54:*6*

**signing** 3:*11*

**similar** 33:*24* 46:*23* 54:*5*

**simply** 17:*17* 19:*2, 6* 20:*14* 29:*22* 43:*6, 21* 50:*21* 54:*12* 58:*16* 60:*3*

**single** 68:*18*

**sir** 5:*1, 13, 18* 8:*2, 15* 9:*21* 18:*22* 24:*18* 26:*20* 27:*22* 28:*7, 10, 21* 34:*24* 36:*22, 25* 40:*8, 14* 41:*10* 42:*8, 13* 47:*17, 22* 48:*21, 24* 49:*2, 5* 51:*16, 20* 52:*3, 6, 9, 12* 53:*4, 12, 15* 55:*10, 13* 56:*16, 19, 23* 57:*7, 12, 23* 58:*2, 6* 61:*8, 12* 63:*20, 23, 25* 64:*2, 17, 19* 68:*3, 12, 15*

**Six** 7:*21* 13:*14* 27:*10* 43:*17* 44:*3, 4, 7* 45:*3, 18*

**six-month** 53:*7*

**skipped** 36:*18*

**slot** 30:*20* 44:*20, 21* 45:*7*

**slots** 42:*19*

**Smith** 2:*2* 24:*25* 62:*22, 25*

**social** 17:*2* 31:*21* 33:*10*

**solely** 12:*9*

**solution** 32:*8*

**solve** 34:*7*

**somebody** 29:*7, 10, 24* 30:*5, 6* 33:*16* 39:*6* 43:*19* 48:*4* 61:*2, 3, 4* 69:*6*

**someone's** 37:*14*

**somewhat** 32:*3* 63:*4*

**sorry** 13:*11* 24:*20* 25:*23* 28:*4* 29:*3* 30:*14* 50:*8* 56:*24* 57:*2* 62:*8* 67:*5*

**sought** 15:*11*

**source** 35:*17* 43:*8*

**sources** 17:*6, 7*

**South** 2:*9* 74:*4*

**speak** 5:*15* 8:*9* 12:*21* 57:*2*

**speaking** 62:*17*

**specialist** 16:*22*

**specialized** 41:*16*

**specific** 10:*23* 12:*19* 13:*19* 14:*20* 15:*2* 18:*3, 6* 28:*24* 58:*15* 61:*23*

**specifically** 14:*24* 15:*13, 14* 18:*23* 25:*17* 29:*7* 33:*21* 35:*12* 40:*3* 41:*15* 50:*5* 60:*19* 61:*18, 24* 62:*3*

**spend** 15:*23*

**spending** 22:*8*

**spent** 10:*14*

**spoke** 10:*19* 13:*13* 16:*15* 43:*25* 44:*6, 8, 11, 17* 45:*13* 54:*2* 69:*3*

**spoken** 42:*16*

**spongible** 65:*23*

**Sprankel** 40:*23* 41:*3*

**Sprankel's** 41:*8*

**staff** 11:*18* 16:*4* 66:*17, 18* 67:*10*

**staffed** 50:*25* 51:*3*

**staffing** 15:*12* 67:*24*

68:8, 19
**Stan** 67:15
**stand** 38:23
**standard** 38:13 67:2
**standardized** 49:20
**Standards** 47:3, 5, 7, 14, 20, 24 66:16, 19
**standpoint** 21:10, 11
**start** 4:18 39:8
**starting** 39:11
**State** 4:4 31:23, 25 33:8, 20 34:5 64:4 70:2, 11 71:2
**statement** 65:15
**STATES** 1:1 38:16
**stating** 4:18
**status** 64:5
**stay** 59:4 65:17
**STEFANY** 2:5 9:19 24:15, 17 36:14, 18, 21 57:13 59:19 61:20 69:14, 16 74:2, 7
**Stenographer** 1:14 71:17
**stenographic** 71:7
**stenographically** 71:5
**step** 11:7
**stepping** 60:7
**steps** 21:23 29:24
**stipulated** 3:9
**stop** 6:6
**streamlining** 49:11, 22
**strike** 24:20 28:4 56:24
**subscribe** 73:4
**subsequently** 55:6
**suggest** 11:3
**suggested** 19:12
**Suite** 2:3, 8
**Suite225** 74:3
**supervisor** 30:18 51:24
**supervisors** 21:1 56:11, 12
**supervisory** 49:16
**supposed** 67:19
**sure** 5:12 7:4, 23 9:9 14:1 16:6 18:16

23:15 32:18 37:3 57:15 61:16, 21 62:2, 11 66:13, 20, 21 67:13
**suspend** 69:17
**switched** 55:11
**sworn** 4:8 70:5
**system** 18:14 19:10, 17 38:24 39:8, 14, 15 40:7, 13

**< T >**
**take** 6:4 9:3 29:24 35:9 50:9 55:6 59:8
**TAKEN** 1:10 4:1 57:16 63:9 74:8
**takers** 56:4
**talk** 11:13, 14, 18 15:6 20:25 39:10, 11 46:6
**talked** 15:7, 9 16:8 20:25 21:1 46:8 55:25
**talking** 11:10 21:4 43:17
**Tampa** 2:9 74:4
**taxpayer** 19:7
**taxpayers** 9:12 17:5 21:24
**TDY** 30:6, 14
**TDY'd** 30:7
**Team** 7:24
**technician** 7:23
**technologically** 7:24
**tell** 37:21 50:23 67:18, 21
**tells** 68:22
**temporarily** 30:17
**Temporary** 30:14
**tenure** 64:7
**term** 39:9
**terminate** 17:17
**terminated** 37:16, 18
**terms** 62:12
**testified** 4:8
**testify** 5:3 7:8, 15
**testifying** 5:7 6:9, 11
**TESTIMONY** 3:1 5:6, 20 7:2

**Thank** 4:16 24:17 36:21 74:19
**thing** 21:25 32:15 33:4
**things** 4:24 11:16, 17 17:20 20:1, 12, 15, 16 32:25 50:20, 22 59:9 65:1, 23, 24 67:15
**think** 8:25 12:4 14:6, 7, 10 16:14, 21 17:11, 25 18:17 19:19 28:3 31:19 32:23 34:18 37:25 38:17 39:2, 16 41:20 43:16 45:2 46:5 48:1 55:6 59:24 60:2 63:1 64:20 65:14 68:19 69:6, 9
**thinking** 6:9
**third** 47:2
**thirty** 74:18
**Thomas** 30:14
**thought** 13:21 26:3, 4 43:16
**thoughts** 11:19 15:16 18:25 19:1
**thousands** 7:12
**three** 67:1, 3
**TIME** 1:11 5:15 8:25 10:14 11:9 14:7, 10, 19 15:23 17:24 18:18 20:6 21:21 22:15 23:20 26:25 27:1 28:23 29:15, 17 32:9 34:10, 13 38:18 39:5 40:22, 24 42:20 43:7, 11 45:9, 25 48:5, 7, 19 49:21 52:1, 4, 22 53:13 54:19 56:13, 17 57:21 59:3 60:23 67:9 69:7, 16
**today** 4:16 5:3 6:9 7:18 8:1
**today's** 8:3
**told** 14:10 15:14
**top** 29:19 59:6
**topic** 7:3, 8, 16 39:25

**total** 60:15
**tour** 14:19
**tours** 14:21
**Traci** 48:7, 19, 22
**traffic** 16:14, 15, 16, 17 40:21 41:11, 13, 14, 15, 16, 18, 22, 23 42:1, 3, 14, 23 43:9, 24 44:3, 16, 23 45:5, 15 46:12, 22
**training** 47:8 48:2
**transcribe** 5:10, 15
**transcribed** 74:8
**transcript** 3:11 71:6 72:1, 5, 6 73:4 74:9, 11, 12, 14
**transfer** 30:5
**transferred** 14:1 48:2, 3 67:10
**transfers** 10:6
**transitory** 17:14
**tried** 46:10
**true** 30:10 71:7
**trusts** 31:5
**truthfully** 5:3 6:9
**try** 5:22 15:4 33:1 42:20
**trying** 14:6 27:2
**TTY** 30:13
**turn** 30:10
**turns** 29:23 45:11
**two** 8:6 12:6, 7, 20 17:5 18:2 26:24 27:3, 11 42:14 43:2, 12 56:11 62:11 63:21 68:10, 20, 23
**two-part** 9:7

**< U >**
**ultimately** 61:25
**unclearly** 57:2
**Undersheriff** 26:17
**undersigned** 70:4
**understaffed** 15:21
**understand** 5:2, 5, 21 6:1, 11, 14, 19 7:7 38:21 46:7 55:5
**understanding** 8:18 45:13, 17 51:16 59:14

**Understood**  7:*25*  31:*23*  32:*18, 23*
**unhesitantly**  34:*9*
**unit**  13:*25*  14:*1*  15:*7, 8*  16:*16, 17, 19*  19:*24*  20:*11*  21:*23, 24*  29:*9, 11, 12*  34:*19*  41:*13, 14, 17, 25*  42:*3*  47:*9*  50:*3*  66:*20, 25*  67:*3, 11*  68:*19, 22*
**UNITED**  1:*1*
**units**  11:*14*  16:*4*  19:*3*  20:*1, 22, 23*  49:*8*
**Unjustifiable**  22:*6, 7*
**unlimited**  32:*15*
**unnecessarily**  17:*21*
**unnecessary**  21:*22*  22:*4*  23:*5, 12*  47:*13*
**unrelated**  32:*25*
**untenable**  22:*4, 5*
**unusual**  15:*10*
**upper**  15:*17*
**use**  19:*19*  22:*25*  38:*20*  39:*9*  56:*3*  57:*24*  74:*9*
**utilization**  32:*16*
**utilize**  32:*3*
**utilizing**  21:*17*

**< V >**
**vacant**  45:*15, 22*  46:*11*
**valid**  20:*14*
**value**  17:*12, 13*
**varies**  41:*13*
**variety**  19:*20*  32:*24*
**various**  11:*13*
**vehicles**  54:*10, 13*
**viewed**  60:*15*
**vision**  9:*11*
**visit**  52:*19*
**visited**  54:*1*
**voluntarily**  35:*6*
**voluntary**  35:*17*
**vs**  1:*4*

**< W >**
**wait**  5:*15, 16*
**walking**  11:*9*

**want**  5:*19*  28:*22*  32:*14*  36:*6*  63:*2, 3*  66:*10, 13*
**wanted**  15:*16*  18:*20*  37:*24*  39:*19*
**warrant**  17:*23*  19:*9*  49:*12, 14*
**warranted**  13:*4*
**waste**  23:*8, 9*
**wasted**  23:*8*
**water**  6:*5*
**way**  14:*25*  19:*25*  20:*2, 3, 8, 10*  22:*1*  45:*4*  49:*9*
**week**  12:*7, 20*  14:*18*  15:*10*
**Well**  22:*8*  23:*9*  30:*25*  45:*11*  49:*15*  50:*13*  51:*7*  60:*7*  66:*15*
**went**  15:*5, 14*  17:*16*  20:*11*  36:*19*  58:*16*  66:*2*
**we're**  4:*24*  9:*12*  22:*8*  27:*2, 17*  30:*17*  43:*17*  45:*11*
**we've**  10:*11*  26:*24*
**wise**  14:*2*
**withdrawn**  37:*5, 8, 13, 15*  38:*16*
**WITNESS**  4:*10*  46:*19*  69:*20*  70:*6*
**wonderful**  33:*4*
**word**  9:*8*  23:*8*  39:*3*
**work**  15:*9*  17:*1, 2, 6*  18:*13, 15*  31:*21*  33:*1*  41:*3*  49:*19*  54:*6, 22*
**worked**  57:*21*
**worker**  31:*21*  33:*10*
**working**  26:*22*  39:*18*  40:*25*  41:*1*
**workload**  16:*20*  17:*23, 24*  49:*21, 23*  54:*11*  55:*25*  56:*1*  66:*17*  67:*5, 6, 10, 16, 20*  68:*9*
**workloads**  11:*15*  19:*20*  20:*18, 20*
**works**  7:*24*  41:*6*

**world**  68:*23*
**worries**  30:*16*  57:*4*
**WRITE**  72:*1*
**written**  25:*5*  64:*18, 21*
**wrong**  9:*8*  33:*10*
**wrote**  64:*8*

**< Y >**
**Yankee**  30:*15*
**Yeah**  11:*6*  23:*19*  24:*13*  47:*19*  57:*4*
**year**  29:*1, 21*
**years**  4:*22*  9:*1*  20:*2, 13, 14*  34:*13*  41:*9*  48:*19*  52:*4*  54:*19*  56:*17*  59:*6, 15, 18*  61:*14*  67:*1, 3*  68:*17*  69:*6*
**younger**  61:*3, 14*

**< Z >**
**Zoom**  1:*12*  2:*5, 11*  5:*6*  7:*24*  24:*12*

Deposition of John Holloway                                    Jenna Clark v. Carmine Marceno

## WORD LIST

**< $ >**
**$150,000**  *(1)*
**$30,000**  *(1)*

**< 1 >**
**1**  *(5)*
**1,200**  *(1)*
**1,400**  *(1)*
**1/31/2021**  *(1)*
**1:01**  *(3)*
**10**  *(3)*
**10/10/2023**  *(1)*
**10th**  *(3)*
**11**  *(1)*
**12:03**  *(1)*
**12:15**  *(1)*
**12:47**  *(1)*
**123**  *(2)*
**13**  *(1)*
**1310**  *(1)*
**1316**  *(2)*
**1318**  *(2)*
**14750**  *(1)*
**14th**  *(1)*
**1700**  *(1)*

**< 2 >**
**2**  *(3)*
**20**  *(2)*
**2019**  *(11)*
**2020**  *(4)*
**2021**  *(33)*
**2022**  *(1)*
**2023**  *(6)*
**20th**  *(2)*
**21**  *(4)*
**215**  *(1)*
**22-002723-CI**  *(1)*
**225**  *(1)*
**24**  *(2)*
**25**  *(1)*
**251-1210**  *(1)*
**26**  *(1)*
**26th**  *(1)*
**27**  *(2)*
**278990**  *(1)*
**28th**  *(1)*

**< 3 >**
**3**  *(4)*
**30**  *(3)*
**305**  *(1)*
**324**  *(2)*
**33131**  *(1)*
**33606**  *(2)*
**341-3616**  *(1)*
**36**  *(1)*
**3rd**  *(1)*

**< 4 >**
**4**  *(5)*
**40**  *(2)*
**4350**  *(2)*
**4386**  *(2)*
**4412**  *(2)*
**4492**  *(3)*
**46**  *(1)*
**48**  *(1)*
**4th**  *(1)*

**< 5 >**
**5**  *(3)*
**51**  *(1)*
**58**  *(2)*
**59**  *(1)*

**< 6 >**
**6**  *(3)*
**6/21/2026**  *(1)*
**6/24**  *(1)*
**6/24/2021**  *(1)*
**63**  *(1)*
**66**  *(2)*

**< 7 >**
**7**  *(3)*
**70**  *(1)*
**701**  *(1)*
**71**  *(1)*
**72**  *(1)*
**73**  *(1)*

**< 8 >**
**813**  *(1)*

**< 9 >**

**9/4/2021**  *(1)*
**9:42**  *(1)*
**946-1884**  *(1)*

**< A >**
**a.m**  *(3)*
**Abbi**  *(3)*
**A-B-B-I**  *(1)*
**ability**  *(1)*
**able**  *(3)*
**above-styled**  *(1)*
**absorb**  *(1)*
**absorbed**  *(19)*
**abused**  *(1)*
**accomplishing**  *(1)*
**accreditation**  *(3)*
**accuracy**  *(1)*
**accurate**  *(3)*
**achieving**  *(1)*
**acknowledge**  *(4)*
**acknowledged**  *(3)*
**act**  *(2)*
**action**  *(3)*
**actively**  *(1)*
**activities**  *(1)*
**added**  *(3)*
**adding**  *(1)*
**addition**  *(4)*
**additional**  *(1)*
**addressed**  *(1)*
**adequate**  *(1)*
**adequately**  *(3)*
**administrative**  *(1)*
**advising**  *(1)*
**Affairs**  *(1)*
**affect**  *(2)*
**Affirmative**  *(2)*
**age**  *(6)*
**agency**  *(54)*
**agency-wide**  *(1)*
**agent**  *(1)*
**ago**  *(2)*
**agree**  *(1)*
**agreed**  *(4)*
**ahead**  *(5)*
**air**  *(1)*
**alike**  *(1)*
**Allen**  *(2)*
**allocations**  *(1)*

**allowed**  *(1)*
**alter**  *(1)*
**Amended**  *(1)*
**AMENDMENT**  *(1)*
**amendments**  *(1)*
**amount**  *(1)*
**Amy**  *(7)*
**analysis**  *(6)*
**and/or**  *(2)*
**anecdotal**  *(1)*
**answer**  *(5)*
**answers**  *(3)*
**Anthony**  *(2)*
**anticipate**  *(1)*
**Antoinette**  *(1)*
**anybody**  *(3)*
**anytime**  *(1)*
**anyway**  *(1)*
**apologize**  *(4)*
**apparent**  *(6)*
**apparently**  *(1)*
**APPEARANCES**  *(1)*
**appeared**  *(8)*
**appears**  *(2)*
**application**  *(1)*
**apply**  *(4)*
**applying**  *(1)*
**appointment**  *(7)*
**approach**  *(1)*
**appropriate**  *(4)*
**appropriately**  *(2)*
**approval**  *(6)*
**approve**  *(3)*
**Approved**  *(8)*
**approximately**  *(1)*
**Aquila**  *(6)*
**area**  *(1)*
**areas**  *(6)*
**asked**  *(7)*
**asking**  *(2)*
**aspects**  *(1)*
**Assessment**  *(3)*
**assessments**  *(1)*
**assigned**  *(10)*
**assist**  *(2)*
**assistant/secretary**  *(1)*
**assisted**  *(1)*
**assume**  *(2)*
**assumed**  *(6)*

Deposition of John Holloway                                    Jenna Clark v. Carmine Marceno

assumption *(2)*
attached *(2)*
attempted *(1)*
attending *(1)*
attention *(5)*
attorney *(3)*
attrition *(3)*
August *(11)*
authenticate *(1)*
authority *(1)*
authorized *(1)*
available *(7)*
Avenue *(3)*
average *(1)*
aviation *(3)*
aware *(7)*

< B >
back *(9)*
baggage *(1)*
bandy *(1)*
Bartz *(4)*
based *(11)*
basically *(3)*
basis *(11)*
bat *(1)*
Bates *(11)*
bathroom *(1)*
bearing *(1)*
BEHALF *(4)*
belief *(1)*
believe *(53)*
believed *(1)*
benefited *(1)*
benefits *(1)*
best *(9)*
better *(6)*
binding *(1)*
bit *(1)*
blanked *(1)*
Blue *(2)*
board *(1)*
borderline *(1)*
box *(1)*
break *(1)*
Brickell *(1)*
bring *(4)*
brings *(1)*
brochures *(1)*

brought *(3)*
burden *(1)*
Bureau *(2)*
business *(8)*
businesslike *(1)*
busy *(1)*
buy *(1)*

< C >
calculation *(2)*
call *(6)*
called *(3)*
capable *(1)*
capacity *(5)*
captain *(2)*
captain's *(1)*
careful *(1)*
caretaker *(1)*
CARMINE *(4)*
cars *(1)*
CASE *(2)*
cc *(1)*
ceasing *(1)*
certain *(4)*
Certainly *(2)*
CERTIFICATE *(4)*
certify *(3)*
challenged *(1)*
challenges *(1)*
chance *(2)*
change *(6)*
changed *(2)*
changes *(2)*
changes/corrections
 *(1)*
checks *(3)*
Chief *(3)*
choice *(3)*
choices *(1)*
choose *(5)*
chose *(4)*
circumstances *(5)*
citizen *(1)*
citizens *(1)*
city *(1)*
civilian *(1)*
CLARK *(15)*
Clark's *(1)*
clear *(1)*

clearly *(3)*
client *(5)*
closer *(3)*
coinciding *(1)*
collect *(2)*
column *(1)*
come *(4)*
comes *(1)*
command *(2)*
commencing *(1)*
comment *(4)*
comments *(1)*
Commission *(2)*
common *(2)*
Communications *(7)*
Community *(5)*
company *(1)*
Complaint *(1)*
complete *(2)*
complex *(2)*
complicated *(2)*
conclusion *(5)*
conclusions *(1)*
conduct *(1)*
conducted *(4)*
conducting *(2)*
confused *(1)*
confusing *(1)*
conjunction *(1)*
connected *(1)*
consecutively *(1)*
consider *(11)*
consideration *(8)*
considered *(3)*
consist *(1)*
constant *(1)*
constantly *(6)*
consulted *(1)*
consuming *(1)*
contact *(1)*
contemporaneous *(4)*
context *(2)*
continual *(1)*
continue *(1)*
continuing *(1)*
continuously *(1)*
contract *(9)*
contracted *(6)*
contractor *(1)*

contractually *(1)*
control *(1)*
conversation *(3)*
conversations *(4)*
convincing *(1)*
Coordinator *(15)*
coordinator's *(1)*
copied *(1)*
copy *(6)*
corporate *(1)*
correct *(43)*
CORRECTIONS *(2)*
corrections/changes
 *(1)*
correctly *(1)*
cost *(2)*
costs *(2)*
council *(1)*
counsel *(6)*
County *(55)*
course *(2)*
COURT *(9)*
COVER *(4)*
crashes *(1)*
created *(3)*
Creating *(1)*
Crew *(1)*
C-R-E-W *(1)*
crime *(2)*
criminal *(2)*
criteria *(1)*
critiqued *(1)*
critiquing *(1)*
CRU *(6)*
C-R-U *(1)*
current *(2)*
cut *(2)*
Cypress *(1)*

< D >
data *(5)*
DATE *(16)*
dated *(3)*
DAVID *(2)*
Dawn *(5)*
day *(7)*
days *(2)*
day-to-day *(4)*
deal *(4)*

Deposition of John Holloway

Jenna Clark v. Carmine Marceno

| | | | |
|---|---|---|---|
| **dealership** *(1)* | **discussion** *(5)* | **elimination** *(5)* | **factor** *(2)* |
| **dealing** *(2)* | **discussions** *(4)* | **e-mail** *(1)* | **factors** *(3)* |
| **Dear** *(1)* | **dispatchers** *(1)* | **employed** *(1)* | **facts** *(5)* |
| **December** *(2)* | **distribute** *(2)* | **employee** *(3)* | **fair** *(5)* |
| **decide** *(1)* | **DISTRICT** *(2)* | **employees** *(28)* | **familiar** *(1)* |
| **decided** *(1)* | **divert** *(1)* | **employing** *(1)* | **far** *(4)* |
| **deciding** *(1)* | **diverted** *(2)* | **employment** *(3)* | **faster** *(1)* |
| **decision** *(21)* | **diverting** *(1)* | **empty** *(1)* | **father** *(1)* |
| **decisional** *(1)* | **division** *(3)* | **encounter** *(2)* | **faulty** *(1)* |
| **decision-making** *(7)* | **divisions** *(1)* | **encountered** *(3)* | **February** *(4)* |
| **decisions** *(11)* | **document** *(30)* | **encountering** *(1)* | **federal** *(2)* |
| **Defendant** *(4)* | **documents** *(7)* | **enforcement** *(4)* | **FEEL** *(1)* |
| **Defendant's** *(9)* | **doing** *(13)* | **ensure** *(1)* | **felt** *(1)* |
| **Defenses** *(1)* | **doubtless** *(1)* | **enter** *(1)* | **FERNANDEZ** *(7)* |
| **Dell** *(6)* | **dozens** *(1)* | **entities** *(1)* | **field** *(1)* |
| **Delta** *(1)* | **drafting** *(1)* | **equipment** *(2)* | **fill** *(6)* |
| **demotions** *(1)* | **draw** *(2)* | **ERRATA** *(5)* | **filled** *(11)* |
| **department** *(11)* | **drawing** *(2)* | **ERROR** *(2)* | **filling** *(2)* |
| **departments** *(5)* | | **especially** *(1)* | **final** *(7)* |
| **Deponent** *(2)* | **dstefany@anblaw.com** | **ESQUIRE** *(5)* | **finalized** *(3)* |
| **deposed** *(2)* | *(1)* | **Estep** *(3)* | **financially** *(2)* |
| **DEPOSITION** *(16)* | **duly** *(2)* | **event** *(1)* | **financing** *(1)* |
| **deputies** *(7)* | **duplicating** *(1)* | **eventual** *(1)* | **find** *(5)* |
| **deputy** *(3)* | **duties** *(15)* | **eventually** *(4)* | **finest** *(1)* |
| **Derek** *(1)* | **duty** *(2)* | **everybody** *(2)* | **finger** *(1)* |
| **describe** *(1)* | | **evident** *(1)* | **finish** *(2)* |
| **described** *(6)* | **< E >** | **exactly** *(1)* | **first** *(9)* |
| **designed** *(2)* | **earlier** *(3)* | **Examination** *(2)* | **five** *(2)* |
| **desire** *(4)* | **early** *(3)* | **examine** *(1)* | **Fleet** *(13)* |
| **detectives** *(4)* | **easily** *(3)* | **examined** *(2)* | **flippant** *(1)* |
| **determination** *(5)* | **edge** *(1)* | **exceeds** *(1)* | **floating** *(1)* |
| **determinations** *(2)* | **effect** *(3)* | **Exhibit** *(16)* | **FLORIDA** *(14)* |
| **determine** *(3)* | **effective** *(3)* | **exist** *(5)* | **focus** *(3)* |
| **determined** *(2)* | **effectively** *(6)* | **existed** *(8)* | **folks** *(8)* |
| **devoted** *(1)* | **efficiencies** *(1)* | **expenses** *(1)* | **follow** *(1)* |
| **difference** *(1)* | **efficiency** *(1)* | **experience** *(5)* | **follows** *(1)* |
| **different** *(4)* | **efficient** *(3)* | **expiration** *(1)* | **force** *(51)* |
| **difficult** *(1)* | **efficiently** *(11)* | **expired** *(1)* | **Ford** *(2)* |
| **difficulty** *(1)* | **effort** *(2)* | **Expires** *(1)* | **foregoing** *(2)* |
| **Direct** *(3)* | **efforts** *(1)* | **explained** *(1)* | **form** *(2)* |
| **DIRECTED** *(1)* | **eight** *(2)* | **expressed** *(1)* | **formula** *(1)* |
| **directives** *(1)* | **either** *(7)* | **expressly** *(1)* | **Fort** *(1)* |
| **director** *(25)* | **elect** *(2)* | **extent** *(8)* | **forward** *(1)* |
| **directors** *(2)* | **elected** *(1)* | **externally** *(3)* | **frame** *(1)* |
| **directorship** *(3)* | **eligibility** *(1)* | | **friction** *(2)* |
| **disagrees** *(1)* | **eligible** *(6)* | **< F >** | **front** *(2)* |
| **discuss** *(5)* | **eliminate** *(16)* | **face** *(1)* | **FRS** *(16)* |
| **discussed** *(3)* | **eliminated** *(101)* | **facilitate** *(1)* | **full** *(1)* |
| **discussing** *(3)* | **eliminating** *(9)* | **fact** *(4)* | **full-time** *(1)* |

Deposition of John Holloway

Jenna Clark v. Carmine Marceno

functions  *(2)*
fund  *(2)*
funding  *(6)*
funds  *(1)*
further  *(3)*
future  *(2)*

**< G >**
gathered  *(1)*
general  *(1)*
generally  *(3)*
generated  *(2)*
generic  *(1)*
gentleman  *(1)*
gesture  *(1)*
getting  *(3)*
give  *(16)*
given  *(6)*
giving  *(1)*
glass  *(1)*
go  *(15)*
goal  *(4)*
goals  *(1)*
goes  *(2)*
going  *(16)*
Good  *(8)*
government  *(2)*
grave  *(1)*
great  *(1)*
greatly  *(1)*
Group  *(1)*
grown  *(2)*
guess  *(2)*
guide  *(1)*
guilty  *(1)*

**< H >**
habit  *(1)*
half  *(1)*
hand  *(2)*
handle  *(2)*
handled  *(1)*
hands-on  *(1)*
happen  *(1)*
happened  *(2)*
happening  *(1)*
happens  *(2)*
happy  *(1)*
harming  *(1)*

head  *(1)*
headquarters  *(1)*
heads  *(1)*
hear  *(1)*
Heikkila  *(6)*
held  *(1)*
helicopters  *(1)*
help  *(4)*
helped  *(1)*
helping  *(1)*
hereto  *(1)*
hesitate  *(1)*
HH  *(1)*
high  *(2)*
higher  *(3)*
highest  *(1)*
high-level  *(1)*
HILLSBOROUGH  *(2)*
him/her  *(1)*
hold  *(1)*
HOLLOWAY  *(12)*
H-O-L-L-O-W-A-Y  *(1)*
homework  *(2)*
homicide  *(1)*
hours  *(1)*
HR  *(1)*
human  *(6)*
Hyde  *(2)*

**< I >**
idea  *(5)*
ideas  *(2)*
identification  *(4)*
identified  *(4)*
identify  *(5)*
imagine  *(1)*
impact  *(4)*
impetus  *(1)*
implement  *(3)*
implemented  *(3)*
improvements  *(1)*
inaccurate  *(1)*
inadequate  *(1)*
inaudible  *(1)*
include  *(3)*
included  *(4)*
increase  *(2)*

increasing  *(1)*
incurred  *(1)*
indicated  *(4)*
indicating  *(2)*
individual  *(10)*
individualized  *(1)*
individuals  *(10)*
individual's  *(1)*
inflation  *(1)*
influence  *(2)*
information  *(6)*
informing  *(1)*
initiative  *(1)*
input  *(8)*
inquiring  *(1)*
Inspection  *(4)*
Inspections  *(3)*
inspectors  *(2)*
instance  *(5)*
instantly  *(2)*
instruct  *(1)*
instructions  *(1)*
interest  *(3)*
interested  *(1)*
internal  *(2)*
internally  *(6)*
inventory  *(1)*
investigation  *(1)*
involved  *(2)*
irrelevant  *(1)*
issue  *(3)*
issues  *(6)*
items  *(4)*
its  *(5)*

**< J >**
James  *(4)*
Jamie  *(4)*
January  *(1)*
JENNA  *(10)*
job  *(7)*
jobs  *(1)*
JOHN  *(9)*
Jones  *(6)*
judge  *(1)*
July  *(12)*
June  *(6)*
jury  *(1)*
justified  *(4)*

justify  *(3)*

**< K >**
keep  *(1)*
keeping  *(1)*
kept  *(1)*
kind  *(6)*
kinds  *(1)*
knew  *(3)*
know  *(40)*
knowledge  *(3)*
known  *(1)*
knows  *(1)*
KYLE  *(7)*
kyle@dereksmithlaw.com  *(2)*

**< L >**
label  *(10)*
lack  *(1)*
lady's  *(1)*
Large  *(2)*
late  *(1)*
Law  *(6)*
lawsuit  *(2)*
LCSO  *(1)*
lead  *(2)*
leave  *(2)*
led  *(1)*
Lee  *(43)*
left  *(1)*
left-hand  *(1)*
Legal  *(13)*
length  *(2)*
letter  *(19)*
letters  *(1)*
level  *(10)*
levels  *(2)*
Liaison  *(4)*
liberally  *(1)*
Lieutenant  *(1)*
life  *(1)*
limited  *(2)*
line  *(2)*
list  *(16)*
listed  *(16)*
little  *(1)*
load  *(1)*
location  *(2)*

locations (2)
long (5)
longer (2)
look (11)
looked (12)
looking (17)
looks (5)
lose (1)
lot (7)
low (1)
lower (8)
lower-management (1)

< M >
MACDONALD (34)
maintain (2)
maintained (1)
maintaining (1)
maintenance (1)
major (9)
majority (1)
making (9)
manage (1)
management (30)
manager (16)
managers (3)
MARCENO (4)
March (2)
marginal (1)
mark (5)
marked (5)
Marsha (3)
matter (1)
maximize (1)
mean (16)
meaning (1)
means (1)
mechanic (2)
mechanistic (1)
meet (2)
meetings (3)
MELISSA (7)
member (2)
members (2)
mention (1)
mentioned (6)
message (8)
met (1)

Miami (1)
MIDDLE (1)
mid-level (1)
Mile (1)
mind (1)
minute (4)
missed (1)
mission (3)
mistake (1)
moment (1)
money (9)
month (2)
months (1)
morning (3)
mother (1)
motorcycles (1)
move (1)
moved (3)
moving (3)
Myers (1)

< N >
name (4)
nature (1)
necessarily (1)
necessary (7)
need (31)
needed (11)
needing (1)
needs (8)
Nelson (1)
never (4)
nomenclature (1)
noncriminal (1)
normal (1)
Norton (2)
Notary (2)
NOTE (4)
noted (1)
notes (3)
notice (1)
noticed (1)
notifications (2)
notify (1)
November (1)
number (12)
numbered (1)
numbers (3)

< O >
OATH (4)
Object (1)
Objection (1)
objections (1)
objective (1)
objectives (1)
obligation (2)
obligations (4)
observation (1)
observations (2)
observed (1)
obtain (1)
obtained (1)
obvious (4)
obviously (1)
occasions (1)
occupied (4)
occupying (3)
occur (1)
occurred (2)
October (9)
offer (1)
offered (2)
Office (46)
officers (1)
official (6)
officially (2)
oftentimes (1)
oil (1)
Okay (15)
old (6)
older (1)
once (2)
ones (2)
open (3)
operate (10)
operating (4)
operation (1)
operations (12)
opinion (1)
opinions (2)
opportunities (3)
opportunity (10)
opposed (2)
opposing (1)
option (3)
Options (1)
ordered (2)

ordinarily (1)
ordinary (2)
organization (1)
organizations (1)
oriented (1)
original (3)
outgrown (1)
out-of-pocket (1)
outreach (5)
outside (2)
outweighed (1)
oversee (1)
overstaffed (1)

< P >
p.m (5)
PA (2)
package (4)
packet (1)
PAGE (9)
pages (3)
Paragraph (6)
Park (2)
Parkway (1)
part (31)
participating (1)
particular (3)
parties (3)
parts (1)
path (1)
patrol (4)
pay (6)
paying (3)
payroll (1)
pension (3)
people (27)
people's (1)
perform (1)
performance (1)
performed (2)
performing (1)
performs (1)
permanent (3)
person (15)
personal (3)
personally (1)
person's (1)
perspective (1)
Petracca (1)

Deposition of John Holloway                                             Jenna Clark v. Carmine Marceno

philosophy (1)
phone (1)
physically (1)
PLACE (3)
placed (1)
placing (1)
Plaintiff (3)
Plaintiff's (14)
plan (1)
planes (1)
Planning (3)
play (2)
please (12)
PLLC (1)
point (19)
points (1)
policies (3)
policy (4)
policy-making (1)
pops (1)
position (112)
positions (121)
possibility (1)
possible (4)
possibly (1)
prepare (1)
prepared (5)
present (1)
presented (2)
pretty (1)
prevent (1)
previously (2)
primary (1)
principles (1)
priorities (1)
probably (9)
problem (2)
problems (3)
procedure (1)
procedures (4)
Professional (8)
program (6)
programs (3)
promotions (1)
promptly (1)
proposal (19)
proposals (1)
propose (6)
proposed (7)

proposing (2)
propounded (1)
protection (1)
provide (6)
provided (11)
provides (3)
providing (1)
Public (6)
purchase (1)
purchasing (39)
purpose (1)
purposes (1)
pursuant (1)
put (1)

< Q >
qualified (3)
quantify (1)
question (2)
questionable (1)
questions (6)
quotes (1)

< R >
Ramsey (2)
ran (2)
rank (1)
reach (2)
reached (6)
READ (14)
reading (3)
ready (3)
really (2)
reason (4)
reasonable (3)
reasonably (2)
reassign (1)
reassigned (2)
recall (23)
recalled (1)
receive (1)
received (4)
receiving (1)
recess (2)
recognize (5)
recollection (14)
recommendations (1)
recommended (4)
record (7)

records (6)
reduce (2)
reduced (3)
reducing (1)
reduction (47)
reductions (3)
redundant (4)
reexamine (2)
refer (3)
referenced (2)
referencing (3)
referrals (4)
referred (1)
referring (6)
refresh (1)
regard (2)
regarding (9)
Regardless (2)
regards (1)
relative (2)
relatively (1)
relevant (2)
relocate (1)
remain (1)
remaining (1)
remember (11)
remotely (2)
renew (1)
rephrase (1)
report (6)
REPORTED (2)
REPORTER (6)
REPORTER'S (1)
reports (2)
represent (1)
representative (1)
requested (1)
requesting (1)
require (1)
required (5)
requirement (1)
requirements (2)
research (7)
reserved (1)
residents (2)
resign (2)
resigned/position (1)
resigns (2)
Resource (1)

resources (18)
respective (1)
respond (1)
response (4)
responses (3)
responsibilities (8)
responsibility (4)
responsible (2)
result (2)
resulted (2)
retain (1)
retire (26)
retired (6)
retired/position (7)
retirement (18)
retirement/position (1)
retires (3)
retiring (6)
RETURN (1)
revealed (1)
review (16)
reviewed (7)
reviewing (2)
reword (1)
right (14)
role (15)
roles (6)
room (1)
Roughly (3)
routine (5)
routinely (1)
row (1)
rumors (1)
run (2)
running (2)

< S >
safe (1)
safety (1)
salaries (5)
salary (2)
satisfied (1)
satisfy (1)
save (2)
savings (1)
saw (3)
says (13)
scale (1)

scanned *(2)*
school *(1)*
scientific *(1)*
scope *(1)*
screen *(1)*
scroll *(2)*
seal *(1)*
search *(1)*
second *(5)*
secret *(1)*
secretary *(19)*
section *(3)*
see *(15)*
seek *(3)*
seen *(5)*
select *(2)*
selected *(15)*
selecting *(4)*
send *(2)*
senior *(19)*
seniority *(1)*
seniors *(1)*
sense *(10)*
sent *(2)*
sentence *(1)*
separate *(1)*
September *(1)*
serious *(2)*
seriously *(1)*
served *(1)*
Services *(30)*
set *(1)*
seven *(2)*
share *(1)*
shared *(8)*
SHEET *(6)*
Sheriff *(51)*
Sheriff's *(48)*
show *(5)*
showed *(4)*
showing *(7)*
shrug *(1)*
side *(1)*
SIGN *(4)*
SIGNATURE *(1)*
signed *(1)*
significance *(1)*
significant *(5)*
significantly *(3)*

signing *(1)*
similar *(3)*
simply *(11)*
single *(1)*
sir *(57)*
Six *(9)*
six-month *(1)*
skipped *(1)*
slot *(4)*
slots *(1)*
Smith *(4)*
social *(3)*
solely *(1)*
solution *(1)*
solve *(1)*
somebody *(13)*
someone's *(1)*
somewhat *(2)*
sorry *(11)*
sought *(1)*
source *(2)*
sources *(2)*
South *(2)*
speak *(4)*
speaking *(1)*
specialist *(1)*
specialized *(1)*
specific *(10)*
specifically *(15)*
spend *(1)*
spending *(1)*
spent *(1)*
spoke *(12)*
spoken *(1)*
spongible *(1)*
Sprankel *(2)*
Sprankel's *(1)*
staff *(5)*
staffed *(2)*
staffing *(4)*
Stan *(1)*
stand *(1)*
standard *(2)*
standardized *(1)*
Standards *(8)*
standpoint *(2)*
start *(2)*
starting *(1)*
State *(10)*

statement *(1)*
STATES *(2)*
stating *(1)*
status *(1)*
stay *(2)*
STEFANY *(14)*
Stenographer *(2)*
stenographic *(1)*
stenographically *(1)*
step *(1)*
stepping *(1)*
steps *(2)*
stipulated *(1)*
stop *(1)*
streamlining *(2)*
strike *(3)*
subscribe *(1)*
subsequently *(1)*
suggest *(1)*
suggested *(1)*
Suite *(2)*
Suite225 *(1)*
supervisor *(1)*
supervisors *(3)*
supervisory *(1)*
supposed *(1)*
sure *(19)*
suspend *(1)*
switched *(1)*
sworn *(2)*
system *(9)*

< T >
take *(7)*
TAKEN *(5)*
takers *(1)*
talk *(8)*
talked *(8)*
talking *(3)*
Tampa *(2)*
taxpayer *(1)*
taxpayers *(3)*
TDY *(2)*
TDY'd *(1)*
Team *(1)*
technician *(1)*
technologically *(1)*
tell *(4)*
tells *(1)*

temporarily *(1)*
Temporary *(1)*
tenure *(1)*
term *(1)*
terminate *(1)*
terminated *(2)*
terms *(1)*
testified *(1)*
testify *(3)*
testifying *(3)*
TESTIMONY *(4)*
Thank *(4)*
thing *(3)*
things *(16)*
think *(33)*
thinking *(1)*
third *(1)*
thirty *(1)*
Thomas *(1)*
thought *(4)*
thoughts *(4)*
thousands *(1)*
three *(3)*
TIME *(49)*
today *(5)*
today's *(1)*
told *(2)*
top *(2)*
topic *(4)*
total *(1)*
tour *(1)*
tours *(1)*
Traci *(3)*
traffic *(27)*
training *(2)*
transcribe *(2)*
transcribed *(1)*
transcript *(11)*
transfer *(1)*
transferred *(4)*
transfers *(1)*
transitory *(1)*
tried *(1)*
true *(2)*
trusts *(1)*
truthfully *(2)*
try *(4)*
trying *(2)*
TTY *(1)*

turn  *(1)*
turns  *(2)*
two  *(18)*
two-part  *(1)*

**< U >**
ultimately  *(1)*
unclearly  *(1)*
Undersheriff  *(1)*
undersigned  *(1)*
understaffed  *(1)*
understand  *(11)*
understanding  *(5)*
Understood  *(4)*
unhesitantly  *(1)*
unit  *(30)*
UNITED  *(1)*
units  *(10)*
Unjustifiable  *(2)*
unlimited  *(2)*
unnecessarily  *(1)*
unnecessary  *(6)*
unrelated  *(1)*
untenable  *(2)*
unusual  *(1)*
upper  *(1)*
use  *(8)*
utilization  *(1)*
utilize  *(1)*
utilizing  *(1)*

**< V >**
vacant  *(3)*
valid  *(1)*
value  *(2)*
varies  *(1)*
variety  *(2)*
various  *(1)*
vehicles  *(2)*
viewed  *(1)*
vision  *(1)*
visit  *(1)*
visited  *(1)*
voluntarily  *(1)*
voluntary  *(1)*
vs  *(1)*

**< W >**
wait  *(2)*

walking  *(1)*
want  *(8)*
wanted  *(4)*
warrant  *(4)*
warranted  *(1)*
waste  *(2)*
wasted  *(1)*
water  *(1)*
way  *(9)*
week  *(4)*
Well  *(9)*
went  *(7)*
we're  *(8)*
we've  *(3)*
wise  *(1)*
withdrawn  *(5)*
WITNESS  *(4)*
wonderful  *(1)*
word  *(4)*
work  *(12)*
worked  *(1)*
worker  *(2)*
working  *(4)*
workload  *(15)*
workloads  *(5)*
works  *(2)*
world  *(1)*
worries  *(2)*
WRITE  *(1)*
written  *(3)*
wrong  *(2)*
wrote  *(1)*

**< Y >**
Yankee  *(1)*
Yeah  *(5)*
year  *(2)*
years  *(21)*
younger  *(2)*

**< Z >**
Zoom  *(6)*

# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

**JENNA CLARK,**

     Plaintiff,

                                    Case No. 2:22-cv-614-SPC-NPM

**v.**

**CARMINE MARCENO, in his official capacity as Sheriff of Lee County, Florida,**

     Defendant.

_____/

## PLAINTIFF'S NOTICE OF RULE 30(b)(6) DEPOSITION

**PLEASE TAKE NOTICE** that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Plaintiff, JENNA CLARK ("Plaintiff"), shall take the deposition upon oral examination of Defendant, CARMINE MARCENO, in his official capacity as Sheriff of Lee County, Florida ("Defendant"), through one or more representatives who shall be designated to testify on Defendant's behalf regarding all information known or reasonably available to Defendant with respect to the subject matter identified in Schedule A. This deposition shall commence on the following dates and times:

| DATE/TIME | LOCATION |
|---|---|
| October 4th, 2023, at 11:00 AM | Via Zoom |
| October 10th, 2023, at 10:00 AM | Via Zoom |

1

| October 11th, 2023, at 10:00 AM | Via Zoom |
| October 17th, 2023, at 10:00 AM | Via Zoom |
| October 18th, 2023, at 10:00 AM | Via Zoom |

The deposition will continue from day to day until completed before a notary public or other person authorized by law to administer oaths. The deposition will be conducted remotely through Everest Court Reporting and will be recorded stenographically.

Dated: Miami, Florida **DEREK SMITH LAW GROUP, PLLC**
   August 30, 2023, *Counsel for Plaintiff*

/s/ Kyle T. MacDonald
Kyle T. MacDonald, Esq.
Florida Bar No.: 1038749
Derek Smith Law Group, PLLC
701 Brickell Ave, Suite 1310
Miami, FL 33131
Tel: (305) 946-1884
Fax: (305) 503-6741
Kyle@dereksmithlaw.com

## <u>SCHEDULE A</u>
## LIST OF TOPICS FOR DEFENDANT'S REPRESENTATIVE
### (hereinafter "LCSO" and/or "Defendant")

1.     Knowledge of each and every document provided by Defendant in response to Plaintiff's discovery requests.

2.     Knowledge related to Jenna Clark's employment with Defendant, including compensation and benefits paid to Jenna Clark from 2018 until the last day of her employment.

3.     Knowledge related to all of the benefits Jenna Clark received subject to her employment with Defendant, including pension plan payments, 401k benefits, profit sharing, health benefits, retirement plans, and any other benefit Jenna Clark received from 2018 until the last day of her employment.

4.     Knowledge related to benefits that Defendant offered to employees in general, including the cash value of each benefit offered, when Defendant began to offer said benefits, and descriptions of benefit packages that Defendant included as part of the compensation employees received.

5.     Knowledge related to the amount of money that Jenna Clark was paid from 2018 until the last day of her employment.

6.     Knowledge related to the amount of money that similarly situated employees to Jenna Clark were paid.

7.     Knowledge of the policies or procedures provided by and/or maintained by Defendant with regard to the prevention of discrimination and harassment in the workplace.

8.     Knowledge of the policies or procedures provided by and/or maintained by Defendant with regard to the prevention of discrimination and harassment in the workplace.

9.     Knowledge of the policies or procedures provided by and/or maintained by Defendant with regard to leave benefits, paid-time-off benefits, FMLA benefits, and any other leave of absences.

10. Knowledge of any employee handbook for Defendant that was in effect at the time of Jenna Clark's employment from 2018 until the last day of her employment.

11. Knowledge related to reports of discrimination, including but not limited to, reports of discrimination that were presented and/or made during the time period when Jenna Clark was employed with Defendant from 2018 until the last day of her employment.

12. Knowledge related to Defendant's policies and procedures for preventing discrimination and harassment in the workplace and investigating and engaging in corrective action when discrimination is discovered.

13. Knowledge related to the agency-wide reduction in force conducted by Defendant in or around 2021, including knowledge of the persons involved in deciding the positions to be eliminated, the criteria used to select positions to be eliminated, and the compensation and leave benefits for the employees/positions ultimately selected to be eliminated.

14. Knowledge related to Defendant's fiscal budget and Defendant's operations, including revenue, expenses, and any budgetary impacts of the agency-wide reduction in force conducted by Defendant in or around 2021.

15. Knowledge regarding the following employees, including their dates of hire, job titles, knowledge of the amount of compensation paid to them, the amount of leave benefits available to them, the amount of leave they used for any reason (including FMLA leave, paid time off, or any other leave benefit offered), their age, their termination/resignation dates, and the reason for their termination/resignation:

    a. James Jones, Director of Fleet Management
    b. Jenna Clark, Director of Purchasing
    c. Anthony Ramsey, Communications Manager
    d. Amy DellAquilla, Community Liason
    e. Jami Bartz, Senior Services Coordinator
    f. Marsha Sprankel, Secretary of Traffic

16. Knowledge related to Annmarie Reno's employment with Defendant, including but not limited to, her entire personnel file, dates of employment, job assignments, job titles, compensation, promotions,

benefits, discipline, and complaints of unlawful employment practices made against her.

17. Knowledge related to Dawn Heikkila's employment with Defendant, including but not limited to, her entire personnel file, dates of employment, job assignments, job titles, compensation, promotions, benefits, discipline, and complaints of unlawful employment practices made against her.

18. Knowledge related to John Holloway's employment with Defendant, including but not limited to, his entire personnel file, dates of employment, job assignments, job titles, compensation, promotions, benefits, discipline, and complaints of unlawful employment practices made against him.

19. Knowledge related to Jenna Clark's employment with Defendant, including but not limited to, dates of employment, job assignments, compensation, promotions, discipline, benefits, job titles, and termination, from 2018 until the last day of her employment.

20. Knowledge related to the reason for Jenna Clark's termination from her employment with Defendant.

21. Knowledge related to any communications between Defendant's employees and Jenna Clark regarding Jenna Clark's termination and alternative positions with Defendant offered to Jenna Clark, if any, from 2018 until the last day of Jenna Clark's employment.

22. Knowledge of all correspondence, writings, and documents sent by Defendant regarding disciplinary action or termination of Jenna Clark, if any, from 2018 until the last day of Jenna Clark's employment.

23. Knowledge any investigations performed by Defendant regarding Jenna Clark's reports of discrimination and harassment in the workplace or filing of administrative charges.

24. Knowledge related to any leave requested by Jenna Clark during her employment, including FMLA leave, paid time off, unpaid time off, and any other type of leave of absence offered by Defendant, from 2018 until the last day of Jenna Clark's employment.

25.     Knowledge related to performance reviews and Defendant's performance review policies, procedures, and protocols.

26.     Knowledge as to Defendant's Position Statement filed with the EEOC and the Answer filed in response to Plaintiff's Complaint.

27.     Knowledge as to Defendant's document and record keeping proceed used to record or keep track of communications amongst Defendant's employees, including but not limited to any electronic communication technology used by Defendant's employees.

28.     Knowledge related to performance reviews that Jenna Clark received or underwent during her employment with Defendant including dates of each performance review and the substance of each performance review, from 2018 until the last day of Jenna Clark's employment.

29.     Knowledge of organizational charts and lists identifying the divisions and management structure for Defendant.

30.     Knowledge of charges filed with the Equal Employment Opportunity Commission and the Florida Commission on Human Relations from January of 2016 through December 31, 2022.

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document is being served on August 30, 2023, on all counsel of record on the service list below via e-mail transmission.

By: *<u>/s/ Kyle T. MacDonald</u>*
Kyle T. MacDonald, Esq.

## <u>SERVICE LIST</u>

**ALLEN, NORTON & BLUE, PA**

David J. Stefany
324 S. Hyde Park Ave
Suite 225
Tampa, FL 33606
813/251-1210
Fax: 813/253-2006
Email: dstefany@anblaw.com

Maelyn Marie Morrison
324 S. Hyde Park Ave., Suite 225
Tampa, FL 33606
813-251-1210
Fax: 813-253-2006
Email: mmorrison@anblaw.com

*Counsel for Defendant*

# EXHIBIT 3

**From:** Heikkila, Dawn <​████████████​>
**Sent:** Wednesday, February 05, 2020 10:43 AM EST
**To:** Traurig, Shelley <​████████████​>
**Subject:** FW: memo John.doc
**Attachment(s):** "memo John.doc","ATT00001.txt"

Dawn Heikkila, Director

Lee County Sheriff's Office
Desk:████████
mailto:████████████
www.sheriffleefl.org
-----Original Message-----
From: Holloway, John <████████████ or██
Sent: Thursday, June 20, 2019 9:42 AM
To: Heikkila, Dawn <​████████████​>
Cc: Smith, Abbi <​████████​>; Hornsby, Antonette <​████████████████​>
Subject: memo John.doc

Good Morning Dawn-

The Sheriff has approved the Reductions in Force recommended by Operations & Legal Services Bureau and other Command Staff members.

The memo does not identify the individuals in the positions to be eliminated, however, I believe you have been provided with that information.  If not, please contact Abbi to review the spreadsheet with also identifies the positions, as well as the five current employees holding those positions.

Please call me with any questions or concerns.

John

John Holloway | Chief Of Operations
Desk:████████
Legal Services Executive Bureau
Lee County Sheriff's Office
mailto:████████████ | http://www.sheriffleefl.org

***IMPORTANT MESSAGE***
This message is intended for the use of the person or entity to whom it is addressed and may contain information that is privileged and confidential, the disclosure of which is governed by applicable law. If the reader of this email is not the intended recipient or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this information is STRICTLY PROHIBITED. If you have received this email by error, please notify us immediately and destroy the related message. This footnote also confirms that this email message has been swept for the presence of computer viruses, worms, hostile scripts and other email-borne network threats. PLEASE NOTE: Florida has a very broad public records law. Most written communications to or from government officials are public records available to the public and media upon request. Your email communications may be subject to public disclosure per Sec. 119 F.S.

LCSO/Clark
DEF004492

# EXHIBIT 4

| POSITIONS ELIMINATED | | | | | | |
|---|---|---|---|---|---|---|
| Position | Name | Status | Age | Gender | Supervisor | Comment |
| Senior Services Coordinator | Jami Bartz | Inactive | 58 | Female | Claire Schell | 1/31/2021- Retired/Position Eliminated |
| Secretary of Traffic | Marsha Sprankel | Inactive | 66 | Female | Dennis Petraca | 2/28/21- Retired/Position Eliminated |
| Major of Professional Standards | Tracy Estep | Inactive | 48 | Female | John Holloway | 6/24/21 - Retired/Position Eliminated |
| Director of Purchasing | Jenna Clark | Inactive | 59 | Female | Annmarie Reno | 9/4/2021 - Retired/Position Eliminated |
| Community Liaison | Amy DellAquilla | Inactive | 58 | Female | Michael Truscott | 10/11/2021- Resigned/Position Eliminated |
| Director of Fleet Management | James Jones | Active | 51 | Male | Jeremiah Marcotte | 11/4/2021 - Title Change to Fleet Services Specialist/Position Eliminiated/Pay Cut |
| Communications Manager | Anthony Ramsey | Inactive | 46 | Male | Karen Ciofani | 10/14/21- Resigned/Position Eliminated |

**LCSO/Clark**
**DEF000123**

# EXHIBIT 5



*Carmine Marceno*

**Sheriff**

**State of Florida**
**County of Lee**

*"Proud to Serve"*

August 15, 2021

Dear Mrs. Clark,

The Lee County Sheriff's Office has undergone an evaluation of significant aspects of current operations to determine ways to improve policies, practices and efficiencies. As you know, the Sheriff's Office was forced to absorb additional expenses and obligations as well as other increased costs including but not limited to; substantial increases in FRS employer pension rates, LCSO's self-funded Health Plan costs and inmate medical expenses.

As a result of this evaluation, LCSO is conducting a *Reduction in Force*. Effective September 4, 2021 your position as "Purchasing Director" is being eliminated. You will be placed on Administrative Leave with Pay immediately upon this notice and given the opportunity to retire.

**Deadline for this decision will be September 3, 2021 at 4:00pm**; or your appointment will be withdrawn on September 4, 2021.

Human Resources has included basic information in this packet but contacting the individuals below will be crucial for whatever option you choose. Your contact for HR will be Cari Turner, she can be reached at 239-477-1360; your contact for Health Benefits and FRS is Doreen Salvagno, she can be reached at 239-477-1121.

Thank you for your service to The Lee County Sheriff's Office and I wish you well in future endeavors.

Sincerely,

Dawn Heikkila
Director of Human Resources
Lee County Sheriff's Office



*"The Lee County Sheriff's Office is an Equal Opportunity Employer"*
**14750 Six Mile Cypress Parkway • Fort Myers, Florida 33912-4406 • (239) 477-1000**

**LCSO/Clark**
**DEF004350**

# EXHIBIT 6

**UNDER SHERIFF MARCENO:**

**Overcame Major Staffing Shortage for deputies**

**A.      For many years, LCSO was unable to hire and retain sworn deputies, and so we were understaffed.**   We have revered the trend and **today, LCSO is fully staffed with sworn deputies**.

We accomplished this by:

1)  **Saving money in other areas and transferring those savings to fund deputy positions**.
    a.  We utilized state-of-the-art technology and better management practices to **reduce the number of civilian employees, through attrition**, creating more funding for deputy positions;
    b.  We **re-evaluated every civilian position** and **transferred employees** to other areas of the agency to assure every employee was allowed to be **as productive as possible**;
    c.  We **analyzed every vendor contract to eliminate contract**s;
    d.  We retained only those vendor contracts which are absolutely necessary, and analyzed and **renegotiated the cost of those remaining contracts**;
    e.  We have more **correctly categorized employees into "non-exempt" and "exempt" status, consistent with current I.R.S. guidelines** allowing employees more freedom to work efficiently, and lowering unnecessary overtime costs;
    f.  We began **monitoring and working to release non-violent inmates who require major medical care expenditures,** reducing taxpayer funded medical costs for those who **pose no danger to the community.**

These efforts, and other improvements, some of which are included below, have resulted in millions of dollars in savings, which funded the measures necessary to further improve LCSO's performance as a premier law enforcement agency.

2)  **Using the savings created by this common-sense management**.
    a.  **We increased pay for starting deputies by $9,000;**
    b.  **We increased the pay** for sergeants, lieutenants, and other supervisors;
    c.  **We increased the number of applicants we sponsor for both Correctional and law Enforcement Academies;**
    d.  We **opened the Academy Sponsorship program to all employees** throughout the agency;
    e.  We **fully funded and maintained our highly competitive benefits package** - which had been severely endangered by major current and anticipated cost increases.

3)  **We improved and redoubled recruiting efforts** and adjusted the application process to be more competitive with other law enforcement agencies.

**Today – for the first time in over 4 years, due to competitive pay, benefits and extraordinarily high morale, LCSO is fully staffed in all law enforcement positions.**

**LCSO/Clark
DEF001316**

## Vastly Improved Technology

**B**.       Again, using the savings realized by best practices, we are have made **major advancements in state-of-the-art technology, further improving** our ability to **protect our residents and solve crimes.**

1. **We will soon open** – **at no cost to the taxpayers - the most advanced Real Time Crime Center/Intelligence Unit in Southwest Florida.**  This Center, funded by drug money forfeited through LCSO's legal Team, will allow our deputies to be even more proactive and our detectives to solve even more crime.
2. We have acquired and are utilizing:
    a. Additional **Mobile License Plate Readers (LPRs);**
    b. **Additional Fixed LPRs;**
    c. Additional **Surveillance Towers;**
    d. **Mobile Surveillance Units;**
    e. **Facial Recognition Software** which identifies criminal suspects;
    f. **Additional cameras** to monitor public areas;
    g. Additional access to **security cameras** in malls, shopping centers and major institutions;

These technological improvements act as a "force multiplier" allowing LCSO, using current employee levels, to deter and prevent crime, as well as solve crimes even more rapidly and efficiently.


## Management Practices

**C**.       We have **reassigned deputies and detectives** based upon ever-changing crime trends and constantly evolving demographics, and consistent growth.

1. We have assigned more detectives and resources to the **Violent Crime Unit (VCU), improving our ability to identify and arrest the "worst of the worst";**
2. We have **added substantial numbers of School Resource Officers**, improving protection for every public school in Lee County;
3. We have **added substantial numbers of deputies to the Patrol Division;**
4. We have **re-scheduled detectives to include evening, weekend and holidays;**
5. **We have re-scheduled Crime Scene Forensic Technicians to include evening, weekend and holidays;**

This schedule changes increase the number of deputies and detectives in service at any given time, reducing response times; and allows deputies and detectives to operate even more effectively and efficiently.

We constantly monitor ever-changing public safety demands, and modify assignments and transfer resources to provide Lee County residents the best "bang for the buck" for their law enforcement dollar.

**LCSO/Clark
DEF001317**

## Community Response Unit (CRU)

We have created and staffed the **Community Response Unit (CRU)** with sworn deputies and civilians, and combined those resources with our Public Affairs Bureau (PAB) providing:

The ability to highly focus substantial both enforcement and crime prevention resources on targeted areas to rapidly address criminal issues and improve the quality of life for residents.

## Corrections Mental Health and Re-Entry Units

Far too often jail is a revolving door here we re-arrest inmates within days – if not hours – of their release.  To address this problem:

1. **We created and staffed a specialized Mental Health Unit** in Corrections Bureau to provide mental health care for inmates while incarcerated, as well as seamlessly transfer care and counseling for these inmates when released.
2. **We added additional agency staff and resources to the Corrections' Re-Entry Unit** to assist inmates when released with obtaining identification and accessing public and private assistance for housing and employment to improve their ability to avoid re-arrest.

**LCSO/Clark
DEF001318**

# EXHIBIT 7

# Lee County Sheriff's Office

# Office of Professional Standards

# Staff Inspection Final Report



# Purchasing

# Workload Assessment and Staff Inspection

# October 2020

LCSO/Clark
DEF004386

# Lee County Sheriff's Office

---
Sheriff Carmine Marceno
Office of the Sheriff

Date _____

---
Undersheriff Eric Smith
Office of the Sheriff

Date _____

---
Chief John Holloway
Office of the Sheriff

Date _____

---
Annmarie Reno
Support Services Executive Bureau

Date _____

---
Jenna Clark
Purchasing Director

Date _____

---
Traci Estep
Professional Standards Division

Date _____

---
Commander Paul Cummins
Professional Standards Division

Date _____

---
Captain Matthew Herterick
Training Division

Date _____

---
Sergeant Diana Cintron
Staff Inspector – Professional Standards Division

Date _____

**LCSO/Clark**
**DEF004387**

# Lee County Sheriff's Office

## Table of Contents

Title Page ................................................................................................................ 1

Signatures Page ...................................................................................................... 2

Table of Contents .................................................................................................. 3

Executive Summary................................................................................................ 4

Purchasing Formal Inspection ............................................................................... 6

Introduction ........................................................................................................... 7

Description of Purchasing……….......................................................................... 7

Mission, Objectives, and Methodology of Formal Inspection ........................... 8

Policy, Procedure, and Accreditation Compliance .............................................9

Staffing Assessment...............................................................................................11

Personnel Assessment............................................................................................ 16

      Member Surveys ........................................................................................ 16

      Personal Interviews .................................................................................... 22

      Member Self-Assessments ........................................................................ 22

      Inspector Observations............................................................................... 24

Conclusion............................................................................................................. 25

References.............................................................................................................. 27

LCSO/Clark
DEF004388

# Lee County Sheriff's Office

## Executive Summary – Purchasing Inspection

In August 2020, Sergeant Diana Cintron of the Lee County Sheriff's Office Professional Standards Division began a formal staff inspection of Purchasing.  The summarized results are below:

## Conclusion

1. Does Purchasing meet the agency's formal expectations?

   *Yes.*

2. Does Purchasing's practices and procedures ensure compliance with LCSO policies, procedures, and professional standards?

   *Yes.*

3. Are there deficiencies in integrity, training, morale, policy, supervision, or personnel at Purchasing?

   *There are no recognizable deficiencies in integrity, training, morale, policy, first line supervision, and personnel.*

4. Are resources adequate for achieving agency goals and objectives?

   *Several Purchasing Agents requested a handheld Barcode scanner and a camera to take pictures of stock items.  The staffing resources are inadequate according to the workload analysis.  The addition of two (2) Purchasing Agent allocations is recommended for Purchasing.*

5. Are internal and external communications effective?

   *Yes.*

6. Is there sufficient safety and security for personnel?

   *Yes.  There is sufficient safety and security for personnel, and the equipment provided meets and exceeds all operational and Accreditation standards.*

7. Are the written directives for this unit adequate?

   *Yes.  Written directives meet all State and Federal laws, and Accreditation Standards.*

LCSO/Clark
DEF004389

# Lee County Sheriff's Office

8. Evaluation of the record keeping practices for organization, completeness, and ability to retrieve information.

   *The record keeping practices of Purchasing are organized, complete, and the software available provides easy retrieval of information.*

9. Other Recommendations
   *There are no other recommendations at this time.*

### **Objectives**

1. Does Purchasing comply with the law, policy, and CALEA standards? _Yes_.

2. Is the Purchasing facility safety and security appropriate? _Yes_.

3. Are equipment safety, and equipment needs met? _Yes._

4. Is adequate supervision assigned to Purchasing? _Yes_.

5. Are adequate personnel assigned to Purchasing?  _No._

   _Recommendation:_ The current staffing level is inadequate and it is recommended that two (2) additional Purchasing Agent positions be allocated.


The Purchasing Division of the Lee County Sheriff's Office appears to be running at a high to very high level of productivity according to all of the employees.  Most of the personnel appear to be happy to very happy to be assigned there.  Supervisors appear extremely qualified, and are well liked by their employees.  Nearly all of the staff showed high to very high levels of morale and job satisfaction.

It is difficult to obtain the perfect level of equipment, service, and employee satisfaction in a law enforcement agency.  The Purchasing Division is a very small unit with a group of very hard working and dedicated employees.  With their expertise in purchasing goods and services for the department, the certified staff can focus on keeping the residents and visitors of Lee County safe.

LCSO/Clark
DEF004390

# Lee County Sheriff's Office

# Purchasing Formal Staff Inspection

LCSO/Clark
DEF004391

# Lee County Sheriff's Office

## Purchasing Formal Staff Inspection

## Introduction

In August 2020, Sergeant Diana Cintron of the Lee County Sheriff's Office Professional Standards Division began a formal staff inspection of the Purchasing Division, commonly referred to as "Purchasing."  On August 26, 2020, Sgt. Cintron held a pre-inspection meeting with Purchasing Director Jenna Clark.  It was determined that Purchasing Director Clark would be the liaison for the inspection process.  The inspection began in October of 2020 and concluded in November 2020.

## Description of Purchasing

### Location

The Lee County Sheriff's Office Purchasing Division is comprised of Purchasing Director/Management and Purchasing Agents.  The strength of the Central Purchasing System is its ability to serve the operating components/divisions without requiring them to maintain their own internal purchasing process.  The value of centralized purchasing has long been recognized in both government and private business.

The goal of Purchasing is to obtain items at the lowest reasonable rate and within the time requested, or as soon as possible.  The Purchasing Division is also responsible for ensuring proper authorization and recording of all purchase transactions by its personnel.

There are three different purchasing procedures:  Standard Purchasing requires an online purchase order; In-House Store Purchasing requires an online requisition; and Software Purchasing requires Technical Support and Facilities Division Director approval prior to submission of an online purchase order.

Purchasing is located in the Lee County Sheriff's Office Main Headquarters at 14750 Six Mile Cypress Parkway, Fort Myers, FL 33912.  Lee County Sheriff's Office personnel have access to Purchasing and its employees Monday - Friday, 9:00 a.m. – 4:00 p.m.  There is ample parking for personnel.  The building provides adequate security with video surveillance.  There are no major issues with the location or property.

### Personnel

As of October 2020, Purchasing contains 7 allotments distributed as follows: 1 Purchasing Director, 1 Purchasing Manager, 5 Purchasing Agents.

### Daily Operations

LCSO/Clark
DEF004392

# Lee County Sheriff's Office

Purchasing Division personnel work four, 10-hour days.  Scheduling is set to cover a workweek of Monday – Friday.

Purchasing Director position involves responsible supervisory, administrative and operational duties specific to the position.  The Director researches and prepares various reports, composes and constructs policy, procedure and directives, and the budget for the component. The Purchasing Director Jenna Clark works from 8:00 a.m. – 6:00 p.m., Tuesday - Friday.

The Purchasing Manager position involves administrative and clerical work purchasing a variety of supplies and equipment.  Work involves responsibility for research, pricing and negotiation for purchase of quality items at the best price, preparing purchase orders, and keeping an inventory of items ordered and received.  Duties include contacting vendors for availability of products and the provision of contracted services.  Work is performed under the general supervision of the Purchasing Director.  Purchasing Manager Shannon Lehman works 6:30 a.m. – 4:30 p.m., Monday – Thursday.

The Purchasing Agents duties involve responsibility for research, pricing and negotiation for purchase of quality items at the best price, preparing purchase orders, and keeping an inventory of items ordered and received.  Duties include contacting vendors for availability of products, preparing bid specifications, and following-up on delivery of products and the provision of contracted services.  Additionally, Purchasing agents answer phones, provide customer service to employees at the front counter, and meet vendors at the loading dock and accept delivery of products.

Purchasing Agent Daysi Castillo works 7:00 a.m. – 5:00 p.m., Monday – Friday.  Purchasing Agent Christine Cross works 6:00 a.m. – 4:00 p.m., Tuesday – Friday.  Purchasing Agent Danielle DePonto works 7:15 a.m. – 5:15 p.m., Monday – Thursday.  Purchasing Agent Brenda Hector works 8:00 a.m. – 6:00 p.m., Monday and Friday and 10:00 a.m. – 8:00 p.m. Tuesday and Thursday.  Purchasing Agent Gwen Legler works 6:00 a.m. – 4:00 p.m., Tuesday - Friday.

## Mission, Objectives, and Methodology of Formal Inspection

1. **Mission**
   a. To determine if Purchasing meets the agency's formal expectations.
   b. To review practices and procedures to ensure compliance with LCSO policies, procedures, and professional standards.
   c. To detect deficiencies in integrity, training, morale, policy, supervision, or personnel.
   d. To determine if resources are adequate for achieving agency goals and objectives.
   e. To evaluate the effectiveness regarding internal and external communications.
   f. To evaluate the safety and security of personnel.
   g. To evaluate the adequacy of written directives related to this unit.

LCSO/Clark
DEF004393

# Lee County Sheriff's Office

    h. To review the record keeping practices for organization, completeness, and ability to retrieve information.

**2. Objectives**

    a. Ensure compliance with the law, policy, and CALEA standards.

    b. Ensure facility safety and security is appropriate.

    c. Ensure equipment safety, and equipment needs are met.

    d. Ensure that adequate supervision is assigned.

    e. Ensure that adequate personnel are assigned.

**3. Methodology**

    a. Meetings, email and phone contact with supervisors.

    b. Physical inspection of facilities.

    c. Review of relevant databases (PowerDMS, CAD, etc...)

    d. Surveys, including a component survey and unit member survey.

    e. Personal interviews with personnel.

    f. Analysis of the Division workload.

## Policy, Procedure, and Accreditation Compliance

**Commander's Component Survey**

Purchasing Director Jenna Clark completed a "Component Survey" as part of this formal inspection. The Component Survey noted no concerns.

**Power DMS Inbox Summary**

Sgt. Diana Cintron generated a *Signatures Summary* and a *Student Records* report in the Power DMS system. The report revealed no major issues. This shows that personnel sign all mandatory documents and complete online courses in a timely manner.

**Official Manpower Allotments**

As of October 21, 2020, Purchasing contains 7 allotments distributed as follows: 1 Purchasing Director, 1 Purchasing Manager, 5 Purchasing Agents.

The Purchasing budget and allocations (Budget Account #20302) Manpower Report is provided in the Appendix.

**Current Budget**

Sergeant Cintron obtained a copy of the Purchasing current budget for FY 20/21. Purchasing is allotted $1,665,414.00. No anomalies were noted in their expenditure report and their budget is consistent with that of other similar units at the Sheriff's Office.

LCSO/Clark
DEF004394

# Lee County Sheriff's Office

**Accreditation Compliance**

Sgt. Cintron received an email from Manager Tanya Tanner in Accreditation on November 5, 2020.  Manager Tanner stated that Purchasing was up-to-date on all of their standards and that there were no concerns or anomalies.  A copy of the Accreditation standards for Purchasing is located in the Appendix.

**Goals and Objectives**

Goals and Objectives are written goals and written objectives that agency components use to measure the success or failure of their unit.  Located on the agency intranet, personnel are able to see and obtain a copy of each goal and objective for their unit.  Unit Commanders update these goals and objectives in January of each calendar year.  The formal Goals and Objectives for Purchasing can be found in the Appendix.

1. **Written Goals and Objectives**

   At the time of the inspection, the 2019 Goals and Objectives were completed.  The 2019 Goals and Objectives revealed the following concerns and notable accomplishments:

   a. Track number of purchase orders processed.
      i. 2019 Baseline:
         Total purchase orders and pick tickets processed:  6,641, a 19% increase from 2018.

         *Recommendations – No recommendations at this time.*

   b. Maintain efficiency in inventory control.
      i. 2019 Baseline:
         During 2019, the NIGP (National Institute for Government Purchasing) Commodity/Service Codes have not been consistently utilized.  The goods and services that we acquire are not enough volume to utilize the codes. Photo imaging of equipment and supplies is an ongoing process so this would be considered not on target.

         *Recommendations – No Recommendations at this time.  The process is moving forward per Director Jenna Clark.*

**LCSO/Clark
DEF004395**

# Lee County Sheriff's Office

**Job Task Analysis (JTA's)**

Purchasing has the following non-staff level positions:  Purchasing Agent.  The Job Task Analysis for the above listed job classifications are in the Appendix.

**Facilities and Equipment**

Purchasing is located in the Lee County Sheriff's Office Main Headquarters at 14750 Six Mile Cypress Parkway, Fort Myers, FL 33912.  Lee County Sheriff's Office personnel have access to Human Resources and its employees Monday - Friday, 9:00 a.m. – 4:00 p.m.  There is ample parking for personnel.  The building provides adequate security with video surveillance.  There are no major issues with the location or property.

**Facility Safety and Security**

Purchasing has a controlled access system for entry into the secure areas of the building, and all equipment is protected and locked.  Purchasing maintains a good combination of security and approachability for members, and the controlled access and provides a higher than normal level of security.

## Staffing Assessment

**Introduction**

The Lee County Sheriff's Office is required to perform periodic workload assessments so that personnel may be appropriately allocated and distributed across the various organizational components.

The Commission on Accreditation for Law Enforcement Agencies (CALEA) standard 16.1.2 states: "The agency allocates personnel to, and distributes them within all organizational components in accordance with documented periodic workload assessments."  The purpose of this standards is to encourage the appropriate deployment of personnel by determining service demands through the use of workload assessments and computer-based or manual methods of personnel allocation and distribution. (Shane, 2009, p.99)

The intent of this standard is to encourage the equalization of individual workloads among and within organizational components.  The analysis should specify all incidents and factors used in making each workload assessment and indicate any time and location factors necessary to complete a task.

Basing the allocation of personnel on workload demands can have a significant influence on the efficiency and effectiveness of the agency.  The agency should attempt to prevent over or under staffing by ensuring that, the personnel strength of an organizational component is consistent with the workload.  The nature or number of tasks as well as their complexity, location, and time

LCSO/Clark
DEF004396

# Lee County Sheriff's Office

required for completion are some of the factors influencing workload demands.  The process of allocating personnel to each organizational component also permits the agency to determine the overall number of personnel required to meet its needs and fulfill its objectives.

Assignment of personnel to Purchasing should be based on a thorough analysis of what Purchasing Agents are actually responsible for.  The work of Purchasing Agents is much more than answering telephone calls, reading, and returning emails to other personnel within the agency.  It is conducting tasks related to research, pricing and negotiation for purchase of quality items at the best price, preparing purchase orders, and keeping an inventory of items ordered and received.  Duties include contacting vendors for availability of products, preparing bid specifications, and following-up on delivery of products and the provision of contracted services. Additionally, personnel answer phones, provide customer service to employees at the front counter, and meet vendors at the loading dock and accept delivery of products.

**Workload Assessment Methodology**

The methodology used to perform the Purchasing Agents Workload Assessment is one suggested by CALEA inspectors and is formally presented in the textbook *What Every Chief Executive Should Know; Using Data to Measure Police Performance* by Dr. Jon Shane, who is a professor of criminal justice at the John Jay College of Criminal Justice at the City University of New York.  Dr. Shane's model is easy to use, easily taught to others, and accurate in determining staffing needs.

1. <u>**Purchasing Agents**</u>

   **The Explanation of Each Step in the Methodology for Purchasing Agents - Self-Reported Workload Analysis**

   The methodology used to perform the Purchasing Agents Workload Assessment is the same one used by the Lee County Sheriff's Office in previous years to determine staffing needs of various units and it includes workload and actual work on their regular duties.

   **Explanation of Each Step in the Methodology**

   > **Step 1**- Gather existing data on Purchasing Agents activities to determine those tasks completed daily by Purchasing Agents has to create a list of principle modalities.

   > **Step 2**- Develop a list of principle modalities. The Purchasing Agents have reported these tasks as common tasks performed daily. (AKA principle modalities).

   >     i.    Phone Calls and Emails
   >    ii.    Checking in Orders, and Receive Orders

LCSO/Clark
DEF004397

# Lee County Sheriff's Office

   iii.    Pull Pick Ticket Orders and Send Order Ready Notifications

   iv.    Customer Service Front Counter/Back Door, Receive/Process Packages

   v.    Process Pick Ticket Orders, Process Purchase Orders and Pull Orders

   vi.    Enter In-House Supply Replenishment Order, Enter Requisitions/Orders

   vii.    Meeting with Jenna, Shannon or Assist Other Employees

   viii.    Receive Purchase Orders

   ix.    Enter/Finish Jail Supply Order, Finish Reviewing Supplies for Corrections

   x.    Convert Requisitions to Purchase Orders, Finish/Follow-up Pending Requisitions

   xi.    Enter/Update JM Todd New Leases

   xii.    Follow-up with Vendors Open Orders/Orders Not Delivered

   xiii.    Process/Convert Requisitions, Scan Requisitions and Purchase Orders

   xiv.    Process New Hire, Size Appointment New Hire, Fill Out Paperwork for New Hires

   xv.    Cut Patches Off Used Uniforms and Hang/Dispose of Uniform

   xvi.    Process Uniform Request/Returns, Check Used Uniforms, Work in New/Used Uniforms

   xvii.    Pull/Restock Uniforms and Equipment for Uniform Request, Restock Inner Belts

   xviii.    Add Sizing Labels to Garment Bags for New LE Uniform

   xix.    Other Administration Duties

**Step 3**- Total minutes available for work in a typical day, and typical week, were calculated with MS Excel.

**Step 4**- Total minutes used and left unused for work by Purchasing Agents were calculated with MS Excel.

**Step 5**- The percentage of actual available minutes used by the unit was calculated with MS Excel.

**Step 6**- The top five modalities on which Purchasing Agents spend the majority of their time were calculated with MS Excel.

**Step 7**- The relief factor of 1.33 was included in these calculations.

The below chart indicates the results for the time required to fulfill Purchasing Agents demands.  The summarized results indicate that there is a requirement of 7 full-time equivalent (FTE) positions to handle the Purchasing Agents workload.  This indicates that a total of 5 (five) employees are performing the work of seven (7) FTE positions.  The self-reported analysis also indicated that the Purchasing Agents are using 100% of their available time working on Purchasing Agent principal modalities.  It would appear

LCSO/Clark
DEF004398

# Lee County Sheriff's Office

that the current staffing level is inadequate and it is recommended that two (2) additional Purchasing Agent positions be allocated.  The full results can be found in the Appendix.

| Purchasing - Civilian Purchasing Agent - TIME / WORKLOAD ANALYSIS | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Tasks Routinely Performed by The Detectives** | **Day 1** | **Day 2** | **Day 3** | **Day 4** | **Weekly Minutes** | **Weekly Hours** | **Monthly Hours** | **Annual Hours** | **% Of Weekly Minutes** |
| Phone calls and Emails | 693 | 579 | 602 | 652 | 2526 | 42.10 | 182.29 | 2187.516 | 20.83% |
| Checking in Orders, Receive Orders | 14 | 179 | 88 | 140 | 421 | 7.02 | 30.38 | 364.586 | 3.47% |
| Full Pick Ticket Orders and Send Order Ready Notifications | 153 | 42 | 19 | 6 | 220 | 3.67 | 15.88 | 190.52 | 1.81% |
| Customer Service Front Counter/Back Door, Receive/Process Packages | 448 | 426 | 583 | 567 | 2024 | 33.73 | 146.07 | 1752.784 | 16.69% |
| Process Pick Ticket Orders, Process Purchase Orders and Pull Orders | 412 | 355 | 281 | 395 | 1043 | 17.38 | 75.27 | 903.238 | 8.60% |
| Entered In House Supply Replenishment Order, Enter Requisitions/Orders | 111 | 239 | 62 | 98 | 490 | 8.17 | 35.36 | 424.34 | 4.04% |
| Meeting with Jenna, Shannon or Assist other Employees | 73 | 137 | 140 | 45 | 395 | 6.58 | 28.51 | 342.07 | 3.26% |
| Receiving Purchase Orders | 23 | 0 | 0 | 0 | 23 | 0.38 | 1.66 | 19.918 | 0.19% |
| Enter/Finish Jail Supply Order, Finish Reviewing Supplies For Corrections | 61 | 0 | 0 | 0 | 61 | 1.02 | 4.40 | 52.826 | 0.50% |
| Convert Requisitions to Purchase Orders, Finish/Follow-up Pending Requestions | 0 | 39 | 46 | 159 | 244 | 4.07 | 17.61 | 211.304 | 2.01% |
| Enter/Update JM Todd New Leases | 0 | 0 | 274 | 0 | 274 | 4.57 | 19.77 | 237.284 | 2.26% |
| Follow-up with Vendors Open Orders/Orders Not Delivered | 0 | 0 | 0 | 33 | 33 | 0.55 | 2.38 | 28.578 | 0.27% |
| Process/Convert Requisitions, Scan Requisitions and Purchase Orders | 278 | 246 | 434 | 331 | 1269 | 21.15 | 91.58 | 1098.954 | 10.46% |
| Process New Hire, Size Appointment New Hire, Fill Out Paperwork for New Hires | 27 | 41 | 60 | 7 | 135 | 2.25 | 9.74 | 116.91 | 1.11% |
| Cut Patches Off Used Uniforms and Hang/Dispose Uniform | 21 | 77 | 0 | 0 | 98 | 1.63 | 7.07 | 84.868 | 0.81% |
| Process Uniform Request/Returns, Check Used Uniforms, Work in New/Used Uniforms | 239 | 249 | 245 | 295 | 1028 | 17.13 | 74.19 | 890.248 | 8.48% |
| Pulled/Restocked Uniforms & Equipment for Uniform Request, Restock Inner Belts | 7 | 35 | 0 | 0 | 42 | 0.70 | 3.03 | 36.372 | 0.35% |
| Add Sizing Labels to Garment Bags for New LE Uniform | 0 | 0 | 20 | 0 | 20 | 0.33 | 1.44 | 17.32 | 0.16% |
| Other Administrative Duties | 441 | 579 | 221 | 420 | 1661 | 27.68 | 119.87 | 1438.426 | 13.69% |
| Total = | 3001 | 3003 | 3035 | 2968 | 12007 | 200.12 | 866.51 | 10398.062 | 98.99% |

| Total Available Minutes / Includes ALL Time With No Deductions | | |
|---|---|---|
| Total Daily Minutes Actually Available For Work   600 x 4 = 2400 | 2400 | 600 available work minutes in one shift times 4 shifts each week   (breaks are part of relief factor included in calculations below) |
| Total Weekly Minutes Actually Available For Work 600 x 4 x 5 = 12000 | 12000 | 600 available minutes in one shift times 4 Shifts times 5 unit members |
| Total Weekly Minutes Actually Used For Work By This Unit | 12007 | Actual documented time worked by the Unit during a regular four day work week. |
| Unused Work Minutes | -7 | Actual available time not taken advantage of |
| Percentage Of Actual Available Minutes Used By This Unit | 100% | Percentage of the actual available time used by the entire unit as a whole |

| Top Five Categories This Unit Is Spending Time On Weekly | |
|---|---|
| Tasks Related to New Hire - Scan, Start Action Sheet, Prep New File | 20.83% |
| Tasks Related to Other Administrative Duties | 16.69% |
| Tasks Related to Phone calls and Emails | 13.69% |
| Tasks Related to Applications, Applicants, Employment Verification | 10.46% |
| Tasks Related to MUNIS - Management, Repair, Requests, Documentation | 8.60% |
| *70% of their work week is spent on these five categories* | 70% |

| Full Time Equivalency Evaluation | | |
|---|---|---|
| One Full Time Equivalent / Actual Work Time With Deductions | 1574 | 1 FTE = 1574 Hours = 10 Hrs Daily x 4 Days Weekly x 40 Hrs Weekly x 52.14 Weeks Yearly = 2086 Hrs Relief Factor of 512 hours = 1574 Hrs |
| Total Annual Hours | 10398.062 | Total FTE hours worked by the unit annually |
| **Full Time Equivalency** | **7** | *This number indicates that 5 Purchasing Agents are doing the work of 7 Purchasing Agents during an average work week.* |

(This chart can be viewed in the Appendix)

**Relief Factor Calculations and Tables for Purchasing Agents**

Purchasing Agents are permitted a specified number of Vacation, Sick, Personal, and Training hours that takes them away from their regular duties.  Therefore, a relief factor, which accounts for personnel usage of this time, must be factored into the staffing assessment.  Using averages, the Relief Factor for Purchasing Agents working 10-hour shifts is 1.33.  This means that 1.33 people must be hired to do the work of one full time equivalent position.

LCSO/Clark
DEF004399

# Lee County Sheriff's Office

| | Standard Relief Factor for Civilian Employees 10/Shift | |
|---|---|---|
| | Category | Civilian |
| 1 | Total hours identified by policy (based on a standard 40 hour work week (40 x 52.14 = 2086) | 2086 |
| 2 | Vacation Hours Per Year | 160 |
| 3 | Personal Hours Per Year | 100 |
| 4 | Sick Hours Per Year | 80 |
| 5 | Break Time Hours Per Year | 172 |
| 6 | Total of Lines 2-6 | 512 |
| 7 | Subtract Line 6 from Line 1 | 1574 |
| 8 | Relief Factor (divide line 1 by line 7 and round to 2 decimal places) | 1.33 |

As indicated by the Time/Workload Analysis chart, the shift relief factor was already calculated into the Purchasing Agents workload. Including the shift relief factor, the workload of 7 Purchasing Agents will require two (2) additional allocations. It should be noted that this assessment revealed existing Purchasing Agents are working on principle modalities 100% of the time.

**Results Summary**

As of this assessment, there are 7 total allotments in Purchasing with 5 non-supervisory positions. There are five (5) Purchasing Agents doing the work of 7.

*Recommendation* – The addition of two (2) Purchasing Agent allocations.

LCSO/Clark
DEF004400

# Lee County Sheriff's Office

## <u>Personnel Assessment</u>

1. **Member Surveys**

   As part of the workload inspection of Purchasing, all members received a "Member Survey" disseminated by Sgt. Diana Cintron consisting of thirty-one (31) questions directly related to the individual worker. Sgt. Cintron provided seven (7) unit members with a hyperlink to the anonymous, confidential, web-based survey and requested it be completed. Seven (7) of the 7 members or 100% of personnel responded. A copy of the thirty-question member survey is included in the appendix.

   Below are the survey questions:

   1) Do you believe that your unit is performing at an acceptable level?
   2) Are you aware of any policies or procedures that are not being followed?
   3) If you answered yes to the above question, please specify which policy or procedure is not being followed?
   4) Has technology improved your personal work performance?
   5) Is your work satisfying?
   6) Do you know the goals and objectives of your unit?
   7) Do you have the necessary tools and resources to do your job?
   8) If you do not have the necessary tools and resources to do your job, please list the tools and resources that you need.
   9) Is your equipment periodically inspected as required by policy?
   10) Were you given the requisite training upon selection to your unit?
   11) Have you received additional unit related training since you started in this unit?
   12) Is training available to you in your current assignment?
   13) Has the training you have received improved your job performance?
   14) Is your supervisor aware of your work performance?
   15) Does your supervisor support your actions and decision?
   16) Does your supervisor encourage your ideas and opinions?
   17) Does your supervisor inform you on matters that affect your job?
   18) (Short answer question) What are the positive things about your unit/shift?
   19) (Short answer question) What are the negative things about your unit/shift?
   20) (Short answer question) Have you taken an active role in finding solutions to unit issues?
   21) (Short answer question) What could you or the agency do to help maximize your job performance?
   22) (Short answer question) Is there any equipment not provided to you that could help you to perform better?

LCSO/Clark
DEF004401

# Lee County Sheriff's Office

23) (Short answer question) If you answered yes to the above, please list the equipment that could be provided which would help you perform your job better.

24) (Short answer question) Is there any training that you would like to have more frequently?

25) (Short answer question) If you answered yes to the above, please list the type of training you would like to receive.

26) (Short answer question) Are there any procedures that can be modified to save time?

27) (Short answer question) If you answered yes to the above, please list the procedure changes that you would make to save time.

28) Are you aware that all files, spread sheets and/or pertinent information should be uploaded to the proper program or sent to the official custodian within the Lee County Sheriff's Office and not be kept in your own personal files?

29) Do you have any personal files that should be uploaded in Spillman or any other LCSO programs?

30) (Short answer question) Is there anything you would like to add about your work or your unit?  If so, please let us know below.

31) What would you like us to know that would benefit Purchasing or was not covered previously?

**_Survey Responses:_**

(Duplicate or unassociated written answers have been omitted.  The full responses can be viewed in the Appendix.

1.  Do you believe that your unit is performing at an acceptable level?
    i.  Yes – 100%
    ii. No – 0%
2.  Are you aware of any policies or procedures that are not being followed?
    i.  Yes – 0%
    ii. No – 100%
3.  If you answered yes to the above question, please specify which policy or procedure is not being followed.  N/A
4.  Has technology improved your personal work performance?
    i.  Yes – 86%
    ii. No – 14%
5.  Is your work satisfying?
    i.  Yes – 100%
    ii. No – 0%
6.  Do you know the goals and objectives of your unit?
    i.  Yes – 100%

LCSO/Clark
DEF004402

# Lee County Sheriff's Office

      ii.  No – 0%

7.  Do you have the necessary tools and resources to do your job?
      i.  Yes – 83%
      ii.  No – 17%

8.  (Short answer question) If you do not have the necessary tools and resources to do your job, please list the tools and resources that you need.
      i.  Written Answers:
          a.  "Although would like to add a few bar code scanners, along with a good camera to take pictures of stock items."
          b.  "The tools they have given us to do the job is very labor intensive and inconsistent when performing certain tasks.  Which in turn makes the job very frustrating at times."
          c.  "Would be nice to have a handheld scanner to scan items directly into the person's issuance."

9.  Is your equipment periodically inspected as required by policy?
      i.  Yes – 100%
      ii.  No – 0%

10.  Were you given the requisite training upon selection to your unit
      i.  Yes – 100%
      ii.  No – 0%

11.  Have you received additional unit related training since you started in this unit?
      i.  Yes – 100%
      ii.  No – 0%

12.  Is training available to you in your current assignment?
      i.  Yes – 100%
      ii.  No – 0%

13.  Has the training you received improved your job performance?
      i.  Yes – 100%
      ii.  No – 0%

14.  Is your supervisor aware of your work performance?
      i.  Yes – 100%
      ii.  No – 0%

15.  Does your supervisor support your actions and decisions?
      i.  Yes – 100%
      ii.  No – 0%

16.  Does your supervisor encourage your ideas and opinions?
      i.  Yes – 100%
      ii.  No – 0%

17.  Does your supervisor inform you on matters that affect your job?
      i.  Yes – 100%

LCSO/Clark
DEF004403

# Lee County Sheriff's Office

    ii.  No – 0%

18. (Short answer question)   What are the positive things about your unit/shift?

    i.  Written Answers:

        a.  "I feel everyone tries to work as a team, and I am approachable if they have concerns."

        b.  "Management in the unit is very approachable and easy to talk with.  I enjoy the job, just not the Munis program we have switched to, to complete the job."

        c.  "Every day is a challenge and in this unit you can't never stop learning."

        d.  "We are able to provide customer service and necessities to other employees in the agency."

        e.  "I am able to successfully work with my partner/co-workers, have great support from my supervisors, different projects, responsibilities to stay busy, great relationships with other employees in the agency and co-workers."

        f.  "Each member has different areas that they handle and excel in. The team has an excellent work ethic and multi-task both individually and as a unit."

        g.  "Open door policy.  Both Shannon and Jenna are always willing to help and to also answer any questions or problems I come across."

19. (Short answer question)  What are the negative things about your unit/shift?

    i.  Written Answers:

        a.  "N/A."

        b.  "The glitchy Munis program we are using to do the job."

        c.  "In occasions the miscommunication."

        d.  "Sometime attitudes can be difficult to deal with."

        e.  "Others with low morale, negativity or causing issues with other."

        f.  It is a smaller unit, so when it comes to scheduling it can hard to have multiple personnel off?"

20. Have you taken an active role in finding solutions to unit issues?

    i.  Yes – 71%

    ii.  No – 29%

21. (Short answer question)  What could you or the agency do to help maximize your job performance?

    i.  Written Answers:

        a.  "N/A."

        b.  "Nothing that I can think of at this time.  They already have given us a counter person which has help tremendously with the interruptions in completing tasks in the Munis

LCSO/Clark
DEF004404

# Lee County Sheriff's Office

system and given us desk top scanners to help with the workload."

 c. "Provide better salary and more trainings in other areas."

 d. "Improve morale."

 e. "Help to update technology so we are not so paper heavy and doing things manually, such as a scanning/inventory system that ties in with our purchasing system (Munis), electronic signatures, etc."

 f. "Would be nice to have a handheld scanner to scan items directly into the person's issuance."

22. Is there any equipment not provided to you that could help you to perform better?

 i. Yes – 43%

 ii. No – 57%

23. If you answered yes to the above, please list the equipment that could be provided which would help you perform your job better.

 i. Written Answers:

  a. "Bar code scanners (handheld)."

  b. "A handheld scanner that would help with scanning uniforms right in to the employee issuance if this was possible based on procurement program we have in place."

  c. "Would be nice to have a handheld scanner to scan items directly into the person's issuance."

24. Is there any training that you would like to have more frequently?

 i. Yes – 43%

 ii. No – 57%

25. If you answered yes to the above, please list the type of training you would like to receive.

 i. Written answers

  a. "Cross training in different areas within the unit."

  b. "Anything relating to effectively dealing with people."

  c. "Anything customer service or dealing with people."

26. Are there any procedures that can be modified to save time?

 i. Yes – 57%

 ii. No – 43%

27. If you answered yes to the above, please list the procedure changes that you would make to save time.

 i. Written answers

  a. "Entering of uniform requests in Munis.  Lots of steps to enter each item."

LCSO/Clark
DEF004405

# Lee County Sheriff's Office

  b. "As mentioned above, advanced technology systems in place would help decrease manual issuance/receipts and having to scan paper.  Electronic signatures for issued items, scanning system to take inventory and manage receipts/issuance."

  c. "A handheld scanner than would help with scanning uniforms right into the employee issuance if this was possible, based on procurement program we have in place."

  d. "Would be nice to have a handheld scanner to scan items directly into the person's issuance."

28.  Are you aware that all files, spread sheets and/or pertinent information should be uploaded to the proper program or sent to the official custodian within the Lee County Sheriff's Office and not be kept in your own personal files? Is there anything you would like to add about your work or your unit?

  i. Yes – 100%

  ii. No – 0%

29. Do you have any personal files that should be uploaded in Spillman or any other LCSO programs?

  i. Yes – 0%

  ii. No – 100%

30.  (Short answer question) Is there anything you would like to add about your work or your unit?

  i. Written Answers:

   a. "The girls in Purchasing work very hard, they are team players and very conscientious in the work they do."

   b. "We have a good little unit here with great management."

   c. "Some co-workers should mind their own business."

   d. "We have a hard working group of people that are tasked with a large workload and they handle it."

   e. "I enjoy my job and really like working for Jenna and Shannon."

31. What would you like us to know that would benefit the Human Resources Unit or was not covered previously?

  i. Written answers

   a. "Nothing."

The major issues observed in the member survey are as follows:

  1) *Equipment*:

   a. Throughout the survey, it was mentioned by several Purchasing Agents that they would like to have a handheld Barcode scanner that would scan information into the employee issuance.

   b. A good camera to take pictures of stock items.

LCSO/Clark
DEF004406

# Lee County Sheriff's Office

    c.  Advanced technology systems in place would help decrease manual issuance/receipts and having to scan paper. Electronic signatures for issued items, scanning system to take inventory and manage receipts/issuance.

*Recommendation*: If Director Clark agrees with the suggestions of the additional equipment/technology, it should be investigated to determine cost and effectiveness.

2) *Training*:
    a.  Cross training in different areas within the unit.
    b.  A class on effectively dealing with people.
    c.  A class on customer service.

*Recommendation*: The individual should find out where these classes/courses are being offered and provide the Training Division, Paula Robinson, with the information so it may be uploaded into TMS and apply for the offered course.

## 2. Personal Interviews

Sgt. Cintron made an unannounced visit to speak to the Purchasing Agents in the Purchasing Division. Sgt. Cintron spoke to several people asking them what their job duties were, what their daily tasks comprised of, and their overall job happiness. The only issue brought up was regarding a handheld scanner to make their job tasks quicker and easier. Although, the unit is a small unit, it appears that the Purchasing Agents and Management are a very closely knitted group. Sgt. Cintron was sitting at the break table and one Purchasing Agent was eating her lunch. She appeared to be happy and content with her position in Purchasing. It was very busy and non-stop.

## 3. Member Self-Assessments

An online Member Self-Assessment was distributed to each member in Purchasing. These anonymous assessments asked personnel to answer four questions and state their highest level of formal education. Seven of the seven members (100%) returned the assessment. The possible answers to the questions were Very High, High, Neutral, Low, and Very Low. The questions were as follows:

1) Morale can be described as one's emotional or mental condition with respect to cheerfulness, confidence, zeal, etc., especially in the face of opposition, hardship, etc… Which of these best describes your personal level of morale?

LCSO/Clark
DEF004407

# Lee County Sheriff's Office

2) Job satisfaction can be defined as how content an individual is with his or her job, in other words, whether or not they like the job or individual aspects of their position, such as nature of work. Which one of these best describes your level of job satisfaction?

3) Worker happiness is that happiness that workers feel when they are satisfied with their job and work conditions. Which one of these best describes your level of worker happiness?

4) Productivity can be defined as the quality, state, or fact of being able to generate, create, enhance, or bring forth goods and services. Which of these best describes your personal level of productivity?

5) Which of these describes your highest level of formal education?

The answers were as follows:

1) Which of these best describes your personal level of morale?
   a. Very High – 25%
   b. High – 50%
   c. Neutral – 25%
   d. Low – 0%
   e. Very Low – 0%

2) Which of these best describes your level of job satisfaction?
   a. Very High – 14%
   b. High – 71%
   c. Neutral – 14%
   d. Low – 0%
   e. Very Low – 0%

3) Which of these best describes your level of worker happiness?
   a. Very High – 13%
   b. High – 75%
   c. Neutral – 13%
   d. Low – 0%
   e. Very Low – 0%

4) Which of these best describes your level of productivity?
   a. Very High – 38%
   b. High – 50%
   c. Neutral – 13%
   d. Low – 0%
   e. Very Low – 0%

5) Which of these best describes your current level of education?
   a. Doctorate – 0%
   b. Masters – 25%

LCSO/Clark
DEF004408

# Lee County Sheriff's Office

    c.   Bachelors – 24%

    d.   Associates – 0%

    e.   Some College – 38%

    f.   HS Diploma – 13%

    g.   GED – 0%

This assessment showed that Purchasing employees have levels of morale, job satisfaction, worker happiness, and productivity ranged from neutral to very high. Productivity was noted at very high by 50% and high at 50%. It also showed that several employees had had attained a degree(s) at the level of postsecondary education.

*Note* – Members are encouraged to take advantage of Lee County Sheriff's Office benefits to obtain a low cost, high-quality education.

**4. Inspector Observations**

Sgt. Cintron made an unannounced visit to Purchasing, speaking to random personnel and observing their work habits.   The personnel appeared to be very happy and comfortable in their positions.  Sgt. Cintron observed that the atmosphere was friendly and welcoming. Sgt. Cintron noticed that the telephone was constantly ringing and the Purchasing Agents were working at the front counter assisting fellow employees. Additionally, Purchasing Agents were reviewing purchase orders and picking up COVID-19 supplies to handout to a fellow worker at the front counter.   The employees were very outgoing and very attentive to Sgt. Cintron's questions and needs. Sgt. Cintron felt very comfortable and welcomed by all of the employees.

**LCSO/Clark
DEF004409**

# Lee County Sheriff's Office

## __Conclusion__

### __Mission Conclusion__

1. Does Purchasing meet the agency's formal expectations?

   _Yes_.

2. Does Purchasing practices and procedures ensure compliance with LCSO policies, procedures, and professional standards?

   _Yes._

3. Are there deficiencies in integrity, training, morale, policy, supervision, or personnel at Purchasing?

   _There are no recognizable deficiencies in integrity, training, morale, policy, first line supervision, and personnel._

4. Are resources adequate for achieving agency goals and objectives?

   _Several Purchasing Agents requested a handheld Barcode scanner and a camera to take pictures of stock items.  The staffing resources are inadequate according to the workload analysis.  The addition of two (2) Purchasing Agent allocations is recommended for the Purchasing Division._

5. Are internal and external communications effective?

   _Yes._

6. Is there sufficient safety and security for personnel?

   _Yes_.  _There is sufficient safety and security for personnel, and the equipment provided meets and exceeds all operational and Accreditation standards._

7. Are the written directives for this unit adequate?

   _Yes_.  _Written directives meet all State and Federal laws, and Accreditation Standards._

8. Evaluation of the record keeping practices for organization, completeness, and ability to retrieve information.

**LCSO/Clark
DEF004410**

# Lee County Sheriff's Office

*The record keeping practices of Purchasing are organized, complete, and the software available provides easy retrieval of information.*

9. Other Recommendations
*There are no other recommendations at this time.*

**Objectives**

6. Does Purchasing comply with the law, policy, and CALEA standards?  *Yes*.

7. Is the Purchasing facility safety and security appropriate? *Yes*.

*8.* Are equipment safety, and equipment needs met? *Yes.*

9. Is adequate supervision assigned to Purchasing? *Yes*.

*10.* Are adequate personnel assigned to Purchasing?  *No.*

*Recommendation:* The current staffing level is inadequate and it is recommended that two (2) additional Purchasing Agent positions be allocated.

The Purchasing Division of the Lee County Sheriff's Office appears to be running at a high to very high level of productivity according to all of the employees.  Most of the personnel appear to be happy to very happy to be assigned there.  Supervisors appear extremely qualified, and are well liked by their employees.  Nearly all of the staff showed high to very high levels of morale and job satisfaction.

It is difficult to obtain the perfect level of equipment, service, and employee satisfaction in a law enforcement agency.  The Purchasing Division is a very small unit with a group of very hard working and dedicated employees.  With their expertise in purchasing goods and services for the department, the certified staff can focus on keeping the residents and visitors of Lee County safe

LCSO/Clark
DEF004411

# Lee County Sheriff's Office

**References**

Lee County Sheriff's Office (2020) *Operations Manual:  2020*.  Fort Myers, FL:  LCSO
PowerDMS.

Shane, J.M. (2009).  *What every chief executive should know:  Using data to measure police
performance.*  Flushing, NY:  Loose-leaf Law Publications Inc.

**LCSO/Clark
DEF004412**