Deposition of Dawn Heikkila                              Jenna Clark v. Carmine Marceno

```
 1              UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF FLORIDA
 2

 3

    JENNA CLARK,
 4
         Plaintiff,
 5                              CASE NO.: 2:22-cv-614-SPC-NPM
    v.
 6
    CARMINE MARCENO, in
 7  his official capacity
    as Sheriff of Lee
 8  Country, Florida,

 9       Defendant.
    ----------------------/
10
                        ZOOM DEPOSITION OF
11
                         DAWN HEIKKILA
12
                 TAKEN ON BEHALF OF PLAINTIFF
13

14
    DATE TAKEN:     Wednesday, October 11, 2023
15
    TIME:          11:24 a.m. to 12:42 p.m.
16
    PLACE:         All parties appeared via videoconference
17

18

19

20

21

22
            Examination of the witness taken before:
23
                        Julie S. Evans
24           Court Reporter and Notary Public

25
```

Deposition of Dawn Heikkila                                    Jenna Clark v. Carmine Marceno

 1   APPEARANCES:

 2   KYLE T. MACDONALD, ESQUIRE (via Zoom)
     Derek Smith Law Group, PLLC
 3   520 Brickell Key Dr.
     Suite O-301
 4   Miami, Florida 33131

 5        On behalf of the Plaintiff.

 6   DAVID J. STEFANY, ESQUIRE (via Zoom)
     Allen Norton & Blue, P.A.
 7   324 South Hyde Park Avenue
     Suite 225
 8   Tampa, Florida 33606-4128

 9        On behalf of the Defendant.

10
                         - - - - -
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    EXAMINATION INDEX

 2   ZOOM TESTIMONY OF DAWN HEIKKILA
          DIRECT BY MR. MACDONALD                    4
 3        CROSS BY MR. STEFANY                       35

 4   CERTIFICATE OF OATH                             43

 5   CERTIFICATE OF REPORTER                         44

 6
                        EXHIBIT INDEX
 7
     Plaintiff's
 8    9      Bates 3431: Excerpt from LCSO employee   15
             policy
 9
      10     Bates 1294-1295: 8/12/21 email between   17
10           Jenna Clark and Dawn Heikilla

11
                       - - - - -
12
                   S T I P U L A T I O N S
13
          It is hereby agreed and so stipulated by and
14
     between the parties hereto, through their respective
15
     counsel, that the reading and signing of the transcript
16
     are hereby waived.
17
                       - - - - -
18

19

20

21

22

23

24

25
```

```
1              P R O C E E D I N G S
2          THE COURT REPORTER:  This is the Zoom
3      deposition of Dawn Heikkila, being taken in the
4      matter of Clark v. Marceno as Sheriff of Lee
5      County, Florida.
6          Please raise your right hand.  Do you solemnly
7      swear or affirm your testimony will be the truth,
8      the whole truth, nothing but the truth, so help you
9      God?
10       THE WITNESS:  I do.
11  THEREUPON:
12                  DAWN HEIKKILA,
13  having first been duly sworn, testified as follows:
14                  DIRECT EXAMINATION
15  BY MR. MACDONALD:
16      Q.   Could you please state your full name for the
17  purposes of the record, please.
18      A.   Dawn Marie Heikkila.
19      Q.   And do you understand that you've been placed
20  under oath and that you have an obligation to testify
21  truthfully?
22      A.   I do.
23      Q.   And do you understand that, even though we are
24  conducting this deposition through Zoom, your testimony
25  has the same force and effect as if you were testifying
```

1    in a court of law, before a judge and jury?

2         A.   Yes.

3         Q.   Is there anything that would prevent you from

4    thinking clearly and testifying truthfully today?

5         A.   No.

6         Q.   Where do you currently work?

7         A.   At the Forsyth County Government, in Winston

8    Salem, North Carolina.

9         Q.   And when did you start that position?

10        A.   I started in July of 2023.

11        Q.   And where did you work, prior to that?

12        A.   For Lee County Sheriff's Office.

13        Q.   How long did you work with the Lee County

14   Sheriff's Office for?

15        A.   24 years and a couple of months.

16        Q.   What was the last position you held at the Lee

17   County Sheriff's Office?

18        A.   Director of human resources.

19        Q.   And what did you do, as the director of human

20   resources?

21        A.   I hired people; I administered -- I was

22   supervisor of the Risk Management Unit and of the

23   Benefits Unit and Human Resources, hiring, and things

24   like that.

25        Q.   Who did you report to, as director of human

 1  resources?

 2       A.   Before I left, Annmarie Reno.

 3       Q.   Did you hold any other positions during your

 4  employment at the Lee County Sheriff's Office?

 5       A.   I did, yes.

 6       Q.   What positions did you hold?

 7       A.   Risk manager, and I started as a human resource

 8  assistant, I believe.

 9       Q.   Do you have any training in human resources?

10       A.   I do.

11       Q.   And what training have you received related to

12  human resources?

13       A.   Wow, a lot; I've gone to many, many conferences

14  and formal training and, you know, I have a bachelor's

15  degree.  Through the years, every year, I went to -- you

16  know, just about every year, we went to various

17  trainings.  I could not possibly recall all of them for

18  you, but lots of training.

19       Q.   Are you a member of the Society of Human

20  Resources Management, also known as SHRM?

21       A.   Yes.

22       Q.   How long have you been a member for?

23       A.   Oh, gosh, probably since 2005 or -- a long time.

24       Q.   When you were director of human resources at

25  the Lee County Sheriff's Office, did any employees

1   report directly to you?

2       A.   Yes.

3       Q.   And which employees were those?

4       A.   Carrie Turner, Cindy Jinx (ph); those were two

5   of my direct reports, at the end.  Right before I

6   retired, those were the two.

7       Q.   In your role as director of human resources,

8   were you involved in decisions to hire or fire employees?

9       A.   Yes.

10      Q.   What was your role in terminating employees at

11  the Lee County Sheriff's Office?

12      A.   Terminating employees was notice; I did the

13  notifications most of the time.

14      Q.   How did you typically notify employees that

15  they were being terminated?

16      A.   Sometimes, just in writing; other times, in

17  person and in writing; sometimes just in person,

18  depending on the situation.

19      Q.   In your role as director of human resources,

20  did you receive any training related to discrimination?

21      A.   Yes.

22      Q.   What training did you receive?

23      A.   Many, many times through the years, it was part

24  of -- it was part of my training; I couldn't tell you

25  how many times or specifically.  The Florida Sheriff's

1   Association does a lot of that; that's the only one I

2   could probably recall specifically.

3        Q.   Did you ever give any trainings related to

4   discrimination to employees of the Lee County Sheriff's

5   Office?

6        A.   I'm sorry, could you repeat that.

7        Q.   Did you ever give any training related to

8   discrimination, in your role as director of human

9   resources?

10       A.   Yes.

11       Q.   What trainings did you give to employees?

12       A.   There was a time when we -- when I participated

13  in supervisor training, and that included a

14  discrimination piece.  Many, many years ago, we did

15  that; not recently.

16       Q.   Do you recall what that training covered?

17       A.   Well, you know, it was from a supervisor

18  standpoint, so it was, you know, basically -- I mean, I

19  trained out of a manual that we purchased from a

20  discrimination -- you know, a whole program; so I didn't

21  make it up, myself.  It would have been formalized.

22       Q.   In your role as director of human resources,

23  were you involved in receiving complaints of

24  discrimination or harassment?

25       A.   Yes.

1    Q.   What was your role in receiving complaints of

2    discrimination or harassment?

3    A.   Employees could come to me and report or

4    discuss, if they had a situation where they felt they

5    were being discriminated against or harassed; they could

6    report it to me, I would gather the information, and I

7    would basically get the appropriate parties involved to

8    do the investigation.

9    Q.   Did you conduct the investigation into --

10   strike that.  Did you conduct an investigation into

11   every complaint of discrimination that you received?

12   A.   I did not conduct the investigations, no.

13   Q.   Who conducted those investigations?

14   A.   That's a broad question, but so I don't know

15   exactly the answer to that.  I can tell you that

16   Internal Affairs was a division in the Sheriff's Office

17   that was tasked with completing -- you know, with

18   conducting investigations, and that's who I would have

19   referred any complaints, along with my chain of command.

20   Q.   What was the last time you received a complaint

21   of discrimination in your role as director of human

22   resources?

23   A.   That would have been Christian Mojica.

24        THE COURT REPORTER:  Could you repeat that

25   name?

```
 1            THE WITNESS:  Christian Mojica.  M-O-J-I-C-A, I
 2       believe.
 3  BY MR. MACDONALD:
 4       Q.   And who is Christian Mojica?
 5       A.   He was a corrections officer at the Sheriff's
 6  Office.  I think his whole -- I he was a corrections
 7  officer the whole time he worked there.  I'm not
 8  positive, but that's what he was doing when I took the
 9  complaint.
10       Q.   What did Christian Mojica complain to you
11  about?
12       A.   Several things; he had numerous complaints
13  throughout the years.  He didn't want to work night
14  shift, so he was complaining when other people got
15  transferred from the night shift, you know, if it wasn't
16  him.  He -- I think he complained -- he did complain one
17  time because he thought someone poisoned his coffee.  He
18  complained when he didn't get promoted to sergeant;
19  although he eventually did get promoted to sergeant, but
20  at one time, that was one of his complaints.  I think
21  that's all the formal complaints he made.  I think;
22  that's what I remember, in terms of formal complaints
23  from him.
24       Q.   When was the most recent formal complaint that
25  Christian Mojica made to you?
```

1    A.    When?  I want to say it was probably around --

2  hold on, I have it here in my notes.  Can I check my

3  notes?  I might have it.  If you want -- it was probably

4  in the last year or two that I worked there, but I don't

5  know.  I don't know exactly.

6    Q.    What specifically did Christian Mojica report

7  to you in the last time that he made a formal complaint

8  to you?

9    A.    That would have been, he wanted transferred to

10  days; he was having health issues, and he wanted

11  transferred to days.  He was bringing in doctor's notes

12  that suggested he work the days.  And there was no day

13  shift open, so he wasn't getting transferred and that's

14  why he complained to me, because he felt that he should

15  be transferred to days, regardless if there was a

16  position open.

17    Q.    And what did you do in response to this

18  complaint?

19    A.    I notified my chain of command that he had a

20  complaint, so that it could be investigated.

21    Q.    And was it investigated?

22    A.    Yes, it was.

23    Q.    Who conducted that investigation?

24    A.    I believe it was a chief -- I don't know what

25  his title was at the time; I think it was Matthew Sands.

1    I think it was Chief Sands, at the time, in accordance

2    probably with IA.  But I believe that's who I got the

3    information back from, that the investigation was

4    completed.  There could have been other people involved;

5    I'm not aware.

6        Q.   Did Christian Mojica ever complain to you

7    regarding FMLA leave?

8        A.   I talked to him about FMLA leave; he took a lot

9    of FMLA leave, I think; I don't know that there was ever

10   a real complaint on his part, regarding that.  But I

11   mean, he did take FMLA leave quite a few times.

12       Q.   What was the outcome of the investigation with

13   Christian Mojica?

14       A.   It was that there were no positions available

15   on the day shift, and so he didn't get -- he wasn't

16   getting transferred because there were just no positions

17   available; and we couldn't create a position for him,

18   just because he wanted to be on days.  So I believe it

19   was just found that, you know, that there was just

20   wasn't a position available for him, and that's why he

21   wasn't being transferred.

22       Q.   When did you first meet Jenna Clark?

23       A.   I have no idea.  I started work there in 1999,

24   so probably -- maybe -- I don't know.  Sometime.  A long

25   time ago.

1    Q.   How often did you interact with Jenna Clark

2  when she was director of purchasing?

3    A.   Well, I mean, not frequently.  You know, I

4  mean, there was a time when we had meetings in our

5  bureau, and I would have seen her at those meetings.

6  But towards -- you know, that was early on in my career.

7  So I mean, if I stopped in there or if she stopped into

8  HR.  Most of the time, it would have been over the

9  phone, you know, if she had a question or I had a

10  question.  But it was not frequent.

11    Q.   And who was Ms. Clark's supervisor, as director

12  of purchasing?

13    A.   Annmarie Reno would have been, you know, in the

14  most recent years.

15    Q.   How often did you interact with Annmarie Reno?

16    A.   A lot.  She was my supervisor, as well.

17    Q.   What was Annmarie Reno's title?

18    A.   Executive director of person -- support

19  services.

20    Q.   Did Annmarie Reno ever talk to you about Jenna

21  Clark, during your employment?

22    A.   Yes.

23    Q.   What would Annmarie Reno discuss with you

24  regarding Jenna Clark?

25    A.   She discussed one time when Jenna -- when she

1   had to have a coaching session with Jenna; she discussed

2   that with me, briefly, you know.  And I mean, other than

3   that, she discussed when Jenna was needing to be out for

4   a medical condition that she was having and to put --

5   about FMLA.  I mean, that's probably about it, that I

6   can recall anyway.  And then, obviously, about the

7   Reduction in Force, yeah.

8       Q.   Did Annmarie Reno ever complain to you about

9   Jenna Clark or her job performance to you?

10      A.   No.

11      Q.   Did Annmarie Reno and Jenna Clark get along

12  well, as far as you understand?

13      A.   I believe so, yes.

14      Q.   Do you know if Annmarie Reno still works for

15  the Lee County Sheriff's Office?

16      A.   I believe she does.

17      Q.   Did you ever interact with Annmarie Reno --

18  sorry, strike that.  Did you ever discuss the handling

19  of FMLA leave requests with Annmarie Reno?

20      A.   I don't think so, no.  I mean, you'd have to

21  give me a specific for that.  Not in general, no.  I

22  knew what to do, how to handle those.

23      Q.   Did you ever discuss any leave requests made by

24  Jenna Clark with Annmarie Reno?

25      A.   Well, Annmarie told me that Jenna was going to

Deposition of Dawn Heikkila                                    Jenna Clark v. Carmine Marceno

1   be out for a surgery and I know that -- and Jenna told

2   me too; but, yeah, Annmarie told me.  And then there was

3   a time when Annmarie told me Jenna was going out on FMLA

4   also.  That's about it, I think.

5       Q.   I'm going to show you a document.  (Screen

6   share began.)  We will mark this as Plaintiff's Exhibit

7   9, and it's defendant's Bates label 3431.  I'll have you

8   read through this.

9       A.   (Witness peruses the document.) okay.

10      Q.   Do you recognize this document?

11      A.   Yes.

12      Q.   And what is it?

13      A.   It's an excerpt from our policy.

14      Q.   Is this an email message sent by you?

15      A.   Yes.

16      Q.   And is this a message sent to Jenna Clark and

17  Shannon Lehman?

18      A.   Yes.

19      Q.   And this message appears to be dated June 18,

20  2020, at 12:47 p.m.; correct?

21      A.   Correct.

22      Q.   Why did you send this message to Jenna Clark

23  and Shannon Lehman?

24      A.   I don't remember.

25      Q.   Is this the FMLA leave policy for the Lee

1    County Sheriff's Office?

2        A.    No.

3        Q.    How would you describe that, then?

4        A.    This is part of a policy that talks about --

5    really, it's more like leave without pay.  Basically,

6    the reason for this is so that employees know that they

7    have to -- if they have accrued time, they have to use

8    it, if they're going to be away from work, rather than

9    going without pay, unless -- the only part of that for

10   FMLA is, FMLA is an unpaid entitlement; so there's an

11   excerpt in here that talks about, you konw, unless it's

12   FMLA.  But that's what that's for.

13       Q.    You do not recall why you sent this message to

14   Jenna Clark and Shannon Lehman?

15       A.    I don't.

16       Q.    Who is Shannon Lehman?

17       A.    Shannon is the manager in Purchasing; she

18   worked for Jenna.

19       Q.    Do you see the sentence where it says, "A

20   pattern of abuse may be cause for disciplinary action"?

21       A.    Yes.

22       Q.    Do you know what it's referring to, by "a

23   pattern of abuse"?

24       A.    Leave, some type of leave.

25       Q.    As the director of human resources, did you

1    ever have any employees engage in a pattern of abuse in

2    using leave?

3          A.    Employees that reported to me, or in general?

4          Q.    In general, in your role as director of human

5    resources, are you aware of any employees that engaged

6    in a pattern of abuse as it relates to leave?

7          A.    I'm sure I was.  I'm sure I heard of issues, at

8    some point in time throughout my career.  But this type

9    of situation would be investigated through Internal

10   Affairs.

11         Q.    Are you aware of any employees that were

12   disciplined for engaging in a pattern of abuse as it

13   relates to leave, during your time at the Lee County

14   Sheriff's Office?

15         A.    I know -- I know it occurred, but I can't

16   recall any specific names.

17         Q.    I'll show you another document.  We'll mark

18   this as Plaintiff's No. 10.  It's Bates labeled 1294 and

19   1295.  I'll give you a moment to review this.  Just let

20   me know when to scroll.

21         A.    Yes, I'm familiar with this.  Go ahead.

22         Q.    I'm going to scroll down, just to give you an

23   opportunity to review it.

24         A.    Yes.  Got it.

25         Q.    Do you recognize this document?

1    A.   Yes.

2    Q.   And what is it?

3    A.   This is an email trail from Jenna and I, where

4    Jenna was going out for a surgery; she told Annmarie,

5    Annmarie approved it, and told her to make sure that she

6    let me know, in case we needed to apply FMLA.  So this

7    is me going back and forth with Jenna, asking her how

8    long she was going to be out, so I could establish

9    whether that 7 days -- you know, whether it was going to

10   be a lot more or if it was not.  And this is where she

11   told me that, and then I instructed her on what to do if

12   it was going to be longer.

13   Q.   In this first message, dated August 12, 2021,

14   at 12:26 p.m., this is a message from Jenna Clark;

15   correct?

16   A.   Correct.

17   Q.   And it's directed towards you; correct?

18   A.   Correct.

19   Q.   And in this message, Ms. Clark is notifying you

20   that she has a surgery scheduled on the 18th of August;

21   correct?

22   A.   Correct.

23   Q.   When Annmarie Reno approved Ms. Clark's time,

24   would she have decided the type of leave that Ms. Clark

25   would take?

1          MR. STEFANY:  Objection as to form.  You may

2      answer.

3          THE WITNESS:  Policy would have indicated what

4      kind of leave she had and whatever she had in her

5      accrual bank.

6   BY MR. MACDONALD:

7      Q.   Let me ask you this.  Did Annmarie Reno ever

8   communicate the type of leave that Jenna Clark should

9   take for her surgery?

10     A.   No.

11     Q.   Did Annmarie Reno discuss this specific leave

12  request with you?

13     A.   Just to say, did -- I think I remember her

14  saying or, you know, "Jenna got with you; she's going to

15  be out; I approved it; I told her to get with you."  And

16  I said, "She did."

17     Q.   When you received this message from Jenna

18  Clark, did you understand it to be a request to use FMLA

19  leave?

20     A.   Well, I understood it to be a qualifying event

21  for FMLA, sure.  Yeah.

22     Q.   At the time you received this message, did you

23  believe that Jenna Clark was eligible to take FMLA

24  leave?

25     A.   I did, yes.

1    Q.    And do you see the next message dated August

2  12, 2021, at 1:04 p.m.?

3    A.    Yes.

4    Q.    And this is a message from you, to Jenna Clark;

5  correct?

6    A.    Correct.

7    Q.    Who is the Amy that you reference in this

8  email?

9    A.    Amy is the person I mentioned who handles FMLA,

10  in Risk Management.

11    Q.    And why did you mention whether Ms. Clark would

12  be out for more than a week, in that email?

13    A.    Because it was our practice to not require the

14  employee to go through all the paperwork requirements

15  and certifications for an FMLA, if they gave us enough

16  information to know it was a qualifying event; and if

17  they said it was only going to be a short amount of

18  time, we would not make them go through all the process

19  of the paperwork for just 7 days.  Because by the time

20  they would -- if we did, by the time they got the

21  paperwork, you know, they would be back to work.

22         So there was no need for us to do that.  It was

23  approved time; we had no issue with her being out; we

24  knew it was a qualifying event.  And, yeah, that's why I

25  said, let me know if it's going to be longer, and we'll

1    activate the FMLA for you.  But for just 7 days, she was

2    already getting approval.

3         Q.   Did you have to document this request anywhere?

4         A.   I mean, I made a note of it for myself, so that

5    I would follow up and make sure that she came back, but,

6    no.  Annmarie would have taken care of that

7    documentation that was required.

8         Q.   And what documentation would be required?

9         A.   Just her time sheet.  You know, just making

10   sure she completed her time sheet so that she would get

11   her pay.

12        Q.   And do you see the message dated August 12,

13   2021, at 1:06 p.m.?

14        A.   Yes.

15        Q.   And this is a message from Jenna Clark to you;

16   correct?

17        A.   Correct.

18        Q.   And in it, it appears that Jenna Clark is

19   telling you the amount of days that she'll be out; is

20   that correct?

21        A.   Correct.

22        Q.   And she said, "a total of 7 days"; is that

23   right?

24        A.   Yes.

25        Q.   She also tells you the dates that she's going

Deposition of Dawn Heikkila                                    Jenna Clark v. Carmine Marceno

1   to be out; is that right?

2       A.   Yes.

3       Q.   And do you see the message dated August 12,

4   2021, at 1:16 p.m.?

5       A.   Yes.

6       Q.   And this is a message from you, to Jenna Clark;

7   correct?

8       A.   Correct.

9       Q.   And in this message, you tell Jenna Clark that,

10  "While we are so busy right now, then I am going to hold

11  off on the FMLA"; is that correct?

12      A.   Correct.

13      Q.   What do you mean, "we are so busy right now"?

14      A.   Oh, well, during that time, it was during Covid

15  and our Risk Management unit was just slammed.  And so I

16  was indicating that, that I wasn't going to refer her to

17  Amy, unless she was going to be out more than the 7 days

18  that we normally allow people to be out before we

19  require the FMLA documentation.

20      Q.   And when you say "we," who is that referring

21  to?

22      A.   Management and Human Resources; people who

23  administer the FMLA and are responsible for it.

24      Q.   What documentation was required for an FMLA

25  request?

1      A.   Well, there's a certification of physician;

2   it's a document that the doctor has to fill out,

3   indicating, you know, what he's doing, documenting that

4   it's a serious health condition, that it makes someone

5   eligible for FMLA entitlement; and it indicates, you

6   know, the length of duration of the event, so that we

7   would know the expected duration.

8      Q.   And that's a medical certification form that

9   you described; is that correct?

10     A.   It is.

11     Q.   Is there any other FMLA documentation that's

12  required, besides the medical certification form that

13  you described?

14     A.   Required?  No.  There are other forms, but the

15  piece that qualifies someone, that's required, is that

16  certification.

17     Q.   What are the other forms?

18     A.   I mean, there's forms that Risk Management

19  fills out, to designate the leave; there's a return to

20  work form that can be filled out by a doctor, if they

21  don't already do that, that we can ask them to fill out;

22  you know, there's different pieces to the FMLA,

23  depending on what information the doctor gives.  There's

24  a request for FMLA that can be filled out, if somebody

25  wants to use that, but we don't require it.

1    Q.   When you said, "I will have to do the FMLA

2  paperwork," was that referring to the medical

3  certification form, or some other documentation?

4    A.   Wait a minute, let me see.  "If you end up

5  needing more time than that, just let me know, and I

6  will have to do the FMLA paperwork."  That means that

7  Amy would send a packet to Jenna that included -- it

8  included information on FMLA, how it works, the

9  certification of physician that Jenna would need to get

10 her doctor to fill out; it includes return to work, you

11 know, the duration, a return to work form that the

12 doctor can use to fill out.  It's really just a

13 designation packet; Amy would do that.

14   Q.   Those forms would be required to be completed

15 by Ms. Clark and her physician; correct?

16   A.   They're completed by the doctor.

17   Q.   Would you have to complete any of those forms?

18   A.   No.

19   Q.   So then, what did you mean when you said that,

20 "I will have to do the FMLA paperwork"?

21   A.   My people; I was meaning my people, my Risk

22 Management folks; Amy or whoever was, you know, filling

23 in for Amy at the time.

24   Q.   You meant that she would have to send it to

25 Ms. Clark?

1      A.    We send it -- we can email it too.  But, either

2  way, we have to initiate that process, if we're

3  requiring it, yes.  Again, with this one, Jenna was

4  already approved and she thought it was only going to be

5  7 days; I wasn't going to put everybody through all of

6  the need to do that, knowing that it was very short and

7  she gave us enough information to know that it was

8  approved and it was a qualifying event.  So, yeah, it

9  was just really the comment that I made and the

10  information I put there was letting her know, you know,

11  "You're covered, you're approved, and let me know if

12  it's going to be longer, and I'll take care of it."

13      Q.    What happens when an employee at the Lee County

14  Sheriff's Office wants to use FMLA leave for less than 7

15  days?

16      A.    They can.  They can.  I mean, FMLA is an

17  entitlement, you know.  We would go back -- we would go

18  back and designate it.  With Jenna, we would have gone

19  back and designated that first 7 days as FMLA, if she

20  had been out long enough, you know, to need us to

21  actually do that.  But when you're giving someone the

22  time off, you're giving them the entitlement, regardless

23  of the paperwork.  So again, what's the purpose of doing

24  the paperwork when you're going above the requirement,

25  in the beginning.

1    Q.   How is the -- or -- sorry.  When you say "we,"

2    you say that you were referring to you and the remainder

3    of your department; is that correct?

4    A.   Yes.  Yes, I was speaking for my department.

5    Q.   And what was your department referred to as?

6    A.   Human Resources/Risk Management/benefits.

7    Q.   Did how busy, you know, Human Resources was,

8    impact how you would handle an FMLA leave request?

9    A.   Only that I didn't -- I didn't notify Amy that

10   Jenna was out, because I wasn't requiring her to do

11   anything with it yet and it was being approved and

12   handled, you know, by her supervisor.  So there was no

13   need for Amy to get involved and do anything, when I

14   didn't believe, at that point, that it was ever going to

15   turn into a leave beyond the 7 days.

16   Q.   And at the time that you exchanged these

17   messages with Ms. Clark, you believe she had a

18   qualifying health condition; is that right?

19   A.   That is correct.

20   Q.   What health condition did you believe Ms. Clark

21   had?

22   A.   She indicated she was having surgery.

23   Q.   Did you know what the surgery was for?

24   A.   I did not.  I did not, no.  I don't think I

25   still know.

1    Q.   Did Ms. Clark ever make you aware of any health

2  conditions that she suffered from, prior to this request?

3    A.   Yes, she did.

4    Q.   What health conditions did she make you aware

5  of?

6    A.   Oh, I know I'm under deposition, but is it

7  fair, under HIPAA, for me to discuss things that Jenna

8  disclosed to me about her health, to people other than

9  her, without her approving that?  I feel like --

10   Q.   Yes, you can disclose her health condition.

11        THE WITNESS:  David?

12        MR. STEFANY:  You can disclose what

13   communications the Plaintiff gave you concerning

14   her health.

15        THE WITNESS:  She told me that she had a heart

16   condition, and she told me that she had a breast

17   surgery.

18  BY MR. MACDONALD:

19   Q.   And when did she tell you about those?

20   A.   She told me that she had breast implants years

21  ago and that she believed that those breast implants

22  were causing her to have all kinds of health issues and

23  that she was considering having them removed.

24   Q.   And when did she tell you about the heart

25  condition?

1   A.   Well, that was when she was -- she had open

2   heart surgery.  I didn't know anything about that until

3   after she was already back from FMLA and all that.

4   Yeah.  I mean, we didn't really have very many talks

5   about the heart surgery.

6   Q.   Was Ms. Clark the person who told you about the

7   heart surgery?

8   A.   No.  No.  I would have -- I learned that she

9   was out by the FMLA paperwork, I believe, from Risk

10  Management.  But I know I talked to Annmarie about it.

11  Q.   What did you discuss with Annmarie Reno, in

12  regards to the surgery that Ms. Clark underwent?

13  A.   Just that Jenna was really sick and that she

14  was going to be out for a while, that she was having

15  open heart surgery; Annmarie let me know that.  And I

16  let the girls in Risk know that.  And then, when Jenna

17  came back, of course, you know, I talked to her about

18  that; just, you know, "how are you doing, how are you

19  feeling," things like that.  But that surgery, I think

20  that happened -- I don't think I found out about that

21  until, you know, after it was already happening.

22  Q.   And when did that surgery for Ms. Clark occur?

23  A.   Unless I look at documents, I honestly don't

24  recall what year or, you know.

25  Q.   Do you recall if it was more than five years

1    ago?

2         A.   I don't think so.  I think it was probably

3    within the last five years.

4         Q.   And you said that Ms. Clark used FMLA leave for

5    that surgery; is that correct?

6         A.   Yes, I believe she did.  She was out a while.

7         Q.   Besides the surgery, do you remember any other

8    instances of Ms. Clark using FMLA leave benefits?

9         A.   I don't remember any.

10        Q.   Was Ms. Clark on leave when she was notified of

11   her termination?

12        A.   She was.  She was not working; she was out.

13        Q.   What type of leave was Ms. Clark on, when she

14   was notified that she was being terminated?

15        A.   She was out with that surgery, I think -- yeah,

16   the one that's discussed in that email.

17        Q.   Do you know what type of leave that was

18   classified as, internally, with the Lee County Sheriff's

19   Office?

20        A.   Sick leave, is what I would -- I don't know how

21   her time sheet was completed.  But I knew she was having

22   surgery, you know, and I knew she was out; so really,

23   sick leave would have been how I would have described it.

24        Q.   And you wrote the letter letting Ms. Clark know

25   her position was being terminated; is that correct?

1    A.   Yes.

2    Q.   And when was that letter written?

3    A.   August 15 of 2021.

4    Q.   And is that the date that you wrote the letter

5  to Ms. Clark?

6    A.   Yes.

7    Q.   So you wrote the letter to Ms. Clark notifying

8  her that her position was being eliminated roughly three

9  days after this email exchange; is that correct?

10    A.   Correct.

11    Q.   Did the fact that Ms. Clark was on leave have

12  any impact on the timing of that notification of her

13  position being eliminated?

14    A.   No.  No.  No, I didn't even know about it.  I

15  wrote the letter when I was told about the Reduction in

16  Force.

17    Q.   Did you know that Ms. Clark was on leave, when

18  you wrote that letter about the Reduction in Force?

19    A.   I did, yes.

20    Q.   Did that raise any concerns for you?

21    A.   How -- I mean, I had talked to Annmarie about

22  it.  Yeah, when she told me about it, I asked a couple

23  of questions.  But the answers were sufficient, and so I

24  sent the letter.

25    Q.   When you spoke with Annmarie Reno about writing

1   this letter, did you discuss the fact that Ms. Clark was

2   on leave at the time?

3       A.   I did.

4       Q.   And what did you discuss in that regard?

5       A.   I told Annmarie that Jenna was on leave and

6   asked -- I said, "I'm just concerned, because we are

7   eliminating a position while she's on leave."  I said,

8   you know, "Should we wait until she returns in notifying

9   her?"

10          And Annmarie said, no, that she needed to be

11  notified right away, because it was happening and it was

12  happening that day and that they didn't want her to hear

13  about it from someone else; that they needed to her

14  about it first, before other people did.  So I agreed

15  with that, and we went ahead and got Jenna involved and

16  let her know, so that she could, you know, be -- not be

17  blindsided by someone else.  Because it was happening.

18      Q.   Why were you concerned about the fact that

19  Ms. Clark was on leave?

20      A.   Because she needed to be told, and I didn't

21  know what her condition was, in order to be able to

22  notify her.  I knew that she'd had surgery; I didn't

23  know if I could call her up or, you know, how Annmarie

24  was planning to do the notice.  I didn't want this

25  information getting out and, you know, someone telling

1   her and her not knowing what was happening.  So I was

2   discussing with Annmarie, what is the plan for executing

3   this Reduction in Force, because Jenna is not in the

4   office.

5       Q.   Were you concerned because Ms. Clark may still

6   be recovering from her surgery?

7       A.   Well, I was -- I was concerned how we were

8   going to tell her.  Annmarie had been in contact with

9   her, I hadn't.  So, yeah, I had no idea; like, "Have you

10   talked to her?  Have you told her?  Is this letter the

11   first notice?"  You know, that kind of thing.

12          I was trying to -- I mean, Jenna is a human

13   being; I wanted to make sure that we were treating her

14   the way that I would want to be treated and she needs to

15   know that from us, not from her co-workers, that we'd

16   eliminated her position.  So that was the conversation

17   that I was having with Annmarie is, what is the plan to

18   execute this Reduction in Force.

19          And at that point, Annmarie told me she had

20   texted with Jenna and talked to Jenna.  So I knew that

21   there had been some conversation and Jenna was okay to

22   -- you know, I sent the notification letter; it was okay

23   to send it.

24       Q.   And in response, Annmarie Reno instructed you

25   to send the letter, even though the fact that Ms. Clark

1   was on leave; correct?

2       A.   Correct.

3       Q.   During your time as director of human

4   resources, are you aware of any other employees of the

5   Lee County Sheriff's Office that were terminated while

6   they were out on leave?

7       A.   I know a lot of people have not returned to

8   work from a leave, whatever -- you know, whatever the

9   situation was, whether it was a termination or a

10  retirement or.   I do know that other people have done

11  that.

12      Q.   And you're referring to an employee not

13  returning from leave?

14      A.   Yes.   Correct.

15      Q.   Are you aware of any employees that were

16  notified that their position was being eliminated, while

17  they were out on leave, during your time as director of

18  human resources?

19      A.   No.   I don't recall for sure if there was

20  anyone else that was out on leave.

21      Q.   If Ms. Clark's leave had been designated using

22  that FMLA paperwork, would that have impacted the timing

23  of the notification that her position was being

24  eliminated?

25      A.   No, it wouldn't have.   That was my reasoning

1   with talking to Annmarie.  And it was happening

2   regardless; it had nothing to do with the fact that she

3   was out.  The Reduction in Force was happening, and that

4   was my concern is, because Jenna wasn't at work, how we

5   were going to notify her.  But it was happening,

6   regardless of her status.  It's my understanding this

7   had been in the works for -- again, I told you, I think

8   earlier, that the Reduction in Force had been happening

9   for years.

10      Q.   And how did you learn that those reductions in

11  force had been in the works?

12      A.   I was told when I needed to send the notices; I

13  was told when it was time to -- you know, when it was

14  happening, because I was the one who sent the notices.

15      Q.   During your time as director of human

16  resources, did the Lee County Sheriff's Office have any

17  policies against terminating employees while they're

18  recovering from surgery?

19      A.   No.

20      Q.   While you were the director of human resources,

21  did the Lee County Sheriff's Office have any policies

22  against terminating employees while they were on FMLA

23  leave?

24      A.   No.  I mean, there are FMLA policies and FMLA

25  rules, but there was no policy stating it can't be done,

 1   no.

 2        Q.   Well, those are all the questions I have for

 3   you today.  I want to thank you for your time.  And

 4   Mr. Stefany may have some questions for you.

 5        A.   Okay.

 6             MR. STEFANY:  Let's take a five-minute break,

 7        and then I'll be back and see if I have any

 8        questions.

 9             THE COURT REPORTER:  We're off the record.

10             (A brief recess was taken.)

11             THE COURT REPORTER:  We are back on the record.

12             MR. STEFANY:  Ms. Heikkila, I just have a few

13        questions for you.  Kyle, can you put back up

14        Exhibit 10 on the share screen.

15             MR. MACDONALD:  Yes.  (Screen share began and

16        said document was displayed.)

17                       CROSS-EXAMINATION

18   BY MR. STEFANY:

19        Q.   Ms. Heikkila, can you see this document?

20        A.   Yes.

21        Q.   I just want to be clear, for my understanding.

22   As of August of 2021, do you by chance recall what work

23   schedule Jenna Clark worked, from week to week?

24        A.   Well, she was a director, so she would have

25   either been on a four-day or a five-day work week; I

1    don't know that I ever knew her schedule, other than

2    that.

3         Q.   Okay.  So if her timesheets reflected that she

4    only worked Monday through Thursday in August of 2021,

5    that would seem to me to indicate that she was on a

6    four-day work schedule, with four 10-hour workdays; is

7    that right?

8         A.   Yes.

9         Q.   Okay.  So as I review this email trail which

10   was previously marked and identified as Exhibit 10, if I

11   go to Jenna Clark's email to you, which is dated August

12   12, 2021, at 1:06 p.m., it seems to me she's telling you

13   what days she's going to need to be out, which begins on

14   August 18 through the 20th, and then she's out again on

15   the 24th through the 27th; correct?

16        A.   Correct.

17        Q.   All right.  So in identifying the days that she

18   expected to be out from her scheduled work, when you

19   provided the letter that you have identified of notice

20   of her job's elimination, dated August 15, she would not

21   have -- she would not yet have been on leave; correct?

22        A.   Not according to this email.

23        Q.   Okay.  So I believe your testimony earlier was

24   that at the time Annmarie Reno asked you to compose and

25   send a letter to Jenna Clark, notifying her of her job

1    elimination, she said to you at the same conversation or

2    she indicated to you at the same conversation that she

3    was going to authorize administrative leave with pay for

4    Ms. Clark; did I understand your testimony correctly?

5        A.   No.  She told me that we were eliminating

6    Jenna's job immediately and that the undersheriff had

7    approved her to be paid administrative leave with pay

8    for the period included in this letter, like, for

9    additional time for her to decide if she -- what she

10   wanted to do.  Essentially, that's what Annmarie told

11   me.

12       Q.   Okay.  So and that was all during the same

13   conversation where you were asked to provide the letter

14   of August 15, 2021?

15       A.   Correct.

16       Q.   All right.  So did you prepare that letter and

17   send it out to Ms. Clark on the same day you had the

18   conversation with Annmarie Reno, or were they on

19   different days?

20       A.   I believe it was the same day, but I said -- it

21   was possible that she told me one day and that the

22   letter didn't go out until the next day; but it was

23   definitely within a day.

24       Q.   Okay.  And is it your recollection -- and my

25   notes just are not clear.  Is it your recollection that

1   the letter went out via mail and email, or just mail?

2       A.   I did not know for sure if it went out both; I

3   know that it would have gone out via regular mail, for

4   sure.

5       Q.   Okay.  So a quick look at the calendar confirms

6   to me that August 15, 2021 was actually a Sunday.  So if

7   a letter was drafted on a Sunday, would it have gone out

8   that Sunday, or would it have gone out on the next day,

9   the Monday, if you recall?

10      A.   Yes.  It was drafted on the 15th, which to me

11  tells me that they were eliminating the position with

12  the beginning of a new week, a new payroll week.  For

13  action sheets, we do that at the beginning of a pay

14  period.  So it tells me that that was the effective date

15  of the action, which was the Reduction in Force; and I

16  would not have been there on a Sunday to mail that

17  letter, so I would say it went out the day after, in the

18  mail.

19      Q.   All right.  And it reflects -- the

20  documentation that I'm familiar with reflects that for

21  the period beginning, it looks like beginning the 17th

22  of August, which would have been a Tuesday, August 17,

23  2021, that that was the first -- that was the first day

24  that Jenna Clark began administrative leave with pay,

25  and she remained in that status until her retirement

1    date of September 3rd of 2021.  Is that consistent with

2    your recollection?

3         A.   Yes.  And it makes sense.  She was probably on

4    a Tuesday-through-Friday work week.

5         Q.   Okay.  And if she was actually on a Monday --

6    was it possible that she could have been on a Monday-

7    through-Thursday work week, at that time?

8         A.   Well, it's possible if she worked Monday.  You

9    know, according -- if she was --

10        Q.   I'm looking at some documentation, which you

11   don't have the benefit of, that reflects that she worked

12   10 hours on August 16, 2021.

13        A.   Okay.  Well, yeah.  I guess what I can't

14   explain then -- it's possible, obviously, if that's the

15   case.  I didn't expect you to say that because I wrote

16   the letter for August 15.  So that's where I'm thrown

17   off a little, that I wrote the letter on the 15th and

18   you say she worked on the 16th and the leave started on

19   the 17th; that's kind of weird to me.

20        Q.   Well, I'm just looking at the time sheet.

21             MR. STEFANY:  And, Counsel, just for the

22        record, it's Defense Bates 000421, is the time

23        sheet that I'm referring to, for purposes of

24        clarity.

25             MR. MACDONALD:  Thank you.

1    BY MR. STEFANY:

2        Q.   With respect to your earlier testimony, you

3    also mentioned that there was a concern discussed

4    between you and Annmarie Reno about needing to get the

5    notification to Jenna Clark before she found out some

6    other way -- that's my paraphrase.  Did I understand

7    your testimony correctly?

8        A.   Yes.

9        Q.   Was there any conversation during that

10   discussion with Annmarie Reno, as to how it would be

11   that Jenna Clark might otherwise find out about her job

12   elimination, if the notice wasn't promptly given to her?

13       A.   Well, because it was going to become -- there

14   was a notification to employees that there was a

15   Reduction in Force and that we were reducing/eliminating

16   positions; and if -- so if one of her co-workers, you

17   know, Shannon, or somebody that worked with her -- you

18   know, they were friends; they called, they talked to

19   each other on the phone.  Once it becomes common

20   knowledge, she would have heard it from somewhere.

21       Q.   Okay.

22       A.   So, yes, that was my concern, how we would do

23   it.

24       Q.   And what role, if any, would you have had in

25   effectuating that communication about the RIF, if at

1   all?

2       A.   Well, I wanted to know, am I telling her, am I

3   calling her, or are you?  Because normally, a supervisor

4   would have that conversation, and I would be a part of

5   it.  But Annmarie said that she was taking care of

6   letting Jenna know; and then it was up to me to formally

7   do the letter and talk to her about what her decisions

8   were, going forward.  She was basically turning it over

9   to me.

10      Q.   Okay.  And did you ever have a communication

11  with Annmarie Reno that confirmed when, in fact, Ann

12  Marie's notice to Jenna Clark took place?

13      A.   I remember Annmarie saying that she had -- that

14  she had talked to her, so it was okay for me to send the

15  letter.

16      Q.   So by that communication and recollection, do I

17  understand that the communication between Annmarie Reno

18  and Jenna Clark took place sometime prior to August 15

19  when you drafted the letter?

20      A.   That's what I would have said, except for you

21  just told me she worked on the 16th; so, no, it must not

22  have happened that way.  She must have told her after

23  the 16th, and I must have just dated the letter based on

24  the pay period that the position was eliminated.  That's

25  all I can conclude, based on the information I have

1    today.   I don't recall any of that; you know, that

2    particular time frame, I don't recall that right now.

3         Q.   Okay.   And I understand your testimony from

4    earlier is that with respect to the heart surgery that

5    Jenna Clark had and missed some time with FMLA leave as

6    a consequence, you don't recall when that took place?

7         A.   No.   I think it was -- I don't recall exactly.

8    I mean, it was probably within like a year or so.   It

9    was within her last couple of years of employment; I'm

10   pretty sure of that, yes.

11             MR. STEFANY:   That's all I have, thank you.

12             Any redirect, Kyle?

13             MR. MACDONALD:   No, no redirect.

14             MR. STEFANY:   Ms. Heikkila, you have the right

15        to review a transcript of your deposition testimony

16        if one is made, or you can waive the reading of the

17        transcript.   The court reporter just needs to know

18        which you would prefer to do before she closes the

19        record.   And I would say that pertains to both

20        transcripts, your 30(b)(6) transcript, as well as

21        your individual transcript, if ordered.

22             THE WITNESS:   I'll waive the reading.

23             THE COURT REPORTER:   We're off the record.

24             (Thereupon the deposition was terminated at

25   12:42 p.m.

Deposition of Dawn Heikkila                                        Jenna Clark v. Carmine Marceno

```
 1                    CERTIFICATE OF OATH

 2   STATE OF FLORIDA   )
     COUNTY OF ORANGE   )
 3
             I, Julie S. Evans, Professional Court Reporter,
 4
     Notary Public, State of Florida, certify that DAWN
 5
     HEIKKILA appeared before me via Zoom on October 11,
 6
     2023, and was duly sworn.
 7
             Witness my hand and official seal this 28th day
 8
     of December 2023.
 9

10

11

12       _____
         JULIE S. EVANS
13       Professional Court Reporter
         Notary Public, State of Florida
14       My Commission No. GG939756
         Expires:  1/21/2024
15

16

17

18

19

20

21

22

23

24

25
```

Deposition of Dawn Heikkila                                    Jenna Clark v. Carmine Marceno

```
 1                CERTIFICATE OF REPORTER

 2     STATE OF FLORIDA  )
       COUNTY OF ORANGE  )
 3
               I, Julie S. Evans, Professional Court Reporter,
 4
       do hereby certify that I was authorized to and did
 5
       stenographically report the deposition of DAWN HEIKKILA;
 6
       that a review of the transcript was not requested; and
 7
       that the foregoing transcript, page number 1 through 42,
 8
       is a true and complete record of my stenographic notes.
 9

10             I further certify that I am not a relative,

11     employee, attorney, or counsel of any of the parties,

12     nor am I a relative or employee of any of the parties'

13     attorneys or counsel connected with the action, nor am I

14     financially interested in the action.

15
               Dated this 28th day of December 2023.
16

17

18     _____
       Julie S. Evans
19     Professional Court Reporter

20

21

22

23

24

25
```

Deposition of Dawn Heikkila　　　　　　　　　　　　　　Jenna Clark v. Carmine Marceno

## WORD INDEX

**< 0 >**
**000421**  39:*22*

**< 1 >**
**1**  44:*2*
**1/21/2024**  43:*13*
**1:04**  20:*2*
**1:06**  21:*13*  36:*12*
**1:16**  22:*4*
**10**  3:*8*  17:*18*  35:*14*
*36:10*  39:*12*
**10-hour**  36:*6*
**11**  1:*9*  43:*2*
**11:24**  1:*9*
**12**  18:*13*  20:*2*  21:*12*
*22:3*  36:*12*
**12:26**  18:*14*
**12:42**  1:*9*  42:*25*
**12:47**  15:*20*
**1294**  17:*18*
**1294-1295**  3:*8*
**1295**  17:*19*
**15**  3:*8*  30:*3*  36:*20*
*37:14*  38:*6*  39:*16*
*41:18*
**15th**  38:*10*  39:*17*
**16**  39:*12*
**16th**  39:*18*  41:*21*, *23*
**17**  3:*8*  38:*22*
**17th**  38:*21*  39:*19*
**18**  15:*19*  36:*14*
**18th**  18:*20*
**1999**  12:*23*

**< 2 >**
**2:22-cv-614-SPC-**
**NPM**  1:*5*
**2005**  6:*23*
**2020**  15:*20*
**2021**  18:*13*  20:*2*
*21:13*  22:*4*  30:*3*
*35:22*  36:*4*, *12*  37:*14*
*38:6*, *23*  39:*1*, *12*
**2023**  1:*9*  5:*10*  43:*2*
*44:14*
**20th**  36:*14*
**225**  2:*7*

**24**  5:*15*
**24th**  36:*15*
**27th**  36:*15*
**28th**  43:*2*  44:*14*

**< 3 >**
**30(b)(6**  42:*20*
**324**  2:*7*
**33131**  2:*4*
**33606-4128**  2:*8*
**3431**  3:*8*  15:*7*
**35**  3:*3*
**3rd**  39:*1*

**< 4 >**
**4**  3:*2*
**42**  44:*2*
**43**  3:*4*
**44**  3:*5*

**< 5 >**
**520**  2:*3*

**< 7 >**
**7**  18:*9*  20:*19*  21:*1*,
*22*  22:*17*  25:*5*, *14*, *19*
*26:15*

**< 8 >**
**8/12/21**  3:*8*

**< 9 >**
**9**  3:*8*  15:*7*

**< A >**
**a.m**  1:*9*
**able**  31:*21*
**abuse**  16:*20*, *23*  17:*1*,
*6*, *12*
**accrual**  19:*5*
**accrued**  16:*7*
**action**  16:*20*  38:*13*,
*15*  44:*13*, *14*
**activate**  21:*1*
**additional**  37:*9*
**administer**  22:*23*
**administered**  5:*21*
**administrative**  37:*3*,
*7*  38:*24*

**Affairs**  9:*16*  17:*10*
**affirm**  4:*7*
**ago**  8:*14*  12:*25*
*27:21*  29:*1*
**agreed**  3:*10*  31:*14*
**ahead**  17:*21*  31:*15*
**Allen**  2:*6*
**allow**  22:*18*
**amount**  20:*17*  21:*19*
**Amy**  20:*7*, *9*  22:*17*
*24:7*, *13*, *22*, *23*  26:*9*,
*13*
**Ann**  41:*11*
**Annmarie**  6:*2*  13:*13*,
*15*, *17*, *20*, *23*  14:*8*, *11*,
*14*, *17*, *19*, *24*, *25*  15:*2*,
*3*  18:*4*, *5*, *23*  19:*7*, *11*
*21:6*  28:*10*, *11*, *15*
*30:21*, *25*  31:*5*, *10*, *23*
*32:2*, *8*, *17*, *19*, *24*
*34:1*  36:*24*  37:*10*, *18*
*40:4*, *10*  41:*5*, *11*, *13*,
*17*
**answer**  9:*15*  19:*2*
**answers**  30:*23*
**anyway**  14:*6*
**APPEARANCES**  2:*1*
**appeared**  1:*9*  43:*2*
**appears**  15:*19*  21:*18*
**apply**  18:*6*
**appropriate**  9:*7*
**approval**  21:*2*
**approved**  18:*5*, *23*
*19:15*  20:*23*  25:*4*, *8*,
*11*  26:*11*  37:*7*
**approving**  27:*9*
**asked**  30:*22*  31:*6*
*36:24*  37:*13*
**asking**  18:*7*
**assistant**  6:*8*
**Association**  8:*1*
**attorney**  44:*11*
**attorneys**  44:*13*
**August**  18:*13*, *20*
*20:1*  21:*12*  22:*3*
*30:3*  35:*22*  36:*4*, *11*,
*14*, *20*  37:*14*  38:*6*, *22*
*39:12*, *16*  41:*18*
**authorize**  37:*3*

**authorized**  44:*2*
**available**  12:*14*, *17*, *20*
**Avenue**  2:*7*
**aware**  12:*5*  17:*5*, *11*
*27:1*, *4*  33:*4*, *15*

**< B >**
**bachelor's**  6:*14*
**back**  12:*3*  18:*7*
*20:21*  21:*5*  25:*17*, *18*,
*19*  28:*3*, *17*  35:*7*, *11*,
*13*
**bank**  19:*5*
**based**  41:*23*, *25*
**basically**  8:*18*  9:*7*
*16:5*  41:*8*
**Bates**  3:*8*  15:*7*
*17:18*  39:*22*
**began**  15:*6*  35:*15*
*38:24*
**beginning**  25:*25*
*38:12*, *13*, *21*
**begins**  36:*13*
**BEHALF**  1:*9*  2:*5*, *9*
**believe**  6:*8*  10:*2*
*11:24*  12:*2*, *18*  14:*13*,
*16*  19:*23*  26:*14*, *17*,
*20*  28:*9*  29:*6*  36:*23*
*37:20*
**believed**  27:*21*
**benefit**  39:*11*
**Benefits**  5:*23*  29:*8*
**beyond**  26:*15*
**blindsided**  31:*17*
**Blue**  2:*6*
**break**  35:*6*
**breast**  27:*16*, *20*, *21*
**Brickell**  2:*3*
**brief**  35:*10*
**briefly**  14:*2*
**bringing**  11:*11*
**broad**  9:*14*
**bureau**  13:*5*
**busy**  22:*10*, *13*  26:*7*

**< C >**
**calendar**  38:*5*
**call**  31:*23*
**called**  40:*18*

calling 41:*3*
capacity 1:*7*
care 21:*6* 25:*12* 41:*5*
career 13:*6* 17:*8*
**CARMINE** 1:*5*
**Carolina** 5:*8*
**Carrie** 7:*4*
**CASE** 1:*5* 18:*6*
 39:*15*
cause 16:*20*
causing 27:*22*
**CERTIFICATE** 3:*4*,
*5* 43:*1* 44:*1*
certification 23:*1, 8,*
*12, 16* 24:*3, 9*
certifications 20:*15*
certify 43:*2* 44:*2, 10*
chain 9:*19* 11:*19*
chance 35:*22*
check 11:*2*
chief 11:*24* 12:*1*
**Christian** 9:*23* 10:*1,*
*4, 10, 25* 11:*6* 12:*6,*
*13*
**Cindy** 7:*4*
clarity 39:*24*
**CLARK** 1:*1* 3:*10*
 4:*4* 12:*22* 13:*1, 21,*
*24* 14:*9, 11, 24* 15:*16,*
*22* 16:*14* 18:*14, 19,*
*24* 19:*8, 18, 23* 20:*4,*
*11* 21:*15, 18* 22:*6, 9*
*24:15, 25* 26:*17, 20*
*27:1* 28:*6, 12, 22*
*29:4, 8, 10, 13, 24*
*30:5, 7, 11, 17* 31:*1,*
*19* 32:*5, 25* 35:*23*
*36:25* 37:*4, 17* 38:*24*
*40:5, 11* 41:*12, 18*
*42:5*
**Clark's** 13:*11* 18:*23*
*33:21* 36:*11*
classified 29:*18*
clear 35:*21* 37:*25*
clearly 5:*4*
closes 42:*18*
coaching 14:*1*
coffee 10:*17*
come 9:*3*

command 9:*19* 11:*19*
comment 25:*9*
**Commission** 43:*13*
common 40:*19*
communicate 19:*8*
communication 40:*25*
 41:*10, 16, 17*
communications
 27:*13*
complain 10:*10, 16*
 12:*6* 14:*8*
complained 10:*16, 18*
 11:*14*
complaining 10:*14*
complaint 9:*11, 20*
 10:*9, 24* 11:*7, 18, 20*
 12:*10*
complaints 8:*23* 9:*1,*
*19* 10:*12, 20, 21, 22*
complete 24:*17* 44:*2*
completed 12:*4*
 21:*10* 24:*14, 16*
 29:*21*
completing 9:*17*
compose 36:*24*
concern 34:*4* 40:*3,*
*22*
concerned 31:*6, 18*
 32:*5, 7*
concerning 27:*13*
concerns 30:*20*
conclude 41:*25*
condition 14:*4* 23:*4*
 26:*18, 20* 27:*10, 16,*
*25* 31:*21*
conditions 27:*2, 4*
conduct 9:*9, 10, 12*
conducted 9:*13*
 11:*23*
conducting 4:*24* 9:*18*
conferences 6:*13*
confirmed 41:*11*
confirms 38:*5*
connected 44:*13*
consequence 42:*6*
considering 27:*23*
consistent 39:*1*
contact 32:*8*

conversation 32:*16,*
*21* 37:*1, 2, 13, 18*
 40:*9* 41:*4*
correct 15:*20, 21*
 18:*15, 16, 17, 18, 21,*
*22* 20:*5, 6* 21:*16, 17,*
*20, 21* 22:*7, 8, 11, 12*
 23:*9* 24:*15* 26:*3, 19*
 29:*5, 25* 30:*9, 10*
 33:*1, 2, 14* 36:*15, 16,*
*21* 37:*15*
corrections 10:*5, 6*
correctly 37:*4* 40:*7*
counsel 3:*10* 39:*21*
 44:*11, 13*
**Country** 1:*8*
**County** 4:*5* 5:*7, 12,*
*13, 17* 6:*4, 25* 7:*11*
 8:*4* 14:*15* 16:*1*
 17:*13* 25:*13* 29:*18*
 33:*5* 34:*16, 21* 43:*2*
 44:*2*
couple 5:*15* 30:*22*
 42:*9*
course 28:*17*
**COURT** 1:*1, 24* 4:*2*
 5:*1* 9:*24* 35:*9, 11*
 42:*17, 23* 43:*2, 12*
 44:*2, 19*
covered 8:*16* 25:*11*
**Covid** 22:*14*
co-workers 32:*15*
 40:*16*
create 12:*17*
**CROSS** 3:*3*
**CROSS-**
**EXAMINATION**
 35:*17*
currently 5:*6*

**< D >**
**DATE** 1:*9* 30:*4*
 38:*14* 39:*1*
dated 15:*19* 18:*13*
 20:*1* 21:*12* 22:*3*
 36:*11, 20* 41:*23*
 44:*14*
dates 21:*25*
**DAVID** 2:*6* 27:*11*

**DAWN** 1:*9* 3:*2, 10*
 4:*3, 12, 18* 43:*2* 44:*2*
day 11:*12* 12:*15*
 31:*12* 37:*17, 20, 21,*
*22, 23* 38:*8, 17, 23*
 43:*2* 44:*14*
days 11:*10, 11, 12, 15*
 12:*18* 18:*9* 20:*19*
 21:*1, 19, 22* 22:*17*
 25:*5, 15, 19* 26:*15*
 30:*9* 36:*13, 17* 37:*19*
**December** 43:*2* 44:*14*
decide 37:*9*
decided 18:*24*
decisions 7:*8* 41:*7*
**Defendant** 1:*9* 2:*9*
defendant's 15:*7*
**Defense** 39:*22*
definitely 37:*23*
degree 6:*15*
department 26:*3, 4, 5*
depending 7:*18*
 23:*23*
**DEPOSITION** 1:*9*
 4:*3, 24* 27:*6* 42:*15,*
*24* 44:*2*
**Derek** 2:*2*
describe 16:*3*
described 23:*9, 13*
 29:*23*
designate 23:*19*
 25:*18*
designated 25:*19*
 33:*21*
designation 24:*13*
different 23:*22* 37:*19*
**DIRECT** 3:*2* 4:*14*
 7:*5*
directed 18:*17*
directly 7:*1*
**Director** 5:*18, 19, 25*
 6:*24* 7:*7, 19* 8:*8, 22*
 9:*21* 13:*2, 11, 18*
 16:*25* 17:*4* 33:*3, 17*
 34:*15, 20* 35:*24*
disciplinary 16:*20*
disciplined 17:*12*
disclose 27:*10, 12*
disclosed 27:*8*
discriminated 9:*5*

Deposition of Dawn Heikkila                                                    Jenna Clark v. Carmine Marceno

discrimination 7:*20*
8:*4*, *8*, *14*, *20*, *24* 9:*2*,
*11*, *21*
discuss 9:*4* 13:*23*
14:*18*, *23* 19:*11* 27:*7*
28:*11* 31:*1*, *4*
discussed 13:*25* 14:*1*,
*3* 29:*16* 40:*3*
discussing 32:*2*
discussion 40:*10*
displayed 35:*16*
DISTRICT 1:*1*
division 9:*16*
doctor 23:*2*, *20*, *23*
24:*10*, *12*, *16*
doctor's 11:*11*
document 15:*5*, *9*, *10*
17:*17*, *25* 21:*3* 23:*2*
35:*16*, *19*
documentation 21:*7*,
*8* 22:*19*, *24* 23:*11*
24:*3* 38:*20* 39:*10*
documenting 23:*3*
documents 28:*23*
doing 10:*8* 23:*3*
25:*23* 28:*18*
Dr 2:*3*
drafted 38:*7*, *10*
41:*19*
duly 4:*13* 43:*2*
duration 23:*6*, *7*
24:*11*

< E >
earlier 34:*8* 36:*23*
40:*2* 42:*4*
early 13:*6*
effect 4:*25*
effective 38:*14*
effectuating 40:*25*
either 25:*1* 35:*25*
eligible 19:*23* 23:*5*
eliminated 30:*8*, *13*
32:*16* 33:*16*, *24*
41:*24*
eliminating 31:*7*
37:*5* 38:*11*
elimination 36:*20*
37:*1* 40:*12*

email 3:*8* 15:*14*
18:*3* 20:*8*, *12* 25:*1*
29:*16* 30:*9* 36:*9*, *11*,
*22* 38:*1*
employee 3:*8* 20:*14*
25:*13* 33:*12* 44:*11*,
*12*
employees 6:*25* 7:*3*,
*8*, *10*, *12*, *14* 8:*4*, *11*
9:*3* 16:*6* 17:*1*, *3*, *5*,
*11* 33:*4*, *15* 34:*17*, *22*
40:*14*
employment 6:*4*
13:*21* 42:*9*
engage 17:*1*
engaged 17:*5*
engaging 17:*12*
entitlement 16:*10*
23:*5* 25:*17*, *22*
ESQUIRE 2:*2*, *6*
Essentially 37:*10*
establish 18:*8*
Evans 1:*9* 43:*2*, *11*
44:*2*, *18*
event 19:*20* 20:*16*,
*24* 23:*6* 25:*8*
eventually 10:*19*
everybody 25:*5*
exactly 9:*15* 11:*5*
42:*7*
Examination 1:*9* 3:*1*
4:*14*
Excerpt 3:*8* 15:*13*
16:*11*
exchange 30:*9*
exchanged 26:*16*
execute 32:*18*
executing 32:*2*
Executive 13:*18*
EXHIBIT 3:*5* 15:*6*
35:*14* 36:*10*
expect 39:*15*
expected 23:*7* 36:*18*
Expires 43:*13*
explain 39:*14*

< F >
fact 30:*11* 31:*1*, *18*
32:*25* 34:*2* 41:*11*

fair 27:*7*
familiar 17:*21* 38:*20*
far 14:*12*
feel 27:*9*
feeling 28:*19*
felt 9:*4* 11:*14*
fill 23:*2*, *21* 24:*10*, *12*
filled 23:*20*, *24*
filling 24:*22*
fills 23:*19*
financially 44:*14*
find 40:*11*
fire 7:*8*
first 4:*13* 12:*22*
18:*13* 25:*19* 31:*14*
32:*11* 38:*23*
five 28:*25* 29:*3*
five-day 35:*25*
five-minute 35:*6*
FLORIDA 1:*1*, *8*
2:*4*, *8* 4:*5* 7:*25* 43:*2*,
*12* 44:*2*
FMLA 12:*7*, *8*, *9*, *11*
14:*5*, *19* 15:*3*, *25*
16:*10*, *12* 18:*6* 19:*18*,
*21*, *23* 20:*9*, *15* 21:*1*
22:*11*, *19*, *23*, *24* 23:*5*,
*11*, *22*, *24* 24:*1*, *6*, *8*,
*20* 25:*14*, *16*, *19* 26:*8*
28:*3*, *9* 29:*4*, *8* 33:*22*
34:*22*, *24* 42:*5*
folks 24:*22*
follow 21:*5*
follows 4:*13*
force 4:*25* 14:*7*
30:*16*, *18* 32:*3*, *18*
34:*3*, *8*, *11* 38:*15*
40:*15*
foregoing 44:*2*
form 19:*1* 23:*8*, *12*,
*20* 24:*3*, *11*
formal 6:*14* 10:*21*,
*22*, *24* 11:*7*
formalized 8:*21*
formally 41:*6*
forms 23:*14*, *17*, *18*
24:*14*, *17*
Forsyth 5:*7*
forth 18:*7*
forward 41:*8*

found 12:*19* 28:*20*
40:*5*
four 36:*6*
four-day 35:*25* 36:*6*
frame 42:*2*
frequent 13:*10*
frequently 13:*3*
friends 40:*18*
full 4:*16*
further 44:*10*

< G >
gather 9:*6*
general 14:*21* 17:*3*, *4*
getting 11:*13* 12:*16*
21:*2* 31:*25*
GG939756 43:*13*
girls 28:*16*
give 8:*3*, *7*, *11* 14:*21*
17:*19*, *22*
given 40:*12*
gives 23:*23*
giving 25:*21*, *22*
Go 17:*21* 20:*14*, *18*
25:*17* 36:*11* 37:*22*
God 4:*9*
going 14:*25* 15:*3*, *5*
16:*8*, *9* 17:*22* 18:*4*, *7*,
*8*, *9*, *12* 19:*14* 20:*17*,
*25* 21:*25* 22:*10*, *16*,
*17* 25:*4*, *5*, *12*, *24*
26:*14* 28:*14* 32:*8*
34:*5* 36:*13* 37:*3*
40:*13* 41:*8*
gosh 6:*23*
Government 5:*7*
Group 2:*2*
guess 39:*13*

< H >
hand 4:*6* 43:*2*
handle 14:*22* 26:*8*
handled 26:*12*
handles 20:*9*
handling 14:*18*
happened 28:*20*
41:*22*
happening 28:*21*
31:*11*, *12*, *17* 32:*1*

Deposition of Dawn Heikkila                                          Jenna Clark v. Carmine Marceno

34:*1*, *3*, *5*, *8*, *14*
**happens**  25:*13*
**harassed**  9:*5*
**harassment**  8:*24*  9:*2*
**health**  11:*10*  23:*4*
  26:*18*, *20*  27:*1*, *4*, *8*,
  *10*, *14*, *22*
**hear**  31:*12*
**heard**  17:*7*  40:*20*
**heart**  27:*15*, *24*  28:*2*,
  *5*, *7*, *15*  42:*4*
**Heikilla**  3:*10*
**HEIKKILA**  1:*9*  3:*2*
  4:*3*, *12*, *18*  35:*12*, *19*
  42:*14*  43:*2*  44:*2*
**held**  5:*16*
**help**  4:*8*
**hereto**  3:*10*
**HIPAA**  27:*7*
**hire**  7:*8*
**hired**  5:*21*
**hiring**  5:*23*
**hold**  6:*3*, *6*  11:*2*
  22:*10*
**honestly**  28:*23*
**hours**  39:*12*
**HR**  13:*8*
**human**  5:*18*, *19*, *23*,
  *25*  6:*7*, *9*, *12*, *19*, *24*
  *7*:*7*, *19*  8:*8*, *22*  9:*21*
  16:*25*  17:*4*  22:*22*
  26:*6*, *7*  32:*12*  33:*3*,
  *18*  34:*15*, *20*
**Hyde**  2:*7*

**< I >**
**IA**  12:*2*
**idea**  12:*23*  32:*9*
**identified**  36:*10*, *19*
**identifying**  36:*17*
**immediately**  37:*6*
**impact**  26:*8*  30:*12*
**impacted**  33:*22*
**implants**  27:*20*, *21*
**included**  8:*13*  24:*7*,
  *8*  37:*8*
**includes**  24:*10*
**INDEX**  3:*1*, *5*
**indicate**  36:*5*

**indicated**  19:*3*  26:*22*
  37:*2*
**indicates**  23:*5*
**indicating**  22:*16*  23:*3*
**individual**  42:*21*
**information**  9:*6*
  12:*3*  20:*16*  23:*23*
  24:*8*  25:*7*, *10*  31:*25*
  41:*25*
**initiate**  25:*2*
**instances**  29:*8*
**instructed**  18:*11*
  32:*24*
**interact**  13:*1*, *15*
  14:*17*
**interested**  44:*14*
**Internal**  9:*16*  17:*9*
**internally**  29:*18*
**investigated**  11:*20*, *21*
  17:*9*
**investigation**  9:*8*, *9*,
  *10*  11:*23*  12:*3*, *12*
**investigations**  9:*12*,
  *13*, *18*
**involved**  7:*8*  8:*23*
  9:*7*  12:*4*  26:*13*
  31:*15*
**issue**  20:*23*
**issues**  11:*10*  17:*7*
  27:*22*

**< J >**
**JENNA**  1:*1*  3:*10*
  12:*22*  13:*1*, *20*, *24*, *25*
  14:*1*, *3*, *9*, *11*, *24*, *25*
  15:*1*, *3*, *16*, *22*  16:*14*,
  *18*  18:*3*, *4*, *7*, *14*  19:*8*,
  *14*, *17*, *23*  20:*4*  21:*15*,
  *18*  22:*6*, *9*  24:*7*, *9*
  25:*3*, *18*  26:*10*  27:*7*
  28:*13*, *16*  31:*5*, *15*
  32:*3*, *12*, *20*, *21*  34:*4*
  35:*23*  36:*11*, *25*
  38:*24*  40:*5*, *11*  41:*6*,
  *12*, *18*  42:*5*
**Jenna's**  37:*6*
**Jinx**  7:*4*
**job**  14:*9*  36:*25*  37:*6*
  40:*11*

**job's**  36:*20*
**judge**  5:*1*
**Julie**  1:*9*  43:*2*, *11*
  44:*2*, *18*
**July**  5:*10*
**June**  15:*19*
**jury**  5:*1*

**< K >**
**Key**  2:*3*
**kind**  19:*4*  32:*11*
  39:*19*
**kinds**  27:*22*
**knew**  14:*22*  20:*24*
  29:*21*, *22*  31:*22*
  32:*20*  36:*1*
**knonw**  16:*11*
**know**  6:*14*, *16*  8:*17*,
  *18*, *20*  9:*14*, *17*  10:*15*
  11:*5*, *24*  12:*9*, *19*, *24*
  13:*3*, *6*, *9*, *13*  14:*2*, *14*
  15:*1*  16:*6*, *22*  17:*15*,
  *20*  18:*6*, *9*  19:*14*
  20:*16*, *21*, *25*  21:*9*
  23:*3*, *6*, *7*, *22*  24:*5*, *11*,
  *22*  25:*7*, *10*, *11*, *17*, *20*
  26:*7*, *12*, *23*, *25*  27:*6*
  28:*2*, *10*, *15*, *16*, *17*, *18*,
  *21*, *24*  29:*17*, *20*, *22*,
  *24*  30:*14*, *17*  31:*8*, *16*,
  *21*, *23*, *25*  32:*11*, *15*,
  *22*  33:*7*, *8*, *10*  34:*13*
  36:*1*  38:*2*, *3*  39:*9*
  40:*17*, *18*  41:*2*, *6*
  42:*1*, *17*
**knowing**  25:*6*  32:*1*
**knowledge**  40:*20*
**known**  6:*20*
**KYLE**  2:*2*  35:*13*
  42:*12*

**< L >**
**label**  15:*7*
**labeled**  17:*18*
**Law**  2:*2*  5:*1*
**LCSO**  3:*8*
**learn**  34:*10*
**learned**  28:*8*
**leave**  12:*7*, *8*, *9*, *11*
  14:*19*, *23*  15:*25*  16:*5*,

**24**  17:*2*, *6*, *13*  18:*24*
  19:*4*, *8*, *11*, *19*, *24*
  23:*19*  25:*14*  26:*8*, *15*
  29:*4*, *8*, *10*, *13*, *17*, *20*,
  *23*  30:*11*, *17*  31:*2*, *5*,
  *7*, *19*  33:*1*, *6*, *8*, *13*, *17*,
  *20*, *21*  34:*23*  36:*21*
  37:*3*, *7*  38:*24*  39:*18*
  42:*5*
**Lee**  1:*7*  4:*4*  5:*12*, *13*,
  *16*  6:*4*, *25*  7:*11*  8:*4*
  14:*15*  15:*25*  17:*13*
  25:*13*  29:*18*  33:*5*
  34:*16*, *21*
**left**  6:*2*
**Lehman**  15:*17*, *23*
  16:*14*, *16*
**length**  23:*6*
**letter**  19:*24*  30:*2*, *4*,
  *7*, *15*, *18*, *24*  31:*1*
  32:*10*, *22*, *25*  36:*19*,
  *25*  37:*8*, *13*, *16*, *22*
  38:*1*, *7*, *17*  39:*16*, *17*
  41:*7*, *15*, *19*, *23*
**letting**  25:*10*  29:*24*
  41:*6*
**little**  39:*17*
**long**  5:*13*  6:*22*, *23*
  12:*24*  18:*8*  25:*20*
**longer**  18:*12*  20:*25*
  25:*12*
**look**  28:*23*  38:*5*
**looking**  39:*10*, *20*
**looks**  38:*21*
**lot**  6:*13*  8:*1*  12:*8*
  13:*16*  18:*10*  33:*7*
**lots**  6:*18*

**< M >**
**MACDONALD**  2:*2*
  3:*2*  4:*15*  10:*3*  19:*6*
  27:*18*  35:*15*  39:*25*
  42:*13*
**mail**  38:*1*, *3*, *16*, *18*
**making**  21:*9*
**Management**  5:*22*
  6:*20*  20:*10*  22:*15*, *22*
  23:*18*  24:*22*  28:*10*
**Management/benefits**

26:6
**manager** 6:7 16:17
**manual** 8:19
**MARCENO** 1:5 4:4
**Marie** 4:18
**Marie's** 41:12
**mark** 15:6 17:17
**marked** 36:10
**matter** 4:4
**Matthew** 11:25
**mean** 8:18 12:11
13:3, 4, 7 14:2, 5, 20
21:4 22:13 23:18
24:19 25:16 28:4
30:21 32:12 34:24
42:8
**meaning** 24:21
**means** 24:6
**meant** 24:24
**medical** 14:4 23:8,
12 24:2
**meet** 12:22
**meetings** 13:4, 5
**member** 6:19, 22
**mention** 20:11
**mentioned** 20:9 40:3
**message** 15:14, 16, 19,
22 16:13 18:13, 14,
19 19:17, 22 20:1, 4
21:12, 15 22:3, 6, 9
**messages** 26:17
**Miami** 2:4
**MIDDLE** 1:1
**minute** 24:4
**missed** 42:5
**Mojica** 9:23 10:1, 4,
10, 25 11:6 12:6, 13
**M-O-J-I-C-A** 10:1
**moment** 17:19
**Monday** 36:4 38:9
39:5, 6, 8
**months** 5:15

**< N >**
**name** 4:16 9:25
**names** 17:16
**need** 20:22 24:9
25:6, 20 26:13 36:13
**needed** 18:6 31:10,
13, 20 34:12

**needing** 14:3 24:5
40:4
**needs** 32:14 42:17
**new** 38:12
**night** 10:13, 15
**normally** 22:18 41:3
**North** 5:8
**Norton** 2:6
**Notary** 1:24 43:2, 12
**note** 21:4
**notes** 11:2, 3, 11
37:25 44:2
**notice** 7:12 31:24
32:11 36:19 40:12
41:12
**notices** 34:12, 14
**notification** 30:12
32:22 33:23 40:5, 14
**notifications** 7:13
**notified** 11:19 29:10,
14 31:11 33:16
**notify** 7:14 26:9
31:22 34:5
**notifying** 18:19 30:7
31:8 36:25
**number** 44:2
**numerous** 10:12

**< O >**
**O-301** 2:3
**OATH** 3:4 4:20
43:1
**Objection** 19:1
**obligation** 4:20
**obviously** 14:6 39:14
**occur** 28:22
**occurred** 17:15
**October** 1:9 43:2
**Office** 5:12, 14, 17
6:4, 25 7:11 8:5
9:16 10:6 14:15
16:1 17:14 25:14
29:19 32:4 33:5
34:16, 21
**officer** 10:5, 7
**official** 1:7 43:2
**Oh** 6:23 22:14 27:6
**okay** 15:9 32:21, 22
35:5 36:3, 9, 23
37:12, 24 38:5 39:5,

13 40:21 41:10, 14
42:3
**Once** 40:19
**open** 11:13, 16 28:1,
15
**opportunity** 17:23
**ORANGE** 43:2 44:2
**order** 31:21
**ordered** 42:21
**outcome** 12:12

**< P >**
**P.A** 2:6
**p.m** 1:9 15:20
18:14 20:2 21:13
22:4 36:12 42:25
**packet** 24:7, 13
**page** 44:2
**paid** 37:7
**paperwork** 20:14, 19,
21 24:2, 6, 20 25:23,
24 28:9 33:22
**paraphrase** 40:6
**Park** 2:7
**part** 7:23, 24 12:10
16:4, 9 41:4
**participated** 8:12
**particular** 42:2
**parties** 1:9 3:10 9:7
44:11, 12
**pattern** 16:20, 23
17:1, 6, 12
**pay** 16:5, 9 21:11
37:3, 7 38:13, 24
41:24
**payroll** 38:12
**people** 5:21 10:14
12:4 22:18, 22 24:21
27:8 31:14 33:7, 10
**performance** 14:9
**period** 37:8 38:14,
21 41:24
**person** 7:17 13:18
20:9 28:6
**pertains** 42:19
**peruses** 15:9
**ph** 7:4
**phone** 13:9 40:19
**physician** 23:1 24:9,

15
**piece** 8:14 23:15
**pieces** 23:22
**PLACE** 1:9 41:12,
18 42:6
**placed** 4:19
**Plaintiff** 1:1, 9 2:5
27:13
**Plaintiff's** 3:5 15:6
17:18
**plan** 32:2, 17
**planning** 31:24
**Please** 4:6, 16, 17
**PLLC** 2:2
**point** 17:8 26:14
32:19
**poisoned** 10:17
**policies** 34:17, 21, 24
**policy** 3:8 15:13, 25
16:4 19:3 34:25
**position** 5:9, 16
11:16 12:17, 20
29:25 30:8, 13 31:7
32:16 33:16, 23
38:11 41:24
**positions** 6:3, 6
12:14, 16 40:16
**positive** 10:8
**possible** 37:21 39:6,
8, 14
**possibly** 6:17
**practice** 20:13
**prefer** 42:18
**prepare** 37:16
**pretty** 42:10
**prevent** 5:3
**previously** 36:10
**prior** 5:11 27:2
41:18
**probably** 6:23 8:2
11:1, 3 12:2, 24 14:5
29:2 39:3 42:8
**process** 20:18 25:2
**Professional** 43:2, 12
44:2, 19
**program** 8:20
**promoted** 10:18, 19
**promptly** 40:12
**provide** 37:13

Deposition of Dawn Heikkila                                    Jenna Clark v. Carmine Marceno

**provided**  36:*19*
**Public**  1:*24*  43:2, *12*
**purchased**  8:*19*
**purchasing**  13:2, *12*
16:*17*
**purpose**  25:*23*
**purposes**  4:*17*  39:*23*
**put**  14:*4*  25:5, *10*
35:*13*

**< Q >**
**qualifies**  23:*15*
**qualifying**  19:*20*
20:*16*, *24*  25:8  26:*18*
**question**  9:*14*  13:9,
*10*
**questions**  30:*23*  35:2,
*4*, *8*, *13*
**quick**  38:*5*
**quite**  12:*11*

**< R >**
**raise**  4:6  30:*20*
**read**  15:*8*
**reading**  3:*10*  42:*16*,
*22*
**real**  12:*10*
**really**  16:5  24:*12*
25:9  28:*4*, *13*  29:22
**reason**  16:6
**reasoning**  33:*25*
**recall**  6:*17*  8:2, *16*
14:6  16:*13*  17:*16*
28:*24*, *25*  33:*19*
35:22  38:9  42:*1*, *2*, *6*,
*7*
**receive**  7:*20*, *22*
**received**  6:*11*  9:*11*,
*20*  19:*17*, *22*
**receiving**  8:*23*  9:*1*
**recess**  35:*10*
**recognize**  15:*10*
17:*25*
**recollection**  37:*24*, *25*
39:*2*  41:*16*
**record**  4:*17*  35:9, *11*
39:22  42:*19*, *23*  44:2
**recovering**  32:6
34:*18*
**redirect**  42:*12*, *13*

**reducing/eliminating**
40:*15*
**Reduction**  14:7
30:*15*, *18*  32:3, *18*
34:*3*, 8  38:*15*  40:*15*
**reductions**  34:*10*
**refer**  22:*16*
**reference**  20:7
**referred**  9:*19*  26:5
**referring**  16:22
22:*20*  24:2  26:2
33:*12*  39:*23*
**reflected**  36:*3*
**reflects**  38:*19*, *20*
39:*11*
**regard**  31:*4*
**regarding**  12:7, *10*
13:*24*
**regardless**  11:*15*
25:22  34:2, *6*
**regards**  28:*12*
**regular**  38:*3*
**related**  6:*11*  7:*20*
8:*3*, *7*
**relates**  17:6, *13*
**relative**  44:*10*, *12*
**remainder**  26:*2*
**remained**  38:*25*
**remember**  10:22
15:*24*  19:*13*  29:7, *9*
41:*13*
**removed**  27:*23*
**Reno**  6:2  13:*13*, *15*,
*20*, *23*  14:8, *11*, *14*, *17*,
*19*, *24*  18:*23*  19:7, *11*
28:*11*  30:25  32:24
36:*24*  37:*18*  40:*4*, *10*
41:*11*, *17*
**Reno's**  13:*17*
**repeat**  8:6  9:*24*
**report**  5:*25*  7:*1*  9:*3*,
*6*  11:6  44:2
**reported**  17:*3*
**Reporter**  1:*24*  3:5
4:*2*  9:24  35:9, *11*
41:*17*, *23*  43:2, *12*
44:*1*, *2*, *19*
**reports**  7:*5*

**request**  19:*12*, *18*
21:*3*  22:25  23:*24*
26:*8*  27:*2*
**requested**  44:2
**requests**  14:*19*, *23*
**require**  20:*13*  22:*19*
23:25
**required**  21:7, *8*
22:*24*  23:*12*, *14*, *15*
24:*14*
**requirement**  25:*24*
**requirements**  20:*14*
**requiring**  25:3  26:*10*
**resource**  6:7
**resources**  5:*18*, *20*, *23*
6:*1*, *9*, *12*, *20*, 24  7:7,
*19*  8:9, *22*  9:*22*
16:25  17:5  22:22
26:7  33:*4*, *18*  34:*16*,
*20*
**Resources/Risk**  26:6
**respect**  40:2  42:*4*
**respective**  3:*10*
**response**  11:*17*  32:*24*
**responsible**  22:*23*
**retired**  7:6
**retirement**  33:*10*
38:25
**return**  23:*19*  24:*10*,
*11*
**returned**  33:7
**returning**  33:*13*
**returns**  31:8
**review**  17:*19*, *23*
36:9  42:*15*  44:2
**RIF**  40:*25*
**right**  4:6  7:5  21:*23*
22:*1*, *10*, *13*  26:*18*
31:*11*  36:7, *17*  37:*16*
38:*19*  42:2, *14*
**Risk**  5:22  6:7  20:*10*
22:*15*  23:*18*  24:*21*
28:*9*, *16*
**role**  7:7, *10*, *19*  8:*8*,
*22*  9:*1*, *21*  17:*4*
40:*24*
**roughly**  30:*8*
**rules**  34:*25*

**< S >**
**Salem**  5:*8*
**Sands**  11:*25*  12:*1*
**saying**  19:*14*  41:*13*
**says**  16:*19*
**schedule**  35:*23*  36:*1*,
6
**scheduled**  18:*20*
36:*18*
**Screen**  15:5  35:*14*,
*15*
**scroll**  17:*20*, *22*
**seal**  43:2
**see**  16:*19*  20:*1*
21:*12*  22:3  24:*4*
35:7, *19*
**seen**  13:5
**send**  15:22  24:7, *24*
25:*1*  32:*23*, *25*  34:*12*
36:25  37:*17*  41:*14*
**sense**  39:*3*
**sent**  15:*14*, *16*  16:*13*
30:*24*  32:22  34:*14*
**sentence**  16:*19*
**September**  39:*1*
**sergeant**  10:*18*, *19*
**serious**  23:*4*
**services**  13:*19*
**session**  14:*1*
**Shannon**  15:*17*, *23*
16:*14*, *16*, *17*  40:*17*
**share**  15:6  35:*14*, *15*
**she'd**  31:22
**sheet**  21:9, *10*  29:*21*
39:*20*, *23*
**sheets**  38:*13*
**she'll**  21:*19*
**Sheriff**  1:7  4:*4*
**Sheriff's**  5:*12*, *14*, *17*
6:*4*, *25*  7:*11*, *25*  8:*4*
9:*16*  10:5  14:*15*
16:*1*  17:*14*  25:*14*
29:*18*  33:5  34:*16*, *21*
**shift**  10:*14*, *15*  11:*13*
12:*15*
**short**  20:*17*  25:6
**show**  15:5  17:*17*
**SHRM**  6:*20*
**sick**  28:*13*  29:*20*, *23*
**signing**  3:*10*

Deposition of Dawn Heikkila                                                                 Jenna Clark v. Carmine Marceno

**situation** 7:*18* 9:*4*
17:*9* 33:*9*
**slammed** 22:*15*
**Smith** 2:*2*
**Society** 6:*19*
**solemnly** 4:*6*
**somebody** 23:*24*
40:*17*
**sorry** 8:*6* 14:*18* 26:*1*
**South** 2:*7*
**speaking** 26:*4*
**specific** 14:*21* 17:*16*
19:*11*
**specifically** 7:*25* 8:*2*
11:*6*
**spoke** 30:*25*
**standpoint** 8:*18*
**start** 5:*9*
**started** 5:*10* 6:*7*
12:*23* 39:*18*
**state** 4:*16* 43:*2*, *12*
44:*2*
**STATES** 1:*1*
**stating** 34:*25*
**status** 34:6 38:*25*
**STEFANY** 2:6 3:*3*
19:*1* 27:*12* 35:*4*, *6*,
*12*, *18* 39:*21* 40:*1*
42:*11*, *14*
**stenographic** 44:*2*
**stenographically** 44:*2*
**stipulated** 3:*10*
**stopped** 13:*7*
**strike** 9:*10* 14:*18*
**suffered** 27:*2*
**sufficient** 30:*23*
**suggested** 11:*12*
**Suite** 2:*3*, *7*
**Sunday** 38:*6*, *7*, *8*, *16*
**supervisor** 5:*22* 8:*13*,
*17* 13:*11*, *16* 26:*12*
41:*3*
**support** 13:*18*
**sure** 17:*7* 18:*5*
19:*21* 21:*5*, *10* 32:*13*
33:*19* 38:*2*, *4* 42:*10*
**surgery** 15:*1* 18:*4*,
*20* 19:*9* 26:*22*, *23*
27:*17* 28:*2*, *5*, *7*, *12*,
*15*, *19*, *22* 29:*5*, *7*, *15*,

*22* 31:*22* 32:*6* 34:*18*
42:*4*
**swear** 4:*7*
**sworn** 4:*13* 43:*2*

**< T >**
**take** 12:*11* 18:*25*
19:*9*, *23* 25:*12* 35:*6*
**TAKEN** 1:*9* 4:*3*
21:*6* 35:*10*
**talk** 13:*20* 41:*7*
**talked** 12:*8* 28:*10*,
*17* 30:*21* 32:*10*, *20*
40:*18* 41:*14*
**talking** 34:*1*
**talks** 16:*4*, *11* 28:*4*
**Tampa** 2:*8*
**tasked** 9:*17*
**tell** 7:*24* 9:*15* 22:*9*
27:*19*, *24* 32:*8*
**telling** 21:*19* 31:*25*
36:*12* 41:*2*
**tells** 21:*25* 38:*11*, *14*
**terminated** 7:*15*
29:*14*, *25* 33:*5* 42:*24*
**terminating** 7:*10*, *12*
34:*17*, *22*
**termination** 29:*11*
33:*9*
**terms** 10:*22*
**testified** 4:*13*
**testify** 4:*20*
**testifying** 4:*25* 5:*4*
**TESTIMONY** 3:*2*
4:*7*, *24* 36:*23* 37:*4*
40:*2*, *7* 42:*3*, *15*
**texted** 32:*20*
**thank** 35:*3* 39:*25*
42:*11*
**thing** 32:*11*
**things** 5:*23* 10:*12*
27:*7* 28:*19*
**think** 10:*6*, *16*, *20*, *21*
11:*25* 12:*1*, *9* 14:*20*
15:*4* 19:*13* 26:*24*
28:*19*, *20* 29:*2*, *15*
34:*7* 42:*7*
**thinking** 5:*4*
**thought** 10:*17* 25:*4*
**three** 30:*8*

**through-Thursday**
39:*7*
**thrown** 39:*16*
**Thursday** 36:*4*
**TIME** 1:*9* 6:*23*
7:*13* 8:*12* 9:*20* 10:*7*,
*17*, *20* 11:*7*, *25* 12:*1*,
*25* 13:*4*, *8*, *25* 15:*3*
16:*7* 17:*8*, *13* 18:*23*
19:*22* 20:*18*, *19*, *20*,
*23* 21:*9*, *10* 22:*14*
24:*5*, *23* 25:*22* 26:*16*
29:*21* 31:*2* 33:*3*, *17*
34:*13*, *15* 35:*3* 36:*24*
37:*9* 39:*7*, *20*, *22*
42:*2*, *5*
**times** 7:*16*, *23*, *25*
12:*11*
**timesheets** 36:*3*
**timing** 30:*12* 33:*22*
**title** 11:*25* 13:*17*
**today** 5:*4* 35:*3* 42:*1*
**told** 14:*25* 15:*1*, *2*, *3*
18:*4*, *5*, *11* 19:*15*
27:*15*, *16*, *20* 28:*6*
30:*15*, *22* 31:*5*, *20*
32:*10*, *19* 34:*7*, *12*, *13*
37:*5*, *10*, *21* 41:*21*, *22*
**total** 21:*22*
**trail** 18:*3* 36:*9*
**trained** 8:*19*
**training** 6:*9*, *11*, *14*,
*18* 7:*20*, *22*, *24* 8:*7*,
*13*, *16*
**trainings** 6:*17* 8:*3*, *11*
**transcript** 3:*10*
42:*15*, *17*, *20*, *21* 44:*2*
**transcripts** 42:*20*
**transferred** 10:*15*
11:*9*, *11*, *13*, *15* 12:*16*,
*21*
**treated** 32:*14*
**treating** 32:*13*
**true** 44:*2*
**truth** 4:*7*, *8*
**truthfully** 4:*21* 5:*4*
**trying** 32:*12*
**Tuesday** 38:*22*
**Tuesday-through-**

**Friday** 39:*4*
**turn** 26:*15*
**Turner** 7:*4*
**turning** 41:*8*
**two** 7:*4*, *6* 11:*4*
**type** 16:*24* 17:*8*
18:*24* 19:*8* 29:*13*, *17*
**typically** 7:*14*

**< U >**
**undersheriff** 37:*6*
**understand** 4:*19*, *23*
14:*12* 19:*18* 37:*4*
40:*6* 41:*17* 42:*3*
**understanding** 34:*6*
35:*21*
**understood** 19:*20*
**underwent** 28:*12*
**Unit** 5:*22*, *23* 22:*15*
**UNITED** 1:*1*
**unpaid** 16:*10*
**use** 16:*7* 19:*18*
23:*25* 24:*12* 25:*14*

**< V >**
**various** 6:*16*
**videoconference** 1:*9*

**< W >**
**Wait** 24:*4* 31:*8*
**waive** 42:*16*, *22*
**waived** 3:*10*
**want** 10:*13* 11:*1*, *3*
31:*12*, *24* 32:*14* 35:*3*,
*21*
**wanted** 11:*9*, *10*
12:*18* 32:*13* 37:*10*
41:*2*
**wants** 23:*25* 25:*14*
**way** 25:*2* 32:*14*
40:*6* 41:*22*
**Wednesday** 1:*9*
**week** 20:*12* 35:*23*,
*25* 38:*12* 39:*4*, *7*
**weird** 39:*19*
**Well** 8:*17* 13:*3*, *16*
14:*12*, *25* 19:*20*
22:*14* 23:*1* 28:*1*
32:*7* 35:*2*, *24* 39:*8*,

*13, 20*  40:*13*  41:*2*
42:*20*
**went**  6:*15, 16*  31:*15*
38:*1, 2, 17*
**we're**  25:2  35:9
42:*23*
**Winston**  5:7
**witness**  1:*9*  4:*10*
10:*1*  15:*9*  19:*3*
27:*11, 15*  42:22  43:2
**work**  5:6, *11, 13*
10:*13*  11:*12*  12:*23*
16:8  20:*21*  23:*20*
24:*10, 11*  33:8  34:4
35:22, *25*  36:6, *18*
39:*4, 7*
**workdays**  36:6
**worked**  10:7  11:*4*
16:*18*  35:*23*  36:*4*
39:*8, 11, 18*  40:*17*
41:*21*
**working**  29:*12*
**works**  14:*14*  24:8
34:7, *11*
**Wow**  6:*13*
**writing**  7:*16, 17*
30:*25*
**written**  30:2
**wrote**  29:24  30:*4, 7,*
*15, 18*  39:*15, 17*

**< Y >**
**yeah**  14:7  15:2
19:*21*  20:24  25:8
28:*4*  29:*15*  30:22
32:9  39:*13*
**year**  6:*15, 16*  11:*4*
28:24  42:8
**years**  5:*15*  6:*15*
7:*23*  8:*14*  10:*13*
13:*14*  27:20  28:25
29:*3*  34:9  42:9

**< Z >**
**ZOOM**  1:*9*  2:2, *6*
3:*2*  4:2, *24*  43:2

Deposition of Dawn Heikkila

Jenna Clark v. Carmine Marceno

**WORD LIST**

**< 0 >**
**000421** *(1)*

**< 1 >**
**1** *(1)*
**1/21/2024** *(1)*
**1:04** *(1)*
**1:06** *(2)*
**1:16** *(1)*
**10** *(5)*
**10-hour** *(1)*
**11** *(2)*
**11:24** *(1)*
**12** *(5)*
**12:26** *(1)*
**12:42** *(2)*
**12:47** *(1)*
**1294** *(1)*
**1294-1295** *(1)*
**1295** *(1)*
**15** *(7)*
**15th** *(2)*
**16** *(1)*
**16th** *(3)*
**17** *(2)*
**17th** *(2)*
**18** *(2)*
**18th** *(1)*
**1999** *(1)*

**< 2 >**
**2:22-cv-614-SPC-NPM** *(1)*
**2005** *(1)*
**2020** *(1)*
**2021** *(13)*
**2023** *(5)*
**20th** *(1)*
**225** *(1)*
**24** *(1)*
**24th** *(1)*
**27th** *(1)*
**28th** *(2)*

**< 3 >**
**30(b)(6** *(1)*
**324** *(1)*

**33131** *(1)*
**33606-4128** *(1)*
**3431** *(2)*
**35** *(1)*
**3rd** *(1)*

**< 4 >**
**4** *(1)*
**42** *(1)*
**43** *(1)*
**44** *(1)*

**< 5 >**
**520** *(1)*

**< 7 >**
**7** *(9)*

**< 8 >**
**8/12/21** *(1)*

**< 9 >**
**9** *(2)*

**< A >**
**a.m** *(1)*
**able** *(1)*
**abuse** *(5)*
**accrual** *(1)*
**accrued** *(1)*
**action** *(5)*
**activate** *(1)*
**additional** *(1)*
**administer** *(1)*
**administered** *(1)*
**administrative** *(3)*
**Affairs** *(2)*
**affirm** *(1)*
**ago** *(4)*
**agreed** *(2)*
**ahead** *(2)*
**Allen** *(1)*
**allow** *(1)*
**amount** *(2)*
**Amy** *(9)*
**Ann** *(1)*
**Annmarie** *(44)*
**answer** *(2)*
**answers** *(1)*

**anyway** *(1)*
**APPEARANCES** *(1)*
**appeared** *(2)*
**appears** *(2)*
**apply** *(1)*
**appropriate** *(1)*
**approval** *(1)*
**approved** *(9)*
**approving** *(1)*
**asked** *(4)*
**asking** *(1)*
**assistant** *(1)*
**Association** *(1)*
**attorney** *(1)*
**attorneys** *(1)*
**August** *(18)*
**authorize** *(1)*
**authorized** *(1)*
**available** *(3)*
**Avenue** *(1)*
**aware** *(7)*

**< B >**
**bachelor's** *(1)*
**back** *(12)*
**bank** *(1)*
**based** *(2)*
**basically** *(4)*
**Bates** *(5)*
**began** *(3)*
**beginning** *(5)*
**begins** *(1)*
**BEHALF** *(3)*
**believe** *(15)*
**believed** *(1)*
**benefit** *(1)*
**Benefits** *(2)*
**beyond** *(1)*
**blindsided** *(1)*
**Blue** *(1)*
**break** *(1)*
**breast** *(3)*
**Brickell** *(1)*
**brief** *(1)*
**briefly** *(1)*
**bringing** *(1)*
**broad** *(1)*
**bureau** *(1)*
**busy** *(3)*

**< C >**
**calendar** *(1)*
**call** *(1)*
**called** *(1)*
**calling** *(1)*
**capacity** *(1)*
**care** *(3)*
**career** *(2)*
**CARMINE** *(1)*
**Carolina** *(1)*
**Carrie** *(1)*
**CASE** *(3)*
**cause** *(1)*
**causing** *(1)*
**CERTIFICATE** *(4)*
**certification** *(6)*
**certifications** *(1)*
**certify** *(3)*
**chain** *(2)*
**chance** *(1)*
**check** *(1)*
**chief** *(2)*
**Christian** *(8)*
**Cindy** *(1)*
**clarity** *(1)*
**CLARK** *(56)*
**Clark's** *(4)*
**classified** *(1)*
**clear** *(2)*
**clearly** *(1)*
**closes** *(1)*
**coaching** *(1)*
**coffee** *(1)*
**come** *(1)*
**command** *(2)*
**comment** *(1)*
**Commission** *(1)*
**common** *(1)*
**communicate** *(1)*
**communication** *(4)*
**communications** *(1)*
**complain** *(4)*
**complained** *(3)*
**complaining** *(1)*
**complaint** *(8)*
**complaints** *(7)*
**complete** *(2)*
**completed** *(5)*

completing  *(1)*
compose  *(1)*
concern  *(3)*
concerned  *(4)*
concerning  *(1)*
concerns  *(1)*
conclude  *(1)*
condition  *(8)*
conditions  *(2)*
conduct  *(3)*
conducted  *(2)*
conducting  *(2)*
conferences  *(1)*
confirmed  *(1)*
confirms  *(1)*
connected  *(1)*
consequence  *(1)*
considering  *(1)*
consistent  *(1)*
contact  *(1)*
conversation  *(8)*
correct  *(33)*
corrections  *(2)*
correctly  *(2)*
counsel  *(4)*
Country  *(1)*
County  *(19)*
couple  *(3)*
course  *(1)*
COURT  *(13)*
covered  *(2)*
Covid  *(1)*
co-workers  *(2)*
create  *(1)*
CROSS  *(1)*
CROSS-
EXAMINATION  *(1)*
currently  *(1)*

**< D >**
DATE  *(4)*
dated  *(9)*
dates  *(1)*
DAVID  *(2)*
DAWN  *(8)*
day  *(13)*
days  *(19)*
December  *(2)*
decide  *(1)*

decided  *(1)*
decisions  *(2)*
Defendant  *(2)*
defendant's  *(1)*
Defense  *(1)*
definitely  *(1)*
degree  *(1)*
department  *(3)*
depending  *(2)*
DEPOSITION  *(7)*
Derek  *(1)*
describe  *(1)*
described  *(3)*
designate  *(2)*
designated  *(2)*
designation  *(1)*
different  *(2)*
DIRECT  *(3)*
directed  *(1)*
directly  *(1)*
Director  *(19)*
disciplinary  *(1)*
disciplined  *(1)*
disclose  *(2)*
disclosed  *(1)*
discriminated  *(1)*
discrimination  *(6)*
discuss  *(9)*
discussed  *(5)*
discussing  *(1)*
discussion  *(1)*
displayed  *(1)*
DISTRICT  *(2)*
division  *(1)*
doctor  *(6)*
doctor's  *(1)*
document  *(9)*
documentation  *(8)*
documenting  *(1)*
documents  *(1)*
doing  *(4)*
Dr  *(1)*
drafted  *(3)*
duly  *(2)*
duration  *(3)*

**< E >**
earlier  *(4)*
early  *(1)*

effect  *(1)*
effective  *(1)*
effectuating  *(1)*
either  *(2)*
eligible  *(1)*
eliminated  *(6)*
eliminating  *(3)*
elimination  *(3)*
email  *(12)*
employee  *(6)*
employees  *(19)*
employment  *(3)*
engage  *(1)*
engaged  *(1)*
engaging  *(1)*
entitlement  *(4)*
ESQUIRE  *(2)*
Essentially  *(1)*
establish  *(1)*
Evans  *(5)*
event  *(5)*
eventually  *(1)*
everybody  *(1)*
exactly  *(3)*
Examination  *(3)*
Excerpt  *(3)*
exchange  *(1)*
exchanged  *(1)*
execute  *(1)*
executing  *(1)*
Executive  *(1)*
EXHIBIT  *(4)*
expect  *(1)*
expected  *(2)*
Expires  *(1)*
explain  *(1)*

**< F >**
fact  *(6)*
fair  *(1)*
familiar  *(2)*
far  *(1)*
feel  *(1)*
feeling  *(1)*
felt  *(2)*
fill  *(4)*
filled  *(2)*
filling  *(1)*
fills  *(1)*

financially  *(1)*
find  *(1)*
fire  *(1)*
first  *(8)*
five  *(2)*
five-day  *(1)*
five-minute  *(1)*
FLORIDA  *(10)*
FMLA  *(43)*
folks  *(1)*
follow  *(1)*
follows  *(1)*
force  *(11)*
foregoing  *(1)*
form  *(6)*
formal  *(5)*
formalized  *(1)*
formally  *(1)*
forms  *(5)*
Forsyth  *(1)*
forth  *(1)*
forward  *(1)*
found  *(3)*
four  *(1)*
four-day  *(2)*
frame  *(1)*
frequent  *(1)*
frequently  *(1)*
friends  *(1)*
full  *(1)*
further  *(1)*

**< G >**
gather  *(1)*
general  *(3)*
getting  *(4)*
GG939756  *(1)*
girls  *(1)*
give  *(6)*
given  *(1)*
gives  *(1)*
giving  *(2)*
Go  *(7)*
God  *(1)*
going  *(30)*
gosh  *(1)*
Government  *(1)*
Group  *(1)*
guess  *(1)*

Deposition of Dawn Heikkila                                           Jenna Clark v. Carmine Marceno

**< H >**
**hand**  *(2)*
**handle**  *(2)*
**handled**  *(1)*
**handles**  *(1)*
**handling**  *(1)*
**happened**  *(2)*
**happening**  *(10)*
**happens**  *(1)*
**harassed**  *(1)*
**harassment**  *(2)*
**health**  *(10)*
**hear**  *(1)*
**heard**  *(2)*
**heart**  *(7)*
**Heikilla**  *(1)*
**HEIKKILA**  *(10)*
**held**  *(1)*
**help**  *(1)*
**hereto**  *(1)*
**HIPAA**  *(1)*
**hire**  *(1)*
**hired**  *(1)*
**hiring**  *(1)*
**hold**  *(4)*
**honestly**  *(1)*
**hours**  *(1)*
**HR**  *(1)*
**human**  *(24)*
**Hyde**  *(1)*

**< I >**
**IA**  *(1)*
**idea**  *(2)*
**identified**  *(2)*
**identifying**  *(1)*
**immediately**  *(1)*
**impact**  *(2)*
**impacted**  *(1)*
**implants**  *(2)*
**included**  *(4)*
**includes**  *(1)*
**INDEX**  *(2)*
**indicate**  *(1)*
**indicated**  *(3)*
**indicates**  *(1)*
**indicating**  *(2)*
**individual**  *(1)*

**information**  *(9)*
**initiate**  *(1)*
**instances**  *(1)*
**instructed**  *(2)*
**interact**  *(3)*
**interested**  *(1)*
**Internal**  *(2)*
**internally**  *(1)*
**investigated**  *(3)*
**investigation**  *(6)*
**investigations**  *(3)*
**involved**  *(6)*
**issue**  *(1)*
**issues**  *(3)*

**< J >**
**JENNA**  *(58)*
**Jenna's**  *(1)*
**Jinx**  *(1)*
**job**  *(4)*
**job's**  *(1)*
**judge**  *(1)*
**Julie**  *(5)*
**July**  *(1)*
**June**  *(1)*
**jury**  *(1)*

**< K >**
**Key**  *(1)*
**kind**  *(3)*
**kinds**  *(1)*
**knew**  *(7)*
**knonw**  *(1)*
**know**  *(89)*
**knowing**  *(2)*
**knowledge**  *(1)*
**known**  *(1)*
**KYLE**  *(3)*

**< L >**
**label**  *(1)*
**labeled**  *(1)*
**Law**  *(2)*
**LCSO**  *(1)*
**learn**  *(1)*
**learned**  *(1)*
**leave**  *(50)*
**Lee**  *(17)*
**left**  *(1)*

**Lehman**  *(4)*
**length**  *(1)*
**letter**  *(26)*
**letting**  *(3)*
**little**  *(1)*
**long**  *(6)*
**longer**  *(3)*
**look**  *(1)*
**looking**  *(2)*
**looks**  *(1)*
**lot**  *(6)*
**lots**  *(1)*

**< M >**
**MACDONALD**  *(9)*
**mail**  *(1)*
**making**  *(1)*
**Management**  *(8)*
**Management/benefits**
  *(1)*
**manager**  *(2)*
**manual**  *(1)*
**MARCENO**  *(2)*
**Marie**  *(1)*
**Marie's**  *(1)*
**mark**  *(2)*
**marked**  *(1)*
**matter**  *(1)*
**Matthew**  *(1)*
**mean**  *(18)*
**meaning**  *(1)*
**means**  *(1)*
**meant**  *(1)*
**medical**  *(4)*
**meet**  *(1)*
**meetings**  *(2)*
**member**  *(2)*
**mention**  *(1)*
**mentioned**  *(2)*
**message**  *(17)*
**messages**  *(1)*
**Miami**  *(1)*
**MIDDLE**  *(1)*
**minute**  *(1)*
**missed**  *(1)*
**Mojica**  *(8)*
**M-O-J-I-C-A**  *(1)*
**moment**  *(1)*
**Monday**  *(5)*

**months**  *(1)*

**< N >**
**name**  *(2)*
**names**  *(1)*
**need**  *(6)*
**needed**  *(5)*
**needing**  *(3)*
**needs**  *(2)*
**new**  *(2)*
**night**  *(2)*
**normally**  *(2)*
**North**  *(1)*
**Norton**  *(1)*
**Notary**  *(3)*
**note**  *(1)*
**notes**  *(5)*
**notice**  *(6)*
**notices**  *(2)*
**notification**  *(5)*
**notifications**  *(1)*
**notified**  *(5)*
**notify**  *(4)*
**notifying**  *(4)*
**number**  *(1)*
**numerous**  *(1)*

**< O >**
**O-301**  *(1)*
**OATH**  *(3)*
**Objection**  *(1)*
**obligation**  *(1)*
**obviously**  *(2)*
**occur**  *(1)*
**occurred**  *(1)*
**October**  *(2)*
**Office**  *(18)*
**officer**  *(2)*
**official**  *(2)*
**Oh**  *(3)*
**okay**  *(16)*
**Once**  *(1)*
**open**  *(4)*
**opportunity**  *(1)*
**ORANGE**  *(2)*
**order**  *(1)*
**ordered**  *(1)*
**outcome**  *(1)*

Deposition of Dawn Heikkila                                                    Jenna Clark v. Carmine Marceno

**< P >**
P.A  *(1)*
p.m  *(8)*
packet  *(2)*
page  *(1)*
paid  *(1)*
paperwork  *(10)*
paraphrase  *(1)*
Park  *(1)*
part  *(6)*
participated  *(1)*
particular  *(1)*
parties  *(5)*
pattern  *(5)*
pay  *(8)*
payroll  *(1)*
people  *(11)*
performance  *(1)*
period  *(4)*
person  *(5)*
pertains  *(1)*
peruses  *(1)*
ph  *(1)*
phone  *(2)*
physician  *(3)*
piece  *(2)*
pieces  *(1)*
PLACE  *(4)*
placed  *(1)*
Plaintiff  *(4)*
Plaintiff's  *(3)*
plan  *(2)*
planning  *(1)*
Please  *(3)*
PLLC  *(1)*
point  *(3)*
poisoned  *(1)*
policies  *(3)*
policy  *(6)*
position  *(14)*
positions  *(5)*
positive  *(1)*
possible  *(4)*
possibly  *(1)*
practice  *(1)*
prefer  *(1)*
prepare  *(1)*
pretty  *(1)*
prevent  *(1)*

previously  *(1)*
prior  *(3)*
probably  *(10)*
process  *(2)*
Professional  *(4)*
program  *(1)*
promoted  *(2)*
promptly  *(1)*
provide  *(1)*
provided  *(1)*
Public  *(3)*
purchased  *(1)*
purchasing  *(3)*
purpose  *(1)*
purposes  *(2)*
put  *(4)*

**< Q >**
qualifies  *(1)*
qualifying  *(5)*
question  *(3)*
questions  *(5)*
quick  *(1)*
quite  *(1)*

**< R >**
raise  *(2)*
read  *(1)*
reading  *(3)*
real  *(1)*
really  *(6)*
reason  *(1)*
reasoning  *(1)*
recall  *(15)*
receive  *(2)*
received  *(5)*
receiving  *(2)*
recess  *(1)*
recognize  *(2)*
recollection  *(4)*
record  *(7)*
recovering  *(2)*
redirect  *(2)*
reducing/eliminating  *(1)*
Reduction  *(9)*
reductions  *(1)*
refer  *(1)*
reference  *(1)*

referred  *(2)*
referring  *(6)*
reflected  *(1)*
reflects  *(3)*
regard  *(1)*
regarding  *(3)*
regardless  *(4)*
regards  *(1)*
regular  *(1)*
related  *(4)*
relates  *(2)*
relative  *(2)*
remainder  *(1)*
remained  *(1)*
remember  *(6)*
removed  *(1)*
Reno  *(23)*
Reno's  *(1)*
repeat  *(2)*
report  *(6)*
reported  *(1)*
Reporter  *(13)*
reports  *(1)*
request  *(7)*
requested  *(1)*
requests  *(2)*
require  *(3)*
required  *(7)*
requirement  *(1)*
requirements  *(1)*
requiring  *(2)*
resource  *(1)*
resources  *(21)*
Resources/Risk  *(1)*
respect  *(2)*
respective  *(1)*
response  *(2)*
responsible  *(1)*
retired  *(1)*
retirement  *(2)*
return  *(3)*
returned  *(1)*
returning  *(1)*
returns  *(1)*
review  *(5)*
RIF  *(1)*
right  *(14)*
Risk  *(8)*
role  *(9)*

roughly  *(1)*
rules  *(1)*

**< S >**
Salem  *(1)*
Sands  *(2)*
saying  *(2)*
says  *(1)*
schedule  *(3)*
scheduled  *(2)*
Screen  *(3)*
scroll  *(2)*
seal  *(1)*
see  *(7)*
seen  *(1)*
send  *(10)*
sense  *(1)*
sent  *(6)*
sentence  *(1)*
September  *(1)*
sergeant  *(2)*
serious  *(1)*
services  *(1)*
session  *(1)*
Shannon  *(6)*
share  *(3)*
she'd  *(1)*
sheet  *(5)*
sheets  *(1)*
she'll  *(1)*
Sheriff  *(1)*
Sheriff's  *(18)*
shift  *(4)*
short  *(2)*
show  *(2)*
SHRM  *(1)*
sick  *(3)*
signing  *(1)*
situation  *(4)*
slammed  *(1)*
Smith  *(1)*
Society  *(1)*
solemnly  *(1)*
somebody  *(2)*
sorry  *(3)*
South  *(1)*
speaking  *(1)*
specific  *(3)*
specifically  *(3)*

Deposition of Dawn Heikkila

Jenna Clark v. Carmine Marceno

**spoke**  *(1)*
**standpoint**  *(1)*
**start**  *(1)*
**started**  *(4)*
**state**  *(5)*
**STATES**  *(1)*
**stating**  *(1)*
**status**  *(2)*
**STEFANY**  *(12)*
**stenographic**  *(1)*
**stenographically**  *(1)*
**stipulated**  *(1)*
**stopped**  *(2)*
**strike**  *(2)*
**suffered**  *(1)*
**sufficient**  *(1)*
**suggested**  *(1)*
**Suite**  *(2)*
**Sunday**  *(4)*
**supervisor**  *(7)*
**support**  *(1)*
**sure**  *(11)*
**surgery**  *(22)*
**swear**  *(1)*
**sworn**  *(2)*

**< T >**
**take**  *(6)*
**TAKEN**  *(6)*
**talk**  *(2)*
**talked**  *(8)*
**talking**  *(1)*
**talks**  *(3)*
**Tampa**  *(1)*
**tasked**  *(1)*
**tell**  *(6)*
**telling**  *(4)*
**tells**  *(3)*
**terminated**  *(5)*
**terminating**  *(4)*
**termination**  *(2)*
**terms**  *(1)*
**testified**  *(1)*
**testify**  *(1)*
**testifying**  *(2)*
**TESTIMONY**  *(9)*
**texted**  *(1)*
**thank**  *(3)*
**thing**  *(1)*

**things**  *(4)*
**think**  *(18)*
**thinking**  *(1)*
**thought**  *(2)*
**three**  *(1)*
**through-Thursday**  *(1)*
**thrown**  *(1)*
**Thursday**  *(1)*
**TIME**  *(46)*
**times**  *(4)*
**timesheets**  *(1)*
**timing**  *(2)*
**title**  *(2)*
**today**  *(3)*
**told**  *(26)*
**total**  *(1)*
**trail**  *(2)*
**trained**  *(1)*
**training**  *(10)*
**trainings**  *(3)*
**transcript**  *(7)*
**transcripts**  *(1)*
**transferred**  *(7)*
**treated**  *(1)*
**treating**  *(1)*
**true**  *(1)*
**truth**  *(3)*
**truthfully**  *(2)*
**trying**  *(1)*
**Tuesday**  *(1)*
**Tuesday-through-Friday**  *(1)*
**turn**  *(1)*
**Turner**  *(1)*
**turning**  *(1)*
**two**  *(3)*
**type**  *(6)*
**typically**  *(1)*

**< U >**
**undersheriff**  *(1)*
**understand**  *(8)*
**understanding**  *(2)*
**understood**  *(1)*
**underwent**  *(1)*
**Unit**  *(3)*
**UNITED**  *(1)*
**unpaid**  *(1)*
**use**  *(5)*

**< V >**
**various**  *(1)*
**videoconference**  *(1)*

**< W >**
**Wait**  *(2)*
**waive**  *(2)*
**waived**  *(1)*
**want**  *(8)*
**wanted**  *(6)*
**wants**  *(2)*
**way**  *(4)*
**Wednesday**  *(1)*
**week**  *(8)*
**weird**  *(1)*
**Well**  *(18)*
**went**  *(6)*
**we're**  *(3)*
**Winston**  *(1)*
**witness**  *(9)*
**work**  *(19)*
**workdays**  *(1)*
**worked**  *(10)*
**working**  *(1)*
**works**  *(4)*
**Wow**  *(1)*
**writing**  *(3)*
**written**  *(1)*
**wrote**  *(7)*

**< Y >**
**yeah**  *(10)*
**year**  *(5)*
**years**  *(11)*

**< Z >**
**ZOOM**  *(7)*

# EXHIBIT 9

**From:** Heikkila, Dawn <████████████████>
**Sent:** Thursday, June 18, 2020 12:47 PM EDT
**To:** Clark, Jenna <JClark@sheriffleefl.org>; Lehman, Shannon <████████████████>
**Subject:** RE: from policy Chapter 22

Full-time members are required to work a full-time schedule or account for hours missed by using accrued leave time. If a member must be absent from work for whatever reason, they must use the appropriate amount of accrued leave time that would bring their combined work and leave time to the scheduled 80 or 84 hours required for the pay period. The employee may not choose to take time missed from work as "Leave without pay" unless it is approved FMLA. If the member has exhausted all accrued leave time, the missed time then becomes leave without pay. A pattern of abuse may be cause for disciplinary action.



**Dawn Heikkila, Director**

Lee County Sheriff's Office
**Desk:** ████████████
████████████
www.sheriffleefl.org

***IMPORTANT MESSAGE***

This message is intended for the use of the person or entity to whom it is addressed and may contain information that is privileged and confidential, the disclosure of which is governed by applicable law. If the reader of this email is not the intended recipient or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this information is STRICTLY PROHIBITED. If you have received this email by error, please notify us immediately and destroy the related message. This footnote also confirms that this email message has been swept for the presence of computer viruses, worms, hostile scripts and other email-borne network threats. PLEASE NOTE: Florida has a very broad public records law. Most written communications to or from government officials are public records available to the public and media upon request. Your email communications may be subject to public disclosure per Sec. 119 F.S.

# EXHIBIT 10

**From:** Heikkila, Dawn <██████████████████>
**Sent:** Thursday, August 12, 2021 1:16 PM EDT
**To:** Clark, Jenna <JClark@sheriffleefl.org>
**Subject:** RE: message

Ok…well we are so busy right now that I am going to hold off on the FMLA…if you end up needing more time that that just let me know and I will have to do the FMLA paperwork.

Thanks and I wish you a speedy recovery!!



### Dawn Heikkila, Director

Lee County Sheriff's Office
Desk: ██████████
DHeikkila@sheriffleefl.org
www.sheriffleefl.org

**From:** Clark, Jenna <JClark@sheriffleefl.org>
**Sent:** Thursday, August 12, 2021 1:06 PM
**To:** Heikkila, Dawn ██████████████████
**Subject:** RE: message

18-20
24-27
Total of 7 days.

**Jenna Clark** | Purchasing Director
Desk: 239-477-1313
**Purchasing**
**Lee County Sheriff's Office**
JClark@sheriffleefl.org | www.sheriffleefl.org

**From:** Heikkila, Dawn ██████████████████
**Sent:** Thursday, August 12, 2021 1:04 PM
**To:** Clark, Jenna <JClark@sheriffleefl.org>
**Subject:** RE: message

Ok…if you are out more than a week I will forward it to Amy for FMLA…do you know how long you plan to be out?



### Dawn Heikkila, Director

Lee County Sheriff's Office
**Desk:** 239-477-1132
DHeikkila@sheriffleefl.org
www.sheriffleefl.org

**From:** Clark, Jenna <JClark@sheriffleefl.org>
**Sent:** Thursday, August 12, 2021 12:26 PM
**To:** Heikkila, Dawn ██████████████████
**Subject:** message

Hi Dawn –

I called you to let you know I have surgery scheduled on the 18th - Annmarie said to let you know, she already approved my time.

Thanks!
Jenna

**Jenna Clark** | Purchasing Director
Desk: 239-477-1313
**Purchasing**
**Lee County Sheriff's Office**
JClark@sheriffleefl.org | www.sheriffleefl.org

***IMPORTANT MESSAGE***

**LCSO/Clark
DEF001294**

This message is intended for the use of the person or entity to whom it is addressed and may contain information that is privileged and confidential, the disclosure of which is governed by applicable law. If the reader of this email is not the intended recipient or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this information is STRICTLY PROHIBITED. If you have received this email by error, please notify us immediately and destroy the related message. This footnote also confirms that this email message has been swept for the presence of computer viruses, worms, hostile scripts and other email-borne network threats. PLEASE NOTE: Florida has a very broad public records law. Most written communications to or from government officials are public records available to the public and media upon request. Your email communications may be subject to public disclosure per Sec. 119 F.S.

**LCSO/Clark**
**DEF001295**