```
 1                UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
 2

 3

    JENNA CLARK,
 4
        Plaintiff,
 5                                 CASE NO.: 2:22-cv-614-SPC-NPM
    v.
 6
    CARMINE MARCENO, in
 7  his official capacity
    as Sheriff of Lee
 8  Country, Florida,

 9      Defendant.
    ----------------------/
10
                        ZOOM DEPOSITION OF
11
                          DAWN HEIKKILA
12
                 TAKEN ON BEHALF OF PLAINTIFF
13

14
    DATE TAKEN:     Wednesday, October 11, 2023
15
    TIME:           10 a.m. to 11:15 a.m.
16
    PLACE:          All parties appeared via videoconference
17

18

19

20

21

22
            Examination of the witness taken before:
23
                        Julie S. Evans
24            Court Reporter and Notary Public

25
```

Deposition of Dawn Heikkila 30(b)(6)                    Jenna Clark v. Carmine Marceno

```
 1    APPEARANCES:

 2    KYLE T. MACDONALD, ESQUIRE (via Zoom)
      Derek Smith Law Group, PLLC
 3    520 Brickell Key Dr.
      Suite O-301
 4    Miami, Florida 33131

 5         On behalf of the Plaintiff.

 6    DAVID J. STEFANY, ESQUIRE (via Zoom)
      Allen Norton & Blue, P.A.
 7    324 South Hyde Park Avenue
      Suite 225
 8    Tampa, Florida 33606-4128

 9         On behalf of the Defendant.

10
                         - - - - -
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        EXAMINATION INDEX

2    ZOOM TESTIMONY OF DAWN HEIKKILA
            DIRECT BY MR. MACDONALD                          4
3
     CERTIFICATE OF OATH                                     44
4
     CERTIFICATE OF REPORTER                                 45
5

6

7                          EXHIBIT INDEX

     Plaintiff's
8     1      Notice of Taking Deposition                     7

9
                          - - - - -
10
                  S T I P U L A T I O N S
11
            It is hereby agreed and so stipulated by and
12
     between the parties hereto, through their respective
13
     counsel, that the reading and signing of the transcript
14
     are hereby waived.
15
                          - - - - -
16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2          THE COURT REPORTER:  Today is Wednesday,

3      October 11, 2023.  The time is approximately

4      10 a.m. this is the Zoom deposition of Dawn

5      Heikkila, being taken in the matter of Clark v.

6      Carmine Marceno, pending in the United States

7      District Court.  Will counsel please state their

8      appearance, beginning with Plaintiff's counsel.

9          MR. MACDONALD:  This is Kyle Mac Donald for the

10      Plaintiff, Jennifer Clark.

11          MR. STEFANY:  David Stefany, for Sheriff

12      Carmine Marceno.

13        THE COURT REPORTER:  Please raise your right

14      hand.  Do you solemnly swear or affirm your

15      testimony will be the truth, the whole truth,

16      nothing but the truth, so help you God?

17        THE WITNESS:  Yes, I do.

18    THEREUPON:

19                    DAWN HEIKKILA,

20    having first been duly sworn, testified as follows:

21                    DIRECT EXAMINATION

22    BY MR. MACDONALD:

23      Q.   Good morning.  My name is Kyle MacDonald, and I

24    represent Jenna Clark in her lawsuit against Carmine

25    Marceno in his official capacity as Sheriff of Lee

 1   County, Florida.  Thank you for being here today.

 2       A.   Sure, no problem.

 3       Q.   Can you please start by stating your full name,

 4   for the record.

 5       A.   Dawn Marie Heikkila.

 6       Q.   Have you ever been deposed before,

 7   Ms. Heikkila?

 8       A.   Yes, I have.

 9       Q.   And when were you deposed previously?

10       A.   It's been years, years ago.

11       Q.   Okay.  Even though you've been deposed before,

12   I'm just going to go over a few things so we're on the

13   same page.  Okay?

14       A.   Okay.

15       Q.   Do you understand that you've been placed under

16   oath and that you have the obligation to testify

17   truthfully today?

18       A.   Yes, I do.

19       Q.   And do you understand even though we are

20   conducting this deposition via Zoom, you have the same

21   -- sorry -- your testimony has the same force and effect

22   as if you were testifying in a court of law, before a

23   judge and jury?

24       A.   Yes, I do.

25       Q.   Now, the court reporter cannot transcribe

1  inaudible responses like a gesture or a shrug, so please

2  just make sure you respond clearly, just as you have

3  been.  Okay?

4       A.   Yes.

5       Q.   And the court reporter also cannot accurately

6  reflect our responses if we are speaking at the same

7  time, so I will wait until you finish your answer, and

8  I'd just ask that you wait until I finish my questions.

9  Okay?

10      A.   Okay.

11      Q.   Now, we want to ensure we're getting your best

12 testimony, so if you do not understand a question or

13 something seems confusing, just let me know and I can

14 try to rephrase the question for you.  Okay?

15      A.   Okay.

16      Q.   If you need to take a break at any point, to

17 get a glass of water, use the bathroom, anything like

18 that, just let me know, and we can go ahead and take a

19 break.  Okay?

20      A.   Okay.

21      Q.   Do you understand that you are here today to

22 testify on behalf of the Lee County Sheriff's Office?

23      A.   Yes.

24      Q.   And do you understand that your answers are

25 based not only on your personal knowledge but also all

1  knowledge known or reasonably available to the Lee

2  County Sheriff's Office?

3      A.   Yes.

4      Q.   And do you understand that your answers will be

5  binding on the Lee County Sheriff's Office?

6      A.   Yes.

7      Q.   I'm going to share my screen with you.  This

8  has been previously marked as Plaintiff's Exhibit 1.

9  Have you seen this document before?

10     A.   Yes.  (Document was scrolled through.)  Yes.

11     Q.   And are you prepared today to testify regarding

12  the topics listed in paragraphs 3 and 4?

13     A.   Yes.

14     Q.   And are you prepared to testify regarding the

15  topic listed in paragraph 11?

16     A.   Yes.

17     Q.   And are you prepared to testify regarding the

18  topics listed in paragraphs 16 through 24?  And I can

19  scroll.

20     A.   Yes.

21     Q.   And are you prepared to testify regarding the

22  topics listed in paragraphs 26 and 30?

23     A.   Yes.

24     Q.   Where are you conducting this deposition today

25  from?

1    A.    My home.

2    Q.    Is anyone else in the room with you?

3    A.    No.

4    Q.    Do you have any documents in front of you?

5    A.    Yes.

6    Q.    And what documents are those?

7    A.    The one you just showed me.

8    Q.    Any other documents, besides that deposition

9  notice?

10   A.    I have a notebook that I can take notes on, if

11 I need to; I have a couple of other letters that -- I

12 have a couple of other letters that I pulled up, you

13 know, that were pertaining to these numbers that I can

14 reference.

15   Q.    Okay.

16   A.    Or documents, whatever, yeah.

17   Q.    Can you tell me specifically which letters you

18 have?

19   A.    Oh, I have the letter that I sent to Jenna,

20 notifying her that we were -- of the Reduction in Force

21 and I have the subpoena notice and I have the Zoom link

22 notice.

23   Q.    What did you do to prepare for today's

24 deposition?

25   A.    I looked through this packet of questions that

1  you -- or that was sent to me, to familiarize myself in

2  what was going to be asked or what I needed to, you

3  know, be prepared for.

4      Q.   Did you speak with anyone besides the attorney

5  for the Lee County Sheriff's Office about your

6  deposition today?

7      A.   No.

8      Q.   Are you familiar with my client, Jenna Clark?

9      A.   Yes.

10     Q.   Do you know how long Jenna Clark worked at the

11 Lee County Sheriff's Office for?

12     A.   Twenty-plus years; I don't know the exact

13 number, offhand.

14     Q.   What position did Jenna Clark hold when she

15 left the Lee County Sheriff's Office?

16     A.   Director of purchasing.

17     Q.   And what did Ms. Clark do, as the director of

18 purchasing?

19     A.   She managed all the uniforms and all the

20 supplies that the Sheriff's Office needed, everything

21 that we purchased as an agency went through Purchasing;

22 and she held our warehousing, you know, of all the stock

23 that we kept on hand; that was her responsibility.

24     Q.   Any other duties you can think of, besides the

25 ones that you just described?

1    A.   I'm sure there are many, but not that I can

2  think of, in particular.

3    Q.   Did Jenna Clark receive any benefits as part of

4  her employment with Lee County Sheriff's Office?

5    A.   Yes.

6    Q.   What kind of benefits did Ms. Clark receive as

7  part of her employment?

8    A.   Aside from her salary, she would have received

9  sick, vacation, and personal time; health benefits/

10  health insurance; retirement benefits; those were all

11  provided for her.  And then, any other benefits she

12  choose to purchase she could have done that, as well.

13  There were additional things offered; I don't know if

14  she purchased them or not.

15    Q.   What were the different types of leave benefits

16  available to Ms. Clark?  I believe you mentioned a few

17  of those briefly.

18    A.   Paid leaves are sick, vacation, and personal.

19    Q.   You said those are sick, vacation, and

20  personal; correct?

21    A.   Correct.

22    Q.   How much sick leave was afforded to Ms. Clark,

23  as part of her employment?

24    A.   Over her entire career?  Or -- I don't

25  understand your question.

1    Q.   Let me rephrase.  So in the last year of Jenna

2  Clark's employment, how much sick leave was she

3  afforded, as an employee of Lee County Sheriff's Office?

4    A.   Can I look it up?  Because I don't have it in

5  my head.

6    Q.   In terms of looking it up, do you mean like a

7  policy handbook for the Lee County Sheriff's Office?

8    A.   Sure, yeah.  Because, you know, she accrues

9  different amounts of time based on her tenure.  So I

10  don't remember, anymore, the number of hours she would

11  have accrued per pay period for a twenty-year-plus

12  employee.

13    Q.   Okay.  So it depends on the length of service

14  for an employee of Lee County Sheriff's Office?

15    A.   Yes.  It increases as you -- I think it's ten

16  and twenty years, it increases; not personal, but sick

17  and vacation.

18    Q.   And what can the sick leave benefits be used

19  for?

20    A.   For their own personal sickness, for the

21  sickness of an immediate family member, to go to the

22  doctor, things like that.

23    Q.   And I know you said you can't recall the

24  specific amount of sick leave that Jenna Clark was

25  afforded.  But do you have any idea, generally, of what

1    the scale looks like, in terms of sick leave benefits

2    afforded to Lee County Sheriff's Office employees?

3        A.   I know that they accrue per paycheck; so every

4    time they get paid, they accrue additional hours in both

5    sick bay and personal time, depending on where they're

6    at in that tenure.

7        Q.   Does vacation time accrue in the same manner

8    that you just described?

9        A.   It does.

10       Q.   Do you recall how much vacation time Jenna

11   Clark was afforded during her last year of employment

12   with the Lee County Sheriff's Office?

13       A.   I do not.

14       Q.   Do you have any idea what the scale looks like,

15   generally, for vacation time afforded to employees of

16   Lee County Sheriff's Office?

17       A.   I don't understand that question, "scale."

18       Q.   So just speaking generally, in terms of the

19   vacation time that's afforded to Lee County Sheriff's

20   Office employees, do you have any idea what the range is

21   that's afforded to employees, in terms of the leave

22   that's given to them?

23       A.   Everybody accrues the same amount based on

24   their tenure; so every person, it would depend on their

25   years of service and where they fall in that, you know,

1    category.  So but everybody accrues the same, in terms

2    of that.

3        Q.   And what can vacation leave be used for?

4        A.   If it's requested and approved, it can be used

5    for basically anything someone wants to do, away from

6    the office.

7        Q.   How much personal leave time was afforded to

8    Jenna Clark during her last year of employment with Lee

9    County Sheriff's Office?

10       A.   Well, every civilian employee would receive 100

11   hours per year, and most of -- for the -- for most of

12   her career, it would have been 50 hours in January and

13   50 hours in July.  There were a number of years, in

14   between there, that they started doing just 100, you

15   know, all together.  But I don't recall what years those

16   were.  Either way, it would have been -- if she stayed

17   the entire year or if she was there just through July,

18   you know, it would have been 100, just like all the

19   other civilian employees.

20       Q.   And for each of these types of leave -- for the

21   sick leave, vacation leave, and personal leave -- what

22   is the request process, if an employee wants to use

23   those benefits?

24       A.   They would need to speak to their supervisor

25   and enter the request into the time keeping system, VCS.

 1      Q.    And that's for each of those three different
 2    types of leave?
 3      A.    Correct.
 4      Q.    Once an employee enters a request into VCS, who
 5    does that request go to, for approval?
 6      A.    Their immediate supervisor.
 7      Q.    Who would have Jenna Clark's requests have gone
 8    to, during her last year of employment with Lee County
 9    Sheriff's Office, in VCS?
10      A.    Annmarie Reno.
11      Q.    And you said, in addition to submitting the
12    request to VCS, an employee was also required to speak
13    with their supervisor regarding their request?
14      A.    Well, they would -- if they can't enter it,
15    let's say, because you're talking sick, vacation, and
16    personal, sometimes if someone is sick, they're not able
17    to enter in the VCS; that's when they would need to
18    speak to their supervisor.  They could just speak to
19    their supervisor, but it has to be entered in the VCS as
20    well, at some point.
21      Q.    Was Jenna Clark entitled to FMLA benefits, as
22    part of her employment with the Lee County Sheriff's
23    Office?
24      A.    Yes.
25      Q.    What was the process for Jenna Clark to use her

1   FMLA benefits, during the last year of her employment

2   with the Lee County Sheriff's Office?

3        A.   All she had to do was qualify.

4        Q.   And how does an employee qualify?

5        A.   By working 1250 hours in 12 months and having a

6   personal health condition that her doctor would certify

7   as qualifying.

8        Q.   And was Jenna Clark required to submit a

9   request to use her FMLA benefits?

10       A.   She was not required, no.

11       Q.   Did Jenna Clark need to inform anyone, if she

12  wanted to use her FMLA leave benefits?

13       A.   No.

14       Q.   Did Lee County Sheriff's Office have any kind

15  of FMLA policy in place regarding the use of those

16  benefits?

17       A.   Yes.

18       Q.   Can you tell me about those.

19       A.   Just that they exist and explaining to the

20  employees what the regulations are for FMLA, what's a

21  serious health condition, some guidelines on how they

22  can go about, you know, using those benefits.  Yeah,

23  just so they know it exists and that it's there for

24  them; who to contact, you know, your supervisor, HR,

25  Risk Management, things like that, if they want to do

1   that or need to or have questions, what have you.

2         Q.   Did Jenna Clark ever submit any FMLA requests

3   between 2018 and the last date of her employment?

4         A.   I believe she was on FMLA during the last

5   several years.  I don't recall if she actually submitted

6   a request or if she just notified her supervisor that

7   she needed, you know, to be out for a qualifying event.

8         Q.   If Ms. Clark did submit an FMLA leave request,

9   who would that go to in the Lee County Sheriff's Office?

10        A.   It could go to her supervisor; but, ultimately,

11  it would need to go to Risk Management.

12        Q.   And who in Risk Management would handle that

13  request?

14        A.   Well, over the years, there have been many

15  people; but in her last year, it would have been Amy

16  Hurts (ph).

17        Q.   And what was Amy Hurts' title, if you recall,

18  during that last year of Ms. Clark's employment?

19        A.   Risk management analyst, I believe.

20        Q.   Did Jenna Clark ever submit an FMLA leave

21  request to you, personally?

22        A.   No.  Not that I recall an official request, no.

23  We spoke about FMLA but, you know, not a document

24  requesting it.

25        Q.   When did you speak with Ms. Clark regarding

1  FMLA leave?

2     A.   Let's see if I have that date in front of me

3  with this -- I don't think I have that.  But I spoke

4  with her when she needed to go out for her last

5  qualifying event; I guess that would have been in 2021.

6     Q.   And was this a conversation in person, or was

7  this an email?

8     A.   It was -- it was not in person; it was over the

9  phone, and we emailed back and forth some.

10    Q.   And what did you discuss on the phone with

11 Ms. Clark?

12    A.   Well, in -- she had told Annmarie that she

13 needed to be out, and Annmarie had approved her time --

14 you know, her being away from the office; and then

15 Annmarie told her to touch base with me or with Risk

16 Management, to let us know, in case she needed to be out

17 longer than the initial 7 days that they had discussed.

18         And so she did that; she reached out to me, to

19 let me know that she was going to be out.  And I

20 discussed with her the number of days that she would be

21 out, which is what I would always do, to determine what

22 we needed to do on our end.  So that's it; I gave her

23 instructions on that, you know, and that was it.

24    Q.   Why did Annmarie Reno instruct Ms. Clark to

25 discuss with you regarding the FMLA leave?

1    A.   Just to make me aware that she was going to be

2    out and if there was potential -- if she needed to be

3    out longer, then we would have activated an FMLA leave

4    for her.  So I would monitor and, you know, make sure

5    she returned to work basically, within the amount of

6    time she said she was going to.

7    Q.   Now why would Annmarie Reno refer her to you,

8    as opposed to Risk Management?

9    A.   I can't answer that; maybe... I don't know, I'm

10   the director.  You know, it wasn't uncommon to say,

11   "Hey, get with Dawn, let her know; and then Dawn will

12   let her folks know, or Dawn will monitor."  I mean,

13   she's a director, I'm a director.  I can't answer for

14   Annmarie, but that's what I would assume.

15   Q.   Now, you also mentioned the number of days in

16   regards to Ms. Clark's FMLA leave requests.  What did

17   the number of days have to do with the requests?

18   A.   Just an internal practice that we had, that if

19   someone is going to be out 7 days or less, we didn't

20   require them -- you know, if we knew, if we were

21   familiar enough with their situation, they had shared

22   enough information with us that we knew it would be a

23   qualifying event; and/or we were willing to, you know,

24   approve the time away from work, with or without the

25   position certification, we wouldn't require them to do

1    all the paperwork involved in FMLA.  You know, 7 days,

2    by the time you get all that paperwork together, you're

3    back to work, so we didn't -- you know, when they're

4    sick or they're going through something already, we just

5    didn't feel it was necessary.

6          So it became an internal practice of ours, that

7    7 days or less, we felt that was a time that, if we had

8    enough information, we would just approve their leave

9    and let them take care of what they needed to take care

10   of.  And as long as they returned, then we wouldn't

11   require all the additional paperwork that FMLA involves.

12   Q.   And was that always the case if the leave were

13   for less than 7 days, or did it depend on the

14   circumstances of the employee?

15   A.   I mean, it always depends on what the employee

16   shares with you, as an employer.  If they share enough

17   information about their health condition that you have

18   no question about them being out, then -- and about the

19   FMLA, then, you know.  Or if you have -- if the

20   supervisor is just willing to approve the time away

21   because it's such a short amount of time.  Our policy

22   says a supervisor can approve up to three weeks without

23   upper level approval.  So, yeah, it's -- it's common

24   practice for us to do that without additional paperwork.

25   Q.   And for Jenna Clark, would that decision be

1    left up to you, or would it be left up to Annmarie Reno

2    as to whether that paperwork would be required?

3        A.   It was left up to me.

4        Q.   And did you require Ms. Clark to submit the

5    paperwork for that instance when she spoke to you about

6    leave?

7        A.   I did not.

8        Q.   And that was because the leave was for less

9    than 7 days?

10       A.   And because she shared with me enough

11   information about her health condition that I knew it

12   would qualify, and if she needed additional time, then

13   the FMLA would be applied.

14       Q.   If an employee takes leave for less than those

15   7 days, what is it classified as, in terms of leave

16   benefits?

17       A.   It depends on what the employee asks for and

18   what the situation is; you know, according to policy,

19   there are certain leaves that are sick leaves and

20   certain leaves that are other.  So if they shared enough

21   information with the supervisor and they followed

22   policy, that would dictate what kind of leave they were

23   using.

24       Q.   In that instance, when Jenna Clark spoke to you

25   regarding the leave request, what was that leave

1    classified as, if not FMLA leave?

2        A.   She spoke to me about her need to be away from

3    the office; she did not speak to me about what kind of

4    pay or what kind of leave she would use.  That would

5    have -- she did not speak to me about that.

6        Q.   Who would make the determination for Ms. Clark

7    as to what kind of leave that would be classified as?

8        A.   I suppose the person doing their time sheet; so

9    more than likely, that person and their immediate

10   supervisor is who has to approve it.

11       Q.   And in terms of what the leave could be

12   classified as, does it fall into those three categories

13   that we previously discussed: sick leave, vacation, or

14   personal time?

15       A.   If they have available to them those three, one

16   of those three times, then, yes, it could.  Mm-hm.

17       Q.   If an employee was to take leave under the FMLA

18   for less than 7 days, was there a limit on the amount of

19   time, let's say, that an employee could do that, or was

20   that discretionary with the supervisor?

21       A.   Was there a limit?  No.

22       Q.   What is "admin leave with pay"?

23       A.   It's something that the agency uses to pay an

24   employee to be out and where it does not involve using

25   any of their accrued time; paid by the agency,

 1  essentially.

 2      Q.   And when would admin leave with pay be used for

 3  an employee?

 4      A.   That could be used for anything that the

 5  sheriff wanted to use it for.

 6      Q.   And who determines if admin leave with pay

 7  could be used for an employee?

 8      A.   The sheriff or his designee.

 9      Q.   Do you know if Jenna Clark was ever placed on

10  admin leave with pay, from 2018 until the last date of

11  her employment?

12      A.   She was.

13      Q.   And do you recall when that was, roughly, that

14  she was placed on admin leave with pay?

15      A.   It was when we notified her of the Reduction in

16  Force.

17      Q.   And who made the decision to place Ms. Clark on

18  the admin leave with pay, at that time?

19      A.   You know, I'm not sure; I know who told me to

20  do it, but I'm not sure whose decision that would have

21  been.

22      Q.   And who told you to do that?

23      A.   Annmarie Reno.

24      Q.   Was this in person that Annmarie Reno asked you

25  to do that, or was this an email?

1      A.   It would have been over the phone.

2      Q.   Do you remember when that roughly was, that

3 phone call with Ms. Reno?

4      A.   It was the day before or the day of the letter

5 that was written; and so it looks like the letter -- I

6 have the letter here, August 15 of '21.

7      Q.   Is there a limit on the amount of admin leave

8 with pay that an employee can use?

9      A.   Not that I'm aware of.

10      Q.   Are you aware of any other instances where

11 Ms. Clark used admin leave with pay, besides that time

12 before she was sent the letter?

13      A.   No.

14      Q.   When you spoke with Ms. Reno regarding the

15 admin leave with pay, was anything else discussed on

16 that phone call?

17      A.   Just what she wanted me to put in the letter,

18 what was happening, and -- yes, what relevant

19 information I needed for notifying Jenna.

20      Q.   Did Jenna Clark receive any pension benefits,

21 as part of her employment with the Lee County Sheriff's

22 Office?

23      A.   She did.

24      Q.   Can you tell me about the pension benefits.

25      A.   Sure.  What do you need to know?

1      Q.   Well, what are the pension benefits of the Lee

2  County Sheriff's Office?

3      A.   Well, pension benefits are something that, once

4  you -- when you start working for an agency that, you

5  know, in the Florida pension system, you become -- and

6  once you've become -- gosh, the word.  Anyway, after a

7  period of time, like she did, you receive a benefit for

8  your lifetime; that's what the pension is.

9         And so a civilian, you know, there's a

10  multiplier involved, and it involves your salary, your

11  high five years of salary, and your -- and/or your age,

12  your number of years of service, things like that.  And

13  there's a calculation that is done by the Florida

14  Retirement System for -- to determine what your -- what

15  that dollar value would be; it's paid monthly for the

16  rest of your life.

17      Q.   And does the time at which an employee retires

18  impact the amount of pension benefits that are paid to

19  them?

20      A.   Does the what?

21      Q.   Does the amount of time or amount of years of

22  service that an employee has worked at the Lee County

23  Sheriff's Office impact the amount of pension benefits

24  that are paid to them?

25      A.   Yes.  Their years of service is part of the

1   multiplier.

2       Q.   And is there a certain length of time that

3   employees have to reach, to get the full pension

4   benefits?

5       A.   "Vesting" was the term that I was having a hard

6   time with; once they're vested, they own whatever

7   benefits they earn, and so, no.  I mean, once they're

8   vested, it's just, you apply that formula and that's how

9   your pension benefits are determined.

10      Q.   Do the pension benefits continue to increase

11  with years of service, or is there a cap, at some point,

12  in the amount of years of service that an employee has

13  worked?

14      A.   No.  That's part of the multiplier; that's part

15  of the formula, the years of service; so whatever that

16  number is, is applied to the formula.

17      Q.   Were you involved in administering pension

18  benefits at the Lee County Sheriff's Office?

19      A.   Well, involved in administering -- Florida

20  Retirement System is who administers the pension

21  benefits.

22      Q.   Did you have any involvement in employees using

23  the Florida Retirement System?

24      A.   I mean, they go directly to the Florida

25  Retirement System.  They have a log-in; they have a

Deposition of Dawn Heikkila 30(b)(6)                    Jenna Clark v. Carmine Marceno

1   phone number.  So I mean, they go directly to that.

2   They don't have to go through me.

3       Q.   Do you know if Ms. Clark was eligible for her

4   full pension benefits, when she left the Lee County

5   Sheriff's Office?

6           MR. STEFANY:  I'm going to object to the form.

7       You may answer it.

8           THE WITNESS:  She was vested.

9   BY MR. MACDONALD:

10      Q.   Vested, meaning that she was entitled to some

11  pension benefits?

12      A.   Correct.  Yes.

13      Q.   Would Ms. Clark have seen an increase in her

14  pension benefits if she had remained at the Lee County

15  Sheriff's Office?

16      A.   Yes.

17      Q.   Do you know if there are any penalties for

18  early retirement, under the Florida Retirement System?

19      A.   There are penalties for taking your pension,

20  for distribution, if you have not met the years of

21  service or the age requirement.

22      Q.   And do you know what the years of service

23  requirement was for the Lee County Sheriff's Office to

24  not have that penalty when you retire?

25      A.   For Jenna; correct?

1    Q.   Yes, for Jenna Clark.

2    A.   For Jenna, 30 years of service would have been

3  for her class of employee.

4    Q.   And you said there was an age requirement, as

5  well?

6    A.   It's an and/or; 30 years, or age 62, whichever

7  comes first.

8    Q.   And do you know what the penalty is if you do

9  not hit one of those two criteria when you retire?

10   A.   Yes.  The penalty is 5 percent a year -- let me

11  think; let me be sure.  5 percent a year for every year

12  that you leave prior to, yes.

13   Q.   Did Ms. Clark receive -- sorry, strike that.

14       Did Ms. Clark reach 30 years of service with

15  the Lee County Sheriff's Office, as required?

16   A.   She did not.

17   Q.   And Ms. Clark would have received a penalty

18  under the Florida Retirement System, as a result;

19  correct?

20   A.   If she would have separated employment and

21  drawn her pension, taken a distribution, then yes, the

22  formula would have involved a penalty.

23   Q.   Are you able to separate from employment with

24  the Lee County Sheriff's Office and not draw the

25  pension?

1    A.    You are, yes.

2    Q.    How does eligibility for that 30 years of

3  service work, if you're separated and don't draw the

4  pension?

5    A.    I think what you're asking is, how do you avoid

6  the penalty?

7    Q.    Yes.  Let's say you're separated, but you don't

8  draw the pension.

9    A.    You wait until you're age 62 to draw the

10  pension, and then there's no penalty.

11    Q.    Under those pension benefits, are you able to

12  work and have employment in, let's say, a different

13  position?

14    A.    What exactly do you mean?

15    Q.    So if an employee of the Lee County Sheriff's

16  Office was to draw their pension, are they able to have

17  employment?

18    A.    Yes.

19    Q.    During Ms. Clark's employment, was she ever

20  disciplined, as far as you're aware?

21    A.    I believe one time she might have -- I don't

22  know that I would call it discipline; I would call it,

23  maybe, counseling.  I'm not aware of any discipline, but

24  I believe it was maybe just a counseling session.

25    Q.    What do you recall about that counseling?

1    A.   Well, Annmarie was talking to me about it, and

2  it was just that she had to have a conversation with

3  Jenna regarding something that Jenna had done that had

4  upset one of her subordinates.

5    Q.   Do you remember, roughly, when this was?

6    A.   I do not... like, roughly, you know, last five

7  years.

8    Q.   Do you remember which subordinate was involved

9  in that situation that you just described?

10   A.   I do not know.

11   Q.   Did Annmarie Reno ever speak to you about any

12  other issues with Jenna Clark besides that counseling

13  instance?

14   A.   I don't think so, no.

15   Q.   How did you respond to Annmarie Reno when she

16  told you about that situation?

17   A.   I felt that she handled it correctly.

18   Q.   And how did Ms. Reno handle it?

19   A.   She had a conversation with Jenna and coached

20  her on what's appropriate to say or do, regarding

21  whatever the situation was.

22   Q.   And besides that instance that you described,

23  you're not aware of any other counseling or discipline

24  that was given to Ms. Clark; correct?

25   A.   I'd read a letter in her file, at some point,

1    where she -- where Annmarie counseled her, that had to

2    do with destruct -- getting rid of old uniforms and a

3    directive that Annmarie had given her and Jenna didn't

4    follow.

5        Q.    When did you read that letter or document?

6        A.    When going through the information I had for

7    this -- you know, preparing for this deposition; just

8    recently.

9        Q.    Was that the first time you saw that letter?

10       A.    Yes.

11       Q.    Had Annmarie Reno ever discussed that incident

12   with you, prior to you reading that letter?

13       A.    No.

14       Q.    Do you remember if that letter included the

15   dates of when that incident occurred?

16       A.    It did.

17       Q.    And do you remember, roughly, when it was?

18       A.    Roughly, it would have been -- I think we

19   restructured that unit in, maybe, 2020; so it was when

20   we restructured the voice unit.  So I think it would

21   have been in maybe '19 or '20.  I didn't really pay

22   attention to the date.

23       Q.    Who was responsible for evaluating Ms. Clark's

24   job performance?

25       A.    Her supervisor, Annmarie Reno.

1    Q.   Do you remember when Ms. Clark was notified of

2    her termination from the Lee County Sheriff's Office?

3    A.   Well, I wrote the letter to her, August 15 of

4    2021, and that was when she was instructed that her

5    position was being eliminated.  And so, in that letter,

6    she was given a deadline.

7    Q.   And what was that deadline?

8    A.   It was September 3rd of 2021.

9    Q.   And what did Ms. Clark have to do by that

10   deadline?

11   A.   She had to decide if she was going to retire or

12   if she was going to continue employment, like with

13   another job, by applying for another job.  I should say,

14   if she was going to separate employment; she didn't

15   actually have to take the distribution and retire, but

16   she could.

17   Q.   And you said that you wrote that letter;

18   correct?

19   A.   Yes.

20   Q.   And were you instructed to write that letter?

21   A.   Yes.

22   Q.   Were you instructed by Annmarie Reno?

23   A.   Yes.

24   Q.   What did Annmarie Reno say to you, when she

25   instructed you to write the letter?

1    A.   She told me to notify Jenna, she told me when

2  the dates were going to be, and she told me how she was

3  going to be handled regarding her -- the administrative

4  leave, her pay.

5    Q.   Was that the first time that you learned that

6  Jenna Clark's position was being eliminated?

7    A.   Yes.

8    Q.   What was your reaction when you learned that

9  Jenna Clark's position was being eliminated?

10    A.   I said, okay, and, you know, needed to know the

11  details of the responsibilities of my position.

12    Q.   Did Annmarie Reno tell you why Jenna Clark's

13  position was being eliminated?

14    A.   She said it was part of our Reduction in Force.

15    Q.   Is that the first time that you had learned

16  that a Reduction in Force was being conducted by the Lee

17  County Sheriff's Office?

18    A.   No.

19    Q.   When did you learn that -- first learn that a

20  Reduction in Force was being conducted by the Lee County

21  Sheriff's Office?

22    A.   It was happening for several years, when

23  Sheriff Marceno took over; so I don't know how long

24  after he took over, but it was during his tenure as

25  sheriff.

1    Q.   Did Annmarie Reno ask you to draft a similar

2  letter for any other employees at the Lee County

3  Sheriff's Office?

4    A.   I would have to say, yes.  I didn't always

5  report to Annmarie Reno, but I was -- I drafted others,

6  whether Ann -- so whether it was Annmarie that asked or

7  whoever my supervisor asked; this wasn't the first

8  letter I'd drafted.

9    Q.   Did you draft any other letters related to the

10  Reduction in Force in 2021?

11    A.   I believe so.  I believe in 2021, there were

12  others that I did.  I don't recall how many.

13    Q.   Did you ever draft a letter related to the

14  Reduction in Force for Anthony Ramsey?

15    A.   No.  No, I don't recall that name being one of

16  the letters I did.

17    Q.   Did you ever draft a letter related to the

18  Reduction in Force for Amy Delaquilla?

19    A.   No.  I don't recall that one either.

20    Q.   Did you ever write a letter related to a

21  Reduction in Force for Jamie Bartz?

22    A.   No.

23    Q.   Did you ever write a letter related to the

24  Reduction in Force for Marcia Sprankel?

25    A.   No, I don't think so.

1    Q.   Did you ever write a letter related to the

2    Reduction in Force for James Jones?

3    A.   James Jones... I think James Jones still works

4    there, so I guess that answer would be no.

5    Q.   So, no, you do not recall writing a letter

6    related to the Reduction in Force for James Jones?

7    A.   No.

8    Q.   Did you send that letter to Ms. Clark?

9    A.   I did, yes.

10   Q.   How did you send it to her?

11   A.   I would have mailed it; I might have even

12   emailed it to her.  Because I remember speaking with her

13   about it, so I might have emailed it to her.  But I know

14   I would have sent it through U.S. Mail.

15   Q.   And you said you spoke with Ms. Clark about the

16   letter, as well?

17   A.   I did.

18   Q.   And when did you speak with Ms. Clark about the

19   letter?

20   A.   When we were talking about other jobs or what

21   her options -- she was asking, you know, what her

22   options were; I remember having a conversation with her

23   about what she was going to do.  She was trying to

24   decide.

25   Q.   And did you initiate that phone call, or did

1  Ms. Clark initiate that phone call?

2      A.   I don't recall.  I don't want to guess.  I

3  don't really remember.

4      Q.   What was the purpose of that phone call with

5  Ms. Clark after you sent the letter?

6      A.   Well, I -- I believe that my discussions with

7  Jenna all -- after Annmarie notified her of what was

8  happening, all revolved around her -- what her options

9  were going forward and her benefits and things like

10  that; she was asking questions, and I was answering

11  them.

12      Q.   Did you explain to Ms. Clark what options were

13  available to her?

14      A.   I answered questions for her that she had; I

15  wouldn't say that I went into a full explanation of all

16  her options.  But I was there answering her questions.

17      Q.   Do you remember what specifically Ms. Clark

18  asked you on that call?

19      A.   She was asking about other positions that were

20  open that she could apply for, and she was asking about

21  her health benefits if she chose to separate; I recall

22  her asking about her sick, vacation, and personal -- or

23  accrued time, if she chose to take another -- you know,

24  apply for another job, a different job than what she

25  had.  That's all I really remember talking about.

1    Q.   And you said you did not discuss the full

2    options that may be available to her; correct?

3    A.   I discussed how she -- I gave her information

4    as to how she would get that information; you know, I

5    gave her -- I instructed her to contact Florida

6    Retirement System; I would have given her the

7    information on who to call to gather the information.  I

8    did that.  I did not provide the details to her,

9    directly.  I wanted her to educate herself on all of her

10   options, so she could make the best choice.

11   Q.   If Ms. Clark did not choose to retire early,

12   what would happen to her position at the Lee County

13   Sheriff's Office, based on the letter that you wrote?

14        MR. STEFANY:  Object to the form of the

15        question.  You may answer it.

16        THE WITNESS:  Well, her position was being

17        eliminated, and that didn't have anything to do

18        with what she chose to do later.

19   BY MR. MACDONALD:

20   Q.   What do you mean by that?

21   A.   You know, it was being eliminated, whether --

22   and then, after that, what Jenna chooses to do, whether

23   she decides to take another job or to separate

24   employment, whether she chooses to take a distribution

25   with her pension; those all were things that Jenna had

1    to decide.  But the position, itself, was being

2    eliminated, regardless of that.

3         Q.    Meaning that Ms. Clark's current position would

4    no longer be available, regardless of what she chose;

5    correct?

6         A.    Correct.

7         Q.    Did Ms. Clark discuss potential penalties for

8    early retirement with you, on that phone call?

9         A.    I remember discussing that, her asking about

10   penalties, yes.  And that's when I was referring her to

11   the Florida Retirement System and -- but, yes, she did

12   mention penalties.

13        Q.    And on that phone call with Jenna Clark, she

14   also asked you about other positions at the Lee County

15   Sheriff's Office that she could apply for?

16        A.    Yes.  I don't know if it was the phone call or

17   the in-person but, yes, we had that conversation.

18        Q.    And what did you say, when she asked you about

19   that?

20        A.    I told her the positions that were open at that

21   time.  I recall there being one or two; communications

22   operator was one that we talked about that she would

23   have been able to do.  There might have been an auto

24   mechanic, if I remember correctly.

25        Q.    Do you remember if you spoke to Ms. Clark

1   regarding the pay rates for those positions?

2       A.   I did speak to her about the pay rates for

3   communications operator.

4       Q.   Do you remember what that pay rate was?

5       A.   I don't remember the exact amount, no.

6       Q.   Was it more or less than Jenna Clark was making

7   in her last role with the Lee County Sheriff's Office?

8       A.   It was less.

9       Q.   Was that also true for the auto mechanic

10  position?

11      A.   You know, I don't know that we discussed the

12  auto mechanic that far.  You had to qualify for the

13  position so, you know, it wouldn't have been one that we

14  pursued that far.

15      Q.   What were the qualifications for the auto

16  mechanic position?

17      A.   I mean, you had to know how to work on cars and

18  have experience working on cars.  I don't recall the

19  details, but I do know that that was one that -- the

20  only one Jenna thought that she would have shown any

21  interest in was the communications, so that's the one we

22  talked about.

23      Q.   What is an academy position?

24      A.   Academy?  It's a schooling for law enforcement

25  and corrections officers.

1   Q.   Was Ms. Clark eligible to apply for any academy

2   positions, at the time of her position being eliminated?

3   A.   She could have, yeah.

4   Q.   And you said you have to be certified to have

5   an academy position; is that correct?

6   A.   No.  That's how you get certified; you have to

7   go to the academy, in order to obtain -- in order to sit

8   for the state exam, you have to successfully complete

9   the academy, and then sit for a state exam to become

10  certified.

11  Q.   Was Ms. Clark certified, at the time her

12  position was eliminated?

13  A.   No.

14  Q.   So unless Ms. Clark obtained additional

15  education and training, she was not eligible to apply

16  for any academy positions?

17  A.   She was eligible to apply for academy; she

18  wasn't eligible to actually do a law enforcement

19  officer's job, until she graduated and passed the state

20  exam.  That's what the purpose of an academy was for.

21  Q.   Did you discuss the responsibilities of a

22  communications call taker with Ms. Clark, when you spoke

23  with her?

24  A.   No.

25  Q.   Did you discuss any of the specifics regarding

1    that position with Ms. Clark?

2         A.   Other than pay, no.

3         Q.   Did you tell Ms. Clark that any of the

4    positions required memory or attention to detail?

5         A.   No.

6         Q.   Are you familiar with the position of

7    communications call taker, generally?

8         A.   Yes.

9         Q.   And what does that position do with the Lee

10   County Sheriff's Office?

11        A.   They answer the phones and talk to people;

12   9-1-1 calls, general calls to the Sheriff's Office,

13   things like that.

14        Q.   At the time of your phone call with Ms. Clark,

15   did you believe that she was qualified for the position

16   of communications call taker?

17        A.   Yes.

18        Q.   And at the time of your phone call with

19   Ms. Clark, did you believe that she was qualified for

20   the position of automotive mechanic?

21        A.   No.

22        Q.   Did you encourage Ms. Clark to apply to either

23   position, the communications call taker or automotive

24   mechanic?

25        A.   I did encourage her to apply for the call taker

1    position, yes.

2        Q.   If Ms. Clark chose to apply for the

3    communications call taker position, what would that

4    process have entailed?

5        A.   She would have had an interview with the

6    management team over in Communications, and they would

7    have evaluated her for her ability to perform that job

8    and determine if she was a good fit for that job; they

9    would have made her an offer for that position, and we

10   would have hired her for that position.

11       Q.   Would Ms. Clark's accrued vacation or sick

12   leave time have been affected if she had taken the role

13   of communications call taker?

14       A.   She would have still had it; she would have

15   still had all that time, yeah.

16       Q.   So it would not be impacted, if she had taken

17   the communications call taker role?

18       A.   Her accrual ranks would have remained the same,

19   regardless of her position; they follow you as a person,

20   whatever position you're in.

21       Q.   Besides your conversation with Ms. Clark via

22   phone, were there any other communications with

23   Ms. Clark regarding the positions that were available

24   for her to apply to?

25       A.   Like I said, she sat in my office, at some

1   point, and we had a face-to-face conversation; other

2   than that, I think, no, that's it.

3        Q.   Did you discuss anything else with Ms. Clark,

4   when you spoke to her in person on that occasion?

5        A.   Not that I recall.

6        Q.   If Ms. Clark chose to apply and received the

7   position for communications call taker, would that

8   impact her pension benefits?

9        A.   Yes.

10       Q.   How would they be impacted?

11       A.   Well, she would have continued to earn years of

12   service, so they would have gone up; the multiplier

13   would have been affected by the years of service.

14       Q.   Do you know what Ms. Clark ultimately decided

15   to do in terms of her options for employment, after you

16   spoke with her?

17       A.   I do.

18       Q.   And what did Ms. Clark do?

19       A.   She chose to separate employment.

20       Q.   And how do you know that?

21       A.   She told me, and I saw the paperwork come

22   through for her to do that.

23       Q.   When did she tell you that she was choosing to

24   retire early?

25       A.   In that in-person -- in that face-to-face

1   conversation, she indicated that that was what she was

2   going to do.  She wasn't -- she wasn't really interested

3   in doing the communications job; she indicated that that

4   was not something she wanted to do.

5       Q.   Did she tell you why she did not want that

6   position, communications call taker?

7       A.   No, I don't believe she did.  I don't think she

8   elaborated on that; she just said no.

9       Q.   Did you speak with Ms. Clark after that

10  conversation in person with her?

11      A.   I don't -- I don't recall any specific

12  conversations or the time frames.  I really don't

13  remember if I talked to her again.

14          MR. MACDONALD:  So those are all the questions

15      I have for you in your capacity representing the

16      Lee County Sheriff's Office.  Mr. Stefany may have

17      some questions for you.

18          MR. STEFANY:  I don't have any questions for

19      the witness at this time.

20          MR. MACDONALD:  We will suspend the deposition

21      at 11:15.

22          (Thereupon, the deposition was terminated at

23  11:15 a.m.)

24

25

1                          CERTIFICATE OF OATH

2      STATE OF FLORIDA    )
       COUNTY OF ORANGE    )
3
               I, Julie S. Evans, Professional Court Reporter,
4
       Notary Public, State of Florida, certify that DAWN
5
       HEIKKILA appeared before me via Zoom on October 11,
6
       2023, and was duly sworn.
7
               Witness my hand and official seal this 28th day
8
       of December 2023.
9

10

11                                              Notary Public State of Florida
                                                Julie Evans
12         _Julie Evans_                        My Commission GG 939756
                                                Expires 01/21/2024
13         JULIE S. EVANS
           Professional Court Reporter
14         Notary Public, State of Florida
           My Commission No. GG939756
15         Expires:  1/21/2024

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF REPORTER

 2    STATE OF FLORIDA   )
      COUNTY OF ORANGE   )
 3
              I, Julie S. Evans, Professional Court Reporter,
 4
      do hereby certify that I was authorized to and did
 5
      stenographically report the deposition of DAWN HEIKKILA;
 6
      that a review of the transcript was not requested; and
 7
      that the foregoing transcript, page number 1 through 43,
 8
      is a true and complete record of my stenographic notes.
 9

10            I further certify that I am not a relative,

11    employee, attorney, or counsel of any of the parties,

12    nor am I a relative or employee of any of the parties'

13    attorneys or counsel connected with the action, nor am I

14    financially interested in the action.

15            Dated this 28th day of December 2023.

16

17

18    _____
                                    Julie S. Evans
19                                  Professional Court Reporter

20

21

22

23

24

25
```

Deposition of Dawn Heikkila 30(b)(6)                                    Jenna Clark v. Carmine Marceno

**WORD INDEX**

**< 1 >**
**1**  3:*8*  7:*8*  45:*2*
**1/21/2024**  44:*13*
**10**  1:*9*  4:*4*
**100**  13:*10, 14, 18*
**11**  1:*9*  4:*3*  7:*15*
  44:*2*
**11:15**  1:*9*  43:*21, 23*
**12**  15:*5*
**1250**  15:*5*
**15**  23:*6*  31:*3*
**16**  7:*18*
**19**  30:*21*

**< 2 >**
**2:22-cv-614-SPC-**
**NPM**  1:*5*
**20**  30:*21*
**2018**  16:*3*  22:*10*
**2020**  30:*19*
**2021**  17:*5*  31:*4, 8*
  33:*10, 11*
**2023**  1:*9*  4:*3*  44:*2*
  45:*14*
**21**  23:*6*
**225**  2:*7*
**24**  7:*18*
**26**  7:*22*
**28th**  44:*2*  45:*14*

**< 3 >**
**3**  7:*12*
**30**  7:*22*  27:*2, 6, 14*
  28:*2*
**324**  2:*7*
**33131**  2:*4*
**33606-4128**  2:*8*
**3rd**  31:*8*

**< 4 >**
**4**  3:*2*  7:*12*
**43**  45:*2*
**44**  3:*2*
**45**  3:*2*

**< 5 >**
**5**  27:*10, 11*

**50**  13:*12, 13*
**520**  2:*3*

**< 6 >**
**62**  27:*6*  28:*9*

**< 7 >**
**7**  3:*8*  17:*17*  18:*19*
  19:*1, 7, 13*  20:*9, 15*
  21:*18*

**< 9 >**
**9-1-1**  40:*12*

**< A >**
**a.m**  1:*9*  4:*4*  43:*23*
**ability**  41:*7*
**able**  14:*16*  27:*23*
  28:*11, 16*  37:*23*
**academy**  38:*23, 24*
  39:*1, 5, 7, 9, 16, 17, 20*
**accrual**  41:*18*
**accrue**  12:*3, 4, 7*
**accrued**  11:*11*  21:*25*
  35:*23*  41:*11*
**accrues**  11:*8*  12:*23*
  13:*1*
**accurately**  6:*5*
**action**  45:*13, 14*
**activated**  18:*3*
**addition**  14:*11*
**additional**  10:*13*
  12:*4*  19:*11, 24*  20:*12*
  39:*14*
**admin**  21:*22*  22:*2, 6,*
  *10, 14, 18*  23:*7, 11, 15*
**administering**  25:*17,*
  *19*
**administers**  25:*20*
**administrative**  32:*3*
**affirm**  4:*14*
**afforded**  10:*22*  11:*3,*
  *25*  12:*2, 11, 15, 19, 21*
  13:*7*
**age**  24:*11*  26:*21*
  27:*4, 6*  28:*9*
**agency**  9:*21*  21:*23,*
  *25*  24:*4*
**ago**  5:*10*

**agreed**  3:*8*
**ahead**  6:*18*
**Allen**  2:*6*
**amount**  11:*24*  12:*23*
  18:*5*  19:*21*  21:*18*
  23:*7*  24:*18, 21, 23*
  25:*12*  38:*5*
**amounts**  11:*9*
**Amy**  16:*15, 17*  33:*18*
**analyst**  16:*19*
**and/or**  18:*23*  24:*11*
  27:*6*
**Ann**  33:*6*
**Annmarie**  14:*10*
  17:*12, 13, 15, 24*  18:*7,*
  *14*  20:*1*  22:*23, 24*
  29:*1, 11, 15*  30:*1, 3,*
  *11, 25*  31:*22, 24*
  32:*12*  33:*1, 5, 6*  35:*7*
**answer**  6:*7*  18:*9, 13*
  26:*7*  34:*4*  36:*15*
  40:*11*
**answered**  35:*14*
**answering**  35:*10, 16*
**answers**  6:*24*  7:*4*
**Anthony**  33:*14*
**anymore**  11:*10*
**Anyway**  24:*6*
**appearance**  4:*8*
**APPEARANCES**  2:*1*
**appeared**  1:*9*  44:*2*
**applied**  20:*13*  25:*16*
**apply**  25:*8*  35:*20, 24*
  37:*15*  39:*1, 15, 17*
  40:*22, 25*  41:*2, 24*
  42:*6*
**applying**  31:*13*
**appropriate**  29:*20*
**approval**  14:*5*  19:*23*
**approve**  18:*24*  19:*8,*
  *20, 22*  21:*10*
**approved**  13:*4*  17:*13*
**approximately**  4:*3*
**Aside**  10:*8*
**asked**  9:*2*  22:*24*
  33:*6, 7*  35:*18*  37:*14,*
  *18*
**asking**  28:*5*  34:*21*
  35:*10, 19, 20, 22*  37:*9*

**asks**  20:*17*
**assume**  18:*14*
**attention**  30:*22*  40:*4*
**attorney**  9:*4*  45:*11*
**attorneys**  45:*13*
**August**  23:*6*  31:*3*
**authorized**  45:*2*
**auto**  37:*23*  38:*9, 12,*
  *15*
**automotive**  40:*20, 23*
**available**  7:*1*  10:*16*
  21:*15*  35:*13*  36:*2*
  37:*4*  41:*23*
**Avenue**  2:*7*
**avoid**  28:*5*
**aware**  18:*1*  23:*9, 10*
  28:*20, 23*  29:*23*

**< B >**
**back**  17:*9*  19:*3*
**Bartz**  33:*21*
**base**  17:*15*
**based**  6:*25*  11:*9*
  12:*23*  36:*13*
**basically**  13:*5*  18:*5*
**bathroom**  6:*17*
**bay**  12:*5*
**beginning**  4:*8*
**BEHALF**  1:*9*  2:*5, 9*
  6:*22*
**believe**  10:*16*  16:*4,*
  *19*  28:*21, 24*  33:*11*
  35:*6*  40:*15, 19*  43:*7*
**benefit**  24:*7*
**benefits**  10:*3, 6, 9, 10,*
  *11, 15*  11:*18*  12:*1*
  13:*23*  14:*21*  15:*1, 9,*
  *12, 16, 22*  20:*16*
  23:*20, 24*  24:*1, 3, 18,*
  *23*  25:*4, 7, 9, 10, 18,*
  *21*  26:*4, 11, 14*  28:*11*
  35:*9, 21*  42:*8*
**best**  6:*11*  36:*10*
**binding**  7:*5*
**Blue**  2:*6*
**break**  6:*16, 19*
**Brickell**  2:*3*
**briefly**  10:*17*

Deposition of Dawn Heikkila 30(b)(6)                                    Jenna Clark v. Carmine Marceno

< C >
calculation   24:*13*
call   23:*3, 16*   28:22
   34:25   35:*1, 4, 18*
   36:7   37:*8, 13, 16*
   39:22   40:*7, 14, 16, 18,*
   *23, 25*   41:*3, 13, 17*
   42:7   43:6
calls   40:*12*
cap   25:*11*
capacity   1:7   4:25
   43:*15*
care   19:9
career   10:24   13:*12*
CARMINE   1:5   4:6,
   *12, 24*
cars   38:*17, 18*
CASE   1:5   17:*16*
   19:*12*
categories   21:*12*
category   13:*1*
certain   20:*19, 20*
   25:2
CERTIFICATE   3:2
   44:*1*   45:*1*
certification   18:*25*
certified   39:*4, 6, 10,*
   *11*
certify   15:6   44:2
   45:*2, 10*
choice   36:*10*
choose   10:*12*   36:*11*
chooses   36:22, *24*
choosing   42:*23*
chose   35:*21, 23*
   36:*18*   37:4   41:2
   42:*6, 19*
circumstances   19:*14*
civilian   13:*10, 19*
   24:9
CLARK   1:*1*   4:*5, 10,*
   *24*   9:*8, 10, 14, 17*
   10:*3, 6, 16, 22*   11:24
   12:*11*   13:8   14:2*1, 25*
   15:*8, 11*   16:*2, 8, 20,*
   *25*   17:*11, 24*   19:25
   20:*4, 24*   21:6   22:9,
   *17*   23:*11, 20*   26:*3, 13*
   27:*1, 13, 14, 17*   29:*12,*
   *24*   31:*1, 9*   34:*8, 15,*

18   35:*1, 5, 12, 17*
   36:*11*   37:*7, 13, 25*
   38:6   39:*1, 11, 14, 22*
   40:*1, 3, 14, 19, 22*
   41:*2, 21, 23*   42:*3, 6,*
   *14, 18*   43:9
Clark's   11:2   14:7
   16:*18*   18:*16*   28:*19*
   30:*23*   32:*6, 9, 12*
   37:*3*   41:*11*
class   27:*3*
classified   20:*15*   21:*1,*
   *7, 12*
clearly   6:2
client   9:*8*
coached   29:*19*
come   42:2*1*
comes   27:7
Commission   44:*13*
common   19:*23*
communications
   37:*21*   38:*3, 21*   39:22
   40:*7, 16, 23*   41:*3, 6,*
   *13, 17, 22*   42:7   43:*3,*
   *6*
complete   39:*8*   45:2
condition   15:*6, 21*
   19:*17*   20:*11*
conducted   32:*16, 20*
conducting   5:20   7:24
confusing   6:*13*
connected   45:*13*
contact   15:*24*   36:5
continue   50:*10*   31:*12*
continued   42:*11*
conversation   17:6
   29:*2, 19*   34:22   37:*17*
   41:2*1*   42:*1*   43:*1, 10*
conversations   43:*12*
correct   10:2*0, 21*
   14:*3*   26:*12, 25*   27:*19*
   29:*24*   31:*18*   36:2
   37:*5, 6*   39:5
corrections   38:*25*
correctly   29:*17*   37:*24*
counsel   3:8   4:*7, 8*
   45:*11, 13*
counseled   30:*1*
counseling   28:*23, 24,*

25   29:*12, 23*
Country   1:*8*
County   5:*1*   6:22
   7:*2, 5*   9:*5, 11, 15*
   10:*4*   11:*3, 7, 14*   12:*2,*
   *12, 16, 19*   13:9   14:*8,*
   *22*   15:*2, 14*   16:9
   23:2*1*   24:*2, 22*   25:*18*
   26:*4, 14, 23*   27:*15, 24*
   28:*15*   31:2   32:*17, 20*
   33:2   36:*12*   37:*14*
   38:7   40:*10*   43:*16*
   44:2   45:2
couple   8:*11, 12*
COURT   1:*1, 24*   4:*2,*
   *7, 13*   5:*22, 25*   6:5
   44:*2, 12*   45:*2, 19*
criteria   27:9
current   37:*3*

< D >
DATE   1:9   16:*3*
   17:2   22:*10*   30:22
Dated   45:*14*
dates   30:*15*   32:2
DAVID   2:6   4:*11*
DAWN   1:9   3:2   4:*4,*
   *19*   5:*5*   18:*11, 12*
   44:2   45:2
day   23:*4*   44:2   45:*14*
days   17:*17, 20*   18:*15,*
   *17, 19*   19:*1, 7, 13*
   20:*9, 15*   21:*18*
deadline   31:*6, 7, 10*
December   44:2   45:*14*
decide   31:*11*   34:24
   37:*1*
decided   42:*14*
decides   36:*23*
decision   19:*25*   22:*17,*
   *20*
Defendant   1:9   2:9
Delaquilla   33:*18*
depend   12:24   19:*13*
depending   12:*5*
depends   11:*3*   19:*15*
   20:*17*
deposed   5:*6, 9, 11*
DEPOSITION   1:9
   3:8   4:*4*   5:*20*   7:24

8:*8, 24*   9:6   30:*7*
   43:2*0, 22*   45:2
Derek   2:*2*
described   9:*25*   12:*8*
   29:*9, 22*
designee   22:*8*
destruct   30:*2*
detail   40:*4*
details   32:*11*   36:*8*
   38:*19*
determination   21:*6*
determine   17:2*1*
   24:*14*   41:*8*
determined   25:*9*
determines   22:*6*
dictate   20:*22*
different   10:*15*   11:*9*
   14:*1*   28:*12*   35:*24*
DIRECT   3:2   4:2*1*
directive   30:*3*
directly   25:*24*   26:*1*
   36:*9*
Director   9:*16, 17*
   18:*10, 13*
discipline   28:*22, 23*
   29:*23*
disciplined   28:2*0*
discretionary   21:2*0*
discuss   17:*10, 25*
   36:*1*   37:*7*   39:*21, 25*
   42:*3*
discussed   17:*17, 20*
   21:*13*   23:*15*   30:*11*
   36:*3*   38:*11*
discussing   37:*9*
discussions   35:*6*
distribution   26:2*0*
   27:2*1*   31:*15*   36:*24*
DISTRICT   1:*1*   4:*7*
doctor   11:*22*   15:*6*
document   7:*9, 10*
   16:*23*   30:*5*
documents   8:*4, 6, 8,*
   *16*
doing   13:*14*   21:*8*
   43:*3*
dollar   24:*15*
Donald   4:*9*
Dr   2:*3*

**draft** 33:*1, 9, 13, 17*
**drafted** 33:*5, 8*
**draw** 27:*24* 28:*3, 8, 9, 16*
**drawn** 27:*21*
**duly** 4:*20* 44:*2*
**duties** 9:*24*

**< E >**
**early** 26:*18* 36:*11* 37:*8* 42:*24*
**earn** 25:*7* 42:*11*
**educate** 36:*9*
**education** 39:*15*
**effect** 5:*21*
**Either** 13:*16* 33:*19* 40:*22*
**elaborated** 43:*8*
**eligibility** 28:*2*
**eligible** 26:*3* 39:*1, 15, 17, 18*
**eliminated** 31:*5* 32:*6, 9, 13* 36:*17, 21* 37:*2* 39:*2, 12*
**email** 17:*7* 22:*25*
**emailed** 17:*9* 34:*12, 13*
**employee** 11:*3, 12, 14* 13:*10, 22* 14:*4, 12* 15:*4* 19:*14, 15* 20:*14, 17* 21:*17, 19, 24* 22:*3, 7* 23:*8* 24:*17, 22* 25:*12* 27:*3* 28:*15* 45:*11, 12*
**employees** 12:*2, 15, 20, 21* 13:*19* 15:*20* 25:*3, 22* 33:*2*
**employer** 19:*16*
**employment** 10:*4, 7, 23* 11:*2* 12:*11* 13:*8* 14:*8, 22* 15:*1* 16:*3, 18* 22:*11* 23:*21* 27:*20, 23* 28:*12, 17, 19* 31:*12, 14* 36:*24* 42:*15, 19*
**encourage** 40:*22, 25*
**enforcement** 38:*24* 39:*18*
**ensure** 6:*11*

**entailed** 41:*4*
**enter** 13:*25* 14:*14, 17*
**entered** 14:*19*
**enters** 14:*4*
**entire** 10:*24* 13:*17*
**entitled** 14:*21* 26:*10*
**ESQUIRE** 2:*2, 6*
**essentially** 22:*1*
**evaluated** 41:*7*
**evaluating** 30:*23*
**Evans** 1:*9* 44:*2, 11* 45:*2, 18*
**event** 16:*7* 17:*5* 18:*23*
**Everybody** 12:*23* 13:*1*
**exact** 9:*12* 38:*5*
**exactly** 28:*14*
**exam** 39:*8, 9, 20*
**Examination** 1:*9* 3:*1* 4:*21*
**EXHIBIT** 3:*2* 7:*8*
**exist** 15:*19*
**exists** 15:*23*
**experience** 38:*18*
**Expires** 44:*13*
**explain** 35:*12*
**explaining** 15:*19*
**explanation** 35:*15*

**< F >**
**face-to-face** 42:*1, 25*
**fall** 12:*25* 21:*12*
**familiar** 9:*8* 18:*21* 40:*6*
**familiarize** 9:*1*
**family** 11:*21*
**far** 28:*20* 38:*12, 14*
**feel** 19:*5*
**felt** 19:*7* 29:*17*
**file** 29:*25*
**financially** 45:*14*
**finish** 6:*7, 8*
**first** 4:*20* 27:*7* 30:*9* 32:*5, 15, 19* 33:*7*
**fit** 41:*8*
**five** 24:*11* 29:*6*
**FLORIDA** 1:*1, 8* 2:*4, 8* 5:*1* 24:*5, 13* 25:*19, 23, 24* 26:*18*

27:*18* 36:*5* 37:*11* 44:*2, 12* 45:*2*
**FMLA** 14:*21* 15:*1, 9, 12, 15, 20* 16:*2, 4, 8, 20, 23* 17:*1, 25* 18:*3, 16* 19:*1, 11, 19* 20:*13* 21:*1, 17*
**folks** 18:*12*
**follow** 30:*4* 41:*19*
**followed** 20:*21*
**follows** 4:*20*
**force** 5:*21* 8:*20* 22:*16* 32:*14, 16, 20* 33:*10, 14, 18, 21, 24* 34:*2, 6*
**foregoing** 45:*2*
**form** 26:*6* 36:*14*
**formula** 25:*8, 15, 16* 27:*22*
**forth** 17:*9*
**forward** 35:*9*
**frames** 43:*12*
**front** 8:*4* 17:*2*
**full** 5:*3* 25:*3* 26:*4* 35:*15* 36:*1*
**further** 45:*10*

**< G >**
**gather** 36:*7*
**general** 40:*12*
**generally** 11:*25* 12:*15, 18* 40:*7*
**gesture** 6:*1*
**getting** 6:*11* 30:*2*
**GG939756** 44:*13*
**given** 12:*22* 29:*24* 30:*3* 31:*6* 36:*6*
**glass** 6:*17*
**go** 5:*12* 6:*18* 11:*21* 14:*5* 15:*22* 16:*9, 10, 11* 17:*4* 25:*24* 26:*1, 2* 39:*7*
**God** 4:*16*
**going** 5:*12* 7:*7* 9:*2* 17:*19* 18:*1, 6, 19* 19:*4* 26:*6* 30:*6* 31:*11, 12, 14* 32:*2, 3* 34:*23* 35:*9* 43:*2*
**Good** 4:*23* 41:*8*

**gosh** 24:*6*
**graduated** 39:*19*
**Group** 2:*2*
**guess** 17:*5* 34:*4* 35:*2*
**guidelines** 15:*21*

**< H >**
**hand** 4:*14* 9:*23* 44:*2*
**handbook** 11:*7*
**handle** 16:*12* 29:*18*
**handled** 29:*17* 32:*3*
**happen** 36:*12*
**happening** 23:*18* 32:*22* 35:*8*
**hard** 25:*5*
**head** 11:*5*
**health** 10:*9, 10* 15:*6, 21* 19:*17* 20:*11* 35:*21*
**HEIKKILA** 1:*9* 3:*2* 4:*5, 19* 5:*5, 7* 44:*2* 45:*2*
**held** 9:*22*
**help** 4:*16*
**hereto** 3:*8*
**Hey** 18:*11*
**high** 24:*11*
**hired** 41:*10*
**hit** 27:*9*
**hold** 9:*14*
**home** 8:*1*
**hours** 11:*10* 12:*4* 13:*11, 12, 13* 15:*5*
**HR** 15:*24*
**Hurts** 16:*16, 17*
**Hyde** 2:*7*

**< I >**
**idea** 11:*25* 12:*14, 20*
**immediate** 11:*21* 14:*6* 21:*9*
**impact** 24:*18, 23* 42:*8*
**impacted** 41:*16* 42:*10*
**inaudible** 6:*1*
**incident** 30:*11, 15*
**included** 30:*14*
**increase** 25:*10* 26:*13*

**increases** 11:*15*, *16*
**INDEX** 3:*1*, *2*
**indicated** 43:*1*, *3*
**inform** 15:*11*
**information** 18:22
 19:8, *17* 20:*11*, *21*
 23:*19* 30:6 36:*3*, *4*, *7*
**initial** 17:*17*
**initiate** 34:25 35:*1*
**in-person** 37:*17*
 42:25
**instance** 20:*5*, *24*
 29:*13*, *22*
**instances** 23:*10*
**instruct** 17:*24*
**instructed** 31:*4*, *20*,
 22, *25* 36:*5*
**instructions** 17:*23*
**insurance** 10:*10*
**interest** 38:*21*
**interested** 43:2 45:*14*
**internal** 18:*18* 19:6
**interview** 41:*5*
**involve** 21:*24*
**involved** 19:*1* 24:*10*
 25:*17*, *19* 27:22 29:8
**involvement** 25:22
**involves** 19:*11* 24:*10*
**issues** 29:*12*

**< J >**
**James** 34:2, *3*, *6*
**Jamie** 33:*21*
**January** 13:*12*
**JENNA** 1:*1* 4:*24*
 8:*19* 9:8, *10*, *14* 10:*3*
 11:*1*, *24* 12:*10* 13:8
 14:7, *21*, *25* 15:8, *11*
 16:2, *20* 19:25 20:*24*
 22:9 23:*19*, *20* 26:25
 27:*1*, *2* 29:*3*, *12*, *19*
 30:*3* 32:*1*, 6, 9, *12*
 35:7 36:22, *25* 37:*13*
 38:6, *20*
**Jennifer** 4:*10*
**job** 30:*24* 31:*13*
 35:*24* 36:*23* 39:*19*
 41:7, 8 43:*3*
**jobs** 34:*20*

**Jones** 34:2, *3*, *6*
**judge** 5:*23*
**Julie** 1:*9* 44:2, *11*
 45:2, *18*
**July** 13:*13*, *17*
**jury** 5:*23*

**< K >**
**keeping** 13:*25*
**kept** 9:*23*
**Key** 2:*3*
**kind** 10:6 15:*14*
 20:22 21:*3*, *4*, *7*
**knew** 18:*20*, *22* 20:*11*
**know** 6:*13*, *18* 8:*13*
 9:*3*, *10*, *12*, *22* 10:*13*
 11:8, *23* 12:*3*, *25*
 13:*15*, *18* 15:22, *23*,
 *24* 16:*7*, *23* 17:*14*, *16*,
 *19*, *23* 18:*4*, *9*, *10*, *11*,
 *12*, *20*, *23* 19:*1*, *3*, *19*
 20:*18* 22:9, *19* 23:25
 24:*5*, 9 26:*3*, *17*, *22*
 27:8 28:22 29:6, *10*
 30:7 32:*10*, *23* 34:*13*,
 *21* 35:*23* 36:*4*, *21*
 37:*16* 38:*11*, *13*, *17*,
 *19* 42:*14*, *20*
**knowledge** 6:*25* 7:*1*
**known** 7:*1*
**KYLE** 2:*2* 4:*9*, *23*

**< L >**
**Law** 2:2 5:22 38:*24*
 39:*18*
**lawsuit** 4:*24*
**learn** 32:*19*
**learned** 32:5, 8, *15*
**leave** 10:*15*, *22* 11:*2*,
 *18*, *24* 12:*1*, *21* 13:*3*,
 *7*, *20*, *21* 14:2 15:*12*
 16:8, *20* 17:*1*, *25*
 18:*3*, *16* 19:8, *12*
 20:6, *8*, *14*, *15*, *22*, *25*
 21:*1*, *4*, *7*, *11*, *13*, *17*,
 *22* 22:2, *6*, *10*, *14*, *18*
 23:*7*, *11*, *15* 27:*12*
 32:*4* 41:*12*
**leaves** 10:*18* 20:*19*,
 *20*

**Lee** 1:*7* 4:25 6:22
 7:*1*, 5 9:5, *11*, *15*
 10:*4* 11:*3*, *7*, *14* 12:2,
 *12*, *16*, *19* 13:8 14:*8*,
 *22* 15:2, *14* 16:9
 23:*21* 24:*1*, *22* 25:*18*
 26:*4*, *14*, *23* 27:*15*, *24*
 28:*15* 31:2 32:*16*, *20*
 33:2 36:*12* 37:*14*
 38:7 40:9 43:*16*
**left** 9:*15* 20:*1*, *3*
 26:*4*
**length** 11:*13* 25:2
**letter** 8:*19* 23:4, *5*, *6*,
 *12*, *17* 29:25 30:5, *9*,
 *12*, *14* 31:*3*, *5*, *17*, *20*,
 25 33:*2*, *8*, *13*, *17*, *20*,
 23 34:*1*, *5*, *8*, *16*, *19*
 35:5 36:*13*
**letters** 8:*11*, *12*, *17*
 33:*9*, *16*
**level** 19:*23*
**life** 24:*16*
**lifetime** 24:*8*
**limit** 21:*18*, *21* 23:7
**link** 8:*21*
**listed** 7:*12*, *15*, *18*, *22*
**log-in** 25:*25*
**long** 9:*10* 19:*10*
 32:*23*
**longer** 17:*17* 18:*3*
 37:*4*
**look** 11:*4*
**looked** 8:*25*
**looking** 11:6
**looks** 12:*1*, *14* 23:*5*

**< M >**
**Mac** 4:*9*
**MACDONALD** 2:2
 3:2 4:*9*, *22*, *23* 26:9
 36:*19* 43:*14*, *20*
**Mail** 34:*14*
**mailed** 34:*11*
**making** 38:6
**managed** 9:*19*
**Management** 15:*25*
 16:*11*, *12*, *19* 17:*16*
 18:8 41:6
**manner** 12:7

**MARCENO** 1:*5* 4:*6*,
 *12*, *25* 32:*23*
**Marcia** 33:*24*
**Marie** 5:*5*
**marked** 7:*8*
**matter** 4:*5*
**mean** 11:6 18:*12*
 19:*15* 25:*7*, *24* 26:*1*
 28:*14* 36:*20* 38:*17*
**meaning** 26:*10* 37:*3*
**mechanic** 37:*24* 38:*9*,
 *12*, *16* 40:*20*, *24*
**member** 11:*21*
**memory** 40:*4*
**mention** 37:*12*
**mentioned** 10:*16*
 18:*15*
**met** 26:*20*
**Miami** 2:*4*
**MIDDLE** 1:*1*
**Mm-hm** 21:*16*
**monitor** 18:*4*, *12*
**monthly** 24:*15*
**months** 15:*5*
**morning** 4:*23*
**multiplier** 24:*10*
 25:*1*, *14* 42:*12*

**< N >**
**name** 4:*23* 5:*3*
 33:*15*
**necessary** 19:*5*
**need** 6:*16* 8:*11*
 13:*24* 14:*17* 15:*11*
 16:*1*, *11* 21:2 23:*25*
**needed** 9:*2*, *20* 16:*7*
 17:*4*, *13*, *16*, *22* 18:2
 19:*9* 20:*12* 23:*19*
 32:*10*
**Norton** 2:*6*
**Notary** 1:*24* 44:2, *12*
**notebook** 8:*10*
**notes** 8:*10* 45:2
**Notice** 3:*8* 8:*9*, *21*, *22*
**notified** 16:6 22:*15*
 31:*1* 35:7
**notify** 32:*1*
**notifying** 8:*20* 23:*19*
**number** 9:*13* 11:*10*
 13:*13* 17:*20* 18:*15*,

*17* 24:*12* 25:*16* 26:*1*
45:*2*
**numbers** 8:*13*

**< O >**
**O-301** 2:*3*
**OATH** 3:2 5:16
44:*1*
**object** 26:6 36:*14*
**obligation** 5:*16*
**obtain** 39:7
**obtained** 39:*14*
**occasion** 42:*4*
**occurred** 30:*15*
**October** 1:*9* 4:*3*
44:2
**offer** 41:*9*
**offered** 10:*13*
**offhand** 9:*13*
**Office** 6:22 7:2, *5*
9:*5*, *11*, *15*, *20* 10:*4*
11:*3*, *7*, *14* 12:2, *12*,
*16*, *20* 13:6, *9* 14:*9*,
*23* 15:2, *14* 16:*9*
17:*14* 21:3 23:22
24:2, *23* 25:*18* 26:*5*,
*15*, *23* 27:*15*, *24*
28:*16* 31:2 32:*17*, *21*
33:*3* 36:*13* 37:*15*
38:7 40:*10*, *12* 41:*25*
43:*16*
**officers** 38:*25*
**officer's** 39:*19*
**official** 1:7 4:25
16:22 44:2
**Oh** 8:*19*
**Okay** 5:*11*, *13*, *14*
6:*3*, *9*, *10*, *14*, *15*, *19*,
*20* 8:*15* 11:*13* 32:*10*
**old** 30:2
**Once** 14:*4* 24:*3*, *6*
25:6, *7*
**ones** 9:*25*
**open** 35:*20* 37:*20*
**operator** 37:*22* 38:*3*
**opposed** 18:*8*
**options** 34:2*1*, *22*
35:8, *12*, *16* 36:2, *10*
42:*15*

**ORANGE** 44:2 45:2
**order** 39:*7*

**< P >**
**P.A** 2:*6*
**packet** 8:*25*
**page** 5:*13* 45:2
**Paid** 10:*18* 12:*4*
21:*25* 24:*15*, *18*, *24*
**paperwork** 19:*1*, *2*,
*11*, *24* 20:2, *5* 42:*21*
**paragraph** 7:*15*
**paragraphs** 7:*12*, *18*,
*22*
**Park** 2:*7*
**part** 10:*3*, *7*, *23*
14:*22* 23:2*1* 24:*25*
25:*14* 32:*14*
**particular** 10:2
**parties** 1:*9* 3:*8*
45:*11*, *12*
**passed** 39:*19*
**pay** 11:*11* 21:*4*, *22*,
*23* 22:2, *6*, *10*, *14*, *18*
23:8, *11*, *15* 30:2*1*
32:*4* 38:*1*, *2*, *4* 40:2
**paycheck** 12:*3*
**penalties** 26:*17*, *19*
37:*7*, *10*, *12*
**penalty** 26:24 27:8,
*10*, *17*, *22* 28:6, *10*
**pending** 4:*6*
**pension** 23:20, *24*
24:*1*, *3*, *5*, *8*, *18*, *23*
25:*3*, *9*, *10*, *17*, *20*
26:*4*, *11*, *14*, *19* 27:2*1*,
*25* 28:*4*, *8*, *10*, *11*, *16*
36:*25* 42:*8*
**people** 16:*15* 40:*11*
**percent** 27:*10*, *11*
**perform** 41:*7*
**performance** 30:*24*
**period** 11:*11* 24:*7*
**person** 12:*24* 17:*6*, *8*
21:*8*, *9* 22:24 41:*19*
42:*4* 43:*10*
**personal** 6:*25* 10:*9*,
*18*, *20* 11:*16*, *20* 12:*5*
13:*7*, *21* 14:*16* 15:*6*

21:*14* 35:22
**personally** 16:2*1*
**pertaining** 8:*13*
**ph** 16:*16*
**phone** 17:*9*, *10* 23:*1*,
*3*, *16* 26:*1* 34:25
35:*1*, *4* 37:8, *13*, *16*
40:*14*, *18* 41:22
**phones** 40:*11*
**PLACE** 1:*9* 15:*15*
22:*17*
**placed** 5:*15* 22:*9*, *14*
**Plaintiff** 1:*1*, *9* 2:*5*
4:*10*
**Plaintiff's** 3:2 4:*8*
7:*8*
**please** 4:*7*, *13* 5:*3*
6:*1*
**PLLC** 2:*2*
**point** 6:*16* 14:2*0*
25:*11* 29:25 42:*1*
**policy** 11:*7* 15:*15*
19:2*1* 20:*18*, *22*
**position** 9:*14* 18:25
28:*13* 31:5 32:6, *9*,
*11*, *13* 36:*12*, *16* 37:*1*,
*3* 38:*10*, *13*, *16*, *23*
39:2, *5*, *12* 40:*1*, *6*, *9*,
*15*, *20*, *23* 41:*1*, *3*, *9*,
*10*, *19*, *20* 42:7 43:6
**positions** 35:*19*
37:*14*, *20* 38:*1* 39:2,
*16* 40:*4* 41:23
**potential** 18:2 37:7
**practice** 18:*18* 19:6,
*24*
**prepare** 8:*23*
**prepared** 7:*11*, *14*, *17*,
*21* 9:*3*
**preparing** 30:7
**previously** 5:9 7:8
21:*13*
**prior** 27:*12* 30:*12*
**problem** 5:2
**process** 13:22 14:25
41:*4*
**Professional** 44:2, *12*
45:2, *19*
**provide** 36:*8*

**provided** 10:*11*
**Public** 1:*24* 44:2, *12*
**pulled** 8:*12*
**purchase** 10:*12*
**purchased** 9:2*1*
10:*14*
**purchasing** 9:*16*, *18*,
*21*
**purpose** 35:*4* 39:2*0*
**pursued** 38:*14*
**put** 23:*17*

**< Q >**
**qualifications** 38:*15*
**qualified** 40:*15*, *19*
**qualify** 15:*3*, *4* 20:*12*
38:*12*
**qualifying** 15:7 16:7
17:*5* 18:23
**question** 6:*12*, *14*
10:25 12:*17* 19:*18*
36:*15*
**questions** 6:8 8:25
16:*1* 35:*10*, *14*, *16*
43:*14*, *17*, *18*

**< R >**
**raise** 4:*13*
**Ramsey** 33:*14*
**range** 12:2*0*
**ranks** 41:*18*
**rate** 38:*4*
**rates** 38:*1*, *2*
**reach** 25:*3* 27:*14*
**reached** 17:*18*
**reaction** 32:8
**read** 29:25 30:5
**reading** 3:8 30:*12*
**really** 30:2*1* 35:*3*, *25*
43:2, *12*
**reasonably** 7:*1*
**recall** 11:*23* 12:*10*
13:*15* 16:*5*, *17*, *22*
22:*13* 28:25 33:*12*,
*15*, *19* 34:5 35:2, *21*
37:2*1* 38:*18* 42:*5*
43:*11*
**receive** 10:*3*, *6* 13:*10*
23:2*0* 24:7 27:*13*

**received** 10:*8* 27:*17* 42:*6*

**record** 5:*4* 45:2

**Reduction** 8:2*0* 22:*15* 32:*14*, *16*, *20* 33:*10*, *14*, *18*, *21*, *24* 34:2, *6*

**refer** 18:*7*

**reference** 8:*14*

**referring** 37:*10*

**reflect** 6:*6*

**regarding** 7:*11*, *14*, *17*, *21* 14:*13* 15:*15* 16:*25* 17:*25* 20:*25* 23:*14* 29:*3*, *20* 32:*3* 38:*1* 39:*25* 41:*23*

**regardless** 37:*2*, *4* 41:*19*

**regards** 18:*16*

**regulations** 15:2*0*

**related** 33:*9*, *13*, *17*, *20*, *23* 34:*1*, *6*

**relative** 45:*10*, *12*

**relevant** 23:*18*

**remained** 26:*14* 41:*18*

**remember** 11:*10* 23:2 29:*5*, *8* 30:*14*, *17* 31:*1* 34:*12*, *22* 35:*3*, *17*, *25* 37:*9*, *24*, *25* 38:*4*, *5* 43:*13*

**Reno** 14:*10* 17:*24* 18:*7* 20:*1* 22:*23*, *24* 23:*3*, *14* 29:*11*, *15*, *18* 30:*11*, *25* 31:*22*, *24* 32:*12* 33:*1*, *5*

**rephrase** 6:*14* 11:*1*

**report** 33:*5* 45:2

**Reporter** 1:*24* 3:2 4:2, *13* 5:25 6:*5* 44:2, *12* 45:*1*, *2*, *19*

**represent** 4:*24*

**representing** 43:*15*

**request** 13:22, *25* 14:*4*, *5*, *12*, *13* 15:*9* 16:*6*, *8*, *13*, *21*, 22 20:*25*

**requested** 13:*4* 45:2

**requesting** 16:*24*

**requests** 14:*7* 16:2 18:*16*, *17*

**require** 18:2*0*, *25* 19:*11* 20:*4*

**required** 14:*12* 15:*8*, *10* 20:2 27:*15* 40:*4*

**requirement** 26:2*1*, *23* 27:*4*

**respective** 3:*8*

**respond** 6:2 29:*15*

**responses** 6:*1*, *6*

**responsibilities** 32:*11* 39:2*1*

**responsibility** 9:*23*

**responsible** 30:*23*

**rest** 24:*16*

**restructured** 30:*19*, *20*

**result** 27:*18*

**retire** 26:*24* 27:*9* 31:*11*, *15* 36:*11* 42:*24*

**retirement** 10:*10* 24:*14* 25:2*0*, *23*, *25* 26:*18* 27:*18* 36:*6* 37:*8*, *11*

**retires** 24:*17*

**returned** 18:*5* 19:*10*

**review** 45:2

**revolved** 35:*8*

**rid** 30:2

**right** 4:*13*

**Risk** 15:*25* 16:*11*, *12*, *19* 17:*15* 18:*8*

**role** 38:*7* 41:*12*, *17*

**room** 8:2

**roughly** 22:*13* 23:2 29:*5*, *6* 30:*17*, *18*

**< S >**

**salary** 10:*8* 24:*10*, *11*

**sat** 41:*25*

**saw** 30:*9* 42:2*1*

**says** 19:*22*

**scale** 12:*1*, *14*, *17*

**schooling** 38:*24*

**screen** 7:*7*

**scroll** 7:*19*

**scrolled** 7:*10*

**seal** 44:2

**see** 17:2

**seen** 7:*9* 26:*13*

**send** 34:8, *10*

**sent** 8:*19* 9:*1* 23:*12* 34:*14* 35:*5*

**separate** 27:*23* 31:*14* 35:2*1* 36:*23* 42:*19*

**separated** 27:2*0* 28:*3*, *7*

**September** 31:*8*

**serious** 15:2*1*

**service** 11:*13* 12:25 24:*12*, *22*, *25* 25:*11*, *12*, *15* 26:2*1*, *22* 27:2, *14* 28:*3* 42:*12*, *13*

**session** 28:*24*

**share** 7:*7* 19:*16*

**shared** 18:2*1* 20:*10*, *20*

**shares** 19:*16*

**sheet** 21:*8*

**Sheriff** 1:*7* 4:*11*, *25* 22:*5*, *8* 32:*23*, *25*

**Sheriff's** 6:22 7:2, *5* 9:*5*, *11*, *15*, *20* 10:*4* 11:*3*, *7*, *14* 12:2, *12*, *16*, *19* 13:*9* 14:*9*, *22* 15:2, *14* 16:*9* 23:2*1* 24:2, *23* 25:*18* 26:*5*, *15*, *23* 27:*15*, *24* 28:*15* 31:2 32:*17*, *21* 33:*3* 36:*13* 37:*15* 38:*7* 40:*10*, *12* 43:*16*

**short** 19:2*1*

**showed** 8:*7*

**shown** 38:2*0*

**shrug** 6:*1*

**sick** 10:*9*, *18*, *19*, 22 11:2, *16*, *18*, *24* 12:*1*, *5* 13:2*1* 14:*15*, *16* 19:*4* 20:*19* 21:*13* 35:22 41:*11*

**sickness** 11:2*0*, *21*

**signing** 3:*8*

**similar** 33:*1*

**sit** 39:*7*, *9*

**situation** 18:2*1* 20:*18* 29:*9*, *16*, *21*

**Smith** 2:2

**solemnly** 4:*14*

**sorry** 5:2*1* 27:*13*

**South** 2:*7*

**speak** 9:*4* 13:2*4* 14:*12*, *18* 16:*25* 21:*3*, *5* 29:*11* 34:*18* 38:2 43:*9*

**speaking** 6:*6* 12:*18* 34:*12*

**specific** 11:2*4* 43:*11*

**specifically** 8:*17* 35:*17*

**specifics** 39:*25*

**spoke** 16:2*3* 17:*3* 20:*5*, *24* 21:2 23:*14* 34:*15* 37:25 39:22 42:*4*, *16*

**Sprankel** 33:2*4*

**start** 5:*3* 24:*4*

**started** 13:*14*

**state** 4:*7* 39:*8*, *9*, *19* 44:2, *12* 45:2

**STATES** 1:*1* 4:*6*

**stating** 5:*3*

**stayed** 13:*16*

**STEFANY** 2:*6* 4:*11* 26:*6* 36:*14* 43:*16*, *18*

**stenographic** 45:2

**stenographically** 45:2

**stipulated** 3:*8*

**stock** 9:22

**strike** 27:*13*

**submit** 15:*8* 16:2, *8*, *20* 20:*4*

**submitted** 16:*5*

**submitting** 14:*11*

**subordinate** 29:*8*

**subordinates** 29:*4*

**subpoena** 8:2*1*

**successfully** 39:*8*

**Suite** 2:*3*, *7*

**supervisor** 13:2*4* 14:*6*, *13*, *18*, *19* 15:2*4* 16:*6*, *10* 19:2*0*, 22 20:2*1* 21:*10*, *20* 30:*25* 33:*7*

**supplies** 9:2*0*

**suppose** 21:*8*

**Sure** 5:2  6:2  10:*1*
11:8  18:*4*  22:*19, 20*
23:*25*  27:*11*
**suspend** 43:*20*
**swear** 4:*14*
**sworn** 4:*20*  44:2
**system** 13:*25*  24:5,
*14*  25:20, *23, 25*
26:*18*  27:*18*  36:6
37:*11*

**< T >**
**take** 6:*16, 18*  8:*10*
19:9  21:*17*  31:15
35:*23*  36:*23, 24*
**TAKEN** 1:9  4:5
27:*21*  41:*12, 16*
**taker** 39:22  40:7, *16,*
*23, 25*  41:*3, 13, 17*
42:7  43:6
**takes** 20:*14*
**talk** 40:*11*
**talked** 37:22  38:22
43:*13*
**talking** 14:*15*  29:*1*
34:*20*  35:25
**Tampa** 2:8
**team** 41:6
**tell** 8:*17*  15:*18*
23:*24*  32:*12*  40:*3*
42:*23*  43:5
**ten** 11:*15*
**tenure** 11:9  12:6, *24*
32:*24*
**term** 25:5
**terminated** 43:22
**termination** 31:2
**terms** 11:6  12:*1, 18,*
*21*  13:*1*  20:*15*  21:*11*
42:*15*
**testified** 4:*20*
**testify** 5:*16*  6:22
7:*11, 14, 17, 21*
**testifying** 5:22
**TESTIMONY** 3:2
4:*15*  5:*21*  6:*12*
**Thank** 5:*1*
**things** 5:*12*  10:*13*
11:22  15:25  24:*12*
35:9  36:25  40:*13*

**think** 9:*24*  10:2
11:*15*  17:*3*  27:*11*
28:5  29:*14*  30:*18, 20*
33:25  34:*3*  42:2
43:*7*
**thought** 38:*20*
**three** 14:*1*  19:22
21:*12, 15, 16*
**TIME** 1:9  4:3  6:7
10:9  11:9  12:*4, 5, 7,*
*10, 15, 19*  13:*7, 25*
17:*13*  18:*6, 24*  19:*2,*
*7, 20, 21*  20:*12*  21:*8,*
*14, 19, 25*  22:*18*
23:*11*  24:*7, 17, 21*
25:*2, 6*  28:*21*  30:9
32:5, *15*  35:*23*  37:*21*
39:*2, 11*  40:*14, 18*
41:*12, 15*  43:*12, 19*
**times** 21:*16*
**title** 16:*17*
**Today** 4:2  5:*1, 17*
6:*21*  7:*11, 24*  9:6
**today's** 8:23
**told** 17:*12, 15*  22:*19,*
*22*  29:*16*  32:*1, 2*
37:*20*  42:*21*
**topic** 7:*15*
**topics** 7:*12, 18, 22*
**touch** 17:*15*
**training** 39:*15*
**transcribe** 5:*25*
**transcript** 3:8  45:2
**true** 38:9  45:2
**truth** 4:*15, 16*
**truthfully** 5:*17*
**try** 6:*14*
**trying** 34:*23*
**twenty** 11:*16*
**Twenty-plus** 9:*12*
**twenty-year-plus**
11:*11*
**two** 27:9  37:*21*
**types** 10:*15*  13:*20*
14:2

**< U >**
**U.S** 34:*14*
**ultimately** 16:*10*

42:*14*
**uncommon** 18:*10*
**understand** 5:*15, 19*
6:*12, 21, 24*  7:*4*
10:25  12:*17*
**uniforms** 9:*19*  30:2
**unit** 30:*19, 20*
**UNITED** 1:*1*  4:6
**upper** 19:*23*
**upset** 29:*4*
**use** 6:*17*  13:22
14:25  15:9, *12, 15*
21:*4*  22:5  23:8
**uses** 21:*23*

**< V >**
**vacation** 10:9, *18, 19*
11:*17*  12:7, *10, 15, 19*
13:*3, 21*  14:*15*  21:*13*
35:22  41:*11*
**value** 24:*15*
**VCS** 13:*25*  14:*4, 9,*
*12, 17, 19*
**vested** 25:*6, 8*  26:*8,*
*10*
**Vesting** 25:5
**videoconference** 1:9
**voice** 30:*20*

**< W >**
**wait** 6:*7, 8*  28:9
**waived** 3:8
**want** 6:*11*  15:25
35:2  43:5
**wanted** 15:*12*  22:5
23:*17*  36:9  43:*4*
**wants** 13:5, *22*
**warehousing** 9:22
**water** 6:*17*
**way** 13:*16*
**Wednesday** 1:9  4:2
**weeks** 19:22
**well** 10:*12*  13:*10*
14:*14, 20*  16:*14*
17:*12*  24:*1, 3*  25:*19*
27:5  29:*1*  31:*3*
34:*16*  35:6  36:*16*
42:*11*
**went** 9:*21*  35:*15*

**we're** 5:*12*  6:*11*
**whichever** 27:6
**willing** 18:*23*  19:*20*
**witness** 1:9  4:*17*
26:8  36:*16*  43:*19*
44:2
**word** 24:6
**work** 18:5, *24*  19:*3*
28:*3, 12*  38:*17*
**worked** 9:*10*  24:22
25:*13*
**working** 15:5  24:4
38:*18*
**works** 34:*3*
**write** 31:*20, 25*
33:*20, 23*  34:*1*
**writing** 34:5
**written** 23:5
**wrote** 31:*3, 17*  36:*13*

**< Y >**
**yeah** 8:*16*  11:8
15:22  19:*23*  39:*3*
41:*15*
**year** 11:*1*  12:*11*
13:*8, 11, 17*  14:8
15:*1*  16:*15, 18*  27:*10,*
*11*
**years** 5:*10*  9:*12*
11:*16*  12:25  13:*13,*
*15*  16:5, *14*  24:*11, 12,*
*21, 25*  25:*11, 12, 15*
26:20, *22*  27:*2, 6, 14*
28:2  29:*7*  32:22
42:*11, 13*

**< Z >**
**ZOOM** 1:9  2:2, *6*
3:2  4:*4*  5:*20*  8:*21*
44:2

Deposition of Dawn Heikkila 30(b)(6)                    Jenna Clark v. Carmine Marceno

### WORD LIST

**< 1 >**
**1** *(3)*
**1/21/2024** *(1)*
**10** *(2)*
**100** *(3)*
**11** *(4)*
**11:15** *(3)*
**12** *(1)*
**1250** *(1)*
**15** *(2)*
**16** *(1)*
**19** *(1)*

**< 2 >**
**2:22-cv-614-SPC-NPM** *(1)*
**20** *(1)*
**2018** *(2)*
**2020** *(1)*
**2021** *(5)*
**2023** *(5)*
**21** *(1)*
**225** *(1)*
**24** *(1)*
**26** *(1)*
**28th** *(2)*

**< 3 >**
**3** *(1)*
**30** *(5)*
**324** *(1)*
**33131** *(1)*
**33606-4128** *(1)*
**3rd** *(1)*

**< 4 >**
**4** *(2)*
**43** *(1)*
**44** *(1)*
**45** *(1)*

**< 5 >**
**5** *(2)*
**50** *(2)*
**520** *(1)*

**< 6 >**

**62** *(2)*

**< 7 >**
**7** *(9)*

**< 9 >**
**9-1-1** *(1)*

**< A >**
**a.m** *(4)*
**ability** *(1)*
**able** *(5)*
**academy** *(9)*
**accrual** *(1)*
**accrue** *(3)*
**accrued** *(4)*
**accrues** *(3)*
**accurately** *(1)*
**action** *(2)*
**activated** *(1)*
**addition** *(1)*
**additional** *(6)*
**admin** *(9)*
**administering** *(2)*
**administers** *(1)*
**administrative** *(1)*
**affirm** *(1)*
**afforded** *(9)*
**age** *(5)*
**agency** *(4)*
**ago** *(1)*
**agreed** *(1)*
**ahead** *(1)*
**Allen** *(1)*
**amount** *(12)*
**amounts** *(1)*
**Amy** *(3)*
**analyst** *(1)*
**and/or** *(3)*
**Ann** *(1)*
**Annmarie** *(24)*
**answer** *(7)*
**answered** *(1)*
**answering** *(2)*
**answers** *(2)*
**Anthony** *(1)*
**anymore** *(1)*
**Anyway** *(1)*
**appearance** *(1)*

**APPEARANCES** *(1)*
**appeared** *(2)*
**applied** *(2)*
**apply** *(12)*
**applying** *(1)*
**appropriate** *(1)*
**approval** *(2)*
**approve** *(5)*
**approved** *(2)*
**approximately** *(1)*
**Aside** *(1)*
**asked** *(7)*
**asking** *(7)*
**asks** *(1)*
**assume** *(1)*
**attention** *(2)*
**attorney** *(2)*
**attorneys** *(1)*
**August** *(2)*
**authorized** *(1)*
**auto** *(4)*
**automotive** *(2)*
**available** *(7)*
**Avenue** *(1)*
**avoid** *(1)*
**aware** *(6)*

**< B >**
**back** *(2)*
**Bartz** *(1)*
**base** *(1)*
**based** *(4)*
**basically** *(2)*
**bathroom** *(1)*
**bay** *(1)*
**beginning** *(1)*
**BEHALF** *(4)*
**believe** *(11)*
**benefit** *(1)*
**benefits** *(35)*
**best** *(2)*
**binding** *(1)*
**Blue** *(1)*
**break** *(2)*
**Brickell** *(1)*
**briefly** *(1)*

**< C >**
**calculation** *(1)*

**call** *(24)*
**calls** *(2)*
**cap** *(1)*
**capacity** *(3)*
**care** *(2)*
**career** *(2)*
**CARMINE** *(4)*
**cars** *(2)*
**CASE** *(3)*
**categories** *(1)*
**category** *(1)*
**certain** *(3)*
**CERTIFICATE** *(4)*
**certification** *(1)*
**certified** *(4)*
**certify** *(4)*
**choice** *(1)*
**choose** *(2)*
**chooses** *(2)*
**choosing** *(1)*
**chose** *(7)*
**circumstances** *(1)*
**civilian** *(3)*
**CLARK** *(72)*
**Clark's** *(11)*
**class** *(1)*
**classified** *(4)*
**clearly** *(1)*
**client** *(1)*
**coached** *(1)*
**come** *(2)*
**comes** *(1)*
**Commission** *(1)*
**common** *(1)*
**communications** *(15)*
**complete** *(2)*
**condition** *(2)*
**conducted** *(2)*
**conducting** *(2)*
**confusing** *(1)*
**connected** *(1)*
**contact** *(2)*
**continue** *(2)*
**continued** *(1)*
**conversation** *(9)*
**conversations** *(1)*
**correct** *(12)*
**corrections** *(1)*
**correctly** *(2)*

Deposition of Dawn Heikkila 30(b)(6)                                    Jenna Clark v. Carmine Marceno

| | | | |
|---|---|---|---|
| counsel  *(5)* | discretionary  *(1)* | evaluated  *(1)* | **< G >** |
| counseled  *(1)* | discuss  *(7)* | evaluating  *(1)* | gather  *(1)* |
| counseling  *(5)* | discussed  *(7)* | Evans  *(5)* | general  *(1)* |
| Country  *(1)* | discussing  *(1)* | event  *(3)* | generally  *(4)* |
| County  *(42)* | discussions  *(1)* | Everybody  *(2)* | gesture  *(1)* |
| couple  *(2)* | distribution  *(4)* | exact  *(2)* | getting  *(2)* |
| COURT  *(12)* | DISTRICT  *(3)* | exactly  *(1)* | GG939756  *(1)* |
| criteria  *(1)* | doctor  *(2)* | exam  *(3)* | given  *(5)* |
| current  *(1)* | document  *(4)* | Examination  *(3)* | glass  *(1)* |
| | documents  *(4)* | EXHIBIT  *(2)* | go  *(13)* |
| **< D >** | doing  *(3)* | exist  *(1)* | God  *(1)* |
| DATE  *(5)* | dollar  *(1)* | exists  *(1)* | going  *(18)* |
| Dated  *(1)* | Donald  *(1)* | experience  *(1)* | Good  *(2)* |
| dates  *(2)* | Dr  *(1)* | Expires  *(1)* | gosh  *(1)* |
| DAVID  *(2)* | draft  *(4)* | explain  *(1)* | graduated  *(1)* |
| DAWN  *(10)* | drafted  *(1)* | explaining  *(1)* | Group  *(1)* |
| day  *(4)* | draw  *(5)* | explanation  *(1)* | guess  *(3)* |
| days  *(11)* | drawn  *(1)* | | guidelines  *(1)* |
| deadline  *(3)* | duly  *(2)* | **< F >** | |
| December  *(2)* | duties  *(1)* | face-to-face  *(2)* | **< H >** |
| decide  *(3)* | | fall  *(2)* | hand  *(3)* |
| decided  *(1)* | **< E >** | familiar  *(3)* | handbook  *(1)* |
| decides  *(1)* | early  *(4)* | familiarize  *(1)* | handle  *(2)* |
| decision  *(3)* | earn  *(2)* | family  *(1)* | handled  *(2)* |
| Defendant  *(2)* | educate  *(1)* | far  *(3)* | happen  *(1)* |
| Delaquilla  *(1)* | education  *(1)* | feel  *(1)* | happening  *(3)* |
| depend  *(2)* | effect  *(1)* | felt  *(2)* | hard  *(1)* |
| depending  *(1)* | Either  *(3)* | file  *(2)* | head  *(1)* |
| depends  *(3)* | elaborated  *(1)* | financially  *(1)* | health  *(7)* |
| deposed  *(3)* | eligibility  *(1)* | finish  *(2)* | HEIKKILA  *(8)* |
| DEPOSITION  *(12)* | eligible  *(5)* | first  *(7)* | held  *(1)* |
| Derek  *(1)* | eliminated  *(9)* | fit  *(1)* | help  *(1)* |
| described  *(4)* | email  *(2)* | five  *(2)* | hereto  *(1)* |
| designee  *(1)* | emailed  *(3)* | FLORIDA  *(18)* | Hey  *(1)* |
| destruct  *(1)* | employee  *(25)* | FMLA  *(21)* | high  *(1)* |
| detail  *(1)* | employees  *(9)* | folks  *(1)* | hired  *(1)* |
| details  *(3)* | employer  *(1)* | follow  *(2)* | hit  *(1)* |
| determination  *(1)* | employment  *(23)* | followed  *(1)* | hold  *(1)* |
| determine  *(3)* | encourage  *(2)* | follows  *(1)* | home  *(1)* |
| determined  *(1)* | enforcement  *(2)* | force  *(13)* | hours  *(6)* |
| determines  *(1)* | ensure  *(1)* | foregoing  *(1)* | HR  *(1)* |
| dictate  *(1)* | entailed  *(1)* | form  *(1)* | Hurts  *(2)* |
| different  *(5)* | enter  *(3)* | formula  *(4)* | Hyde  *(1)* |
| DIRECT  *(2)* | entered  *(1)* | forth  *(1)* | |
| directive  *(1)* | enters  *(1)* | forward  *(1)* | **< I >** |
| directly  *(3)* | entire  *(2)* | frames  *(1)* | idea  *(3)* |
| Director  *(5)* | entitled  *(2)* | front  *(2)* | immediate  *(3)* |
| discipline  *(3)* | ESQUIRE  *(2)* | full  *(5)* | impact  *(3)* |
| disciplined  *(1)* | essentially  *(1)* | further  *(1)* | |

Deposition of Dawn Heikkila 30(b)(6)                    Jenna Clark v. Carmine Marceno

**impacted**  *(2)*
**inaudible**  *(1)*
**incident**  *(2)*
**included**  *(1)*
**increase**  *(2)*
**increases**  *(2)*
**INDEX**  *(2)*
**indicated**  *(2)*
**inform**  *(1)*
**information**  *(11)*
**initial**  *(1)*
**initiate**  *(2)*
**in-person**  *(2)*
**instance**  *(4)*
**instances**  *(1)*
**instruct**  *(1)*
**instructed**  *(5)*
**instructions**  *(1)*
**insurance**  *(1)*
**interest**  *(1)*
**interested**  *(2)*
**internal**  *(2)*
**interview**  *(1)*
**involve**  *(1)*
**involved**  *(6)*
**involvement**  *(1)*
**involves**  *(2)*
**issues**  *(1)*

**< J >**
**James**  *(4)*
**Jamie**  *(1)*
**January**  *(1)*
**JENNA**  *(41)*
**Jennifer**  *(1)*
**job**  *(10)*
**jobs**  *(1)*
**Jones**  *(4)*
**judge**  *(1)*
**Julie**  *(5)*
**July**  *(2)*
**jury**  *(1)*

**< K >**
**keeping**  *(1)*
**kept**  *(1)*
**Key**  *(1)*
**kind**  *(6)*
**knew**  *(3)*

**know**  *(64)*
**knowledge**  *(2)*
**known**  *(1)*
**KYLE**  *(3)*

**< L >**
**Law**  *(4)*
**lawsuit**  *(1)*
**learn**  *(2)*
**learned**  *(3)*
**leave**  *(48)*
**leaves**  *(4)*
**Lee**  *(41)*
**left**  *(5)*
**length**  *(2)*
**letter**  *(29)*
**letters**  *(5)*
**level**  *(1)*
**life**  *(1)*
**lifetime**  *(1)*
**limit**  *(3)*
**link**  *(1)*
**listed**  *(4)*
**log-in**  *(1)*
**long**  *(3)*
**longer**  *(3)*
**look**  *(1)*
**looked**  *(1)*
**looking**  *(1)*
**looks**  *(3)*

**< M >**
**Mac**  *(1)*
**MACDONALD**  *(9)*
**Mail**  *(1)*
**mailed**  *(1)*
**making**  *(1)*
**managed**  *(1)*
**Management**  *(7)*
**manner**  *(1)*
**MARCENO**  *(5)*
**Marcia**  *(1)*
**Marie**  *(1)*
**marked**  *(1)*
**matter**  *(1)*
**mean**  *(9)*
**meaning**  *(2)*
**mechanic**  *(6)*
**member**  *(1)*

**memory**  *(1)*
**mention**  *(1)*
**mentioned**  *(2)*
**met**  *(1)*
**Miami**  *(1)*
**MIDDLE**  *(1)*
**Mm-hm**  *(1)*
**monitor**  *(2)*
**monthly**  *(1)*
**months**  *(1)*
**morning**  *(1)*
**multiplier**  *(4)*

**< N >**
**name**  *(3)*
**necessary**  *(1)*
**need**  *(9)*
**needed**  *(12)*
**Norton**  *(1)*
**Notary**  *(3)*
**notebook**  *(1)*
**notes**  *(2)*
**Notice**  *(4)*
**notified**  *(4)*
**notify**  *(1)*
**notifying**  *(2)*
**number**  *(10)*
**numbers**  *(1)*

**< O >**
**O-301**  *(1)*
**OATH**  *(3)*
**object**  *(2)*
**obligation**  *(1)*
**obtain**  *(1)*
**obtained**  *(1)*
**occasion**  *(1)*
**occurred**  *(1)*
**October**  *(3)*
**offer**  *(1)*
**offered**  *(1)*
**offhand**  *(1)*
**Office**  *(45)*
**officers**  *(1)*
**officer's**  *(1)*
**official**  *(4)*
**Oh**  *(1)*
**Okay**  *(13)*
**old**  *(1)*

**Once**  *(5)*
**ones**  *(1)*
**open**  *(2)*
**operator**  *(2)*
**opposed**  *(1)*
**options**  *(8)*
**ORANGE**  *(2)*
**order**  *(2)*

**< P >**
**P.A**  *(1)*
**packet**  *(1)*
**page**  *(2)*
**Paid**  *(6)*
**paperwork**  *(7)*
**paragraph**  *(1)*
**paragraphs**  *(3)*
**Park**  *(1)*
**part**  *(9)*
**particular**  *(1)*
**parties**  *(4)*
**passed**  *(1)*
**pay**  *(18)*
**paycheck**  *(1)*
**penalties**  *(5)*
**penalty**  *(7)*
**pending**  *(1)*
**pension**  *(26)*
**people**  *(2)*
**percent**  *(2)*
**perform**  *(1)*
**performance**  *(1)*
**period**  *(2)*
**person**  *(9)*
**personal**  *(13)*
**personally**  *(1)*
**pertaining**  *(1)*
**ph**  *(1)*
**phone**  *(15)*
**phones**  *(1)*
**PLACE**  *(3)*
**placed**  *(3)*
**Plaintiff**  *(4)*
**Plaintiff's**  *(3)*
**please**  *(4)*
**PLLC**  *(1)*
**point**  *(5)*
**policy**  *(5)*
**position**  *(33)*

positions  (8)
potential  (2)
practice  (3)
prepare  (1)
prepared  (5)
preparing  (1)
previously  (3)
prior  (2)
problem  (1)
process  (3)
Professional  (4)
provide  (1)
provided  (1)
Public  (3)
pulled  (1)
purchase  (1)
purchased  (2)
purchasing  (3)
purpose  (2)
pursued  (1)
put  (1)

< Q >
qualifications  (1)
qualified  (2)
qualify  (4)
qualifying  (4)
question  (6)
questions  (9)

< R >
raise  (1)
Ramsey  (1)
range  (1)
ranks  (1)
rate  (1)
rates  (2)
reach  (2)
reached  (1)
reaction  (1)
read  (2)
reading  (2)
really  (5)
reasonably  (1)
recall  (18)
receive  (6)
received  (3)
record  (2)
Reduction  (12)

refer  (1)
reference  (1)
referring  (1)
reflect  (1)
regarding  (16)
regardless  (3)
regards  (1)
regulations  (1)
related  (7)
relative  (2)
relevant  (1)
remained  (2)
remember  (18)
Reno  (18)
rephrase  (2)
report  (2)
Reporter  (11)
represent  (1)
representing  (1)
request  (13)
requested  (2)
requesting  (1)
requests  (4)
require  (4)
required  (6)
requirement  (3)
respective  (1)
respond  (2)
responses  (2)
responsibilities  (2)
responsibility  (1)
responsible  (1)
rest  (1)
restructured  (2)
result  (1)
retire  (6)
retirement  (11)
retires  (1)
returned  (2)
review  (1)
revolved  (1)
rid  (1)
right  (1)
Risk  (6)
role  (3)
room  (1)
roughly  (6)

< S >

salary  (3)
sat  (1)
saw  (2)
says  (1)
scale  (3)
schooling  (1)
screen  (1)
scroll  (1)
scrolled  (1)
seal  (1)
see  (1)
seen  (2)
send  (2)
sent  (5)
separate  (5)
separated  (3)
September  (1)
serious  (1)
service  (15)
session  (1)
share  (2)
shared  (3)
shares  (1)
sheet  (1)
Sheriff  (7)
Sheriff's  (41)
short  (1)
showed  (1)
shown  (1)
shrug  (1)
sick  (18)
sickness  (2)
signing  (1)
similar  (1)
sit  (2)
situation  (5)
Smith  (1)
solemnly  (1)
sorry  (2)
South  (1)
speak  (12)
speaking  (3)
specific  (2)
specifically  (2)
specifics  (1)
spoke  (11)
Sprankel  (1)
start  (2)
started  (1)

state  (8)
STATES  (2)
stating  (1)
stayed  (1)
STEFANY  (7)
stenographic  (1)
stenographically  (1)
stipulated  (1)
stock  (1)
strike  (1)
submit  (5)
submitted  (1)
submitting  (1)
subordinate  (1)
subordinates  (1)
subpoena  (1)
successfully  (1)
Suite  (2)
supervisor  (15)
supplies  (1)
suppose  (1)
Sure  (9)
suspend  (1)
swear  (1)
sworn  (2)
system  (10)

< T >
take  (10)
TAKEN  (7)
taker  (10)
takes  (1)
talk  (1)
talked  (3)
talking  (4)
Tampa  (1)
team  (1)
tell  (7)
ten  (1)
tenure  (4)
term  (1)
terminated  (1)
termination  (1)
terms  (8)
testified  (1)
testify  (6)
testifying  (1)
TESTIMONY  (4)
Thank  (1)

**things**  *(8)*
**think**  *(13)*
**thought**  *(1)*
**three**  *(5)*
**TIME**  *(46)*
**times**  *(1)*
**title**  *(1)*
**Today**  *(7)*
**today's**  *(1)*
**told**  *(10)*
**topic**  *(1)*
**topics**  *(3)*
**touch**  *(1)*
**training**  *(1)*
**transcribe**  *(1)*
**transcript**  *(2)*
**true**  *(2)*
**truth**  *(3)*
**truthfully**  *(1)*
**try**  *(1)*
**trying**  *(1)*
**twenty**  *(1)*
**Twenty-plus**  *(1)*
**twenty-year-plus**  *(1)*
**two**  *(2)*
**types**  *(3)*

**< U >**
**U.S**  *(1)*
**ultimately**  *(2)*
**uncommon**  *(1)*
**understand**  *(8)*
**uniforms**  *(2)*
**unit**  *(2)*
**UNITED**  *(2)*
**upper**  *(1)*
**upset**  *(1)*
**use**  *(9)*
**uses**  *(1)*

**< V >**
**vacation**  *(14)*
**value**  *(1)*
**VCS**  *(6)*
**vested**  *(4)*
**Vesting**  *(1)*
**videoconference**  *(1)*
**voice**  *(1)*

**< W >**
**wait**  *(3)*
**waived**  *(1)*
**want**  *(4)*
**wanted**  *(5)*
**wants**  *(2)*
**warehousing**  *(1)*
**water**  *(1)*
**way**  *(1)*
**Wednesday**  *(2)*
**weeks**  *(1)*
**well**  *(16)*
**went**  *(2)*
**we're**  *(2)*
**whichever**  *(1)*
**willing**  *(1)*
**witness**  *(6)*
**word**  *(1)*
**work**  *(6)*
**worked**  *(3)*
**working**  *(3)*
**works**  *(1)*
**write**  *(5)*
**writing**  *(1)*
**written**  *(1)*
**wrote**  *(3)*

**< Y >**
**yeah**  *(6)*
**year**  *(12)*
**years**  *(26)*

**< Z >**
**ZOOM**  *(8)*

# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

**JENNA CLARK,**

      Plaintiff,

                                            Case No. 2:22-cv-614-SPC-NPM

**v.**

**CARMINE MARCENO, in his official capacity as Sheriff of Lee County, Florida,**

      Defendant.

_____/

### PLAINTIFF'S NOTICE OF RULE 30(b)(6) DEPOSITION

**PLEASE TAKE NOTICE** that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Plaintiff, JENNA CLARK ("Plaintiff"), shall take the deposition upon oral examination of Defendant, CARMINE MARCENO, in his official capacity as Sheriff of Lee County, Florida ("Defendant"), through one or more representatives who shall be designated to testify on Defendant's behalf regarding all information known or reasonably available to Defendant with respect to the subject matter identified in Schedule A. This deposition shall commence on the following dates and times:

| DATE/TIME | LOCATION |
|---|---|
| October 4th, 2023, at 11:00 AM | Via Zoom |
| October 10th, 2023, at 10:00 AM | Via Zoom |

1

October 11th, 2023, at 10:00 AM          Via Zoom

October 17th, 2023, at 10:00 AM          Via Zoom

October 18th, 2023, at 10:00 AM          Via Zoom

The deposition will continue from day to day until completed before a notary public or other person authorized by law to administer oaths. The deposition will be conducted remotely through Everest Court Reporting and will be recorded stenographically.

Dated:  Miami, Florida          **DEREK SMITH LAW GROUP, PLLC**
       August 30, 2023,          *Counsel for Plaintiff*

                    /s/ Kyle T. MacDonald
                    Kyle T. MacDonald, Esq.
                    Florida Bar No.: 1038749
                    Derek Smith Law Group, PLLC
                    701 Brickell Ave, Suite 1310
                    Miami, FL 33131
                    Tel: (305) 946-1884
                    Fax: (305) 503-6741
                    Kyle@dereksmithlaw.com

## <u>SCHEDULE A</u>
## LIST OF TOPICS FOR DEFENDANT'S REPRESENTATIVE
### (hereinafter "LCSO" and/or "Defendant")

1.    Knowledge of each and every document provided by Defendant in response to Plaintiff's discovery requests.

2.    Knowledge related to Jenna Clark's employment with Defendant, including compensation and benefits paid to Jenna Clark from 2018 until the last day of her employment.

3.    Knowledge related to all of the benefits Jenna Clark received subject to her employment with Defendant, including pension plan payments, 401k benefits, profit sharing, health benefits, retirement plans, and any other benefit Jenna Clark received from 2018 until the last day of her employment.

4.    Knowledge related to benefits that Defendant offered to employees in general, including the cash value of each benefit offered, when Defendant began to offer said benefits, and descriptions of benefit packages that Defendant included as part of the compensation employees received.

5.    Knowledge related to the amount of money that Jenna Clark was paid from 2018 until the last day of her employment.

6.    Knowledge related to the amount of money that similarly situated employees to Jenna Clark were paid.

7.    Knowledge of the policies or procedures provided by and/or maintained by Defendant with regard to the prevention of discrimination and harassment in the workplace.

8.    Knowledge of the policies or procedures provided by and/or maintained by Defendant with regard to the prevention of discrimination and harassment in the workplace.

9.    Knowledge of the policies or procedures provided by and/or maintained by Defendant with regard to leave benefits, paid-time-off benefits, FMLA benefits, and any other leave of absences.

10.   Knowledge of any employee handbook for Defendant that was in effect at the time of Jenna Clark's employment from 2018 until the last day of her employment.

11.   Knowledge related to reports of discrimination, including but not limited to, reports of discrimination that were presented and/or made during the time period when Jenna Clark was employed with Defendant from 2018 until the last day of her employment.

12.   Knowledge related to Defendant's policies and procedures for preventing discrimination and harassment in the workplace and investigating and engaging in corrective action when discrimination is discovered.

13.   Knowledge related to the agency-wide reduction in force conducted by Defendant in or around 2021, including knowledge of the persons involved in deciding the positions to be eliminated, the criteria used to select positions to be eliminated, and the compensation and leave benefits for the employees/positions ultimately selected to be eliminated.

14.   Knowledge related to Defendant's fiscal budget and Defendant's operations, including revenue, expenses, and any budgetary impacts of the agency-wide reduction in force conducted by Defendant in or around 2021.

15.   Knowledge regarding the following employees, including their dates of hire, job titles, knowledge of the amount of compensation paid to them, the amount of leave benefits available to them, the amount of leave they used for any reason (including FMLA leave, paid time off, or any other leave benefit offered), their age, their termination/resignation dates, and the reason for their termination/resignation:

   a.  James Jones, Director of Fleet Management
   b.  Jenna Clark, Director of Purchasing
   c.  Anthony Ramsey, Communications Manager
   d.  Amy DellAquilla, Community Liason
   e.  Jami Bartz, Senior Services Coordinator
   f.  Marsha Sprankel, Secretary of Traffic

16.   Knowledge related to Annmarie Reno's employment with Defendant, including but not limited to, her entire personnel file, dates of employment, job assignments, job titles, compensation, promotions,

benefits, discipline, and complaints of unlawful employment practices made against her.

17.  Knowledge related to Dawn Heikkila's employment with Defendant, including but not limited to, her entire personnel file, dates of employment, job assignments, job titles, compensation, promotions, benefits, discipline, and complaints of unlawful employment practices made against her.

18.  Knowledge related to John Holloway's employment with Defendant, including but not limited to, his entire personnel file, dates of employment, job assignments, job titles, compensation, promotions, benefits, discipline, and complaints of unlawful employment practices made against him.

19.  Knowledge related to Jenna Clark's employment with Defendant, including but not limited to, dates of employment, job assignments, compensation, promotions, discipline, benefits, job titles, and termination, from 2018 until the last day of her employment.

20.  Knowledge related to the reason for Jenna Clark's termination from her employment with Defendant.

21.  Knowledge related to any communications between Defendant's employees and Jenna Clark regarding Jenna Clark's termination and alternative positions with Defendant offered to Jenna Clark, if any, from 2018 until the last day of Jenna Clark's employment.

22.  Knowledge of all correspondence, writings, and documents sent by Defendant regarding disciplinary action or termination of Jenna Clark, if any, from 2018 until the last day of Jenna Clark's employment.

23.  Knowledge any investigations performed by Defendant regarding Jenna Clark's reports of discrimination and harassment in the workplace or filing of administrative charges.

24.  Knowledge related to any leave requested by Jenna Clark during her employment, including FMLA leave, paid time off, unpaid time off, and any other type of leave of absence offered by Defendant, from 2018 until the last day of Jenna Clark's employment.

25.   Knowledge related to performance reviews and Defendant's performance review policies, procedures, and protocols.

26.   Knowledge as to Defendant's Position Statement filed with the EEOC and the Answer filed in response to Plaintiff's Complaint.

27.   Knowledge as to Defendant's document and record keeping proceed used to record or keep track of communications amongst Defendant's employees, including but not limited to any electronic communication technology used by Defendant's employees.

28.   Knowledge related to performance reviews that Jenna Clark received or underwent during her employment with Defendant including dates of each performance review and the substance of each performance review, from 2018 until the last day of Jenna Clark's employment.

29.   Knowledge of organizational charts and lists identifying the divisions and management structure for Defendant.

30.   Knowledge of charges filed with the Equal Employment Opportunity Commission and the Florida Commission on Human Relations from January of 2016 through December 31, 2022.

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document is being served on August 30, 2023, on all counsel of record on the service list below via e-mail transmission.

By: *<u>/s/ Kyle T. MacDonald</u>*
Kyle T. MacDonald, Esq.

## <u>SERVICE LIST</u>

**ALLEN, NORTON & BLUE, PA**

David J. Stefany
324 S. Hyde Park Ave
Suite 225
Tampa, FL 33606
813/251-1210
Fax: 813/253-2006
Email: dstefany@anblaw.com

Maelyn Marie Morrison
324 S. Hyde Park Ave., Suite 225
Tampa, FL 33606
813-251-1210
Fax: 813-253-2006
Email: mmorrison@anblaw.com

*Counsel for Defendant*

# EXHIBIT 9

**From:** Heikkila, Dawn <███████████████>
**Sent:** Thursday, June 18, 2020 12:47 PM EDT
**To:** Clark, Jenna <JClark@sheriffleefl.org>; Lehman, Shannon <████████████████>
**Subject:** RE: from policy Chapter 22

Full-time members are required to work a full-time schedule or account for hours missed by using accrued leave time. If a member must be absent from work for whatever reason, they must use the appropriate amount of accrued leave time that would bring their combined work and leave time to the scheduled 80 or 84 hours required for the pay period. The employee may not choose to take time missed from work as "Leave without pay" unless it is approved FMLA. If the member has exhausted all accrued leave time, the missed time then becomes leave without pay. A pattern of abuse may be cause for disciplinary action.



**Dawn Heikkila, Director**

Lee County Sheriff's Office
**Desk:** ██████████████
██████████████████
www.sheriffleefl.org

***IMPORTANT MESSAGE***

This message is intended for the use of the person or entity to whom it is addressed and may contain information that is privileged and confidential, the disclosure of which is governed by applicable law. If the reader of this email is not the intended recipient or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this information is STRICTLY PROHIBITED. If you have received this email by error, please notify us immediately and destroy the related message. This footnote also confirms that this email message has been swept for the presence of computer viruses, worms, hostile scripts and other email-borne network threats. PLEASE NOTE: Florida has a very broad public records law. Most written communications to or from government officials are public records available to the public and media upon request. Your email communications may be subject to public disclosure per Sec. 119 F.S.

# EXHIBIT 10

**From:** Heikkila, Dawn <​█████████████​>
**Sent:** Thursday, August 12, 2021 1:16 PM EDT
**To:** Clark, Jenna <JClark@sheriffleefl.org>
**Subject:** RE: message

Ok…well we are so busy right now that I am going to hold off on the FMLA…if you end up needing more time that that just let me know and I will have to do the FMLA paperwork.

Thanks and I will wish you a speedy recovery!!



**Dawn Heikkila, Director**

Lee County Sheriff's Office
Desk: ████████
DHeikkila@sheriffleefl.org
www.sheriffleefl.org

**From:** Clark, Jenna <JClark@sheriffleefl.org>
**Sent:** Thursday, August 12, 2021 1:06 PM
**To:** Heikkila, Dawn ████████████
**Subject:** RE: message

18-20
24-27
Total of 7 days.

**Jenna Clark** | Purchasing Director
Desk: 239-477-1313
**Purchasing**
**Lee County Sheriff's Office**
JClark@sheriffleefl.org | www.sheriffleefl.org

**From:** Heikkila, Dawn ███████████████
**Sent:** Thursday, August 12, 2021 1:04 PM
**To:** Clark, Jenna <JClark@sheriffleefl.org>
**Subject:** RE: message

Ok…if you are out more than a week I will forward it to Amy for FMLA…do you know how long you plan to be out?



**Dawn Heikkila, Director**

Lee County Sheriff's Office
Desk: 239-477-1132
DHeikkila@sheriffleefl.org
www.sheriffleefl.org

**From:** Clark, Jenna <JClark@sheriffleefl.org>
**Sent:** Thursday, August 12, 2021 12:26 PM
**To:** Heikkila, Dawn ████████████
**Subject:** message

Hi Dawn –

I called you to let you know I have surgery scheduled on the 18th - Annmarie said to let you know, she already approved my time.

Thanks!
Jenna

**Jenna Clark** | Purchasing Director
Desk: 239-477-1313
**Purchasing**
**Lee County Sheriff's Office**
JClark@sheriffleefl.org | www.sheriffleefl.org

***IMPORTANT MESSAGE***

**LCSO/Clark
DEF001294**

This message is intended for the use of the person or entity to whom it is addressed and may contain information that is privileged and confidential, the disclosure of which is governed by applicable law. If the reader of this email is not the intended recipient or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this information is STRICTLY PROHIBITED. If you have received this email by error, please notify us immediately and destroy the related message. This footnote also confirms that this email message has been swept for the presence of computer viruses, worms, hostile scripts and other email-borne network threats. PLEASE NOTE: Florida has a very broad public records law. Most written communications to or from government officials are public records available to the public and media upon request. Your email communications may be subject to public disclosure per Sec. 119 F.S.

**LCSO/Clark**
**DEF001295**